**BOIES SCHILLER FLEXNER LLP**
Joshua Michelangelo Stein (Bar No. 298856)
jstein@bsfllp.com
Nicholas Antonio Santos (Bar No. 335767)
nsantos@bsfllp.com
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899

David Boies (*pro hac vice* forthcoming*)*
dboies@bsfllp.com
Alexander Boies (*pro hac vice* forthcoming*)*
aboies@bsfllp.com
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

Sigrid S. McCawley (*pro hac vice* forthcoming*)*
smccawley@bsfllp.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011/Fax: (954) 356-0022

Jenny Kim (*pro hac vice* forthcoming*)*
jkim@bsfllp.com
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel: (212) 446-2300
Fax: (212) 446-2350

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (*pro hac vice* forthcoming)
mcanty@labaton.com
Carol C. Villegas (*pro hac vice* forthcoming)
cvillegas@labaton.com
Danielle Izzo (*pro hac vice* forthcoming)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gary M. Klinger (*pro hac vice* forthcoming)
gklinger@milberg.com
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: (866) 252-0878

Alexandra M. Honeycutt (*pro hac vice*
forthcoming)
ahoneycutt@milberg.com
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel:  (865) 247-0080

***Attorneys for Plaintiffs***

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AJITA ABRAHAM ON BEHALF OF A.A. (A MINOR), individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>META PLATFORMS, INC., INSTAGRAM, LLC, META PAYMENTS, INC., and META PLATFORMS TECHNOLOGIES,<br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................................................1

JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT .................................2

RELEVANT TIMES ................................................................................................3

PLAINTIFF..............................................................................................................3

DEFENDANTS .........................................................................................................3

ALLEGED FACTS...................................................................................................5

I.    Meta Specifically Targets Young Users As A Core Part Of Its Business
      Strategy ...................................................................................................5

II.   To Attract Young Users, Meta Has Incorporated Dangerous And Addictive
      Features Into Instagram..........................................................................8

      A. Meta's Engagement-Based Feed System Is Designed To Generate Addictive
         Behavior In Its Young Users................................................................8

         1.    Recommendation Algorithms .................................................9

         2.    Social Comparison Features Such As "Likes".......................15

         3.    Audiovisual And Haptic Notifications....................................19

         4.    Other Engagement Feed Features ..........................................20

      B. Meta Uses Additional Features To Increase Young Users' Time On
         Instagram To Unsafe Levels ...............................................................21

         1.    Visual filters............................................................................21

         2.    "Live" and "Reels" Functions................................................23

         3.    Multiple Accounts ..................................................................25

         4.    Autoplay..................................................................................25

III.  Instagram Can Cause Young Users Specific, Significant, and Permanent
      Physical And Mental Harms ..................................................................26

IV.   Meta Targets Particularly Young Users, Including Those Under The Age Of 13 ........33

      A. Meta Allows Users Under The Age Of 13 To Access Instagram............................33

      B. Meta Knows That Its Supposed "Gatekeeping" Function Is Totally
         Ineffective ............................................................................................36

**CLASS ACTION COMPLAINT**

C. Meta's Collection Of Personal Information From Children Under The Age Of 13 Violates COPPA ...................................................................................38

    1.   Meta Has Actual Knowledge That It Is Gathering Information From Users Under 13 ...................................................................39

    2.   Instagram is "Directed To Children" .........................................39

V.    Meta Fails To Provide Adequate Warnings About The Dangers Of Instagram To Young Users ...................................................................................42

    A.   Meta's Published Guidance About Young Users And Instagram Is Woefully Inadequate And Misleading ...............................................42

    B.   Meta's Public Statements About Instagram Are False And Misleading ..........45

NAMED PLAINTIFF ALLEGATIONS .................................................................48

CLASS ACTION ALLEGATIONS .......................................................................49

CLAIMS FOR RELIEF ......................................................................................52

COUNT I: STRICT LIABILITY – DESIGN DEFECT ..............................................52

COUNT II: STRICT LIABILITY – FAILURE TO WARN .........................................55

COUNT III: NEGLIGENCE – DESIGN .................................................................58

COUNT IV: NEGLIGENCE – FAILURE TO WARN ...............................................61

COUNT V: COLORADO CONSUMER PROTECTION ACT .....................................63

COUNT VI: CONNECTICUT UNFAIR TRADE PRACTICES ACT ...........................64

COUNT VII: DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT ...............65

COUNT VIII: HAWAII DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ..........66

COUNT IX: IDAHO CONSUMER PROTECTION ACT ...........................................68

COUNT X: ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ...........................................................................................69

COUNT XI: MICHIGAN CONSUMER PROTECTION ACT .....................................70

COUNT XII: NEW HAMPSHIRE CONSUMER PROTECTION ACT .........................71

COUNT XIII: NEW JERSEY CONSUMER FRAUD ACT ........................................72

COUNT XIV: NEW MEXICO UNFAIR TRADE PRACTICES ACT ...........................73

COUNT XV: NEW YORK DECEPTIVE TRADE PRACTICES ACT ...........................74

COUNT XVI: OHIO DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ...............................75

COUNT XVII: TENNESSEE CONSUMER PROTECTION ACT.........................................................76

COUNT XVIII: VERMONT CONSUMER PROTECTION ACT ..........................................................77

COUNT XIX: WASHINGTON CONSUMER PROTECTION ACT .....................................................78

COUNT XX: UNJUST ENRICHMENT.................................................................................................79

PRAYER FOR RELIEF .........................................................................................................................80

JURY DEMAND .....................................................................................................................................81

**CLASS ACTION COMPLAINT**

Plaintiff A.A. ("Plaintiff"), individually and on behalf of all other minors similarly situated ("Class Members"), files this Complaint against defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platform Technologies (collectively, "Defendants" or "Meta"), and in support alleges the following:

## SUMMARY OF THE CASE

1.      This action seeks relief for the Plaintiff and Class Members against Meta, a social media conglomerate that targets minors and encourages, to the point of addiction, their harmful overuse of Meta's platforms.  This country universally bans minor access to other addictive products, like tobacco and alcohol, because of the physical and psychological damage such products can inflict. Social media is no different, and Meta's own documents prove that it knows its products harm children.  Nonetheless, Meta has done nothing to improve its social media products or limit their access to young users.  In fact, a child can sign up for Meta's harmful products in a matter of minutes, without any parental or guardian guidance or consent.

2.      Meta products include "Facebook," its well-known social media platform, and "Instagram."  When using these platforms, the user is able to post messages, pictures, and videos; view postings by other users, including news outlets and influencers; and communicate with those other users.  Limited to these functions, Meta's products might have been safe for minors.  However, Meta has, in violation of both state and federal law, manipulated its products in an effort to further entice and ultimately ensnare young people into a harmful obsession with social media; these efforts include functions that relentlessly feed harmful content to young Meta users.  Meta has hidden the impacts of these features, made misleading public statements about their effect on young users, and publicly pretends to care about issues like parental controls and limiting youth access.

3.      Meta's scheme involves a number of related endeavors.  Most significantly, Meta's entire youth business model focuses on maximizing profits from youth-targeted advertising by maximizing the time that young users spend on Instagram.  Consistent with this business model, Meta has developed a set of psychologically manipulative Instagram features designed to instill in young users an uncontrollable desire to be on Instagram.  Meta is aware that the developing brains of young users are particularly vulnerable to certain forms of manipulation, and it affirmatively chooses to

1
**CLASS ACTION COMPLAINT**

exploit those vulnerabilities through targeted features such as recommendation algorithms; social comparison functions such as "Likes," "Live," and "Reels"; audiovisual and haptic alerts (that recall young users to Instagram, even while at school and late in the night); visual filter features known to promote young users' body dysmorphia; and content-presentation formats (such as infinite scroll) designed to discourage young users' attempts to self-regulate and disengage from Instagram.

4.      Research shows that young people's use of Meta's products is associated with depression, anxiety, insomnia, interference with education and daily life, and other negative outcomes. Indeed, Meta's own internal research demonstrates that use of Instagram results in such harms, and yet it has done nothing to lessen those harms and has failed to issue any meaningful warnings about its products or limit youth access.  Instead, Meta has encouraged parents to allow their children to use Meta's products, publicly contending that banning children from Instagram will cause "social ostracization."

5.      Supplying harmful products to children is unlawful in every jurisdiction in this country, under both state and federal law and basic principles of products liability.  And yet, that is what Meta does every hour of every day of every year.  Meta's conduct has harmed Plaintiff and Class Members and will continue to harm them unless and until it is stopped.  As demonstrated in more detail below, Plaintiff and Class Members are entitled to both compensatory and injunctive relief for Meta's unlawful conduct.  Meta must also be disgorged of all profits earned from these practices.

**JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000,000 (five billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

7.      This Court has specific personal jurisdiction over Defendants because the Defendants have a significant office presence and transact likewise significant business in (and directed toward) the State of California.  Furthermore, Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of California.

8.      Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class

Members reside in this District; Defendants have offices and engage in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and Defendants received substantial profits from Class Members who reside in this District.

9.     Divisional Assignment: Assignment to the San Francisco or Oakland Division is proper under Civil L.R. 3-2(c) because Defendants are headquartered in San Mateo County and a substantial part of the events or omissions that give rise to the claims occurred therein.

## RELEVANT TIMES

10.     Defendants conduct constitutes a continuing violation of the laws supporting Plaintiff's claims for relief, beginning at a time unknown to the Plaintiff, but no later than 2012, and such claims have continuously accrued through the present and continue to accrue.

## PLAINTIFF

11.     Minor A.A. is a thirteen-year-old from New York, New York. She has been using Instagram since she was ten years old.

## DEFENDANTS

12.     Defendants in this action include Meta Platforms, Inc. ("Meta Platforms"), Instagram, LLC ("Instagram"), Meta Payments, Inc. ("Meta Payments"), and Meta Platforms Technologies, LLC ("Meta Technologies") (collectively, "Meta").

13.     Defendant Meta Platforms is a Delaware corporation with its principal place of business in Menlo Park, California.  As relevant here, Meta Platforms, through itself or its subsidiaries, develops, markets, and operates social media platforms and other internet-based platforms and products including Facebook, Instagram, Messenger, and WhatsApp.

14.     At all times material to this Complaint, acting alone or in concert with its subsidiaries (identified below), Meta Platforms has advertised, marketed, and distributed Instagram to consumers throughout the United States.  At all times material to this Complaint, Meta Platforms formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Meta Platforms currently operates its business primarily through its subsidiaries. Meta Platforms' key subsidiaries include Instagram, Meta Payments, and Meta Technologies.

3
**CLASS ACTION COMPLAINT**

15.     Defendant Instagram offers a mobile application that enables users to share content such as photographs and videos online and over social networks.  Instagram is a limited liability company formed in Delaware, and shares its principal place of business in Menlo Park, California, with Meta Platforms.

16.     Defendant Meta Payments is incorporated in the State of Florida and shares its principal place of business in Menlo Park, California, with Meta Platforms.  Meta Payments processes payments made through Meta's Social Media Platforms.

17.     Defendant Meta Technologies is a Delaware limited liability company and shares its principal place of business in Menlo Park, California, with Meta Platforms.  Previously known as Facebook Technologies, LLC, Meta Technologies has absorbed Meta's Oculus business segment, which it acquired in 2014.  Meta Technologies develops Meta's virtual reality technology.

18.     Meta operates as a common enterprise.  All Defendants have their principal place of business at Meta Platforms' corporate headquarters in Menlo Park, California.  Meta also represents itself as a common enterprise.  Meta's financial disclosures describe Facebook, Instagram, Messenger, and WhatsApp, as Meta's "'Family' of products," and report revenue and expenses for the entire "family" together.  Instagram's Terms of Use agreement currently identifies "The Instagram Service" as "one of the Meta Products, provided to you by Meta Platforms, Inc." Meta's supplemental terms of service for its "Meta Platforms Technologies Products" is similarly styled as an agreement between Meta Platforms and the user. "Meta Platforms Technologies Products" are defined to include its VR-related products, such as its Meta Quest and Oculus virtual reality headsets, and Meta Horizon Worlds, its virtual reality social media platform. Meta Platforms also reports its revenue from its VR business segment in its financial disclosures.

19.     Further, Meta's corporate website represents the leaders of its subsidiaries as Meta's "executives" alongside Zuckerberg and other Meta Platforms executives.  For example, Adam Mosseri is identified as "Head of Instagram" and is described as having "been at Meta" for more than 11 years.  Stephane Kasriel, the CEO of Meta Payments, is identified on Meta's website as "the head of Commerce and Financial Technologies at Meta" who "oversees all commerce and fintech work across Meta's technologies and platforms."

4

**CLASS ACTION COMPLAINT**

20.     Defendants conducted the unlawful activity as alleged wholly and/or primarily out of their headquarters in California, which is where Defendants directed their employees to take the unlawful actions detailed in this Complaint.

21.     Because Meta operates as a common enterprise, each Defendant is jointly and severally liable for the acts and practices alleged below.

## ALLEGED FACTS

**I.     Meta Specifically Targets Young Users As A Core Part Of Its Business Strategy**

22.     Meta focuses on attracting and retaining young users on Instagram and has done so for years.  As one Meta product designer summarized in an internal email, "[s]hort summary is the 'the [sic] young ones are the best ones.' You want to bring people to your service young and early." According to a Director of Product Management at Instagram, the "focu[s]" is "on getting a very clear understanding of our current US DAP [Daily Active People] and MAP [Monthly Active People] growth situation, opportunities, and challenges because 1) US Teens are our #1 cohort for both long-term growth of IG and FB Family incrementality."

23.     Consistent with this focus, any substantive changes to Instagram are viewed in light of their impact on young users.  For example, Jenni Romanek, Vice President and Head of Analytics for Instagram, asked the following question about changes to the Instagram platform: "We've said in the past we're teen first, but not teen only.  However, are the tradeoffs we're making w[ith] all the complexity we're about to add to the app going to cause us to *not* be teen first for the next gen of teens?"  And, an email to Sheryl Sandberg, the former Chief Operating Officer of Meta Platforms, from 2016 reveals Meta's plan to "'win over' teens" by seeking to: "[g]et more teen-oriented creators;" "[g]et more teens connected to these creators"; and, importantly, regarding design of the product, "[s]treamline sharing and discovery of content" and "[i]nvest in Live for this segment."

24.     Young user engagement is regularly tracked by Meta, including any successful (or unsuccessful) efforts to stave off its decline on Facebook.  As an internal 2018 mid-year report noted, "Facebook's engagement and appeal among teens continue[d] to diminish," and Meta "no longer believe[d] that [it could] be successful by iterating through incremental improvements and stacking up small wins on Facebook" and adjusted its strategy.  Meta planned to "reverse the negative decline in

teen engagement on Facebook" by "focus[ing its] bets on early teens in markets where we have an acute teen problem (mostly the US & western markets) and will test new teen experiences for retention in the US first."

25. This concern over young user engagement (and its decline) naturally has extended to Instagram. Currently, about 22 million teens log on to Instagram in the U.S. each day, and in recent years, Instagram has become Meta's most successful social media platform in attracting and retaining young users. Within approximately two years of its purchase by Meta, over 50 percent of teenagers in the United States used Instagram.

26. Instagram's Adult Classifier Model estimates that the following numbers of teenage users, ages 13-17 (by state), used Instagram from July 2020 to June 2021:

| State | Daily Active Users | Monthly Active Users |
|---|---|---|
| Arizona | 383,405 - 434,575 | 493,510 - 582,893 |
| California | 2,148,402 - 2,680,451 | 2,642,133 - 3,374,235 |
| Colorado | 261,746 - 300,161 | 349,770 - 410,981 |
| Connecticut | 180,619 - 204,560 | 231,146 - 271,979 |
| Delaware | 51,223 - 61,428 | 67,600 - 82,719 |
| Georgia | 615,595 - 763,113 | 806,937 - 1,065,088 |
| Hawaii | 79,952 - 93,124 | 99,075 - 120,647 |
| Idaho | 93,820 - 107,394 | 125,949 - 146,601 |
| Illinois | 623,387 - 747,760 | 819,715 - 994,684 |
| Indiana | 361,150 - 405,445 | 496,549 - 569,533 |
| Kansas | 146,545 - 168,727 | 205,196 - 239,975 |
| Kentucky | 250,799 - 278,479 | 345,732 - 398,455 |
| Louisiana | 250,953 - 293,318 | 358,303 - 412,329 |
| Maine | 56,755 - 66,832 | 78,294 - 92,154 |
| Maryland | 321,966 - 370,063 | 413,196 - 481,659 |
| Michigan | 468,156 - 563,293 | 638,779 - 770,061 |

**CLASS ACTION COMPLAINT**

| | | |
|---|---|---|
| Minnesota | 261,181 - 296,118 | 346,087 - 400,661 |
| Missouri | 286,454 - 354,289 | 398,603 - 488,675 |
| Nebraska | 108,449 - 117,862 | 143,897 - 159,775 |
| New Jersey | 487,291 - 583,620 | 602,860 - 744,112 |
| New York | 881,994 - 1,090,071 | 1,152,233 - 1,430,783 |
| North Carolina | 577,827 - 669,721 | 770,142 - 898,767 |
| North Dakota | 33,828 - 37,743 | 45,827 - 52,160 |
| Ohio | 591,475 - 714,620 | 802,184 - 967,219 |
| Oregon | 181,144 - 214,544 | 239,199 - 290,988 |
| Pennsylvania | 603,464 - 771,966 | 798,435 - 1,024,721 |
| Rhode Island | 52,113 - 62,035 | 68,474 - 85,592 |
| South Carolina | 263,682 - 306,022 | 366,599 - 434,134 |
| South Dakota | 39,582 - 44,318 | 55,022 - 62,492 |
| Virginia | 437,616 - 520,802 | 572,496 - 684,140 |
| Washington | 329,723 - 407,685 | 438,050 - 539,584 |
| West Virginia | 83,557 - 99,219 | 123,763 - 148,547 |
| Wisconsin | 268,240 - 314,742 | 366,708 - 426,114 |

27.     As this table shows, teenagers are a substantial and critical market for Instagram.  Meta and its advertisers want to attract young people because they are more likely to: (1) be influenced by advertisements; (2) become lifelong customers; and (3) set trends that the rest of society emulates. And, because advertisers want to target ads to young users, Meta permits targeting of advertising to teenagers based on their age, gender, and location. As one Meta employee expressed in an August 2017 email, one of Meta's "Longer-term Focus Areas" was how to "get teens to share their location with us so we can leverage that data for awesome product experiences and also analytics around high schools."

28.     Meta has acknowledged the importance of its young user market by quantifying those users' value to the company in internal correspondence.  For example, an internal email circulated in

September 2018 showed Meta characterizing its youngest users in terms of their "Lifetime Value (LTV)" to the company, defined as the cumulative total profit expected from a user: "The lifetime value of a 13 y/o teen is roughly $270 per teen."

**II.   To Attract Young Users, Meta Has Incorporated Dangerous And Addictive Features Into Instagram**

29.     In order to attract and keep young users, Meta has developed and implemented features on Instagram to keep young users engaged on the platform to an extent that is universally understood to be harmful.  These features include "engagement-based feeds" and particularized features in those feeds, as well as interactive features like visual filters, "Live," and "Reels."

**A.   Meta's Engagement-Based Feed System Is Designed To Generate Addictive Behavior In Its Young Users**

30.     On a social media platform, a feed is a stream of content, such as text, images, and videos, which is displayed to a user.  It can include updates from the user's friends or followers, as well as content from pages or accounts that the user has chosen to follow.

31.     Meta originally displayed content in a user's feed on its social media products chronologically, *i.e.*, in the order the content was posted by others.  However, Meta ultimately moved from chronological feeds to engagement-based feeds for Instagram in 2016.  Meta's engagement-based feeds push a Meta-selected mixture of content to young users and include several functions designed to ensnare young minds, including algorithmically driven recommendations, "infinite scroll" functions, "push" notifications, and ephemeral content.  All of these functions are designed to engage the young user and keep him or her on Meta's social media productions, including Facebook and Instagram, for unhealthy periods of time.

32.     User feeds also include content from other advertisers, influencers, or other individuals that the original user does not follow, labeled as "suggested posts." This feature is automatically enabled for all users and can only be temporarily disabled through an option to "Snooze suggested posts in feed," which lasts for 30 days and is accessed by navigating a complicated menu of settings and content preferences. Further, even this temporary control over the user's own feed is conditional upon the realization from the user themselves that they are viewing targeted or "suggested" content

**CLASS ACTION COMPLAINT**

instead of content generated by the users they selectively follow. To turn on the "snooze" feature, a user must access their settings, a button which is separate and not highlighted from the user feed.  The "suggested posts" feature keeps users addicted to the unpredictable and often problematic content on their feeds.

### 1.    Recommendation Algorithms

33.    Instagram employs "recommendation algorithms" in its engagement-based user feeds. Recommendation algorithms use data points, or "signals," harvested from individual users to choose and/or arrange each new piece of content to display to that user.  Such signals include, but are not limited to, overt actions such as "liking" a post or unconscious actions such as lingering on (but not otherwise engaging with) certain content.

34.    Although Meta employs recommendation algorithms universally across its social media platforms, Meta alters these algorithms to maximize youth engagement in several ways.  For example, the algorithms organize content to be displayed to users in a random and nonchronological sequence, so that users cannot know which posts will be displayed next and constantly seek to refresh their feed. This phenomenon is referred to by psychologists as "variable reinforcement schedules" or "variable reward schedules."

35.    As Dr. Mark D. Griffiths, Distinguished Professor of Behavioral Addiction at Nottingham Trent University, explains:

> The rewards [experienced on social media platforms] – which may be physiological, psychological and/or social – can be infrequent but even the anticipation of one of these rewards can be psychologically and/or physiologically pleasing. The rewards are what psychologists refer to as variable reinforcement schedules . . . and is one of the main reasons why social media users repeatedly check their screens. Social media sites are 'chock-ablock' with unpredictable rewards. Habitual social media users never know if their next message or notification will be the one that makes them feel really good. In short, random rewards keep individuals responding for longer and has been found in other activities such as the playing of slot machines and video games.[1]

---

[1] Mark D. Griffiths, *Adolescent Social Networking: How Do Social Media Operators Facilitate Habitual Use?*, 36 Educ. & Health J. 66, 67 (2018), http://archive.today/cPgJ1 (internal references omitted).

**CLASS ACTION COMPLAINT**

36.     "Variable reinforcement schedules" keep young users increasingly dependent and addicted to Meta's social media platforms. The unpredictable pattern of posts triggers a rush of dopamine, a neurotransmitter known as the "pleasure chemical," in anticipation of social media content and stimuli. This trains young user's brains to be increasingly unstable, as the neurons from dopamine only cause a temporary effect then crashes after release, where an "individual can become disheartened and disengaged."[2] As this happens over and over, every day, the dopamine levels and balance in young user's brains are becoming significantly altered by Meta's recommendation algorithms.

37.     For example, as researchers Rasan Burhan and Jalal Moradzadeh explain, the variable reinforcement schedules that Instagram is built upon lead to "addiction with dopamine implicated":

> [T]he user can be kept in a loop.  Essentially, that's how the social media apps exploit these innate systems.  The way this comes about is through a term referred to as Variable Reward Schedules. This works by positive stimuli being provided at random intervals. By users checking their phones for notifications and updates at periodic intervals for something that could be intrinsically rewarding.  Most of the time it's a neutral stimuli, but on occasion there may be a positive stimuli leading to the rewarding dopamine release hence keeping the user in the feedback loop.[3]

38.     The tremendous negative effect Meta's recommendation algorithms have on young user's mental health and well-being has been acknowledged by its own employees. In one internal communication discussing potential "[c]ontent policies" for the unlaunched "Instagram Youth" product, Meta employees expressed concern with the "well-being challenge" of "content on IG triggering negative emotions among tweens and impacting their mental well-being (and) our ranking algorithms taking [them] into negative spirals & feedback loops that are hard to exit from."

39.     Meta even studied, and purposefully designed their platforms to exploit, the effects the intermittent triggering of dopamine releases has on on its young users.  For example, a 2020 internal

---

[2] Rasan Burhan & Jalal Moradzadeh, *Neurotransmitter Dopamine (DA) and its Role in the Development of Social Media Addiction*, 11 J. Neurology & Neurophysiology 1, 1 (2020), http://archive.today/kxldL.
[3] *Id.* at 1-2.

**CLASS ACTION COMPLAINT**

Meta presentation described Meta's efforts to study adolescent biology and neuroscience in order to "gain valuable unchanging insights to inform product strategy today," noting that "teens' decisions and behavior are mainly driven by emotion, the intrigue of novelty and reward."  The document continued, "teens are insatiable when it comes to 'feel good' dopamine effects" and "IG [Instagram] has a pretty good hold on the serendipitous aspect of discovery through our Explore surface, recommendations and social graph.  And every time one of our teen users finds something unexpected their brains deliver them a dopamine hit."  Sean Parker, founding president of Meta, candidly admitted in an interview:

> The thought process that went into building these applications, Facebook being the first of them . . . was all about: "[h]ow do we consume as much of your time and conscious attention as possible?" That means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content and that's going to get you . . . more likes and comments. It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators— me, Mark [Zuckerberg], Kevin Systrom on Instagram, all of these people— understood this consciously. And we did it anyway.

40.     Meta also harvests data from its young users to craft recommendation algorithms tailored to individual preferences and designed to keep every user addicted. In a June 8, 2021, public blog post on Instagram's website, Adam Mosseri, the CEO of Instagram, stated that Meta collects and supplies its recommendation algorithms with thousands of "signals" across Instagram's Feed and Stories, including "[y]our activity" and "[y]our history of interacting with someone."  Mosseri's post explained that the collection of "[y]our activity . . . helps us understand what you might be interested in . . ." and the collection of "[y]our history of interacting with someone . . . gives us a sense of how interested you are generally in seeing posts from a particular person."  Meta's recommendation algorithms are fed by tracking young user's engagements, and all of the platform's features— including likes, posts, and constant notifications—are built on keeping young users on the platform all day and every day.

41.     Most disturbingly, as part of this personalization process, Meta's recommendation algorithms also periodically present young users with psychologically and emotionally gripping

content. Some of the most disturbing content, presented without warning, is related to eating

disorders, violence, negative self- perception and body image issues, bullying, and other categories of

content known by Meta to provoke intense reactions.  Periodically serving harmful or disturbing

content has been shown to keep young users on the platforms longer.

42.     Meta describes the manipulative effect the recommendation algorithms have on users

as "preference amplification" (sometimes referred to as falling into "rabbit holes"), as the algorithmic

model prioritizes user engagement and categories of content to keep users on:

> [P]eople don't just fall into rabbit-holes (and we stopped using this term.)
> They have some preference that our models amplify (hence the term
> "preference amplification") - eg, follow accounts, like reels, etc. Then they
> tend to "drift" towards what the rec[ommendation] sys[tem] shows them,
> which is further picked up by the model, which makes the problem even
> worse.

43.     Meta's own internal research reveals how these "preference amplifications" work on

young users.  For example, in a March 2021 internal investigation focusing on "eating disorder

content on Instagram," researchers created a "test user" profile, through which Meta's team followed

existing users with account names such as @st4rv_1ng (a stylization of the word "starving"),

@skinx_bones, @prettywhenimhungry, and @skinny_goals_.  After the test user began following

these accounts, Instagram's recommendation algorithms generated a list of "Suggestions For You"

that included accounts related to anorexia, such as @milkyskinandbones, @skinny._.binge,

@_skinandbones__, and @applecoreanorexic.  As another example, an internal Meta document from

2018 recognized that "seeing SSI [suicide and self-injury] admissions on Instagram is significantly

associated with increased time spent" on Instagram.

44.     Similarly, Meta's recommendation algorithms also push content that Meta internally

categorizes as "Negative Appearance Comparison" or "NAC" content (meaning content with a

tendency to cause users to feel worse about their body or appearance). Meta pushes and highlights

NAC content on Instagram's Explore Feed, a page where Meta presents new pages and interests for

users to follow.  As one internal research paper stated:

> Pooled across all topics, seeing more unconnected content [*i.e.*, content from
> accounts that a user has not chosen to follow] is associated with worse
> appearance comparison. Women who spend proportionally more time on

Explore (where we promote unconnected content) also have higher levels of appearance comparison . . . . In a recent listening session, one creator described Explore as "a landmine for everything I want to avoid on IG" . . . because it triggers appearance comparison.

45.    In July 2021, Meta researchers published internally a paper entitled "Negative Appearance Comparison (also, "NAC"):  Amplified exposure to High-NAC content in IG Explore." In this study, the researchers used "Drebbel" – a "proprietary "system for understanding the impact of our recommendation systems on bad societal outcomes" – to "examine[] the consumption of High-NAC content on Explore and its associated outcomes."  They described their methodology and findings as follows:

> To understand what happens, we examined how views of High-NAC content changed over time for both people who had amplified exposure on April 10th and people who did not . . . . Specifically, we compared trends in High-NAC content consumption prior to this time (prior to the week ending 3/20), and a week later (the week ending 4/17 onwards). Entering the state of amplified exposure was associated with a ~5-10% increase in consumption of High-NAC content that lasted about 6 weeks. Comparing High-NAC content consumption in the week prior (ending 3/20) and week following (ending 4/17), people consumed about 10.8% more High-NAC content. After an additional 4 weeks, people were still consuming about 4.8% more High-NAC content compared to before.

46.    The researchers further found that "[f]or people who did not have amplified exposure, High-NAC content consumption declined 5.7% in that same time period (3/20 vs. 4/17), by 5.4% after 4 weeks, and by 5.3% after an additional 2 weeks. As such, amplified exposure may still have a residual effect after 6 weeks."  The researchers also concluded that "[a]fter entering the state of amplified exposure, teen girls consumed 14.9% more High-NAC content in the week following, compared to 13.1% for teen boys."

47.    By advertising NAC content in user's Explore Feeds, the algorithms exacerbate already harmful trends in society, especially as NAC content is disproportionately advertised to women and young girls. Meta's researchers observed that High-Negative Appearance Comparison content appears both in Instagram's Main Feed and in Explore, but that "17% of people see substantially more (at least 20 percentage points) High-NAC content in Explore than in Feed," and that "[i]t's worse for women and teen girls."  The researchers stated that their "findings suggest that our algorithms may be

13
**CLASS ACTION COMPLAINT**

1   increasing exposure to High-NAC content beyond the preferences that people have indicated."

2        48.     Meta is aware of the significant impact of NAC content on young users.  Meta has

3   conceded that for teens in the top 10% of High-Negative Appearance Comparison consumption, 57%

4   of Instagram's recommendations in Explore were for High-Negative Appearance Comparison content.

5   Meta employees characterized this phenomenon as Meta "choosing to show them a lot and potentially

6   amplifying."  The statistic is even higher for teen girls in that category:  70.96 percent of content they

7   encountered in Explore was classified as High-Negative Appearance Comparison.

8        49.     This increased NAC exposure has resulted in 75 percent of U.S. teen girls "see[ing]

9   10%+ or more content that's problematic" and the fact that "approximately 70% of teen girls may [be]

10   see[ing] 'too much' sensitive content" that "is associated with more negative appearance comparison."

11   Meta researchers have also concluded that a "majority of teen girls experience negative social

12   comparison[4] and a significant share of them think IG makes it worse."  Meta also knows that 13.5% of

13   teen girls on Instagram say the platform makes thoughts of suicide and self-injury worse, that 17% of

14   teen girls on Instagram say the platform makes eating issues worse, and that Meta makes body image

15   issues worse for one in three teen girls.

16        50.     Instagram researchers have also observed that "[s]ocial comparison exacerbates

17   problems teens are dealing with" in that, "[a]lthough others' behaviors online can hurt, the self-

18   scrutiny and anxiety associated with personal consumption patterns is more damaging to mental

19   health."  In particular, Instagram researchers noted that social comparison "[c]an cause or exacerbate a

20   number of issues," including "body image, eating disorders, anxiety, loneliness, depression, envy,

21   online aggression, [and] passive use."

22        51.     Plenty of additional internal Meta research confirms the significant health problems

23   associated with the NAC content pushed by its own recommendation algorithms:

24       (a)     A January 2019 internal Meta report linked negative social comparison to loneliness

25            and loneliness with "higher negative affect;"

26

27

28   [4] Internal Meta documents define negative social comparison as "[w]hen someone feels bad about themselves after comparing themselves with others."

**CLASS ACTION COMPLAINT**

(b)      A March 2021 internal Meta paper found that Instagram heavily emphasized content that promoted negative appearance comparison. Fashion and beauty, relationships, "[w]estern pop stars who emphasize their bodies," and images that "emphasize women's bodies generally (e.g., cleavage, swimwear)" are topics that are "likely to make viewers, especially teen girls, feel worse about their bodies"—especially when posted by celebrities and non-friends. The paper observed that "these topics comprise 1/4 of what people see on Instagram," and "1/3 for teen girls."

(c)      A June 2021 internal Meta paper concluded that "the algorithm behind new-user top-account recommendations may be unintentionally amplifying negative social comparison . . . ."

(d)      A 2022 internal Meta research document noted that "we primarily recommend top accounts to new users (78% of recs to new users are top accounts), and being recommended more top accounts is associated with seeing more High-Negative Appearance Comparison content a month later."

52.      In fact, in 2021, a Meta researcher suggested that Instagram could decrease the frequency at which users were exposed to NAC content by "depriv[ing]" those users "of content we believe is likely to cause negative appearance comparison and see where there is any topline impact on survey responses" regarding well-being.  Indeed, as Instagram researchers noted: "[y]oung people know that their own personal consumption patterns have a harmful impact on their self-esteem, but they don't adopt different patterns.  In some cases, they can get addicted to things that make them feel bad."

53.      Meta instead took no steps to reduce NAC exposure and prioritizes business concerns over NAC's effects on young users by failing to effectively eliminate, or even reduce, the staggering amount of NAC content pushed to their feeds.  As one Meta employee put it, "we've done some early experimentation with the Drebbel team on additional enforcement for users who we detect to be in a rabbithole on Feed Recs. [In sum] we did see a meaningful drop in exposure with targeted demotion, but it came with a clear engagement cost . . . ."

**2.      <u>Social Comparison Features Such As "Likes"</u>**

54.     Meta's engagement-based feeds revolve around features that encourage users to compare themselves and their content to others, such as the quantification and display of "like" ("Like") counts on each piece of content, a feature developed between 2010 and 2013.  Thus, users post content (photos or videos) to elicit and display the approval of others through the number of "Likes" expressed through Instagram's heart icon or Facebook's "thumbs-up" icon.

55.     Through internal studies, Meta has learned that the mental health of young users is significantly impacted by the public quantification of Like counts on Instagram posts. Meta is aware that "66% of teen girls on IG experience negative social comparison," along with "40% of teen boys" as a result of the Likes feature.  An April 2020 Meta study candidly concluded:  "[s]eeing high Like counts is associated with feeling worse (more negative, less positive comparison)."  A 2021 internal Meta report concluded that teens suffered from "constant negative comparisons" on Instagram from the combination of Meta's features that advertise triggering content and continue to display the number of Likes on every post.

56.     On Instagram, Meta also selectively displays more "popular" posts (*i.e.,* the posts with the most Likes) over others, further encouraging and worsening the negative social effects the quantification of Likes has on users.  As an April 2020 study explained:

> [R]anking algorithms may prioritize posts with more feedback, since feedback is one signal of the posts people want to interact with. Altogether, this means that people are more likely to see their friends' highest-feedback posts. If people compare the feedback they receive on their posts to the feedback their friends receive, they may overestimate their friends' popularity and feel worse by comparison.

57.     Meta acknowledges that "[y]oung people perceive Instagram as a popularity contest" and "[t]o a great extent, social pressure is something built-in to the Instagram experience." In other words, "[t]he quest to create the most perfect and popular images is the central task in the game of Instagram," which causes "the mechanics of Instagram [to] amplify the impact of social comparison."

58.     In 2020, Meta researchers, reacting to evidence of negative comparisons as a result of Likes, conducted an experiment and recommended design changes.  The experiment (referred to

**CLASS ACTION COMPLAINT**

generally as "Project Daisy")[5] found that by "hiding Like counts [on Instagram posts]," Meta could initiate "decreases in negative social comparison" among its users.  Young users reported that hiding Like counts decreased their attention paid to the number of Likes that their posts had received.  The researchers' report ultimately recommended hiding Like counts for the entire Instagram platform.

59.     Meta knew that "social comparison on Fb and IG is highest among teens and young adults" and that Project Daisy "had a statistically significant impact on reducing the frequency of 'like' comparison for teens."  Indeed, an internal Meta email from August 2020 noted that Project Daisy's removal of Like counts resulted in "less social comparison" and that "negative social comparison decrease[d] more over time" for Project Daisy participants.

60.     In an internal email from April 2021, Instagram's Head of Public Policy Karina Newton noted, "we have continued to get the advice [from experts] that we should have Daisy on by default for teens."  One Meta researcher stated that Daisy "is one of the clearest things (supported by research) that we can do to positively impact social comparison and well-being on IG and we should ship it."  On the same email thread, another Meta researcher wrote that social comparison was "shown (repeatedly) [to be] among the top drivers of well-being on FB and IG" and that "Daisy is such a rare case where a product intervention can improve well-being for almost everyone that uses our products."  Significantly, Meta also knew that Daisy had "received overwhelmingly positive responses from policy makers, press, and academics alike."

61.     Promisingly, a February 2020 internal Meta document noted that "[D]aisy was announced last year and is expected to be the primary marketing focus this year," and a "Company Narrative" document listed Daisy as a "key story" to land externally regarding Meta's efforts to improve user well-being.  However, other Meta communications acknowledged that any efforts to improve teen safety and well-being would need to be accompanied by "retaining our focus on teen engagement."

---

[5]  Meta had actually carried out two pilot versions of Project Daisy:  Pure Daisy (wherein the Like counts on all posts except one's own were hidden) and Popular Daisy (wherein the Like counts on posts from certain highly followed accounts were visible, but the Like counts on the average users' posts were hidden).  Both Daisy programs successfully "reduced the negative impact of seeing posts with many Likes."  Pure Daisy was more effective than Popular Daisy, but both reduced users' experiences of negative social comparison.

62.     In the end, Meta effectively abandoned Project Daisy, calling it "extremely low on the long list of problems we need to solve."  Meta employees noted that Daisy "got stuck in a political war b[e]tw[ee]n Fidji [Simo, then-Head of Facebook] + Adam [Mosseri] + Mark [Zuckerberg]."  When discussing Meta's decision not to implement Daisy, Meta employees acknowledged that Mosseri put Meta "in an awful position" because he "publicly talked about [Daisy], [and] all but promised we'd do this."  Nonetheless, Meta kept the default display of Like counts for content viewed by young users on Instagram.  After assessing the impact of Project Daisy on user engagement and revenue – including an estimated 1% negative effect on Meta's advertising revenue – Meta decided not to implement Project Daisy as a default setting on Instagram.

63.     Currently, users who wish to hide Like counts from posts in their Instagram Feeds must navigate submenus of preferences to affirmatively opt in.  In January 2021, Meta researchers explicitly acknowledged in an internal chat that making Daisy available as an opt-in setting rather than a default setting "won't actually be effective at reducing [social comparison]" and that an opt-in option "is highly unlikely to be useful."

64.     Meta misled the public in several statements attempting to explain why Daisy was not implemented.  For example, a May 2021 Meta blog post, entitled "Giving People More Control on Instagram and Facebook," Meta claimed that although the company tested Daisy "to see if it might depressurize people's experience on Instagram," Meta had decided not to implement it as a default because "not seeing like counts was beneficial for some, and annoying to others."  Similarly, Meta's prepared talking points regarding Project Daisy stated that Meta was implementing Daisy as an opt-in feature because "[f]or some people, hiding public like counts helped people focus less on the number and more on the content, [but] for others it didn't really matter much."  And, in a May 2021 interview about Daisy, Mosseri falsely stated that "there was very little impact and the result was neutral," and, therefore, Meta made Daisy an opt-in feature.

65.     Of course, Meta could have taken any number of actions to minimize the harmful social effects of Like counts on young users by, for instance, enabling hidden Like counts for the age group, but they failed to do so.  Instead, Meta continues to leave quantified Like counts as the default setting for all of Instagram's content and users, despite its well-known and even publicly

**CLASS ACTION COMPLAINT**

acknowledged adverse effects on youth well-being.

### 3. <u>Audiovisual And Haptic Notifications</u>

66.     Instagram uses a constant barrage of notifications to recall young users' attention back to the platform when they are engaging in unrelated activities and otherwise disengaged from social media, such as attending school.  For example, Meta knows that Instagram's default notification settings, which send frequent notifications to young user's smartphones, increases the quantity and frequency of young user's interactions with the platform.

67.     In fact, the Instagram app takes advantage of a wide range of possible notification methods on user's smartphones, all of which are employed to recall a user's attention back to the social media platform. Users are recalled not just by one notification, but by a list of notifications including haptic alerts (vibration or pulse), banner notifications, sound notifications, badge notifications (a persistently displayed red indicator encircling a number representing certain events that have not yet been viewed by the user), and email notifications.

68.     The purpose of these notices is more engagement.  Internal Meta documents outline Meta's strategy of pursuing "Teen Growth" by "leverag[ing] teens' higher tolerance for notifications to push retention and engagement," and a June 2020 "research priorities" memorandum included studying the question: "[h]ow can notifications re-engage less active users with Instagram?"

69.     Meta sends notifications to young users when other Instagram users take any of the following actions:

- Follow the young user;
- Go "Live" (*i.e.*, start a live broadcast);
- Like or comment on the young user's posts;
- Mentioning the young user in a comment or tagging the user in a post; or
- Sending the young user a message.

70.     Meta knows that these notifications create a sense of dependency in, and are thus psychologically harmful to, young users.  In a November 2019 internal presentation entitled "IG Notification Systems Roadshow," Meta's employees acknowledged that some of its users are "overloaded because they are inherently more susceptible to notification dependency."  Nonetheless,

the presentation proposed no changes to protect young users' mental health and instead deferred the "harmful effect on teen usage" for further investigation.  In other internal documents, Meta has acknowledged that "[i]n academic experiments, smartphone notifications caused inattention and hyperactivity among teens, and they reduced productivity and well-being."

71.     In June 2018, Meta prepared an internal presentation entitled "Facebook 'Addiction,'" which proposed that Meta reduce notifications to curb problematic use in users.  But Meta did nothing. All users, by default, still have notifications enabled. While such constant notifications can technically be disabled, Meta knows that leaving notifications on by default greatly decreases the number of users who will manually switch them off.

72.     Of course, any effort to reduce notifications is, to Meta, a threat to its business.  In an email chain from late 2017 and early 2018 – which included Mosseri and other Meta executives – Meta addressed declines in U.S. engagement metrics and the association of engagement declines with notification reductions. One Meta employee stated that the company faces a trade-off between "[p]reserving a better notification experience for people" and "[r]ecovering US DAP [Daily Active People] impact."  In the same email thread, Facebook Chief Product Officer Chris Cox stated, "[i]f we think that the filtered [notification] experience is better for people, I feel strongly that we shouldn't revert this because a metric is down.  The heart of the matter is that we need to get better at making the harder decisions where the metric isn't the main decision criteria: the experience is."  Then-Vice President of Analytics Alex Schultz added, "fundamentally I believe that we have abused the notifications channel as a company."

73.     The final few emails on the chain from then-Facebook Product Management Director for Growth, Andrew Bocking, end the discussion.  Meta chose to prioritize engagement over reducing notifications: "just got clear input from Naomi [Gleit] that US DAP [Daily Active People] is a bigger concern for Mark [Zuckerberg] right now than user experience," and "we just got a very clear and strong message from Mark that DAP [Daily Active People] (and specifically US DAP [Daily Active People]) is extremely important and we must change the trajectory from the negative one."

### 4.   Other Engagement Feed Features

74.     Meta's engagement-based feed also incorporates a "teaser" function known as "infinite

20

**CLASS ACTION COMPLAINT**

scroll."  The infinite scroll displays additional content at the bottom of a user's screen when they are viewing a single post, such that every post is viewed with others waiting below it (as the top portion of the next post is shown on the same screen).  This "teasing" of yet-to-be-viewed content continues indefinitely; as the user continues to scrolls down their feed, new content is automatically generated and continues to "tease" more and more posts and content. This "teasing" feature is intended to keep young Instagram users addicted and spending more time on the platform.  As the June 2018 "Facebook 'Addiction'" presentation acknowledged, "aspects of Facebook," including "mindless" consumption of a feed and the fact that "it is easy to keep scrolling and go on frequently," make it "difficult to limit one's use."  As the inventor of infinite scroll noted about the feature's addictive qualities, "[i]f you don't give your brain time to catch up with your impulses . . . you just keep scrolling."

75.    Meta also continued to manipulate the engagement of young users by making certain content in an Instagram feed only temporarily viewable through so-called "ephemeral content." Ephemeral content, including notification and visual design cues indicating that the content will soon disappear forever, leads young users to more and more frequently open Instagram to avoid "missing out" on any new content Meta has deemed as important. This phenomenon is called "Fear of Missing Out," or "FOMO."  Meta designed ephemeral content features in Instagram to induce this sense of FOMO in young users.  For example, in August 2016, Meta introduced the "Stories" feature to Instagram, which shows images and narratives on the platform for only a short amount of time before disappearing.  An internal Meta document from 2018 states: "we've invested in [Facebook] stories – and have seen engagement more than double[;] teen original sharing [is] up for the first time since 2012."

**B.    Meta Uses Additional Features To Increase Young Users' Time On Instagram To Unsafe Levels**

      **1.    Visual filters**

76.    Meta also makes visual filters that simulate facial plastic surgery available to young users on Instagram.  Meta's leadership (including Instagram's former Head of Policy, Karina Newton) understands that these filters "actively encourage[e] young girls into body dysmorphia."  Further,

Meta leaders communicated these concerns about the "severe impacts" of these filters on users'

mental health to Zuckerberg, but Zuckerberg dismissed them.

77.     In November 2019, Margaret Gould Stewart, Meta's then-Vice President of Product

Design and Responsible Innovation, initiated an email conversation, with the subject "[Feedback

needed] Plastic Surgery AR Effects + Camera Settings Policies," addressing recipients including

Andrew Bosworth (Meta's Chief Technology Officer), Mosseri (Head of Instagram), Fidji Simo

(then-Head of Facebook), and Newton.  Stewart described the "PR fire" in mid-October 2019 caused

over public allegations that Meta was "allowing the promotion of plastic surgery" through "selfie"

camera filters on Instagram, filters which can be easily accessed by Instagram's youngest users.

78.     In response to public attention on the filter's harmful effects on young users, Meta

experimented with a ban on the camera filter. This was a change Stewart attempted to make

permanent but it was ultimately only temporary. In support of her position, Stewart distributed a

briefing memorandum to Meta executives detailing the "significant concerns" raised by "global well-

being experts . . . about the impact of these effects on body dysmorphia and eating disorders,"

especially for teenage girls.  Separately, Stewart urged Meta's leadership that "when it comes to

products or technology that are used extensively by minors (under 18) I do believe we have an

obligation to act more proactively in mitigating potential harm . . . ."

79.     The briefing memo noted that setting a minimum age of 18 years old and older for

users to access the filters would be ineffective because Instagram's own age-gating procedures were

flawed. The memo acknowledged that "minors will still have access to the filters, especially on IG"

even if Meta chose to institute such a limit, which they did not.  The document also warned that

"Facebook and Instagram use is associated with body image issues and anxiety among users and

particularly among women and teenage girls," and that long-term studies of the effects of visual filters

"likely will not be available before the potentially damaging impact to user wellbeing manifests."

80.     Newton agreed with Stewart that the temporary ban on the camera filter should have

been a permanent change, expressing concern that these filters were "actively encouraging young girls

into body dysmorphia and enabling self-view of an idealized face that can result in serious issues."

Newton further noted that "outside academics and experts consulted were nearly unanimous on the

**CLASS ACTION COMPLAINT**

harm here."

81.     A meeting with Zuckerberg to discuss the matter was then scheduled for April 2, 2020, and a "Cosmetic Surgery Effects Pre-Read" document was prepared and circulated in anticipation of that meeting.  The "pre-read" detailed Meta's consultation with "21 independent experts around the world," finding that "[t]hese extreme cosmetic surgery effects can have severe impacts on both the individuals using the effects and those viewing the images."  Experts told Meta that "[c]hildren are particularly vulnerable" to these impacts, in addition to "those with a history of mental health challenges [and] eating disorders[.]"  The memo also included Meta's review of academic research on the negative effects of edited images on viewers' satisfaction with their own bodies, as well as anecdotal evidence that "editing one's own selfie images could activate desire for cosmetic surgery."

82.      In addition to noting the experts' "agree[ment] that these effects are cause for concern for mental health and wellbeing, especially" for women and girls, the memo noted that continuing the ban may have a "negative growth impact" on the company.

83.     On April 1, 2020, the meeting was canceled one day before it was scheduled to occur. Rather than rescheduling the meeting, Zuckerberg immediately vetoed the proposal to ban camera filters that simulated plastic surgery and dismissed his own employees' concerns as "paternalistic."

84.     Zuckerberg stressed that there was a "clear[] demand" for the filters, and wrongly asserted that he had seen "no data" suggesting that the filters were harmful.  After Zuckerberg rejected the proposal to permanently ban plastic surgery simulation camera filters, Stewart wrote to Zuckerberg, "I respect your call on this and I'll support it, but want to just say for the record that I don't think it's the right call given the risks . . . I just hope that years from now we will look back and feel good about the decision we made here."

## 2.     "Live" and "Reels" Functions

85.     Not satisfied with the addictive features already built into its platforms, Meta also offers the "Live" function, which encourages users to livestream videos to followers or the public. Meta launched Facebook Live on a limited basis to celebrities and other high-profile users in August 2015, and the feature was made available for all users by April 2016.  Instagram soon followed in November 2016. "Going Live" encourages users to bring more of their personal lives online by

**CLASS ACTION COMPLAINT**

creating video content in real time that their followers can watch and react to. When an individual user

goes live on their account, Instagram pushes the content by sending a notification to their followers.

86.     The Live feature was a success in attracting even more young users. Meta

was aware of this effect, as an internal February 2017 memorandum states that among Meta's

approximately 9.2 million "Live" broadcasts per day, "[Meta] found that 35% of [Live] broadcasters

are teens (early and late high school)." An executive summary circulated to Sandberg in 2016

regarding Live content indicated the goal "to drive substantial watch time via Live" and the "emphasis

on partners to appeal to teens."

87.     Meta has worked hard to make Live content enticing to young users. For example, in

an attachment sent to Sandberg in 2016, a Meta employee wrote that Meta planned to "incentivize top

creators and experts to publish high quality and high frequency Live [content]," and that "Live content

alone is likely not enough to beat YT [YouTube] watch time . . . ." The employee then recommended,

"[t]o drive substantial watch time via Live, we'll need to broaden the program beyond partner deals to

allow a much broader set of partners to monetize[.]" The employee also noted that "this set of

partners would generate 9.5M[illion] viewer hours/day and ~$203M[illion] in gross ad revenue" and

that Meta would launch Live with "75-100 global partners, prioritized by . . . [e]mphasis on partners

who appeal to teens and map to key topic areas," such as "digital stars w/teen focus[.]"

88.     In addition to the Live feature, Meta has also designed and implemented several video

features, including "IGTV," "Instagram Video," and "Reels."[6] As with other features, Meta's focus

was on teen engagement:  an internal email from April 2019 revealed that Meta's "Q2 stretch goal"

was "2M[illion] hours of teen watch time" on IGTV.

89.     Reels, however, has been the video feature most marketed to young users. Reels'

videos are algorithmically presented based on a number of factors targeted to individual users,

including the user's activity, the popularity of the content, and the viewer's connection to the creator.

Metrics such as "like" counts, comments, and views are displayed on the screen of the video itself,

---

[6] IGTV was revamped in October 2021 (in a shift to Instagram Video), and ultimately removed
completely from the Platform in March 2022. Reels was merged with and superseded "Instagram
Video" in June 2022.

**CLASS ACTION COMPLAINT**

reducing the need for users to turn away from the video page.  In a presentation on engaging young users, Meta conceded that it was "investing heavily in Reels, Stories & Creators in an effort to generate more value for teens" on Instagram.  As one Meta employee put it, "obviously teens are key to winni[]ng in Reels."

90.    Meta could limit young user access to Live and Reel videos; instead, Meta has done the opposite and elected to use these content features to induce a sense of urgency (FOMO) in its young users.  Tellingly, an October 2019 internal presentation entitled, "Teen Mental Health Deep Dive" discussed the findings from a survey of over 2,500 teenagers who use Instagram on at least a monthly basis.  Among the conclusions was the finding that "[y]oung people are acutely aware that Instagram can be bad for their mental health yet are compelled to spend time on the app for fear of missing out on cultural and social trends."

### 3.    **Multiple Accounts**

91.    Yet another Meta feature perpetuating constant engagement from young users is the "multiple accounts" function, which allows users to register up to five accounts without having to log out of any one account to access another.  Each additional account multiplies the amount of content and personalized Feeds demanding a young user's attention and "increase[es] engagement" of "teens by driving more connections."

92.    For example, a 2019 internal chat indicates that Meta hoped teens would "feel more comfortable sharing and engaging" with multiple accounts in order to "drive up" engagement (Daily Active People) and signal to "younger teens who are coming onto the platform" to do the same.  A Meta data scientist (and currently the Director of Data Science at Meta) suggested that Meta should consider targeting those secondary accounts "with more upsells," and Instagram's Senior Director of Project Management concluded that it would be a "promising strategy" for Meta to "prioritize" and promote multiple accounts to teens by "increas[ing] awareness and value of multiple accounts."

### 4.    **Autoplay**

93.    Meta additionally deploys the autoplay feature to keep young users on Instagram, built to take advantage of an individual's weaknesses and to combat any desires to exit out of the platforms.  An internal document from June 2018 warned that "stories or videos that autoplay" can constitute

"cues for Facebook use that influence people's behavior based on automatic tendencies, when they don't want to be using Facebook."

94.     In August 2021, Meta notified its staff that YouTube turned off autoplay for users under the age of 18.  The significance of this decision was discussed in the following chat between two Meta researchers: "Researcher 1: 'Turning off autoplay for teens seems like a huge move! Imagine if we turned off infinite scroll for teens.' Researcher 2: 'Yeah, I was thinking the same thing. Autoplay is HUGE.'"

95.     By providing an automatic and never-ending supply of content, the autoplay feature keeps users addicted to watching more and more content without even being aware of it.  As commentators have observed, "it's the way Instagram encourages you to watch Stories at every turn that makes them addicting:"

> Stories are the first thing you see when you open the app—they're housed at the top of the screen—but they also periodically show up in the middle of scrolling through your feed . . . And once you're watching one person's Story, you're automatically shepherded into the next person's Story without ever even leaving the interface.

### III.   Instagram Can Cause Young Users Specific, Significant, and Permanent Physical And Mental Harms

96.     Increased use of social media platforms, including Instagram, results in physical and mental health harms particularly for young users, who experience higher rates of depressive episodes, anxiety, sleep disturbances, suicide, and other mental health issues.[7] Therefore, when adolescent users become addicted to Instagram, they risk experiencing these potentially permanent mental health conditions without possessing adequate means of protection.

97.     Meta's acquisition of Instagram in 2012 marked a key event that kicked off a dramatic rise in the number of young users on social media in the United States. The number of users on Instagram ballooned from 50 million users in 2012 to over 500 million users by 2016, with a significant share of its user base composed of young users.  With this increase in users—and business

---

[7]  *See, e.g.*, Jonathan Haidt & Jean Twenge, Social Media and Mental Health: A Collaborative Review (unpublished manuscript, on file with New York University), *available at* tinyurl.com/SocialMediaMentalHealthReview (last visited Oct. 23, 2023); Jacqueline Nesi et al., *Handbook of Adolescent Digital Media Use and Mental Health*, Cambridge Univ. Press (2022).

success for Meta—Meta's focus on designing features that keep users on the platform for longer and longer periods of time created worse mental health outcomes for heavy consumers of social media as compared to light consumers.[8]

98.    In fact, spending hours and hours on social media, as Meta programs young users to do, has been more strongly associated with poor psychological health (such as self-harm behaviors, depressive symptoms, low life satisfaction, and low self-esteem) than hours spent on electronic gaming and watching TV.[9]  Young users even become so addicted to social media that they forego sleep, as heavy social media use causes poorer sleep patterns[10] (*e.g.*, later sleep and wake times on school days and trouble falling back asleep after nighttime awakening) and poorer sleep quality.[11] Such sleep interference in turn causes or exacerbates symptoms of depression and anxiety.  Without sleep, individuals experience a myriad of negative physical and mental health effects, for instance a decreased antibody response to vaccines.[12]

99.    As young users are less able to self-regulate the amount of time spent on social media, they are more susceptible to the dangerous physical and mental harms caused by social media addictions. Companies like Meta capitalize on these psychological vulnerabilities of young users to garner more business, ignoring the harms and serious health effects their products have on young users even as such harms grow larger. This is a classic example of what researchers call a feedback loop: those who use social media habitually are less able to regulate their behavior; that habitual use, in turn, can lead back to more social-media use; and restarting the cycle, that additional use makes it

[8] *See, e.g.*, Jean Twenge & W. Keith Campbell, *Digital Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychiatric Q. 311 (2019).
[9] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations with Mental Health Vary by Activity and Gender*, 56 Soc. Psychiatry & Psychiatric Epidemiology 2017 (2021).
[10] Holly Scott et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings from the UK Millennium Cohort Study*, 9 BMJ Open 1 (2019); Garrett Hisler et al., *Associations Between Screen Time and Short Sleep Duration Among Adolescents Varies by Media Type: Evidence from a Cohort Study*, 66 Sleep Med. 92 (2020).
[11] Megan A. Moreno & Anna F. Jolliff, *Depression and Anxiety in the Context of Digital Media*, *in* Handbook of Adolescent Digital Media Use and Mental Health 227 (2022); *see also, e.g.,* Huges Sampasa-Kanyinga et al., *Use of Social Media is Associated With Short Sleep Duration in a Dose-Response Manner in Students Aged 11 to 20 Years*, 107 Acta Paediatrica 694, 694-700 (2018).
[12] Karine Spiegel et al., *A Meta-analysis of the Associations Between Insufficient Sleep Duration and Antibody Response to Vaccination*, 33 Current Biology 998 (2023).

27
**CLASS ACTION COMPLAINT**

even harder to regulate the problematic behavior.[13]

100.   Excessive social media use influences the social development of young users at an already crucial and vulnerable point in their lives. Research indicates that going through puberty while being a heavy social media user interferes with a sensitive period for social learning.[14]  Specifically, as noted in a news article published by the American Psychological Association, regular Instagram usage can influence periods of adolescent development by publicizing and immortalizing regular social interactions.[15] For instance, Instagram offers quantifiable social endorsement in the form of "likes", which has been shown to distinctly impact neural reward responses in adolescent brains.[16] Finally, heavy use of social media in this sensitive developmental period can have negative impacts on long-term life satisfaction.[17]

101.   Social media notifications have become so routine to young users—trained to develop FOMO—that they often feel an extra need to be connected even at night and frequently wake up throughout the night to check their notifications.[18]  Socializing at night makes it harder for young users to sleep.[19]

102.   Young users who use social media for more than five hours per day are three times more likely than non-users to not sleep enough,[20] contributing to associated physical and mental health impacts.  Children who use social media for more than five hours per day are many times more

[13] Maria T. Maza et al., *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, 177 JAMA Pediatrics 160 (2023).
[14] *See, e.g.*, Amy Orben et al., *Windows of Developmental Sensitivity to Social Media*, 13 NATURE COMM. 1649 (2022).
[15]Zara Abrams, *Why young brains are especially vulnerable to social media*, AMER. PSYCH. ASS'N. (Feb 3, 2022) https://www.apa.org/news/apa/2022/social-media-children-teens.
[16] Lauren E. Sherman et al., *The Power of the Like in Adolescence: Effects of Peer Influence on Neural and Behavioral Responses to Social Media*, 27 PSYCH. SCI. 1027–35 (2016).
[17] Amy Orben et al., *Windows of Developmental Sensitivity to Social Media*, 13 NATURE COMM. 1649 (2022).
[18] Anushree Tandron et al., *Sleepless Due to Social Media? Investigating Problematic Sleep Due to Social Media and Social Media Sleep Hygiene*, 113 Computers in Human Behavior 106487 (2020).
[19] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescents' Sleep: A Longitudinal Study on the Protective Role of Parental Rules Regarding Internet Use Before Sleep*, 18 Intl. J. Envtl. Res. Pub. Health 1346 (2021).
[20] Sampasa-Kanyinga et al., *supra* note 11; *see also* Marian Freedman & Michael G. Burke, *Social Media and Sleep Duration-There Is a Connection!*, 35 Contemp. Pediatrics J. (2018).

**CLASS ACTION COMPLAINT**

likely to have clinically relevant symptoms of depression than non-users.[21]

103.    Social media addiction (including Instagram use) has also been associated with poor academic performance.[22] This relationship can be both direct (time spent on social media reduces time spent studying) and indirect (negative mental health consequences of social media addiction impact academic performance).[23] For instance, young people addicted to Instagram can receive lower grades and exhibit poorer in-school performance due to digital distractions.[24] Further, Instagram addiction can lead to lower self-esteem, which is heavily associated with procrastination and poor academic achievement.[25] Unfortunately for young students, the low self-esteem and procrastinatory behavior caused by Instagram addiction can have irreparable, long-lasting effects on their academic career (and life).

104.    Instagram has also been associated with deliberate self-harm (DSH) by underage users.[26] Many children who engage in DSH use Instagram to find community among like-minded individuals (which is, according to Meta's advertising, the app's intended use).[27] However, researchers have found that Instagram's algorithm can cause children who engage in DSH to be flooded with DSH content, which can normalize and then sensationalize self-harm.[28] In one study, nearly 50% of adolescent users who eventually engaged in DSH reported viewing DSH-related accounts for several months before self- harming.[29] Therefore, rather than providing a safe,

[21] Twenge & Farley, *supra* note 9.

[22] Cecilie Schou Andreassen, *Online Social Network Site Addiction: A Comprehensive Review*, 2 TECH. AND ADDICTION, 175–184 (2015).

[23] *Id.*

[24] Behzad Foroughi et al., *Associations Between Instagram Addiction, Academic Performance, Social Anxiety, Depression, and Life Satisfaction Among University Students*, 20 INT'L. J. OF MENTAL HEALTH AND ADDICTION, 2221–2242 (2022).

[25] Aycan Pekpazar et al., *Role of Instagram Addiction on Academic Performance among Turkish University Students: Mediating Effect of Procrastination*, 2 COMPUTERS AND EDUC. 100049 (2021).

[26] Carla Moss et al., *Assessing the impact of Instagram use and deliberate self-harm in adolescents: A scoping review*, 32 INT'L. J. MENTAL HEALTH NURSING 14, 15 (2023).

[27] R.C. Brown, et al., *#cutting: Non-suicidal self-injury (NSSI) on Instagram*, 48, PSYCH MED. 337–46 (2018).

[28] *Id.*; A.M. Memon, *The role of online social networking on deliberate self-harm and suicidality in adolescents: A systematized review of literature*, 60 INDIAN J. OF PSYCH. 384–92 (2018).

[29] R.C. Brown et. al., *"I just finally wanted to belong somewhere" – Qualitative analysis of experiences with posting pictures of self-injury on Instagram*, 11 FRONTIERS IN PSYCH. 1–8 (2020).

**CLASS ACTION COMPLAINT**

destigmatized community, Instagram can cause its most vulnerable users to emulate and permanently adopt self-harming behavior.[30]

105.    In its Youth Risk Behavior Study, the Centers for Disease Control and Prevention (CDC) observed that the percentage of high school students "who experienced persistent feelings of sadness or hopelessness" skyrocketed in the decade after Instagram's rise to popularity in 2012.[31] This same time period saw an increase in youth hospitalization rates for suicidal ideation and suicide attempts. For instance, in 2008, prior to the rise of Instagram, hospital visits for suicidal ideation and attempts represented only 0.66% of visits among all age ranges, and just by 2015 this increased to 1.82%.[32]

106.    The immense popularity of platforms like Instagram has viciously targeted and caused serious harms to girls and young women and their perception of themselves.  Immediately before Instagram's rise in popularity and usership, major predictors for the mental health well-being of U.S. girls and young women were stable or trending down.  This promising trend was reversed, however, as the rates of suicides, self-poisonings, major depressive episodes, and depressive symptoms among girls and young women jumped demonstrably after Instagram's rise to popularity in 2012.[33]

---

[30] A.M. Memon, *The role of online social networking on deliberate self-harm and suicidality in adolescents: A systematized review of literature*, 60 INDIAN J. OF PSYCH.. 384–92 (2018); R.A. Record et al., *#Selfharm om #Instagram: Examining user awareness and use on Instagram's self-harm reporting tool*, 35 HEALTH COMMC'N. 894–901 (2020).
[31] *Youth Risk Behavior Survey, Data Summary & Trends Report: 2011-2021*, at 61, Ctrs. for Disease Control & Prevention (2023), archive.ph/NYuQX.
[32] G.F. Plemmons et al., *Hospitalization for Suicide Ideation or Attempt: 2008-2015*, 141 Pediatrics 1, 4-5 (2018); *see also* Brett Burstein et al., *Suicidal Attempts and Ideation Among Children and Adolescents in US Emergency Departments, 2007-2015*, 173 JAMA Pediatrics 598, 598-600 (2019).
[33] Jean Twenge*, Increases in Depression, Self-Harm, and Suicide Among U.S. Adolescents After 2012 and Links to Technology Use: Possible Mechanisms*, 2 Psychiatric Res. Clinical Prac. 19 (2020).

**CLASS ACTION COMPLAINT**

**FIGURE 1**
Indicators of poor mental health among U.S. girls and young women, 2001–2018[a]
[a]Standard deviations are within means at the generational level, not at the individual level, and thus should not be used to calculate individual-level effect sizes.
[b]Source: Centers for Disease Control and Prevention. Suicide rates among 12- to 14-year-old girls.
[c]Source: Spiller et al. (14). Self-poisoning among 13- to 15-year-old girls.
[d]Source: Twenge et al. (11). Major depressive episode among 14- to 15-year-old girls.
[e]Sources: Keyes et al. (8) and Twenge et al. (9). Depressive symptoms among eighth-grade girls.

107.    Particularly disturbing is the rise of suicidal ideation among girls over the time period that Instagram use has surged.  According to the CDC's Youth Risk Behavior Survey, in 2011, 19% of high school girls seriously considered attempting suicide. By 2021, that figure reached 30%.[34]  This increase in suicidal ideation among girls has been matched by an increase in suicide attempts. In just the one decade of Instagram's rising popularity, there was a 30% increase in the rate of high school girls who attempted suicide.[35]

108.    Increased rates of suicidal ideation and attempts have led to an overall higher rate of completed suicide among young girls.  Indeed, in 2013 alone – the year after Instagram's surge in popularity among young users – the suicide rate for 13-year-old girls jumped by around 50%.[36]

109.    These tragic effects are caused by Meta's own intentional design choices and practices that exploit the desires of young users to gain social acceptance and development, and Meta makes it easy for them to become addicted to their platforms. Internally, Meta employees recognized this fact,

---

[34] *Youth Risk Behavior Survey*, *supra* note 31.
[35] *Id.*
[36] Haidt & Twenge, *supra* note 7, at 316.

while deliberately avoiding an external narrative using the word "addiction."  In 2020, a Meta

employee noted that "[t]he feedback, essentially, is that (1) teens feel addicted to IG and feel a

pressure to be present, (2) like addicts, they feel that they are unable to stop themselves from being on

IG, and (3) the tools we currently have aren't effective at limiting their time on the ap[p]."  However,

that employee was  "cautious about calling it an addiction," and another employee responded:

"[t]otally agree, we would never want to say that!"

110.    In February 2019, Meta employees informed Sandberg that "when social media use

displaces sleep in adolescents (via nighttime social media use), it is negatively correlated to indicators

of mental health."  The harms of sleep disturbance and negative social comparison spirals reinforce

each other and become even more harmful in combination, as illustrated by the following Meta

graphic:



111.    Meta has also known since as early as 2015 that Instagram creates anxiety in teens.

Instagram Research Manager noted that Instagram "[p]rofile anxiety is real" for teens, because "the

mechanics of Profile are in direct conflict with the everyday moments [teens] want to share."

112.    Further, Meta knows that "the always-on nature of social media" means that "teens

have few ways to escape negative experiences when they occur," such as bullying and harassment.  As

a Meta researcher noted, there is "very likely" a "funnel" from the way Instagram feeds content to

appearance comparison, body image issues, and depression.

113.    All of Instagram's known consequences—including the disruption of normal sleep

**CLASS ACTION COMPLAINT**

patterns, innumerous and grave mental health impacts, facilitation of social comparison, anxiety, and failing to prevent and in fact creating a culture of bullying and harassment—have not only transformed the social lives of young users but in doing so endangered them to serious physical and mental harm. Meta has known that Instagram's features hold tremendous power over vulnerable teens and has capacity to cause or exacerbate thoughts of suicide and self-injury.  Meta's research estimated that, on Instagram, "the vast majority of people who admit and promote SSI [suicide and self-injury] are teens (45%-60%)."

114.    In an internal Meta survey in or about 2021, 6% of teen girls in the U.S. and 13% of teen girls in the U.K. "traced their desire to self-harm/commit suicide to Instagram."  Fifteen percent of Instagram users told Meta that they thought the platform made thoughts of suicide or self-injury worse, and in February 2019, an internal Meta research presentation noted that "those with lived experiences of SSI [suicide and self-injury] say they limit their time on Instagram when they're in a crisis [and] rather than using Instagram as a source of support during a crisis, users pull back from the app, saying it is stressful[,] overwhelming[, and] triggering."

115.    Meta's top leaders and executives are aware of, and yet callously ignore, their platform's detrimental and serious effects on young users' mental health and well-being.  As internal researchers told Zuckerberg, social media "can and does attenuate or exacerbate a user's experience with mental health issues."  Indeed, Zuckerberg's staff informed him that "a sizable proportion of [Instagram] users (under a third) think we make issues related to mental health worse."  Nevertheless, Meta has done nothing and continues to psychologically exploit the well-being of young users.

**IV.    Meta Targets Particularly Young Users, Including Those Under The Age Of 13**

116.    Access to Instagram is supposed to be limited to users 13 years of age and older. However, even this ridiculously inadequate rule for child usage is not enforced by Meta.  In fact, Meta actually encourages children under the age of 13 to use Instagram and looks the other way when it becomes aware of such usage.

**A.    Meta Allows Users Under The Age Of 13 To Access Instagram**

117.    Meta internal communications show that under-13 users are an intended audience of Instagram.  Meta has extensively studied the habits and attitudes of users under age 13, through

**CLASS ACTION COMPLAINT**

confidential surveys, focus groups, and other internal studies.  For example, in March 2020, Meta circulated a study called "Beyond the Individual User: Understanding our Products through the Household Ecosystem." In this study, Meta compiled data from surveys that Meta conducted with families containing at least one parent, one teen, and one preteen (a child under the age of 13).  Meta collected information about how teens encourage their siblings who are under 13 years old to use social media, seeking to target children under the age of 13 to use Instagram and onboard more generations of Instagram users.  As another example, in November 2020, Meta employees discussed how to ensure that Instagram retained a market share of children under the age of 13 (whom they referred to as "future teens").

118.    At times, Meta has even publicly acknowledged that garnering Instagram users under age 13 serves their business.  For example, in September 2018, Meta released a "guide" for parents, urging them to allow their children to join Instagram, lest the children risk "social marginalization." Commentators noted that the guide suggested that children under the age of 13 already use Instagram, and the guide indicated that Instagram did not collect ages of users at time of signup.

119.    Meta explicitly lists "pre-teens" in financial review and market analysis documents.

120.    One internal Meta presentation contains a chart depicting Instagram's Monthly Active People Penetration, showing approximately 20-60% penetration in the 11- to 13-year-old age cohorts:



121.    In a related chart, Meta tracked Daily Active People by Time from 2013 to 2018:

1
2
3
4
5
6
7
8
9
10
11



12   122.   This chart reveals that in 2016, approximately 20% of users from the 2004 birth year

13   cohort (*i.e.*, Instagram users who were 12 years old at the time) used Instagram on at least a daily

14   basis.  The Daily Active People by Time chart describes the daily and continuously increasing use of

15   Instagram by under-13 users again as "penetration," signaling Meta's knowledge that under-13 users

16   were on Instagram and their view of the age group as one to target.

17   123.   And, in January 2018, Zuckerberg received a report that included information on

18   under-13 users on Instagram, in advance of a meeting with the Youth Team.  That report explained

19   that Meta "can estimate that there were 4M[illion] people under 13 in 2015 on IG [in the US]. This

20   represents around 30% of all 10-12 year[] old[s] in the US."

21   124.   Meta also possesses survey data from 2020 indicating that, out of 3,983 children

22   responding, 22% of child respondents aged 6 to 9 and 35% of child respondents aged 10 to 12 had

23   used Instagram.  In May 2021, Meta received external research conducted on social media platforms

24   including Instagram; this research, provided by an organization called Thorn, revealed that of children

25   ages 9-12, 40% used Instagram daily.

26   125.   Meta also made sure to gain a significant understanding and awareness of the market

27   potential for under-13 users. Meta knows and has reviewed and cited external data showing that 81%

28   of "children start[] using social media between the ages of 8 and 13," that "93% of 6–12-year-olds in

35

**CLASS ACTION COMPLAINT**

the US have access to tablets or smartphones, and 66% have their own device."  In a document discussing how to secure teen and under-13 engagement with Instagram, Meta noted that its own research found "children first get a smart phone (average age 10.3) and then a social media account (average age 11.4)" and "the largest percentage (39%) got their first account between ages 10 and 12." Statistics tracking digital technology usage by children under the age of 13 were also presented to Meta's board of directors, showing Meta's continued effort to build products to attract children to its platforms, particularly Instagram.

126.    In addition, Meta acquires actual knowledge of specific under-13 user accounts through external complaints regarding users under the age of 13 on Instagram, and employees even tell parents how to skirt around the age requirements.  For example, in February 2018, after learning of a potential under-13 user, Meta employees exchanged emails discussing how to contact the user's mother.  One Meta employee suggested telling the mother that if her daughter was under 13, "we can keep her account up if you would like to take control over the account and update the bio accordingly." A Meta product policy manager acknowledged that Meta had "done something similar like this in the past" to "coach[]" a parent or parents to keep their under 13-year-old children's accounts online.

127.    In another email thread, Meta employees discussed why a 12-year-old girl's four accounts were not deleted, despite complaints from the girl's mother stating her daughter was 12 years old and requesting the accounts to be taken down. The employees concluded that "the accounts were ignored" in part because representatives of Meta "couldn't tell for sure the user was underage."

128.    Additionally, Meta automatically ignores certain external reports that Instagram users are under 13 years old, instead of disabling their accounts as they are supposed to.  In 2021, Meta received over 402,000 reports of under-13 users on Instagram via its underage reporting webform and in-app underage reporting process. But Meta's records show that fewer than 164,000 – far fewer than half of the reported accounts – were "disabled for potentially being under the age of 13" that year.  As an internal Meta document from 2018 acknowledges: "we do very little to keep U13s off our platform."

**B.    <u>Meta Knows That Its Supposed "Gatekeeping" Function Is Totally Ineffective</u>**

129.    Even though Instagram is nominally restricted to those who are 13 years and older,

Meta is aware that:  (a) many users lie about their age when they sign up for Instagram, (b) "users under 18 lie about their age far more often than adults," and (c) millions of its users are under the age of 13.  In fact, Instagram's gatekeeping function was originally designed to facilitate such lies.  Specifically, Meta's sign-up page contained a drop-down menu that automatically generated a date and year of birth representing the user to be 13 years old.  The design of the "age gate" signaled to children the specific date that they could affirm to advance through the registration process, even though the date automatically populated by Instagram was not their actual date of birth.

130.    Meta only recently changed Instagram's sign-up page to automatically generate the instant date and year, rather than a date 13 years prior.  However, Meta's adoption of an age gate that permits the user to enter any date of birth, regardless of its accuracy, still does not prevent under-13 users from creating Instagram accounts.  In fact, Instagram's current age gate allows users under age 13 to make several attempts at entering a date of birth which would yield an age of over 13, thus permitting the user to create an account.  Instagram only temporarily blocks an underage user's renewed attempts for a mere 12 hours before permitting them to try again.

131.    Internal Meta documents reveal that the company is aware that under-13 users routinely supply a false date of birth when registering for Instagram, and that this was enabled by Meta's own design choices. For example, in a December 2017 internal chat, an Instagram employee noted that "roughly 90%" of users claiming to be 13 years old had misrepresented their age.  In February 2021, when responding to an email regarding user retention among young people, a Meta employee explained, "[W]e know that stated age = 13 contains a lot of misrepresenters (presumably, those younger than 13)."

132.    In January 2021, in an internal chat with Meta's Director of Data Science, a Meta employee noted that, for purposes of internal planning and strategy, Meta could not rely on the "stated" age of users who claim to be 13 years old because "they lie about it a TON."

133.    And in 2021, a Meta employee stated that internal data "suggests only 40% of labeled 15yo actually report a 'Teen Stated Age' (it's even lower for 13yos)," which confirms that "[t]eens indeed very rarely give their proper age."  As Mosseri stated bluntly in a November 2021 internal chat, "Tweens want access to Instagram, and they lie about their age to get it now. We'd like it if they

aged up from an age-appropriate version to the full [version]of Instagram, so the explicit strategy, which is on pause, is to let them download the main app and cater the experience to their age."  In an internal email from 2019, Davis asked Nick Clegg to "clarify with product leadership whether goal for age collection is to implement measures needed to identify and remove u13 age liars, which may impact growth, or whether we are waiting to test growth impact before committing to anything."

134.    In sum, Meta has long been aware of, and has repeatedly failed to change, the fact that Instagram's age gate efforts address the problem of under-13 users in name only. Instagram utilized no age gate for several years, then implemented an age gate that defaulted to an entry of ages over 13, and now uses an age gate that still depends on an under-13 user to correctly self-report their own age, without any verification.  Remarkably, the lack of parental or guardian guidance or consent functions means that under-13 users can register and lie about their age themselves. A 10-year-old, smart enough to pretend he or she is 13, can become a new Meta user anytime he or she wants.

**C.**    **Meta's Collection Of Personal Information From Children Under The Age Of 13 Violates COPPA**

135.    As with all of its users, Meta gathers personal information from this "valuable" audience of under 13-year-olds, a violation of federal law, namely the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6502, *et seq.*

136.    COPPA protects the privacy of children by requiring technology companies like Meta to obtain informed consent from parents prior to collecting the personal information of children online.  Meta routinely violates COPPA in its operation of Instagram by collecting the personal information of children without first obtaining (or even attempting to obtain) verifiable parental consent, as required by the statute.

137.    The term "child" is defined by 15 U.S.C. § 6501(1) to mean an individual under the age of 13.  "Verifiable parental consent" requires, at a minimum, providing a child's parent with notice of Meta's "personal information collection, use, and disclosure practices" and Meta obtaining the parent's authorization for Meta to collect, use, or disclose the child's information.  "Personal information" is defined to mean "individually identifiable information about an individual collected online," including the child's name, address, email address, personal identifiers, geolocation

information, and photographs or videos of the child. 15 U.S.C. § 6501(8); 16 C.F.R § 312.2.  COPPA

applies to social media companies like Meta if:  (a) they have actual knowledge that their social media

platforms are collecting personal information from children; or (b) they direct the services of their

social media platforms to children. 15 U.S.C. § 6502(a)(1).  Meta has notice and consent-seeking

obligations under both of these definitions.

### 1.   Meta Has Actual Knowledge That It Is Gathering Information From Users Under 13

138.   As demonstrated in detail above, Meta has actual knowledge that users under the age of

13 are using Instagram, and that it is collecting personal information from those users.

### 2.   Instagram is "Directed To Children"

139.   Independent of Meta's actual knowledge, Meta is also subject to COPPA's verifiable

parental consent requirement because Instagram is "directed to children." 15 U.S.C. § 6502(a)(1); 16

C.F.R. § 312.2.

140.   The Federal Trade Commission (FTC) has promulgated regulations listing factors for

determining whether an online service is directed to children and therefore subject to the statute's

"verifiable parental consent" requirement.  These factors include:

> subject matter, visual content, use of animated characters or child-
> oriented activities and incentives, music or other audio content, age of
> models, presence of child celebrities or celebrities who appeal to
> children, language or other characteristics of the Web site or online
> service, as well as whether advertising promoting or appearing on the
> Web site or online service is directed to children. The Commission will
> also consider competent and reliable empirical evidence regarding
> audience composition, and evidence regarding the intended audience.

16 C.F.R. § 312.2.

141.   An online service is "directed to children" if it "targets children as one of its audiences

- even if children are not the primary audience."[37]  Even if a website claims to target teenagers or

adults, "in reality, [the] site may attract a substantial number of children under 13, and thus may be

---

[37] July 2020, COPPA Guidance; available at, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.

**CLASS ACTION COMPLAINT**

considered [to be] . . . 'directed to children' . . . ."[38]  Under 16 C.F.R. § 312.2, empirical evidence regarding audience composition is relevant to determining whether an online service, or a portion thereof, is directed to children.  As detailed above, Meta's own records reveal that Instagram's audience composition includes millions of children under the age of 13.

142.    In addition, under 16 C.F.R. § 312.2, "subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content" are relevant to determining whether an online service is directed to children. Instagram publicly hosts thousands of accounts and pages on its platform that include child-oriented subject matter, characters, activities, music, and other categories of content for children.

143.    To list only a few representative examples, Meta has admitted that it hosts the following accounts or pages on Instagram. Each such account or page on Instagram is child-oriented because it hosts images and videos relating to a character, product or brand that is specially made for and/or marketed to children:

| Instagram Page | URL |
| --- | --- |
| Bluey | https://www.instagram.com/officialblueytv/ |
| DC Super Hero Girls | https://www.instagram.com/dcsuperherogirls/ |
| Disney Junior | https://www.instagram.com/disneyjunior/ |
| Dr. Seuss | https://www.instagram.com/drseuss/ |
| Dragon Ball Super | https://www.instagram.com/dragonballsuper/ |
| Hasbro | https://www.instagram.com/hasbro/ |
| Hello Kitty | https://www.instagram.com/hellokitty/ |
| Hot Wheels | https://www.instagram.com/hotwheelsofficial/ |
| JoJo Siwa | https://www.instagram.com/itsjojosiwa/ |
| Lego | https://www.instagram.com/lego/ |

---

[38] *Id.*

**CLASS ACTION COMPLAINT**

| | |
|---|---|
| Mickey Mouse | https://www.instagram.com/mickeymouse/ |
| Miraculous Ladybug | https://www.instagram.com/miraculous/ |
| Monster High | https://www.instagram.com/monsterhigh/ |
| My Little Pony | https://www.instagram.com/mylittlepony/ |
| Nick Jr. | https://www.instagram.com/nickjr/ |
| Nickelodeon | https://www.instagram.com/nickelodeon/ |
| Paddington Bear | https://www.instagram.com/paddingtonbear/ |
| Patrick Star | https://www.instagram.com/officialpatrickstar/ |
| PAW Patrol | https://www.instagram.com/pawpatrol/ |
| PBS Kids | https://www.instagram.com/pbskids/ |
| Peppa Pig | https://www.instagram.com/officialpeppa/ |
| Pokemon | https://www.instagram.com/pokemon/ |
| Rugrats | https://www.instagram.com/rugrats/ |
| Sesame Street | https://www.instagram.com/sesamestreet/ |
| Sonic the Hedgehog | https://www.instagram.com/sonicthehedgehog/ |
| SpongeBob SquarePants | https://www.instagram.com/spongebob/ |
| Teenage Mutant Ninja Turtles | https://www.instagram.com/tmnt/ |
| Thomas & Friends | https://www.instagram.com/thomasandfriends/ |
| Transformers | https://www.instagram.com/transformersofficial/ |

144.    Additionally, under 16 C.F.R. § 312.2, the "age of models, presence of child celebrities, [and] celebrities who appeal to children" are relevant to determining whether an online service, or a portion thereof, is directed to children.  Meta hosts, maintains, and promotes thousands of accounts on Instagram that are dedicated to displaying images and videos of child models, child celebrities, and other child-oriented celebrities.

145.    In an email exchange from 2019 discussing Meta's response to a New York Times exposé on child influencer accounts, a Meta employee wrote "Branded content for under 13 is happening on IG."  The employee then discusses three types of under-13 influencers/actors (on accounts run by parents) on Instagram and acknowledges that branded content posted by child influencers under the age of 13 (such as video game reviews) appeals to children under 13.

## V.    Meta Fails To Provide Adequate Warnings About The Dangers Of Instagram To Young Users

### A.   Meta's Published Guidance About Young Users And Instagram Is Woefully Inadequate And Misleading

146.    On its websites, Meta claims that it works to "keep[] Instagram a safe and supportive place."[39] Meta says nothing about how various features, including its recommendation algorithms, actually do the opposite.  For example, Meta does not make disclosures to parents of young users, or to young users themselves, about the promotion of High-Negative Appearance Comparison content to young users from recommendation algorithms. Nor does Meta disclose that exposing those young users to High-NAC content on Instagram tends to exacerbate physical and psychological problems for those young users.

147.    One of the features that Meta touts for safe use of Instagram, is "Daily Limit," which is a tool to give users the ability to restrict the amount of time they spend on Instagram each day. However, despite the feature's name, it is ineffective and easily overridden.

148.    Daily Limit must be programmed by the user, who puts in a maximum amount of time that the user can be on a particular social media product in a single day.  Meta purports to encourage parents to use Daily Limit with their children, alongside other supervision tools.  But these tools are not automatically applicable when a child creates an Instagram account.  Rather, the young user (not the parent) must affirmatively "opt-in" to use the supervision tools.  In other words, under the current model, teenagers must self-regulate and affirmatively ask their parents to supervise their Instagram use.

149.    Moreover, Daily Limit limits nothing.  Instead, it merely causes a notification to pop

---

[39] https://about.instagram.com/safety.

**CLASS ACTION COMPLAINT**

up when a user reaches the maximum amount of time previously specified.  The notification can then be easily dismissed with the hit of a button, and the user can return to Instagram in seconds. In fact, the Daily Limit pop-up notification even invites the user to reconsider their preferred time limit, encouraging them to stay on longer.  Since its inception, Meta has further watered down the Daily Limit tool:  In February 2022, Meta quietly raised the minimum option for Daily Limit to 30 minutes from the initial selection of ten minutes previously provided.

150.   In December 2021, Instagram also launched the "Take a Break" tool.  Take a Break sends users a pop-up notification when they have spent more than a specified period of time scrolling without interruption.  Just like the Daily Limit notification, however, the Take a Break notification is easily overridden for a quick return to more infinite scrolling.  As one Meta employee addressed this conundrum: "if we are spending so much time on 'taking a break nudge' how are we actually going to solve for mental health needs of our users?"

151.   Meta employees have internally acknowledged that Meta's time limitation tools are ineffective because of their structural failings—they are not adopted by a majority of Instagram users —and Meta actually considered removing these tools altogether.  In March 2020, Meta conceded that only 1.4% of Daily Active People (Instagram users who access the platform daily) have a time spent reminder set and that 25% of these people hit their time spent in a given day.  In 2020, Newton, then Head of Public Policy, stated that she believed user adoption of time spent tools was low in part because "we did no in-app education about it and haven't evolved or improved it over time."

152.   Meta could have alternatively designed its Daily Limit and Take a Break features to actually achieve their stated functions, and could have provided young users and their parents with robust tools that, once enabled, allowed real controls over Instagram use.  For the purpose of increasing profits, Meta chose not to do so.

153.   Thus, instead of warning parents and young users of the dangers of Instagram, Meta has gone to great lengths to solicit increased numbers of young users to join and spend more time on their platforms.  For example, in September 2018, Meta released a "guide" for parents, urging them to allow their children to join Instagram, lest the children risk "social marginalization."  Commentators noted that the guide suggested that children under the age of 13 already use Instagram, and the guide

43

**CLASS ACTION COMPLAINT**

indicated that Instagram did not collect ages of users at time of signup.

154.    Meta's desire to enroll young users is also obvious across Instagram's website. For instance, Meta presents Instagram's "Family Center" supervision tools as a way to "create positive Instagram experiences together."[40]  However, these tools provide no warnings about the risks and dangers of using Instagram and, rather, are meant to encourage young-user Instagram under the ostensible but false guise of "safety."

155.    Meta's intent is most evident when a new user downloads and signs up for Instagram. When a child signs up for Instagram, they are never confronted with a clear, conspicuous warning detailing the possible risks and dangers associated with Instagram's features and that child is never told that he or she needs parental consent.  Instead, upon downloading an Instagram application, the child is asked to enter his or her birthday. Instagram does not verify whether the user is truthful in doing so.

156.    After the child enters a birthday, he or she is then asked to create a username and to agree to Instagram's terms of use.  Upon agreeing to the terms of use, the user is "welcomed" to Instagram and is directed to "customize [their] experience" by syncing their phone's contact information with Instagram and is presented with a seemingly random list of individuals to follow.

157.    Lastly, the child is asked whether he or she would like to "turn on" their notifications. After making this decision, the child is able to use Instagram. At no point during the setup process is the child prompted with a clear, conspicuous warning of anything, including the well-known risks and dangers of Instagram's features.  Indeed, the entire set up process makes clear that Instagram is designed to "enhance" the users' experience and to maximize the amount of time Instagram users spend on the application. And, once again, Meta never requires the involvement of a parent or guardian.

158.    In late 2023, Meta began an advertising campaign on television and online streaming platforms which stated that "Instagram wants to work with Congress to require parental approval wherever teens under sixteen download apps."  Meta has never explained why it is not able to create parental consent features on its own, without congressional mandate.  Many products potentially

---

[40] https://about.instagram.com/familysupport

inappropriate for children require parent consent.  And, countless other products that are dangerous to children are outright banned until adulthood.  Meta, however, operates differently: it supplies dangerous products to children with impunity.

### B.      Meta's Public Statements About Instagram Are False And Misleading

159.      Unsurprisingly, Meta has publicly misrepresented the negative impact of the features incorporated into Instagram that drive young users to unhealthy amounts of time on the platform.  For example, during a public earnings call on January 29, 2020, Sandberg stated, "[we] have to keep people safe and give them control over their experience on our apps.  And we are."  Later that year, on October 29, 2020, Sandberg explained during a different public earnings call that "[w]hile we continue to invest in helping businesses, we are equally focused on keeping our platform safe."

160.      In June 2019, Mosseri (Head of Instagram) told CBS in an interview that teen well-being was a top priority. And two years later, in May 2021, Mosseri minimized Instagram's negative impact on teens, characterizing it to a Wall Street Journal reporter as "quite small."  In response to an October 2021 "60 Minutes" exposé on Meta's social media products and the harms they cause, Meta provided a decidedly false public statement: "Protecting our community is more important than maximizing our profits."  And, in December 2021, Mosseri wrote in a blog post entitled "Raising the Standard for Protecting Teens and Supporting Parents Online" that "[a]t Instagram, we've been working for a long time to keep young people safe on the app."

161.      Meta has also publicly stated and emphasized to lawmakers how safe its platforms, including Instagram, are for young users.  On September 30, 2021, Meta executive Antigone Davis testified to Congress, "[w]e have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17."  In early December 2022, Meta employees collaborated on an internal document regarding Meta's response to "Teen Well-being," listing the following "key messages to land" externally: "Instagram takes our responsibility for young people seriously.  We want to keep them safe on the platform and promote their well-being," and "[w]e have substantial investments and launched meaningful changes to improve teen safety and [w]ell[-being]."  Of course, none of this was true.

162.      During congressional testimony on March 25, 2021, Zuckerberg stated his apparent

belief that Meta's social media products did not harm children.  Instead, Zuckerberg suggested that Meta's platforms, including Instagram, are beneficial to users of all ages as they "help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do."

163.    Zuckerberg knew his testimony was false.  For example, in 2019 and 2020, Zuckerberg and Mosseri met multiple times with Jonathan Haidt, a New York University professor studying the effects of social media on teens' mental health.  Haidt brought concerns regarding Meta's social media products, including Instagram, and their effects on "teen girls, whose rates of depression and self-harm have increased the most."  Zuckerberg's executive assistant and other Meta staff briefed him that Haidt planned to ask what the company was doing to study and address this issue.  But the talking points Meta prepared did not include the company's adverse findings.  Haidt recalled that "[i]t was not suggested to me that they had internal research showing a problem."

164.    Meta has also falsely represented that its recommendation algorithms are benign and designed for young users' well-being.  For example, during a congressional hearing on March 25, 2021, Zuckerberg denied that Meta "make[s] money off creating an addiction to [its] platforms."  At the same hearing, Zuckerberg stated that "the way we design our algorithms is to encourage meaningful social interactions" and denied that Meta's teams "have goals[] of trying to increase the amount of time that people spend [using Meta's platforms]."

165.    Elsewhere, Meta has reiterated that its recommendation algorithms are optimized to yield "positive experience[s]" or "meaningful interactions" as opposed to maximizing "time spent" by users on platforms like Instagram.  For example, on September 30, 2021, Davis testified before Congress that Meta "made changes to our News Feed to allow for more meaningful interactions, knowing it would impact time spent" and that Meta did this "because we were trying to build a positive, more positive experience."  In a June 2021 post on the Instagram website, titled "Shedding More Light on How Instagram Works," Mosseri describes Meta's recommendation algorithms by providing examples of benign content recommendations (e.g., "if you're interested in dumplings you might see posts about related topics, like gyoza and dim sum . . .").

166.    Meta has also publicly denied that it pushes NAC content on its users.  For example, in

September 2021, Davis denied that Meta promotes harmful content, (such as content regarding eating disorders) to youth, when she testified before Congress, stating, "we do not direct people towards content that promotes eating disorders. That actually violates our policies, and we remove that content when we become aware of it. We actually use AI to find content like that and remove it."  Similarly, an internal document from 2021 outlining Sandberg's prepared talking points for a meeting with Meta's clients included the statement, "we do not amplify extreme content."

167.    The Instagram website also falsely boasts that "[a]t Instagram, we have guidelines that govern what content we recommend to people" and misleadingly states that Instagram "avoid[s] making recommendations that may be inappropriate for younger viewers . . . We use technology to detect both content and accounts that don't meet these Recommendations Guidelines and to help us avoid recommending them.  As always, content that goes against our Community Guidelines will be removed from Instagram."

168.    Some Meta employees have gone so far as to recommend hiding and censoring specific internal Meta research about teen mental health.  In an internal chat from 2021, Meta employees suggested censoring terms such as "mental health" in internal documents that "might become public" to avoid scrutiny.  Externally, Meta's leadership has made false statements about the company's research. On December 8, 2021, Mosseri told Congress, "I don't believe [Meta's] research suggests that our products are addictive."

169.    Of course, Meta's own research did suggest that their products were addictive, as they were intended to be.  This also makes common sense: as Newton acknowledged in an internal email from May 2021, "it's not 'regulators' or 'critics' who think [I]nstagram is unhealthy for young teens – it's everyone from researchers and academic experts to parents. [T]he blueprint of the app is inherently not designed for an age group that don't [sic] have the same cognitive and emotional skills that older teens do."

170.    Through these and other misrepresentations to young users, parents, Congress, and other members of the public, Meta deceived the public about the qualities, nature, and effects of Instagram, all in a feeble effort to hide the significant harm they cause.

**NAMED PLAINTIFF ALLEGATIONS**

171.    Minor A.A. is a thirteen-year-old from New York, New York. She has been using Instagram since she was ten years old.

172.    When A.A. first created an Instagram account she indicated that she was thirteen years old.  Meta never verified her age.

173.    A.A. spends about five hours a day on Instagram throughout the week. About three-four hours of that time is spent watching "Reels."  Instagram's recommendation algorithm constantly feeds A.A. with content she enjoys watching, leading to endless scrolling on Instagram. A.A.'s personal explore page is inundated with content she finds entertaining and enjoys, such as horseback riding videos and comedic videos that satirize the middle school and high school experience.  A.A. spends about thirty minutes to one hour before she sleeps scrolling through Instagram's Reels.

174.    Instagram's recommendation algorithm has also fed A.A. violent and gory content. A.A. often receives disturbing and emotionally upsetting videos, such as violent car accidents and fights, while she is scrolling through Instagram.

175.    A.A. has developed self-deprecating thoughts about her body and appearance since she began using Instagram.  Instagram's recommendation algorithm has provided her content of other women that A.A. perceives as being more attractive than her.

176.    A.A. compares herself to the women she sees on Instagram Reels because of Meta's recommendation algorithm, leading to harmful feelings about her facial and body features.  Indeed, A.A. often uses Instagram's facial filters to change her features and make them more in-line with the women she sees on Reels because she has been made to feel physically inadequate by the content she is fed on Reels.

177.    Instagram's ephemeral content has negatively impacted A.A. A.A. checks her Instagram account about every fifteen minutes to make sure that she does not miss any of her friends' Instagram Stories.  When A.A. does not see her friends' Instagram Stories, she becomes frustrated. A.A.'s constant Instagram use has had a severe and negative impact on her relationship with her family and her performance at school.

178.    A.A. always checks her Instagram notifications as soon as possible.  If she does not

check her notifications as soon as she receives them, she becomes overwhelmed with anxiety.

179.     While A.A. mostly uses Instagram to watch Reels, she also posts pictures and Stories. When A.A. sees that her friends viewed her Story but did not like it, she feels like her friends are ignoring her. A.A. has internalized the belief that her friends are constantly ignoring her when they do not "Like" or otherwise engage with her Stories, which has led to self-deprecating feelings, including anxiety and depression.

180.     A.A.'s inability to limit her Instagram use has impacted her relationship with her family. A.A. cannot stop using Instagram when she is in the presence of her family.  Although A.A.'s parents have attempted to create boundaries between A.A. and Instagram, A.A. nevertheless checks her Instagram account in the presence of her parents to quell her anxiety and ensure she does not miss any ephemeral content.

181.     A.A.'s grades have been negatively impacted because of her constant Instagram use. A.A. is unable to put her phone away and constantly checks Instagram while she is doing her homework. A.A. often stays up late trying to rush and finish her homework because of her constant Instagram use.

182.     Meta's recommendation algorithm has made A.A. addicted to Instagram because it constantly provides psychologically and emotionally manipulative content that compels her insatiable desire to constantly use Instagram.

183.     A.A. was never warned by Meta about the addictive nature of Instagram's recommendation algorithm.

## CLASS ACTION ALLEGATIONS

184.     Plaintiff brings this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(c)(4) on behalf of the following proposed classes:

1.  **Respecting Counts I-IV and XX:** All minors in the United States who use or have used Instagram during the Class Period.

2.  **Respecting Counts V-XIX:** All minors in the following states who use or have used Instagram during the Class Period: Colorado, Connecticut, the District of Columbia,

**CLASS ACTION COMPLAINT**

Hawaii, Idaho, Illinois, Michigan, New Hampshire, New Jersey, New Mexico, New York, Ohio, Tennessee, Vermont, and Washington.

The Class Period is the limitations period for all claims alleged below.

185.     Excluded from the Class are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their families); (2) Defendants, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, legal representatives; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel, Class counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

186.     **Ascertainability**: Membership of the Class is defined based on objective criteria and individual members will be identifiable from Defendants' records, including from Defendants' massive data storage, consumer accounts, and enterprise services. Based on information readily accessible to it, Defendants can identify members of the Class whose represented age is between 13 to 17 years old and who created and maintained an Instagram account during the Class Period.

187.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable.  About 22 million teens log into Instagram in the United States every day. Additionally, Meta has actual knowledge that millions of Instagram users are under the age of 13.  An internal report presented to Mark Zuckerberg demonstrates that Meta has actual knowledge of 4 million under-13 users.

188.     **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff has been harmed by the risks and dangers posed by Instagram, including abuse, addiction, and compulsive use which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, sleep disruptions, and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death.

189.     **Adequacy**.  Plaintiff will fairly and adequately protect the interests of the Class and

have retained counsel competent and experienced in class action litigation. Plaintiff is committed to the vigorous prosecution of this action and has no interests that are adverse or antagonistic to the Class.  Plaintiff's counsel are three experienced class action law firms with national reputations for vigorously adjudicating class actions.

190.    **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class.  The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Defendants. It would be virtually impossible or impractical for most, if not all, Class Members to redress the wrongs done to them on an individual basis.  Furthermore, individual litigation would be unmanageable for the Court system as it would result in hundreds of millions of individual lawsuits creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the court system.  In contrast, a class action would present far fewer management difficulties.  Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court.  The members of the Class are reasonably ascertainable through methods typical of class action practice and procedure, including through Defendants' own records.

191.    There are questions of law or fact common to the class that predominate over any individual issues, such as whether Meta's design and operation of Instagram is addictive, harmful, deceptive, or unlawful; whether Meta breached any duties to the class members; whether Meta violated any state or federal laws or regulations; and what are the appropriate remedies for the class members.

192.    The named plaintiff and the class members have suffered actual injury or harm as a result of Meta's conduct, and this injury or harm is measurable and compensable, such as reduced well-being, impaired health, diminished academic performance, increased medical expenses, and loss of privacy, as a result of their addiction and exposure to Instagram.

**Requirements of Fed. R. Civ. P. 23(b)(2).**

193.    Meta has acted on grounds generally applicable to the Class by engaging in a common course of conduct of violating state products liability and consumer protection laws, thereby making

1  appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

2  **Requirements of Fed. R. Civ. P. 23(c)(4).**

3  194.    Utilizing Rule 23(c)(4) to certify the Class for class-wide adjudication on particular

4  issues regarding Meta's liability would materially advance the disposition of the litigation as a whole.

5  Issues common to the class include, but are not limited to, the following:

6       a.    Whether the defects alleged concern "products";

7       b.    Whether prolonged use of Instagram generally causes various mental health issues in

8          young adolescents and teenagers;

9       c.    Whether the Instagram Recommendation Algorithm is addictive;

10       d.    Whether Meta failed to warn Class Members about the addictive nature of certain

11          Instagram features, such as Reels and Stories;

12       e.    Whether certain Instagram features, such as Reels and Stories, are defective and

13          unreasonably dangerous;

14       f.    Whether Meta concealed or omitted material information not otherwise known or

15          available, concerning the health effects and addictive nature of using Instagram;

16       g.    Whether Meta failed to disclose material facts concerning the health effects and

17          addictive nature of using Instagram;

18       h.    Whether Meta knowingly made materially false or misleading  statements that the

19          public would reasonably rely upon concerning the health effects and addictive nature of

20          using Instagram; and

21       i.    Whether Meta is liable for the claims for relief outlined below for this conduct.

22          **<u>CLAIMS FOR RELIEF</u>**

23       **<u>COUNT I: STRICT LIABILITY – DESIGN DEFECT</u>**

24           **<u>(Against All Defendants)</u>**

25  195.    Plaintiff and Class Members reallege and incorporate by reference each preceding and

26  succeeding paragraph as though set forth fully at length herein.

27  196.    At all relevant times, Defendants designed, developed, managed, operated, tested,

28  produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and

benefitted from Instagram, a social media product, used by Plaintiff and Class Members.

197.   Instagram, and its various features, algorithms and programming, are designed and intended to be social media products.

198.    Instagram is distributed, supplied, and sold to the public through retail channels (*i.e.*, the Apple App "Store" and the Google Play "Store").

199.   Instagram is marketed and advertised to the public for the use of ordinary consumers.

200.   The Defendants defectively designed Instagram to addict minors who were particularly incapable of appreciating the risks posed by Instagram, and particularly susceptible to harms from Instagram.

201.   The defects in the design of Instagram existed prior to the release of Instagram to Plaintiff and Class Members, and there was no substantial change to Instagram between the time of their upload by each Defendant to public or retail channels (*e.g.*, the App Store or Google Play) and the time of their distribution to Plaintiff and Class Members via download or URL access.

202.   Plaintiff and Class Members used Instagram as intended, and Defendants knew or, by the exercise of reasonable care, should have known that Plaintiff and Class Members would use Instagram without inspection for its addictive nature.

203.   Defendants defectively designed Instagram to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

204.   Defendants failed to test the safety of the features it developed and implemented for use on Instagram. When Defendants did perform some product testing and otherwise had knowledge of ongoing harm to Plaintiff and Class Members, it failed to adequately remedy Instagram's defects or warn Plaintiff and Class Members.  Instead, Defendants continued to indicate to the public that Instagram was safe.

205.   Instagram is defective in design and poses a substantial likelihood of harm for the reasons set forth herein, because it fails to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because Instagram is less safe than an ordinary consumer would expect when used in such a manner.  Children and teenagers are among the

ordinary consumers of Instagram. Indeed, each Defendant markets, promotes, and advertises Instagram to pre-teen and young consumers. Pre-teen and young consumers, and their parents and guardians, do not expect Instagram to be psychologically and neurologically addictive when it is used in its intended manner by its intended audience.  They do not expect the algorithms and other features embedded by each Defendant in Instagram to make them initially and progressively more stimulative, to maximize young consumers' usage time.  They do not expect each Defendants' revenues and profits to be directly tied to the strength of this addictive mechanism and dependent on young consumers spending several hours a day using Instagram.

206.    Instagram is likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms.  Those harms include but are not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues for young consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

207.    The risks inherent in the design of Instagram significantly outweigh any benefit of such design.

208.    Defendants could have utilized cost-effective, reasonably feasible alternative designs including parental controls, algorithmic changes and changes to the addictive features described above, to minimize the harms to young consumers described herein.  Indeed, as detailed above, Defendants had knowledge of, and even considered, certain alternative designs that would have reduced minors' addictive and compulsive engagement with Instagram, and which would have effectively served the same purpose of Instagram while reducing the gravity and severity of danger posed by Instagram's defects to young consumers.

209.    Plaintiff used Instagram as intended or in reasonably foreseeable ways.

210.    The physical, emotional, and economic injuries of Plaintiff were reasonably foreseeable to Defendants at the time of Instagram's development, design, advertising, marketing, promotion, and distribution.  In fact, as alleged above, Defendants knew about the physical,

emotional, and economic injuries that Instagram was causing, and could cause, on Plaintiff and Class Members.

211.    Instagram was defective and unreasonably dangerous when it left the Defendants' possession and control. The defects continued to exist through the product's distribution to and use by consumers, including Plaintiff, who used Instagram without any substantial change in the product's condition.

212.    Plaintiff was injured as a direct and proximate result of Defendants' respective defective designs as described herein.  Instagram's defective design was a substantial factor in causing harm to Plaintiff.

213.    The nature of the unlawful acts that created safety concerns for Plaintiff and Class Members are not the type of risks that are immediately apparent from using Instagram. Many Class Members are continuing to use Instagram.  When Plaintiff and Class Members use Instagram, they will not be able to independently verify whether Instagram continues to pose an unreasonable risk or rely on Defendants' respective representations in the future.

214.    The Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish each Defendant and deter others from like conduct.

215.    Plaintiff and Class Members demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT II: STRICT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

216.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

217.     At all relevant times, the Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and

1 | benefitted from Instagram, a social media product, used by Plaintiff and Class Members.

2 | 218.   Plaintiff and Class Members were foreseeable users of Instagram.

3 | 219.   Instagram is distributed and sold to the public through retail channels (*e.g.*, the Apple
4 | App "Store" and the Google Play "Store").

5 | 220.   Defendants sold and distributed Instagram to Plaintiff and Class Members in a
6 | defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm
7 | to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which
8 | can lead to a cascade of harms.  Those harms include but are not limited to dissociative behavior,
9 | withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky
10 | behavior, exposure to predators, sexual exploitation, and profound mental health issues for young
11 | consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-
12 | harm, insomnia, eating disorders, death, and other harmful effects.

13 | 221.   Instagram is dangerous, to an extent beyond that contemplated by the ordinary user
14 | who used Instagram, because it encourages unhealthy, addictive engagement and compulsive use.

15 | 222.   Defendants knew or, by the exercise of reasonable care, should have known that
16 | Instagram posed risks of harm to youth considering its own internal data and knowledge regarding
17 | Instagram at the time of development, design, marketing, promotion, advertising, and distribution.

18 | 223.   Instagram is defective and unreasonably dangerous because, among other reasons
19 | described herein, each Defendant failed to exercise reasonable care to inform users that, among other
20 | things:

21 | a.   Instagram can cause addiction, compulsive use, and/or other concomitant
22 | physical and mental injuries;

23 | b.   Instagram harvests and utilizes young users' data in such a way that increases a
24 | young user's risk of addiction to Instagram and concomitant physical and
25 | mental injuries;

26 | c.   The algorithmically-targeted feeds in Instagram are designed to promote
27 | increasingly stimulative and alarming content to encourage compulsive

28 |

engagement by the young user, raising the risk of mental health harms
including but not limited to depression, self-harm, and eating disorders;

d.      Instagram includes features such as appearance-altering "filters" that are known
to promote negative social comparison body dysmorphia, and related injuries
among youth by promoting artificial and unrealistic beauty standards;

e.      New users of Instagram can identify themselves as minors, begin to use the
product, and do so indefinitely, without any time or usage limitations, without
ever receiving a safety warning, and without ever having to provide information
so that each Defendant can warn the young users' parents or guardians;

f.      The likelihood and severity of harm is greater for minors;

g.      The likelihood and intensity of these harmful effects is exacerbated by the
interaction of Instagram's features with one another, and by algorithms and
other source code design that is currently publicly unknown and hidden from
the young users and the government;

224.    Ordinary users would not have recognized the potential risks of Instagram when used
in a manner reasonably foreseeable to each of the Defendants.

225.    Had Plaintiff and Class Members received proper or adequate warnings or instructions
as to the risks of using Instagram, Plaintiff and Class Members would have heeded the warnings
and/or instructions.

226.    Defendants' failures to adequately warn Plaintiff and Class Members about the risks of
Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and
Class Members.

227.    The nature of the unlawful acts that created safety concerns for Plaintiff and Class
Members are not the type of risks that are immediately apparent from using Instagram. Many Class
Members are continuing to use Instagram.  When Plaintiff and Class Members use Instagram, they
will not be able to independently verify whether Instagram continues to pose an unreasonable risk or
rely on Defendants' respective representations in the future.

228.    Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton,

1    reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a

2    conscious and depraved indifference to the consequences of its conduct, including to the health,

3    safety, and welfare of their customers, and warrants an award of punitive damages in an amount

4    sufficient to punish each Defendant and deter others from like conduct.

5         229.    Plaintiff and Class Members demand judgment against each Defendant for

6    compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such

7    other relief as the Court deems proper.

8                        **COUNT III: NEGLIGENCE – DESIGN**

9                           **(Against All Defendants)**

10        230.    Plaintiff and Class Members reallege and incorporate by reference each preceding and

11   succeeding paragraph as though set forth fully at length herein.

12        231.    At all relevant times, Defendants designed, developed, managed, operated, tested,

13   produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and

14   benefitted from Instagram, a social media product, used by Plaintiff and Class Members.

15        232.    Instagram was designed and intended to be a social media product.

16        233.    Defendants knew or, by the exercise of reasonable care, should have known that

17   Instagram was dangerous, harmful, and injurious when used by youth in a reasonably foreseeable

18   manner.

19        234.    Defendants knew that Instagram posed risk of harm to youth. These risks were known

20   in light of each of the Defendants' own internal data and knowledge regarding Instagram at the time

21   of the product's development, design, marketing, promotion, advertising, and distribution to Plaintiff

22   and Class Members.

23        235.    Defendants knew, or by the exercise of reasonable care, should have known, that

24   ordinary consumers such as Plaintiff and Class Members would not have realized the potential risks

25   and dangers of Instagram.  Those risks include abuse, addiction, and compulsive use in youth which

26   can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal

27   symptoms, social isolation, damage to body image and self-worth, increased risky behavior, sleep

28   disruptions, exposure to predators, sexual exploitation, and profound mental health issues including

but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

236.   Defendants owed a duty to all reasonably foreseeable Instagram users to design a safe product.

237.   Defendants owed a heightened duty of care to minor users of Instagram because children's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage.  Children are also more neurologically vulnerable than adults to the addictive aspects of Instagram, such as the peer approval that comes from amassing followers and Likes.

238.   Defendants owe a particularly heightened duty of care to pre-teen users (those under the age of 13), whose personal information is accorded special attention under federal law. *See* 15 U.S.C. § 6501 *et seq.*

239.   Plaintiff and Class Members were foreseeable users of Instagram.

240.   Defendants knew that minors such as Plaintiff and Class Members would use, did use, and are currently using Instagram.

241.   Defendants breached their duty in designing Instagram.

242.   Defendants breached their respective duty by failing to use reasonable care in the design of Instagram by negligently designing it with features and algorithms as described above that specifically are addictive and harmful to youth, who were particularly unable to appreciate the risks posed by Instagram.

243.   Defendants breached their duty by designing Instagram in a manner less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

244.   Defendants breached their duty by failing to use reasonable care in the design of Instagram by negligently designing Instagram with features and algorithms as described above that created or increased the risk of abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, sleep disruptions, exposure to

1  predators, sexual exploitation, and profound mental health issues including but not limited to

2  depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death,

3  and other harmful effects.

4      245.   Defendants breached their respective duty by failing to use reasonable care to use cost-

5  effective, reasonably feasible alternative designs, including algorithmic changes and changes to the

6  addictive features described above, and other safety measures, to minimize the harms described

7  herein.  Alternative designs that would reduce the addictive features of Instagram were available,

8  would have effectively served the same purpose as the defectively designed Instagram platform and

9  would have reduced the gravity and severity of danger Instagram posed minor Plaintiff and Class

10  Members.  Indeed, Defendants had knowledge of, and even considered, certain alternative designs that

11  would have reduced the severity of danger posed by Instagram to minors.

12      246.   A reasonable company under the same or similar circumstances as Defendants would

13  have designed a safer product.

14      247.   At all relevant times, Plaintiff and Class Members used Instagram in the manner in

15  which they were intended by Defendants to be used.

16      248.   As a direct and proximate result of the Defendants' breached duties, Plaintiff and Class

17  Members were harmed. Defendants' design of Instagram was a substantial factor in causing the

18  Plaintiff's and Class Members' harms and injuries.

19      249.   The nature of the unlawful acts that created safety concerns for Plaintiff and Class

20  Members are not the type of risks that are immediately apparent from using Instagram. Plaintiff and

21  Class Members are continuing to use Instagram. When Plaintiff and Class Members use Instagram,

22  they will not be independently able to verify whether Instagram continues to pose an unreasonable

23  risk or rely on Defendants' respective representations in the future.

24      250.   Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton,

25  reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a

26  conscious and depraved indifference to the consequences of its conduct, including to the health,

27  safety, and welfare of their customers, and warrants an award of punitive damages in an amount

28  sufficient to punish Defendants and deter others from like conduct.

251.    Defendants use sophisticated algorithms thereby making Instagram a product, not the type of platform within the protections of the Communications Decency Act and/or First Amendment. As a product, its negligent design features are responsible for the harms detailed above and below both as part of a causal chain and as a proximate cause.

252.    Plaintiff and Class Members demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT IV: NEGLIGENCE – FAILURE TO WARN

### (Against All Defendants)

253.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

254.    At all relevant times, the Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from Instagram, a social media product, used by Plaintiff and Class Members.

255.    Plaintiff and Class Members were foreseeable users of Instagram.

256.    Defendants knew that use of Instagram was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth.

257.    Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff and Class Members would not have realized the potential risks and dangers of Instagram including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, sleep disruptions, and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death.

258.    Had Plaintiff and Class Members received proper or adequate warnings about the risks of Instagram, Plaintiff and Class Members would have heeded such warnings.

259.    Defendants knew or, by the exercise of reasonable care, should have known that Instagram posed risks of harm to youth. These risks were known and knowable in light of the

Defendants' own internal data and knowledge regarding Instagram at the time of development, design, marketing, promotion, advertising, and distribution to Plaintiff and Class Members.

260.   Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide adequate warnings about the risk of using Instagram that were known to the Defendants, or that Defendants should have known through the exercise of reasonable care.

261.   Defendants owed a heightened duty of care to minor users and their parents to warn about Instagram's risks because adolescent brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage. Children are also more neurologically vulnerable than adults to the addictive aspects of Instagram, including but not limited to the "flow state" created by an endless Feed and the public social validation created by follows and Likes.

262.   The Defendants owe a particularly heightened duty of care to users under the age of 13, whose personal information is accorded special protections under federal law. *See* 15 U.S.C. § 6501 *et seq.*

263.   Defendants breached their duty by failing to use reasonable care in providing adequate warnings to Plaintiff and Class Members, as set forth above.

264.   A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

265.   At all relevant times, Defendants could have provided adequate warnings to prevent the harm and injuries described herein.

266.   As a direct and proximate result of Defendants' breach of their respective duty to provide adequate warnings, Plaintiff and Class Members were harmed and sustained the injuries set forth herein. The Defendants' failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiff and Class Members.

267.   As a direct and proximate result of the Defendants' failure to warn, Plaintiff and Class Members require and/or will require more healthcare and services and did incur medical, health,

incidental, and related expenses.

268.   The injuries of Plaintiff and Class Members cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

269.   The nature of the unlawful acts that created safety concerns for Plaintiff and Class Members are not the type of risks that are immediately apparent from using Instagram. Plaintiff and Class Members are continuing to use Instagram. When Plaintiff and Class Members use Instagram, they will not be able to independently verify whether Instagram continues to pose an unreasonable risk or rely on Defendants' representations in the future.

270.   Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

271.   Plaintiff and Class Members demand judgment against each Defendant for injunctive relief and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT V: COLORADO CONSUMER PROTECTION ACT

### Colo. Rev. Stat. § 6-1-105(e)

### (Against All Defendants)

272.   Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273.   Defendants are engaged in trade or commerce within the meaning of Colorado's Consumer Protection Act.

274.   Plaintiff and Class Members are consumers within the meaning of Colorado's Consumer Protection Act.

275.   Col. Rev. Stat. § 6-1-105(e) declares unlawful "a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person … either knowingly or recklessly makes a false representation as to the characteristics … of goods."

276.     Defendants have violated Colorado's Consumer Protection Act by knowingly making false public representations about the purported safety of Instagram's Recommendation Algorithm, Reels, and other features described herein.

277.     Defendants knew or, by the exercise of reasonable care, should have known that the public representations about Instagram's safety were materially false, considering its own internal data and knowledge regarding Instagram at the time of development.

278.     Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

279.     As described herein, Defendants' deceptive and unlawful trade practice significantly impacted the public as actual or potential customers of the Defendants' business.

280.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

281.     Defendants' knowing false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

282.     Pursuant to Colo. Rev. Stat. § 6-1-113(2.9), Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

283.     Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 6-1-113(2.9) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT VI: CONNECTICUT UNFAIR TRADE PRACTICES ACT

## Conn. Gen. Stat. § 42-110b(a)

## (Against All Defendants)

284.     Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.     Defendants are engaged in trade or commerce within the meaning of Connecticut's Unfair Trade Practices Act.

286.    Plaintiff and Class Members are consumers within the meaning of Connecticut's Unfair Trade Practices Act.

287.    Conn. Gen. Stat. § 42-110b(a) broadly declares unlawful "unfair or deceptive acts in the conduct of any trade or commerce."

288.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

289.    Defendants have violated Connecticut's Unfair Trade Practices Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with teenage Instagram use and by making false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

290.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

291.    Defendants' knowing false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

292.    Pursuant to Conn. Gen. Stat. § 42-110g(d), Plaintiff and Class Members are making claims for actual damages, attorneys' fees, and costs.

293.    Defendants continue to conceal and knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 42-110g(d) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT VII: DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT

### Code of the District of Columbia § 28–3904

### (Against All Defendants)

294.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

295.    Defendants are engaged in trade or commerce within the meaning of the District of Columbia's Consumer Protection Act.

296.     Plaintiff and Class Members are consumers within the meaning of the District of Columbia's Consumer Protection Act.

297.     The Code of the District of Columbia § 28–3904 broadly declares unlawful "unfair or deceptive trade practice[s]."

298.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

299.     Defendants have violated the District of Columbia's Consumer Protection Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with teenage Instagram use and by making false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

300.     Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

301.     Defendants' knowing false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

302.     Plaintiff's proposed class action is in the public interest because Meta's unlawful and deceptive trade practices have affected a significant number of teenagers: a positive result will be an efficient way to hold Meta accountable for the harm it knowingly caused teenage Instagram users.

303.     Pursuant to the Code of the District of Columbia § 28–3904, Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

304.     Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  The District of Columbia's Consumer Protection Act entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT VIII: HAWAII DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### Haw. Rev. Stat. § 480-2(a)

### (Against All Defendants)

305.     Plaintiff and Class Members reallege and incorporate by reference each preceding and

66

succeeding paragraph as though set forth fully at length herein.

306.    Defendants are engaged in trade or commerce within the meaning of Hawaii's Deceptive and Unfair Trade Practices Act.

307.    Plaintiff and Class Members are consumers within the meaning of Hawaii's Deceptive and Unfair Trade Practices Act.

308.    Haw. Rev. Stat. § 480-2(a) broadly declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."

309.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

310.    Defendants have violated Hawaii's Deceptive and Unfair Trade Practices Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with teenage Instagram use and by making false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

311.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

312.    Defendants' knowing false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

313.    Plaintiff's proposed class action is in the public interest because Meta's unlawful and deceptive trade practices have affected a significant number of teenagers: a positive result will be an efficient way to hold Meta accountable for the harm it knowingly caused teenage Instagram users.

314.    Pursuant to Haw. Rev. Stat. § 480-13(d), Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

315.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 480-13(b)(2) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

**COUNT IX: IDAHO CONSUMER PROTECTION ACT**

**Idaho Code § 48-603(5)**

**(Against All Defendants)**

316.     Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

317.     Defendants are engaged in trade or commerce within the meaning of Idaho's Consumer Protection Act.

318.     Plaintiff and Class Members are consumers within the meaning of Idaho's Consumer Protection Act.

319.     Plaintiff and Class Members entered into a contract with Meta prior to using Instagram.

320.     Idaho Code § 48-603(5) makes it unlawful to "represent[] that goods or services have . . . characteristics that they do not have."

321.     Defendants have violated Idaho's Consumer Protection Act by knowingly making materially false public representations about the purported safety of Instagram's Recommendation Algorithm, Reels, and other features described herein.

322.     Defendants knew or, by the exercise of reasonable care, should have known that the public representations about Instagram's safety were false, considering its own internal data and knowledge regarding Instagram at the time of development.

323.     Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

324.     Defendants' knowing false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

325.     Pursuant to Idaho Code § 48-608(1), Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

326.     Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 48-608(1) entitles Plaintiff and Class Members to injunctive relief to put an

end to Defendants' deceptive practices.

## COUNT X: ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### Illinois Code § 505/2

### (Against All Defendants)

327.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

328.    Defendants are engaged in trade or commerce within the meaning of Illinois' Consumer Fraud and Deceptive Business Practices Act.

329.    Plaintiff and Class Members are consumers within the meaning of Illinois' Consumer Fraud and Deceptive Business Practices Act.

330.    Section 505/2 declares that "unfair or deceptive acts or practices … are hereby declared unlawful."

331.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

332.    Defendants have violated Illinois' Consumer Fraud and Deceptive Business Practices Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

333.    By knowingly concealing information related to Instagram's negative health effects and publicly making materially false statements, Defendants intended for Plaintiff and Class Members to rely on the deception, in order to further encourage Instagram use.

334.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

335.    Defendants' knowing false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

336.    Pursuant to ILCS § 505/2S, Plaintiff and Class Members are making claims for actual damages, attorneys' fees, and costs.

337.    Defendants continue to knowingly make materially false and misleading statements

about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 505/10a(c) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT XI: MICHIGAN CONSUMER PROTECTION ACT

### Michigan Comp. Laws Ann. § 445.903(c)

### (Against All Defendants)

338.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

339.    Defendants are engaged in trade or commerce within the meaning of Michigan's Consumer Protection Act.

340.    Plaintiff and Class Members are consumers within the meaning of Michigan's Consumer Protection Act.

341.    Mich. Comp. Laws Ann. § 445.903(c) makes it unlawful to "represent[] that goods or services have . . . characteristics that they do not have."

342.    Defendants have violated Michigan's Consumer Protection Act by knowingly making materially false public representations about the purported safety of Instagram's Recommendation Algorithm, Reels, and other features described herein.

343.    Instagram is a social media application primarily designed for personal use and Plaintiff and Class Members used Instagram primarily for personal purposes.

344.    Defendants knew or, by the exercise of reasonable care, should have known that the public representations about Instagram's safety were materially false, considering its own internal data and knowledge regarding Instagram at the time of development.

345.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

346.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

347.    Pursuant to Mich. Comp. Laws Ann. § 445.911(2), Plaintiff and Class Members are

70
**CLASS ACTION COMPLAINT**

making claims for actual damages, statutory damages, attorneys' fees, and costs.

348.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 445.911(1)(b) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

### COUNT XII: NEW HAMPSHIRE CONSUMER PROTECTION ACT

### N.H. Rev. Stat. Ann. § 358-A:2

### (Against All Defendants)

349.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

350.    Defendants are engaged in trade or commerce within the meaning of New Hampshire's Consumer Fraud Act.

351.    Plaintiff and Class Members are consumers within the meaning of New Hampshire's Consumer Fraud Act.

352.    Section 358-A:2 of the New Hampshire Consumer Protection Act broadly declares that it is "unlawful for any person to use . . . any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

353.    Defendants are considered people within the meaning of New Hampshire's Consumer Protection Act.

354.    Defendants unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

355.    Defendants have violated New Hampshire's Consumer Protection Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

356.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

71

**CLASS ACTION COMPLAINT**

357.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

358.    Pursuant to N.H. Rev. Stat. Ann. § 358-A:10(I), Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

359.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 358-A:10 entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT XIII: NEW JERSEY CONSUMER FRAUD ACT

## New Jersey Stat. Ann. § 56:8-2

## (Against All Defendants)

360.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

361.    Defendants are engaged in trade or commerce within the meaning of New Jersey's Consumer Fraud Act.

362.    Plaintiff and Class Members are consumers within the meaning of New Jersey's Consumer Fraud Act.

363.    Section 56:8-2 of the New Jersey Consumer Fraud Act makes it unlawful to use or employ "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale . . . of any merchandise."

364.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

365.    Defendants have violated New Jersey's Consumer Fraud Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary. These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

366.    Defendants' unlawful and deceptive representations were made by Defendants' agents

within the scope of their employment during the course of Defendants' business.

367.   Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

368.   Pursuant to New Jersey Stat. Ann. § 56:8-19, Plaintiff and Class Members are making claims for actual damages, attorneys' fees, and costs.

369.   Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 56:8-19 entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT XIV: NEW MEXICO UNFAIR TRADE PRACTICES ACT

### New Mexico Stat. Ann. § 57-12-3

### (Against All Defendants)

370.   Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

371.   Defendants are engaged in trade or commerce within the meaning of New Mexico's Unfair Trade Practices Act.

372.   Plaintiff and Class Members are consumers within the meaning of New Mexico's Unfair Trade Practices Act.

373.   Section 57-12-3 of the New Mexico Unfair Trade Practices Act broadly declares that "unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

374.   Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

375.   Defendants have violated New Mexico's Unfair Trade Practices Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary. These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

376.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

377.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

378.    Pursuant to New Mexico Stat. Ann. § 57-12-3, Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

379.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 57-12-3 entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT XV: NEW YORK DECEPTIVE TRADE PRACTICES ACT

### New York Gen. Bus. Law § 349

### (Against All Defendants)

380.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

381.    Defendants are engaged in trade or commerce within the meaning of New York's Deceptive Trade Practices Act.

382.    Plaintiff and Class Members are consumers within the meaning of New York's Deceptive Trade Practices Act.

383.    New York Gen. Bus. Law § 349 broadly states that "deceptive acts or practices in the conduct of any business, trade or commerce . . . in this state are hereby declared unlawful."

384.    Defendants' unfair and deceptive practices, as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

385.    Defendants' unfair and deceptive practices were directed towards all consumers, including consumers in New York state.

386.    Defendants have violated New York's Deceptive Trade Practices Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with Instagram

74
**CLASS ACTION COMPLAINT**

use and by making materially false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

387.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

388.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

389.    Pursuant to New York Gen. Bus. Law § 349(h), Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

390.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 349(h) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

### COUNT XVI: OHIO DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### Ohio Rev. Code § 4165.02(A)(7)

### (Against All Defendants)

391.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.    Defendants are engaged in trade or commerce within the meaning of Ohio's Deceptive Trade Practices Act.

393.    Plaintiff and Class Members are consumers within the meaning of Ohio's Deceptive Trade Practices Act.

394.    Section 4165.02(A)(7) of the Ohio Deceptive and Unfair Trade Practices Act prohibits business from "represent[ing] that goods or services have . . . characteristics . . . that they do not have."

395.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

396.    Defendants have violated Ohio's Deceptive Trade Practices Act by, amongst other

75

**CLASS ACTION COMPLAINT**

things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

397.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

398.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

399.    Pursuant to Ohio Rev. Code § 4165.03(A)(2), Plaintiff and Class Members are making claims for actual damages, statutory damages, attorneys' fees, and costs.

400.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 4165.03(A)(1) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT XVII: TENNESSEE CONSUMER PROTECTION ACT

### Tenn. Code § 47-18-104(b)(5)

### (Against All Defendants)

401.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

402.    Defendants are engaged in trade or commerce within the meaning of Tennessee's Consumer Protection Act.

403.    Plaintiff and Class Members are consumers within the meaning of Tennessee's Consumer Protection Act.

404.    Section 47-18-104(b)(5) of the Tennessee Consumer Protection Act prohibits business from "representing that goods or services have . . . characteristics that they do not have."

405.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

406.    Defendants have violated Tennessee's Consumer Protection Act by, amongst other

**CLASS ACTION COMPLAINT**

1  things, knowingly concealing internal data that exposed the dangers associated with Instagram use and
2  by making materially false public representations to the contrary.  These practices offend public
3  policies and are immoral, unethical, unscrupulous, and injurious to consumers.

4      407.  Defendants' unlawful and deceptive representations were made by Defendants' agents
5  within the scope of their employment during the course of Defendants' business.

6      408.  Defendants' knowing materially false representations about the safety of Instagram was
7  a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

8      409.  Pursuant to Tenn. Code Ann. §§ 47-18-109(e)(1)-(2), Plaintiff and Class Members are
9  making claims for actual damages, attorneys' fees, and costs.

10      410.  Defendants continue to knowingly make materially false and misleading statements
11  about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to
12  suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's
13  purported safety.  Section 47-18-109(a)(1) entitles Plaintiff and Class Members to injunctive relief to
14  put an end to Defendants' deceptive practices.

15  ## COUNT XVIII: VERMONT CONSUMER PROTECTION ACT

16  ## Vt. Stat. Ann. Tit. 9 § 2461(b)

17  ## (Against All Defendants)

18      411.  Plaintiff and Class Members reallege and incorporate by reference each preceding and
19  succeeding paragraph as though set forth fully at length herein.

20      412.  Defendants are engaged in trade or commerce within the meaning of Vermont's
21  Consumer Protection Act.

22      413.  Plaintiff and Class Members are consumers within the meaning of Vermont's
23  Consumer Protection Act.

24      414.  Section 2641(b) of the Vermont Consumer Protection Act broadly declares that "unfair
25  or deceptive acts or practices in commerce are hereby declared unlawful."

26      415.  Defendants' unfair and deceptive practices as described herein are objectively likely to
27  mislead—and have misled—consumers acting reasonably under the circumstances.

28      416.  Defendants have violated Vermont's Consumer Protection Act by, amongst other

things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

417.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

418.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

419.    Pursuant to Vt. Ann. Tit. 9 § 2461(b), Plaintiff and Class Members are making claims for actual damages, attorneys' fees, and costs.

420.    Defendants continue to knowingly make materially false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 2461(b) entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

## COUNT XIX: WASHINGTON CONSUMER PROTECTION ACT

### Wash. Rev. Code § 19.86.020

### (Against All Defendants)

421.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

422.    Defendants are engaged in trade or commerce within the meaning of Washington's Consumer Protection Act.

423.    Plaintiff and Class Members are consumers within the meaning of Washington's Consumer Protection Act.

424.    Section 19.86.020 of the Washington Consumer Protection Act broadly declares that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

425.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably under the circumstances.

426.    Defendants' have violated Washington's Consumer Protection Act by, amongst other things, knowingly concealing internal data that exposed the dangers associated with Instagram use and by making materially false public representations to the contrary.  These practices offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

427.    Defendants' unlawful and deceptive representations were made by Defendants' agents within the scope of their employment during the course of Defendants' business.

428.    As described herein, Defendants' deceptive and unlawful trade practice significantly impacted the public as actual or potential customers of the Defendants' business.

429.    Defendants' knowing materially false representations about the safety of Instagram was a proximate cause and a substantial factor in the injuries sustained by Plaintiff and Class Members.

430.    Pursuant to Wash. Rev. Code § 19.86.090, Plaintiff and Class Members are making claims for actual damages, attorneys' fees, and costs.

431.    Defendants continue to knowingly make false and misleading statements about Instagram's purported safety.  Plaintiff and Class Members have suffered and will continue to suffer irreparable harm if Defendants continue to knowingly make false statements about Instagram's purported safety.  Section 19.86.090 entitles Plaintiff and Class Members to injunctive relief to put an end to Defendants' deceptive practices.

### COUNT XX: UNJUST ENRICHMENT

### (Against All Defendants)

432.    Plaintiff and Class Members reallege and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

433.    Plaintiff and Class Members conferred upon Defendants an economic benefit, in the nature of revenue, earnings, and profits, compensation, and benefits resulting from Defendants' unfair and/or unlawful practices.

434.    Defendants' financial benefits resulting from its unlawful and inequitable conduct are economically traceable to these unfair and/or unlawful practices.

435.    That economic benefit is a direct and proximate result of Defendants' unfair and/or unlawful practices.

436.    This conduct was wrongful, knowing, and conscious.

437.    It would be inequitable and unjust for Defendants to be permitted to retain any of the unlawful proceeds resulting from Defendants' unfair and/or unlawful conduct.

438.    As alleged in this Complaint, Defendants have been unjustly enriched as a result of Defendants' wrongful conduct.

439.    Plaintiff and Class Members are accordingly entitled to equitable relief including restitution and/or non-restitutionary disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unfair and/or unlawful practices, in whole or in part, including through the establishment of a constructive trust.

440.    Plaintiff and Class Members lack an adequate remedy at law with respect to this claim and all claims, because damages cannot adequately compensate for or address the possibly permanent physical and mental harms outlined above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court:

A.      Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Appoint Plaintiff to represent the Classes;

C.      Appoint undersigned counsel to represent the Classes;

D.      Award compensatory damages, including statutory and/or treble damages where available, to Plaintiff and the Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

E.      Award compensatory and nominal damages to Plaintiff and the Class Members against Defendants;

F.      Award punitive damages to Plaintiff and the Class Members against Defendant;

G.      Non-restitutionary disgorgement of all of Defendants' profits that were derived, in whole or in part, from Defendants' unlawful targeting and marketing to minors of its Instagram platform;

H.      Order Defendants to disgorge all revenues and profits wrongfully obtained;

1      I.      Preliminarily and permanently enjoin Defendants, and its officers, agents, servants,

2   employees, and attorneys, from:

3               1.      Allowing minors to create an Instagram account without parental consent;

4               2.      Providing minor-user accounts access to the Explore page, Recommendation

5                       Algorithms, "Like" counts, plastic surgery-simulating camera filters, ephemeral

6                       content, infinite scroll, autoplay or Instagram Reels;

7               3.      Preventing parental controls, like mandatory time limitations on Instagram;

8               4.      Allowing push notifications on minor-user accounts;

9               5.      Conducting market research on minor-users; and

10              6.      Continuing or engaging in the unlawful conduct complained of herein.

11     J.      Award Plaintiff and the Class Members their reasonable costs and expenses incurred in

12   this action, including attorneys' fees and expert fees; and

13     K.      Grant Plaintiff and the Class Members such further relief as the Court deems

14   appropriate.

15                                      **<u>JURY DEMAND</u>**

16          Plaintiff requests a jury trial on all issues triable to a jury.

**CLASS ACTION COMPLAINT**

Dated:  August 5, 2024          Respectfully Submitted,


**BOIES SCHILLER FLEXNER LLP**


By:    */s/ Joshua Michelangelo Stein*
           Joshua Michelangelo Stein

*Attorneys for Plaintiffs*

Joshua Michelangelo Stein (Bar No. 298856)
jstein@bsfllp.com
Nicholas Santos (Bar No. 335767)
nsantos@bsfllp.com
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899

David Boies (*pro hac vice* forthcoming)
dboies@bsfllp.com
Alexander Boies (*pro hac vice* forthcoming)
aboies@bsfllp.com
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749 8300

Sigrid S. McCawley (*pro hac vice* forthcoming)
smccawley@bsfllp.com
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
Fax: (954) 356-0022

Jenny Kim (*pro hac vice* forthcoming)
jkim@bsfllp.com
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel: (212) 446-2300
Fax: (212) 446-2350

**LABATON KELLER SUCHAROW LLP**

Michael P. Canty (*pro hac vice* forthcoming)
mcanty@labaton.com
Carol C. Villegas (*pro hac vice* forthcoming)
cvillegas@labaton.com

82
**CLASS ACTION COMPLAINT**

Danielle Izzo (*pro hac vice* forthcoming)
dizzo@labaton.com
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**

Gary M. Klinger (*pro hac vice* forthcoming)
gklinger@milberg.com
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: 866.252.0878

Alexandra M. Honeycutt (*pro hac vice* forthcoming)
ahoneycutt@milberg.com
800 S. Gay Street, Suite 1100
Knoxville, TN  37929
Tel:  865-247-0080
Fax: 865-522-0049

Attorneys *for Plaintiffs*

**CLASS ACTION COMPLAINT**