*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IN RE: SOCIAL MEDIA | ) | **Motions to Dismiss** |
| ADOLESCENT ADDICTION/ | ) | |
| PERSONAL INJURY PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | NO. C 22-03047 YGR |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | Pages 1 - 196 |
| | ) | |
| _____) | | Oakland, California |
| | | Friday, October 27, 2023 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:              Lieff Cabraser Heimann & Bernstein LLP
                             275 Battery Street, 30th Floor
                             San Francisco, California  94111
                       BY:   PATRICK I. ANDREWS,
                             ELIZABETH J. CABRASER,
                             LEXI J. HAZAM, ATTORNEYS AT LAW

                             Lieff Cabraser Heimann & Bernstein LLP
                             250 Hudson Street, 8th Floor
                             New York, New York  10013-1413
                       BY:   JASON L. LICHTMAN,
                             GABRIEL PANEK, ATTORNEYS AT LAW

                             Seeger Weiss LLP
                             55 Challenger Road, Sixth Floor
                             Ridgefield Park, New Jersey  07660
                       BY:   CHRISTOPHER L. AYERS,
                             JENNIFER R. SCULLION, ATTORNEYS AT LAW

              (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

**A P P E A R A N C E S (CONT'D.)**

```
For Plaintiffs:          Motley Rice LLC
                         401 9th Street NW Suite 630
                         Washington, DC  20004
                    BY:  ABIGAIL BURMAN,
                         MATHEW JASKINSKI,
                         PREVIN WARREN, ATTORNEYS AT LAW


                         Andrus Anderson LLP
                         155 Montgomery Street, Suite 900
                         San Francisco, California  94104
                    BY:  JENNIE LEE ANDERSON, ATTORNEY AT LAW


                         Gibbs Law Group
                         1111 Broadway, Suite 2100
                         Oakland, California  94607
                    BY:  ANDREW MURA, ATTORNEY AT LAW


For the Meta             Covington & Burling LLP
Defendants:              One City Center
                         850 Tenth Street, NW
                         Washington, DC  20001-4956
                    BY:  PHYLLIS A. JONES, ATTORNEY AT LAW


                         Covington & Burling LLP
                         1999 Avenue of the Stars, Suite 3500
                         Los Angeles, California  90067
                    BY:  ASHLEY SIMONSEN, ATTORNEYS AT LAW


                         Covington & Burling LLP
                         620 Eighth Avenue
                         New York, New York  10018
                    BY:  GREGORY L. HALPERIN,
                         PAUL W. SCHMIDT, ATTORNEYS AT LAW


For Defendant Snap       Munger, Tolles & Olson
Inc.:                    560 Mission Street, 27th Floor
                         San Francisco, California  94105
                    BY:  JONATHAN H. BLAVIN,
                         ROSE L. EHLER, ATTORNEYS AT LAW
```

**A P P E A R A N C E S (CONT'D.)**

```
For Defendant TikTok    King & Spalding LLP
Inc.; ByteDance, Inc.:  1180 Peachtree Street, N.E.
                        Suite 1600
                        Atlanta, Georgia  30309-3521
                   BY:  GEOFFREY M. DRAKE, ATTORNEY AT LAW


                        Faegre Drinker Biddle & Reath LLP
                        300 North Meridian Street, Suite 2500
                        Indianapolis, Indiana  46204
                   BY:  ANDREA PIERSON, ATTORNEY AT LAW

For Defendant Alphabet  Wilson, Sonsini, Goodrich & Rosati
Inc.; Google, LLC;      One Market Plaza
YouTube, Inc.:          Spear Tower, Suite 3300
                        San Francisco, California  94105
                   BY:  LAUREN GALLO WHITE, ATTORNEY AT LAW


                        Wilson, Sonsini, Goodrich & Rosati
                        633 W. 5th Street, Suite 1550
                        Los Angeles, California  90071-2027
                   BY:  MATTHEW DONAHUE, OF COUNSEL


                        Wilson, Sonsini, Goodrich & Rosati
                        1301 Avenue of the Americas,
                        40th Floor
                        New York, New York  10019-6022
                   BY:  BRIAN M. WILLEN, ATTORNEY AT LAW



                        --oOo--
```

```
 1    Friday, October 27, 2023                          10:28 a.m.
 2                        P R O C E E D I N G S
 3                             --o0o--
 4
 5         THE CLERK:  Morning, everyone.  These proceedings are
 6    being court-reported by this court.  Any other recording of
 7    the proceeding, either by video, audio, including screen shots
 8    or other copying of the hearing is strictly prohibited.
 9       Your Honor, now calling the civil matter 20-MD-03047-YGR,
10    In Re: Social Media Adolescent Addiction Personal Injury
11    Products Liability Litigation.
12       Parties could please state their names and appearances
13    starting with the plaintiff for the record.
14         MS. HAZAM:  Your Honor, Lexie -- on behalf of --
15         THE COURT:  And you want -- you can either -- you can
16    all come up very quickly.  This will be one of the few times
17    we do this.
18       After today, I'll have another protocol in place so that
19    we don't waste time in this regard.
20       But go ahead.
21         MS. HAZAM:  Good morning, Your Honor.  Lexie Hazam on
22    behalf of plaintiffs.
23         THE COURT:  Good morning.
24         MS. SCULLION:  Good morning, Your Honor.  Jennifer
25    Scullion for the plaintiffs.
```

```
 1              THE COURT:  Okay.  Good morning.

 2              MR. WARREN:  Good morning, Your Honor.  Previn Warren

 3    on behalf of plaintiffs.

 4              THE COURT:  Good morning.

 5              MS. CABRASER:  Good morning, Your Honor, Elizabeth

 6    Cabraser for plaintiffs.

 7              THE COURT:  Good morning.

 8              MS ANDERSON:  Good morning, Your Honor.  Jennie Lee

 9    Anderson for plaintiffs.

10              THE COURT:  Okay.  Good morning.

11              MR. MURA:  Good morning.  Andre Mura for the

12    plaintiffs.

13              THE COURT:  Okay.  Thank you.

14         As I get to know you all better, this will be less

15    necessary.

16         All right.  On the defense.

17              MR. SCHMIDT:  Good morning, Your Honor.  Paul Schmidt

18    for the Meta defendants, along with several of my colleagues

19    and in-house colleagues.

20              THE COURT:  Okay.  Hold on.  Mr. Schmidt, you haven't

21    appeared here before, have you?

22              MR. SCHMIDT:  Yes, Your Honor.  I was here at the

23    last hearing.

24              THE COURT:  Okay.

25              MR. SCHMIDT:  Actually, both hearings.  But I spoke
```

```
 1    at the last hearing.
 2            MS. SIMONSEN:  Good morning, Your Honor.  Ashley
 3    Simonsen, Covington & Burling, for the Meta defendants.  And I
 4    do want to note that we have representatives from our client
 5    in the audience today.
 6            THE COURT:  Okay.  Good morning.
 7            MS. JONES:  Good morning, Your Honor.  Phyllis Jones
 8    also from Covington & Burling on behalf of the Meta
 9    defendants.  Nice to see you again.
10            THE COURT:  You, too, Ms. Jones.
11            MR. HALPERIN:  Good morning, Your Honor.  Greg
12    Halperin from Covington & Burling on behalf of the Meta
13    defendants as well.
14            THE COURT:  Okay.
15            MR. WILLEN:  Good morning, Your Honor.  Brian Willen
16    from Wilson Sonsini on behalf of the Google defendants.
17            THE COURT:  All right.  Good morning.  Wait.  You
18    said -- oh, Brian Willen.  I see.
19            MR. WILLEN:  Yes, that's right.
20            THE COURT:  Okay.  Great.  Thank you.
21            MR. DONAHUE:  Good morning, Your Honor.  Matthew
22    Donahue also from Wilson Sonsini on behalf of the Google
23    defendants.
24            THE COURT:  Okay.  Good morning.
25            MS. EHLER:  Good morning, Your Honor.  Rose Ehler
```

1    from Munger, Tolles & Olson on behalf of defendant Snap.

2         **THE COURT:**  Okay.  Good morning.

3         **MR. BLAVIN:**  Good morning, Your Honor.  Jonathan

4    Blavin from Munger, Tolles on behalf of defendant Snap.

5         **THE COURT:**  Oh, okay.  Great.  Good morning.

6         **MR. DRAKE:**  Good morning.  Geoffrey Drake, King &

7    Spalding, for the TikTok defendants.

8         **THE COURT:**  Okay.  Good morning.

9         **MS. PIERSON:**  Good morning.  Andrea Pierson Faegre

10   Drinker for the TikTok defendants.

11        **THE COURT:**  Okay.  Good morning.

12      And then we had a Lauren White who signed in.

13        **MS. WHITE:**  Good morning, Your Honor.  Lauren White

14   with Wilson Sonsini on behalf of the Google defendants.

15        **THE COURT:**  Good morning.

16      Okay.

17      So I thought my case management order indicated that I

18   wanted you all to send us two days in advance the list of

19   individuals who would be appearing so that we would have that

20   on the docket.  Looks like it was limited to CMC's, but I'll

21   here clarify that that happens at all the hearings, not just

22   CMC's.  And I can make that clear in a written order later.

23   But it helps keep the court documents organized and efficient

24   and helps Mr. Cuenco.

25      But, again, this is helpful for me as -- as I get to learn

```
 1    the lawyers in this particular -- in the products liability

 2    world.

 3        All right.  We have a lot to do today.  We will take

 4    breaks when I deem them necessary.  We will -- and I did

 5    receive the email from liaison counsel about your proposed

 6    agenda.  What I'll say is that we will loosely follow that.

 7        I have a number of questions.  This will not be like some

 8    of the other arguments perhaps.  I am hopeful to have an order

 9    out relatively soon in this case.

10        But what I'd like to know before we get started -- and

11    we'll go through this -- is whether you've divided up argument

12    among a variety of lawyers.  So I'd like one person at each

13    mic, whoever is the lead.  And then we'll go through the

14    various topics that at least I see us reviewing and can tell

15    me who's going to argue what.  All right?

16        So, again, just for the court reporter, if you'll state

17    your names for the record.

18            MS. HAZAM:  Lexie Hazam on behalf of plaintiffs.

19            MR. SCHMIDT:  Paul Schmidt on behalf of Meta.

20            THE COURT:  Okay.

21        I take it -- Section 230, who's going to do that section?

22            MS. HAZAM:  Your Honor, for the plaintiffs Previn

23    Warren will be arguing that section.

24            THE COURT:  Okay.

25            MR. SCHMIDT:  And, Your Honor, for the defense I
```

```
 1    will, Paul Schmidt.

 2                THE COURT:  Okay.

 3        After that, we'll move to the First Amendment.  Who will

 4    do that?

 5                MS. HAZAM:  Your Honor, my colleague Elizabeth

 6    Cabraser will handle that argument.

 7                MR. SCHMIDT:  Your Honor, Brian Willen will handle

 8    that argument.

 9                THE COURT:  Okay.

10        And then we'll move into products.  I -- I have divided it

11    up -- I don't know if you've divided it up, the first issue

12    being whether something is a product.

13        Is anybody going to address that issue specifically?

14                MS. HAZAM:  Yes, Your Honor.  I will address that

15    issue, Lexie Hazam, on behalf of plaintiffs.

16                THE COURT:  Okay.

17                MR. SCHMIDT:  And, Your Honor, my partner Ashley

18    Simonsen will address that issue for the defense.

19                THE COURT:  Okay.

20        The next issue will be duty?

21                MS. HAZAM:  Your Honor, Jennifer Scullion will

22    address that question for plaintiffs.

23                MR. SCHMIDT:  And, Your Honor, Geoff Drake will

24    address that issue on behalf of defendants.

25                THE COURT:  Then causation?
```

```
 1              MS. HAZAM:  Your Honor, I will address that question
 2    for plaintiffs, Lexie Hazam.
 3              MR. SCHMIDT:  Your Honor, Jonathan Blavin will
 4    address that issue for the defendants.
 5              THE COURT:  Negligence per se.
 6              MS. HAZAM:  Andre Mura will address that for
 7    plaintiffs.
 8              MR. SCHMIDT:  Matt Donahue, Your Honor, for
 9    defendants.
10              THE COURT:  And then I understand the Snap defendants
11    specifically wanted just a little time for their issues.
12              MS. HAZAM:  Jennifer Scullion will address that for
13    plaintiffs.
14              MR. SCHMIDT:  And Rose Ehler for Snap.
15              THE COURT:  Okay.  I -- I will then have a number of
16    things that I want to discuss just generically so we can get
17    there -- we can talk about that -- more about the variety of
18    the other cases that have been filed since the last time we
19    spoke, the overlap --
20          It was interesting.  I was at the -- as Ms. Cabraser
21    knows -- in all total transparency -- I was at the MDL
22    conference earlier this week, and I was sitting there
23    listening to my colleagues and I was checking my phone, as we
24    all do, and there was a news report about all the AG's
25    complaint.  I thought, oh, that sounds interesting.  Clicked
```

1    on the link.  Sure enough, it was filed in our district.

2    Asked my law clerks to promptly send me the complaint, which

3    they did, and I said, "Who got it off the wheel?"  And they

4    said, "You."

5        So I don't know.  Maybe it's just karma.  But that case is

6    mine.  Would have been mine probably.  But it is mine.

7        Is anyone here from the state AG's, by any chance?

8                        (Hands raised.)

9        **THE COURT:**  Okay.  Great.  Well, then I'll have you

10   come up so I can meet those of you from the state AG's who are

11   here.

12       And then, obviously, we have all the school district

13   cases, and I want to talk to you all about that as well.

14       We had a law firm that made an appearance on behalf of the

15   defense, so my colleague Magistrate Judge Hixson recused

16   himself from any further work on this.

17       I am -- it is not clear to me that Judge Cisneros is going

18   to be the magistrate judge.  We're working that out with a

19   couple of us who have MDL's, but I should have that resolved

20   by Monday or Tuesday.

21       The new magistrate judges are at -- at school right now,

22   so we'll figure that out soon.

23       Okay.  Well, then let's go ahead and have Mr. Warren

24   and -- is it Mr. Schmidt; is that right -- come on up.

25       Okay.  So I take it that you all didn't put together any

1    PowerPoint presentations or anything like that that you

2    expected to use today; is that right?

3            **MR. SCHMIDT:**  That is correct, Your Honor.

4            **MR. WARREN:**  That's right.

5            **THE COURT:**  Okay.

6        In general, if you ever do, you make sure to exchange

7    those in advance before you bring them into court.

8        And here's going to be the fun part.  And that is, I don't

9    know if you're going to expect what I'm going to do, and if

10   you don't, that will be more fun.

11       But, look, we spent a lot of time working on this -- on

12   this already.  And you have both taken what I view is "all or

13   nothing" approaches to the issue of Section 230.  And I don't

14   agree that that's the proper approach.

15       Section 230 protects from liability -- it has three

16   separate subparts, right -- the provider or user of an

17   interactive computer service.  I don't think people really

18   have any dispute that that's what we're dealing with.

19       Right, Mr. Previn [sic]?

20           **MR. WARREN:**  That's correct, Your Honor.

21           **THE COURT:**  "Whom a plaintiff seeks to treat under a

22   state law causes of action as a publisher of the -- or a

23   speaker of information provided by another information content

24   provider."

25       Defendants claim that under that section, everything is

```
 1    out.  Plaintiffs claim that's not so.  My view is that it is
 2    more -- and much more complicated than either of -- either of
 3    you have briefed.  Hence, we have spent a significant amount
 4    of time analyzing each of the alleged defects in the
 5    complaint, which is significant.
 6        And I'm going to give you an opportunity to respond to how
 7    I have classified and categorized all of these alleged
 8    defects.
 9        If you want to take a few minutes and argue that it's all
10    or nothing, save it to the end and we'll see how much
11    bandwidth anybody has to make those arguments.
12        To the extent that you think you're right -- and, again, I
13    don't think you're right and my order will explain why that
14    is -- it's preserved for appeal.  You can always take it up on
15    appeal.
16        But I think that what we are forced to do in this case is
17    look at every defect and determine -- because, you know --
18    because despite what you say, there are plenty of courts that
19    have treated platforms as having a product, and that is
20    because what the court is doing is looking at the
21    functionality, so that's what we have to do.
22        So we have a nice little -- and we knew there were going
23    to be a lot of people, and there are certainly people
24    listening and watching in.  For those of you who are arguing,
25    we can give you a hard copy of this, what I'll ask Mr. Cuenco
```

```
 1    to pull up on the screens, the first group.

 2              MR. SCHMIDT:  Thank you.

 3              MR. WARREN:  Thank you.

 4         THE COURT:  First group of defects.  The --

 5                  (Demonstrative published.)

 6         THE COURT:  Most of the defects that we could discern

 7    from the complaint in some kind of organized way came from a

 8    Section -- from Paragraph 845 of the complaint.  And we've

 9    grouped them just in terms of logic.

10         So Group 1, robust age verification.  That's Subsection

11    (a), 845.  Effective parental controls, 845 Subsection (b).

12    And effective parental notifications, 845 Subsection 3 [sic].

13         The question here is, in my view, how Section 230 would

14    bar -- in each of these groups that I'm going to give you --

15    and I think I have a total of six different groups.

16         Yes, we'll go through six different groups.

17         -- how Section 230 really addresses that particular group.

18         So, Mr. Schmidt, we'll start with you.  Why would

19    Section 230 prohibit these things?  I don't see content.

20              MR. SCHMIDT:  And, Your Honor's, question focuses on

21    Group 1 or to go through all -- all of them right now?

22              THE COURT:  We're to go through this group right

23    here.

24              MR. SCHMIDT:  And, Your Honor, I would like at some

25    point, just picking up on Your Honor's comment, to address the
```

1    point about why we have taken an "all or nothing" position, as

2    Your Honor framed it, 'cause I think there's an important

3    point to be made there.

4        But in terms of this first group, age verification,

5    parental controls, parental notification, the case law

6    recognizes two reasons those types of claims are subject to

7    Section 230.

8        The first reason is that they go to the basic question of

9    who can access content.  The Section 230 test, of course, as

10    stated in *Barnes*, is whether the duty that the plaintiff

11    alleges the defendant violated derives from the defendant's

12    status or conduct as a publisher or speaker.

13        That's consistently obviously with the language from

14    Section 230 that Your Honor read.  These features are --

15    relate to publisher-type activity in two ways.  One is they

16    address the question of who can access content, which is a

17    core publisher activity, who can -- who can see content.

18        Judge Orrick recognized this point in the *Fields* decision,

19    the decision to furnish an account or prohibit a particular

20    user from obtaining an account is itself publishing activity.

21    That's the first point I would make on these features.

22        The second point is the way plaintiffs have pled their

23    claims on these points, parental controls is a good example.

24    They plead these claims in term of these features or defects

25    in these features leading adolescents to see content that they

 1  shouldn't see when they make that express in paragraphs of

 2  their master complaint, for example, like 503 and 523 where

 3  they talk about parents not being able to see content and that

 4  leading to adolescents seeing dangerous content or harmful

 5  content.

 6      Courts have repeatedly recognized that those types of

 7  claims are within Section 230 because those types of claims go

 8  to the question of whether content should be published for

 9  specific individuals.

10      The *Doe II* case that we cited from the California Court of

11  Appeals makes that point.  The *LW* case from the Southern

12  District of California makes that --

13          **THE COURT:**  And I'm going to stop you just briefly

14  and ask my court reporter if you're talking too fast.

15                  (Off-the-record discussion.)

16          **MR. SCHMIDT:**  I will slow down either way, Your

17  Honor.  I --

18          **THE COURT:**  Thank you.

19          **MR. SCHMIDT:**  I take the point.

20      So the cases I was citing that I think speak to this

21  second point about claims deriving from content that

22  adolescents access where the allegation is they shouldn't be

23  able to access that content, that has been addressed by the

24  California Court of Appeal in *Doe II*; by the Southern District

25  of California in the *LW* case; by the Fifth Circuit in the *Doe*

1    *vs. MySpace* case, which is --

2            **THE COURT:**  So under *Barnes*, the standard is that the

3    behavior should be or is identical to publishing or speaking.

4    *Barnes* doesn't use "related."  You use "related," but *Barnes*

5    uses "identical."  So how is it identical?

6            **MR. SCHMIDT:**  The language from *Barnes* that we would

7    use -- that we would cite the court to is the language saying

8    "where the duty derives from the defendant's conduct as a

9    publisher or speaker."  That's *Barnes* at page 1102.

10        Allowing someone to have access to content that's being

11   disseminated, third-party content.  That's publisher conduct.

12        Allowing content to be available, not taking down content

13   that is allegedly harmful for a minor or adolescents.  That's

14   conduct in the words of *Barnes*.  That's publisher-type

15   content -- conduct, who can see --

16           **THE COURT:**  Verifying age, you can do that without

17   any reference to removing or publishing conduct.

18           **MR. SCHMIDT:**  It limits con- -- content for specific

19   individuals.  It certainly can limit it for minor individuals

20   because if they don't pass the age verification, they can't

21   access the content.  That's, I think, Judge Orrick's point in

22   the *Fields* case, that the decision to grant access is itself a

23   publishing-type activity.

24        And it could limit access to adults as well, depending on

25   whether they go through the age verification process that --

1          **THE COURT:**  And parental controls?

2          **MR. SCHMIDT:**  Parental control --

3          **THE COURT:**  That has nothing to do with content.

4    That is just a control that allows -- at most, it's related.

5    How is it identical?

6          **MR. SCHMIDT:**  It is publisher content -- conduct

7    insofar as it relates to who can -- insofar as it determines

8    who can access content.  Parental controls could lead to

9    content not being accessed.

10       But also, as the plaintiffs have pled their claims in this

11   case, their parental control arguments are premised on the

12   lack of parental controls, meaning certain users see content

13   that they shouldn't see under the allegations.

14       That's a claim for de-publication that -- as pled, the

15   parental control claim is linked to specific content that

16   should not be available for specific users.  An example --

17         **THE COURT:**  So it is your view that Section 230 gives

18   the defendants the right to publish -- defendants, not third

19   parties, but defendants the right to publish content to

20   children even when their parents don't want them to have an

21   account?

22         **MR. SCHMIDT:**  I think what Section 230 does is it

23   prohibits civil liability allegations based on that, because

24   those are allegations based on publisher conduct.

25         **THE COURT:**  So you believe that Section 230 gives you

1    the immunity to publish content to children even when parents

2    do not want them to have an account.  Is that your position?

3        **MR. SCHMIDT:**  That's the position, yes, that's been

4    expressed in cases dealing with those types of allegations

5    like the *Doe II* case, like the *LW vs. Snap* case, like other

6    cases.  *Doe* from the Fifth Circuit, *Doe* from the Southern

7    District of Texas is -- that involves a question of

8    de-publication, not allowing access.

9        That's what Section 230 prohibits.

10       **THE COURT:**  Mr. Previn, a response?

11       **MR. WARREN:**  Thank you, Your Honor.  Previn Warren

12   for the plaintiffs.

13       A few points.  First, I believe Mr. Schmidt's legal test

14   bottoms out in a but-for test.  If content is merely involved

15   in some way, shape, for form with what they're doing, then

16   Section 230 prohibits the claim.

17       That's not the test in the Ninth Circuit.

18       In *HomeAway*, the Ninth Circuit made that very clear.  It

19   said, quote, "It is not enough that third-party content is

20   involved."

21       So what the test is, is, as *HomeAway* makes quite clear, if

22   the claim would necessarily require removal of content, then a

23   claim based in state or local law cannot proceed against the

24   platform and the age verification and parental control aspects

25   of our account would not necessarily require the removal of

1    content.

2        If they might incidentally involve perhaps removal or

3    changing of content, that's not enough.  And *HomeAway* makes

4    that quite clear.  The -- the platforms there said, well, in

5    order to actually obey the local ordinance, we would have to

6    in effect change what listings appear on our site.  So, you

7    know, ergo, we have no choice but to do this.

8        But the court said, "No, you do have a choice.  You can

9    actually decide not to complete the booking transaction

10   without removing anything on the platform."

11       And our age verification and parental control claims work

12   the same way.  Yes, content is involved at some level, but

13   that's not what the claim is about, and their -- the removal

14   of content would not be the necessarily required.

15       So to speak to the two specific features:  Age

16   verification, you know, this is tantamount to saying that, you

17   know, if -- if, you know, there's a cardboard cutout of a

18   bouncer at the front of the door and -- and you let all the

19   kids in, that somehow the claim is about what liquor is being

20   served.  They're two completely unrelated issues.

21       I mean, yes, you know, liquor is involved in a bar.  But

22   age verification, making sure that there's robust controls at

23   the front of that bar, really is independent of what's getting

24   served.

25       Mr. Schmidt cited a couple of cases, none of which are

1    actually binding.  *Doe II* from California state court has been

2    distinguished by *Omegle* from the District Court of Oregon,

3    which is, of course, in the Ninth Circuit and -- on an

4    age-gating claim sounding in product liability.  And the court

5    let that claim move forward.

6        *Doe vs. MySpace*, a Fifth Circuit case, never been cited

7    with approval here in the Ninth Circuit.

8        On the parental controls point, you know, to be -- to be

9    blunt, I find the claim remarkable, given the text of

10   Section 230, which itemizes the policies of the United States

11   in passing Section 230(c)(1).

12       And -- and (b)(4) says that one of the goals -- one of the

13   express goals of Congress in passing the statute was to

14   empower parents to restrict their children's access to

15   objectionable or inappropriate online material.

16       That's not an argument from the legislative history.

17   That's not divining the thoughts of Congress people.  That's

18   the policy of the United States written into the text of the

19   statute.

20       So the notion that 230(c)(1) is now being weaponized to

21   reduce parental control is, to me, a perversion of what the

22   statute clearly was intended to do and what the text of it

23   says that it does do.

24            **THE COURT:**  Let me ask you -- 'cause certainly it was

25   difficult for our analysis in -- in terms of the nature and

1    the choices that you made in how you crafted the complaint,

2    the master complaint.

3        Counsel is correct that it is replete with content-based

4    allegations.  And -- you know, so -- so even though your

5    briefs are quite focused on being non-content-based, and you

6    argue vociferously, as you must, that it is not content-based,

7    your complaint certainly has a lot of content-based

8    allegations in it.

9        So address that issue, and -- why are they there?  Why

10   shouldn't the court, you know, take defendants point, if all

11   that -- that these are really content-based allegations?

12        **MR. WARREN:**  Your Honor, there's no question that

13   content is involved in this lawsuit.  There's no question that

14   content is involved in the complaint.  We don't shy away from

15   that.  But it's not the test in the Ninth Circuit that the

16   mere presence of content in the causal chain eliminates the

17   claim under binding Ninth Circuit law.

18        What the test is, is whether the claim is seeking to hold

19   the platform derivatively liable for what others say or do on

20   line.

21        If we are seeking to sue Meta saying, we don't like this

22   stuff on your site.  You should take it down.  It's bad stuff.

23   Then that is squarely within the *Stratton Oakmont* paradigm,

24   and we can't do that.

25        But that's not what we're doing.  We're seeking to hold

1    the platforms directly liable for their own conduct.  And,

2    yes, that conduct does, at some level, ultimately involve

3    content.  It -- this is a thing that defendants involved in.

4    Part of their business is publishing content.  That is a fact.

5    We don't shy away from that fact.

6        But the test in the Ninth Circuit is, what are you suing

7    over?  Are you suing over the, quote, unquote, bad content?

8    And so in a case like *Dyroff* or *Gonzalez*, which was vacated,

9    where the content, the heroin-related posting, the

10   ISIS-related recruiting videos, that's what was squarely at

11   issue.  And the plaintiff ultimately was saying, "Take that

12   bad stuff down.  Bad things happen because people saw that

13   stuff, and we don't like it."

14       230(c)(1) doesn't permit those claims.  But, here, we're

15   doing something profoundly different.  We are asking

16   defendants to change how their platforms are structured to

17   prevent addiction and to prevent kids from compulsively using

18   these platforms for hours and hours at a time and develop,

19   through that compulsive overuse, a whole series of sequelae,

20   ranging from body dysmorphia to depression, anxiety, and other

21   harms.

22       Given that that's the nature of the claim and 230(c)(1)

23   asks for a claims-based analysis, a duty-based analysis, the

24   fact that -- that content exists here and that we talk about

25   it in the complaint is -- should not be of any moment.

1      And we don't run away from those various allegations.

2   They're part of the story here.  And -- and that's okay.

3   230(c)(1) doesn't suggest that it has to be a completely

4   contentless paradigm in order for a cause of action to move

5   forward.

6      And you see that in -- in -- very clearly in *Barnes*.  So

7   in *Barnes*, the promissory estoppel claim was upheld.  And the

8   court said removing the defamatory post is quintessential

9   publisher conduct.  They openly said that.  But not

10  withstanding the fact that it is, the claim was allowed to

11  proceed because the problem with what the platform had done

12  was break its promise.  They promised the person they would

13  take the defamatory post down, and then they didn't do it.

14      So content removal itself was -- was squarely part of the

15  story, part of the allegation.  But because the cause of

16  action was seeking to hold the platform liable for something

17  other than merely removing posts or not putting up bad posts,

18  it could move forward.

19          **THE COURT:**  Response.

20          **MR. SCHMIDT:**  Thank you, Your Honor.

21      Four short responses.  We're not arguing for a but-for

22  standard.  The case law is very clear in determining the

23  limits of the but-for standard.  And I'd go right to the

24  *Barnes* decision.

25      *Barnes* looks at the source of the duty.  If the duty

1   derives from publisher content or publisher activity, it's

2   barred.  And in *Barnes*, that barred almost all the claims

3   except for the narrow promissory estoppel claim, where making

4   a specific promise to a specific individual was not publisher

5   activity.

6       Here, they are challenging publisher activity in terms of

7   saying, "Limit who can see content.  Limit the content they

8   can see."

9       The second point in terms of the goals of Section 230,

10  Section 230 is very clear on both the goals.  They include the

11  goals Mr. Warren mentioned.  They include goals regarding

12  promoting the Internet and -- ensuring vibrant free speech.

13  They implement those goals in very clear ways.

14      They implement the goal about parental access in

15  Subsection (d). in Subsection 230(d), where Congress talks

16  about providers notifying parents of any -- of commercially

17  available software that may assist the customer in limiting

18  access.  That's how that goal is effectuated.

19      The goal of preserving free speech, of preserving the

20  growth of the Internet, is implement through (c)(1), which is

21  a simple rule.  If you treat a service provider as a publisher

22  or speaker of third-party content -- of any information, in

23  the words of the statute, then that enjoys immunity.

24  That's -- that's where the immunity kicks in.  And the two

25  don't -- those two provisions don't limit each other.

```
 1           The third point I'd make is that Your Honor's right to ask
 2    about content and the role of content here.  Ninth Circuit
 3    case law prohibits holding defendants liable for information
 4    originating with the third-party user.  That's what their
 5    claims depend on doing, both in terms of their theory of
 6    addiction to content.  They're saying that specific content --
 7           THE COURT:  You're -- now you're --
 8       Go ahead.  Finish your statement.
 9           MR. SCHMIDT:  I was just going to say, that's what
10    their theories depend on, in terms of addiction -- alleged
11    addiction to harmful content, and then viewing harmful
12    content.
13       The final point I wanted to make just in response, and
14    it --
15           THE COURT:  You know, one of the reasons why I have
16    problems with that argument is that in terms of parental
17    controls, notification, age verification, those particular
18    issues -- they -- you know, parents -- parents are very
19    different in -- in what they allow and what they don't allow.
20    Some are much more controlling.  Others are not.
21       And so these kinds of issues don't always -- and in many
22    cases, most cases perhaps, relate to half of the things that
23    are in the complaint.  That is, parents might -- you know,
24    parents have wide-ranging views on what they want their kids
25    to see or have access to that -- so to -- so to claim that
```

1    somehow it's just tied to the content allegations in the

2    complaint seems to me to be not realistic.

3         MR. SCHMIDT:  Well, I think they -- as they've pled

4    their claims about adolescent access, their claim's based on

5    content.  But I think Your Honor's question goes to a broader

6    point which goes back to the goals of Section 230.

7       Section 230 had a goal of preserving a vibrant Internet.

8    It had a goal of facilitating parental controls.  It chose to

9    balance those goals by saying there will be immunity from

10   civil liability.

11        THE COURT:  Right, but what these are saying is that

12   you haven't provided the -- the -- the mechanism to adequately

13   give effective controls.  And that's why I separated these out

14   from others.

15        MR. SCHMIDT:  Um-hmm.

16        THE COURT:  Because they're not specific to any

17   specific content.

18        MR. SCHMIDT:  Well --

19        THE COURT:  They are related to the ability to just

20   control.  Whatever the content is.  Whatever the content is.

21   There -- there could be parents who -- who don't want their

22   kids to -- to read, you know, classics.

23        MR. SCHMIDT:  Um-hmm.

24        THE COURT:  That's their choice.

25        MR. SCHMIDT:  I don't think that's how they've pled

1   their claims.  They've pled their claims by linking those

2   allegations up to harms that are related to content.

3          THE COURT:  And I take it that's going to be your

4   argument throughout the morning in a sense?

5          MR. SCHMIDT:  I think it depends on the feature, Your

6   Honor, on -- on what we're talking about.  In that case -- and

7   I can cite very specific paragraphs from the master complaint,

8   that's how they've pled their claims.

9      What -- what Section 230 tried to do is it tried to

10  achieve goals relating to harmful content or negative content

11  or provocative content by self-regulation.

12         THE COURT:  If I don't agree with your view of their

13  complaint, do you have a alternative argument or not?

14         MR. SCHMIDT:  Our view of their complaint in terms of

15  whether they link it up to -- to harm from content?

16         THE COURT:  Correct.

17         MR. SCHMIDT:  I think the alternative argument is

18  just the one -- I'd say two things on that.  One, it's what I

19  said before, that questions about access have been recognized

20  as covered by Section 230, questions about access to specific

21  content have been.

22     But the second point I would make goes to a comment Your

23  Honor made during Mr. Warren's argument, which is the kind of

24  interconnected nature of their challenges.  As they plead

25  their claims, they constantly plead their claims as

1    interrelated.  The features they're challenging are

2    interrelated.  In their words, defendants' respective products

3    features work in combination to create and maintain a user's

4    flow-like state.  That's paragraph 89.

5        Again and again, they've presented to the Court this

6    argument that it's all of it together where they haven't given

7    the Court a way to pull out individual features and say under

8    the pleadings they've pled, that feature is enough.

9            **THE COURT:**  So I'm going to encourage you -- I

10   understand that that's your argument, right?  And I look at

11   their briefs -- and they totally refute what it is that you

12   are arguing.  Your view of their complain is not articulated

13   as their view of their complaint.

14       I do understand that's your argument.  So I want you to

15   recognize that I understand that's your argument.

16           **MR. SCHMIDT:**  Thank you, Your Honor.

17           **THE COURT:**  To the extent you have an alternative

18   argument adopting their view of their complaint, now is the

19   time to let me know what your argument is, because I know the

20   other one.

21           **MR. SCHMIDT:**  Okay.  I think that's our argument.

22   And it's based on what they say in their complaint.  It's not

23   trying to construe their complaint.

24           **THE COURT:**  Defendants do this all the time.

25       I have to tell you, I understand that's your argument.

 1   But I'm providing you with an opportunity.  And if you don't

 2   have -- you know, if you need to -- to tow the line, then tow

 3   the line.  But now is your opportunity.

 4         **MR. SCHMIDT:**  I think our point is the one that --

 5   that I've tried to make.  That, as we read their complaint, as

 6   we look at what they say in their complaint, which Section 230

 7   says it's not how they characterize it.  It's not how they

 8   frame the cause of action.  It's what they're actually

 9   arguing.  Then that links it to content, that they're saying

10   that links it to the access -- the question of access to

11   content.

12         **THE COURT:**  All right.

13     Let's move on to Group 2 unless you wanted to say

14   something, Mr. Previn --

15         **MR. WARREN:**  If I -- if I may have brief moment to

16   respond just to a couple issues because I think they will flow

17   through the remainder of the discussion.

18     Mr. Schmidt said something to the effect that we are

19   alleging kids are addicted to content.  We are not alleging

20   that kids are addicted to content.  I think it's -- I'd like

21   to be as clear about that as I can.  We're not here to be the

22   content police of the photos or videos or messages that are on

23   these platforms.

24     We're not asking defendants to remove anything.  And the

25   addiction at issue is not simply that kids like content too

 1    much.

 2        We're talking about a documented neurobiological process

 3    through which specific platform features manipulate the timing

 4    of dopamine release in kids to promote compulsive use.  It is

 5    operant conditioning.  At bottom, it is content neutral.  It

 6    may very well be content blind.

 7        The addiction is not to the content.  It's to the

 8    platforms.

 9        To the extent --

10        **THE COURT:**  And we'll talk about that later because

11    I -- I need to push you on that topic.  But keep going.

12        **MR. WARREN:**  Thank -- and I'm more than happy to be

13    pushed, of course, but what I -- what I do want to note is

14    that to the extent Mr. Schmidt says it's addiction to content,

15    that is a factual dispute.  And we are here on a 12(b)(6)

16    motion.  Our facts have to be taken as true at this particular

17    stage.

18        On the parental -- on the implementation of effective

19    parental supervision point, Mr. Schmidt said, well, that's

20    implemented through 230(d).  I don't know what the basis is

21    for saying that's the sole place in which the parental

22    supervision goal is the implemented.

23        Congress doesn't say, "here are five goals, and here are

24    the five places in the statute where each goal is

25    implemented."  That's not how the statute is written at all.

```
1         On 230(d), I'm glad Mr. Schmidt raised it.  What that says
2    is that an interactive computer service shall notify such
3    customer that parental control protections are commercially
4    available that may assist the customer in limiting access to
5    material that is harmful to minors.
6         Defendant's haven't done that.  I don't know if we need to
7    amend our complaint to add a new cause of action under
8    Section 230(d), but the point is the statute creates certain
9    obligations on these platforms, not only to have effective
10   parental controls but to let everyone know of their existence,
11   and they don't do that, and that's what our complaint alleges.
12             THE COURT:  Okay.  Let's move to Group 2.
13                  (Demonstrative published.)
14             THE COURT:  This relates to access controls.  So you
15   can take a few minutes and take -- or not a few minutes,
16   but --
17                  (Off-the-record discussion.)
18             THE COURT:  Okay.  Thank you.
19        All right.  Mr. Schmidt.
20            MR. SCHMIDT:  Yes.  I think these are similar points
21   to the prior points.  Controlling how access occurs, who has
22   access and the manner of access has been recognized by cases
23   as involving publisher activity, publisher content, publisher
24   conduct.
25        And I would simply say, again, if we go through these --
```

1    some of these individual allegations -- an example is the

2    blocks --

3          THE COURT:  Oh, let's look at -- give me your

4    response on 845(f) and (g).  Eighty-four -- 845(f) talks about

5    opting in.  So, again, nothing to do with content.  This is

6    all about the ability of the user to self-regulate.  That

7    would be (g) as well.

8       Not related to content in that sense.  You know, related

9    in a -- in a arm's length sense, but certainly not derivative.

10      These are -- and not identical.  These are tools.

11         MR. SCHMIDT:  Um-hmm.  I'll be brief on these two,

12   Your Honor.  I think the points are similar.

13      One is deciding how someone accesses content that is being

14   provided by a service.  Deciding what to tell them about the

15   content has been recognized as a publisher function, that if

16   you say -- any one of these --

17         THE COURT:  You're not publishing.  They're not

18   publishing.

19         MR. SCHMIDT:  But I don't --

20         THE COURT:  Remember?  It's identical.  That's

21   what -- that's what *Barnes* says.

22         MR. SCHMIDT:  Yes.

23         THE COURT:  It has to be identical to publishing or

24   identical to speaking.  It's neither.

25         MR. SCHMIDT:  And I think where we would take issue

1    with that is that there are absolutely cases that talk about

2    publishing activity involving publishing or de-publishing.

3    And these clearly don't relate to publishing or de-publishing.

4        There are also cases, including the *Dyroff* case from the

5    Ninth Circuit, that reach broader in defining "publishing

6    activity." *Dyroff* says it includes tools meant to facilitate

7    the communication and content of others.

8        The *Force* case from the Second Circuit says it includes

9    arranging and distributing third-party information.

10        Those get at the idea that the manner in which a publisher

11    presents information as a publisher beyond just, yea, or, nay,

12    does it appear is publisher activity.  And we think these

13    features fall within that.

14        But then I would -- I would make my point again that they

15    as they have pled their complaint have intertwined these

16    features with other features that actually do directly relate

17    to questions about publishing or de-publishing content to

18    specific individuals.

19        They haven't pled to the court that -- take 845(f), that

20    that alone supports any of their claims.  And that goes to a

21    comment Your Honor made in asking Mr. Warren a question.

22    They've pled interrelated claims where they've not given the

23    Court a way to say, these fall away, these go ahead, absent

24    repleading.

25            THE COURT:  Okay.  Mr. Warren, a response to that.

1       And with respect to (e) and (h) -- so 845(e), which talks

2   about default protective limits, and I -- and I emphasize the

3   word "default."  So default protective limits to the length

4   and frequency of sessions.  And then (h), blocks to use during

5   certain times of the day, such as school hours or late at

6   night.

7       How is that not more like identical to publishing given

8   that in a way what you're saying is that you want to mandate

9   the actual ability to publish.

10          **MR. WARREN:**  Yes, Your Honor.

11      Well, I'd have a few responses to that and I don't want to

12  fight the premise of the question, and I certainly will

13  attempt to answer it, but I -- we don't believe that the test

14  in Ninth Circuit is, is it publishing or is it not publishing.

15  How close to publishing does it look like.

16      That concept derives from the Fourth Circuit in a case

17  called *Zeran*.  And they articulated something called the

18  traditional editorial functions test that had some provenance

19  in other circuits but not this circuit.

20      To the limited extent the traditional editorial functions

21  test was picked up, it was 20 years ago in the *Batzel* case,

22  and -- and that test was used for -- for Prong 3 of the bronze

23  [sic] analysis.  It was used to answer the question, whose

24  content is it?  And if all the publisher had done was

25  something traditional, editorial in nature, editing an email,

1   for example, or changing a font, that wasn't enough for the

2   publisher to become a codeveloper of that content such that

3   Prong 3 was satisfied.

4       Traditional editorial is not the test in the Ninth Circuit

5   for analyzing Prong 2, which asks whether the claim treats the

6   publisher as the speaker of the content.  That question is

7   answered through a different test which is really supplied

8   most succinctly by the *HomeAway* case.  And it asks the

9   question, would the cause of action -- would the claim

10  necessarily require removal of content?  And our claims do

11  not.

12      So to -- to speak specifically to -- to some of the issues

13  that -- that Your Honor raised and my colleague Mr. Schmidt

14  raised, this notion that *Dyroff* expanded the horizon of what

15  counts or doesn't count as publishing, well, that was limited

16  two years after *Dyroff* in *Lemmon*.

17      And what *Lemmon* said was "Our case law has never suggested

18  that Internet companies enjoy absolute immunity from all

19  claims related to their content-neutral tools.  And then

20  elsewhere it said, those who use the Internet thus continue to

21  face the prospect of liability even for their neutral tools so

22  long as plaintiffs' claims do not blame them for the content

23  that third parties generate with those tools."

24      So even if there is a publishing-like tool that's on offer

25  from the platform, if the claim -- if the cause of action

 1   isn't seeking to hold the publisher liable for content, it can

 2   move forward.  So it's not really looking to how much is the

 3   tool like the publishing.

 4        And so for that reason --

 5             THE COURT:  So what is your Ninth Circuit authority

 6   for the proposition that 230 does not include editorial

 7   conduct?

 8             MR. WARREN:  Well, it's not that it doesn't include

 9   or -- it's not that it includes or not includes.  It's just

10   that the test is different.  The test isn't looking at whether

11   it's editorial conduct or not.  The test is looking at the

12   claim and the duty alleged to have been violated.

13        And authority for that would be *HomeAway*, *Barnes* itself,

14   *Lemmon*, and I think most prominently, the *Roommates* case,

15   which is the Ninth Circuit's only en banc opinion on

16   Section 230 and really ought to control over all those panel

17   decisions since there hasn't been any intervening authority

18   from the Supreme Court.  As Your Honor well knows, the

19   Supreme Court punted on the question of Section 230.

20        So *Roommates* is really the -- you know, the signal -- the

21   most persua- -- it ought to be the most persuasive authority

22   from -- from the Ninth Circuit.

23        And I want to do [sic] quote *Roommates* since it's en banc.

24   This is Footnote 24.  It says, "Requiring website owners to

25   refrain from taking affirmative acts that are unlawful does

1    not strike us an undue burden.  These are, after all,

2    businesses that are being held responsible only for their own

3    conduct.  There's no vicarious liability for the misconduct of

4    their customers.  Compliance with laws of general

5    applicability seems like an entirely justified burden for all

6    businesses, whether they operate online or through quaint

7    brick-and-mortar facilities."

8         So those are, you know, some of the authorities I would

9    cite for the notion that this is a claims-based test rather

10   than an individual functions of the platform test and whether

11   it is or isn't like publication.  And because it's claims

12   based, that is why we allege these as intertwined.

13        We also allege them as intertwined 'cause that's how they

14   work.  I mean, look at it from the perspective of the actual

15   plaintiffs at issue in this case, the kids who are using these

16   platforms upwards or 10 or 11, 12, hours a day.  They're all

17   these features.  They're using them simultaneously.  They're

18   using them in synch.

19        It's -- it's very hard to tease out, oh, this particular

20   feature is the sole cause of the addiction.  Maybe as facts --

21   factual discovery develops and as expert discovery develops,

22   it may become possible to do that.  But from the lived

23   experience of these victims, they're just interacting with all

24   these things at once.  And that is just -- that is the truth

25   about what's going on.

1      THE COURT:  So would you argue, then, that if the

2  Court doesn't find that all of these -- or, you know -- so

3  you're -- actually, you're going back to your "all or nothing"

4  approach.

5      MR. WARREN:  Well, Your Honor, I know you've said it.

6  We've preserved it for appeal, so I don't need to beat that

7  horse.  But -- but we do think that is the right approach.  We

8  think that -- it's not all or nothing.  It's claimed based.

9  It should be assessed on the basis of each claim and the duty

10  at issue in each claim.

11      THE COURT:  Mr. Schmidt, a response and especially on

12  the three cases cited, *HomeAway*, *Lemmon*, and *Roommates*.

13      MR. SCHMIDT:  Yeah, Your Honor.  Thank you.

14     A factual and a legal response.  The factual response,

15  that it's not about de-publishing content.  We see for some of

16  these features, it is.  If you block use during certain times

17  of day, that is de-publishing content during those times of

18  day.

19     In terms of case law, Mr. Warren suggested the *Zeran* case

20  somehow doesn't apply in the Ninth Circuit.  *Barnes* invoked

21  it.  *Roommates* invoked it.  *Roommates* is also a Prong 3 case,

22  and the plaintiffs have stated very clearly that they are not

23  challenging Prong 3.  They're not arguing that the services in

24  this case have contributed the information themselves.

25     *Lemmon* in terms of if I have hit the cases, the third

1    case, is a perfect example of where the but-for line lies.  In

2    *Lemmon*, the content was completely irrelevant to the case, and

3    the Court made that point at Page 1093.  "This is a clear

4    example of a claim that simply does not rest on third-party

5    content," and then they go on because it only involved being

6    able to see in the app the speed at which someone was moving.

7        They went on to say if it did involve content, if it

8    involved the publication of content, that would be different

9    if the claim -- and the Court talks about that in Footnote 4.

10   And district courts both outside this circuit and within this

11   circuit have recognized that narrow reading of *Lemmon* where it

12   really doesn't involve publication, then it is outside of

13   Section 230.  But where it does, then it's within Section 230.

14       Here, it does, as other cases dealing with similar claims

15   like the *LW* case, the *Bride* case, both from within the Ninth

16   Circuit, the *Anderson* case from outside the Ninth Circuit have

17   recognized.

18       I don't believe that --

19       **THE COURT:**  Right.  A response on the cases that I

20   mentioned and Mr. Previn mentioned?

21       **MR. SCHMIDT:**  Yeah.  I might have missed the cases.

22   I think I covered all of them except *HomeAway*.  But if I

23   missed others, please let me know.

24       In terms of *HomeAway*, *Homeway* was a case where the claim

25   fell outside of Section 230 because it only regulated

1    off-platform facilitation of -- of bookings.  It was distinct.

2    It didn't impose liability that was -- that addressed online

3    property listings or other content.

4            **MR. WARREN:**  Your Honor, I -- I think I have a

5    profoundly different view of how some of these cases work and

6    what they say.

7        Starting with *Lemmon*, the very same footnote Mr. Schmidt

8    quoted, it said that "proving causation through the Snap that

9    the plaintiff sent would not implicate 230(c)(1) immunity

10    because the parents do not fault Snap for publishing that

11    photo message."

12        I think that's really important because --

13            **THE COURT:**  Yeah, but in *Lemmon*, right, we were

14    dealing with the functionality.

15            **MR. WARREN:**  Yes, Your Honor.  We were --

16            **THE COURT:**  And -- and that's -- so I -- I -- so it's

17    unclear to me how you can say this should be a claims-based

18    analysis and then cite *Lemmon*, which was clearly

19    functionality.  That's how it got past 230.

20            **MR. WARREN:**  Yes, Your Honor.

21        All of the functions were defendants' conduct.  They were

22    the tools that defendants were providing.  We think that's

23    true here also, whether you go function by function or you

24    deal with it broadly and say, this is about defendant's

25    conduct and what they are doing, rather than seeking to hold

1    them liable for what they published.  And that's the line in

2    *Lemmon*.

3        It's not a test of was content involved, which is how

4    Mr. Schmidt paraphrased it.  Contents going to be involved.

5    Its about what are we suing over?  What are we seeking to hold

6    them liable for?  And in *Lemmon*, they weren't seeking to hold

7    them liable for any posts, but they said, "if you want to

8    prove causation through the posts, that's fine," and they were

9    very explicit about that in Footnote 4.

10       I'm trying to remember the other cases.  *HomeAway*, which I

11   think was at issue in this -- in this round, if you will, we

12   don't see that as a purely off-platform case.  The -- the

13   platforms actually in that case said the -- the practical

14   effect of this ruling is that we're going to have to limit the

15   postings on our platform.

16       And the Court said, "too bad.  It's not necessarily

17   required by the cause of action.  If that's what you want to

18   do, if that's how you seek to respond to this liability, okay.

19   But that -- that's not going to be prohibited by

20   Section 230(c)(1)."

21       And on *Roommates* -- I think that might have been the other

22   one if I'm remembering this correctly -- yes, it is a case

23   concerning Prong 3.  By the same token, it is the Court's

24   en banc opinion on Section 230.  And they have many things to

25   say about how the statute works as a whole and the overall

1  policy -- you know, the guiding Congress in passing it and how

2  it ought to work in the Ninth Circuit.

3      So I do think it's an important case to -- to consider as

4  we move forward here.

5          **THE COURT:**  Anything else on any of the specifics

6  referenced in this group, so Subsection (e), (f), (g), (h) and

7  (m) of 845?

8          **MR. SCHMIDT:**  No.  May I say one more thing on the

9  cases, Your Honor?

10         **THE COURT:**  You may.

11         **MR. SCHMIDT:**  *Lemmon*, as I think Your Honor pointed

12  out, could not be more clear.  At Page 1093 of *Lemmon*, it

13  states "This case presents a clear example of a claim that

14  simply does not rest on third-party content."  The duty there

15  did not relate to third-party content.

16         **THE COURT:**  The same -- the same response back to you

17  as I did to Mr. Previn, which is that many of the cases

18  that -- that have been cited where courts are moving forward

19  or not moving forward, sometimes there's -- and frequently you

20  don't get huge amounts of analysis, you just get decisions,

21  and I understand that.  But a thread that runs through them is

22  the focus on functionality.

23      And, you know, there are many component parameters to this

24  sprawling -- and all of the various claims and all of the

25  various plaintiffs, et cetera.  But -- but the threat of

 1    functionality seems to me to be something that runs through

 2    all of those cases.

 3        And that's why I take issue with your just, no, it's

 4    all -- it's all out, because there are more objective

 5    functionality decisions that are being made that are being

 6    questioned and that are being challenged.  And it doesn't seem

 7    to me that you can escape that.

 8        **MR. SCHMIDT:**  I -- I would say to that, Your Honor,

 9    two things.  One is that functionality is certainly a theme of

10    the cases.  There are a range of cases within the Ninth

11    Circuit, including the *Dyroff* case itself, that talk about

12    functionality and allegations about functions, not taking a

13    plaintiff necessarily outside of Section 230.

14        For example, at Page 1095 of the *Dyroff* decision, it

15    talked about the contention in the case, that some of the

16    site's functions, including user anonymity and grouping

17    facilitated illegal drug sales.

18        What I think resolves the functionality question is where

19    the duty asserted lies.  If the duty asserted relates to

20    something that is not publisher content, if it involves

21    something that is not publisher content, like in *Lemmon*, then

22    it's not protected by Section 230 even if there are these

23    lurking content issues out there.

24        If the duty involved is publisher content, then it is

25    within Section 230.  And what we tried to do in addressing the

1    features challenges is -- there are some features they allege
2    that we'll come to that are, I think, indisputably under
3    controlling Ninth Circuit law publisher content, like the
4    algorithms.
5        There are other features that the manner in which they've
6    pled them invokes conduct.  And one might imagine that in a
7    very different type of pleading, there might be some kind of
8    Section 230 -- on a different set of the facts, there might be
9    some kind of Section 230 claim there.  But as they've pled
10   them, they fall within Section 230.
11       Just to round out the cases, in the *HomeAway* case, the
12   Court, again to this duty point, the holding was the ordinance
13   does not require the platforms to monitor third-party content
14   and thus falls outside of the CDA's immunity.  The ordinance
15   prohibits processing transactions for unregistered properties.
16       In the *Roommates*.com decision, given the acknowledgment
17   that it relates to an issue that Prong 3 that is not at issue
18   in this case -- I'll simply note that at the close of the
19   opinion upon page 1174, the en banc decision makes a point of
20   saying websites are complicated enterprises, and there will
21   always be close cases where a lawyer could argue that
22   something the website operator did encouraged the illegality.
23   Such close cases, we believe, must be resolved in favor of
24   immunity, lest we cut the heart out of Section 230 by forcing
25   websites to face death by 10,000 duck bites."

 1         Few lines later, "Section 230 must be interpreted to

 2    protect websites not merely from ultimate liability but from

 3    having to fight costly and protracted legal battles.

 4         That -- that theme, I think, guides the duty question,

 5    whether the duty at issue derives from publisher conduct.

 6              THE COURT:  All right.  Let's move on to the next

 7    group.

 8              MR. WARREN:  Your Honor, may I very briefly be heard?

 9         Two quick points, on *Roommates*, I do want to alert the

10    court to some other quotes from *Roommates*, and here's one.

11              THE COURT:  You know what?  I've read *Roommates*.

12    I'll read it again.  I don't really need you all to quote it

13    to me, but --

14              MR. WARREN:  Fair enough, Your Honor.

15              THE COURT:  -- if you want to make an argument about

16    it, go ahead.  I don't know that it's all that difficult.

17              MR. WARREN:  Well, the argument is simply that it

18    rejects the broad construction that Mr. Schmidt was proposing.

19    And it said that, you know, the risk of getting a close case

20    wrong is not a justification for overbroad immunity 'cause

21    that's always what defendants are going to argue and it would

22    result in --

23              THE COURT:  And it's a two-way street.  And -- but

24    neither one of you like the street that I seem to be on.

25              MR. WARREN:  Well, I'll try to get over there as soon

1      as I can, Your Honor.

2                  THE COURT:  Okay.

3         Go ahead.

4           MR. WARREN:  If I may, the only other thing I'd say

5      is in looking at the duty -- and I think this is going to sort

6      of maybe -- maybe plague us as we go through because of this

7      difference in view.

8         It's not looking at whether the duty involves something

9      that's publisher conduct or not.  It's whether the duty

10     involves holding the platform liable for what somebody else

11     said.  And that's the test and -- and *Barnes* just -- if the

12     test is what Mr. Schmidt asserts, *Barnes* makes no sense

13     because *Barnes* says, here we have something that's

14     quintessential publisher conduct -- we're calling it

15     quintessential publisher conduct.  And yet the claim about

16     that conduct can move forward.  That could not be true if the

17     test was, does the duty concern publishing conduct or not.

18                  THE COURT:  Group 3.

19                  MR. SCHMIDT:  Group 3, Your Honor --

20                      (Demonstrative published.)

21           MR. SCHMIDT:  -- this gets to the algorithm point.

22     Algorithms are the means by which defendants disseminate

23     content and the way that much of the Internet disseminates

24     content.  They're the means by which decisions are made about

25     who sees what content.  That's how the plaintiffs have pled

 1    that claim in terms of their algorithm allegations.

 2            THE COURT:  So focus on 845(l).  That's not third

 3    party.  That's content by defendants.

 4            MR. SCHMIDT:  Yeah, l subpoena a good example of one

 5    where there, we're relying on the manner in which they plead

 6    their notifications claims.

 7        They certainly talk about notifications in the night or at

 8    off hours.  But that's not, as we understand their pleading as

 9    they have pled it, the source of their claim.  If it were,

10    that might be a claim against the phone companies that have

11    the services that give the notifications.

12        Their claim against defendants here is different.  It's

13    that seeing the notifications --

14            THE COURT:  But what about content created by -- so

15    Subsection (l) --

16            MR. SCHMIDT:  Yes.

17            THE COURT:  -- content created by defendants such as

18    awards.  And I don't know if the lawyer for Snap wants to

19    address this with you, but that's your own content.

20            MR. SCHMIDT:  That's not the argument they've made.

21    They disclaim in their opposition brief that their arguments

22    depend on any content that defendants have created.

23        They expressly waive that issue.  And it makes sense that

24    they waive that issue because, here, they say it on Page 9,

25    plaintiffs do not rely on the third *Barnes* factor as they do

1    not argue defendants are information content providers whose

2    product features are content.

3        It makes sense that they waive that issue, because even in

4    paragraph 845(l), they make their notifications challenge

5    based on encouraging users to view content limits on the

6    strategic timing and clustering of notifications to lure back

7    users.

8        That's how they plead notifications in their complaint,

9    throughout their complaint, and that brings it within *Dyroff*,

10   which talks about notifications as one of the features -- the

11   words of *Dyroff* are the features -- and I'm going to get it

12   wrong -- trying to do it from memory.

13       But *Dyroff* recognizes that features used to facilitate

14   communications mentioning notifications by name are publisher

15   activity.

16            **THE COURT:**  Mr. Previn.

17        **MR. WARREN:**  Thank you, Your Honor.  And --

18            **THE COURT:**  And I do need you to spend some time on

19   the algorithm because you referenced it earlier, but the

20   allegations with respect to the algorithms all seem to focus

21   on selective notifications and algorithms which are selecting

22   or being -- or -- where things are happening based upon

23   content, and it's third-party content.

24        **MR. WARREN:**  Thank you, Your Honor.

25        If I may, at the risk of being impertinent, my first name

1    is Previn.  My last name is Warren.

2         **THE COURT:**  Oh, sorry.

3         **MR. WARREN:**  Thank you.

4         **THE COURT:**  No, actually, thank you very much.

5         **MR. WARREN:**  Thank you.

6         I would like to address the algorithms.  I think that is

7    a -- clearly a very important aspect of the case.  There are

8    multiple kinds of algorithms at issue with these platform.  On

9    kind of algorithm is a content-moderation algorithm.  It says

10   what are we going to let on the platform and what are we not

11   going to let on the platform?  What's going to get seen?

12   What's not going to get seen?

13        That's not what this lawsuit's about.  We're arguing about

14   the algorithms processes volumes of user data from kids and

15   based on crunching all of that data in content-blind manner

16   determines what is most likely to keep the kid hooked on the

17   platform for as long as possible.

18        It's irrelevant to the machine-learning algorithm, to the

19   AI, which is, frankly, what it is, what the content is, what

20   the substance of it is.  That's just not at issue here.

21        What's at issue is how do we hook the kids?  What are we

22   going to do to hook the kids?  And so that's what this lawsuit

23   is about.  We're not saying, do a better job screening out

24   ISIS posts.  Do a better job screening out Hamas posts.

25        That's the kind of claim that was at issue in a case like

1    *Gonzalez* or *Dyroff*.  This is fundamentally new and

2    fundamentally different because we're looking at the structure

3    of how they use operant conditioning through machine learning

4    to hook kids, irrespective of the substance of what's shown.

5         **THE COURT:**  Where -- what is the best articulation in

6    your complaint for that proposition?

7         **MR. WARREN:**  Well, Your Honor, that may take me a

8    second, but let me do my best to get there as quickly as I

9    can.

10        Sure.  Paragraph 12 would be one.  I'm happy to read it,

11   but I -- you know, also just happy to refer you to it.  That's

12   one example right at the outset of our complaint that talks

13   about what the algorithms are doing.  And the idea is they're

14   exploiting the neurophysiology of kids to keep them hooked.

15   That's what we are ultimately seeking to hold the defendants

16   liable for.

17                 (Pause in the proceedings.)

18        **MR. WARREN:**  I think Paragraph 74 would be another

19   example.  I don't know if each of those paragraphs is

20   expressly using the word "algorithm", but that is what they

21   ultimately are about, and that is what so much of this case is

22   about is the machine-learning process through which addiction

23   is effectuated by the -- by the defendants.

24        **THE COURT:**  I still don't understand how -- how

25   that's not in-extractible from the content.  That is --

1          MR. WARREN:  Right.  It isn't.

2          THE COURT:  The -- the addictions -- whatever it

3    is -- you know, if it's -- the content that they are -- well,

4    yeah, I -- it seems to me inextricably tied to content.

5          MR. WARREN:  Content is involved.  There's no

6    question about it, Your Honor.  But that's not a problem for

7    us because there's no but-for test.  And the fact that the

8    algorithms are ultimately presenting content to kids is fine

9    if we're not suing over that content.  We're suing over the

10   structure of the algorithm, the design in the algorithm.

11       And *Lemmon* makes clear if the duty is that of a

12   manufacturer and seeking to hold the manufacturer liable for a

13   defective product, that's completely different than the duty

14   of a publisher in, you know, selecting improper or proper

15   content and seeking to hold them liable for whether the

16   content is lawful or unlawful, good or bad.  Again, we're not

17   here to be the content police.

18       And, yes, algorithms show kids content.  That's absolutely

19   true.  That's absolutely true.  But that's not what makes them

20   addictive.  And that's not what we're suing about.  We're

21   suing about the fact that they're structured in a specific way

22   that defendants know through their own studies will hook kids

23   and keep them from, you know, enjoying all the attributes of

24   childhood that we enjoyed, going outside, having friends,

25   doing extracurricular activity, sports.

1    They're on they're phones all day all night.  That's not

2    because of what they're seeing.  That's not because the

3    content's so good.  It's because the algorithm is designed

4    specifically to hook them.

5         **THE COURT:**  What can a publisher, then, on an online

6    platform consider when making a publishing decision?  Aren't

7    you trying to impact that approach?

8         **MR. WARREN:**  Your Honor, I don't believe --

9         **THE COURT:**  In the sense of -- in the sense of trying

10   to limit a publisher, just from a -- kind of -- trying to take

11   this as objective as possible, right?

12       If they're a publisher, aren't you trying in effect to

13   limit that?

14       **MR. WARREN:**  No, Your Honor.  They can leave every

15   single piece of content up on their platform, and it wouldn't

16   change anything about our lawsuit.

17       I don't think there's editorial judgment involved in what

18   they show.  I don't think there's any judgment at all from any

19   human.  I think it is a machine.  I think it is an algorithm

20   that -- that works in the background, and the algorithm

21   that -- the AI is deciding what ultimately gets shown, not on

22   the basis of what the content is, but on the basis of what

23   effect it wants to have.

24       So the idea that these are -- this is the *New York Times*

25   op ed page or something.  It couldn't be more different.

1    There's no people in a room sitting around looking at the

2    substance of posts and deciding what's good or bad and in what

3    order they're going to go.  That's just not how these products

4    work, and that's part of what makes this case new.

5            **THE COURT:**  "And it's part" -- what was the last word

6    you said?

7            **MR. WARREN:**  Part of what makes this case new.

8            **THE COURT:**  Does 230 regulate AI?

9            **MR. SCHMIDT:**  I don't think they pled AI, Your Honor,

10   in their complaint.  They've pled code that is used to use

11   algorithms that --

12           **THE COURT:**  Where do you plead AI?

13           **MR. WARREN:**  I don't think we used the word "AI," but

14   that's what it is.  It's computer code that is a

15   machine-learning model.  It's a neural network.  I mean, these

16   are ultimately factual issues, exact -- how exactly a computer

17   engineer is going to describe this, what labels to use.  But

18   that's what this is.  There's no --

19       I don't think there's any question on a factual level that

20   that's what this is.  If we used the acronym "AI" or not -- I

21   don't know if we had, but I don't see that as being

22   material --

23           **THE COURT:**  Well, does 230 impact computer code?

24       His -- his point is that this is not -- you're not

25   regulating some person or people or editorial board.  It's

1    just computer code.

2        Does 230 -- has any court addressed whether 230 manages --

3    provides immunity for computer code?

4        **MR. SCHMIDT:**  Um-hmm.  Yes.  *Force* has.  *Force*

5    addressed that question from the Second Circuit and said that

6    doesn't change things.  Even if the use of computer code may

7    or may not have been anticipated at the time of -- Section 230

8    was enacted, Section 230 was clearly enacted under the express

9    goals of the statute to promote the continued development of

10   the Internet and, therefore, bring in new features that have

11   become essential to manage the vast volume of information that

12   is available on the Internet.

13       *Force* directly addresses that issue.  *Dyroff* implicitly

14   addresses that issue because *Dyroff* from the Ninth Circuit

15   also directly addresses algorithms and calls them one of the

16   tools meant to facilitate the communication and content of

17   others.

18       **THE COURT:**  Why don't you address *Dyroff*.

19       **MR. WARREN:**  I'd be happy to, Your Honor.

20       The first thing I'd say was *Dyroff* was at bottom, as -- as

21   Judge Kuhl recognized, a case about specific content.  And

22   they -- it was packaged with references to algorithms and all

23   the rest of it, that's true, but at bottom, the problem was

24   the posting about heroin.  And I'll -- in the complaint from

25   *Dyroff* says that at Paragraph 73.  They're seeking to hold

them liable for letting users anonymously traffic in illegal

deadly narcotics.  That's the problem in *Dyroff*, and so it's

distinguishable on that basis alone.

*Lemmon* is also a case about computer code.  I mean, the --

the product at the issue, the defect at issue, was not only by

the way the speed filter but also the rewards and incentives

in Snapchat, which are literally some of the same features at

issue in this case.

It was not just the speed filter and *Lemmon*'s very clear

on that point.  So these are all, at bottom, cases about

computer.  But *Force* is not a case that has been picked up in

the Ninth Circuit except through *Gonzalez*, which was vacated.

And it was a splinter decision.  Judge

Katzmann's concurrent -- partial concurrence, partial dissent

has had as much of a provenance in a life as the majority

there.  I don't think *Force* at the end of the day should be

particularly persuasive in how the Court rules here,

especially given that it's reasoning is misaligned with

binding Ninth Circuit cases.

**MR. SCHMIDT:**  Your Honor, there's no Ninth Circuit

case that *Force* is out of synch with.  It's the same

application as *Dyroff*.  It's the conclusion that the court

reached in *Gonzalez* before it was vacated.  The dispute that

was just referenced regarding *Gonzalez* was over the third

prong, not over the second prong, and it's consistent -- it

1    follows from both the goals and the text of Section 230, which

2    applies to any information provided by another and treating a

3    defendant as a publisher of that information.

4        It's still publishing if there's an algorithm used to

5    determine what gets published, just as it would still be

6    publishing if a old media publisher randomly sorted

7    publications or had some other means of doing it.

8        The method of publication -- there's no support in the

9    case law that says if it becomes automated, that somehow takes

10   it out of the clear language of Section 230 and the clear

11   goals of Section 230.

12       If I may briefly respond to the point that this really is

13   not about content, that these are, quote, "content blind."

14       A, legally that doesn't matter for the reasons we've been

15   talking about.  But B, that's also a fundamental

16   misconstruction of the way in which the complaint is written,

17   and that's legion throughout the complaint.

18       Paragraph 76, just a few paragraphs after one of the

19   paragraphs that Mr. Warren cited, is where they lay out their

20   theory of addiction.  Defendants design their apps to attract

21   and addict youth.  And one of the first things they talk about

22   is how they, quote, harvest user data and use this information

23   to generate and push algorithmically tailored feeds of photos

24   and videos.

25       Their theory of addiction is that for each user, the

1    defendants have become so good at identifying content they

2    would find compelling, that it's addictive.  And that's what

3    that paragraph says.  And that runs throughout the complaint.

4        560 talks about the algorithm and talks about it pointing

5    to specific types of allegedly harmful content, body image

6    content in that case.

7        Paragraph 758 and 759 talk about the algorithm making it

8    more likely to encounter harmful content.  Paragraph 267,

9    algorithms direct users to alarming and aversive material.

10    597, algorithms make it more likely that users will encounter

11    harmful content.

12        Ultimately, the core theory here was directly addressed in

13    the *Force* decision.  Their argument is you're so good at

14    providing content that, good or bad, people find compelling

15    that it becomes addictive.

16        *Force* said that makes no sense under Section 230.  It

17    would turn Section 230(c)(1) upside down to hold that Congress

18    intended that when publishers of third-party content become

19    especially adept at performing the functions of publishers,

20    they're no longer immunized from civil liability.

21        Common sense tells us that this is about content.  If all

22    the services displayed was Mr. Warren and I arguing, they

23    wouldn't be addictive.  If they had no content at all, they

24    wouldn't be addictive.

25            THE COURT:  And to think that Congress anticipated

```
 1    this is, I think, also a stretch.
 2            MR. SCHMIDT:  For sure.  I don't think anyone
 3    anticipated how the Internet would work.  And what Congress
 4    anticipated -- and I didn't mean to suggest that Congress had
 5    in mind that there would be algorithms or any other range of
 6    potential publishing conduct.
 7        What they anticipated was that the Internet would grow in
 8    different ways and they didn't impose limits recognizing that.
 9    They have gone back in at least one instance to amend
10    Section 230 when it was applied in a way that they didn't
11    believe it should be applied.  That limit hasn't been imposed
12    here.
13            THE COURT:  Let's move on and, you know -- well,
14    let's move on to Group 4, which relates to --
15                    (Demonstrative published.)
16            THE COURT:  -- conduct -- CSAM.  Any further thoughts
17    on this particular group?
18        And I haven't -- so my other question would be on this
19    group is, does it overlap with what the state AG's are arguing
20    in any way?
21            MR. WARREN:  I'd be happy to address that latter
22    point.  I'm not sure if the question was to me.
23            THE COURT:  Go ahead.
24            MR. WARREN:  My answer is I don't -- I don't know.
25    We -- the state AG complaints are very -- very new.  I don't
```

1    recall them specifically pleading about CSAM, but I could -- I

2    could very well be wrong about that and, unfortunately, just

3    don't have a more developed answer right now.  But maybe --

4    I'm -- I'm sure one of my colleagues will let me know soon.

5                **THE COURT:**  Any other thoughts on Group 4?

6                **MR. SCHMIDT:**  The only --

7                **MR. WARREN:**  I'm sorry.  Mr. Schmidt, please.

8                        (Simultaneous colloquy.)

9                **MR. WARREN:**  Well, I would just say this.  I actually

10   think that there is -- there are maybe multiple things going

11   on within this group that actually could be teased out.

12        One of the claims that we've alleged that's a priority

13   claim is negligence per se.  And part of the duties we're

14   alleging through that claim are under the PROTECT Act.  That's

15   18 U.S.C. 2258(a) and 2258(b).  Those particular requirements

16   are that a platform must report known CSAM to the authorities.

17        If it knows there's CSAM on the platform, it's got to

18   report to the authorities.  And that's a very, very important

19   obligation on the platform because if the authorities don't

20   know, they can't take action to prevent re-victimization of

21   kids and stop sexual predation on the platforms.

22        That's -- that reporting requirement is not about removal

23   of CSAM.  That's not what the reporting requirement obligates

24   the platform to do.

25        There are other features on here that do, candidly,

 1    require removal of CSAM.  And we believe CSAM is different in

 2    kind and should be thought of different in kind as other

 3    content because it is contraband and illegal under federal

 4    criminal law.  I understand there are cases against us on that

 5    point.  This is an issue that we feel is important to preserve

 6    on appeal.

 7        The only Ninth Circuit case to address whether -- how

 8    Section 230(c)(1) interacts with the removal of C1 is an

 9    unpublished opinion.  But I would say with respect to some of

10    these other issues in terms of reporting, the report

11    obligations, which is before Your Honor now, that is not

12    immunized under Section 230(c)(1).

13        And the other federal CSAM causes of action are

14    nonpriority claims that we'll brief in due course and bring to

15    Your Honor's attention.

16            THE COURT:  I would say two things.

17        All right.  *HomeAway* says that Section 230 provides

18    immunity from a claim where a duty would require an Internet

19    company to monitor third-party content.  This is what these

20    seem to allege in terms of monitoring.

21        That said, the defendants don't really brief this in their

22    motion to dismiss, at least not specifically.  So that's on

23    them.  It's their motion.

24        So any comments?

25            MR. WARREN:  I would just add that there is a

1    monitoring component to some of these, but there is also a

2    component of what you do when you know.  And if they know

3    there's CSAM -- if it's apparent -- there's an apparent

4    violation of the statutes, there's something else they have to

5    do.

6        So that really isn't about removal or monitoring.  It's

7    about what do you do when -- when that's brought to your

8    attention.  And that is a -- I think it's own -- you may want

9    to call it a subgroup or something, but it ought to be treated

10   somewhat different or something under --

11       **THE COURT:**  So if it's not monitoring, what is it?  I

12   understood it to be monitoring, that that's what the

13   allegations were.

14       This is under a subsection of 845, so it wasn't separately

15   pled.  But then, again, like I said, the defendants don't

16   address this in any specific way because they took an "all or

17   nothing" approach.

18       **MR. WARREN:**  Your Honor, some of these are not about

19   monitoring.

20       (Interruption by the Official Certified Stenographic

21   Reporter to request clarification.)

22       **MR. WARREN:**  I apologize.

23       (t) concerns limiting the use of geo-locating for minors.

24       **THE COURT:**  Right, but isn't there a case

25   specifically on that?

 1          MR. WARREN:   There -- I mean, the case that really we

 2     think is controlling is *Omegle*, and that is about the -- how

 3     a -- products defects facilitate grooming and facilitate

 4     sexual exploitation.  I don't know if Your Honor had a

 5     different one in mind.  Maybe -- it's just not coming to the

 6     top of my mind.

 7          Product features that recommend minor accounts to adult

 8     strangers.  That's not about removing CSAM.  It's not about

 9     removing any content.  It's about -- and *Omegle* really is very

10     squarely on point for this feature.  It's about is the

11     platform defectively constructed such that adults can pose as

12     minors and then the platform itself recommends those accounts

13     to kids.

14          It is brokering that connection through content really

15     that the platform is generating, saying, "here's someone that

16     you might like to know" and that is fostering an environment

17     where sextortion is rampant on the platform.  That's not about

18     removal of content, so I would -- (t) and (u) would fall

19     outside of what you're noting.  And then (p), again, is about

20     reporting protocols.  And I don't think -- again, that's what

21     do you do when you know.  The authorities have to be notified.

22          It is just fundamental to keeping the Internet safe.  The

23     authorities have to be notified when CSAM exists.  And when

24     the platforms know, they have to take considered effort to

25     make sure those obligations are satisfied.  So I would say (p)

1    also falls outside of the *HomeAway* -- *HomeAway* test.

2            **THE COURT:**  Mr. Schmidt.

3            **MR. SCHMIDT:**  Yes, Your Honor.

4        We did attempt to address the CSAM allegations, obviously

5    not very well in terms of making clear where we were doing

6    that.  But we do that in the context of responding to the

7    negligence per se claim, including, for example, in our global

8    reply brief at pages 34 and 35 where we both talk about the

9    defects that my colleague will address in the negligence

10   per se claim but then make the point that if there were actual

11   pled allegations here, they would be barred by Section 230.

12       And then in our 230 motion, we address that at page 12,

13   talking again about the negligence per se claim because that's

14   where we had understood they had focused their CSAM

15   allegations.

16       In terms of geo-location, the case that I know that is on

17   point regarding geo-location is *Herrick vs. Grindr*.  It's an

18   unpublished decision from 2019 from the Second Circuit, and it

19   expressly talks about geo-location figures.  That's 765 Fed.

20   Appendix 586, and the pin cite is 590, 591.

21       There's also a DC Circuit case that gets at the same

22   point, *Marshall's Locksmith vs. Google*, which talks about

23   location information being content, and that tracks up to the

24   allegations they make about location information, which is

25   that what's harmful from the location information is the

1    information being posted and that causing harm.

2        They allege that in their complaint.

3        One final point on CSAM, we understood their CSAM claims

4    maybe incorrectly.

5        **THE COURT:**  So let me -- look, I'm happy to get some

6    clarity, right?  Because as I've noted, all of these come from

7    Section 845, which isn't -- which is in fact in the products

8    liability claim.

9        **MR. WARREN:**  Yes, Your Honor.

10        **THE COURT:**  So are you saying that I can strike the

11    CSAM paragraphs from the product claim and only focus on them

12    with respect to the negligence per se claim?

13        Is that what you're saying?

14        **MR. WARREN:**  Your Honor, I think some of them, yes.

15    I don't think everything in this group would be amenable to

16    that, not --

17        **THE COURT:**  Well, tell me which ones.

18        **MR. WARREN:**  Okay.  I will.  If I may, (p), which

19    concerns reporting protocols for the reasons I -- I noted.

20    Once you know, irrespective of whether you monitor or not,

21    what do you do.  And the "what do you do" isn't, are you

22    taking it down?  It's are you letting the feds know so that

23    they can take action.

24        (t), geo-location, *Herrick vs. Grindr*, not a geo-location

25    case.  I -- at least I don't read it that way.  That's a case

1    in which someone put up a fake account pretending to be

2    somebody else.  That somebody else got a lot of harassing

3    solicitations, and then the platform was told to take it down.

4    It's squarely about take-down, removal of improper content,

5    not about geo-location.

6        *Marshall's Locksmith* is only in the most incidental way

7    about -- it's not really about geo-location at all.  Yes, it

8    concerns a map insofar as it shows where certain locksmith

9    locations are, but it's not --

10            **THE COURT:**  Mr. Warren, I want the record to be very

11    clear, so let's just -- just give me the ones that you --

12    just -- by number, the ones that I can strike or at least

13    ignore and footnote under the products liability cause of

14    action, which is where they currently sit, and focus solely on

15    them in terms of the negligence per se.

16        So I'll go through it.  So (o), 845(o), yes or no, can I

17    strike it from products liability?

18            **MR. WARREN:**  Yes, Your Honor.

19            **THE COURT:**  All right.  So that will go into

20    negligence per se.

21        The same thing with (p), then.  Negligence per se only,

22    right?  Or not?

23            **MR. WARREN:**  No.  I would --

24            **THE COURT:**  Okay.

25            **MR. WARREN:**  I do not think that can be stricken.

```
 1              THE COURT:  How about (q)?

 2              MR. WARREN:  Yes.

 3              THE COURT:  (r)?

 4              MR. WARREN:  Yes, Your Honor.

 5              THE COURT:  (s)?

 6              MR. WARREN:  Yes, Your Honor.

 7              THE COURT:  (t)?

 8              MR. WARREN:  No, Your Honor.

 9              THE COURT:  (u)?

10              MR. WARREN:  No.

11              THE COURT:  Okay.

12          All right then.  Any other comments on (p), (t), or (u)?

13          No?

14              MR. WARREN:  Not from plaintiffs.

15              MR. SCHMIDT:  I do, Your Honor.

16          I don't believe I responded to Your Honor's earlier

17      question about the Attorney General complaints.  As we

18      understand those complaints, those are focused on COPPA, not

19      on the PROTECT Act or CSAM per se.  As Mr. Warren noted,

20      they're quite voluminous.

21          The one that's before this court is quite a voluminous

22      complaint.  There are references to adult/minor interactions,

23      so I don't want to ignore those.  But they're not focused

24      on -- on CSAM per se, as we understand those complaints.

25      They're focused on COPPA.
```

1    In terms of the specific remaining challenges in the
2  product liability claims that Mr. Warren has flagged, (p),
3  (t), and (u), I'll stand on what I said previously with
4  respect to geo-location.  The questions in (p) and (u) --
5  well, particularly (u) has been addressed by cases like *LW vs.*
6  *Snap* from the Southern District of California, like *Doe II*
7  from the Court of Appeal.
8    With (p), there's no theory that we see in the complaint
9  for how that caused individual plaintiffs harm other than in
10 terms of that content being -- being harmful.
11   Obviously, defendants have very important CSAM reporting
12 obligations.  We don't understand them to have pled a claim
13 based on harm from those reporting allegations.
14        **THE COURT:**  All right.
15        **MR. WARREN:**  Your Honor, may I briefly address that
16 last point?
17        **THE COURT:**  Quickly, and that doesn't mean to speak
18 faster.
19        **MR. WARREN:**  I do make that mistake.  I appreciate
20 the caution.
21   There are very few -- I did just want to say, there very
22 few CSAM cases in the MDL at this point, less than two dozen
23 short-form complaints that raise CSAM allegations.  So I just
24 wanted to make that point so we can understand the scale of
25 these issues relative to everything else.

1    And, really, that's all I -- all I wanted to add.

2    **THE COURT:**  Okay.

3    5 discusses filters.  6 discusses warnings.

4    (Demonstrative published.)

5    **THE COURT:**  So on 5?

6    **MR. SCHMIDT:**  On 5, Your Honor, I think this is

7    another type of challenge that's being made that focuses on

8    where the manner in which they've pled the claim focuses on

9    content.  They have not focused their filters claim on just

10   the simple act of using filters.

11   Instead, they have repeatedly pled their filters claims in

12   terms of the harm.  In the use of the phrase "social

13   comparison" throughout their complaint, they refer to specific

14   type of filtered content from celebrities and others

15   throughout their complaint.

16   The claim that is pled or the allegations that are pled

17   relating to filters relate to seeing filtered content, having

18   people comment on filtered content, and alleged harms from

19   that filtered content being available.

20   That claim is pled.  Obviously Snap and -- the *Lemmon* case

21   involved a different type of filter where the publication of

22   filtered content wasn't essential to the claim.

23   That's not what we've here.  Here, we have repeated

24   allegations -- paragraph 88, paragraph 315, paragraph 652,

25   paragraph 110 -- where they're repeatedly linking up the

```
 1    filters to viewing filtered content, to seeing someone else's
 2    content, to other people seeing their content, and that being
 3    the source of both the duty in terms of not allowing that
 4    content and -- that is a de-publication claim -- and the harm
 5    in terms of harm from seeing that content.
 6            MR. WARREN:  May I respond?
 7            THE COURT:  You may, Mr. Warren.
 8            MR. WARREN:  Thank you.
 9        Mr. Schmidt is raising a factual issue around what is the
10    cause of the harm here.
11        What we've alleged is that it's -- the duty is not to not
12    allow filtered content.  The duty is not to have defective
13    beauty filters that by their mere presence on the platform
14    contribute to body dysmorphia and eating disorders.
15        Now, I do want to point out one really late-breaking fact
16    that no one could know.  The State of Vermont filed a
17    complaint in Vermont state court, and they revealed one thing
18    that they learned in the course of their investigation, which
19    is a -- a literature review from Meta from the 2018.
20        And this disclosed in their complaint.  The literature
21    review indicated that the mere act of using body filters
22    contributes to body dysmorphia and eating disorders, something
23    Meta knew and hid.
24        The mere fact of them being on the platform available for
25    use, that's not about I saw skinny girls and felt sad.  That's
```

1   about the filters being there, the features being there.

2       Now, to the extent there's a dispute about what's the

3   causal mechanism and where the weight is in that chain, that

4   is, again, a factual issue that requires development, as the

5   State of Vermont's complaint very clearly demonstrates.

6           **THE COURT:**  Any response?

7       **MR. SCHMIDT:**  Yeah the fact that we have to go

8   outside the complaint to try to support the claim proves that

9   that claim is not pled.  None of those allegations that were

10  just referenced are in the complaint.  That's not the claim

11  that's pled in the complaint.

12      The claim that is pled in the complaint that filtered

13  content --

14          **THE COURT:**  What I understand the complaint to have

15  alleged is that the filters allow or encourage their kids to

16  change their bodies to be ideal.  That's what's pled.  At

17  least that's my understanding, having read it.

18          **MR. SCHMIDT:**  If --

19          **THE COURT:**  And maybe there's something more

20  specific -- and certainly there's more specificity as to what

21  Meta may have known.

22      But that's certainly -- this is not news to me.  That's

23  what I understood the complaint to allege.

24          **MR. SCHMIDT:**  I'll take one example of that, Your

25  Honor.

1      Paragraph 88 contains exactly some of the allegations that

2   Your Honor was just referencing.

3      It says -- it talks about --

4          **THE COURT:**  And remember, complaints are notice

5   complaints.  Right?

6      The question is, is it plausible under what's alleged.

7          **MR. SCHMIDT:**  Yes.

8      The pleading that they have made is they talk about

9   appearance-altering filters built into defendants' apps which

10  underscore conventional and often racially biased standards of

11  beauty by allowing users to remove blemishes -- and I think

12  that's Your Honor -- exactly what Your Honor was getting at.

13     In the same paragraph of the complaint -- in fact, the way

14  they start the complaint -- that paragraph of the complaint is

15  the design also encourages unhealthy negative social

16  comparisons, which in turn cause body image issues and related

17  mental and physical disorders.

18     A "social comparison" necessarily involves seeing content.

19  That's what the comparison that's being made involves where

20  they state the harm and the causation and the defect, as they

21  put it, or the design problem.  They're talking about viewing

22  content.  And they do that throughout that paragraph.

23  Defendants' apps provide a continuous stream of these filtered

24  and fake appearances and experiences that encourages harmful

25  body image comparison by adolescents.

1          They even go so far as the print third-party content

2     issues on this very issue.  In paragraphs 515 and 514 of their

3     complaint illustrating that their complaint isn't cabined to

4     someone using filters and never having any problems from

5     publication of either their filtered content or seeing someone

6     other's [sic] filtered content.

7          That might be a different claim, but that's not the claim

8     they've pled.  They've pled a claim of social comparison.

9               **THE COURT:**  Response.

10              **MR. WARREN:**  Your Honor, I would respond first by

11    pointing to Paragraph 104, which talks about a 2016 study in

12    which 52 percent of girls said they use image filters every

13    day.  Eighty percent reported using an app to change their

14    appearance before the age of 13.  And 77 percent of girls

15    reported trying to change or hide at least one part of the

16    their body before posting a photo of themselves.

17         The social comparison, yes, it may be to others.  But it's

18    also to yourself, what could I look like?  What should I look

19    like?  The body I have now is not the body I want, and these

20    filters show me what I could be and what I should be.  And I

21    should take action to go like that idealized version of

22    myself.

23         That's wrong, and it's caused, in large measure, through

24    these filters that are features of the defendants' platforms.

25              **THE COURT:**  All right.  Group 6.

```
 1                    (Demonstrative published.)

 2          THE COURT:  Let me ask with respect to Group 6.

 3      Again, you've put this in paragraph 845 under the products

 4   claim.  Obviously, there seems to be some overlap with the

 5   failure to warn.  Should it be just the failure to warn, or is

 6   it part of the products?

 7          MR. WARREN:  It should just be the failure to warn,

 8   Your Honor.

 9          THE COURT:  All right.  So it can be stricken in the

10   products.

11          MR. WARREN:  That would be perfectly acceptable to

12   us.

13      But if I may, I would like to address failure to warn.

14          THE COURT:  We'll get there.

15      Again, I'm -- think it's incumbent upon the court to, you

16   know, analyze the specificity of what's in front of us.  And

17   that requires digging down into the weeds, and -- and, again,

18   what has been difficult about the way in which the complaint

19   was presented is that it's not that specific.

20      I mean, it's very long, but it's not organized in that

21   kind of way.

22      All right.  Let's go ahead and move on to the -- well,

23   First Amendment.

24          MR. WARREN:  Thank you, Your Honor.  I would -- think

25   we're going to switch -- switch personnel for that one.
```

```
 1              MR. SCHMIDT:  We will as well, Your Honor.  Thank you
 2      for hearing us out.
 3              THE COURT:  Thank you.
 4                      (Pause in the proceedings.)
 5              THE COURT:  So -- and let's -- let's have appearances
 6      made.
 7          Ms. Cabraser, good morning.  Or good afternoon at this
 8      point?
 9              MS. CABRASER:  Good afternoon, Your Honor.  Elizabeth
10      Cabraser for plaintiffs.
11              MR. WILLEN:  Good afternoon, Your Honor.  Brian
12      Willen for the Google defendants but here on behalf of
13      everybody.
14              THE COURT:  Okay.
15          So with respect to the First Amendment issues, again,
16      my -- my view is that I'm -- is that I have to look at
17      specificity.  My plan would be to look at it in the same way
18      as the last set of groups that we did in terms of the various
19      allegations.
20          I will repeat again here, as is the case with the entire
21      briefing, you've both taken an "all or nothing" approach in
22      many ways to what the issues are.
23          I don't know if your colleagues left that chart for you.
24      You're welcome to use that chart in your presentation, or -- I
25      think many of the issues overlap, but I'll -- I'll leave it to
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    your discretion.

2        It's your motion, you may begin.

3        **MR. WILLEN:**  Sure.  I mean, would you like me to

4    start with what's called Group 1?  Would that be helpful?

5        **THE COURT:**  If -- if you want.  That's -- that's

6    fine.

7        **MR. WILLEN:**  Well, I mean, there's a lot of ways we

8    can -- we can go into this.  It seems like, Your Honor -- and

9    I totally agree this is a useful way to proceed, is to look at

10   these different allegations, look at these different features

11   and think about how in this case the First Amendment applies

12   to them.  I think some are easier than others.  And I'm happy

13   to start with Group 1.

14       I'm also happy to start with where we end, which I think

15   is a particularly clear-cut example of where the First

16   Amendment applies, so --

17       Well, why don't I -- okay.  Why don't I start with the

18   filter, since that is sort of on my mind and I think on the

19   Court's mind.  So this is an area where I think there's a

20   difference between the First Amendment and Section -- and

21   Section 230.

22       So the debate that you had with -- with -- on the 230

23   issue about whether the allegations here are better understood

24   as the -- the problem is that the filters publish content and

25   people see that filtered content and develop body dysmorphia,

```
 1        other problems.

 2            Or the problem is that the presence of the filters leads

 3        people to create content that then harms them or harms their

 4        psychology.  Doesn't really matter for purposes of the First

 5        Amendment.

 6            So start from the premise that what is -- what is a filter

 7        here.  These -- these are edited photographs and videos.  This

 8        is -- this is pure speech, okay?  So we have people creating

 9        speech and people viewing speech.

10            And the allegations, the theory of liability that the

11        plaintiffs are asserting with respect to these filters --

12        and -- and Mr. Warren said this expressly, the complaint says

13        it at length.  The problem that they have, the reason that

14        they think the filters are tortious or negligent or defective

15        is because they communicate allegedly a message.

16                THE COURT:  So you're saying a filter is a speech.

17                MR. WILLEN:  I am saying that a filtered image is

18        absolutely speech.  It is a photograph that is edited in a

19        particular way.  It's no different than the use of auto-tune

20        to -- to change the pitch of music --

21                THE COURT:  No, no, no.  I'm not asking about the

22        output.  I am asking about the -- the device, whatever you

23        want to call it, the filter itself.

24                MR. WILLEN:  Yeah.  The filter itself is a tool

25        for creating --
```

```
 1              THE COURT:  It is a tool.

 2              MR. WILLEN:  Yes.  And --

 3              THE COURT:  It's a tool.

 4              MR. WILLEN:  Yes.

 5              THE COURT:  How is a tool -- how is that tool speech?

 6              MR. WILLEN:  Ah.  Okay.

 7         So the Ninth Circuit has had a number of cases about this,

 8    including most recently the Project Veritas vs. Schmidt case

 9    and the Hermosa Beach case involving the tattoo parlor, all of

10    which have said basically the -- the act of creating speech,

11    which may involve conduct, it may involve tools, in one case

12    the tattoo gun; in other cases, a camera; or -- or many other

13    objects or tools, the -- the Ninth Circuit has said very

14    clearly that those are speech because they are directly and

15    intimately and necessarily create -- connected to the output.

16         So you can't disaggregate the product from the process

17    used to create it.

18              THE COURT:  Response.  Is a filter speech?

19              MS. CABRASER:  A filter is a tool that may or may not

20    constitute speech.  And whether it does or does not constitute

21    speech is not the end of the question with respect to

22    liability.  And I think the Hermosa Beach case illustrates

23    that.

24         The Ninth Circuit was quite enthusiastic about tattoos and

25    tattooing as expressive conduct or speech but yet reminded us
```

1   of the obvious, which is that, quote, a tattoo punitively

2   affixed is unprotected if it creates a damage or injury.

3       And one could go farther and say that a tattoo is purely

4   expressive, but if the tattoo misspells the name inside the

5   heart, it's a tort.

6       The Ninth Circuit --

7           **THE COURT:**  "No regerts [phonetic]"?

8           **MS. CABRASER:**  Pardon me?

9           **THE COURT:**  "No regerts"?

10          **MS. CABRASER:**  Or "Arnie" instead of "Annie" inside

11  the heart.  And, in fact, the Ninth Circuit revisited *Hermosa*

12  *Beach* much more recently in *Edge vs. City of Everett* where

13  tattoos were part of what was at issue with respect to the --

14  the bikini baristas, who claimed the expressive right to wear

15  very scanty attire in part because they were expressing female

16  empowerment and wanted more visibility with their tattoos.

17      The Ninth Circuit said something, which I think ought to

18  be the overlay for this entire discussion, Your Honor.  And

19  that is "context is everything" and that protected expression

20  or speech in one context -- you know, tattooing your

21  sweetheart on your arm, is not protected in another context

22  when it is visible to customers right next to a tip jar at a

23  retail establishment.

24      So clearly, context -- whether or not there's a message

25  that anyone is attempting to convey -- and here, these filters

1    don't convey a specific message of the tool designer.  They're

2    simply one more functionality, one more design feature that

3    the complaint clearly alleges has one intent and one goal in

4    mind, which is to use features, content, et cetera, as

5    fungible fodder to maximize screen time and to maximize ad

6    revenue.

7         That is the purpose, that is the function of -- of the

8    code, the algorithms, the bots, that are providing not just

9    the -- the filters but the other functions online.  And that

10   is what's keeping adolescents online.  And that is what is

11   causing the harms that we allege.

12        **THE COURT:**  Let me ask you about 845(l), which is the

13   notifications of content created by the defendants.  How does

14   the First Amendment argument relate to that particular kind of

15   functionality that has been alleged as a defect?

16        **MS. CABRASER:**  That, I think, completely maps on to a

17   proper conduct that can be mandated or regulated consistent

18   with the First Amendment.

19        It is akin to a time, place, or manner restriction.  It is

20   akin to the privacy interest, which the Supreme Court has

21   repeatedly invoked in First Amendment cases, recognizing that

22   parents have the right to control what their children see,

23   everyone has a right to control what they view in their own

24   home and private spaces.  And what might be appropriate

25   expression in an open public forum can stop at the door step.

```
1            And so requirements that would make a product
2    non-defective or less defective or any function non-defective
3    or less defective by providing appropriate warnings are
4    protected -- are consistent with First Amendment protections.
5            And, in fact, in a related area, where a failure to warn,
6    that is, manufacturer, the defendant knows something, the
7    customer does not, decides not to talk about it while
8    promoting other features, that is utterly unprotected by the
9    First Amendment.
10            THE COURT:  So I'd like to talk about that, because
11    the briefing doesn't really do, I think, a --
12                    (Demonstrative published.)
13            THE COURT:  -- as good of a job as it probably could
14    have with respect to the overlay between the First Amendment
15    and the failure-to-warn claims.
16            Given an -- because some of this -- I'll -- much of this
17    was put in the products claim.
18            So talk to me about those issues in particular, the First
19    Amendment and the failure-to-warn.
20            MS. CABRASER:  A failure-to-warn is what is often
21    called a marketing defect in product liability law.  It is
22    considered a defect as much as a design defect is, and tort
23    liability could arise from failure to warn.
24            It's also sometimes discussed in the context of fraud.
25    And we didn't brief these cases, Your Honor.  My apologies,
```

1    but when I began to look at these categories and think about

2    this is a failure-to-warn situation, I was reminded of the

3    District of Columbia's Circuit -- Circuit's 2009 decision in

4    *United States vs. Phillip Morris*, which was the United States

5    government's civil RICO injunctive relief case against the

6    tobacco industry for marketing -- all sorts of marketing

7    defects including marketing light cigarettes.

8        The tobacco companies of course raised a First Amendment

9    defense, and they -- they briefed it and argued it

10   vociferously.  It earned one sentence in the decision of the

11   DC Circuit as I recall, which is that fraud is completely

12   unprotected by the First Amendment.

13       So this is -- when we get to that -- this area of the

14   claims, what we're talking about -- what the defendants knew

15   and didn't notify --

16               THE COURT:  So if I could interrupt.

17                    (Simultaneous colloquy.)

18               THE COURT:  -- for a moment.

19           MS. CABRASER:  Sorry.

20               THE COURT:  No, that's all right.

21       So it might be barred in the context of the -- the product

22   defect claims but not barred under a separate theory.

23       Is that what you're saying?

24           MS. CABRASER:  I'm saying, Your Honor, that fraud,

25   deceptive conduct, deceptive speech, omission of material

1    facts, is never protected by the First Amendment.

2        I think that's probably the only categorical statement

3    that could be made about the First Amendment.

4        **THE COURT:**  The -- the issue that I'm raising with

5    subsection (l) is that it is brought, as I understood it, as a

6    design defect --

7        **MS. CABRASER:**  Um-hmm.

8        **THE COURT:**  -- theory.

9        **MS. CABRASER:**  Um-hmm.

10       **THE COURT:**  It may have also been brought under a

11   theory of failure to warn and -- but those have to be

12   analytically separately analyzed, right?  So that's why I'm

13   asking the question.

14       **MS. CABRASER:**  I understand, Your Honor.

15       And I think -- I think Mr. Warren answered it as well as

16   anyone could.  Part of the ultimate process of putting each of

17   these design features in the proper bucket or category is, as

18   he noted, going to depend on ongoing discovery and a deeper

19   understanding by plaintiffs of how each of these design

20   features actually functions.

21       Because, as Your Honor noted, it may be the functionality;

22   it may be the toolness of this particular product; or it may

23   be more about the content -- I'm sorry -- the conduct of the

24   defendants in how they're using it.

25       One way or another, if it causes harm and if it was

1  foreseeable, if it could have been avoided and prevented

2  through appropriate means such as notification, there's

3  liability for it.

4      But at this point, I understand it's -- it's a question of

5  where exactly does it fit.  It may fit in both places.

6          THE COURT:  All right.  A response.

7          MR. WILLEN:  Well, there were a number of things

8  said, so let me just quickly go back to filters because I

9  think Ms. Cabraser put her finger on exactly the problem.

10     So, yes, I agree, context matters and the message matters.

11     So the problem with the filter theory, the reason it is

12  fundamentally at odds with the First Amendment, is because the

13  liability that they seek to impose is entirely based on their

14  allegation about what message the filters communicate.

15     They say -- they allege at length, Paragraph 315, 515,

16  652, the filters communicate to teens, to minors, that they

17  are only attractive when they are filtered, when they are

18  edited.  And they are seeking to impose liability on

19  defendants for communicating that message through the filters

20  and through the filtered images.

21     So that is a pure content-based speech liability claim.

22  It is imposing liability because they do not like the message

23  that is sent.  That message is protected speech on their

24  theory.

25     So that's the filters.

1    I think the next thing we talked about was notifications.

2    So, again, there's not many allegations in the complaint about

3    notifications.  But the ones that there are, Paragraph 488 and

4    292, I think clearly take them into the realm of protected

5    speech, and that's true for two reasons.

6        So the first is that the allegation fundamentally is the

7    notifications tell you that there is content, there is speech,

8    there is information on these services that you may want to go

9    look at.

10       So the -- the ultimate liability, the ultimate harm that's

11   being imposed is the harm from viewing or engaging with that

12   speech.  But insofar as the notification can be considered

13   separate from that, the -- the harm is providing information

14   about speech.

15       So that under *Sorrell*, under many other cases, providing

16   information is speech.  Certainly providing information about

17   speech is speech.  And certainly where the ultimate liability

18   is premised on the harm that occurs for engaging or

19   communicating based on the speech that you are notified about,

20   that is also speech.

21       Now, in Paragraph 292, there's even another problem, which

22   is -- this is an allegation about Meta's notifications.  And

23   it basically says Meta calibrates notifications in particular

24   ways, so it -- this is -- I'm quoting, "Meta intentionally

25   chooses to display only a limited amount of information in the

1  notification in order to trigger curiosity."

2      So that is an allegation that is taking issue very

3  specifically and very concretely with the content of an

4  informational notice that Meta is sending.  They are saying,

5  it is defective because it only includes certain information

6  and not other information.

7      So this would be equivalent to a claim that said, the

8  *New York Times* is liable because it sends you a notification

9  that says there's a breaking news story but it doesn't tell

10  you what the news story is.  To go to that, to figure what --

11  to figure out what the story is, you have to go on the

12  *New York Times* website and look.

13      So either the liability is for the content of the

14  notification, which is clearly a First Amendment problem.  Or

15  it is for what I think really is going on here, which is once

16  you're notified about something, then you want to go see what

17  it is, you want to go on, read content, view content,

18  communicate with people so --

19          **THE COURT:**  Let me just stop you for a moment and let

20  my court reporter know, when we finish this section, we'll

21  take a break.

22          **THE CERTIFIED STENOGRAPHIC REPORTER:**  Yes, Your

23  Honor.  Thank you.

24          **THE COURT:**  Thank you.

25      Let's talk about algorithms and the First Amendment.

1    So your thoughts with respect to that.

2                     (Demonstrative published.)

3         **THE COURT:**  I'll leave it open.

4         **MS. CABRASER:**  I think that it is a stretch.  And,

5    again, this is a very new issue for the courts.  It is a

6    stretch to say that an algorithm that operates according to a

7    very sophisticated and predestined code to interact in a

8    private space, the user's own phone or platform, to accomplish

9    one mission, which is to call up content indiscriminately as

10   generic fodder to accomplish the mission of maximizing screen

11   time, whose expression is that?

12       It's not human expression, even indirectly at this point.

13   We're very far away from any editorial judgment or function

14   that's happening down the hall.  The defendants are doing that

15   when they're trying to comply with Section 230 in terms of

16   content moderation.  But that's not our claim here.

17       This is about utilizing content for a sole purpose.  Not

18   to express a viewpoint or an idea or even to sell a particular

19   product, right?  It's not even commercial speech.  It's just

20   keep a person involved, prevent them from disengaging, intrude

21   upon their privacy, overcome their own decision-making

22   process.

23       And one of the authors that has engaged with this most

24   recently, Margaret Newman.  We cited her article.

25   "Manipulation in the First Amendment" talks about the process

1    of manipulation, which is not expression.  It's not

2    persuasion.  It's not something that the First Amendment

3    enables and allows and protects us all when we do that.

4        It is really seeking to override someone else's

5    decision-making process while exploiting cognitive, emotional,

6    or other vulnerabilities.

7        Tim Wu also writes about machine speech and basically

8    breaks that down to say, it's not human speech.  It's not even

9    corporate speech.  It's not something that the First Amendment

10   does or should protect in the same way.  So I think the

11   context is everything, as the Ninth Circuit has said in *Edge*

12   *vs. Everett*.

13       And what's happening here, what the complaint is alleging

14   in a holistic way -- and I appreciate that Your Honor is

15   parsing these paragraphs very -- very specifically.  But there

16   is an overarching theme of the complaint.  And that is that

17   what these algorithms, these design features, these tools are

18   designed to do and what they do very well and at a highly

19   sophisticated level to overcome the vulnerabilities of the

20   users to intrude into their privacy and to prevent

21   disengagement.

22       And even the oldest First Circuit decisions talking about

23   the right to freedom of speech and expression ends where the

24   right to privacy in one's home begins.

25       The right -- freedom of speech is -- is accompanied by

1    freedom from speech.  People need to be able to look away, to

2    disengage, to prevent intrusion.

3        When they can't do that, when the noisy sound truck never

4    turns off, when the band doesn't stop playing at 11:00 p.m.,

5    it doesn't matter what the content or suppression of -- of the

6    band is.  It doesn't matter what message the noisy sound truck

7    is blaring.  If we can't get away from it, if we can't

8    disengage, then the First Amendment doesn't protect that

9    violation of our rights and interests.

10        And that's the central problem that this complaint is

11    trying to solve and that we're all grappling with.

12            THE COURT:  Well, the defendants would say that there

13    is an overarching theme and that the holistic approach of the

14    complaint is that it's content based.  I mean, they -- they

15    take that argument and flip it and say that I should throw the

16    whole thing out precisely because you spend pages and pages,

17    perhaps even a hundred or so, on the -- on the content.

18        So I -- a word from you on the strategic choice or the

19    tactical choice to focus so much in the complaint on content

20    and then try to ignore it in the opposition.

21            MS. CABRASER:  I think, Your Honor, that Mr. Warren

22    expressed it very well.  We're not running from content.  And

23    there are so many specific examples of content in the

24    complaint, it's true, to illustrate the overarching point.

25        But the overarching point is this:  The complaint is

1    asking the defendants to compensate plaintiffs for the actual

2    harms the interactive design features of their products caused

3    and to correct those features so that they operate as -- they

4    can continue to operate them -- to avoid committing these

5    torts in the future.

6        This doesn't require content deletion, moderation, or

7    censorship of speech or ideas, even the ones we mention in the

8    complaint that we don't like.  It doesn't require defendants

9    to act any differently as publishers or editors to the extent

10   they actually do.

11       It simply means that in order to avoid ongoing liability,

12   they must change the addictive functions of their medium, not

13   the content of the messages that others have posted there.

14       If they do this, the First Amendment is fully honored.

15   The ideas and expressions in the content posted by users and

16   those of the defendants themselves will be free to compete in

17   the marketplace of ideas, as the First Amendment

18   contemplates --

19            THE COURT:  All right.

20            MS. CABRASER:  -- on their merits in an open forum,

21   not through addictive platform features.  I -- and I'm sorry

22   to get a little carried away here -- that capture and deploy

23   content as random fodder to keep eyes on screens while

24   depriving viewers of the freedom and the right to disengage.

25            THE COURT:  Response.

1    MR. WILLEN: If the allegations about the algorithms

2    in particular were truly content neutral, we'd have a

3    different conversation. We had still have a First Amendment

4    issue, but it would be a different conversation, but that is

5    simply not the complaint that they drafted, and I think the

6    Court is very well aware of that.

7    I would just give you a couple of particular examples, so

8    Paragraph 560 about TikTok, this is a quote, far from

9    promoting educational content, TikTok's algorithms instead

10   actively send its young American users down a rabbit hole of

11   artificially filtered, ideal body images, dangerous viral,

12   violence, and self-harm.

13   With respect to YouTube, 758. This is the central

14   allegation they make about the algorithm. YouTube's

15   algorithm, quote, makes it more likely for children to

16   encounter harmful content.

17   They say the same thing in 267 about Meta, alarming and

18   adversive material, et cetera. I could go on and on and on.

19   There's vast paragraphs about this, so they want to run away

20   from it now. But, again, that's not the complaint.

21   What the complaint that they actually filed says very

22   clearly is that the problem with algorithms, the reason

23   they're defective, the reason they're tortious, is because

24   they ever select and recommend and push to people harmful

25   content, and the liability is based on that. That is, content

1    based speech regulation.

2        This is what these algorithms are doing is recommending

3    and suggesting speech to people.  They don't like the speech

4    that is being recommended.  They don't like the speech that is

5    being suggested.  They think it's harmful.  Okay.  That is a

6    content-based speech regulation, plain and simple.

7        So I -- you know, they are trying to run away from that

8    now, but that's not the complaint that they filed.

9        I think the -- the right answer here with respect to the

10   algorithms, in light of the overwhelming content-based nature

11   of their allegations, is to say that the First Amendment and

12   Section 230 apply to them.

13       If they want to try to re-plead a complaint that makes the

14   arguments in the way that Ms. Cabraser has just made them,

15   they can try to do that.  We'll have a different conversation.

16   There's still a First Amendment issue there, but it may be a

17   different one.

18       And then just very briefly with respect to the -- the

19   point about computer speech, et cetera, they obviously can't

20   point to a single case.  They're citing some academic

21   literature.  There's no case that says that.

22       What these algorithm do is embody the judgment that the

23   platforms, the humans, the corporations have made.  They're

24   designed to -- to automate and make that process work at

25   scale.  But they are still protective of the first amendment.

1          And the case I would point the court to is a case called

2     *Zhang vs. Baidu*, which is a Southern District of New York

3     case, cited in our papers.  That case involved Google search,

4     and the -- the argument was and the Court ultimately held that

5     Google's search algorithms were protected speech under the

6     First Amendment such that the plaintiffs there couldn't

7     complain about content that they wanted to see in Google

8     search results not being there.

9          The court expressly held that the fact that those

10    editorial judgments about what content to publish, how to

11    publish it, what rank and order to publish it in was protected

12    speech, notwithstanding the fact that it was done through

13    algorithms.

14         So the same argument they've made here was rejected there.

15    That's the case that I think was directly on point, but, of

16    course, there's all sorts of cases.

17              **THE COURT:**  But the speech relative to that algorithm

18    related to political speech, not to what is being argued here,

19    which is nothing in particular.  It's just the quantity and

20    the timing of it to overcome decision-making processes.

21              **MR. WILLEN:**  Well, so --

22              **THE COURT:**  It was political speech, right?

23              **MR. WILLEN:**  That case involved political speech,

24    yes. And that was -- of course had nothing to do with the

25    holding about -- I was responding specifically to the point

1    about algorithms, which I think is --

2            **THE COURT:**  Slow down.

3            **MR. WILLEN:**  -- isn't relevant to the algorithm is

4    the algorithm speech question.

5        Yes, that case involved political speech, but here, all

6    the content that we've been talking about, the-- adversive

7    content, harmful social comparison content, content about

8    eating disorders, et cetera, all of that is protected speech

9    under the First Amendment.  The plaintiffs haven't argued

10   otherwise.

11       Now, some of it, in fact, may be political speech, but, of

12   course, you know, the Supreme Court has been very clear and

13   the Ninth Circuit's been very clearly, that protected speech

14   is protected speech.

15       Political speech often is the sort of centerpiece of the

16   First Amendment.  But the First Amendment clearly applies to

17   all this material.

18       So insofar as they're seeking, as the complaint does, to

19   hold us liable for recommending or suggesting content that

20   they believe to be harmful, that's fully protected, and

21   that's -- fully implicates the First Amendment just as much as

22   in *Zhang vs. Baidu* or any other -- any other case involving

23   protected suppression.

24       It's -- you know, you have the *Brown* decision in the

25   Supreme Court, which involved, you know, violent --

```
1              THE COURT:  All right.

2              MR. WILLEN:  -- video games.

3              THE COURT:  Let's -- you can -- I'll let you wrap up

4      after the break on this topic.  But I do think that I've

5      extended my -- the time with respect to my court reporter a

6      little bit too long, so we'll -- we'll stand in recess until

7      about just five minutes to one, so be ready to go; everybody

8      should be back.

9          Thank you.

10             THE CLERK:  Court's in recess.

11         (Recess taken at 12:38 P.M.; proceedings resumed at 1:01

12     P.M.)

13             THE CLERK:  Good afternoon, Your Honor.  Re-calling

14     the matter of 22-MD-30047-YGR, in re: Social Media Adolescent

15     Addiction Personal Jury Products Liability Litigation.

16             THE COURT:  All right.  The record will reflect that

17     the parties are present.

18         Okay.  So back to the First Amendment, any concluding

19     thoughts.

20             MS. CABRASER:  Your Honor, with permission, yes.

21         Responding to a specific allegation in the complaint

22     that -- that counsel for defendants pointed out, and I think

23     it was subparagraph 560 about the lack of the usage limits

24     on -- on the filters.

25         And the allegation does talk about content.  We have a lot
```

1    of allegations about content that we don't like, but this is

2    what -- this is what our First Amendment point is.

3        When we allege that TikTok's algorithm instead actively

4    sends its young American users down a harmful rabbit hole of

5    artificially filtered ideal body images and dangerous viral

6    challenges, the defendant is concentrating on the content

7    aspect of that.  We are -- we are concentrating on the

8    inescapability aspect of that, the fact that it is a rabbit

9    hole.

10        And we're invoking the Supreme Court's balancing test

11    where speech can be limited where the degree of captivity

12    makes it impractical for the unwilling viewer to avoid -- or

13    auditor to avoid exposure.  That's *Cohen vs. California*.

14    That's also the *Erznoznik* case, the outdoor drive-in movie

15    theater.  If you don't like it, then you can leave or avoid

16    it.

17        If you can get out of a rabbit hole, then the First

18    Amendment is protected speech and -- and expression is

19    protected and privacy is protected.

20        So the complaint is about changing design of the product,

21    not the content that it uses.

22            **THE COURT:**  All right.

23        Any other final thoughts?

24            **MR. WILLEN:**  Yes.  Well, two things on that.

25        So I think, again, they've just admitted that the

1    complaint is content based and making allegations based on --

2            THE COURT:  I think we can all -- no need to repeat

3    it.

4            MR. WILLEN:  Sure.

5            THE COURT:  Right?  There's lots of -- in that

6    complaint, and I've mentioned it myself, where it's content

7    based.

8            MR. WILLEN:  Right.

9            THE COURT:  It is not -- also, remember the

10   procedural posture of this case.

11      What I need to do is to view the complaint in the light

12   most favorable to the plaintiffs, not the defendants.

13           MR. WILLEN:  I completely agree with that.  And so

14   insofar as -- I mean, we're going feature by feature, and

15   we're talking about the algorithms, and those allegations are

16   inseparable from the harmful content that they say the

17   algorithms facilitate.

18      Just briefly on the captive audience point, not an

19   argument that they made in at the brief, I would note.  But

20   the -- there's not a single case that's ever said that the

21   captive audience doctrine could apply where the theory is that

22   the speech at issue was essentially too compelling, too

23   enticing, people couldn't look away from it because they

24   wanted to keep looking at it.

25      Those are cases about physical confinement where you're in

1    a place where you cannot be otherwise.

2            THE COURT:  But how is that different in the new

3    world, right?  Tort law is here to address the changes that

4    exist in society.  And what happened -- what used to happen in

5    the 1920s or '30s or '40s or '50s is different than a hundred

6    years later.

7            MR. WILLEN:  That's absolutely true.  The -- the

8    principles of First Amendment though, do, not change.  And to

9    hold that this -- this is a very, very narrow body of cases.

10   And I think there's a reason that they didn't invoke those

11   cases in their opposition on this point.

12       So, for example, the *Rowan* case involved a specific -- a

13   statute that gave people who receive mail the specific right

14   to opt out of getting communications from particular senders

15   and the delivery of mail into the home.

16       So this case doesn't actually involve the home.  This

17   involves the communication of -- of information and ideas to

18   wherever people happen to be.  Sometimes they're at home;

19   sometimes, they're not.  But it's not a case specifically

20   about the privacy of the home.  And it doesn't involve an

21   optout, which -- which *Rowan* emphasized as -- as the important

22   feature of that case, and --

23           THE COURT:  Well, I have issues with respect to

24   optout in my factors, don't I?

25       That was -- that was on the list that I provided to you

1     earlier, or -- that comes from Section 8 -- 845, I thought.

2          Maybe it's just opt-in.

3          **MR. WILLEN:**  Yeah, I think -- I think that's right.

4     In any event --

5          **THE COURT:**  Section 845(g), self-limiting tolls --

6     tools.  Isn't that optout?

7                         (Pause in the proceedings.)

8          **MR. WILLEN:**  I think that's -- I think those are

9     tools -- I'm not sure I totally understand them, but I -- I

10    think the idea there is some sort of timeout, where, you know,

11    the -- after a certain amount of time, the -- the service

12    would shut off or -- or provide --

13         **THE COURT:**  How is that not optout?

14         **MR. WILLEN:**  Well, it's -- there's not --

15    (Interruption by the Official Certified Stenographic

16    Reporter to request counsel speak more slowly.)

17         **MR. WILLEN:**  Of course.  I'm so sorry.

18    *Rowen* is a case about the -- a specific request from a

19    homeowner to say, "I do not want to receive any mail from this

20    person."  And the question is, under those circumstances, does

21    the sender of mail have a right to send mail into the home of

22    the person who has specifically made that optout request.

23    That's what the Supreme Court said.

24         Now, in this case, there's not an allegation that any of

25    the plaintiffs have come forward and said, "I said I don't

1    want to receive communications from particular person or

2    particular kind of content" and that was overwritten.

3         There's -- there are allegations here -- or at least a

4    theory of product liability that says they want to have some

5    sort of setting that would limit the amount of time that

6    people can --

7              THE COURT:  Well, how is that not parental controls

8    and parental notifications?

9              MR. WILLEN:  Okay.  Well, we -- I'm happy to talk

10   about the parental controls and parental notifications --

11             THE COURT:  I'm just saying that you're making some

12   statements that would seem to have analogies to some of the

13   design claims in the -- in the complaint.

14             MR. WILLEN:  Okay.  So with respect to parental

15   controls and -- and age verification, which I think is

16   Group 1 -- so this is pretty clearly a First Amendment issue

17   in the sense of -- one way to think about this is what would

18   happen if these requirements were embodied in legislation, if

19   there were a statute, a regulation, that required what they

20   are seeking through the application of tort law, to have

21   parental controls, age verification, age limitations.

22        And we know the answer to that question because those

23   statutes have been enacted and have been challenged

24   successfully on First Amendment grounds.

25        So very recently, case in Arkansas *NetChoice vs. Griffin*,

1   granted a preliminary injunction enjoining an Arkansas law

2   that imposed age verification and parental control

3   requirements on certain social media websites.

4       Judge Freeman's decision in the *NetChoice vs. Bonta* case

5   enjoined California's new age-appropriate design code law

6   which has age verification or age acknowledgment requirements.

7       So we -- we have case after case after case that has

8   specifically applied the First Amendment to requirements that

9   are seeking to impose age limitations and parental controls on

10  websites that are disseminating and facilitating speech to

11  minors.  And there's good reason for that.

12      The -- the problem with their age verification and

13  parental control allegations in this case is that those

14  allegations are not allegations of defect in the air.

15      The question the court has to answer is, why do the

16  plaintiffs think that having what they view as a lack of

17  age -- proper age verification or parental controls -- why is

18  that a harmful problem?  What is the injury that results from

19  that supposed lack of those features?  That's the question to

20  ask.

21      And when you ask that question, the only answer I think

22  that you can give is that -- that the reason it is harmful is

23  because what happens as a result of that is that minors are

24  exposed to more speech than the plaintiffs think they should

25  be exposed to, and they are exposed to more harmful speech

1  than the plaintiffs think they should be exposed to.

2      And both of those raise very serious compelling First

3  Amendment problems that when -- have been analyzed in the

4  context of legislation, the courts have consistently held that

5  those kinds of requirements are unconstitutional and violate

6  the First Amendment.

7      And it's not any different, and we would actually submit

8  it's a easier case where you have those requirements being

9  imposed through tort liability rather than through legislative

10  deliberation.

11          **THE COURT:**  Any response?

12          **MS. CABRASER:**  Yes.  Planned Parenthood case vs.

13  Newman, Ninth Circuit, very recent, cert denied, 2022, did

14  talk about electronic means and stated what so many other

15  cases that it cites have stated, which is that the First

16  Amendment is not a license to intrude by electronic means.

17      And that's the problem here.  So it's not wrong.  It's not

18  violative of the First Amendment.  It's fully consistent with

19  the First Amendment to use age verification, parental

20  controls, notifications, other design corrections that are

21  going to protect children and warn parents before going down

22  that inescapable rabbit hole that the rest of the design

23  features of the defendants' products are putting them in.

24      Those types of restrictions, particularly in response to

25  community outcry were upheld on First Amendment grounds by the

1    Ninth Circuit *Edge vs. City of Everett*.  That's the bikini

2    baristas case, and they were very specific.

3        So they were specifically drawn -- they were specifically

4    drawn to enable the community to protect itself from unwanted

5    intrusive expressive behavior.  They did undergo a First

6    Amendment test.  And -- and they won, consistent with the

7    First Amendment.  Because, again, it's a balancing of rights

8    and interests.

9        Nobody owns the First Amendment.  No particular group, no

10   industry, nobody owns it, even in the electronic age, even

11   when it's very difficult for us to conceive of having a world

12   that is designed for each individual under-aged user

13   supposedly for maximum engagement that can result in real

14   harm.

15       I may have said something confusing before the break.

16   With respect to the failure-to-warn aspect of our complaint.

17   It is not limited only to allegations that sound in fraud.  It

18   is a product liability type of design defect.  And we did cite

19   in our opposition brief the blood factors case, the *Factor

20   VIII and IX Blood Products* MDL case, 25F.Supp. 3rd at 848,

21   that does have a First Amendment discussion and concludes --

22   that was Judge Grady -- that there is no immunity in

23   failure-to-warn cases.  There's no First Amendment immunity.

24   That case happened to involve negligent failure-to-warn, but

25   it applies across the board.

```
1            The Metabolife case we cite was another example of that.

2                 THE COURT:  Okay.

3                 MR. WILLEN:  Can I --

4                 THE COURT:  I think we need to move to products.

5                 MR. WILLEN:  Can I just respond very briefly to that

6      just on -- on Newman, 'cause it's a case they've cited now a

7      couple times.

8            So that case has nothing to do with -- with

9      failure-to-warn or with age verification or anything else.

10     It's just garden variety torts.  It's fraud.  It's trespass.

11     And the Court says that -- you don't get an exemption just

12     because ultimately your goal is to -- to do journalism.

13           And the -- the Edge case has nothing to do with speech

14     publication.  And in the context of speech publication cases,

15     courts including the Ninth Circuit, including the

16     Supreme Court, have repeatedly found that age limitations do

17     violate the First Amendment.  Obviously, the Reno vs. ACLU

18     case --

19           (Interruption by the Official Certified Stenographic

20     Reporter to request clarification and that counsel speak more

21     slowly.)

22                 MR. WILLEN:  The Reno vs. ACLU case and the Powell's

23     Book case in the Ninth Circuit, where you have age limitations

24     designed to protect minors from certain kinds of allegedly

25     harmful speech, both struck down on First Amendment grounds.
```

```
 1              THE COURT:  Products.
 2              MR. WILLEN:  Thank you, Your Honor.
 3              MS. CABRASER:  Thank you, Your Honor.
 4              THE COURT:  And I know you both, but for the record,
 5     go ahead and re-introduce yourself.
 6              MS. HAZAM:  Good afternoon, Your Honor.  Lexie Hazam
 7     for plaintiffs.
 8              MS. SIMONSEN:  Good afternoon, Your Honor.  Ashley
 9     Simonsen Covington & Burling for the Meta defendants.
10              THE COURT:  Okay.  Good afternoon.
11         So once again, I think the approach taken was not as
12     organized for my purposes as I would like.  And I think part
13     of this always because, you know, you're advocates and so
14     you're doing what you think is best for your client.  I'm a
15     judge; I'm trying to get to the right answer in an analytical
16     way, regardless of who wins.
17         So it seems to me that we have to have a framework.  There
18     are states where I think no one disagrees in terms of defining
19     whether something is a product, that the thing must be
20     tangible.  And in those states where the thing has to be
21     tangible, seems to me that you can't have a products liability
22     case for those states.
23         I believe the parties agree that's Arkansas, Delaware,
24     Illinois, Maryland, Minnesota, Ohio, and Tennessee.
25         I can't -- you know, no one, I think, really disputes
```

1    that -- that this is not tangible.  Right?

2           **MS. HAZAM:**  Your Honor, I -- I don't think plaintiffs

3    dispute that it's not tangible.  I think they dispute whether

4    it's sufficiently analogous, and some of those states follow

5    restatements that would allow for that.

6           **THE COURT:**  All right.  Then we'll get to that.

7    We'll drill down on those issues, but I thought that some

8    states -- to the extent that a state has clearly stated that

9    it must be tangible, this is not tangible.

10       So next -- so then the question is, well, what do I do

11   with that.

12       You all chose particular states to brief, but it seems to

13   me that both for Georgia and New York, which were your chosen

14   states, they've generally hewn to the second and third

15   restatements, and that's where I've focused my efforts in

16   terms of trying to figure out a framework for analyzing back

17   to my list, functionality, because I think that's -- it's

18   incumbent upon me to figure out whether this particular kinds

19   [sic] of functionality that is at -- at issue qualifies as a

20   product.

21       I understand that the defendants say none of it's a

22   product.  And the plaintiffs say all of it's a product.  And

23   that's -- I understand, as the advocates, the positions that

24   you take.  It doesn't help me trying to dig down and analyze.

25       So that's where I have focused in terms of figuring out

1    whether or not these functionalities in that chart constitute

2    products under -- under the law.

3        And under the restatement, where I have something that is

4    intangible, then, yes, as you mention, the question is, is it

5    analogous to the distribution and use of tangible personal

6    property, so I'll ask that question.

7        Second, services are not products even when commercially

8    provided.  So if something is a service, then it could not be

9    classified as a product.

10       And third, ideas, thoughts, and expressive content also

11   cannot be classified as products.  So what I have done is to

12   try to figure out under that metric whether all of this

13   functionality is a product or not.  You can comment.

14       We'll start with you.  It's your motion.

15            **MS. SIMONSEN:**  Thank you, Your Honor.

16       I think the -- the way that you've broken it down makes a

17   lot of the sense.  I think big picture, these applications --

18   defendants' applications -- I want to focus on the second

19   prong of your three-part framework, that these are services,

20   not products.

21       The -- the case law, I just want to emphasize, is uniform

22   to the extent it has addressed these defendants' applications

23   in holding that they are services and not products --

24            **THE COURT:**  But, again, all of those -- the cases

25   that you refer to are broad-brush cases.  There are cases that

1    they refer to where the focus is on a particular

2    functionality, and you're wrong.  The courts have not sided

3    with the defendants.

4            **MS. SIMONSEN:**  Well --

5            **THE COURT:**  So you do not win in every single case.

6            **MS. SIMONSEN:**  Your Honor, with respect to the *Lemmon*

7    and the *Maynard* case, which I believe is what you may be

8    referring to involving the Snapchat application and

9    specifically the speed filter, the courts in those cases did

10   not reach the question of and it was not briefed whether those

11   were products subject to product liability --

12           **THE COURT:**  Could have always been because it was

13   kind of obvious.

14           **MS. SIMONSEN:**  Well, Your Honor, even in those cases,

15   the product liability claims weren't even brought.  But -- but

16   taking a step back, and I mean, we can sort of walk through

17   these feature by feature.  And maybe we should start with the

18   filters because I know that in the *Lemmon* case, what was at

19   issue was a speed filter.

20       Again, the Court did not reach the question of whether

21   that was a product subject to product liability law.  I think

22   that the closest possible analogy to that case that plaintiffs

23   have been able to point to where the court reached that

24   question was the *Brooks* case in Florida which involved the

25   Lyft application where notifications were sent to drivers and

1   the drivers were distracted by the notifications and as a

2   result, there was a car crash.

3       So a unifying theme of -- the three best cases for them,

4   two of which didn't even reach the question of whether the

5   application at issue was a product -- all of them involved

6   either -- in the *Brooks* case, an application that was designed

7   to be used with a vehicle that was essentially the equivalent

8   of being embedded in a good, which is consistent with how the

9   restatement now considers we should think about things like

10  software.

11      In the case of *Lemmon* and *Maynard*, we had a use of the

12  Snapchat service, which itself is a service, in connection

13  with driving a vehicle, and as a result, a car crash occurred,

14  and the plaintiffs alleged physical injury from that car

15  crash.

16      There is no allegation in these cases that these

17  plaintiffs were using these applications in connection with

18  navigating a vehicle.  And to state it more broadly, they --

19  there's no allegation that the only physical thing that these

20  applications with integrated into, namely an iPhone, harmed

21  them in any way.  There is no --

22          **THE COURT:**  So I need you to focus on this element;

23  that is, on whether or not the functionality can constitute a

24  product, because whether or not any individual plaintiff can

25  later allege specific causation is a separate and distinct

1    issue.  You all keep wanting to integrate causation with an

2    element of the claim.  They are separate and distinct

3    elements.

4         MS. SIMONSEN:  Respectfully, Your Honor, I think in

5    this case, that the argument we're making isn't one of

6    causation.  It is that the only instances in which courts have

7    recognized that software can be treated as a product are

8    instances where the software is embedded in a physical good or

9    expressly designed, in the case of *Brooks*, to be used with a

10   car.

11      And that physical good --

12         THE COURT:  -- phone, a mobile device, not a good.

13         MS. SIMONSEN:  And the second part is and that

14   physical product caused harm.  And in this case, the

15   plaintiffs aren't alleging, for instance, that somehow

16   defendants' software overrode iPhone settings in such a way

17   that it caused a blinding light to emit from the phone or

18   deafened users in the volume at which it played videos.  That

19   is kind of the closest analogy I think you can draw between,

20   for instance, the *Brooks* case and this case.  And it's not

21   what they're alleging.  What they are alleging --

22         THE COURT:  All right.  So what are you alleging

23   then?

24         MS. HAZAM:  Thank you, Your Honor.

25      I would like to start by saying the claims here target the

1    design of products that exploit kids' brains.  They do not

2    target ideas or content.  That alone I think distinguishes

3    many of the cases that defendants cite, particularly the cases

4    dealing with traditional media and video games.  Virtually

5    every one of those decisions noted that the plaintiffs were

6    attacking ideas, thoughts, expressions.

7        The courts in -- virtually all the states with the

8    exception of a few that have had adopted their own product

9    liability statutes follow one or both of the restatement

10   seconds and the Restatement (Third) of torts.

11       Under the Restatement (Second), a product is something

12   that causes physical harm to the user and arrives at the user

13   without substantial change in its condition.

14       Under the Restatement (Third), as Your Honor acknowledged,

15   a product is a tangible item or one whose context of

16   distribution for use is analogous to a tangible item.

17       We believe both those tests are met here.  And in fact,

18   the signals under each of those restatements is often similar.

19       Here, the defendants apps are software.  Like other

20   products, this software is mass-marketed.  It's

21   mass-distributed through the stream of commerce.  It's

22   obtained at stores.  It's made by product designers.  And

23   defendants profit from its use.

24       And there is a seminal Ninth Circuit case dating back over

25   30 years that stated that software may be a product,

especially if it's mass-produced.  That's the *Winter* case.

The third restatement recognized that *Winter* so suggested and that many commentators have urged its treatment as such.

In addition, unlike the software that existed at the time of *Winter* and the third restatement, the kids today interact with these products by touch.  They tap, they scroll, they swipe these products all day long.

Coming to *Lemmon*, a much more recent case from the Ninth Circuit, it treated the Snap application as a product in upholding a product liability claim.  I believe Counsel said that there were no product liability claims brought there. There absolutely were product liability claims.

And, in fact, what *Lemmon* said is that the duty of the defendant there, Snap, one of the defendants here, was as a manufacturer to make a reasonably safe product in upholding product liability claims.

The Court reversed the lower court's ruling, finding that instead the duty was a publisher.  And on remand, the district court said it was shifting to treating Snap as a manufacturer in a negligent design claim, a common product liability tort. Those were the actual words that the Court used.

Other courts have, likewise, treated Snap as a product, including the Georgia Supreme Court in the case of *Maynard v. Snap* which reversed two lower courts dismissals of the products -- of a product liability claim.  And it said that as

1    a manufacturer, Snap had a duty to reduce foreseeable risk of

2    harm presented by its product.

3         And then in the *Brooks v. Lyft* case that Counsel

4    referenced, the Florida appellate court squarely addressed the

5    questions of whether an app is a product for purposes of

6    product liability law and found on a full factual record at

7    summary judgment that it was.

8         It distinguished -- going to the question of a service,

9    that Your Honor referenced, it distinguished between Lyft's

10   role as a provider of services, ride-share services, and its

11   role as a designer and a distributor of its app.

12        And it rejected the argument, similar to the one made by

13   defendants here, that the plaintiffs' claims were based on

14   expressions or ideas rather than the app's design.

15        Again, as I indicated at the outset, echoing Mr. Warren

16   and Ms. Cabraser this morning, plaintiffs' claims did not

17   target content, they target design.  That's where the duty

18   arises from.

19        *Brooks* also addressed the policy factors, like those set

20   out in Restatement (Third) to guide the analysis when the

21   restatement's definition of "product" does not provide an

22   unequivocal answer.  And it found that Lyft is in the stream

23   of commerce and that it's the -- the party best positioned to

24   minimize the risk.  That would be true here as well.

25        The cases, as I indicated, the defendants cite in support

1    of their argument are inapposite or distinguishable.  The

2    traditional media cases do not involve apps and do target

3    ideas and expression.

4        Those would be cases like *Way vs. Boy Scouts*, *Davidson vs.*

5    *Time Warner*, this court's decision in *Estate of B.H. vs.*

6    *Netflix*.

7                **THE COURT:**  Let me ask you something --

8                **MS. HAZAM:**  Yes.

9                **THE COURT:**  -- specific to the outline that I

10   provided.

11               **MS. HAZAM:**  Yes.

12               **THE COURT:**  So, again, we go back to these filters.

13   The allegations with respect to filters, how is it a design

14   defect versus a failure to warn?

15               **MS. HAZAM:**  Well, Your Honor, it's possible that it

16   may be both.  The -- the fact that defendants have an app that

17   has this functionality as part of it, a filter, which a user

18   can use, as Mr. Warren indicated, to change their own

19   appearance and may be harmed by that aspect of it even prior

20   to or without any communication, that may be a defect.

21       There may also be a duty to warn -- plaintiffs have

22   alleged a duty to warn under both strict product liability and

23   negligent product liability about the addictiveness of

24   defendants apps, and that may be a component of that

25   addictiveness.

1          **THE COURT:**  On your side, then, how is a filter a

2    service?  You're not doing anything other than providing the

3    tool.

4          **MS. SIMONSEN:**  Well, just to back up a second, Your

5    Honor, this idea that we're providing tools doesn't of course

6    transform this into a tangible product.

7       All of the functionalities that we've focused on today are

8    themselves intangible, as Your Honor noted.  There can be no

9    dispute about that, so --

10         **THE COURT:**  Right, but that doesn't end the analysis.

11         **MS. SIMONSEN:**  So the mere fact that a -- so a

12    filter --

13         **THE COURT:**  Correct?  Just because it's not tangible

14    does not end the analysis.

15         **MS. SIMONSEN:**  I think that it does end the analysis

16    across a number of jurisdictions.  And it's only at the outer

17    limits of product liability law that there are some courts

18    that have acknowledged that when software, which is

19    intangible --

20         **THE COURT:**  Am I misstating what the restatement

21    says?

22         **MS. SIMONSEN:**  No, you're not, Your Honor.  That is

23    the right analysis, to look at kind of how it compares to a

24    physical product.

25       And along those lines, we can -- we can look at these apps

 1    and see that even under plaintiffs' own characterization, they

 2    do not resemble mass-marketed, mass-produced goods.

 3        Although these applications certainly are download --

 4    downloaded from an app store by the plaintiffs, from that

 5    point in time onward, they differ completely for every

 6    individual user.

 7        They're -- they're -- plaintiffs' addiction allegations

 8    are, in fact, premised on the idea that these are customized

 9    tailored applications with individualized --

10        **THE COURT:**  Again, it's pretty generic.  Do you want

11    to tell me specifically which allegations you're talking

12    about?  I've got six different groups under 845.

13        **MS. SIMONSEN:**  Sure.  So, Your Honor, I -- I may

14    just -- why don't we start with -- with the algorithms, so --

15    the usage-max- -- maximizing algorithms.  The algorithms

16    themselves are obviously intangible code.  And the allegation

17    that plaintiffs are making is that the algorithms somehow are

18    products but they are not physical and what they do is provide

19    a service.  That service is the delivery of content in order

20    for users to consume.

21        And, furthermore -- and this gets to the third prong of

22    the test Your Honor set forth -- if -- one were to apply

23    product liability law to algorithms, there's no question that

24    it would result in the chilling of free speech and expression.

25    And it would be regulating the role of these defendants as

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1      publishers in bringing information and ideas to the public.

2          And that's exactly what the *Winter* court said can't be

3      done with respect to product liability law.

4          *Winters'* endorsed by the restatement.  It's been followed

5      by every court to address similar allegations where the

6      alleged harm comes from exposure to some kind of content.

7      Now, the plaintiffs say over and over that they're not

8      attacking -- they're not taking issue with the content.  But,

9      of course, they are.

10          In a usage-maximizing algorithm, plaintiffs themselves

11      allege that the -- the harm occurs because it leads

12      plaintiffs, the users, down rabbit holes.

13          And the way that they describe rabbit holes are the

14      presentation of the same type of content, one piece of content

15      after the next after the next after the next, and that that is

16      what is addicting the users.

17          And in order to apply product liability law, then, to say

18      that an algorithm has to present less of a certain type of

19      content, to stop displaying content after a certain period of

20      time would be to reach into freedom of expression and ideas

21      and seek to regulate it.  And the courts are very clear that

22      that's something product liability law can't do.

23              **THE COURT:**  How is providing effective parental

24      controls a thought, idea, or expressive content?

25              **MS. SIMONSEN:**  It's because parental controls as well

```
 1    as age verification are simply --
 2            THE COURT:  Are simply what?  They're tools.
 3            MS. SIMONSEN:  They are features of these
 4    applications that control who can access content.  And so if
 5    there were some kind of a requirement, for instance, that
 6    the --
 7            THE COURT:  Well, you don't know what they're going
 8    to do with it.  You're making an assumption.  You're making an
 9    assumption about how the tool is used.
10            MS. SIMONSEN:  Well, in the case of -- of parental
11    controls, I think one can assume that if those were more
12    robust, which is essentially what the plaintiffs are alleging
13    they should be, that parents would use them in such a way that
14    they would monitor --
15            THE COURT:  They may, they may not, right?
16            MS. SIMONSEN:  But -- but they may, and so if there
17    is some requirement that parental controls be made available
18    so that content and in- -- intangible information and ideas is
19    regulated in some way, treating that content as a -- it
20    effectively would be treating that content as a product that
21    these parents would be controlling through the parental
22    control features.  And in that way, it absolutely implicates
23    expression and ideas.
24            THE COURT:  I think it's down the line.
25        Ms. Hazam, a response on that one?
```

1          **MS. HAZAM:**  Yes, Your Honor.

2          I'll -- I'll start with the idea of the algorithm being

3     usage-maximizing.  We do not believe that that depends in any

4     way on content.  We believe that this is essentially a black

5     box even to the defendants themselves.

6          The algorithm simply operates to keep eyes on a screen for

7     as long as possible so that these young users see as much

8     advertising as possible and the defendants bring in as much

9     revenue as possible from it.

10         That does not mean content has no role in this case, won't

11    be part of the evidence in this case.  *Lemmon* contemplated the

12    content there would also be part of the case.

13         We do not have to meet a standard of but-for causation.

14         The -- the standard that we have to meet is that we're not

15    going for content to be taken down, and -- and we are not

16    here.

17         I'd also like to address Ms. Simonsen's comments with

18    regards to *Winter* and its concern with the First Amendment.

19    *Winter* draws this very distinction between a product and the

20    ideas or the content.  It does not require that to be a

21    physical distinction or a tangible/intangible dichotomy.

22         It talks about software.  It also talks about a compass.

23    And it says that the compass doesn't have to injure you

24    physically by blowing up in your hand.  It could injure you

25    because it walks you off a cliff by being inaccurate.

1        But plaintiffs do not disagree that this idea that you

2   cannot have a products claim that attacks ideas and expression

3   isn't a built-in limit to product liability.  In other words,

4   we would say that the First Amendment provides a limiting

5   factor and that what we have to ask is what are the claims

6   targeting and how does the duty arise.

7        **THE COURT:**  In terms of analogies to the distribution

8   and use of tangible personal property, what kind of analogies

9   exist for age verification and parental controls?

10       **MS. HAZAM:**  In terms of a traditional product?  Is

11  that what you're asking, a tangible traditional product?

12       **THE COURT:**  In terms of the first test under the

13  restatement.

14       **MS. HAZAM:**  So the restatement refers to things

15  like -- it refers to two things.  It has -- the context of the

16  use and distribution, which is anything that's mass-marketed,

17  mass-distributed.  You could have other kinds of products that

18  have built-in forms of restricting who uses them that go

19  sometimes to -- in the form of warnings, sometimes in the form

20  of actual physical aspects of the product, like fingerprinting

21  or -- or eyes scanning.

22       It also, however, talks about policy factors.  And

23  particularly when the definition is not unequivocal, you would

24  look to these policy factors.  And those policy factors would

25  very much, I think, favor considering things like inadequate

```
 1    age verification and parental controls to be products or
 2    components of a product, as the case may be.  The life and
 3    health value particularly of children would -- would, I think,
 4    mandate in fact that that policy factor weighs in -- in favor
 5    of those functionalities being products.
 6        The greater ability of the defendants to understand them
 7    and change their design would also -- in other words, parents
 8    and children themselves would have a much more difficult time
 9    imposing those kinds of controls.  And so would other policy
10    factors.
11            MS. SIMONSEN:  Your Honor, if I may respond on the
12    parental controls point.
13            THE COURT:  You may.  And then we'll -- we'll move to
14    duty.
15            MS. SIMONSEN:  And, Your Honor, asked the question
16    can you identify a parental-control-type product that's
17    mass-distributed, and I did not hear Ms. Hazam identify one.
18        I think, you know, the analogy would be requiring that
19    there be some kind of parental controls provided in connection
20    with the broadcast of the television, which, of course, it
21    doesn't apply to, because those are intangible ideas and
22    information.
23        I do want to respond to a few other points Ms. Hazam
24    made --
25            THE COURT:  You know, it used to be that children
```

1    couldn't get into R-rated movies.  It used to be that you had

2    to show IDs.  I mean, there are all sorts of -- so I -- and,

3    frankly, there were a number of things that could never be

4    shown on TV, so I don't understand your analogy.

5          **MS. SIMONSEN:**  But -- but we're not dealing with --

6    plaintiffs aren't proposing those types of regulations here.

7       What they're proposing that -- is that there be controls

8    for parents to allow their children to access content

9    regardless of what that content is, and that does implicate

10   speech and expression.  I do want --

11         **THE COURT:**  Well, what they're saying is that the

12   parent -- there should be controls for the parents.  And what

13   parents do with that is the parents' concern, not your

14   clients.

15         **MS. SIMONSEN:**  But that does not change the fact that

16   the parental controls themselves are intangible and that as

17   applied -- the thing that plaintiffs want to do is to change

18   parental controls so that minors' access to information and

19   ideas is potentially more difficult.

20      And it could be the case that in some instances -- and

21   this is just to back up sort of on the policy point that Your

22   Honor touched on at the outset.

23      I mean, when you think about what is a service versus a

24   product.  It's something that at the end of the day, you can

25   identify a uniform defect that raises a similar risk of harm

1    for all users that can be reduced in the same way for all

2    users.

3        And a parental control isn't necessarily going to reduce

4    the risk of harm that these plaintiffs allege in the same way

5    for all users.  It might actually cause some users to have a

6    worse experience.

7        One example would be the fitspiration content that these

8    plaintiffs focus on as allegedly causing body image issues.

9    That content may cause body image issues for some.  It may

10    inspire others to exercise.  If parental controls are required

11    to a certain point where parents could limit minors' access to

12    content such as fitspiration content, such as any of the other

13    types of contents that these plaintiffs have put at issue,

14    like sensationalist videos, et cetera.

15        **THE COURT:**  Well, I don't see the complaint saying

16    that they -- that they're asking you to do it for specific

17    content.  I thought it was a global -- a global lock, so to

18    speak.

19              (Simultaneous colloquy.)

20        **THE COURT:**  -- a global control, irrespective of

21    content.

22        **MS. SIMONSEN:**  It may be a global lock and

23    control but it --

24        **THE COURT:**  But there's a difference.

25        **MS. SIMONSEN:**  But regardless of the type of content,

 1  it still is affecting access to information and ideas.  It's

 2  regulating the role of these defendants in bringing intangible

 3  information and ideas to the public, which is exactly what

 4  *Winter* --

 5       **THE COURT:**  Well, it may or may not be.  It's --

 6  certainly it is -- it is providing parents with control.

 7       **MS. HAZAM:**  Your Honor, if I may -- if I may respond

 8  briefly, I believe that in fact this situation is very

 9  analogous to the movie-type scenario you're imagining.

10       It's simply that technology has advanced to the point

11  where there's something in children's pockets during the day

12  when their parents aren't there, parents can't be hovering

13  over them during every moment.

14       And so the verification and the blocks have to be built

15  into the product.  There's nobody standing at the gate of the

16  movie theater.  That is, in fact, already the case with some

17  physical products, too, so if you just look at Legos.  Legos

18  are a physical game, and they have printed on them that

19  they're not to be used by children of a certain age.

20       So I don't think that the fact that the parent control is

21  not in the traditional realm of products built into the

22  product itself and instead is a gateway that might involve,

23  you know, a checkpoint that is -- you know, before you get in

24  the movie theater makes any significant difference here.

25       I would also like to briefly address this idea that

1    products have to be static and that they are uniform in both

2    the way they operate and in the user experience of it.  That

3    is not the case.

4        There is no case law to suggest that products have to be

5    static or that products can't respond to after-market inputs.

6    And, in fact, many products today do precisely that.

7        Think of self-driving cars, self-parking cars, your Nest

8    thermostat.  Even traditional products often have settings.

9    You set your oven to bake, and you set your oven to roast.  It

10   might work well on one setting, it might not work well on the

11   other.

12       Drugs are a great example.  Drugs interact with different

13   people in different ways.  They may, in fact, be beneficial to

14   many patients who take the drug.  And in others, they may

15   cause a harm that warrants either a safer design or a warning.

16   And those are very much the bases of traditional product

17   liability claims.

18       **MS. SIMONSEN:**  And, Your Honor, if I may respond just

19   briefly on those points, I think it's notable that every

20   example Ms. Hazam has offered involves a physical product.

21   Self-driving cars.  It may be that there's some kind of

22   software integrated into the cars that causes them to move in

23   different ways for different users, but it is still a phsical

24   product and item capable of causing harm if the software

25   malfunctions in a similar way that could be reduced for

1    everyone by a change in the code.

2        Oven settings, drugs, Ms. Hazam mentioned.  All of these

3    things are instances where you have software integrated into a

4    good -- not the drug case -- but the oven-setting case.

5        With respect to drugs, of course, that's a physical pill

6    that -- that users are taking that can physically affect them.

7        Ms. Hazam just did recognize that -- that this case is

8    analogous to a checkpoint at a movie theater so that minors

9    can't access certain -- something behind the checkpoint.

10        Well, what's behind the checkpoint?  It's content.  That

11    we're concerned about exposing children to the same exact

12    thing is true with respect to the content at issue on these

13    platforms.

14        Ms. Hazam also mentioned Legos as an example of a good

15    that comes with a warning not to be used by children under a

16    certain age.  That's because they are of a certain size that

17    children under a certain age might ingest them physically.

18        So all of these instances have no analogy to the case --

19    to this case that we're talking about here where the parental

20    controls at issue would be limiting access to information and

21    ideas through defendants' applications.

22        I also just want to correct a couple of points Ms. Hazam

23    made.  One is that the *Lemmon* case involved product liability

24    case.  It absolutely did not.  It was a pure negligence claim.

25    There was not a product liability claim ever raised.  And the

1    only issue that was addressed was Section 230.

2        The Ninth Circuit did not address whether that was a

3    product subject to product liability law.  And, in fact,

4    the -- that's why it wasn't briefed, because product liability

5    claims were not raised.

6        I also want to touch on Ms. Hazam's mentioning of the fact

7    that minors interact with these applications by touch, through

8    swiping, scrolling, et cetera.  The key is that they're not

9    alleging any harm from that touching or that swiping or that

10   scrolling.  They're not claiming that somehow the software

11   caused the phones to overheat and they burned their fingers on

12   the phone.

13       They're -- they're not alleging that by scrolling for so

14   long, somehow they suffered some kind of eye damage.  What

15   they are alleging is that because these applications were

16   designed to be so compelling to these users, that they looked

17   at the content, consumed the content, consumed the intangible

18   information and ideas for too long.

19           **THE COURT:**  How is the brain different from a finger?

20           **MS. SIMONSEN:**  Well, I think it's different from a

21   finger in this case because the harm is coming from alleged --

22   the alleged harmed.

23           **THE COURT:**  But the harm is to the brain.

24           **MS. SIMONSEN:**  But it is as a result of, according

25   the plaintiffs, being lured back to the applications time and

1    again by particular content.  Whether that's -- guess what

2    there's -- there's been a "like" by one of your friends on a

3    photo, or some -- that you posted, or, you know, some kind

4    of --

5            **THE COURT:**  But why isn't the injury to the brain a

6    physical -- and why isn't the brain's interaction with the

7    device physical?

8            **MS. SIMONSEN:**  Because it's in -- because it comes

9    from intangible information and ideas.  It is all effectuated

10   in this case -- all of the adding harm that they claim is

11   effectuated by looking at a phone and consuming information

12   and content.

13       And so in that way, we know it is off limits from the

14   standpoint of product liability law.  That's what the *Winter*

15   decision says and a long line of cases following *Winter* in

16   circumstances very, very analogous to those here, including

17   claims relating to an algorithm because -- and that's the

18   *Christie* case because an algorithm's information, guidance,

19   ideas, and recommendations are not tangible personal property.

20       The -- the same has been held with respect to Internet

21   sites in the *James vs. Meow Median* case where the claim was

22   that those sites were responsible for a minor's mental

23   distress.  And it's because the words and images purveyed were

24   not tangible.

25       The *Quinteros* case involved the mobile app that was

1   allegedly psychologically addictive and the court expressly

2   held that the product liabilities claims couldn't apply

3   because the app was not a product.

4           **THE COURT:**  All right.

5       Last word.

6           **MS. HAZAM:**  Thank you.

7       Just to briefly respond.  I think we have a fundamental

8   difference of understanding *Lemmon* and *Winter*.  The *Lemmon*

9   case --

10          **THE COURT:**  I don't need anything on *Lemmon* and

11  *Winter*.

12          **MS. HAZAM:**  Okay.

13      I would like to note that this idea that the product has

14  to cause harm through physical force is one that *Winter* itself

15  recognizes is not the case with the compass example that a --

16  specifically about it not exploding in your hand and instead

17  leading you off a cliff.

18      That would be similar to, as I said, the Nest thermostat.

19  If you set your Nest one night, and you go to sleep, and due

20  to a defect in the software, it makes your house a 110 degrees

21  and you have heat stroke, I don't think anyone would say you

22  don't have a product liability claim against Nest because it's

23  just the software and doesn't control the actual radiator in

24  your home.

25      The same applies in the *Brooks v. Lyft* case.  The Lyft

```
1    software is the app.  It's not the car.  The Lyft software is

2    what is alleged to be the source of the harm and the duty by

3    plaintiff in that case.

4        And then, finally, a number of the cases that Counsel

5    referred to, the Rogers case, the Quinteros case, the James v.

6    Meow Media, again, are very clear about the ideas being what

7    is targeted by the plaintiffs' claim.

8        I also would like to note that while the exercise of

9    analogies is -- is useful and required by the restatement, the

10   restatement itself acknowledges that the definition has to be

11   guided by policy factors as well and by technological change.

12       The Brooks case, I thought, put this well by saying, "the

13   definition of product should be fluid to accommodate

14   developments in technology and is not susceptible to a crabbed

15   definition.  Decisions regarding what constitutes a product

16   are reached in light of public policy behind the imposition of

17   strict product liability."

18       That echoes California case law going back to Justice

19   Traynor's concurring opinion in Escola v. Coca Cola.

20           THE COURT:  Okay.  We're going to move to duty.

21           MS. HAZAM:  Thank you, Your Honor.

22           THE COURT:  And -- and I have the Jennifer Scullion

23   and Geoff --

24               (Simultaneous colloquy.)

25           MS. SCULLION:  -- get some water.
```

```
 1              THE COURT:  Yes.

 2              MS. SCULLION:  Thank you.

 3              THE COURT:  Geoff break?

 4              MR. DRAKE:  Yes.

 5              MS. SCULLION:  Mr. break, water?

 6              MR. DRAKE:  Oh, yes --

 7              THE COURT:  So with respect to duty, I don't think

 8     it's a controversial proposition that product-based negligence

 9     claims require a product.  We just had argument on that.  So

10     for purposes of this portion, you need to assume that there is

11     a product.  If you don't assume that there is a product, you

12     can sit down.  All right?

13              MR. DRAKE:  I will so assume.

14              THE COURT:  Thank you.

15         All right.  So assuming that there is a product, I also

16     think it is not on an uncontrovertible proposition that, in

17     general, product makers owe duties relative to the

18     manufacturer and introduction of products into the stream of

19     commerce.  Right?  That's just the basic principle.

20              MS. SCULLION:  Correct.

21              THE COURT:  Agreed?

22              MS. SCULLION:  Yes.

23              THE COURT:  Agreed?

24              MR. DRAKE:  Yes.

25              THE COURT:  Okay.
```

1    So at least we're clear on that and we don't have to -- we

2    don't have to regurgitate any of that.

3    So what I'd like to hear argument on with respect to duty

4    is a duty to prevent harm from third parties.

5    Think the plaintiffs concede -- and there are two tests

6    for this -- special relationship and circumstances under which

7    a company creates a risk of harm by third parties to its

8    users.

9    I think the plaintiffs concede that there is no special

10   relationship, right?

11   **MS. SCULLION:**  Correct, Your Honor.

12   **THE COURT:**  So we're just proceeding under this issue

13   of whether the company creates the risk of harm.

14   Again, going to the restatement, the Restatement (Third)

15   creates a distinction between misfeasance and nonfeasance.

16   Are we still on the same page?

17   **MS. SCULLION:**  Yes, Your Honor.

18   **MR. DRAKE:**  Yes.  Understood.

19   **THE COURT:**  Okay.  So with respect to misfeasance,

20   there must be affirmative actions.

21   So to the plaintiffs, where and how do you specifically

22   allege that defendants affirmatively created a risk of harm to

23   the plaintiffs through their design choices?

24   **MS. SCULLION:**  Sure.

25   Your Honor, I was going to start actually with the

1    parental controls grouping that you looked at.  And there -- I

2    mean, with parental controls, as I think what you've alluded

3    to, what we're talking about is not parents needing to know

4    what their children with seeing or -- or hearing.  It's about

5    what their kids are doing with their time, where their

6    spending their time, how are they spending it, especially with

7    young children, who are they spending that time with.

8        The defendants made a product that we allege they targeted

9    to children, that they know children, including very young

10   children, are using regularly.

11       Defendants want to have it seemingly both ways,

12   disclaiming to have any special relationship to protect the

13   children.  But on the other hand, we've alleged that they've,

14   in fact, interfered with parents' ability to protect their

15   children.  That's who's left to protect the children.

16       They have placed the kids in a much worse off position by

17   launching them into the Wild West of -- of the online

18   environment with other adults, including predators.  So that's

19   number one.  They've placed the children at risk by

20   undermining parental controls, failing to give robust parental

21   controls.

22       In addition, again, our basic allegation is that these

23   products have been designed to addict children, to induce

24   compulsive behavior, compulsive use of the product.

25       The designs here are pushed -- are pushing kids

 1    intentionally to use the products more and more.  What does

 2    that include?  That includes trying to make as many

 3    connections as possible online, trying to have as much use of

 4    the product and as much engagement.

 5        So, for example, we've alleged with respect to Meta's,

 6    quote, "people you may know" recommendations, recommendations

 7    to users to connect with other users.  That's at Paragraph

 8    394.

 9        We have made allegations with respect to Snapchat's "quick

10    add" feature.  That is unsafe for children and remains unsafe

11    despite the changes that Snap says it has made to that

12    feature.  That's at Paragraph 530.

13            THE COURT:  And where is the -- where is the

14    affirmative allegations and conduct relative to criminal

15    behavior?

16            MS. SCULLION:  With respect to -- to sexual

17    predators?

18            THE COURT:  Any criminal behavior that is alleged,

19    so, yes.

20            MS. SCULLION:  So -- so we allege, for example, with

21    respect to Snapchat.  I have some examples here.  That by

22    encouraging kids to get these trophies and social rewards,

23    "Snap streaks," you're encouraging them to, in fact, connect

24    with more people.  And restatement tells us that you have

25    to -- when you're dealing with kids, you have to understand

1    that kids are going to act recklessly and carelessly.  And

2    that includes in this environment going ahead and adding

3    people who Snap has recommended to them but the child does not

4    actually know in real life.

5        Now Snap says --

6        **THE COURT:**  So you're saying that the recommendations

7    to adults, they should have known or they do know that -- that

8    those adults include adults with criminal intent.

9        **MS. SCULLION:**  That they know that includes sexual

10    predators, yes.  And they've had reports of sexual predation,

11    and there's -- these connections still occur.

12        And, again, it ties back to the design of the product,

13    again, intended to produce maximal engagement by kids, use it

14    morning, noon, and night.  Use it as much as possible with as

15    many people as possible.  And when you're dealing with kids,

16    that's going to include engaging in reckless -- reckless

17    connections with people who in the ordinary world we would

18    say, they are strangers.  They may have been recommended to

19    you on the app, but you don't actually know them in the real

20    world.  They're just strangers who are connected through the

21    app's algorithms.

22        **THE COURT:**  Does there have to be more?  I mean, that

23    is -- child goes -- you know, or young teens go to a movie

24    theater.  There could be sexual predators in the movie

25    theater.  How is the movie theater affirmatively acting to

1    engage those children with sexual predators?

2           MS. SCULLION:   So, again, I think the issue is has

3    this movie theater actually put the child at greater risk by

4    anything it has done.  And we say that they have done that

5    here.  And, again, I start with the undermining of parental

6    controls.

7        We have a situation where they know young kids are

8    encouraged to and do create fake accounts that parents can't

9    see.  Parents can't know who their children are dealing with

10   online.  That puts children at risk 'cause parents are the

11   first line of defense in most cases to prevent their kids from

12   engaging in risky behavior.

13       So they've already undermined that affirmatively.  They've

14   made it easy for kids to evade the parental controls.  They've

15   encouraged kids to engage in reckless activity.

16       Second, again, are these connection recommendations.  Now,

17   Snapchat has said that it has recently changed how it does

18   connections.  We still say it's -- it's -- puts kids at risk.

19       But the important thing is that it recognizes that it

20   could, in fact, age-gate, if you will, how recommendations

21   work so that recommendations will work differently for

22   children than for adults.

23       And -- and so it -- that they have -- by using these

24   recommendation features, we think that they've put children at

25   risk.

1          In addition, we've highlighted with respect to Snapchat,

2     for example, the ephemeral disappearing messages.  Again, for

3     young children, foreseeably encourage kids to send risky,

4     sexual messages.  And, again, that they have encouraged that

5     activity through the overall design of the app.

6          And my colleague has helpfully pointed out that at master

7     complaint Paragraph 155 we cite to a -- a study, the Thorn

8     study, that made several key findings about the -- the

9     prevalence of sexually exploitation on the defendants'

10    platforms.

11              **THE COURT:**  And what was the date of the study?

12              **MS. SCULLION:**  I will get it.  Hold on one second.

13              **THE COURT:**  All right.  While you're doing that, a

14    response.

15              **MR. DRAKE:**  Thank you, Your Honor.

16         While I'll accept that the basis of the -- of the

17    question, Your Honor, to assume for purposes of the argument

18    that this is a product, it doesn't necessarily negate the

19    volume of case law that has addressed the duty question in the

20    context of online platforms.

21         And I think it's telling that in Ms. Scullion's remarks,

22    she didn't cite to any cases that have looked to the very

23    specific design features that she's citing and faulting us for

24    in the complaint and like -- linked it up to a case that has

25    found that a duty in that context exists and has been

1    applied -- not just to products generally but to the type of

2    products, which I'll use that term for purposes of this

3    argument, that we're talking about in these particular cases.

4         And I think we can go through each of the different groups

5    that Your Honor has lumped the allegations or divided and

6    categorized the allegations into and look at specific cases

7    that have found in each of those contexts there to be no duty.

8         For a whole host of -- of different reasons, some of the

9    reasons that Your Honor articulated.  Some of the reasons

10   being third-party harm for which there's no duty.  Some public

11   policy reasons.  Some issues regarding foreseeability and --

12   issues with the allegations there.

13        But just to start and address the specific allegations

14   that Ms. Scullion cited, we can start with Group 1 and group

15   2 of -- of the allegations, the age verification, the parental

16   controls, the access controls.

17        And I think there's cases that are exactly or -- or very

18   much on point and very instructive.  One, for example, Your

19   Honor, is the *Doe v. MySpace* case from the Western District of

20   Texas.  The Court there found no duty to protect minors from

21   sexual predators on the platform, even though there were

22   allegations that the platform was designed in a way to make it

23   easier or to enhance the connections between these two

24   categories of individuals.

25             **THE COURT:**  So most of the cases that you've cited to

1    me are website and online service cases generally.  My

2    question is specific to products.  And they're analyzed

3    separately.

4            **MR. DRAKE:**  They --

5            **THE COURT:**  Do you have any thoughts on that?

6            **MR. DRAKE:**  I do, Your Honor, because I think -- I

7    think the point is even if these services are considered to be

8    products, the reasoning and the discussion in the case law

9    that addresses whether there's a duty for a negligence claim

10   in the context of an online platform is very instructive, and

11   it's one of the most instructive sources that we can look at

12   to determine whether or not a duty should exist in this

13   context, whether you call them products or not products.

14       I don't think the decision, for example, in the *MySpace*

15   case that I just cited -- it doesn't turn on whether or not

16   the service was a product.  It doesn't really address that

17   issue at all.

18       It turns on whether or not an allegation that the design

19   of a platform made it easier for a sexual predator to get at a

20   minor was sufficient to plead an applicable, cognizable duty

21   under, in that case, I believe, Texas law.  And the Court

22   found it did not.  There is no duty in that situation to

23   prevent and to design the platform in a way that would protect

24   minors on the platform from a sexual predator.

25       The same reasoning applies in the *Craig's List* case out of

1    the Western District of Washington.  That case involved a

2    negligence claim that involved very similar -- very similar

3    allegations that -- very horrific allegations linking up sex

4    trafficking forum on the website to individuals.

5         THE COURT:  If your client has knowledge that the

6    manner in which the product is designed encourages sexual

7    predators to communicate with kids, how is there not a duty

8    under that hypothetical?

9         MR. DRAKE:  Well, there's no duty because, first of

10   all, there's a third-party intervening, so that's come up

11   repeatedly in the case law, whether the *Craig's List* case, the

12   *MySpace* case, or various other cases.

13       Number two, it's not -- even though a site -- evidence

14   could be cited, for example -- this happened in the *Jackson v.*

15   *Airbnb* case.  There the plaintiff went out of their way to try

16   to cite instances in which violent crimes had happened at

17   Airbnb's to put the plaintiff -- or the defendant in that

18   case, rather, Airbnb, on notice that those kind of events

19   occur at those kind of rental properties and that the app was

20   inadequately designed to be able to prevent those occurrences

21   from occurring.

22       THE COURT:  I don't think in that case that the Court

23   found a product.

24       MR. DRAKE:  No, I don't believe that was addressed in

25   the aspect of the case, Your Honor.

1              THE COURT:  Okay.

2         MR. DRAKE:  So I think -- I think the -- the point I

3    was trying to make with citing some of the case law as I

4    was -- I think we have to try to look at what case law is most

5    analogous.  And if point I was making was some of the cases

6    that address whether a duty exists with the type of

7    allegations that we're here talking about don't depend on

8    whether or not the service is a product or not a product.

9         And one can assume even that -- that it is a product.

10   Even then, I think there's a significant foreseeability

11   problem that underscores much of the case law that would apply

12   with equal force to address many of the allegations, undercut

13   them, and -- and lead the court to find no duty.

14        As the court -- the Supreme Court discussed this very

15   issue, I think, Your Honor, in the *Taamneh* case describing the

16   relationship between the users of a platform and the platform

17   manufacturer as being at arm's length.

18        And in that case, it dealt with the defendants allegedly

19   being culpable in associating and connecting bad actors with

20   the users of the platform.

21        But on -- more broadly on the foreseeability question, I

22   think the big difference when dealing with this type of,

23   quote, unquote, product is that it -- the interactions between

24   the individual and the product as it's designed is much more

25   attenuated and different, such that the foreseeability chain

1    that underscores a lot of the duty law does not exist.

2        For example, the defendants in these cases developed these

3    platforms where users can upload voluminous -- billions of

4    different types of various types of content.  All the users

5    then interact with that content in a bespoke, unique,

6    different way that is unpredictable at the outset.

7        That variable experience, in turn, can cause, according to

8    the plaintiffs' allegations, a small number of individuals of

9    the billions of people who these platforms to experience some

10   differing array of injuries.

11       And that already attenuated chain is further broken in

12   the -- in the context in which you asked the question when a

13   third party is involved and is involved in injuring the

14   plaintiffs.

15       I can't think of a case standing here, Your Honor, that on

16   that set of factual allegations, whether it involves a car and

17   more traditional type of product that we're used to, or an

18   online platform or website, even if deemed to be a product,

19   that has found a duty.

20           **THE COURT:**  Response.

21           **MS. SCULLION:**  Your Honor, first of all, the Thorn

22   study was from 2021.  And among other things, it did note that

23   recidivism, with respect to the prevalence against sexual

24   exploitation on defendants' platforms is a problem, that over

25   half of the participants who had blocked or reported someone

```
 1   say they were recontacted online and that younger boys were
 2   particularly at risk.
 3        Your Honor, I do want to respond on -- on Doe V MySpace.
 4   That case really proceeded on essentially a premises
 5   liability -- analogy to a premises liability.  And there was a
 6   finding that there was no special relationship.
 7        Again, we're not talking about premises liability or
 8   special relationship.  We've alleged that the designs of these
 9   platforms put kids at greater risk.
10        Your Honor, in terms of product cases that have examined
11   this question of foreseeability of actions by -- by third
12   parties, the Brooks case, where it was entirely foreseeable
13   that through the way that the app was designed, that there
14   would be distracted driving.  There was duty.
15        Maynard, also said, with respect to distracted driving,
16   there from --
17             THE COURT:  What about third parties?
18             MS. SCULLION:  I'm sorry?
19             THE COURT:  I said, what about third parties?  Is
20   it --
21             MS. SCULLION:  Sure.
22             THE COURT:  Is there a distinction, one -- and I
23   think there is with respect to third parties, not just general
24   foreseeability; and, two, criminal activity in particular?
25             MS. SCULLION:  So, Your Honor, the reason I was -- I
```

1   was citing to -- so *Brooks Maynard*, *Lemmon* as well, is there,

2   you had reckless driving that, in fact, wound up killing and

3   injuring folks.  That is criminal behavior.  It was

4   foreseeable, and it was in fact induced by the designs of the

5   apps there.

6       And still there was a duty.  And in those cases, it's

7   important to understand, a duty not just to the users of the

8   app, is what we're talking about here, a duty to the users.

9       In those cases, the duty was actually to nonusers, so my

10  colleague has referenced the idea of this being sort of an

11  attenuated circumstance.  Not at all.

12      These are there -- these kids are the kids they targeted.

13  These kids are their direct consumers.  These are the kids

14  that they are, in fact, directly communicating with morning,

15  noon, and night through notifications, nudges, suggestions to

16  use the app.

17      These are kids whose data they're monitoring their every

18  move while they're on this the app so the defendants can, in

19  fact, monetize that data.  This is an incredibly direct

20  relationship, and the injuries to the children are direct.

21      And, Your Honor, you've sort of cap- -- captioned this

22  whole proceeding is about, you know, all or nothing.  And that

23  is one of the most striking things about defendants' position

24  here, is they have taken the extreme position that they owe

25  these children no duty at all, merely because they are an

```
 1        online business, and because they are large.

 2            Your Honor, case after case has said, online businesses,

 3        in fact owe duties to their customers.  We see that in the two

 4        Facebook decisions from this -- from this district, again, as

 5        well as cases like Maynard, Lemmon, Brooks, online businesses

 6        owe duties of care.

 7            And in fact, the fact --

 8                THE COURT:  Well, let me ask this.

 9                MS. SCULLION:  Go ahead.

10                THE COURT:  -- to Mr. --

11                MS. SCULLION:  Drake.

12                THE COURT:  So is that the position that you're

13        attempting to take, that you owe no duty?

14                MR. DRAKE:  No.  That's not the --

15                THE COURT:  All right.  So what --

16                        (Simultaneous colloquy.)

17                MR. DRAKE:  -- wouldn't articulate it that way, Your

18        Honor.

19                THE COURT:  So what duty do you owe?  What duty do

20        you owe to these children?

21                MR. DRAKE:  Well, I think that's a -- an amorphous

22        question that's hard to answer --

23                        (Simultaneous colloquy.)

24                THE COURT:  -- best you can.

25                MR. DRAKE:  Well --
```

1          **THE COURT:**  Do the best you can.  You're a --

2          **MR. DRAKE:**  I think --

3          **THE COURT:**  -- collectively represent billion-dollar

4     companies.

5        What duty do owe to these adolescents?

6          **MR. DRAKE:**  Well, I'm not sure that I know what duty

7     the companies would owe based on any case that I been able to

8     find to be able to articulate a duty for Your Honor today and

9     I think that's part of the problem that we're struggling

10    with --

11         **THE COURT:**  That is part of the problem.  That is

12    part of the problem, that you seem to suggest you have no

13    duty.

14         **MR. DRAKE:**  Well, we're suggesting that we have no

15    cognizable, recognized duty under the laws of the 49 states

16    that -- that are mostly at issue here -- I guess could we

17    could say all 50 states if -- if we want -- that has looked at

18    this exact set of allegations.  The plaintiffs had the burden

19    to plead that duty under Rule 88 --

20         **THE COURT:**  And you had a duty bringing a motion to

21    dismiss to say that nothing is there and -- and you get to be

22    scot-free.

23         **MR. DRAKE:**  Well, we -- what we've articulated in our

24    motion, Your Honor, is that a general duty to design a

25    platform in a safe way is no --

1              THE COURT:  So you don't -- you don't have a duty

2     to --

3              MR. DRAKE:  Not as articulated.

4              THE COURT:  -- to design a platform in a safe way.

5     That's what you want -- that's what you want to argue.

6              MR. DRAKE:  Well, what I'm arguing --

7              THE COURT:  Yes or no?  Yes or no?

8              MR. DRAKE:  Well, yes, I do want to argue that, Your

9     Honor.

10             THE COURT:  That you have -- let me write it down.

11    No duty to design a platform in a safe way.  That's what you

12    said.

13             MR. DRAKE:  That duty does not exist under the law.

14    It has not been articulated by any of the cases that we've

15    looked at, that we've cited at length in our brief.  The

16    courts have repeatedly looked at this issue in a whole host of

17    different contexts, whether traditional media or modern media

18    or social media.

19        And the courts have found that pleading a one-sentence

20    duty that says you have a duty to design your platform in a

21    safe way is not a cognizable duty.  It does not satisfy the

22    burden to plead a duty under Rule 8.

23        And it has been repeatedly rejected by numerous courts in

24    the context specifically of online platforms and for reasons,

25    many of which Mr. Willen articulated earlier, which is that to

```
 1    recognize such a duty as articulated would stifle free
 2    expression.  And that is a significant policy objective that
 3    courts have repeatedly recognized.  And that allegations like
 4    those in the complaint here do not satisfy the foreseeability
 5    standard that courts have also articulated --
 6              THE COURT:  Any response?
 7                   (Simultaneous colloquy.)
 8              MR. DRAKE:  -- recognizes it underpinning --
 9              MS. SCULLION:  Yes, Your Honor.  As Your Honor's
10    picked up on, they -- they do, in fact, allege -- and this is
11    motion to dismiss at page 28.  They say, "no state has
12    recognized any duty of an online service to its customers."
13    It's flat.  It's extreme.  It's not supported by the law.
14        And -- and I've already talked about the various cases,
15    including in this district, that have found duties of care
16    owed to the customers of online service -- online --
17                   (Simultaneous colloquy.)
18              THE COURT:  Could I have my state AG reps --
19        Well, actually, I will get to you.
20        I'm curious to know whether the 40 state attorney generals
21    are going to agree with you, that your clients have no duty to
22    design a platform in a safe way.
23              MR. DRAKE:  Well, if I could just -- just to add one
24    more point to that, Your Honor.  I was speaking in the context
25    of tort and negligence liability and duty.
```

```
 1              THE COURT:  Okay.
 2              MR. DRAKE:  Not in the context of perhaps federal
 3    statutes whether COPPA or PROTECT or other statutes that might
 4    exist, but in the context of common law --
 5              THE COURT:  In the context of the law that we
 6    generally deal with in these kinds of things.
 7         All right.  We're moving on.  Causation.
 8              MS. SCULLION:  Thank you, Your Honor.
 9              THE COURT:  Okay.  So my notes with respect to
10    causation, I have Ms. Hazam back and Mr. Blavin.
11              MR. BLAVIN:  Correct.  Mr. Blavin.
12              THE COURT:  Blavin?
13              MR. BLAVIN:  Yes.  Thank you, Your Honor.
14              THE COURT:  Well, at least I didn't call you
15    "Mr. Jonathan."
16              MR. BLAVIN:  That would have been fine, too.
17              THE COURT:  I had a classmate in college, and we
18    called him "the guy with two last names."  Sorry about that.
19         Okay.  Causation.  Everybody has agreed -- I think we've
20    heard repeatedly today that we aren't dealing with but-for
21    causation, right?
22              MS. HAZAM:  Correct, Your Honor.
23              THE COURT:  Correct?
24              MR. BLAVIN:  Correct, Your Honor.
25              THE COURT:  Okay.
```

1    So the real question is here about proximate cause.    And

2    let me say this on the outset.

3    As I said at the beginning, I don't -- I'll go back and

4    consider, right?    That's why we have oral argument.

5    But I did not walk into this courtroom thinking that this

6    was an "all or nothing" proposition, that it was incumbent

7    upon the Court given the perspectives of the parties, as is

8    often the case, to figure out what is appropriate and what

9    isn't under the framework as provided by the law.    And so

10   that's what I've been attempting to do.

11   In that regard, causation to me is -- is -- is a two-step

12   process.    That is, generally speaking -- and we're talking

13   about general causation -- I think that there's plenty of

14   allegations in the complaint, assuming the accuracy of the

15   allegations, that general causation exists.

16   If I narrow the claims to functionality that I think is

17   appropriate under the -- the metrics that we've been

18   discussing all day, then I do believe at some point the

19   plaintiffs are going to have to indicate in their complaints

20   individually how any of their damage is caused by what's

21   allowed to proceed.

22   So I don't reach that issue and I won't reach that issue.

23   And I -- I know that the defendants have made a -- a big deal

24   of that argument, that they have a right to test causation

25   and -- and they do, but so that we aren't wasting time, I do

1    want you to understand that that is kind of a further step.

2        When the -- when the defendants came in here in the first

3    instance, as you know, you all said, I have -- we have the --

4    and I grew up in Texas -- we have the silver bullet.  The

5    whole thing's thrown out because of Section 230.  It's all

6    thrown out.  It's all thrown out.

7        So there's no point, in my view, in having plaintiffs spin

8    their wheels if the entire thing is thrown out.  It's not

9    clear to me that the entire thing is thrown out, in which

10   case, once the order issues, the -- the plaintiffs are then

11   going to have to assess, can you articulate causation

12   individually given what's allowed to proceed.

13       So I say that as an overview because I don't think today

14   as we -- as you stand here and I sit here, that I can -- you

15   know, that I can resolve all causation issues.

16       So that's my opening.

17       You can proceed.  It's your motion.

18       **MR. BLAVIN:**  Thank you, Your Honor.  And it's

19   incredibly helpful to hear.

20       As Your Honor's aware, we've made that broader causation

21   argument, which I completely understand Your Honor's points.

22   I may touch on that briefly, but I'll put that to the side.

23       We've also made a causation argument focused specifically

24   on the issue dovetailing with the duty section relating to

25   harms that are caused by third parties, so I would like to

1    focus on that.  I think that ties into a particular set of

2    features and functionalities which are challenged in the

3    master complaint.

4        And this is a narrow argument, which I -- we would submit

5    it's clear based upon the allegations of the complaint under

6    the governing precedent that they have not sufficiently

7    alleged causation.

8        Now, these are the --

9            **THE COURT:**  I'll stop you right there, and that's

10   helpful.

11       The plaintiffs have alleged that the test for causation

12   with respect to third-party misconduct is reasonable

13   foreseeability.

14       Do you agree with that test, yes or no?

15           **MR. BLAVIN:**  If you look at the cases, Your Honor,

16   that have addressed this, they have said general

17   foreseeability that there may be third-party harm is not

18   sufficient to establish proximate causation.  That's --

19           **THE COURT:**  So is your answer "yes" or "no"?

20           **MR. BLAVIN:**  As to general foreseeability of some

21   harm, the answer is no, that is not sufficient to establish --

22           **THE COURT:**  Then what is the test?

23           **MR. BLAVIN:**  The test is you need to show that

24   defendants played a substantial factor in demonstrating the

25   specific types of harm.  Now foreseeability ties into that to

1  the extent there was knowledge that you knew of a specific bad

2  actor using your platform and you somehow played a role --

3      **THE COURT:**  Slow down.

4      **MR. BLAVIN:**  Thank you, Your Honor.

5    -- you somehow played a role that did more than simply

6  providing that potentially bad actor with tools,

7  functionalities, which, again, generally apply across the

8  entire platform.

9      There's billions of users on these platforms.  And what

10  the Supreme Court, for example, in the *Taamneh* case made

11  clear -- and, again, that case dealt with provision of

12  accounts to terrorists.  It dealt with messaging and

13  networking functionality, a algorithmic matching and

14  terrorists to one another and to content -- the Court made

15  clear that the mere creation of social media platforms is

16  insufficient to establish liability for that, even where --

17  and the court made this clear -- even where the wrongdoers

18  were using the services, the companies knew this, and they

19  failed to stop them.

20      The Supreme Court surveyed state tort law across the

21  country in that case and said that holding platforms liable

22  for failing to prevent third-party misuse would, quote, run

23  roughshod over the typical limits of tort liability.

24      And *Crosby vs. Twitter* case -- this is from the Sixth

25  Circuit -- again, similar allegations that the defendants

1    provided platforms to ISIS.  ISIS used those platforms to post

2    graphic and threatening content and to connect and reconnect

3    with terrorists.

4        The court dismissed -- the Sixth Circuit upheld the

5    dismissal of the negligence claims under state law for an

6    absence of proximate causation.  The Court specifically noted

7    on Your Honor's question, is general foreseeability enough,

8    "We expect defendants' websites to cause some ripples of harm

9    that would flow far beyond the defendants' misconduct, but

10   defendants do not proximately cause all of those potential

11   ripples."

12       And the Court specifically analyzed substantial factor --

13           **THE COURT:**  With respect to products -- product

14   defect cases, do you have any product defect cases as opposed

15   to negligence cases that discuss a test other than reasonable

16   foreseeability?

17           **MR. BLAVIN:**  Well, again, I would say that the -- the

18   question of proximate causation I think in the Twitter vs. --

19   the *Crosby vs. Twitter* case --

20           **THE COURT:**  *Crosby* vs. Twitter was negligence.

21           **MR. BLAVIN:**  Proximate causation, I think the

22   *Modisette vs. Apple* case dealt with product liability claims

23   there.  That was a case, again, in which a user was misusing

24   FaceTime while driving.  It was a California Court of Appeal

25   case.  The Court --

1    **THE COURT:**  Well, again, that wasn't a products

2    liability case.

3    **MR. BLAVIN:**  I believe, Your Honor, there were

4    product claims in that case in addition to negligence claims.

5    But the Court specifically noted that it was foreseeable

6    to Apple that there would be some general misuse of FaceTime

7    while driving.  In fact, Apple had applied for a patent

8    application to prevent FaceTime to be used while driving, so

9    foreseeability was assumed by the Court of Appeal.  And the

10   Court said, that doesn't establish proximate causation under

11   California law.

12   And the plaintiffs there very similarly alleged that Apple

13   failed to implement a safer alternative design that would

14   have, quote, prevented drivers from utilizing FaceTime while

15   driving.  And this is the person using FaceTime while driving

16   caused an accident, so it was a -- it was related to

17   third-party harm.

18   Again, in the *Crosby* case, the allegations [sic] was that

19   Twitter should have created a content-neutral algorithm to

20   prevent ISIS from --

21   **THE COURT:**  Okay.  Okay.  Stop talking about *Crosby*

22   because it's not a products case.  It's a negligence case.

23   **MR. BLAVIN:**  Well, Your Honor, they haven't

24   articulated a different proximate causation standard with

25   respect to third-party harm between negligence and -- and

1    product liability cases.

2              **THE COURT:**  They --

3              **MR. BLAVIN:**  I don't think there is one.

4              **THE COURT:**  All right.

5        Let's -- let's focus on the test.  Reasonable

6    foreseeability is what I understand the plaintiffs' test to

7    be.

8              **MS. HAZAM:**  Yes, Your Honor.

9        We believe that the test is the test whether there's

10   third-party misconduct involved or not.  It remains one of

11   reasonable foreseeability and, where applicable under state

12   law, substantial factor causation.

13       There can, of course, be more than one proximate cause in

14   any given case and the case law and the Restatement (Third) of

15   torts made clear that even criminal behavior can be reasonably

16   foreseeable in some circumstances as plaintiffs have alleged

17   is the case here.

18       Cases that have found that are cited in the papers

19   including -- include the *Juul* case, the *City of Everett*

20   opioids case, and the *Ileto* case.

21       The restatement says the conduct of a defendant can lack

22   reasonable care insofar as it foreseeably combines with or

23   permits the improper conduct of the third party.  So that's

24   the restatement's statement of the test, which plaintiffs

25   agree with.

1          And they do -- we do not believe that there are additional

2     heightened standards along the lines of what Mr. Blavin is

3     arguing.

4          Plaintiffs have alleged here that defendants' platforms

5     have features that foreseeably and substantially contributed

6     to harms to plaintiffs including CSAM harms.  And those

7     functionalities include recommending adult connections to

8     minors, as with the case in the *Omegle* case, geo-location of

9     minors, making profiles of minors public and inadequate age

10    and parental controls.

11         Plaintiffs do not believe that defendants' cases suggest

12    otherwise.  They do not suggest any blanket immunity or

13    exception for social media apps as defendants have suggested.

14    The cases simply don't stand for that.

15         In addition to the distinction that Your Honor has

16    mentioned with regards to product liability and negligence,

17    the *Crosby*, *Fields*, *Gonzalez*, and *Taamneh* cases were all

18    Anti-terrorism Act cases in which the plaintiff alleged no

19    facts connecting the alleged use of the platform of attacks,

20    no evidence of viewing the videos or of planning the attacks

21    on them.

22         Another case cited by defendants, *A.B. vs. Salesforce*, in

23    that case, the defendant, Salesforce, did not design or

24    sanitize the ads on the back-page platform the plaintiffs

25    argued caused the harm.  They were only involved in financing,

1    which was simply too remote.

2        And, in fact, *Lemmon*, *Maynard*, and *Brooks*, as my colleague

3    Ms. Scullion mentioned, did allow claims to proceed against an

4    app despite intervening tortious conduct but the drivers.

5        Finally the *Modisette* case, which was the primary case

6    that Judge Kuhl applied in issuing her opinion in the JCCP

7    proceedings parallel to these, in that case, the plaintiff was

8    not actually using FaceTime.  The application at issue --

9    while all of our plaintiffs are all users of the defendants'

10    products, essentially that case found that Apple did not owe a

11    duty to protect non-FaceTime users from the possibility that

12    someone using FaceTime would drive distractedly.

13        Here, all plaintiffs were users of the defendant's apps,

14    as were all the third parties involved in the harm.

15            **THE COURT:**  Well, and as I recall that case, the use

16    wasn't as the intended use.  And here, the allegations are the

17    use is as the intended use.

18            **MS. HAZAM:**  That's correct, Your Honor.

19            **THE COURT:**  All right.

20            **MS. HAZAM:**  To the extent there is a close question

21    here about the role of third parties' wrongful conduct and

22    whether they break the chain of causation, that should be a

23    question for the jury according the case law, including the

24    *Barnard* case and *Torres* case.

25            **THE COURT:**  Well, that's usually a fact question.

1          **MR. BLAVIN:**  Your Honor, if I may respond to some of

2     that?

3          **THE COURT:**  You may.

4          **MR. BLAVIN:**  Thank you, Your Honor.

5       First, all of these cases were decided on the pleadings

6     when you have these third parties engaged in criminal

7     misconduct on the platforms.

8       They weren't fact questions.  They weren't summary

9     judgments.  The courts -- and including the *Taamneh* case that

10    went up to the Supreme Court.  They were all resolved on the

11    pleadings.

12      And what these cases effectively focus upon the fact that

13    that there's no distinction between facilitation, which

14    they've alleged, and an absence of causation.  Facilitation

15    does not equate to causation.

16      And here, there's no significantly [sic] distinction

17    between plaintiffs' argument, for example, the master

18    complaint, paragraph 164, that, quote, "predators used

19    defendants apps to recruit and sexually exploit children," and

20    the plaintiffs' arguments in *Taamneh*, *Crosby*, and *Fields* that

21    these services help terrorists recruit new members and plan

22    attacks.

23      And I want to push back on one statement that Counsel

24    said, that this is somehow intentional.  There's zero

25    allegations, Your Honor, in the complaint that defendants

1    intentionally design their products to facilitate third-party

2    criminal conduct.

3        In fact, the terms of service explicitly prohibit this.

4    They don't point to a single allegation in the complaint that

5    defendants knew that a particular person was misusing the

6    services and failed to take action.  And that's exactly what

7    the Supreme Court said, that when you have general knowledge

8    of wrongdoing, that is not sufficient to create a duty under

9    state tort law or to establish causation.

10           THE COURT:  I'd like a response on that.

11           MS. HAZAM:  Yes, Your Honor.  First, on the *Crosby*

12    and *Fields* case point --

13           THE COURT:  No, no.  I'm talking about the

14    intentional design.

15           MS. HAZAM:  Sure.

16        The point I think arose out of an argument that the terms

17    of service are being violated here.  Courts have found that

18    that is not an obstacle to demonstrating causation in cases

19    like this --

20           THE COURT:  Where is your allegation of intentional

21    design to facilitate wrongdoing or knowledge of wrongdoing?

22           MS. HAZAM:  We do have allegations of wrongdoing in

23    the sense of allegations of predators being on these apps and

24    the defendants being aware of that.

25        And certainly I don't think they would -- well, I don't

1    want to speak for them, but they report that, so there is

2    awareness there.

3        **THE COURT:**  Okay.

4        **MR. BLAVIN:**  Your Honor, that is the same general

5    awareness that *Taamneh*, *Crosby*, *Fields* held is insufficient.

6    And just briefly, Your Honor, the *LW vs. Snap* case dealt with

7    these specific allegations that somehow Snap should be subject

8    to liability because it failed to design its platform in a way

9    to present this third-party misuse.  They challenged "Quick

10   Add," friend recommendations, which are challenged here.  They

11   had challenged ephemeral content, and the Court's analysis, it

12   deals with 230.  The Court said Section 230 bars these claims,

13   and I would --

14       **THE COURT:**  We're past 230 --

15                       (Simultaneous colloquy.)

16       **MR. BLAVIN:**  -- ties into this question of who is the

17   ultimate wrongdoer and can you hold the platform liable for

18   third-party conduct?

19       **THE COURT:**  All right.

20       **MS. HAZAM:**  Your Honor, if I may respond just very

21   briefly.  Because we keep coming back to these antiterrorism

22   cases, I just want to make the point that in those cases,

23   there was no allegation that there was actual planning of the

24   attack tied to the injury that took place on the platforms.

25       That's distinct from here, where the plaintiffs allege

1    that the -- that the platforms' design themselves is linked to

2    their injuries.

3        I also just want to note that with regards to the *LW v.*

4    *Snap*, that was not a causation-based decision.  It is a

5    decision about Section 230.  It does not reach a ruling on

6    causation.

7            **THE COURT:**  All right.

8        Failure to warn.

9            **MS. HAZAM:**  I'm sorry, Your Honor.  Did you -- do you

10   mean to call negligence per se?

11           **THE COURT:**  I thought --

12       Okay.  Yes, go ahead.

13           **MS. HAZAM:**  Thank you.

14           **THE COURT:**  Okay.

15       So now I have -- is it Mr. Donahue?

16           **MR. DONAHUE:**  Yes.

17           **THE COURT:**  Okay.  And let's see --

18           **MR. MURA:**  Andre Mura, Your Honor.

19           **THE COURT:**  I was looking for your card.

20       How do I spell that?

21           **MR. MURA:**  M-U-R-A.

22           **THE COURT:**  Okay.  Great.

23       I feel like with negligence per se, you all ran out of

24   space.  I -- you know, again, I -- in many ways, you seem to

25   talk past each other.

 1      There is a focus on two statutes in Oregon and yet, you
 2  know, there's no agreement on the few cases that exist in
 3  terms of --
 4      Anyway, I -- I'm not sure I'm going to get to negligence
 5  per se in this order.  I think I might end up having to
 6  require additional briefing given the gaps that I think exist.
 7      But I'll give you some time, so go ahead.
 8          MR. DONAHUE:  Thank you, Your Honor.
 9      And we'd be happy to submit additional briefing if Your
10  Honor would like it.
11      We do think that there is a global issue with plaintiffs'
12  claims generally as a matter of state tort law.  While states
13  have different specific rules regarding what kind of a statute
14  can give rise to a claim for negligence per se -- and I think
15  we do -- we outline quite a bit of that in the appendix
16  section of our brief -- every state agrees that there are
17  limit --
18          THE COURT:  And you understand that you both cite the
19  same cases and there's no discussion, right, so --
20          MR. DONAHUE:  Well, we agree, Your Honor.  And many
21  cases I think -- we are pointing to specific doctrines, which
22  plaintiffs then point to the case to talk about something
23  different but they don't address, for instance, the fact that
24  some states require preexisting common-law duties.
25      So we'll point to a case that says, in Texas, for

1    instance, you must have a preexisting common-law duty before a

2    negligence per se claim can supply a standard of care from a

3    legislative enactment.  And so pointing to that case to say

4    that Texas recognizes negligence per se claim based on a

5    legislative enactment is not necessarily responsive.

6        And I mean, this is something, obviously, we can address

7    in supplemental briefing.  Our space was somewhat limited.  I

8    think we tried to do what we could with this issue in the

9    appendix.

10       But just one global issue to be clear is plaintiffs --

11   there's -- there's nowhere do I see them laying out the work

12   explaining top to bottom how this claim would be viable in any

13   state.

14       The -- the best they do is try the claim that there are

15   states in which a claim is not necessarily blocked by one of

16   the per se rules we cite, like, for instance, the necessity

17   for a common-law duty.

18           **THE COURT:**  Do you agree that some of the claim -- or

19   some of the states categorically foreclose negligence per se?

20           **MR. MURA:**  We did identify some states that would not

21   allow a standalone cause of action for negligence per se.

22       In some of those states, negligence -- the evidence can be

23   used to support negligence.

24           **THE COURT:**  Right.

25           **MR. MURA:**  And so in these instances, we tried to

1    identify those states.

2        But we also disagree with some of these barriers that --

3    that defendants are -- are characterizing.  I'll respond to

4    the one that was just made.

5        It's quite common under the law that federal statutes are

6    given negligence per se effect even if the federal law is not

7    privately enforceable.

8        One of the sort of rules that defendants distilled for

9    some states, not all states, but they said that there has to

10   be a common-law antecedent, so you have to point to something

11   in the common law that imposes the same thing that mirrors the

12   statute, the same duty.

13       So, for example, they said there has to be a common-law

14   duty to report CSAM to a federally established nonprofit.  But

15   that's not the law.  The restatement makes plain that

16   negligence per se is not intended simply to duplicate the

17   common law.  If it were, negligence per se would be entirely

18   redundant and serve no function.

19       It's simply the formulation of a duty with respect to what

20   the legislature is -- is establishing for a standard of care.

21   And courts as a matter of the common law will look and defer

22   to statutes in terms of deciding that standard of care and the

23   duty and that's very well established in the law.

24       So happy to continue to brief negligence per se.  I do

25   think we sort of ran out of space and were trying to do this

1    in a table format, which can be difficult.

2        I know other MDL judges have allowed negligence per se to

3    remain in the master complaint and then dealt with negligence

4    per se at the summary judgment stage when it is raised for --

5            **THE COURT:**  Say that again?

6            **MR. MURA:**  In some --

7            **THE COURT:**  The MDL judges have or have not?

8            **MR. MURA:**  Have.

9        So, for example, in the -- in the 3M MDL, it was at the

10   summary judgment stage that Judge Rogers considered both

11   choice of law and those individual questions because you could

12   sort of see how for different plaintiffs, it might not be

13   clear even what their choice of law might be, so defendants

14   might be saying it's one law, we might be saying it's another,

15   and that might have an impact on whether negligence per se

16   exists at all.

17       And so for economy purposes, some courts have allowed

18   negligence per se in the master complaint, serves an

19   administrative function where defendants can learn which

20   plaintiffs are actually relying on violations of the PROTECT

21   Act here or COPPA to know that those claims are being alleged.

22       They'll -- those claims will be developed, and then those

23   claims could be litigated at the summary judgment stage or if

24   the court could hear individual states, the court wouldn't

25   need to rule and provide sort of a treatise on 50 states' law

1    for negligence per se.

2        **THE COURT:**  Yeah, I can tell you I'm not interested

3    in providing a treatise on 50 states' law, but -- I mean, the

4    I've written long orders, but, you know, I've got a few other

5    orders to get out.

6        **MR. DONAHUE:**  We understand that, Your Honor.  And as

7    I've -- I don't know that plaintiffs have shown that there is

8    any state in which this claim would be viable as a negligent

9    per se claim, so I don't know that we need -- I don't know

10   that we need to brief 50 states to reach that conclusion.

11       But what we were just discussing about the individual

12   plaintiffs does bring up another global issue that we talked

13   about.  And, again, as Your Honor's aware, we were a little

14   pressed for space.  But at the end of our brief where we

15   discuss -- there is a standing issue with these claims here

16   because plaintiffs' allegation -- if you look at them, it's

17   really about how defendants run their services.

18       There's no allegation, for instance, that any particular

19   plaintiff had their data collected when a particular service

20   was aware of their age without parental consent in violation

21   of COPPA.

22       And it's not clear if such a plaintiff existed what their

23   claim for harm would be in terms of a tort injury.  And

24   that's -- that's both -- that's both a tort issue, because

25   there's requirement generally to have injury for a tort claim,

1   and in the case of negligence per se, they need to allege an
2   injury of the kind that the legislative enactment was designed
3   to protect.
4       It's also an Article III standing issue because what this
5   starts to sound like is a general claim in the air that the
6   defendants are not compliant with the federal statute and
7   will -- will figure out later what the complications of that.
8   And that's not a justiciable case or controversy under
9   Article III in addition to all of the state tort issues.
10          MR. MURA:  Your Honor, the -- the injuries that have
11  been alleged here, the emotional harms, mental harms, those
12  are traditionally recognized injuries that are compensable in
13  tort, so there isn't an Article III standing problem.
14      When defendants talk about the PROTECT Act as a sort of
15  mere reporting statute, they're really misdescribing the
16  PROTECT Act.  It's a safety statute.  I mean, it's quite
17  literally called "The PROTECT Act," and it's serving to
18  protect children from being revictimized through the
19  proliferation of CSAM.
20      And so when reporting is avoided or undercut, it creates
21  an increased and foreseeable risk of CSAM exploitation.
22  That's -- that's the negligence per se there.
23      Same thing with COPPA.  I'm sure the state AG's would be
24  very surprised to hear there are standing problems to bring
25  COPPA claims.  There's no standing problem with respect to the

1    plaintiffs here.

2        The individuals who have selected these claims are

3    alleging that they've been personally affected by these

4    specific violations.  And the evidence later would show more

5    in the way in which the failure to report led to their

6    victimization, or with respect to COPPA, that the -- that the

7    defendants illegally obtained information about them when they

8    were under 13 to fuel their addiction engines and to hook them

9    to their platforms.

10        So those are very specific targeted allegations about

11    individual plaintiffs that establish Article III injury.

12        **THE COURT:**  Okay.

13        **MR. DONAHUE:**  Again, Your Honor, I don't think there

14    are -- I'm not sure exactly what allegation Mr. Mura was

15    referring to there.  But I don't think there are actually

16    allegations in the complaint that spell out the causal

17    mechanism between a COPPA -- between a COPPA violation and

18    whatever these injuries that are being alleged arise from

19    COPPA are.

20        I think other than the general claims of -- you know,

21    there's a whole range of injuries, mental, physical and

22    emotional.  There's no actual discussion of data collection

23    leads to this, to that, for this plaintiff.

24        And that -- that is a fundamental Article III issue in

25    that lack of a injury.  It's also just a -- a pleading issue

```
 1    in that we really don't even have, beyond bare-bones
 2    allegations of your clients violated statutes, therefore, our
 3    line is injured -- plausible factual allegations that explain
 4    the basis for relief.
 5            THE COURT:  What -- what paragraphs, if any, do you
 6    comply with that obligation to allege sufficient standing?
 7            MR. MURA:  Well, Your Honor, we talk about --
 8            THE COURT:  And I mean, standing with respect to
 9    these two particular acts.
10            MR. MURA:  With respect to these two acts, we talk
11    about the scope of the acts and the circumstances in which --
12            THE COURT:  Do you have paragraph numbers for me or
13    not?
14            MR. MURA:  It would be -- yes.
15        I'd point the court to the -- the knowledge paragraphs
16    relating, for example, for COPPA.  There, we talk about how
17    defendants have --
18            THE COURT:  Could you give me the numbers.
19            MR. MURA:  Yes, Your Honor.
20        For Meta and YouTube, it's Paragraph 13, 334, 725 to 726.
21    Those are paragraphs demonstrating that the defendants -- Meta
22    there specifically, and YouTube, affirmatively have knowledge
23    that the plaintiffs -- particular plaintiffs are under 13 when
24    they're on their applications.
25        And so they -- those individuals' information is being
```

1    collected without parental consent and notice and leading to

2    the very harms that Congress talked about.

3        The COPPA was enacted to enhance parental involvement in

4    kids' activities online and to maintain their -- their data

5    security and their privacy.  And so the harms that we're

6    alleging here is that defendants illegally obtained their data

7    from these specific individuals to power their particular

8    platforms in an addictive way and the hook these children

9    early on before they were 13.

10       So those are the specific allegations of injury.  And then

11   individual plaintiffs in the short-form complaints have

12   identified whether they are persons who were under 13 when

13   this occurred.

14           THE COURT:  So you're not asserting these against

15   Snap?

16           MR. MURA:  We are, Your Honor.  I can continue.

17       Paragraph 416.

18           THE COURT:  Relative to whom?

19           MR. MURA:  That is relative to Meta.  With respect to

20   Snap, I'd point the court to Paragraph 452, which is a

21   discussion of their knowledge of their awareness that this is

22   happening.

23       With respect to Paragraph 460, there's a discussion of how

24   they designed their platforms in a way to lure children.

25       With respect to TikTok, I don't have a paragraph with me,

1    but in those -- I believe it's in the 600s, there's a

2    discussion of how the algorithmic targeting of -- of TikTok

3    itself is to obtain information of users' age.

4        And there's also -- with respect to COPPA, it's not simply

5    the actual knowledge, but there's this other prong of COPPA

6    that relates to "directed to children," that the platforms

7    themselves have designed their platforms in a way that's

8    direct to children.  That's independent of actual knowledge.

9    And we've alleged facts for each of the defendants with

10   respect to that.

11       So for Meta, we've alleged that it's a child-directed

12   site, so Meta made focus groups for teens.  That's Paragraph

13   258.  It's designed its platform in a way to -- with pokes and

14   waves to attract teens and under-aged users.  That's also

15   Paragraph 258.

16       Paragraph 290 to 291 has a discussion of how Meta features

17   under-aged kids or -- or kids -- or tweens in ads.  And then

18   there's a discussion in Paragraph 389 for Meta about how Meta

19   knows up to 15 percent of ten-year-olds use Facebook or

20   Instagram.

21       Similar with Snap, there's a -- Paragraphs 439, 457, 478

22   discuss the ways in which Snap is a child-directed site

23   because of the designs, using cartoonish colors, using

24   cartoonish designs.  There's a discussion of advertising in

25   Paragraph 460.  And there's a discussion of their own internal

1    awareness, which is that 13 percent of kids 8 through 12 use

2    Snapchat.

3        For TikTok, there's a discussion how it's a child-directed

4    site.  In paragraphs 563, there TikTok first designed -- was

5    first designed for a leadership syncing of pop music.  This

6    was specifically targeting teens and tweens, we allege.

7        We allege song libraries for Disney and School.  And the

8    FTC concluded in paragraphs -- we allege in Paragraphs 572 to

9    573, that a third of daily users in the U.S. were 14 or

10   younger as of July 2020 on TikTok.

11       And for YouTube, we allege that it's a leader in reaching

12   children from ages 6 to 11.  That's paragraph 707 to 709.  And

13   that Google uses kids in ads, 737 to 738.  There are quite a

14   few more allegations.

15       I'll sort of stop reading the complaint to the -- to, Your

16   Honor.  But I think this is precisely within what Congress is

17   concerned about, which is what happens -- the injuries that

18   occur when platforms obtain information from kids when they're

19   under 13 without parental consent or control.

20       And those are the very injuries that Congress discussed

21   article III injury, the Supreme Court has said can be informed

22   by congressional acts of injury and -- and harms, and that's

23   precisely what we would point the Court to here.

24           **THE COURT:**  All right.

25           **MR. DONAHUE:**  Your Honor, just briefly I think the --

1   the allegations that were just cited to the Court illustrate

2   our point, though almost everything that was cited was

3   statistics about numbers of users on the sites.  It was claims

4   about generally what defendants may know about or be able to

5   estimate about numbers of users on sites.

6       There was nothing I heard there that was related to any

7   plaintiffs' particular injury, other than Mr. Mura's statement

8   that some plaintiffs have checked the box indicating that they

9   were below the age of 13.

10      Nothing about, you know, data collection or parental

11  consent as necessary to state a COPPA claim.

12          **THE COURT:**  Any response?

13          **MR. MURA:**  Well, the short-form complaint doesn't ask

14  that detail.  That detail will come later in terms of the

15  individual plaintiffs and their individual information of

16  injury.

17          **THE COURT:**  All right.

18      Okay.  I have the overview and you've got mine.

19          **MR. MURA:**  Thank you.

20          **MR. DONAHUE:**  And just on that last point, obviously

21  it's -- it's our view that plaintiffs' complaints, the short

22  form and the long form together, need to state a claim

23  sufficient to satisfy the -- the requirement of federal rules.

24          **THE COURT:**  I understand.

25          **MR. DONAHUE:**  They can't fill that later.

```
 1            THE COURT:  Okay.

 2            MR. DONAHUE:  Thank you, Your Honor.

 3            THE COURT:  We will take another short break.  I will

 4       be back on the bench at --

 5         So, Raynee, we have one argument, and I have some case

 6       management stuff.

 7                      (Off-the-record discussion.)

 8            THE COURT:  Let's just keep going, then, so we can

 9       finish in off.

10         Snap wanted to address the court.

11         And here I have Ms. Scullion back and Ms. -- is it Ehler?

12       Eiler [phonetic]?

13            MS. EHLER:  It's Ehler, Your Honor. Thank you.

14            THE COURT:  Ehler.  Go ahead.

15            MS. EHLER:  Rose Ehler, Munger, Tolles & Olsen, on

16       behalf of Snap.

17         I wanted to start sort of where Your Honor is with

18       breaking this down a little bit more into the specifics that

19       you've been focused on as it relates to functionality and also

20       the differences between the platforms.

21         And Snap filed a separate motion to dismiss, and we did

22       because the defendants are all different.  And we think that

23       the plaintiffs' allegations are uniquely deficient against

24       Snap.

25         So I want to start with why Snapchat is different.  It's
```

1      fundamentally a communication platform.  Its focus is actually

2      on connecting real-world friends, giving them a tool to

3      communicate through short videos and photos that disappear.

4      We call those "snaps."

5          And the primary purpose is more similar to your iPhone or

6      my iPhone iMessage application than it is to other forms of

7      more typical social media.  And we know this because Snapchat

8      actually opens to a camera.  It opens to a visual camera that

9      you can then take a Snap and send it.

10         It doesn't open to an algorithmic feed.  It doesn't have a

11     public "like" feature.  Those are different.  Second, as it

12     relates to the harms -- and I think it's important to, as Your

13     Honor has been talking about looking at the functionalities,

14     to connect the functionalities that are alleged in the

15     complaint to the harms that are alleged in the complaint.

16         And as it relates to Snapchat in particular, the core

17     harms, the actual really severe harms are caused by

18     third-party bad actors.

19         Now, the platform is opened to everyone, and these tools

20     are used by many people for completely normal communications

21     reasons.  But they can be abused by bad actors.  And sometimes

22     they are.  And Snapchat works hard to avoid that to the best

23     of its ability.  But Section 230 prohibits holding the

24     platform itself liable for the conduct of those third-party

25     bad actors.  And that's the *LW* case that's been cited a number

1    of times for Your Honor today.

2        There are two other points that I wanted to raise with

3    respect to those features which my colleague I believe

4    mentioned before, which is how Snapchat's design is actually

5    aimed at preventing strangers and minors from connecting.

6        So first is that Snapchat has always made minor profiles

7    private.  That's the default setting.  And then, second, what

8    the complaint actually alleges as to "Quick Add" is that you

9    have to have a number of friends in common before someone will

10    be recommended to you.  So these aren't just complete

11    strangers.  They're people that are friends of friends or in

12    your network.

13        And then once we get beyond those -- the third-party

14    harms, the severe harms, the -- the functionalities that are

15    left -- bless you -- the functionalities that are left -- the

16    complaint doesn't allege that they actually reach the severity

17    of harm necessary for these sort of products liability claims.

18        So, you know, "Snap Streaks" or "Charms," the complaint

19    alleges that they cause negative feelings if a streak is

20    broken, and, you know, stress or anxiety.  But there are no

21    allegations specific to Snapchat as it relates to these other

22    features that rise to the level of the severe emotional

23    distress or physical harm that's required by -- by the

24    restatements.

25        There can't be just be free-standing addiction claims,

1  which is essentially what it amounts to.  They have to

2  actually connect to a harm.  And as to Snap, those harms are

3  not alleged.

4      I'll pause there.

5          **THE COURT:**  Response.

6          **MS. SCULLION:**  Afternoon, Your Honor.  Once again,

7  Jennifer Scullion for the plaintiffs.

8      Your Honor, plaintiffs' claims against Snap are based on

9  the same type of defects and same types of injuries we assert

10  against each of the defendants.

11      Snap does not stand alone, nor is it different from the

12  other defendants.  We allege Snap built its products using

13  designs that are -- dangerous to kids.  And they're dangerous

14  because of the behavior that the designs compel in kids.

15      And the result is that kids using Snapchat are suffering

16  injuries like addiction.  And I want to be clear.  Addiction

17  is an injury.  As Your Honor alluded to, this is an impact on

18  the brain.  It's a change in the way the brain works.  It's a

19  change in real-world behavior.

20      Addiction and compulsive behavior are, in fact, injuries.

21  There's no law that says addiction stand alone is not an

22  injury.

23      We also allege that it results in injuries of sleep

24  deprivation.  Again, tangible, real-world, serious, especially

25  for children.  Eating disorders, anxiety, and depression.  And

1       that's at master complaint Paragraphs 440 and 467.

2           I would underscore here that Judge Kuhl used Snapchat as

3       the example of how the JCCP plaintiffs had, in fact, stated a

4       claim for negligence there.  Understood, on a non-product

5       basis.

6           All the same reasoning applies here with respect to our

7       product claims.  And as -- as my colleague has just

8       articulated the argument that Snap is raising in its motion

9       really sound much more like summary judgment.

10          So, for example, this dispute about whether because

11      they're endless speed video is not on the home page but,

12      instead, requires a child to click on another tab, does that

13      materially alter the harm to the child.  We've alleged it is

14      just as harmful, that it's inducing, again, a flow state in

15      children, which is -- which is dangerous.

16          Similarly with respect to the "Quick Add" feature.  Yes,

17      Snap says it has changed the -- the "Quick Add" feature.  We

18      say it still is unreasonably dangerous because although kids

19      may only be connecting with people, quote, in their network,

20      this is an online network, which just means it's another

21      person who they may already be connected to online is

22      connected with somebody else.

23          You don't know that that child knows that person, that

24      adult, for example, in real life.  Those are strangers.

25          So, again, none of the -- these arguments are appropriate

1    here at this time, they are raising questions that go to

2    specific causation, severity of harm, all things that would be

3    tested on a case-by-case basis after discovery.

4        We're here prediscovery under Rule 12, the focus here is

5    what we alleged.  Our allegations are concrete, plausible, and

6    they're presumed true.

7            **THE COURT:**  Okay.

8            **MS. EHLER:**  Just briefly, Your Honor.  Judge Kuhl

9    dismissed the products liability claims.  She found that it

10   wasn't a product, so I don't think her order helps the

11   plaintiffs here at all.

12       And regarding the question of whether addiction standing

13   alone is an injury, that -- I think that's a legal question.

14   And I think that the cases that we've cited -- my colleague

15   didn't cite any cases for the concept that addiction is a

16   sufficient harm for a products liability claim.

17       And the cases that we've cited and the restatement say

18   that you have to reach a level of severe distress or physical

19   harm.  And when you look at the actual allegations and -- and

20   I think I quoted for "Snap Streak," the allegations say

21   "negative feelings."

22       And the -- the fact that there are hundreds of pages

23   doesn't change whether the plaintiffs are able to actually

24   draw a connection between features on one hand and severe harm

25   on the other.  And that is not to say that there are not

1    allegations of some severe harm in the complaint.

2        But as to Snap, those relate to third-party bad actor

3    conduct, not to the sorts of features like "Snap Streak," and

4    other features that have been mentioned.  And I do I think

5    that there's an element of just drilling down to see whether

6    the actual features are sufficient to state claim.

7        And then the last thing I'll say is that plaintiffs want

8    design to matter whether it suits them.  So there's a lot of

9    emphasis today about how these are designed.  But then they

10   don't want design to matter when it doesn't suit them, because

11   they say just ignore the fact that the algorithmic feed with

12   respect to Snapchat is a completely separate tab and is used

13   differently and it opens to a camera.  I think that as --

14        THE COURT:  Well, you agree that there's no way that

15   I can resolve factual disputes at this stage, right?  That's

16   not my job.

17        MS. EHLER:  That's right, Your Honor.

18        I'm looking at the allegations in the complaint, and

19   the -- the problem with a several-hundred page complaint is

20   it's hard to actually pin down the specific allegations as to

21   each feature.

22        But when you do look at those closely, you can't make

23   the -- the plaintiffs have not been able to actually connect

24   the features to any serious harm as it relates to Snap, once

25   you've set aside the third-party harm we think is barred by

```
 1    230.
 2         MS. SCULLION:  So, Your Honor, starting again, with
 3    what we've actually alleged, so, again, we allege with
 4    specificity that Snapchat has, again, the same types of design
 5    defects.  Flow state design, Paragraphs 491 and -93, 494,
 6    -95 --
 7                   (Simultaneous colloquy.)
 8         MS. SCULLION:  Sorry.
 9         THE COURT:  Now you're repeating yourself.
10         MS. SCULLION:  I apologize.
11    So we've alleged that they have -- in fact they have these
12    design defects.  My colleague is focusing on the seriousness
13    of the harm.
14    Again, addiction is a physical harm.  There's an actual
15    physical change that happens to the brain, and it happens to
16    behavior in the real world.
17    With respect to emotional harm, we have, in fact, alleged
18    that Snapchat's design -- and this is, again, Paragraph 440 of
19    our complaint -- causes young users to suffer increased
20    anxiety, depression, disordered eating, sleep deprivation,
21    suicide, and other severe mental and physical injuries.
22    I recognize that Snap has tried to brush this off in a
23    footnote in its reply that says that our paragraph doesn't in
24    fact identify any Snapchat-specific feature.
25    That's wrong.  The very last sentence of Paragraph 440
```

1   points to multiple Snapchat features:  Snap Streaks,

2   disappearing messages, filters, lenses, and examples of how

3   Snap has designed Snapchat in a ways that entice, exploit, and

4   addict kids.

5       Similarly Paragraph 467, we allege that Snapchat's social

6   metrics features encourage endless passive consumption, which

7   induces addiction, compulsive use, and other severe mental and

8   physical harm.

9       Your Honor, again, these are plausible based on the

10  allegations about the way that children's neuro- --

11  neurophysiology and psychology work.

12      The allegations about how these types of design features

13  operate with respect to children, and what the actual result

14  is.

15      We can have -- I'm sure we'll have -- hopefully, heated

16  disputes later on in the case when we get to experts about

17  whether any particular case a child's harm is severe enough

18  and whether it has been linked to the child's Snapchat use.

19      For purposes of Rule 12 where we are today, we have

20  alleged more than enough to satisfy the plausibility standard.

21              **THE COURT:**  Okay.  Anything else.

22          **MS. EHLER:**  I'd just be repeating myself, Your Honor.

23              **THE COURT:**  All right.  Thank you.

24          **MS. SCULLION:**  Thank you, Your Honor.

25              **THE COURT:**  Thank you.

1          Well, I think it's probably getting late enough that most

2    of you who are coming from other parts of the country will not

3    be getting the last flight out.

4          So I hope at least you can go find a terrific restaurant

5    to -- to have dinner at.

6          I need to talk to you about case management.  So if I

7    could have someone from each side at the MIC.

8          And then I have Ms. Hazam and Ms. Jones?

9          **MS. JONES:**  Yes, Your Honor.

10         **MS. HAZAM:**  Your Honor, there is also just one

11   preliminary matter if you'd allow me briefly relating to the

12   argument that just occurred.

13         Your Honor had raised during the argument regarding

14   product liability a number of states that Your Honor believed

15   the claim may be foreclosed.  And I think the intent was to

16   perhaps circle back to that.  We didn't have the opportunity

17   to do so.  Plaintiffs would be prepared to either do so very

18   briefly now or if Your Honor would permit briefing on solely

19   those states to address the concern regarding them.

20         **THE COURT:**  This is with negligence per se?

21         **MS. HAZAM:**  No, I'm sorry.  This was during the

22   argument in which myself and Ms. Simonsen discussed whether we

23   had a product for purposes of product liability law.

24         Your Honor at one point listed, I believe, six states in

25   which you believed had to be a tangible product or there was

1  no product liability claim.

2          **THE COURT:**  And you disagree that -- with those six

3  states.

4          **MS. HAZAM:**  With the exception of one, Your Honor.

5          **THE COURT:**  Okay.  So which is the one.

6          **MS. HAZAM:**  Ohio, we would concede that because it's

7  a statutory products liability law, strict product liability,

8  and negligent product liability are not permitted under of

9  course general negligence may still proceed separately.

10         **THE COURT:**  I will go back and just take a look at

11  where my note came from.  If I need briefing, I'll ask for it.

12         **MS. HAZAM:**  Thank you, Your Honor.

13         **THE COURT:**  Okay.

14     Can somebody tell me with respect to the school district

15  complaints what the status of those are.  They don't sign on

16  to the master amended complaint.  Isn't that correct?

17     And what is the plan for the school districts?

18         **MS. HAZAM:**  Thank you, Your Honor.

19     They do not sign on to the individual plaintiffs' personal

20  injury master complaint; that is correct.  They have all filed

21  their own complaint.  There are a considerable number of them

22  now coordinated as part of this MDL.

23     Various counsel in the room represent those school

24  districts, including myself and the other co-lead counsel and

25  others present here today.

1          Those claims have not been set for any kind of motion

2     practice.  However, we do know that in the JCCP parallel

3     proceeding, there were discussions to tee up motion practice

4     against the school districts.  And the parties agreed upon a

5     demurrer schedule that was submitted to the Court and I

6     believe the Court will be adopting, which has demurrers

7     starting in February against it's either three or four

8     exemplar social district -- school district, excuse me,

9     complaints.  And I believe the briefing is completed in

10    mid-April.

11         Plaintiffs here have indicated that we would be willing to

12    follow the same schedule if the Court sees fit.  And I believe

13    defendants are, although I'll let Ms. Jones speak for that.

14         **MS. JONES:**  Yeah, the only gloss I would add to that,

15    Your Honor, is that the timing of the demurrer briefing

16    schedule was keyed off of Judge Kuhl's ruling.

17         So Ms. Hazam is correct when she says we would be open to

18    taking a similar type of approach, insofar as once we have the

19    order from Your Honor on the motion to dismiss that's

20    currently pending, we could then figure out what the most

21    sensible briefing is for the school district.

22         **MS. HAZAM:**  And to be clear, that was not our

23    understanding.  Our understanding was it would be the same

24    dates, and they are fairly far out as of now, so I think we

25    do, in fact, have a -- a possible difference there, although

```
 1    we're happy to meet and confer.  We had flagged this as a
 2    potential agenda item.  And the defendants were opposed to
 3    having a case management conference, so we haven't had the
 4    opportunity.  But we'd be happy to do so.
 5         THE COURT:  So the plan, then, is -- and I think
 6    we're at about 150 districts at this point.
 7         MS. HAZAM:  Yes, Your Honor.
 8         THE COURT:  -- that you have a representative sample,
 9    and then somehow -- what happens to the other 146?
10         MS. HAZAM:  So, Your Honor, that is how it's
11    proceeding in the JCCP.  We obviously want to consult with
12    Your Honor about how you'd like it to proceed here.
13         They are following a procedure that was similar to the one
14    used in the Juul litigation in this district in which the
15    parties selected -- you could call them bellwether, you could
16    call them exemplars -- it's a small number -- against which
17    initial demurrers would be brought.
18         The school districts generally allege a very similar set
19    of claims, and as part of that selection process, the parties
20    argued to the Court as to why they would be appropriate.
21         Plaintiffs are amenable to that procedure here, but,
22    obviously, would seek the Court's feedback.
23         THE COURT:  Well, I'm amenable to whatever is most
24    efficient for all of them, 'cause I -- you know, what I don't
25    want and what concerns me about that approach is -- is that
```

1    somehow you -- you know, good lawyers, right?

2         So we as judges make rulings, and you -- and you lose one,

3    and you think okay.  Well, I've got another 146.  I can try

4    something else.  That's not -- I'm not interested in repeat

5    bites at the apple, so I'll have to think about whether that

6    makes sense.  And you all should think about whether that

7    makes sense.

8         That's why we have a master complaint.  It seems to me

9    that if there are issues that, you know, are similar across

10   the board, that the briefing on those could happen, and then

11   everybody would have to sign on to the decision and it -- be

12   bound by whatever it is.

13        These -- these proceedings are meant to create

14   efficiencies in the system.

15             MS. JONES:  Your Honor, if I may, I think probably

16   the next step for the lawyers at least is to just meet and

17   confer about this.  I don't think we've had a recent

18   conversation about the prospect of a master complaint or not.

19   And I'm not sure what the current thinking on that is.

20        I think probably we need to have a discussion about some

21   of those basic questions first.

22             THE COURT:  I agree.  But I was just trying to get

23   the lay of the land.

24             MS. JONES:  Understood.

25             THE COURT:  So I'm going to over -- I'm not going to

1    try to coordinate right now in terms of your schedules.

2         My schedule is very tight through the end of the year, and

3    so -- there are lots of lawyers in here.  As I always say when

4    I have a roomful of lawyers, your billing fees for today

5    compete my annual salary.

6         So, next we're going to have a CMC, case management

7    conference, November 16th at 11:00 a.m., and then another one

8    December 13th at 10:30 a.m.

9         Hopefully that fits with most of you, but that's what fits

10   with me.

11            **MS. HAZAM:**  Yes, Your Honor.

12            **THE COURT:**  In advance of those -- and I'm hoping to

13   have an order out in advance so that you can digest it.

14        But I would obviously want to talk about -- I'll take your

15   agenda.  Make sure to get it to me in advance.

16        I think we have to talk about the school district

17   complaints, the next round of briefing, assuming for purposes

18   of argument that I've trimmed the master complaint and

19   something's moving forward, the short-form complaints are

20   going to have to be fleshed out in that context.

21        And, you know, we still have -- and it may make sense to

22   do it sooner.  It may make sense to do it later.  I don't know

23   'cause there still has to be briefing.

24            **MS. HAZAM:**  Your Honor, if I may, one process that

25   the parties have anticipated for that fleshing out that Your

1    Honor referred to is the use of a plaintiff fact sheet.  That

2    fact sheet is nearly finalized through having been negotiated

3    by the parties in the JCCP proceeding in which the -- both the

4    MDL plaintiffs and the JCCP plaintiffs participated.

5              **THE COURT:**  Okay.

6              **MS. HAZAM:**  And that does contain much of the

7    information that I believe defendants have sought up and Your

8    Honor may be referring to with regards to things like features

9    that may have been used, diagnoses that may have been given.

10   It is final, I think, barring one or two implementation order

11   issues.

12             **THE COURT:**  Well, I haven't seen it.

13             **MS. HAZAM:**  Yes, Your Honor.  We would submit it of

14   course to, Your Honor.  I'm offering it as a way to address

15   that concern.

16        Once it is entered in the JCCP, we can meet and confer.

17   But I'm anticipating that the parties would likely be

18   agreeable to submitting it here as well.

19             **THE COURT:**  Okay.

20        And to the AG's in the audience or the AG reps, I will be

21   setting your case for -- on the same case management schedule.

22   Okay?

23        Can someone tell me what "negligent undertaking" is?

24        No -- yeah.  What is "negligent undertaking" with respect

25   to Claim 6, and why have we alleged number 18 -- or you have

1    alleged a loss of consortium in this case?

2         **MS. HAZAM:**  Well, negligent undertaking, I think

3    another person from my team may be best suited to addressing.

4       I also think that as we move forward after we see your

5    judge's order, we will determine as plaintiffs the claims on

6    which we would still be proceeding in addition to any that

7    survive, if any do.

8       With regards to loss of consortium, there are death cases

9    as part of this --

10        **THE COURT:**  So loss of society?

11        **MS. HAZAM:**  Yes.  There are situations in which you

12   have -- in some states, you can have a loss of consortium

13   claim by a family member and may encompass loss of society as

14   well.  It was a pleading try to capture 50 states' law.

15        **THE COURT:**  Okay.  Well, in California, loss of

16   consortium requires a valid marriage, so I don't think any of

17   these adolescents are married, are they?

18        **MS. HAZAM:**  Very, very few, if any.  But there is an

19   aspect of that claim that is meant to capture other family

20   members in other states.

21        **THE COURT:**  In terms of thinking about the next round

22   of briefing, and I'll listen to your proposals, I would like

23   you to think about what elements you wanted to brief with

24   respect to those claims because -- and, again, in light of an

25   order, because with respect to some of these, some might --

 1    some elements might be more compelling for a motion to dismiss

 2    than others.

 3       And if -- if we're going to continue to roll out these

 4    orders, I'd like to be able to get the briefing focused so

 5    that we can.

 6       I'm hopeful that I'll be able to give this case a bit more

 7    attention and get things out a bit sooner, but I do want you

 8    to think about that.

 9       One of the issues that is frequently a problem in class

10    actions, for instance, are misrepresentation claims, in part

11    because rarely can individual plaintiffs -- rarely is there

12    reliance on specific representations.

13       And those kinds of claims, you know, the -- that might

14    merit some motion work.  It's -- it's why those claims rarely

15    get certified by classes because the individual plaintiffs

16    don't remember any of this or can't plead that they relied

17    specifically on any kind of particular representation, and

18    those things need to be pled.

19       So, anyway, that's why I'm saying, identify that one

20    element of those claims because I'd like you to focus on what

21    really is the most compelling element that might eliminate a

22    claim.

23            MS. HAZAM:  Understood, Your Honor.

24       Some of those claims that Your Honor referenced, for

25    example, our fraudulent concealment claim are alleged only

```
1    against Meta, so only one defendant.  That was one of the
2    claims that survived the demurrer in the JCCP, so it is one
3    that could be teed up for briefing.
4        Another priority on the plaintiff's side would be the
5    general negligence.
6            MS. JONES:  And we would, similarly, Your Honor, be
7    opening to briefing those issues in the next round.  The
8    misrepresentation claim against Meta did not go forward in the
9    JCCP, including on the ground that you mentioned, the failure
10   to show reliance so that's something that we're very focused
11   on as well.
12           THE COURT:  The request to deal with negligence
13   today, denied.
14           MS. HAZAM:  Thank you, Your Honor.
15           THE COURT:  Mr. Cuenco, you can terminate that
16   request.
17           THE CLERK:  Yes, Your Honor.
18           THE COURT:  Look, we just had too much.  And I think
19   that defendants are entitled to fully brief issues.  Judge
20   Kuhl, I have a great deal of respect for her.  We chat not --
21   on Snapchat or any of your platforms -- but we do communicate.
22   And, you know, we may disagree.  And I said to her, you know,
23   that's okay.  We're -- we both have opinions on these things.
24       All right.  So those are my thoughts about getting ready
25   for the next phase.
```

1        Any questions or comments?

2        **MS. HAZAM:**  I have just one, Your Honor.  There is

3    one other pending matter that plaintiffs wanted to alert the

4    Court to and -- and perhaps see if it could be set to be

5    heard.

6        That is, there's a pending motion for relief from

7    Magistrate Judge Hixson's order regarding expert disclosure,

8    which goes to the protective order in the litigation.  That's

9    Docket number 303.

10        I don't know if Your Honor would be amenable to having it

11    heard at either of the upcoming conferences or separately, but

12    it will be important if discovery gets under way in the

13    litigation.

14        **THE COURT:**  Depends on how much time I have to spend

15    to get the order out.  If not the next one, then one after.

16        If I can deal it on the papers.  I'll deal with it on the

17    papers.  I haven't -- I haven't looked at it, so -- I been --

18    I been trying to get my arms around this particular set.

19        **MS. HAZAM:**  Understood.

20        **THE COURT:**  Other questions?

21        Ms. Anderson.

22        **MS. ANDERSON:**  Yes, Jennie Lee Anderson on behalf of

23    plaintiffs.

24        Your Honor, your chambers had reached out to me with

25    respect to the *Frank vs. Meta* motion to proceed under a

1    pseudonym and wanted to address at the next CMC.  I have had a

2    chance to confer with counsel if you want me to go ahead and

3    update you now.

4              THE COURT:  Sure.

5         MS. ANDERSON:  Okay.  So the situation is, is that

6    the plaintiff is an adult survivor of CSAM exposure

7    experienced as a minor.  And they want to proceed under a

8    pseudonym.  In fact, even rather than the initials but rather

9    the pseudonym that is the National Center for Missing and

10   Exploited Children series name because of the very, very

11   highly sensitive nature of the CSAM and some identifying

12   factors in the allegations as they've explained in the motion.

13      So that's why they brought a separate motion.

14             THE COURT:  Okay.  And is there an objection?  Have

15   you met and conferred?

16        MS. JONES:  We've not met and conferred.  But

17   we're -- I don't think we'd have any objection we're certainly

18   happy to defer to --

19                   (Simultaneous colloquy.)

20             THE COURT:  And you can't talk to each other, except

21   down the hall, or when I --

22        MS. ANDERSON:  Excuse me, Your Honor.  I had

23   conferred with the plaintiffs' counsel to find out what their

24   intentions were with the motion.

25             THE COURT:  So why don't you all talk to each other

1    and perhaps send me a stipulation to address the issue.

2             **MS. JONES:**  That's fine.  I don't expect we're going

3    to have a dispute over that.

4             **THE COURT:**  Great.

5             **MS. ANDERSON:**  Thank you, Your Honor.

6             **THE COURT:**  Other issues.

7             **MS. HAZAM:**  Not from the plaintiffs, Your Honor.

8             **MS. JONES:**  Not from the defendants, Your Honor.

9             **THE COURT:**  Okay.  Everybody's energetic?  Yes?

10            **MS. JONES:**  Yes, indeed.

11            **THE COURT:**  Less energetic than when you got here,

12   I'm sure.

13      Anyway, terrific argument.  Thank you very much.

14      We're adjourned.

15            **THE CLERK:**  Court is adjourned.

16          (Proceedings were concluded at 3:24 P.M.)

17                        --o0o--

18

19

20

21

22

23

24

25

1

2               **CERTIFICATE OF REPORTER**

3

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11    _____

12       Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                Sunday, November 5, 2023

14

15

16

17

18

19

20

21

22

23

24

25