1

*[Submitting Counsel on Signature Page]*

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11 | IN RE: SOCIAL MEDIA ADOLESCENT | No. 4:22-md-3047
ADDICTION/PERSONAL INJURY

12 | PRODUCTS LIABILITY LITIGATION | MDL No. 3047

13

14 | | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT**

15 | This Document Relates to:

16 | ALL ACTIONS

17 | | **Hearing:**
Date: TBD

18 | | Time: TBD
Place: Oakland, California

19 | | Judge: Hon. Yvonne Gonzalez Rogers

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................... 1

II.  BACKGROUND .................................................................................................... 2

III. ARGUMENT ......................................................................................................... 7

   **A.**   Defendants' Threshold Arguments Misconstrue Plaintiffs' Allegations and Rely on Previously Rejected Arguments. ................................................................................ 7

      **1.**   Section 230 Does Not Bar Plaintiffs' Claims. ................................................. 7

         **a)**   Section 230 Does Not Bar Plaintiffs' Negligence Claim. .......................... 7

         **b)**   Section 230 Does Not Bar the School Districts' Public Nuisance Claim. ............... 8

         **c)**   This Court's Feature-By-Feature Analysis Produces the Same Result. ............... 10

         **d)**   The Court Should Permit the School Districts to Allege Negligence and Public Nuisance Claims Based on *All* Features. ...................................... 13

      **2.**   The First Amendment Does Not Bar the School Districts' Claims ........................... 14

      **3.**   Defendants' Purported Derivative Injury Rule Does Not Bar Plaintiffs' Claims. ...... 18

         **a)**   The School Districts Are Directly Harmed by Defendants' Conduct. ................ 19

         **b)**   The Harms Suffered by the School Districts Are Not Too Remote. .................... 20

      **4.**   The School Districts Properly Plead Proximate Cause. ....................................... 21

         **a)**   The School Districts Suffered Foreseeable Harm Caused by Defendants' Defectively Designed Products. ...................................................... 22

         **b)**   Defendants' Causation Case Law Arose in Distinct and Inapplicable Contexts. ........................................................................... 24

   **B.**   The School Districts Have Adequately Pled Public Nuisance. ................................. 26

      **1.**   Public Nuisance Is Not Limited to Use of or Interference with Land. ..................... 27

      **2.**   Public Nuisance Claims May Relate to a Product When Such Product Causes a Substantial Interference With a Public Right. ........................................ 29

      **3.**   The School Districts Adequately Allege Interference with Public Rights. ................ 33

      **4.**   The School Districts Adequately Allege Special Injury and Abatement. .................. 38

         **a)**   Defendants' Interference with Public Rights Harmed the School Districts. ......... 39

         **b)**   The Special Injury to the School Districts Is Different from the Injury to Minors and the Public. ............................................................... 40

   **C.**   Plaintiffs Properly Plead Negligence Claims. ................................................... 43

      **1.**   Defendants Had a Duty to the School Districts Because Their Harms Were Foreseeable and Liability Here Is Supported by Public Policy. ........................ 44

         **a)**   Under the Laws of the 17 States at Issue, the Question of Duty Focuses Squarely on Foreseeability and Public Policy. .................................. 44

      **2.**   Defendants' Argument Regarding Third-Party Harm Misses the Mark. ................... 49

　　　　**3.**　The Economic Loss Rule Is Inapplicable Where, as Here, Duties Are Imposed
　　　　　　by Law. ........................................................................................... 52

**IV.**　CONCLUSION ....................................................................................................... 54

Appendix ...................................................................................................................... 57

　　**A.**　States where proximate cause is a factual question rarely resolvable on a motion to
　　　　dismiss. (Footnote 9) ................................................................................. 57

　　**B.**　States where foreseeability is the linchpin of proximate cause and foreseeable
　　　　intervening actions (by plaintiffs or third parties) will not break the chain of
　　　　causation. (Footnotes 12 & 13) ................................................................... 57

　　**C.**　States where a person's negligence may combine with another factor to cause harm.
　　　　(Footnote 14) ............................................................................................. 58

　　**D.**　States where public nuisance laws either expressly reject, or do not require, a nexus
　　　　to land. (Footnote 21) ................................................................................. 59

　　**E.**　State Constitutions granting a right to public education. (Footnotes 30, 42). ................. 60

　　**F.**　States where foreseeability of harm is key to duty analysis. (Footnote 38) .................... 60

　　**G.**　In these states, the economic loss rule does not bar negligence claims which arise
　　　　from an independent legal duty. (Footnote 50) ................................................. 61

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*A.M. v. Omegle.com, LLC,*
  614 F. Supp. 3d 814 (D. Or. 2022) ............................................................ 8, 12

*Abi-Najm v. Concord Condo., LLC,*
  699 S.E.2d 483 (Va. 2010) ........................................................................ 62

*Abrams v. City of Chicago,*
  811 N.E.2d 670 (Ill. 2004) ........................................................................ 58

*ACLU v. Johnson,*
  4 F. Supp. 2d 1029 (D.N.M. 1998) ........................................................... 16

*ACLU v. Mukasey,*
  534 F.3d 181 (3d Cir. 2008) ...................................................................... 16

*Akin v. Bd. of Ed. of Riverside Unified Sch. Dist.,*
  262 Cal. App. 2d 161 (1968) ..................................................................... 49

*Allegheny General Hospital v. Philip Morris, Inc.,*
  228 F.3d 429 (3d Cir. 2000) ...................................................................... 42

*Althaus ex rel. Althaus v. Cohen,*
  756 A.2d 1166 (Pa. 2000) ......................................................................... 49

*Anchorage v. Integrated Concepts & Rsch. Corp.,*
  2015 WL 926219 (D. Alaska Mar. 4, 2015) .............................................. 53

*Arriaga v. New England Gas Co.,*
  483 F. Supp. 2d 177 (D.R.I. 2007) ............................................................ 42

*Ass'n of Vill. Council Presidents Reg'l Hous. Auth. v. Mael,*
  507 P.3d 963 (Alaska 2022) ...................................................................... 61

*Association of Washington Public Hospital Districts v. Philip Morris, Inc.,*
  241 F.3d 696 (9th Cir. 2001) .............................................................. 20, 21

*Baptiste v. Bethlehem Landfill Co.,*
  965 F.3d 214 (3d Cir. 2020) ...................................................................... 43

*Bauer v. Armslist, LLC,*
  572 F. Supp. 3d 641 (E.D. Wis. 2021) .................................................. 9, 10

*Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.,*
  29 F. Supp. 3d 808 (E.D. La. 2014) .......................................................... 59

*Bill v. Superior Ct.*,
  137 Cal.App.3d 1002 (1982) ............................................................................. 50

*Boynton v. Burglass*,
  590 So. 2d 446 (Fla. Dist. Ct. App. 1991) ........................................................ 50

*Brown v. Entertainment Merchants Association*,
  564 U.S. 786 (2011) .......................................................................................... 17

*Brown v. USA Taekwondo*,
  11 Cal. 5th 204 (2021) ...................................................................................... 51

*Brown & Williamson Tobacco Corp. v. CSX Transp., Inc.*,
  882 F. Supp. 511 (E.D.N.C. 1995) ............................................................... 57, 58

*Browning v. Belue*,
  116 So. 509 (Ala. Ct. App. 1928) ..................................................................... 28

*Bryant v. Atl. Car Rental, Inc.*,
  127 So. 2d 910 (Fla. Dist. Ct. App. 1961) ........................................................ 26

*Butts v. Sw. Energy Prod. Co.*,
  2013 WL 12177102 (M.D. Pa. Apr. 26, 2013) ............................................. 59, 60

*Casebolt v. Cowan*,
  829 P.2d 352 (Colo. 1992) ................................................................................ 60

*Cash & Carry Am., Inc. v. Roof Sols., Inc.*,
  117 A.3d 52 (Md. Ct. Spec. App. 2015) ............................................................ 53

*Chomatopoulos v. Roma DeNotte Soc. Club*,
  515 A.2d 296 (N.J. Super. Ct. Law. Div. 1985) ................................................ 58

*Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2022) .......................................................... 20, 21, 26, 31

*City & Cnty. of S.F. v. Purdue Pharma L.P.*,
  491 F. Supp. 3d 610 (N.D. Cal. 2020) ................................................................ 9

*City & Cnty. of S.F. v. Purdue Pharma L.P.*,
  620 F. Supp. 3d 936 (N.D. Cal. 2022) .............................................................. 59

*City of Boston v. Smith & Wesson Corp.*,
  2000 WL 1473568 (Mass. Super. Ct. 2000) ................................................. 20, 26

*City of Chicago v. Am. Cyanamid Co.*,
  823 N.E.2d 126 (Ill. Ct. App. 2005) ................................................................. 37

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) .............................................................. 25, 29, 32, 37

*City of College Park v. 2600 Camp Creek, LLC,*
666 S.E.2d 607 (Ga. Ct. App. 2008) ........................................................... 59

*City of Everett v. Purdue Pharma L.P.,*
2017 WL 4236062 (W.D. Wash. Sept. 25, 2017) ................................. 20, 21

*City of Gary ex rel. King v. Smith & Wesson Corp.,*
801 N.E.2d 1222 (Ind. 2003) ............................................................. *passim*

*City of Reno v. Purdue Pharma, L.P.,*
2018 WL 5730158 (D. Nev. Nov. 2, 2018) .................................................. 59

*City of Va. Beach v. Murphy,*
389 S.E.2d 462 (Va. 1990) .......................................................................... 60

*City of Wyoming v. Procter & Gamble Co.,*
210 F. Supp. 3d 1137 (D. Minn. 2016) ....................................................... 31

*Coleman v. Martinez,*
254 A.3d 632 (N.J. 2021) ............................................................................ 61

*Collins v. Tri-State Zoological Park of W. Md., Inc.,*
514 F. Supp. 3d 773 (D. Md. 2021) ............................................................. 59

*Colonial Inn Motor Lodge, for Use & Benefit of Cincinnati Ins. Co. v. Gay,*
680 N.E.2d 407 (Ill. Ct. App. 1997) ........................................................... 57

*Com. Bank/Pa. v. First Union Nat'l Bank,*
911 A.2d 133 (Pa. Super. Ct. 2006) ............................................................ 48

*Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.,*
2021 WL 5908758 (D.S.C. Dec. 13, 2021) ................................................. 31

*Commonwealth v. Endo Health Solutions Inc.,*
2018 WL 3635765 (Ky. Cir. Ct. July 10, 2018) .......................................... 23

*Commonwealth v. Monsanto Co.,*
269 A.3d 623 (Pa. Commw. Ct. 2021) ................................................... 41, 59

*Crosby v. Twitter, Inc.,*
921 F.3d 617 (6th Cir. 2019) ....................................................................... 25

*D'Ambra v. Peak Bldg. Corp.,*
680 A.2d 939 (R.I. 1996) ............................................................................ 57

*Daniel v. Armslist,LLC,*
926 N.W.2d 710 (Wis. 2019) ........................................................................ 9

*Daniels ex rel. Webb v. Reel,*
515 S.E.2d 22 (N.C. Ct. App. 1999) ........................................................... 44

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 (N.D. Ill. 2009) ............................................................. 10

*Deines v. Atlas Energy Servs., LLC*,
    484 P.3d 798 (Colo. 2021) ............................................................................ 57

*Delfino v. Agilent Techs., Inc.*,
    52 Cal. Rptr. 3d 376 (Cal. Ct. App. 2006) .................................................... 48

*Dittman v. UPMC*,
    196 A.3d 1036 (Pa. 2018) ....................................................................... 53, 62

*Doe II v. MySpace, Inc.*,
    175 Cal. App. 4th 561 (2009) ........................................................................ 12

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ............................................................. 7, 10, 14

*Doe v. Myspace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ......................................................................... 11

*Dorsey v. Reider*,
    139 So. 3d 860 (Fla. 2014) ............................................................................ 60

*Dunn Bus Serv. v. McKinley*,
    178 So. 865 (Fla. 1937) ................................................................................. 57

*E. Me. Med. Ctr. v. Teva Pharma. USA, Inc.*,
    Case No. BCD-CIV-2022-00025 (Me. Super. Ct. Feb. 13, 2023) ................. 42

*Est. of Mickelsen v. North-Wend Foods, Inc.*,
    274 P.3d 1193 (Alaska 2012) ........................................................................ 50

*Est. of Smith ex rel. Smith v. Mahoney's Silver Nugget, Inc.*,
    265 P.3d 688 (2011) ...................................................................................... 61

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
    91 F.4th 511 (9th Cir. 2024) .............................................................. 20, 21, 26

*Fayetteville Ark. Hosp. Co. v. Amneal Pharms., LLC*,
    Case No. 72CV-20-156 (Ark. Cir. Ct. Dec. 16, 2022) .................................. 42

*Fields v. Twitter*,
    881 F.3d 739 (9th Cir. 2018) ......................................................................... 25

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016) ......................................................... 11

*Fireman's Fund Ins. Co v. SEC Donohue, Inc.*,
    679 N.E.2d 1197 (Ill. 1997) ........................................................................... 53

*Fischer v. Home Depot U.S.A., Inc.*,
  2019 WL 4131699 (D. Alaska Aug. 30, 2019) ........................................................................ 44

*Flynn v. Nickerson Cmty. Ctr.*,
  177 A.3d 468 (R.I. 2018) ...................................................................................................... 50

*Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*,
  405 F. Supp. 3d 408 (W.D.N.Y. 2019) .................................................................................. 43

*Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*,
  280 P.3d 542 (Alaska 2012) .................................................................................................. 59

*Ga. CVS Pharmacy, LLC v. Carmichael*,
  890 S.E.2d 209 (Ga. 2023) .................................................................................................... 57

*Gamache v. Airbnb, Inc.*,
  2017 WL 3431651 (Cal. Ct. App. Aug. 10, 2017) ................................................................. 24

*Georgia Dep't of Transp. v. Owens*,
  766 S.E.2d 569 (Ga. Ct. App. 2014) ..................................................................................... 57

*Gilbert v. Stewart*,
  255 A.3d 1101 (N.J. 2021) ............................................................................................... 57, 58

*Gilmore v. Stanmar, Inc.*,
  633 N.E.2d 985 (Ill. Ct. App. 1994) ...................................................................................... 59

*Gonzalez v. Google, Inc.*,
  335 F. Supp. 3d 1156 (N.D. Cal. 2018) ................................................................................. 25

*Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*,
  101 P.3d 792 (Nev. 2004) ...................................................................................................... 57

*Graven v. Vail Assocs., Inc.*,
  909 P.2d 514 (Colo. 1995) ..................................................................................................... 58

*Gray v. Derderian*,
  365 F. Supp. 2d 218 (D.R.I. 2005) ........................................................................................ 58

*Grieco v. Daiho Sangyo, Inc.*,
  344 So. 3d 11 (Fla. Dist. Ct. App. 2022) ......................................................................... 48, 57

*Hacala v. Bird Rides, Inc.*,
  90 Cal. App. 5th 292 (2023) .................................................................................................. 51

*Hairston v. Alexander Tank & Equip. Co.*,
  311 S.E.2d 559 (N.C. 1984) .................................................................................................. 58

*Happel v. Wal-Mart Stores, Inc.*,
  766 N.E.2d 1118 (Ill. 2002) ......................................................................... 60

*Harper v. Guarantee Auto Stores*,
  533 N.E.2d 1258 (Ind. Ct. App. 1989) ....................................................... 58

*Herrick v. Grindr LLC*,
  306 F. Supp. 3d 579 (S.D.N.Y. 2018) ......................................................... 10

*Herrick v. Grindr LLC*,
  765 F. App'x 586 (2d Cir. 2019) ................................................................. 11

*Hodgkins ex rel. Hodgkins v. Peterson*,
  355 F.3d 1048 (7th Cir. 2004) ..................................................................... 17

*Hoery v. United States*,
  64 P.3d 214 (Colo. 2003) ............................................................................. 59

*Hurn v. Greenway*,
  293 P.3d 480 (Alaska 2013) ......................................................................... 60

*Ileto v. Glock Inc.*,
  349 F.3d 1191 (9th Cir. 2003) ............................................................... *passim*

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
  567 F. Supp. 3d 667 (D.S.C. 2021) ............................................................. 46

*In re Certified Question from Fourteenth Dist. Ct. of Appeals of Tex.*,
  740 N.W.2d 206 (Mich. 2007) ..................................................................... 48

*In re Chinese Manufactured Drywall Prod. Liab. Litig.*,
  680 F. Supp. 2d 780 (E.D. La. 2010) .......................................................... 52

*In re Firearm Cases*,
  126 Cal. App. 4th 959 (2005) ....................................................................... 30

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020) .................................................. *passim*

*In Re Kia Hyundai Veh. Theft Litig.*,
  2023 WL 8126870 (C.D. Cal. Nov. 17, 2023) ....................................... 31, 36

*In re Lead Paint*,
  924 A.2d 484 (N.J. 2007) ........................................................................ 29, 32

*In re McKinsey & Co., Inc. NationalPrescription Opiate Consultant Litigation*,
  2023 WL 4670291 (N.D. Cal. July 20, 2023) ........................................ 41, 42

*In re Natl. Prescription Opiate Litig.*,
  589 F. Supp. 3d 790 (N.D. Ohio 2022) ........................................................ 26

*In re Nat'l Prescription Opiate Litig.*,
2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ........................................................ 23, 42

*In re Nat'l Prescription Opiate Litig.*,
452 F. Supp. 3d 745 (N.D. Ohio 2020) ................................................................ *passim*

*In re Opioid Litig.*,
2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) .......................................... 23, 36, 39, 42

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) ......................................................... *passim*

*In re StarLink Corn Prods. Liab. Litig.*,
212 F. Supp. 2d 828 (N.D. Ill. 2002) ............................................................................ 41

*J.T. Baggerly v. CSX Transp., Inc.*,
635 S.E.2d 97 (S.C. 2006) ............................................................................................. 58

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979) .................................................................................................... 50

*James v. Arms Tech., Inc.*,
820 A.2d 27 (N.J. Super. Ct. App. Div. 2003) ......................................................... 29, 41

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016) ........................................................................................... 12

*Jefferson v. Qwik Korner Mkt., Inc.*,
34 Cal. Rptr. 2d 171 (Cal. Ct. App.1994) .................................................................... 48

*Jenkins v. Payne*,
251 Va. 465 S.E.2d 795 (Va. 1996) ............................................................................. 58

*John Crane, Inc. v. Jones*,
604 S.E.2d 822 (Ga. 2004) ........................................................................................... 58

*John Rocchio Corp. v. Pare Eng'g Corp.*,
201 A.3d 316 (R.I. 2019) .......................................................................................... 48, 52

*Johnson v. 3M*,
563 F. Supp. 3d 1253 (N.D. Ga. 2021) ............................................................. 41, 52, 61

*Kathleen R. v. Cityof Livermore*,
87 Cal. App. 4th 684 (2001) .......................................................................................... 10

*Kennedy Krieger Inst., Inc. v. Partlow*,
191 A.3d 425 (Md. 2018) ......................................................................................... 47, 61

*Kesner v. Superior Ct.*,
1 Cal. 5th 1132 (2016) ............................................................................................ 50, 60

*Knight v. Merhige,*
    133 So. 3d 1140 (Fla. Dist. Ct. App. 2014)...................................................................... 48

*Kuciemba v. Victory Woodworks, Inc.,*
    531 P.3d 924 (Cal. 2023)..................................................................................................... 48

*Kumaraperu v. Feldsted,*
    187 Cal. Rptr. 3d 583 (Cal. Ct. App. 2015)...................................................................... 26

*L.W. v. Snap Inc.,*
    2023 WL 3830365 (S.D. Cal. June 5, 2023) ..................................................................... 10

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,*
    191 F.3d 229 (2d Cir. 1999) ......................................................................................... 20, 21

*Lanser v. Riddle,*
    2013 WL 10408619 (Alaska Sup. Ct. July 1, 2013) ........................................................ 42

*Lemmon v. Snap, Inc.,*
    995 F.3d 1085 (9th Cir. 2021) ..................................................................................... 7, 8, 9

*Lopez v. Nevada,*
    2023 WL 9056866 (D. Nev. Dec. 29, 2023) ..................................................................... 57

*Louisiana Crawfish Producers Association—West v. Amerada Hess Corporation,*
    935 So.2d 380 (La. App. 3rd Cir.2006).............................................................................. 52

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................................. 19

*Matthews v. Williford,*
    318 So. 2d 480 (Fla. Dist. Ct. App. 1975).......................................................................... 57

*Mayor & City Council of Balt. v. Monsanto Co.,*
    2020 WL 1529014 (D. Md. Mar. 31, 2020) ................................................................ 31, 41

*McCain v. Fla. Power Corp.,*
    593 So. 2d 500 (Fla. 1992) .................................................................................................. 50

*Mellen v. Lane,*
    659 S.E.2d 236 (S.C. Ct. App. 2008) ................................................................................ 58

*Mich. State Chiropractic Ass'n v. Kelley,*
    262 N.W.2d 676 (Mich. Ct. App. 1977)............................................................................. 28

*Mike v. Borough of Aliquippa,*
    421 A.2d 251 (Pa. Super. Ct. 1980) ................................................................................... 24

*Mitman v. LA 1, LLC,*
    2023 WL 8270780 (Nev. 2023)........................................................................................... 61

*Modisette v. Apple Inc.*,
  30 Cal. App. 5th 136 (2018) .......................................................................... 26, 50

*Nami Res. Co., L.L.C. v. Asher Land & Min., Ltd.*,
  554 S.W.3d 323 (Ky. 2018) ................................................................................ 61

*NetChoice, LLC v. Bonta*,
  2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ................................................... 16

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............................................. 16, 17

*NetChoice, LLC v. Yost*,
  2024 WL 104336 (S.D. Ohio Jan. 9, 2024) .................................................. 16, 17

*Noble v. L.A. Dodgers, Inc.*,
  214 Cal. Rptr. 395 (Cal. Ct. App. 1985) ............................................................ 57

*Oliver v. Narragansett Bay Ins. Co.*,
  205 A.3d 445 (R.I. 2019) .................................................................................... 61

*Oulla v. Velazues*,
  831 S.E.2d 450 (S.C. Ct. App. 2019) .................................................................. 50

*Overcash v. S.C. Elec. & Gas Co.*,
  614 S.E.2d 619 (S.C. 2005) ................................................................................ 28

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) .............................................................................................. 51

*Page v. Niagara Chem. Div. of Food Mach. & Chem. Corp.*,
  68 So. 2d 382 (Fla. 1953) ................................................................................... 42

*Penelas v. Arms Tech., Inc.*,
  778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) ....................................................... 33

*Penelas v. Arms Tech., Inc.*,
  1999 WL 1204353 (Fl. Cir. Ct. Dec. 13, 1999) ................................................. 33

*People v. ConAgra Grocery Prods. Co.*,
  227 Cal. Rptr. 3d 499 (Cal. App. 2017) ............................................................. 36

*Perkins v. Entergy Corp.*,
  782 So. 2d 606 (La. 2001) .................................................................................. 58

*Phillips v. Cricket Lighters*,
  841 A.2d 1000 (Pa. 2003) ............................................................................ 50, 61

*Pittway Corp. v. Collins*,
  973 A.2d 771 (Md. App. Ct. 2009) ............................................................... 57, 58

*Pompano Horse Club v. State*,
   111 So. 801 (Fla. 1927) ................................................................................. 28

*Prescott v. Slide Fire Sols., LP*,
   410 F. Supp. 3d 1123 (D. Nev. 2019) ........................................................... 50

*Price v. Blaine Kern Artista, Inc.*,
   893 P.2d 367 (Nev. 1995) ............................................................................. 58

*PSINet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ........................................................................ 16

*Purvis v. Aveanna Healthcare, LLC*,
   563 F. Supp. 3d 1360 (N.D. Ga. 2021) ......................................................... 60

*Quisenberry v. Huntington Ingalls Inc.*,
   818 S.E.2d 805 (Va. 2018) ............................................................................ 61

*Residences at Ivy Quad Unit Owners Ass'n, Inc. v. Ivy Quad Dev., LLC*,
   179 N.E.3d 977 (Ind. 2022) .......................................................................... 52

*Rhode Island v. Atl. Richfield Co.*,
   357 F. Supp. 3d 129 (D.R.I. 2018) ............................................................... 60

*Rincon Band of Luiseño Mission Indians v. Flynt*,
   286 Cal. Rptr. 3d 29 (Cal. Ct. App. 2021) ................................................... 40

*Roberie v. VonBokern*,
   2006 WL 2454647 (Ky. Aug. 24, 2006) ....................................................... 59

*Roberts v. Benoit*,
   605 So. 2d 1032 (La. 1991) ........................................................................... 57

*Roche v. Ugly Duckling Car Sales, Inc.*,
   879 A.2d 785 (Pa. Super. Ct. 2005) ............................................................. 48

*Rogers v. Martin*,
   63 N.E.3d 316 (Ind. 2016) ............................................................................ 60

*Rougeau v. Hosp. Serv. Dist. No. 2 of Beauregard Par.*,
   368 So. 3d 1196 (La. Ct. App. July 26, 2023) .............................................. 46

*Rowland v. Christian*,
   443 P.2d 561 (Cal. 1968) ............................................................... 44, 45, 50

*Ruiz v. ConAgra Foods Packaged Foods LLC*,
   606 F. Supp. 3d 881 (E.D. Wis. 2022) ......................................................... 48

*Russo v. United States*,
   37 F. Supp. 2d 450 (E.D. Va. 1999) ....................................................... 57, 58

*Saltiel v. GSI Consultants, Inc.*,
   788 A.2d 268 (N.J. 2002) .................................................................................. 62

*Se. Booksellers Ass'n v. McMaster*,
   371 F. Supp. 2d 773 (D.S.C. 2005) ..................................................................... 17

*Semler v. Psychiatric Inst. of Wash., D.C.*,
   538 F.2d 121 (4th Cir. 1976) .............................................................................. 58

*Severa v. Solvay Specialty Polymers USA, LLC*,
   524 F. Supp. 3d 381 (D.N.J. 2021) ...................................................................... 59

*Sheen v. Wells Fargo Bank, N.A.*,
   505 P.3d 625 (Cal. 2022) ................................................................................... 53

*Shelton v. Kentucky Easter Seals Soc.*, Inc.,
   413 S.W.3d 901 (Ky. 2013) ................................................................................ 61

*State Dep't of State Hosps. v. Super. Ct.*,
   349 P.3d 1013 (Cal. 2015) .................................................................................. 26

*State ex rel. Howes v. W.R. Peele, Sr. Trust*,
   876 F. Supp. 733 (E.D.N.C. 1995) ...................................................................... 59

*State ex rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021) .................................................................................. 35

*State ex rel. Stein v. EIDP, Inc.*,
   2023 WL 2326101 (N.C. Super. Ct. Mar. 2, 2023) ............................................. 41

*State ex rel. Swann v. Pack*,
   527 S.W.2d 99 (Tenn. 1975) ............................................................................... 28

*State v. Canty*,
   105 S.W. 1078 (Mo. 1907) ................................................................................. 28

*State v. Exxon Mobil Corp.*,
   406 F. Supp. 3d 420 (D. Md. 2019) ..................................................................... 31

*State v. Lead Industries Associations, Inc.*,
   951 A.2d 428 (R.I. 2008) ............................................................... 25, 32, 33, 37

*State v. Purdue Pharma L.P.*,
   2018 WL 4468439 (Alaska Super. Ct. July 12, 2018) .................................. 23, 41

*State v. Purdue Pharma L.P.*,
   2018 WL 7892618 (Sup. Ct. Wash. May 14, 2018) ............................................ 27

*State v. Purdue Pharma L.P.*,
   2019 WL 3991963 (R.I. Super. Ct. Aug. 16, 2019) ............................................ 37

*State v. Purdue Pharma L.P.*,
   2022 WL 577874 (Sup. Ct. R.I. Feb. 18, 2022) ................................................ 27, 29, 41

*Stein v. Asheville City Bd. Of Educ.*,
   626 S.E.2d 263 (2006) .......................................................................................... 61

*Stiens v. Bausch & Lomb Inc.*,
   626 S.W.3d 191 (Ky. Ct. App. 2020) .................................................................. 44

*Sturgis v. R+L Carriers, Inc.*,
   2019 WL 13084410 (N.D. Ind. Nov. 14, 2019) ................................................ 44

*There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*,
   19 F.3d 1165 (7th Cir. 1994) ............................................................................. 18

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*,
   110 So.3d 399 (Fla. 2013) .................................................................................. 52

*Totman v. A.C. & S., Inc.*,
   2002 WL 393697 (R.I. Super. Ct. Feb. 11, 2002) ............................................. 58

*TS &C Invs., LLC, v. Beusa Energy, Inc.*,
   637 F. Supp. 2d  (W.D. La. 2009) ...................................................................... 52

*Twitter, Inc. v. Taamneh*,
   598 U.S. 471 (2023) ....................................................................................... 24, 25

*Union Pac. R.R. Co. v. Sharp*,
   330 Ark. 174 (1997) ........................................................................................... 57

*Walmart, Inc. v. Reeves*,
   671 S.W.3d 24 (Ky. 2023) .................................................................................. 47

*Webber v. Armslist LLC*,
   70 F.4th 945 (7th Cir. 2023) ................................................................................. 9

*Weis v. Superior Court of San Diego Cnty.*,
   30 Cal. App. 730 (1916) ..................................................................................... 28

*Winschel v. Brown*,
   171 P.3d 142 (Alaska 2017) ............................................................................... 57

*Zamora v. Columbia Broad. Sys.*,
   480 F. Supp. 199 (S.D. Fla. 1979) ..................................................................... 50

<u>Statutes</u>

47 U.S.C. § 230 ........................................................................................................ 1, 2

Ala. Code § 6-5-120 ................................................................................................ 8, 60

Alaska Const. art. 7, § 1 ...................................................................................................... 60

Cal. Civ. Code § 3479 ...................................................................................................... 8, 60

Cal. Civ. Code § 3480 .......................................................................................................... 35

Cal. Const. art. IX, §§ 1 ........................................................................................................ 60

Cal. Const. art. IX, §§ 5 ........................................................................................................ 60

Colo. Const. art. IX, § 2 ........................................................................................................ 60

Fla. Const. art. IX, § 1 ........................................................................................................... 60

Ga. Code Ann. § 41-1-1 ..................................................................................................... 8, 60

Ga. Code Ann. § 51-1-11 ........................................................................................................ 61

Ga. Const. art. VIII, § 1 ......................................................................................................... 60

Idaho Code § 52-101 .......................................................................................................... 8, 60

Ill. Const. art. X, § 1 ............................................................................................................. 60

Ind. Code Ann. § 32-30-6-6 ............................................................................................... 8, 60

Ind. Const art. VIII, § 1 ......................................................................................................... 60

Ky. Const. § 183 .................................................................................................................... 60

La. C.C. Art. 2315 .............................................................................................................. 8, 60

La. Const. art. VIII, § 1 ......................................................................................................... 60

Md. Const. art. VIII, § 1 ........................................................................................................ 60

Mont. Code Ann. § 27-30-101 ......................................................................................... 8, 9, 60

N.C. Const. Art. I, § 15 .......................................................................................................... 60

N.D. Cent. Code § 42-01-01 ............................................................................................... 9, 60

N.J. Const. art. VIII, § 4 ........................................................................................................ 60

N.M. Stat. Ann. § 30-8-1 .................................................................................................... 9, 60

Nev. Const. art. XI, § 2 .......................................................................................................... 60

Okla. Stat. Ann. tit. 50, § 1 ................................................................................................. 9, 60

Pa. Const. Art. III, § 14 .......................................................................................................... 60

R.I. Const. art. XII, § 1 ................................................................................................ 60

S.C. Const. art. XI, § 3 ................................................................................................ 60

SDCL § 21-10-1 ..................................................................................................... 9, 60

Utah Code Ann. § 76-10-803 ................................................................................. 9, 60

Va. Const. art. VIII, § 1 ............................................................................................... 60

Wash. Rev. Code Ann. § 7.48.120 ........................................................................ 9, 60

Rules

Fed. R. Civ. P. 15(a)(2) ............................................................................................... 53

Other Authorities

66 C.J.S. Nuisances § 8 .............................................................................................. 28

Antigone Davis, *Parenting in a Digital World is Hard. Congress Can Make It Easier*, Meta (Nov. 15, 2023), https://about.fb.com/news/2023/11/online-teen-safety-legislation-is-needed ... 15

*Legislative Framework to Protect Children and Teens Online*, Google, https://static.googleusercontent.com/media/publicpolicy.google/en//resources/youth-legislative-framework.pdf ........................................................................................... 15

*Senate Congressional Testimony of Evan Spiegel as Delivered*, Snap (Jan. 31, 2024), https://newsroom.snap.com/senate-congressional-oral-testimony-of-evan-spiegel-jan-31-2024 ............................................................................................................................ 15

Restatement (Second) of Torts § 821 ......................................................................... 33

Restatement (Second) of Torts § 821B .................................................................. *passim*

Restatement (Second) of Torts § 821C ....................................................................... 38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  INTRODUCTION[1]

Plaintiffs are local governments and school districts—the first responders in the health crisis caused by Defendants' social media platforms. They are incurring substantial costs because they must combat the many harms that have resulted from Defendants' concerted effort to addict students to their apps.[2] As Plaintiffs explain here, Defendants' precipitation and propagation of this health crisis violates the common laws of negligence and public nuisance in all of the states where the School Districts are located.[3]

Now, Plaintiffs seek compensation for the overwhelming resources they have dedicated to combatting the harm caused by Defendants' apps, as well as entry of an order of abatement against this dangerous conduct. The School Districts' claims are firmly rooted in centuries-old common law principles reinforced by a multitude of recent decisions, including Judge Orrick's recent decision in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.* ("*JUUL*"), 497 F. Supp. 3d 552 (N.D. Cal. 2020), and similar decisions addressing the opioids epidemic.

Defendants' motion to dismiss, by contrast, raises arguments that range from the irrelevant (citing the law of states not at issue) to the revisionist (attempting to avoid this Court's previous decisions regarding 47 U.S.C. § 230 and the First Amendment). Plaintiffs respectfully ask this Court to reject all of them.

*First*, Defendants' so-called "threshold" arguments all fail. The School Districts' Complaint does not run afoul of § 230 because, in attempting to hold Defendants liable for their negligent conduct and creation of a public nuisance, the School Districts do not seek to "treat[]" Defendants as

---

[1] "Plaintiffs" and "School Districts" refer jointly to the school districts and local government entities that have filed suits for negligence and/or public nuisance in this action.

All references to "¶" refer to Plaintiffs' Master Complaint (Local Government and School District), ECF No. 504 ("Complaint"). The School Districts cite Defendants' Motion to Dismiss (ECF No. 601) as "Mot." Unless otherwise indicated all internal citations and quotations are omitted and all emphases are added.

[2] *See generally In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig*., 2023 WL 7524912 (N.D. Cal. Nov. 14, 2023).

[3] Alaska, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, New Jersey, Nevada, North Carolina, Pennsylvania, Rhode Island, South Carolina, and Virginia.

1  publishers or speakers of information. 47 U.S.C. § 230(c)(1). Rather, Plaintiffs challenge Defendants'

2  conduct in designing, operating, promoting, and marketing their platforms. These allegations "do not

3  implicate publishing or monitoring of third-party content and thus are not barred by [§] 230." *In re*

4  *Soc. Media*, 2023 WL 7524912, at *11. Likewise, the School Districts' claims are not barred by the

5  First Amendment because addressing them "would not require that defendants change how or what

6  speech they disseminate." *Id.* at *18. In addition, the School Districts' claims are distinct from the

7  products liability claims that the personal injury plaintiffs assert, and the School Districts' Complaint

8  establishes how this distinct harm was foreseeable (and thus properly alleges causation).

9      *Second*, Defendants attempt to unduly narrow the reach of public nuisance law. The School

10  Districts' public nuisance claims fit well within the historical and recent scope of public nuisance,

11  which "does not necessarily involve interference with use and enjoyment of land." Restatement

12  (Second) of Torts § 821B, cmt. h (1979). Plaintiffs also satisfy the elements of public nuisance: they

13  allege interference with a public right (the right to public education, health, and safety), and they have

14  alleged injuries (related to providing education, disciplinary, and youth mental health-services) that

15  are different in kind from those suffered by the general public. Plaintiffs therefore may recover

16  damages and secure abatement for the public nuisance Defendants created.

17      *Finally*, Defendants are not entitled to dismissal of Plaintiffs' negligence claims based either

18  on a purported lack of duty or the economic loss rule. It was foreseeable that addicting youth to

19  Defendants' products and promoting social media use in schools would require the School Districts

20  to respond, by bolstering the services they provide students and repairing the damage to their systems

21  and property—at great expense. Public policy considerations strongly support a duty requiring

22  Defendants to avoid addicting youth and disrupting public education and public health. And, for the

23  majority of the states at issue, the economic loss rule does not apply to negligence and public nuisance

24  claims like those asserted here. Even where the rule applies more broadly, however, it does not bar

25  claims in situations like this where Defendants' duties arise independently under the law.

26  **II.  BACKGROUND**

27      For over a decade, Defendants—the largest and most influential technology companies in the

28  world—have set their sights on school-aged children. ¶¶7, 16, 56-67, 213-28, 267-68, 566-67, 683-

84, 849-850. To do so, Defendants intentionally sought to "infiltrate schools" so that "their addictive platforms [would] spread[] through entire school communities." ¶¶214-28. Predictably, Defendants' conduct has harmed the school districts and local governments they sought to "infiltrate." *Id*. Compulsive use of Defendants' platforms by minor students has caused "significant disruption to schools' operations, greatly frustrates their ability to achieve their mandate of educating students in a safe and healthy environment, and forces school districts to expend or divert significant resources in response." ¶195. As one of the primary mental health services providers for school-aged children—providing mental health services to millions of children each year—school districts have been overwhelmed by the demand for services caused by Defendants' conduct. ¶¶200-08. School districts must further contend with property damage, increased truancy, classroom disruptions, behavioral issues, and decreased academic performance resulting from Defendants' conduct. ¶¶207-10.

Plaintiffs have had to expend, divert, and increase financial and personnel resources to address these disruptive forces, including to: repair property damage; confiscate cell phones and other devices; respond to increased mental and behavioral health issues among students; investigate and respond to threats to schools and students; implement new information technology as well as physical resources to limit access to, and mitigate risks caused by, Defendants' platforms; develop and revise teaching plans; provide additional learning support; hire additional mental health personnel; address student disciplinary issue; modify mental health curricula; create education materials about social media addiction and harm; route students to counselors and mental health service providers; develop additional mental health resources; train teachers to support student mental health; update student handbooks to address use of Defendants' platforms; update school policies to address use of Defendants' platforms; and address these issues with parents and guardians. ¶212. Mental health services provided by local governments have been similarly "overburdened by the increase in youth mental health issues caused by social media addiction," straining community behavioral and mental health services and support services for school children and minors. ¶¶234-48.

The harms Defendants' platforms have caused to school districts and local governments were not only foreseeable—Defendants designed their platforms *for the express purpose* of addicting young users with full knowledge of the disruption that would occur as a result. Armed with insights

and research from social psychology, along with near limitless resources, Defendants knowingly designed their social media platforms to hook young users, encouraging and rewarding excessive and compulsive use. ¶¶7, 9-16, 68-125. Increasing children's and teens' use is "central to Defendants' business model" because young users are more easily addicted to social media than adults. ¶57. Because younger users will spend more time on their platforms, Defendants can deliver more advertisements and generate higher revenues from their use. *Id.* Defendants see young users as key to driving the long-term growth of their platforms. ¶¶213-28, 325-49, 575-93, 702-10, 849-62.

In pursuit of that goal, Defendants' efforts were devastatingly successful. A majority of teens and near-majorities of tweens and children now use Defendants' platforms, with young users reporting that they use social media "almost constantly." ¶¶59-60. The wellbeing of young people has suffered as a result, with social media driving a host of mental and behavioral health harms, including: increases in anxiety and depression; increases in disordered sleep and a reduction in sleep quality; poor emotion regulation; inability to focus; difficulty forming friendships; increases in disordered eating and body dysmorphia; increased development of attention-deficit/hyperactivity disorder (ADHD); and even suicide. ¶¶134-82.

This public health crisis is felt deeply where children and teens spend the majority of their waking hours: at school. Social media addiction has eroded children and teen's academic performance, with studies linking excessive use of, and addiction to, Defendants' platforms with lower grades and increased academic stress. ¶160. Defendants deliberately designed their platforms to encourage compulsive use of their platforms during school. ¶65. One study showed that young social media users received a median of 237 notifications in a typical day, with maximums of more than 4,500, and that nearly one-quarter of those arrived during school hours. *Id.* It was obvious that Defendants' actions would cause the harms the School District Plaintiffs suffered, including but not limited to: diverting resources to limiting social media use; hiring additional staff such as counselors to address issues caused by social media addiction; dealing with property damage; dealing with threats; expending resources on new technologies; and purchasing physical barriers, such as magnetic pouches, to limit social media use in schools. ¶212.

Defendants knew their actions were seriously impacting young people and school districts, yet pushed ahead with their plan to farm as much attention from school children as they could for one simple reason: profit. ¶16. Meta, for example, categorizes high schools as either "Facebook" or "non-Facebook" and analyzes Instagram use on a school level. ¶¶16, 1020a. A November 2018 Meta planning document stated: "Winning schools is the way to win with teens because an individual teen's engagement is highly correlated with school MAP [Monthly Active People] penetration. Solving jobs related to school and building school network effects is a way to increase overall teen usage." ¶58. One Meta presentation, reviewed by Mark Zuckerberg, commented that "high school is the key driver of U.S. teen social activity and occupied 6+ hours per day." ¶214. Thus, Meta made a "big 2017 bet" on "high school communities," to try to attract teens. *Id.* In 2018, Meta's Instagram platform allotted most of its global annual marketing budget to targeting 13-to-15-year-old children, a marketing demographic it calls "early high school." ¶322.

Similarly, TikTok admits its platform interferes with the school day and students' sleep, noting that "we send notifications to users during the school day and in some cases, up until midnight." ¶220. Still, TikTok directly targets schools. TikTok identified approximately 80 high schools around the United States and sent them a TikTok toolkit for "back to school nights." ¶221. TikTok views U.S. teens as a "golden audience" and has designed its platform to capture their attention. ¶686. TikTok's own designer calls its infinite scroll feature "behavioral cocaine." ¶¶765-67. And TikTok challenges encourage destructive behavior, predictably causing havoc at schools. ¶¶787-88.

Snap also directly targets schools, designing campaigns for its advertisers that highlight its connection and access to schoolchildren:

¶224.

When Snap once launched an update to Snapchat during the school day, a Kansas teacher called it the most disruptive thing of her 16-year career, likening the update to "crack" for students. ¶223. Snap boasts about its "Back to School on Snapchat" and "Snap to School" programs, noting that 90% of students aged 13 to 24 in the United States and United Kingdom use the app. ¶224. Snap's own research lists "during work/school" as one of the times people are most likely to use the platform. ¶579. But rather than viewing such use as a cause for concern, Snap's leadership celebrates immersive use. In May 2012, CEO Evan Spiegel reported that the company was "thrilled" to learn that most of Snapchat's users were high school students using the platform during class. ¶575. To capitalize on young users, Snap strives to be "more immersive" than any other platform, recognizing that any loss over the command of its users' attention will hurt its bottom-line. ¶¶579-80.

Meanwhile, Google's YouTube is the most popular social media program with students, used by 95% of students aged 13 to 17. ¶225. YouTube tries to integrate itself into children's school-life, expressly advertising itself for use in the classroom on a website labeled YouTube.com/Teachers, which provides "tips and tricks for bringing YouTube into the classroom." ¶226. Google even pitched its advertising reach to toy-maker Mattel, claiming that YouTube is the industry leader in reaching children aged 6 to 11. ¶227. And by connecting YouTube accounts to Google accounts such as Gmail, Google makes it more difficult for addicted teens to delete their YouTube accounts. ¶921.

1    "Each Defendant knew or should have known that its platforms were causing serious harm,

2    and negative impacts on public schools and other local government entities." ¶255. Each Defendant

3    could have, but failed to, make design changes to reduce or prevent these harms. ¶256. And each

4    Defendant intended for their actions to affect Plaintiffs, as they targeted youth who attend public

5    schools as a key consumer group, necessarily injuring schools and government services in the process.

6    ¶1019.

7    **III. ARGUMENT**

8        **A.    Defendants' Threshold Arguments Misconstrue Plaintiffs' Allegations and Rely**

9            **on Previously Rejected Arguments.**

10        Defendants' latest attempt to raise defenses under § 230 and the First Amendment rehash

11    arguments this Court already rejected. Defendants also unsuccessfully advance the so-called

12    "derivative injury rule" and an alleged lack of proximate causation between Defendants' intentional

13    targeting of young users in schools and the costs that those same schools have incurred in redressing

14    the foreseeable harm from use. The Court should reject all of these arguments.

15            **1.    Section 230 Does Not Bar Plaintiffs' Claims.**

16        This Court's prior motion-to-dismiss ruling dooms Defendants' argument that § 230 provides

17    blanket protection from tort liability for negligence or public nuisance. Neither claim seeks to impose

18    liability because of any Defendant's "status or conduct as a publisher or speaker." *Soc. Media*, 2023

19    WL 7524912, at *9 (quoting *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021)). Instead,

20    the School Districts seek to hold Defendants liable for negligently designing, operating, promoting,

21    and marketing their platforms—and the resulting public nuisance—not for the content of any speech

22    they published. Put another way, Defendants' duties "could 'have been satisfied without changes to

23    the content posted by the website's users and without conducting a detailed investigation.'" *Id.*

24    (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016)).

25            **a)    Section 230 Does Not Bar Plaintiffs' Negligence Claim.**

26        The School Districts seek to hold Defendants liable for their choice to target minors when

27    developing, operating, and marketing addictive platforms, all while knowing that the School Districts

28    would be on the front lines of dealing with the mental health crisis Defendants created. ¶3; *see also*

¶¶30, 969-70, 1020. The School Districts' complaint illustrates how many of Defendants' design choices have worked to addict students and youth. *See, e.g.*, ¶¶398-434 (Facebook and Instagram), 594-626 (Snapchat), 726-78 (TikTok), 873-918 (YouTube). The source of their negligence liability is their "deliberate" choice to "design[]," "promot[e]," and "market[]" platforms that they knew to be addictive; their failure to take "reasonable care" as they made those choices; and their subsequent failure to warn users and the public about the known risks associated with use—even at times "engaging in the deliberate concealment, misrepresentation, and obstruction of public awareness of serious health risks to users of [the] platforms." ¶31. Thus, the duty Defendants breached relates to the design of their platform, not their determination of how or what to publish. *Soc. Media*, 2023 WL 7524912, at *16.

"Critically, [§] 230 does not create immunity simply because publication of third-party content is relevant to or a but-for cause of the plaintiff's harm." *Id*. at *9. Because the School Districts allege Defendants "violated their duty to plaintiffs through conduct other than publishing third-party content and could have met their duty without changes to publishing conduct," the School Districts' negligence claim is not barred by § 230. *Soc. Media*, 2023 WL 7524912, at *14 (relying on *Lemmon* and *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814 (D. Or. 2022)). Indeed, this Court has already held that § 230 does not bar the personal injury plaintiffs' negligence claims based on failure to warn for this very reason. *Id*. at *16.

**b)    Section 230 Does Not Bar the School Districts' Public Nuisance Claim.**

Nor does the School Districts' public nuisance claim seek to treat Defendants as publishers of third-party content. *Soc. Media*, 2023 WL 7524912, at *9. "A public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1) (1979).[4] Under the Restatement, the thrust of the public nuisance analysis looks to the actions, choices, and affirmative conduct of the defendant. *Id*. at § 821B(2).

---

[4] The School Districts allege public nuisance claims against all Defendants under the common law of all states or other jurisdictions whose laws are applicable to any Plaintiffs' claims, as well as under Ala. Code § 6-5-120, Cal. Civ. Code § 3479 *et. seq.*; Ga. Code Ann. § 41-1-1, *et seq.*; Idaho Code § 52-101 *et seq.*; Ind. Code Ann. § 32-30-6-6 *et seq.*; La. C.C. Art. 2315 *et. seq.*; Mont. Code Ann. §

The School Districts here allege that Defendants unreasonably interfered with the public rights to health, safety, and education by designing their platforms to addict children, and directly marketing their platforms to children, despite knowing that the platforms were especially harmful to them. ¶¶968-70. These public nuisance claims are based on Defendants' roles as the designers and promoters of their platforms, not on content they displayed to any particular user or on their choice to publish or depublish third-party content. *See Lemmon*, 995 F.3d at 1093. To comply with their state-law duties to refrain from unreasonable interference with rights general to the public, Defendants would need to change only their own marketing, development, and design decisions. *JUUL*, 497 F. Supp. 3d at 645-47 (allegations that manufacturer produced, promoted, distributed, and marketed e-cigarettes for underage use in school districts and counties plausibly stated claims for public nuisance); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1210-14 (9th Cir. 2003) ("creating an illegal secondary market for guns"); *City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 673 (N.D. Cal. 2020) ("promoted, distributed, and dispensed opioids, despite knowing of the hazard that such conduct would create") (cleaned up). Defendants could meet those duties "without changes to publishing conduct." *Soc. Media*, 2023 WL 7524912, at *14. Defendants' § 230 defense thus fails.

Defendants' own cases underscore this distinction. Mot. at 7. In *Daniel v. Armslist, LLC*, the Wisconsin Supreme Court rejected a public nuisance claim where the allegations that a website facilitated illegal gun sales amounted to "simply another way of claiming that Armslist is liable for publishing third-party firearm advertisements and for failing to properly screen who may access this content." 926 N.W.2d 710, 725-26 (Wis. 2019). Subsequently, courts *allowed* public nuisance claims alleging "that Armslist should have structured the website differently," for example by "includ[ing] safeguards and screening/monitoring provisions," and "implement[ing] measures that would prevent illegal firearms dealers from using the website to sell guns without a license." *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641, 663 (E.D. Wis. 2021), *aff'd sub nom. Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023). Section 230 did not bar those public nuisance theories because they did not "challenge the *content* of ads posted on the Armslist.com website." *Id*. Plaintiffs' public nuisance claim here

---

27-30-101 *et seq.*; N.D. Cent. Code Ann. § 42-01-01; N.M. Stat. Ann. § 30-8-1; Okla. Stat. Ann. tit. 50, § 1 *et seq.*; SDCL § 21-10-1; Utah Code Ann. § 76-10-803 *et seq.*; and Wash. Rev. Code Ann. § 7.48.120 *et. seq. See* ¶¶967-68.

PLS.' OPP'N. TO DEFS.' MOT. TO DISMISS
(LOCAL GOVERNMENT AND SCHOOL DISTRICT)
CASE NO. 4:22-MD-03047

targets the same sort of "affirmative conduct," *see id.* at 664—Defendants' "design, development, production, operation, promotion, distribution, and marketing of their social media platforms to attract and addict minors." ¶970.

Defendants' other cases could not be more different from the facts here. Those cases all turned exclusively on the content at issue. For example, in *Dart v. Craigslist, Inc.*, the plaintiff sought to hold an online bulletin board liable for "negligently *publishing* harmful information *created by its users*." 665 F. Supp. 2d 961, 967-70 (N.D. Ill. 2009). And in *Kathleen R. v. City of Livermore*, a parent sued a public library because her child was able to view pornography through a library computer. 87 Cal. App. 4th 684, 691-702 (2001). Section 230 applied because these lawsuits sought to hold the defendants liable for the act of publication alone—nothing more.

Defendants similarly rely on inapposite cases involving allegations that defendants failed to adequately monitor user activity on their sites. *See, e.g.*, *Herrick v. Grindr LLC*, 306 F. Supp. 3d 579, 584 (S.D.N.Y. 2018) (failure to monitor for fake dating profiles); *L.W. v. Snap Inc.*, 2023 WL 3830365, at *8 (S.D. Cal. June 5, 2023) (failure to monitor for sex crimes against children on Snapchat). These cases, as this Court has explained, are fundamentally different from duties—such as failure-to-warn—that do not require Defendants to "mak[e] any changes to how they publish content." *Soc. Media*, 2023 WL 7524912, at *16. Just so, the School Districts' public nuisance claim does not impose a duty "to remove any user content or otherwise affect how [a website] publishes or monitors such content." *Internet Brands*, 824 F.3d at 851.

### c)  This Court's Feature-By-Feature Analysis Produces the Same Result.

Even if the Court were to use a feature-by-feature analysis for the negligence and public nuisance claims—which is not required here because neither claim turns on the publication of content—the Court's prior ruling demands that the claims proceed. Not only did the Court find that the personal injury plaintiffs' failure-to-warn allegations were not barred by Section 230, but even on a strict products liability theory, the Court found that claims challenging certain design features do not treat Defendants as publishers or speakers, including: (1) failing to provide effective parental controls, including notification to parents that children are using the platforms; (2) failing to provide

options for users to self-restrict time used on a platform; (3) making account deletion challenging; (4) failing to use robust age verification; (5) making reporting predators challenging; (6) offering appearance-altering filters; (7) failing to label filtered content; (8) choosing to notify users with Defendants' own content in a manner that increases addictive use; and (9) failing to implement reporting protocols that allow visitors to report CSAM without creating an account. *Soc. Media.*, 2023 WL 7524912, at *11-13. Here, the School Districts allege that by choosing to design and operate platforms with these features, Defendants acted negligently and unreasonably interfered with rights common to the public.[5] At minimum, any allegations predicated on Defendants' design of these features survive § 230.

   ***Parental Controls & Age Verification.*** As Defendants admit, the School Districts' allegation that Defendants negligently failed to incorporate proper parental controls relates to the harmful and addictive design features—in other words, aspects of Defendants' platforms themselves, not the presence of harmful content. Mot. at 11-12 (quoting ¶¶104, 593, 867). The School Districts allege Defendants could have designed their platforms with more robust parental controls and effective age verification—indeed, that the companies were aware of the deficiency but ignored the problem—yet chose to act in a manner that fell below a reasonable standard of care, creating a youth mental health epidemic. *See, e.g.*, ¶380.

   Defendants claim § 230 absolves them of liability for failing to protect users from third-party content. Mot. at 6-16. This is a red herring. The School Districts allege Defendants are liable for failing to implement reasonable measures to protect students from *Defendants' own platforms*. The flaw in Defendants' reasoning is underscored by the fact that their cases each involve a harm caused by specific third-party content or action that is then attributed to the interactive computer service. *See* Mot. at 12 (citing *Doe v. Myspace, Inc.*, 528 F.3d 413, 420-21 (5th Cir. 2008) (sexual assault that occurred off-platform); *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) (failing to

---

[5] *See, e.g.*, ¶¶104, 350, 371-81, 555, 593, 630, 647-49, 720-25, 827, 838, 864-72 (parental controls); 105, 268, 271, 322, 349, 399, 432, 574, 731-32, 769-70, 875, 891, 976, 984 (restrict time of use); 104, 130-33, 351-70, 588-93, 712-19, 838, 864-66, 933, 948 (age verification); 8, 435-39, 618-19, 794-804, 921-22 (delete accounts); 8, 89, 108, 122, 452-61, 563, 585, 640-46, 657, 766, 779-82 (filters); 574, 595, 601-05, 609, 812 (notifications of defendants' content); 381, 542, 547, 551-54, 668, 672, 815-18, 821, 944-46, 951-56 (predator and CSAM reporting).

monitor fraudulent profiles); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1126 (N.D. Cal. 2016) (failing to monitor for accounts operated by alleged terrorists); *Doe II v. MySpace, Inc.*, 175 Cal. App. 4th 561, 573-75 (2009) (sexual assault that occurred off-platform); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016) (failing to monitor and remove trafficking advertisements). Here, by contrast, the School Districts allege that the controls and age-verification tools were necessary to prevent harm from use of the platform themselves. Defendants cite no case that precludes negligence liability in such an instance.

Even if the Court considered the allegations about parental controls and age verification to necessarily implicate user-generated content, they do not impact Defendants' publishing activities. Courts have considered similar features to be gate-keeping functions that occur "*before* any content is exchanged" between users. *See A.M.*, 614 F. Supp. 3d at 821. The Court already explained why age verification measures are "broader" than Defendants suggest, and Defendants give the Court no reason to revisit that ruling. *See Soc. Media*, 2023 WL 7524912, at *12.

**Options for Self-Restriction and Ease of Account Deletion.** Although the School Districts allege that Defendants negligently failed "to implement opt-in restrictions to the length and frequency of use sessions," ¶8, or "provide self-limiting tools" to students and youth, ¶105, Defendants say nothing about these in their Motion. Claims predicated on the lack of such reasonable features may proceed. *Soc. Media*, 2023 WL 7524912, at *12.

**Filters & Labeling Filtered Content.** Through sleight-of-hand, Defendants conflate the School Districts' allegations about Defendants' image-filter tools (and failure to label filtered images) with claims about recommendation algorithms. *See* Mot. at 10. Just as they did in their motion to dismiss the personal injury priority claims, Defendants "ignore" the School Districts' allegations—and here, they also ignore the Court's prior reasoning that "filters are harmful regardless of whether children eventually post the images that they filtered," and that labeling filtered images has nothing to do with user-generated content and instead targets Defendants' own choices. *See Soc. Media*, 2023 WL 7524912, at *12.

**Approval Features & Defendants' Own Content.** Defendants overread the Court's prior order regarding approval features, such as "Likes" or "Hearts." The Court previously found that

"where *notifications* are made to alert users to third-party content, [§] 230 bars plaintiffs' product defect claims." *Soc. Media*, 2023 WL 7524912, at *15. The School Districts' allegations about approval features are broader than the harm that relates to the timing of notifications about likes or hearts. *See* ¶¶120-21, 179 (alleging that the existence of the Like feature itself exploits adolescents' desire for social approval). Approval features, like image filter tools, are designed and created by Defendants; consequently, Defendants must face the School Districts' allegations that they intentionally targeted teens who they knew were uniquely vulnerable to the pressures of societal approval with these features to increase their profits. *See* ¶85. Relatedly, Defendants have nothing to say about the Court's limitation of § 230 immunity to exclude Defendants' *own* content—such as Snap Streaks. *See* ¶¶608-14; *accord Soc. Media*, 2023 WL 7524912, at *13 ("To the extent defendants send notifications of their own content, Section 230 provides no immunity.").

**Reporting Predators & CSAM.** Again, Defendants completely fail to address the School Districts' allegations that they make it unreasonably difficult to report predators and the presence of CSAM. *See* ¶107. The Court previously ruled that increasing ease and availability of reporting tools does not implicate Defendants' role as publishers of content. *See Soc. Media*, 2023 WL 7524912, at *13. Under the Court's prior ruling, Defendants must face liability for their own negligence related to their own course of conduct, and nothing in their motion compels a different result.

> ### d) The Court Should Permit the School Districts to Allege Negligence and Public Nuisance Claims Based on *All* Features.

The School Districts note that the Court previously held that § 230 bars the personal injury plaintiffs' design defect claims arising out of certain allegedly defective features, including: (1) the lack of default limits on length and frequency of use sessions; (2) the lack of blocks to use during certain times of day (such as during school hours); (3) the endless Feed feature; (4) geolocation sharing features; (5) recommending minor accounts to adult users; (6) implementing features that limit content to short-form or ephemeral content, or that allow private content sharing; (7) timing and clustering notifications in a manner that promotes addictive use; and (8) using algorithms that are designed to promote addictive engagement. *See Soc. Media*, 2023 WL 7524912 at *13-16. The Court,

however, declined to dismiss the personal injury plaintiffs' failure-to-warn claims even as those claims pertain to these features. *Id.* at *16.

Here, the Court should similarly decline to dismiss the School Districts' negligence and public nuisance claims as to these remaining features. As with the personal injury plaintiffs' failure-to-warn claims, the School Districts' Complaint alleges that Defendants "are liable for conduct other than publishing of third-party content and that they could address their duty without changing what they publish." *Soc. Media*, 2023 WL 7524912, at *16; *see also Internet Brands*, 824 F.3d at 853 (finding no immunity under § 230 because "[t]he tort duty asserted here does not arise from an alleged failure to adequately regulate access to user content or to monitor internal communications").

***Algorithms.*** The School Districts allege that Defendants weaponized dozens of content-agnostic data points regarding user interaction—including when and where a user interacts with a post, the length of time spent hovering over or interacting with a post, and the number of times a post has been viewed, liked, saved, or shared—to "maximize user attention to their platforms, untethered from any consideration of what that attention is being directed to." ¶¶94, 95. Importantly, however, they do not "challenge defendants' use of algorithms to determine whether, when, and to whom to publish third-party content"; nor do they seek to "chang[e] the way defendants' publish third-party content." *Soc. Media*, 2023 WL 7524912, at *15; ¶92. Because "the conduct at issue is distinct from determinations of what to publish and how," *Soc. Media*, 2023 WL 7524912, at *16, § 230 is no bar.

***Default Limits on Time and Frequency of Use and Blocks During School.*** The School Districts detail how Defendants' choice not to limit users' access to their platforms in general or at certain times of day in particular have directly injured them. *See* ¶25 (alleging school districts are considering spending millions—if they even can—to block cell service in schools to limit social media use during school). Defendants could alter their own conduct and hence satisfy their alleged duty without changes to the publication of third-party content. *See Soc. Media*, 2023 WL 7524912, at *16 n.24 (citing *Lemmon*).

## 2.    The First Amendment Does Not Bar the School Districts' Claims

This Court previously recognized that tort suits against these Defendants for insufficient age verification and defective parental controls—among other defective features—are consistent with the

First Amendment because such claims "would not require that defendants change how or what speech they disseminate." *Soc. Media*, 2023 WL 7524912, at *17. Defendants now urge this Court to reject its prior decision. But, in doing so, they make the same mistake this Court recognized previously: they ignore crucial parts of the reasoning of the decisions they cite and try to incorrectly present those decisions as endorsing categorical rules that are not the law.

*Age Verification*. This Court previously recognized that allegations identical to the School Districts' "pose a plausible theory under which failure to validly verify user age harms users that is distinct from harm caused by consumption of third-party content on defendants' platforms." *Soc. Media*, 2023 WL 7524912, at *12. Defendants argue the Court got it wrong, and that age verification requirements are unconstitutional.[6] Mot. at 17-19. But Defendants' cases do not stand for such a categorical rule, and Defendants present no reason for the Court to depart from its previous decision. This Court already held that the allegation Defendants' platforms are defective because they do not use "robust age verification" "would not require that defendants change how or what speech they disseminate." *Soc. Media*, 2023 WL 7524912, at *18. That is also the case with the School Districts' Complaint, which likewise alleges that Defendants' age-verification features and parental controls are "ineffective" and "inadequate." *E.g.*, ¶¶218, 350-81, 648, 838, 864. In order to implement robust age verification and parental controls, Defendants would not be required to alter or limit access to any protected speech. Thus, the First Amendment poses no barrier to recovery. *See Soc. Media*, 2023 WL 7524912, at *18.

Defendants cite much of the same case law this Court previously rejected. *First,* recent cases dealing with statutorily mandated age-verification regimes have no application here. Those cases

---

[6] Notably, Defendants' capacious view of the First Amendment here is at odds with legislation they have publicly supported. Meta, for example, has called for "federal legislation that requires app stores to get parents' approval whenever their teens under 16 download apps." Antigone Davis, *Parenting in a Digital World is Hard. Congress Can Make It Easier*, Meta (Nov. 15, 2023), https://about.fb.com/news/2023/11/online-teen-safety-legislation-is-needed. Google takes the position that legislation should "[a]ddress the need for robust parental control options". *Legislative Framework to Protect Children and Teens Online*, Google, https://static.googleusercontent.com/media/publicpolicy.google/en//resources/youth-legislative-framework.pdf (last visited Feb. 22, 2024). And Snap has announced its support for legislation that would require parental controls on social media sites. *Senate Congressional Testimony of Evan Spiegel as Delivered*, Snap (Jan. 31, 2024), https://newsroom.snap.com/senate-congressional-oral-testimony-of-evan-spiegel-jan-31-2024. Supporting government mandated age verification and parental controls before Congress while urging this Court to declare such features unconstitutional is what some might call chutzpah.

involved facial challenges to laws that operated as governmental prior restraints on speech. *See NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *1 (W.D. Ark. Aug. 31, 2023) ("Self-reporting one's age (a common industry practice) is not sufficient; Arkansans must submit age-verifying documentation before accessing a social media platform."). No such issue is at play here. Those particular measures risked broadly foreclosing speech by adults as well as minors, *see id.* at *17, but courts still considered the import of *platform design* in stemming the harms minors experience when using social media platforms, *see id.* at *20 (noting that "time spent on social media" is a key problem and continued parental involvement part of the solution). *Second,* the states' professed reasons for requiring such measures (privacy concerns, protecting against the dangers posed by social media) did not square with the "breathtakingly blunt instrument" of cutting off all access without proof of *identity*. *NetChoice, LLC v. Yost*, 2024 WL 104336, at *9 (S.D. Ohio Jan. 9, 2024); *see NetChoice, LLC v. Bonta*, 2023 WL 6135551, at *12 (N.D. Cal. Sept. 18, 2023) (finding that requiring "documentary evidence of age or automated estimation based on facial recognition . . . would appear to counter the State's interest in increasing privacy protections for children"). The fact that some age verification measures act as impermissible prior restraints on speech does not mean that all do; the First Amendment is an affirmative defense, and there is no basis for drawing such a line now.

Likewise, the cases that Defendants say, "invalidated attempts to require internet services to limit access to content based on a user's age" (Mot. at 18) are not so sweeping as to be relevant here. *ACLU v. Mukasey*, 534 F.3d 181, 191 (3d Cir. 2008), involved a prohibition on material "harmful to minors," where it was uncertain who constituted a minor or why "an infant, a five-year old, or a person just shy of age seventeen" should all be treated identically with respect to that material. As with the *NetChoice* prior restraint cases, that decision involved a blanket prohibition on access that did not adequately address the harm at issue. So too in the other cases, some of which created issues specific to adult users not at issue here. *See PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (questioning the "reasonableness and effectiveness" of the identity verification measure at issue and stating that unwillingness by "adults" to provide required information without guarantee of anonymity could deter use of platform); *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1031-33 (D.N.M. 1998) (challenged law would have required credit card or debit card verification and court held that

"[r]equiring age verification before providing access to speech on the Internet would bar many people from accessing important information—such as gynecological information—anonymously"); *Se. Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 783 (D.S.C. 2005) (similar).

    *Parental Controls.* As this Court has already recognized in the context of individual personal injury claims, the types of parental controls the School Districts allege Defendants should have implemented are analogous to the "[m]yriad tangible products contain[ing] parental locks or controls to protect young children" including "parental locks on bottles containing prescription medicines" or "parental locks on televisions that enable adults to determine which channels or shows young children should be permitted to watch while unsupervised." *Soc. Media*, 2023 WL 7524912, at *30. "Such claims are therefore content-agnostic." *Id.* This Court's prior reasoning was sound and should apply with equal force here.

    Defendants' argument to the contrary relies primarily on misinterpreting the third footnote in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011). In that footnote, the Supreme Court distinguished between "the power to *enforce* parental prohibitions" (which are permissible) and "the power to prevent children from hearing or saying anything *without their parents' prior consent*" (which may not be). *Id.* at 795 n.3. This case falls into the first category: Plaintiffs do not claim that Defendants must bar access to young users without parental consent, but that Defendants must implement features to enforce parents' decisions to supervise their children and limit access to Defendants' platforms. *See, e.g.*, ¶¶380, 555, 593. Much as the state could require "that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," *Brown*, 564 U.S. at 795 n.3, so too could this Court require Defendants to repair the defective aspects of their platforms that do not honor parents' choices. The other cases Defendants cite that involve parental controls uniformly deal with similarly structured bans on access without parental consent. *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1064 (7th Cir. 2004); *Griffin*, 2023 WL 5660155 at *1; *Yost*, 2024 WL 104336, at *1, 9. Those kinds of bans are wholly different than the safety features Plaintiffs contend should have been implemented here—a nuance Defendants ignore.

1      ***Issues Unchallenged by Defendants.*** Defendants' Motion is even more striking for what it

2      does not attack. In their briefing on the personal injury cases, "defendants' motion did not raise any

3      arguments specifically addressing application of the First Amendment to failure to warn claims." *Soc.*

4      *Media*, 2023 WL 7524912 at *18. Once again, Defendants ignore this issue in their briefing here—

5      despite the fact the Complaint is clear that Defendants' failure to warn is a key part of the wrongful

6      conduct that created the public nuisance that harms these Plaintiffs. *E.g.*, ¶¶7-28; 31; 67; 265; 335;

7      398; 517; 558-65; 629; 650-69; 792; 824-32; 957-65; 1034-38. They do so because they do not have

8      a serious argument that the First Amendment bars claims premised on a failure to warn. Likewise,

9      Defendants make no argument to challenge this Court's (correct) conclusion that the First

10     Amendment does not bar claims based on "filter-related defects," "[n]ot providing options to users

11     to self-restrict time used on a platform," "[m]aking it challenging for users to choose to delete their

12     account," and "[n]ot implementing reporting protocols to allow users or visitors of defendants'

13     platforms to report CSAM and adult predator accounts specifically without the need to create or log

14     in to the products prior to reporting." *Soc. Media*, 2023 WL 7524912, at *18.

15     ***Notifications Regarding Defendants' Own Content.*** The School Districts acknowledge that

16     this Court's prior ruling held that allegations related to notifications to users by Defendants of

17     Defendants' own content were barred by the First Amendment. *Soc. Media*, 2023 WL 7524912, at

18     *18. The School Districts respectfully submit that the Court's prior ruling was erroneous on this point,

19     and do so to preserve appellate rights. Such notifications "are no more 'expression' than are such

20     statements as '21' in a game of blackjack or 'three peaches!' by someone who has just pulled the

21     handle of a one-armed bandit." *There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*, 19 F.3d 1165,

22     1167 (7th Cir. 1994). That does not rise to the level of speech.

23              **3.      Defendants' Purported Derivative Injury Rule Does Not Bar Plaintiffs'**

24                        **Claims.**

25              Defendants next argue that the School Districts cannot recover for the harm they have incurred

26     as government entities because their "injuries flow from harms allegedly suffered by minor users of

27     Defendants' platforms." Mot. at 20. Harm to the School Districts is distinct from injuries sustained

28     by Defendants' young users, and redressing the School Districts' injuries is not predicated on the

1    Court holding that the personal injury plaintiffs are also entitled to relief. Defendants ignore these

2    clear statements of law and instead make the sweeping and incorrect argument that public nuisance

3    claims are barred any time an individual might also have suffered harm from the scheme at issue.

4    Time and time again, courts have rejected such a myopic view of public nuisance law. This Court

5    should do the same.

6                    a)    **The School Districts Are Directly Harmed by Defendants'**

7                          **Conduct.**

8            As recounted above, the health crisis caused by Defendants' products led the School Districts

9    to incur several categories of massive financial harm. These include educating youth, parents, and

10   staff about social media addiction and harm; expending and increasing resources and staff time to

11   confiscate cell phones and address student mental health and behavioral issues; repairing property

12   damaged as a result of students acting out because of problems caused by Defendants' products;

13   developing new and revised teaching plans to address students' altered learning habits; hiring

14   additional mental health personnel and investing resources in mental health programs; and updating

15   student handbooks and school policies to address social media use. *See* ¶212.

16           These are the types of direct harms that give rise to public nuisance claims by government

17   entities.[7] *JUUL*, for instance, rejected an argument materially identical to Defendants', finding that

18   government entity plaintiffs stated a claim by pointing to "injuries as a result of a public health crisis

19   in their school districts and communities" that the JUUL defendants "created and sustained" through

20   "negligent and nuisance-causing conduct, i.e., by developing a product with features that appeal to

21   youth and then directly targeting youth with its marketing." 497 F. Supp. 3d at 664. As with the

22   School Districts, plaintiffs in that case "suffered direct harm in combatting the crisis through multiple

23   forms of costs and damages." *Id.*; *see also id.* at 621 (listing damages including "the costs of hiring

24   and training staff to address e-cigarette use, development of programs and materials to address e-

25   cigarette use, costs of tutoring and other services for students who were disciplined for e-cigarette

26   use, physical alterations to their properties to address and deter further e-cigarette use, and disposal

27   _____

28   [7] Accordingly, these allegations of concrete and particularized economic and property harms dispose of Defendants' argument that the School Districts do not satisfy the first of Article III's standing requirements. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

of the hazardous waste resulting from e-cigarette use"). That recovery was permissible because the government entities did not "seek to recover costs expended by students or any other third party," nor did they "seek compensation for any damages or personal injuries suffered by students who used JUUL." *Id.* at 664.

The *JUUL* court stated succinctly what many other courts have explained: the School Districts have suffered a direct, rather than derivative, injury in this context. Where, as here, a public entity suffers harm in the form of increased costs to ameliorate or abate conditions created by a public nuisance, its injuries are direct, not derivative, because they "exist even if no third party is harmed." *City of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568, at *5-6 (Mass. Super. Ct. 2000). That is, "[w]holly apart from any harm" caused by defendants to the individual children who comprise the public entity's community, and "regardless" of whether any given incident involving defendants' nuisance-causing products harms a particular youth, public entity "[p]laintiffs sustain injury" where they must expend resources "to respond to defendants' conduct" and "ensure school safety." *Id.* at *6 (providing examples of "costs for . . . increased security . . . and youth intervention services"); *see also Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148-49 (Ohio 2022) (endorsing *Boston* court's reasoning); *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 537 (9th Cir. 2024) (same, citing *JUUL*, and explaining that a plaintiff forced to "proactively spend more funds to bolster its healthcare facilities [and] social services" would not be alleging derivative injury).

**b)    The Harms Suffered by the School Districts Are Not Too Remote.**

Defendants characterize the School Districts' injuries as too indirect to be actionable. But the common law, properly understood, does not "embrace[ ] a rule which bars all claims for 'indirect' injuries." *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017). The School Districts' injuries are not indirect in any legally cognizable or otherwise meaningful sense.

Defendants largely point to *Association of Washington Public Hospital Districts v. Philip Morris, Inc.* ("*Wash. Hosp. Dists.*"), 241 F.3d 696 (9th Cir. 2001), and *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.* ("*Laborers Loc. 17*"), 191 F.3d 229 (2d Cir. 1999). The differences between this case and those are straightforward, both as a matter of facts and law. In *Wash. Hosp.*

*Dists.*, the government entities sought "their unreimbursed costs for treating patients suffering from tobacco-related illnesses." 241 F.3d at 700. Similarly, the union benefit fund in *Laborers Loc. 17* sought to recover "money expended to provide medical treatment to plaintiffs' participants and beneficiaries who have suffered and are suffering from tobacco-related illnesses." 191 F.3d at 233 (alterations adopted). But cases "seeking damages for unreimbursed medical expenses related to tobacco use" are "distinguishable." *JUUL*, 497 F. Supp. 3d at 665. Here, as in *JUUL*, "injuries in the form of operational costs that were directly borne by [the School Districts], not passed on by any intermediate party," are distinct injuries that are not too remote from the harm caused by Defendants. *Id.*

As an additional matter, *Wash. Hosp. Dists.*, *Laborers Loc. 17*, and many other of Defendants' cited cases (*see* Mot. at 20-21) arose in the context of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). The School Districts' state common-law claims are not subjected to this "more stringent" causation standard. *JUUL*, 497 F. Supp. 3d at 665; *see City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *6 (in a state public nuisance action, distinguishing *Wash. Hosp. Dists.* as "inapposite" because that case "applied a proximate cause standard from RICO law"). Thus, even apart from the factual distinction between this case (which seeks compensation for harm directly suffered by the School Districts) and the ones Defendants cite (which sought compensation for the same harm suffered by personal injury plaintiffs), the holdings in *Wash. Hosp. Dists.* and *Laborers Loc. 17* do not control this case.[8]

### 4. The School Districts Properly Plead Proximate Cause.

The School Districts sufficiently allege that Defendants' conduct was a proximate cause of the harm they suffered. As an initial matter, it is well-established that proximate cause is a factual

---

[8] But even if RICO's causation standard applied here, as measured by the *Holmes* policy factors, Plaintiffs would meet it. They seek "easily comput[able]" damages for their "own harm" in the form of costs incurred to remediate the effects Defendants' misconduct, with no risk of double recovery for individuals' injuries because they do not (and cannot) sue to redress the harms of their students. *Cincinnati*, 768 N.E.2d at 1149 (applying factors); *see also JUUL*, 497 F. Supp. 3d at 621 (finding that "[n]one of the *Holmes* factors . . . weigh against the [school districts'] showing of proximate cause and standing" for their RICO claims); *Estados Unidos Mexicanos*, 91 F.4th at 538 (finding *Holmes* factors satisfied for similar reasons, "[a]ssuming these considerations apply outside of the RICO context," and holding that "any such difficulties" with computing damages "are best resolved" after expert discovery).

question rarely resolvable on a motion to dismiss.[9] But as this Court recognized in the context of the personal injury plaintiffs' motion to dismiss, the touchstone of proximate cause is "whether the harm alleged is the foreseeable result of the at-issue conduct," *Soc. Media*, 2023 WL 7524912, at *40— here, too, Plaintiffs allege that Defendants' "design choices with respect to their platforms" caused Plaintiffs to suffer injury well within Defendants' expectations. *See id.* at *41. Foreseeability—and with it, proximate causation—is satisfied.

### a)     The School Districts Suffered Foreseeable Harm Caused by Defendants' Defectively Designed Products.

It was foreseeable that the School Districts, which stand on the front lines of providing educational, disciplinary, and youth mental health services to the nation's children, would be harmed by Defendants' deliberate choices to addict minors to their platforms. Defendants' design and marketing of their platforms to addict youth obligated the School Districts, as the primary providers of education and mental health services to minors, to divert and increase resources to address the youth mental health crisis. And these harms were eminently predictable: as detailed in the Complaint, "[a] growing body of scientific research, including Defendants' own (previously concealed) studies, draws a direct line between Defendants' conscious, intentional design choices and the youth mental health crisis gripping our nation." ¶11. In fact, "[c]apturing young users is central to Defendants' business model." ¶57; *see also* ¶¶68, 91, 104-09.

Several courts have found similar allegations sufficient to show proximate cause in other actions brought by public entities alleging public nuisance and negligence. Most relevant here, Judge Orrick found in *JUUL* that local government and school district plaintiffs sufficiently alleged that e-cigarette defendants proximately caused the injuries that school districts incurred to address the youth e-cigarette crisis created by defendants' successful efforts to addict children to their products, including increased costs of counseling, training, educating, and disciplining students, physical modifications to schools, disposing of hazardous waste, and funding necessary education, prevention and youth-tailored cessation programs. 497 F. Supp. 3d at 578. Notably, Judge Orrick rejected a similar attempt by defendants to rewrite the allegations, finding:

---

[9] *See* Appendix, Section A.

The government entities do not seek to recover costs expended by students or any other third party. Nor do they seek compensation for any damages or personal injuries suffered by students who used JUUL. Rather, *they allege injuries as a result of a public health crisis in their school districts and communities that JLI created and sustained through its negligent and nuisance-causing conduct, i.e., by developing a product with features that appeal to youth and then directly targeting youth with its marketing*. The government entities suffered direct harm in combatting the crisis through multiple forms of costs and damages. The injuries caused by JLI were not only foreseeable, they were an intended consequence of JLI's conduct. Even if, as JLI contends, students deliberately using JUUL products at schools were intervening acts to the government entities' injuries, *those intervening acts were reasonably foreseeable given JLI's alleged youth-targeting conduct and do not undermine proximate cause.*

*Id.* at 664-65.

Furthermore, courts have reached similar conclusions in public entity suits brought in connection with the opioid crisis. For example, in *State v. Purdue Pharma L.P.*, the court held that Alaska had adequately alleged that an opioid manufacturer proximately caused it to incur "expenses for the medical care of Alaska's population due to overuse, addiction, injury, overdose, and death." 2018 WL 4468439, at *1 (Alaska Super. Ct. July 12, 2018). The court in *Commonwealth v. Endo Health Solutions Inc*. reached a similar conclusion, applying Kentucky law, and finding that the government sufficiently alleged defendants' actions "served as a proximate cause for the harms the Commonwealth has endured from the opioid epidemic."[10] 2018 WL 3635765, at *4 (Ky. Cir. Ct. July 10, 2018). These holdings are not unique to California, Florida, Pennsylvania, Alaska, and Kentucky, but are consistent with the laws of the other twelve states at issue as well.[11] The same result should be reached here under each of the relevant state laws.

As explained above, these harms to public entities are redressable because the linchpin of proximate cause is foreseeability—i.e., whether defendants could reasonably foresee the

---

[10] *See also In re Nat'l Prescription Opiate Litig.—Summit Cnty.* ("*Summit County*"), 2018 WL 6628898, at *5-6 (N.D. Ohio Dec. 19, 2018) (Ohio county sufficiently alleged proximate causation for RICO claims seeking recovery for costs incurred responding to opioid crisis); *In re Opioid Litig.*, 2018 WL 3115102, at *34 (N.Y. Sup. Ct. June 18, 2018) (New York counties adequately pled that opioid manufacturers' conduct proximately caused them to expend "extraordinary amounts . . . to combat the opioid crisis allegedly caused by the deceptive marketing campaign").

[11] The twelve other states are Colorado, Georgia, Illinois, Indiana, Louisiana, Maryland, Nevada, New Jersey, North Carolina, Rhode Island, South Carolina, and Virginia.

1    consequences of their actions. *See, e.g.*, *Soc. Media*, 2023 WL 7524912, at *40.[12] What matters, as

2    Defendants' own authority recognizes, is whether harmful actions in the causal chain leading to

3    plaintiffs were foreseeable. *See* Mot. at 27 (citing *Mike v. Borough of Aliquippa*, 421 A.2d 251, 256-

4    257 (Pa. Super. Ct. 1980) ("An intervening criminal act of a third person may indeed be a superseding

5    cause of injury, *but not where the criminal act is reasonably foreseeable*."); *Gamache v. Airbnb, Inc*.,

6    2017 WL 3431651, at *2 (Cal. Ct. App. Aug. 10, 2017) (finding that plaintiffs made no allegation

7    "that [defendant] operated its online platform in a manner that encouraged the nuisance activity in

8    any way").

9        As Judge Orrick explained in *JUUL*, where a defendant targets youth to addict them to

10    dangerous products, it is foreseeable that school districts will suffer harm. 497 F. Supp. 3d at 664-65.

11    Even if the acts of third parties, like students, function as a conduit for the harm, this does not shield

12    Defendants from liability and "do[es] not undermine proximate cause" where the acts are a

13    foreseeable result of Defendants' efforts to target youth. *Id.* at 665 (finding use of JUUL products at

14    schools was reasonably foreseeable given alleged youth-targeting conduct).[13]

15        That is the case here, where Defendants' intentional design of their platforms' features to

16    addict minors resulted in foreseeable harms to the schools, which must respond to and ameliorate

17    issues with students' mental health and behavior. In any case, Defendants' conduct need only be a

18    contributing factor in causing the School Districts' harm, not the sole cause—a determination that, as

19    with proximate cause generally, is left to the jury.[14]

20                    **b)    Defendants' Causation Case Law Arose in Distinct and**

21                            **Inapplicable Contexts.**

22        Defendants' citations to cases brought against social media platforms under the Anti-

23    Terrorism Act ("ATA") applied distinct law to different facts. The Supreme Court's decision in

24    *Twitter, Inc. v. Taamneh*, was not about proximate cause, or affirmative misconduct, but instead about

25    whether a social media platform was subject to "aiding-and-abetting liability for mere passive

---

26    [12] *See* Appendix, Section B.

27    [13] *See* Appendix, Section B.

28    [14] *See* Appendix, Section C.

nonfeasance" under the ATA's distinct statutory proximate cause standard. 598 U.S. 471, 500 (2023) (further recognizing that there may be "situations where the provider of routine services does so in an unusual way or provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack"); *see also Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1176 (N.D. Cal. 2018) (explaining finding in *Fields v. Twitter*, 881 F.3d 739 (9th Cir. 2018) that heightened "direct relationship" test required under ATA is different that foreseeability test generally required to show proximate cause); *Crosby v. Twitter, Inc*., 921 F.3d 617, 626 (6th Cir. 2019) (finding allegations insufficient to link Twitter's actions and ISIS radicalization that led to the Pulse nightclub shooting). Similarly unhelpful is *State v. Lead Industries Associations, Inc.*, where the court did not hold that plaintiffs failed to satisfy proximate cause, but instead turned on case-specific principles of "public right," which as set forth in Section III.B.2 are satisfied here, and "control" which is not at issue. 951 A.2d 428, 453-55 (R.I. 2008) ("[W]e need not decide whether defendants' conduct was unreasonable or whether defendants caused an injury to children in Rhode Island."). These cases are irrelevant to this Court's consideration of whether Plaintiffs have properly pled proximate cause for their common law claims.

Defendants' attempt to compare themselves to gun manufacturers does not fare any better. In *City of Chicago v. Beretta U.S.A. Corp*., 821 N.E.2d 1099, 1136-38 (Ill. 2004), while the court did address proximate cause, it relied heavily on facts specific to that case and public policy determinations under Illinois law in holding that plaintiffs had not sufficiently pled that gun dealers could reasonably foresee that the guns they lawfully sold would be illegally obtained and used to commit crimes. That fact-specific determination is inapplicable here.[15] Indeed, other courts, such as the Indiana Supreme Court, have relied on similar legal principles but reached different conclusions as to proximate cause when considering claims against gun manufacturers. *See City of Gary*, 801 N.E.2d at 1228 (holding that under Indiana law the City of Gary had sufficiently alleged proximate cause in a lawsuit against several gun manufacturers, distributors, and dealers alleging that the possession of unlawfully purchased guns contributed to crime that requires expenditure of public

---

[15] Even if this case were applicable (it is not), it applies Illinois law and does not apply to the public nuisance and negligence claims brought under the laws of the other states at issue.

resources); *see also Estados Unidos Mexicanos*, 91 F.4th at 537 (similar); *City of Boston*, 2000 WL 1473568, at *5-6 (similar); *Cincinnati*, 768 N.E.2d at 1148-49 (similar). Here, Plaintiffs have adequately alleged that it is foreseeable that Defendants' conduct in designing and marketing their platforms to addict youth will harm School Districts by requiring them to increase their expenditures on and divert resources from their mission to provide education and youth mental health services. *See, e.g.*, ¶¶104-09.

Still other cases cited by Defendants involve facts that are incomparable to those alleged here or situations whose particulars made it impossible for a reasonable person to foresee certain consequences of her actions. *See, e.g.*, *Kumaraperu v. Feldsted*, 187 Cal. Rptr. 3d 583, 586 (Cal. Ct. App. 2015) (baseless and unsupported criminal prosecution could not reasonably have been foreseen by defendants); *Bryant v. Atl. Car Rental, Inc.*, 127 So. 2d 910, 911 (Fla. Dist. Ct. App. 1961) (following "general rule that, in the absence of a prohibitory statute or ordinance, an owner or operator of an automobile who leaves it unattended with key in the ignition switch is not liable for negligent operation of the automobile by one who steals it"); *State Dep't of State Hosps. v. Super. Ct.*, 349 P.3d 1013, 1024 (Cal. 2015) (causation only supported by "speculative and conjectural claims"). And finally, *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136 (2018), involved a products liability action brought by a third-party non-user of Apple's allegedly defective iPhone. *Id.* at 155. Here, the School Districts' cause of action and resulting harm are directly linked to Defendants' affirmative conduct, not derivative of overlapping harm with the personal injury plaintiffs, *see supra* Section III.A.3.

Accordingly, the School Districts have adequately alleged proximate cause.

## B.    The School Districts Have Adequately Pled Public Nuisance.

Defendants attempt to defeat the School Districts' public nuisance claims by pointing to laws of states not at issue here and misconstruing the relevant common law related to public nuisance.[16]

---

[16] Despite Defendants' 17 different cites to *Hunter v. Johnson & Johnson* throughout their brief, Oklahoma is not one of the states subject to this motion. *See* Mot. at 1 n. 1 (identifying the 17 states at issue, none of which are Oklahoma). As the Opioids MDL Court held when addressing this same argument, "Oklahoma law is different and inapplicable." *In re Natl. Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 815 (N.D. Ohio 2022).

The Restatement and case law confirm that public nuisance actions are not limited to interference with use and enjoyment of land as Defendants assert. Restatement (Second) of Torts § 821B, cmt. h ("Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land."). This public nuisance action inherently involves an "unreasonable interference with a right common to the general public" because it involves Defendants' interference with public education, health, and safety, which are matters of serious public concern. *Id.* at § 821B; *see also JUUL*, 497 F. Supp. 3d at 648 (denying motion to dismiss public nuisance claims relating to the "public health crisis of youth e-cigarette use and wholesale addiction of kids to nicotine").[17] In addition, the School Districts have alleged special injury. Defendants specifically targeted school districts and schoolchildren in their campaigns to addict youth to their platforms, because, as Meta admitted "Winning Teens = Winning High Schools." *See, e.g.*, ¶¶56-67, 213-28. As a result, the School Districts have suffered serious harm, different in kind from that of the general public, as they provide public education and youth mental health services. ¶¶193-251. *See JUUL*, 497 F. Supp. 3d at 648 (finding special injury adequately based on similar allegations). The Complaint establishes the elements of public nuisance, and the Court should allow this claim to proceed.

Finally, allowing a public nuisance claim here would not countenance all public nuisance claims related to harms caused by any product or service, as Defendants suggest. Fortunately, most products and services do not create national public crises or interfere with public rights. But where, as here, the nation is facing a "youth mental health crisis" caused by Defendants' conduct, applying public nuisance law to their interference with public rights is both appropriate and necessary. *See, e.g.*, ¶¶1, 11-12, 17-19, 134-82.

### 1. Public Nuisance Is Not Limited to Use of or Interference with Land.

Defendants' assertion that all public nuisance claims are limited to interference with "the use of land or real property" is unfounded. Mot. at 31. It is well established that public nuisance claims are not so limited and, instead, extend to other types of "unreasonable interference[s] with a right

---

[17] *See also State v. Purdue Pharma L.P.*, 2018 WL 7892618, at *1-2 (Sup. Ct. Wash. May 14, 2018) (same re the opioid epidemic); *State v. Purdue Pharma L.P.*, 2022 WL 577874, at *1 (Sup. Ct. R.I. Feb. 18, 2022); (same re the "scourge that has been labeled 'the Opioid Crisis'"); *Ileto*, 349 F.3d at 1211 (same re gun violence).

common to the general public," including "interference with the public health . . . the public safety . . . the public peace . . . the public comfort . . . [and] with the public convenience." Restatement (Second) of Torts § 821B, cmt. b.[18] Indeed, the comments to the Restatement expressly reject the notion that a nexus to land is required: "Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." *Id.* at § 821B, cmt. h.[19] Consistent with this established approach, all of the relevant jurisdictions except South Carolina[20] either lack or explicitly reject a requirement that public nuisance claims must involve harm to land or property.[21] In any case, the School Districts have alleged interference with use of their property, *see, e.g.*, ¶¶6, 32, 209, 212, 241, 248, 975, 990, 999-1000, though such allegations are not necessary to state a claim.

In attempting to argue otherwise, Defendants repeatedly rely on cases from states that are not among the 17 at issue here.[22] In the 17 relevant jurisdictions, Defendants repeatedly misrepresent the law. For example, Defendants' citation to the *dissenting opinion* in *Pompano Horse Club v. State*, 111 So. 801, 816 (Fla. 1927) (C.J. Ellis, dissenting), does not support tying public nuisance to land use in Florida. *See In re Nat'l Prescription Opiate Litig. —West Boca*, 452 F. Supp. 3d 745, 775 (N.D.

---

[18] The Reporter's Note to § 821B is replete with examples of public nuisances not tied to land. *See Mich. State Chiropractic Ass'n v. Kelley*, 262 N.W.2d 676 (Mich. Ct. App. 1977) (practice of medicine without license); *Browning v. Belue*, 116 So. 509 (Ala. Ct. App. 1928) (vicious dog); *State ex rel. Swann v. Pack*, 527 S.W.2d 99 (Tenn. 1975), *cert. denied*, 424 U.S. 954 (1976) (snake handling at religious ceremony); *Weis v. Superior Court of San Diego Cnty.*, 30 Cal. App. 730 (1916) (indecent exhibition); *State v. Canty*, 105 S.W. 1078 (Mo. 1907) (bullfight).

[19] Despite Defendants' assertion that limiting public nuisance claims to use of land is the majority rule, the major treatises as well as the Restatement disagree. 66 C.J.S. Nuisances § 8 ("Public nuisance law is concerned with the interference with a public right, and cases in that realm typically involve conduct that allegedly interferes with the public health and safety, while private nuisance law is concerned with conduct that interferes with an individual's private right to the use and enjoyment of the individual's land" and noting some nuisances are both). Defendants also concede that interference with land is not required in California or Indiana. *See* Mot. at 33 n.20.

[20] South Carolina does require that a plaintiff suffer "injury to the individual's real or personal property" to show special injury. *Overcash v. S.C. Elec. & Gas Co.*, 614 S.E.2d 619, 622 (S.C. 2005). But this is no bar; the School Districts adequately allege property damage. *See* ¶¶109, 184, 186-87, 212, 241, 787, 792, 973, 990, 999-1000, 1023.

[21] *See* Appendix, Section D.

[22] Arkansas, Connecticut, Iowa, Michigan, New York, North Dakota, Oklahoma, Texas, and West Virginia are not among the 17 states at issue here, making Defendants' citation to those states' laws irrelevant and misleading. *See, e.g,* Mot. at 31, 32, n.19. Regardless, to the extent those states require property damage, Plaintiffs sufficiently allege property damage as noted above.

---

1    Ohio 2020) ("The Court concludes that Florida nuisance law does not require an interference with

2    the use and enjoyment of property."). Similarly, in *State v. Purdue Pharma L.P.*, the court found that

3    Rhode Island law does not impose a land use requirement for public nuisance claims, recognizing

4    that "freedom from an overabundance of prescription opioids is a public right" and that "[t]he crisis

5    has taxed not only the public coffers but an entire network of healthcare and social services." 2022

6    WL 577874, at *28. In New Jersey, while the court in *In re Lead Paint* noted nuisances "traditionally

7    aris[e] on the defendant's land," it also recognized that all that is required for a public nuisance claim

8    is "an interference with a public right" as set forth in the Restatement. 924 A.2d 484, 495 (N.J. 2007).

9    In fact, in *James v. Arms Tech., Inc.*, 820 A.2d 27, 35 (N.J. Super. Ct. App. Div. 2003), the court did

10   not impose a land use requirement, and allowed a New Jersey municipality to bring a public nuisance

11   claim alleging defendants' conduct created an illegal gun market causing it to "expend significant

12   government funds on 'police protection, overtime, emergency services, coroner and morgue services,

13   pension benefits, health care, social services and other necessary facilities and services . . . due to . .

14   . the . . . distribution, promotion and sale of guns.'" In *City of Chicago*, while as noted above, the

15   court dismissed on other grounds unique to Illinois law, the court nonetheless recognized that "it is

16   clear that neither the use or misuse of land nor the invasion of property rights of another is required

17   for a public nuisance to be found." 821 N.E.2d at 1111.

18          None of Defendants' authority supports the sweeping proposition that the 17 states at issue

19   here require land use for public nuisance claims.

20          **2.      Public Nuisance Claims May Relate to a Product When Such Product**

21          **Causes a Substantial Interference With a Public Right.**

22          Defendants incorrectly argue that public nuisance claims cannot involve products. *See* Mot.

23   at 35-36. This argument conflicts with established law and mischaracterizes the School Districts'

24   allegations.

25          There is no bright-line rule that a public nuisance claim cannot in any way relate to a product.

26   To the contrary, "under the Restatement's broad definition, a public nuisance action can be

27   maintained for injuries caused by a product if the facts establish that the design, manufacturing,

28   marketing or sale of the product unreasonably interferes with a right common to the general public."

*Ileto*, 349 F.3d at 1214. In *Ileto*, the Ninth Circuit explained that even though a product was involved, the alleged nuisance was not premised on the manufacturers' legal sales of guns, but instead, on their creation of a bigger, secondary market by "purposefully over-saturating the legal gun market in order to take advantage of re-sales to distributors that they know or should know will in turn sell to illegal buyers." *Id.*; *see also, e.g.*, *City of Gary*, 801 N.E.2d at 1229 ("The essence of the City's claim is that handgun manufacturers, distributors, and dealers conduct their business in a manner that unreasonably interferes with public rights in the City of Gary, and therefore have created a public nuisance," under Indiana law, which is consistent with the Restatement).

The relevant question is whether a claim sounds in product liability based solely on a product defect or sounds in public nuisance based on interference with a public right. As the *JUUL* court explained:

> The allegations here do not concern the JUUL product itself, but rather the alleged consequence of JLI's conduct. Put differently, the public nuisance claims are premised on JLI's aggressive promotion of JUUL to teens and efforts to create and maintain an e-cigarette market based on youth sales, not on any alleged defect in JUUL products. This is not, as JLI contends, an attempt to stretch nuisance law to allow claims against manufacturers of allegedly dangerous products or based on failures to warn in the marketing of those products. The public nuisance claims alleged here are not as novel as JLI characterizes them to be; similar claims have been alleged in numerous opioid and gun manufacturer cases.

497 F. Supp. 3d at 646.

As in *JUUL*, the School Districts' claims here do not concern product liability law as they do not seek to recover for injuries suffered from a defective product.[23] *Id.* at 647. The School Districts' claims are premised on Defendants' platform designs and marketing, which are geared to targeting and addicting minors, and thereby interfere with public rights to education, health and safety. Simply

---

[23] Defendants contend that this Court should not follow *Ileto*, claiming that it is inconsistent with later-decided California cases, citing only the Appellate Division's decision in *In re Firearm Cases*, 126 Cal. App. 4th 959, 990 (2005). Mot. at n. 22. But *Firearm Cases* was decided at summary judgment where the court found that "there is no evidence of either of the contentions underlying the causes of action in *Ileto*." 126 Cal. 4th at 990. The court also did not cite to any California Supreme Court cases holding otherwise, merely stating that it found the views expressed "by the dissenters to the denial of rehearing *en banc* in *Ileto* instructive." *Id.* The Ninth Circuit's decision in *Ileto* is binding precedent on this Court, not the views of the dissenters to an order denying *en banc* review of that decision or dicta in a Court of Appeal decision stating that the *Ileto* dissent was "instructive." While Defendants ask this court to ignore *JUUL*, which cited to *Ileto*, they offer no sound justification for straying from Judge Orrick's well-reasoned opinion. *See* Mot. at n.22. *JUUL* is doubtless the most factually and legally similar case in this District.

1    put, regardless of whether a product is involved, "[i]f an activity meets the requirements of an

2    unreasonable interference with a public right, it may constitute a public nuisance." *City of Gary*, 801

3    N.E.2d at 1233.

4            Here, too, the School Districts do not seek to hold Defendants liable merely as creators of

5    products.[24] Defendants designed their platforms in a way that is addictive, targeted them at youth and

6    the School Districts, and sought to maximize minors' use at the expense of mental health, seriously

7    disrupting the public health, safety, and education in schools and communities. *See, e.g.*, ¶264

8    ("Defendants purposefully sought to attract and addict minors—including those who attend Plaintiffs'

9    schools and reside in Plaintiffs' communities—to their social media platforms and engaged in

10   substantial efforts to promote, distribute, and market their social media platforms to minors, despite

11   knowing that their design choices made the social media platforms incredibly dangerous to

12   adolescents."). As in *JUUL*, "the government entities' public nuisance claims do not stretch into

13   product liability law," 497 F. Supp. 3d at 647, and courts have routinely allowed public nuisance

14   claims where, as here, Defendants interfered with public rights, regardless of whether a product is

15   involved.[25]

16           Further, Defendants' slippery slope argument is unfounded. *See, e.g.*, Mot. at 36. Few cases

17   involving products can establish an unreasonable interference with a right common to the general

---

18   [24] Defendants again equivocate as to whether the laws from states other than the 17 at issue here are
19   relevant, citing inapplicable cases from Oklahoma and Connecticut in footnote 21, but arguing in *the
20   same footnote* that the Court should ignore *Cincinnati*, 768 N.E. 2d at n.21, because "[t]here are no
     School District Plaintiffs from Ohio in the MDL."

21   [25] *Mayor & City Council of Balt. v. Monsanto Co.*, 2020 WL 1529014, at *10 (D. Md. Mar. 31, 2020)
     ("The City has alleged that Monsanto manufactured, distributed, marketed, and promoted PCBs,
22   resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the
     City's stormwater and other water systems and waters."); *State v. Exxon Mobil Corp.*, 406 F. Supp.
23   3d 420, 467-68 (D. Md. 2019) (allowing public nuisance claim against manufacturer of MTBE
     gasoline additive); *Comm'rs of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 2021
24   WL 5908758, at *7 (D.S.C. Dec. 13, 2021) (permitting public nuisance claim related to product to
     proceed under South Carolina law at the motion to dismiss stage (citing as persuasive authority *City
25   of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1162 (D. Minn. 2016) (denying motion
     to dismiss public nuisance claim relating to a product and noting "a substantial interference with a
26   community's publicly funded, publicly operated wastewater treatment is an interference with an
     activity of the entire community."))); *In Re Kia Hyundai Veh. Theft Litig.*, 2023 WL 8126870, at *8
27   (C.D. Cal. Nov. 17, 2023) (denying motion to dismiss public nuisance claim brought by government
     plaintiffs relating to vehicle design causing crime spree, finding "[i]t is the interference with the use
28   of public roads that invokes the public right necessary to state a public nuisance claim" under the
     laws of Wisconsin, Ohio, Maryland, Washington, Missouri, New York, and Indiana).

---

public as this one does. The School Districts' ability to clear this hurdle is due to the seriousness of the harm here and the widespread impact of Defendants' conduct on society as their actions have led to a national youth mental health crisis and severe interference with public rights as well as the operations of public schools and local governments. ¶¶1, 11-12, 17-19, 134-82; 193-251; *see also City of Gary*, 801 N.E.2d at 1231 ("Whether [a nuisance] is unreasonable turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified."). Nor does imposing liability through the School Districts' claims chill free expression and communication. *See supra* Section II.A.2.

Against this backdrop, Defendants' authority is inapposite.[26] Again, none of the School Districts are in Oklahoma, and *Hunter* does not apply. *City of Chicago* is limited to Illinois law (one state out of 17 at issue here) under a specific set of facts and does not categorically prohibit public nuisance claims involving products. To the contrary, as the court noted, defendants' assertion that "a product which has caused injury cannot be classified as a nuisance . . . is not entirely helpful when a *public* nuisance is alleged." 821 N.E.2d at 1118; *see also id.* at 1124 ("[I]t is possible to create a public nuisance by conducting a lawful enterprise in an unreasonable manner.").

Defendants also omit critical language from *In re Lead Paint*, where the New Jersey Supreme Court suggested a future plaintiff could sufficiently plead a public nuisance claim based on a product that "interferes with the public health" by alleging a product "bears the necessary link to [a] current health crisis" at the time the defendant distributed the product, as the School Districts do here. 924 A.2d at 433-34 (noting that based on the facts before it, "the conduct that has given rise to the public health crisis" was not the defendants' conduct but "poor maintenance of premises where lead paint may be found by the owners of those premises").[27] The Rhode Island court in *Lead Industries*

---

[26] Defendants also attempt to use the term "product" as a sword and a shield, arguing on one hand that their platforms are not products as they did in the motion to dismiss the personal injury claims and in this motion, *see, e.g.*, Mot. at 36, while also arguing that nuisance law does not apply to their conduct because it involves a product, *see, e.g.*, Mot. at 33.

[27] The New Jersey court recognized that "there may be room, in other circumstances, for an expanded definition of the tort of public nuisance," but it was not necessary in that case where the legislature had already "acted swiftly to address that public health crisis" with a "a careful and comprehensive scheme," a solution not present here. *Id.* at 440.

similarly dismissed the public nuisance claim because the plaintiff failed to allege "any facts that would support a conclusion that defendants were in control of the lead pigment at the time it harmed Rhode Island's children." 951 A.2d at 455. Here, the School Districts allege Defendants' conduct caused the youth mental health crisis and harm to Plaintiffs as the primary providers of education, disciplinary and mental health services to minors. ¶¶248, 264, 525, 557-58, 564, 650, 659, 662, 806, 824, 831, 924, 957, 964. The School Districts further allege that Defendants controlled their platforms at all times leading up to and when the School Districts were harmed. ¶¶1004-10. Indeed, Defendants have never lost control of their platforms and can and do make changes to the way the platforms operate daily. *See id.*[28]

### 3.    The School Districts Adequately Allege Interference with Public Rights.

Conduct constituting an "unreasonable interference with a right common to the general public" includes conduct that "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience." Restatement (Second) of Torts § 821. The School Districts have sufficiently alleged interference with multiple public rights as a result of Defendants' conduct, including public rights to education, health and safety. *See, e.g.*, ¶974 (alleging substantial interference with rights to health, safety, peace, comfort, convenience, and public education).

Public nuisance law in each of the jurisdictions at issue here prohibits conduct that interferes with public health.[29] As alleged in the Complaint, Defendants' conduct has interfered with the mental

---

[28] Likewise, as the *JUUL* court found, *Penelas* is "based on [] alleged facts that differ materially" from those alleged here. 497 F. Supp. 3d at 647. There, the trial court dismissed the plaintiff's case about the "criminal or reckless misuse of firearms by third parties who are ***beyond the control*** of the defendants" and found that the action did not involve a government entity "entitled to abate" a nuisance or "violations involving a direct connection to real property owned or operated by the government entity." *Penelas v. Arms Tech., Inc.*, 1999 WL 1204353, at *4 (Fl. Cir. Ct. Dec. 13, 1999). Here, on the other hand, the School Districts are governmental entities seeking to abate a nuisance impacting their use and enjoyment of the property they operate, and created by Defendants' own conduct in designing, promoting, and marketing platforms they know are dangerous to youth. *See* ¶¶109, 184, 186-87, 212, 241, 787, 792, 973, 990, 999-1000, 1023. In review of this unpublished trial court decision, the appellate court did not discuss whether public nuisance law could apply to products at all, but merely held that a different statute preempted the trial court's use of its injunctive powers to mandate the redesign of firearms. *Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042, 1045 (Fla. Dist. Ct. App. 2001).

[29] *See supra*, footnote 17 [public nuisance cases under various states' laws].

health of school-aged children, thereby interfering with a public right to health. Numerous public health officials and organizations have recognized that the nation is suffering from a "youth mental health crisis," driven in large part by Defendants' conduct. *See, e.g.*, ¶982. "[T]he current state of youth mental health has caused the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, and the Children's Hospital Association to declare a national emergency." *Id.* For example, "in 2019 one in three high school students and half of female students reported persistent feelings of sadness or hopelessness, an overall increase of 40% from 2009." *Id.* And "[n]early all researchers now agree that there are correlations between . . . time spent on social media and . . . mental health problems." ¶178; *see also* ¶¶132-78 (summarizing literature connecting the youth mental health crisis to Defendants' social media platforms and the design features they have implemented). As "one of the main providers of mental health services for school-aged children," the School Districts have been severely impacted by the public health crisis created by Defendants' conduct. ¶200; *see also* ¶¶193-212; ¶¶966-1011. Similarly, Defendants have interfered with public safety. *See, e.g.*, ¶989; *see also* Restatement (Second) of Torts § 821B; *supra* note 18.

Defendants' conduct has also interfered with the right to a public education, expressly recognized in many jurisdictions. *See, e.g.*, ¶¶3, 974, 978.[30] As alleged, "[p]ublic education serves as the cornerstone of a just and equitable society," ¶3, and "Defendants' conduct has [] undermined students' rights to public education and undermined school districts' ability to provide students with a safe and high-quality public education." ¶207. For example, a report published by the American Federation of Teachers highlighted the impact of students' social media use on the public education system, noting the "dramatic disruption in the teaching and learning ecosystems of all our nation's schools" and the fact that Defendants' conduct "detracts from the primary mission of our schools, which is to educate our children." ¶199. "Students' compulsive, problematic use of Defendants' platforms results in significant disruption to schools' operations, greatly frustrates their ability to achieve their mandate of educating students in a safe and healthy environment, and forces school districts to expend or divert significant resources in response." ¶194.

---

[30] *See* Appendix, Section E.

1      Defendants' interference with the public rights to health, safety and education not only affects

2      addicted minors, but also other students, teachers, the School Districts, and whole communities.

3      ¶¶193-212, 264-65. And, as described below, the School Districts are specially injured. *See infra*

4      Section III.B.4.

5          Defendants attempt to evade liability by reframing their interference with public rights as

6      individuals' right to be free from "personal injuries allegedly caused by a product" or a right "to be

7      free from the consequences of others' allegedly harmful use of products and services." Mot. at 37-

8      38.[31] But this mischaracterizes the allegations in the Complaint. As the School Districts allege: "The

9      widespread and compulsive use of Defendants' platforms has consequences beyond the harm to

10     minors using the platforms. It has fundamentally changed the learning and teaching environment at

11     Plaintiffs' schools, affecting students, parents, teachers, administrators, coaches, counselors, and

12     other members of Plaintiffs' communities." ¶193. Defendants' conduct in targeting school districts

13     and designing and marketing their platforms to target and addict schoolchildren interferes with the

14     public rights to education, health and safety both for minors and the public at large.

15         Crucially, "[i]t is not . . . necessary that the entire community be affected by a public nuisance,

16     so long as the nuisance will interfere with those who come in contact with it in the exercise of a public

17     right or it otherwise affects the interests of the community at large." Restatement (Second) of Torts

18     § 821B, cmt. g.[32] In fact, "[i]n many cases the interests of the entire community may be affected by

19     a danger to even one individual." *Id.* For this reason, Defendants' assertion that their conduct does

20     not equally affect rights of all members of the community misses the mark. The commonly held rights

21     of the School Districts' communities are substantially impacted by conduct that targets and harms

22     youth. And Defendants' conduct affects rights to public health, safety and education that are common

23

---

24     [31] Meanwhile, *Hunter* found defendants' role in creating the opioid crisis was not actionable under
       Oklahoma's public nuisance statute because Oklahoma limits public nuisance claims to instances in
25     which defendants committed crimes or caused injury to property. *State ex rel. Hunter v. Johnson &
       Johnson*, 499 P.3d 719, 724-25 (Okla. 2021). Again, despite the repeated citations to this case made
26     by Defendants, Oklahoma law is not at issue here.

27     [32] In addition, some states define "public nuisance to include interference with 'any considerable
       number of persons;' and under these statutes no public right as such need be involved." *Id.*; *see, e.g.*,
28     Cal. Civ. Code § 3480 (in addition to the "entire community," nuisance may affect "any considerable
       number of persons").

to communities as a whole. Defendants' argument implies that when conduct impacts private and

public rights alike it should be addressed only through claims that protect private rights. This is not

the law.

Indeed, courts have rejected similar arguments by defendants attempting to escape liability

for public nuisances they created. For example, in the context of companies peddling addictive

nicotine products to youth and harming school districts and local governments, the *JUUL* court found:

> As for the manufacturer defendants' claim that the plaintiffs have failed to plead
> substantial interference with a public right, it suffices to note the defendants' failure
> to establish why public health is not a right common to the general public, nor why
> such continuing, deceptive conduct as alleged would not amount to interference; it can
> scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged
> to have created or contributed to a crisis of epidemic proportions, has affected a
> considerable number of persons.

497 F. Supp. 3d at 648 (quoting *In re Opioid Litig.*, 2018 WL 3115102, at *21); *see also In Re Kia

Hyundai Veh. Theft Litig.*, 2023 WL 8126870, at *8 (rejecting defendants' argument that a public

nuisance claim brought by government entities against a product manufacturer did not implicate a

public right); *People v. ConAgra Grocery Prods. Co*., 227 Cal. Rptr. 3d 499, 552 (Cal. App. 2017)

("The community has a collective social interest in the safety of children in residential housing.

Interior residential lead paint interferes with the community's 'public right' to housing that does not

poison children.").

Plaintiffs' allegations here go beyond Defendants' characterizations of the harms as

fundamentally private ones that have "downstream consequences for schools." Mot. at 40.

Defendants have not just created an issue for individual students who use social media, but for the

entire public school system and local communities. As explained in the Complaint:

> Staff and teachers cannot ignore students who are in crisis and need to support those
> students, even if this comes at the expense of the educational goals and experience for
> the larger student body. School campuses are public spaces, and classes and activities
> are communal experiences. Increases in anxiety, depression, suicidal ideation, and
> other mental health crises impact both the students suffering from these problems and
> the other students, teachers, and staff who need to interact with these students.

¶196; *see also* ¶990 ("The youth mental health crisis is infecting all aspects of education").

Ultimately, as Plaintiffs allege, it is not just individual youth who are suffering. Defendants' conduct

has systemically disrupted entire communities and interfered with the public rights to education,

health and safety. Plaintiffs have no option to ignore the youth mental health crisis that Defendants'

1    conduct has caused and instead are on the front lines battling this nuisance and addressing the youth

2    mental health crisis in their schools and communities.

3         While Defendants rely heavily on *Lead Industries* when discussing public rights (Mot. at 37-

4    44), they ignore its statement that a public nuisance includes "behavior that unreasonably interferes

5    with the health, safety, peace, comfort or convenience of the general community." 951 A.2d at 446.

6    And they glaze over the critical distinction between the facts of that case and those alleged here. *Lead*

7    *Industries* involved injuries suffered by children exposed to lead not in *public spaces* such as schools

8    but more often in private settings, which the Court emphasized when it rejected the public nuisance

9    claim. 951 A.2d at 454 ("[T]the exposure to lead-based paint usually occurs within the most private

10   and intimate of surroundings, his or her own home"); *cf.* ¶65 ("Defendants have also deliberately

11   designed their platforms to encourage the compulsive use of these platforms during the school day,"

12   on public school campuses), ¶¶220, 575. Subsequent case law from Rhode Island has distinguished

13   *Lead Industries* on these facts, finding that the opioid crisis constituted an interference with a public

14   right—just as the youth mental health crisis caused by Defendants does here. *State v. Purdue Pharma*

15   *L.P.*, 2019 WL 3991963, at *9 (R.I. Super. Ct. Aug. 16, 2019).

16        Similarly, *City of Chicago* is distinguishable. That case explicitly acknowledged a right to

17   public health, citing the Second Restatement § 821B, concerning the existence of "a public right, as

18   opposed to an individual right, to be free from the threat of illegal conduct by others," and ultimately

19   resolved the case on other grounds. 821 N.E.2d at 1114 ("[public] rights include the right[] of public

20   health"); *see also id.* at 1116 (noting the court "need not decide" whether plaintiffs' allegations

21   qualified as interference with a public right); *see also City of Chicago v. Am. Cyanamid Co.*, 823

22   N.E.2d 126, 133 (Ill. Ct. App. 2005) (characterizing *City of Chicago v. Beretta* as having decided the

23   case on grounds other than public rights).

24        The allegations here are not that Defendants' platforms were used by third parties to harm

25   Plaintiffs, but instead that Defendants' conduct in designing and marketing their platforms to target

26   and addict minors directly interfered with public health. As the School Districts here have alleged,

27   Defendants have made "conscious, intentional design choices" that have created a "youth mental

28   health crisis," ¶11, resulting in significant disruption to the educational environment, and requiring

                                              37                 PLS.' OPP'N. TO DEFS.' MOT. TO DISMISS
                                                                (LOCAL GOVERNMENT AND SCHOOL DISTRICT)
                                                                CASE NO. 4:22-MD-03047

increased mental health services, and increased staffing and funding from the School Districts. *See, e.g.*, ¶¶16, 21-26. And far from being unforeseeable, Defendants knew the harm they were causing and "deliberately designed their platforms to encourage the compulsive use of these platforms during the school day," ¶65, "deliberately targeted school-aged children" and "counted on use of their addictive platforms spreading through entire school communities," "knowing the impact this could have on schools." ¶214. Defendants' conduct has thus created a public youth mental health crisis in this nation, leaving public school districts and local governments reeling to try to abate the problem and fund much-needed services. *See, e.g.*, ¶¶1, 11-12, 17-19, 134-82. Public nuisance law appropriately permits the School Districts to seek redress from Defendants for their interference with public rights and the harm Defendants caused them.

### 4. The School Districts Adequately Allege Special Injury and Abatement.

To the extent required,[33] the School Districts have adequately pled that they suffered "special injury" different from that suffered by the general public. ¶989. The School Districts "provide sufficient detail []about the kinds of harms caused by [defendant's] conduct that is unique to schools and different in kind from that suffered by the general public in their community[,]" including expending and diverting resources to address the youth mental health crisis. *JUUL*, 497 F. Supp. 3d at 648; *see also* ¶¶973, 989-1002.

Public schools serve a unique role in the community—not only are they responsible for ensuring their students' rights to a quality education, but they are also the primary providers of youth mental health services. ¶4. Defendants' platforms cause daily disruption in schools and the School

---

[33] Significantly, as recognized in the Restatement (Second) of Torts § 821C, public agencies empowered to represent the state or a political subdivision are not required to show special injury in order to pursue claims for abatement. Accordingly, Defendants do not contend that the local government plaintiffs must show special injury to pursue claims for abatement. *See* Mot. at 45 n.38. Still, Defendants do not cite any authority supporting their sweeping statement that "school district plaintiffs may bring public nuisance claims only as private plaintiffs" and are thus required to show special injury, even for abatement. Mot. at 44. Rather, Defendants purport to support this argument with citations to general practice guidelines, one case from South Carolina, and state statutes from California, Georgia and Indiana—none of which hold that school districts cannot pursue claims as public entities. Mot. at n.34. Accordingly, Defendants have failed to carry their burden to support dismissal on the grounds that School Districts may only bring public nuisance claims as private plaintiffs, and as such, the Court should deny the motion to dismiss the School Districts' public nuisance claims for abatement. As discussed herein, the School Districts also properly plead public nuisance claims for damages by adequately alleging special injury.

1    Districts have spent significant resources to address youth mental and behavioral health issues caused

2    by Defendants' conduct. Use of Defendants' platforms has eroded students' mental health and ability

3    to focus and learn and has resulted in increased mental health and behavioral problems—which the

4    School Districts are left to address through increased funding, employees, and services. ¶¶193-251.

5    As such, the School Districts have suffered special injuries different in kind from the public and can

6    assert public nuisance claims seeking damages and abatement. ¶¶989-1002.

a)     **Defendants' Interference with Public Rights Harmed the School Districts.**

9    Defendants wrongly claim that the School Districts cannot bring a public nuisance claim

10   because the public rights in question belong to their students. *See* Mot. at 45. This misconstrues the

11   law by conflating special injury with public rights. Public rights are "common to all members of the

12   general public,"[34] and Defendants' interference with the public rights to health, safety, and education

13   necessarily implicates public schools and local governments, which have been left to battle "an

14   unprecedented mental health crisis." *See* ¶1. Public rights and special injury are two separate concepts

15   and Defendants' interference with public rights here, *see supra* Section III.B.3, causes a special injury

16   to the School Districts.

17   Indeed, courts have denied motions to dismiss public nuisance claims caused by a defendant's

18   unreasonable interference with public health, like those the School Districts assert here. For example,

19   in *JUUL*, the court allowed school districts in California, Florida, Pennsylvania, and elsewhere to

20   seek damages from an e-cigarette company under their public nuisance claims, finding that (i) the

21   "government entity complaints adequately describe a public health crisis of youth e-cigarette use and

22   wholesale addiction of kids to nicotine" sufficient to show interference with a public right, 497 F.

23   Supp. 3d at 648; and (ii) the defendant's conduct in targeting youth "caus[ed] extreme disruption in

24   classrooms and unique harm to schools that is different in kind than the community at large." *Id.* at

25   650. Notably, the defendant in *JUUL* made the same argument that the public right belonged to the

26   students; however, the court rejected that argument, recognizing it "misconstrues these allegations,"

27   and found that the harms suffered by the school districts were different in kind from the harm to the

28   ───────────────────────────────

[34] Restatement (Second) of Torts § 821B, cmt. g.

public and minors. *Id.* at 648; *see also In re Opioid Litig.*, 2018 WL 3115102, at *22. The same is true here.

Defendant's reliance (Mot. at 45) on the factually inapposite *Rincon Band of Luiseño Mission Indians v. Flynt*, 286 Cal. Rptr. 3d 29, 62 (Cal. Ct. App. 2021), is misplaced. The court there found the tribe was not specially injured by a public nuisance because it sought "to protect the Tribes' own exclusive rights to offer gaming of the very same type they claim is injurious to the general public, and the right of the Tribe Entities and Tribe Members to profit from that exclusive right." *Id.* As the court explained: "This runs contrary to the purpose of public nuisance laws, which are 'not designed to benefit disadvantaged competitors.'" *Id.* (citation omitted). As *Rincon* itself noted, "the Tribes, just like any other governmental entity, would have authority to address any alleged nuisance presented by banked card games within their own communities." *Id.* at 60. Here, the School Districts have suffered a special injury because they are on the front lines addressing the youth mental health crisis, which greatly affects their school and community operations as a result of Defendants' interference with the public rights to health safety, and education. ¶¶194-212.

> **b)    The Special Injury to the School Districts Is Different from the Injury to Minors and the Public.**

This case is a classic example of special injury that is different in kind from that suffered by the general public. The harm to schools—which occurred almost entirely on school property—is unique given the role schools play educating youth and addressing youth mental health. *See, e.g.*, ¶¶193-231 (explaining that Defendants' conduct "has fundamentally changed the learning and teaching environment at Plaintiffs' schools" and that school districts "have been, and continue to be, uniquely harmed by students' compulsive use of, and addiction to, social media"). And this special injury should be no surprise to Defendants, who "deliberately targeted school-aged children" and "set out to infiltrate schools specifically," knowing the impact their actions were having on schools. ¶214. The harm to local governments, which fund schools and provide youth mental health services, is also different from the harm to the public. ¶¶232-51 (explaining the nuisance has "placed severe burdens and financial strains on local governments"). The injury pled by the School Districts—including the need to (i) hire additional personnel to address students' mental, emotional, and social health issues;

1   and (ii) divert resources to address behavioral and disciplinary issues and educate staff, students, and

2   members of the public about the harms of Defendants' platforms and address property damage—is

3   manifestly different in kind than the personal injury harms suffered by the users of Defendants'

4   platforms and the harm to the public at large.

5       Comparable harms have been found to state a claim for public nuisance. *JUUL*, 497 F. Supp.

6   3d at 649 ("The school districts provide sufficient detail in their complaints about the kinds of harms

7   caused by [Defendants'] conduct that is unique to schools and different in kind from that suffered by

8   the general public in their community."); *see West Boca*, 452 F. Supp. 3d at 774 (finding increased

9   operational costs imposed by a public nuisance to concrete economic losses that differ in kind

10  from a generalized injury to public health).[35]

11      Defendants' cited authority does not hold otherwise. For example, the court in *In re McKinsey*

12  *& Co., Inc. National Prescription Opiate Consultant Litigation* found that the plaintiffs there—

13  parents of children born with neonatal abstinence syndrome—were not "uniquely harmed" because

14  they experienced the same exact "personal injuries from opioid exposure" that harmed the public

15  generally. 2023 WL 4670291, at *9 (N.D. Cal. July 20, 2023). Unlike the plaintiffs in *McKinsey*, the

16  ───────────────

[35] *See also Purdue Pharma L.P.*, 2018 WL 4468439, at *4 (holding that the plaintiff alleged public nuisance where defendant's conduct "injured the State by causing deaths, overwhelming medical resources and emergency rooms, increasing illegal activity and law enforcement activities, increasing costs for medical care of infants born with neonatal abstinence syndrome and requiring foster treatment, and incurring significant expenses in addiction treatment"); *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1341 (N.D. Ga. 2021), *aff'd sub nom. Johnson v. 3M Co.*, 55 F.4th 1304 (11th Cir. 2022) (finding that plaintiffs had alleged special injury where they had to "pay the added costs of attempting to remove the PFAS contamination by way of increased rates and surcharges they incur as ratepayers"); *In re StarLink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 848 (N.D. Ill. 2002) (finding that commercial corn farmers alleging genetically modified corn increased their costs and depressed corn prices suffered special injury under public nuisance laws of multiple states); *City of Gary*, 801 N.E.2d at 1240 (permitting city to seek "compensation for various forms of responses to gun use or illegal sales"); *Mayor & City Council of Balt.*, 2020 WL 1529014, at *9 (holding that city alleged special injury where it suffered "costly damage to its stormwater system" and that it "incurred costs as a result of implementing impervious surface restoration efforts"); *James*, 820 A.2d at 53 (permitting city to bring public nuisance claim alleging defendants' conduct created an illegal gun market causing it to "expend significant government funds on 'police protection, overtime, emergency services, coroner and morgue services, pension benefits, health care, social services and other necessary facilities and services . . . due to . . . the . . . distribution, promotion and sale of guns'"); *State ex rel. Stein v. EIDP, Inc.*, 2023 WL 2326101, at *7 (N.C. Super. Ct. Mar. 2, 2023) (upholding public nuisance claim seeking costs of abatement and damage to state's property); *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 653 (Pa. Commw. Ct. 2021) (permitting recovery of governmental expenditures necessary to address nuisance); *Purdue Pharma L.P.*, 2022 WL 577874, at *28 (denying summary judgment where plaintiffs presented evidence that public nuisance maintained by defendants had "taxed . . . the public coffers").

1    School Districts' injuries are distinct from the personal injuries of individual users of Defendants'

2    platforms—indeed, in *McKinsey*, the defendant had already settled with "various governmental

3    entities," and their claims were not at issue. *Id.* at *1. Defendants also rely on *Allegheny General*

4    *Hospital v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000), in which the Third Circuit found

5    that unreimbursed medical expenses claimed by hospitals were merely "derivative of the nonpaying

6    patients' injuries." Just as Judge Orrick recognized in *JUUL*, however, Plaintiffs seek "operational

7    costs that were directly borne by them, not passed on by any intermediate party." 497 F. Supp. 3d at

8    665 (distinguishing *Allegheny General Hospital* and instead following cases permitting recovery

9    where plaintiffs alleged similar injuries in the form of operational costs that were directly borne by

10   them) (citing *West Boca*, 452 F.Supp.3d at 764; *Summit County*, 2018 WL 6628898, at *5; and *In re*

11   *Opioid Litig.*, 2018 WL 3115102, at *26-27).

12        Defendants' argument that courts "routinely dismiss" public nuisance claims such as this is

13   belied by the fact that the two other cases Defendants rely on in the body of their brief are unpublished

14   decisions from Maine and Arkansas—two states which are not among the 17 states at issue here.[36]

15   *See* Mot. at 46 (citing *E. Me. Med. Ctr. v. Teva Pharma. USA, Inc.*, Case No. BCD-CIV-2022-00025

16   (Ex. A) at *10 (Me. Super. Ct. Feb. 13, 2023); *Fayetteville Ark. Hosp. Co. v. Amneal Pharms.*, *LLC*,

17   Case No. 72CV-20-156 (Ex. B) at *4 (Ark. Cir. Ct. Dec. 16, 2022)).

18

19

---

20   [36] Defendants' other authority cited in footnote 41 is also inapposite. While the court in *Lanser v.*
     *Riddle* found the plaintiff lacked a special injury at the summary judgment phase, the plaintiff there

21   had "abandon[ed] a claim for economic damages," and thus the court did not consider the plaintiffs'
     argument that the nuisance made it more difficult for him to sell homes. 2013 WL 10408619, at *6

22   (Alaska Sup. Ct. July 1, 2013). Thus, all that remained was exposure to odors caused by the nuisance,
     which was "not sufficiently different in kind from the injury suffered by [the plaintiff's] neighbors."

23   *Id.* At issue in *Arriaga v. New England Gas Co.*, 483 F. Supp. 2d 177, 187 (D.R.I. 2007), was a
     motion to remand. *Id.* at 180-81. There, the plaintiffs alleged they were exposed to mercury spilled

24   by the defendants. *Id.* In assessing whether two defendants were properly joined, the court found that
     the plaintiffs had not suffered "special damages," because the "effect of exposure to the mercury . . .

25   would be the same for other members of the public." *Id.* at 187. In *Page v. Niagara Chem. Div. of*
     *Food Mach. & Chem. Corp.*, 68 So. 2d 382, 384 (Fla. 1953), the plaintiffs were employees of a

26   railroad company who alleged that "dangerous insecticide chemicals, dusts, stenches, odors and
     noxious gases" escaping from the defendant's plant adjacent to their workplace constituted a public

27   nuisance. *Id.* at 383. The court found that these harms would impact any member of the general public
     in the area, and only affected the plaintiffs to "a greater degree," which did not "entitle them to

28   injunctive relief." *Id.* at 384. Unlike the plaintiffs in these cases, Plaintiffs have alleged harms unique
     to School Districts that are distinct from those of the general public.

1    Further, Defendants' assertion that other private entities, such as private schools and mental-

2    health providers, may also have been affected by the youth mental health crisis does not deprive

3    Plaintiffs of their right to pursue public nuisance claims. A plaintiff's harm can be both different from

4    that "common to an entire community" and nevertheless shared by those similarly situated. *See*

5    *JUUL*, 497 F. Supp. 3d at 649-50 (holding that plaintiffs pled "unique harm to **schools** that is different

6    in kind than the **community at large**"); *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 222 (3d

7    Cir. 2020) (explaining that the lower court had incorrectly compared injuries suffered by the plaintiffs

8    "with the same injuries suffered by similarly situated class members" rather than comparing "the

9    injuries suffered by putative class members . . . with the harm shared by all community members").[37]

10   **C.    Plaintiffs Properly Plead Negligence Claims.**

11       Defendants challenge Plaintiffs' negligence claims on two grounds: duty and the economic

12   loss rule. Neither is well taken. Again, the *JUUL* court rejected nearly identical arguments, finding

13   defendants had a duty to school districts based on their deliberate targeting of minors and that the

14   economic loss doctrine did not apply under California, Pennsylvania and Florida law. 497 F. Supp.

15   3d at 655 (defendant's "actions in marketing JUUL directly to teens placed the school districts in the

16   'foreseeable zone of risk'"); *id.* at 659-61 (finding economic loss doctrine inapplicable). Here,

17   Defendants similarly had a duty of care to the School Districts based on (1) the foreseeability that

18   addicting youth and promoting social media use in schools would lead to the harms suffered by the

19   School Districts, and (2) the public policy considerations that support requiring Defendants to avoid

20   addicting youth and disrupting public education and public health. The Court should follow that

21   sound reasoning here.

22       Second, the economic loss rule does not apply in the thirteen states where Defendants claim

23   the rule applies. Contrary to Defendants' assertion, Louisiana does not recognize the rule, and the

24   remaining states at issue do not apply it in cases like this one, where the School Districts seek redress

25   for harms sounding classically in tort.

---

[37] *See also Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*, 405 F. Supp. 3d 408, 443 (W.D.N.Y. 2019) ("A 'special injury' need not be 'unique,' and simply because a large number of individuals suffer from a peculiar injury does not mean that the injury is not different in kind from that sustained by the public at large.").

1

2

### 1. Defendants Had a Duty to the School Districts Because Their Harms Were Foreseeable and Liability Here Is Supported by Public Policy.

Defendants owed Plaintiffs a duty of care because the harms Defendants' actions caused the School Districts were foreseeable, and public policy considerations support recognizing a duty here. The School Districts allege that Defendants intentionally designed addictive platforms that encouraged youth to use social media during the school day. *E.g.*, ¶¶110-24, 214-28. Defendants' conduct foreseeably led to massive disruptions in the School Districts' operations, including their ability to provide education and other social, disciplinary, and mental health services. All Defendants targeted youth served by the School Districts, ¶¶214-28; the School Districts were therefore foreseeable victims of Defendants' negligence. For the foreseeability reason and other considerations—including the close connection between Defendants' conduct and the School Districts' injuries, the moral blameworthiness of Defendants' conduct, and the importance of preventing future harm to children and School Districts—public policy supports imposing a duty of care on Defendants.

### a) Under the Laws of the 17 States at Issue, the Question of Duty Focuses Squarely on Foreseeability and Public Policy.

As Defendants recognize, foreseeability of harm is the touchstone in determining whether to recognize a duty of care. *See* Mot. at 52, 54. It is a near-universal consideration, and it is the primary factor in fifteen of the states at issue.[38] Two states, Kentucky and North Carolina, even impose a general duty to act with due care to avoid injury to others. *See Stiens v. Bausch & Lomb Inc.*, 626 S.W.3d 191, 200 (Ky. Ct. App. 2020) (Kentucky law imposes a "universal duty of care"); *Daniels ex rel. Webb v. Reel*, 515 S.E.2d 22, 27 (N.C. Ct. App. 1999) (under North Carolina law, "every person is under the general duty to . . . act, or to use that which he controls, as not to injure another"). Some states also consider public policy, but usually in conjunction with foreseeability. *See, e.g.*, *Sturgis v. R+L Carriers, Inc.*, 2019 WL 13084410, at *3 (N.D. Ind. Nov. 14, 2019) (including "public policy concerns" in three-part test); *Fischer v. Home Depot U.S.A., Inc.*, 2019 WL 4131699, at *4 n.40 (D. Alaska Aug. 30, 2019) (listing foreseeability as first public policy factor in multi-part duty test);

---

[38] *See* Appendix, Section F.

*Rowland v. Christian*, 443 P.2d 561, 564 (Cal. 1968) (same). Given the ubiquity of foreseeability and policy considerations in the various states' tests for determining a duty, this Court should focus its duty analysis on those issues.[39] *See JUUL*, 497 F. Supp. 3d at 655 (noting the importance of policy and foreseeability factors to the duty analysis in five states, including three of the seventeen invoked by Defendants' motion).

The harms to the School Districts were clearly foreseeable, based on Defendants' targeting of children and schools. ¶¶214-28. Specifically, it is foreseeable that School Districts would need to divert and increase resources, hire additional counselors, and take other actions to address the youth mental health crisis that Defendants knew they were creating. ¶¶180, 234-42, 246-51, 264, 972-73, 977-87, 990, 1007-08, 1016-25. While Defendants offer conclusory statements about foreseeability, these arguments are based on what Defendants would like Plaintiffs' allegations to be, rather than what they actually pleaded. Defendants intended to addict children of school age to their platforms, encouraged use of their platforms during the school day, and actively sought to infiltrate Plaintiffs' schools. ¶¶214-28. Defendants' protestation that the School Districts' harms were unforeseeable strains credulity. Given Defendants' knowledge that their platforms are designed to addict children at school, coupled with the unique role that modern public schools play in American society, it would have been obvious to Defendants that their actions would cause harms to the School Districts.

Scientific research, some conducted by Defendants themselves, "draws a direct line between Defendants' conscious, intentional design choices" to the youth mental health crisis caused by addiction to their platforms. ¶11. The problems the School Districts allege are associated with social media addiction include, but are not limited to, lack of control, persistently seeking access to social media platforms, developing withdrawal symptoms when not using social media, neglecting responsibilities, and sleep deprivation. ¶¶137, 144. Defendants have long been aware of research analyzing these problems caused by youth social media addiction; yet they still targeted minors and schools with the goal of promoting addiction and compulsive use. ¶¶138, 214-28. The havoc that this addiction crisis would wreak on schools—which have a unique responsibility to provide for the

---

[39] Plaintiffs are not arguing that they have a "special relationship" with Defendants as a general matter. But Plaintiffs reserve the right to make that argument in an individual case.

welfare of American children, in addition to the physical environment where they spend the vast majority of their waking hours—was eminently foreseeable. Clearly, if Defendants knew that their platforms were causing students to suffer lack of control, sleep deprivation, withdrawal symptoms, and neglect of responsibilities, among other issues, *e.g.*, ¶¶86, 109-24, 137-38, 220, 228, 415, 427, 448, 489, 503, 571, 913, it was foreseeable that School Districts trying to educate and care for students experiencing those serious issues would suffer negative impacts, including but not limited to diverting resources to limiting social media use; hiring additional staff such as counselors to address issues caused by social media addiction; dealing with property damage; dealing with threats; expending resources on new technologies; and purchasing physical barriers, such as magnetic pouches, to limit social media use in schools. ¶212.

Although Louisiana and South Carolina focus less on foreseeability than other states, Defendants still owed a duty under their laws. Louisiana's general principles of fault impose "an almost universal legal duty on the part of a defendant in a negligence case to conform to the standard of conduct of a reasonable person in like circumstances." *Rougeau v. Hosp. Serv. Dist. No. 2 of Beauregard Par.*, 368 So. 3d 1196, 1215 (La. Ct. App. July 26, 2023). In Louisiana, the existence and extent of a duty depends on the "facts and circumstances of the case, and the relationship of the parties." *Id.* Similarly, in South Carolina, "[i]t is the relationship between the parties . . . that determines whether the law will recognize a duty in a given context." *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 680 (D.S.C. 2021). Here, Defendants intentionally targeted schools and their students in order to increase their numbers of children and teens users, knowingly exposing these minors to platforms designed to promote compulsive use and addiction. ¶¶56-90, 134-182, 214-228.

Again, Judge Orrick's analysis in *JUUL* is instructive. In *JUUL*, the plaintiff school districts argued that they were harmed by the defendants' marketing to youth. *JUUL*, 497 F. Supp. 3d at 655-56. The Court concluded that, under the tests for duty under California and Florida law, the defendants' conduct placed the school districts in the "foreseeable zone of risk." *Id.* at 656. The court noted that defendants' youth-targeted marketing "foreseeably led to widespread injury to schools that are foreseeably on the 'front lines' of the [youth vaping] crisis." *Id.* at 656-57. Under Pennsylvania

law, the court observed that, in addition to the foreseeability of the school districts' harm, "the need for prevention of youth vaping is unquestionable and social utility weighs in favor of imposing a duty." *Id.* at 657. The same is true in this case. Just as the *JUUL* defendants marketed their harmful products to teens, Defendants here have focused on driving school-aged children to their platforms and addicting them, despite knowing their platforms are dangerous for minors. And just as the *JUUL* defendants targeted schools through "education" programs, these Defendants have targeted schools through marketing and through school-based programs, as set forth above.

Further, public policy factors support finding a duty here for reasons similar to those discussed in *JUUL*. Under California law, policy factors in the duty analysis include "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." *JUUL*, 497 F. Supp. 3d at 655. The court noted that defendants' conduct brought an addictive product into schools, "foreseeably caus[ing] a multitude of problems for the schools districts." *Id.* at 655. Here, there is similarly a close connection between the Defendants' alleged actions—designing and marketing their platforms to target and addict children and encouraging use in schools—and the resulting harm to the School Districts. The moral blame is extremely high. As detailed above, Plaintiffs allege that Defendants intended to addict millions of children to their platforms and did not care about the impact to youth mental health or the disruptions to the School Districts' operations. Plaintiffs further allege that Defendants intended for their addictive platforms to be used during the school day, foreseeably disrupting the educational process. Finally, there is a clear need to prevent future harm by deterring Defendants from promoting addiction and use in schools.

Not one case cited by Defendants supports their foreseeability argument on these facts. Instead, Defendants cite several cases for general points of law, one of which *did* find a duty. *See Partlow*, 191 A.3d at 451-52. None of the remaining cases involved a defendant directing conduct toward people for whom the plaintiffs had supervisory responsibility—as is the situation here. *See Walmart, Inc. v. Reeves*, 671 S.W.3d 24, 28-29 (Ky. 2023) (plaintiff sued Walmart after robbery in

parking lot); *Grieco*, 344 So. 3d at 26-27 (no duty for compressed air manufacturer to protect against user getting high and causing auto accident); *Jefferson v. Qwik Korner Mkt., Inc.*, 34 Cal. Rptr. 2d 171 (Cal. Ct. App.1994) (no duty for convenience store to patron struck by vehicle on sidewalk); *Com. Bank/Pa. v. First Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. Ct. 2006) (no duty for bank to take action against client's bank account to prevent fraud on another bank); *Roche v. Ugly Duckling Car Sales, Inc.*, 879 A.2d 785, 790-91 (Pa. Super. Ct. 2005) (car dealership had no duty to police officer struck by car that juveniles stole from the lot).[40] Based on the School Districts' allegations, this case is far more similar to *JUUL* and the opioid litigation, where the plaintiffs' harm was foreseeable, than to these accident-based cases.

Defendants' other authorities purportedly express concern about limitless liability but involved wholly different factual scenarios.[41] *See Ruiz v. ConAgra Foods Packaged Foods LLC*, 606 F. Supp. 3d 881, 889-90 (E.D. Wis. 2022) (no duty to prevent spread of COVID-19); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 950 (Cal. 2023) (same); *In re Certified Question from Fourteenth Dist. Ct. of Appeals of Tex.*, 740 N.W.2d 206, 218 (Mich. 2007) (no duty to protect world from asbestos fibers); *Knight v. Merhige*, 133 So. 3d 1140, 1144 (Fla. Dist. Ct. App. 2014) (no duty to victim of murder); *Delfino v. Agilent Techs., Inc.*, 52 Cal. Rptr. 3d 376, 398-99 (Cal. Ct. App. 2006) (no duty to control employee who made threats outside scope of business).

Here, there is no concern about limitless liability because Plaintiffs seek to hold Defendants responsible for targeting youth and schools, causing foreseeable harm to School Districts, including on their property. Given Defendants' conduct and deliberate choices, the School Districts are not merely incidental victims of the harm Defendants caused. *See JUUL*, 497 F. Supp. 3d at 658 (holding that school district plaintiffs' "specific allegations answer JLI's concerns about limitless or unbounded liability"). Plaintiffs do not claim a duty owed to the public generally for a course of conduct that affected them in the same way any individual would be affected. Instead, they

---

[40] Defendants cite other cases for the proposition that foreseeability is not the entire inquiry. (*See* Mot. at 52-53). But as described above, foreseeability is the primary inquiry in 15 of the 17 states at issue and is a key part of the duty. There is no legal basis to dismiss the School Districts' claims for lack of duty if the harm was foreseeable—which it was.

[41] *John Rocchio Corp. v. Pare Eng'g Corp.*, 201 A.3d 316, 323 (R.I. 2019), was decided on lack of foreseeability, not on policy grounds, though the court noted the limitless liability concern.

painstakingly alleged a direct connection between Defendants' actions, the intended effects of those actions, and the impact on the School Districts as providers of public services that are, with the exception of parents, overwhelmingly the primary points of contact with school-aged children.

As a last-ditch effort, Defendants claim that speculative First Amendment harms caution against recognizing that they owe School Districts a duty of care. Mot. at 56-57. But the School Districts are not trying to constrain any right to provide content. Plaintiffs' claims are based on platform design choices that addict children and cause chaos in schools. This Court has already determined that many of Plaintiffs' allegations do not infringe on Defendants' free-speech rights, and cases in which courts invoked free speech rights based on content are factually inapposite. *Soc. Media*, 2023 WL 7524912, at *17-19. To the extent that Defendants' policy argument relies on the weightiness of a constitutional right, all 17 states at issue have constitutional provisions protecting the right to public education.[42] Given the importance of public education, the policy factors support finding Defendants owed School Districts a duty. *See Akin v. Bd. of Ed. of Riverside Unified Sch. Dist.*, 262 Cal. App. 2d 161, 168-69 (1968) (rejecting First Amendment argument and noting that "[t]he public derives benefit where public school students are academically trained in classroom devoid of disruptive influences" in upholding a district's ban on facial hair).

For these reasons, this Court should conclude that the foreseeability and policy factors strongly support finding that Defendants had a duty to the School Districts.

### 2. Defendants' Argument Regarding Third-Party Harm Misses the Mark.

The Court should also reject Defendants' unfounded argument that they do not have a duty to protect the School Districts from "third parties"—i.e., their own students. *See* Mot. at 47-49. If that argument had merit, it would have prevailed in the JUUL and opioid litigations. It did not. Instead, as these courts understood, duty exists where the "third party" and the injured plaintiff were closely connected and were harmed through the same course of conduct that foreseeably extended the impact of the defendant's negligence. *JUUL*, 497 F. Supp. 3d at 655-57; *West Boca*, 452 F. Supp. 3d at 786-87. A close relationship between the plaintiff and defendant is one way to create a duty, but it is not the *only* way, as evidenced by the muti-part tests used in many states. *See, e.g.*, *Althaus ex rel. Althaus*

---

[42] *See* Appendix, Section E.

1  *v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000);  *Est. of Mickelsen v. North-Wend Foods, Inc.*, 274 P.3d

2  1193, 1199 (Alaska 2012); *Rowland*, 443 P.2d at 564 (California).

3      Defendants' argument relies heavily on inapposite cases in which there were no connections

4  among the three parties involved.[43] Here, the School Districts are charged with educating and

5  providing certain services to minors who use Defendants' platforms. This case, therefore, is far more

6  similar to those in which there is a close connection between the injured "second party" and alleged

7  "third party." *See, e.g.*, *Kesner v. Superior Ct.*, 1 Cal. 5th 1132, 1145-58 (2016) (applying "*Rowland*

8  factors" to find that defendant employer had a "duty to prevent take-home asbestos exposure," where

9  plaintiff was injured by exposure to clothing of employee/family member); *Cricket Lighters*, 841

10  A.2d at 1010 (lighter manufacturer had duty to estates of people killed in house fire after 2-year-old

11  grabbed lighter and lit curtains on fire); *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979)

12  (contractor had duty to plaintiff restaurant based on construction contract with county, from whom

13  plaintiff leased premises); *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992) (based on

14  foreseeability of harm, power company had duty to landowner where employee erroneously marked

15  area of property as safe for digging); *see also JUUL*, 497 F. Supp. 3d at 655-57; *West Boca*, 452 F.

16  Supp. 3d at 786-87. In all of these cases, courts found a duty where, despite another party's

17  involvement in the defendant's misconduct, the defendant foreseeably harmed the plaintiffs.

18      If the School Districts' students constitute "third parties" at all, they are closely connected to

19  the School Districts, who are responsible for their learning and well-being. Critically, the duty alleged

20  is based on Defendants' own actions and the foreseeable consequences therefrom. Duty has been

21  found in cases with far more tenuous relationships among the parties than this one. *See, e.g.*, *Ileto*,

22  349 F.3d at 1205-06 (finding duty under California law from gun manufacturer to survivor of man

23  killed by weapon, based on foreseeability of harm and policy factors); *Prescott v. Slide Fire Sols.*,

---

24  [43] *See Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 201-02 (S.D. Fla. 1979) (no duty from

25  television station to murder victim where perpetrator watched violent show); *Flynn v. Nickerson Cmty. Ctr.*, 177 A.3d 468, 477-79 (R.I. 2018) (no duty from landowner whose van was stolen to party

26  whose vehicle was hit by thief); *Oulla v. Velazues*, 831 S.E.2d 450, 458 (S.C. Ct. App. 2019) (no duty from sod company that loaded pallet onto truck to party rear-ended when pallet fell off);

27  *Modisette*, 30 Cal. App. 5th at 148-49 (no duty from Apple to motorist injured by driver using iPhone); *Boynton v. Burglass*, 590 So. 2d 446, 447-49 (Fla. Dist. Ct. App. 1991) (no duty from

28  psychiatrist to party murdered by patient); *Bill v. Superior Ct.*, 137 Cal.App.3d 1002, 1014-15 (1982) (no duty from movie producer to movie patron who was shot).

1  *LP*, 410 F. Supp. 3d 1123, 1140-42 (D. Nev. 2019) (finding duty under Nevada law from seller of

2  "bump stocks" to those injured or killed in mass shooting, noting that allegations were based on

3  defendant's own conduct and the foreseeable result, not based on third party's actions).

4  Defendants' other cases are clearly distinguishable. In *Brown v. USA Taekwondo*, the court

5  analyzed whether the governing body of taekwondo had a duty to sexually abused plaintiffs, even

6  though they had not contributed to the harm. 11 Cal. 5th 204, 214 (2021). Conversely, the School

7  Districts allege numerous harmful actions taken directly by Defendants. If anything, *Brown* aids the

8  School Districts, based on the statement that "the law imposes a general duty of care on a defendant

9  only when it is the defendant who has created a risk of harm to the plaintiff, including when the

10  defendant is responsible for making the plaintiff's position worse." *Id.* Defendants created their

11  platforms and designed them to maximize engagement. *E.g.*, ¶7. Further, the School Districts allege

12  various actions by Defendants that made their position "worse." Nor is *Packingham v. North*

13  *Carolina*, 582 U.S. 98 (2017), helpful to Defendants. There, the Court rejected a North Carolina law

14  that denied all social media access to certain people. *Id.* at 108. The School Districts here are not

15  trying to deny anyone's access to all social media.

16  Finally, Defendants rely on that this Court's ruling on personal injury plaintiffs' misfeasance

17  allegations in the context of harms from sexual predators. *Soc. Media*, 2023 WL 7524912, at *35-38.

18  But here, the School Districts allege with great specificity how Defendants intentionally targeted and

19  addicted youth to their platforms and encouraged use in schools. The purported "second" and "third"

20  parties are far more closely connected, as the School Districts are the primary providers of education

21  and mental health services for the affected students. And the School Districts are not alleging "a duty

22  to prevent harm *by third parties to their users*," as this Court characterized the prior inquiry. *Id.* at

23  *35. Instead, the School Districts' allegations are based on Defendants' own harmful actions, which

24  harmed both users and the School Districts. Thus, in this instance, *Hacala v. Bird Rides, Inc.*, 90 Cal.

25  App. 5th 292 (2023), which this Court distinguished in the personal injury suits, *see Soc. Media*, 2023

26  WL 7524912, at *38, is on point. In *Hacala*, as here, the plaintiff alleged that the defendant's actions

27  contributed to cause the harm, which also involved another party. 90 Cal. App. 5th at 311-12. While

28  Defendants' actions also constitute "misfeasance," such a conclusion is unnecessary to determine that

1  Defendants owed a duty of care to the School Districts because the School Districts' harm was the

2  foreseeable result of Defendants' conduct.

3            **3.    The Economic Loss Rule Is Inapplicable Where, as Here, Duties Are**

4                 **Imposed by Law.**

5            This Court should also reject Defendants' argument (Mot. at 57) that, in thirteen states, the

6  "economic loss rule" bars tort recovery for economic losses.[44] The argument fails out of the gate

7  because it is undisputed that the rule is inapplicable in Colorado, North Carolina, and South Carolina.

8  Mot. at 57, n.54. And contrary to Defendants' assertion, Louisiana does not recognize the rule. *In re*

9  *Chinese Manufactured Drywall Prod. Liab. Litig.*, 680 F. Supp. 2d 780, 796 (E.D. La. 2010)

10 ("Louisiana does not recognize the [economic loss rule], nor does it recognize a doctrine sufficiently

11 similar.").[45]

12           As to the remaining states, the economic loss rule can have no application here because it

13 simply does not apply in cases where a plaintiff "cannot, and is not attempting to, avail himself of

14 any remedies of warranty or contract law," but rather seeks redress for harms that "sound[] classically

15 in tort." *Johnson*, 563 F. Supp. 3d at 1310 (contaminated drinking water). Consistent with this general

16 principle, some apply the rule only in suits on contracts or products liability actions,[46] while others

17

18

19  [44] Defendants contend the economic loss rule bars claims in the following states: Alaska, California,
20  Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Nevada, New Jersey, Pennsylvania,
    Rhode Island, and Virginia.

21  [45] Defendants' citation to *TS &C Invs., LLC, v. Beusa Energy, Inc*., 637 F. Supp. 2d 372 (W.D. La.
22  2009), does not compel a different result, because there, the court did not rely on Louisiana law.
    Instead, the federal court—whose decision is not binding on the Northern District of California—
23  made an "*Erie* guess," relying on a single decision of a Louisiana intermediate appellate court, which
    in turn, cited federal maritime law to apply the economic loss rule to non-maritime state law claims.
24  *Id.* at 375 (citing *Louisiana Crawfish Producers Association—West v. Amerada Hess Corporation*,
    935 So.2d 380 (La. App. 3rd Cir.2006)).

25  [46] *Residences at Ivy Quad Unit Owners Ass'n, Inc. v. Ivy Quad Dev., LLC*, 179 N.E.3d 977, 984 (Ind.
26  2022) ("[W]ithout a factual basis demonstrating any contractual relationship between the HOA and
    the Matthews Defendants, it would be unjust to foreclose a tort theory of relief based on the economic
27  loss doctrine."); *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So.3d 399,
    407 (Fla. 2013) ("economic loss rule applies only in the products liability context"); *John Rocchio*
28  *Corp.*, 201 A.3d at 321 n.5 (R.I. 2019) (economic loss rule only bars claims where commercial entities
    have entered into contracts).

do not apply it where the duty breached in tort risks physical harm or property damage.[47] And, for this reason too, the majority—Alaska,[48] California,[49] Georgia, Kentucky, Nevada, New Jersey, Pennsylvania, and Virginia—hold that it does not bar negligence claims, like those at issue here, which arise from an independent legal duty.[50]

For example, under Pennsylvania law, application of the economic loss doctrine "turns on the determination of the source of the duty plaintiff claims the defendant owed." *Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018). Where the relevant duty "arises independently of any contractual duties between the parties, then a breach of that duty may support a tort action." *Id.* Accordingly, in *JUUL*, the court concluded that Pennsylvania's economic loss doctrine would not bar the plaintiffs' negligence claims, because "the school districts plausibly plead a common-law duty that arises independently from any contractual obligations." 497 F. Supp. 3d at 660. The same is true here, where Plaintiffs allege Defendants breached an independent duty arising in tort that risked physical harms rather than purely economic loss. As such, Plaintiffs' claims under Alaska, California, Georgia, Illinois, Pennsylvania, and Virginia law also are not barred by the economic loss rule because Defendants have an independent duty under tort law grounded in public policy and the foreseeability of the harm to the School Districts. *See supra* Section III.C.1.

---

[47] *Fireman's Fund Ins. Co v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200 (Ill. 1997) (economic loss rule does not bar actions arising from "personal injury or property damages resulting from a tortious event"); *Cash & Carry Am., Inc. v. Roof Sols., Inc.*, 117 A.3d 52, 60-62 (Md. Ct. Spec. App. 2015) (economic loss doctrine only applies in cases where the "risk of harm" is "not solely economic loss," but rather "personal injury and death and damage to personal property").

[48] As Defendants' own authority recognizes, Alaska recognizes an exception to the economic loss rule where, as here, a defendant's conduct risks economic harm to a foreseeable plaintiff. *Anchorage v. Integrated Concepts & Rsch. Corp.*, 2015 WL 926219, at *5 (D. Alaska Mar. 4, 2015) ("[A] defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury or property damage, to particular plaintiffs or *plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct.* A defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty.").

[49] *Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625, 643 (Cal. 2022), *reh'g den.* (June 1, 2022), is inapposite. There, the court determined that the plaintiffs' claim was "not independent" of his "original mortgage contract," and thus the economic loss doctrine applied. *Id.* at 633. Indeed, the court there explicitly stated that even between contracting parties "[n]ot all tort claims for monetary losses . . . are barred by the economic loss rule," which bars only those which "arise form—or are not independent of—the parties' underlying contracts." *Id.*

[50] *See* Appendix, Section G.

1

## IV. CONCLUSION

2      For the foregoing reasons, Defendants' Motion should be denied. If the Motion is granted in

3  any respect, the Court should grant leave to amend. Fed. R. Civ. P. 15(a)(2).

4  DATED: March 4, 2023                             Respectfully submitted,

5  */s/ Previn Warren*                              */s/ Lexi J. Hazam*
   PREVIN WARREN                                    LEXI J. HAZAM
6  **MOTLEY RICE LLC**                              **LIEFF CABRASER HEIMANN &**
   401 9th Street NW Suite 630                      **BERNSTEIN, LLP**
7  Washington DC 20004                              275 Battery Street, 29th Floor
   T: 202-386-9610                                  San Francisco, CA 94111-3339
8  pwarren@motleyrice.com                           Telephone: 415-956-1000
                                                    lhazam@lchb.com
9

10                                                  *Plaintiffs' Co-Lead Counsel*

11 */s/ Christopher A. Seeger*
   CHRISTOPHER A. SEEGER
   **SEEGER WEISS, LLP**
12 55 Challenger Road, 6th Floor
   Ridgefield Park, NJ 07660
13 Telephone: 973-639-9100
   cseeger@seegerweiss.com
14

15 *Counsel to Co-Lead Counsel*

16 MICHAEL M. WEINKOWITZ                            MELISSA L. YEATES
   **LEVIN SEDRAN & BERMAN, LLP**                   **KESSLER TOPAZ**
17 510 Walnut Street, Suite 500                     **MELTZER CHECK, LLP**
   Philadelphia, PA 19106                           280 King of Prussia Road
18 Telephone: 215-592-1500                          Radnor, PA 19087
   MWeinkowitz@lfsbalw.com                          Telephone: 610-667-7706
19                                                  myeates@ktmc.com

20 *Plaintiffs' Steering Committee Leadership*
   *Co-Chair of Local Government Entity*            *Co-Chair of Local Government Entity*
21 *Subcommittee*                                   *Subcommittee*

22 ANDRE MURA
   **GIBBS LAW GROUP LLP**
23 1111 Broadway, Suite 2100
   Oakland, CA 94607
24 Telephone: 510-350-9717
   amm@classlawgroup.com
25

26 *Plaintiffs' Steering Committee Leadership*
   *Chair of Motion to Dismiss Briefing*
27 *Subcommittee*

28

1    JAMES J. BILSBORROW                     ALEXANDRA WALSH
     **WEITZ & LUXENBERG, PC**               **WALSH LAW**
2    700 BROADWAY                            1050 Connecticut Ave, NW, Suite 500
3    NEW YORK, NY 10003                      Washington D.C. 20036
     Telephone: 212-558-5500                 T: 202-780-3014
4    jbilsborrow@weitzlux.com                awalsh@alexwalshlaw.com

5    JAYNE CONROY                            MATTHEW BERGMAN
     **SIMMONS HANLY CONROY, LLC**           **SOCIAL MEDIA VICTIMS LAW**
6                                            **CENTER**
     112 Madison Ave, 7th Floor             821 Second Avenue, Suite 2100
7    New York, NY 10016                      Seattle, WA 98104
     Telephone: 917-882-5522                 Telephone: 206-741-4862
8    jconroy@simmonsfirm.com                 matt@socialmediavictims.org
9                                            *Plaintiffs' Steering Committee Leadership*

10

11   THOMAS CARTMELL                         PAIGE BOLDT
     **WAGSTAFF & CARTMELL LLP**             **WALSH LAW**
12   4740 Grand Avenue, Suite 300            1050 Connecticut Ave, NW, Suite 500
13   Kansas City, MO 64112                   Washington D.C. 20036
     Telephone: 816 701-1100                 T: 202-780-3014
14   tcartmell@wcllp.com                     PBoldt@alexwalshlaw.com

15   CARRIE GOLDBERG                         SIN-TING MARY LIU
     **C.A. GOLDBERG, PLLC**                 **AYLSTOCK WITKIN KREIS &**
16   16 Court St.                            **OVERHOLTZ, PLLC**
17   Brooklyn, NY 11241                      17 East Main Street, Suite 200
     T: (646) 666-8908                       Pensacola, Fl 32502
18   carrie@cagoldberglaw.com                Telephone: 510-698-9566
19                                           mliu@awkolaw.com

20   EMMIE PAULOS                            ROLAND TELLIS
     **LEVIN PAPANTONIO RAFFERTY**           **BARON & BUDD, P.C.**
21   316 South Baylen Street, Suite 600     15910 Ventura Boulevard, Suite 1600
22   Pensacola, FL 32502                     Encino, CA 91436
     Telephone: 850-435-7107                 Telephone: (818) 839-2333
23   epaulos@levinlaw.com                    rtellis@baronbudd.com

24   DIANDRA "FU" DEBROSSE ZIMMERMANN        HILLARY NAPPI
     **DICELLO LEVITT**                      **HACH & ROSE LLP**
25   505 20th St North, Suite 1500           112 Madison Avenue, 10th Floor
26   Birmingham, Alabama 35203               New York, New York 10016
     Telephone: 205.855.5700                 Tel: 212.213.8311
27   fu@dicellolevitt.com                    hnappi@hrsclaw.com

28

---

RUTH RIZKALLA
**CARLSON LAW FIRM**
100 E. Central Texas Expy
Killeen, TX 76541
(254) 526-5688
RRizkalla@carlsonattorneys.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Floor
New York, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

*Plaintiffs' Steering Committee*

1

**Appendix**

2    **A.    States where proximate cause is a factual question rarely resolvable on a motion

3    to dismiss. (Footnote 9).**

4         **AK:** *Winschel v. Brown*, 171 P.3d 142, 148-49 (Alaska 2017); **CA:** *Ileto v. Glock Inc*.,  349

5    F.3d 1191, 1206 (9th Cir. 2003); **CO:** *Deines v. Atlas Energy Servs., LLC*, 484 P.3d 798, 802-07

6    (Colo. 2021); **NC:** *Brown & Williamson Tobacco Corp. v. CSX Transp., Inc*., 882 F. Supp. 511, 515

7    (E.D.N.C. 1995); **VA:** *Russo v. United States*, 37 F. Supp. 2d 450, 454-55 (E.D. Va. 1999); *see also*

8    **AR:** *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 181-83 (1997) (jury verdict); **CA:** *Noble v. L.A.*

9    *Dodgers, Inc*., 214 Cal. Rptr. 395, 396-99 (Cal. Ct. App. 1985) (jury verdict); **FL:** *Dunn Bus Serv. v.*

10   *McKinley*, 178 So. 865, 866-69 (Fla. 1937) (jury instruction); **FL:** *Matthews v. Williford*, 318 So. 2d

11   480, 481-83 (Fla. Dist. Ct. App. 1975) (jury verdict); **FL:** *Grieco v. Daiho Sangyo, Inc*., 344 So. 3d

12   11, 22-27 (Fla. Dist. Ct. App. 2022) (summary judgment); **GA:** *Georgia Dep't of Transp. v. Owens*,

13   766 S.E.2d 569, 578 (Ga. Ct. App. 2014) (summary judgment); **NV:** *Goodrich & Pennington Mortg.*

14   *Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 792, 797-98 (Nev. 2004) (judgment); **RI:** *D'Ambra v. Peak*

15   *Bldg. Corp*., 680 A.2d 939, 940-41 (R.I. 1996) (directed verdict).

16   **B.    States where foreseeability is the linchpin of proximate cause and foreseeable

17   intervening actions (by plaintiffs or third parties) will not break the chain of

18   causation. (Footnotes 12 & 13)**

19        **CO:** *Deines*, 484 P.3d at 802; **GA:** *Ga. CVS Pharmacy, LLC v. Carmichael*, 890 S.E.2d 209,

20   227 (Ga. 2023); **IL:** *Colonial Inn Motor Lodge, for Use & Benefit of Cincinnati Ins. Co. v. Gay*, 680

21   N.E.2d 407, 415-16 (Ill. Ct. App. 1997); **IN:** *City of Gary ex rel. King v. Smith & Wesson Corp*., 801

22   N.E.2d 1222, 1244-46 (Ind. 2003); **LA:** *Roberts v. Benoit*, 605 So. 2d 1032, 1054-56 (La. 1991), *on*

23   *reh'g* (May 28, 1992); **MD:** *Pittway Corp. v. Collins*, 973 A.2d 771, 788, 792-96 (Md. App. Ct.

24   2009); **NV:** *Lopez v. Nevada*, 2023 WL 9056866, at *7 (D. Nev. Dec. 29, 2023) ("[F]oreseeable

25   intervening causes . . . will not supersede the defendant's responsibility"); **NJ:** *Gilbert v. Stewart*,

26   255 A.3d 1101, 1114 (N.J. 2021) ("[A] tortfeasor will be held answerable if its 'negligent conduct

27   was a substantial factor in bringing about the injuries,' even where there are 'other intervening causes

28   which were foreseeable or were normal incidents of the risk created.'"); **NJ:** *Chomatopoulos v. Roma*

*DeNotte Soc. Club*, 515 A.2d 296, 300 (N.J. Super. Ct. Law. Div. 1985) ("A tortfeasor is not exonerated from liability by the fact that the injurious act which occurred was criminal."); **NC:** *Brown & Williamson Tobacco Corp.*, 882 F. Supp. at 514-16; **RI:** *Gray v. Derderian*, 365 F. Supp. 2d 218, 230 (D.R.I. 2005) (rejecting defendant's argument that intervening negligent and criminal acts defeated proximate cause because "[t]he key, as with the duty analysis, is foreseeability: Are the intervening acts the natural and probable consequence of the defendant's negligence; and could those intervening acts have reasonably been anticipated by the defendant?"); **SC:** *Mellen v. Lane*, 659 S.E.2d 236, 249, 280 (S.C. Ct. App. 2008); **VA:** *Russo*, 37 F. Supp. 2d at 452; **VA:** *Semler v. Psychiatric Inst. of Wash., D.C.*, 538 F.2d 121, 126 (4th Cir. 1976) (recognizing proximate cause satisfied where murder was foreseeable).

## C.  States where a person's negligence may combine with another factor to cause harm. (Footnote 14).

**CO:** *Graven v. Vail Assocs., Inc.*, 909 P.2d 514, 520-21 (Colo. 1995) (substantial factor); **GA:** *John Crane, Inc. v. Jones*, 604 S.E.2d 822, 824 (Ga. 2004) (contributing factor); **IL:** *Abrams v. City of Chicago*, 811 N.E.2d 670, 674-75 (Ill. 2004) ("A defendant's conduct is a material element and substantial factor in bringing about the injury if, absent that conduct, the injury would not have occurred."); **IN:** *Harper v. Guarantee Auto Stores*, 533 N.E.2d 1258, 1264 (Ind. Ct. App. 1989) (substantial factor); **LA:** *Perkins v. Entergy Corp.*, 782 So. 2d 606, 612 (La. 2001) (same); **MD:** *Pittway Corp. v. Collins*, 973 A.2d 771, 787, 792 (Md. 2009) (same); **NV:** *Price v. Blaine Kern Artista, Inc.*, 893 P.2d 367, 370-71 (Nev. 1995) (same); **NJ:** *Gilbert v. Stewart*, 255 A.3d 1101, 1114, 1116 (N.J. 2021) (same); **NC:** *Hairston v. Alexander Tank & Equip. Co.*, 311 S.E.2d 559, 565–66 (N.C. 1984) ("When two or more proximate causes join and concur in producing the result complained of, the author of each cause may be held for the injuries inflicted"); **RI:** *Totman v. A.C. & S., Inc.*, 2002 WL 393697, at *4 (R.I. Super. Ct. Feb. 11, 2002) (substantial factor); **SC:** *J.T. Baggerly v. CSX Transp., Inc.*, 635 S.E.2d 97, 101 (S.C. 2006) ("concurring or a contributing proximate cause"); **VA:** *Jenkins v. Payne*, 251 Va. 465 S.E.2d 795, 798-99 (Va. 1996) ("In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's

negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury.")

  **D.**  **States where public nuisance laws either expressly reject, or do not require, a nexus to land. (Footnote 21).**

  **AK:** *See Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 548 n.27 (Alaska 2012) (adopting § 821B); **CA**: *City & Cnty. of S.F. v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 1007 (N.D. Cal. 2022) (public nuisance "defined in broad terms" and "never imposed such a requirement that there be some form of injury to land or property"); **CO**: *Hoery v. United States*, 64 P.3d 214, 218 n.5 (Colo. 2003) (distinguishing private nuisance which requires an "interest in . . . land" from public nuisance which "covers the invasion of public rights"); **FL**: *West Boca*, 452 F. Supp. 3d at 775 ("Florida nuisance law does not require an interference with the use and enjoyment of property."); **GA**: *City of College Park v. 2600 Camp Creek, LLC*, 666 S.E.2d 607, 608-09 (Ga. Ct. App. 2008) (adopting § 821B); **IL:** *Gilmore v. Stanmar, Inc.*, 633 N.E.2d 985, 992 (Ill. Ct. App. 1994) (adopting § 821B); **IN:** *City of Gary*, 801 N.E.2d at 1233 ("[T]here is no requirement that the activity involve an unlawful activity or use of land."); **KY:** *Roberie v. VonBokern*, 2006 WL 2454647, at *3 (Ky. Aug. 24, 2006), as modified (Dec. 21, 2006) (adopting § 821B); **LA:** *Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 29 F. Supp. 3d 808, 855 n.387 (E.D. La. 2014) (adopting § 821B); **MD**: *Collins v. Tri-State Zoological Park of W. Md., Inc.*, 514 F. Supp. 3d 773, 780-781 (D. Md. 2021) (adopting § 821B and noting "Maryland has historically recognized a public nuisance claim where a defendant's business operations involve dereliction of public morals"); **NJ**: *Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 393-94 (D.N.J. 2021) (adopting § 821B); **NV**: *City of Reno v. Purdue Pharma, L.P.*, 2018 WL 5730158, at *2 (D. Nev. Nov. 2, 2018) (adopting § 821B); **NC**: *State ex rel. Howes v. W.R. Peele, Sr. Trust*, 876 F. Supp. 733, 741 (E.D.N.C. 1995) (adopting § 821B and reasoning "[w]hatever tends to endanger life, or generate disease, and affect the health of the community . . . is generally, at common law, a public nuisance'"); **PA**: *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 648 (Pa. Commw. Ct. 2021) (adopting § 821B and noting public nuisance "affects health, safety or morals"); *Butts v. Sw. Energy Prod. Co.*, 2013 WL 12177102, at *4 (M.D. Pa. Apr.

26, 2013) (distinguishing private nuisance which involves "interference with . . . land" from public nuisance which involves "interference with a public right, and . . . the public health and safety"); **RI:** *Rhode Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129, 142 (D.R.I. 2018) (public nuisance is "behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community"); **VA:** *City of Va. Beach v. Murphy*, 389 S.E.2d 462, 464 (Va. 1990) (distinguishing public nuisances which "affect people generally" from private nuisances which are "anything done to the hurt of the lands . . . of another"); *see also* Rest. 2d Torts § 821B(1) (1979); Ala. Code § 6-5-120; Cal. Civ. Code § 3479; Ga. Code § 41-1-1; Idaho Code § 52-101; Ind. Code § 32-30-6-6; La. C.C. Art. 2315; Mont. Code § 27-30-101; N.D. Cent. Code § 42-01-01; N.M. Stat. § 30-8-1; Okla. Stat. tit. 50, § 1; SDCL § 21-10-1; Utah Code § 76-10-803; Wash. Rev. Code § 7.48.120.

### E.    State Constitutions granting a right to public education. (Footnotes 30, 42).

**AK:** Alaska Const. art. 7, § 1; **CA:** Cal. Const. art. IX, §§ 1, 5; **CO:** Colo. Const. art. IX, § 2; **FL:** Fla. Const. art. IX, § 1; **GA:** Ga. Const. art. VIII, § 1 *et seq.*;; **IL:** Ill. Const. art. X, § 1 *et seq.*; **IN:** Ind. Const. art. VIII, § 1; **KY:** Ky. Const. § 183; **LA:** La. Const. art. VIII, § 1; **MD:** Md. Const. art. VIII, § 1 *et seq.*; **NJ:** N.J. Const. art. VIII, § 4, ¶1; **NV:** Nev. Const. art. XI, § 2; **NC:** N.C. Const. Art. I, § 15; **PA:** Pa. Const. Art. III, § 14; **RI:** R.I. Const. art. XII, § 1; **SC:** S.C. Const. art. XI, § 3; **VA:** Va. Const. art. VIII, § 1.

### F.    States where foreseeability of harm is key to duty analysis. (Footnote 38)

**AK:** *Hurn v. Greenway*, 293 P.3d 480, 486–87 (Alaska 2013) ("foreseeability of harm is the most important" duty factor); **CA**: *Kesner v. Superior Ct.*, 384 P.3d 283, 294 (2016) ("the touchstone of the [duty] analysis is the foreseeability of that intervening conduct"); **CO:** *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992) (evaluating "the foreseeability and likelihood of injury" when determining duty); **FL:** *Dorsey v. Reider*, 139 So. 3d 860, 863 (Fla. 2014) (duty "depends upon . . . foreseeability of harm"); **GA:** *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1369 (N.D. Ga. 2021) (duty "is predicated on what should be anticipated"); **IL**: *Happel v. Wal-Mart Stores, Inc.*, 766 N.E.2d 1118, 1123 (Ill. 2002) (listing "foreseeability" as first of "relevant factors" used to "determin[e] whether a duty exists"); **IN:** *Rogers v. Martin*, 63 N.E.3d 316, 325 (Ind. 2016) ("in the duty arena,

foreseeability is a general threshold determination"); **KY:** *Shelton v. Kentucky Easter Seals Soc.*, Inc., 413 S.W.3d 901, 908 (Ky. 2013) ("foreseeability . . . is the most important factor in determining whether a duty exists"); **MD:** *Kennedy Krieger Inst., Inc. v. Partlow*, 191 A.3d 425, 440 (Md. 2018) (foreseeability is "the principal determinant of duty); **NV:** *Est. of Smith ex rel. Smith v. Mahoney's Silver Nugget, Inc.*, 265 P.3d 688, 689 (2011) ("the duty . . . must be determined . . . by considering whether the wrongful act that precipitated the plaintiff's injury was foreseeable"); **NJ:** *Coleman v. Martinez*, 254 A.3d 632, 645 (N.J. 2021) (a "court must first consider the foreseeability of harm to a potential plaintiff" when determining duty); **NC:** *Stein v. Asheville City Bd. Of Educ.*, 626 S.E.2d 263, 267 (2006) ("No legal duty exists unless the injury to the plaintiff was foreseeable and avoidable"); **PA:** *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003) (duty analysis considers "foreseeability of the harm incurred"); **RI:** *Oliver v. Narragansett Bay Ins. Co.*, 205 A.3d 445, 453 (R.I. 2019) (listing "the foreseeability of harm to the plaintiff" as first factor in duty analysis); **VA:** *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 811 (Va. 2018) (foreseeability is a "necessary consideration" for duty).

### G.    In these states, the economic loss rule does not bar negligence claims which arise from an independent legal duty. (Footnote 50)

**AK**: *Ass'n of Vill. Council Presidents Reg'l Hous. Auth. v. Mael*, 507 P.3d 963, 973 (Alaska 2022) (economic loss rule will not bar recovery in tort for breach of a duty imposed independent of a contract); **CA:** *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 660-61 (N.D. Cal. 2020) (the economic loss doctrine did not bar plaintiff's claims that arose from a common law duty "given the foreseeability and public policy considerations" at issue there); **GA:** Ga. Code Ann. § 51-1-11 (the economic loss rule does not apply "in cases where the party would have a right of action for the injury done independently of the contract"); *see also Johnson v. 3M*, 563 F. Supp. 3d 1253, 1310 (N.D. Ga. 2021); **KY:** *Nami Res. Co., L.L.C. v. Asher Land & Min., Ltd.*, 554 S.W.3d 323, 336 (Ky. 2018) ("A breach of a duty arising independently of any contract duties between the parties . . . may support a tort action."); **NV:** *Mitman v. LA 1, LLC*, 2023 WL 8270780, at *5 (Nev. 2023) (economic loss rule "does not bar recovery in tort where the defendant had a duty imposed by law rather than by contract," even "where the defendant's intentional breach of that duty

caused purely monetary harm to the plaintiff.") (internal quotation marks omitted); **NJ:** *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002) (economic loss doctrine does not bar claim where "the breaching party owes an independent duty imposed by law"); **PA:** *Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018) ( "if the duty arises independently of any contractual duties between the parties, then a breach of that duty may support a tort action"); **VA:** *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 489 (Va. 2010) (the economic loss doctrine does not bar tort claims that arise independent of a contract).

**SIGNATURE ATTESTATION**

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

*/s/ Andre M. Mura*

Andre M. Mura