UNITED STATES DISTRICT COURT    *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

```
IN RE: SOCIAL MEDIA          )    Zuckerberg Motion to Dismiss
ADOLESCENT ADDICTION/        )
PERSONAL INJURY PRODUCTS     )    Further Case Management
LIABILITY LITIGATION         )
                             )    NO. C 22-03047 YGR
                             )
ALL ACTIONS                  )    Pages 1 - 94
                             )
_____)    Oakland, California
                                  Friday, February 23, 2024
```

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          Lieff, Cabraser, Heimann &
                         Bernstein
                         275 Battery Street, 30th Floor
                         San Francisco, California  94111
                    BY:  MICHAEL LEVIN-GESUNDHEIT,
                         LEXI J. HAZAM, ATTORNEYS AT LAW

                         Lieff Cabraser Heimann & Bernstein LLP
                         250 Hudson Street, 8th Floor
                         New York, New York  10013
                    BY:  KELLY K. MCNABB, ATTORNEY AT LAW


                         Seeger Weiss LLP
                         55 Challenger Road, Sixth Floor
                         Ridgefield Park, New Jersey  07660
                    BY:  CHRISTOPHER A. SEEGER, ATTORNEY AT LAW

              (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1              A P P E A R A N C E S  (CONT'D.)

 2

 3    For Plaintiffs:        Motley Rice LLC
                             401 9th Street NW Suite 630
 4                           Washington, DC  20004
                        BY:  NELSON L. DRAKE, ATTORNEY AT LAW
 5

 6                           Motley Rice LLC
                             28 Bridgeside Boulevard
 7                           Mt. Pleasant, South Carolina  29464
                        BY:  ANNIE E. KOUBA, ATTORNEY AT LAW
 8

 9                           Motley Rice LLC
                             20 Church Street, 17th Floor
10                           Hartford, Connecticut  06103
                        BY:  MATHEW P. JASINSKI, ATTORNEY AT LAW
11

12                           Andrus Anderson LLP
                             155 Montgomery Street, Suite 900
13                           San Francisco, California  94104
                        BY:  JENNIE LEE ANDERSON, ATTORNEY AT LAW
14

15                           Morgan & Morgan
                             220 W. Garden Street, 9th Floor
16                           Pensacola, Florida  32502
                        BY:  EMILY C. JEFFCOTT, ATTORNEY AT LAW
17

18                           Gibbs Law Group
                             1111 Broadway, Suite 2100
19                           Oakland, California  94607
                        BY:  ANDRE M. MURA, ATTORNEY AT LAW
20

21                           Kessler Topaz Meltzer Check LLP
                             280 King of Prussia Road
22                           Radnor, Pennsylvania  19087
                        BY:  MELISSA L. YEATES, ATTORNEY AT LAW
23

24

25
```

```
 1                    A P P E A R A N C E S (CONT'D.)

 2

 3   For Plaintiffs:           Levin Sedran & Berman LLP
                               510 Walnut Street, Suite 500
 4                             Philadelphia, Pennsylvania  19106
                          BY:  MICHAEL M. WEINKOWITZ, ATTORNEY AT LAW
 5

 6   For Plaintiff Colorado    Colorado Department of Law
     Attorney General:         1300 Broadway, 6th Floor
 7                             Denver, Colorado  80203
                          BY:  BIANCA MIYATA,
 8                             SENIOR ASSISTANT ATTORNEY GENERAL

 9   For Plaintiff State:      California Department of Justice
     of California Attorney    Attorney General's Office
10   General:                  455 Golden Gate Avenue, 11th Floor
                               San Francisco, California  94102
11                        BY:  MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL

12                             California Department of Justice
                               1515 Clay Street, 20th Floor
13                             Oakland, California  94612-0550
                          BY:  JOSHUA OLSZEWSKI-JUBELIRER,
14                             DEPUTY ATTORNEY GENERAL

15

16   For Plaintiff Kentucky:   Office of the Kentucky Attorney
     Attorney General:         General
17                             Consumer & Senior Protection
                               1024 Capital Center Drive, Suite 2000
18                             Frankfort, Kentucky  40601
                          BY:  DANIEL KEISER, COMMISSIONER
19

20

21

22

23

24

25
```

```
 1                  A P P E A R A N C E S (CONT'D.)

 2

 3   For Plaintiff          New Jersey Office of the Attorney
     New Jersey Office of    General
     the Attorney General:  Division of Law
 4                          124 Halsey Street
                            P.O. Box 45029
 5                          Newark, New Jersey  07102
                      BY:   THOMAS HYUNH,
 6                          MANDY WANG, DEPUTY ATTORNEYS GENERAL

 7

 8   For the Meta           Covington & Burling LLP
     Defendants:            One City Center
 9                          850 Tenth Street, NW
                            Washington, DC  20001-4956
10                    BY:   TiMOTHY HESTER,
                            MICHAEL X. IMBROSCIO, ATTORNEYS AT LAW
11

12                          Covington & Burling LLP
                            415 Mission Street, Suite 5400
13                          San Francisco, California  94105-2533
                      BY:   ISAAC D. CHAPUT, ATTORNEY AT LAW
14
                            Covington & Burling LLP
15                          1999 Avenue of the Stars, Suite 3500
                            Los Angeles, California  90067-4643
16                    BY:   ASHLEY M. SIMONSEN, ATTORNEY AT LAW

17                          Gibson, Dunn & Crutcher
                            620 Eighth Avenue
18                          New York, New York  10018
                      BY:   GREGORY L. HALPERIN, ATTORNEY AT LAW
19

20   For Defendant Snap     Munger, Tolles & Olson
     Inc.:                  560 Mission Street, 27th Floor
21                          San Francisco, California  94105
                      BY:   JONATHAN H. BLAVIN,  ATTORNEY AT LAW
22

23   For Defendant TikTok   King & Spalding LLP
     Inc.; ByteDance, Inc.: 1180 Peachtree Street, N.E.
24                          Suite 1600
                            Atlanta, Georgia  30309-3521
25                    BY:   GEOFFREY M. DRAKE, ATTORNEY AT LAW
```

# A P P E A R A N C E S (CONT'D.)

```
 1

 2

 3   For Defendant TikTok    Faegre Drinker Biddle & Reath LLP
     Inc.; ByteDance, Inc.:  90 S. 7th Street, Suite 2200
 4                           Minneapolis, Minnesota  55402
                       BY:  AMY FITERMAN,
 5                           ANDREA PIERSON, ATTORNEYS AT LAW

 6

 7   For Defendant Alphabet  Wilson, Sonsini, Goodrich & Rosati
     Inc.; Google, LLC;      633 West Fifth Avenue
 8   Roblox; YouTube, Inc.:  Los Angeles, California  90071-2048
                       BY:  MATTHEW DONOHUE, ATTORNEY AT LAW
 9

10   For Defendant           Williams & Connolly LLP
     YouTube, LLC:           680 Maine Avenue SW
11                           Washington, DC  20024
                       BY:  JOSEPH G. PETROSINELLI,
12                           ATTORNEY AT LAW

13

14                            --OOO--

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Friday, February 23, 2024                           9:31 a.m.
 2                       P R O C E E D I N G S
 3                           --o0o--
 4
 5          THE CLERK:  Good morning, everyone.
 6      Calling the matter of 22-MD-03047-YGR, In Re: Social Media
 7   Adolescent Addiction Personal Injury Products Liability
 8   Litigation.
 9      Parties, please step forward and state your appearances
10   for the record.
11          THE COURT:  No. I know we always do that.  We're not
12   having people step forward.
13          THE CLERK:  Yes, Your Honor.
14          THE COURT:  We have -- per or -- it will take too
15   long.
16      Per our nominal protocol, you should have signed in
17   already.  If you didn't sign in and you want to be listed as
18   having attended, make sure you do it before you leave.  Just
19   identify yourself if you come to the mic and you're speaking.
20      Okay.  So a number of things to talk about today.  I've
21   read your case management statement in advance.  Appreciate
22   that.  Have an update from Judge Kuhl.  I have an update from
23   Judge Kang.  I'm sure you will give me your own versions of
24   the updates.
25      Let's get started.  First, let's just take argument on the
```

```
 1      Zuckerman [sic] motion.  So who'll be arguing those -- that
 2      issue?
 3              MR. HESTER:  Good morning, Your Honor.  Timothy
 4      Hester on behalf of Mark Zuckerberg.
 5              THE COURT:  Good morning.  And you're from which
 6      firm?
 7              MR. HESTER:  Covington & Burling, Your Honor.
 8              THE COURT:  Okay.  Great.
 9              MR. JASINSKI:  And good morning, Your Honor.  Matthew
10      Jasinski with Motley Rice on behalf of the individual
11      plaintiffs who have sued Mr. Zuckerberg.
12              THE COURT:  Okay.
13          I'm sorry, sir.  You said your name was...?
14              MR. HESTER:  Timothy Hester, Your Honor, of
15      Covington & Burling.
16              THE COURT:  And Matthew Jasinski.
17              MR. JASINSKI:  Yes, Your Honor.
18              THE COURT:  Okay.
19          All right.  So why don't you first each address the issue
20      that I laid out in the supplemental order that I issued with
21      respect to the briefing.
22          Before I turn the mic over to you, though -- and we'll
23      discuss this in terms of the current briefing on other
24      issues -- I do want everyone to understand my perspective.
25          I do think it's incumbent upon the Court to actually
```

 1    evaluate the laws of the various states that are presented by

 2    any given motion.

 3        In this particular motion, the states or at least one

 4    state seems to -- to have a different perspective on issues

 5    of, like, duty.  And yet, neither side really engages with the

 6    distinctions that exist.

 7        And you certainly don't help the Court by identifying

 8    the -- the controlling law of the various states for the

 9    plaintiffs who have filed suit.  And that means more work for

10    us.

11        And like I've said before, you look around this room,

12    there are lots of lawyers.  We actually need you to help us do

13    this work, especially -- you know, especially if you're

14    bringing a motion, so we need to know going forward what your

15    view is on the controlling authority for the states that are

16    at issue.

17        You may proceed.

18        **MR. HESTER:**  Thank you, Your Honor.

19        So on the plaintiffs' briefing, they focused on the

20    question of fraudulent omission, but I understand that the

21    Court's order has raised the question of negligent

22    misrepresentation, and so that's the point I wanted to respond

23    to in relation of the Court's order on the supplemental

24    briefing.

25        From amongst states --

```
 1              THE COURT:  Let me ask you this:  How many states'
 2    laws are we dealing with?
 3              MR. HESTER:  Fifteen in total, Your Honor, if we
 4    count California.  The Court's order had it right in terms of
 5    the plaintiffs' states of residence with one exception.
 6    There's also at least one plaintiff from Massachusetts.
 7              THE COURT:  Okay.  And which --
 8              MR. HESTER:  So I would add that to the list.
 9              THE COURT:  And which case number is that?  Or could
10    you tell me the --
11              MR. HESTER:  Yes, the -- that's -- that's case
12    number --
13              THE COURT:  Or tell me the name first.
14              MR. HESTER:  The plaintiff is Jada Cameron.
15              THE COURT:  No, I'm going to have that first name
16    struck.
17       Are you -- Was that a first name that you used?
18              MR. HESTER:  I -- it's listed in the caption, Your
19    Honor.
20              THE COURT:  Okay.
21              MR. HESTER:  But -- but the case number is
22    4-23-CV-03266, just one plaintiff from Massachusetts.
23              THE COURT:  Oh, 3266.
24              MR. HESTER:  Yes, Your Honor.
25              THE COURT:  I'm looking at my list.  Hold on.
```

```
1          I had that -- okay.  So it's not South Carolina?

2          MR. HESTER:  We don't have that as South Carolina,

3   Your Honor.  We had that one as Massachusetts.

4          THE COURT:  What is it?

5          MR. JASINSKI:  The plaintiff resides in

6   Massachusetts, Your Honor.  The place of use was

7   South Carolina, and the selected forum is the District of

8   South Carolina, so --

9          THE COURT:  Yeah, the transfer forum was

10  South Carolina.

11         MR. HESTER:  All right, Your Honor.  Well, okay.

12  Thank you.  I mean, we can -- we can proceed that way.

13         So I think that with that -- with that small caveat, then

14  we -- we believe those -- the states listed in the Court's

15  order are the right ones at issue; namely, the -- the forum

16  states and, in addition, the state of California.

17         And none of the -- none of these 25 plaintiffs who've

18  asserted individual claims against Mr. Zuckerberg reside or --

19  in California.  But I understand the Court's order listed

20  that, and it's obviously one of the jurisdictions at issue.

21         THE COURT:  Well, in part I listed it because you all

22  cite a lot of California law.  And I appreciate that.  I'm

23  pretty familiar with California law after all these years.

24         But California doesn't control other states' jurisdictions

25  unless, you know, they have the exact same rule, and then it
```

 1    can be looked at as persuasive authority, not binding

 2    authority, and so sometimes that's helpful.

 3        But proceed.

 4            **MR. HESTER:**  Well --

 5            **THE COURT:**  I've -- I've indicated, you know, my

 6    concern.

 7            **MR. HESTER:**  So, Your Honor, so among these states

 8    that we're talking about, there's one group of states that

 9    requires an affirmative statement to support a claim of

10    negligent misrepresentation.  And that includes Colorado,

11    Maryland, Georgia, North Carolina, Ohio, Texas, and Wisconsin.

12            **THE COURT:**  Right.  Okay.

13        So -- try to circuit this.  As I understand the briefing,

14    defendants -- I mean, plaintiffs are not proceeding on a

15    theory of an affirmative statement; is that correct or not?

16            **MR. JASINSKI:**  These plaintiffs are not, Your Honor;

17    that is correct.

18            **THE COURT:**  Okay.  So the motion is granted with

19    respect to any claim to the extent otherwise argued of

20    affirmative statements, right?

21        So now that's all gone.

22            **MR. HESTER:**  Yes, Your Honor.  Exactly.

23        And that was where I wanted to go because I do think

24    there's two buckets of states.  There's that bucket that I

25    just described.  Then there's a second bucket, a group of

1    states -- a smaller group -- that recognizes a claim for

2    negligent misrepresentation by omission, and there's five of

3    those by our count, Connecticut, Pennsylvania, South Carolina,

4    Arizona, and New York.

5        And as to those states, they're very clear that they

6    require a duty to disclose if the claim is negligent

7    misrepresentation through omission.

8        And so just as an example out of -- out of the Connecticut

9    District Court, *Office Furniture Rental v. Liberty Mutual*, 981

10   F.Supp. 2nd 111 at 120.  Quote, such a cause of action based

11   on omission arises only if the defendant had a duty to

12   disclose the omitted information.

13       And that is true for all of these five states.  In one

14   fashion or another, they recognize the tort of a negligent

15   misrepresentation by omission, but they require a duty to

16   disclose.

17           **THE COURT:**  Okay.  And will you confirm for me,

18   Mr. Hester, that you actually didn't brief this, right?

19           **MR. HESTER:**  And -- and, Your Honor, the reason it

20   wasn't briefed is because it wasn't called out separately in

21   the plaintiffs' brief.  They focused on a fraud claim.

22           **THE COURT:**  No, you brought the motion.

23           **MR. HESTER:**  The original motion -- and just to

24   clarify that, and we're listening to the Court.  But the

25   original motion was addressed, we -- we understood, to the

1    statements asserted in the complaint.

2        Then the plaintiffs' opposition brief said, no, we're only

3    alleging -- as to Mr. Zuckerberg personally, we're only

4    alleging claims based on omissions.

5        So then, as I'm sure the Court has discerned, in the reply

6    brief, the briefing switched over to a question of omissions.

7    But just to -- so that the Court understands, we -- we had

8    originally understood that the plaintiffs were asserting

9    personal claims against Mr. Zuckerberger [sic] based on

10   statements he had made, and that was clarified, then, by their

11   opposition brief, that they're only asserting omissions

12   claims.  That's why we switched over to address the omissions

13   claims fully in the reply brief.

14       But at that point, the plaintiffs had not called out a

15   misrepresentation by omission claim separately.  They had

16   really focused on the fraud claim.  That's -- that's the

17   reason --

18       I understand the Court has to address this law, and we

19   take that seriously, and we -- we will take that on board

20   going forward.  But that -- that's the reason that we hadn't

21   called out this separate question of the tort of negligent

22   misrepresentation by omission.

23       But I think the key point is you get to the same place,

24   because all of these states that recognize the tort of a

25   negligent misrepresentation by omission require a duty to

```
1    disclose, which is the heart of our briefing on the fraud by

2    omission claim.

3              THE COURT:  On the reply.

4         MR. HESTER:  Yes --

5              THE COURT:  And I don't have --

6         MR. HESTER:  -- on the reply.

7              THE COURT:  And that's always, right, from our

8    perspective, it's a concern because you bring it up in reply

9    so I don't have anything from the plaintiffs to address the

10   legal issues.

11             MR. HESTER:  Well, we had raised -- we had raised the

12   omission point in the last section of our opening brief, your

13   Honor.

14      That's the -- the last -- the last part of our opening

15   brief did address omission.  And then the plaintiffs in

16   their -- in their opposition brief made it very clear that

17   they were confining themselves to omission.

18      That's -- that's at least for the Court the explanation as

19   to how the briefing came out that way.

20      But I think at the end of the day, the Court is getting

21   the same information because the core issue before the Court,

22   both on this negligent misrepresentation by omission theory

23   and on the fraudulent omission theory, is the same.  It's the

24   exact same issue, which is duty to disclose.

25      And that gets to the second question the Court raised,
```

```
 1    which is, is there a need to undertake a choice of law

 2    analysis.  And we submit there's not, because the duty to

 3    disclose law across the country is essentially identical.

 4         And there's not going to be a meaningful substantive

 5    difference or a meaningful outcome determinative difference in

 6    law between states on this question of duty to disclose.

 7         So we think that the Court does not need to engage in this

 8    analysis because under the law of any of these states, the

 9    duty to disclose analysis is the same.

10              THE COURT:  All right.  Let me stop you.

11         And, Mr. Jasinski -- did I say that right?

12              MR. JASINSKI:  You did, Your Honor.  You said it

13    correctly.

14              THE COURT:  Your response so far.

15              MR. JASINSKI:  Yes, Your Honor.

16         I actually agree with -- with many of the things that my

17    adversary said.  I think working backwards, the plaintiffs

18    agree that the Court does not need to engage in a choice of

19    law analysis at this time.

20         And -- and I would also agree that I think the central

21    question is with respect to duty.  One of the questions the

22    Court had posed in its order was the extent to which there

23    were some states that articulated a duty of care versus a duty

24    to disclose.  I think that's actually a distinction without a

25    difference.
```

```
 1        It arises in the case law because sometimes the courts are
 2   asking whether when somebody is speaking, if that person has
 3   a -- a duty of care to speak accurately.  That can also --
 4   that stems from the Restatement Section 552.
 5        There can also be a duty of disclosure, but Restatement
 6   Section 551 also characterizes that as a duty of care, so
 7   I'm -- it's a long-winded way of saying I think we agree that
 8   the principal question is with respect to duty.  That is true
 9   for the fraudulent omission claim, and it is true for the
10   negligent misrepresentation omission claim.
11        Where I would disagree is on the sort of count of states.
12        THE COURT:  Okay.  So let's -- before you move to
13   that, do we then -- do you also agree that it is a distinction
14   without a difference in terms of the Court's analysis of
15   states that use the phrase "duty of care" versus those that
16   say a "duty to disclose"?
17        MR. HESTER:  I would adjust it slightly, Your Honor.
18        As we read the cases, the duty of care concept applies in
19   the context of affirmative statements.  So in relation to the
20   states in that first bucket where there's a requirement for an
21   affirmative statement to support a claim of negligent
22   misrepresentation, that's where the duty of care becomes the
23   controlling principle.
24        The -- so just with that adjustment, Your Honor, I
25   certainly agree that ultimately, the question is duty of
```

 1    disclosure, and the restatement in some cases fold into that a

 2    reference to duty of care, but ultimately, the question

 3    remains, is there a duty of disclosure.

 4        You could have, for instance, within a fiduciary

 5    relationship a question whether the fiduciary behaved with

 6    adequate care.  But ultimately, it still is the question of

 7    duty of disclosure.

 8            **THE COURT:**  All right.

 9        Let's -- let's focus on duty of disclosure first.

10        I know --

11            **MR. JASINSKI:**  Would you like to hear from me on

12    which states, Your Honor, in terms of my disagreement with

13    respect to negligent omission?

14            **THE COURT:**  Okay.  So with respect to negligent

15    omission, I have from the defendants -- their list is

16    Connecticut, Pennsylvania, Arizona, South Carolina, and

17    New York.

18            **MR. JASINSKI:**  Correct.

19            **THE COURT:**  And yours is what?

20            **MR. JASINSKI:**  Let me tell you the states that I

21    think we would acknowledge do not recognize negligent

22    omission:  California, Georgia, and Ohio.  We think there

23    is -- and we certainly agree that Arizona, Connecticut,

24    New York, Pennsylvania, and South Carolina do recognize it.

25    And we think that the -- the balance of states, which if I

```
 1    have my list right, would be Colorado --
 2            THE COURT:  Hold on.  Hold on.
 3            MR. JASINSKI:  Yes.
 4            THE COURT:  So you agree that those that recognize
 5    include Connecticut, Pennsylvania, New York, and
 6    South Carolina.  So you don't agree with Arizona?
 7            MR. JASINSKI:  We do agree with Arizona.
 8            THE COURT:  Do you agree with all five of theirs?
 9            MR. JASINSKI:  With respect to states that
10    acknowledge -- we think there are others that do as well.
11            THE COURT:  Okay.  And the others that you think
12    acknowledge it?
13            MR. JASINSKI:  Colorado, Maryland, North Carolina,
14    Texas, Virginia, and Wisconsin either acknowledge it or have
15    not answered the question in the negative.
16            THE COURT:  Okay.  So what I am going to want after
17    this is over is your list.  Don't want the argument.  I don't
18    need the argument.  If I need argument, I'll ask you for it.
19            MR. JASINSKI:  Yes, Your Honor.
20            THE COURT:  What I want is your best cases on each
21    side -- and, actually, your best case, no more than two per
22    state -- that -- upon which you believe that the claim for
23    negligent misrepresentation does not exist on the defendants'
24    side and does exist on the plaintiffs' sides with respect to
25    that next set of six states.  So Colorado, Maryland,
```

```
 1        North Carolina, Texas, Virginia, and Wisconsin.

 2          Okay?

 3                MR. JASINSKI:  Yes, Your Honor.

 4                MR. HESTER:  And, Your Honor, I assume it's not

 5        helpful to just start reading cases off today, that it would

 6        be better, more productive, if we do that later in the -- in

 7        the supplemental briefing.

 8                THE COURT:  I think it -- it's just -- I'm hoping you

 9        already have them, that you're not going to go do research.

10          I actually have a whole list of cases, too.  It's -- it

11        would be better and certainly more efficient --

12                MR. JASINSKI:  Yes.

13                THE COURT:  -- to just file the one page with the

14        list for those states.

15          And there will likely be more of these things to do, so

16        this is just the first in a litany.

17          Okay.  So let's -- let's, then, talk about -- there is

18        some agreement at least with respect to -- well, I guess the

19        question -- before we go back to the states upon which we

20        agree there is a claim, is the analysis any different,

21        Mr. Jasinski, for the other six that you've identified?

22                MR. JASINSKI:  With -- with respect to any portion of

23        the -- the theory of negligent omission?  I just want to make

24        sure I understand the Court's question.

25                THE COURT:  Yes.
```

```
 1              MR. JASINSKI:  I don't -- I don't believe so.

 2        I think at the end of the day, the question, again, that

 3   is really applicable to both the negligent omission theory and

 4   the fraud by omission theory is the existence of the duty of

 5   disclosure.

 6              THE COURT:  Okay.

 7              MR. JASINSKI:  And I think that that analysis will

 8   apply with equal force to all of those states.  And we don't

 9   perceive there to be a -- a difference in -- a material

10   difference in the way that states approach that question.

11        I think -- I think we agree with opposing counsel on that.

12              THE COURT:  Okay.

13              MR. HESTER:  And -- And we agree with that, Your

14   Honor.

15        We do think the duty of the disclosure is the core

16   principle and the core question in these states, both with --

17   with respect to fraudulent omission and negligent omission.

18              THE COURT:  Okay.  So -- so let's talk about duty,

19   then.

20        We'll go to you, Mr. Hester.

21              MR. HESTER:  Okay, Your Honor.

22        A duty to disclose requires a transactional or fiduciary

23   relationship between the parties, what the courts invariably

24   refer to as a special relationship.

25        And I think the *LiMandri* case that we've cited in our
```

1   reply brief, 52 Cal App. 4th, 326 at 337, states it very well.

2       And I'll just give a couple of quotes for the court.

3   First, quote is a matter of common sense, such a relationship

4   can only come into being as part of the result of some sort of

5   transaction between the parties.

6       And then the Court goes on to say, quote, a duty to

7   disclose may arise from the relationship between seller and

8   buyer, employer and prospective employee, doctor and patient,

9   or parties entering into any kind of contract.

10      And then the Court goes on to say, quote --

11          **THE COURT:**  Can you address -- and I think generally

12  speaking, many states have this special relationship issue.

13  And I don't think --

14      Well, let me just ask the plaintiffs.  You're not alleging

15  a special relationship, are you?  And you're not alleging that

16  you could allege a special relationship, are you?

17          **MR. JASINSKI:**  Well, I guess it depends on what a

18  "special relationship" is, Your Honor, and -- and that's

19  important.  We don't allege a fiduciary relationship, for

20  sure.

21      We -- we really allege two -- two grounds for the way in

22  which the -- the duty arose here.  One is that we believe that

23  Mr. Zuckerberg was an active participant in the tort itself;

24  that is in and of itself either a ground to recognize a duty

25  or effectively an exception to the duty requirement, as Judge

1    Chen found in the *In re Chrysler Dodge EcoDiesel* case, so that

2    that's point 1 I want to make.

3        Point 2 is that there is a relationship here consistent

4    with the --

5            **THE COURT:**  Has anybody other than Judge Chen found

6    an exception to the special relationship requirement?

7            **MR. JASINSKI:**  Well, the way Judge Chen -- I -- I

8    guess I don't want to call it an exception.  I'm going to

9    answer the question "yes," and I'm -- actually, I'm going to

10   answer it no because I'm looking at another Judge Chen case,

11   so I don't know the answer to that question.

12       But let me -- let me articulate how it's described.

13           **THE COURT:**  Slow down.

14           **MR. JASINSKI:**  Yes, I'm sorry.

15       In the *EcoDiesel* case, what Judge Chen said was that an

16   affirm act of concealment by the defendant effectively negates

17   the duty to disclose requirement, i.e., there is a

18   difference --

19           **THE COURT:**  Yeah, you just need to breathe.  Remember

20   to breathe.

21       And it's been a really long week for me, so it would be

22   helpful for me not to have to -- they're getting me more

23   coffee.  It would be helpful for me if you didn't speak so

24   fast.

25           **MR. JASINSKI:**  Apparently, I should have had less.

1    I'll start over.

2        Judge Chen said, an affirmative act of concealment by the

3    defendant effectively negates the duty to disclose

4    requirement; i.e. there is a difference between silence where

5    a duty to disclose is required, an act of concealment, where

6    there is no such requirement.

7        And in the *In Re: MyFord Touch* case, I think Judge Chen

8    articulated it a little differently, noting that when the

9    defendant actively conceals a material fact from the

10    plaintiff, that is a circumstance from which a duty to

11    disclose can arise.

12        But I think equally important is the fact that under

13    the -- the active participant theory of -- of corporate

14    officer liability, the -- it is the -- the officer who is

15    participating in the company's tort.

16        **THE COURT:**  So let's -- let's talk a little bit about

17    this corporate officer responsibility doctrine.

18        Is it a separate and distinct doctrine that supplants

19    duty?  Because -- and, you know, I'm not sure I have really

20    sufficient briefing on this issue either because it's a --

21    personal liability under that doctrine seems to be a -- a

22    separate analysis from whether a duty exists under a common

23    tort.

24        **MR. JASINSKI:**  I'd agree.  I would agree.  I --

25    because I think the question is --

```
 1            THE COURT:  Yeah, but then it should be separately
 2    argued.  I'm talking about --
 3            MR. JASINSKI:  I --
 4            THE COURT:  -- duty.
 5            MR. JASINSKI:  Fair enough, Your Honor.
 6        And I think because of the way that Judge Chen articulated
 7    it, I wanted to describe that for you.  But I will --
 8            THE COURT:  I understand that it's out there, and
 9    it's on my list of things to talk to you all about.
10        But the duty analysis is a different analysis.
11            MR. JASINSKI:  So I will focus on that, Your Honor.
12        In terms of a -- a duty that Mark Zuckerberg owed separate
13    and apart from any participation in his company's tort, we
14    believe that arises by virtue of the relationship that he
15    formed with the users of his platform given his outsized role
16    at this company and in -- and his prominence in essentially
17    becoming the face and voice of the company.
18        He is a household name, unlike any other CEO.  I gather
19    most Americans could not tell you who the CEO of Proctor &
20    Gamble is or General Motors or, for that matter, TikTok.
21        But the facts against Mr. Zuckerberg, I think, are more
22    persuasive than those against -- I'm so sorry --
23    Mr. Marchionne, was the CEO of Chrysler, Fiat in *EcoDiesel*.
24    And the plaintiffs alleged a misrepresentation claim and also
25    an omission claim against him.  And Judge Chen concluded that
```

1    that claim should survive a motion to dismiss because

2    Mr. Marchionne not only had signed off on the company's

3    statement, but it was a reasonable inference that he was

4    involved in and knowledgeable about what was happening.

5            THE COURT:  So -- so you -- you agree that there's no

6    fiduciary relationship, right?

7            MR. JASINSKI:  I agree.

8            THE COURT:  And you agree that there's no

9    confidential relationship, right?

10           MR. JASINSKI:  I agree.

11           THE COURT:  So what you're arguing is that there is

12   some close relationship that one -- I mean --

13           MR. JASINSKI:  It --

14           THE COURT:  What is the -- right, what is -- what is

15   the element under the law that these facts that you're

16   alleging falls under?

17           MR. JASINSKI:  When you look at the duty analysis in,

18   for example, the *In re Volkswagen Timing Chain* case, and the

19   Court surveyed many statements there and recognized a duty to

20   disclose where the defendant possesses exclusive or superior

21   knowledge or actively conceals omitted information.

22       The Court looked at some other states, Georgia, Ohio,

23   South Carolina, and Texas, saying there is a duty to impose

24   known safety defects.

25       Mark Zuckerberg was well aware of all of the defects in

1     this case.  I don't think there's any question that the

2     complaint sufficiently alleges that.

3         **THE COURT:**  The issue with respect to superior

4     knowledge that was discussed in those cases, wasn't it

5     discussed in the context of the entity and not the person?

6         **MR. JASINSKI:**  Not in *EcoDiesel*.  I think in

7     EcoDiesel, it was with respect to both.  I think I would

8     agree, Your Honor, in the *Timing Chain* case and the *In Re*

9     *MyFord Touch* case that I mentioned earlier.

10        There are other cases we've cited, including the *Dean vs.*

11    *Beckley* case, which involved a warranty for an RV and

12    statements made by the owner of the company sort of suggesting

13    that the manufacturer was solvent and -- when he had knowledge

14    that that wasn't the case and the warranty was going to be

15    worthless.

16        And so in that context, you have a -- someone with

17    superior knowledge who is making statements -- and we do rely

18    on the fact that statements were made.  I -- we're not --

19    these plaintiffs are not suing because they relied on any of

20    the express statements by Mr. Zuckerberg, but the -- the cases

21    are uniform that when a defendant makes a partial

22    representation but suppresses some material facts, that a duty

23    to disclose exists.

24        So I think you -- you do -- the relationship here is by

25    virtue of the fact that these plaintiffs are users of

1  Mr. Zuckerberg's company's platforms.  That is true.  But that

2  is also true in other cases, like the RV case I mentioned and,

3  certainly, the *EcoDiesel* case where employees, in particular

4  officers, are charged with a duty based upon their superior

5  knowledge and their decision to speak on the topic.

6        **THE COURT:**  All right.  Let me get a response from

7  Mr. Hester, especially on the issue of -- of superior

8  knowledge.

9        **MR. HESTER:**  Yes.

10        **THE COURT:**  And what I would also say is there are --

11  or appear to be some states that don't reference the issue of

12  duty but reference the issue of foreseeability.

13        **MR. HESTER:**  Well, Your Honor.

14        **THE COURT:**  So --

15        **MR. HESTER:**  First of all, on this question of

16  superior knowledge, I think counsel's argument is confusing

17  these two points.

18      One point is whether a corporate entity has some

19  obligation of disclosure, which is what almost all of these

20  car defect cases involve, a corporate entity.  And sure, there

21  might be some circumstances where there could be some basis

22  for corporate officer liability, but that's based on a duty of

23  disclosure ultimately of the entity, not an individual.

24      So I do think the -- we have to go back to this first

25  principle that when the plaintiffs are suing Mr. Zuckerberg in

1    his personal capacity, not based on statements by Meta but

2    based on his own statements and purporting to sue him

3    individually, they have to show a special relationship with

4    Mr. Zuckerberg and --

5            THE COURT:  Well --

6            MR. HESTER:  -- they can't base that on specialized

7    knowledge alone.

8            THE COURT:  What about *EcoDiesel*?

9            MR. HESTER:  *EcoDiesel* I believe is still the same

10    fact pattern.  It's the question of the corporate entity where

11    there's a -- there's a question of corporate officer liability

12    but it flows back through the entity's failure to disclose and

13    acts by the entity.

14        And here, the plaintiffs were very clear in saying that

15    they're not asserting their claim against Mr. Zuckerberg based

16    on his actions as a corporate officer.  They're asserting

17    liability against Mr. Zuckerberg personally.

18        And in that setting, superior knowledge can't support a

19    duty to disclose.  If that were true, it would be the case

20    that any employee, any senior officer of any company would

21    have a duty to make disclosures to the world.  Because, of

22    course, company officers have more knowledge than individual

23    consumers about their company and it -- and that's not the

24    case law.

25        Every case that the plaintiffs rely on in their briefing

1    for the duty to disclose involves the fact pattern of a

2    special relationship, such as a contract or a lease

3    negotiation or some other fiduciary relationship that supports

4    the special relationship.

5        There's no case that the plaintiffs cite where superior

6    knowledge alone without some special relationship supports the

7    duty of disclosure.

8        And, Your Honor, on the point about the states that we're

9    talking about, I -- I continue to go back to the point that in

10    all of these states, whether we're talking about fraudulent

11    omission or negligent misrepresentation by omission, they

12    still -- you still have to establish a duty to disclose.

13        And without the special relationship, that defeats the

14    plaintiffs' claims as a matter of law.

15        And I think, as the Court's questions indicate, the

16    plaintiffs really aren't making an allegation of any facts

17    that would or could support a special relationship under

18    established case law all across the country.

19        And it would be a stunning proposition to think that

20    merely having superior knowledge or having -- I think counsel

21    said an outsized role prominently in public discourse, somehow

22    that creates a duty to disclose to the public.

23        That can't -- that can't be the law, and that's not where

24    the law is all across the country.

25            MR. JASINSKI:  May I respond, Your Honor?

1          **THE COURT:**  You may.

2          **MR. JASINSKI:**  I just -- I want to correct, I think,

3     maybe one misimpression.

4          I think I heard Counsel saying something to the effect

5     that we've -- we're not alleging that Mr. Zuckerberg is liable

6     for what his company did.  And that's true.

7          But that's not to say that we aren't alleging that he is

8     liable because he was a direct participant in that tort.  And

9     I realize Your Honor doesn't want to hear that right now, but

10    I just want to draw that distinction.

11         With respect to the question of superior knowledge, I

12    think in any of the exemplar cases where an individual is --

13    has liability, these -- whether it's a contract or something

14    else, you have in the cases we cited businesses as well.

15         They -- the essence of it -- this is not the notion that

16    CEOs have to go around uttering things about their companies.

17    But when you couple the superior knowledge that Mr. Zuckerbird

18    [phonetic] had -- Zuckerberg has with his role internally with

19    respect to the very defects alleged in the case with the fact

20    that he has spoken repeatedly, publicly, and made repeated

21    assurances about the safety of those products, which is

22    directly at issue in this case, safety being one of the most

23    material things that anybody at a company can talk about.

24         Whether we're viewing this as a sort of independent duty

25    that Mr. Zuckerberg had separate and apart from his company or

1    whether we view it as a duty where he was an active

2    participant in the breach that is -- of his -- by his company

3    is a distinction ultimately without difference.  They lead to

4    the same place.  We have viewed that as being duty.

5            THE COURT:  Well, it's a distinction that might make

6    a difference in terms of the theory, and it's better to get

7    the law right now than to wait and have to do it again at

8    summary judgment.

9        So you may have pled alternative theories of relief.  That

10   doesn't mean that if one is just wrong that it goes forward.

11           MR. JASINSKI:  Well, Your Honor -- I don't think

12   they're alternative.  I think they are symbiotic.

13           THE COURT:  So --

14           MR. HESTER:  May I respond just briefly to that, Your

15   Honor?

16           THE COURT:  Hold on.

17       So I now understand that you're alleging that he's a

18   direct participant; is that right?

19           MR. JASINSKI:  Correct.

20           THE COURT:  And then I guess, Mr. Hester, are you

21   claiming -- well, I -- it's not really briefed 'cause this is

22   on Zuckerberg himself.

23       Is there some notion that Meta doesn't have a duty to

24   disclose?

25           MR. HESTER:  Your Honor, that's -- that's not an

1    argument we've made, and it's not -- it's not the argument

2    that's at issue here.

3        I -- I think it is really important to keep this

4    distinction between actions by the entity where there's a

5    question of corporate officer liability for actions of the

6    entity versus this assertion that Mr. Zuckerberg himself

7    personally has committed a tort for which the plaintiffs can

8    hold him liable.

9        On that second point, that's where they have to show a

10   special relationship, and they can't.

11           **THE COURT:**  I -- I understand.

12           **MR. HESTER:**  And on the first point, we understand --

13   we haven't argued the lack of a duty to disclose.  And I

14   think, again, the car cases are instructive there, that --

15   that there could be circumstances where a company because of

16   the products or services it provides could, in theory, have an

17   obligation to -- to disclose.  But that's different from the

18   question of Mr. Zuckerberg personally.

19           **THE COURT:**  Well, let's -- let's move to this

20   alternative theory that I think I hear plaintiffs

21   articulating.

22        So what I hear is that you believe Mr. Zuckerberg should

23   be liable for Meta's alleged nondisclosure under this

24   corporate officer responsibility theory; is that right?  But

25   that's derivative from what Meta's -- that's derivative from

1    Meta.

2         MR. JASINSKI:  Well, I was going to say that that's

3    right, Your Honor.  I'm -- I'm struggling with whether it's

4    derivative of Meta, but the -- I guess the point is the same,

5    that -- we viewed it as duty.  We viewed it as duty.

6         THE COURT:  So let me ask a slightly different

7    question to Mr. Hester.

8        Your motion does not -- does not address at this point the

9    inability of plaintiffs to hold Mr. Zuckerberg liable, then,

10   for Meta's alleged activity under this corporate officer

11   responsibility theory, correct?

12        MR. HESTER:  No, we -- we did address that, Your

13   Honor, in our opening brief.

14        THE COURT:  But if you don't argue that Meta doesn't

15   have a relationship -- or doesn't have a duty not to

16   disclose -- so I'm going to assume for purposes of argument

17   that they do.  Then how is Mr. Zuckerberg not potentially

18   liable under that theory?

19        MR. HESTER:  Well, Your Honor, in our opening brief,

20   we noted that the plaintiffs had not established a basis under

21   prevailing law all across the country for holding him liable

22   for the actions of Meta as an entity.

23        And the complaint is full of allegations about Meta.  And

24   it's only in the short form supplemental complaints that we

25   get allegations of omissions by Mr. Zuckerberg personally.  So

1    our point in our opening brief was the plaintiffs had not

2    alleged facts sufficient to establish a basis for holding

3    Mr. Zuckerberg or any other individual officer of Meta

4    personally responsible for the conduct of Meta.

5        And then in opposition, the plaintiff said, and I'll quote

6    from their brief, page 6, they were not suing Mr. Zuckerberg,

7    quote, as an executive of Meta.  They said that in their

8    brief.

9        So in our reply -- again, to explain for the Court the

10   reason the briefing has progressed this way, we took that

11   representation.  The plaintiffs said they were not suing him

12   as an executive of Meta.  They said they were suing him in

13   his -- for his personal conduct.  And as we understand that

14   concession from the plaintiffs, they were not asserting a

15   theory of corporate officer responsibility.

16           **THE COURT:**  Oh, well, okay.

17           **MR. JASINSKI:**  May I be heard?

18           **THE COURT:**  A response.

19           **MR. JASINSKI:**  Yeah, Your Honor, I disagree with

20   that.

21       What Mr. Zuckerberg argued in his motion was that his mere

22   status as an executive does not confer liability on a

23   corporate officer for alleged conduct of the corporation.

24       That's what he argued.

25       We agree.  And we do not contend that Mr. Zuckerberg's

1      mere status as an executive gives rise to liability here.

2           We -- we do argue and -- and, you know, I apologize to the

3      Court if it's not clear, but -- but when we look at the

4      *EcoDiesel* case, for example, we viewed it within the framework

5      of duty.

6           But we do argue the active conduct by Mr. Zuckerberg in

7      the nondisclosure by Meta.  And that is what we argue in

8      support of the -- the duty --

9                **THE COURT:**  All right.

10               **MR. JASINSKI:**  -- active participation.

11               **THE COURT:**  Let me -- and there are many allegations

12     that -- that are referenced.

13          Let's assume for purposes of argument that I agree with

14     plaintiffs, that that's -- that it's fair to interpret your

15     briefing as -- as focusing on status as opposed to focusing on

16     the numerous allegations in the complaint that talk about what

17     Mr. Zuckerberg himself was personally doing.

18          Do you have an argument as to why, based upon those

19     allegations, he should not be held potentially liable under

20     the corporate officer responsibility doctrine?

21               **MR. HESTER:**  Yes, Your Honor.

22          The -- the point would be that simply alleging actions by

23     a CEO or any other senior officer of a company, which is all

24     the complaint alleges as to Mr. Zuckerberg.  It alleges things

25     he did as the CEO of the company.  That's not sufficient.

```
 1              THE COURT:  Well, what is sufficient under the -- I
 2   mean, you agree the doctrine exists.
 3              MR. HESTER:  The doctrine exists of corporate
 4   officer --
 5              THE COURT:  Right.
 6              MR. HESTER:  -- liability, yes, Your Honor.
 7              THE COURT:  So -- and do all the states -- well, the
 8   states that are in play, do those states agree on the legal
 9   context for that particular doctrine --
10              MR. HESTER:  The -- the basic --
11              THE COURT:  -- from your -- so you -- for
12   Connecticut --
13              MR. HESTER:  I'm sorry, Your Honor.
14              THE COURT:  -- Pennsylvania, Arizona, South Carolina,
15   and New York from your perspective?
16              MR. HESTER:  Well, the -- the basic concepts of
17   corporate officer liability are not meaningfully different in
18   our view across the country.
19              THE COURT:  Okay.  'Cause you cite to -- well, you
20   cite to Alabama, which isn't in play.  I'm not sure why you
21   cite to Alabama.  You cite to California, not in play.
22   Massachusetts, not in play.
23        The only one you cite to is New York.  So I have no law
24   from you on Connecticut, Pennsylvania, Arizona,
25   South Carolina.
```

1      Do I understand that your perspective is that all of those

2   states follow New York?

3      **MR. HESTER:**  Essentially in -- perhaps not in exactly

4   the same words but the same concept.

5      But we were also relying on what the plaintiffs said in

6   their brief where they said they weren't suing him as an

7   executive.

8      **THE COURT:**  That's why --

9      **MR. HESTER:**  So I think it's fair to hold them to

10   their concession, Your Honor.

11      If they had gone at it a different way, if they had said,

12   oh, no, our theory is corporate officer responsibility, that

13   would be a different question from the one they framed up.

14   They -- they took great pains to emphasize that they are --

15   that their theory is --

16      **THE COURT:**  So.

17      **MR. HESTER:**  -- his personal activity.

18      **THE COURT:**  Mr. Hester, I'm not going to do this

19   thing multiple times.  We're focused on these issues.  I could

20   give them leave to amend.  It's -- I -- I am only interested

21   in doing things efficiently.

22      So there is no way that any circuit would say to me, you

23   should have granted that motion without leave to amend.  No

24   circuit would say that.

25      So even if you're standing here, correct, it doesn't

1    matter, 'cause I'd have to give them leave to amend.

2            **MR. HESTER:**  I understand, Your Honor.

3            **THE COURT:**  Okay.

4       So then a substantive response, assuming for purposes of

5    argument that they've made the allegations -- I -- it's not

6    clear to me that you can make any more allegations, are there?

7       Is this the entirety of what it is that you're relying on?

8            **MR. JASINSKI:**  Well, yes -- at this juncture, Your

9    Honor, that's what we know.

10       And I do want to make note that we have cross-referenced

11   the Attorney General's complaint, which has a number of

12   different allegations about Mr. Zuckerberg's involvement that

13   the master complaint for the personal injury plaintiffs now

14   incorporates by reference various allegations in the

15   Attorney Generals' complaint that has a litany of information.

16   I won't -- I have --

17           **THE COURT:**  So I have paragraphs 339 to -63 of the AG

18   complaint.

19           **MR. JASINSKI:**  Well, I -- think it's more than that,

20   Your Honor.

21           **THE COURT:**  Among others.

22       All right.  So are you --

23           **MR. HESTER:**  So, Your Honor, I --

24           **THE COURT:**  Are you prepared to respond substantively

25   on that topic?

```
 1              MR. HESTER:  Well, I -- taking the point -- the

 2    Court's point about amendment, the point I would make at this

 3    stage is we're not faced with sufficient allegations to

 4    establish corporate officer liability for the actions of Meta,

 5    that the -- the complaint as pled right now is focused on

 6    allegations as to Meta's activity.

 7         Mr. Zuckerberg, among others, is called out as one of the

 8    people who participated in the acts of Meta.  And it seems to

 9    me that they -- that's not sufficient under the case law to

10    establish liability personally for individual officers.

11              THE COURT:  All right.  And --

12              MR. HESTER:  We had read the -- we had read the

13    short-form complaints as focusing on something very different,

14    which was omissions purportedly made by Mr. Zuckerberg

15    personally.  And that's what they pled as to their claims

16    against Mr. Zuckerberg.

17              THE COURT:  All right.

18         Does anybody -- or do the plaintiffs disagree with the

19    defendants that the relevant standard for Connecticut,

20    Pennsylvania, Arizona, and South Carolina is the same as

21    New York?

22              MR. JASINSKI:  For corporate officer responsibility?

23    Yes, Your Honor.

24              THE COURT:  And there are other states, Colorado,

25    Maryland, North Carolina, Texas, Virginia, and Wisconsin.  Do
```

 1    they also comply with the standard articulated by New York?

 2          **MR. JASINSKI:**  When we looked at each of the states

 3    in Your Honor's order from earlier this week, our conclusion

 4    is that each of them basically articulates the same standard

 5    of active participation in a wrong or authorizing, directing,

 6    that it be done.  That is -- the -- different words are used

 7    in states, but in our view, they mean that.

 8          **THE COURT:**  Do you agree, Mr. Hester?

 9          **MR. HESTER:**  I -- I agree, Your Honor.

10       I also did want to emphasize, though, that it is far from

11    clear to me that the question would be governed by the law of

12    these individual states.

13          **THE COURT:**  Okay.  Well, then why?

14          **MR. HESTER:**  Because we're talking about a CEO based

15    in California, a corporation based in California.  It's not

16    obvious to me that the law of all these multiple states

17    governs the question of corporate officer liability.

18       That's certainly something -- if the Court's so inclined,

19    I think we've gotten some more clarity on what the plaintiffs'

20    theory is today.

21       If the Court's so inclined, we would ask the opportunity

22    for leave to brief this question of corporate officer

23    responsibility.

24          **MR. JASINSKI:**  I --

25          **MR. HESTER:**  'Cause it was not something that was

1    called out in a way that led to briefing on this issue, as the

2    Court has noted.

3         **MR. JASINSKI:**  If I may, two responses.

4         First, with respect to the mention of California, I

5    believe California was included on the Court's list, and that

6    is one of the states that we looked at and believe that it has

7    effectively the same participation standard.

8         Two, I -- we do rely and did rely in the brief on the

9    *EcoDiesel* decision.  I think that is directly on point here.

10   That was a case in which the allegation was that Chrysler had

11   a defeat device that was designed to circumvent emission

12   standards.  And included in that case were allegations that --

13   that there were omissions made and failure to disclose with

14   respect to that defeat device.

15        The Court said it was a reasonable inference that

16   Mr. Marchionne, the CEO, was directly involved with and

17   therefore knowledgeable about what was happening with the

18   *EcoDiesel* engines and the company's concealment of the defeat

19   devices.

20        And in this case, Your Honor, we have allegations that

21   Mr. Zuckerberg was knowledgeable about the very serious safety

22   risks concealed by Meta.  The master complaint is replete with

23   allegations including drawn from the AG's complaint.

24        We know going back to 2016, Mr. Zuckerberg received

25   internal research regarding the negative health effects of

1    using Meta's platforms.  That's AG paragraph 416.

2        We know that Meta was actively investigating the issue of

3    addiction in 2017.  That's the personal injuries plaintiffs'

4    master complaint at paragraph 298.

5        We know that around that same time in late 20- -- I'm

6    sorry -- in late 2018, I believe, Active Daily People was a

7    bigger concern than user well-being for Mr. Zuckerberg.  AG

8    paragraph 318 to -22.

9        We know in 2018, Mr. Zuckerberg received a report on under

10   13 users on Instagram.  That's AG paragraph 657.

11       In April 2019, Meta's own researchers directly told

12   Mr. Zuckerberg --

13            **THE COURT:**  All of this in your brief or not?

14            **MR. JASINSKI:**  I can't say for sure that at all of

15   this is in the brief, Your Honor.

16            **THE COURT:**  Okay.

17            **MR. HESTER:**  And I would say --

18            **THE COURT:**  Do you have a perspective --

19            **MR. HESTER:**   Sorry, Your Honor.

20            **THE COURT:**  -- Mr. Hester, on the laws -- there's a

21   dispute here with respect to which states provide for

22   negligent misrepresentation under an omission theory.

23       The plaintiffs identified six more from your five.  With

24   respect to those six, as you stand here, do you have a

25   perspective with re- -- on -- as to the implication of the

1    corporate officer responsibility theory for those six states?

2        Is it all going to be the same?

3        **MR. HESTER:**  Your Honor, I -- I would -- I would

4    believe that the case law across the country more or less is

5    going to be the same on corporate officer liability.

6        It's not clear to me that six or eight or nine different

7    laws would apply to this question in any event.

8        I think it's a different issue from the tort of negligent

9    misrepresentation.  But if I just caveat that, I don't think

10    the law is going to differ across the states.

11        But I want to emphasize again for the Court, I think this

12    is a -- this is a new point.  This is -- this is not the way

13    the plaintiffs argued it in their opposition, because they --

14    they were really not focused on actions by Meta for which

15    Mr. Zuckerberg should help -- be held personally liable, which

16    is the thrust of these car cases.  They were focused on a

17    separate question, personal liability for Mr. Zuckerberg

18    separate and apart from liability for Meta.

19        So I -- I would, again, flag that I think this is a --

20    this is a change in approach from what we saw in -- in the

21    plaintiffs' briefing.  We understood them to be focusing on

22    the question of Mr. Zuckerberg's personal liability, not

23    dependent upon actions by Meta, the entity.

24        Now they're talking about case law involving car defects

25    and the like where you start with the corporation, and the

1    question is whether the officers get held liable for that

2    corporation's activity.  That's a new theory.  That's not what

3    they briefed.

4            THE COURT:  All right.

5            MR. JASINSKI:  May I be heard on that, Your Honor?

6            THE COURT:  Your perspective is you did.

7            MR. JASINSKI:  Yeah.  Your Honor, our perspective --

8    I'm sorry.

9            THE COURT:  So --

10           MR. JASINSKI:  Well, but I --

11           THE COURT:  -- going to get this teased out, so I

12   don't need to hear -- you know, I don't need to hear the

13   bickering about did I, did I not.

14           MR. JASINSKI:  And I don't mean it to be bickering.

15   I don't mean it for that purpose.

16      What I -- what I mean is to say that we do allege conduct

17   by Mr. Zuckerberg.  We a- -- which is his active

18   participation, so I -- what I'm struggling with as I hear my

19   colleague --

20           THE COURT:  Let's --

21           MR. JASINSKI:  -- is that those allegations are not

22   intended to exist in a vacuum.  They are his conduct, of

23   course.

24           THE COURT:  Well, they thought what you were doing is

25   that you were alleging that under affirmative

1   misrepresentation arguments.  We now know that's not the case,

2   so we've made some progress.

3      Let's move to the issue of reliance.  Reliance tends to be

4   a very fact-specific issue.

5      So from the defendants' side, why would I resolve that on

6   a motion to dismiss?  Typically don't resolve those kinds of

7   issues on a motion to dismiss.

8      And then on the plaintiffs' side, are the plaintiff fact

9   sheets going to be more specific about which of these

10  statements or how these individuals relied on Mr. Zuckerberg's

11  statements and/or omissions?  That's what I'd like to hear

12  about.

13     Mr. Hester, we'll start with you.

14        **MR. HESTER:**  Thank you, Your Honor.

15     So we do see this as a separate basis for dismissal

16  putting aside this duty of disclosure point we've already

17  discussed, the failure to meet the pleading requirements of

18  Rule 9(b) for a fraud claim.

19     The cases recognize there's some relaxation of Rule 9(b)'s

20  requirements for an omissions claim because it's hard to plead

21  the time and place of an omission, of course.

22        **THE COURT:**  Right.

23        **MR. HESTER:**  But there's -- heightened pleading

24  requirements still apply.  And I would cite the Court to

25  *Kearns v. Ford Motor Company*, which is in our reply brief.

1          **THE COURT:**  And do you agree that all of the states

2     have a consistent view on this issue?

3          **MR. HESTER:**  I -- I believe so.  I also would think

4     on this particular question, I think it's a question of

5     federal -- federal law, the pleading standards that would

6     apply here.

7          **THE COURT:**  Okay.

8               (Simultaneous colloquy.)

9          **MR. HESTER:**  So there's two pieces that I think

10    really demonstrate where the plaintiffs fall short in their

11    pleadings.

12         They have to plead that the plaintiffs would have known of

13    the omitted statements if made.  That is a requirement.  And

14    we cite in our opposi- -- in our reply brief the *In Re: ZF-TRW*

15    *Airbag Control* case where the Court says a plaintiff alleging

16    fraud must still be able to show she would have been aware of

17    the information had it been disclosed.

18         And the plaintiffs concede this.  In their reply brief,

19    they -- sorry.  In their opposition brief, they say that the

20    plaintiffs must still plausibly allege that they would have

21    been aware of the omitted information had it been publicly

22    revealed.  And there is no allegation that they would have

23    known of the statements if made.  And so they fall short of

24    Rule 9(b) on that basis alone.

25         They -- they make a generalized argument that, of course,

1    they would have known.  But that's not enough under Rule 9(b).

2       There's a separate problem with their pleading aside from

3    that lack of reliance.  They also have to plead that they

4    would have changed their behavior if they'd known the

5    information.  And that's directly contradicted by the

6    complaints.  Because the plaintiffs in their opposition brief

7    make the point.  They highlight the point that the information

8    that they allege was concealed by Mr. Zuckerberg was, quote,

9    actually revealed by whistleblower Frances Haugen.  That's in

10   their opposition page 15.

11      Yet, the plaintiffs also allege that they continue to use

12   Meta's services to this day.

13      So that -- they cannot allege reliance on these facts

14   because they themselves say the omitted information that they

15   say was omitted was disclosed.  And they continue to use the

16   service.

17      So that fails the Rule 9(b) requirement of showing that

18   they would have changed their behavior.  That's one of the

19   requirements for their claim.

20      And it fails even under the more relaxed standards of

21   Rule 8.  It's implausible under *Twombly* because they're

22   talking about information that they say they would have done

23   something different, yet they continue to use the service.

24          **THE COURT:**  All right.  Response?

25          **MR. HESTER:**  So I think in two respects their --

1    their pleading falls well short.

2              **THE COURT:**  Response.

3              **MR. JASINSKI:**  Yes, Your Honor.

4        Basic principles, we agree that -- that there are

5    essentially two criteria for reliance, the opportunity to

6    receive information, and that the plaintiff would have behaved

7    differently.  So let me take those in turn.

8        The -- with respect to the opportunity to receive

9    information, in the context of a -- an omission case like

10   this, in the *Daniel vs. Ford* case, the Ninth Circuit indicated

11   that the -- the essence is whether there is a communication

12   channel through which the information can be provided to the

13   plaintiffs.

14       And in the *EcoDiesel* case, Judge Chen concluded that given

15   the issue in that case and the concealment, it was -- it was

16   something that received nationwide media attention.  That is,

17   of course, the case here as well.

18       Moreover, the plaintiffs are users of the platform.  If

19   Mr. Zuckerberg had made a disclosure, he could have done so

20   through the platform.  If he had made a disclosure, it would

21   have been communicated widely nationwide.  And you'd, frankly,

22   have to be living under a rock not to hear it.  So we think

23   the *EcoDiesel* case is on point.

24       As to the -- forgive me for the -- missing the acronym,

25   the *ZF-TRW* case, I would -- I would note that the Court in

1    that case granted leave to amend.  And so if the Court

2    concludes that we haven't alleged enough here -- although this

3    is a issue of fact, I agree with Your Honor -- I don't think

4    that the -- the answer would be a dismissal with prejudice.  I

5    think it would be more of an opportunity to articulate the

6    various channels through which they may have heard it.

7        But I think that -- I think that we -- that it's

8    sufficient to say that this information was -- was so

9    important, so material that that, in fact, would have made its

10   way to these plaintiffs.

11       With respect to the -- the aspect of behaving differently,

12   the plaintiffs do allege that they would behave differently if

13   they had had the information in time.

14       The very essence of this case is that these products are

15   designed to be addictive.  The notion --

16           THE COURT:  So when was the Haugen disclosure?

17           MR. JASINSKI:  I believe it was in the fall of '21,

18   Your Honor.

19           THE COURT:  So is there going to be some notion by

20   the plaintiffs that given that they were potentially on notice

21   in 2021, that anything that happened after 2021 is not in

22   play?

23           MR. JASINSKI:  You mean a motion by the defendants?

24           THE COURT:  No, by the plaintiffs.  If the issue is,

25   is it right that the law says that you would have had to have

1    changed your behavior, and -- I mean, that's -- that was his

2    second ground.

3         **MR. JASINSKI:**  Well, my -- my point, Your Honor, is

4    that the very nature of the case here, the claim as an

5    addiction case, is that it's not so simple as to say that

6    these plaintiffs could at that point change their behavior.

7         Continued use by somebody who is addicted to the product

8    does not suggest that -- that they wouldn't have behaved

9    differently if they had had important information about the

10   design of these products earlier on.

11        And -- and completing ceasing use also is not necessarily

12   the only way in which somebody could change behavior here.

13   It's not the only way in which a parent could change behavior

14   in terms of policing the use of the platforms.

15        So I don't -- I think that the defendant, Mr. Zuckerberg

16   paints with too broad a brush.

17        **THE COURT:**  Is that an accurate statement of the law,

18   though, that there has to be some change in behavior to show

19   reliance?

20        **MR. JASINSKI:**  Well, I don't think that that is --

21   Sorry, Your Honor.

22        I don't think that there -- let me ponder that for just a

23   moment, Your Honor.

24        **THE COURT:**  Do the laws of the states at play with

25   respect to the reliance issue -- so not the pleading issue,

1    but the reliance issue, do they all indicate that this is --

2    that there has to be a change in behavior to show reliance?

3         MR. HESTER:  Well, Your Honor, I can't say that I've

4    canvassed that particular question in each of the states.

5         We understood this to be a general principle that, in

6    fact, wasn't disputed.

7         I would point the Court to the *Haddad v. Merck* case that

8    we cite in our briefs out of the Central District of

9    California where the Court found no reliance where the

10   plaintiff continued to use a drug after withheld information

11   was disclosed.  We had viewed that as a general principle, so

12   I -- I would believe that it would be the same, but I haven't

13   canvassed it yet, Your Honor.

14        MR. JASINSKI:  And I can answer Your -- Your Honor's

15   question directed to me and distinguish, I think, that case.

16        That -- that case involved a pharmaceutical where the

17   question was whether the prescribing physician had changed his

18   prescribing behavior based upon a black box warning, and the

19   answer was no.  And so there was no reliance on the omitted

20   information because the prescriber didn't change his

21   prescribing.

22        Again, I go back to the point here that we have a product

23   that is designed to be addictive and that the only way in

24   which one could change behavior is not necessarily ceasing

25   use, so the fact that --

1          **THE COURT:**  That wasn't my question.  My question is,

2     does the analysis require the -- of the elements of reliance

3     me to consider whether there is some kind of evidence of

4     changed behavior?

5         I understand there could be different views of what that

6     would mean.  But is it a general and universal principle for

7     all the states in play with respect to reliance?

8          **MR. JASINSKI:**  The -- yes, is going to be my answer.

9     And I want to qualify it a little by saying at the pleading

10    stage, Your Honor, many courts have found that the reliance

11    can be inferred by the materiality of the omitted information.

12        And what I would offer to the Court is I don't think that

13    it -- that the -- that Mr. Zuckerberg can rebut that simply by

14    saying in the context of the allegations here that these

15    plaintiffs continued using the product.  It's not as simple as

16    the prescribing pharmaceutical case.

17         **THE COURT:**  Okay.

18         **MR. JASINSKI:**  So the Court --

19         **THE COURT:**  Any response?

20         **MR. HESTER:**  Yes, Your Honor.  I think there's two

21    separate questions.  One is materiality which can be inferred

22    by the nature of the allegedly withheld information.  Separate

23    question is the plaintiff has to establish that he or she

24    would have done something different had the information been

25    disclosed.  It's, otherwise, an implausible claim.

```
 1              THE COURT:  Well, what --

 2                   (Simultaneous colloquy.)

 3         MR. HESTER:  -- under rule 8 or Rule 9.

 4              THE COURT:  What happened in the tobacco cases?  Was

 5    there -- was this addressed in the tobacco cases where you

 6    have an addiction and people -- and the reason I use that,

 7    right, is that people understand.  It's -- when you're dealing

 8    with certain kinds of issues, easier said than done.

 9              MR. HESTER:  Well, Your Honor --

10              THE COURT:  I have defendants who come in here every

11    week who are ordered not to use meth or fentanyl or something

12    like that, or cocaine, and they're trying, but it's hard.

13              MR. HESTER:  Couple of observations.  Just so the

14    record is clear, Your Honor -- and I know we're not talking

15    about the factual issues now -- we don't think the plaintiffs

16    can prove the addiction.

17         But put that aside, I think Counsel's comments reflected

18    that there are other kinds of changes that even he

19    acknowledges could have been made.  Parents could have

20    monitored the use of social media services differently.  Could

21    have made decisions to reduce --

22              THE COURT:  I asked about tobacco cases.  Do you have

23    any information?

24              MR. HESTER:  And -- I don't have -- I don't have

25    information, Your Honor.  I would submit it's a different fact
```

1   pattern from this.  I don't think they --

2         THE COURT:  How is it different?  If it's an

3   addiction issue and the question is reliance, and what they're

4   arguing on their side is given the nature of the alleged

5   injury, doing something to change your behavior has to be

6   viewed in these kinds of cases differently because of the

7   addiction, sounds like the tobacco cases are an accurate

8   analogy.

9         MR. HESTER:  I think they're different in this

10  respect, Your Honor.

11      A lot of conduct that the plaintiffs are alleging they

12  would have done differently involves the parents, the people

13  who are not even alleging an addiction.

14      Put aside the fact that we don't think they can prove

15  addiction, but we're talking here about teens.  And the

16  question is parents who say, "I would have done something

17  different vis-a-vis my teen."  The parents are not saying

18  they're addicted.  The parents are saying, "I would have

19  monitored the behavior differently."  That's different from

20  somebody who's smoking.

21        THE COURT:  I take it you have kids.

22        MR. HESTER:  I do.  They've kept me busy for a long

23  time, Your Honor.

24        THE COURT:  They keep you busy and sometimes they

25  know more than you do, right?

1          **MR. JASINSKI:**  Your Honor, if I may?

2          **THE COURT:**  Technology.

3      Go ahead.

4          **MR. JASINSKI:**  Couple responses to that.

5      First -- first of all, working backwards, with respect to

6      the parents, the kids are not the -- their -- their age isn't

7      static.  The -- the opportunity to intervene has closed for

8      these children.

9      So for -- for those early users of this, the idea that --

10     that the parent could make some change when hearing of the

11     information in, say, 2021, it's not -- it's not necessarily

12     relevant anymore.

13         **THE COURT:**  Depends on the plan.

14         **MR. JASINSKI:**  And that is a fact question.  And --

15     ultimately.  And -- and that goes to the PSF question that

16     Your Honor asked, the answer is yes.  And I think these are

17     exactly the types of questions that the defendants are going

18     to be able to ask.  And it is true that these issues came up

19     in the tobacco litigation, and they're going to ask many

20     questions about the opportunity these plaintiffs had to hear

21     information, what they heard, when they heard, what they did.

22     They're obviously going to probe the addiction issue.

23     These are all fact issues that are not appropriate for

24     disposition at the motion to dismiss pleading stage.

25     And my understanding is that -- from having been passed a

```
1    note from my colleagues -- that, yes, in the tobacco cases and
2    in the Juul case, the -- the issue of -- of reliance came up
3    in the similar context.  And it -- and because of the
4    addiction issue, it's not something that can be answered at
5    the motion to dismiss stage.
6              MR. HESTER:  Your Honor, just very briefly in this,
7    though.  The Court is faced with a pleading that's
8    implausible.  The -- the short-form complaints in one of two
9    sentences say, "had we known of this information, we would
10   have acted differently."  Yet, the information has been known
11   to them for years.
12        And so it's an implausibility problem.  It is a pleadings
13   problem.  I understand there's a separate question --
14             THE COURT:  The short --
15                       (Simultaneous colloquy.)
16             MR. HESTER:  -- factually.
17             THE COURT:  Are the short-form complaints going to --
18   or the plaintiff fact sheets going to flush the issue out?
19             MR. JASINSKI:  That's my understanding, Your Honor.
20   And I -- I don't think that these short-form complaints are
21   implausible.  It means something that they would have made a
22   change at the time, and the timing of that change is -- is
23   meaningful.  And there are specific allegations by a number
24   of --
25             THE COURT:  Okay.
```

```
 1            MR. JASINSKI:  -- these plaintiffs on that front.

 2            THE COURT:  All right.  We need to move to some other

 3    issues in today's conference.

 4        Anything else you want me to consider?

 5            MR. HESTER:  No, I think, Your Honor, we've -- we've

 6    handled it pretty well.  Thank you.

 7            MR. JASINSKI:  When would you like our list, Your

 8    Honor, with the cases for the states and negligent omission?

 9            THE COURT:  Well, is a week sufficient?

10            MR. JASINSKI:  Yes.

11            MR. HESTER:  Yes, Your Honor.

12            THE WITNESS:  All right.  One week.

13        Thank you.

14            MR. JASINSKI:  Thank you, Your Honor.

15            MR. HESTER:  Thank you.

16            THE COURT:  Okay.  Next, let's go ahead and -- let's

17    move to the bellwether questions and protocols.

18        And I see at the mics, Ms. Hazam.

19            MS. HAZAM:  Good morning, Your Honor.

20            THE COURT:  Good morning.

21            MS. PIERSON:  Good morning.  Andrea Pierson, Your

22    Honor.

23            THE COURT:  All right.  Ms. Pierson.

24        Okay.  So with respect to this issue, I have a number of

25    questions.  I charted out your various -- and I just want to
```

 1    go through those first.

 2        And this is coming from Docket 618.  So you indicate

 3    separately that --

 4        And I think we're at 223 cases; is that correct?

 5            MS. HAZAM:  Of the personal injury cases, I believe

 6    that's close.  My numbers from this morning are 218.  It is

 7    obviously a shifting landscape, which may be one reason the

 8    parties are slightly apart on certain figures.  But as of this

 9    morning, I had 218.

10            MS. PIERSON:  Your Honor, we have short-form

11    complaint data from 223 personal injury plaintiffs.

12            MS. HAZAM:  I would note, Your Honor, that there are

13    occasionally dismissals.

14            THE COURT:  Right.

15            MS. HAZAM:  Which could account for the difference,

16    although I do not know that.

17            THE COURT:  I need to add that to the list.

18        Did we get a resolution of how to deal with the -- sent an

19    email.  Can we deal with that quickly, maybe, at the mic?

20            MS. ANDERSON:  Jennie Anderson on behalf of

21    plaintiffs.  We've begun the -- conferring on that issue, and

22    we hope to submit -- be able to submit something to the

23    Court -- hopefully a stipulation -- shortly.

24            THE COURT:  Okay.  Is there anything I need to weigh

25    in on today?  If not, I can put it on the list; we can discuss

1     it later.

2              **MS. SIMONSEN:**  Nothing from defendants'

3     perspective -- Ashley Simonsen for the Meta defendants -- that

4     Your Honor needs to weigh in on.

5              **MS. ANDERSON:**  Agreed.

6              **MS. SIMONSEN:**  Thank you, Your Honor.

7              **THE COURT:**  All right.

8        So defendants say that they've got 28 cases where

9     plaintiffs do not allege addiction or compulsive use, and

10    plaintiffs identify 24.

11             **MS. HAZAM:**  Your Honor, we actually have an update to

12    that figure in part because we were surprised see that many

13    cases not alleging addiction, even though they remain a very

14    small minority -- in our view not representative -- we

15    inquired with the firms whose short-form complaints so

16    indicated.

17       And our understanding, based on information received just

18    this morning, is that at least 20 of those will be amended to

19    allege addiction and that they were errors in short-form

20    complaints, largely those filed early on.

21             **THE COURT:**  So --

22             **MS. HAZAM:**  -- have certain counsel here today who

23    could attest to that themselves.

24             **THE COURT:**  All right.  That's fine.

25       So you think it's going to be somewhere in the

```
 1   neighborhood of 45?

 2          MS. HAZAM:  Forty-five -- I'm sorry.

 3          THE COURT:  I have 24, and then you said you're going

 4   to add 20?

 5          MS. HAZAM:  No.  I'm sorry.  The opposite, Your

 6   Honor.

 7      These were mistakes in at least 20 of these short-form

 8   complaints in not alleging addiction.  We have not reached the

 9   final 3 to 4.  It may well be the case with them as well, but

10   I cannot say that with any certain today.  But we are left

11   with approximately 3 to 4 that will not be alleging addiction

12   after those amended short-form complaints are filed.

13          THE COURT:  Okay.

14          MS. PIERSON:  Your Honor, if it's helpful, I've

15   brought a chart of the statistics that we compiled from the

16   short-form complaints that I'd be happy to share with the

17   Court and with plaintiffs' counsel.

18          THE COURT:  We'll turn on the ELMO, and you can put

19   it on the ELMO so --

20          MS. PIERSON:  Sure.

21          THE COURT:  -- everybody can see it.

22      So what I have again from your statement at 618, 29 cases

23   where -- defendants indicate there are 29 statements where

24   there are allegations of suicide.  Plaintiff didn't respond at

25   all.
```

 1              **MS. HAZAM:**  I can respond now, Your Honor, if you'd

 2      like.  As of this morning, we had counted 30.  Those do not

 3      include 3 wrongful death cases that are not suicide cases but,

 4      instead, challenged cases.

 5              **THE COURT:**  Wrongful death cases, defendants say

 6      five, and you didn't respond.  You now say three.

 7              **MS. HAZAM:**  Three.  That is the total we had as of

 8      this morning.

 9              **THE COURT:**  Allegations of body dysmorphia, you don't

10      seem to be that far off, and it could be that you're looking

11      at different datasets.  Defendants say 53, plaintiffs say 49.

12          And then allegations of sleep disorders, again, not that

13      far off.  Defendants say 50, plaintiffs say 45.

14          In terms of characteristics, the -- defendants indicate

15      gender issues, 23 percent male, 77 percent female.  There's no

16      response from plaintiffs.

17              **MS. HAZAM:**  There is no gender data to date, Your

18      Honor.  So the short-form complaints do not ask for gender.

19      They have names.  We don't know how defendants have derived

20      this information, if they are making assumptions based on

21      names, if they are looking at their own account data in some

22      manner.

23              **THE COURT:**  All right.

24              **MS. HAZAM:**  This is one of the reasons we do not

25      think it's appropriate to be in any way incorporated.

```
 1              THE COURT:  Ms. Pierson?

 2              MS. PIERSON:  We would note, of course, that

 3      plaintiffs' counsel speaks directly to their clients.

 4              THE COURT:  Ms. Pierson, where's your data from?

 5              MS. PIERSON:  Sure.  Our data comes from analysis,

 6      both of names and -- and investigation of the plaintiffs

 7      themselves, not from their -- their account data, but through

 8      other means.

 9         And -- and, of course, plaintiffs' counsel speaks directly

10      to their clients, so if there were some contrary data on

11      gender, I -- I would expect them to share that with us.

12              THE COURT:  In terms of the issue of -- of -- that

13      the -- again, defendants have raised this -- adult at the time

14      of filing.  And you have -- and plaintiffs talk about age at

15      the time of first use.

16         Okay.  So with respect to defendants' articulation, they

17      have 46 percent -- 46 percent of the plaintiffs were 18 at --

18      or older at the time of filing.

19         I have no response from plaintiff.

20              MS. HAZAM:  Correct, Your Honor.  We have not even

21      attempted to compile our own statistics on that because we do

22      not believe it has any import to the issues in this case,

23      tells you nothing about liability, causation, or damages.  And

24      it says nothing about what is important that is age related in

25      this case, which is age of first use -- that obviously goes
```

```
 1    directly to plaintiffs' age verification claim as well as

 2    other claims.

 3        We did --

 4            THE COURT:  All right.

 5        MS. HAZAM:  -- compile some data on that which is

 6    reflected in the statement.

 7            THE COURT:  All right.  What is the point of being an

 8    adult -- why is that data relevant?

 9        MS. PIERSON:  There are a few reasons, Your Honor.  I

10    mean, we have been told throughout the course of this MDL that

11    this MDL is -- is about children and that the MDL is made up

12    of children.  But the reality is, as we noted in our papers,

13    46 percent of the plaintiffs were over 18 at the time of

14    filing.  And, in fact, 52 percent of plaintiffs are over 18

15    today.

16        That's an important demographic that's very different than

17    what plaintiffs' counsel suggest this MDL is comprised of.

18    But in addition to that, there's some practical reasons that a

19    significant portion of the bellwether pool's selection should

20    be adults.

21        We know that adult plaintiffs are more likely to have

22    broad experience with the platforms.  We know that they're

23    able to sit for fulsome depositions.  And we know that they

24    are best able to articulate and describe the injuries, which

25    will be squarely at issue on the question of causation.
```

1          Those are the reasons why, Your Honor, we ask that the

2    court require the parties to consider in their bellwether

3    selections a proportional share of adult plaintiffs and also

4    of male plaintiffs.

5          **MS. HAZAM:**  If I may respond.

6          **THE COURT:**  Why don't I have data from you, then,

7    about first use?

8          **MS. PIERSON:**  We won't know that until we get the

9    plaintiff fact sheets, Your Honor.  The -- the short-form --

10         **THE COURT:**  Do you think that it's not relevant,

11   first use?

12        What's your perspective on the characteristic?

13         **MS. PIERSON:**  On the characteristic of first use?

14         **THE COURT:**  Yeah.

15         **MS. PIERSON:**  I think --

16         **THE COURT:**  I mean, they have here that over

17   50 percent of the plaintiffs were under the age of 10 at first

18   use and over 75 percent were under the age of 12.  So even if

19   you are right, that the 52 percent were over 18, chances are a

20   huge portion of those started using at 12.

21         **MS. PIERSON:**  And --

22         **THE COURT:**  And so part of this is -- yes, they may

23   be adults now, but they were children when it started.

24         **MS. PIERSON:**  And we will hear testimony about that

25   from adult plaintiffs, Your Honor.  That's part of the reason

1    that we suggest that we should be considering adult

2    plaintiffs, not because they started using the platforms as

3    adults but, rather, because they'll have broad experience and

4    can speak to that.

5        Until we receive plaintiffs' experts report, we really

6    won't know what the pivotal point in time is, Your Honor.

7    We've heard them suggest that sometimes it's age at first use.

8    Sometimes they've told us it's age at peak use.  At other

9    sometimes, they've told us that the question is duration of

10   use.  So until we get to the disclosure of expert --

11           **THE COURT:**  But wouldn't it be more important for

12   us -- I mean, and -- look, none of this is going to be looked

13   at in a vacuum.

14       The notion that I would choose someone for a bellwether

15   trial who's been using it from the age of 17 to 18 is probably

16   low, 'cause that's not apparently representative, right, of

17   all of these plaintiffs.

18       If I have 75 percent who started using them under the age

19   of 12, you can -- I can reasonably say that some of those

20   bellwethers are going to include plaintiffs who were under the

21   age of 12 when they started using.

22       So just talking about the filing age isn't -- you know,

23   isn't dispositive in any way.  It is one of many

24   considerations.

25       I will also say that it is highly unlikely that I would

1    put in a bellwether situation a child of 10 or 12 on the

2    stand.

3        I had to testify as a ten-year old, and I am very

4    sensitive to putting children up there for no reason.

5    Sometimes we have to do it.  Sometimes judges have to do it.

6    More in the state court than in the federal court.  But you

7    have not found a judge who would do that easily.

8            **MS. PIERSON:**  Fortunately, I don't think you'll be

9    faced with that situation, Your Honor.  There are only 20

10   plaintiffs who are under the age of 13 in this MDL.

11           **THE COURT:**  I thought you said you didn't know.

12           **MS. PIERSON:**  No.  I -- I don't have data on first

13   use, age at first use.

14       What I know is the data of the age of the plaintiffs today

15   because we have their date of birth.

16           **THE COURT:**  Yeah.

17           **MS. PIERSON:**  So --

18           **MS. HAZAM:**  Your Honor, if I could --

19           **THE COURT:**  You could also have -- I know 14- and

20   15-year-olds who are probably more articulate and self aware

21   than 18-year-olds.

22       It is not dispositive.  It is and should be a

23   consideration on both sides.

24       And -- and let me say this, too.  I would suggest to you

25   that you don't want to waste your choices on picking people

1    who aren't going to give us data because I won't choose them.

2    So you do so at your own peril.  It may be appropriate to have

3    one suicide, just so we know what the tail is on something

4    like that.

5        And it may be appropriate to have one who alleges no

6    addiction or compulsive use so that we know what those outside

7    barriers are with the balance in the middle.

8        I understand that Judge Kuhl and I have very different

9    views about picking bellwethers.

10        But I don't think -- I don't think it's a perfect science.

11    And my goal is to have datapoints that give you information.

12    That's my goal.

13        So what do you want me to do with this?

14        **MS. HAZAM:**  Your Honor, plaintiffs are not suggesting

15    that age become a criteria for the bellwether pool or that the

16    bellwether pool be selected with any breakdown based on age.

17    That was, of course, defendants' suggestion.

18        The statistics that we derived were derived from the same

19    sources defendants have access to, not our unique access to

20    the plaintiffs.  They were derived from the short-form

21    complaints which indicate a birth date and the date when a

22    certain plaintiff started using a platform.  The plaintiff

23    preservation forms also include date of birth.

24        So we were using those same sources, but it is not our

25    suggestion that age become a part of the criteria.  It is

```
 1    however our strong position that age at time of filing has no
 2    relevance whatsoever.
 3        It is not at all surprising that plaintiffs who experience
 4    these harms as children may not file until they reach the age
 5    of majority.  But it doesn't tell us anything important about
 6    how age plays into these claims, so our position --
 7            THE COURT:  From what I --
 8            MS. HAZAM:  -- is that age should not be used as a
 9    criterion but can be taken into account, of course, by the
10    parties and the court in making selections.
11            THE COURT:  So what do you want me to do?  I'm mean,
12    I'm not saying that you can't think about it.  I'm not saying
13    that you can't argue it.
14            MS. HAZAM:  Right.
15            MS. PIERSON:  Your Honor --
16            THE COURT:  I'm not talking to you.
17        Ms. Pierson?
18            MS. PIERSON:  Thank you, Your Honor.
19        I think defendants' only request as it relates to age and
20    gender, and -- and your comments this morning are helpful.  We
21    think these are important factors that help to define a
22    representative pool.
23            THE COURT:  I don't --
24                (Simultaneous colloquy.)
25            THE COURT:  I don't disagree with you, but, you know,
```

1   do I -- you're going to make your arguments.  You're going to

2   give me data from these individuals, and we're going to select

3   some folks.  I think it's -- I think -- age is merely, as I

4   think about it, only a -- a way of trying to identify whether

5   someone is mature enough to go through this process, which

6   will not be insignificant.

7       And that's why I'll tell you right now, don't bring me any

8   10-year-olds or 12-year-olds because I'm going to reject them.

9           **MS. HAZAM:**  Understood.

10          **MS. PIERSON:**  We certainly -- certainly won't, Your

11  Honor.  And -- and I appreciate your comments this morning on

12  the things that you'll be looking for as you're choosing

13  the -- the bellwether cases.

14      You asked the question of, you know, what do we want you

15  to do, and -- and I think, you know, to prioritize our asks in

16  the CMC statement, I would say our first priority is to ask

17  the Court to be consistent in how you handle the outliers.

18  And we believe both suicide and non-addiction cases to be

19  outliers.

20      Plaintiffs' omission of non-addiction cases and other

21  cases and claims -- like, there are 11 cases that allege ADHD

22  caused by the platforms.  There are other cases of small

23  number that they have excluded, yet somehow they believe that

24  suicide cases should be included at this juncture.

25      Our belief that is that they should -- the Court should

1    consistently exclude those as outliers now for a couple of

2    reasons.  One reason, Your Honor, is that with just six

3    bellwether picks, if the pool is narrowed now to exclude

4    outlier cases, it allows the parties or really forces the

5    parties to look more to the middle and representativeness from

6    the get-go.

7        We know that plaintiff fact sheets will be served in the

8    personal injury cases on April the 1st and that by April the

9    15th, we need to provide you with our selections and briefing

10   on the selections.

11       So there's a very short window of time for us to analyze

12   the data and determine what is truly representative when we

13   have answers from the plaintiffs themselves to [sic] the form

14   of plaintiff fact sheets.

15       So narrowing the pool now to exclude outliers has a

16   significant benefit to the Court later so that you're not

17   hearing argument about -- about those things at a later --

18   later date.  I'd say our second priority, Your Honor, is that

19   you include the body dysmorphia and sleep disorder cases.

20   There's really no reason to exclude them.

21       We know that more than 50 plaintiffs claim those injuries,

22   50 each for both body dysmorphia and sleeping disorders.  We

23   know that the master complaint itself includes allegations

24   that make clear that plaintiffs believe that sleeping

25   disorders are the gateway to a number of other injuries.

```
 1          And there are three separate allegations in the master
 2   complaint that treat eating disorders and body dysmorphia as
 3   one, making the allegation that filters lead to self-image
 4   problems --
 5                    (Simultaneous colloquy.)
 6          MS. PIERSON:  -- lead to body dysmorphia --
 7          THE COURT:  I'm not deciding today, so previewing the
 8   argument for two months from now, I'm not sure does you any
 9   good.
10          MS. PIERSON:  Understood.
11      Our only request is that those things be added to the
12   criteria for bellwether pool selection, that those plaintiffs
13   be eligible to be selected.
14          THE COURT:  Response.
15          MS. HAZAM:  Yes, Your Honor.
16      Those two injuries that Counsel just referred to, body
17   dysmorphia and sleep disorder occur almost universally
18   together with other qualifying injuries so the parties have
19   agreed already that eating disorders --
20          THE COURT:  So why do you disagree vehemently with
21   their approach?  So what?
22          MS. HAZAM:  I -- I simply believe it will be a tiny
23   number of plaintiffs who would be eligible by virtue of having
24   only those injuries and not the others.
25          THE COURT:  Then why are we fighting about it?  Then
```

```
 1    let them have what they want, and you present their best case,

 2    they're going to present their best case, and I'm going to

 3    decide.

 4        Why should we fight about this?

 5            MS. HAZAM:  Fine with that, Your Honor.  We can argue

 6    about representativeness at the time of selection.  That would

 7    be our argument, that these are a tiny number of plaintiffs.

 8            THE COURT:  Okay.  So --

 9            MS. HAZAM:  That's fine.

10            THE COURT:  -- I don't understand why we're arguing

11    about it.

12            MS. HAZAM:  Can I speak to the suicide cases, if Your

13    Honor will permit?

14            THE COURT:  Okay.

15            MS. HAZAM:  On the suicide cases, Counsel compared

16    them to the cases that don't allege addiction.  I don't

17    believe that is an apples-to-apples comparison.

18        We now know that there may be 3 to 4 plaintiffs who don't

19    allege addiction.  There are 29 or 30, depending on who has

20    the correct statistics, who allege suicide.  It is a type of

21    self-harm.  To include self-harm including suicide attempts as

22    the parties have already agreed but exclude its most severe

23    form does not make sense to plaintiffs.

24        It's a not insignificant number at about 14 percent of the

25    plaintiff population.  But it will be considerably larger in
```

1  terms of value so it may inform settlement.

2     We believe that it makes sense to have some of most severe

3  cases in the mix being worked up for possible early trials.

4     The parties don't have to select these cases, nor does the

5  Court.  Nor does the Court have to put any such case first

6  before others.  But having them worked up, we believe, is

7  important for understanding overall value and informing

8  resolution.

9            **MS. PIERSON:**  Your Honor, if I may respond briefly.

10     It -- it is difficult when we've been discussing this

11  issue, we've briefed this issue, and suddenly today the

12  information that Counsel presents is different than the

13  short-form complaints.  And, in fact, they haven't been

14  amended yet.

15     So I -- I would just say the record before the Court comes

16  from short-form complaint data that was completed by these

17  lawyers, and that data suggests that there are 28 cases of

18  non-addiction.

19     We will, of course, know the answer to this precisely when

20  we get PFS data because the plaintiffs themselves complete

21  that, and there is a specific blank for -- for addiction,

22  so --

23            **THE COURT:**  I think there's another reason to include

24  the suicide cases, and that is because of all the cases, I

25  struggle understanding how the suicide cases are going to be

1    able to -- to present a case on causation that is not content

2    driven.

3        And it's only -- and -- you know, it is this set of cases

4    that are -- that are going to be briefed and -- and worked up

5    that are going to go through summary judgment.  And -- so I

6    think it needs to be worked up.

7        **MS. PIERSON:**  There are unique legal questions, Your

8    Honor, and -- and unique cause questions, too.

9        Defendants' position is that those questions can be

10   addressed within the context of the 55 suicide attempt cases.

11   Without the -- the distracting or barbell factor that comes

12   with a completed suicide.

13       There are no unique questions of cause that are presented

14   with suicide that we can't address squarely within the suicide

15   attempt cases.

16       **THE COURT:**  And you could be right, so you're going

17   to give me attempted, they're going to give me completed.

18       And then -- I'm not going to decide this in a vacuum, and

19   right now, that's what you're asking me to do.  I've seen none

20   of these individual fact sheets.  All I have is the master

21   complaints.  So that's where I am.

22       **MS. PIERSON:**  If that's your decision, Your Honor,

23   the criteria that are articulated on page 8 of the CMC as the

24   agreed-upon criteria -- I think the only change you would need

25   to make to that would be to add body dysmorphia and sleeping

1   disorders.  That should resolve -- resolve the issue.

2       Our -- our request for consistency and treatment of the

3   outliers was that if Your Honor chose to include the suicide

4   cases, that the non-addiction cases also be included.  But the

5   Court need not make any changes to the criteria stated in the

6   CMC in order for those cases to be included.

7           **MS. HAZAM:**  And, Your Honor, while we maintain our

8   position with regards to non-addiction cases, I've already

9   indicated that we accept Your Honor's guidance with regards to

10  body dysmorphia and -- and sleep disorder such that the

11  parties will make their arguments regarding how representative

12  cases that only allege that and not the other injuries are.

13          **THE COURT:**  All right.

14      I'll put it in the order that comes out after today.

15          **MS. PIERSON:**  Thank you, Your Honor.

16          **MS. HAZAM:**  Thank you, Your Honor.

17          **THE COURT:**  Okay.  Let's move then --

18      Well, did you want to talk today about the timing issues

19  with respect to the plaintiff fact sheets?

20          **MR. WEINKOWITZ:**  Good morning, Your Honor.

21          **THE COURT:**  At the microphones, Mr. Weinkowitz?

22          **MR. WEINKOWITZ:**  Weinkowitz, yes, Your Honor.

23          **THE COURT:**  And --

24          **MR. DRAKE:**  Geoffrey Drake, King & Spalding, for the

25  TikTok defendants, Your Honor.  Good morning.

```
 1              THE COURT:  Good morning.

 2              MR. WEINKOWITZ:  We have good news for you, Your

 3    Honor.

 4              THE COURT:  Great.

 5              MR. WEINKOWITZ:  We resolved our issues yesterday.

 6              THE COURT:  Perfect.

 7              MR. WEINKOWITZ:  So we'll be submitting an

 8    implementation order.  I'll get that over to the defendants

 9    after this status conference, and we'll get it in to you

10    shortly.

11              THE COURT:  Excellent.  Glad I have you on board

12    Weinkowitz.  It's a good decision.

13              MR. WEINKOWITZ:  Thank you.

14              THE COURT:  Okay.  Thank you.

15              MR. DRAKE:  Thank you, Your Honor.

16              THE COURT:  I want to talk about the State AG claims

17    next.

18         Who's going to -- okay.  So I have Miyata?  Ms. Miyata?

19              MS. MIYATA:  Yes.  Bianca Miyata for the State AG's.

20              THE COURT:  Okay.  And, Mr. Hester, they're sending

21    you back?

22              MR. HESTER:  Yes.  Back for a second round, Your

23    Honor.

24              THE COURT:  Okay.

25         So a couple of things.  First, I want to talk about jury
```

1    versus noninjury claims.  And then I want to take a look at

2    the current briefing and the responses to that and whether we

3    can -- whether we need to get ahead of the game on some --

4    making sure that there is accurate articulations of the

5    various states -- kind of back to where -- I kind of alluded

6    to this earlier, Mr. Hester.

7       I see that the State AGs have indicated that they are

8    willing to waive juries.

9            **MS. MIYATA:**  That's correct.

10            **THE COURT:**  And Meta has -- is not there.  But what I

11    don't know and what I would like to know is whether there's an

12    entitlement to it in the first instance.  So you can't demand

13    it if you're not entitled to it.

14            **MR. HESTER:**  Yes, Your Honor.

15            **THE COURT:**  And so have you all done a survey of the

16    various claims that are at issue and whether or not there's an

17    entitlement to a jury trial in the first instance?

18            **MR. HESTER:**  We -- we've looked at that, Your Honor.

19    We believe that we do have an entitlement to a jury trial as a

20    matter of right under the Seventh Amendment based on the *Tull*

21    *vs. United States* decision.

22            **THE COURT:**  All right.  I'm talking about the state

23    laws' version -- so for instance, if -- if all I was dealing

24    with was a UCL claim under California law, you're not entitled

25    to it.  I don't care what the Seventh Amendment is.  The state

1    of California -- the Supreme Court of California says for our

2    claim, you're not entitled to it.

3            **MR. HESTER:**  I think it's a federal question, Your

4    Honor.  It's a federal question in federal court on -- as to

5    whether we're entitled to a jury trial right.  There's

6    different standards in state court.  But in federal court,

7    there's a jury trial right that attaches under the Seventh

8    Amendment.  The Seventh Amendment doesn't apply to trials in

9    state court.

10           **THE COURT:**  A response?

11           **MS. MIYATA:**  Your Honor, to the extent that Meta may

12   be requesting a jury trial on all claims, I guess is what I'm

13   hearing, I'd -- I'd like to understand which claims those are.

14      It's the states' position that this action is equitable

15   and that our request for relief is equitable.  And as such,

16   the right for a jury trial -- you know, the states have agreed

17   to waive any right under state law which may attach.

18      And I think we'd like to better understand which claims

19   Meta -- Meta seeks to -- Meta believes they may have this

20   entitlement for --

21           **THE COURT:**  Yeah, I mean --

22           **MS. MIYATA:**  -- before we can respond.

23           **THE COURT:**  -- it would be important because even

24   when you have a jury trial -- frequently, there are -- in all

25   sorts of context, patent context, antitrust context, all sorts

```
1    of context.
2         You're not always -- a jury certain doesn't give equitable
3    relief, does not give injunctive relief, so you're not
4    entitled to it.
5              MR. HESTER:  As to relief, Your Honor, but as -- that
6    may be true.  And the Tull case, for instance, draws that
7    distinction between an entitlement to a jury trial on the
8    remedy under civil penalties versus liability.
9         But as to the -- as to the liability phase, we're entitled
10   to a jury trial.  At this point, we're not -- we're simply
11   being clear, we're not waiving our right to a jury trial.  And
12   we believe we have one as a matter of Seventh Amendment right
13   because the Tull case and others reflect that in federal
14   court, there's a Seventh Amendment right to a jury trial
15   where, as here, the AGs are seeking civil penalties.
16        All of their -- all of their claims ultimately reduce to a
17   claim for civil penalties.  And the Tull case addressed that
18   very scenario, so we think that --
19             THE COURT:  I don't think you cited that case in the
20   statement, did you?
21             MR. HESTER:  Yes, we did, Your Honor.
22             THE COURT:  Okay.
23             MR. HESTER:  It's -- it's Tull v. United States, 481
24   U.S. 412.  And it's -- its in our statement of position.
25             THE COURT:  I see it.
```

1          MR. HESTER:  But --

2          THE COURT:  All right.  Do you have any response to

3     that case?

4          MS. MIYATA:  I do, Your Honor.

5       I do not believe that our case boils down merely to civil

6     penalties.  Instead, the states seek significant injunctive

7     relief.  The states seek disgorgement.  And, again, those are

8     remedies that are clearly equitable in nature, not legal.

9       I believe that perhaps my friend on the other side paints

10    with a too broad a brush when saying that our case merely

11    boils down to civil penalties.

12         THE COURT:  Well, you put in here that you seek

13    statutory civil penalties.

14         MS. MIYATA:  That's correct.

15         THE COURT:  And so --

16         MS. MIYATA:  But not solely statutory civil

17    penalties.

18         THE COURT:  Correct.  But -- but we also frequently

19    bifurcate.

20         MS. MIYATA:  Correct.

21         THE COURT:  So do you agree that under this case,

22    they have a jury trial right on claims in -- where civil

23    penalties are asserted?

24         MS. MIYATA:  Your Honor, I think we would have to

25    brief that question further, but as I stand here today, I

1    would say that the civil penalties that flow from consumer

2    protection cases and flow from our UDAP laws, again, are

3    equitable in nature.  Those are not the types of penalties

4    that are determined, like damages, as a legal -- as a form of

5    legal relief.

6         **THE COURT:**  Well, I -- I think I -- I would like to

7    understand the landscape.  And so I want you to work on a

8    joint submission and -- I don't need it tomorrow.  I don't

9    need it in a week, but I do want to have it.

10        So for each state, an identification of what remedies

11   you're seeking, injunctive, statutory damages, restitution,

12   disgorgement, whatever it is.  It can be in a chart.  I like

13   charts.  They don't have a lot of adverbs.

14        So I envision, you know -- each state can do their own

15   chart, with a -- you know, with each of the remedies, and then

16   just say -- you know, have a box, jury or not jury, and let me

17   know.

18        Then you can send that to the defendants.  If you disagree

19   with their articulation of whether or not a jury is entitled,

20   then you let me know.

21        And then I can -- you know, and then we can move from

22   there.  Under all cases, if they're seeking -- and I think

23   that they are -- I think it's pretty clear that injunctive

24   relief is not afforded by a jury -- so in whatever case, it

25   would have to have both a -- you know, it would have to have a

```
 1    court component to it in terms of injunctive relief.

 2              MS. MIYATA:  And, Your Honor, just to clarify, in the

 3    chart we are to inform Your Honor about our position about

 4    whether a jury trial would be afforded under state law; is

 5    that correct?

 6              THE COURT:  Correct.

 7              MS. MIYATA:  Okay.

 8              THE COURT:  Under state law.

 9              MS. MIYATA:  Thank you.

10              MR. HESTER:  And, your Honor --

11              THE COURT:  I understand that you've got your other

12    arguments.

13              MR. HESTER:  Right.

14              THE COURT:  But I want to make sure that we all agree

15    in the first instance as to what the states themselves are

16    affording.  Because, you know -- yeah.

17              MR. HESTER:  The -- understood, Your Honor.

18         I just want to make clear so that we're communicating

19    well.  We're distinguishing between the question of jury trial

20    on liability and the question of jury trial on remedies.  And

21    we understand the issue is different and -- and potentially

22    may be meaningfully different on this question of a Seventh

23    Amendment right.

24         The Tull case itself recognizes the difference, finds a

25    jury trial right under the Seventh Amendment to liability on a
```

1   civil penalties claim but did not find a jury trial right on

2   the remedy.

3      So I think it's also going to be important in this chart

4   that there be a distinction drawn in what the AGs provide us

5   between the liability question and the remedy question.

6   They're different.

7         **THE COURT:**  So just -- we'd add a column on

8   liability.

9         **MS. MIYATA:**  Happy to do that, Your Honor.

10        **THE COURT:**  And then if you -- I would ask that you

11  meet and confer about the meaning of *Tull*.  And if you

12  disagree, then I can get some short briefs on the meaning of

13  *Tull*.  But I think we can parallel process that.  It's really

14  something that I need to get my arms around in terms of trial.

15  That's all.

16        **MR. HESTER:**  So, Your Honor, we should hold off on

17  this Seventh Amendment question for now and simply focus on

18  the state law issue?

19        **THE COURT:**  I would.  And I'd ask that you meet and

20  confer on the Seventh Amendment issue because you may

21  ultimately agree.

22        **MR. HESTER:**  Right.

23        **THE COURT:**  In which case, then what I would want is

24  a joint statement of what your agreement is.  I like it in

25  writing so that you can't take it back later, so --

```
1         Okay?
2         So maybe if you could get that to me a week before our
3    next conference so that we could just have maybe a short
4    discussion about it and then see where we go from there.
5              MR. HESTER:  Will do, Your Honor.
6              MS. MIYATA:  Thank you, Your Honor.
7              MR. HESTER:  Thank you.
8              THE COURT:  Thank you.
9         Don't leave yet.
10        Unless someone else -- I mean, unless -- yeah.
11        You can bring someone else if you need a life line,
12   Mr. Hester.
13             THE COURT:  Okay.
14        I have not read and it's not fully briefed Meta's motion
15   to dismiss the AG's complaint, the Florida AG complaint, and
16   then the personal injury claims for consumer protection and
17   misrepresentation.  Docket 517.
18        And I do have an opposition, but the reply is not yet due.
19   Or oppositions.
20        I do try to do my job in terms of understanding what the
21   various states laws require.  And in my view, I don't always
22   get that from the parties.
23        So I will ask on the front end, understanding I didn't
24   read this -- I see some bold language -- some bolded states in
25   the motion.
```

```
 1        Have you -- you know, have you teased those issues out by
 2   states?
 3        I see that there are some appendices on the oppositions
 4   which, you know, do try to tease out the -- the state law
 5   issues with respect to these topics.
 6        One of the things -- and I'm looking at, you know, some of
 7   the tables at Docket 600, and there's an appendix at 599 that,
 8   you know, seem to try to do some of this.
 9        For me, it would be me efficient if the defendants in your
10   reply kind of appended the tables, right, with your
11   perspective so that we don't have to cut and paste or try to
12   do that kind of combination ourselves.
13        So any reactions to that issue or, you know, whether --
14   I -- because I haven't read it, I'm not -- I don't have a lot
15   of clarity in what -- in my guidance.
16        What I'm looking for is to make sure I have what I need so
17   that we can move forward without having to do some
18   supplemental order again and say, could you please do X, Y and
19   Z on a state-wide basis because you haven't done it.
20        MR. HESTER:  I know we're in the midst of the
21   briefing, and, Your Honor, we are undertaking to go state by
22   state.  In some respects, we sometimes clump states together
23   because we think they raise a common issue.
24        We can certainly also take on board the point about an
25   appendix that would help the Court and be more sort of linear
```

```
 1    in a sense, not purely argumentative but would just have the
 2    key points.  And so yes, we can do that, and that's certainly
 3    what we're undertaking to do, is to provide an answer on the
 4    state law of each state at issue.
 5        We don't always address every element.  We address the
 6    elements that we think are dispositive on the point.  But
 7    that's what we've undertaken to do.
 8        And we can certainly -- and I think my -- the earlier
 9    discussion with the Court illuminates the importance of
10    providing the Court with this.  So we -- we will certainly
11    keep that in mind and work on it as we're finalizing this
12    reply.
13             THE COURT:  Well, it would -- you know, I would
14    appreciate it if the plaintiffs would give editable versions
15    of their appendices to the defendants, because -- and some of
16    this -- like, I'm looking at some of these.  It doesn't --
17    like, Appendix 1 at page 32 of 51, all this looks like is a
18    statement of what the law is and what the definition of
19    certain things are.
20        It would be helpful for me to have on here from the
21    defense "agreed."  Right?
22             MR. HESTER:  Right.
23             THE COURT:  So that we don't have to go and
24    double-check.  And if you don't agree, you know, we don't
25    agree that's the definition of "consumer."  See a case that
```

1    might have explained it differently.

2        This is something that I do routinely for summary

3    judgments.  You know, I started off as a state court judge

4    here, and we have separate statements of facts where you have

5    to exchange these things, and we -- we have one document that

6    does it.

7        I frequently do it in patent cases where I ask them to

8    combine their -- you know, they have to combine some of their

9    disclosures to help us out.

10        So if the appendices could be shared so that they could be

11    annotated by the defense and, you know -- and if for some

12    reason, we need to give you an opportunity to respond, we'll

13    give you an opportunity to respond.

14        But what I'm trying to do is have it all in one place as

15    opposed to us trying to pull it together, which just takes

16    extra time.

17            **MR. HESTER:**  I --

18            **MS. MIYATA:**  We're happy --

19            **MR. HESTER:**  I understand.  Thank you.

20        Go ahead.

21            **MS. MIYATA:**  We're happy to provide those editable --

22    our editable appendix to defendants.  I would note that in the

23    motion to dismiss, defendant has addressed numerous state laws

24    in different ways, and many of these are addressed in string

25    cites or in mentions, and we've done our best in our response

1    in our opposition, I think, to respond to those in a thorough

2    and systematic way, I think, to make sure that we're touching

3    on each state's law.

4        But to the extent that the Court would like to have a more

5    thorough explanation or a more -- you know, a more a fulsome

6    discussion, I think, of the state-by-state laws, we would

7    request supplemental briefing.

8             **THE COURT:**  Yeah, and --

9        **MS. MIYATA:**  Within the confines of the page limits,

10    I think there was only so much all the parties could do.

11            **THE COURT:**  I agree.  And I understand there are

12    limits.  As I said to my law clerk, though, I am reluctant to

13    give you more pages because I'm still not getting what I want,

14    so having more pages of what I don't want doesn't help me.

15        What I'm looking for are ways to efficiently digest this

16    information.

17            **MS. MIYATA:**  Yeah.

18            **THE COURT:**  And having it compiled together sometimes

19    makes it more efficient for us.  So --

20        **MR. HESTER:**  Your Honor, we're listening to the

21    Court.  And I think we understand that -- what the Court is

22    asking us to do.

23        The page limits do sometimes constrain us, but I also

24    understand the point about making sure we're giving the Court

25    what you need.

1          Our reply brief, I believe, is due Monday.  It would be

2     hard for us to shift course a little bit on some of this by

3     Monday, Your Honor, I -- not that we -- we been trying to do

4     this, but I'm not sure it will be as systematic as the Court

5     would like.

6          If we could have another week, I think we could do better.

7          **THE COURT:**  I think that's fine.  You could have

8     another week.

9          **MS. MIYATA:**  Okay.

10         And to be clear, the appendix that we are to work on

11    together to provide to defendants is the appendix that we have

12    provided merely on state law.  I believe that defendants also

13    filed an appendix with regard to misrepresentations where they

14    stated some positions about what may have or may not have met

15    requirements.

16         Is that appendix also one that we should be looking at to

17    compile and put together?

18         **THE COURT:**  I -- I don't know where that is.

19         **MS. MIYATA:**  Think that's attached to -- I believe

20    that's attached to Meta's motion to dismiss --

21         **THE COURT:**  Okay.

22         **MS. MIYATA:**  -- the State AGs' claims.

23         **THE COURT:**  I don't have that one, but, again, if you

24    could give it to them and if you could, you know, also file --

25    I'm not looking at it, so I don't know what it is.

1          **MR. HESTER:**  It was -- it was a listing of all of the

2     alleged misrepresentations in the complaint.  And it was a

3     listing of our position as to why they were not actionable for

4     various reasons.

5          So it was -- it was really Meta's reference tool for the

6     Court.  I think it may be different from what the Court is now

7     asking us for, which is something really focused on the -- on

8     the elements of state law.

9          **THE COURT:**  So if -- I don't know that I'm going to

10    need a -- you know, statement-by-statement issue with respect

11    to the statements.  If I need it, then I'll ask for it.

12         **MS. MIYATA:**  Understood.

13         **THE COURT:**  Again, I do it in security cases.  I

14    require them to identify, and then -- and then I get the

15    response.  But security cases are different, so --

16         **MS. MIYATA:**  And to be clear --

17         **THE COURT:**  Let me take a look at it and, you know,

18    we'll give you enough time.  But I don't know that I need

19    that.

20         **MS. MIYATA:**  Thank you.

21         And to be clear, in the plaintiffs' -- I believe in the

22    plaintiffs' collective responses and oppositions, we only

23    responded regarding the states that Meta targeted in their

24    motion to dismiss and regarding those states' laws.

25         To the extent that -- that Meta or defendants intend to

1     address additional states' laws in their reply, we would ask

2     for the opportunity to respond to that additional new

3     argument.

4           **THE COURT:**  Okay.  Well, when you get the reply, if

5     you -- if you think that you -- that it would be appropriate,

6     then file a request and tell me what you're thinking about

7     specifically and what you think you need.

8           **MS. MIYATA:**  Understood.  Thank you, Your Honor.

9           **THE COURT:**  Okay?  All right.  Great.

10           **MR. HESTER:**  Thank you, Your Honor.

11           **MS. MIYATA:**  And may I -- while we're on this same

12     topic about motion to dismiss and the states' claims, we were

13     hopeful that we could request that Your Honor set this for

14     hearing just for planning purposes.

15           **THE COURT:**  So it -- yeah, we're -- my plan is to --

16     to have a -- the argument happen at least in the first

17     instance at the next hearing in April.

18           **MS. MIYATA:**  In April.  Okay.

19           **THE COURT:**  In April.

20      And I may need two rounds of -- you know, depending on how

21     much is coming in, et cetera, I may need two rounds.  But I

22     think in the first instance, you should be prepared to argue

23     it in April.

24           **MS. MIYATA:**  All right.  Thank you.

25           **THE COURT:**  The other one that we will try to get to

1    in April is the remand motion.  That was noticed for the wrong

2    day.  It should have been noticed for the same day as the

3    conference, so we'll just issue a clerk's notice to deal with

4    that.  Okay?

5        Okay.  I think that's all I had on my list.  I'll open it

6    up in case anybody else has other things they want to talk

7    about.

8            **MS. HAZAM:**  Your Honor, Lexie Hazam for plaintiffs.

9        I wanted to clarify one thing with regards to Your Honor's

10   scheduling order, which is CMO10, if I may?

11           **THE COURT:**  Yeah.

12           **MS. HAZAM:**  Page 2 of CMO10 lists dates for case

13   specific experts, plaintiffs' opening briefs, defendants'

14   responsive briefs, et cetera.  And it has the Court's

15   identification of the bellwether trial pools happening in

16   between those two dates.

17           **THE COURT:**  I do.  And here's why.

18           **MS. HAZAM:**  Okay.

19           **THE COURT:**  Not all of the cases that have been

20   identified are going to go to trial, so what I'm trying to do

21   is narrow the amount of work that you have to do to get ready

22   for trial.

23       It appeared to me that we needed to have plaintiffs'

24   opening reports as additional information to decide which

25   cases go to trial.  I don't need defendants' reports for that

```
 1    purpose.

 2         So once we get that -- and I don't think defendants need

 3    defendants' report and I don't think you need defendants'

 4    reports to identify which are going to go to trial.

 5         But -- so once the plaintiffs opening reports come out, it

 6    seems to me that's the additional information that's needed to

 7    make, then, the final selection, and then that's what gets

 8    focused on.  And those are the other reports that should get

 9    issued.

10         Again, the point is to narrow the expense and the amount

11    that you have to do.  And, obviously, you know, if other cases

12    are going to go, they're going to go and you can do it later.

13    But I don't think that we need everybody's all expert

14    discovery done on cases that aren't going to trial at -- at

15    that time.  That was my rationale.

16              MS. HAZAM:  Understood, Your Honor.  That answers my

17    question.

18              THE COURT:  Okay.  Any -- any other questions?

19              MS. SIMONSEN:  No other questions.  Thank you, Your

20    Honor.

21              THE COURT:  Okay.

22              MS. HAZAM:  Thank you.

23              THE COURT:  Okay.  Anything else that you all want to

24    talk about today?

25              MS. HAZAM:  Nothing for plaintiffs, Your Honor.
```

1        **MS. PIERSON:**  Nothing for defendants, Your Honor.

2        **THE COURT:**  Terrific.  Then you can have lunch before

3    you get to your airplanes.

4        All right.  We're adjourned.  Thank you.

5        (Proceedings were concluded at 11:34 A.M.)

6                        --o0o--

7

8

9

10

11                    <u>**CERTIFICATE OF REPORTER**</u>

12

13        I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15    I further certify that I am neither counsel for, related to,

16    nor employed by any of the parties to the action in which this

17    hearing was taken, and further that I am not financially nor

18    otherwise interested in the outcome of the action.

19

20    _____

21    Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

22            Thursday, February 29, 2024

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*