Pages 1 - 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA ADOLESCENT      )
ADDICTION/PERSONAL INJURY            )
PRODUCTS LIABILITY LITIGATION        )   NO. 22-MD-03047 YGR (PHK)
_____      )

San Francisco, California
Monday, March 18, 2024

**APPEARANCES:**

For Plaintiffs:

        MOTLEY RICE LLC
        28 Bridgeside Boulevard
        Mount Pleasant, South Carolina 29464
    BY:  **ANNIE E. KOUBA**
        **ATTORNEY AT LAW**

        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
        275 Battery Street, 29th Floor
        San Francisco, California 94111
    BY:  **LEXI J. HAZAM**
        **MICHAEL I. LEVIN-GESUNDHEIT**
        **ATTORNEYS AT LAW**

        BEASLEY ALLEN LAW FIRM
        218 Commerce Street
        Montgomery, Alabama 36104
    BY:  **JOSEPH G. VanZANDT**
        **ATTORNEY AT LAW**

        GIBBS LAW GROUP, LLP
        1111 Broadway, Suite 2100
        Oakland, California 94607
    BY:  **ANDRE M. MURA**
        **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
        CSR No. 7445, Official United States Reporter

**APPEARANCES**:   **(CONTINUED)**

For Plaintiff State of Colorado, ex rel. Philip J. Weiser,
Attorney General Via Zoom:

                     COLORADO DEPARTMENT OF LAW
                     1300 Broadway, Sixth Floor
                     Denver, Colorado 80203
              BY:  **BIANCA MIYATA**
                   **SENIOR ASSISTANT ATTORNEY GENERAL**

For Plaintiff the People of the State of California:

                     CALIFORNIA DEPARTMENT OF JUSTICE
                     OFFICE OF THE ATTORNEY GENERAL
                     455 Golden Gate Avenue, 11th Floor
                     San Francisco, California 94102
              BY:  **MEGAN M. O'NEILL**
                   **DEPUTY ATTORNEY GENERAL**

For Plaintiff the Commonwealth of Kentucky:

                     KENTUCKY OFFICE OF THE ATTORNEY GENERAL
                     COMMONWEALTH OF KENTUCKY
                     Office of Consumer Protection
                     1024 Capital Center Drive, Suite 200
                     Frankfort, Kentucky 40601
              BY:  **J. CHRISTIAN LEWIS**
                   **ASSISTANT ATTORNEY GENERAL**


For Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.;
Facebook Holdings, LLC; Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC;
Siculus, Inc.; and Mark Elliot Zuckerberg:

                     COVINGTON & BURLING LLP
                     1999 Avenue of the Stars, Suite 3500
                     Los Angeles, California 90067
              BY:  **ASHLEY M. SIMONSEN**
                   **ATTORNEY AT LAW**

                     COVINGTON & BURLING LLP
                     Five Palo Alto Square
                     3000 El Camino Real
                     Palo Alto, California 94306
              BY:  **MEGAN L. RODGERS**
                   **ATTORNEY AT LAW**


         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:   (CONTINUED)**

For Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.;
Facebook Holdings, LLC; Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC;
Siculus, Inc.; and Mark Elliot Zuckerberg:

                          COVINGTON & BURLING LLP
                          Sales Force Tower
                          415 Mission Street, Suite 5400
                          San Francisco, California 94105
                    BY:   **ISAAC D. CHAPUT, ATTORNEY AT LAW**

                          COVINGTON & BURLING LLP
                          One City Center
                          850 Tenth Street, NW
                          Washington, D.C. 20001
                    BY:   **PAUL W. SCHMIDT, ATTORNEY AT LAW**
                          (Via Zoom)


For Defendant Snap Inc.:
                          MUNGER, TOLLES & OLSON LLP
                          355 South Grand Avenue, 35th Floor
                          Los Angeles, California 90071
                    BY:   **FAYE PAUL TELLER, ATTORNEY AT LAW**
                          **ARIEL T. TESHUVA, ATTORNEY AT LAW**

                          MUNGER, TOLLES & OLSON LLP
                          560 Mission Street, 27th Floor
                          San Francisco, California  94105
                    BY:   **JONATHAN H. BLAVIN, ATTORNEY AT LAW**

                          MUNGER, TOLLES & OLSON LLP
                          601 Massachusetts Avenue, NW
                          Washington, D.C.  20001
                    BY:   **LAUREN BELL, ATTORNEY AT LAW**


For Defendants TikTok Inc. and ByteDance Inc.:
                          FAEGRE DRINKER BIDDLE & REATH LLP
                          300 North Meridian Street, Suite 2500
                          Indianapolis, Indiana 46204
                    BY:   **PATRICK J. REILLY, ATTORNEY AT LAW**
                          **ANDREA R. PIERSON, ATTORNEY AT LAW**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
1    For Defendants YouTube, LLC, and Google LLC:
                        MORGAN, LEWIS & BOCKIUS LLP
2                       300 South Grand Avenue, 22nd Floor
                        Los Angeles, California 90071
3               BY:     JESSE S. KROMPIER, ATTORNEY AT LAW

4                       WILSON, SONSINI, GOODRICH & ROSATI
                        633 West Fifth Street, 15th Floor
5                       Los Angeles, California 90071
                BY:     CHRISTOPHER C. CHIOU, ATTORNEY AT LAW
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **<u>Monday - March 18, 2024</u>**                                    **<u>2:03 p.m.</u>** |
| 2 | **<u>P R O C E E D I N G S</u>** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Now calling 22-MD-3047-YGR, In Re:  Social |
| 5 | Media Adolescent Addiction and Personal Injury Products |
| 6 | Liability Litigation. |
| 7 |    Counsel, please approach when speaking and state your |
| 8 | name, for the record.  If the first people could come up and |
| 9 | state their appearances, beginning with plaintiff, that would |
| 10 | be great. |
| 11 | **MS. KOUBA:**  Good morning, Your Honor.  May it please |
| 12 | the Court, my name is Annie Kouba.  I'm with Motley Rice law |
| 13 | firm, and I represent the plaintiffs in this matter. |
| 14 | **THE COURT:**  Good afternoon. |
| 15 | **MR. REILLY:**  Hi, Your Honor.  Patrick Reilly from |
| 16 | Faegre Drinker, and I'm speaking on behalf of the TikTok |
| 17 | defendants. |
| 18 | **THE COURT:**  Good afternoon. |
| 19 |    And are you going to speak generally on behalf of all |
| 20 | defendants? |
| 21 | **MR. REILLY:**  Yes.  Well, I was just going to, if it's |
| 22 | helpful for Your Honor, just catch -- I guess, give you a |
| 23 | little refresh on kind of where we are and kind of where we've |
| 24 | been in the past couple weeks to kind of get where we are now. |
| 25 | Is that helpful? |

1          **THE COURT:**  Okay.  Does it relate to the depo

2    protocol?

3          **MR. REILLY:**  It does, yes.

4          **THE COURT:**  Okay.

5          **MS. KOUBA:**  Yes.

6                          (Laughter.)

7          **THE COURT:**  Okay.

8          **MR. REILLY:**  Yeah.  Fair question.

9      So Your Honor will recall that on February 27th, we

10   submitted competing protocols, along with a joint statement of

11   the issues on which we couldn't agree.  And since that time,

12   consistent with your prior guidance, we've continued to meet

13   and confer to try to resolve as many issues as possible to

14   bring you here today.

15         And others can correct me where I'm wrong, but I think

16   there's been at least six meet and confers, if not more; and

17   those have also included lead trial counsel, many of which are

18   here today.  I've been a part of each one of those meet and

19   confers, Your Honor, and I can represent they've been extensive

20   and respectful, obviously, which is important in my book.

21         As a result, the parties have narrowed the issues on which

22   we can't agree to just two.  One relates to cross noticing and

23   one relates to the production of custodial files before

24   depositions.  And despite our best efforts, those are the ones

25   in which we need your Court's guidance.

1       And so I think what you have in your hands, although I

2   don't have X-ray vision -- yeah, there we go -- is, I think,

3   maybe the updated deposition protocol that was submitted today

4   from Mr. Krompier.

5       And I think you'll note, Your Honor, that at least

6   helpfully, I think, in my book, there's just one protocol for

7   you to look at, and there's -- the two issues on which I said

8   before, they're highlighted.  I think it's starting on maybe

9   page 10 of Exhibit 1.  And it shows, I think helpfully, kind of

10  what's the plaintiffs' proposal and the defendants' proposal so

11  you don't have to kind of scramble among all the different

12  versions.

13      So just as a brief refresh, that's where we are today.

14          **THE COURT:**  Thank you for the refresh.

15      Thanks.  And I commend you all for meeting and conferring

16  and narrowing the disputes.  I wish you'd told us on Friday so

17  I didn't have to spend the weekend reading all this stuff.  But

18  that's great.  Keep doing that, and, obviously, keep narrowing

19  your disputes.  It's better for you all to work out your

20  differences with each other if you can.

21      Okay.  So do you want to talk about cross-noticed depos

22  first?  Is that the first issue.

23          **MR. REILLY:**  Sure.

24          **MS. KOUBA:**  Sure.  Your Honor, would you like

25  plaintiffs or defendants to go first?

1          **THE COURT:**  Well, let's do plaintiffs, since they're

2     in that order here.

3          **MS. KOUBA:**  Great.  And, also, good afternoon, not

4     good morning.  I apologize.  The travel has my sense of time a

5     little bit out of whack.

6          So, Your Honor, as our colleague across the aisle stated,

7     the parties have worked diligently to try to narrow the

8     disputes as far as we possibly could.  Unfortunately, these

9     last two disputes, we simply couldn't reach agreement on.  And

10    the plaintiffs view them as intertwined.

11         But for the cross-noticing of depositions, plaintiffs see

12    this as an imbalance of prejudice or essential hardship upon

13    the parties.  For the plaintiffs, being forced to cross-notice

14    into a deposition in another jurisdiction in a case that we

15    don't even have an agreed-upon definition of as being

16    related -- even that, the parties have not come to agreement

17    on -- means that plaintiffs' discretion to try the case to the

18    benefit of their plaintiffs, as we are ethically obligated to

19    do, would be taken away from us and put into the hands of other

20    litigations of other plaintiffs and potentially even of the

21    defendants themselves as it regards timing of these

22    depositions, as it regards a host of procedural issues and

23    logistical issues that would be a problem.

24         Plaintiffs may be forced to cross-notice or lose the

25    opportunity to depose a witness in a litigation that's farther

1    along in discovery.  They may have negotiated different search

2    terms or custodians in that litigation.  We may not have access

3    to those files.

4         And that's what I was previewing, that we think these are

5    intertwined, because if we don't have access to those custodial

6    files in advance of the deposition, we're clearly at a

7    disadvantage going in, especially if we're precluded from going

8    back and redeposing that deponent without the benefit of the

9    most important custodial files.

10        So plaintiffs see this as extremely prejudicial to our

11   ability to work up a case in the manner that we see fit and as

12   best for our clients, best for the plaintiffs in what is

13   already a coordinated litigation between the JCCP, the AGs, the

14   various plaintiffs in between, the personal injury plaintiffs

15   and school district plaintiffs and local government entity

16   plaintiffs.

17        Having to add to that the potential of being whisked into

18   another litigation at the whim of another plaintiff that we do

19   not have any kind of coordination agreement with, that we do

20   not have a relationship with, that we do not know the status of

21   their litigation, would put us at a severe disadvantage, given

22   the remedy -- or the result, rather, would be that we simply

23   lose the opportunity to depose that person.

24        The remedy that defendants would have in that situation,

25   if they truly feel it would be too burdensome to have that

1    person deposed again, is what is standard in all multidistrict

2    litigations and even in, I believe, all cases in general, which

3    is to bring to the Court a motion for a protective order.

4         Trying to shift that burden onto the plaintiffs to prove

5    good cause every single time we want to take a deposition that

6    may or may not have been noticed in another litigation, that

7    may or may not have issues that are common to the litigation

8    here is an improper shifting of that burden.

9         And furthermore, Your Honor, we won't have any control of

10   what depositions are coming up first, even.  That could matter

11   greatly.  Even if we have documents and we're going through and

12   trying to determine how we want to use our set number of hours,

13   the 240 hours per defendant allotted by this Court, if we are

14   taken into another jurisdiction under a use-it-or-lose-it

15   provision, as I've been referring to this part of the

16   deposition protocol, then those are hours that we might feel

17   obligated to use that, once we're in that deposition, realize

18   are really not that related, useful, or helpful to the

19   plaintiffs' burden to collect evidence during this discovery

20   phase.

21        **THE COURT:**  Well, okay.  But if it's not helpful, you

22   can just end the deposition.  You haven't used the hours.

23   Right?

24        **MS. KOUBA:**  Certainly, Your Honor.  But I think much

25   more important than that is the obligation that we would have

```
 1    to do this.

 2         I want to reiterate that plaintiffs have told

 3    defendants -- and, hopefully, my colleagues would agree that

 4    this is true and something we've offered -- we certainly will

 5    cross-notice when the deposition is one that we are certain is

 6    a custodian or a witness that we want to take the deposition

 7    of, one that we feel prepared to take based on the documents

 8    produced to date, one that we think is in the best interest of

 9    our clients.  We're certainly not saying that we won't

10    streamline discovery and work with both defendants and

11    plaintiffs, to the extent we can, in another litigation to

12    streamline discovery.

13         But the practical effect of making it a requirement, which

14    I have never seen in any complex litigation in the country --

15    and I did try to run some searches to find an example of when a

16    plaintiff has been required to cross-notice into another

17    litigation that may or may not have some similarities to the

18    one at issue, and I couldn't find one.

19         But aside from how unusual this would be, it also is not

20    actually streamlined at all.  What it's going to do is have the

21    parties back in front of Your Honor commonly, with plaintiffs

22    coming to you with motions to show good cause of why we should

23    now get an opportunity to depose a witness.

24         And even more practically, for instance, if we are whisked

25    into a jurisdiction where this deposition protocol cannot apply
```

1    because there's an existing deposition protocol in that case

2    already where there might be a local rule or law that is

3    already binding the parties in that court, even if all the

4    parties make their best efforts, even just assuming the best of

5    every party involved, what may end up happening is that the

6    laws of that court do not allow plaintiffs to take advantage of

7    the full 12 hours that we're entitled to under Your Honor's

8    ruling for each deposition.

9         It also, practically, will end up that defendants'

10   interest in this, as opposed to plaintiffs' interests that I've

11   touched on briefly, is that they will not have their witnesses

12   deposed multiple times.

13        While we understand that interest, the practical effect of

14   it is that they will still be deposed for multiple days in most

15   cases and in most scenarios.  Even if the questioning is not

16   duplicative -- and we certainly wouldn't intend for it to be --

17   the amount of time allocated to MDL and JCCP plaintiffs under

18   Your Honor's orders is 12 full hours.  With the agreement that

19   the parties have come to regarding adjournment at seven hours

20   if the deponent would so wish or even if we do push through,

21   considering that we would also have to consider the interests

22   of the party who noticed the deposition in the first place in

23   the foreign jurisdiction, I can't imagine a scenario in most

24   cases where we would be able to complete that deposition with

25   direct and redirect, cross and recross of multiple parties in

1    one day.

2        Defendants are essentially asking for the Court to ensure

3    that their witnesses are not deposed multiple times, but what

4    they really mean is that they will be deposed multiple times,

5    simply in -- simply in days that follow one another, sequential

6    days.

7        And the amount of burden that defendants are bringing up

8    with that problem is not nearly as related to the prejudice

9    that plaintiffs would suffer if we were forced to try our case

10   on another jurisdiction's terms.

11       This MDL and JCCP consolidated litigation represents far

12   and away the most plaintiffs with the greatest interest against

13   social media companies in the country.  We have 35 state

14   Attorneys General.  We have California plaintiffs and federal

15   plaintiffs.  Within those, we have the categories of

16   plaintiffs, including personal injury, school district, local

17   government entities.

18       We have all worked together well to make sure we're not

19   duplicating testimony.  But throwing in another foreign

20   jurisdiction that, without a definition of a related case, we

21   don't even know will be particularly related -- I think we've

22   been working under the circumstances that it might be an

23   Attorney General case that sends the initial deposition notice

24   that plaintiffs would be forced to cross-notice into.

25       Some of those cases may align well with our strategy of

1    the case and may align well with the witnesses we want to take.

2    And in that instance, we would certainly cross-notice into that

3    litigation and work to the best of our ability to make sure

4    that we don't duplicate efforts.

5        In other cases, the claims at issue are very different

6    from those in this case.  That's why the plaintiffs in the

7    state cases chose to remain in their own jurisdictions and not

8    join the MDL.

9        In other cases, it may not be a state Attorney General at

10   all.  It may be a personal injury case that shares very little

11   in common with the cases at issue here except that the

12   defendants are common.  And going into that sort of litigation

13   puts plaintiffs in the MDL and JCCP at an even greater

14   disadvantage because the questioning in that litigation may be

15   almost entirely unrelated to the line of questioning that we

16   would like to pursue to represent our clients.

17       **THE COURT:**  But in that case, it's likely you would

18   choose not to cross-notice then.  Right?

19       **MS. KOUBA:**  Well, Your Honor, it may be that the

20   witness is important to our case and we would choose to not

21   cross-notice and then lose our opportunity entirely to depose

22   that witness based under defendants' proposed language.

23       **THE COURT:**  All right.  Let me hear from the

24   defendants.

25       **MR. CHAPUT:**  Thank you, Your Honor.

1          What I hear opposing counsel saying is they want,

2     effectively, unfettered ability to redo depositions *seriatim*

3     with -- even though witnesses are going to be deposed in other

4     litigations across the country that are highly related to this

5     action.

6          What defendants are asking for is a relatively commonsense

7     suggestion that if plaintiffs elect not to cross-notice a

8     deposition when they have the opportunity to do so, that while

9     the -- that deposition won't eat into their time limits, but

10    they also would need to show good cause in order to bring that

11    witness in for a second deposition.

12         This is an entirely fair compromise because it encourages

13    all parties to be efficient.  It gives plaintiffs the

14    opportunity to depose any of the defendants' employees who are

15    deposed in other actions without requiring the waste and the

16    undue burden that would result from duplicative depositions of

17    defendants' employees in multiple litigations.

18         Counsel referenced that perhaps there would be an instance

19    where they would be unable to adequately represent their

20    clients as a result of some rules that may exist in other

21    jurisdictions.  I'm not sure what specific rules counsel is

22    referring to, but that, to me, sounds like it would most likely

23    give rise to good cause that they would be able to redepose the

24    witness if they truly could not adequately represent their

25    clients.

1    The same goes with respect to the lack of custodial files.

2  If there were an individual who was a custodian in this

3  litigation and plaintiffs here had not yet received a

4  production of their custodial files, it most likely would

5  similarly be good cause to -- for them to be able to depose

6  that individual again in the future.

7    And I don't think that what defendants are proposing would

8  lead to a host of disputes over whether there was good cause.

9  I think that all counsel would, again, seek to work together

10  cooperatively to make sure that plaintiffs had the information

11  they needed in order to progress efficiently.

12    Unless Your Honor has any questions, I think that's all I

13  have for now.

14    **THE COURT:**  What's the harm in having the parties meet

15  and confer and come up with a list of what you all consider to

16  be the related actions?  What's the barrier to that?

17    **MR. CHAPUT:**  I don't believe there is any barrier,

18  Your Honor.  I think, actually, the parties are working

19  cooperatively to attempt to do that in the -- in connection

20  with the privilege log protocol already.  So I would think that

21  the two lists would probably be the same across the two

22  protocols.

23    **THE COURT:**  So I'm going to order you to attach to the

24  depo protocol the list of cases that you consider both parties

25  can agree are, quote, related actions for purposes of the

1    deposition protocol.  Okay?

2            **MR. CHAPUT:**  (Nods head.)

3            **THE COURT:**  And you can always -- if a new case gets

4    filed or something comes up, the defendants know who's suing

5    them.  Right?  So, presumably, you would know better than

6    anybody else what you think are, quote, related cases.

7        So, for example, if it's a completely tangential,

8    unrelated -- I don't know -- a patent case -- I mean,

9    presumably, you know what you think is a related case.  You can

10   talk about it and put it on the list.  And if you need to amend

11   it, you'll certainly be expected to do that as the case goes

12   on.  So at least we've cabined and identified from what other

13   cases these other notices can arise from.

14       So I'm going to order that as part of -- and attach it as

15   an appendix to the depo protocol.

16       Any questions on that?

17           **MR. CHAPUT:**  No questions, Your Honor.

18           **MS. KOUBA:**  Not on that, Your Honor.

19           **THE COURT:**  Okay.  Any objection to doing that?

20   I think it's a reasonable way to solve that issue.

21       Okay.  Secondly, whether it's a motion for good cause to

22   take a deposition later or a motion for a protective order,

23   essentially the issue gets teed up for me.  I've got to decide

24   one way or the other.

25       Those types of issues don't really get decided primarily

1    on who has the burden of proof.  So while I take plaintiffs'

2    point on the procedural posture of how that would get teed up

3    to me, at the end of the day, if there's a reasonable grounds

4    for having to take somebody's deposition that was not taken

5    when it was first noticed -- well let me ask you this:  Of the

6    known related actions, other state AGs, how many of them are so

7    advanced that you're going to get depo notices in the next

8    month or two?

9          **MS. KOUBA:**  Well, Your Honor, I'm sure that defendants

10   would have greater knowledge of that, as you mentioned before.

11   But it is our understanding that some of those cases are ahead

12   of us, for lack of better terms, in moving into discovery.  But

13   I will defer to defendants if that's incorrect.

14        But the real issue here is that no matter where they are

15   in discovery, they may be able to issue deposition notices,

16   have documents that we don't have access to.  If it's filed

17   tomorrow, it could be a jurisdiction that moves incredibly

18   quickly and sets a schedule that's ahead.  And really what's at

19   stake here is a vast departure from what is standard procedure

20   in any of these cases, which is that plaintiffs should be

21   entitled to pick what witnesses they'd like to depose and when

22   and not be at the whim of another litigation, no matter how

23   related.

24         **THE COURT:**  Okay.  Kind of goes to the custodial files

25   issue, which I'll address in a second.

1      On this point, let's assume you get notice that somebody

2    else has noticed some witness's deposition.  Is 21 days not

3    enough time to figure out how related that case is and whether

4    that's somebody you want to depose?

5           MS. KOUBA:  No, Your Honor, unfortunately not -- it

6    isn't *de facto* enough time.  And by that, I mean there may be

7    cases in which we have indicated we will be happy to

8    cross-notice in.  This is not a blanket refusal to

9    cross-notice.  And if we have enough information to make that

10   informed decision, we certainly will work to do so.

11      We also don't want to use up all of our hours on a

12   deposition that may be beneficial to plaintiffs to cross-notice

13   and work well with other plaintiffs to minimize the amount of

14   hours we're using.  We are already incentivized to do that.

15   But if we don't have the option, if we must cross-notice in or

16   lose the --

17           THE COURT:  I'm not going to grant a waiver, so you're

18   not going to -- it's not use-it-or-lose-it.  Okay?

19           MS. KOUBA:  Okay.

20           THE COURT:  I saw in defendants' initial proposal it

21   was a complete waiver.  They backed off from that.  I saw the

22   proposal from this morning.  Essentially, it's a secondary

23   procedure where you have the right to seek to depose the person

24   who you chose not to earlier if you can show good cause,

25   according to their proposal.  Right?

1          **MS. KOUBA:**  Understood, Your Honor.

2          **THE COURT:**  So it's not a use-it-or-lose-it situation.

3    I was not going to grant them a waiver provision anyway.

4    Right?  So you're not at risk of that.

5          **MS. KOUBA:**  Understood, Your Honor.  And I will move

6    on from that point but simply say that we believe that that is

7    still causing unnecessary delay and it's a departure from the

8    usual way that things are done, which is for defendants to seek

9    a protective order for a deposition they believe is infringing

10   on the rights of one of their witnesses that is within their

11   control.

12         **THE COURT:**  Again, procedurally --

13         **MS. KOUBA:**  That said --

14         **THE COURT:**  Okay.  Procedurally, whether it's a motion

15   for a protective order by one side or a motion, essentially,

16   for leave to take a deposition for the other, it's still the

17   same argument.  Regardless of how it's teed up, it's going to

18   be the same arguments on both sides, isn't it?  I mean, you're

19   not going to argue something markedly different why you need to

20   take the deposition even in response to a motion for a

21   protective order.

22         **MS. KOUBA:**  Well, Your Honor, it just -- I understand

23   your concern, and I understand that it would be arguments that

24   are similar each time.  But this is the part of the litigation

25   we are supposed to be able to drive.  This is the part that we

1    are supposed to be able to depose the witnesses that we believe

2    will provide relevant evidence to prove our case.

3         Pushing that burden onto plaintiffs -- and understanding

4    what Your Honor is saying, that we would have to respond either

5    way to a protective order -- is still unfair.  It's still

6    putting the initial burden onto plaintiffs to show why we

7    should be able to depose a witness when that should be just the

8    *de facto* rule, that we should be able to depose a witness that

9    we believe has discoverable evidence relevant to our case to

10   prove our case.  And having to take the extra step initially on

11   the plaintiff side is unfair.

12        But to answer your initial question, which I apologize for

13   getting sidetracked down that rabbit hole, but to answer your

14   initial question of why 21 days isn't enough is because it will

15   simply depend upon the circumstances.  As I said, in some

16   circumstances it will be enough and we'll happily cross-notice

17   in.  But in circumstances that, unfortunately, we anticipate

18   will arise, based on the amount of documents we've gotten so

19   far, based on the lack of clarity of what other litigations are

20   pending and where they are in discovery and all of those other

21   variables that are out of our control, we may not be in a

22   position to even assess if this is a person that we will want

23   to take a deposition of.  And if we lean towards thinking it is

24   but we don't have the documents to support it, that's a waste

25   of everyone's time.

1          **THE COURT:**  Well, let me stop you there.

2      Making the decision on whether or not you want to depose

3   them is different from scheduling when the deposition is going

4   to be taken.

5          **MS. KOUBA:**  Certainly, Your Honor, I agree.

6          **THE COURT:**  I assume the parties are going to

7   cooperate -- if you are going to cross-notice a depo, you're

8   going to cooperate in scheduling it so that the custodial files

9   and documents are produced to your satisfaction before you can

10  take it.  And you can try to negotiate with the counsel in the

11  other case on that scheduling; and if they refuse or if

12  the Court in that other -- why isn't that good cause to come to

13  me later?

14         **MS. KOUBA:**  Your Honor, I agree.  We have no control

15  over the plaintiffs in the other litigation.  That would be the

16  biggest stumbling block.  But the -- or maybe second biggest

17  because I think perhaps the biggest stumbling block is we have

18  not yet gotten defendants to represent that they will provide

19  those documents prior to substantial completion of discovery,

20  which the date is currently in September.

21         **THE COURT:**  Let's move to that.  Okay.  So I've seen

22  the arguments and all that on the custodial files.

23         **MR. CHAPUT:**  Your Honor -- I apologize.  If I may,

24  very briefly.

25      Your Honor asked a question about other related

1    proceedings and whether there are depositions that have been

2    noticed.

3         Just to give Your Honor that answer, if I may, only one

4    deposition has been schedule to date in any related case

5    involving Meta; and Meta opted not to cross-notice that

6    particular deposition because we felt that it was too early in

7    discovery in this case to fairly expect plaintiffs to

8    participate in that deposition.

9         There are some additional deposition dates that have been

10   requested of Meta, and we have not yet determined whether to

11   ask plaintiffs or encourage them to cross-notice those

12   depositions.

13        **THE COURT:**  Okay.  All right.  So this goes to

14   custodial files, and I think it helps, hopefully, to address

15   some of the issues here on the cross-noticed depositions.

16        I've seen the arguments on timing and all this.  Reading

17   kind of between the lines of the proposals and all that, it

18   seems to me that people are going to be waiting way too long to

19   start talking about scheduling depositions for my comfort.  So

20   here's what I'm going to do.

21        Starting with next month's DMC -- that is the April DMC --

22   I want you to attach to your DMC status report a chart.

23   All right?  And the chart is going to say -- either side, I

24   want you to put the names, titles, companies, contact

25   information, if known, of the person/persons you reasonably

1   expect to depose in your case or cases -- all right? -- without

2   serving a notice yet.  All right?  So if there are people you

3   already know you think you're going to depose, put them on the

4   chart list.

5       The chart should also be updated every month for every DMC

6   status report.  Okay?  And prior to preparing each status

7   report each month, the parties are ordered to meet and confer

8   to discuss scheduling those depositions or the depositions of

9   those people identified in the chart, at a minimum, and any

10  others.  Okay?

11      And setting dates for those -- you can set the dates for

12  the depositions after September; you can set them before

13  December -- September; or you can set them any time in the fact

14  discovery period.  But I want you to start scheduling and start

15  the scheduling discussion soon so that you -- what I don't want

16  to see is depo notices being sent out in September and October

17  and then people come back to me and say, "Oh, there's no time,"

18  or "We have to quadruple track."  All right?

19      I know there's a universe of people both sides know this

20  month, next month, the next couple of months, who they're

21  probably going to depose, and I want you to start talking about

22  that in an organized way, and I want to see status reports on

23  that in a form of a chart every month.  And I'm going to start

24  asking questions if you're not moving forward on that.

25  All right?

1          **MS. KOUBA:**  Your Honor, may -- oh, I'm sorry.  You may

2    be covering this.

3          **THE COURT:**  I'm not done.  Okay?

4       So the chart should include a column that identifies the

5    date that the person was identified to the other side as

6    somebody you want to depose.  All right?  And then a different

7    column that has the actual date agreed to for deposing that

8    person or persons.  All right?

9       As soon as a person is identified on that chart, the party

10   defending that person has, presumptively, 60 days from the date

11   of identification to produce their custodial files.  All right?

12   60 days should be more than enough to find the custodial files

13   of identified persons.  All right?

14      You can always reach agreement on extending that deadline

15   on an individualized basis if it's someone who has just a huge

16   amount of files or a huge amount of documents or however you

17   want to reach agreement on it.

18      You can also -- if you really need to, the party who would

19   be producing the files can come to me and ask for an extension

20   of time if you can't reach agreement on that, but you better

21   have a good reason why, because I think 60 days is more than

22   enough, given all the representations that have been given

23   about people working on collecting documents.  Okay?

24      The chart should also include a column that tells whether

25   that person's custodial files have been produced or not --

1    all right? -- and the date of production.

2        And I'm going to give you some incentives now.  All right.

3    If a party -- let me ask it this way:  Has anybody started

4    noticing any depositions?  Have you started talking about

5    scheduling any depositions?

6        **MS. KOUBA:**  Yes, Your Honor, but only as to 30(b)(6)

7    topics at this time.

8        **THE COURT:**  Okay.  So I'm going to incentivize you to

9    start identifying individuals to start that scheduling

10   discussion.  Okay?

11       For any persons who are identified before the next DMC, by

12   April 22nd, the deposing party gets an extra hour of depo for

13   that person, and it doesn't count against their time limits.

14       For witnesses -- and this goes both ways.  All right?

15       For witnesses identified by the DMC in May, May 10th, you

16   get an extra 45 minutes.  Again, it doesn't count against your

17   depo time.

18       And for witnesses identified by June -- the June DMC -- I

19   forgot the date of that -- the deposing party gets an extra

20   30 minutes.  Okay?

21       So hour, 45, 30 minutes over the next three months.

22       All right.  And then once you've reached the agreed-upon

23   date and all that, you can actually issue the depo notice.

24       This should, I think, resolve most of your concerns about

25   cross-noticed depositions because you'll have that time.

 1          And I'm going to tell you right now, if the parties in

 2     that other case won't agree with you on scheduling and won't

 3     agree with you on time limits and whatever, I'm here to be

 4     reasonable and give you -- I think I already heard that that's

 5     probably good cause for you to take the deposition at a later

 6     date.

 7          **MS. KOUBA:**  Your Honor, may I ask two clarifying

 8     questions?

 9          **THE COURT:**  Sure.

10          **MS. KOUBA:**  The first is, in the chart that you are

11     anticipating for the parties, I was trying to write down as you

12     were going, but I wanted to clarify.  Part of what will aid

13     plaintiffs immensely in choosing which folks we think are most

14     important to depose is general document production.

15          Will we also have a column updating Your Honor on what

16     documents have been produced?  Because depending on the

17     defendant, we have zero documents to work off of at this point.

18          **THE COURT:**  I think the DMC status report generally

19     talks about the status of discovery.  I think you can handle it

20     there.  You don't need to go person by person at that point in

21     the chart.

22          **MS. KOUBA:**  Correct, Your Honor.  I didn't mean person

23     by person.  I just meant to show if, for instance, we have many

24     fewer names that we can produce for a certain party because we

25     haven't received any actual substantive production of documents

1    yet.  Your Honor would understand the position we would be in

2    if we were shooting in the dark, so to say, on what employees

3    would be important to depose.

4         THE COURT:  You can certainly put in the status report

5    the status of receipt of documents in the discovery section.

6    You can certainly do that.

7         But part of the reason for giving you the incentives is,

8    if there are people who you know now or you'll know between now

9    and June who you probably want to depose, let's get you

10    started.  All right?

11         MS. KOUBA:  Yes, Your Honor.  And I'm not going to

12    derail us into topics that will come up on Thursday, but part

13    of the issue with that, particularly for YouTube and Snapchat,

14    is that we don't have significant documents at all from either

15    of those defendants.  So any people we might want to depose are

16    truly shots in the dark.  We simply don't know at this point.

17    It would be based off initial disclosures, which we also have

18    flagged were very few from all defendants, just a handful.

19         THE COURT:  Don't anticipate you're going to identify

20    every witness this month.  So the reason I've phased the

21    incentives is my recognition, realistically, that there are

22    going to be people you add to the chart as the process goes on.

23    But what I don't want to have happen is suddenly both sides to

24    exchange 200 depo notices in July.

25         MS. KOUBA:  Understood.

1          **THE COURT:**  That's too chaotic.

2      So let's start it now.  Let's do it in an organized way.

3  And, of course, the chart will get updated every month.  Okay?

4          **MS. KOUBA:**  Understood.

5          **THE COURT:**  And if it's somebody who you don't have

6  the documents for and you only found out their name in July,

7  well that's why we have a fact discovery period.  Right?

8          **MS. KOUBA:**  Thank you, Your Honor.

9          **THE COURT:**  The point is, I don't want you holding

10  back names now.

11          **MS. KOUBA:**  Absolutely understood.

12          **THE COURT:**  Okay?

13          **MS. TESHUVA:**  May I be heard, Your Honor?

14          **THE COURT:**  Sure.

15          **MS. TESHUVA:**  Hi.  Ariel Teshuva from Munger, Tolles &

16  Olson representing defendant Snap.  So I'd like to address two

17  points.

18      First, with respect to the timing of the incentives,

19  because bellwethers will not be selected until April,

20  defendants are not going to be in a position to start

21  identifying what witnesses they want to depose on the plaintiff

22  side until May.  So the incentives are a bit lopsided as

23  Your Honor has laid them up right now, just given the timing of

24  when defendants will be in a position to start investigating

25  and identifying witnesses for deposition in the bellwether

1  cases.

2          **THE COURT:**  There are no individuals, no witnesses?

3  You've done no investigation as to who potential witnesses are

4  on the defense side?

5          **MS. TESHUVA:**  We have not had the opportunity to do so

6  because we're not getting plaintiff fact sheets until,

7  I believe, the end of this month.

8          **THE COURT:**  Besides the bellwether plaintiffs, are

9  there no other people out there in the world who you want to

10  depose?

11          **MS. TESHUVA:**  Not that I am aware of, standing here.

12  We need to know who the bellwether plaintiffs are.  We need to

13  investigate their cases.  We need to know who plaintiffs'

14  experts are.

15          **THE COURT:**  Well, the timing works the way it works

16  partly because I think your side has argued that discovery is

17  somewhat unbalanced here because you're corporations; you have

18  lots more people working for you and you probably have more

19  people who are going to get deposed than an individual

20  plaintiff in an individual case.

21      So part of the incentive helping you out is finding out

22  from the plaintiffs who they want to depose sooner rather than

23  later.

24          **MS. TESHUVA:**  I agree with you that it would be great

25  to know sooner rather than later, but in terms of the --

1          **THE COURT:**  It will be great.

2          **MS. TESHUVA:**  In terms of the incentives of adding

3     extra deposition hours, it seems unfair to me to incentivize it

4     starting now, given that we're not in a position to even start

5     identifying witnesses until next month.

6          **THE COURT:**  You know, it is what it is.  And if the

7     incentives fall slightly differently, it's the difference

8     between an hour and 45 minutes if you get it by May.  So I'm

9     not going to change that.

10          **MS. TESHUVA:**  Okay.  And then with respect to -- with

11    respect to the overall custodial file issues, I do just want to

12    make a brief point about why 60 days, while it sounds like a

13    lot, is actually not a lot in the context of this kind of

14    document review.

15          And the reason why is that when we review documents -- at

16    least speaking for defendant Snap and what I understand to be

17    the best practices -- we don't review them by custodian.

18    Typically, we collect the documents for everybody; we

19    de-duplicate them against one another; and then we review them

20    chronologically.

21          And the reason why is that that is the most efficient for

22    a variety of reasons, including because it allows reviewers to

23    look at similar documents at the same time.  It makes privilege

24    review more efficient.  There's a lot of reasons overall to do

25    it that way.

1    If we are ordered to reprioritize deposition- -- the

2  review of custodial files based on when plaintiffs identify who

3  they want to depose, that requires us to kind of, at a moment's

4  notice, every DMC, be redoing the document review, which,

5  again, sounds easy until you try to do it, and then it gets

6  very, very difficult.  Because documents have to go through

7  several passive reviews; it takes a long time just to shift

8  documents from one path to another.

9    So while I understand and, instinctively, you hear

10  60 days, it sounds like a long time, in the world of complex

11  document review, it is actually not a long time at all.

12    And what I would submit is that, given that we have so

13  little time between now and the substantial completion

14  deadline, it's most efficient for everybody for us to do

15  document review in the way that gets it done fastest.  And the

16  way to get it done fastest is to do what we normally do, which

17  is to review chronologically using de-duplication for

18  efficiency.

19    **THE COURT:**  I heard representations from your side

20  that the defendants have already started collecting and

21  reviewing documents.  You already have documents in the

22  process.  It's very easy, I know, through relativity to figure

23  out who the custodians are for each of those documents.

24    And you can certainly sort and figure out which documents

25  have already been through the review process and at least

1   produce those from those custodial files.  Right?  And if

2   there's more out there that haven't, it's not that hard.

3       I've done document production as an associate and as a

4   partner.  It's not as hard as you're saying it is.  60 days is

5   more than enough.

6           **MS. TESHUVA:**  And, again, respectfully --

7           **THE COURT:**  And I said if you really, really need more

8   time and you have good cause, you can come to me and say:  We

9   need an extension of time.

10          **MS. TESHUVA:**  To the extent -- you know, if we have to

11  do it the other way, to the extent that plaintiffs ask us where

12  we are in the process of document production or come to us and

13  say, "Okay.  We want to depose this witness in June.  Can you

14  go get us, you know, this document that they authored?" I

15  think, at least speaking for Snap, we would definitely be

16  willing to do that.

17      But in terms of structuring the entire overall document

18  review to sequence it based on the timing of depositions, I can

19  guarantee it will result in a loss of efficiency.

20          **THE COURT:**  All I said was you have to produce the

21  custodial file within 60 days of the witness being identified.

22  When you schedule the actual deposition being held, that's

23  divorced from that.  You can set the schedule for October, or

24  you can actually do the deposition later.  All right?

25      But you need to get the custodial files out in an orderly

1   fashion, because what's going to happen is, if you don't start

2   getting the custodial files out starting at least in June,

3   we're going to -- it's the same problem as too many depo

4   notices getting served in September.  All right.

5       And part of my goal is to make sure this train runs not

6   only on time, but efficiently and quickly; and if it requires

7   the defendants to reorganize whoever their review teams are to

8   accommodate this, I know your vendors can do that.

9       **MS. TESHUVA:**  Understood, Your Honor.

10      With respect to the number of witnesses to be deposed and

11  the incentives, I do just want to revisit one more point, which

12  is, as I understand Your Honor's plan to be is if plaintiffs

13  depose 50 -- tell us that they want to depose 50 extra people,

14  that means that they get 50 extra hours.

15      And I don't hear anything --

16      **THE COURT:**  They have the total number of hours that

17  they have that I gave -- I'm not adding -- I mean, if they

18  notice too many depositions, they're going to use up all their

19  time.  Right?  So it's not 50 extra people.

20      **MS. TESHUVA:**  Well, would -- by putting somebody on

21  the chart, is that a commitment for -- would that require some

22  sort of commitment from plaintiffs that this is somebody that

23  they in good faith actually plan to depose?  Or --

24      **THE COURT:**  Yes.

25      **MS. TESHUVA:**  Okay.

1        **MS. KOUBA:**  Yes, Your Honor, if I could just chime in

2   there.  It absolutely would be someone in good faith that we

3   plan to depose.

4        But I just want to clarify that if something in our

5   discovery review changes our mind on that, we wouldn't be

6   penalized for dropping someone from a chart.

7        **THE COURT:**  Don't abuse that.  If I get -- from the

8   defense side, if I get the indication that you're overloading

9   the chart in order to just burden them and you withdraw even

10  more than 10 percent of the people you put on the list, I'm

11  going to look very negatively on that.

12       **MS. KOUBA:**  Understood, Your Honor.

13       **THE COURT:**  Don't abuse the charting process.  All

14  right?

15       **MS. KOUBA:**  We'd have no intention to.

16       **THE COURT:**  Okay.  So anybody you put on the chart --

17  goes both ways -- right? -- you are representing to me these

18  are people you do actually intend in good faith to depose, and

19  you better have a good reason for taking them off the chart

20  later.

21       **MS. KOUBA:**  Understood, Your Honor.

22       **MR. CHAPUT:**  Apologies, Your Honor.  May I just seek

23  one point of clarification?

24       **THE COURT:**  Sure.

25       **MR. CHAPUT:**  I just want to make sure I heard

1    Your Honor correctly, which is that the additional hour that

2    plaintiffs are getting would expand, for example, a deposition

3    from 12 hours to 13 hours; but it would not expand the overall

4    time limit they have to work with from 240 to 241.  Am I

5    understanding Your Honor correctly?

6         **THE COURT:**  Effectively, they're getting the

7    extra hour, but that extra hour doesn't detract from their

8    overall time limit, if you understand what I'm saying.

9         **MR. CHAPUT:**  So --

10        **THE COURT:**  In other words, it's as if they've taken a

11   12-hour deposition, even though it's 13.  So when you're

12   subtracting from their total, you don't subtract 13 hours.

13        **MR. CHAPUT:**  So I think the concern that my colleague

14   was raising still applies, which is that if plaintiffs were to

15   put 100 people on the list they provide in April, they would

16   get 340 hours of deposition time at that point instead of the

17   240-hour limit that Your Honor has already set.

18        **THE COURT:**  Do you really think they're going to take

19   an extra hour of deposition with every single witness?  I doubt

20   it.  I mean, 12 hours is a long time.

21        **MR. CHAPUT:**  It is a long time, Your Honor.  However,

22   this -- it would be a very significant departure from

23   Your Honor's prior ruling on the deposition limits; and so --

24        **THE COURT:**  Again -- well, do you have an estimate now

25   of who you would put on the list for April, how many?

1          **MS. KOUBA:**  I don't know how many, Your Honor; but

2     certainly not a hundred.  And I promise both Your Honor and

3     defendants that we are not going to do 100 depositions at an

4     hour extra to artificially inflate those numbers.  I don't

5     think we could.

6          **THE COURT:**  Again, the risk that you're posing --

7     again, you can come back to me if they put a hundred

8     depositions on the list in April -- which I think it'd be

9     great, which means that they're telling me that in good faith

10    these are the hundred people they plan to depose.  That's

11    probably going to use up most of their time.  You should be

12    happy about that because it limits the number of depositions

13    you think you're going to have to defend down the line.

14         **MR. CHAPUT:**  And just so I'm sure I'm understanding

15    how this provision would work in practice, if plaintiffs were

16    to take, say, a six-hour deposition, that six-hour deposition

17    would still count as six hours against their limit; correct?

18    The extra hour only kicks in to the extent they are exceeding

19    12 hours with a particular witness?

20         **THE COURT:**  Exactly.

21         **MR. CHAPUT:**  Has Your Honor perhaps considered having

22    some sort of cap on the number of witnesses that plaintiffs can

23    add to the list each month during the period where they have

24    this incentive so that we don't end up in a situation where,

25    for example, we're arguing that, you know, 50 witnesses for one

1    defendant is too many to get this extra hour of time with?

2        **THE COURT:**  I mean, if they plan on deposing 50

3    witnesses from a company, they're going to depose 50 witnesses

4    from that company.  I don't think the incentive is going to

5    cause them to add people to the list.  Do you?

6        **MS. KOUBA:**  That's correct, Your Honor.

7        If I may just interject, I also think it would go against

8    the previous ruling, which did not limit us to a set number of

9    depositions but, rather, efficient use of an hours' total.

10       We are not -- we have zero intention of abusing that; and

11   already, if we are having to cross-notice into depositions in

12   other litigations, that's unlikely to be 12 hours there.  It

13   may have to be under certain circumstances and may have to go

14   to 13.  It will incentivize us, likely, to choose the folks

15   that we are most certain we will have to depose in this

16   litigation, and some of those people may be important enough

17   that they will be longer depositions.

18       But we're not going to scour the Internet for people that

19   we don't know anything about simply to run up the tab of

20   depositions.  Our hours are still at risk here.

21       **MR. CHAPUT:**  So -- apologies, Your Honor.  Go ahead.

22       **THE COURT:**  Okay.  So if, in a given month, the DMC

23   chart gets expanded to such an extent that a defendant or a

24   plaintiff thinks that there's some unforeseen burden that's

25   arisen because of it, you can raise it with me at the DMC.

1          **MR. CHAPUT:**  Thank you, Your Honor.

2          **THE COURT:**  But the issue you're raising is a

3   hypothetical.  We don't know if it's ever going to happen.

4          **MR. CHAPUT:**  Thank you, Your Honor.

5          **MS. TESHUVA:**  Your Honor, if I may just be heard on

6   one point briefly.

7          **THE COURT:**  Sure.

8          **MS. TESHUVA:**  Given the issue that I was raising

9   earlier about the timing of bellwether selection and the PFS

10  process, would Your Honor be willing to have the one-hour

11  incentive start the first time that a party names witnesses to

12  be deposed in a DMC?

13      So for plaintiffs, it would presumably be the next one.

14  For defendants, it would be the one after that.

15         **THE COURT:**  I don't understand the request.

16         **MS. TESHUVA:**  The request is, essentially, if

17  defendants name witnesses to be deposed on the plaintiff side

18  for the first time in May, we would request that we get the

19  one-hour incentive rather than the 45 minutes, just because

20  we're not in a position to begin naming witnesses until that

21  DMC.

22         **THE COURT:**  Any objection --

23         **MS. KOUBA:**  May I respond?

24         **THE COURT:**  Any objection to that?

25         **MS. KOUBA:**  I do think that the -- each side is not

1  getting exactly what they want here, and that's the nature of

2  this litigation.

3       I think there are still people that they could identify to

4  depose.  Each side, I anticipate -- because we have discussed

5  this -- will want to depose third parties, and they'll be the

6  noticing party on that.

7       And bellwethers are, frankly, just so different from what

8  we are talking about in this scenario with these large

9  corporations and tons of defendants.  That's why we have very

10  different restrictions, in the first place, on the amount of

11  hours.  It's why we have restrictions on how long a deposition

12  could go.

13       I would certainly hope that defendants wouldn't use this

14  to expand the amount of time, for instance, that a minor could

15  be deposed or that a treating provider could be proposed [sic].

16  There would just be a myriad of issues in treating them exactly

17  apples for apples.

18       **THE COURT:**  I tell you what.  I'll do this:  I'll

19  change the deadlines for identifying.  So you get the hour if

20  they're identified on or before the last day of April, which

21  I think is April 30th.  All right.  Gives you more time.  And

22  then you get the 45 minutes if it's the last day of May, which

23  is the 31st; and then you get the extra 30 minutes for the last

24  day of June, which is the 30th.

25       **MR. REILLY:**  Hi, Your Honor.  Patrick Reilly for the

1   TikTok defendants.

2        Is it possible to still retain the spirit of what you're

3   doing and maybe have a cap for both sides if, like -- for

4   instance, ten extra hours or something, five or ten extra

5   hours, so that, again, we're still meeting within the incentive

6   of trying to add and identify as many people as possible now,

7   but not going to the burden of what we talked about where we're

8   essentially expanding, you know, 240 hours into 290 hours or

9   300 hours, et cetera?  Or at least perhaps consider it for this

10  first instance, see how it goes.  And then we can always

11  revisit that.

12       **THE COURT:**  Well, why don't we see how it goes, and

13  you can report to me at the next DMC.

14       **MR. REILLY:**  Could we have the cap on there first and

15  then see how it goes?

16       **THE COURT:**  That's the whole point about seeing how it

17  goes.

18       **MR. REILLY:**  Okay.  So is there an ability, then, to

19  readjust after we see how things go?

20       **THE COURT:**  The Court is always free to reconsider its

21  own orders.  So, yes.

22       **MR. REILLY:**  Okay.  Thank you.

23       **THE COURT:**  So if you come to me and say "This is

24  totally not working and here are the eight gazillion reasons"

25  and they agree, then, I'm a reasonable man.

1    **MS. KOUBA:**  Your Honor, I see there's a line, so I
2  don't want to jump ahead.  But if I may be very briefly heard
3  on just a point of clarification.
4        **THE COURT:**  Sure.
5        **MS. KOUBA:**  I did just want to reiterate that,
6  particularly for minors, that set limit of a shorter amount of
7  hours, three hours or four hours, depending, I believe, without
8  looking back at Your Honor's order, I would hope that that
9  amount of time would not be increased by defendants identifying
10  them earlier, considering that bellwether plaintiffs are going
11  to be deposed no matter what anyway.  There's actually no
12  benefit in identifying them as someone to have their deposition
13  taken.  They're certainly going to have their deposition taken.
14        **THE COURT:**  No.  They get the extra hour.  I mean, the
15  whole point is to start giving you incentives to start
16  scheduling now.  All right?  And what I don't want is for them
17  to name and issue the depo notice for bellwethers in October.
18  That's not going to happen.
19        **MS. KOUBA:**  I understand, Your Honor.  I would even be
20  happy to give that hour to another non-minor plaintiff or
21  non-minor family member or friend.  I'm actually not trying to
22  be difficult here.  I just -- I hate to subject a minor
23  plaintiff, who may be 14, 15, 16 years old, to extra deposition
24  time to incentivize defendants to put them down first.
25        **THE COURT:**  Well, I don't know.

1    Defendants okay with swapping out an hour from a minor to

2    somebody else?

3        **MS. SIMONSEN:**  I think it may be premature to address,

4    since we don't even know what the ages of the bellwether

5    plaintiffs are going to be.  It could be that we don't have

6    plaintiffs that currently are minors by the time we get our

7    bellwether plaintiffs.

8        I will tell you that I don't think we have any intention

9    of trying to put a minor plaintiff up for deposition any longer

10   than the limit that we already negotiated.  I do think that the

11   incentive should apply for us if there's a particular

12   bellwether plaintiff where there's a reason that we would like

13   that extra hour.  You know, I think we want to think really

14   hard about it, but there's a possibility that we'd want to put

15   them on a list early.  But I think we can probably revisit this

16   once we know who the bellwether plaintiffs are.

17   (Stenographer interrupts for clarification of the record.)

18       **MS. SIMONSEN:**  Ashley Simonsen, Covington & Burling,

19   for the Meta defendants.

20       **THE COURT:**  Actually, that's the same point I made.

21   What you pointed out is a hypothetical.  We don't really know

22   who the bellwethers are and how many of them are going to be

23   minors and how many of them for which an extra hour could be an

24   issue or not.

25       You're certainly free to reach a swap deal.  Right?  And

1    so I would encourage you to work things out if it's a minor

2    especially.

3            MS. KOUBA:  Understood, Your Honor.

4            MS. SIMONSEN:  And I just did have one point of

5    clarification.

6            THE COURT:  Sure.

7            MS. SIMONSEN:  Understanding that Your Honor is trying

8    to incentivize the parties to notice depositions or identify

9    potential deponents early so that they can then be --

10           THE COURT:  Actual deponents.

11           MS. SIMONSEN:  -- actual deponents so that they can

12   then presumably be scheduled early, is there any sort of

13   requirement that if a certain number of individuals is

14   identified on a list by the end of April, in which case I

15   understand defendants are required to produce their custodial

16   files within 60 days, that they then be deposed within a

17   certain period of time?

18           THE COURT:  No.  The whole point is identify them and

19   then start negotiating the actual date of the actual deposition

20   for whenever it makes sense for you all.

21           MS. SIMONSEN:  Okay.

22           THE COURT:  Like I said, we have a fact discovery

23   cutoff of December.  But what I don't want to have happen is

24   for you to not even talk about scheduling until September.

25   All right?  So I want you to put the names on the table, start

1   talking, and start filling in that calendar.

2          **MS. SIMONSEN:**  Understood, Your Honor.

3      And I think the other point that might be helpful there is

4   if the custodial file production might be tied to the date the

5   deposition is then scheduled for.  Could there at least be some

6   kind of cap on the number of witnesses identified on a

7   particular list for which custodial files must be produced

8   within 60 days?  So, for instance, the first ten deponents,

9   custodial files produced within 60 days; for the next ten

10  deponents, within 90 days.

11         **THE COURT:**  Why don't we keep it the way it is and

12  see -- you're raising a hypothetical that it might be a

13  problem.  We don't know that yet.  Okay?  So let's see how many

14  people they put on the list, how hard it is actually to get all

15  their files out in 60 days.

16     Again, you can come to me and say:  Judge, we need an

17  extra two weeks or a month to finish these other people.  I'm

18  probably going to -- if you're making progress in terms of

19  scheduling and talking about it, I'm probably going to be

20  reasonable in listening to those requests.  Okay?

21         **MS. SIMONSEN:**  Thank you, Your Honor.

22         **THE COURT:**  Presumptively, 60 days should be enough

23  time to get those out.

24         **MS. SIMONSEN:**  Understood.  Thank you.

25         **THE COURT:**  All right.

1          **MS. KOUBA:**  Thank you, Your Honor.

2          **THE COURT:**  So does that actually resolve your

3    concerns about the noticing in of depos?  Because, presumably,

4    if a depo is noticed in and you choose not to notice it --

5    right? -- you've already probably made the choice that you're

6    not going to put them on the list.  Right?

7          **MS. KOUBA:**  I think that's right, Your Honor, as long

8    as we're not losing the opportunity, if something comes up

9    later, to come to you for good cause.

10         **THE COURT:**  You are not losing that ability.

11         **MS. KOUBA:**  And the last -- I know you're tried of

12   clarifying questions on this probably.

13         But if a deposition is noticed in another jurisdiction but

14   was not on our list but, upon review of that deponent, we don't

15   want to forego our opportunity to depose them, would their

16   custodial file still then be due within 60 days of that notice

17   of deposition, although plaintiffs were not the ones that

18   noticed it?

19         **THE COURT:**  Well, 60 days from the time they were put

20   on the chart.  So if you decide on Day -- let's say it gets

21   noticed on Day X, but on Day X plus 20, you finally decide

22   you're going to --

23         **MS. KOUBA:**  Right.

24         **THE COURT:**  -- add them to the chart.

25         Then you add them to the chart, and that starts the 60

1    days.

2            **MS. KOUBA:**  That makes sense, Your Honor.  So if we

3    add them to the chart that day, after a rush of research, then

4    that's when the 60 days would begin?

5            **THE COURT:**  Right.

6            **MS. KOUBA:**  Thank you, Your Honor.

7            **THE COURT:**  Because presumably, that means you want to

8    depose them.  You just have to start talking.  Right?  And

9    that's when you're going to find out whether the other court

10   and the lawyers in the other case are going to cooperate with

11   you in terms of scheduling and all that.

12        And if not, then you come back to me, and we figure out --

13   if you can't work it out.  Please try to work that out.  Right?

14   But if you can't work it out, you're going to have to come back

15   to me.

16           **MS. KOUBA:**  Understood, Your Honor.  Thank you.

17           **MS. TESHUVA:**  Nothing further from me, unless any of

18   my colleagues has...

19           **THE COURT:**  Oh.  This might be one of our shortest

20   discovery hearings ever.  That's great.

21           **MS. TESHUVA:**  We have nothing.

22           **THE COURT:**  All right.  Let me see what else.

23           **MR. REILLY:**  So, Your Honor, while you're looking

24   there, so I guess from a nuts-and-bolts perspective, kind of

25   what are the next steps?

1          You've ordered us to do kind of, I guess, a number of

2    things within a certain time period; but from the deposition

3    protocol, is there anything else you need from us?

4          **THE COURT:**  Yeah.  You're going to need to edit it to

5    reflect what I've ordered here today in terms of, well,

6    everything.  You'll probably get the transcript and figure all

7    that out, especially with the chart and that stuff, and then

8    get it to me once it's done.

9          But on that point -- let's see.

10         Aah, okay.  Section D -- let's see -- your draft depo

11   protocol at -- I'm looking at the one you filed today, Docket

12   Number 688, page 18 of 32 of the PDF, has page 8 at the

13   bottom -- at the top says -- no.  Wrong one.  Sorry.  Not that

14   one.

15         Here we go.  Sorry.  Page 23 of 32, which is page 13 at

16   the bottom.

17         Section K, disputes during a deposition or relating to

18   depositions.  Are you all with me?

19         **MS. KOUBA:**  Yes, Your Honor.

20         **MR. REILLY:**  I'm getting there, Your Honor, but go

21   ahead.

22         **THE COURT:**  Page 23 of 32.

23         **MR. REILLY:**  This right here.  Yeah.  Thank you.

24         **THE COURT:**  All right.  So you do correctly say that

25   you can resolve disputes according to Section D or H of my

1    standing order.  I'm going to amend that, however.

2         So if you do -- if a party does want an emergency hearing,

3    by phone call or otherwise, with the Court during a deposition,

4    prior to contacting the Court, the primary -- I think you call

5    them interrogating or questioning -- lawyer has to meet and

6    confer with the primary defending counsel about the dispute.

7    Presumably, you're going to; but I want to make sure that it

8    doesn't preemptively turn into a dispute and nobody tries to

9    talk it through.  All right?  So the primary interrogating

10   lawyer and the primary defending lawyer have to meet and

11   confer.

12        If unable to resolve, lead trial counsel for the party

13   represented by that primary questioning lawyer and lead trial

14   counsel for the party represented by that primary defending

15   counsel have to meet and confer either in person -- for

16   example, if they happen to be at the deposition together or

17   they're in the same town -- or by videoconference.  All right.

18        And then if it's still not resolved after those meet and

19   confers, then at the emergency call with the Court, you have to

20   be able to certify to me that the meet and confers have

21   happened and have not been able to resolve or narrow the

22   dispute.

23             **MR. REILLY:**  So this is all during the deposition --

24   or I guess during a break, but during the deposition?

25             **THE COURT:**  Yes.  Presumably, I foresee a large number

1    of depositions coming, and what I don't want to have happen is

2    to get calls every day from lawyers at depositions because

3    there's a dispute.  I want you to try to work things out as

4    much as possible before contacting me.

5         Now, if there is that kind of call with the Court about a

6    dispute during a deposition, the parties are instructed to

7    alert the court reporter that he or she should be prepared to

8    read to me, read to the Court the question and answer that led

9    to the dispute.  Because I know they often have to flip back

10   through and note where they're supposed to read from, so you've

11   got to give them time to do that.

12        **MS. KOUBA:**  Understood, Your Honor.

13        **THE COURT:**  Okay.  Other issues I just want to raise

14   with the draft you submitted.

15        Okay.  This is -- again, if you're with me, it's page 15

16   of 32 of the -- of the draft.  This would be paragraph A-4, at

17   the top of that page.  You see where I am?

18        **MS. KOUBA:**  Yes, Your Honor.

19        **THE COURT:**  The last sentence started out, which is

20   good (as read):

21             ". . . good faith efforts to coordinate the

22        scheduling of depositions," blah-blah-blah.

23        You should edit that to include "and meet and confer in

24   good faith and coordinate in good faith with lawyers from any

25   other action that's a 'related action' if it's applicable."

1          **MR. REILLY:**  That's in A-4, you said, Your Honor?

2          **THE COURT:**  Yes.  It's just to make sure that the

3    parties who are not part of the MDL but who are part of that

4    related action are included in the good faith.

5          And then if the deposition is cross-noticed by either

6    side, a copy of the deposition protocol should be served on the

7    lawyers involved in that other case.

8          I've seen this in other depo protocols.  You didn't really

9    address it here.  You implied that you're probably going to do

10   a lot of electronic exhibit showing during depositions.

11         Do you really need extra hard copies at every deposition

12   to hand out?  You're kind of requiring yourselves to do that.

13   I'm looking at page 25 of 32.  It's paragraph 3 at the top.

14         **MS. KOUBA:**  Your Honor, it's plaintiffs' position

15   that, no, we do not.

16         **MR. REILLY:**  Yeah.  I think it's defendants' position

17   that that may come up and that may be required.  So I don't

18   want to necessarily throw that out now.

19         **THE COURT:**  Okay.  So one --

20         **MR. REILLY:**  Perhaps we can meet and confer, though?

21         **THE COURT:**  Meet and confer.  So one approach I've

22   seen to this is if, say, three business days before the

23   deposition, the interrogating lawyer can send a list of the

24   documents they think they're going to use as exhibits; and if

25   they've given that list -- it's not binding -- right? -- and

1   it's not limiting; but if they give a good faith estimated list

2   of documents they might use as exhibits, then the other side

3   can get their own copies, bring their own electronic copies.

4        I just don't want you all cutting down a lot of trees

5   unnecessarily.

6            **MS. KOUBA:**  Your Honor, may I respond with --

7            **THE COURT:**  Yes.

8            **MS. KOUBA:**  -- what -- I think, actually, the parties

9   may have been in agreement on this without further guidance,

10  and it's possibly not as clearly drafted as it could be, which,

11  you know, we accept.

12       But I think what the parties had actually agreed to was

13  that in most cases, physical documents won't be required in any

14  event.

15       However, if there is a deponent that would be more

16  comfortable with physical documents for whatever reason,

17  whether that be advanced age or poor eyesight or an inability

18  to adequately use technology, then the plaintiffs would provide

19  those physical copies in advance of the deposition.  But in

20  most cases, we would simply proceed with electronic copies.

21           **THE COURT:**  Okay.  Is that your understanding?

22           **MR. REILLY:**  Yeah.  I think what she's saying is

23  right.  In other words, there is kind of a default that most

24  likely, most are going to typically involve remote exhibits,

25  things like that but, again, not kind of a hard-and-fast rule.

1          **THE COURT:**  Okay.  Really what I was focused on here,

2     it's about extra copies to hand out to counsel.  I just don't

3     think you're going to need that in most cases.  Right?

4          **MS. KOUBA:**  I'm pretty handy with an iPad.  How

5     about y'all?

6          **MR. REILLY:**  Yeah.  That part, we can take another

7     look at, Your Honor.

8          **THE COURT:**  Take another look at that.  Again, let's

9     minimize the amount of environmental damage we do.

10         All right.  And then, again, I've seen this addressed in

11    other protocols.  I'm looking at -- it's Section O, starting at

12    the bottom of page 27, it's about remote depositions, and

13    really spilling over to the top, 28 of 32.

14         I'm going to -- I assume you either have an understanding

15    as to this and all that, but there's no provision here as to

16    who's responsible for and who's going to pay for real time or

17    other remote transcript services for a remote deposition.

18         So has that been worked out and it's just not reflected

19    here, or is it something you need guidance on?

20         **MS. KOUBA:**  I believe, Your Honor, that the noticing

21    party will intend to pay for -- please correct me, too, if I'm

22    wrong -- for the video and the transcript for themselves and

23    that the party attending, if any party wants real-time

24    capabilities, that that party will individually pay for

25    real-time capabilities.  I don't think it's something that both

1   parties have to have.

2       If plaintiffs want a copy of the transcript and video,

3   which we likely will, we'll pay for that separately; but the

4   cost of having an actual videographer and stenographer present

5   will be upon the noticing party.

6           **THE COURT:**  Okay.  Is that --

7           **MR. REILLY:**  Yeah.  I think what we have in there...

8       Yeah.  I think it actually is in a different...

9       Yeah.  We have in "Means of Recording" in II-D-3,

10  Your Honor, it says (as read):

11          "The noticing Party shall bear the expense of

12          stenographic recording . . . ."

13      So I guess it depends what we're saying that this falls

14  under.  But it seemed, like, reasonable to assume that that

15  would fall under that as well.

16          **THE COURT:**  Well, that's for the transcript.  What I'm

17  talking about is the cost of real time, which can be an extra

18  cost above.

19          **MS. KOUBA:**  I think that real time will be upon the

20  party that is requesting it.

21          **MR. REILLY:**  Well, how about we think about it,

22  Your Honor, and come back to you if we need guidance.  I'm

23  confident --

24          **THE COURT:**  What I don't want --

25          **MR. REILLY:**  -- we'll be able to come to resolution.

1          **THE COURT:**  What I don't want to get is an emergency

2     motion:  Who's going to pay for real time?

3          **MS. KOUBA:**  Oh.  Yeah, I wouldn't want to do that to

4     you, Your Honor.

5          **THE COURT:**  Okay.  All right.

6          **MR. REILLY:**  I don't think we'd want to subject

7     ourselves to that either.

8          **THE COURT:**  And, again, because I know there are

9     other, call them, related actions out there that are not part

10    of the MDL/JCCP -- I didn't see this in here.  Maybe I missed

11    it -- there should be a limitation in here -- maybe it fits

12    under "Use of Depositions" -- but some limitation that any

13    transcripts that arise from depositions in this case can only

14    be provided in another case if the party in that other case

15    agrees to be bound by the protective order here or if everybody

16    agrees that the protective order in that case applies to it and

17    it's substantially similar to the protective order here.

18        I just don't want to -- I want to make sure that if

19    there's a protective order and the deposition transcript is

20    produced to another party in a different case that's not part

21    of the MDL or JCCP, that we still have the same protections

22    substantially.

23          **MR. REILLY:**  Yeah, that makes sense, Your Honor.

24          **MS. KOUBA:**  Of course, Your Honor.  We're happy to

25    comply with that.

1    But based on that, you've reminded me of another potential

2  issue.  If we are cross-noticeed into another jurisdiction --

3  "we" being the MDL and JCCP plaintiffs -- should we work in a

4  provision in here or should we get on the record somewhere that

5  the entirety of that transcript will be available and

6  admissible in this Court, not just the part where MDL and JCCP

7  plaintiffs are questioning?  Since we will be under the duty to

8  not be duplicative in our questioning, we would want to get the

9  benefit of that earlier testimony.

10    **THE COURT:**  I don't think there's an objection to

11  that.  Of course, admissibility is --

12    **MS. KOUBA:**  Sure.

13    **THE COURT:**  That's a different issue.  Right?  But

14  whether it's available to be used as potentially admissible --

15    **MS. KOUBA:**  Potentially.

16    **THE COURT:**  -- and used in discovery in this case, I

17  don't think there would be an objection to that.

18    **MR. REILLY:**  Yeah.  As long as we're not waiving

19  anything regarding admissibility, which, again, I know we have

20  kind of separate here in the protocol.

21    **MS. KOUBA:**  Yeah.  I apologize.  That was just a slip

22  of the tongue.  I wasn't trying to get a fast one on the Court

23  or defendants --

24    **MR. REILLY:**  Sure.

25    **MS. KOUBA:**  -- with admissibility.

1          **THE COURT:**  If you want to add some language to that,

2    maybe -- there's probably a provision in here that touches

3    close to that.  You can add some language to that as well.

4        That actually reminds me of another point.  Hang on.

5        Yeah.  No.  Okay.  We covered it.

6        All right.  So I think I've covered everything I had on my

7    checklist for the depo protocol.  Do you need more clarity on,

8    kind of, edits to it before you submit it to me?

9          **MS. KOUBA:**  Not from the plaintiffs, Your Honor.

10          **MR. REILLY:**  Yeah.  Not right now, Your Honor.  We'll

11    come back to -- we know where you are, if we do.

12                        (Laughter.)

13        **THE COURT:**  If between now and Thursday you think of

14    something, I'm sure you won't -- somebody on your side won't

15    hesitate to raise it with me on Thursday.

16        Okay.  I saw the 40-page report you filed on Friday.  I'm

17    still going through it.  I don't want to dive into the issues

18    for Thursday yet.  But is there anything -- because I haven't

19    gone through it entirely in detail, is there anything in that

20    report from Friday that we've mooted by what we've gone through

21    today, or is it all brand-new stuff?

22          **MS. KOUBA:**  I believe, Your Honor, that it would all

23    still be non-duplicative, unfortunately.  I didn't want to be

24    the bearer of that news from plaintiffs' side but...

25          **MS. SIMONSEN:**  I think that's right, Your Honor, if

1  we're speaking about the issues that we've identified as ripe.

2      That said, there is the ESI protocol in there.  I think

3  that has now been mooted by virtue of us having filed, and

4  Your Honor entered, our agreed stipulated ESI protocol.

5          **THE COURT:**  Okay.  All right.  So anything further

6  from the plaintiffs for today?

7          **MS. KOUBA:**  Not from us, Your Honor.

8          **THE COURT:**  Anything further from the defense?

9          **MS. SIMONSEN:**  No, Your Honor.  Thank you.

10         **THE COURT:**  All right.  So we're adjourned until

11  Thursday.  See some or all of you then.

12      Thank you.  And thank you for your arguments too.

13         **THE CLERK:**  We're off the record in this matter.

14      Court is in recess.

15              (Proceedings adjourned at 3:10 p.m.)

16                      ---o0o---

17              **CERTIFICATE OF REPORTER**

18      I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20  DATE:  Wednesday, March 20, 2024

21

22                  *Ana Dub*

23  _____

24          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
            CSR No. 7445, Official United States Reporter

25