UNITED STATES DISTRICT COURT     *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IN RE: SOCIAL MEDIA | ) | **Further Case Management** |
| ADOLESCENT ADDICTION/ | ) | |
| PERSONAL INJURY PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | NO. C 22-03047 YGR |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | Pages 1 - 33 |
| | ) | |
| _____ | ) | Oakland, California |
| | | Friday, March 22, 2024 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:        Lieff, Cabraser, Heimann &
                       Bernstein
                       275 Battery Street, 30th Floor
                       San Francisco, California  94111
                  BY:  LEXI J. HAZAM, ATTORNEY AT LAW

                       Lieff Cabraser Heimann & Bernstein LLP
                       250 Hudson Street, 8th Floor
                       New York, New York  10013
                  BY:  KELLY K. MCNABB, ATTORNEY AT LAW

                       Seeger Weiss LLP
                       55 Challenger Road, Sixth Floor
                       Ridgefield Park, New Jersey  07660
                  BY:  AUDREY SIEGEL, ATTORNEY AT LAW

          (Appearances continued next page)

Reported By:      Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## A P P E A R A N C E S (CONT'D.)

```
For Plaintiffs:          Motley Rice LLC
                         401 9th Street NW Suite 630
                         Washington, DC  20004
                   BY:   PREVIN WARREN, ATTORNEY AT LAW

                         Motley Rice LLC
                         28 Bridgeside Boulevard
                         Mt. Pleasant, South Carolina  29464
                   BY:   ANNIE E. KOUBA, ATTORNEY AT LAW

                         Andrus Anderson LLP
                         155 Montgomery Street, Suite 900
                         San Francisco, California  94104
                   BY:   JENNIE LEE ANDERSON, ATTORNEY AT LAW

                         Kessler Topaz Meltzer Check LLP
                         280 King of Prussia Road
                         Radnor, Pennsylvania  19087
                   BY:   MELISSA L. YEATES, ATTORNEY AT LAW

                         Beasley Allen Crow Methvin Portis &
                            Miles, P.C.
                         234 Commerce Street
                         Montgomery, Alabama  36103
                   BY:   JOSEPH G. VANZANDT, ATTORNEY AT LAW


For Plaintiff Colorado   Colorado Department of Law
Attorney General:        1300 Broadway, 6th Floor
                         Denver, Colorado  80203
                   BY:   BIANCA MIYATA,
                         SENIOR ASSISTANT ATTORNEY GENERAL


For Plaintiff State      Cooper & Kirk PLLC
of Montana:              1523 New Hamphire Avenue NW
                         Washington, D.C.  20036
                   BY:   BRIAN W. BARNES, ATTORNEY AT LAW


For Plaintiff State:     California Department of Justice
of California Attorney   Attorney General's Office
General:                 455 Golden Gate Avenue, 11th Floor
                         San Francisco, California  94102
                   BY:   MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL
```

# A P P E A R A N C E S (CONT'D.)

```
                         California Department of Justice
                         1515 Clay Street, 20th Floor
                         Oakland, California  94612-0550
                    BY:  JOSHUA OLSZEWSKI-JUBELIRER,
                         DEPUTY ATTORNEY GENERAL


For Plaintiff Kentucky:  Office of the Kentucky Attorney
Attorney General:        General
                         Consumer & Senior Protection
                         1024 Capital Center Drive, Suite 2000
                         Frankfort, Kentucky  40601
                    BY:  CHRISTIAN LEWIS, COMMISSIONER


For the Meta             Covington & Burling LLP
Defendants:              One City Center
                         850 Tenth Street, NW
                         Washington, DC  20001-4956
                    BY:  TIMOTHY HESTER,
                         PAUL SCHMIDT, ATTORNEYS AT LAW


                         Covington & Burling LLP
                         1999 Avenue of the Stars, Suite 3500
                         Los Angeles, California  90067-4643
                    BY:  ASHLEY M. SIMONSEN, ATTORNEY AT LAW


For Defendant Snap       Munger, Tolles & Olson
Inc.:                    560 Mission Street, 27th Floor
                         San Francisco, California  94105
                    BY:  JONATHAN H. BLAVIN,  ATTORNEY AT LAW


For Defendant TikTok     King & Spalding LLP
Inc.; ByteDance, Inc.:   1180 Peachtree Street, N.E.
                         Suite 1600
                         Atlanta, Georgia  30309-3521
                    BY:  GEOFFREY M. DRAKE, ATTORNEY AT LAW


                         King & Spalding LLP
                         1700 Pennsylvania Avenue NW
                         Suite 900
                         Washington, D.C.  20006
                    BY:  DAVID P. MATTERN, ATTORNEY AT LAW
```

## A P P E A R A N C E S (CONT'D.)

```
For Defendant Alphabet   Wilson, Sonsini, Goodrich & Rosati
Inc.; Google, LLC;       633 West Fifth Avenue
Roblox; YouTube, Inc.:   Los Angeles, California  90071-2048
                    BY:  MATTHEW DONOHUE, ATTORNEY AT LAW
```

--oOo--

```
 1    Friday, March 22, 2024                          1:31 p.m.
 2                    P R O C E E D I N G S
 3                         --o0o--
 4
 5        THE CLERK:  Good afternoon everyone.
 6        Calling this afternoon's matter, 22-MD-03047-YGR, In Re:
 7    Social Media Adolescent Addiction/Personal Injury Products
 8    Liability Litigation.
 9        Appearances will be added to the -- will be posted with
10    the minutes this afternoon.
11        Thank you.
12        THE COURT:  Okay.  Let's get started.
13        Again, a reminder when you come to the mic, please
14    identify yourselves.  Makes it easier for my court reporter.
15        First, we'll just do some administrative tasks.  So
16    there's the AG motion to file appendices at Docket 701.  It is
17    unopposed.  The motion's granted.  701 shall be terminated.
18        There are a number of Guardians ad Litem applications.
19    Those are at 641 and the motions to seal at 640.  I have
20    worked with my staff.  I've granted them.  We're just in the
21    process of getting everything posted, so you should see them
22    come across soon.
23        With respect to the chart under *Tull*, that's at 648 -- or
24    684, I'll talk to the parties on that one real quick.
25        MS. HAZAM:  Good afternoon, Your Honor.  Bianca
```

1    Miyata for the state AGs.

2         **MR. HESTER:**  Good afternoon, Your Honor.  Timothy

3    Hester of Covington & Burling for Meta.

4         **THE COURT:**  Okay.  Good afternoon.

5      So the goal here is to -- for me to know and for you all

6    to confer and figure out which of these things needs to be

7    tried to a jury versus are there any to which a jury is not

8    entitled.  That's the ultimate goal.

9      Now, if everything's entitled to a jury, no need for a

10   chart.  Just tell me you've all met and conferred, and

11   everything's entitled to a jury.

12     But when we were last here, you had mentioned *Tull*.  You

13   did not have a specific perspective on it.  It's now a month

14   later.  So I'm not trying to make busy work.  What I'm trying

15   to do is understand if there are certain claims in certain

16   states for which a jury trial is not required and/or is not --

17   you know, party is not entitled to them.

18     That's my goal.  So how do we get to the end goal here?

19        **MS. HAZAM:**  Your Honor, if I may, Mr. Hester --

20   Mr. Hester and myself have met and conferred several times

21   about this topic.

22              (Off-the-record discussion.)

23        **MS. HAZAM:**  We have met and conferred several times

24   on the topic, and the state AGs do agree that *Tull* is the

25   relevant authority here*, Tull* and its progeny cases.  However,

```
 1    we're not necessarily aligned on the result of the application
 2    of Tull.
 3        And at the beginning of our conferrals, I think both
 4    parties read the Court's request for a chart to ask the AGs to
 5    provide and for Meta to respond on the state law on whether a
 6    jury is required or each state law and remedy.  But as our
 7    conversations developed and we realized that we were aligned
 8    that Tull was the relevant authority, we had further
 9    discussions about the scope of this chart.
10        Seeking clarification about the scope of the chart for a
11    couple of different reasons.  The question of whether Tull
12    would actually require a jury trial on the these state claims
13    is an issue of first impression among the states, and the
14    states have some concerns --
15            THE COURT:  Is it -- I'm sorry.
16            MS. HAZAM:  Yes.
17            THE COURT:  Is an issue of first impression among all
18    the states or among some states?
19            MS. HAZAM:  We believe that the question of whether
20    Tull applies to state consumer protection claims is a question
21    of first impression among the 35 states.
22            THE COURT:  Okay.
23            MS. HAZAM:  And the state AGs have some concern about
24    preemptively providing a position on that question of law
25    where Meta has not yet demanded a jury and that actual demand
```

1    may not -- that demand may not come to fruition.

2        So there's a couple things in the background with our

3    thinking there, including the fact that there is a pending

4    Supreme Court opinion in *Jarkesy*.  Argument has been heard in

5    that case.  An opinion will issue this spring.  And that may

6    well impact the scope of the federal jury trial right under

7    *Tull* and the Seventh Amendment.

8        And for that reason as well as the states' hesitation, I

9    think, to provide a preemptive opinion on a hypothetical jury

10    demand, the states would ask -- the state AGs would ask the

11    Court to hold this question in abeyance.

12        To the extent that this is a question that is certainly

13    pertinent and relevant for the Court's scheduling, we're happy

14    to discuss what could be done with regard to the scheduling,

15    and the states are certainly open to the scheduling of a trial

16    date falling in September before the previous October '25 -- I

17    think it's October '25 trial date that's on the books.  We are

18    certainly open to that.  And that could always be vacated in

19    the event that the Court were to determine that that's not

20    appropriate.

21        But the states have severe reservations about opining in

22    the hypothetical on a unsettled unaddressed issue of law at

23    this point for an issue that Meta has not actually made a

24    demand for.

25            **THE COURT:**  All right.

```
 1        A response, Mr. Hester.

 2           MR. HESTER:  Your Honor, I -- as -- as we read the

 3    Court's last order, it was for the state AGs to identify the

 4    nature of the claims they were asserting under their state

 5    laws and, in particular, to specify whether they were

 6    asserting a claim for civil penalties.

 7        We're not -- I didn't read the Court's order to be saying

 8    tell me whether or not a jury trial right attaches under each

 9    of your claims.

10           THE COURT:  Well, I think that was ultimately the

11    point; that is, you could be right technically.  But the --

12    but only -- the nature of the question was to be able to

13    discern whether a jury trial was -- was being requested.

14           MR. HESTER:  Right.

15        Well, Your -- Your Honor, it seems to us that the -- that

16    the first step, after we've now agreed that *Tull* is the

17    controlling authority here, is to confirm that each of the

18    states is seeking civil penalties under its consumer

19    protection statute, which we think is pretty clear from the

20    nature of the complaints.

21           THE COURT:  Okay.  But do you have a response to what

22    she said?  I've not -- that's what I was asking for.

23           MR. HESTER:  Well, the -- our response is that we

24    believe we have an entitlement to a jury trial in relation to

25    any claim for civil penalties, so we think it would be helpful
```

```
 1    to confirm that.

 2       We -- I -- I had read the Court's order to be getting to

 3    that point, that we needed confirmation on the nature of the

 4    penalties they were seeking, damages and/or civil penalties

 5    and that would then --

 6            THE COURT:  Right, but for the -- but for the purpose

 7    of trying to schedule and figure out if there was a way to get

 8    a bench trial versus not having a bench trial, so there --

 9    it's not an inquiry without a purpose.

10            MR. HESTER:  Right.  I understand, Your Honor.

11            THE COURT:  And I didn't know about Tull.  So I will

12    at this point then withdraw the request.  We'll hold it in

13    abeyance.

14       What is the name of the case again that you made reference

15    to?

16            MS. HAZAM:  Your Honor, it is called Jarkesy, and if

17    I could spell that.  It's J-a-r-k-e-s-y.  That case has been

18    argued before the Supreme Court, so I would anticipate its

19    issuance before the end of the term in June.

20            THE COURT:  Okay.  Well, we would hold it and figure

21    out where we go next after that decision comes out.

22       Thank you.

23            MS. HAZAM:  Thank you.

24            MR. HESTER:  Thank you, Your Honor.

25            THE COURT:  All right.  Docket 678, there's a small
```

1    little typo that had to be fixed to amend the school district

2    master complaint to change the name of defendant TikTok

3    Limited PTE to TikTok Limited.  That motion is granted.  678

4    is terminated.

5        Okay.  In the joint -- the agenda and joint statement, I

6    do want to just confirm and -- I believe I'm right, but it

7    wasn't defined.  In your statement, your reference to "DFS" is

8    to "defendants fact sheets," right?

9            **MS. HAZAM:**  Correct.

10           **THE COURT:**  Okay.  Can someone give me an update as

11   to what happened with Judge Kuhl two days ago.  I've been a

12   little bit busy and have not reached out to her.

13           **MS. McNABB:**  Good afternoon, Your Honor.  Kelly

14   McNab, Lieff Cabraser for the plaintiffs.

15           **THE COURT:**  Okay.

16           **MS. SIMONSEN:**  Good afternoon, Your Honor.  Ashley

17   Simonsen for the Meta defendants from Covington & Burling.

18           **THE COURT:**  All right.  Good afternoon.

19       Go ahead.

20           **MS. McNABB:**  We -- the parties had a conference with

21   Judge Kuhl on Wednesday.  There was discussion about the

22   defendant fact sheet.  The parties in the JCCP are still

23   working on finalizing the defendant fact sheet.

24       And there was some discussion about data that's referred

25   to as snapshots.  It's data that the defendants have been

1    capturing once they receive account information from the

2    plaintiffs as part of their preservation obligations.

3        But with respect to the defendant fact sheet, that fact

4    sheet is limited to roughly three categories of information.

5    It's --

6            **THE COURT:**  I -- Okay.  Sorry.

7        **MS. McNABB:**  Okay.  I don't have to provide

8    information about what's requested in the defendant fact

9    sheet, but they are --

10           **THE COURT:**  Yeah, I'm just trying to understand --

11       **MS. McNABB:**  Where it stands?

12           **THE COURT:**  -- what happened with Judge Kuhl.

13       **MS. SIMONSEN:**  And I'm happy to provide an update on

14   that.  I'm not sure if Ms. McNabb was there.  We did have a

15   conference with Judge Kuhl on Wednesday.

16       The principal issue that we discussed was bellwether

17   selection for the personal injury plaintiffs.  And Judge Kuhl

18   determined that there would be 24 personal injury bellwether

19   plaintiffs in the JCCP.  In advance of the conference, she

20   sent the parties a message proposing a first draft of

21   potential categories of bellwether plaintiffs.

22       She had already ordered the parties to meet and confer on

23   a grid that will be populated with DFS and PFS data to help

24   analyze how bellwe- -- how plaintiffs might be allocated into

25   those categories.

1    She stated that her view is that bellwether plaintiffs

2    should be selected on a random basis with a certain number of

3    plaintiffs selected out of each of the categories that the

4    Court and the parties ultimately determine is appropriate.

5    At a high level, the categories that she broke down relate

6    to specific injury categories such as self harm, eating

7    disorders, depression and anxiety, as well as certain factors

8    relating to frequency of use as well as the age of first use.

9    So the parties are to continue meeting and conferring on

10    which categories may be -- from which bellwether plaintiffs

11    may be selected.

12    Judge Kuhl also set a December 6th deadline for the

13    parties to complete fact discovery on the personal injury

14    bellwether plaintiffs with the expectation then that expert

15    discovery would follow the same time line as Your Honor has

16    set out in CMO10.

17    With respect to the school district bellwether plaintiffs,

18    Judge Kuhl held that she will wait until she rules on the

19    pending demurrer to the school district complaints before

20    issuing any decisions or orders with respect to those

21    plaintiffs.

22    That was the primary issue that was addressed --

23         **THE COURT:**  Okay.

24         **MS. SIMONSEN:**  -- at that conference.

25         **THE COURT:**  Would you agree?

```
 1              MS. McNABB:  Yes, I would agree.  But with specific
 2    reference to the defendant fact sheet, the parties reported
 3    that they are continuing to meet and confer to finalize those
 4    fact sheets, as well as an implementation order which would
 5    contain a stipulation that the defendants would not be
 6    considering information that is uniquely in their possession
 7    in their bellwether selection process.
 8              MS. SIMONSEN:  And, Your Honor, there is no DFS
 9    process.  As Your Honor is aware in this court, the plaintiffs
10    did not request one, so we're --
11              THE COURT:  Well, are we going -- we can pivot to
12    that issue.  That wasn't what I was asking about.
13        But we can pivot.
14              MS. SIMONSEN:  Certainly.  My colleague Jonathan
15    Blavin will address that.
16              THE COURT:  Okay.
17              MR. BLAVIN:  Good afternoon, Your Honor.  Jonathan
18    Blavin from Munger Tolles on behalf of defendants now.
19              THE COURT:  Okay.  So.
20        I do understand with respect to the selection process,
21    there is this dispute over whether defendants should consider
22    that information.  I've read both parties' statements.  And my
23    view is they can consider it.
24        The plaintiffs have so much more information on their
25    clients than the defense does.  Most importantly, in any kind
```

1    of case like this are the clients -- your clients' ability to

2    withstand examination on cross-examination, how they appear,

3    and their credibility.

4        None of that is within the grasp of the defendants, so in

5    my view, in many ways, this levels the playing field.  You

6    each have a little bit of information that the other doesn't,

7    and we'll see where it -- where it lands.

8        Otherwise, I'm going to kick -- you know, I set this

9    schedule because plaintiffs wanted to move quickly.  And there

10   are consequences to that decision.  This is one of them.

11       If you want to kick them forward and push back the trial

12   dates, defendants are happy to do that.  They don't want this

13   trial schedule.  So do you want to keep your trial schedule or

14   not?

15           **MS. McNABB:**  Yes, Your Honor, we do want to keep our

16   trial schedule.

17           **THE COURT:**  Okay.  Then they can consider the

18   information.

19       Next issue.

20       Let's see.  Why don't we stick on this issue of

21   bellwethers and pretrial order number 11.  There were two

22   requests that pretrial order 11 be modified, one to change the

23   lexicon language; and, two, to add the phrase "suicidality,"

24   open paren, or "suicidal ideation," closed paren in addition

25   to Subsection B.

1          Those stipulations will be granted, but they'll be -- the

2     text of those orders will come under pretrial order number 12.

3     I don't want there to be lots of little orders everywhere.

4     It -- it makes it very difficult to track over time.

5          So the issue of having a non-Meta defendant in bellwether

6     criteria.  Let me just say this.  As you all know -- and we

7     will -- we'll see.  I think it's actually a very good test

8     case.

9          Judge Kuhl has a very different view of how to pick these

10    bellwethers than I do.  It is very mathematical.  I get that.

11    And I'll be interested to see what the results are.  Mine is

12    much more organic.

13         I don't think it is likely that I would pick a bellwether

14    that you submit to me that doesn't have Meta given that 95,

15    96, 97 percent of the claims have Meta defendants.  If you

16    want to use your pick to make that argument, well, go ahead.

17    Be my guest.  I really -- it really doesn't bug me.  If they

18    want to -- if you want to go down that road.

19         I'd rather see what they have to say.  How -- how -- I

20    don't -- because this is a vacuum for me, right?  So it would

21    have to be a great argument for me to ignore the fact that

22    that would only apply to 3 percent.  And I don't know how you

23    are going to make that argument that somehow sets a tiny

24    fraction when these are supposed to be bellwethers -- would

25    satisfy your obligation to present me with representative --

 1    a -- some kind of representative sample.

 2        So -- so it's a pretty high bar.

 3        **MS. SIMONSEN:**  And your point is as well taken, Your

 4    Honor.  I think -- the point we're trying to make is, you

 5    know, there are also approximately, I think, 65 percent of the

 6    cases that name Snap and that name TikTok as a defendant, and

 7    so sort of the same logic would seem to apply there.

 8        There's just no reason to single out Meta as the only

 9    defendant that needs to be named in order for a case to be

10    eligible.  It may well be that both sides' proposal in the

11    case is in which Meta is named as a defendant.

12        But we see no reason, given the volume of cases that also

13    name at least two of the -- of the other defendants in these

14    cases, why Meta as a defendant should be a criteria.

15        **THE COURT:**  Yeah, but Meta's not the only one being

16    named.  So it's Meta plus.

17        **MS. SIMONSEN:**  Correct.  It's -- it's -- well, it

18    depends on, of course, what case, right --

19        **THE COURT:**  Of.

20        **MS. SIMONSEN:**  -- the.

21        **THE COURT:**  I totally understand that, but that's my

22    point, is that it's Meta in -- what's the number?  98?

23        **MS. HAZAM:**  For what criterion, I'm sorry, Your

24    Honor.

25        **THE COURT:**  How many of the claims include Meta?

1        **MS. HAZAM:**  By our account, all but 11, so over

2    95 percent.  I think their count is 12, so not much different.

3        **THE COURT:**  Okay.  So if over 95 of the -- percent of

4    the claims have Meta either individually or Meta plus someone

5    else, like I said, I think it would be hard -- it will be hard

6    to convince me that all of them should not have Meta.  In

7    some -- in some version of Meta, right?  So --

8        But, again, it frankly, I don't -- I don't know why you'd

9    push so hard on this because it may mean that I just don't

10    take one of their choices and they've wasted a choice.

11        **MS. HAZAM:**  Your Honor, with the Court's guidance,

12    we're satisfied.  We're -- we're happy to allow for the

13    possibility of a non-Meta case being proposed.  We understand

14    the Court's instructions.

15        **THE COURT:**  All right.  So go ahead.

16        **MS. SIMONSEN:**  Thank you, Your Honor.

17        **THE COURT:**  Okay.

18        There is problems with the most recent filing yesterday,

19    and I am referring to Docket 709, the stipulated

20    implementation order governing school district plaintiff fact

21    sheet and supplemental plaintiff fact sheet.

22        So I think this was just a -- a lot of moving pieces.

23    Someone, whoever was in charge of getting the filing right,

24    just screwed up on one of the exhibits, so here's what

25    happens.

```
 1         As I understand it, 675, which was the prior incarnation
 2    of 709 is superseded by 709.  So 675 is terminated.  But when
 3    you all filed 709, you filed Exhibit A properly.  709-1 is
 4    correct.
 5         But when you filed 709-2, which was supposed to be the
 6    supplemental plaintiff fact sheet, you filed the old plaintiff
 7    fact sheet, which is 675-1.  So I think it's just -- it was
 8    just a filing error.
 9              MR. WARREN:  That definitely sounds like that.
10         Previn Warren for the plaintiffs.
11              MR. DRAKE:  Geoffrey Drake, King & Spalding, for the
12    TikTok defendants.  I had the same question as I was preparing
13    to come over here today, Your Honor, and I think we can -- we
14    can get this corrected.
15              THE COURT:  We can do it one of two ways.  You can
16    refile the stipulation with the correct exhibits, or you can
17    stipulate on the record that I will substitute in the correct
18    document, which I understand to be 675-2.
19              MR. DRAKE:  My preference -- I don't know what
20    Mr. Warren's would be -- is that we refile it to ensure that
21    we do it correctly because I don't want to misspeak as to some
22    nuance of detail that perhaps is incorrect when I think some
23    other folks in our teams were handling the primary filing.  I
24    think that would be the cleanest way to do it.
25              MR. WARREN:  Absolutely agree.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1              THE COURT:  Okay.  Then I'm going to terminate 675 as
 2     moot.  I'm going to terminate 709 as premature.
 3              MR. WARREN:  Very well, Your Honor.
 4              MR. DRAKE:  Sorry for that, Your Honor.  We'll fix
 5     that.
 6              THE COURT:  Okay.
 7         Question about the -- and we sent an email about this, so
 8     the school district multi-plaintiff cases, I just want to make
 9     sure that we're on board with the procedural issues here.
10         Who do I have for school district cases?
11         So there are eight school district plaintiffs that have
12     transferred into this MDL.  Case number 24-594 transferred in
13     but has multiple plaintiffs cases in that one case, which is
14     not the process that we have been using in terms of how we're
15     managing these cases.
16         So is -- is there anything we need to do in terms of
17     procedural orders to address these multi-plaintiff member
18     cases that are being transferred because we're not allowing
19     multi-plaintiffs in direct filing cases.
20              MS. SIMONSEN:  Your Honor, Ashley Simonsen for the
21     Meta defendants.
22         Subject to plaintiffs' views, I believe that those
23     individual plaintiff school districts would be required to
24     file short-form complaints, which I think may resolve the
25     issue insofar as there would eventually be stand-alone
```

1    complaints for each of them.

2         **MR. WARREN:**  I believe that's correct, Your Honor.

3    Previn Warren for the plaintiffs.

4    That does seem like one fairly administratively easy way

5    to solve the problem if it works for the Court.

6         **THE COURT:**  Okay.  So then they will -- once they're

7    transferred in, the -- the notion is that they'll file their

8    own short-form complaint, and that will resolve the issue.

9         **MR. WARREN:**  Correct, Your Honor.

10        **MS. SIMONSEN:**  And, Your Honor, I believe that the

11   implementation order that you may already have entered or that

12   will be entered if there's an amended version pending -- I

13   believe that it does provide a deadline for cases transferred

14   into this MDL to file short-form complaints.

15   And I only mention that so that Your Honor is aware that I

16   think administratively you already have set up a procedure to

17   deal with this.

18        **MR. WARREN:**  I believe that's correct.

19        **THE COURT:**  Okay.  Great.  Thank you.

20        **MS. SIMONSEN:**  Um-hmm.

21        **THE COURT:**  Okay.

22        **MR. WARREN:**  May I ask the Court, was that the only

23   transferred case that had that issue, 24-5 --

24        **THE COURT:**  That's the only one we've noticed.

25        **MR. WARREN:**  Okay.

1          **THE COURT:**  The Clerk's Office reached out to us.

2          **MR. WARREN:**  Okay.  Thank you.

3          **THE COURT:**  Okay.

4          **MR. WARREN:**  We can -- I ask because we could reach

5     out to the attorneys that are responsible for that case and

6     let them know about the short-form complaint process.

7          **THE COURT:**  Yeah.  So far as that's the only one that

8     we've seen.  If there are others, then we missed them.

9          **MR. WARREN:**  We'll check as well.  Thank you.

10         **THE COURT:**  Okay.  Thanks.

11         Back to the AGs, I had a question.  So in addition to the

12    multistate complaint transferred in -- this is, again, a

13    transfer issue -- we've got -- Utah and New Mexico and Montana

14    have all filed complaints.  Utah and New Mexico's are pending

15    in state court, but the State of Montana's has been

16    transferred.

17         State of Montana has not joined the dismissal briefing,

18    so -- or does Meta -- have you talked about this?  Is Meta

19    planning to move to dismiss the Montana complaint?  Where with

20    do we stand on the Montana issue.

21         (Interruption by the Certified Shorthand Reporter to

22    request counsel to identify himself for the record.)

23         **MR. LEIWS:**  My apologies Chris Lewis for the

24    Attorneys General.

25         Brian Barnes is counsel for Montana.

```
1        To my knowledge, there's not been discussion with Meta yet
2    regarding that motion to dis-brief -- to dismiss briefing
3    specifically as to Montana.
4            MR. HESTER:  That's correct, Your Honor.
5            THE COURT:  So there has not been, you said?
6            MR. LEIWS:  That's correct.
7            MR. BARNES:  And I'm Brian Barnes for the State of
8    Montana.
9        And that -- and that's correct.  We haven't conferred with
10   the other side about briefing on a motion to dismiss.
11           MR. HESTER:  I -- Your Honor, Timothy Hester on
12   behalf of Meta.
13       I think it's -- reflects a fact that Montana came late
14   after this briefing had been put in place already.  That's why
15   we haven't really addressed this yet.
16           THE COURT:  Okay.  So what I have done sometimes when
17   I have this kind of collective -- collective briefing is --
18   and then I have late-comers to the parties, so to speak,
19   right -- is I issue my -- my order, and then I issue an order
20   to show cause why it shouldn't apply.
21       So we can do that approach or, you know, something
22   similar.  But -- but my suggestion would be if you want to
23   actually -- or maybe you all will agree to have them
24   participate informally.  I don't know.
25       But if -- if there is a perspective that you want me to
```

1   consider, it's -- can either, I guess, consider it, or I can

2   figure out or you all can figure out a way to bring you into

3   the process, now or that's likely what I would do in the

4   future.

5          **MR. BARNES:**  And, Your Honor, I think the show cause

6   mechanism that the Court suggested is a reasonable one and

7   could be an efficient approach.

8       The one thing I'd flag for the Court is that the Montana

9   complaint includes some claims that really don't overlap with

10  the multistate complaint.  And so at one point or another,

11  there -- you know, I'll have to see what the motion to dismiss

12  briefing looks like, but it's likely that our complaint will

13  present the Court with some legal issues that it doesn't have

14  in the -- in the other cases.

15         **THE COURT:**  And can you tell me what those are.

16         **MR. BARNES:**  Sure.  So the -- much of the Montana

17  complaint focuses on alleged misrepresentations by Meta about

18  the availability of mature content on the Instagram platform.

19  And that -- to the best of my knowledge, that's not -- it's

20  certainly not a -- a claim that's in the multistate complaint,

21  and I'm -- I'm not sure that there are similar claims before

22  the Court in -- in any of the other MDL cases.

23         **THE COURT:**  Okay.

24      Mr. Hester.

25         **MR. HESTER:**  Well, it does seem to us, Your Honor,

1    that the most efficient way to sift this out would be to await

2    the Court's ruling on the -- on the bigger motion to dismiss,

3    and then we can determine what's left and how that would

4    apply.

5        And it may well be that the parties would be able to work

6    it out once the Court rules on -- on the larger motion to

7    dismiss.  So it does seem more efficient and less burdensome

8    on the Court than providing a separate set of motions at this

9    point.

10            **THE COURT:**  Okay.

11            **MR. BARNES:**  Montana vigorously agrees.

12            **THE COURT:**  Right.

13        That's a good use of the word "vigorous."  I always -- I

14    have to tell you, when you -- when I see it in the papers, I

15    always remind my clerks about that great scene in *A Few Good*

16    *Men.*  "Denied."

17        "No, I vigorously -- vigorously object."

18        "Denied."

19        Okay.  Thank you.

20            **MR. BARNES:**  Thank you, Your Honor.

21            **MR. HESTER:**  Thank you, Your Honor.

22            **THE COURT:**  Okay.

23        So in terms of future arguments, there's a reference in

24    the -- in your outline -- let -- this is what I can tell you.

25    My plan -- my plan is that April, we'll have argument on the

1    AG -- motion to dismiss the AG complaints and the consumer

2    protection claims.

3        If I can get to the school district cases, I will, but I'm

4    not sure that I will.

5        I don't know that you all spend much time looking at

6    what's going on out here, but I just issued an injunction on

7    the Bureau of Prisons female facility here in Dublin, and

8    that's taking a chunk of my time.

9        And then later this month, I have *Epic Games vs. Apple*

10   coming back on a contempt motion, so that will take some time

11   as well.

12       And so I'm shuffling -- I promise you, we're working very

13   hard to keep everything going and keeping you all moving

14   along.  And if I can, I will get to it.  I'm just not sure

15   that I -- if I can, I'll let you know so you can prepare for

16   the hearing.  Okay?

17       If not, May is the target for that one.

18       June would then be the target for the nonpriority claims

19   and the -- also in June, the CCM Snap arguments as well.

20       So that's the current plan.  Again, things -- you know,

21   the life of a district judge, one day you can have everything

22   under control and the next day, it's all gone, or you --

23   working really hard, and they settle.

24       So you never -- never know what happens, so if things

25   change, I'll -- you know, I'll let you know, so we can keep

1    you apprised.

2        Those were the things that I had on my list.  And -- and I

3    would say also, I don't want to keep you all here more than

4    you need to be.  You should just be prepared to spend all day

5    in April to the extent that -- so that we can get everything

6    done with all of the bellwether issues and everything else.

7        The only reason I take breaks is not for you.  It is for

8    my court reporter.

9        So I went -- they were teasing me because I went out to

10   the prison, spent nine hours without nothing -- without

11   coffee, water, break, lunch.  I can go.  And I'll have you go

12   with me.

13       But I will -- I love my court reporters.  So we will take

14   breaks, but we'll just -- we'll start at the beginning of the

15   day, and we'll just keep going till we get done.  We'll take a

16   short lunch.  You don't want a big lunch anyway, you'll fall

17   asleep, so -- okay?

18       What else do you all have?

19           MR. WARREN:  Previn Warren for the plaintiffs.

20       Not a terribly much.  We did want to flag that on May 10th

21   there's a CMC at 9:30 and a DMC at 1:00, which I think is

22   fine, but to your point about, you know, going -- going all

23   day, there -- either we wanted to just flag in case that was

24   inadvertent on the Court's part.

25           THE COURT:  Let me check.  It -- it may not have been

1    because --

2         **THE CLERK:**  9:30, Your Honor, on May 10th.

3         **THE COURT:**  Yeah.  I'm just seeing what else I

4    have -- my May tends to be a wreck.

5       So typically -- let's see.  What did you -- yeah, so I --

6    so that's my standard day, is Friday.

7       So I would have raised this question with Judge Kang.

8    Maybe he's not available on Thursday.

9         **MR. WARREN:**  I see.  Okay.

10         **THE COURT:**  'Cause I thought he was trying to do

11    Thursdays, and I'm doing Friday.

12         **MR. WARREN:**  Uh-huh.

13         **THE COURT:**  And I don't do Thursdays because that's

14    my criminal calendar.  So as far as I can see, I have mine on

15    the correct day.

16         **MR. WARREN:**  Very well.  We -- we can raise that with

17    Judge Kang just to make sure that that was deliberate.  We

18    just -- we just want to make sure that we can get to

19    San Francisco in time.

20         **THE COURT:**  Right.  And he -- our system just went

21    through a system migration.  I can't even get my email up

22    here, so I can't send him a note.

23       But he and I can coordinate to make sure obviously that

24    you can -- you can make it to both.  I know that there's some

25    judicial trainings in May, and it could just be that he's in a

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1    training on May 9th so did it for -- assuming when we would be

2    done --

3              MR. WARREN:  Right.

4              THE COURT:  -- doing it after that.

5              MR. WARREN:  Yeah.  And it's no problem for the --

6    for the plaintiffs.  I'm assuming it's no problem for the

7    defendants provided that we get out of the CMC, you know,

8    around -- I don't know, I suppose noon.  I don't know how the

9    traffic patterns are.

10             THE COURT:  You know what, this is the problem.

11        Well, there -- I think there's a judicial training, so let

12   me -- let me confer with him.

13        What does our Thursday look like, Edwin?

14             THE CLERK:  The 9th, Your Honor?

15             THE COURT:  Yes.

16             THE CLERK:  Sentencing at 9:00, and two statuses at

17   10:00, and another sentencing at 3:00 p.m. Your Honor.

18             THE COURT:  Okay.  Why don't I move you to the ninth.

19   So we can --

20        What time are my statuses again?

21             THE CLERK:  One status at 9:00 together with one

22   sentencing.  At 10:00 a.m., one status conference.  2:00 p.m.,

23   one status conference.

24             THE COURT:  Okay.  Let's go ahead and start you all

25   at 10:30.
```

```
1           And I'll do my criminal calendar in advance and then

2      afterwards.

3           Okay?

4           Other issues you want to discuss?

5                MR. WARREN:  I don't think so, Your Honor.

6           One thought, to the extent it's helpful, that the

7      nonpriority claims that I know you'll be hearing in most

8      likely June, it's possible we could break those up and perhaps

9      do some of the smaller, more manageable ones during other

10     hearing -- instead of doing the school district issue and

11     trying to do that on April 19th when I know Your Honor has a

12     lot already going on, you know, perhaps we could do --

13               THE COURT:  Well, I had the school district scheduled

14     for May.  Not June.

15               MR. WARREN:  I'm -- I might have misunderstood, Your

16     Honor.  I thought you were thinking maybe we would do it on

17     April but if not May, but that's fine.

18               THE COURT:  So what I said is if I could get to it, I

19     would but right now, it's scheduled for May.

20               MR. WARREN:  Very well.

21               THE COURT:  Okay?

22               MR. SCHMIDT:  Paul Schmidt for Meta, Your Honor.  I

23     have the easiest argument.

24          Thank you for the guidance.  We have nothing further.

25               THE COURT:  Okay.  And I did try to get you all out
```

```
 1        of here earlier.

 2                MR. BLAVIN:  Thank you, Your Honor.

 3                THE COURT:  My apologies.  Like I said it's been

 4        very, very busy, and I just forgot to let you know that my

 5        trial resolved.

 6                MR. WARREN:  I believe Ms. Hazam may have one small

 7        issue.

 8                THE COURT:  Yes.

 9                MS. HAZAM:  Thank you, Your Honor.  Lexi Hazam for

10        plaintiffs.

11           I just wanted to update you that with regards to the

12        complaint Your Honor referred to at 24-594, this is the

13        complaint with the first plaintiff --

14                THE COURT:  Yes.

15                MS. HAZAM:  -- being the Board of Education for East

16        Prairie, my understanding is that they have filed the

17        individual short-form complaints already, although I am

18        seeking to actually see them to confirm.

19                THE COURT:  Okay.

20                MS. HAZAM:  But I've been given that information.

21                THE COURT:  Okay.  Great.  Terrific.  Thank you.

22                MS. HAZAM:  Thank you, Your Honor.

23                MR. BLAVIN:  Thank you, your Honor.

24                MS. MIYATA:  Apologies, Your Honor.  Bianca Miyata

25        for the state AGs.
```

1        I have one final point to raise, and that is that the

2   parties have been meeting and conferring about filing times

3   and attempting to improve upon and streamline our

4   collaboration and the proof for joint filing.  And we have

5   submitted a stipulation to the Court asking the Court to order

6   a filing time of 4:00 o'clock p.m. for all joint filings.

7             **THE COURT:**  I will do that in the next case

8   management order.

9             **MS. MIYATA:**  All right.  Thank you, Your Honor.

10             **THE COURT:**  You know, the law clerks don't understand

11   what we used to do.

12        Do people remember the bikers -- the bike runners who

13   would be at the law firms, and you were scrambling to get them

14   your -- your box or your bag or whatever.  I -- and they

15   would -- you know, those bikes would just go whipping -- you

16   should not have been on the road, like, the hour before filing

17   date -- you know, 5:00 o'clock.

18        And -- you know, and then we have all this electronic

19   stuff, right, and one wonders whether it's good or bad that

20   there's a midnight filing time.  I think it just makes it

21   worse on the lawyers.

22             **MS. HAZAM:**  I'm glad they're not biking at midnight.

23   That would be bad.

24             **THE COURT:**  But my point is, you know, lawyers

25   operate on deadlines.  So you're going to scramble if it's

```
1    five, you're going to scramble if it's midnight.  The question
2    is when are you going to scramble?  So 4:00 o'clock is --
3    that's, you know, reasonable.  That works nicely.
4              MS. HAZAM:  Thank you, Your Honor.
5              THE COURT:  I will include that.
6         Okay.  I'm just double-checking my notes here to see if I
7    got everything on my agenda.
8                   (Pause in the proceedings.)
9              THE COURT:  Yeah, I think that's it.  So this will
10   probably be the shortest conference that we have.
11        Enjoy the weekend.  And I'll see you in about a month,
12   okay?
13        We're adjourned.
14             THE CLERK:  Court is adjourned.
15             (Proceedings were concluded at 2:14 P.M.)
16                        --o0o--
17
18
19
20
21
22
23
24
25
```

1

2                    **CERTIFICATE OF REPORTER**

3

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11   _____

12          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                    Tuesday, March 26, 2024

14

15

16

17

18

19

20

21

22

23

24

25