**PAGES 1 - 166**

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY      )
PRODUCTS LIABILITY LITIGATION. )
                               )
                               )    **NO. 4:22-MD-03047-YGR**
_____)

                              Oakland, California
                              Friday, April 19, 2024

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                   SEEGER WEISS, LLP
                   55 Challenger Road, 6th Floor
                   Ridgefield Park, NJ 07660
              BY:  **AUDREY SIEGEL, ESQ.**

                   LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                   275 Battery Street, 29th Floor
                   San Francisco, CA 94111
              BY:  **LEXI J. HAZAM, ESQ.**
                   **PATRICK I. ANDREWS, ESQ.**
                   **MICHAEL I. LEVIN-GESUNDHEIT, ESQ.**

                   LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                   250 Hudson Street, 8th Floor
                   New York, NY 10013
              BY:  **JASON L. LICHTMAN, ESQ.**
                   **GABRIEL A. PANEK, ESQ.**
                   **KELLY K. McNABB, ESQ.**

                   MOTLEY RICE, LLC
                   401 9th Street Northwest, Suite 630
                   Washington, DC 20004
              BY:  **PREVIN WARREN, ESQ.**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

```
APPEARANCES (Cont.'d):

For Plaintiffs:
                  MOTLEY RICE, LLC
                  210 Lake Drive East
                  Cherry Hill, NJ 08002
            BY:  ESTHER E. BEREZOFSKY, ESQ.

                  MOTLEY RICE, LLC
                  20 Church Street
                  Hartford, CT 06103
            BY:  MATHEW P. JASINSKI, ESQ.

                  MOTLEY RICE, LLC
                  28 Bridgeside Boulevard
                  Mt. Pleasant, SC 29464
            BY:  JESSICA L. CARROLL, ESQ.

                  ANDRUS ANDERSON, LLP
                  155 Montgomery Street, Suite 900
                  San Francisco, CA 94104
            BY:  JENNIE L. ANDERSON, ESQ.

                  SOCIAL MEDIA VICTIMS LAW CENTER, PLLC
                  821 Second Avenue, Suite 2100
                  Seattle, WA 98104
            BY:  GLENN S. DRAPER, ESQ.

                  KESSLER, TOPAZ, MELTZER, AND CHECK, LLP
                  280 King of Prussia Road
                  Radnor, PA 19087
            BY:  MELISSA L. YEATES, ESQ.

                  LEVIN, SEDRAN AND BERMAN, LLP
                  510 Walnut Street, Suite 500
                  Philadelphia, PA 19106
            BY:  MICHAEL M. WEINKOWITZ, ESQ.

                  BRUSTER, PLLC
                  680 North Carroll Avenue, Suite 110
                  Southlake, TX 76092
            BY:  EDWARD K. CHIN, ESQ.

                  COLORADO DEPARTMENT OF LAW
                  1300 Broadway, 6th Floor
                  Denver, CO 80203
            BY:  BIANCA MIYATA, ESQ.
```

```
APPEARANCES (Cont.'d):
```

For Plaintiffs:

                    OFFICE OF THE ATTORNEY GENERAL
                    455 Golden Gate Avenue, 11th Floor
                    San Francisco, CA 94102
            BY:  **MEGAN O'NEILL, ESQ.**
                 **NAYHA ARORA, ESQ.**

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    1515 Clay Street, Suite 2000
                    Oakland, CA 94612
            BY:  **JOSHUA E. OLSZEWSKI-JUBELIRER, ESQ.**

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    CONSUMER PROTECTION SECTION
                    300 South Spring Street
                    Los Angeles, CA 90013
            BY:  **MARISSA ROY, ESQ.**
                 **BERNARD A. ESKANDARI, ESQ.**

                    GIBBS LAW GROUP, LLP
                    1111 Broadway, Suite 2100
                    Oakland, CA 94607
            BY:  **ANDRE M. MURA, ESQ.**

                    CARELLA, BYRNE, CECCHI, OLSTEIN,
                    BRODY & AGNELLO, P.C.
                    5 Becker Farm Road
                    Roseland, NJ 07068
            BY:  **MICHAEL A. INNES, ESQ.**

                    BEASLEY, ALLEN, CROW, METHVIN,
                    PORTIS & MILES, PC
                    234 Commerce Street
                    Montgomery, AL 36103
            BY:  **JOSEPH G. VANZANDT, ESQ.**

                    ILLINOIS ATTORNEY GENERAL'S OFFICE
                    115 South LaSalle Street, 26th Floor
                    Chicago, IL 60603
            BY:  **DANIEL EDELSTEIN, ESQ.**

                    CONNECTICUT OFFICE OF THE ATTORNEY GENERAL
                    165 Capitol Avenue
                    Hartford, CT 06106
            BY:  **LAUREN BIDRA, ESQ.**

```
APPEARANCES (Cont.'d):

For Plaintiffs:
                    OFFICE OF THE SOUTH CAROLINA
                    ATTORNEY GENERAL
                    P.O. Box 11549
                    Columbia, SC 29211
              BY:   ANNA C. SMITH, ESQ.

                    FLORIDA OFFICE OF THE ATTORNEY GENERAL
                    Consumer Protection
                    135 West Central Boulevard
                    Orlando, FL 32801
              BY:   DONNA C. VALIN, ESQ.

                    LOUISIANA DEPARTMENT OF JUSTICE
                    Office of Attorney General
                    Public Protection Division
                    Consumer Protection Section
                    1885 North 3rd Street, 4th Floor
                    Baton Rouge, LA 70802
              BY:   ARHAM MUGHAL, ESQ.

                    PENNSYVANIA OFFICE OF ATTORNEY GENERAL
                    Mezzanine Level, 1251 Waterfront Pl #201,
                    Pittsburgh, PA 15222
              BY:   JONATHAN BURNS, ESQ.

                    WASHINGTON OFFICE OF THE ATTOREY GENERAL
                    800 5th Ave, #2000
                    Seattle, WA 98104
              BY:   RABI LAHIRI, ESQ.

                    INDIANA STATE ATTORNEY GENERAL'S OFFICE
                    302 West Washington Street, 5th Floor
                    Indianapolis, IN 46204
              BY:   MARK SNODGRASS, ESQ.

For Defendants:
                    COVINGTON AND BURLING, LLP
                    One City Center, 850 Tenth Street Northwest
                    Washington, DC 20001
              BY:   PAUL W. SCHMIDT, ESQ.
                    TIMOTHY C. HESTER, ESQ.

                    COVINGTON AND BURLING, LLP
                    620 Eighth Ave
                    New York, NY 10018
              BY:   GREGORY L. HALPERIN, ESQ.
```

```
APPEARANCES (Cont.'d):
```

For Defendants:

                    COVINGTON AND BURLING, LLP
                    1999 Avenue of the Stars, Suite 3500
                    Los Angeles, CA 90067
          BY:  **ASHLEY M. SIMONSEN, ESQ.**

                    COVINGTON AND BURLING, LLP
                    Salesforce Tower
                    415 Mission Street, Suite 5400
                    San Francisco, CA 94105
          BY:  **ISAAC D. CHAPUT, ESQ.**

                    MUNGER, TOLLES AND OLSON, LLP
                    560 Mission Street, 27th Floor
                    San Francisco, CA 94105
          BY:  **JONATHAN H. BLAVIN, ESQ.**

                    MUNGER, TOLLES AND OLSON, LLP
                    601 Massachusetts Avenue Northwest
                    Suite 500 East
                    Washington, DC 20001
          BY:  **LAUREN BELL, ESQ.**

                    KING & SPALDING, LLP
                    1180 Peachtree Street Northeast, Suite 1600
                    Atlanta, GA 30309
          BY:  **GEOFFREY DRAKE, ESQ.**

                    FAEGRE, DRINKER, BIDDLE & REATH, LLP
                    300 North Meridian Street, Suite 2500
                    Indianapolis, IN 46204
          BY:  **ANDREA PIERSON, ESQ.**

                    WILSON, SONSINI, GOODRICH & ROSATI
                    953 East Third Street, Suite 100
                    Los Angeles, CA 90013
          BY:  **MATTHEW DONOHUE, ESQ.**

                    MORGAN LEWIS BOCKIUS
                    300 South Grand Avenue, 22nd Floor
                    Los Angeles, CA 90071
          BY:  **YARDENA R. ZWANG-WEISSMAN, ESQ.**

                    WILLIAMS AND CONNOLLY, LLP
                    725 12th Street
                    Washington, DC 20005
          BY:  **ASHLEY W. HARDIN, ESQ.**

| | |
|---|---|
| 1 | **Friday - April 19, 2024**                              **9:05 a.m.** |
| 2 |                  **P R O C E E D I N G S** |
| 3 |                      ---o0o--- |
| 4 |       **THE COURT:**  All right.  Good morning, everyone. |
| 5 |       **THE COURTROOM DEPUTY:**  Please be seated. |
| 6 |    Good morning.  Your Honor, calling the civil matter |
| 7 | 22-MD-3047-YGR, In Re: Social Media Adolescent Addiction |
| 8 | Personal Injury Products Liability Litigation.  Appearances |
| 9 | will be added at today's minutes for sign-in. |
| 10 |       **THE COURT:**  Thank you. |
| 11 |    Okay.  Let's go ahead and start.  So you know what?  I |
| 12 | forgot a binder.  I only brought in four; I needed five.  I'll |
| 13 | be right back.  We're going to start with the bellwether. |
| 14 |    Okay.  Who is addressing the bellwether issue? |
| 15 | Appearances, please. |
| 16 |       **MS. HAZAM:**  Good morning, Your Honor.  Lexi Hazam for |
| 17 | plaintiffs.  I will be addressing the personal injury |
| 18 | bellwethers.  Mr. Weinkowitz will address school district |
| 19 | bellwethers. |
| 20 |       **THE COURT:**  Okay. |
| 21 |       **MS. PIERSON:**  Good morning, Your Honor.  Andrea |
| 22 | Pierson, Faegre Drinker, for the Tiktok defendants.  I'll be |
| 23 | addressing the personal injury bellwethers, and my colleague, |
| 24 | Geoffrey Drake, will be addressing the school district |
| 25 | bellwethers. |

1          **THE COURT:**  Okay.  I received the *Lexecon* objections.

2    I think there was an e-mail, something filed last night with

3    respect to potential other issues.  So an update first.

4          **MS. HAZAM:**  Yes, Your Honor.  Lexi Hazam.

5          The e-mails that Your Honor received last night, one was

6    an e-mail from plaintiffs with regards to information that has

7    been designated confidential about the personal injury

8    plaintiffs that is --

9          **THE COURT:**  I don't intend to use people's names.

10         **MS. HAZAM:**  Okay.  Thank you, Your Honor.

11         Would you prefer that the parties refer to the plaintiffs

12   in a particular manner, or do you prefer that the parties not

13   address specific bellwether cases?

14         **THE COURT:**  Well, I don't know that we're going to

15   need specifics.  I'm actually interested in knowing what the

16   response is on the *Lexecon* objections.  Procedurally what is

17   your response?

18         **MS. PIERSON:**  Thank you, Your Honor.

19         And maybe just by way of background I would say this, that

20   the sands have shifted underneath us considerably in the last

21   48 hours.  The Court is aware from our e-mail message last

22   night that one of the bellwether plaintiffs' counsel has

23   informed us of intent to dismiss.

24         **THE COURT:**  Right.

25         **MS. PIERSON:**  Two have informed us of their refusal

1    to waive *Lexecon* to have their cases tried in this case.  And

2    in addition to that, five bellwether plaintiffs made material

3    changes to their PFSs regarding age of first use, years of use,

4    first use, and duration of use just overnight.  That's eight of

5    12 bellwethers impacted in just the last 48 hours, including

6    four of six of the defendants' picks.

7        So, Your Honor, to address specifically, how do we propose

8    to deal with these issues, including the *Lexecon* issues?  We

9    would ask the Court for four things, Your Honor:

10       First, is that further amendments to the parties'

11   bellwether picks should be foreclosed, and the plaintiffs

12   should provide notice to the defendants within seven days of

13   all other cases in which they intend to seek leave to amend

14   their complaints.  In addition, if further amendments are

15   sought, the plaintiffs should be required to meet and confer

16   with the defendants to explain both the basis for their

17   amendments, and defendants should have the opportunity to

18   object to any motion for leave to assert further amendments.

19       The second relief that we request, Your Honor, is that

20   plaintiffs should be required to confirm within seven days that

21   each plaintiff in this MDL wishes to pursue their case and will

22   not dismiss their case if selected as a bellwether.

23       Third, with respect to *Lexecon*, Your Honor, given that

24   one-third of the defendants' bellwether selections have

25   asserted *Lexecon*, CMO 12 should be modified to require all

1    plaintiffs to state within seven days whether they intend to

2    assert *Lexecon* objections.  Otherwise, there is a significant

3    risk that any replacement selections made by defendants will

4    assert *Lexecon* objections, prolonging and skewing the selection

5    process.

6         Finally, Your Honor, the Court will recall that PFSs are

7    due for cases in which plaintiffs failed to submit one on May

8    the 15th.  Defendants should have at least until May the 15th

9    to select replacement bellwethers for the three cases at issue

10   by virtue of the dismissals and the refusals to waive *Lexecon*,

11   and the personal injury case deadline should be extended

12   commensurate with the time lost due to the repeatedness of the

13   selection process, the need to repeat it.

14        That's the relief that we would request, Your Honor.

15             **MS. HAZAM:**  If I may respond, Your Honor?

16             **THE COURT:**  You're going to be able to respond, but I

17   do agree with the defendants that this has caused significant

18   issues, and some measure of relief will be provided.  I'm

19   not -- you know, look, the reality is is that games get played

20   in MDLs.  All I've done is advance the game-playing.  And what

21   a number of judges in MDLs experience is that this happens at

22   the time of trial.  Right?  People pull out at the time of

23   trial.  That's why I actually like this process.  Now, I know

24   now.  So I have just advanced a significant amount of games-

25   playing, and we're going to stop it.

1          So at a minimum, I think it is entirely appropriate to

2     have every single plaintiff decide whether or not they've got a

3     *Lexecon* objection.  I won't have the defendants go through and

4     pick people only for them to pull out at the last minute -- and

5     it's not really the last minute -- for them to pull out.  And

6     this process, as far as I'm concerned, needs to be redone.

7          But you can respond.

8               **MS. HAZAM:**  Thank you, Your Honor.

9          Respectfully, we are glad that this process is happening

10    now, too.  We agree with the sense and efficiency of having

11    these issues arise now rather than later.

12         I would submit, Your Honor, it's my plea that these are

13    not extraordinary circumstances meriting extraordinary relief.

14    They are fairly typical of MDLs.  The plaintiffs moved as soon

15    as --

16              **THE COURT:**  What do people mean by extraordinary

17    relief, other than everything's going to get pushed at this

18    point to address the fact that we were supposed to have

19    bellwether selection by today in order to meet the aggressive

20    timetable?  So I suspect everything's going to get pushed at

21    least, or maybe 30 days is sufficient.  But it's going to get

22    pushed because of what just happened.

23              **MS. HAZAM:**  Understood, Your Honor.

24         When you say everything will be pushed, plaintiffs would

25    submit that there's not a need as of now to push the remainder

1    of the entire schedule, including the trial date, because --

2              **THE COURT:**  I'm not sure of that.  We'll see.

3              **MS. HAZAM:**  Okay.  If I may respond to a few of the

4    points that had been made.

5          With regards to amendments, there are several plaintiffs

6    in the bellwether pool who have sought consent from the

7    defendants to amend their short-form complaints to add

8    additional defendants and some other information.  That

9    information is in their PFSs, their plaintiff fact sheets, and

10   that is spurring the request for leave to amend.  We do not

11   believe that that is prejudicial to defendants at this early

12   stage of the proceedings.

13         We are, of course, amenable to defendants picking

14   replacements for these three plaintiffs, one of whom is

15   dismissing with prejudice.  So, if anything, that operates to

16   defendants' advantage.  That is one fewer case in the

17   litigation.  And the other two are exercising their rights

18   under *Lexecon*, which are provided for both under the law and in

19   Your Honor's order.

20         We informed defendants immediately upon learning that

21   there would be *Lexecon* objections.  We sought to learn whether

22   there would be any immediately.  The deadline for those

23   objections is not until April 25th, but defendants are already

24   aware of the only ones that there will be as to the personal

25   injury plaintiffs.  Defendants have not raised any of their

1   specific requests for relief that were just enumerated with

2   plaintiffs prior to this hearing.  We understand the Court may

3   be inclined to grant some of those.

4           **THE COURT:**  Well, when were they supposed to do it?

5           **MS. HAZAM:**  We have been discussing these matters

6   with defendants over the past few days.  So we have discussed

7   these issues of *Lexecon* dismissals, et cetera.

8       Plaintiffs would merely request that Your Honor take into

9   account that we believe that there is more than sufficient time

10  to address replacing bellwethers and to provide information

11  along the lines of what Your Honor is requesting with regards

12  to intent under *Lexecon*.  That is a large endeavor because of

13  the number of individual plaintiffs who need to be consulted,

14  but we will undertake it, and we will undertake it as swiftly

15  as we can.  We do not believe there is cause presently to

16  extend discovery cutoffs or a trial date.

17          **MS. PIERSON:**  Your Honor, maybe just one response.

18      I appreciate your guidance with respect to the *Lexecon*

19  issue in particular, but on this question of amending

20  complaints, I want to be clear that the facts that I recited to

21  you just a moment ago about eight of the 12 bellwethers, those

22  have come to light for us within the last 24 to 36 hours.  So

23  these, for us, are late-breaking events.  Of course, this is

24  information that's been within the plaintiffs' possession for a

25  much longer period of time.  It is impossible to choose

1    bellwethers with any degree of confidence, when we don't know

2    who the defendants are or the age of first use, peak use, or

3    any of the factors the plaintiffs point to as representative.

4    This information has been within the exclusive possession of

5    the plaintiffs for months now.

6         So that's why we request, Your Honor, that -- the process

7    that I outlined.  That, in fact, the plaintiff should have to

8    give us notice that they intend to seek leave to amend, there

9    should be an opportunity to object, but that once a bellwether

10   is selected, the sands cannot change under our feet.

11        **MS. HAZAM:**  Your Honor, just one point I'd like to

12   make in response to that.

13        We are not in exclusive possession of some of this

14   information.  The usage of the defendants' platforms by the

15   plaintiffs is, in fact, more in their possession than ours in

16   the sense that they have access to data that we do not have.

17   Some of these plaintiffs do not have an ability to download

18   their data and do not have access to their account history.  So

19   their answers to the plaintiff fact sheets on this front, which

20   is what the defendants are referring to, is to the best of

21   their knowledge and recollection.

22        So we don't actually believe that that is always the case.

23   We have given --

24        **THE COURT:**  Stop a moment.

25        (Pause in proceedings.)

1          **THE COURT:**  Okay.  You may proceed.

2          **MS. HAZAM:**  Simply one other point that I wanted to

3    make, Your Honor, is that one of the *Lexecon* objections that

4    has been raised, has been raised due to a fact that would

5    literally physically prevent a plaintiff from attending trial

6    in California, and that was publicly available information.

7    The plaintiff is on probation, as disclosed in the plaintiff's

8    PFS, and the conditions of probation, which are available on

9    the public docket, would prevent the plaintiff from travel.

10          **THE COURT:**  I -- that's not necessarily true.

11    Do you practice criminal law?

12          **MS. HAZAM:**  I don't.

13          **THE COURT:**  Do you know how that works?

14          **MS. HAZAM:**  I only know what I read in the probation

15    order.

16          **THE COURT:**  All that you have to do is apply to the

17    judge, and we do that all the time, all the time, and we give

18    temporary relief to be -- to locate to a different place for

19    particular purposes.

20          **MS. HAZAM:**  Understood, Your Honor.

21    *Lexecon* does give plaintiffs the right to raise these

22    objections.

23          **THE COURT:**  It does, correct.

24          **MS. HAZAM:**  I'm clarifying the basis for it.

25          **THE COURT:**  It does.

1    All right.  So you need to redo this process, and we need

2  to know which plaintiffs are going to exercise their right,

3  which they're entitled to do, versus not.

4    How much time do the plaintiffs need?

5         **MS. HAZAM:**  Do I understand Your Honor correctly that

6  you want that for all plaintiffs?

7         **THE COURT:**  All plaintiffs.

8         **MS. HAZAM:**  So, Your Honor, that would total

9  approximately 200 plaintiffs.  I -- and we're talking about the

10  personal injury plaintiffs presently, I believe, is that

11  correct, and not the school district plaintiffs?

12         **THE COURT:**  I'll talk to Mr. Weinkowitz.

13         **MS. HAZAM:**  Okay.  For the personal injury

14  plaintiffs, Your Honor's timeline is probably one that we can

15  meet.  We would do our utmost to do so.  So I believe Your

16  Honor was contemplating approximately 30 days.

17         **THE COURT:**  All right.  Thirty days takes us to ...

18         **MS. HAZAM:**  I believe it would be May 17th, Your

19  Honor.

20         **THE COURT:**  All right.  That's 28 days.

21    So all plaintiffs must exercise their *Lexecon* objections

22  no later than May 17th.  Otherwise, they're waived.

23         **MS. HAZAM:**  Understood, Your Honor.

24         **THE COURT:**  Now, with respect to where we are now, I

25  take it -- and remind me.  I'm looking for your list.  Let's

1  start with plaintiffs.  Looking at your list, page 5 of 25,

2  Docket 757-1.

3          **MS. HAZAM:**  Yes, Your Honor.

4          **THE COURT:**  Of these six -- and I apologize.  Things

5  came in last night, and I've been dealing on a nonstop basis

6  with the Dublin BOP since Monday.  So I haven't made notes on

7  my list here, which is why we need to walk through it.

8      Did anybody of your six assert a *Lexecon* objection?

9          **MS. HAZAM:**  They did not, Your Honor, and they will

10  not.

11          **THE COURT:**  Okay.  So your six are set and cannot be

12  changed.

13          **MS. HAZAM:**  Understood, Your Honor.

14          **THE COURT:**  Going to defendants' list, and I'm at

15  Docket 756-1, Exhibit 1, which is page 28 of 28.  Again, I have

16  six.  Number 3 has stated a *Lexecon* objection, and which

17  others, using numbers?

18          **MS. HAZAM:**  Your Honor, number 3 has stated a *Lexecon*

19  objection, number 1 has stated that the case will be dismissed

20  with prejudice.  And using the Exhibit 1 chart and numbering

21  just by going down the rows, the final one, number 6, has also

22  raised a *Lexecon* objection.

23          **THE COURT:**  Okay.  Defendants get three more picks.

24          **MS. HAZAM:**  And, Your Honor, I just want to make sure

25  we're talking about the same case, if I may.  The case I

1    referred to as row 6 on Exhibit 1, it is Row 6 on Exhibit 1, in

2    the e-mail that we sent to Your Honor it was labeled

3    differently.  So I just want to read the case number, if I may,

4    to confirm.

5              THE COURT:  I don't have case numbers on Exhibit 1.

6              MS. HAZAM:  Okay.  That's correct.

7              THE COURT:  What I can say is that this is the, last

8    name starts with an "M".

9              MS. HAZAM:  Yes, correct.

10        Thank you, Your Honor.

11             THE COURT:  Okay.  So defendants, then, the pool

12   doesn't change.  I would expect, and I do expect that you will

13   rank who you want as your next three picks, and you will know

14   on the 17th whether or not they're asserting *Lexecon*

15   objections.  So I should have an answer for you on your next

16   three picks by May 22nd.

17             MS. PIERSON:  Thank you, Your Honor.

18        There was additional relief that we think is appropriate,

19   Your Honor, as I mentioned, with respect to the amendments of

20   the complaints and also amendments to the PFSs.

21             THE COURT:  So I have to look at those on an

22   individual basis.  Complaints get amended all the time.  The

23   question is whether it's a significant amendment or not.  And

24   that's what the discovery process is.  You have information

25   that they don't have.  They have information that you don't

1    have.

2        So certainly it would seem to me that the defendants

3    shouldn't change.  That if they are -- there cannot be a change

4    in defendants.  You should know whether you're on Snap, or

5    Tiktok or Facebook.  If they don't know, that's a problem for

6    you two.

7            MS. PIERSON:  So, Your Honor, our specific request

8    with respect to docket -- and I think it's consistent with what

9    you're saying, is that once a case is chosen as a bellwether,

10   the pick is disclosed by defendants, that there should be no

11   further amendments as to the parties that are involved.  So we

12   would ask that the deadline that the Court has given with

13   respect to *Lexecon* waivers, that that should also be our guide

14   as it relates to notice of intent for leave to amend to add

15   defendants, and that once a case is chosen, the parties should

16   not be entitled to change, or plaintiff should not be entitled

17   to add or change the defendants after that point.

18           THE COURT:  I don't think there's a problem with

19   that.

20       Is there an objection?

21           MS. HAZAM:  Your Honor, there is to a limited extent,

22   and that is that we have a process in place by which we learn

23   from defendants if there are counts that they believe are

24   associated with the plaintiffs.  This is part of the plaintiff

25   fact sheet process, and not all plaintiffs had the benefit of

1    that information prior to their PFSs due to various delays,

2    including on defendants' side of the ledger.  And if there is a

3    disclosure of information about an account that plaintiffs were

4    not aware of, keeping in mind that these are often very young

5    people, and we often have a long span of time that may be

6    pertinent.

7            **THE COURT:**  They currently are not young.  They are

8    currently adults.

9            **MS. HAZAM:**  I'm referring to the larger pool.

10   Approximately 40 percent of the plaintiffs in the larger pool

11   that defendants might be choosing from here are not yet adults.

12   But in today's electronic world, going back 10 years, knowing

13   every account you may have used can sometimes be challenging,

14   which is why that process was implemented.  If that process

15   results in accounts that plaintiffs were not previously aware

16   of -- and we have to take the first step as part of this

17   process in identifying the accounts we are aware of.  So we do

18   that.  Long before they get a PFS, the defendants get that

19   information.

20       They, then, come back to us with accounts that aren't on

21   the list we did first.  That may affect naming of defendants in

22   these cases.  I think if there is good cause akin to that,

23   plaintiffs should be able to seek leave of court to amend.

24   Defendants, of course, can exercise their rights to --

25           **MS. PIERSON:**  Your Honor, our view is that these

1    cases have been on file for a year or more, in large part, and

2    that the plaintiffs had --

3         **THE COURT:**  When is the information going to be

4    disclosed to the plaintiffs that you have in your possession?

5    The information she's talking about, when is it disclosed?

6         **MS. PIERSON:**  They served us with hundreds of

7    requests for production, Your Honor.  There's information being

8    disclosed all the time.

9         **MS. HAZAM:**  Your Honor, those requests for production

10   don't go to individual plaintiffs.  I believe the process Your

11   Honor is referring to is going to happen through what I just

12   outlined, as well as the defendant fact sheet, which is being

13   negotiated before Judge Kuhl; I believe will be addressed again

14   this coming week.  Once that is in place, we will have more

15   fulsome information about these plaintiffs.

16        **MS. PIERSON:**  Well, and you recall, Your Honor, we

17   did have this discussion about defendant fact sheets, and when

18   the plaintiffs asked for this incredibly aggressive schedule,

19   they did not include in that some process for defendant fact

20   sheets.  We talked about that with Your Honor at the last

21   hearing, I believe, and Your Honor said because the plaintiffs

22   had asked for this aggressive schedule, that the process can't

23   be held up now by some claim that they don't have access to

24   information about their accounts.

25        The reality is that the plaintiffs can download their own

1    data, and they've had the ability to do that since the, you

2    know, for as long as their case has been filed, if not before

3    that.

4        So I just want to be clear, Your Honor, you know, you're

5    building in an additional 30 days into the process, and during

6    that time, the plaintiff should be conducting a census of their

7    cases.  They should be talking to their clients about whether

8    they intend to dismiss or not.  They should be looking at this

9    information.  We should not choose bellwethers, only to have

10   age at first use, peak use change in the PFSs, or the parties

11   themselves change.  You know, we spent an incredible amount of

12   time and resources in the two-week period of time between when

13   we received 200 PFSs on April the 1st, to provide our picks on

14   April the 15th, only to have that process completely undone.

15   So respectfully --

16          **THE COURT:**  Not completely undone.  Let's not

17   overstate.

18          **MS. PIERSON:**  Understood, Your Honor.

19          **THE COURT:**  I really am not in the mood for hyperbole

20   today.  Okay?  I got a lot of hyperbole beginning at 7:00 a.m.

21   this morning, so I'm not in the mood for it.  Let's stick to

22   the facts.

23       The reality is that I can't know everything, so the

24   default is is that there shouldn't be a change.  If something

25   extraordinary happens or is different, you can bring a motion.

1    But the bar is very high, and it may -- and it may have ripple

2    effects that you don't appreciate.  So I won't bar motions, but

3    the hurdle is high.

4              **MS. HAZAM:**  Understood, Your Honor.

5              **MS. PIERSON:**  Thank you, Your Honor.

6              **THE COURT:**  All right.

7              **MS. PIERSON:**  Your Honor, I do have some concern

8    about --

9              **THE COURT:**  Hold on.  Because I didn't have realtime,

10   so I didn't have my list of the things you were asking for,

11   which I don't have in writing.

12             **MS. PIERSON:**  Sure.

13             **THE COURT:**  Is there something else in your list?

14             **MS. PIERSON:**  Sure.

15       We ask that Your Honor, in that process, address the

16   amendments.  That within seven days they should notify the

17   defendants of all cases in which they intend to seek leave to

18   amend the complaints, and that they be required to meet and

19   confer to explain the basis of the amendment, and then file a

20   motion for leave with this Court, to which we can object or may

21   choose not to.  So as it relates to the amendments, that's the

22   process that we requested.

23       We also ask that the Court require the plaintiffs, within

24   seven days, to talk to their clients and confirm that they will

25   not dismiss their case if it's selected as a bellwether;

```
1   confirm that they want to pursue their case; have that live
2   conversation.
3        We addressed the Lexecon issue.
4        And then the last issue, Your Honor, was just with respect
5   to the time that defendants have to replace the three
6   bellwethers, and that's the point that I was just about to
7   make.  I am concerned, Your Honor, that this pool could change
8   substantially once the plaintiffs review their cases for
9   amendments to PFSs, for amendments to the complaints and also
10  for the Lexecon issue.  And candidly, I think one week is too
11  tight for defendants to provide three picks, knowing the
12  substantial amount of change that could occur.
13       Just as I've been talking, yet another of the bellwether
14  plaintiffs that was chosen by defendants has changed key
15  information.  The plaintiff fact sheet --
16            THE COURT:  Well, tell me which one and what.  Give
17  me a number.  So what number?  You're left with 2, 4 and 5.
18            MS. PIERSON:  Five.
19            THE COURT:  Okay.  What did 5 change?
20            MS. PIERSON:  Information about the dates of usage,
21  which will affect age at first use.
22            THE COURT:  Which is -- so what is that now?
23            MS. PIERSON:  I'm sorry, Your Honor.  I don't have
24  that in front of me.
25            MS. HAZAM:  Your Honor, I --
```

1          **MS. PIERSON:**  I only know that it's been changed

2     while we are here.

3          **MS. HAZAM:**  I can address this.

4      I'd first like to note that the changes that are being

5     made to the PFSs right now are largely in response to

6     deficiency notices received by the defendants, received from

7     the defendants.  That is a contemplated part of the process.

8     It is a universal part of a PFS process.  It is discovery.

9     Discovery gets amended and supplemented.

10          **THE COURT:**  Give me the information.

11          **MS. HAZAM:**  Yes.

12      And as to this particular case, there was -- we noted, on

13    the basis of a chart we just received from defendants last

14    night, there was an inconsistency that suggested one age in one

15    place and a different age in another place as to the age of

16    first use.  So we inquired and learned this morning that one of

17    them was correct and the other was not.  These are typical

18    discovery issues that are being resolved by plaintiffs as

19    promptly as possible and now being held against us.

20          **THE COURT:**  Okay.  Still waiting for the answer.

21          **MS. HAZAM:**  That was the answer, I'm sorry.  The

22    answer is that there was an inconsistency --

23          **THE COURT:**  No.

24          **MS. HAZAM:**  Sorry.

25          **THE COURT:**  I'm looking at the chart.

```
 1                 MS. HAZAM:  Yes.

 2                 THE COURT:  Age of first use changes to what?

 3                 MS. HAZAM:  I believe that the age of first use the

 4    defendants had in their chart was nine, and the actual age is

 5    11.

 6                 THE COURT:  I have here six, so which is it?  Six,

 7    nine, 11?

 8                 MS. HAZAM:  I'm sorry.  Maybe I'm looking at -- can

 9    Your Honor -- you're using defendants' exhibit at the end?

10                 THE COURT:  I'm looking at their chart, page 28 of

11    28.

12                 MS. HAZAM:  And you're using number 5?  I just want

13    to clarify so I can answer.

14                 THE COURT:  B, as in boy, H, as in hat.

15                 MS. HAZAM:  I do have someone here who could answer

16    that question if you'd --

17                 MS. PIERSON:  Your Honor, I believe my colleague,

18    Mr. Halperin can answer that.

19                 THE COURT:  All right.  Mr. Halperin?

20                 MR. HALPERIN:  Good morning, Your Honor.

21          The changes that we received with regard to this

22    plaintiff, based on a very quick review of the fact sheet that

23    literally came in during this hearing --

24                 THE COURT:  Don't -- again, don't repeat.  We have a

25    lot to do today.
```

1          **MR. HALPERIN:**  Sorry, Judge.

2          **THE COURT:**  So I don't want to hear any repetition,

3     and I don't want to hear any hyperbole.

4          **MR. HALPERIN:**  Yes, Your Honor.

5        The changes that we have found are that the time, the

6     number of minutes per night for two accounts have been cut in

7     half.

8          **THE COURT:**  Okay.  So --

9          **MR. HALPERIN:**  The age --

10         **THE COURT:**  -- that's not a basis upon which you

11    argued anything in this motion.

12         **MR. HALPERIN:**  That's correct, Your Honor.

13         **THE COURT:**  Okay.  So that's not relevant to me.

14         **MR. HALPERIN:**  Okay.  The time used has changed.  The

15    average daily use was changed on one platform was changed from

16    720 minutes, down to 200 minutes.  On another platform from 720

17    minutes, down to a hundred.

18         **THE COURT:**  Are you talking about the daily uses?

19    Because that's the metric that you gave me.

20         **MR. HALPERIN:**  Yes, Your Honor.  I can tabulate it,

21    if you give me one second just to do some math on the fly.

22         **THE COURT:**  And you already knew that there was some

23    kind of inaccuracy, because your chart indicates that the PFS

24    alleged more than 24 hours per day, which is not -- which can't

25    be done.

1          **MR. HALPERIN:**  Right, Your Honor.

2          **THE COURT:**  So you knew there was a problem with this

3    to begin with when you chose it.

4        But go ahead.  What is the average daily use now?

5          **MR. HALPERIN:**  It is now 6.8 hours.

6          **THE COURT:**  All right.  6.8 versus 10-plus, I'm not

7    sure how much that matters.

8          **MS. HAZAM:**  Your Honor, with respect, that was why we

9    changed this this morning.  This client is represented by my

10   firm, and we noted that the minutes had an issue in our

11   calculations, again, based on defendants' chart and brief, and

12   we rushed to address it.  We regret the error, but again, this

13   is a typical part of the discovery process, and defendants are

14   issuing multiple lengthy --

15         **THE COURT:**  I -- again, use words sparingly.

16         **MR. HALPERIN:**  Your Honor, there was one other

17   change, as well, to the injury alleged.

18         **THE COURT:**  All right.

19         **MR. HALPERIN:**  Laxative use was added as an injury,

20   overexercise was added as an injury, and orthostatic dizziness

21   was added as an injury.

22         **THE COURT:**  Okay.  Again, that doesn't make a huge --

23   it's not a huge difference.

24         **MR. HALPERIN:**  Understood, Your Honor.

25         **THE COURT:**  In fact, what it is, is it gives you more

1     specifics with respect to some of this other stuff.  So to the

2     extent that's an objection, it's overruled.

3         There is no perfect picks.  When I reviewed your arguments

4     and looked at the data that had been provided to justify your

5     arguments, you each only get six picks.  And there are lots of

6     different metrics.  So you're cutting them and slicing them in

7     slightly different ways.  That's why I said just a moment ago

8     that, you know, the objection that there is a change frankly

9     didn't really seem to matter, given the kinds of choices that

10    you're making and the arguments that you're making for those

11    choices.

12        So what I did is I looked at the metrics that you provided

13    me.  I tried to compare apples to apples.  Sometimes I only had

14    apples and oranges.  But age was clearly a factor, age of first

15    use, gender, geography.  For purposes of bellwethers, I think

16    that that matters, the type of injury, and obviously the

17    defendant.

18        I think both sides skewed, perhaps in a way that benefits

19    them, each side.  But as a totality, because you both skewed

20    for your own benefit, a group that I thought was basically

21    representative.  You did the same thing with the school

22    districts.  You both skewed, but collectively there's balance.

23        So I disagree that you can't, given the factors that you

24    argued, I disagree that you can't make those choices, because

25    there is -- we don't have perfection here.  And the factors

1    that are the big-issue factors that I just went through are

2    easily discernible, and I think -- and those are the ones that

3    I'm looking at to see if I have balance in terms of

4    bellwethers.

5          There were no cases, though, from the northwest.  Why is

6    that?

7          **MS. HAZAM:**  Your Honor, if I may, I can take a stab

8    at answering that.

9          To the extent that California can be considered partially

10   northwest, there are very few California plaintiffs in the MDL

11   because of a lack of diversity.  I frankly don't have numbers

12   in front of me on the other northwest states, but I know that

13   they were not among the states that had the largest number of

14   plaintiffs, which were Illinois, both sides picked an Illinois

15   case; New York, we picked a New York case; Georgia, we picked a

16   New York (sic) case, and a few others.  I don't believe that

17   the -- that Oregon and Washington ranked highly, but we can get

18   you that information certainly if it's a concern of the Court.

19         **MS. PIERSON:**  We did look at that information, as

20   well, Your Honor.  And I agree, there were very few plaintiffs

21   from the west and northwest in this pool.

22         **MS. HAZAM:**  We do have a plaintiff from Arizona, and

23   that represents the western states among our picks.  The

24   defendants did not have any picks west of Illinois.

25         **MS. PIERSON:**  Although there is one from Colorado,

1    right?

2                 **THE COURT:**  No.

3                 **MS. HAZAM:**  No.

4                 **THE COURT:**  You had two from Pennsylvania --

5                 **MS. PIERSON:**  Okay.

6                 **THE COURT:**  -- one from Alabama, one from Virginia,

7    one from Kentucky and one from Illinois.

8                 **MS. PIERSON:**  That's correct, Your Honor.  I'm sorry,

9    I was looking at my chart of all the picks.

10                 **THE COURT:**  I think geography matters.  Having grown

11   up in Texas, having gone to school on the East Coast, and

12   having lived as an adult in California, very different.  Each

13   of those areas is different, and how people interact and

14   operate is different.  And so, for me, making sure that we have

15   geographic diversity is quite important.

16          Now, kids can be kids.  That's why age matters and use

17   matters.  Again, I think the reference gender, I think it is

18   entirely appropriate to have a male pick.  The plaintiffs chose

19   not to do that.  But like I said, you picked more men than

20   females, so you skewed.  But collectively, because they picked

21   none, that gave balance.  That's an example of each of you

22   skewing, with the ultimate results being balance.  So those are

23   some of the statistics that I'm looking at.

24          All right.

25                 **MS. PIERSON:**  Your Honor, may I make one request in

1    following up on the factors that you just identified?

2        We looked at those factors, as well.  We highlighted them.

3    They're in our brief.  Those are important, I think, to both

4    sides.  And our concern with respect to the changes in the

5    PFSs, while we agree those are changes that are made in

6    response to deficiency letters, we've now sent out deficiency

7    letters in all the cases where we have PFSs to date.  But we

8    need to know what those factors are, too, to be able to choose,

9    to bring to you cases that are representative, we need to know

10   for sure what is the age at first use.

11       You know, information --

12       (Simultaneous crosstalk.)

13       **THE COURT:**  So, again, the difference between a

14   six-year-old and a seven-year-old is minor.  The difference

15   between a six- and seven-year-old and an 11- and 12-year-old is

16   significantly different.  So one year isn't going to change the

17   analysis, and maybe not even two years.

18       When I looked at this, I am looking at buckets.  So, you

19   know, like I said, it's not necessarily going to be perfect.

20   Clearly, significant changes are a problem, or could be a

21   problem.  And perhaps the way I deal with that if that happens

22   is that you get another pick.  This is a -- this is an organic

23   process.

24       **MS. PIERSON:**  Understood.

25       I think my only ask there, Your Honor, that was in this

1    30-day period of time that you've given the plaintiffs to

2    review their cases for *Lexecon*, it seems appropriate that

3    during that period of time they should also review for these

4    key things that you've identified today.

5            **THE COURT:**  I agree.  I agree.

6        And the -- you know, the incentive to do that is not to

7    extend the schedule, is not to give them an extra pick that you

8    don't want -- that you will not -- I will not reciprocate.

9        So it's in your interest to make sure that the information

10   is as complete as possible if we're gonna keep on this

11   schedule.

12           **MS. HAZAM:**  Understood, Your Honor.  We agree that we

13   have every incentive to provide as fulsome and accurate of

14   information as possible.

15       I will note that of the things Your Honor mentioned, the

16   plaintiff geographic location is not going to change.  The

17   plaintiff's current age is not going to change.  The issue is

18   age of first use, as I understand it.  We do our best on that

19   front, and will continue to do so.  The -- again, our responses

20   to defendants' questions, some of which we don't believe are

21   even deficiencies, but putting that aside, our responses are

22   designed to be responsive, and it seems that that process is

23   now sort of being weaponized against plaintiffs.

24       But I will say that particularly with age of first use, I

25   believe that generally defendants have that information in a

1    more reliable and precise form than we do.  That doesn't mean

2    we aren't endeavoring to provide it.  It doesn't mean we aren't

3    doing download your data when we're able, which is not always,

4    because sometimes plaintiffs can't access their accounts.

5         But most of the information Your Honor has listed is not

6    something that will change.

7              **THE COURT:**  Okay.  Then I won't have any extra

8    motions.

9         All right.  Let's talk about the school districts.

10             **MS. HAZAM:**  Thank you, Your Honor.

11             **THE COURT:**  And for the record.

12             **MR. WEINKOWITZ:**  Good morning, Your Honor.  Mike

13   Weinkowitz on behalf of the plaintiffs.

14             **MS. YEATES:**  Good morning, Your Honor.  Melissa

15   Yeates on behalf of the school district plaintiffs.

16             **MR. DRAKE:**  Good morning.  Geoffrey Drake, King &

17   Spalding, for the Tiktok defendants.

18             **THE COURT:**  Okay.  This was an interesting review.

19   Again, I think that both sides skewed to some extent.

20        The metrics that you gave me and that I was looking at

21   include geography, suburban.  Population size, the -- and that

22   is the population size of the school district.  One of you used

23   income level, the other used percentage of free meals.  So not

24   quite apple-to-apple kind of comparison.

25        Ultimately -- well, and I think the defendants gave me

1  another metric which I found to be useful, which was, we're

2  looking at 20 percent of the districts as being in what I would

3  call kind of the small range, so 1750 or less in terms of

4  school district size; 20 percent being over 30,000, and then

5  60 percent somewhere in the middle.

6      So as I looked at all of these different groups, I ended

7  up having one that was what I would call like a mega school,

8  225,000, which is, you know, perhaps is a useful data point.

9  That is, like having one person who suffered a suicide might be

10  a useful data point, having something that's mega like that;

11  two that were large, five that were small, and four that were

12  somewhat medium, given those various metrics.  And then

13  obviously, as I've mentioned before, the geographic locations.

14      Again, you know, defendants had -- well, you each had one

15  in Maryland, you each had one in New Jersey, you each had one

16  in South Carolina, and then Georgia was included, Florida, and

17  a second South Carolina school.  Well, and then we had Utah.

18      So I think, in balance, given your collective choices, I

19  am comfortable.

20      All right.  Are there issues with this group?

21          MR. WEINKOWITZ:  Your Honor, we have canvassed all of

22  the plaintiffs' school districts since we've got the defense

23  picks.  None of the plaintiffs' -- all of the plaintiffs' picks

24  will waive *Lexecon*.  The defendants, we have talked to every

25  school district of the defendants' picks, and we have two that

1   have not indicated yet that whether they will object or whether

2   they will not, but the rest have.

3      So there are two outliers --

4         **THE COURT:**  Four are objecting, or four are waiving?

5         **MR. WEINKOWITZ:**  Four are waiving.  Everyone is

6   waiving, except for two that I haven't heard back from.

7         **THE COURT:**  Okay.  And which are the two?

8         **MR. WEINKOWITZ:**  The two are Baltimore city and

9   Dekalb, and the prob --

10        **THE COURT:**  Baltimore city and -- I only have the

11   states.

12        **MR. WEINKOWITZ:**  Dekalb, Georgia, Your Honor.

13      And, you know, the process is a little bit different for a

14   school district.  You have to reach out to the solicitor.  You

15   have to have the board consider it.  And we'll have answers by

16   the 25th, and the moment I have an answer, I'll let the

17   defendants know.

18        **THE COURT:**  Okay.  So both of those are what I put in

19   the large category.

20        **MR. DRAKE:**  That's right, Your Honor.  Those were our

21   two efforts to select relatively large districts to be

22   representative of the whole.

23        **THE COURT:**  Okay.  So that we get ahead of this, what

24   I would ask is that you have a short list.  Pick whatever

25   number you want; six, eight, 10.  Send that list to plaintiffs'

1   counsel.  And I ask that, I want to know within a week whether
2   that list that you are giving them, whether there's a *Lexecon*
3   issue.  So they have to waive whatever that list is.  Waive --
4           **MR. WEINKOWITZ:**  Yes, Your Honor.
5           **THE COURT:**  -- or they have to -- or we need to know.
6   And that way you have that information in advance in the event
7   that your two first picks do not waive.
8           **MR. DRAKE:**  Okay.  That's fine, Your Honor.
9       It might take us a little bit of time to identify or come
10  to agreement on that next group of six to 10.  Maybe, maybe we
11  could do it in a week or so, or 10 days.  Again, the *Lexecon*
12  waiver is after that -- is before that deadline I just gave, I
13  suppose, but ...
14          **THE COURT:**  As long as you're on track with the
15  individual plaintiffs, I'm fine.  So I will ask that the two of
16  you meet and confer and agree on a process and on dates, and
17  you only come to me if you have an issue.
18          **MR. DRAKE:**  Yes, Your Honor.
19      Just one question, Your Honor.  As to the districts that
20  Mr. Weinkowitz has already indicated are not waiving *Lexecon*,
21  and as to the plaintiffs' selections, I assume that discovery
22  is --
23          **THE COURT:**  Well, as I heard it, everybody has waived
24  except for two who are uncertain.
25          **MR. DRAKE:**  Correct.

1        And as to those entities and as to the plaintiffs' six

2   entities, I would just like to confirm that discovery is open

3   and can commence and we can get rolling.

4              THE COURT:  Absolutely.

5              MR. DRAKE:  Okay.

6              MR. WEINKOWITZ:  Yes, Your Honor.  That's fine.

7              THE COURT:  Okay.  Any other issues with respect to

8   this group?

9              MR. WEINKOWITZ:  No, not on our end, Your Honor.

10             THE COURT:  Okay.

11             MR. DRAKE:  Not on our end.  Thank you.

12             THE COURT:  Okay.  Thank you.

13             MS. PIERSON:  Just one clarifying question.  Is it

14  your intent to take up the schedule for the personal injury

15  cases after we get through this process in May?

16             THE COURT:  I'll look at what we have right now.

17        So right now, the close of fact discovery is

18  December 20th.  With respect to all plaintiffs who have waived

19  *Lexecon*, discovery is open.  So I'll figure out at the next

20  one, or it may even be June or July, whether I need to extend

21  it for those specific individuals who were chosen late, but I'm

22  not going to do it right now.

23             MS. PIERSON:  Understood.  Thank you.

24             THE COURT:  Okay.  Thank you.

25             MR. WEINKOWITZ:  Your Honor, I apologize.  There was

1    one other issue I wanted to raise with regard to the school

2    districts.

3                **THE COURT:**  Okay.  Mr. Weinkowitz.

4                **MR. WEINKOWITZ:**  There are two states in this school

5    district pool, Utah and Arizona, that have not been -- that are

6    not the subject of the motion to dismiss that's currently

7    pending and will be heard before Your Honor at the next status

8    conference.  Our proposal is is that we do briefing before the

9    next status conference and the argument, and I think that we

10   could probably do that very quickly with a limited number of

11   pages.  And my proposal is is that we can even do that briefing

12   simultaneously and submit to the Court so we're ready to argue

13   at -- in May.

14               **THE COURT:**  And I need a name, please.

15               **MS. HARDIN:**  Ashley Hardin from Williams & Connolly

16   on behalf of the YouTube defendants, Your Honor.

17               **THE COURT:**  Okay.  Response?

18               **MS. HARDIN:**  Mr. Weinkowitz just approached us about

19   doing that a few minutes before the hearing, so we haven't had

20   a lot of time to look at it, but it does seem to us based on

21   our quick research that both Utah and Arizona follow the

22   Restatement.  I have some inkling that Mr. Weinkowitz might

23   disagree with that, but the briefing that we've already done

24   would largely cover that.  Of course, if Your Honor would like

25   to receive individualized briefing on those two states, we're

1    happy to provide it.

2            **MR. WEINKOWITZ:**  And, Your Honor, we're happy to

3    forego it.  We'll forego the briefing.  We've briefed these

4    issues ad nauseam with the current briefing, and we think that

5    Arizona and Utah fit right in, and unless there's a specific

6    issue that you would like us, or question you would like us to

7    answer, I think we can proceed.

8            **THE COURT:**  What I need is if you all are -- if you

9    agree that the Restatement applies, and so the briefing with

10   respect to that applies, then what I'd like is a joint

11   stipulation that says, we agree, and the parties will be bound

12   by the Court's decision with respect to those with respect to

13   these two states.  That's -- that would be the most efficient

14   for me.

15           **MR. WEINKOWITZ:**  Yes, Your Honor.

16       Could we meet and confer and get that in to you in a

17   couple of days?

18           **THE COURT:**  Absolutely.

19           **MR. WEINKOWITZ:**  Great.

20           **THE COURT:**  Okay.

21           **MS. HARDIN:**  Thank you, Your Honor.

22           **THE COURT:**  Thank you.

23       Okay.  Anything else you want to discuss with respect to

24   where we are on the bellwether process?  No?

25           **UNIDENTIFIED SPEAKER:**  No, Your Honor.

1          **THE COURT:**  Okay.  Let's move to the motions, then.

2      Okay.  With respect to the motions, have you all divided

3  up the arguments so that I know -- I can tell you the manner in

4  which I will hear argument.

5      First, we will -- first, I'll address the COPPA

6  violations.  Who's arguing that?

7          **MR. SCHMIDT:**  Paul Schmidt for Meta, Your Honor.

8  I'll be arguing that for Meta.

9          **MS. MIYATA:**  Your Honor, Bianca Miyata from Colorado

10  for the state attorneys general and my colleague, Daniel

11  Edelstein from Illinois will be arguing that issue.

12          **THE COURT:**  Okay.  And then after that, Section 230?

13          **MR. SCHMIDT:**  That will be me again on the defense

14  side.  Paul Schmidt for Meta.

15          **THE COURT:**  All right.  Are you doing the entire

16  thing?

17          **MR. SCHMIDT:**  No, thank goodness.  That's the end of

18  me.

19          **THE COURT:**  Okay.  And on plaintiff's side?

20          **MS. MIYATA:**  That will be me for the state AGs, Your

21  Honor.

22          **THE COURT:**  Okay.

23          **MR. PANEK:**  Good morning.  Gabriel Panek for personal

24  injury plaintiffs.  I'll be handling Section 230 with respect

25  to Count 7 in our master complaint.

1          **THE COURT:**  Okay.  With respect to that, the -- well,
2    all right.  I'm sorry.  Your name again?
3          **MR. PANEK:**  Gabriel Panek from Lieff Cabraser.
4          **THE COURT:**  Okay.  The next issue after that are the
5    unfair and unconscionable practices, various acts.  Who will be
6    doing that argument?
7          **MR. SCHMIDT:**  That would be my colleague, Mr. Hester,
8    also from Meta.  Tim Hester.
9          **THE COURT:**  Okay.
10         **MS. MIYATA:**  That will be Lauren Bidra, from
11   Connecticut.
12         **MR. SCHMIDT:**  And also Mr. Blavin.
13         **THE COURT:**  Hold on.  Hold on.
14      Bidra, B-i-d-r-a?
15         **MS. MIYATA:**  Correct, Your Honor.
16         **THE COURT:**  Okay.  And you said also?
17         **MR. SCHMIDT:**  Mr. Jonathan Blavin will address that
18   issue on the personal injury side in terms of non-Meta claims.
19   He represents Snap.
20         **MR. PANEK:**  And I'll be addressing that, Your Honor.
21   Gabriel Panek from Lieff Cabraser.
22         **THE COURT:**  Okay.  Then we'll move to deceptive acts
23   and practices.
24         **MR. SCHMIDT:**  That will be Ms. Simonsen.  Ashley
25   Simonsen, for Meta on the defense.

1          **MS. MIYATA:**  And that will be Megan O'Neal from

2     California, for the state AGs.

3          **THE COURT:**  Okay.

4          **MR. PANEK:**  Your Honor, to the extent that that

5     argument includes whether the threshold requirements of the

6     UDAP statutes apply to personal injury plaintiffs, to the

7     extent Ms. Simonsen raises that, that will once again be

8     Gabriel Panek, myself.

9          **THE COURT:**  With respect to Section 5 of the FTCA, is

10    that going to be addressed separately, and are people

11    interested in addressing the state-by-state issues?

12         **MR. HESTER:**  Your Honor, Timothy Hester, Covington &

13    Burling on behalf of Meta.  I had been planning to walk through

14    state by state on the various issues, including the FTC

15    Section 5 standards and the related issues raised by different

16    state laws.  I had been planning to work through state by

17    state.

18         **THE COURT:**  Okay.

19         **MS. MIYATA:**  And, Your Honor, Lauren Bidra is

20    prepared to do that should the Court find it necessary.

21         **THE COURT:**  Okay.  There are all sorts of other

22    issues related to that, including the trade in commerce

23    requirements.  Is that going to be part of the presentation,

24    Mr. Hester?

25         **MR. HESTER:**  Yes, Your Honor.  I had been planning to

1  address all of those individual state issues as part of my

2  presentation.

3          **THE COURT:**  Okay.  And restitution, as well?

4          **MR. HESTER:**  Ms. Simonsen was going to address

5  restitution as a separate issue, if that's okay by the Court.

6          **MR. SCHMIDT:**  But not to jump in, we'd also be good

7  standing on the papers on that issue.  It's a more discrete

8  issue.  As the Court wishes.

9          **THE COURT:**  Okay.

10          **MS. MIYATA:**  And, Your Honor, we do have an

11  additional colleague who's prepared to speak to trade and

12  commerce.  That would be Anna Smith from South Carolina.  And

13  to the extent the Court requires argument on restitution, I

14  will be addressing that for the state AGs.

15          **MR. PANEK:**  And once again, Your Honor, Gabriel Panek

16  for personal injury plaintiffs.  To the extent that that is

17  where in the argument defendants raise whether that requirement

18  applies to the personal injury plaintiffs' claims, I will be

19  addressing that.

20          **THE COURT:**  Okay.  Mr. Hester, are you going to

21  discuss reliance and ascertainable loss as part of your

22  presentation?

23          **MR. HESTER:**  Your Honor, I had been planning to

24  address ascertainable loss as part of my presentations, and I

25  had been envisioning that Ms. Simonsen would address reliance

 1   as part of the basic misrepresentation issues that she would be

 2   covering.

 3          **THE COURT:**  Ms. Miyata?

 4          **MS. MIYATA:**  Your Honor, I believe reliance will be

 5   discussed by Ms. O'Neill from California.

 6          **THE COURT:**  And ascertainable loss?

 7          **MS. MIYATA:**  Ascertainable loss, again, to the extent

 8   that that's necessary for restitution, I will address that.

 9          **THE COURT:**  Okay.  And I don't really have any

10   questions, but just making sure I understand the flow here.

11          **MR. PANEK:**  And, Your Honor, when those elements come

12   up, it sounds like it's not entirely clear, but whenever they

13   are necessary to be addressed for the personal injury

14   plaintiffs' claims, myself, Gabriel Panek, I will be addressing

15   those.  And Mr. Warren from Motley Rice is prepared to address

16   any arguments regarding counts 8 and 9 and the motion to

17   dismiss as to those claims.

18          **THE COURT:**  Okay.  Personal jurisdiction with-- and

19   pendent jurisdiction with respect to the Middle District of

20   Florida?

21          **MR. HESTER:**  Your Honor, Timothy Hester.  I had been

22   planning to address that issue.

23          **MS. MIYATA:**  And for the state attorneys general,

24   Donna Valin, from Florida, will address that issue.

25          **THE COURT:**  And the motion to remand?

1          **MR. SCHMIDT:**  That would be Isaac Chaput, Your Honor,

2    from Meta, also for Covington.

3          **MR. CHIN:**  Edward Chin from Bruster, PLC on behalf of

4    the Younger plaintiffs.

5          **THE COURT:**  You have to be in front of a microphone.

6          **MR. CHIN:**  Excuse me.  I'm sorry.  Edward Chin of

7    Bruster PLC on behalf of the Younger plaintiffs on that remand

8    motion.

9          **THE COURT:**  Okay.  All right.  As you can see, we

10   have a lot to do.  We'll probably take one break during this

11   process.

12        Let's go ahead and get started with COPPA.

13        **MR. SCHMIDT:**  Yes, Your Honor.  Paul Schmidt again

14   for Meta.  May I proceed?

15        **THE COURT:**  You may.

16        **MR. SCHMIDT:**  Thank you.

17        On our COPPA argument, I want to be clear just at the

18   outset what we're arguing what we're not arguing.  We heard

19   what Your Honor said about the 230 briefing and the breadth of

20   the 230 briefing.  We have tried to be responsive by being very

21   targeted here.  We will, at some future point, challenge their

22   COPPA claim based on alleged actual knowledge.  We're not doing

23   that for a motion to dismiss.

24        Instead, our motion to dismiss focuses on the distinct

25   COPPA claim that they -- that the services at issue, Facebook

1    and Instagram, are directed to children.  That's a distinct

2    legal question where the Court's guidance will shape how the

3    parties litigate and ultimately resolve this case, and it's one

4    that's uniquely presented here in terms of the states having an

5    opportunity to conduct an investigation and make use of that

6    investigation in their complaint on that issue.

7            THE COURT:  Well, and that's -- I want to talk about

8    that first, which is typically in a 12(b)(6) context.

9        If a party has a viable theory upon which to proceed, the

10   motion's denied.  The motion's denied, because the Federal

11   Rules of Civil Procedure do not, do not contemplate use of that

12   procedural mechanism to eliminate a theory.  That's summary

13   judgment.  There's different mechanisms.  Sometimes courts will

14   eliminate a theory for a particular purpose for efficiency's

15   sake.

16       So in many ways you just conceded that if I deny your

17   motion, because you've conceded -- or not conceded, but you're

18   not challenging a viable theory of relief.  So the COPPA claim

19   will proceed, period, despite your motion.

20       So given everything that we have, why should I do that?

21   What is the point of eliminating a theory at this point in

22   time?

23           MR. SCHMIDT:  I think there's two things I would say

24   in response to that, Your Honor.

25       One is although they have a single COPPA count in their

1    complaint, they have pled it as two separate claims in terms

2    of, in the words of their opposition, two independent grounds.

3    In terms of the way they set up their complaints, where they

4    have one section, 642 to 745 paragraphs that addresses actual

5    knowledge, a different section that addresses whether the

6    services are child directed, paragraphs 746 to 805.

7         We don't think it's proper to mesh those in one claim,

8    when they're distinct claims, to try to avoid early Rule

9    12(b)(6) guidance, especially on a critical issue like this.

10   As Your Honor referenced, even if they were treated as just one

11   claim and not independent, as they've been pled in terms of the

12   factual basis for their claims, there is real benefit in an MDL

13   setting like this in doing with COPPA what Your Honor did and

14   what we appreciated Your Honor doing with Section 230,

15   identifying for the parties what remains and what doesn't.

16   Because as to COPPA, that will dramatically shape how the

17   parties work up the case, how the parties ask questions at

18   depositions, what they focus on, what the expert case focuses

19   on, all of which we would otherwise not have the Court's

20   guidance on until, as Your Honor flagged, potentially summary

21   judgment.

22        It's -- in a litigation this complicated, where they have

23   had the benefit of doing their investigation and know what they

24   want to say, to a large extent from that investigation, and

25   have said it in separately pled sets of factual allegations, it

1    would give really meaningful guidance to progress the

2    litigation and ultimately progress it towards resolution.

3        So that would be -- that would be the response on the

4    procedural point.

5        In terms of the substance point, there's no -- and I think

6    this also goes to the procedural point in terms of this being

7    such a threshold legal issue for the Court that really will

8    shape this litigation.

9        There is no case where what the states are trying to do

10    here has been done before.  There's no case law they can cite

11    blessing their theory of what it means to be directed to

12    children.  And, in fact, it's contrary to the statute and the

13    statutory scheme, as I'll address, but it's also contrary to 25

14    years of guidance from the regulator, the FTC, that's charged

15    with both rule-making under COPPA and enforcing COPPA.  And

16    those are the two points I'll touch on, the statutory scheme

17    and the FTC guidance that we think is notable here.

18        In terms of the statute itself, Congress could have

19    written COPPA to have very broad application to require what

20    the states seem to be seeking through their lawsuit, and it

21    didn't.  It didn't require things like age verification, age

22    checks, things like that, that they reference in their lawsuit.

23    Instead, what it did was operate in a very targeted way in two

24    very targeted, distinct circumstances, both of which are

25    focused on what the operator, which is the term the statute

1    uses, does in terms of how it sets up its service, or knows in

2    terms of actual knowledge.

3        So one basis is the actual knowledge basis, actual

4    knowledge that a service is collecting information from a child

5    under 13.  That's meaningful.  Not notice, not constructive

6    knowledge.  Actual knowledge.

7        And then, two, the issue that we're here for, did the

8    operator set up the service so that the service as a whole, or

9    some portion of it would be directed at children.  Again,

10    focused on the acts of the operator and the choices that the

11    operator has made.  There is a statutory definition for what it

12    means to be directed to children.  That statutory definition

13    says there has to be the whole service being targeted to

14    children, or in the words of the statute, some portion of the

15    service being targeted to children.

16        In terms of the whole service, there's no serious argument

17    that Facebook and Instagram are general audience sites, the

18    opposite of a child-directed site.  They're so plainly general

19    audience sites, that when the FTC last amended its regulation

20    on COPPA, it used Facebook as a paradigm example of a general

21    audience site.  And that's supported by the pleadings of the

22    states' complaints, which describe the sites as generally

23    appealing in terms of the audience they're reaching.

24        The description in the complaint of Instagram is:  "A

25    mobile application that allows users to share content, such as

1    photographs and videos, online and over social networks."

2    That's paragraph 35.  And that's the meaning of -- that's the

3    epitome of a general audience site.

4        The other way they could go is to claim that there is a

5    dedicated portion.

6            THE COURT:  I'll need to interrupt you for just a

7    moment.

8        We're going to take a five-minute break.

9            MR. SCHMIDT:  Of course, Your Honor.

10    (A recess was taken from 10:21 a.m. to 10:28 a.m.)

11            THE COURT:  All right.  Are you ready?

12        All right.  We're back on the record.  The record will

13    reflect that the parties are present.

14        Mr. Schmidt.

15            MR. SCHMIDT:  Yes, Your Honor.  Thank you for letting

16    me continue.

17        Just to pick up where I was, I was talking about the

18    statutory structure.  The statutory structure recognizes two

19    distinct claims.  Full knowledge --

20            THE COURT:  Right.

21            MR. SCHMIDT:  -- directed to children.  And that's

22    how they've pled their claims outside of the actual statement,

23    a cause of action.  At page 14 -- 107, starting at page 642,

24    they plead an actual knowledge claim as --

25            THE COURT:  I don't think there's any dispute any

1    about that, right?

2             MR. SCHMIDT:  Okay.  And they do the same --

3             THE COURT:  You agree there's no dispute about that.

4    You have two theories.  You've pled two theories.

5             MR. EDELSTEIN:  Yes, that's true.

6             THE COURT:  Okay.  Let me ask you this.  What kind of

7    deference is owed to the FTC, especially in light of the

8    current Supreme Court?  And this will be a fun discussion,

9    given that we don't really know.

10        Go ahead.

11            MR. SCHMIDT:  I think it's a really good question,

12   because it is a live issue, as Your Honor noted, before the

13   Supreme Court.

14        What's a little different here on the deference question

15   is I don't think there's been any invocation of FTC standards

16   by another party.  There might be in the future, but here, I

17   don't think there's been any invocation of FTC standards by

18   another party that the other side is challenging.

19            THE COURT:  But there are three different things

20   going on, right?  We've got the FTC's definition --

21            MR. SCHMIDT:  Yes.

22            THE COURT:  -- of "directed to children."  We have

23   the FTC's COPPA FAQs, which is different, right?  It's a

24   different document.

25            MR. SCHMIDT:  Yes.

1          **THE COURT:**  And certainly when we do administrative

2    law review, the source of the agency's guide sense a

3    consideration.

4          **MR. SCHMIDT:**  Yes.

5          **THE COURT:**  And then, finally, you know, there is the

6    requirements in terms of the manner of collecting personal

7    information from a child, which is also a different format.

8       Should there be a -- is there a difference in the Court's

9    evaluation of those different sources of guidance from the FTC?

10         **MR. SCHMIDT:**  Well, I think, yeah, there probably is,

11   in that -- first of all, just to add to the list, we have the

12   statute.

13         **THE COURT:**  Right.

14         **MR. SCHMIDT:**  Obviously the statute trumps, and

15   anything contrary is superseded by the statute.  I don't think

16   anyone has relied on anything contra here.  That might happen

17   down the road.

18      In terms of the FTC itself, it did go through the rule-

19   making process, and to the extent there were deference, there

20   would be greatest deference among the FTC statements to the

21   rule.

22      In the context of the rule-making, it did make Federal

23   Register statements in the context of both the original rule

24   and an amended rule and then a regulatory review directed by

25   Congress.  Those probably don't get the same deference as the

 1   rule, but there's no dispute --

 2       Sorry, should I stop, Your Honor?

 3           **THE COURTROOM DEPUTY:**  Sorry, Your Honor.  The court

 4   reporter requests that we identify ourselves before speaking.

 5           **MR. SCHMIDT:**  I apologize.  This is Paul Schmidt

 6   again for Meta.

 7           **MR. EDELSTEIN:**  I don't believe I had introduced

 8   myself personally.  My name is Daniel Edelstein.  I'm from the

 9   Office of the Illinois Attorney General on behalf of the

10   Attorney Generals in this matter.

11           **THE COURT:**  Thank you.

12           **MR. SCHMIDT:**  And then I think the FAQ would get the

13   least deference.  But again, I don't think there's a dispute as

14   to the parts that have been invoked as to how they apply here.

15   That might happen down the road, including on actual knowledge

16   when we come to litigate that issue.

17           **THE COURT:**  But would you agree, or what's your

18   perspective on that topic?

19           **MR. EDELSTEIN:**  I don't think that it's -- at this

20   point I don't think that it's relevant for us the amount of

21   deference given, that the complaint plausibly alleges that the

22   directed-to-children factors have been met on the face of the

23   complaint.

24       And in addition, the specific cite to the FTC's footnote

25   in the statement of purpose from 2013, I think that we can also

1  distinguish that on the facts of this case.  Namely, that --

2  well, on the one hand, that a general audience website can

3  still be subject to COPPA and directed to children if portions

4  of the website are directed to children.  That's from the

5  language in the rule itself.  And although we would dispute

6  that Facebook or Instagram are general audience, we have

7  plausibly alleged that portions of both are directed to

8  children.

9       In addition, the FTC may have said in 2013 that Facebook,

10  and in that same footnote YouTube, in 2013 were general

11  audience, two issues are present with that.  One is that it's

12  been over 10 years since then.  Things have changed.  The

13  Internet has changed.  There's no indication from that footnote

14  that the FTC had evidence of the -- of clearly establishing the

15  directed-to-children factors that the state AGs have pled in

16  this complaint.  And number two, in 2019, the FTC and the New

17  York Attorney General took action against YouTube and

18  ultimately settled that case, finding that although YouTube may

19  have been a general audience website, it had portions that were

20  directed to children.  And in that footnote, it says Facebook

21  and YouTube are general audience.

22       So clearly it's -- whatever standard deference is applied,

23  it's clear from the FTC enforcement policy, and the state AGs

24  for that matter, that general audience websites with child-

25  directed portions are subject to COPPA.

1          THE COURT:  Your response?

2          MR. SCHMIDT:  Yeah.  That goes to the heart of the

3    issue, which is, is -- can a portion of these websites be

4    treated, as the services be treated as child directed.

5          Just briefly in terms of the subsequent FTC record that

6    counsel referenced, there has of course been no such action

7    with regard to either Facebook or Instagram.  With regard to

8    YouTube, as counsel noted and we note in our reply brief at

9    page 3, the FTC did acknowledge that YouTube is a general

10   audience user-generated video-sharing platform, despite the

11   presence of some child-directed content.  What the difference

12   was with YouTube, and it goes to this meaning of what it means

13   to have a portion of the service directed --

14         THE COURT:  Is it Meta's position that individual

15   third-party content account pages cannot constitute a portion

16   of a website?

17         MR. SCHMIDT:  That is our position, Your Honor.  And

18   it's supported in the structure of the statute and in the

19   history on the statute.  In terms of the structure of the

20   statute, it focuses on what the operator is doing, how the

21   operator set up the website, but --

22         THE COURT:  So it has to be, for a portion in your

23   view to exist, it must be created by the service itself?

24         MR. SCHMIDT:  Yes.  There must be something dedicated

25   to children.  That --

1          THE COURT:  And your -- the source of your -- what

2    you really ground yourself in is the statutory language?

3          MR. SCHMIDT:  It's the statutory language, but it's

4    also a couple of extra sources that we cite in Footnote 6 of

5    our reply brief in response to how the states argued this.

6    It's the congressional record, the legislative history, where,

7    in enacting COPPA, the legislative history referred to a

8    portion indicating that there is a, quote, special area for

9    children.  The COPPA regulation tracks that.  It also refers to

10   a separate children's area.  And then the FTC guidance from its

11   last amendment to the COPPA rule made the same point.  There

12   must be a, quote, distinct children's portion or area.

13          And they don't -- they don't plead any of that.  That's

14   not their pleading is that there's a separate children's area.

15   In fact, when they make allegations about that, what they

16   allege is that Meta was looking at creating entirely separate

17   services, like Instagram Kids, that would fill that portion

18   role.  Instead, I think Your Honor hit the nail right on the

19   head.  What they're saying is if they can find in quantum of

20   accounts and pages -- that's the verbiage they use in their

21   opposition brief -- then that takes these entire services, or

22   some ill-defined portion of them, I guess the accounts and

23   services they identify, and make those child directed.  And

24   that's contrary, we think, to the statutory structure and also

25   contrary --

1    **THE COURT:**  What about -- what about the sheer size

2    of a service?  That is, a portion for Meta is substantially

3    bigger --

4    **MR. SCHMIDT:**  Yes.

5    **THE COURT:**  -- than perhaps something that, you know,

6    some smaller independent group that, you know, doesn't have

7    the -- that doesn't have the level of acceptance.  Does that

8    change the analysis at all?

9    **MR. SCHMIDT:**  I think it changes it in the direction

10    that we're arguing, that this attempt to have a COPPA claim by

11    saying, if, on a massive service we can find a certain number

12    of sites or third-party content, then we can say, well, maybe

13    that has appeal to children, even though it has general

14    audience appeal, as well, that converts the whole cite, or that

15    converts some discernible portion of it into a child-directed

16    site.  That's why we say in our brief their arguments would

17    have sweeping consequences, because that argument could be made

18    for any service that gets sufficiently large.  And their

19    examples illustrate that, and I'll just touch on a couple.

20    Some of their examples are plainly meritless.  They say in

21    paragraph 760 of the complaint that there's an Instagram ad

22    that appears to involve, quote, actors who appear to be

23    children or teens, and then they include a screenshot of it.

24    It's very clearly a teen, and the ad itself says that.  It has

25    a banner on the ad that says this is for teens and parents in

1    terms of providing tools for parents and teens to work together

2    to create positive experiences.  It's notable that after their

3    investigation, one of their hallmark examples of something that

4    purportedly makes Instagram child directed is something that is

5    not child directed that, on its express terms, is for teens.

6         Their are other examples, though, make clear that they're

7    doing exactly what Your Honor said.  They're trying to say, if

8    we can find some example of third-party content, that on a

9    general audience site that might have general audience appeal

10   but that also might appeal to children, that fundamentally

11   converts the nature of the service.  They talked about --

12          **THE COURT:**  Let me get a response.

13          **MR. EDELSTEIN:**  Thank you, Your Honor.  There are a

14   number of things to address in that.

15        First, I just wanted to go back and agree with your

16   initial opening point and line of questioning, that we -- that

17   we agree fully that this -- that motion -- or 12(b)(6) motion

18   is improper to dismiss parts of claims.

19          **THE COURT:**  Yeah, I understand that argument.  I

20   don't know if I -- what I'm going to do, but I don't need

21   argument on it.

22          **MR. EDELSTEIN:**  Okay.  Understood.

23          **THE COURT:**  Unless you -- as I said, the reason to do

24   it is if it somehow shapes the litigation.  So is your

25   discovery strategy going to be the same or different if I take

1  out that one theory?

2         **MR. EDELSTEIN:**  We do think that there would be some

3  differences at trial in terms of the discussion and evidence

4  presented in terms of what goes to prove actual knowledge and

5  directed to children, but ultimately the inquiry is directed

6  towards Meta's failure to comply with COPPA by failing to

7  provide notice and consent to parents and risking the safety of

8  children and privacy of children online.

9         **MR. SCHMIDT:**  May I say one thing on that, Your

10 Honor?

11        **THE COURT:**  Well, I think the question is:  If you

12 don't concede that the directed to children isn't an avenue, I

13 would expect that you are going to do discovery on whether you

14 can prove liability under a directed-to-children theory.

15        **MR. EDELSTEIN:**  The -- it would -- the discovery

16 would help us to show -- to form the basis of the allegations

17 that help us to prove their liability under COPPA as a whole.

18        **THE COURT:**  That's not an answer to my question.

19    If you don't concede the theory, then at trial you would

20 ask me to give the jury an instruction under both theories to

21 prove the same claim.  So doesn't that mean you would take

22 discovery on that theory?

23        **MR. EDELSTEIN:**  Yes, we would.

24        **THE COURT:**  All right.  Let's move to the other

25 argument.

1          **MR. EDELSTEIN:**  Understood.  Thank you, Your Honor.

2      So a couple of points that Meta has raised.

3      So first of all, as we said, the AGs have plausibly

4  alleged that a portion -- that portions of Instagram and

5  Facebook are directed to children.  Meta's arguments in their

6  motion overwhelmingly are factual disputes and meant to dispute

7  the facts that the AGs have presented as plausible allegations.

8  This is a motion to dismiss, and this is viewed in the light

9  most favorable to the AGs.  We have plausibly alleged.  This is

10  not an opportunity to dispute what the facts of whether or not

11  a piece of content or an (sic) allegations as a matter of fact

12  and law is -- or is directed to children.  We have plausibly

13  made the case.

14          **THE COURT:**  No.  But the issue of whether third-party

15  content can constitute as a portion is an issue of law, not

16  fact.

17          **MR. EDELSTEIN:**  The -- so the rule states --

18  actually, what the rule states that a website, or a portion

19  thereof, is directed to children if it's targeted to children.

20      "Portion" is undefined in the statute and the rule, and

21  where a -- where one of the factors or one of the elements is

22  undefined under the statute or the rule, we would say -- we

23  would put forward that the correct standard and metric is the

24  one that best fulfills the purpose of the statute, which is to

25  protect children online.

1    Meta's attempt to introduce third-party content as a

2    limiting factor is -- just does not exist in the statute or the

3    rule.  And moreover, in the YouTube case, even if it was third-

4    party content and third-party operate -- providers that were

5    posting the accounts and videos on YouTube, ultimately, at the

6    end of the day, it was still directed to children because of

7    those portions, and YouTube was subject to COPPA.

8         **THE COURT:**  The mixed audience exception, are you

9    arguing that as part of the statute or part of the regulatory

10   scheme?

11        **MR. EDELSTEIN:**  I believe that the mixed audience

12   discussion comes in with the frequently asked questions.

13        **THE COURT:**  And Mr. Schmidt?

14        **MR. SCHMIDT:**  I think that's right.  It's not in the

15   statute.  It doesn't apply here on its face, but it's not in

16   the statute.

17        **MR. EDELSTEIN:**  But we -- in terms of that, the rule

18   states that a website or portion's directed to children if it's

19   targeted to children.  So if children are an audience targeted

20   by the platforms with an analysis of the factors outlined under

21   the rule, whether or not that audience is the primary audience,

22   then it is directed to children.

23        **THE COURT:**  You would agree, Mr. Schmidt, do you not,

24   that a motion to dismiss is not the place for the Court to make

25   factual determinations?

1              **MR. SCHMIDT:**  Yes, and our arguments don't depend on

2    that.

3              **THE COURT:**  And so in terms of the directed-to-

4    children analysis, given that I can't make factual

5    determinations, other than this issue of third-party content,

6    is there anything really else that's really an issue of law, as

7    opposed to factually deciding whether something is directed

8    versus not?

9              **MR. SCHMIDT:**  I think Your Honor's hit the primary

10   issue, but I think there's a few parts to that issue in terms

11   of third-party content.  There's what the statute tells us that

12   meshes with that issue, that the idea that this hasn't been

13   addressed by the statute we think is just wrong.  The statute

14   says we look at whether the operator has directed to children,

15   has targeted to children.  So I think the statute does speak to

16   that question.  The legislative history speaks to that question

17   on the portion issue by talking about dedicated areas for

18   children.  That was what was at issue at YouTube that's not at

19   issue here.  And the FTC has spoken to those issues.

20        There are other parts of COPPA that we think -- there is

21   another part of COPPA that we think is relevant, which is

22   Section 6501(10)(B), which makes clear that a service doesn't

23   become directed to children solely for referring or linking to

24   services that are directed at children.  That reinforces this

25   idea that it's what the operator is setting up their website to

```
 1    do, as opposed to third-party content appearing on their
 2    website.
 3         And then, of course, in terms of the broader statutory
 4    structure --
 5              THE COURT:  But 16 C.F.R., I think it's 312.2, says
 6    the platform -- asks the question about whether the platform,
 7    quote, targets children as its primary audience.  Whether or
 8    not something is primary is a factual question.  Whether or not
 9    something is targeted is a factual question.  Isn't it?
10              MR. SCHMIDT:  I think it could be under certain
11    circumstances, but not here.
12         Here we still have that legal question that Your Honor has
13    identified, which is:  Does the simple presence of third-party
14    content that has general appeal, as well as child appeal,
15    convert -- does that mean targeted?  And our legal argument is,
16    no, it doesn't.  The statute tells us that; the history tells
17    us that; the FTC tells us that.
18         Just to take one of their examples, they cite a Lego
19    account.  That's a general audience account.  Certainly kids do
20    Legos.  Their parents buy them Legos.  Parents, other adults,
21    teens also do Legos.  That's a legal question.  That doesn't
22    require the Court to resolve a fact about how much of Legos are
23    kids, how much is adults.  There's a legal question about
24    whether, when you've had something that has general audience
25    appeal that's operating in the larger setting of a general
```

```
 1   audience website, and that there's no dedicated place set up in
 2   the website for this kind of content, does that convert the
 3   website to a child-directed website?  And the statute says no,
 4   we think the legislative history says no, and the FTC in pretty
 5   consistent guidance says no.  And we cite guidance in our brief
 6   from 1999, 2006, 2013 that's all in line with us.
 7        In 1999, concerns were raised about the initial COPPA
 8   rule, where --
 9             THE COURT:  I understand your argument.
10        All right.  Let's move to Section 230.
11             MR. EDELSTEIN:  Thank you, Your Honor.
12             MR. SCHMIDT:  Thank you, Your Honor.
13        If I may, Paul Schmidt for Meta.  We --
14             THE COURT:  You need to identify yourself.
15             MS. MIYATA:  Good morning, Your Honor.  Bianca Miyata
16   from the state of Colorado for the state attorneys general.
17             THE COURT:  So part of -- and I'd like to hear from
18   Ms. Miyata.  It appears to me that Meta somewhat
19   mischaracterizes the states' theory.  So what would you say is
20   the states' theory?
21             MS. MIYATA:  Your Honor, under Section 230, you know,
22   it appears Meta wants to shield itself with this law, but the
23   states' claims are not aiming to impose any derivative
24   liability based on third-party content.  Instead, we're
25   targeting Meta's own strategic business practices, which harm
```

children.  We believe that to the extent necessary, the Court

could distinguish its ruling barring the personal injury

plaintiffs' claims on certain features that also underlie the

state claims here, because design defect claims and unfairness

claims are fundamentally different.  Should the Court disagree,

we are respectfully requesting that the Court reconsider its

previous order as to the features raised by the states.  I'd

like to speak a little bit to how the Court could, on a

principled matter, distinguish its ruling here, and how the

AGs' claims are really different from the private plaintiffs'

claims.

        The Ninth Circuit has paved the way for a court to reach

different conclusions about Section 230 immunity when looking

at two claims on two different legal theories, but that address

the same conduct.  And that is in *Barnes versus Yahoo*.  In

*Barnes*, I think as the Court knows, a plaintiff wished for

Yahoo to remove explicit content that had been posted against

her will.  The Court barred the plaintiff's negligent

undertaking claim but went ahead and allowed a claim for

promissory estoppel to move through.

        **THE COURT:**  You're speaking too quickly.

        **MS. MIYATA:**  Apologies.  I will slow down.

        In that case, even though the end result under either

claim and the facts underlying those claims were the same, the

Court held that promissory estoppel, unlike negligent

1    undertaking, would not have required Yahoo to remove any third-

2    party user-posted content.

3        And that is exactly so here.  In this case, the states are

4    seeking relief based on unfair business practice claims that do

5    not require Meta to remove, alter or publish any third-party

6    content.

7            **THE COURT:**  Mr. Schmidt?

8            **MR. SCHMIDT:**  The states are asserting the same

9    theory, in our view, that the personal injury plaintiffs were

10   asserting, which is harm from publishing activity, and we

11   think -- the only issue I was planning to address until the

12   states raised this as the failure to warn issue, which, if I

13   may, I'll come back to.

14       But in terms of the states' arguments, first, the law is

15   very clear that Section 230 cuts across claims.  There's no

16   magic to shifting a theory of the claim that takes it outside

17   of Section 230.  *Kimzey* tells us that very directly, from the

18   Ninth Circuit, in terms of saying that you can't avoid

19   Section 230 through creative pleading to advance the same

20   argument that the statute plainly bars.  In a listing of the

21   types of claims that are covered by Section 230, the *Zango* case

22   that we cite in turn invokes the perfect 10 case for the

23   proposition that the CDA protects against state unfair

24   competition claims.

25       Where their claims are based on the same kind of

 1   publishing activity as the personal injury claims are -- and

 2   they very clearly are here.  They're probably a little narrower

 3   in terms of the features they're challenging, but they're

 4   challenging some of the same features that the Court already

 5   addressed.  There's no distinction between challenging that

 6   type of publishing activity in the context of a consumer

 7   protection claim, challenging it in a design defect claim, and

 8   I'd like to have a minute to address challenging in a failure

 9   to warn claim.

10       And *Barnes* actually stands for that very proposition.  The

11   argument that was made was that there were no factual

12   differences between the claim that was allowed to proceed and

13   the claim that was not allowed to proceed, and that's just not

14   accurate as to what *Barnes* held.  What *Barnes* hinged the one

15   claim it could proceed on --

16           **THE COURT:**  Mr. Schmidt, you, too, are -- I know this

17   is early.  It's probably been a long week.  It certainly has

18   been for me.  But you all drank too much coffee.  You're

19   talking too fast.

20           **MR. SCHMIDT:**  Sorry, Your Honor.  That is a problem I

21   have.

22       *Barnes* involved distinct conduct from publishing activity,

23   a separate promise that was not honored, to take action that

24   was certainly related to publishing conduct but that was not

25   itself a form of publishing content -- conduct.  And that's why

1    the *Barnes* court precluded every other claim in the case but

2    allowed that one claim to proceed.

3        In the words of the Court, contract liability here would

4    not come from Yahoo's publishing conduct but from Yahoo's

5    manifest intention to be legally bound, legally obligated to do

6    something.  That's not applicable here.  Here, the publishing

7    conduct that they're challenging is the identical conduct in

8    terms of algorithms, other features that Your Honor found was

9    publishing conduct in its 230 order.

10       THE COURT:  So on your side I understand you think

11   that this is the same issue, and perhaps it is.  By the same

12   token, you also concede, right, that claims of -- their claims

13   of deception are not barred by Section 230 to the extent that

14   they're based on Meta's own affirmative representations?

15       MR. SCHMIDT:  We have not moved on that basis,

16   correct, Your Honor, under 230.

17       THE COURT:  You have moved a couple of times in the

18   briefing, or have mentioned a couple of times in the briefing

19   in footnotes -- you know, there's lots of Ninth Circuit

20   authority that says that you can't bring a substantive motion

21   for relief if you put something in a footnote.  There's also

22   Ninth Circuit authority which indicates that you can't bring a

23   substantive request for relief when you put something in your

24   reply.  And here, you raise only on reply this multiple

25   accounts function, which was not previously addressed.

1          You want to address that topic?

2          **MR. SCHMIDT:**  Yeah, I think the simple reason for

3    that is what we tried to say in our reply, that when we read

4    the complaint, including their specific delineation of what

5    they were alleging was the violating conduct, they did not

6    include multiple accounts.  They had reference in one or two

7    places elsewhere to the multiple accounts issue, but they did

8    not include it in their recitation of the unreasonable acts

9    that they were basing their consumer protection claims on.

10         And I'm referring specifically to paragraph 847 of the

11   complaint.

12         So we moved on what was identified as the alleged unfair

13   and unconscionable acts and practices in that paragraph of that

14   pleading where they were summarizing what they were moving on.

15   In opposition, they came in and said, we've got this multiple

16   counts issue.  So then we addressed it on reply.

17         **THE COURT:**  So why wasn't it in 847?  I mean, you

18   know, these complaints are hundreds of pages long.  Why is it

19   that, you know, defendants can't necessarily, aren't

20   necessarily put on notice if you didn't include it in your

21   summary paragraph?

22         **MS. MIYATA:**  Your Honor, if I may, the location of

23   those allegations within the complaint is not dispositive.  The

24   plaintiff is entitled to organize the complaint as they see fit

25   and to craft a thematic and persuasive narrative regarding

1    Meta's deceptive and unfair scheme.  And the fact that certain

2    features were not specifically highlighted in an end summary in

3    paragraph, I believe you said 847, doesn't necessarily mean

4    that the plaintiff was -- that the defendant was not on notice

5    regarding allegations specifically --

6              **THE COURT:**  Well, let's say that I do allow them to

7    make this argument.  What would your opposition be, since it

8    came in on a reply?

9              **MS. MIYATA:**  Well, our first-line argument to that

10   would be that it should not be entertained, as the Court has

11   already recognized.

12             **THE COURT:**  I understand that.

13             **MS. MIYATA:**  But should it be entertained ...

14             **THE COURT:**  Right.  Assume it is.  Then what?

15             **MS. MIYATA:**  Yes.

16        Should it be entertained, we believe that the opportunity

17   and the encouragement to young people to create multiple

18   accounts such that a young user doesn't miss any content is one

19   piece of an unfair scheme to exploit young users' particular

20   vulnerability to dopamine triggers.  We are not seeking to hold

21   Meta liable for permitting users the opportunity to post

22   content under different names.  Instead, just as the Court I

23   think raised earlier and I think Mr. Schmidt has addressed, we

24   are not seeking to hold Meta liable for allowing particular

25   publishing functions to move forward.  We are concerned with

1    the effect and the overall effect of those functions on young

2    people irrespective of the content that is being manipulated,

3    posted and dealt with as a result of these features.  The same

4    is true with multiple accounts.

5           THE COURT:  I referenced a footnote.  The issue with

6    respect to the footnote was the safe harbor provisions.

7           MR. SCHMIDT:  We don't think that's before the Court,

8    if that makes it easier, Your Honor.

9           THE COURT:  Okay.

10          MR. SCHMIDT:  We highlighted that just as an

11   illustrative point, not to move on that basis.

12          THE COURT:  Okay.  Great.

13          MS. MIYATA:  We would agree.

14          THE COURT:  Okay.  Anything else on this topic?  We

15   can deal with the -- I know people want to talk about the

16   failure to warn, but we can do that later.

17          MS. MIYATA:  Your Honor, if the Court would indulge

18   the states in creating a brief record I think regarding the

19   request to address particular features, we would appreciate the

20   opportunity to discuss that.

21          THE COURT:  Okay.  I'm not going to spend a lot of

22   time, but go ahead.

23          MS. MIYATA:  Understood.

24      Your Honor, we think there are multiple reasons that the

25   Court could either distinguish its ruling about particular

features, or should the Court be so inclined, revisit its

ruling regarding particular features.  And that would be in

keeping with the Ninth Circuit's definition of a publisher

function, as well as considering the fact that we are asking

the Court to look at features employed by many 21st century

businesses who are using new technologies that have never been

considered, I think, by the Ninth Circuit.

Some features that we believe the Court's order previously

addressed would be, for example, the algorithm, the infinite

scroll, and the notifications, as well as likes.  And we would

point out to the Court that these are features that, while used

by Meta in the course of its business, are not exclusively used

by Meta or by other businesses that are engaged in publishing,

and I think that's really critical.  As the Court has correctly

noted in its previous order, that to be subject to Section 230

immunity, conduct needs to be identical with publishing, not

just tangentially related.  We certainly agree that, you know,

in the same vein as *Lemon* here or *Doe versus Internet Brands*,

because Meta is engaged in publishing generally, it could be

said to be a but-for cause for everything they do.  But what

they are seeking here is broad across-the-board immunity for

all of their actions, and that would really be in contravention

of the purpose of Section 230.

**THE COURT:**  Well, let me ask this, because Meta

originally wanted to appeal my decision --

1          **MS. MIYATA:**  Yes.

2          **THE COURT:**  -- and sought to have my approval on

3     that.  I denied it, in part because I wanted to make sure we

4     got through the state AG's complaint.

5          Let's assume for purposes of argument that I continue with

6     my approach to the more specific analysis that I did with the

7     individual plaintiffs and apply that, as well, to the state

8     AGs' complaint.  At that point, you know, do both parties want

9     to take it up to the Ninth Circuit to get the Ninth Circuit

10    review in parallel?  I won't stay this case, because it takes

11    so much time to get through circuits.  Although, I have to say

12    Judge Murguia has done a great job in getting the Ninth

13    Circuit's backlog done, so they are moving things much more

14    quickly.

15         So would the state AGs want to do that, as well, on that

16    narrow issue, so that there's a bit more clarity as we move

17    forward?

18         **MS. MIYATA:**  Your Honor, it's our position that even

19    if the Court were to employ its feature-by-feature analysis

20    here when considering the actual conduct that the state AGs are

21    attempting to find to hold Meta responsible for, those are not

22    publisher functions.  So under any approach, we believe the

23    Court could, on a principled basis, reach a different

24    conclusion here.  If the Court were not to reach that

25    conclusion, I'm not in a position to say what next steps would

1    be taken by the states today.

2            **THE COURT:**  Okay.  Okay.  Can we move on now?

3            **MS. MIYATA:**  Thank you, Your Honor.

4            **THE COURT:**  All right.  Let's move ahead to deceptive

5    acts and practices.  I believe I've got Mr. Hester and

6    Ms. Bidra?

7            **MR. SCHMIDT:**  Yes.

8        May I come back on the Section 230 failure to warn issue?

9    Because that's the one issue we didn't have a chance to argue

10   at the prior hearing that we did want to have the chance to --

11           **THE COURT:**  No, I'll do it later.

12           **MR. SCHMIDT:**  That's all I'm asking, Your Honor.  And

13   my co-counsel might want to address the last question.

14           **MR. DRAKE:**  Yes, Your Honor.  Good afternoon.

15   Geoffrey Drake, King & Spalding for the Tiktok defendants.

16       I believe Your Honor just inquired as to whether the

17   parties might be interested, depending on Your Honor's ruling

18   on this motion, whether now might be a good time to take some

19   of these issues related to the 230 ruling, whether on design

20   defect and/or failure to warn, up to the Ninth Circuit.  And

21   speaking on behalf of Tiktok, and I believe joined in part by

22   Snap, and perhaps others may feel the same way, I don't know

23   the complete lay of the landscape, Your Honor, but we do think

24   that that could be appropriate at this time.  It's something

25   we're considering, and we didn't want to let Your Honor not be

1    aware that it was on our minds.

2        Thank you.

3            **THE COURT:**  Thank you.

4            **MR. SCHMIDT:**  And Meta does agree with that view,

5    that 1292 review would be appropriate at that time.

6            **THE COURT:**  Okay.  Deceptive acts and practices.

7            **MS. BIDRA:**  Your Honor, may I clarify?  Previously --

8    Lauren Bidra, for the record, Your Honor.

9        Previously you listed unfairness as coming before

10   deception.  I just want to clarify whether you want to hear

11   unfairness or deception next.

12           **THE COURT:**  You're right, unfair and unreasonable

13   next.

14           **MS. BIDRA:**  Thank you, Your Honor.  I'm prepared to

15   address that today for the state attorneys general.

16           **MR. HESTER:**  Your Honor, Timothy Hester, Covington &

17   Burling, on behalf of Meta.

18       Your Honor, as I contemplated this argument and all of the

19   state-by-state laws we're going to be discussing, I thought it

20   would be very helpful for the Court and the parties to have a

21   very simple one-page demonstrative that just lists out the

22   states, so that we don't have to spend time reading off a bunch

23   of names of states to the Court, and I thought it would help us

24   keep track of things.  These are all points that are sourced

25   out of our briefs.

1          If I could, if the Court would be willing, I would propose

2     to hand it up to the Court and to the parties.

3               **THE COURT:**  All right.  Why don't we -- can we turn

4     on the ELMO, if you have a copy?  How many?  Do you have three

5     for me?

6               **MR. HESTER:**  Yes, I do, Your Honor.

7               **MS. BIDRA:**  Your Honor, if I may please be heard?

8          To my knowledge, state attorneys general have not been

9     given notice of this, so if --

10              **THE COURT:**  Okay.  Noted.

11              **MS. BIDRA:**  Thank you.

12              **THE COURT:**  It means that you have to take fewer

13    notes.

14         And let's turn on the ELMO, and then everybody else can

15    see it.

16         She's right.  In general, PowerPoints, handouts, I usually

17    require 24 hours.  It's in my standing order.  Make sure you've

18    read it and follow it.

19              **MR. HESTER:**  Apologize, Your Honor.

20         Let me begin by addressing why the attorneys general

21    cannot assert unfair practices claims.

22         Of the 34 states that are covered by the motion to

23    dismiss, 26 states assert claims for unfair practices.  And of

24    those 26 states, 18 states are subject to the FTC Section 5

25    standards, and that's discussed in our brief at page -- at 39

to 41.  Under the Section 5 standards there are three prongs, and the *FTC v. Neovi* decision out of the Ninth Circuit articulated them:  "An unfair practice is one that causes substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers."

I want to focus on the substantial injury point.  That's the clearest issue to resolve on a motion to dismiss.  In the *American Financial Services* case the Court said:  "As a general proposition, substantial injury involves economic or monetary harm and does not cover subjective examples of harm, such as emotional distress."  And the Court went on to say:  "Emotional impact and other more subjective types of harms would not make a practice unfair."

Now, the states quote an FTC statement from 1984 that, quote:  "Unwarranted health and safety risks may also support a finding of unfairness," but they cropped the quote, and they omit the next sentence from the FTC's statement, which, again, says:  "Emotional impact and other more subjective types of harm will not ordinarily make a practice unfair."  That's a quotation out of *International Harvester*, 104 F.T.C. 94' --

THE COURT:  I'd like a response on that.

MS. BIDRA:  Yes, Your Honor.  Thank you.

To take up the first point, the state AGs have briefed and today again disagree with Meta's characterization of what

1    states follow the FTC standard.  Many of our consumer

2    protection statutes state that states are to be guided by the

3    FTC, which is not the same, and it's legally distinct from

4    follow the FTC.  Our surreply chart, Appendix C, lists the

5    nuances of how our individual states treat unfairness.

6         Secondly, with regard to substantial harms, here, the

7    states have plausibly pled that young users, young people, have

8    suffered substantial harm from use of Meta's products.  These

9    substantial harms are not merely speculative nor emotional.

10   They include eating disorders, insomnia, anxiety, depression

11   and even suicide.

12        The FTC has spoken on this, as my colleague from Meta

13   pointed out, and specifically stated that unwarranted health

14   and safety risks do support a finding of unfairness.  And to

15   reiterate, Your Honor, we are not here alleging merely

16   emotional harms.

17        **MR. HESTER:**  Your Honor, if I may just respond

18   briefly.

19        I don't think counsel has answered the point.  Counsel has

20   again quoted the statement from the FTC:  "Unwarranted health

21   and safety risks may support a finding of unfairness," but the

22   states have cropped the quote and omitted the next sentence.

23        **THE COURT:**  Well, the first thing she said is that

24   they don't all follow the FTC, despite what you argue.

25        **MR. HESTER:**  Well, I think --

1          THE COURT:  And guidance and -- guidance is

2    different.

3          MR. HESTER:  Well, Your Honor, I would address that

4    in three parts.

5          There are 13 statutes that specifically incorporate the

6    FTC Section 5 standards.  There are four state supreme courts

7    that have said their statutes are governed by Section 5, even

8    though the statutes don't, on their face, say that.  So that

9    gets us to 17.  Then we get New York, which specifically bases

10   its unfair practices claim on a violation of FTC Section 5.  So

11   we could quibble around the margins as to whether it's at 18,

12   is it 16, but I think the point is there's a very substantial

13   body of these state AGs whose law is governed by FTC Section 5,

14   and they have not come back to dispute the core points about

15   how that standard would be applied to their claims.

16         So I think I -- I would submit, Your Honor, that there's

17   maybe marginal differences, but it's very clear that under most

18   of these state laws, FTC Section 5 is the governing standard

19   for determining an unfair practices claim.

20         So let me go on, if I may.

21         THE COURT:  What does one do with the fact that it

22   costs money to have psychiatrists, it costs money to have

23   psychologists, it costs money to go to the doctor to deal with

24   eating disorders?  All that costs money.  All of that is real

25   harm.  It costs school districts money to have more counselors

1    to deal with the fact that these children have these effects.

2    How can you ignore that in terms of this argument?

3         **MR. HESTER:**  Well, Your Honor, I -- we're really

4    focusing on what's pled, and what's pled is emotional harms and

5    other impacts that are more subjective.

6         And if -- for instance, in paragraph 508 of the

7    consolidated complaint, the states allege there are higher

8    rates of anxiety, depression, sleep disturbances, other mental

9    health concerns.  We don't diminish those, but the case law is

10   clear that that is not a sufficiently concrete allegation of

11   harm to support a claim, and --

12        **THE COURT:**  All right.  Your response?

13        **MS. BIDRA:**  Your Honor, our complaint has plausibly

14   pled concrete substantial injury under the FTCA standard; more

15   than emotional harm, more than anxiety.

16        **THE COURT:**  I need paragraph numbers that I can look

17   at.

18        **MS. BIDRA:**  Paragraph 508 has pled anxiety,

19   depression, insomnia and anxiety.  There is more on eating

20   disorders in paragraph 204.

21        Your Honor --

22        **THE COURT:**  The argument is that those kinds of harms

23   aren't covered.  Are they, or are they not?

24        **MS. BIDRA:**  Yes, Your Honor.  Under the FTCA

25   standard, the harms plausibly pled in the state attorneys

1    general complaint are covered.

2        The courts have also recognized that consumer injury is

3    substantial when it is the aggregate of many small, individual

4    injuries.  So although we are not suggesting these are small

5    injuries, it is also appropriate to look at the magnitude.

6    Here in our complaint, we have user counts pled for each state

7    in our coalition, paragraphs 80 to 81, which do demonstrate the

8    magnitude of young people affected and harmed.

9        To continue on with that, Your Honor, paragraphs 515 and

10   542 of our complaint show how young users are up all night

11   checking their phones, suffering from insomnia and the

12   attendant physical harms with young people not sleeping.

13   Paragraph 542 shows the negative impact that sleep has on young

14   people.

15        **MR. HESTER:**  Your Honor, if I may respond briefly to

16   that.

17        I think counsel's argument makes my point.  The FTC has

18   made is very clear that, quote:  "Emotional impact and other

19   more subjective types of harm will not ordinarily make a

20   practice unfair."  The allegations that counsel has just

21   recited fall exactly into that bucket.  We don't diminish the

22   significance of the allegations, but they don't fit within the

23   FTC Section 5 standards, which require something much more

24   concrete, economic or monetary harm or something that is much

25   more measurable than these kinds of subjective impacts.  That's

1    why they can't state a Section 5 claim.

2            THE COURT:  How do you address that explicit

3    language?

4            MS. BIDRA:  That, Your Honor, the FTC has stated that

5    unwarranted health and safety risks, which clearly we have

6    plausibly pled here, that there are unwarranted health and

7    safety risks to young people from use of Meta's platform.

8        I would also call the Court's attention to *FTC v.*

9    *Accusearch.*  This is a case in which the defendant released

10   personal phone records to folks who would pay for them, such

11   that the phone records were released to stalkers and abusers.

12   And the Court held that:  "The release of these consumer phone

13   records led to a host of emotional harms that are substantial

14   and real and cannot fairly be classified as either trivial or

15   speculative."

16           MR. HESTER:  Your Honor, I don't want to repeat

17   myself, but --

18           THE COURT:  Well, then you shouldn't.

19           MR. HESTER:  I'll try not to.

20       When counsel says that the FTC says unwarranted health and

21   safety risks may support a finding of unfairness, they're not

22   mentioning the next sentence, which says:  "Emotional impact

23   and other more subjective types of harm don't" --

24           THE COURT:  So emotional impact and other subjective

25   harms.  An eating disorder is not an emotional impact.

1          **MR. HESTER:**  It would be a subjective harm within the

2     meaning of that language, Your Honor.

3          **THE COURT:**  How is this -- how is it a subjective

4     harm if there is a medical classification for that?

5          **MR. HESTER:**  Well, Your Honor, the nature of eating

6     disorders vary person by person.  It's quite a subjective

7     standard.

8          **THE COURT:**  Well, so do heart conditions.

9          **MR. HESTER:**  Your Honor, the allegations are much

10     more general.  They're --

11          **THE COURT:**  Of course, they're general.  It's the

12     attorney general.  That is, they're not going to -- they don't

13     have to -- there's no pleading standards that they identify

14     every single person in their jurisdiction.

15          **MR. HESTER:**  Understood, Your Honor.

16          But nonetheless, the point is that the FTC Section 5

17     standard has not been applied there.  There is not a single

18     case that has applied FTC Section 5 to these kinds of injuries

19     that are alleged here.

20          The *FTC v. Accusearch* case which counsel just cited, in

21     that case the Court found documented economic harm, quoting

22     from star page 8 of 2007 Westlaw 4356786.  So that was a case

23     that involved documented economic harm, in addition to other

24     kinds of emotional injury that were at issue there.  There is

25     no case that has ever applied Section 5 to these kinds of

1    allegations.

2            **THE COURT:**  Well, it's new technology.

3            **MR. HESTER:**  Well, Your Honor, it may be new

4    technology, but the kinds of harms that are being alleged here

5    are the kinds of harms that could have been alleged over the

6    last 20 years of FTC jurisprudence.  And the case law --

7            **THE COURT:**  So in *Neovi versus FTC*, or *FTC v. Neovi*,

8    Ninth Circuit case, that case indicates that a small harm to a

9    large number of people can be substantial under the FTC act.

10   Right?  So that satisfies at least one element.

11           **MR. HESTER:**  I agree, Your Honor.

12           **THE COURT:**  Okay.  So why doesn't it fall within the

13   context of that case?

14           **MR. HESTER:**  Because the *Neovi* case specifically

15   said -- relied again on this test that there has to be an

16   economic or monetary harm, that that is the norm for a

17   Section 5 claim.  That was the -- *Neovi* was quoting to *American*

18   *Financial Services* for that test.

19       So even in the --

20           **THE COURT:**  But does *Neovi* apply or not?

21           **MS. BIDRA:**  Yes, Your Honor.

22           **THE COURT:**  And what about the economic reference

23   that he's just mentioned?  What's your response there?

24           **MS. BIDRA:**  It's not dispositive, Your Honor, whether

25   there is an economic impact.  The courts have recognized that

1    consumer injury counts when it is a health risk.  As Your Honor

2    stated before, these are medical conditions:  Insomnia,

3    anxiety, depression.  They're not trivial, nor are they

4    speculative.

5            **THE COURT:**  Well, what about *FTC versus Accusearch*,

6    which was affirmed by the Tenth Circuit?  There, the district

7    court indicated that -- well, there, there was economic harm

8    evidence, and it says:  "In addition to economic harm evidence

9    of a host of emotional harms that are substantial and real

10   cannot be fairly classified as trivial or speculative;" that

11   those can be caused by unlawful business practice.

12      Doesn't that get them over the hump?

13          **MR. HESTER:**  I don't think so, Your Honor, because

14   one key part of that record that the Court highlighted was

15   documented economic harm.  We don't have that here.  There's

16   not an allegation of a documented economic harm.  It's not

17   alleged in the complaint.  The way they have alleged the

18   complaint and the way counsel has described the harms today,

19   those are exactly the kind of, what the -- what the FTC has

20   called --

21          **THE COURT:**  What was the procedural posture of that

22   case?

23          **MR. HESTER:**  In *FTC-Accusearch*?

24          **THE COURT:**  Yes.

25          **MR. HESTER:**  I bel' -- well, Your Honor --

1   **THE COURT:** As I sit here today, it is plausible to

2   me that they could get you thousands and thousands and

3   thousands of medical bills for all of the harm that they have

4   identified here in terms of the economic injury caused by those

5   disorders.

6   **MR. HESTER:** They haven't alleged it that way, Your

7   Honor. I --

8   **THE COURT:** It's not --

9   **MR. HESTER:** I understand.

10   **THE COURT:** The question is whether it's plausible.

11   So I get them to add another sentence, so -- to the

12   complaint? That's why I ask, what was the procedural posture?

13   **MS. BIDRA:** I believe that case had gone further,

14   Your Honor, than motions to dismiss, but I don't have it in my

15   head as I stand here.

16   **THE COURT:** Okay. How about one of the other hundred

17   lawyers in here? Maybe one of you could figure out what the

18   procedural posture is of that case for me.

19   **MR. HESTER:** I could check, Your Honor, if the Court

20   would like.

21   **THE COURT:** You've got people behind you. Just stay

22   at the mic.

23   Will somebody raise their hand when they get it for me?

24   **MS. BIDRA:** Your Honor, may I be heard on one further

25   point for *Accusearch*?

1          THE COURT:  You may.

2          MS. BIDRA:  To counsel's point about attendant

3  economic harm, that was not the case for all of the harmed

4  individuals.  The economic harm was the cost of changing your

5  phone number, and that was not across the board for all the

6  plaintiffs in this case.  They all did not change their phone

7  number.  What they all did was suffer from being stalked and

8  abused when their phone records were unlawfully disclosed.

9          THE COURT:  Okay.  We're going to move on.

10         MR. HESTER:  Thank you, Your Honor.

11         The next states I wanted to address were Minnesota and

12  Missouri, which apply some version of the *Sperry* test, and the

13  *Sperry* test has been discredited at the federal level but still

14  seems to be applied in at least those two states.

15         In Minnesota and Missouri, they recognize that an unfair

16  act can be one that offends public policy, or is unethical, or

17  oppressive, or unscrupulous, or presents a risk of substantial

18  injury to consumers.  We've already been talking about

19  substantial injury, so I won't go back to that, but I don't

20  think they can meet the standards under either Minnesota or

21  Missouri law for an immoral, unethical, oppressive or

22  unscrupulous conduct.

23         That's really best demonstrated by the *City of Chicago v.*

24  *Purdue Pharma* case, where the Court held that --

25         THE COURT:  Who decides whether what the defendants

1    are doing, whether that conduct offends notions of immoral,

2    unethical, oppressive, unscrupulous or substantial injuries to

3    consumers?

4           **MR. HESTER:**  Well, I think it's -- at the first level

5    it's a pleading question.  It's whether they've pled sufficient

6    allegations to establish that.

7           **THE COURT:**  And you don't think that conduct which

8    affects millions of -- potentially millions of children is

9    sufficient?

10          **MR. HESTER:**  I would -- I would -- I would say --

11          **THE COURT:**  It seems all you have to do is look at

12   the newspaper, and you can see that there's plenty of people

13   who think that it does.

14          **MR. HESTER:**  Well, Your Honor, I --

15          **THE COURT:**  So it's plausible.

16          **MR. HESTER:**  I would point the Court just quickly to

17   the *Purdue Pharma* case, where the allegation was that *Purdue*

18   had falsely represented the attributes of opioids, and that had

19   led to widespread abuse, addiction, an entire opioid crisis

20   triggered by *Purdue*'s conduct --

21          **THE COURT:**  Circuit case or district court?

22          **MR. HESTER:**  It's a district court case.

23          **THE COURT:**  Well, then I might disagree with my

24   colleague.

25          **MR. HESTER:**  But I -- it's the best authority that

1    we've been able to identify on how that standard is construed,

2    Your Honor.

3              **THE COURT:**  It's a pretty fact-based inquiry.

4              **MR. HESTER:**  Let me move on, if I may, Your Honor.

5              **MS. BIDRA:**  Your Honor, may I respond to the points

6    said thus far?

7              **THE COURT:**  You may.

8              **MS. BIDRA:**  Thank you.

9         *Loomis v. Slendertone Distribution* is a Southern District

10   of California case that finds that unfairness and whether

11   unfairness has been met is inappropriate at the 12(b)(6)

12   standard, to first address that.

13        Second, my colleague from Meta has also raised the *Sperry*

14   standards, and the states that follow *Sperry*, also known as the

15   cigarette rule, have all plausibly pled each specific prong of

16   *Sperry*.

17        On the prong of whether Meta's conduct is immoral,

18   unethical, oppressive or unscrupulous, Your Honor previously

19   referred to *21st Century Technologies*, and what Meta is doing

20   here is different than other commercial actors in the way it

21   takes young users' data and uses it against them.  That is what

22   is manipulative, Your Honor.  This is hidden from young users.

23   They have no way of knowing this, and their individual

24   vulnerabilities, their sensitivity to dopamine are exploited by

25   Meta, and that makes their practices immoral, unethical,

1    oppressive or unscrupulous.

2        We have also met the public policy prong of *Sperry*.  We

3    have plausibly alleged that Meta has violated COPPA and a host

4    of other state laws to protect minors from -- to protect their

5    privacy online and to protect them from addiction.

6        And the final prong of *Sperry*, Your Honor, is the

7    substantial injury prong, which we have already discussed under

8    the context of the FTC standard.

9        **THE COURT:**  With respect to the breakdown, I don't

10   have -- I don't have a side-by-side with your chart.  This

11   Roman numeral I, you agree with his sub 2?  That is, the two

12   states that follow the *Sperry* test.  Is that correct?

13       **MS. BIDRA:**  No, Your Honor.

14       Again, for the record, this is the first time I'm reading

15   this document, but these -- more states than just Minnesota and

16   Missouri follow the *Sperry* standard, and I would call the

17   Court's attention to the state attorney generals' surreply,

18   Appendix C, where we have annotated how each state in our

19   coalition follows the FTC *Sperry* standard.

20       **THE COURT:**  We'll do a side-by-side.

21       **MR. HESTER:**  Your Honor, I have one question --

22   answer for you on *Accusearch*.  That was on cross motions for

23   summary judgment.

24       **THE COURT:**  Makes a big, big difference.

25       **MR. HESTER:**  I understand, Your Honor, but I guess

1    I'm still trying to focus on the allegations.

2         **THE COURT:**  Well, you're trying to represent your

3    client.  Frankly, it doesn't take me too much to get beyond

4    that particular issue.  There is no transparency.  There is

5    manipulation.  And some of it may be protected under

6    Section 230, but despite public statements by the CEO.

7         All right.  Next issue.

8         **MR. HESTER:**  Your Honor, if I can move on.  I am

9    listening to the Court, and so I want to move on to some other

10   states where I think there may be a slightly different

11   analysis.

12        There's five states in our viewer, Colorado, Indiana,

13   Kansas, New Jersey and Oregon, where the statutes don't

14   recognize a claim for unfair practices without deception.  In

15   other words, they don't permit or contemplate a separate

16   standalone unfair practices claim.  We've addressed those in

17   our motion and in our reply.  I just wanted to highlight a few

18   points.

19        As to Colorado, the states include a footnote in their

20   opposition that we're relying on cases that predate a statutory

21   amendment clarifying that the statute extends to unfair

22   practices.  With respect, we submit that's not correct.  A

23   court in this district recently rejected that very argument and

24   held that the provisions of the Colorado statute, quote,

25   "prescribe only deceptive conduct."  And that's the *HIV*

1    antitrust litigation.

2        As to Indiana, the states argue that the opinion we cite

3    didn't discuss whether a claim for unfair acts could be brought

4    without a corresponding deceptive act, but that case construed

5    the current Indiana statute and held it only applies to

6    misleading acts or acts otherwise prohibited at law.  And

7    that's the *Crum* (phonetic) decision out of the Southern

8    District of Indiana that we cite in our papers.

9        As to Kansas, the states do not dispute that Kansas

10   requires some element of deceptive bargaining conduct.

11       As to New Jersey, the state asserts a claim only under the

12   New Jersey Consumer Fraud Act, and the New Jersey case law

13   makes absolutely clear that the fraud act requires deception,

14   fraud or false pretense.

15       Finally, as to Oregon.

16       **THE COURT:**  So with respect to New Jersey, is it your

17   argument that the Court equates unconscionability with

18   deception?

19       **MR. HESTER:**  Yes; and that's the way the case law has

20   read it.

21       **THE COURT:**  How about you on *Kugler v. Romain*?

22       **MS. BIDRA:**  Yes, Your Honor.

23   May I have an opportunity to go back to previous points

24   after I address Your Honor's present question?

25       **THE COURT:**  Fine.

1          **MS. BIDRA:**  Yes, Your Honor.

2      For New Jersey, may the -- would the Court mind refreshing

3  me on the question?

4          **THE COURT:**  The argument is that in *Kugler*,

5  K-u-g-l-e-r, the Court appeared to equate -- they're arguing

6  that the Court appeared to equate unconscionability with

7  deception.  Do you have a counterargument on that issue?

8          **MS. BIDRA:**  Yes, Your Honor.

9      Based on the plain language of the New Jersey Consumer

10  Fraud Act, that is not accurate, Your Honor.  There is separate

11  unconscionability under the New Jersey law, and that was

12  amended, Your Honor, after *Kugler*.  *Kugler* was decided in 1971,

13  and the New Jersey Consumer Fraud Act was thereafter amended to

14  include this theory.

15          **THE COURT:**  So on~--- with respect to the five states

16  that only reference deceptive unfairness claims, if the Court

17  holds that deceptive acts and practices survive, does it really

18  matter?  Don't the claims of unfairness also survive apropos,

19  you know, our discussion earlier?  You've got a claim that

20  survives regardless of the -- even though you have one theory

21  as opposed to two.  Even our UCL has, here in California, has

22  three different tracks.  So you still get a UCL, and you have

23  three different routes to get there.

24      So doesn't -- the unfairness issue, doesn't it effectively

25  become moot?

1        **MR. HESTER:**  I don't think so, Your Honor.  It's a

2   question of weeding the garden and cleaning things up.  This is

3   the process, as I have seen it, of an MDL court, and I think

4   the Court is working hard on that already, trying to winnow

5   claims so that it becomes more manageable and workable.  This

6   is a lot -- there's a lot of theories here, and helping the

7   parties winnow it down to something that is more manageable is

8   very helpful, especially in this MDL context.  And I -- and,

9   Your Honor --

10       **THE COURT:**  I understand the argument.

11   You wanted to talk about another state?

12       **MS. BIDRA:**  Your Honor, I'd like to respond to the

13   point my colleague from Meta just made.

14   The states all have unfair or unconscionable acts, of the

15   ones that brought it, practices as part of their jurisprudence.

16   And under any standard, the state attorneys general have met

17   their burden to plausibly plead the unfairness test.  That the

18   states have different standards is not dispositive.  At this

19   stage we have plausibly pled every standard, and the attempt by

20   my colleague from Meta to confuse the differences in state laws

21   does not negate that we have plausibly pled unfairness under

22   any standard.

23       **THE COURT:**  Okay.

24       **MS. BIDRA:**  For the sake of efficiency, Your Honor,

25   the states that my colleague has brought up are all briefed

1    separately --

2            **THE COURT:**  Yep.

3            **MS. BIDRA:**  -- in our opposition.

4            **MR. HESTER:**  Yes.

5        Your Honor, there was one state I didn't finish in this

6    litany of the five I was talking about that didn't recognize a

7    claim for deceptive -- for unfair practices separate from

8    deception, and that's Oregon.  And I simply wanted to highlight

9    as to Oregon that the statute, by its terms, only applies to

10   the selling, renting or disposing of services.  That point is

11   unanswered by the states in their opposition.

12           **THE COURT:**  Okay.  Response?

13           **MS. BIDRA:**  Yes, Your Honor.

14       The State of -- for the State of Oregon, the

15   unconscionable tactics listed in their Oregon consumer

16   protection statute are not limited to conduct enumerated.

17   That's a case *Gordon v. Rosenblum*.  And even so, if it were so

18   limited, Oregon revised statute 646.605(9)(a) shows that:

19   "Unconscionable tactics include knowingly taking advantage of a

20   customer's physical infirmity, ignorance, illiteracy or

21   inability to understand the language of an agreement."

22       Here, we have Meta using unconscionable tactics when it

23   takes users' data and uses it against them in the way the

24   platform is designed, to take advantage of their sensitivity to

25   dopamine hits, to always being present to know what their

1    friends are doing.

2        So for the state of Oregon, we have clearly pled that

3    standard.

4            **THE COURT:**  Okay.

5            **MR. HESTER:**  And, Your Honor, just very quickly on

6    that.

7        That doesn't answer the point, because the unconscionable

8    tactics only apply in relationship to the selling, renting or

9    deposing of services.  That's the threshold definitional bar to

10   the claims under Oregon law.

11           **THE COURT:**  Any comment?

12           **MS. BIDRA:**  My colleague will discuss the trade or

13   commerce aspects of this claim.

14           **THE COURT:**  Okay.  I think that does it for the two

15   of you, correct?

16           **MR. HESTER:**  Your Honor, I was going to cover the

17   separate point about whether the consumer protection claims

18   apply at all here, or the consumer protection statutes apply at

19   all, but I don't know if the Court wants to sequence it

20   differently.  That would be the point I would cover next, but I

21   wasn't sure how the Court wanted to handle this.

22       It's this question of whether -- whether these statutes

23   apply where they involve definitions such as a sale, lease or

24   assignment of services, whether the statutes even apply.  It's

25   part two of my demonstrative here.

1          **THE COURT:**  All right.  Well, part of this goes to

2    trade or commerce.

3          **MR. HESTER:**  Yes, Your Honor.

4          **THE COURT:**  So trade or commerce relates to sub 3.

5    What about -- oh, I see what you're doing on sub 2.

6          Okay.  Why don't we go ahead and take our break.  Then we

7    can start up with that again.  We'll stand in recess until

8    12:15.

9          **MR. HESTER:**  Thank you, Your Honor.

10          **MS. BIDRA:**  Thank you, Your Honor.

11          **THE COURTROOM DEPUTY:**  Court is in recess.

12          (A recess was taken from 11:39 a.m. to 12:15 p.m.)

13          **THE COURT:**  You may be seated.

14          Let's go ahead and continue, Mr. Hester.

15          **MR. PANEK:**  Your Honor, if I may, please, briefly.

16    Gabriel Panek from Lieff Cabraser for the personal injury

17    plaintiffs.

18          We just wanted to ask if Your Honor has a preference with

19    regards to hearing argument on Counts 7, 8 and 9 from the

20    personal injury plaintiffs' complaint at the end of the

21    conclusions of the remainder of the argument with respect to

22    the attorneys general, or if you would like us to address the

23    points as they are made throughout the afternoon?

24          **THE COURT:**  No, I think you can do it separately.

25          **MR. PANEK:**  Okay.  Thank you.

1          THE COURT:  Mr. Hester.

2          MR. HESTER:  Thank you, Your Honor.

3      We've been discussing thus far the unfair practices claim.

4  I now wanted to turn to a separate point, which is, from among

5  the 34 states that assert consumer protection claims, the

6  statutes of 17 of them do not apply to the use of a free

7  service, and --

8          THE COURT:  You call it free?

9          MR. HESTER:  Excuse me?

10         THE COURT:  It's just an interesting use of a term,

11 the word "free".  It somehow suggests that they're not making

12 money, which isn't the case.  But, okay.

13         MR. HESTER:  Well, Your Honor, if it would be helpful

14 I could go right to that point, if it would be useful.

15         THE COURT:  Data has value.  You understand that,

16 right?

17         MR. HESTER:  I understand, Your Honor.  But maybe I

18 could speak right to that point.

19     There's a decision that's, I think, right on point, the *In*

20 *Re: Yahoo Customer Data Security Breach Litigation* decision by

21 Judge Koh from 2017, cited at our brief at --

22         THE COURT:  2017, when she was a district court

23 judge, not a Ninth Circuit judge.

24         MR. HESTER:  Yes, yes, Your Honor.  2017 Westlaw

25 3727318, at 32 to 33.

1    In that case, Judge Koh was construing the terms of the

2    CLRA, which, by its terms, defined a consumer as an individual

3    who sells or acquires, by purchase or lease, any goods or

4    services.  And Judge Koh in that case held that the CLRA did

5    not apply to the use of a free service -- that was Yahoo's

6    service -- because the statute only applies if consumers

7    purchase or lease the good or service, and she rejected --

8            THE COURT:  Did she indicate in there whether there

9    was any -- well, first of all, what was the procedural posture?

10           MR. HESTER:  The procedural posture, Your Honor.  I

11   think the case had gone further, but I can check that.

12           THE COURT:  You should all remember, I'm always

13   asking that question, what's the procedural posture?

14       So for the young lawyers in the room, I don't know if

15   there are any, procedural posture matters, because the lens

16   with which the Court views arguments at a motion to dismiss

17   stage is quite wide; that is, is it plausible.  That's a very

18   different lens than when we look at summary judgment.

19           MR. HESTER:  And, Your Honor, the case I'm discussing

20   from Judge Koh was an order granting a motion to dismiss.

21           THE COURT:  All right.

22           MR. HESTER:  And the reason I had not focused on the

23   procedural posture was because she made a legal ruling that I

24   really wanted to highlight for the Court.  And there, she

25   rejected the argument that the collection of personal data to,

1    quote, "maximum profits through targeted advertising," meant

2    there was a purchase or sale.  In quoting from her opinion:

3    "The fact that defendants store personal information and use

4    this personal information for targeted advertising does not

5    indicate that plaintiffs purchased or leased."

6        **THE COURT:**  What did she do in terms of the Google

7    cases subsequent to that?  Because she let a series of claims

8    go through, and Google just settled those cases for a

9    substantial amount of money.

10        **MR. HESTER:**  I'm not sure that this same issue was

11   presented, Your Honor.  This was -- the specific issue she was

12   addressing here was under the CLRA.  Some of the other

13   California statutes raised do not present the same issue,

14   because they don't have the same defined terms.

15        **THE COURT:**  Like the UCL.

16        **MR. HESTER:**  Yes, exactly, exactly.

17       But the CLRA does have this specific definition that I

18   think is quite apropos here.

19        **THE COURT:**  Well, I'm not seeing California as part

20   of the claims, so ...

21        **MR. HESTER:**  No, but I think that the analysis goes

22   to the Court's question about whether the fact that consumer

23   data is used by a service like Meta, whether that constitutes a

24   purchase or a sale.  And Judge Koh rejected that, and she said:

25   "The mere fact that Yahoo gained some profits from plaintiffs'

```
 1   use of Yahoo's free e-mail services does not, by itself,

 2   establish that those plaintiffs purchased those services from

 3   defendant."  And she said:  "The Court is not aware of any

 4   legal authority to support the theory that the transfer of

 5   personal" --

 6            THE COURT:  I understand the argument.  A response,

 7   and I need your name, please.

 8            MS. SMITH:  Yes, this is Anna Smith on behalf of the

 9   state attorneys general, from South Carolina.

10       I think initially, you know, we would say that the CLRA is

11   not at issue here, and California law is not in dispute as to

12   whether or not trade or commerce or a consumer transaction

13   applies.  And so in response --

14            THE COURT:  Do you have any -- look, Judge Koh is a

15   very well-respected jurist.

16            MS. SMITH:  Sure, sure, sure.

17       And I think we would point to, which is also in our

18   briefing, *State V. Google*, which actually is disputing whether

19   or not -- which is in Arizona, not in California.  But where

20   the judge there did say that providing location data in

21   exchange for the use of apps or other services can be

22   considered valuable --

23            THE COURT:  You need to slow down, as well.

24            MS. SMITH:  Yes, yes, Your Honor.  I'm sorry.

25            THE COURT:  And I don't see Arizona on this list
```

 1   either.

 2           **MS. SMITH:**  Yes, Your Honor.

 3       Yeah, Arizona is not -- I do not believe that the -- Meta

 4   has disputed Arizona.  We are just using it as a reference

 5   point for this distinct issue of whether or not the consumer

 6   data --

 7           **THE COURT:**  Is your Section 2 not comprehensive?

 8           **MR. HESTER:**  My -- my --

 9           **THE COURT:**  Arizona -- is there a consumer protection

10   claim brought by Arizona?  And, if so, why is it not on this

11   list?

12           **MR. HESTER:**  No, Arizona is not part of our motion,

13   Your Honor.

14           **THE COURT:**  But they did bring it.

15           **MR. HESTER:**  We haven't brought a claim, a motion to

16   dismiss --

17           **THE COURT:**  That wasn't my question.

18       Did Arizona bring a consumer protection claim?  And, if

19   so, then it sounds like what I'm hearing is that you concede

20   that, under Arizona law, the consumer protection claim would

21   survive.  Everybody agrees that in Arizona it survives; in

22   California it doesn't.  So they're going to -- plaintiffs are

23   going to focus on the Arizona view to support all of these

24   other states, you're going to rely on California to support

25   your arguments, and there is silence with respect to all the

1     other states on this particular issue.

2           **MR. HESTER:** No. I -- Your Honor, I would say, first

3     of all, the reason -- we don't mean to concede anything as to

4     Arizona. We didn't move as a matter of law on Arizona because

5     of some of the case law.

6         The *Google* case that counsel was just talking about

7     involved deception as part of the process of selling and

8     advertising Google products, including smartphones. So it's a

9     different -- it's a different fact scenario from what we're

10     talking about.

11         I was pointing to Judge Koh's decision really to answer

12     the Court's question about the sale of data, but Judge Koh's

13     decision is not the only one that reaches this issue.

14         In the *Ziencik* case that we also cite in our brief reply

15     29, where it said: "Plaintiffs have cited no authority for the

16     idea that exchanging personally identifiable information for

17     use of a free social network application constitutes a purchase

18     or sale."

19         And in the *Indiana v. Tiktok* case the Court said the same

20     thing. It rejected the argument that the free use of Tiktok is

21     a sale, because Tiktok profits from consumers who use the

22     platform.

23         So I wanted to make the point to the Court right out of

24     the box that there is a general recognition in the case law

25     that the use of consumer data -- obviously consumer data is

1    developed and used by Meta for various reasons, but the use of

2    that consumer data doesn't turn the free use of a service into

3    a sale under these cases.

4         **THE COURT:**  Any other comment?  And then we'll move

5    on.

6         **MS. SMITH:**  I think that we would just like to

7    respond in saying that Meta is not offering anything for free.

8    The fact that a young user does not pay literal dollars to Meta

9    in order to access its platforms does not mean that it's free.

10   And, in fact, this has been pled plausibly in our complaint on

11   paragraph 46 of the complaint.  We discuss how Meta has, you

12   know, significant financial interest at stake, and what they

13   are doing is, in exchange for tremendous amounts of valuable

14   data, this young user's personal data, then they are able to

15   convert that into revenue.

16        **THE COURT:**  So Judge Koh is wrong?

17        **MS. SMITH:**  Well, I think also in response to that, I

18   think that the CLRA is not the specific thing at issue here,

19   and that how a consumer being narrowly defined doesn't

20   necessarily translate to how a consumer is going to be defined

21   in all of the relevant states at issue here, the ones that Meta

22   has brought a complaint against.  And I think a consumer can be

23   defined more broadly, as well as, you know, whether --

24        **THE COURT:**  What is your best argument for Judge

25   Koh's analysis on this topic?

1          **MS. SMITH:**  Specifically, that consumer data is not

2   transferable as far as dollars?  Is that the specific question?

3          **THE COURT:**  I don't think he framed it that way, but

4   in the way that Mr. Hester's framed it.

5          **MS. SMITH:**  My apologizes.  I think that --

6          **MR. HESTER:**  If it helped, I could just read what

7   Judge Koh said.

8          **MS. SMITH:**  Thank you.

9          **MR. HESTER:**  She said the statute didn't apply where

10  there's -- there was requirement in the statute of a purchase

11  or a lease, and she said it did not apply to the use of a free

12  service, and she said:  "The fact that the defendants store

13  personal information and use this personal information for

14  targeted advertising, does not indicate that plaintiffs

15  purchased or leased a good or service.  The mere fact that

16  Yahoo gained some profit from plaintiffs' use of Yahoo's free

17  e-mail service does not, by itself, establish that plaintiffs

18  purchased those services from defendant."

19      That was her analysis.

20          **MS. SMITH:**  Yes, thank you for that.

21      And, Your Honor, to address a few things, again, at issue

22  is not necessarily whether or not a sale is required.  So I

23  think that's a very narrow application as far as whether or not

24  there is a consumer transaction at issue.

25          **THE COURT:**  Well, on their list here, they say that

1    these consumer protection claims require a sale, lease or

2    assignment or other disposition of a service.

3         **MS. SMITH:**  Yes, Your Honor.  Are you referencing his

4    chart right here?

5         **THE COURT:**  I am.

6         **MS. SMITH:**  Yes.

7         So there are four states that he -- that they identify:

8    Indiana, Kansas, Ohio and Virginia, that do require a consumer

9    transaction.  I will point out that there is this idea of even

10   just a disposition of value for property or services, or, you

11   know, that it goes much, much further, and -- than just being a

12   sale or lease.  This is -- I think this is very segmented

13   language and is not applying to kind of this whole, you know,

14   broad view of trade and commerce statutes that are to be

15   construed very broadly in its application of whether or not

16   there is, you know, trade or commerce at issue.

17        **MR. HESTER:**  Your Honor, just to correct the record

18   on one point, we've got five states listed here that require a

19   sale, lease or assignment of assets.  That includes Nebraska,

20   which provides for the sale of assets or services as the scope

21   of its consumer protection statute.  So in our view that

22   disposes of these five states, because all of them, by their

23   own terms, by their defined terms, don't apply to the use of a

24   free service.

25        Then in addition, we've got 12 other states to address

```
 1   that provide for consumer protection statutes that apply to
 2   trade or commerce.  And, again, downloading a service for free
 3   is not trade or commerce.  The conventional definition of the
 4   word "trade" is the action of buying and selling goods and
 5   services.  "Commerce," the conventional definition, the
 6   activity of buying and selling.  So the plain meaning of those
 7   terms is reinforced by the underlying statutory definition,
 8   except for Hawaii, which doesn't have any definition of "trade"
 9   or "commerce".  All --
10        THE COURT:  When were those statutes enacted?
11        MR. HESTER:  The statutes that I'm talking about?
12        THE COURT:  Right.  Were they enacted before or after
13   the advent of the Internet and the -- and the new technology at
14   issue?  Any idea?
15        MR. HESTER:  The Court is asking me some good
16   questions, and I'm not -- I don't have them all at my
17   fingerprints.
18        THE COURT:  Okay.  Well, we'll find out, because that
19   matters.
20        MR. HESTER:  So, but I think, Your Honor, again, the
21   point here is that the legislatures have demarcated the scope
22   of these consumer protection statutes.
23        THE COURT:  Well, so these statutes, generally
24   speaking, are quite broad, so that they don't constantly have
25   to be amended to allow for protections of consumers, and that's
```

1  why I asked the question.

2      So if this was enacted in the 1920s, or even the 1970s,

3  then there was no contemplation of what's going on here in

4  2024.

5          MR. HESTER:  Well, Your Honor, I would have two

6  responses to that.

7      First of all, the Internet has been around, and the use of

8  these free services has been around for probably 20, 30 years.

9  So the legislatures are certainly well on notice.

10         THE COURT:  Unless they thought that it was captured

11  anyway because they're so broadly interpreted.

12         MR. HESTER:  But the case law has been clear.  There

13  have been a number of cases now, including the Judge Koh

14  decision that I referred to, including this *Tiktok* decision,

15  including this recent decision, *Ziencik*.  These cases recognize

16  that there's a defined demarcation of the scope of consumer

17  protection statutes, and it's not random that there might be a

18  decision by a legislature that it's going to apply their

19  consumer protection statutes to a range of activity.  Not

20  everything is covered by these statutes.  It requires

21  certain --

22         THE COURT:  I understand your argument.

23      Any response?

24         MS. SMITH:  Yes, Your Honor.

25      To point out, we do think this language here is a bit

1    cherrypicked for a variety of reasons.  For example, the
2    Nebraska statute.  While, yes, it does initially say the sale
3    of assets or services, immediately following that is, in any
4    commerce, directly or indirectly, you know, affecting
5    consumers.  And it's things like that.  And while we, you know,
6    all 12 states he has not gone through, you know, we -- there's
7    very similar broad language that we believe is properly pled to
8    encompass this idea of trade or commerce.  It's either
9    affecting trade or commerce or in connection with a consumer
10   transaction, and that's truly what is at issue here.

11       I would be glad to, you know, also respond regarding the
12   Indiana case.  We do think that is just one case.  It is even,
13   you know, in one state court.  It's currently on appeal, that
14   exact issue of whether or not the other disposition was
15   properly found in that court.  And, you know, on the contrary,
16   a state court in Tennessee found the complete, near complete
17   opposite.  So we don't think that that is dispositive in this
18   case.

19           **THE COURT:**  Well, and, again, look, states have the
20   right, based upon principles of federalism, to make those
21   calls, but the notion that -- I mean, I start from a premise
22   that these are broad, because that's, generally speaking, what
23   the intent of them was.  But I'll look at them individually.
24       Let's move on.
25           **MS. SMITH:**  Thank you, Your Honor.

1          **MR. HESTER:**  Your Honor, if I may just make one more

2    point before we move on very, very quickly.

3          Judge Koh was asked to construe the statute more broadly

4    based on the liberal mandate --

5          **THE COURT:**  I'll read Judge Koh's opinion.

6          **MR. HESTER:**  Okay.  Thank you, Your Honor.

7          Let me move on very quickly, then, to the PI plaintiffs'

8    consumer protection claims which are stated in Count 7.  They

9    state claims --

10          **THE COURT:**  Let Mr. Panek get up.

11          **MR. PANEK:**  Thank you, Your Honor.

12          Gabriel Panek for the personal injury plaintiffs.

13          **MR. HESTER:**  The personal injury plaintiffs state

14    claims under, quote, "applicable state law."  They don't

15    specify which laws they're talking about.  But we've applied in

16    our motion the choice of law approach, where at least one

17    plaintiff claims to have primarily used Meta's services, which

18    is the same choice of law analysis that the Court applied in

19    the recent order on the Zuckerberg motion.

20          So, first of all, we've already talked about 17 states

21    that are also encompassed within the AG motion that we filed

22    that are covered in part two, so I wanted to focus on the

23    additional states that we've highlighted in part three of my

24    demonstrative.

25          The consumer protection statutes of eight other states

1    also do not apply to these personal injury claims.  Idaho,

2    Massachusetts, Tennessee all are limited to the trade or

3    commerce limitation we've been discussing already.  And then

4    five state statutes do not apply by their own definitions.  All

5    of them require a sale or a purchase or some comparable

6    requirement, and I've listed the language in part three.  And

7    those statutory definitions don't meet the requirements, don't

8    meet the concept of the use of a free service as we've been

9    discussing.  So it's slightly -- it's a broader group, Your

10   Honor.  It's the same reasoning that we've been discussing, so

11   I won't --

12           **THE COURT:**  I see Texas in here.  I thought Texas

13   didn't have any claims.

14           **MR. HESTER:**  Well, this is -- this is driven off of

15   personal injury claims, so it would be a personal injury claim.

16           **THE COURT:**  I didn't think we had any Texas

17   plaintiffs.

18           **MR. PANEK:**  I believe we -- Gabriel Panek for

19   personal injury plaintiffs.

20       I believe we do, Your Honor, but I will double-check and

21   confirm with the Court.

22           **THE COURT:**  Go ahead, sorry.

23           **MR. HESTER:**  All right.  Your Honor, there's one more

24   point I wanted to flag for the Court, which is the 18 states --

25   and it's a different point.  Eighteen states require by statute

1    an ascertainable loss, quote, "ascertainable loss," for

2    consumers to assert consumer protection claims.  And those are

3    listed in Appendix G, which provides the Court with the

4    ascertainable loss statutory requirements state by state.

5    That's Document 662-1, at pages 22 to 24.

6        And an ascertainable loss requires monetary damages or

7    some other measurable loss.  A good example is the California

8    UCL, which requires a person who has, quote, "lost money or

9    property."

10       And in the *Marinos* case that we cite in our briefs, the

11   Court says:  "A loss is ascertainable if it is measurable."

12   And in the *D'Agostino* case that we also cite, the Court says:

13   "An ascertainable loss is one that is quantifiable or

14   measurable."  The *Valley Nissan* case:  "Loss of time and energy

15   and mental anguish does not establish an ascertainable loss."

16       So under those standards, the plaintiffs are not alleging

17   an ascertainable loss within the meaning of these statutes, and

18   they can't establish an ascertainable loss as they pled their

19   claim.

20       So, again, this goes back to the point that, as pled, the

21   claims are deficient under the laws of these 18 states.

22           **THE COURT:**  Response?

23           **MR. PANEK:**  Thank you, Your Honor.

24       Taking those arguments in order starting with the consumer

25   transaction or trade and commerce requirement, on the whole, we

1   don't believe that those phrases, which appear in the majority

2   of states defendants have moved to dismiss, on this basis have

3   a heightened sale requirement.  We cite cases in our briefing,

4   *FTD* and *Wynn* and other cases that reject a purchase requirement

5   for those terms.  Indeed, many of the states at issue define

6   what encompasses a consumer transaction or trade or commerce,

7   not with respect to what is a sale, but what is a sale or a

8   disposition of property.  And here, the defendants have not

9   argued that what has occurred here doesn't fall within that.

10          Additionally, even if there is a sale requirement -- and

11  this goes back to Your Honor's colloquy about Judge Koh's

12  opinion in the *Yahoo* case.  For one thing, Judge Koh in the

13  *Yahoo* case recognized that personal information --

14          **THE COURT:**  Slow down.

15          **MR. PANEK:**  Yes, Your Honor.

16          **THE COURT:**  Or you will not get a transcript that's

17  accurate.

18          **MR. PANEK:**  Well, we wouldn't want that to happen, so

19  I will slow down.  Thank you, Your Honor.

20          Judge Koh, in the *Yahoo* case, recognized that personal

21  information has value and in subsequent cases denied motions to

22  dismiss on the basis that plaintiffs who had their information

23  stolen -- this is *Brown v. Google* and *Calhoun v. Google*, and

24  indeed also the District of Maryland, Judge Grimm in the

25  *Marriott* case have all denied on the basis that personal

1    information doesn't constitute money or property.

2        And this case is also distinct, because there's an ongoing

3    monetization of the plaintiffs' data.  That distinguishes this

4    case from a one-time data breach.

5        And the *Arizona versus Google* case that the attorneys

6    general just discussed I think discusses that well, as well.

7    In that state, which is not at issue here, there was a purchase

8    and sale requirement, and the Court said:  "The exchange of

9    personal information from the plaintiffs to the defendants,"

10   who in that case was Google, "for ongoing access to their

11   product was a value, was consideration and was enough to fall

12   within the statute."  Defendants haven't cited any case under

13   Maryland or those other states that they say have a purchase

14   requirement that come out the other way under those states'

15   laws.

16       And then moving on to the ascertainable loss point.  Your

17   Honor said it very well earlier.  It costs money to deal with

18   these harms.  These are serious harms that the personal injury

19   plaintiffs have suffered.  They have suffered greatly, and they

20   have expended resources to redress these harms.  That answers

21   the ascertainable loss question by itself.

22          **THE COURT:**  Are they in the short-form complaint?

23          **MR. PANEK:**  Yes, Your Honor.

24       And they -- the damages that they've suffered and the

25   harms that they've suffered, those, that information is

```
 1   included in the plaintiff fact sheets, which are incorporated

 2   into the short-form complaints.  This provides defendants with

 3   the information about the injuries that the plaintiff suffered

 4   and what they had to expend in redressing them.

 5            Defendants pointed -- Mr. Hester just pointed to Docket

 6   662-1, but that just sets out the fact that some states have an

 7   ascertainable loss requirement.  It doesn't actually define

 8   what an ascertainable loss is.  We've pointed to cases that

 9   they have not rebutted.

10            For instance, the Ferguson case out of New Jersey, that

11   reparative treatment constitutes ascertainable loss, the MT

12   case that a personal injury constitutes ascertainable loss, and

13   many others showing that loss of earnings and bills incurred

14   with personal injuries constitutes ascertainable loss.

15            And I just want to very briefly mention that the three

16   cases Mr. Hester mentioned, Marinos, D'Agostino, Valley, one of

17   those was at summary judgment.

18            THE COURT:  Mr. Panek.

19            MR. PANEK:  I'm so sorry, Your Honor.

20            THE COURT:  I don't know what to have you do.

21            MR. PANEK:  I will slow down.  I will speak slowly.

22   The Marinos case --

23            THE COURT:  Try breathing.

24            MR. PANEK:  I'm sorry?

25            THE COURT:  Try breathing.
```

1        MR. PANEK:  The air is thin up here.

2        THE COURT:  All right.

3        MR. PANEK:  My last point is that the *Marinos* case

4   was on summary judgment, *D'Agostino* and *Valley*, those were

5   after trial.  This is a fact question whether there's an

6   ascertainable loss, but we've satisfied it at this stage.

7        THE COURT:  Any other issue?

8        MR. HESTER:  Your Honor, I -- just one thing that

9   counsel said.  He asserted that we do not claim that the

10  language of sale or other disposition somehow changes the

11  analysis.  Other disposition is the same concept.  There has to

12  be some transfer, some conveyance that's not captured by the

13  use of a free service.  And the case law I think is quite

14  consistent on this point, that if the language of the statute

15  says sale, lease, other assignment or disposition, other

16  disposition still is contemplating some form of conveyance

17  that's not at issue here.

18        THE COURT:  It's kind of like suggesting that there's

19  a free lunch, and I thought all economists agreed there was no

20  such thing.

21        MR. HESTER:  Your Honor, I think it really goes back

22  to this point about the defined scope of the statutes and

23  whether the Court can disregard the way the Court -- the

24  statutes have been written.  That's the point we're making.

25        THE COURT:  I don't think in your briefing, though,

1  you really do address -- and I'll go back and double-check.

2  There were 15, I think, or 20 causes of action in *Brown versus*

3  *Google* and *Calhoun versus Google* and the *RTB* case.  Like I

4  said, all of those moved forward, all of them were data privacy

5  cases, and all of them involved damages.

6      So what happens when we inherit cases from other judges?

7  We don't, you know ...

8      **MR. HESTER:**  But as my colleagues have handed me a

9  note, and, Your Honor, I'll just give it to you for what it's

10  worth, that this issue was not presented in the *Google* case.

11  It was a different issue from the issue before the Court.

12      **THE COURT:**  It could be, but the -- like I said, I

13  need to go back and double-check.  I think she did those cases

14  after the fact.

15      One of the realities is is that there is no, and hasn't

16  been for many, many years, much transparency in terms of how

17  these platforms are operating and what they were doing.  So

18  decisions were being made in the context of being much more

19  blind to what was going on, and that's not lost on me either.

20      **MR. HESTER:**  Your Honor, I would simply say on this

21  point about the free use of a service, I think there's been

22  disclosure for years and years that the consumer data was being

23  what was being developed and used by Meta and other services.

24  I think that's been widely known for years.  I think that's set

25  forth in the Terms of Use, and it's been set forth for years.

1          **THE COURT:**  All right.  Let's move on.

2          **MR. PANEK:**  Thank you, Your Honor.

3          **MR. HESTER:**  Thank you, Your Honor.

4          **THE COURT:**  I'd like argument on the restitution

5   issue.  Seems to me that the states are conflating restitution

6   and disgorgement; they're different.

7        Appearances for the record, please.

8          **MS. MIYATA:**  Bianca Miyata for the state attorneys

9   general.

10         **MS. SIMONSEN:**  Ashley Simonsen, Covington & Burling,

11  for the Meta defendants.

12         **THE COURT:**  Response?

13         **MS. MIYATA:**  Your Honor, I will turn to that in a

14  mere moment, but I would like to first note that Meta's request

15  is premature, because even under the narrow theory of

16  restitution that Meta espouses would be correct here, the state

17  AGs have pleaded sufficient facts to support that request.  And

18  we know that where a plaintiff has alleged facts that would

19  support a request for restitution, dismissal at this early

20  stage is inappropriate.

21        The states have pleaded facts regarding payments to Meta

22  for subscriptions for Meta Verified, which provided features

23  like extra visibility and support.  The states have pleaded

24  allegations regarding Meta's monetization of user data and how

25  Meta takes user data from consumers, which we have discussed

1    earlier today has value, and then turns that into more profits.

2    So I think under any theory, whether a broadened theory of

3    disgorgement or under the narrow theory that Meta has

4    considered, which is the mere exchange of dollars or property,

5    we have made sufficient allegations for that request for a

6    remedy to survive.

7            **MS. SIMONSEN:**  Your Honor, Ashley Simonsen for the

8    Meta defendants.

9        The states have not pled facts that satisfy the

10   restitution requirements under the consumer protection statutes

11   at issue.  Those statutes which we have cited in the back and

12   forth on this is in the states' Appendix E, which is Docket

13   701-2, at page 45.  Those statutes define restitution in terms

14   of essentially the recovery from the defendant of something

15   that was taken from the plaintiff, and there -- in this case,

16   there is nothing that was given by the plaintiffs, the users of

17   Meta services, to Meta that could be restored in a

18   restitutionary sense.

19       The states are pointing to subscriptions for something

20   called Meta Verified.  There's no allegation relating to any

21   deception or unfair practices with respect to that particular

22   subscription service.  That's simply not what their claims

23   relate to.  And for that reason, they can't use whatever

24   payments may have been made by consumers in connection with

25   those subscription to argue that there is a basis for

1  restitution on their claims that focus on entirely different

2  use of Meta services.

3       The second point my colleague has made regarding the

4  allegation that Meta has monetized user data by turning it into

5  profits underscores exactly why what they are doing is trying

6  to conflate what Your Honor recognized at the outset, which is

7  restitution with concepts like disgorgement.  When, to the

8  extent that Meta may make money from advertisers, that is money

9  coming from advertisers.  It is not money coming from the users

10  of Meta services.  The states are not suing on behalf of

11  advertisers, they are suing on behalf of users of Meta

12  services.

13       And so for those reasons, with respect to the restitution

14  claims of the 22 states that we moved to dismiss, as well as

15  the 11 states that are not seeking restitution, there is no

16  restitution claim with respect to those states.

17           **MS. MIYATA:**  Your Honor, if I may.

18       We disagree with Ms. Simonsen's characterization of the

19  states' laws.  While many of the states' laws do include

20  language that say that there is a remedy for restoration of

21  money acquired, it's money acquired by means of or as a result

22  of a violative practice.  There are not laws that say that this

23  money must be paid directly from the user to Meta, and I think

24  this is a great example for why that language is so broad.

25  Meta clearly takes something of value from users and turns it

1    into something of more value.  That is exactly what this

2    language "by means of" is meant to apply to.

3            **MS. SIMONSEN:**  And, Your Honor, we've cited the case

4    law that completely discounts that argument.  I mean, that is

5    not what the state law on this issue interprets restitution to

6    mean.  It is very strictly defined.  I'm sure Your Honor is

7    familiar in California with the *Korea Supply* case.  It is very,

8    very strictly defined for it not to include concepts like

9    disgorgement, or, you know, ill-gotten gains, or any kind of

10   profit that the defendant may have made, to the extent that

11   that profit did not come from the users on whose behalf the

12   suit is brought.

13       And again, we lay all of that authority out in our

14   response to the states' -- the citations in their Appendix E,

15   Docket 701-2, at page 45.

16           **MS. MIYATA:**  And, Your Honor, we disagree with that

17   characterization.  There is ample case law to state that the

18   states' consumer protections laws are to be interpreted

19   broadly.  There's also ample case law that states that the

20   states' laws regarding remedies, these equitable remedies, are

21   to be interpreted, again, broadly.  And I think you'll see in

22   the crafting of our particular requests for relief there are

23   requests for restitution.  There are also requests for any

24   other relief that the Court may deem to be just, or proper, or

25   appropriate here.

1          **THE COURT:**  So in those 22 states is restitution the

2     only remedy, or is injunctive relief and other remedies

3     allowed?

4          **MS. MIYATA:**  Your Honor, I --

5          **THE COURT:**  I'm asking, Ms. Simonsen.

6          **MS. MIYATA:**  Oh, apologies.

7          **MS. SIMONSEN:**  I am certain that injunctive relief is

8     permitted under certain of those consumer protection statutes.

9     For instance, the UCL authorizes injunctive relief as another

10    form of equitable remedy.

11         **THE COURT:**  So, again, back to the very beginning of

12    this conversation.  That doesn't mean that the claim is

13    dismissed.

14         **MS. SIMONSEN:**  They have asserted claims for

15    restitution, and we're moving to dismiss the claims for

16    restitution.  And that is, it's, you know, very common.  I can

17    pull the cites, but in California, that courts, on motions to

18    dismiss, will dismiss UCL claims to the extent that the relief

19    sought is restitutionary in nature and there's been no

20    allegation that there is money or property belonging to the

21    plaintiff in the hands of the defendant.

22         **THE COURT:**  I thought that there was injunctive

23    relief sought, as well.

24         **MS. SIMONSEN:**  There is injunctive relief sought, as

25    well, but Your Honor can dismiss the restitution claims without

1    dismissing the claims for injunctive relief.

2            **THE COURT:**  Well, the claim doesn't get dismissed; it

3    gets narrowed.  That's my point.  You don't dismiss the claim

4    because there isn't separate claims, one for restitution and

5    yet another claim alleged for injunctive relief.  There is one

6    claim that is sought with multiple means of remedies, and what

7    you're asking me to do is narrow the remedy.

8            **MS. SIMONSEN:**  I am asking -- yes, that's correct,

9    Your Honor.  That's what we're requesting.

10           **MS. MIYATA:**  And, Your Honor, I think you hit the

11   nail on the head there.  What Meta's requesting is the

12   dismissal of a remedy, and at this point, because there are

13   adequate facts pled that would plausibly support a theory under

14   that remedy, that cannot be dismissed.  There is case law

15   certainly that says that if a remedy is pled and the claim

16   itself for which the remedy is pled gets dismissed, the remedy

17   doesn't survive.  But that is not what we are talking about

18   here today.

19           **MS. SIMONSEN:**  And, Your Honor, I would just submit

20   that there is benefit, as my colleague, Mr. Schmidt, outlined

21   earlier, there is benefit to figuring out the ways in which

22   this very broad complaint brought on behalf of 33 state

23   attorneys general should be narrowed before we proceed further,

24   and a ruling that they do not have claims for restitution would

25   advance that purpose.

1          **MS. MIYATA:**  Understood.  But that would certainly

2     still be premature to try to narrow the scope of remedies and

3     to try to determine the contours of those appropriate equitable

4     remedies at this early part in the litigation, when, again,

5     they are supported by allegations of plausible facts.

6          **THE COURT:**  All right.  Next issue.

7          **MS. SIMONSEN:**  Your Honor, would you like next to

8     address the deceptive practices claims?

9          **THE COURT:**  Well, I was moving to Florida, but ...

10         **MS. SIMONSEN:**  Certainly happy to defer to my

11    colleague, Mr. Hester, on that point.

12         **MR. HESTER:**  Thank you, Your Honor.

13       We are raising these issues on person'~--

14         **THE COURT:**  We need appearances for the record for

15    purposes of the court reporter, who's not with us.

16         **MR. HESTER:**  Apologies, Your Honor.  Timothy Hester

17    of Covington & Burling on behalf of Meta.

18         **MS. VALIN:**  Donna Valin on behalf of the Florida

19    Attorney General.

20         **MR. HESTER:**  Your Honor, we're raising these issues

21    of personal jurisdiction and venue now to avoid any risk of

22    waiver on the question of personal jurisdiction and venue.  The

23    complaint alleges personal jurisdiction under the Florida

24    long-arm statute, the conventional statute, not under COPPA.

25       Now, Florida now argues in its opposition papers that

1   there's personal jurisdiction under COPPA under nationwide

2   service of process principles.  And nationwide service of

3   process can establish personal jurisdiction over COPPA claims

4   but does not resolve the issue of venue.  And that's stated

5   very clearly in the Ninth Circuit decision in *Action*

6   *Embroidery*, where the Court made clear that venue and personal

7   jurisdiction are two separate and independent inquiries.  And

8   venue is not proper here under COPPA, not proper in Florida

9   under the general venue statute, Section 1391, because venue is

10  proper where the defendant resides or where a substantial part

11  of the events or omissions giving rise to the claim occurred.

12  And that clearly doesn't apply to Florida, even though we

13  recognize that nationwide service of process that establishes

14  personal jurisdiction.

15      And this venue issue needs to be resolved now.

16          **THE COURT:**  Well, I agree.  This looks like it's a

17  good motion.  The question is what, if anything, can you

18  replead.

19          **MS. VALIN:**  Your Honor, I'm sorry.  I'd like to state

20  our position.

21          **THE COURT:**  Okay.

22          **MS. VALIN:**  Our position regarding venue.

23          **THE COURT:**  That's fine.  It's not as if your papers

24  haven't been filed.

25          **MS. VALIN:**  Yes, Your Honor.

1    The defendant, Meta, needs to move to change venue at this

2    juncture.  The case that Meta is citing very clearly

3    establishes that they're very separate concepts.  And in that

4    case, the Court did not reach venue and the venue analysis

5    because they are separate.  So I just want to point that out to

6    the Court.

7             **MR. HESTER:**  And Your --

8             **THE COURT:**  You want me to have yet another round of

9    briefing where things are pretty clear?

10            **MS. VALIN:**  Yes, Your Honor.

11            **THE COURT:**  Why?

12            **MS. VALIN:**  Just so that Florida has the --

13            **THE COURT:**  Don't you have a Rule 11 obligation?

14            **MS. VALIN:**  Yes, Your Honor.

15            **THE COURT:**  And because you have a Rule 11

16   obligation, don't you have an obligation to make things as

17   efficient for the Court, as you know you should under the law?

18            **MS. VALIN:**  Yes, Your Honor.  That is correct.

19            **THE COURT:**  Then why aren't you complying with your

20   Rule 11 obligations?

21            **MS. VALIN:**  We're happy to address venue, Your Honor,

22   if the Court would like to hear venue.

23            **THE COURT:**  Look, again, games don't work very well.

24    How much time do you need to replead your claims with

25   respect to jurisdiction?

1          **MS. VALIN:**  Ten days.

2          **THE COURT:**  Motion's granted.  Ten days to replead.

3          **MR. HESTER:**  Thank you, Your Honor.

4          **MS. VALIN:**  Thank you, Your Honor.

5          **THE COURT:**  At the next conference, you let me know

6    whether there's anything left to do.

7          **MR. HESTER:**  Thank you, Your Honor.

8          **THE COURT:**  All right.  Remand.

9          **MS. MIYATA:**  Your Honor, if I may clarify, did the

10   Court wish to hear argument on the misrepresentation and

11   omission claims?

12         **THE COURT:**  Well, we'll see how I feel after the next

13   one.

14         **MS. MIYATA:**  Okay.  Thank you.

15         **THE COURT:**  Okay.  Appearances for the record.  Start

16   with the plaintiff.

17         **MR. CHIN:**  Edward Chin of Bruster, PLC for the

18   Younger plaintiffs on the motion for remand.

19         **MR. CHAPUT:**  Good afternoon, Your Honor.  Isaac

20   Chaput, Covington & Burling, on behalf of the Meta defendants.

21         **THE COURT:**  Why shouldn't the defendants here be

22   severed and the complaint relative to the New Mexico defendants

23   just be sent to be dealt with in New Mexico and these

24   defendants remain here?  They don't seem to me to relate to

25   each other, and I'm not, and I'm not persuaded by the issue of

1   apportionment.  I understand that in the past, I have not

2   subscribed to the theory that the defendants have brought, but

3   it doesn't seem to me, as I look at the totality of this

4   complaint, that these two sets of defendants should be in the

5   same case.

6         MR. CHIN:  Your Honor, I think it is appropriate to

7   look at the totality.

8       So we've got this timeframe where the minor plaintiff, the

9   deceased plaintiff, she -- I'll refer to her by the initials

10  LK -- she died in -- she committed suicide in July of 2020.

11  She started using social media apps, Instagram, Snapchat and

12  Tiktok, dating as far back as roughly 2011.  So you've got this

13  eight- or nine-year timeframe of use which caused the

14  addiction.  And when we're talking about something that causes

15  addiction, it's not something that happens one time.  It's

16  something that happens over, and over, and over again.  You're

17  using various features, using the primary feature --

18        THE COURT:  That is a totally different case from the

19  other New Mexico defendants.  It's a totally different case.

20        MR. CHIN:  I respectfully disagree.  If I could

21  explain why it's -- it is not totally different?

22      Along the way throughout this course of addiction, when

23  she's encountering these New Mexico individuals, there's three

24  of them:  Mr. Stanford, Rodarte and Anaya.  The first two

25  gentleman, Stanford and Ronaya (phonetic), at separate times

1    they induced her, using Snap, to send sexually explicit photos

2    to them via Snap.  She's using these apps because she's already

3    addicted.  She's not handing them a hard copy.  She's using

4    these apps, this new technology that everyone knows is highly

5    addictive, and she's induced to use this thing that she's

6    highly addicted to.  It's right on her phone all the time, and

7    she's using that to convey these sexually explicit photos for

8    which they then take advantage of.  Independently, Mr. Rodarte,

9    and separately Mr. Stanford.

10        When the jury, if we go to trial on this and

11   everybody's -- you got the verdict form, you got the jury

12   instructions, I think the jury is very likely going to consider

13   when she's sending these Snap photos, for example, to these two

14   gentlemen, why is she doing that?  Who's fully -- who's

15   responsible?  Is she doing it because she's so addicted and

16   there's some liability on the part of Snap, for example, or is

17   it completely independent of that?

18        And when it gets down to closing argument, you can expect

19   these social media defendants to clearly say, hey, don't look

20   at us.  We're just like the telephone.  We're like any neutral

21   thing on the Internet.  Don't look at us, blame these guys.  I

22   don't think a jury -- I think a reasonable jury would really

23   assess who's at fault here.  Is she using a Snap -- the Snap

24   feature where teens know that a picture disappears very

25   quickly, and therefore she's induced to say, hey, maybe if I

1    send this sexually explicit photo no one's going to know about

2    it, there aren't going to be that many consequence, it will

3    just disappear?

4        So we've got this intertwining course of conduct over

5    multiple years.  And granted, there are various people have

6    stepped into this picture.  But if we're -- you definitely see

7    high points of this inner-pointing aspect is the use of these

8    apps.  That's why.  It's not -- you can't see them as separate

9    buckets.  A jury's going to look at everything.

10       How did -- why in the world would a teen send photos like

11   this?  What reasonable person would do that?  Well, first of

12   all, they're a teen.  Oh, maybe she's addicted to this.

13           **THE COURT:**  Response.

14           **MR. CHIN:**  She's unlikely to do this.

15           **THE COURT:**  All right.  A response.

16           **MR. CHAPUT:**  I think Your Honor has hit the nail on

17   the head.  There is no link between the individual defendants

18   in this case and the social media defendants.

19       Counsel --

20           **THE COURT:**  So, so it's not as if there's no link.

21   It's a gray -- it's gray.  It's not black and white.  There is

22   a link.  You just heard it.  There's a link.  So you lose on

23   that one if you say there's no link.

24           **MR. CHAPUT:**  And I did not intend to overstate, Your

25   Honor.

1    But plaintiffs do not allege any association between the

2    individual defendants and the corporate defendants, apart from

3    the alleged misuse by the individual defendants.  That is their

4    messaging of the plaintiff and their alleged taking screenshots

5    of sexually explicit photos that she sent to them, as well as

6    defendant Anaya's messaging of a third party to this case, a

7    friend of the plaintiff's.  But that misuse can't form a basis

8    for liability as the corporate defendants, because plaintiff

9    disclaimed in paragraphs 107 and 108 of the original complaint

10   that they seek to hold the corporate defendants liable for

11   content that was posted by third parties.  And so those

12   messages that were sent by the individual defendants are

13   content posted by third parties that necessarily falls outside

14   of plaintiff's claims.

15       And if you go to the elements of the claims that plaintiff

16   will need to approve (sic) to establish liability as to the two

17   separate groups of defendants, there is zero overlap.  And the

18   fact that the plaintiff may have suffered a single injury

19   attributable, in part allegedly, to all of the different

20   defendants' alleged actions is not enough to support joinder in

21   this case.

22       And I think the *Odah* (phonetic) case that Meta cited is

23   instructive here.  The plaintiff there was involved in two car

24   accidents a few months apart, and she sought to join the

25   individuals responsible for those accidents in a single case.

1    The Court denied the request even though both actions --

2    accidents allegedly contributed to that single set of injuries,

3    and the Court held that the facts surrounding the two incidents

4    were wholly distinct from one another, and that the evidence

5    required in determining the liability in either case will also

6    be completely separate.

7        The same thing is true here.  The evidence that plaintiffs

8    will rely on to establish liability as to the corporate

9    defendants will relate to their design and operation of social

10   media services.  The evidence, meanwhile, that plaintiffs will

11   rely on to establish liability as to the individual defendants

12   is completely separate.  That evidence will focus on those

13   individual defendants' intentional torts.

14       And so the appropriate course here is to sever those

15   individual defendants, allow their claims to -- allow

16   plaintiffs' claims against the individual defendants to proceed

17   in New Mexico state court, and promote judicial efficiency by

18   keeping the claims against the social media defendants here,

19   where they belong, with the hundreds of other cases alleging

20   effectively the same theory.

21           MR. CHIN:  Your Honor, may I respond?

22           THE COURT:  How about the mechanism, the procedural

23   mechanism that you're trying to use?  I've already once said

24   that this is an inappropriate mechanism, and many, many courts

25   have found the same thing.  I don't typically like to be -- to

1   disagree with myself.

2          MR. CHAPUT:  And I understand that, Your Honor.

3          Fraudulent misjoinder has routinely been applied in cases

4   like this involving MDLs even when there was a closer nexus

5   between the claims asserted against the diverse and non-diverse

6   defendants.  One case that I would point Your Honor to was the

7   *Sutton* case out of the Eastern District of California.  And

8   there, plaintiffs' claims against non-diverse individuals for

9   medical negligence in the use of a medical device were

10  procedurally misjoined with claims against manufacturers based

11  on a product liability-related theory arising from the design

12  and manufacture of the same medical device to permit the

13  diverse defendants' right of removal.

14         THE COURT:  Well, why didn't you bring a motion to

15  sever?  They brought the motion for remand.  Why not bring a

16  motion to sever?

17         MR. CHAPUT:  So in the original notice of removal

18  that is precisely what was requested, which is typically

19  procedurally how these cases progress, which is the notice of

20  removal identifies fraudulent misjoinder as the basis for

21  removal and then requests, as part of the notice of removal,

22  severance of the individual defendants.  Or, excuse me, the

23  non-diverse defendants.

24         MR. CHIN:  May I respond, Your Honor?

25         THE COURT:  You may.

1      **MR. CHIN:**  Your Honor, regarding the *Odah* case, there

2  were two separate accidents involving completely different

3  people who drove into the plaintiff's car.  Completely

4  different.  They don't have this string of liability that

5  persists for multiple years, as these social media defendants

6  have.

7      **THE COURT:**  What about paragraphs 107 and 108 that

8  you -- where you disown the content, but here you're arguing

9  content?

10      **MR. CHIN:**  Well, it's gonna -- it does matter that

11  the --

12      **THE COURT:**  It's a problem.

13      **MR. CHIN:**  Well, I think it's -- it doesn't matter in

14  the sense that, yes, the pictures had sexually explicit photos,

15  but, of course, what resulted from that?  These individuals,

16  two of the three New Mexico plaintiffs (sic), basically tried

17  to extort her for sexual favors.  And that led to her -- that

18  contributed to her injuries.

19      So whether it was some other type of photo, you know, but

20  ultimately there were things that affected her, of course.

21  And, you know, so that is part of it, but --

22      **THE COURT:**  So ultimately how fast are cases being

23  tried down there in New Mexico?

24      **MR. CHIN:**  It depends on~--- I honestly, I can't tell

25  you with respect to the Court that this would go back into.  I

1  don't ...

2          **THE COURT:**  You don't practice down there?

3          **MR. CHIN:**  I'm not licensed there.  We're pro hac

4  viced in that original ...

5          **THE COURT:**  Why would I send a case back to a court?

6  What judicial efficiency is there for -- as you heard earlier

7  this morning, doesn't mean just because a case is here doesn't

8  mean that it doesn't ultimately go back for trial.  It means

9  it's here for pretrial proceedings at a minimum, so that other

10 courts don't have to do the same exact thing that we're doing

11 here.

12         **MR. CHIN:**  I think one reason, one is you're more

13 likely to have these individual defendants actually participate

14 in those proceedings.  They were served.  And I should note

15 that they -- that the social media defendants actually moved

16 for -- Meta moved for removal, even though these individual New

17 Mexico defendants had gotten served, and then they never

18 obtained consent from any of those individuals for the removal.

19     And so if this is back in state court, we hope certainly

20 that these individuals, who are in New Mexico, would be much

21 more inclined to participate in a proceeding to defend

22 themselves in New Mexico, nearby, versus going all the way out

23 here, from their perspective, to participate in any of that.

24 They haven't had counsel been entered.  They've -- one has

25 answered.  Mr. Anaya has answered on a pro se is basis.  And

1    certainly you'd like to think that in a proceeding, you'd like

2    to get as many of the -- everybody in it, all the defendants.

3            **THE COURT:**  Okay.

4            **MR. CHIN:**  That's a vast, very significant area of

5    potential efficiency.

6            **THE COURT:**  Well, I disagree, but I'll think about

7    it.

8        Anything else?

9            **MR. CHAPUT:**  Your Honor, if --

10           **MR. CHIN:**  Well, if I could make one more point.

11       I mean, in the *DeWitt* case which both sides have

12   discussed, in the *DeWitt* opinion, Your Honor quoted the Ninth

13   Circuit opinion in the *Gaus v. Miles* as:  "Federal jurisdiction

14   must be rejected if there is any doubt as to the right of

15   removal in the first instance."  Even if one sees this as a

16   gray area, we should win on that basis alone.

17       We would submit that there's significant doubt as to the

18   basis for removal, but if it's a gray area, we should prevail.

19           **THE COURT:**  Anything else?

20           **MR. CHAPUT:**  Your Honor, if I may briefly.

21       First, on the consent point that counsel raised.  I don't

22   believe that was briefed, but in any event, the removal statute

23   requires consent only from the defendants who are properly

24   joined and served.  And since we are asserting that the

25   individual defendants were not properly joined and served,

1    their consent was not required to removal.

2        And with respect to the point that counsel concluded on,

3    numerous cases, numerous courts, particularly in the context of

4    MDLs, have found that a procedural misjoinder theory is

5    appropriate, particularly because of the efficiency-enhancing

6    benefits that it brings to the judge overseeing the MDL.

7        Thank you, Your Honor.

8        **THE COURT:** Okay.  There's one last issue,

9    Ms. Simonsen.

10        **MS. SIMONSEN:**  Your Honor, Ashley Simonsen for the

11    Meta defendants.

12        I did want to note there's one additional issue beyond

13    misrepresentations and omission, which is the failure to warn

14    issue.

15        **THE COURT:**  Oh, right.

16        **MS. SIMONSEN:**  I wanted ensure you -- which you would

17    like to hear first.

18        **THE COURT:**  We can hear failure to warn second.  Go

19    ahead.

20        **MS. O'NEILL:**  And, Your Honor, this is Megan O'Neill

21    on behalf of the state AGs.

22        **MS. SIMONSEN:**  Thank you, Your Honor.

23        So I'll be addressing why both the state AGs, as well as

24    the personal injury plaintiffs' claims based on alleged

25    misrepresentations and omissions fail.

1       At their core, the plaintiffs' misrepresentation and

2  omissions claims are premised on the theory that Meta deceived

3  the public by supposedly touting the safety of its platforms,

4  while allegedly concealing certain alleged risks to adolescents

5  from using those platforms.  The alleged misstatements can

6  generally be divided into six --

7       **THE COURT:**  So tell me -- I'm going to stop you in

8  this regard.  There is not a securities case, and I will not

9  treat it like a securities case.

10      In a securities case, my standing order requires a chart,

11  like you provided me, with every single statement.  Because in

12  a securities case, at a 12(b) -- at the motion to dismiss

13  stage, I am required to evaluate every single statement in

14  terms of its validity under the PSLRA.  I will not do that

15  here, and your arguments in that regard are denied.  So don't

16  even bother to do that.  I look at them in this case globally.

17  I will not look at them some other way.  On some of the other

18  issues I may choose to do that, but not here.

19      So you can proceed.

20      **MS. SIMONSEN:**  Your Honor, may I just note for the

21  record --

22      **THE COURT:**  You can.

23      **MS. SIMONSEN:**  -- that our position that Rule 9(b)

24  does require that the Court address each alleged misstatement,

25  which must be --

1          **THE COURT:**  As long as they have sufficient

2   statements to support the claim, the claim survives.

3          **MS. SIMONSEN:**  That each statement, Meta would --

4          **THE COURT:**  Not every single -- if they have -- if

5   they've alleged 100, and 20 are good and 80 are bad, the claim

6   still survives.

7          **MS. SIMONSEN:**  Understood, Your Honor.

8          **THE COURT:**  And I am not going to go through every

9   single statement in this motion.

10         **MS. SIMONSEN:**  Understood, Your Honor.

11      I understand that if Your Honor finds that there are some

12  statements that are actionable, it's not necessary to address

13  the remainder, and I didn't mean to suggest otherwise.  Only

14  that the --

15         **THE COURT:**  The briefing suggested to the contrary.

16  I'm just telling you I'm not doing it, and you should move

17  forward.

18         **MS. SIMONSEN:**  Okay.  Understood, Your Honor.

19      Well, I will address combinations of sort of statements in

20  different categories.  I'm not going to walk through every

21  single statement with Your Honor.

22      You know, we identify about six categories of statements:

23  Statements relating to safety and well-being; statements

24  relating to providing users with meaningful positive

25  experiences; opinions about research in these areas and related

1    topics; statements about Meta's policies relating to under-13

2    users on the platforms; statements relating to the prevalence

3    of allegedly harmful content on Meta's apps; and statements

4    relating to Project Daisy.

5        Now, just at the outset, I do want to note that the

6    statements that the states and the personal injury plaintiffs

7    have identified are cobbled together from a lot of different

8    sources, only one of which is actually an advertisement.  And I

9    think that that's notable, because particularly the state AGs

10   are trying to make an argument that this was some kind of

11   multi-facetted scheme of misleading advertising and misleading

12   statements and omissions, but, in fact -- and this sorta bears

13   on the trade and commerce argument my colleague was addressing.

14       The sources of these statements are drawn from a number of

15   sources that consumers are highly unlikely ever to have seen or

16   heard, like quarterly earnings calls, tech conferences, blog

17   posts, press releases, one-off interviews going back to 2011.

18   So --

19           **THE COURT:**  State AG claims do not require reliance

20   in the same way that individual claims do.

21           **MS. SIMONSEN:**  Understood, Your Honor.

22       And my point is really to the argument that I think the

23   states are trying to make, which is they're trying to portray

24   this as a consumer deception case, and I think it's notable

25   that the statements that they have identified for the most part

1    aren't statements that consumers would have seen.  But I'll

2    turn to addressing the reasons why, and I'll try to move

3    quickly, Your Honor, these -- in these six categories the

4    plaintiffs have failed to plead an actionable misstatement.

5         So all six categories are nonactionable either because

6    they are statements of opinion or nonobjective, nonverifiable

7    statements that are not measurable, or because the plaintiffs

8    have failed to allege that the statement is actually false or

9    misleading.

10         **THE COURT:**  I understand the complaint to be an

11   omission, partial misrepresentation case.  Once you open the

12   door, then there's an argument that you need to be fully

13   forthcoming.  So you don't put in here the omission analysis,

14   and my view is that the complaint is an omission complaint.

15         **MS. SIMONSEN:**  Your Honor --

16         **THE COURT:**  So we're talking about two entirely --

17   we're in two different ballparks.

18         **MS. SIMONSEN:**  Your Honor, we do address the omission

19   theory.  The plaintiffs' theory --

20         **THE COURT:**  I don't recall that being in your list.

21         **MS. SIMONSEN:**  Well, the state AGs have made clear

22   that their theory of deception here is that there were certain

23   information that was allegedly omitted that made certain

24   statements misleading.  Now, the problem with that theory is

25   that if you look at the statements that they've identified,

1   those statements -- let's take these statements about safety,

2   for instance.  Those statements are not actionable, because

3   they are general nonspecific statements about the safety of the

4   platforms.

5       And we cited a number of cases that have held in directly

6   analogous contexts that generalized assertions about, for

7   instance, Lyft's commitment to safety, its safety measures, the

8   role safety plays in the ride-share market were nonactionable.

9       The *Azule (phonetic) versus BMW* case held that there's

10  nothing specific or measurable about the word "safety".

11      Judge Koh's decision, again, in the *Yahoo* case is

12  particularly instructive.  There, the plaintiffs were

13  challenging as misleading Yahoo's statement that "protecting

14  our systems and our users' information is paramount" on the

15  ground that Yahoo allegedly knew and did not disclose risks of

16  a breach --

17          **THE COURT:**  Okay.

18          **MS. SIMONSEN:**  -- or actual data breaches.

19          **THE COURT:**  Response?

20          **MS. O'NEILL:**  Thank you, Your Honor.

21      I'll just take a few points that Ms. Simonsen made in

22  turn.

23      First, related to whether these statements were made in

24  advertisements or in other contexts.  There's nothing in the

25  states' consumer protection laws that limit their application

1    to traditional forms of advertisement.  As Your Honor has

2    recognized, these statutes are meant to be construed liberally

3    and broadly in favor of consumers, and consumers are aware of

4    statements that are made outside of the context of

5    advertisements.

6        I'd also just note, as Your Honor has recognized, that it

7    is pertinent to look at the overall context of statements when

8    we're evaluating whether consumers are likely to be misled or

9    whether certain acts or practices are capable of misleading or

10   confusing consumers.  So it is entirely appropriate to take

11   into consideration all kinds of messages that the consumer is

12   presented with that they may already know from all different

13   sources of information.

14       With respect to the tenor of our claim, Your Honor is

15   correct that we would urge the Court to view the omissions and

16   affirmative misrepresentations together in the same context as

17   a course of deceptive behavior.  The complaint, of course,

18   specifies information that Meta left out of its

19   representations, which we do believe made those representations

20   false or misleading, but each of those representations

21   represents a circumstance in which Meta has omitted relevant

22   information.  Those misleading misrepresentations and omissions

23   are really two sides of the same coin when we're talking about

24   consumer protection laws.  However, they may be classified or

25   categorized, they are behavior that is likely or has a tendency

1  to deceive consumers.

2      Even if the Court does decide to view these deception

3  claims as affirmative misrepresentations, there is plenty of

4  precedent, and we've cited this in our briefs, holding

5  statements related to safety actionable, particularly when

6  there are certain kinds of contacts which are present here.  I

7  think there are two particular aspects of the contacts that are

8  really important to keep in mind.

9      First is that Meta had embarked on a campaign of selling

10 safety to consumers.  It had done internal research, a

11 narrative audit that showed that consumers were wavering on

12 this point, that consumers weren't sure if its platforms were

13 unsafe.  So it embarked on a campaign to make sure that

14 consumers, their concerns were assuaged; that they were

15 reassured.

16     The second part of contacts which I think is very

17 important is that Meta had extensive knowledge of the ways in

18 which its platforms were not safe.  It had internal studies,

19 internal statistics, internal surveys showing in many different

20 ways how its platforms were not safe for use, in contradiction

21 to how it presented the safety issues on its platform.

22     **THE COURT:**  Mr. Warren?

23     **MR. WARREN:**  Thank you, Your Honor.

24     Previn Warren, co-lead counsel for the personal injury

25 plaintiffs.

1          I'll add just three points, hopefully not duplicative to

2     what Ms. O'Neill had to say.

3          First, that Meta appears to be making the argument that

4     its affirmative statements are mere puffery, but whether a

5     statement is puffery is generally considered a question of

6     fact.  That's the *Ecodiesel* case.  So it's not amenable to

7     resolution on a motion to dismiss.

8          Second, I think the clearest precedent on point here is

9     from Your Honor in the *In Re: Apple Securities Litigation* case

10    in which you observed that, quote:  "A party cannot

11    affirmatively create a positive impression of an area it knows

12    to be doing poorly."

13          **THE COURT:**  So most of that case was thrown out.  I

14    don't know that you want to cite it.

15          **MR. WARREN:**  Fair enough, Your Honor.

16          I'm not citing it for the bottom line, but I think that

17    proposition is a proposition of law that is very applicable in

18    these circumstances, given that the allegations in the

19    complaint, both from the AGs, but from the personal injury

20    claimants, as well, is that Meta knew it had a problem

21    regarding youth safety, and yet it embarked on a campaign to

22    characterize itself as doing well, even though it wasn't.

23          And the third point I'd make is just to clarify so the

24    record is clear, that the personal injury plaintiffs are

25    pursuing a theory of omission.  We cite numerous affirmative

1    misrepresentations in the complaint, and the complaint could

2    fairly be read to have pursued that theory.  At this juncture

3    we are not seeking to hold those as actionable on their own,

4    but rather those affirmative misrepresentations speak to

5    certain elements of the omission claim, for instance, Meta's

6    intent.

7            THE COURT:  The only other issue that I'll take

8    argument on is Noerr-Pennington.  I am not ruling on

9    materiality at a 12(b)(6) motion.  It's rarely, if ever, done,

10   and I won't do it here.

11           MS. SIMONSEN:  Thank you, Your Honor.

12       If I may respond briefly to these points made by the

13   states?

14           THE COURT:  You have two minutes to respond.  So you

15   take your two minutes, you can address whatever you want, but

16   you got two minutes.

17           MS. SIMONSEN:  Thank you, Your Honor.

18       The main point I want to make is that the theory of the

19   case by the states and the personal injury plaintiffs is that

20   Meta supposedly knew about risks to adolescents from the use of

21   its services.  Accepting that as true only for the purposes of

22   this motion to dismiss, that does not make actionable a

23   statement that is merely a generalized statement of, Mr. Warren

24   referred to it as nonactionable puffery.  That's not

25   necessarily what we're calling it, but it is a generalized

1   statement that cannot be verified as true or false.

2       And there are other cases, the *Lyft* case that I mentioned,

3   where there were similarly assertions that Lyft was aware of

4   dangers to riders.  So, for instance, they knew about alleged

5   scores of sexual assaults by Lyft drivers, and the Court held

6   that that did not directly contradict defendant's generalized

7   assertions about Lyft's commitment to safety, its safety

8   measures, and the role safety plays in the ride-share market.

9   Because Lyft did not state that it guaranteed safety, but

10  instead emphasized its belief in the importance of trust and

11  safety, the statements were aspirational, indicative of

12  corporate optimism, and not actionable as material

13  misstatements.

14      The same was true in the *Yahoo* case, where the fact that

15  there were data breaches, or risks of data breaches, that were

16  known, could not make statements, generalized statements about

17  safety, actionable.  And that's --

18          THE COURT:  Is that a securities case?  And was it, I

19  believe, a Northern District case?

20          MS. SIMONSEN:  I believe it was, Your Honor, but the

21  same concepts apply.  And we outline --

22          THE COURT:  I just want to make sure --

23          MS. SIMONSEN:  Yes.

24          THE COURT:  -- that we're talking about something I

25  can look at.  Certainly, it's not binding.

1    **MS. SIMONSEN:**  It was a securities case, Your Honor.

2    And we outline in Appendix A, Docket 701-2, all of the law

3    that out' --

4         **THE COURT:**  It's important to remember in that case

5    the procedural issue.  In that case I may have made the exact

6    same decision that I do not make here, because this is not a

7    securities case, and it is not the same standard.

8    You have 30 seconds left if you want to address Noerr-

9    Pennington.

10        **MS. SIMONSEN:**  Your Honor, it's clear that the 20 or

11   so statements that the plaintiffs identify as having been made

12   to Congress are in the heartland of First Amendment protection.

13        **THE COURT:**  What protected petitioning activity was

14   the defendant engaged in?

15        **MS. SIMONSEN:**  The -- in all three -- so there were

16   three occasions where executives from Meta were appearing

17   before Congress to speak, and I can pull you the language from

18   the transcripts where they were discussing proposed legislation

19   that would affect the social media industry broadly.  And in

20   that context where the defendant is speaking to proposed

21   legislation, that falls squarely within petitioning activity.

22        **THE COURT:**  All right.  The plaintiffs agree that

23   they were petitioning for a change in federal law?

24        **MS. O'NEILL:**  Your Honor, I don't think that that is

25   clear.  I think it's definitely not clear from the record

1    before you, and I think that's one of the reasons why courts,

2    including this Court, have generally held that whether, and to

3    what extent, Noerr-Pennington applies is a fact-intensive

4    inquiry that's not ripe for a motion to dismiss.  So I think

5    there still are questions about whether this truly was

6    petitioning conduct.

7         I think there also are large questions about whether the

8    sham exception to Noerr-Pennington applies.  That exception, of

9    course, in the antitrust context applies when a business uses

10   the governmental process itself, as opposed to any outcome of

11   that process, in an anticompetitive way.  Here, we've alleged

12   that Meta used the governmental process itself, that is the

13   hearings, rather than any outcome of that process related to

14   legislation, in a deceptive and misleading way.  In other

15   words, the hearings were part and parcel of the deception that

16   Meta has engaged in towards the --

17        **THE COURT:**  Were the executives called to Congress,

18   as opposed to, you know, being request' -- as opposed to asking

19   to -- asking for the stage in which to address Congress?

20        **MS. O'NEILL:**  Excuse me, Your Honor.  In asking

21   whether the Meta executives were subpoenaed to ...

22        **THE COURT:**  Sometimes they're subpoenaed, sometimes

23   they do it voluntarily.  I'm asking whether it was Congress who

24   was requesting, as opposed to the executives themselves.

25        **MS. O'NEILL:**  Your Honor, I don't, as we stand here,

1   actually know the factual circumstances.  They were not pled in

2   the complaint or raised by Meta in its motion, so I do not know

3   the specifics.

4              **THE COURT:**  I see.

5              **MS. O'NEILL:**  I think, again, that that is a reason

6   why this inquiry is not ripe.

7       I do think that, you know, whether Meta was called to

8   testify or whether it testified willingly is not really

9   material, again, to the question of whether the sham exception

10  applies.  Whether Meta was voluntarily speaking to Congress or

11  doing so under a subpoena is immaterial to whether they engaged

12  in misleading and deceptive behavior.

13             **THE COURT:**  All right.

14             **MR. WARREN:**  Your Honor, may I be heard?

15             **THE COURT:**  You may.  And you need to speak up,

16  please.

17             **MR. WARREN:**  Oh, thank you.  Sometimes the mic is a

18  little low.

19      Respectfully, the personal injury plaintiffs do not

20  believe this is a close call, and we do not believe that

21  resolution of this issue needs to be deferred to another time.

22  This was an affirmative defense that defendants opted to bring

23  now, prior to the record being developed.  So they could have

24  saved that for later; they chose to bring it now.

25      Nothing in the complaint remotely suggests that Meta was

1    engaged in lobbying activity to petition the government at the

2    time it lied to Congress, which is exactly what we allege they

3    have done.

4        In a question for the record submitted by the Senate

5    Judiciary Committee to Meta, Meta was asked -- and this is in

6    the complaint at paragraph 3690 -- "Is Facebook able to

7    determine whether increased use of its platform among teenage

8    girls has any correlation with increased signs of depression

9    within this demographic through the information collected from

10   its suicide detection algorithm or other technology?"

11       Meta's response was one word:  "No."

12       That was a lie.  That's how we've alleged it in the

13   complaint, and I think nothing about the Senate asking a

14   question to Meta suggests that Meta was engaged in the active

15   First Amendment protected activity of petitioning the

16   government for a rule change, and there is just no record on

17   which the defendants' attempts to build this First Amendment

18   case that they have a right to lie to Congress, notwithstanding

19   the fact that that's a federal crime under 18 U.S.C. 1001.

20       **MS. SIMONSEN:**  Your Honor, respectfully, the

21   allegation that Mr. Warren just pointed to is actually not even

22   an alleged misstatement by the state AGs, and Mr. Warren has

23   already clarified that they are not, the PI plaintiffs are not

24   pursuing claims based on an alleged misstatement.

25       So that statement I would submit, Your Honor, isn't even

1  at issue.

2       It also was not false.  The statement had to do with

3  whether the suicide detection algorithm, you know, is capable

4  of drawing any type of correlation.  And we can obviously get

5  into that at a later point in time, but the notion that these

6  were false statements I could walk through with Your Honor.  I

7  won't do it, but if you look at the statements, you can see

8  many of them are couched as opinions.  Many of them are not

9  measurable.  Many of them are plainly, are plainly true on

10 their face.  The states and the PI plaintiffs have not

11 identified with the requisite particularity what was actually

12 false or misleading about some of these statements.

13      I did want to address, Your Honor, the PI plaintiffs'

14 claims in particular for omissions, which they've clarified

15 today is the only basis for their claims.  Because even, you

16 know, leaving aside the attorney general claims, the omission

17 claims brought by the PI plaintiffs fail because they have

18 failed to plead, whether you call it reliance, materiality or

19 causation, they have failed to allege that they would have

20 changed their behavior had the allegedly omitted information

21 been disclosed.

22      And it is clear.  We set forth the law in our appendices

23 that that is a required element of the misrepresentation and

24 omission claims under all of the states at issue.

25           THE COURT:  Mr. Warren, response.

1        **MR. WARREN:**  Thank you, Your Honor.

2        I think that we easily satisfy the reliance criteria when

3    it comes to omissions.  There are really two prongs under the

4    *Daniel* case which Your Honor cited in your order on the

5    Zuckerberg motion to dismiss, and the first prong is whether

6    plaintiffs would have behaved differently had the truth been

7    known.  The second prong is whether they would have actually

8    heard of the truth had it been disclosed.  And I think we

9    easily survive both of those prongs.

10        On the first, whether plaintiffs would have behaved

11    differently, that bottoms out in a question of materiality.

12    And, again, that's the *Daniels* case.  But materiality is an

13    objective inquiry.  It does not require individualized

14    allegations.  That's clear in case after case, *FCA U.S.*

15    *Monostable Electronic Gearshift* being one, *Ecodiesel* being

16    another.

17        And more to the point, safety risks are material.  That's

18    what the *In Re: Myford Touch* case says.

19        So would plaintiffs have behaved differently is a question

20    of materiality.  Safety risks are material.  And I think if the

21    complaint, if the complaint does anything, it's to walk through

22    the safety risks that we allege are present in these platforms

23    that Meta did not disclose.

24        So that's sub-prong 1 where plaintiffs have behaved

25    differently.  Sub-prong 2 goes to awareness.  And there the

1    question is whether the plaintiffs would have had an

2    opportunity to receive and rely on the omitted information.

3         But these plaintiffs were addicted to Instagram.  They

4    were using these platforms six, seven, eight hours a day.  Of

5    course, they would have been able to get the information about

6    the safety risks if Meta had just put it on the platform.  And

7    that's exactly the issue here.  They didn't do that.  They

8    didn't warn these consumers or their parents.

9         So the notion that they had to read a particular

10   periodical is ludicrous.  They were on the method of

11   communication that the defendants themselves controlled, and we

12   think --

13            THE COURT:  Okay.  Failure to warn.  You want to be

14   heard on that?

15            MS. SIMONSEN:  Your Honor, may I respond briefly?

16   Because I think it is critical to look at the actual

17   allegations in the short-form complaints here.  These personal

18   injury plaintiffs have not alleged reliance.  There are only 25

19   short-form complaints that even contain any specific

20   allegations.

21            THE COURT:  Ask them to put it in the short-form

22   complaint.

23            MS. SIMONSEN:  Yes, Your --

24            THE COURT:  That was negotiated.

25            MS. SIMONSEN:  Your Honor, the short-form complaints

1    provide for the -- an allowance to allege additional facts

2    necessary to support certain causes of action.

3            **THE COURT:**  This is a basic element.  Was this

4    negotiated, or not?

5            **MS. SIMONSEN:**  Well, the short-form complaints were

6    negotiated, and they allow for additional space for plaintiffs

7    asserting individualized claims, like misrepresentations and

8    omissions, to asserts the facts needed to support those claims.

9    Twenty-five plaintiffs chose to try to do that; the remaining

10   175 did not.  This is their pleading burden.  These elements

11   are their pleading burden to plead.

12       And on the point about addiction, Your Honor, I just have

13   to say, at a minimum, the claims for omissions, which, again,

14   are the only claims they're bringing at this point, should be,

15   at a minimum, dismissed with leave to amend for them to allege

16   that they, when they learned of the disclosed information --

17   which, it's undisputed that they did, because the entire

18   premise of their complaint is the information leaked by Frances

19   Haugen, if -- they need to allege that they would have changed

20   their behavior in light of those disclosures that they were

21   unable to because, according to Mr. Warren, they were addicted.

22   That allegation appears nowhere in the complaint.

23       And, again, it is plaintiffs' burden to plead --

24           **THE COURT:**  If you say the word "again," you're done.

25       Next issue.

1      **MR. WARREN:**  Can I very briefly respond, Your Honor?

2      **THE COURT:**  Three sentences, starting now.

3      **MR. WARREN:**  Okay.  This was not part of the short-

4  form complaint form, nor should it have been, because this is

5  an objective inquiry that does not require individualized

6  allegations of reliance.

7      And I did it in two.

8      **THE COURT:**  All right.

9      **MR. BLAVIN:**  Your Honor, Jonathan Blavin from Snap,

10  on behalf of defendant Snap.  We filed a separate joinder on

11  the Count 7 claims against the non-Meta defendants.  If I could

12  just have one minute to make brief argument on that.  It is

13  distinct and separate from --

14      **THE COURT:**  I don't think it's that distinct, but you

15  have one minute.

16      **MR. BLAVIN:**  Okay.  Well, just very briefly, Your

17  Honor, as an initial matter, plaintiffs actually didn't respond

18  to any of the unique separate arguments we made in that

19  joinder, so they have waived any response to that.  But even if

20  the -- Your Honor were to consider the merits, you know, as set

21  forth in that joinder, first, they don't identify any

22  misleading statements, misrepresentations by Tiktok or YouTube

23  whatsoever.  They identify a couple statements from Snap

24  representatives.  They don't, as we explained in the joinder,

25  describe why those statements are actually false in any way.

1  And as set forth in the joinder, the allegations in the

2  complaint actually demonstrate why they are not false.  I'm not

3  going to go through those today, Your Honor.  Your Honor can

4  obviously look at the pleading.

5       But then just finally, Your Honor, again, as to the Meta-

6  related issues, they don't allege any type of reliance as to

7  any statements made by the non-Meta defendants.

8            **THE COURT:**  Thank you.

9            **MR. BLAVIN:**  Thank you.

10           **MR. PANEK:**  Your Honor, Gabriel Panek for the

11  plaintiffs.  And I've -- if I may briefly respond?

12           **THE COURT:**  Thirty seconds.

13           **MR. PANEK:**  Thank you, Your Honor.

14       First, we did respond to that, Snap's separate brief, in

15  our complaint.  We pointed -- in our briefing.  We did point

16  out that they largely focused on misrepresentations, whereas

17  our complaint pursues an omissions theory.

18       And second, our complaint has hundreds of detailed

19  allegations with respect to each separate group of defendants,

20  including where specifically each defendant could have warned

21  of the information and the knowledge that they have, and that

22  satisfies all of the pleading burden at this stage.

23           **THE COURT:**  All right.  Next topic.

24           **MR. PANEK:**  Thank you.

25           **MS. MIYATA:**  Your Honor, before we -- apologies.

1    Bianca Miyata for the state attorneys general.  Before we move

2    off of the motion to dismiss the state AGs' complaint, I did

3    want to go back briefly to the demonstrative that I believe

4    Mr. Hester provided.

5        We have heard from a number of colleagues in our coalition

6    from six separate states that they have concerns about

7    inaccuracies in that demonstrative, and we simply wanted to

8    request, to the extent the Court wishes to rely on any

9    statement regarding state laws in this demonstrative, those

10   states would like to have the opportunity for a limited written

11   response to point the Court to where those laws have been

12   clarified, or stated correctly, rather, in the states' charts

13   and response in lieu of a surreply.

14            **THE COURT:**  They gave me one page.  You can have one

15   page.

16            **MS. MIYATA:**  Excellent, Your Honor.

17       May we submit that within a week -- by a week from today?

18   By the 26th?  Or if the Court would prefer it earlier, we are

19   amenable to that, as well.

20            **THE COURT:**  One week is fine.

21            **MS. MIYATA:**  Okay.  Thank you, Your Honor.

22            **THE COURT:**  You should file that on the docket, the

23   one-pager.

24            **MR. SCHMIDT:**  Okay, Your Honor.  We'll do that.

25       Paul Schmidt for Meta.  May I proceed on the failure to

1  warn argument?

2  　　　　　**THE COURT:**  Who's speaking on the other side?

3  　　　　　**MR. SCHMIDT:**  It is an AG argument in terms of

4  Section 230, failure to warn.

5  　　　　　**THE COURT:**  Go ahead.

6  　　　　　**MS. MIYATA:**  Apologies.

7  　　　　　**THE COURT:**  Go ahead.

8  　　　　　**MR. SCHMIDT:**  This is an issue that's come up several

9  times, including in the interlocutory appellate context.  So I

10  appreciate the opportunity to address this issue.  I'll try to

11  be brief.

12  　　　　Our core point on failure to warn is that the law is very

13  uniform in recognizing that where the failure to warn goes to

14  the same content or the same publishing activity as other

15  claims, it's equally barred by Section 230.  That's true at a

16  general level.  Cases like *Kimzey*, which say that the pleading

17  form doesn't matter.  That's true at the specific level in

18  terms of a line of cases, *Wozniak* just recently from the

19  California court of appeal, *Herrick* from the Second Circuit and

20  Southern District, the *LW* and *Bragg* (phonetic) case from

21  California federal courts, the *Anderson* case, the *Facebook*

22  case, they all recognize that failure to warn claims are

23  subject to Section 230 when they either relate to the same

24  underlying content as other claims or the same publishing

25  activity.

1    Here, the states are challenging underlying content in

2 paragraphs like 187 and 846(c).  They address, quote,

3 "dangerous or harmful content, negative or harmful

4 experiences."  A case like *Herrick* speaks directly to that.

5 Requiring Grindr to post a warning at the outset or along with

6 each profile is no different than requiring Grindr to edit the

7 third-party content itself.

8    The same principles hold true in terms of what Your Honor

9 found in the earlier Section 230 ruling to be publishing

10 activity.  Your Honor made a finding that algorithms and the

11 claim that algorithms were addictive, that was core publishing

12 activity.  I think Your Honor used the word "essential".

13    That's exactly what they're challenging here, both

14 generally as to algorithms, but then also as to a failure to

15 warn.  They have a whole section, for example, starting at

16 page 28 of the complaint talking about their allegation that

17 Meta's algorithms encourage compulsive use.  That's the

18 addiction claim Your Honor addressed, which Meta does not

19 disclose.  That's a failure to warn slash omissions claim.

20 That's heartland within Section 230.  Under Your Honor's

21 reasoning, that algorithm conduct is publishing activity that

22 they are trying to attach liability to, exactly what

23 Section 230 forbids.

24    And that is why cases like *Wazniak* say you can't

25 substitute one -- a failure to warn claim for a non-failure to

1    warn claim on the same conduct.  It would essentially allow

2    every state cause of action otherwise immunized by Section 230

3    to be pleaded as a failure to warn of such information

4    published.

5           *Herrick* did the same thing in the context of a features-

6    type challenge, where the Court said it doesn't matter, the CDA

7    applies at both the individual and systemic or architectural

8    level.

9           The only response they've given is *Internet Brands*.  In

10   *Internet Brands* the warning very clearly had nothing to do with

11   publishing activity.  It had to do with information that the

12   company independently had, and that was the only reason that

13   that claim was allowed to survive.  That's why all of these

14   other cases have perennial, including within the Ninth Circuit,

15   have perennially distinguished *Internet Brands* when the

16   warnings allegations do relate to publishing features like

17   those here.

18          That's our argument on that issue, Your Honor.  Thanks for

19   letting us make it.

20          **THE COURT:**  Any response?

21          **MS. MIYATA:**  Thank you, Your Honor.

22          You know, the AG's claims are based on Meta's own conduct

23   here and on Meta's on speech and its decision not to speak

24   about its knowledge of harms and about its own internal

25   operations.  These claims are not based on the publication of

third-party content, and the Court has already properly ruled
that the failure to warn claims can survive.

I think in some of the cases that my colleague has cited
there was a question about creative pleading.  There's no such
question about creative pleading here.  The states have free-
standing claims regarding these features, and then the states
have free-standing claims regarding how their failure to speak
was part and parcel with their own deceptive scheme.

In *Internet Brands*, I disagree with my colleague's
representation of that case.  Yes, it is true that warnings
could have been posted, but there were warnings about knowledge
about third-party content being posted on the site.  So I don't
think that case is a proper analog here, and we would ask the
Court to apply its previous ruling regarding omissions --
regarding failure to warn claims to the state AGs' omission
claims here, which are part of a greater deceptive scheme.

**MR. SCHMIDT:**  If I may have 30 seconds, Your Honor.

When they say, we're challenging Meta's failure to speak,
it's failure to speak about its publishing activities.  *Dyroff*
tells us, and I think Your Honor rightly found, that something
like algorithms are a heartland publishing activity.  They're
how you present which content people see.  To say you should
have warned about your publishing activities is a direct
attempt to attach liability based on a publishing function.
That's heartland 230, definitional within the statute.  That's

1    why the case law is uniform.

2            **MS. MIYATA:**  May I have one line to respond?

3            **THE COURT:**  You may.

4            **MS. MIYATA:**  The state attorneys general do not seek

5    to impose any liability based on the content that is being

6    published or not.  Instead, they're seeking to impose liability

7    on Meta's failure to speak about the overall effect of its

8    unfair business practices.  That is not the same thing as a

9    failure to speak about the underlying content that is being

10   posted on the platform.

11           **MR. SCHMIDT:**  But if I could say one last sentence.

12       When it goes to publishing activity, that's what

13   Section 230 exists for.  That's what they're saying Meta should

14   have spoken about.

15           **THE COURT:**  Okay.

16           **MR. SCHMIDT:**  Thank you, Your Honor.

17           **THE COURT:**  That's it for the motions.  Is there

18   anything else you want to discuss today?

19           **MS. MIYATA:**  Not from the state AGs, Your Honor.

20           **MR. HESTER:**  Your Honor, Timothy Hester on behalf of

21   Meta.

22       Just one point following up on the Court's order on the

23   motion to dismiss as to Mr. Zuckerberg.  We have consulted and

24   have come up with a schedule, and the Court had asked us to

25   report today on that.

1    We have agreed with the plaintiffs that they will file

2    their consolidated addendum in response to the Court's order by

3    April 26, that Mr. Zuckerberg would renew his motion to dismiss

4    on May 10, that the plaintiffs would file their response or

5    opposition on May 23, and that Mr. Zuckerberg would file his

6    reply on May 30.  We've also agreed to page limits of 10, 10

7    and 6 for the two initial papers, and then 6 for the reply.

8    If that meets with the Court's approval, we can proceed

9    that way.

10    **THE COURT:**  So ordered.

11    **MR. HESTER:**  Thank you, Your Honor.

12    **THE COURT:**  Other issues?

13    **MR. WEINKOWITZ:**  Your Honor, Mike Weinkowitz.  A

14    point of clarification.

15    At the next status conference we're having oral argument

16    on the school district motion to dismiss.  In that school -- in

17    that motion to dismiss, the defendants largely go through the

18    entirety of their 230 and First Amendment argument.  Again, the

19    same argument that we've heard over and over and that we heard

20    in the PI text.  I was wondering if Your Honor would be taking

21    argument on that or would defer argument so that we could focus

22    on nuisance and negligence, instead of rehearing 230 and First

23    Amendment.

24    **MR. SCHMIDT:**  Your Honor, this is the first I've

25    heard of this today.  We do agree generally that the Court's

1  prior analysis as to Section 230 applies equally to the school

2  district's claims.  Those are the arguments we make in our

3  papers certainly.  So to the extent Your Honor is inclined to

4  follow the path Your Honor has previously paved here, you know,

5  we would agree that there's probably not a need to go through

6  that specific analysis again, but the -- you know, at least the

7  school districts thus far have not taken that view.  I think

8  they've tried to distinguish, we would argue unpersuasively,

9  your Court's prior analysis and tried to draw a different

10 distinction.

11      So I don't want to sit here and give up the argument if

12 they are still pressing on that point, because we think it is

13 important that Your Honor continue to apply its previous

14 Section 230 analysis to these claims, as well.

15      **THE COURT:**  Well, you just made your argument, right?

16 I don't need to hear anything else.  Look, I am heading into a

17 three-month trial, so I am not interested in hearing more than

18 what I need to hear.  Let's do it this way.  The default is I

19 don't need argument on that.  I've now heard it twice, maybe

20 even three times.  If I want argument on a specific issue, I'll

21 let you know.

22      **MR. WEINKOWITZ:**  Thank you, Your Honor.

23      **MR. SCHMIDT:**  Thank you.

24      **THE COURT:**  All right.  Other issues?  No?

25      All right.  Then it's taken under submission, and you all

1    have a safe travels, and I'll see you in about a month.

2          **THE COURTROOM DEPUTY:**  Court is adjourned.

3       (Proceedings concluded at 1:51 p.m.)

4                    ---o0o---

5              **CERTIFICATE OF REPORTER**

6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9    DATE:  Monday, APRIL 22, 2024

10

11

12    _____

13       Stephen W. Franklin, RMR, CRR, CPE
        Official Reporter, U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25