Pages 1 - 99

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL   )
INJURY PRODUCTS LIABILITY       )
LITIGATION                      )
                               )  **NO. C 22-md-03047-YGR (PHK)**
                               )
_____)

                              San Francisco, California
                              Thursday, June 20, 2024

APPEARANCES:

For Plaintiffs:
                    LIEFF, CABRASER, HEIMANN
                       & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California 94111
               BY:  **LEXI J. HAZAM, ATTORNEY AT LAW**
                    **MICHAEL LEVIN-GESUNDHEIT,**
                                   **ATTORNEY AT LAW**

                    ANDRUS ANDERSON LLP
                    155 Montgomery Street, Suite 900
                    San Francisco, CA  94104
               BY:  **JENNIE LEE ANDERSON, ATTORNEY AT LAW**

                    MOTLEY RICE LLC
                    28 Bridgeside Boulevard
                    Mount Pleasant, South Carolina 29464
               BY:  **JESSICA L. CARROLL, ATTORNEY AT LAW**

                    SEEGER WEISS LLP
                    1515 Market Street - Suite 1380
                    Philadelphia, Pennsylvania  19102
               BY:  **AUDREY SIEGEL, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No's. 12219

```
 1   APPEARANCES:   (CONTINUED)

 2   For PSC Members:
                             WAGSTAFF & CARTMELL LLP
 3                           4740 Grand Avenue - Suite 300
                             Kansas City, Missouri 64112
 4                   BY:  THOMAS P. CARTMELL, ATTORNEY AT LAW

 5   For Federal/State Liaison:
                             BEASLEY ALLEN CROW METHVIN
 6                             PORTIS & MILES, PC
                             234 Commerce Street
 7                           Montgomery, Alabama 36103
                     BY:  JOSEPH G. VAN ZANDT, ATTORNEY AT LAW
 8
     For Government Entity Subcommittee:
 9                           LEVIN SEDRAN AND BERMAN LLP
                             510 Walnut Street - Suite 500
10                           Philadelphia, Pennsylvania 19106
                     BY:  MICHAEL WEINKOWITZ, ATTORNEY AT LAW
11
     For Plaintiff State of Colorado:
12                           COLORADO DEPARTMENT OF LAW
                             1300 Broadway - 6th floor
13                           Denver, Colorado 80203
                     BY:  BIANCA MIYATA, SENIOR ASSISTANT
14                        ATTORNEY GENERAL

15   For Plaintiff State of California:
                             CALIFORNIA DEPARTMENT OF JUSTICE
16                           455 Golden Gate Avenue - 11th Floor
                             San Francisco, California 94102
17                   BY:  JOSEPH OLSZEWSKI-JUBILIRER
                          DEPUTY ATTORNEY GENERAL
18                        MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL

19   For Plaintiff Commonwealth of Kentucky:
                             KENTUCKY OFFICE OF THE
20                           ATTORNEY GENERAL
                             Office of Consumer Protection
21                           1024 Capital Center Drive - Suite 200
                             Frankfort, Kentucky 40601
22                   BY:  CHRISTIAN LEWIS, COMMISSIONER

23            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

24

25
```

**APPEARANCES**:  (CONTINUED)

For State of New Jersey:

                        NEW JERSEY DIVISION OF LAW
                        DATA PRIVACY & CYBERSECURITY
                        124 Halsey Street
                        5th Floor
                  BY:   **VERNA J. PRAXADAY,**
                        **DEPUTY ATTORNEY GENERAL**

For Defendant Meta:

                        COVINGTON & BURLING LLP
                        1999 Avenue of the Stars - Suite 3500
                        Los Angeles, California 90025
                  BY:   **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        Sales Force Tower
                        415 Mission Street - Suite 5400
                  BY:   **ISAAC D. CHAPUT, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        One City Center
                        850 Tenth Street, NW
                        Washington, D.C.  20001
                  BY:   **PAUL W. SCHMIDT, ATTORNEY AT LAW**

For Defendant Snap:

                        MUNGER, TOLLES & OLSON LLP
                        355 South Grand Avenue - 35th Floor
                        Los Angeles, California 90071
                  BY:   **FAYE PAUL TELLER, ATTORNEY AT LAW**

For Defendant TikTok:

                        KING & SPALDING LLP
                        1180 Peachtree Street
                        Atlanta, Georgia 30309
                  BY:   **GEOFFREY DRAKE, ATTORNEY AT LAW**

                        KING & SPALDING LLP
                        1700 Pennsylvania Ave NW
                        Washington, D.C. 20006
                  BY:   **DAVID P. MATTERN, ATTORNEY AT LAW**


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES**:    **(CONTINUED)**

For Defendant TikTok (Cont'd.)
                        FAEGRE DRINKER BIDDLE & REATH LLP
                        90 S. 7th Street - Suite 2200
                        Minneapolis, Minnesota 55402
                BY:    **AMY R. FITERMAN, ATTORNEY AT LAW**

For Defendant YouTube:
                        WILSON, SONSINI, GOODRICH & ROSATI
                        650 Page Mill Road
                        Palo Alto, California 94304
                BY:    **ANDREW KRAMER, ATTORNEY AT LAW**

                        WILSON, SONSINI, GOODRICH & ROSATI
                        One Market Street
                        Spear Tower - Suite 3300
                        San Francisco, California 94105
                BY:    **LAUREN GALLO WHITE, ATTORNEY AT LAW**

                        WILLIAMS & CONNOLLY LLP
                        680 Maine Avenue, SW
                        Washington, D.C. 20005
                BY:    **JOSEPH PETROSINELLI, ATTORNEY AT LAW**

1    <u>**Thursday - June 20, 2024**</u>                          <u>**1:05 p.m.**</u>

2                        <u>**P R O C E E D I N G S**</u>

3                          ---o0o---

4        **THE CLERK:**  Please remain seated.  Come to order.

5    Court is now in session.  The Honorable Peter H. Kang

6    presiding.

7        Now calling 22-MD-3047, In Re: Social Media Adolescent

8    Addiction and Personal Injury Products Liability Litigation.

9        Counsel, when speaking, please approach the podium and

10   state your appearances for the record.

11       **THE COURT:**  Good afternoon.

12       **ALL:**  Good afternoon.

13       **THE COURT:**  So shall we walk through the status

14   report?

15       The first issue that I see that requires my attention is

16   the request for the issue about extensions for Meta's

17   production of documents from custodians and the request for

18   some limited extensions.  Have you reached agreement on those

19   or --

20       **MS. WALSH:**  Good afternoon, Your Honor.  Alexandra

21   Walsh for the plaintiffs.

22       We are very close to agreement.  We were just continuing

23   our discussions in the hall just now, and I am hopeful that we

24   will be there very soon.

25       **THE COURT:**  Okay.

1          **MS. SIMONSEN:**  Your Honor, I think -- Ashley Simonsen,

2    Covington & Burling, counsel for the Meta defendants.

3          The other update we were going to provide to you today,

4    Your Honor, is -- first of all, thank you for the leave to

5    conduct additional negotiations regarding search terms.

6          The parties, as Your Honor knows, met in person last

7    Wednesday, we met and conferred additionally on Monday and

8    Tuesday of this week, made a number of counterproposals, and

9    we're down to about three disputed search strings where there

10   are --

11         **THE COURT:**  I'm sure you can bridge that gap.

12         **MS. SIMONSEN:**  And we're hopeful we can bridge that

13   gap.

14         And so what we've discussed is seeing if we can do that;

15   and if we can't, submitting letter briefs on any outstanding

16   disputes by Monday.

17         We would ask if Your Honor is able to hear that dispute

18   relatively quickly thereafter, simply because we do need sort

19   of finality on the search terms, and wondered if Your Honor

20   might hear that.  And this relates back to the extensions.

21   I'll get to that in a moment.

22         **THE COURT:**  If it's limited to three search terms, I

23   may be able -- depending on the nature of the dispute, you'll

24   have to brief it, but hopefully it's something that I can just

25   decide on the papers unless you really think it's something

**PROCEEDINGS**

1    that requires a hearing.

2            **MS. SIMONSEN:**  Sure.  I think --

3            **MS. WALSH:**  Your Honor, again, Alex Walsh for the

4    plaintiffs.

5        The only thing that I would add is that from the

6    plaintiffs' perspective, the extensions that you reference as

7    the first issue, there is a connection between that and the

8    search terms.

9            **THE COURT:**  Is that what you were getting to?

10           **MS. SIMONSEN:**  Yes.

11       Okay.  If I could just continue, the connection between

12   the two is that Meta requested these extensions for its

13   production of custodial files for certain custodians.

14           **THE COURT:**  Right.

15           **MS. SIMONSEN:**  For purposes of the 60-day production

16   deadlines, Meta has been using its original search terms and

17   its original relevant time period.  Some of those 60-day

18   deadlines have already come and gone using those, and so Meta's

19   current plan -- was to produce the remaining custodial files

20   that are returned by any additional search terms or expanded

21   relevant time period by the September 20th substantial

22   completion deadline.

23       In discussing with plaintiffs our request for these

24   various extensions -- which would be extensions for the

25   production of documents hitting, again, on Meta's original

**PROCEEDINGS**

```
 1    search terms and relevant time period -- I understand
 2    plaintiffs thought this was clear sooner.  I did not understand
 3    until a couple of hours before this hearing that they would
 4    condition their agreement to those extensions on Meta in turn
 5    agreeing that we would produce all additional custodial files,
 6    including for additional search terms and expanded relevant
 7    time period, within 30 days before depositions, which are now
 8    being scheduled for July at plaintiffs' election and
 9    coordination with the Tennessee Attorney General.
10        So that is now something that plaintiffs are linking to
11    the search term negotiations, which is perfectly fine; but
12    we'll need another couple of days, I think, to work through
13    that issue along with the search terms.
14        MS. WALSH:  And I would emphasize that we are
15    attempting to work through it.  We did have a -- quite a
16    different understanding, which we've identified that
17    misunderstanding now, and we would very much like to work
18    through it because we -- it has been clear for quite some time
19    that the search terms that Meta has been running were not
20    search terms that we agreed were sufficient to return the
21    documents responsive to our discovery request, which is why
22    we've had all of these negotiations.
23        Those search terms are important to us.  We believe
24    they're necessary to obtain what we believe is discoverable
25    information.  And given all of our interest in moving forward,
```

1   not being duplicative, we would like the full custodial files,

2   that is the custodial files, returned by the very close to

3   agreed set of search terms before we take these depositions.

4        And we're very happy to limit it to the people who are

5   coming up before September 22nd to a reasonable time before

6   that, but it's important that we have those full custodial

7   files as we go in to these depositions that are now scheduled.

8        In terms of the dates that are scheduled, as Your Honor

9   knows, these are depositions that were noticed by Tennessee.

10  We very much understand Your Honor's instruction regarding

11  them, and it makes good sense to us.  We have been working

12  with Tennessee explaining the issues, including regarding these

13  document productions.  There's only so much we can do in terms

14  of telling them when they need these -- when these depositions

15  need to take place.

16       We're also cognizant of the discovery schedule for this

17  case, and I believe that the reason Your Honor ordered the

18  60-day deadline was so that we would get these depositions

19  going, which I think both sides are interested in.  But, of

20  course, it's problematic for us if forced to take these

21  depositions without what we believe are the full custodial

22  files for the deponents; and for that reason, we look forward

23  to discussing with Meta and Meta's counsel how we can get those

24  full custodial files just for those limited deponents in

25  sufficient time to prepare for the now-noticed depositions.

1      **THE COURT:**  It sounds like you're going to be talking

2  about that.  So the only guidance I'll give you is keep talking

3  about it and keep making progress on it.  I don't see -- I

4  don't really hear a dispute here.  It's just -- this is really

5  just a timing issue is --

6      **MS. SIMONSEN:**  Yeah.  I think, Your Honor, the

7  dispute -- I mean, just so Your Honor is aware, I mean, the

8  additional search terms that Meta has agreed to over the past

9  couple of weeks, after plaintiffs made movement, will add --

10  they'll increase the review population from an estimated

11  6.7 million documents to 13.7 million.  It's a massive

12  expansion of documents.  We don't yet have agreement on those

13  terms; hopefully we will within the next week.  But the -- I

14  think there is a deposition, for instance, that's been noticed

15  for August 22nd.

16      There is simply just not a lot of time.  We're still

17  trying to get through all those documents for all the

18  custodians in response to all the RFPs.  There's simply not a

19  lot of time.

20      Now, we have said to plaintiffs, and we took into account

21  the September 20th substantial completion -- excuse me.

22      We did take into account, of course, the September 20th

23  substantial completion deadline when we were negotiating these

24  search terms.  And we, just as much as plaintiffs, would like

25  for these depositions not to go forward until our full

 1  custodial productions are made.

 2      But the deadline for those productions is September 20th,

 3  and that's what we've been working toward.  I think we'd be

 4  open to rescheduling some of these depositions for after

 5  September 20th, as I believe was kind of the concept that

 6  Your Honor intended when Your Honor set that deadline with the

 7  idea that the parties would then have three months to take

 8  depositions.

 9      I think the issue we're facing is just grappling with such

10  a massively expanded universe of documents that we've agreed to

11  and depositions that are coming earlier than the substantial

12  completion deadline, but --

13      THE COURT:  Once you run the new search terms, you'll

14  know better than anyone whether the new -- after deduping

15  whether the new search terms actually add materially to any one

16  or two or three or four witnesses' documents.  And it may be

17  that they don't; right?

18      And so the only guidance I can give you there is run the

19  statistics, especially after deduping, and see if there are

20  individuals who have been noticed up, and you could adjust a

21  schedule and get them done first.

22      MS. SIMONSEN:  Will do, Your Honor.

23      THE COURT:  Because it's a smaller universe of

24  documents that just come up after --

25      MS. SIMONSEN:  And we -- we, to be clear, have

**PROCEEDINGS**

1    committed to plaintiffs that we're going to prioritize the

2    documents for any early-noticed depositions.  So we'll continue

3    to work with our client on it and confer with the plaintiffs.

4          **MS. WALSH:**  Thank you, Your Honor.

5       And that's exactly the type of guidance we need.

6       Sorry.  Alex Walsh for the plaintiffs.

7       And thank you for that guidance because that's exactly

8    what we hope to discuss, which is what we're asking for, is

9    these particular deponents who, respectfully, we cannot simply

10   reschedule those depositions.

11      They are depositions that have been noticed by the

12   Attorney General of Tennessee.  And we're doing our best to

13   coordinate and we have been able to coordinate, but there is a

14   limit to our ability as plaintiffs in a different lawsuit, a

15   different jurisdiction with different claims, to require the

16   rescheduling.

17      And I know that the last thing we all want is for those

18   depositions to go forward with incomplete custodial files, from

19   our perspective; and our clients having been prejudiced in not

20   being able to --

21         **THE COURT:**  Yeah, I don't think either side from --

22   nobody wants the depositions to go forward with incomplete

23   document productions ahead of time.  So I think there's -- I

24   don't hear a dispute there either.

25      I mean, at some level, since it's Meta's witnesses who are

1    being deposed, they're in the best position to negotiate the

2    dates for rescheduling the depositions with the Tennessee

3    Attorney General because, normally, if you-all weren't involved

4    in the depositions, that's who you'd be negotiating the dates

5    for the depositions with anyway.

6        So my only thought there is, if you can -- again, assuming

7    everybody's acting cooperatively and reasonably, and

8    understanding the Tennessee Attorney General's not here, but,

9    again, you're in the best position to negotiate with them

10   because it's your witnesses.

11       You say:  Look, these five people, it's a relatively,

12   you know, cabined universe of documents.  We're going to get

13   those produced by whatever date in July or early August --

14   whatever it is; right? -- and so let's do them first.  I mean,

15   I don't see why anybody reasonable would object to that, and

16   so --

17           **MS. WALSH:**  We would absolutely agree.  We're looking

18   for about four weeks prior to when the deposition takes place

19   to give us --

20           **THE COURT:**  I don't hear an objection to that in

21   concept.

22           **MS. SIMONSEN:**  Not in concept, Your Honor.

23       I think the difficulty is that the Tennessee Attorney

24   General, there is no kind of 60-day custodial production

25   deadline in Tennessee; right?

1    And the Attorney General of Tennessee has chosen to notice

2    these depositions for particular dates, apparently

3    understanding that they will not necessarily have all the

4    documents.

5    The Tennessee Attorney General was the, I believe, lead

6    coordinating counsel with the Colorado Attorney General in the

7    presuit investigation.  And I do understand that the deposition

8    protocol that Your Honor entered did require coordination

9    between, you know, these -- these plaintiffs and the Tennessee

10   Attorney General.

11   And so, I think, just as we will absolutely work in good

12   faith to identify which documents we might be able to get out

13   the door sooner, if it is the case that we're not going to be

14   able to do it by the dates of some of these depositions noticed

15   by the Tennessee Attorney General, I think we would just

16   appreciate if the MDL plaintiffs would work with us to work

17   with the Tennessee Attorney General to push those depositions

18   back so that we can ensure that we move those --

19   **THE COURT:**  I'm not hearing an objection to that if it

20   will ensure that you get the documents sufficiently in advance.

21   **MS. WALSH:**  Your Honor, I'd make two points.

22   And having been involved in numerous discussions with

23   folks from the Tennessee Attorney General's Office, I can

24   assure you that we are -- as Your Honor has asked us to do, we

25   are coordinating with them.

1          **THE COURT:**  Yeah.

2          **MS. WALSH:**  It remains the case that we cannot dictate

3    the timing of these.

4          And in addition, Your Honor, we are cognizant of the close

5    of fact discovery coming right up.  So we, A, can't force the

6    Tennessee Attorney General to delay these depositions.  They

7    have their own court to answer to, their own litigation

8    strategy that they're following.

9          We also agree with Your Honor that -- and we very much

10   appreciate the 60-day custodial file deadline so that we can

11   get these depositions going so that we're not

12   quadruple-tracking in the fall.  We need to get these

13   depositions going.

14         And in a world where many of these search terms that have

15   now been agreed are search terms that we proposed to Meta as

16   long ago as early April -- I recognize we are where we are --

17   but we're talking about a limited number of custodians.  We're

18   talking about search terms that they have been aware of for a

19   long time.  We would ask, Your Honor, that they make all

20   efforts to ensure that we have full custodial files in time for

21   those depositions to take place.

22         **THE COURT:**  I'm not hearing an objection to that.  The

23   issue is trying to work out some flexibility on having to

24   reschedule depositions if it becomes necessary.

25         All right.  And I guess, again, since Tennessee isn't

1    here, all I can ask them, I guess, through you, is to be

2    cooperative and work collaboratively even though they're not

3    under my jurisdiction just, you know, as a matter of comity,

4    I guess, or courtesy.

5             **MS. WALSH:**  Yes.  And we are -- please be assured that

6    we are absolutely doing that.

7             **THE COURT:**  All right.

8        All right.  So, yeah, again, I'm not hearing a lot of

9    dispute here, so I just encourage you to keep talking and work

10   this out.  It feels like it's something you should be able to

11   work out.

12            **MS. WALSH:**  And we appreciate the additional time

13   Your Honor gave us and your admonitions because we've worked

14   very well together and we --

15            **THE COURT:**  I'm encouraged that you have --

16            **MS. WALSH:**  -- will continue to do so.

17            **THE COURT:**  Good.  Good.

18            **MS. WALSH:**  Thank you, Your Honor.

19            **THE COURT:**  Okay.  And then there was something about

20   the extension on the privilege logs.

21       Have you reached agreements on that?

22            **MS. WALSH:**  It's wrapped up in the same issue,

23   Your Honor.

24            **THE COURT:**  Okay.  All right.  Okay.

25            **MS. SIMONSEN:**  I believe -- okay.  Yeah.

1          THE COURT:  Okay?

2      And the second group of anticipated deponents, that's all

3  wrapped up in this as well or --

4          MS. WALSH:  Yes.

5          THE COURT:  Okay.

6          MS. SIMONSEN:  I believe, just to clarify, that the

7  privilege log issue deals with the privilege log productions

8  for productions that already happened, and so it -- I don't

9  think it should be wrapped up in this issue.  And I understand

10  you-all previous agreed to that extension.

11          MS. WALSH:  I'm going to have to defer to my colleague

12  on that, Your Honor.

13                      (Pause in proceedings.)

14          MS. WALSH:  Your Honor, if we can -- I think we can

15  work this out with Meta's counsel.

16          THE COURT:  Okay.  Then so ordered.  Work it out.

17                          (Laughter.)

18          THE COURT:  Okay.  So I'm going to turn to ripe

19  discovery disputes, unless there's something else in the

20  sections prior to that in the status report I overlooked.

21          MS. SIMONSEN:  No, Your Honor.  Thank you.

22          THE COURT:  Okay.  So, hopefully, you saw just before

23  the DMC, we issued the order on the six discovery letter

24  briefs.  So that's off my plate.

25      Do you want to talk about Docket 937, the letter brief on

1    limitations on RFPs?

2                    (Pause in proceedings.)

3           **MS. SIMONSEN:**  Apologies.  I'm just getting to that

4    place in my talking points here.

5                    (Pause in proceedings.)

6           **MS. SIMONSEN:**  Apologies, Your Honor.  I'll have to

7    pull it up electronically, but...

8                    (Pause in proceedings.)

9           **MS. SIMONSEN:**  Thank you.

10       Apologies, Your Honor.

11          **THE COURT:**  No, no.  You've got all these associates

12   on your team, it would sure be nice to hear from some of them.

13   You could have handed it off to one of your younger colleagues.

14       All right.  So, I mean, I've read the briefing and I've

15   read the further -- actually, on this one not a lot of further

16   comments.

17       So I appreciate -- what is it? -- the plaintiffs'

18   suggestion or their commitment, I guess, that they won't be

19   serving additional document requests but with two reservations,

20   as I understand that.

21       One is PI/SD plaintiffs reserve the right to serve

22   additional RFPs on Meta for materials that fall outside the

23   relevant time period; and, secondly, follow-up RFPs concerning

24   new development facts or issues that come to light in discovery

25   or otherwise.

1    So is there any objection to the PI/SD plaintiffs'

2    position on that?  I mean, that seems like a pretty nice

3    concession for you-all.

4        **MS. SIMONSEN:**  No, Your Honor.

5    I think at the end of our letter brief we said in the

6    alternative to limiting the number of RFPs going forward, we

7    would ask that you simply order the State Attorneys General to

8    follow that same principle.

9        **THE COURT:**  Okay.  So -- well, Ms. Hazam stood up.

10   So you're just standing up to confirm that that's --

11   you're committed to that?

12       **MS. HAZAM:**  I was.  Thank you, Your Honor.

13   And that, to be clear, has been opposed by Meta to date,

14   but we are very glad to hear Meta now --

15       **THE COURT:**  Okay.

16       **MS. HAZAM:**  -- being agreeable to that.

17   To make it clear, we don't necessarily think that is in

18   conflict with the AGs' position, but I will let Ms. Miyata

19   speak to that.

20       **THE COURT:**  All right.  So can the AGs agree to that

21   same commitment by the PI/SD plaintiffs?

22       **MS. MIYATA:**  Unfortunately, we're not in the position

23   to agree to that same concession today, Your Honor.

24   And apologies.  Bianca Miyata for the State Attorneys

25   General.

**PROCEEDINGS**

1          We are -- we have been working diligently within the time

2    frame and the schedule that was ordered by this Court, as well

3    as Judge Gonzalez Rogers, but we are somewhat differently

4    positioned from the private plaintiffs.

5          We filed our complaint in October of 2023, seven months

6    after that group; and since then, we've been working carefully

7    to ensure that the RFPs we do issue are not duplicative of any

8    that have been issued by our colleagues.

9          We've issued a modest set of requests for production, but

10   we are, simply put, a little bit behind in the time frame.  We

11   didn't receive Meta's first nine productions until May 20th.

12   We didn't receive Meta's first sizeable production of documents

13   until May 24th.

14          **THE COURT:**  Let me ask.  Are you -- on the plaintiffs

15   as a whole, private plaintiffs, you're all getting the same

16   document production from Meta?  In other words, they're not

17   separating out who's getting the documents based on which

18   plaintiff group it is, are they?

19          **MS. MIYATA:**  We should be now, Your Honor, but in the

20   beginning of this year, we were not.  So we did receive a

21   sizeable catch-up production in the late half of May.

22          **THE COURT:**  Okay.  So if you're getting all the same

23   documents that the private plaintiffs have asked for, or are

24   asking for, doesn't -- I mean, I saw -- there was some --

25   there's certainly a disagreement between the parties.  Meta

argued that a lot of your requests were duplicative of the PI/SD plaintiffs, and you said you took pains not to be duplicative.

I'm not going to read all the document requests --

**MS. MIYATA:** Sure.

**THE COURT:** -- but I'm assuming that to the extent they're duplicative, they're moot because you don't -- they've already been asked for.

**MS. MIYATA:** Correct, Your Honor.

And it's our position that they are not duplicative. And to the extent Meta believes they are duplicative, the proper procedure to resolve any disputes would be for us to meet and confer about those issued requests.

**THE COURT:** Okay. So there's a universe of document requests that are nonduplicative -- right? -- that you've been served already.

**MS. MIYATA:** May I follow up on that?

**THE COURT:** Yeah.

**MS. MIYATA:** So it's our position that all of the requests we have served are nonduplicative. I believe what my colleague referred to in the letter brief was a limited number of requests, which were 14 out of 108 in the most recent set, where, out of abundance of clarity, where there was seemingly similar subject matter, we did indicate "to the extent not already produced in response to" and then listed a PI/SD RFP.

1    So really that language was intended to take great pains

2    to ensure that things are not duplicative.

3    We have not been part of all of the negotiations about the

4    PI/SD plaintiffs' RFPs so we don't have insight into which of

5    those requests may have been narrowed, revised, withdrawn, and

6    what documents Meta has agreed to produce in response to all of

7    those RFPs.

8    **THE COURT:**  Are you talking to the plaintiffs' group

9    as a whole?

10   **MS. MIYATA:**  We certainly are talking to the

11   plaintiffs' group, and some of those --

12   **THE COURT:**  Then you would know which are withdrawn or

13   narrowed; right?

14   **MS. MIYATA:**  I'm sorry.  I didn't mean to interrupt.

15   Apologies.

16   **THE COURT:**  That's okay.  But you would know which

17   ones are narrowed -- if you talk amongst your colleagues, you

18   would know.

19   **MS. MIYATA:**  We certainly do.  But some of those

20   negotiations took place before we were part of this litigation,

21   and even before we were part of these conversations about

22   whether or not our discovery would be linked to one another.

23   That was not clear from the inception of the case.

24   **THE COURT:**  But it's clear now.

25   **MS. MIYATA:**  Now it is clear.  And, again,

1    understanding Meta's position, which was made clear to us at

2    the end of May, that they do not wish for us to issue any

3    additional discovery -- despite having six months left in fact

4    discovery -- we began having those conversations, and also

5    pushed out our next set of RFPs in an attempt not to sit on

6    that later so that we could have those conversations and be --

7    you know, check every single T and dot every single I.  But we

8    do believe that the set we issued is not duplicative at this

9    point in time.

10         **THE COURT:**  Okay.  So if you've already served, I

11    think, two sets, if I'm remembering correctly --

12         **MS. MIYATA:**  Two sets, that's correct.

13         **THE COURT:**  Two sets.

14    And you're getting access to everything else that has been

15    produced in response to the other plaintiff groups' document

16    requests, why can't you agree to the commitment that the

17    private plaintiffs are agreeing to?

18    Because you -- presumably, you've asked for just about

19    everything you could want to the extent you differ from the

20    private plaintiffs, and you're also getting everything that

21    they've asked for as well.

22         **MS. MIYATA:**  Not yet, Your Honor.  We are still

23    working with our experts to collaborate about what types of

24    information would be critical to their assessment and analysis

25    in this case.

 1      And, I think, as Your Honor noted in the previous

 2  discovery hearing last month, review of documents leads to

 3  requests for more documents, depositions lead to requests for

 4  more documents.

 5      Again, we have no intention -- and I think we've told --

 6  we've told Ms. Simonsen this.  We have no intention of issuing

 7  700 additional requests for documents.  We have every intention

 8  of being --

 9          THE COURT:  700.  500?

10          MS. MIYATA:  Not even 500, Your Honor.  I can tell you

11  that, not even 500.

12          THE COURT:  100?

13          MS. MIYATA:  That, I can't necessarily commit to at

14  this point.  But we have every intention of being judicious, of

15  avoiding duplication, of being targeted in our RFPs.

16      And we remain committed to meeting and conferring with

17  Meta should they have concerns about issued sets of RFPs at

18  this point.  We have not had the opportunity to meet and confer

19  with Meta regarding any objections they may be bringing to the

20  second set of RFPs.  Instead, we simply hear that their

21  position is that no additional discovery served after May 31st

22  should be considered or responded to.

23      But we don't see any -- we haven't had any conversations

24  about their actual objections to those requests, the substance

25  of those requests, how they may create additional burden, why

1  they're -- why they're disproportionate.  We don't have any

2  insight into that, and I think without those conferrals, this

3  dispute is not really ripe for this Court to set a new

4  deadline.

5       **THE COURT:**  All right.  So what -- putting aside

6  future discovery requests, which -- we'll get to that issue in

7  a bit.

8       What is it about -- is there anything problematic about

9  the two sets that the State AGs have served to date?

10      **MS. SIMONSEN:**  With respect to the first set, no,

11 Your Honor; we did respond and object to those requests.

12      With respect to the second set, it is very duplicative of

13 requests already served by the PI/SD plaintiffs.  In fact, the

14 State AGs invited us to tell them how their requests were

15 duplicative of the private plaintiffs' requests rather than, in

16 the first instance, ensuring that anything they were issuing

17 was truly only additive on top of that.

18      Part of the issue with responding to this very duplicative

19 set of requests this late in the game is we've already gone

20 through extensive meet and confers with the private plaintiffs,

21 all of which, Your Honor, the State Attorneys General were

22 either invited to or attended.  So I don't know what Ms. Bianca

23 [sic] is referring to when she says these negotiations began

24 before they entered the suit.

25      We did not start negotiating RFP responses until after the

**PROCEEDINGS**

1  Attorneys General were in this lawsuit.  And they were invited

2  to those discussions and, indeed, participated in some of them.

3      And so, for that reason, you know, they're -- they're

4  essentially seeking a do-over of disputes that we spent a lot

5  of time and energy working already with plaintiffs to try to

6  resolve.

7      And so, you know, I think Meta might be willing, if the

8  State AGs would withdraw their second set of RFPs and commit to

9  serving what is truly a set of targeted, narrow, follow-up

10  requests limited to issues that are actually unique to their

11  cases, we could consider that.  But it's just, at this late

12  stage, with only three months to substantial completion, there

13  isn't time to go back through this whole exercise over again.

14      And that's consistent with the representations the State

15  Attorneys General made to Your Honor at the January DMC when

16  they joined the personal injury and school district plaintiffs

17  in asking for a trial, at that point, it was March of 2025, and

18  in conjunction with that asked for a November fact discovery

19  cutoff.

20      Your Honor ordered December, one month later.  But the

21  plaintiffs did commit to Your Honor that they would act

22  expeditiously to get RFPs out; and Your Honor said you expected

23  them to do so.

24      It's now four months later and the AGs aren't even

25  committing that they're done with this second set of RFPs.  I

 1   just heard Ms. Miyata saying they're still working with their

 2   expert to put together a third, maybe even a fourth set of

 3   requests for production, which Ms. Miyata has also told me on

 4   meet-and-confer calls they are still working on additional

 5   requests for production.

 6        **THE COURT:**  Okay.  So, first, someone on your team has

 7   gone through the second set of document requests and figured

 8   out which ones are duplicative?  Are you telling me you've

 9   looked at them all and they're all duplicative?

10        **MS. SIMONSEN:**  I believe, that that is the case,

11   Your Honor, but I just am not close enough to it to be able to

12   accurately represent to you today.

13        **THE COURT:**  Okay.  So -- all right.

14        So on that second set, to the extent you've got a good

15   faith belief that, you know, some or all of them are

16   duplicative of what the private plaintiffs have already served

17   on you, you can -- you've got to file your -- you're going to

18   serve your objections and responses anyway.  You can't just not

19   respond; right?  And you can make that response, and that would

20   trigger a discussion about whether there's anything leftover

21   beyond the ones.

22        Because I will say, if they are duplicative and they can

23   show the AGs that they are duplicative, then there's no reason

24   for them to have been served.

25        Now, if they're not duplicative, then -- then they're not

1  and, you know, it's, hopefully, a much smaller number than

2  we're talking about.  And you can go forward from there and

3  negotiate over scope and burden and all that.  But you do have

4  to engage on the ones that are nonduplicative.

5      Now, as to future document requests, you know, you did

6  join -- I'm talking to the State AGs now -- you did join in the

7  request for, you know, expedited scheduling and all that, so

8  I'm -- if you start serving document requests in

9  September-October, and Meta objects that, you know, it's

10  burdensome in light of the discovery schedule, I might be

11  pretty receptive to that kind of objection; right?

12      So if you've got -- if you've got planned a targeted set

13  of follow-up document requests because of your experts say, "Oh

14  out of the hundreds of requests that have been served, for

15  whatever reason somebody missed something critical for their

16  analysis" -- right? -- then you better get those out soon.

17      MS. MIYATA:  I can assure you, Your Honor, we have no

18  intention to continue issuing broad, you know -- broad sets of

19  hundreds of RFPs into September or October of this year; but I

20  think, as we've told Ms. Simonsen, we do intend to -- you know,

21  we are still working and we're working with the time frame set

22  by this Court.

23      And we understand that this request was raised by Meta in

24  February to impose a particular deadline for issuing written

25  discovery, and this Court denied that deadline and noted that

**PROCEEDINGS**

1  there was plenty of time to continue serving additional

2  discovery.

3      **THE COURT:**  With the -- with the admonition that

4  you-all work expeditiously on this as well.  So I don't want --

5  I don't want to have to keep coming back at, you know, the next

6  two, three, four DMCs where the State AGs are serving more

7  document requests.

8      **MS. MIYATA:**  And we are doing so, Your Honor.  We are

9  working expeditiously, but we would have to object and push

10  back on Meta's position that the deadline to do so can be

11  unilaterally and retroactively moved backward.

12      **THE COURT:**  I just told them they can't do that.  So

13  they're going -- they're going to go through --

14      **MS. MIYATA:**  We appreciate that.

15      **THE COURT:**  -- the second set and they're going to

16  respond.  But, you know, if they are truly duplicative, I'm

17  going to expect you to withdraw them.

18      **MS. MIYATA:**  And, Your Honor, we --

19      **THE COURT:**  All right.  I'll just let them stand on

20  the objection.

21      **MS. MIYATA:**  We understand that, Your Honor.  And I

22  think we have told Ms. Simonsen that we do not believe they are

23  duplicative, and we stand ready to meet and confer about any

24  concerns that they may have.

25      **THE COURT:**  Okay.  So when it comes down to the

1  granularity of specific requests, I'm not going to go through

2  that with you here.  I leave it up to your good offices to work

3  out those details.

4      Putting aside, I'm going to say one more round of document

5  requests because your experts say that we really need some

6  targeted extra stuff that wasn't asked for, what -- if I give

7  you that plus what the PI/SD plaintiffs are committing to, is

8  that -- can you agree to that?

9          MS. MIYATA:  May I have just one moment, Your Honor,

10  to confer with my colleague?  I believe we can, but I'd like

11  to --

12          THE COURT:  Uh-huh.

13          MS. MIYATA:  -- base --

14              (Pause in proceedings.)

15          MS. MIYATA:  Yes, Your Honor, we can agree to that.

16          THE COURT:  Okay.  So with respect to the PI/SD

17  plaintiffs, I accept your proffer.  If you want to get up

18  and --

19          MS. HAZAM:  Thank you, Your Honor.  Lexi Hazam for

20  plaintiffs.

21      One clarification of what I said earlier, that I don't

22  believe will come as a surprise to Meta or any defendants, the

23  school district bellwether plaintiffs do intend to propound a

24  discrete, limited set of RFPs specific to themselves on

25  defendants, as is typically done in these cases, as the

1   personal injury bellwether plaintiffs have already done.

2      We could not do that until their selection, which was

3   relatively recent.  And in this case, unlike in many cases,

4   there is no school district defendant fact sheet.  So we have

5   no other way of obtaining information about communications

6   defendants may have had specific to that district or promotions

7   specific to that district.

8      So that is a discrete, small set that is still to be

9   propounded that is not in the nature of, you know, broad

10   liability discovery requests, but I wanted to make that clear

11   on the record.

12      **THE COURT:**  ETA on that set?

13      **MR. WEINKOWITZ:**  Next week, Your Honor, by Wednesday.

14      **MS. HAZAM:**  Mr. Weinkowitz just spoke and said by next

15   Wednesday.

16      **THE COURT:**  All right.  Next Wednesday it is.  So

17   ordered.

18      **MS. HAZAM:**  Thank you, Your Honor.

19      **THE COURT:**  Okay.  So all the plaintiffs are at a --

20   at least are committing that they won't serve further document

21   requests except for they're reserving rights with respect to

22   additional RFPs on Meta for materials that fall outside the

23   relevant time period; and, secondly, reserve the right to serve

24   follow-up RFPs on Meta to obtain materials concerning new

25   developments, facts, or issues that may come to light in

**PROCEEDINGS**

1    discovery or otherwise; e.g., through press releases or

2    congressional testimony.

3        And then there are two other specific objections.  The SD

4    plaintiffs have one more set by next Wednesday to serve.

5        And the AG plaintiffs have -- ETA on your expert-driven

6    final set?

7            **MS. MIYATA:**  Your Honor, we're doing our best.  I

8    hesitate to give you an ETA because that depends on some moving

9    parts that are not entirely within our control.  Experts we're

10   working with, for example, are taking summer vacations.  We

11   have a couple of folks who may be on sabbatical.  What I can

12   tell you is we will be doing that as expeditiously as possible,

13   and well in advance of the substantial completion deadline.

14           **THE COURT:**  Two weeks from now?

15           **MS. MIYATA:**  I don't think I can commit to two weeks.

16   Could we ask for 30 days?

17           **THE COURT:**  Monday, July 15th.

18       And I just want to clarify, I understand, I think

19   everybody -- and I think I've made reference to this -- we all

20   understand that what happens at a deposition, somebody -- a

21   witness mentions a document or two and I -- and then there's a

22   follow-up request for one or two documents that weren't

23   produced.  I consider that to be the kind of follow-up

24   discovery that comes to light during discovery.  It's very

25   normal.  It usually doesn't require a new document request.

1  It's probably something that was already previously asked for

2  but wasn't produced for some reason.

3      So I just want to make sure everybody understands, I view

4  that as a kind of go-get-'em request that comes out of a

5  deposition -- right? -- or the congressional testimony or

6  something like that.

7      So, again, I'm not -- I don't consider those to be

8  burdensome at all because it's just a follow-up of that kind;

9  right?

10     So, Ms. Simonsen, I'm not going to grant you numerical

11  limits or date cutoffs, but with those, I'll call them,

12  category-type limitations, does that satisfy your concerns?

13         **MS. SIMONSEN:**  That is very helpful, Your Honor.  I

14  think just, for the sake of completeness, we'll need to reserve

15  the right if in 30 days we get something that is going to be

16  really difficult to respond to in what will then only be

17  two months left to substantial completion, we'll come back to

18  Your Honor, but I think that's something that we can work

19  with --

20         **THE COURT:**  First, go to them and meet and confer

21  about it.

22         **MS. SIMONSEN:**  Yes, of course, first working with

23  them.

24     Your Honor, there is one issue related to this, which is

25  that, as you know, the parties have come close to reaching

1    agreement on search terms.  However, the State AGs have taken

2    the position that they should still have the opportunity to ask

3    for more search terms in connection with their second set of

4    requests for production.

5        Meta's position is that the deadline for search term

6    negotiations was initially set for May 31st.  Your Honor

7    ordered that.  Your Honor then permitted an additional

8    three weeks for the Meta defendants and plaintiffs to continue

9    negotiating search terms.

10        I understand that the AGs believe that that deadline

11    applied to only already-served RFPs, but their second set of

12    RFPs were served on June 7th.  So they've had two weeks to

13    introduce any new terms they wanted as a result of those

14    requests for production.

15        They chose not to do so.  We assumed that they were doing

16    so, but learned on Monday that, in fact, they reserved the

17    right to ask for more search terms down the road.

18        **THE COURT:**  Have the AGs been participating in the

19    meet and confers on search terms?

20        **MS. MIYATA:**  Your Honor, if I may, we have been

21    participating in these meet and confers, and we've made clear

22    from the inception of these negotiations that we believe that

23    they would apply -- as the parties presented in their statement

24    in May, and as the Court ordered -- to already-served RFPs.

25        That was part of the language of the -- how the issue was

 1    framed up, I think, to the Court.  And that was also in the

 2    language of the Court's order, that the search term negotiation

 3    applied to already-served RFPs.

 4        It would be somewhat nonsensical for us to insist on

 5    continuing to issue RFPs that would not be in -- encaptured or

 6    encapsulated by additionally negotiated search terms.  That is

 7    to say, I don't think that there needs to be an entirely brand

 8    new universe of search terms of the breadth that we have been

 9    discussing, but we've made very clear our position, from the

10    beginning, that the way that the issue was requested to

11    the Court and what the Court did order, applied to the RFPs

12    that were already issued; and that it makes little sense for

13    Meta to simply run one collection of documents with one set of

14    search terms, and then have -- have checked the box on their

15    discovery obligation here.

16        **THE COURT:**  But I don't understand.  If you served a

17    set of document requests --

18        **MS. MIYATA:**  Yes.

19        **THE COURT:**  -- after that order, but you knew, and the

20    parties were still negotiating search terms, why didn't you

21    propose search terms that would encompass your second request?

22        **MS. MIYATA:**  We did propose search terms.  And

23    throughout these negotiations Meta's fervent position has been

24    that the universe of search terms was too large, the number of

25    hits returned was too large, and that that universe needed to

1    get narrowed.

2        And we hear them, and we take them at their word.  But

3    there was little opportunity -- that was in order to reach

4    agreement, where all the parties could reach agreement, we

5    agreed that we would set the question of whether this applied

6    retroactively or forward looking to the side, and relied

7    instead on the parties' joint language submitted in the May

8    discovery management statement, as well as in the language of

9    the Court's order, that this negotiation scope was limited to

10   already-served RFPs.

11       A no point was it discussed on the record or placed in the

12   Court's order that this negotiation should apply to search

13   terms for all time for this very broad case brought by hundreds

14   of private plaintiffs and 35 states.

15       **THE COURT:**  Yeah, but we can't keep open the

16   negotiations on search terms if you're going to keep serving

17   document requests.

18       **MS. MIYATA:**  Understood.

19       **THE COURT:**  At some point it has to come to an end.

20   And it's not going to come to an end in September; right?

21       **MS. MIYATA:**  Understood, Your Honor.

22       And we do not intend to reopen the scope of negotiation

23   that has happened at this point for, I think, what is

24   collectively, between all groups of plaintiffs, perhaps, 800

25   and change, RFPs.

1      But we would anticipate that there will be a limited set

2  of search terms that would be necessary to pull the documents

3  that are unique in the second set of RFPs; and it is possible

4  that with RFPs that are based on our expert collaboration, that

5  there will be some additional search terms needed to pull those

6  documents.

7      I think, inherent in the process of pulling from a limited

8  set of custodians with a set of search terms is the fact that

9  as the parties continue to do discovery, unless we're going to

10  be strictly to go-get-'em requests, there will have to be some

11  openness for negotiation to run new terms across the same

12  universe of documents -- across the universe of documents

13  that's been culled and pulled from the agreed-upon custodians.

14      **MS. SIMONSEN:**  And, Your Honor, if I may respond.

15      I mean, I think Your Honor just articulated the type of

16  targeted follow-up requests that would be appropriate which

17  don't require reopening search terms.

18      The idea that we would, in a month, talk to the AGs

19  about -- even if it's a limited set of search terms, those

20  terms can be very broad.  They can pull back a massive number

21  of additional documents.  It takes time just to process and

22  load those documents and dedupe them against the, again,

23  13.7 million we've already agreed to pull back with the search

24  terms we've agreed to.

25      And so they're just -- and I would just reiterate,

**PROCEEDINGS**

 1   Your Honor, there have been two weeks since they served these

 2   requests on June 7th for them to ask for additional terms to

 3   cover those requests.

 4       The parties' negotiations have been very dynamic.  New

 5   search terms have been proposed.  Meta has agreed to them.

 6   At --

 7           **MS. MIYATA:**  Your Honor --

 8           **THE COURT:**  I've heard from the AGs that they did

 9   propose search terms that would encompass their second request.

10           **MS. MIYATA:**  We did.

11           **MS. SIMONSEN:**  No, they did -- my understanding is

12   that you need additional time in order to propose the search

13   terms you would need for your second set of RFPs.

14       Do I have that wrong?

15           **MS. MIYATA:**  In an abundance of caution, we did

16   propose a number of search terms that we believed would touch

17   on some of our RFPs; but the door was not open to -- I mean,

18   I'll be very clear.  Like, I do not believe the door was opened

19   to the proposal of search terms that would encompass our second

20   set of RFPs.

21       The parties -- I mean, I believe it's difficult because

22   Meta can't, at the same time, say this negotiation is limited

23   to what you've already propounded but at the same time, you

24   should have proposed the search terms that would have

25   encompassed what you have not already propounded.  That's --

1  that puts us kind of between a rock and a hard place.

2      **MS. SIMONSEN:**  We never said that the search term

3  negotiations were limited to what they already propounded.

4      What we said was:  Search term negotiations need to cover

5  all documents that you reasonably think you need at this point

6  in time, and that needs to be concluded by May 31st.

7      That was then extended three weeks.

8      **MS. MIYATA:**  And they do need to be reasonably

9  related.  I mean, it was said that they needed to be reasonably

10 related to already-propounded RFPs.

11     **MS. SIMONSEN:**  And there were two weeks for the State

12 AGs to --

13     **THE COURT:**  Okay.  Address your comments to me, not to

14 each other.

15     **MS. SIMONSEN:**  And there were two weeks for the State

16 AGs to propose those.

17     **THE COURT:**  All right.  I considered the set -- the

18 second set you propounded as part -- it should be part of the

19 search term negotiation.

20     If you've got a set of search terms directed to your

21 second set, you need to get the complete list and negotiate

22 with Meta and get that finalized now -- all right? -- because

23 they're finalizing, hopefully, those -- were there three other

24 terms out there; right?  And so you're -- the window's still

25 open to negotiate on these, but work on -- work together on

 1  that.

 2      The other thing I would tell the AG group, presumably

 3  there are a lot of search terms from the other RFPs out there.

 4  You know, to some extent, I've got to believe that those search

 5  terms would hit on your second set of requests already.  So be

 6  extra vigilant not to be -- to accept that an existing

 7  agreed-upon search term will address what you want.  Okay?

 8          **MS. MIYATA:**  Yes.

 9          **THE COURT:**  All right.

10          **MS. MIYATA:**  And we have been conducting those

11  analyses, Your Honor, and keeping them in mind.

12          **THE COURT:**  Okay.  But I'm going to -- I'm just going

13  to say:  Wrap up in the negotiated search terms the -- all the

14  document requests that have been served to date.  Okay?  To

15  date.

16      And I just want to get the search term negotiation done --

17  all right? -- so they can start processing the documents and

18  get them out to you-all -- right? -- because it's holding up

19  the deposition scheduling.  All right?

20          **MS. MIYATA:**  Understood, Your Honor.

21          **MS. SIMONSEN:**  And, Your Honor, I appreciate that.

22      I think it may be that if we're -- if we have to go back

23  sort of to the drawing board with a number of additional search

24  terms, that we may need a little more time to try to reach

25  agreement.

1    I mean, we had a near global deal.  We are at our capacity

2    to get these documents out the door by September 20th as it is;

3    and so if there are going to be a number terms now requested to

4    be run, that requires seeing how they interact with the terms

5    we've already agreed to, I just don't know if we're going to be

6    able to wrap that up by Monday.

7    I think the AGs have had their opportunity, Your Honor;

8    and I understand you want to give them a chance here, but

9    they've had their opportunity to propose additional terms.  At

10   some point these negotiations need to come to an end, and we

11   would like them to be wrapped up by Monday.  And I just don't

12   know if we can do that if the AGs are going to propose a lot of

13   new terms.

14   **THE COURT:**  Wrap it up by Wednesday.  Okay?  I'll give

15   you until Wednesday.

16   All right.  What I heard is AGs did propose some search

17   terms to you, not their full set but some search terms directed

18   to their second -- their second set of document requests.  You

19   can start looking at those if you haven't looked at them in

20   detail.  Really, you've got -- you made a lot of progress in

21   just one week on the other search terms; right?

22   And how many additional search terms are we talking for

23   the AGs?

24   **MS. MIYATA:**  I'd have to go back and confer with my

25   team, Your Honor.

PROCEEDINGS

1      THE COURT:  Okay.  In the single digits?

2      MS. MIYATA:  Probably not in the single digits, but

3 probably in the double digits.

4      THE COURT:  Okay.  In the teens?

5      MS. MIYATA:  Not in the triple digits, I can tell you

6 that.

7      THE COURT:  In the teens or twenties?

8      MS. MIYATA:  I'd have to go back and confer with my

9 team, Your Honor.  I'm not ready to put a number on the record

10 here today.

11      THE COURT:  How many document requests are in your

12 second set?

13      MS. MIYATA:  We had -- I believe we had 40 document

14 requests in our first set.  Those were quite modest.  Those

15 were merely cleanup requests from the investigation.  And then

16 we had 107 requests in our second set.

17      THE COURT:  All right.  If there are 107, I have to

18 believe a lot of those are going to be satisfied or addressed

19 by the existing search terms.  Okay?  So --

20      MS. MIYATA:  And I believe some are, yes.

21      THE COURT:  -- I'm going to encourage the AGs to

22 minimize the number of additional search terms -- all right? --

23 and to work with Meta to negotiate those.

24      And, you know, discovery is not perfect and you're not

25 going to get every -- nobody gets everything they want in

1    discovery.  So if you have to compromise on it, I'm going to

2    expect to see that.

3        And like I did in the order last week, if I'm seeing

4    people are not being reasonable here, I'm going to make you

5    come here and meet and confer in person in one of the closets.

6    Okay?

7            MS. MIYATA:  I wouldn't want that, Your Honor.  I

8    understand.

9            THE COURT:  Well, that's -- you know, it's my

10   prerogative.  So --

11           MS. MIYATA:  Fair.

12           THE COURT:  -- I think I made the message clear last

13   week about this.  This is -- negotiating search terms is really

14   something you should be able to work out, and you should be

15   able to work it out quickly; right?  Because you know what your

16   document requests are.  You can run the statistics quickly.

17   Get it done in a few days.  Okay?

18           MS. SIMONSEN:  Thank you, Your Honor.

19       I do want to be clear about one thing, which is the

20   State AGs did propose, apparently, some additional terms

21   related to their second RFPs that we have considered in the

22   context of the global discussions.  And to the extent that they

23   were required by the State AGs, they're in the list of 300-plus

24   terms.

25       So it really, to my mind, should be a limited additional

1    set of terms, if any at all, particularly where -- just for

2    Your Honor's awareness, we've agreed to run 25 terms that are

3    just youth terms, like the word "teen," and it's hard to

4    imagine how that wouldn't pull back anything potentially

5    relevant in these cases.

6        **THE COURT:**  So if I hear that it's more than, you

7    know, a dozen or so additional terms, I'm going to start

8    feeling like you're overreaching.

9        Do you understand?

10        **MS. MIYATA:**  Understood, Your Honor.

11        **THE COURT:**  All right.  Because if you've already --

12    if they've already considered a bunch that you've already

13    proposed --

14        **MS. MIYATA:**  So I --

15        **THE COURT:**  -- and there's already several, you

16    know --

17        **MS. MIYATA:**  So if I may push back on that just a

18    little bit.

19        I believe that terms regarding subject matter that was

20    already addressed in the private plaintiffs' RFPs, as well as

21    in our first set of RFPs, are well encompassed in this set.

22    I think there is a set of requests particularly with regard to

23    financial matters in our second set of RFPs that is not

24    encompassed and documented in the current set of RFPs -- in

25    this current set of search terms.

 1          So I want to be very transparent about the fact that I'm

 2   not certain that a dozen search terms will do the trick, but we

 3   will be very judicious and cognizant of the Court's advice to

 4   minimize the list of search terms we are proposing.

 5          **THE COURT:**  And I will say, you know, I'm not on

 6   summer vacation.  I don't know if -- where your experts are on

 7   summer vacation, but they're reachable by phone.  If there are

 8   specific --

 9          **MS. MIYATA:**  In part.

10          **THE COURT:**  -- document -- if there are specific

11   document requests and search terms that your experts tell you

12   offline that there are absolutely critical -- right? -- that

13   you think will be encompassed by your future last set of

14   document requests -- right? --

15          **MS. MIYATA:**  We'll be thinking of that as well.

16          **THE COURT:**  -- get those to Meta this week.  Okay?

17          **MS. MIYATA:**  Understood.

18          **THE COURT:**  All right.  So I'm not limiting it to just

19   what's been served; right?  I want to make the search term

20   negotiation as complete as possible so when it's done next

21   week, hopefully you'll never have to come back to me on that

22   issue.  Okay?

23          **MS. MIYATA:**  Understood, Your Honor.

24          **THE COURT:**  All right.  That handles Docket 937.

25          I'm going to take a short break so they can work on fixing

PROCEEDINGS

 1  the echo in the interim.

 2          MR. VAN ZANDT:  Your Honor, can I make a quick comment

 3  on that same topic?

 4          THE COURT:  Sure.

 5          MR. VAN ZANDT:  My apologies.  Joseph Van Zandt,

 6  co-lead counsel for the JCCP.

 7      My apologies for standing there awkwardly for so long, but

 8  there was a comment made earlier in that discussion that was to

 9  the extent that the RFPs discussed here today would be the

10  extent of the additional RFPs from all the plaintiffs.  And I

11  did want to clarify that, at least for the JCCP, we have a

12  group of bellwether plaintiffs that will be selected next week,

13  and we certainly intend on issuing plaintiff-specific RFPs to

14  the defendants related to those plaintiffs that are selected in

15  the JCCP, and certainly intend to do that through the JCCP

16  court.

17      But I just didn't want to sit here and sit aside and --

18  with that being said and not clarify that.

19          THE COURT:  Thank you.

20      I assume that's not a surprise, Ms. Simonsen.

21          MS. SIMONSEN:  No, it is not.

22          THE COURT:  Okay.  So the JCCP -- are these individual

23  plaintiffs?

24          MR. VAN ZANDT:  Yes, Your Honor.

25          THE COURT:  -- individual plaintiffs will also have

 1  the ability to serve their set of requests.

 2          **MR. VAN ZANDT:**  Thank you, Your Honor.

 3          **THE COURT:**  Next week?

 4          **MR. VAN ZANDT:**  Soon after they are selected.  They

 5  won't be finalized until the 27th, after the hearing with

 6  Judge Kuhl; and once the pool is finalized, those will be

 7  issued soon after they're selected.

 8          **THE COURT:**  But within a week after they're selected?

 9          **MR. VAN ZANDT:**  We will endeavor and do our best on

10  that.

11          **THE COURT:**  Okay.  So --

12          **MR. VAN ZANDT:**  Our goal is to issue them as soon as

13  possible.

14          **THE COURT:**  Okay.  A week.  And if you need to ask for

15  a courtesy extension of that week, I'm sure Ms. Simonsen will

16  give it to you.

17          **MR. VAN ZANDT:**  Thank you.

18          **THE COURT:**  Okay.  So let's take a short break while

19  they try to work out the IT issues.

20          **THE CLERK:**  We're off the record.  Court is in recess.

21                  (Recess taken at 1:56 p.m.)

22              (Proceedings resumed at 2:05 p.m.)

23          **THE CLERK:**  Please remain seated and come to order.

24      Court is now in session.  The Honorable Peter H. Kang

25  presiding.

1      Recalling Multidistrict Litigation 22-3047, In Re: Social

2  Media Adolescent Addiction and Personal Injury Products

3  Liability Litigation.

4        **THE COURT:**  Okay.  Can you-all hear me okay without an

5  echo out there?

6      People are nodding.  Okay.

7      All right.  Let's do Meta relevant time period,

8  ECF Docket 888.

9                    (Pause in proceedings.)

10       **MS. SIMONSEN:**  Ashley Simonsen -- good afternoon

11  again, Your Honor.  Ashley Simonsen, Covington & Burling,

12  counsel for the Meta defendants.

13       **MR. CARTMELL:**  Good afternoon, Your Honor.  Tom

14  Cartmell on behalf of the plaintiffs.  Nice to meet you.  I

15  don't think I've been before you before.

16       **THE COURT:**  Thank you.

17      Okay.  So, again, I've read the briefing and I've read the

18  further briefing in the status report.

19      Well, before I -- why -- okay.  Before I say anything, let

20  me hear what Meta's -- if there's anything -- you don't have to

21  repeat what you've argued.  So anything to add?  Or maybe

22  you've already worked it out and have reached agreement.

23       **MS. SIMONSEN:**  Unfortunately, we have not, Your Honor.

24      We did ask plaintiffs at one point if part of the

25  agreement on search terms could be agreement to our expanded

1  relevant time period; and part of the reason is -- as

2  Your Honor can appreciate, I'm sure -- if the relevant time

3  period is expanded further, that multiplies the collection of

4  documents beyond the -- I mentioned the figure already --

5  13.7 million is what we estimate would be pulled back by the

6  search terms we've agreed to so far over that extended relevant

7  time period.

8      The one additional point I would just kind of throw out,

9  Your Honor, is having learned today that the AGs will be

10 presenting additional search terms, perhaps -- you know, maybe

11 over 10 or more, you know, our original position on relevant

12 time frame was 2015 as the start date.  That is the date that

13 the Attorneys General specified in their presuit civil

14 investigative demand.  Now, they did go back for a couple of

15 other kind of targeted issues a little bit further.

16     I would submit, Your Honor, that 2015 is an eminently

17 reasonable start date.  It aligns with the general start dates

18 that Your Honor has ordered for the other defendants, which I

19 think are around 2015 or 2016.

20     Meta would still agree to go back to 2008 with

21 feature-specific terms for any custodians employed prior to

22 2015.  So they would get that feature-specific discovery going

23 back to the launch date of any features launched before that

24 time, but I think it would help a lot with the search term

25 negotiations to have a little more room there in terms of

**PROCEEDINGS**

1  adding search terms if we could start at 2015, again, going all

2  the way out to April 1st, 2024, consistent with Your Honor's

3  prior rulings.

4      **THE COURT:**  Any objection to that?

5      **MR. CARTMELL:**  Yes, Your Honor.

6  With all due respect, we'd like to, with your permission,

7  argue today, honestly, why we believe that our position that we

8  offered in our negotiations is more appropriate and, honestly,

9  why a relative time period that's based on features with a

10 system that's set up that would have a new set of search terms

11 based on -- specific search terms based on features is really

12 not appropriate for this case.

13 And we've now -- we recognize your order, Your Honor.  I

14 haven't read it yet, but I know it just came, and I heard -- we

15 heard what you said at the last -- at the last status

16 conference.

17 I will say this:  I think Meta is distinguishable, I

18 think, from some of the other defendants for several reasons.

19 I think that a feature-based relevant time period with a search

20 term -- specific search terms that are feature based is going

21 to be very severely, frankly, devastatingly limiting to our

22 discovery that's important to us in this case in the early

23 years.  And what it does is for the first -- according to their

24 interpretation of your order, for the first eight years, we

25 literally -- after Facebook was brought to market, we literally

 1    would get very little to none discovery during that period of

 2    time.

 3         For the first four years, according to Meta, we would

 4    absolutely get no documents -- get a look at or discover any

 5    documents for the first four years.

 6         For the next four years, from 2008 to 2012, they want to

 7    do a specific search term by feature.  And we believe that the

 8    search terms that we have not received yet -- so we're talking

 9    about receiving, probably, nine sets of new search terms over

10    time, and it's -- we think that's very unworkable for a whole

11    host of reasons as well.

12         But specific feature search terms, we've had the chance to

13    look at documents -- I think we're unique a little bit from the

14    other defendants on that point.  And the way that the company

15    is chatting within the company is not talking in terms of those

16    features.  And I think, according to Meta, they're saying that

17    very relevant key documents that we believe exist -- and, in

18    fact, we have some evidence that do exist -- would not be

19    produced to us in that situation.  I want to give you a few

20    examples.

21         But you asked other plaintiffs' attorneys at the last

22    hearing why do we need to go back so far, and so very briefly

23    what I would say is that, Your Honor, we have a negligence

24    claim in the JCCP; a negligence claims in the MDL that has not

25    been ruled on; and a failure to warn claim here.  We also have

 1  a punitive damage claim that I think -- I wanted to emphasize

 2  and emphasize the negligence claim in the JCCP because I don't

 3  think it was necessarily by Meta -- I know in the brief or last

 4  time.

 5       But our claim is that they designed -- not only designed

 6  but implemented, administered, their platforms in a way that

 7  cause kids and young adults to become addicted, problematic

 8  use, addicted use, and then that resulted in all the harms.

 9       Our claim is that they knew or they should have known --

10  our negligence claim -- that the way they designed and

11  implemented and administered and monitored and supervised --

12  not just designed -- their platform, that they should have

13  known would have resulted in that, and in fact, they did.  And

14  their motive and intent -- from the very beginning at Facebook,

15  their notice and knowledge about problems with kids -- about

16  kids from the very beginning at Facebook, are extremely

17  relevant in this case.

18       And I would argue were distinguishable, the Meta case,

19  from the other defendants in some regards because they've been

20  around so long -- right? -- and it turns out that there is a

21  lot of information in the public domain.

22       We brought up for you, Your Honor, Sean Parker, the first

23  president of Meta, who made a statement in 2017 about the

24  development of Facebook, and he said at that time, and I think

25  it's very important (as read):

1              "The thought process that went into building the

2         application, Facebook being the first of them, was

3         all about:  How do we consume as much of your time

4         and conscious attention as possible?"

5         And then he goes on to talk about how "We had" -- "We

6    talked about how we had to give kids a little dopamine hit."

7    And he talks about that it was himself -- and he names Mark

8    Zuckerberg specifically -- who knew what they were doing when

9    they did that.

10        And so in this case, unlike some of the others, just

11   because they haven't been around as much or for as long, we

12   have, in the public domain, evidence we believe that it's

13   extremely likely that at that time period starting at

14   Facebook -- he's talking about the 2004 and 2005 time period

15   when Mr. Parker was involved in the invention -- they were

16   talking about these things.

17        And according to Meta's proposal, those types of

18   conversations that were happening, we would be unable to

19   discover; we would be unable to, you know, get that probative,

20   obviously, evidence that's, you know, extremely important to

21   our case.  Their -- the way it's set up right now, for

22   seven years we wouldn't be able to get any of those documents.

23        And a few other points that I want to make.  We have

24   plaintiffs in the bellwether cases in JCCP that are from --

25   using Facebook from 2006, mid-2000s, currently.  And so I think

**PROCEEDINGS**

1  that's a distinguishing factor, a factor from the others as

2  well.

3       So I think the other thing is that our claims are not all

4  feature based.  You know, our claims are in some respects --

5  for example, with age verification -- and there are some --

6  some dispute between some whether age verification, for

7  example, is a feature or not.  But our claim is, in our

8  pleadings, from the inception of Facebook, their age

9  verification was inadequate.

10      Our experts are looking for documents during the relevant

11 time period when Facebook came out, when they decided in 2005

12 that they were going to open up Facebook, not just to college

13 kids but to high school kids, and then in 2006, when they

14 decided that they were going to open it up to everybody other

15 than those under the age of 2013, [sic] if there were

16 conversations and documents at that time talking about whether

17 they were looking at alternative types of -- or feasible types

18 of age verification or parental controls at that time, we think

19 that period of time is extremely relevant for us.

20      And the other thing is, it's not a secret that when we try

21 this case or when -- you know, when -- it's not a secret what

22 our claim is; that we are claiming that Meta lit the match that

23 started the fire that ended up in the mental health problems

24 with kids.  So we're claiming that they lit the match when in

25 2005 and 2006, they decided to allow everybody 13 and up on

1    this -- on this platform.

2        The other reason that I want to, real quickly, say that I

3    think that in this specific instance, because of the status of

4    the case and because of the Court-imposed deadlines that we

5    have that were talked about previously and keeping in line with

6    those, I think a feature-based relevant time period with new

7    search terms -- because what we're talking about is now going

8    and negotiating -- I think it's nine if we look at all the

9    features that -- and we don't agree at this point what features

10   are at issue, but I think it would be nine.

11       So, for example, if Mark Zuckerberg was involved in all of

12   the feature development, inventions, things like that, then

13   they would run, according to Meta's interpretation, for each of

14   the nine features they would have a different set of

15   feature-specific terms that they would run; and then they would

16   run, according to them, from 2012 on, against all of our terms

17   that we've agreed on.

18       So -- so you're talking about us negotiating I think nine

19   more times on search terms that we haven't received yet, and --

20   and also for our claims which are not feature based and for

21   documents that -- that will not be picked up, relevant

22   documents that won't be picked up if the term of the feature is

23   not in there.

24       For example, if -- if there's a document that says, "Hey,

25   we're seeing a lot of kids on our platform at this point," and

1    that's to Mark Zuckerberg and the response is, "Well, you know,

2    we need to storm forward and, you know, we're not going to do

3    anything about that or change it," that's not going to get

4    picked up.

5         According to Meta, the only way the documents that are

6    relevant for eight years following the time that Facebook

7    was -- was designed and developed and over time continued to be

8    developed and the time period that they were implementing it,

9    we won't get any documents if they don't name the exact

10   feature.

11        For example, Sean Parker's -- if you look at his

12   statements, if we ran Sean Parker's statements, it would be

13   picked up, it would be relevant from the 2012 search terms

14   because he says in the statement "We don't know what we're

15   doing to children's brains," and we've negotiated "children's"

16   as a search term so it would be picked up.

17        But in 2004 until 2012, according to Meta's belief what

18   should happen here, those kinds of statements would not be

19   picked up because they don't name a specific platform.

20        So, you know, we feel strongly that our offer and what

21   should happen here -- and we think we took into consideration,

22   Your Honor, proportionality, the needs of the case, as well as

23   the need for us to get relevant discovery for those first

24   seven years by offering -- we have 127 currents custodians, and

25   from 2010 on, we'll run our search terms that include "youth"

1  and "kids" and "children" and "bullying," and harms that are at

2  issue in the case that also talk about, you know, the relevant

3  claims that we have related to age verification and other

4  things.

5      And for six, only six, custodians would we ask that we get

6  their custodial files and we run the full search terms that

7  we've agreed on.  That would include Mark Zuckerberg, who

8  nobody can argue is not extremely relevant in this case; and

9  other individuals who were there at the time talking with Mark

10  Zuckerberg about the development of these -- of the platform

11  for Facebook:  The chief engineer at that time, the VP of

12  product -- of the product development at that time.

13      Just six.  I don't think that the burden with that is much

14  different than what they're offering, and it allows us to do it

15  more efficiently.  We don't have to continue to negotiate for

16  weeks to a month nine new sets of search terms.  We can get the

17  depositions going, and it protects our ability to get the

18  discovery during the key period of time from that first seven

19  to eight years when we think that's one of the most important

20  times for our case, Your Honor.

21      **MS. SIMONSEN:**  Thank you, Your Honor.  Ashley Simonsen

22  for the Meta defendants.

23      At the prior discovery hearing Your Honor ruled that --

24  you said (as read):

25          "I'm not going to grant anyone blanket discovery

1    across all features for all time for just one giant

2    time frame.  I'm going to basically trigger that

3    discovery based the date that each individual feature

4    was launched."

5        And the approach that we've proposed is consistent with

6    that.

7        This case is -- predominantly it's a product liability

8    case.  It's based on plaintiffs' challenges to 20 or so

9    specific features that were specifically enumerated in their

10   complaint and that Judge Gonzalez Rogers analyzed on a

11   feature-by-feature basis in her motion to dismiss.

12       And so for that reason it makes sense.  Plaintiffs are

13   going to get -- if we go back to 2015, they're going to get

14   nine years of general discovery.  They've not said they won't

15   get documents over that nine-year period touching on the

16   motivations of the company to increase users or the amount of

17   time that users spend on the platforms.  They've not

18   articulated a reason why they need to go all the way back to

19   2004 before they, you know, concede even any of the

20   bellwether -- any of the plaintiffs at all were on the

21   platforms for that kind of general discovery.

22       And I would note, too, that I heard my colleague say that

23   based on this Sean Parker statement, that we wouldn't get a

24   document talking about children's brains.  Well, one of the

25   features that we've agreed to go back in time for is

1    algorithmic recommendations, recognizing that it was in 2009

2    that there was a shift from the chronological feed to the

3    algorithmically driven feed that is the type of algorithm that

4    the plaintiffs are challenging in this case.  If there's a

5    document talking about the impact of that challenged feature on

6    children's brains, it will be returned.

7         On just a few other additional wrap-up points, Your Honor,

8    we can share with plaintiffs the list of feature-specific terms

9    that we propose to run.  They actually already have them

10   because at the outset of our search term negotiations, we

11   proposed a set of feature-specific terms.  There's only, I

12   think, one feature, which is the -- the Facebook friend

13   recommendation feature where there's -- there was kind of one

14   narrow, earlier iteration of that where we would -- we would

15   propose running just a narrower term.  But we can share those

16   with plaintiffs, and we can kind of work them out between now

17   and Wednesday, as apparently, we're going to be doing with

18   respect to the State AGs' new terms.

19        I also wanted to point out, since my colleague mentioned,

20   you know, when the plaintiffs have been using these platforms,

21   that the bellwether plaintiffs did not begin using these

22   platforms, as I understand it, until 2011 and '12.  And so to

23   the extent that that is relevant to what the relevant time

24   period should be for company discovery, I'm not sure it is, but

25   since my colleague brought it up, I think it's relevant -- I

1    think it's worth mentioning that to Your Honor.  There may be

2    some plaintiffs in the pool who used the platforms earlier than

3    that, but the bellwether plaintiffs, it was much -- it was much

4    earlier.

5        Let me make sure there's nothing else I want to point out.

6                    (Pause in proceedings.)

7        **MS. SIMONSEN:**  I think that's it, Your Honor.

8        I get just on the point about nine features, only -- they

9    think there are nine features, I guess, for which we would have

10   to go back in time.  We're very forthcoming with plaintiffs.

11   We shared with them, based on our investigation, the launch

12   date for all of the features for both Instagram and Facebook.

13   We ultimately identified for them five features for which we

14   would go further back in time because they were launched prior

15   to 2011.

16       So, now, if we -- if we start the general time period at

17   2015, we, of course, would look at adding feature-specific

18   terms for any features launched between 2012 and 2015.

19       **MR. CARTMELL:**  Can I just say one thing?  I apologize,

20   Your Honor.

21       **THE COURT:**  Yeah.

22       **MR. CARTMELL:**  Real quick, because I meant to say it

23   and my colleague reminded me.

24       Our failure to warn claims, you know, are not feature

25   specific.  They're failure to warn of the harms, potentially,

1  that could exist, as the surgeon general said.

2     And I'll just leave it at that for now.

3        **THE COURT:**  Okay.

4        **MS. SIMONSEN:**  If I could just very briefly respond on

5  that to say that Judge Gonzalez Rogers analyzed that claim on a

6  feature-by-feature basis.  So I think the way that the Court is

7  looking at that claim is on a feature-by-feature basis.

8        **THE COURT:**  Okay.  So the way -- I mean, consistent

9  with the ruling at the previous hearing, my discussion at the

10 previous hearing, I -- in my mind, there are kind of two

11 categories or universes of document discovery we're talking

12 about here, which is kind of the technical implementation,

13 planning documents for specific features, and then there's kind

14 of the general discovery that we're talking about.

15     So I do continue to believe that discovery with respect to

16 specific features should be triggered by the date those

17 features were developed and released.

18     So on the five that are in the status report, feature

19 discovery on Facebook friend recommendations can start as of

20 January 1, 2008; Facebook algorithmic recommendations starts as

21 of January 1, 2009; Facebook endless scroll starts January 1

22 2009; Facebook geolocation starts January 1, 2010; the Facebook

23 notifications starts January 1, 2011.

24     There is a dispute between the parties about Facebook

25 newsfeed, and this goes to something that I think I alluded to

**PROCEEDINGS**

1   in the order that was issued today.  To the extent the parties

2   are disputing whether a particular feature is actually at issue

3   in the case or not, I mean, to some extent it's the plaintiffs'

4   theories to put them in the case; and so if -- I take it your

5   position is the newsfeed is in the case?

6          **MR. CARTMELL:**  Yes, Your Honor.  Paragraph 195 of our

7   complaint specifically states that.

8          **THE COURT:**  Okay.  So discovery on Facebook newsfeed

9   starts as of January 1, 2006.

10         **MS. SIMONSEN:**  Your Honor, may I respond on that

11  point?  Because it is important, it actually goes to the

12  algorithmic recommendations point.

13       The plaintiffs have defined named features the same way in

14  all 13 sets of their requests for production, and they map onto

15  the allegations of the complaint.

16       The newsfeed, to the extent that's a challenged feature,

17  what plaintiffs are challenging is the algorithmic

18  recommendations appear -- the way the algorithm recommends

19  content to users.

20       In plaintiffs' complaint, they focus specifically on what

21  they refer to as engagement-based ranking algorithms.  So they

22  allege in their complaint that 2009 marked the change from

23  chronological to algorithmic ordering for the Facebook

24  newsfeed; and that in 2009, Meta did away with Facebook's

25  chronological feed in favor of engagement-based ranging.  In

1    2016, it did the same on Instagram.

2        So January 1st, 2009, based on this features approach is

3    the earliest date for which discovery into that feature, which

4    is not newsfeed but algorithmic recommendations, that's the

5    earliest it should go back to.  Because prior to that time, it

6    was a chronological feed the same type of way you might see

7    content on any website, and that's not what plaintiffs are

8    challenging.  They're challenging the specific design of the

9    algorithms used to rank content in a way they claim is

10   addictive.  So we're just going on what they've alleged.

11       MR. CARTMELL:  Your Honor, what we alleged was that

12   there were multiple features -- actually, what we alleged was

13   the platform as a whole was designed improperly, and then we

14   have a whole lot of different -- and I want to bring up

15   other -- other features that are in there.

16       With new -- with the newsfeed it -- paragraph 195, we

17   specifically said this was the first feature that was designed

18   to keep people on the actual platform for the maximum amount of

19   time.  I mean, it's central to our case, and that's when it

20   started.

21       THE COURT:  Okay.  So I think they've articulated at

22   least a reason why it's relevant to discovery -- for discovery

23   purposes going back to January 1, 2006, and I can -- at the

24   last hearing on this similar issue with other defendants,

25   I believe there was an argument plaintiffs made that it goes to

**PROCEEDINGS**

1    alternate designs as well, and alternatives available.  So it's

2    going to go back -- for newsfeed, it's going to go back to

3    January 1st, 2006.

4        You had -- there was discussion about age verification --

5            **MR. CARTMELL:**  Yes.

6            **THE COURT:**  -- which is not one of the features listed

7    here, unless it's subsumed by one of these.  I want to make

8    sure.  If it isn't, I want to address that since you raised it.

9        When do the plaintiffs allege that age verification

10    becomes relevant for your case?

11            **MR. CARTMELL:**  In 2006.  That is when they made the

12    decision that they were going to allow 13-year-olds and up

13    actually on the platform.  Our experts have an opinion that at

14    that time, based on those circumstances, that would be

15    relevant.

16            **THE COURT:**  So as to age verification, same thing.

17    Discovery starts on that feature as of January 1, 2006.

18        With regard to the general time frame for all other

19    nonfeature-specific discovery, you know, I preface it by

20    saying:  If plaintiffs can find targeted document requests

21    based on other evidence that something preceding this --

22    because it is a default cutoff -- that something preceded

23    should be sought in discovery -- I note the Sean Parker quote

24    is from 2017, so -- I mean, but if you've got evidence that

25    there is a document that precedes the default cutoff that I'm

1    going to impose, you can certainly -- you know, the default can

2    be overcome if you've got an evidentiary basis or a basis to

3    find something specific.  All right?

4        But I'm not going to -- as I said before, I'm not going to

5    have kind of a broad early, early, early default discovery date

6    because at some point in time it starts getting -- it starts

7    getting unproportional I believe.

8        So I note that in the status report it was reported to me

9    that the AGs confirmed on May 16th that for many of the State

10   AGs' request served to date, 2012 is the relevant time frame.

11   So the default cutoff date is going to be January 1, 2012,

12   based on that.

13           MR. CARTMELL:  Your --

14           THE COURT:  Go ahead.

15           MR. CARTMELL:  Your Honor, we have other -- multiple

16   other features that are in our pleadings that we -- for

17   example, the "like" button.  There's been an argument by Meta

18   that the "like" button is not included, but it's clear from a

19   page and a half of our pleadings that we're claiming the "like"

20   button is one of those things that gives a dopamine hit that

21   keeps kids on the platform.

22           THE COURT:  Do you have a date for the "like" button?

23           MR. CARTMELL:  2009.

24           MS. SIMONSEN:  Your Honor, again, the "like" button is

25   not a named feature.  It is not a feature that

 1  Judge Gonzalez Rogers analyzed in her decision.  What she

 2  addressed was the timing and clustering of notifications,

 3  including notifications of "likes."  And notifications -- the

 4  time frame for notifications on Instagram, for instance, is

 5  2012 is when that feature launched.

 6      And there will be certainly discovery going back to 2012

 7  about the "like" button.  To the extent it's relevant to this

 8  case, it relates to notifications and those began in 2012.

 9          MR. CARTMELL:  Your Honor, again, the JCCP the "like"

10  button is at issue, and the proceedings and rulings here affect

11  the discovery in the JCCP.  The "like" button is obviously in

12  that case.

13      And, also, the judge has said -- and I think you have also

14  confirmed -- that all of the features in -- and it actually

15  says in the pleadings, it may say "complaint," are at issue in

16  the case.

17      So that's one thing that I think the reason is there's

18  some disagreement here, is they are using a definition in our

19  RFPs that defined seven or eight things.  We have multiple

20  others, like features -- excuse me -- like the "like" button in

21  our pleadings, and I think the pleadings have -- and the judge

22  has ruled the pleadings would actually control in that

23  situation.

24      And so there's several others that -- that, you know, have

25  not been mentioned; but we've always taken the position:  Well,

 1  wait.  If they're in our pleadings, you're put on notice and

 2  we're telling you that they contribute to the addiction or

 3  problematic use or compulsive use of kids.

 4       THE COURT:  I mean, the question is:  Why didn't you

 5  include them in the definition of named features, though?

 6       MR. CARTMELL:  Well, our -- I think some of them would

 7  be subsumed within those definitions, okay, individually.

 8       THE COURT:  The "like" button January 1, 2009.  You

 9  got that.

10       MR. CARTMELL:  Okay.

11       THE COURT:  Are there others?

12       MR. CARTMELL:  Yes, there are others, Your Honor.

13       THE COURT:  What else do you -- what else do you need?

14       MR. CARTMELL:  We have Facebook Chat in April 2008.

15  We have --

16       MS. SIMONSEN:  Your Honor --

17       MR. CARTMELL:  Can -- I'll just read the list --

18       THE COURT:  Yeah.

19       MR. CARTMELL:  -- and then Ms. Simonsen can respond.

20     We have hashtags in January 2011.

21     We have facial recognition tagging in December 2010.

22     We have parental controls.  And, Your Honor, that is

23  another -- from the inception of -- of Facebook, our experts

24  will opine that when they decided in 2004 to allow 13-year-olds

25  to 18-year-olds onto their platform, was there discussions

1   about any parental controls, getting permission from parents,

2   things like that?  That's a central part of our case in this.

3   So parental controls in our -- in our belief is, that that

4   would be 2006, when that happened.

5       Then before 2010, we have CSAM reporting protocols.

6       Geolocation -- actually, CSAM was in 2010.

7       Geolocation was in 2010.

8       And I don't remember if Ms. Simonsen said friend

9   recommendations in May of 2008.

10          **THE COURT:**  Friend recommendation is already there.

11          **MR. CARTMELL:**  Okay.

12          **THE COURT:**  All right.  Do you want to respond?

13          **MS. SIMONSEN:**  Yes, Your Honor.

14      On the point about parental controls, and this goes back

15  to the age verification as well, what plaintiffs, I think, are

16  trying to do is say that -- that they're challenging like the

17  absence of features, when what they are challenging are

18  specific features; namely, the types of parental controls and

19  age verification that Meta was utilizing on its platform.

20      And we confirmed for them that the parental control

21  feature did not launch until much later.  Certainly going

22  back -- the notion that we would go back to 2006 for that does

23  not make sense.  Parental controls were launched on Facebook in

24  2023, and on Instagram in 2022.

25      And I can, you know, provide kind of similar dates when it

1    comes to age verification.  I mean, on Instagram it was in

2    December 2019 that it became mandatory for new account holders

3    to provide their age.  That would be the relevant, I think,

4    start date for that particular feature.

5        I think 2013 is probably the earliest that it would be for

6    Facebook.  That would be when reporting and review and

7    checkpointing started based on our investigation.

8        So, you know, I think -- with respect to parental controls

9    and age verification, I think were covered by the 2012 and

10   forward.

11       To address the remaining points, my colleague mentioned

12   hashtags.  That, again, is not a feature listed in their list

13   of named features.  To Your Honor's point, if that was

14   something they were wanting discovery into as a feature, I

15   don't know why they wouldn't have included it in a definition

16   they included in 13 sets of RFPs that we negotiated

17   extensively.

18       It's also not a feature that has once been mentioned by

19   plaintiffs in any of the conferrals that we have had with them

20   on these issues or in the letter briefing.

21       With respect to facial recognition, again, I don't know

22   that face recognition *per se* -- that is not a named feature.

23   What -- what -- it's just simply not a named feature.  It's not

24   something that they've pursued discovery into to date.  Image

25   filters is the closest thing I can think of that is -- maybe

**PROCEEDINGS**

1  maps onto that.  Those were launched on Facebook in 2017, and

2  on Instagram in 2018.

3      Geolocation, I do agree with my colleague on that one, it

4  was 2010.  We confirmed that with them in the course of our

5  discussions, and so that is one that we've already agreed that

6  we would go back for.

7      And with respect to CSAM, I think plaintiffs have taken

8  the position that anything relating to the reporting of CSAM,

9  including how Meta reported it to the National Center for

10  Exploited and Missing Children [sic] is relevant.  Their

11  complaint focuses only on the ability for users to report CSAM,

12  and that is the feature that Judge Gonzalez Rogers analyzed in

13  her motion to dismiss decision.

14      The earliest date that we've been able to determine that

15  Instagram users had the ability to report suspected CSAM or

16  adult predator accounts specifically was 2012.  So that should

17  be the relevant start date for CSAM we would submit.

18          **THE COURT:**  Is there a date for Facebook?

19          **MS. SIMONSEN:**  I don't have a date -- I do not have a

20  date for Facebook; but my understanding, based on the

21  information we've been able to gather, is that it would likely

22  be around the same date.  It's something we can look into

23  further and try to pin down.  We have been working hard to try

24  to pin that down.

25          **MR. CARTMELL:**  Your Honor, we have 2010 for CSAM

 1  filters -- or CSAM reporting protocols.  And that is in our

 2  complaint and does apply.

 3       **MS. SIMONSEN:**  And I'm not sure -- is -- I would need

 4  to check.  I don't know what that's referring to because,

 5  again, their complaint in places references reporting of CSAM

 6  to NCMEC by Meta.  "NCMEC" is the abbreviation for the

 7  organization I mentioned.

 8       But, again, the feature at issue is the ability for users

 9  to report CSAM and suspected predator accounts to Meta.  And

10  based on our investigation, we understand that it was 2012 that

11  users were able to specifically report suspected CSAM or adult

12  predator accounts.

13       **MR. CARTMELL:**  May I respond?

14       Your Honor, with respect to CSAM reporting and age

15  verification, parental controls, we allege in our -- in our

16  pleadings that they knew about those potential requirements and

17  features that could be implemented, considered them, and

18  didn't -- didn't do them.

19       Our claim with age verification, with CSAM, is that they

20  should have done it sooner and they didn't.  It becomes

21  relevant when it was something that they considered, and we

22  believe that it was something they considered, and the

23  negligence was that they didn't do it.  And so those -- those

24  are obviously relevant.

25       **MS. SIMONSEN:**  And, Your Honor, discovery -- just to

**PROCEEDINGS**

1  respond on that point, discovery back to, say, 2012 on CSAM,

2  back to January 1st of 2012 for CSAM, is going to pull in

3  documents demonstrating that that particular ability to

4  specifically report CSAM wasn't available prior to that time.

5       And so it should be sufficient to go back to the 1st of

6  January.  That gives them some lead time before the feature was

7  actually launched -- right? -- to get documents discussing the

8  development of that particular design feature.  And, again,

9  they're going to get discovery about that issue all the way

10 through to April 1st, 2024.  That should be sufficient.

11      Again, to Your Honor's point, if there's something

12 specific from an earlier period of time they have reason to

13 think they need, they can certainly come back to us.

14      I do think it's worth mentioning again, that expanding the

15 time periods further back on these specific features is just

16 going to jam us on the timeline we already have given,

17 you know, we've already agreed to search terms returning

18 13.7 million documents.

19      I know we haven't had a chance to really talk to

20 Your Honor about it because the parties reached agreement, but

21 we increased the number of custodians we agreed to use from 48

22 to 127, which is a very large number of custodians by any

23 measure for any litigation.

24      And so, you know, I think at some point, particularly

25 given the advanced accelerated schedule these plaintiffs

1  requested, there has to be some reasonable limit on how far

2  back in time some of this discovery can go.

3        **THE COURT:**  Okay.  So do you agree with Ms. Simonsen

4  that what you're -- what you referred to as facial recognition

5  tagging is what she referred to as image filters, or are you

6  talking about different things?

7        **MR. CARTMELL:**  Yeah, no.  So image filters we have as

8  2010 on Instagram, and 2012 on Facebook, and that's both in

9  our -- in our RFP definitions and in our complaint.

10        **MS. SIMONSEN:**  Your Honor, we confirmed in the course

11  of meet and confers that image filters launched on Facebook

12  in 2017, and on Instagram in 2018.  I didn't hear anything back

13  from plaintiffs on that.  This is the first I'm hearing that

14  they had a different date that they thought that those were

15  launched, but those dates have been confirmed through our

16  investigation.  I think it may actually be public that that's

17  when those features launched.

18        **MR. CARTMELL:**  If we have proof of that -- I mean, not

19  that I won't take your word for it, but I'm just saying we have

20  evidence that -- and we put it, I think, in our complaint --

21  that it was in 2010 and 2012.  So we'd just like to confirm

22  that.  If we confirm that that's when it started and there was

23  nothing beforehand, then, you know, obviously it is what it is

24  and we'll be fine with that.

25        But, I mean, we had --

1    **THE COURT:** So I thought I was going to be able to go

2    through all of them with you, but it sounds like you're going

3    to need to meet and confer, so...

4    **MS. SIMONSEN:** It sounds to me like, just on the image

5    filters -- although, I will say, again, Your Honor, we've been

6    trying to reach resolution on these issues for some time.  We

7    shared this information with them.  They didn't challenge it,

8    so --

9    **THE COURT:** Okay.  I hear what you're saying.

10    Okay.  So -- and I don't remember if I said this.  So for

11    Facebook Chats it starts January 1, 2008.

12    Hashtags, January 1, 2011.

13    Image filters, it's going to start -- well, it will be

14    subsumed in the general default because if -- it's going to

15    start 2017.

16    If you have evidence that it started before then, I'm

17    going to order you both to meet and confer and see if that date

18    needs to be altered by agreement.  And that's image

19    filters/facial recognition tagging.

20    Age verification is going to start January 1, 2013.

21    Again, this is based on the same representation by Ms. Simonsen

22    that that's when it launched.

23    And, again, if you've got evidence that you think they

24    considered it -- that it was something that was under

25    consideration, but not implemented prior to that, and you want

**PROCEEDINGS**

1  to get discovery of that, I'm going to order you to meet and

2  confer and see if you can, by agreement, alter that date.

3  Okay?

4      The "likes" go back to January 1, 2009.

5      Parent controls, again, based on it's going to be subsumed

6  by the default.  It looks like you said 2023?  Really?

7      **MS. SIMONSEN:**  2023 and 2022.  Yes, Facebook 2023, and

8  Instagram 2022.

9      **THE COURT:**  So it's going to be the subsumed in the

10 default.  But, again, if you've got evidence that it really

11 does go back to an earlier date, before 2012, because that's --

12 then you're free -- I'm going to order you to meet and confer

13 and try to see if you can work that out.

14     Same thing, CSAM reporting.  Again, because, Ms. Simonsen,

15 I'm going to hold -- because you couldn't give me a date for

16 Meta -- or for Facebook on that one, I'm going to give you

17 January 1, 2010; right?

18     And then on geolocation, it looks like everybody agrees

19 January 1, 2010.  Okay?

20     **MR. CARTMELL:**  Your Honor, on the age verification and

21 the parent controls, just -- just so -- you know, to be clear,

22 our claim is that they -- they were negligent all along and

23 they didn't have them when they should have had.  So when they

24 started, we're saying, is way too late.  And when they should

25 have had them, it seems like that should be the date --

1  right? -- starting in 2006, when they had the opportunity to do

2  it and didn't.  That's what our -- that's what our experts are

3  going to say.  So --

4      **THE COURT:**  The fact that they didn't have it in 2006,

5  I mean, it's a negative.  That's already in the record; right?

6      **MR. CARTMELL:**  But that is -- that's why the

7  feature-based program here is tough; right?  Because we're

8  claiming negligence, that they didn't do things they should

9  have done.  That's part of negligence, and it's relevant during

10  the time period when they should have done it.  And so our

11  claim is --

12      **THE COURT:**  I'm not foreclosing it.  If you've got

13  evidence that you think there are documents -- there's a

14  universe of documents that predate 2013, for example, on age

15  verification, or this specific subset of custodians who you

16  think are critical to that that have documents preceding that,

17  then I'm going to expect you to meet and confer and talk with

18  Ms. Simonsen about, you know, trying to expand that date

19  backwards in time, and I'm sure she'll be reasonable in

20  discussing that with you.  Okay?

21      Remember, I said these are default cutoffs -- right? --

22  and default means default; right?

23      If you can come up with a good reason or a reasonable

24  reason, I expect the parties to work together collaboratively

25  in trying to figure out if there's a reason to go back for

1  specific issues.  Okay?

2       MR. CARTMELL:  Can I ask about notifications?  Was

3  that included?

4     I apologize.  I haven't taken great --

5       THE COURT:  Notifications, January 1, 2011.

6       MR. CARTMELL:  Okay.  We have 2007.

7       MS. SIMONSEN:  Notifications is another one we shared

8  with them in advance.  It was 2011 for Facebook, for Instagram

9  2012.

10       THE COURT:  So, again, if you've got some evidence

11  that you think it started or -- started before 2011, meet and

12  confer.

13       MR. CARTMELL:  Share it with them and meet and confer?

14       THE COURT:  Yeah.

15       MR. CARTMELL:  Okay, we'll do that, Your Honor.

16     I want to just, real quick, look and make sure we didn't

17  miss anything.

18     User options -- oh, I think that's going to be the same --

19  the same thing, that it wasn't implemented until 2021, but our

20  claim is that it should have been implemented earlier than

21  that.  Those are safety sort of safeguards that we're claiming.

22     All right.  I think that covers what I have written down

23  on my list, Your Honor.

24       THE COURT:  Okay.  So we've all got the transcript.  I

25  don't want to have to repeat all that.  So if you need

**PROCEEDINGS**

1    clarification, please refer to the transcript on that.    I

2    assume you-all took good notes of the dates on each of these

3    features.

4         Okay.    In my mind, that resolves this dispute.    Is there

5    anything still open on this particular dispute?

6              **MR. CARTMELL:**    I would --

7              **MS. SIMONSEN:**    Nothing --

8              **MR. CARTMELL:**    Go ahead.    Sorry.

9              **MS. SIMONSEN:**    Nothing from Meta's perspective.

10        I had a clarifying question with respect to the search

11    term negotiations coming out of this, but nothing with respect

12    to Your Honor's rulings.

13             **MR. CARTMELL:**    One thing I would ask, Your Honor.

14        Ms. Simonsen mentioned that they have their search terms

15    for this feature-based program.    We would ask that they provide

16    those to us today or --

17             **THE COURT:**    Me too.    Because you're going to work out

18    search terms and be done with it by next Wednesday; right?

19             **MR. CARTMELL:**    Right.

20             **THE COURT:**    Yes.

21             **MR. CARTMELL:**    So just as soon as possible today or

22    tomorrow, if we could get that.

23        And the only other thing I have, Your Honor, is that --

24             **THE COURT:**    Any objection to that?

25             **MS. SIMONSEN:**    No, not at all.

1        **THE COURT:**  All right.

2        **MR. CARTMELL:**  The only other thing I have is that

3    Mr. Van Zandt from the JCCP would like to say something about

4    this topic.

5        **MR. VAN ZANDT:**  Thank you, Your Honor.  Joseph Van

6    Zandt.

7        And I'm sure you're ready to move on, so I'll be very

8    quick with this.

9        So in terms of the JCCP, I did just want to make a record

10   on this.  So Ms. Simonsen indicated that these are product

11   liability claims in this case, which is not true for the JCCP.

12   The JCCP is based on negligence claims.

13       And the JCCP is where an overwhelming majority of the

14   plaintiffs -- personal injury plaintiffs at least -- are

15   pending.  900 -- over 950 cases compared to, I think,

16   200-something here in the MDL.

17       So this -- a product-by-product or feature-by-feature

18   ruling in terms of the relevance of discovery and going back

19   would really hamstring the claims of the overwhelming majority

20   of the plaintiffs in this litigation.

21       And Your Honor indicated that if we have specific evidence

22   that relevant evidence exists for the time periods, it's hard

23   to get more specific than the former president of the company

24   in 2005, who left the company in 2005, indicating that they

25   knew what they were doing to addict people to the platform and

1    they did it anyway.

2        He left the company in 2005, continued consulting with

3    Mark Zuckerberg for the years after that.  While he might have

4    said the comments in 2017, his only knowledge as to what was

5    happening would have been during that time frame that we're

6    trying to get.

7        The plaintiffs aren't asking to go back that far for

8    everyone.  We're asking for a handful of custodians that would

9    go back to the date they started employment with the company.

10        **THE COURT:**  Mr. Parker is not there so there's no

11    custodian.  I mean, you could subpoena him personally, as an

12    individual.  You're free to do that.  Because we're only

13    talking party discovery here.  If there are individuals who are

14    out there who have left the company, and there are a lot of

15    them, you're free to subpoena them.

16        This is just document discovery.  You're certainly free to

17    depose whoever you want to depose and get testimony.  I'm not

18    putting any limits on time frame -- for the subject matter time

19    frame that you can ask questions on.

20        That's -- you know, if people -- I mean, obviously, you've

21    got some public statements by people.  You've got testimony by

22    people from other cases or from Congress.  There are plenty of

23    ways to depose people on these issues without having to delve

24    into the history, especially for people who aren't at the

25    company anymore.  I mean, I don't know how to get Mr. Parker's

 1    documents at this point.

 2         MR. VAN ZANDT:  Right.  And I'm sure we'll see to

 3    that.  But the point is to the custodians who are still

 4    employed with Meta who were there at the same time Mr. Parker

 5    was, and would have been having these conversations with him --

 6    including Mark Zuckerberg -- the evidence going back to the

 7    date that they joined the company is extremely critical to the

 8    core of the claims in both litigations, but especially the

 9    JCCP.

10         So we're asking for a narrow, narrow window of plaintiffs

11    that would go back to the date -- to the date of initial

12    employment.  I mean, on the -- the entire custodian list, there

13    was -- there's only 15 people on the entire custodian list that

14    were employed there before 2010; and we're not asking for even

15    all of those.  We're asking for a limited universe of

16    plaintiffs that would go back to the date that they started at

17    the company, which we believe will generate incredibly

18    important evidence on motive, intent, and knowledge, which are

19    relevant to the claims in both those litigations.

20         THE COURT:  And you don't think you're going to find

21    when they run the custodial searches on those 15 people for

22    documents going -- in some cases going back to 2008 or even

23    2000 -- yes, at least 2008, you're not going to find anything

24    that's going to either help you point to something earlier?

25         MR. VAN ZANDT:  That's certainly possible, but we --

1    there's no way we can know that.  So it's -- we can't know how

2    long before they launched a certain feature that they started

3    discussing that feature.  We know, at least from comments from

4    Mr. Parker, again, the president in 2005, they're talking about

5    creating a platform that keeps people coming back and gives

6    people dopamine hits.

7        So when they -- when they planned out and mapped out when

8    they were going to release certain features, they could have

9    started discussing those two or three years prior.  So the

10   feature release date really doesn't give us the true background

11   or the motive or intent or knowledge of what these features

12   could do.

13       **THE COURT:**  I've already balanced proportionality

14   versus relevance there and decided that the January 1st of the

15   year the feature comes out.  I hear your argument.  I've

16   already considered it.  Whatever year -- January 1st of the

17   year the feature came out is the appropriate cutoff, I think,

18   for this.

19       But, again, if you find something in the production or you

20   find something in a deposition that leads you to earlier

21   documents, you're free to ask a go-get-'em type or whatever

22   follow up you need to get that.  Again, as I said, these are

23   default cutoffs and you can certainly do your work to try to

24   get at earlier stuff if you really think it's that critical.

25       **MR. VAN ZANDT:**  Thank you, Your Honor.  We do think

**PROCEEDINGS**

 1  it's critical and we've requested it, and understand your --

 2  your instructions about that.

 3       THE COURT:  I'm not foreclosing you from trying to get

 4  at it; but, you know, let's take this -- try to -- I'm trying

 5  to get the first set of document requests done with so you can

 6  get going -- right? -- on this stuff.  Right?  And so that's

 7  where we are.

 8       MR. VAN ZANDT:  Okay.  Thank you.

 9       THE COURT:  Okay.

10       MS. SIMONSEN:  Thank you, Your Honor.

11    May I ask just one clarifying question with respect to

12  search term negotiations?

13       THE COURT:  Sure.

14       MS. SIMONSEN:  I think we've talked through kind of

15  the launch dates of these various features.  Obviously, we're

16  going to be going back further in time than we had planned for

17  certain features.  I think it would help in search term

18  negotiations to have an understanding that Your Honor would

19  endorse an approach where we go back to the date of launch for

20  features launched after 2012.  That would save us from, for

21  instance, in the case of something that launched in 2017,

22  you know, five years worth of running search terms over

23  documents where the feature hasn't even launched yet.

24    I'd just like to know if Your Honor is sort of open to

25  that approach.  It's something that I certainly think we would

1  want to propose as a way to keep the volume something we can

2  manage by September 20th.

3      **MS. WALSH:**  Yeah, Your Honor.  So we worked really

4  hard to get this set of search terms that applies to the

5  default cutoff date, which Your Honor has been very clear

6  about.  I think that that's part of Your Honor sort of

7  balancing that between, you know, what Mr. Cartmell was asking

8  for.

9      And the idea that now we would be going back into that

10  and, first of all, entering into negotiations about what search

11  terms actually apply to particular features and doing

12  carve-outs in the period following is just really taking us

13  backwards.

14      **THE COURT:**  I'm not going to -- anything that --

15  you're not going to do feature-specific searches post the

16  default cutoff.  It's, A, I think it's going to be more

17  complicated than it's worth; and, B, if it really was something

18  launched, say, 5 to 10 years after the default cutoff date, the

19  odds that it's going to be a burdensome or large universe of

20  documents preceding that date is low.  So I just don't think

21  you're saving all that much, and you're actually adding

22  complexity to the search.

23      **MS. SIMONSEN:**  Yeah, just to maybe illustrate this a

24  bit.

25      One of the search terms that we are in dispute over is a

**PROCEEDINGS**

1    search term that plaintiffs would like to run called "time

2    spent," a very broad, very broad term, which we have offered to

3    run back to the date that that particular feature on the

4    platforms was launched as a way to be able to still give them a

5    very, very broad term, but make the volume of documents coming

6    back manageable.

7        I don't know if that changes Your Honor's guidance.  I'm

8    trying to think about ways that we can be creative on Meta's

9    end to try to get to agreement.

10        **THE COURT:**  Okay.  So between now and when you

11   finalize negotiations, if you've got specific terms where you

12   think it reduces the -- both the burden but also it sounds like

13   it reduces the possibility of irrelevant documents kind of

14   being swept in prior to --

15        **MS. SIMONSEN:**  Yes.

16        **THE COURT:**  -- when the feature was launched, work --

17   try to work it out in negotiation.  Certainly, I'm not going to

18   bar you from implementing, you know, specific carve-outs if you

19   want to agree to that --

20        **MS. SIMONSEN:**  Yes.

21        **THE COURT:**  -- but I'm not going impose it.

22        **MS. SIMONSEN:**  Thank you, Your Honor.

23        **MS. WALSH:**  Your Honor, I'd like to be heard just

24   briefly on that because I do think this is important.

25        We have gone back and forth about this; and as I pointed

1  out to Ms. Simonsen in an e-mail this morning -- we've had a

2  lot of e-mails back and forth -- is that -- two things:

3       One, the term of art that Meta chooses to use called "time

4  spent" does relate to a feature.  It also relates to a metric

5  that has been in use; and that is something we have evidence

6  for, that we have found evidence for in the documents produced

7  thus far.

8       It is a metric that Meta cares very much about:  How much

9  time are they getting kids to spend on this platform?

10      Eyes on screens as long as possible.

11      "Time spent" is a term that they use and that they are

12  very carefully tracking all of the time.  So it's not just

13  limited to a feature.

14      And I will say, Your Honor, I realize we're not going

15  backwards in this argument, but this is relevant to a point

16  that my co-counsel and colleague Mr. Cartmell was making.  The

17  time spent feature that they eventually finally -- after there

18  was increasing public awareness outside the company about the

19  harms of this platform, they finally put it into place so they

20  could say, "Oh, we do stuff to protect kids."

21      They were talking about it for years.  They were talking

22  about it and not doing it.

23      And within the default cutoff date to prove our negligence

24  claim, to prove our punitive damages claim, to help with our

25  expert reports, we are entitled -- our clients, these kids, are

**PROCEEDINGS**

1  entitled to evidence of the safety features that they are

2  not -- now touting that they discussed for years and failed to

3  implement.  And "time spent" is an example of that.

4         **THE COURT:**  So if you can't agree on it, then you

5  can't agree on it.  I'm not forcing anyone, but I'm also not

6  granting her any of the carve-outs that she wants.

7         **MS. WALSH:**  I just wanted to make clear that -- that

8  issue.

9         **THE COURT:**  You can argue the merits of the case to

10  Judge Gonzalez Rogers.

11      For purposes of discovery, all I'm saying is if there are

12  specific examples of terms that can be cut off by date later

13  than the default cutoff that both sides can agree to, then you

14  should try to work that out.  That's all I'm saying.

15         **MS. WALSH:**  Certainly, Your Honor.  Thank you.

16         **MS. SIMONSEN:**  Thank you, Your Honor.

17         **THE COURT:**  Anything -- I think that resolves 888.

18      So last is 8 -- is it 848? -- which is YouTube custodians.

19      We're down to two custodians for YouTube.  Tell me you've

20  worked it out.  Right?

21         **MS. WHITE:**  We tried, Your Honor.  We've come a long

22  way.

23         **THE COURT:**  All right.  Please announce yourselves for

24  the record.

25         **MS. WHITE:**  Lauren Gallo White with Wilson Sonsini on

1  behalf of YouTube and Google.

2      **MS. SIEGEL:**  Audrey Siegel with Seeger Weiss on behalf

3  of school district/personal injury plaintiffs.

4      **THE COURT:**  Okay.  And why can't you agree to Ms. --

5  I'm going to mispronounce it -- Wojcicki -- I think that's how

6  she pronounces her name -- and Mr. Mohan?

7      **MS. SIEGEL:**  So YouTube had originally taken the

8  position that neither Wojcicki nor Mohan should be custodians.

9      I understand that they are now arguing that Mohan should

10  be a custodian, but Wojcicki should not, and I will let -- we

11  firmly believe that they should both be custodians.

12      I'm happy to go over it, but --

13      **THE COURT:**  Okay.  So there's no dispute as to

14  Mr. Mohan now?

15      **MS. WHITE:**  Not exactly, Your Honor.  We think --

16      **THE COURT:**  Okay.  Darn it.  Go ahead.

17      **MS. WHITE:**  We have -- we have worked very hard and

18  come very far and have agreed to a long list of custodians,

19  including seven senior executives whose roles and

20  responsibilities touch on the issues and features that are most

21  relevant to plaintiffs' claims.

22      We don't agree that it is plaintiffs' -- of course, it is

23  plaintiffs' burden to show relevancy and in this context where

24  they are demanding even more custodians beyond those we've

25  agreed to, they need to show that these two custodians would

1   have uniquely relevant documents or information, and they

2   haven't done that.

3        And as to the CEO's, whose roles are incredibly broad,

4   they touch on many -- they are aware of a wide variety of

5   topics and issues guiding the corporate strategy even where

6   they are not key decision-makers or even decision-makers.  The

7   burden of collecting from these two individuals is especially

8   high.

9        So we believe that collecting documents from both

10  Mr. Mohan and Ms. Wojcicki would be duplicative and

11  disproportionate here.  We, nonetheless, in an effort to reach

12  compromise, because we have heard Your Honor's instructions,

13  offered Mr. Mohan, the current CEO, in exchange for plaintiffs'

14  agreement to drop Ms. Wojcicki.  They, unfortunately, rejected

15  that proposal.

16       **THE COURT:**  Okay.  So I understand from public reports

17  that Ms. Wojcicki has stepped down as CEO.  So who would be

18  the -- I mean, does she retain her documents?  You're talking

19  about her as a custodian.  I know she -- again, the public

20  reports say she's an adviser to Google and Alphabet, but is she

21  still with YouTube in any capacity?

22       **MS. WHITE:**  She is not, Your Honor.  She stepped down

23  roughly a year and a half ago.

24       **THE COURT:**  So when you're talking about her as a

25  custodian, what are you actually talking about then?  Is there

1    a repository for her documents?

2        **MS. WHITE:**  There are.  Ms. Wojcicki was subject to

3    certain legal holds before she stepped down; but unlike

4    Mr. Mohan, her documents won't cover the entire relevant time

5    period up to the end date.

6        And during the relevant period, Mr. Mohan was effectively

7    Ms. Wojcicki's right hand, and he was a senior executive going

8    back all the way to 2011, which is the earliest start date --

9    for default start date for the search terms that YouTube --

10   Your Honor has ordered as to YouTube.

11       So we think that both of these individuals will be

12   duplicative of the long list we've already agreed to; but at a

13   minimum, one should be sufficient and the current CEO should be

14   sufficient.

15       **MS. SIEGEL:**  If I could respond to that.

16       So, first of all, our understanding is that YouTube and

17   Google retain old employee e-mail addresses, old employee

18   files, including on the shared drive and through e-mail,

19   indefinitely; that they don't delete those.

20       So Ms. Wojcicki's files from that time period, which -- to

21   the extent that they were saved and retained, should continue

22   to be saved and retained.  As my colleague mentioned, she also

23   is probably subject to various litigation holds, which makes it

24   likely that her file was retained.

25       Going beyond that, I -- there were several things that my

1  colleague mentioned that I think are inaccurate.  So the first

2  is that Mr. Mohan was at Google for a longer period of time,

3  but we understand that he didn't move over to YouTube until

4  November of 2015; whereas, Mr. Wojcicki began as CEO of YouTube

5  in February of 2014.  So that's over a year and a half of

6  relevant time period in which Mr. Mohan's files simply would

7  not provide that information.

8           **THE COURT:**  So if I give you Ms. Wojcicki's files, why

9  do you need Mr. Mohan's files?

10          **MS. SIEGEL:**  So we need both files because, as to

11  Mr. Mohan's files -- right? -- he covers the last year which

12  Ms. Wojcicki -- sorry, that name is a little hard -- which

13  Ms. Wojcicki does not cover.  That's the first reason.

14          The second reason is that they are both key

15  decision-makers, but Mr. Mohan was a key decision-maker as

16  chief product officer related to products, user experience, and

17  trust and safety, as we understand it.  And so even if

18  Ms. Wojcicki was part of his decisions, Mr. Mohan is likely to

19  have more documents on those topics for the relevant time

20  period.

21          And, lastly, because there's no reason to suspect --

22  you know, that the standard is not any higher looking at

23  executives than looking at any other custodian, and the

24  question is whether or not the custodian is likely to have

25  relevant information or documents that are unique to their

1   file.

2       And Ms. Wojcicki and Mr. Mohan had separate roles.  While

3   they may -- and they were both key decision-makers on these

4   issues; and while they may have had overlapping e-mails and

5   overlapping documents, there's no reason to suspect that they

6   would have exactly identical e-mails or documents.  For

7   example, Mr. Mohan may well have been communicating with other

8   people working on engineering and products and user experience

9   who are not custodians and on a one-on-one basis.

10      And aside from that, Google has a fairly short default

11  retention period.  I believe it's only approximately a year and

12  a half, unless the e-mails are marked as retained.  And so

13  given that, there's a good chance that one of them may have a

14  document -- may have -- even in e-mails exclusively between the

15  two of them, there may be one who retained the document and one

16  who had not retained the document.

17      And I can say that in *Shenwick vs. Twitter*, the court

18  ordered the production of Jack Dorsey's records for the same

19  basic reason.  They said -- the court said even if -- even

20  if -- they should have -- the fact that they might have

21  identical documents at the front end doesn't necessarily excuse

22  production where the custodian file is relevant because you

23  don't know who will have deleted what, and one custodian could

24  have handwritten notes or other notes to self.

25      And I would also note that there's not -- to the extent

1    that they are duplicative, there's not that much of a burden

2    there because there's no problem for YouTube to just go and

3    deduplicate the documents prior to review.

4        **MS. WHITE:**  So, Your Honor, I'm hearing a lot of

5    speculation in my friend's argument.  I think their argument

6    sort of boils down to the fact that they were CEOs; therefore,

7    *ipse dixit*, they must have uniquely relevant information.

8        The circumstances in other cases, of course courts have

9    ordered CEOs of other companies to be custodians in certain

10   cases and they have rejected those requests in other cases.

11       In this case, all plaintiffs are pointing to is their

12   titles.  If plaintiffs, over the course of discovery, find

13   something that suggests that Ms. Wojcicki has some uniquely

14   relevant information that is not covered by the nearly 60 other

15   custodians we've agreed to, of course we're willing to engage

16   them on that; but at this point standing here today, I don't

17   think they have met that burden.

18       **MS. SIEGEL:**  I -- I strongly disagree with the

19   characterization that we are merely speculating that because

20   they're CEOs, they have relevant information.

21       In the first part, we did in our briefing in the appendix

22   in the exhibit, we pointed to several sources demonstrating

23   that Ms. Wojcicki does have knowledge on these topics.  I mean,

24   Ms. Wojcicki was CEO when Kids was launched in 2015; when

25   digital well-being features was introduced in 2018; when

 1   YouTube disabled comments to children's videos in 2019, due to

 2   predatory conduct; when YouTube was fined and agreed to pay

 3   $170 million by the FTC for COPPA violations, which are at

 4   issue in this case; when the -- when social media, Facebook,

 5   and YouTube first came under scrutiny following the publication

 6   of Facebook's files demonstrating knowledge of mental health

 7   defect -- mental health harm; and when YouTube first testified

 8   before Congress in October of 2021.

 9        Ms. Wojcicki has publicly spoken on almost all of these

10   topics, including in regular blog posts to YouTube.  One of the

11   ones we cited was where she was talking about this issue of

12   COPPA violations and what was being done to prevent it.

13        In addition, Ms. -- this was not in the briefing because

14   the briefing was, you know, quite extensive and listed a large

15   number of custodians, but Ms. Wojcicki also was known to have

16   created an *ad hoc* committee called "Roomba," which she would

17   have meet to tackle these particular types of events.  And that

18   has a rotating group of members per issue, and so not including

19   her as a custodian, we likely would not be able to see all

20   these Roomba documents.

21        So I don't think that that's fair to say, that we're

22   merely just saying that she's the CEO.  That's not the case.

23   She's been an active CEO and a key decision-maker on a lot of

24   these issues.

25        **THE COURT:**  Okay.  So I'm going to order that

1  Ms. Wojcicki be added as a custodian.  Particularly the fact

2  that she's not there anymore, so there's no burden; I mean,

3  it's just her repository of documents.

4          **MS. WHITE:**  Well, your Honor, I dis- -- excuse me.

5          **THE COURT:**  I'm ruling.  Okay?

6      And Mr. Mohan took over as -- well, when she resigned --

7  as I recall, she resigned as CEO last year and Mr. -- so there

8  must have been a transition.  So you get -- I'm going to order

9  that Mr. Mohan's files be searched as of January 1st, 2023,

10  only -- all right? -- to avoid -- to address the

11  proportionality and the risk of duplicativeness concern.

12      That's just a default cutoff.  So, again, if you -- if

13  there's something specific that happened before January 1,

14  2023, that you think Mr. Mohan has a uniquely -- you know, a

15  unique set of documents on, I assume you're going to follow up

16  and meet and confer with YouTube's counsel and you're going to

17  work collaboratively on working that out if possible.  Okay?

18          **MS. WHITE:**  Of course, Your Honor.  We will continue

19  to work collaboratively.

20      If I may just respond to the observation that it would not

21  be burdensome to collect these documents.

22      We obviously disagree.  Ms. Wojcicki had general awareness

23  of many, many issues such that the search term -- broad search

24  terms we've agreed to are likely to hit on a very, very large

25  volume of documents, not to mention the privilege.

1      I'd ask that Your Honor consider shifting the costs of

2  reviewing Ms. Wojcicki's documents to the extent, as we believe

3  to be the case, they will be duplicative of those of the

4  custodians we've already agreed to.

5           THE COURT:   You mean shifting, like shifting the costs

6  to the plaintiffs?

7           MS. WHITE:   Shifting the costs to the plaintiffs,

8  correct.

9           THE COURT:   No, I'm not going to do that.

10          MS. WHITE:   Thank you, Your Honor.

11          THE COURT:   We follow the American rule here.   So it's

12  your -- it's your client's documents.   It's your -- it's your

13  burden to review them.

14      Now, you can try to come up with some agreement on, you

15  know, a more generous clawback provision so that you can -- you

16  don't have to worry so much about privilege if that will help

17  reduce the burden.   I assume the plaintiffs will be reasonable

18  in trying to work out something to reduce the burden there if

19  privilege is a real concern.

20          MS. WHITE:   We appreciate that.

21          MS. SIEGEL:   Thank you.

22          THE COURT:   All right.

23          MS. WHITE:   Thank you.

24          THE COURT:   Okay.   So that handles -- that takes care

25  of, I think, all the ripe disputes.   So at this point, I don't

 1  think there's any reason to talk about the unripe disputes; but

 2  is there anything anybody wants to raise at this juncture?

 3          **MS. HAZAM:**  Not from plaintiffs, Your Honor.

 4          **THE COURT:**  The Defense?

 5          **MR. SCHMIDT:**  Not for defendants, Your Honor.

 6      Paul Schmidt for Meta.

 7          **THE COURT:**  Okay.  We -- there's a couple of cleanup

 8  issues that -- so because of the way the schedule works next

 9  month with the holiday, we've moved up the DMC to coincide with

10  the change in date to the CMC.  So I just remind you the DMC

11  next month is on July 11th, which isn't that far away.

12      But because of the holiday, what I would ask is that the

13  parties submit the DMC status report -- right? -- on -- by

14  noon, by noon on July 3rd.  By noon on July 3rd.  So nobody has

15  to work over the holiday getting it to us, so we'll have it

16  right before the holiday.

17      Okay.  I could give you -- if you don't think it's -- if

18  you think it's burdensome because people are going to be

19  traveling on the 3rd, I could do it due on end of day on the

20  2nd, if you prefer.  I give you that option.

21      Who's going to be working on and who's going to be

22  burdened by working on July 3rd?

23          **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

24      It probably isn't me as much as it is others, but

25  plaintiffs would be amenable to the end of the day on the 2nd.

 1          **MS. SIMONSEN:**  Defendants would as well.  Thank you,

 2   Your Honor.

 3          **THE COURT:**  Okay.

 4          **MS. HAZAM:**  Thank you, Your Honor.

 5          **THE COURT:**  People are traveling for the 4th of July.

 6   So okay.  So DMC statement due by end of day on July 2nd.

 7          And then, we seem to keep talking about this at every

 8   hearing, Docket Number 891 was a temporary sealing motion with

 9   regard to one of the discovery letters to me; but under the

10   protocol, you-all were supposed to file an omnibus sealing

11   motion after the temporary sealing motion.  And in the docket,

12   we didn't see an omnibus sealing motion, and it should have

13   been due around the first week of June, if you follow the

14   deadlines in the protocol.  So I just -- can you just take care

15   of that?

16          **MS. HAZAM:**  Yes, we will, Your Honor.

17          **THE COURT:**  Okay.  So, again, it's -- 891 was the

18   temporary sealing motion, and there should have been an omnibus

19   sealing motion following that.

20          I was thinking of having you bring your lead paralegals in

21   so I could talk to them about sealing motions, but pass that

22   message along.

23          Okay.  So I think that's everything on the administrative

24   kind of logistics side.

25          Anything -- anything from the plaintiffs?

PROCEEDINGS

1    MS. HAZAM:  Nothing further, Your Honor.

2    THE COURT:  Anything from the defense?

3    MS. SIMONSEN:  Nothing further, Your Honor.  Thank

4  you.

5    THE COURT:  We're adjourned to July 11th.

6    MS. HAZAM:  Thank you.

7    THE CLERK:  We're off the record in this matter.

8  Court is in recess.

9        (Proceedings adjourned at 3:18 p.m.)

10        ---o0o---

11    **CERTIFICATE OF REPORTER**

12    I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  DATE:   Sunday, June 23, 2024

16

17

18

19

20  _____
    Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
21        Official Reporter, U.S. District Court

22

23

24

25