Pages 1 - 81

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE SOCIAL MEDIA ADOLESCENT  )
ADDICTION/PERSONAL INJURY      )
PRODUCTS LIABILITY LITIGATION. )
                               )    **NO. 4:22-md-03047-YGR**
                               )
_____)


                          Oakland, California
                          Friday, June 21, 2024

                   **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    ANDRUS ANDERSON LLP
                    155 Montgomery Street - Suite 900
                    San Francisco, California  94104
               BY:  **JENNIE LEE ANDERSON, ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California  94111
               BY:  **LEXI J. HAZAM**
                    **ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


STENOGRAPHICALLY REPORTED BY:
Kelly L. Shainline
CSR No. 13476, RPR, CRR
Official Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                         LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
 3                       250 Hudson Street - 8th Floor
                         New York, New York 10013
 4                BY:    KELLY K. McNABB
                         ATTORNEY AT LAW
 5
                         MOTLEY RICE LLC
 6                       One Corporate Center
                         20 Church Street - 17th Floor
 7                       Hartford, Connecticut  06103
                  BY:    MATHEW P. JASINSKI
 8                       ATTORNEY AT LAW

 9                       MOTLEY RICE LLC
                         401 9th Street N.W., Suite 630
10                       Washington, DC  20004
                  BY:    NELSON L. DRAKE
11                       ATTORNEY AT LAW

12                       SEEGER WEISS LLP
                         55 Challenger Road, 6th Floor
13                       Ridgefield Park, New Jersey  07660
                  BY:    JENNIFER R. SCULLION
14                       ATTORNEY AT LAW

15
                         SOCIAL MEDIA VICTIMS LAW CENTER PLLC
16                       520 Pike Street, Suite 1125
                         Seattle, Washington  98101
17                BY:    MATTHEW P. BERGMAN
                         ATTORNEY AT LAW
18
                         KESSLER, TOPAZ, MELTZER, & CHECK LLP
19                       280 King of Prussia Road
                         Radnor, Pennsylvania  19087
20                BY:    MELISSA L. YEATES
                         ATTORNEY AT LAW
21

22            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

23

24

25
```

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

              LEVIN SEDRAN AND BERMAN LLP
              510 Walnut Street, Suite 500
              Philadelphia, Pennsylvania  19106
      BY:  **MICHAEL M. WEINKOWITZ**
           **ATTORNEY AT LAW**

              MARSH LAW FIRM PLLC
              31 Hudson Yards, 11th Floor
              New York, New York  10001
      BY:  **JAMES R. MARSH**
           **ATTORNEY AT LAW**

              AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC
              17 East Main Street, Suite 200
              Pensacola, Florida  32502
      BY:  **SIN-TING MARY LIU**
           **ATTORNEY AT LAW**

              BARON & BUDD PC
              Encino Plaza
              15910 Ventura Boulevard - Suite 1600
              Encino, California 91436
      BY:  **ROLAND TELLIS**
           **ATTORNEY AT LAW**

For Plaintiff State of Colorado:

              COLORADO DEPARTMENT OF LAW
              1300 Broadway, 6th Floor
              Denver, Colorado  80203
      BY:  **BIANCA MIYATA**
           **SENIOR ASSISTANT ATTORNEY GENERAL**
           **ELIZABETH OREM**
           **ASSISTANT ATTORNEY GENERAL**

For Plaintiff Commonwealth of Kentucky:

              OFFICE OF THE KENTUCKY ATTORNEY GENERAL
              Office of Consumer Protection
              1024 Capital Drive, Suite 200
              Frankfort, Kentucky  40601
      BY:  **CHRISTIAN LEWIS**
           **COMMISSIONER**

       **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)


For Plaintiff People of the State of California:

                          CALIFORNIA DEPARTMENT OF JUSTICE
                          1515 Clay Street, Suite 2000
                          Oakland, California  94612
                    BY:   **JOSHUA OLSZEWSKI-JUBELIRER**
                          **DEPUTY ATTORNEY GENERAL**

                          CALIFORNIA DEPARTMENT OF JUSTICE
                          Attorney General's Office
                          455 Golden Gate Avenue, 11th Floor
                          San Francisco, California  94102
                    BY:   **MEGAN O'NEILL**
                          **DEPUTY ATTORNEY GENERAL**

For Office of the Attorney General, State of Florida,
Department of Legal Affairs:

                          FLORIDA OFFICE OF THE ATTORNEY GENERAL
                          Consumer Protection
                          135 W. Central Boulevard
                          Orlando, Florida 32801
                    BY:   **DONNA C. VALIN**
                          **DEPUTY ATTORNEY GENERAL**


For Meta Defendants:
                          COVINGTON & BURLING LLP
                          1999 Avenue of the Stars - Suite 3500
                          Los Angeles, California  90067
                    BY:   **ASHLEY SIMONSEN**
                          **ATTORNEY AT LAW**

                          COVINGTON & BURLING LLP
                          One City Center
                          850 Tenth Street, NW
                          Washington, D.C.  20001
                    BY:   **PAUL SCHMIDT**
                          **MICHAEL IMBROSCIO**
                          **TIMOTHY HESTER**
                          **ATTORNEYS AT LAW**

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES**:   (CONTINUED)


For Defendant Snap, Inc.:

                        MUNGER, TOLLES & OLSON LLP
                        560 Mission Street - 27th Floor
                        San Francisco, California  94105
              BY:   **JONATHAN H. BLAVIN**
                    **ATTORNEY AT LAW**

For Defendant TikTok, Inc., and ByteDance, Inc.:

                        KING & SPALDING LLP
                        1180 Peachtree Street
                        Atlanta, Georgia  30309
              BY:   **GEOFFREY DRAKE**
                    **ATTORNEY AT LAW**

                        KING & SPALDING LLP
                        1700 Pennsylvania Avenue NW
                        Washington, DC  20006
              BY:   **DAVID MATTERN**
                    **ATTORNEY AT LAW**

                        KING & SPALDING LLP
                        50 California Street - Suite 3300
                        San Francisco, California  94111
              BY:   **BAILEY J. LANGNER**
                    **ATTORNEY AT LAW**

                        FAEGRE DRINKER BIDDLE & REATH LLP
                        300 North Meridian Street, Suite 2500
                        Indianapolis, Indiana  46204
              BY:   **ANDREA PIERSON**
                    **ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:  (CONTINUED)**

For Defendant YouTube, LLC:

                    WILSON, SONSINI, GOODRICH & ROSATI, P.C.
                    953 East Third Street, Suite 100
                    Los Angeles, California  90013
            BY:  **MATTHEW K. DONOHUE**
                 **ATTORNEY AT LAW**

                    WILSON, SONSINI, GOODRICH & ROSATI, P.C.
                    One Market Street
                    Spear Tower - Suite 3300
                    San Francisco, California  94105
            BY:  **LAUREN GALLO WHITE**
                 **ATTORNEY AT LAW**

                    WILLIAMS & CONNOLLY LLP
                    680 Maine Avenue, SW
                    Washington, DC  20024
            BY:  **JOSEPH G. PETROSINELLI**
                 **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **<u>Friday - June 21, 2024</u>**                              **<u>9:28 a.m.</u>** |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 |     **THE CLERK:**  Good morning, everyone. |
| 5 |     These proceedings are being court reported by this court. |
| 6 | Any other recording of this proceeding either by video, audio, |
| 7 | including screenshots or other copying of the hearing, is |
| 8 | strictly prohibited. |
| 9 |     Your Honor, now calling the Multidistrict matter |
| 10 | 22-md-3047-YGR, In Re:  Social Media Adolescent Addiction |
| 11 | Personal Injury Products Liability Litigation. |
| 12 |     Our appearances will be added in today's minutes by |
| 13 | sign-in sheet. |
| 14 |     Good morning, everyone. |
| 15 |     **THE COURT:**  Okay.  So we have a couple of things to do |
| 16 | today; obviously, case management and some argument.  Let's |
| 17 | just get warmed up and start with the case management issues |
| 18 | first. |
| 19 |     There's a stipulation with respect to the motion to |
| 20 | dismiss the Florida AG complaint.  That stipulation is granted. |
| 21 | I think you're already proceeding on that basis in any event. |
| 22 |     In terms of argument, we can set that for August.  The day |
| 23 | that I have available to meet with you in August is August 9th. |
| 24 | Because of this trial, you have one of two options with respect |
| 25 | to timing.  We can meet at 8:30 in the morning, but we really |

1    need to be done by 10:00 when my defendants show up; or we can

2    meet at 1:30 in the afternoon after they leave.

3        So, generally speaking, come on forward if you have a

4    perspective.

5            **MS. VALIN:** Donna Valin, Florida Attorney General.

6        I have no preference, Your Honor.

7            **THE COURT:** Okay. And it's not just that. I mean,

8    it's just our regular normal meeting.

9            **MR. SCHMIDT:** We would have a preference, if that does

10   work for the Court, the 8:30 time.

11           **THE COURT:** Okay. So if we don't finish and we need

12   to meet with the defendants, then you'll all have to go get the

13   coffee across the street and wait until I'm done. Criminal

14   cases take precedence. Okay?

15           **MR. SCHMIDT:** Understood, Your Honor.

16           **THE COURT:** And if I'm drinking a lot of coffee in the

17   morning, you'll know why.

18           **MR. SCHMIDT:** Understood as well.

19           **THE COURT:** So with respect to the July 12th, I

20   don't -- do we have a time for that? That, then, needs to get

21   moved to 8:30 if it's at a later time.

22           **THE CLERK:** It's at 9:30, Your Honor.

23           **THE COURT:** All right. So that will move up to 8:30.

24       Okay. There was an e-mail sent to me about the Zuckerberg

25   motion to dismiss. The trial and a couple of other things have

 1  kept me really busy, so I wasn't prepared -- even though it's

 2  ripe now, I wasn't prepared to hear argument.  On the other

 3  hand, I don't know that I need argument on this one.

 4      Do you-all want to be heard on that motion?

 5          **MR. HESTER:**  Your Honor, Timothy Hester on behalf of

 6  Meta and Mr. Zuckerberg.

 7      We would appreciate the chance to be heard if the Court

 8  has time for us.

 9          **MR. JASINKSI:**  Matthew Jasinski with Motley Rice for

10  the plaintiffs.

11      We would as well.

12          **THE COURT:**  Okay.  So do you -- we can set that for

13  July 12th.

14          **MR. JASINKSI:**  Thank you, Your Honor.

15          **MR. HESTER:**  Yes, Your Honor.  Thank you.

16          **THE COURT:**  Okay.  For my courtroom deputy, I believe

17  the last step I was talking about, that's going to be Docket 29

18  and Case Number 23-5885.  It's got a gavel, so we'll resolve

19  that gavel.

20      I did get your unopposed brief on the intercircuit

21  assignments.  I have mentioned to Chief Judge Sutton that I

22  wanted to talk to him about that, and I haven't had a chance to

23  talk to him yet about it, but it's on my list of things to do.

24  So hopefully I'll get that resolved in the next month or so.

25      I wanted to start with him because he is the chair of the

 1    Executive Committee and I suspect that if Chief Judge Sutton

 2    agrees, everybody else will agree as well.  So that's my plan.

 3         There has been a motion to withdraw as counsel in the

 4    Levin case, 22-6263.  Do I have someone here on that case?

 5    Yes?  No?

 6         I'm going to take it off calendar for next Tuesday.  So

 7    we'll vacate that.  It seems like it should be granted; but it

 8    also appears as if people -- counsel are talking about these

 9    issues with respect to other plaintiffs with whom they've lost

10    contact.  So perhaps we need to do this all at once.

11         Can somebody give me an update on that issue?

12         MS. McNABB:  Good morning, Your Honor.  Kelly McNabb

13    for Lieff Cabraser for the personal injury plaintiffs.

14         MS. PIERSON:  Good morning, Your Honor.  Andrea

15    Pierson, Faegre Drinker, for the defendants.

16         MS. McNABB:  Your Honor, we are meeting and conferring

17    with defendants on a proposed protocol to deal with motions to

18    withdraw as counsel where counsel has been unable to

19    communicate with the client.  Our current count is there's

20    roughly around 20 plaintiffs who have not been able to be

21    reached.  So we're meeting and conferring on a process that

22    hopefully will streamline that issue for Your Honor.

23         THE COURT:  Okay.  And do you -- what about this one

24    that I have on for Tuesday?  Do you then want me to wait with

25    respect to that one?

1          **MS. PIERSON:**  Andrea Pierson.

2      Yes, Your Honor, we'd prefer that you wait.  Our goal was

3  to work with plaintiffs to develop a procedure so that these

4  don't become *pro se* plaintiffs that are difficult for you and

5  for the defendants to communicate with.  We think it's better

6  to have a process that leads those cases to conclusion, and

7  we're working collaboratively with plaintiffs on that.

8          **THE COURT:**  Okay.  So I will do that, but we are

9  taking it off calendar.  Okay?

10         **MS. McNABB:**  Understood.

11         **MS. PIERSON:**  Thank you, Your Honor.

12         **MS. McNABB:**  Thank you.

13         **THE COURT:**  Thank you.

14      Next I've got some *guardian ad litem* applications.  Those

15  are granted.  It's at Docket 829.  And the motion to seal is

16  also granted at 828.

17      I've got motions for leave to file supplemental authority.

18  Those are also granted, Docket 917, 934, and 952.

19      The sealing of defendants' bellwether selections are also

20  granted, and this also relates to the replacement bellwether

21  selections.  So requests at Dockets 811, 756, 757, 900, 905,

22  and 932 are narrowly tailored and contain private information

23  that need not be in the public record.

24      There is a request to deal -- there's another motion to

25  remand coming out of Oregon I believe.  I expect to have the

 1   order on the motion to remand that's pending out pretty

 2   quickly.  I think it makes sense for you-all to just wait and

 3   look at that order.  It may -- it may streamline any briefing.

 4   So that's coming out soon.  Then we can deal with the remand on

 5   the other.  Okay?

 6       All right.  I think those are all the administrative

 7   things that I needed to deal with.  Are there other

 8   administrative issues that you'd like to address?

 9           **MR. DONOHUE:**  Your Honor, Matthew Donohue.

10       One other small thing.  We just wanted to circle back to

11   from a couple months ago when we had the hearing on the

12   priority motion to dismiss.  There was talk back then about

13   potential supplemental briefing on the negligence *per se*

14   claims; and with the briefing wrapping up on a number of these

15   other issues, we just wanted to circle back and see if that was

16   something Your Honor was still interested in.

17           **THE COURT:**  I haven't thought about it.  It wasn't

18   raised in the CMC statement, so I don't have an opinion.

19           **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

20       It wasn't raised with us prior to this hearing either.

21   We're happy to discuss it with defendants and come back to

22   Your Honor regarding it.

23           **THE COURT:**  Yeah.  Why don't you meet and confer, and

24   then we can talk about it in July.

25           **MR. DONOHUE:**  Okay.  I do believe we sent an e-mail,

 1   but we're happy to meet and confer and discuss.

 2          **THE COURT:**  So you could have sent an e-mail; but if

 3   it's not in my statement, then --

 4          **MR. DONOHUE:**  I understand, Your Honor, of course.

 5          **MS. HAZAM:**  I don't believe I have the e-mail, but I'm

 6   happy to discuss also.

 7          **THE COURT:**  All right.  Why don't you meet and confer

 8   on that, and we'll discuss it in July.

 9          **MS. HAZAM:**  Thank you, Your Honor.

10          **MR. DONOHUE:**  Thank you, Your Honor.

11          **THE COURT:**  Okay.  Any other issues you want to get on

12   the radar?

13          **MS. HAZAM:**  None for plaintiffs, Your Honor.

14          **THE COURT:**  I don't see any defendants standing up, so

15   I'll assume nothing for defendants either.

16       Okay.  So let's go straight into argument then.  And to

17   the extent that you are dividing up issues, it would be helpful

18   for me to know who is doing what.

19          **MR. MATTERN:**  Good morning, Your Honor.  David Mattern

20   on behalf of the defendants.

21          **THE COURT:**  Okay.

22          **MR. MATTERN:**  Defendants and plaintiffs conferred, and

23   we anticipate -- I'm happy to deviate based on Your Honor's

24   guidance, but we anticipate argument on duty for Count 5, which

25   is against all defendants.

1          **THE COURT:**  Who's arguing?  What I want to know is:

2     Who's doing the argument?

3          **MR. MATTERN:**  That's right, and I'll be doing the

4     argument on duty.

5          Mr. Schmidt from Meta will be arguing Counts 12 and 14,

6     which are against Meta only.

7          And Mr. Blavin is also here to argue the CSAM claims

8     against Snap that were in some short-form complaints.

9          And then, finally, Bailey Langner is here to argue

10    Counts 16, 17 and 18.

11         **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

12    For plaintiffs, Jennifer Scullion will be arguing Count 5.

13         **THE COURT:**  Hold on.  Hold on.

14                   (Pause in proceedings.)

15         **THE COURT:**  Okay.

16         **MS. HAZAM:**  Matt Jasinski will be arguing Counts 12

17    and 14 as well as this -- sorry.

18         Thank you.

19         Correction.  He will be arguing the Counts 12 and 14.

20    Sorry.

21         Thank you.

22         He will not be arguing and instead James Marsh will be

23    arguing the CSAM Snap-specific claims.

24         And then, finally, Roland Tellis will be arguing Counts 16

25    to 18 for plaintiffs.

1            **THE COURT:**  Okay.  Hold on.  I think I missed the name

2    of the third person.

3            **MS. HAZAM:**  Sure.  James Marsh will be arguing the

4    Snap-specific claims.

5            **THE COURT:**  Okay.  So let's go ahead and start with

6    Count 5, negligence.

7        You may proceed.

8            **MR. MATTERN:**  Thank you, Your Honor, and good morning.

9        I'd like to use our time today on Count 5 to focus on

10   duty, and in particular on plaintiffs' burden to plead a duty,

11   and to talk about two different ways thinking about the

12   allegations in the master complaint and why under either way of

13   thinking, plaintiffs have failed to allege a duty.

14       The first that I want to talk about is that courts have

15   routinely decided not to extend negligence-based claims against

16   broadcasters, against video game makers, and against platforms.

17   These cases spend decades.  They encompass allegations that a

18   defendant service is addictive, claims that a website had

19   inadequate safety measures, and even claims that a publisher

20   did not do enough to protect children.

21       And in declining to apply a duty in these circumstances,

22   courts have noted that negligence-based duties and -- indeed,

23   are not appropriate because the common law was not intended to

24   encompass this kind of conduct.  It ensnares course and

25   line-drawing problems that they're not equipped to deal with,

1    and it would impermissibly chill free expression.

2        These policy considerations, and in particular that torts

3    should be cabined to avoid constitutional issues, are a

4    recurrent feature in these cases and apply equally here.

5        And the second frame that I want to talk about is, even if

6    Your Honor has pause about the first framing, if you just focus

7    on the allegations that are in the master complaint, plaintiffs

8    do not plead a duty.  So the parties appear to agree that this

9    Court's prior order dismissing aspects of the priority claims

10   apply here; and then as they say, whatever was ruled out in the

11   priority order is also ruled out here.

12       **THE COURT:**  Well, I mean, let's deal with that first.

13       Shouldn't the Court's prior order on Section 230 apply to

14   the nine nonpriority claims as well?  I understand people want

15   to appeal that and that's fine, but I don't tend to like to be

16   inconsistent.  So shouldn't they have equal applicability?

17       **MS. SCULLION:**  Your Honor, Jennifer Scullion for the

18   plaintiffs.

19       Your Honor, I think both sides agree that Your Honor

20   called balls and strikes on Section 230, on First Amendment,

21   and that there's nothing about the nonproduct aspects of

22   Count 5 that changes that role preserving our rights with

23   respect to appeal, but I think we've agreed that we don't need

24   to revisit those issues.

25       **THE COURT:**  Okay.  So then what's left?

1          **MR. MATTERN:**  I think that's where the parties have

2    maybe a disagreement.  So based on the allegations that the

3    plaintiffs pleaded in paragraphs 929 and 930, what's left are

4    four subparagraphs that make allegations related to age

5    verification, to parental controls, and to the alleged lack of

6    tools to report misconduct.

7          There's no allegations of failure to warn in Count 5.

8    Indeed, the word "warning" doesn't appear at all between

9    paragraphs 914 and 938.  And what's more, plaintiffs expressly

10   disclaim in paragraph 914 that they're relying on any of the

11   product counts, two of which were for failure to warn.

12         So we think it's clear, both based on the allegations and

13   on what plaintiffs have disclaimed here, that failure to warn

14   is not an element.

15         **THE COURT:**  And do you disagree?

16         **MS. SCULLION:**  Your Honor, we do.

17         **THE COURT:**  All right.  Give me this exact paragraph

18   that you rely on where you claim that there is a failure to

19   warn allegation.

20         **MS. SCULLION:**  Your Honor, we've, of course, alleged

21   failure to warn factually.

22         **THE COURT:**  All I want --

23         **MS. SCULLION:**  Sure.

24         **THE COURT:**  -- are paragraphs.

25         **MS. SCULLION:**  Sure.  Absolutely.

1      If you look at paragraphs 431 through 437 with respect to

2  Meta, paragraphs 543 to '53 with respect to Snap, paragraphs

3  675 to '89 with respect to TikTok, and paragraphs 812 through

4  819 with respect to YouTube, those are specific express factual

5  allegations that each of those defendants failed to properly

6  warn of the risks to children of using their platforms.  All of

7  those factual allegations are incorporated by reference

8  expressly into Count 5 at paragraph 914.

9          **THE COURT:**  All right.  Response.

10         **MR. MATTERN:**  I didn't hear my friend identify any

11  paragraphs between 914 and 938, which is the paragraphs --

12         **THE COURT:**  So 914 says that they reallege and

13  reincorporate by reference each preceding and succeeding

14  paragraphs as though set forth fully at length herein, other

15  than Counts 1 through 4.

16     So that's -- this is a standard approach that litigators

17  always use.  She's given me a series of paragraphs.  I need a

18  response with respect to those paragraphs.

19         **MR. MATTERN:**  Okay.  I have two responses for why

20  those paragraphs are not incorporated, Your Honor.

21     The first is, in the paragraph that you just read from

22  914, it expressly disclaims Counts 1 through 4, two of which

23  are failure to warn claims.

24         **THE COURT:**  All right.  Hold on.

25               (Pause in proceedings.)

1          **THE COURT:**  What paragraph does Count 1 start at?  I

2     don't have my copy of the complaint up here.  I can go get it

3     if I need to.

4          **MR. MATTERN:**  Paragraph 832.

5          **THE COURT:**  Say that again.

6          **MR. MATTERN:**  Paragraph 832.

7          **THE COURT:**  So all of the paragraphs she mentioned

8     precede 832.

9          **MR. MATTERN:**  That's right, Your Honor.  But I think

10    it's important that, one, plaintiffs have disclaimed that they

11    were alleging a failure to warn claim; but, two, even if you

12    don't find that argument convincing, courts have dealt with

13    this argument before when plaintiffs purport to incorporate

14    that.

15         **THE COURT:**  So what you want me to say is -- look, I

16    can do this one of two ways.  I can evaluate the paragraphs

17    that she just gave me; or it sounds like what you're asking me

18    to do is say, "Judge, even though they say in 914 that they

19    didn't incorporate certain paragraphs by reference or even

20    though they say they incorporate these paragraphs by reference,

21    they didn't."

22         **MR. MATTERN:**  That's right, Your Honor.

23         **THE COURT:**  How does that make any sense?

24         **MR. MATTERN:**  So I have two responses to that.  So if

25    you don't buy my argument that they said the failure to warn

```
 1    claims are out, if you don't think that's persuasive, I think
 2    the second argument I'd like to make is that this is a form of
 3    what courts have called shotgun pleading, which is that it's --
 4    the master complaint has over a thousand paragraphs; right?
 5    It's over 200 pages.  It's impossible for defendants to piece
 6    together what the basis is for a plaintiff's claim if they can
 7    later on point to dozens of paragraphs of allegations, as my
 8    friend just did, that weren't pleaded or expressly referenced
 9    in the count itself.  And that's something the courts have
10    looked at before in saying, "No, plaintiffs can't do that."
11         THE COURT:  Okay.  So one of the things that we have
12    and one of the reasons that there's always given multiple --
13    well, I actually -- I only give one opportunity.  Many of my
14    colleagues will give two, three opportunities to reassert.
15         So you now know that they are relying on these paragraphs.
16    That's what the motion practice has uncovered and made clear
17    and solidified.  Do you have a substantive response to those
18    paragraphs?
19         MR. MATTERN:  Yes, Your Honor.  Those paragraphs are
20    insufficient to state a failure to warn claim.  The limited --
21         THE COURT:  Because why?
22         MR. MATTERN:  That's right.  The limited circumstances
23    where courts have recognized negligent failure to warn claims
24    deal with failure to warn about harm from third parties.  This
25    Court's prior order said those third-party harm allegations are
```

out.  We cited the district court decision in *Internet Brands*
that said California does not recognize this type of failure to
warn claim.

      **THE COURT:**  All right.  Give me a minute to get the
complaint.

                    (Pause in proceedings.)

      **THE COURT:**  All right.  I'm looking at 431 to 437.
What's the argument with respect to these?

      **MR. MATTERN:**  So two points again, Your Honor.  Our
position is that for negligence as a -- outside of product
liability, so we're dealing with ordinary negligence, failure
to warn claims are limited to claims about failure to warn
about third-party harm or third-party bad actors, and that's
not supported by the allegations here.

    And to the extent that there was any doubt about that,
this Court's prior orders have held that claims related to
third-party misconduct are barred.

      **THE COURT:**  Response.

      **MS. SCULLION:**  Your Honor, we have alleged failure to
warn with respect to the harm and risk posed by use of the
platforms.  Your Honor recognized that was the nature of the
failure to warn claims plaintiffs have alleged.  They are live.
They are being litigated in this case.

    And as Your Honor has, I think, recognized, we've
incorporated the factual allegations by reference into our

1    negligence claim.  There's no requirement that we separately

2    plead a failure to warn version of negligence.  The authorities

3    we cite are clear that failure to warn is an aspect of what

4    makes your conduct unreasonably harmful, failing to warn about

5    the conduct.

6            THE COURT:  And is that with respect to 543 to 553 as

7    well?

8            MS. SCULLION:  Yes, Your Honor.  If we turn to --

9            THE COURT:  Is that the same with respect to 675 --

10           MS. SCULLION:  389?

11           THE COURT:  -- to 689?

12           MS. SCULLION:  Yes, it is, and also with respect to

13   the factual allegations of YouTube's failure to warn at

14   paragraphs 812 through 819.

15       There is nothing about the fact that this is pled as

16   negligence in a nonproduct setting that makes it any different

17   from the failure to warn claim in the negligent product setting

18   that Your Honor's already found that we can proceed on and is,

19   in fact, being litigated.

20           THE COURT:  Okay.

21           MR. MATTERN:  May I respond, Your Honor?

22       So two points.  So one I already talked about, *Internet*

23   *Brands*, which is a case under California -- or applying

24   California law.  A federal court said, "There's no failure to

25   warn claim recognized here."

1        Another case that deals with that that we discussed in our

2   pleadings is *Dyroff* where in the district court --

3        **THE COURT:**  No, which you discuss in your filings, not

4   your pleadings.

5        **MR. MATTERN:**  All right.  Yes.  Thank you, Your Honor.

6        **THE COURT:**  We've got law students here and they need

7   to know that there's a difference between pleadings and

8   filings, as do lawyers.

9        **MR. MATTERN:**  Thank you for holding me accountable.

10  You're right.

11       As we said in our filings, in *Dyroff* the district court

12  said, "Failure to warn claims not recognized here.  It was not

13  a part of negligence."

14       If Your Honor -- I think that this is enough to resolve

15  plaintiffs' theory here, in part because I haven't heard a

16  response for why this should encompass something more than

17  third-party harm; but if Your Honor doesn't buy that, I think

18  we request an opportunity to fully brief this because our first

19  notice of this was in defendants' opposition.

20       **THE COURT:**  So you didn't -- you had a reply.  Why

21  wasn't it addressed in the reply?

22       **MR. MATTERN:**  We addressed it in our reply,

23  Your Honor.  We didn't expect that -- we think that we're

24  right, that this should not be recognized because it's not

25  pleaded within 914 and 948 and that this is a form of otherwise

```
 1    what some courts have called shotgun pleading.  So that's our

 2    argument there.

 3        We offered --

 4        THE COURT:  But once they -- once they raised it in

 5    the opposition, why is it -- why do you get a second chance

 6    when you were given a reply to address the topic?

 7        MR. MATTERN:  We did address it in our complaint.

 8        THE COURT:  You asked for an additional opportunity.

 9    I'm asking you why you should be given an additional

10    opportunity when you were already given an opportunity.

11        MR. MATTERN:  Again, Your Honor, just in case you have

12    a view that reply doesn't count, that we have to make our

13    arguments in our opening motion, I don't -- we don't want to be

14    prejudiced by that.

15        But, second, I think what we have heard from Ms. Scullion,

16    more elaboration about what their theory of failure to warn is.

17        So I, again, think that you can dismiss the theory for the

18    reasons we've alleged.  I'm only asking that if Your Honor

19    thinks otherwise, to give us an opportunity to brief it more

20    fulsomely.

21        MS. SCULLION:  Your Honor, if you'd like to hear more,

22    we did, in fact, in our opposition specifically call out the

23    factual allegations of failure to warn that were incorporated

24    by reference.  We also pointed out that this is the second time

25    the plaintiffs have -- I'm sorry -- defendants have failed to
```

1    engage with the failure to warn claims.  It was this case on

2    the initial motion to dismiss as well.

3        And with respect to the substance of failure to warn,

4    again, we have cited to the Restatement Third, which makes

5    clear that a failure to warn is a basic form of negligence.

6    There is no requirement that you only have to warn with respect

7    to third-party conduct.

8        When your actions, your conduct creates a risk of harm, an

9    unreasonable risk of harm, you can fulfill your duty by not

10   doing that or by warning appropriately of the risks that you

11   have created.

12       We have alleged both forms of negligence here, that they

13   failed to conform their conduct and they failed to adequately

14   warn of the risks created by their conduct.

15       **MR. MATTERN:**  And, again, Your Honor, we've addressed

16   these specific theories in our papers, and your prior order has

17   said that theories related to third-party harm or third-party

18   bad actors are out.  We think a failure to warn claim in the

19   negligence context is limited to those -- to that scenario.

20       And given that in Your Honor's prior order, we think

21   that's enough to say that the failure to warn count -- sorry --

22   the failure to warn theory, to the extent you believe it's a

23   part of this claim, is out.

24       **THE COURT:**  All right.  Let's move on.  What else do

25   you want to talk about in terms of the Count 5?

1          **MR. MATTERN:**  So I have a couple more points that I'd

2     like to make, Your Honor.  I'm happy to focus on whatever is

3     helpful to you, but maybe to start where we were discussing

4     before is on the point that if you take Your Honor's order and

5     strike out everything that you've said is barred by 230, the

6     First Amendment, or your discussion about third-party harm,

7     what's left is not enough to foreseeably allege a harm that

8     would create a duty.

9          And so plaintiffs primarily point to, just to give you one

10    example to contextualize this, to paragraphs 76 through 90 of

11    the complaint, and this is a passage that almost exclusively

12    discusses what they believe are the methods that platforms use

13    to publish content through algorithms.  And so they talk about

14    intermittent variable awards, likes, algorithms, all the things

15    that Your Honor said in the order on the priority claims were

16    out.

17         In our view, those allegations can't be the basis for

18    what's left for the negligence claim; and once you strike

19    those, there's nothing -- there's nothing left to plausibly

20    allege a duty.

21         I do also want to talk about some of our broader

22    arguments, but I want to pause there in case you have

23    questions.

24          **THE COURT:**  Any response?

25          **MS. SCULLION:**  Your Honor, we certainly did allege a

variety of conduct that we think is negligent in causing harm. Again, Your Honor has ruled some of that on 230 and First Amendment; whereas, based on third-party harm, we're not looking to revisit that.

But Your Honor specifically also found that with respect to allegations of -- for age verification and parental controls and making it more difficult than it should be to report abuse and CSAM, that, in fact, we do allege theories of harm that are not barred by Section 230, not barred by the First Amendment, and don't depend on third-party conduct.

Again, those are incorporated in -- our allegations are incorporated in Count 5 with respect to parental controls. Paragraph 929f. alleges that defendants have developed and operated their platforms in a way that facilitates unsupervised or hidden use.

With respect to age verification, we've alleged at 929e. that defendants have adopted protocols that do not ask for or verify the age of the users.

And with respect to CSAM and abuse reporting, paragraph 929c. alleges that defendants have operated and managed their platforms in a way that exposes children to sexual abuse.

And, again, we've incorporated the factual allegations that all defendants have set up their platforms in a way that make it unnecessarily difficult to report CSAM. That's at paragraph 149. There are specific allegations about barriers

1   to reporting with respect to Meta at paragraph 422, Snap at

2   paragraphs 535 and 536, TikTok at paragraph 667, and for

3   YouTube at paragraphs 810 and 811.

4        THE COURT:  Now, I have addressed this suite of

5   features and they do seem to be incorporated.  So to the extent

6   that there's anything left -- some are, some aren't -- anything

7   else to be said with respect to that substantively?

8        MR. MATTERN:  Yes, Your Honor.  I'm making a slightly

9   different point, which is I take the world as it comes, that

10  parental controls, age verification, and the reporting features

11  are still in; but if you look at the specific factual

12  allegations in the complaint, plaintiffs do not tie those

13  specific features to their theory of harm.

14       So to give you an example --

15       THE COURT:  They don't tie it to negligence?

16       MR. MATTERN:  That's correct.  They don't -- they

17  don't say that the harms that they identify are as a result of

18  issues with these particular features.

19       If I could just offer an example for your consideration

20  just to think about.  If you take the example of parental

21  controls, the first time parental controls is mentioned in the

22  complaint is on paragraph 134.  So we're already 37 pages into

23  the complaint when parental controls even come up, and the

24  first substantive discussion of it are seven paragraphs later

25  on paragraph 141.

 1      When plaintiffs talk about parental controls, they talk

 2  about the defects of parental controls facilitating or leaving

 3  gaps that predators can, in their view, exploit.

 4      What they -- the context in which they discuss parental

 5  controls are only related to harms that are out already under

 6  this Court's prior order because, again, they deal with issues

 7  that are barred by 230 or issues that are out under application

 8  of ordinary tort law.

 9      I'll pause there.

10      **THE COURT:**  Yeah, I don't think that's your strongest

11  argument.

12      Moving along, can I ask?  Ms. Scullion, the plaintiffs did

13  give the Court a multistate survey with respect to the standard

14  in various states, but your briefing -- the plaintiffs'

15  briefing focused almost exclusively on the *Roland* standards for

16  California.

17      Is it your perspective that the *Roland* factors are

18  representative or comprehensive of all of the other analytical

19  frameworks used by all of the other states at issue or not?

20  How are there differences, which states, and what are the

21  differences?

22      **MS. SCULLION:**  Your Honor, neither party focused on

23  specific states in briefing the duty issue.  We do believe that

24  the survey shows that states are looking at substantially the

25  same factors as the *Roland*.  So you've got foreseeability of

1  the harm, directness of the conduct to the harm, and public

2  policy concerns.

3      We have focused --

4          **THE COURT:**  So my question is --

5          **MS. SCULLION:**  Yes.

6          **THE COURT:**  -- do I need to do this work or do you-all

7  concede that if I do it under *Roland*, that is going to be

8  sufficient for all of the states?

9          **MS. SCULLION:**  Your Honor, we are happy to use those

10  factors for all of the states.

11          **THE COURT:**  What about the defense?

12          **MR. MATTERN:**  Your Honor, we have a different view

13  about how the law works, and I can explain it briefly.

14      In California there's a -- sort of a default statutory

15  duty and then the *Roland* factors are applied to carve things

16  out of that statutory duty.

17      In defendants' view, negligence operates the flip of that

18  in every other state, which is that there's no default rule;

19  it's the plaintiffs' burden to show that there's a duty.

20      I think, though, for where this comes down in terms of the

21  analysis that you do to determine whether, like, foreseeability

22  and public policy supports a duty, all states apply a version

23  like that.  And so I think we think the *Roland* factors are -- a

24  version of that is used by all states, but we think it's an

25  important difference that in every other state there's no

```
1    default duty.

2         THE COURT:  So you agree, then, that if I use the

3    Roland standard, they are going to be representative of the

4    analytical framework of all of the other states?

5         MR. MATTERN:  Can I slightly caveat that, Your Honor?

6       I think for purposes of this motion to dismiss, we would

7    accept that, but we would reserve our rights to pre- -- more

8    state-specific arguments in the context of specific cases; but

9    I acknowledge that for purposes of this briefing, the parties

10   did not draw distinctions among all the states.

11      And I do want to note again that California operates

12   differently than other states, that it's still plaintiffs'

13   burden in every other state to establish that there was a duty.

14        THE COURT:  Isn't it always plaintiffs' burden?

15        MS. SCULLION:  And, Your Honor, I mean --

16        THE COURT:  I mean --

17        MS. SCULLION:  -- in any event, we have met that

18   burden.  We have -- we have specifically alleged the duty.

19        THE COURT:  I understand you think that, but it's just

20   an odd framing because this isn't an affirmative defense.  It's

21   a cause of action, and plaintiffs always have the burden on

22   their own cause of action.  So I don't understand the

23   distinction that you're trying to make.

24        MR. MATTERN:  So let me try that one more time,

25   Your Honor.
```

1    I agree.  California, however, has a slightly different

2    application to duty, and you can see this in Judge Kuhl's order

3    in the JCCP.  California -- although we agree that it's always

4    plaintiffs' burden, California sort of puts a thumb on the

5    scale for plaintiffs.  That's something -- and then the *Roland*

6    factors operate to carve -- to carve the duty out.  That's the

7    inverse of what happens in every other state.  So that's the

8    distinction I'm drawing there.

9         **THE COURT:**  I see.

10   All right.  Anything on the *Roland* factors you want to

11   discuss?  If not, we'll move on.

12        **MR. MATTERN:**  Yes, Your Honor.

13   And so this is -- this comes back to the first point I

14   made, which is just a couple of reasons for Your Honor to

15   consider for why it would be inappropriate in the defendants'

16   view to impose a duty here, and these are some of the -- some

17   things that courts have looked at in applying the *Roland*

18   factors, including, Your Honor, in *Estate of B.H.* *vs*. *Netflix*.

19   So we briefed and don't intend to reargue that we think

20   that there are First Amendment issues raised by plaintiffs'

21   theories; and, in fact, Your Honor acknowledged in the motion

22   to -- on the order of the motion to dismiss that there were

23   Section 230 and First Amendment issues.

24   But we think what the important part is courts across the

25   states have sort of applied a constitutional avoidance

1    principle to construing state law in declining to extend torts

2    to encompass conduct that would potentially raise

3    constitutional issues.

4        And so in our view, we don't have to show and you don't

5    have to agree with us that the remaining features necessarily

6    raise First Amendment issues.  But we cited before you cases

7    like *Bonta* that deal with age verification, the *NetChoice* cases

8    where courts have enjoined those statutes on First Amendment

9    grounds.

10        And so we think it's clear, and plaintiffs don't really

11    engage, that there are serious First Amendment questions on

12    these issues; and that enough, applying the sort of

13    constitutional avoidance principle to torts, is enough to say

14    that that's a reason why tort law and why duty should not be

15    extended to encompass the kind of allegations plaintiffs make

16    here.

17        **MS. SCULLION:**  Your Honor, if we might respond on

18    that.

19        **THE COURT:**  Don't interrupt.

20        **MS. SCULLION:**  I apologize.

21        **THE COURT:**  Have I ever generally not let you respond?

22        **MS. SCULLION:**  That is absolutely true.  Thank you.

23        **THE COURT:**  Don't interrupt.

24    Are you done?

25        **MR. MATTERN:**  I'm happy to pause or happy to -- I have

1  a couple more points I'd like to make.

2          **THE COURT:**  Go ahead.

3          **MR. MATTERN:**  So we also think that applying, like, an

4  ordinary negligence principle here would ensnare courts in

5  difficult line-drawing problems, and these are issues that

6  courts like the *Zamora* court in the Southern District of

7  Florida, which rejected imposing a duty on a broadcaster even

8  though the plaintiff brought an addiction claim, because it

9  said courts are ill-equipped to deal with that.  It's something

10  that the Ninth Circuit and Sixth Circuit observed in *Winter* and

11  *Waters* respectively.

12      It's simply that the application of tort law here requires

13  courts to make decisions about platforms that could chill

14  expression in a way that courts really aren't equipped to deal

15  with.

16      And, in fact, I think as an example of this, Your Honor's

17  motion to dismiss order on the priority claims was obviously

18  very thorough and dealt with many different theories parsing

19  sort of theories of what's barred by the First Amendment or

20  what's not or what's barred by federal law or what -- it's a

21  duty is not the kinds of like questions that juries are

22  typically equipped to deal with, which is, again, another

23  policy-based reason why courts have declined to extend tort law

24  in these circumstances.

25      But I'll pause on the public policy factors.

1          THE COURT:  Response.

2          MS. SCULLION:  Again, I apologize for interrupting,

3    Mr. Mattern.

4          Your Honor, Mr. Mattern is really just rehashing the First

5    Amendment issues that Your Honor already has pretty carefully

6    parsed in looking at these features.

7          And Your Honor has already observed that our claims do not

8    solely look to the content or the expressive aspects of the

9    platforms.  You found that there are theories of liability with

10   respect to parental controls, age verification, CSAM reporting,

11   and other features that do not, in fact, require them to change

12   content or to monitor content.

13         And that distinguishes, for example, Your Honor's ruling

14   in *Netflix* in which I believe you looked at and said the

15   content there was inseparable from the injury.  That is not the

16   case here.  That distinction also applies with respect to the

17   *Winter*, the *Waters* case, and the others that my colleague has

18   referenced.

19         This case is much more akin to the *Weirum* decision where

20   the radio station was, in fact, potentially liable in

21   negligence for the manner in which it conducted a radio contest

22   that caused physical harm to bystanders.

23         And I -- I apologize.

24         With respect to the public policy issues that pertain to

25   expressive communication platforms, again, we point to the

1    *Weirum* case recognizing that that's not unlimited deference to

2    public policy.  And what we know from cases such as the *Ileto*

3    case is that when you're looking at the utility of a service

4    and asking about how that impacts the public policy, you don't

5    ask about the service as a whole; you look to the specific

6    conduct that's being challenged.

7        And here we have alleged that these platforms could have

8    robust age verification, robust working, effective parental

9    controls, and still operate.  And, in fact, the hardest thing I

10   have about this argument about age verification, parental

11   controls, CSAM reporting somehow being completely inconsistent

12   with the business of running a communications platform is they

13   purport to have these kind of features already.  They purport

14   to do age verification, they purport to have parental controls,

15   and some form of abuse reporting so it can't be completely

16   inconsistent with them having a communications platform.

17       From what I understand, the argument seems to be if we had

18   those -- if we have effective age verification, effective

19   parental controls, effective reporting, that somehow crosses a

20   line.  Your Honor, that's going to be a question that the

21   experts are going to weigh in on.  There's going to be factual

22   evidence on that, and the jury is going to have to decide what

23   is reasonable.  What could these defendants do?  Could they, in

24   fact, do it better?  And we believe we'll be able to prove they

25   can.

1          THE COURT:  All right.  Let's move on to CSAM.  Thank

2  you.

3          MR. MATTERN:  Thank you, Your Honor.

4          MS. SCULLION:  Thank you, Your Honor.

5          MR. SCHMIDT:  Good morning again, Your Honor.  Paul

6  Schmidt for Meta.

7          THE COURT:  Good morning, Mr. Schmidt.

8          MR. JASINKSI:  Good morning, Your Honor.  Matthew

9  Jasinski with Motley Rice for the individual plaintiffs.

10          THE COURT:  Good morning.

11      All right.  Mr. Schmidt, go ahead.

12          MR. SCHMIDT:  Thank you, Your Honor.

13      I want to start just by saying briefly there's no dispute

14  that these claims involve horrifying allegations in terms of

15  criminal conduct that never should happen by third parties, and

16  obviously our pleadings motion doesn't rest in any way on

17  challenging those contentions.  It rests on the very what we

18  think is straightforward application of Section 230 and the

19  statute, and those are the two points that I'll address

20  focusing mostly on Section 230.

21      In terms of Section 230, this case fits squarely within

22  case law recognizing that these types of claims are precluded

23  by Section 230.  We cite the *Doe #1* case from the Ninth Circuit

24  that addressed exactly these types of allegations.  As the

25  district court decision in that case tells us, the claims there

```
 1   were a duty to report child sexual abuse material.  Twitter was
 2   notified of the CSAM material, and still knowingly received,
 3   maintained, and distributed this child pornography after such
 4   notice.  Those are the precise allegations here.  And the Court
 5   said -- the Ninth Circuit said those kind of allegations are
 6   covered by Section 230.  They are, quote, "per force immune
 7   under Section 230."
 8          THE COURT:  I want to stop you.
 9      Mr. Jasinski, it seems to me that the plaintiffs' theory
10   here is that the defendants' possession is sufficient to
11   satisfy the cause of action, but their possession is not --
12   only comes through third-party content.  So how do you avoid
13   Section 230?
14          MR. JASINKSI:  Well, I think you're drawing a key
15   distinction, Your Honor.  It's the possession that is at issue,
16   not the means by obtaining it.
17          THE COURT:  How do you get possession without the
18   content from other parties?  What do you envision them doing?
19   What do you envision them doing?
20          MR. JASINKSI:  So our understanding of the law,
21   Your Honor, is that the means by which a defendant comes into
22   possession, and it needs to be knowing possession under the
23   statute, is not relevant.
24          THE COURT:  Okay.
25          MR. JASINKSI:  And --
```

1          **THE COURT:**  All right.  That's a distinction.

2      Mr. Schmidt, the means by which you get this, not

3  relevant.

4          **MR. SCHMIDT:**  I think the case law rejects that point.

5  Section 230 rejects that point.  *Doe vs.* -- *Doe #1* directly

6  addresses that point when the allegation was that Twitter

7  knowingly received, maintained, and distributed the receipt --

8  and the maintenance is what the plaintiffs are alleging here --

9  such content even after receiving notice, which is their

10  allegation here.  The verbiage that the Ninth Circuit used in

11  holding that material subject to Section 230 equally applies

12  here.

13          **THE COURT:**  Okay.  Mr. Jasinski, what case best

14  articulates that the means by which they obtain it is

15  irrelevant?

16          **MR. JASINKSI:**  Well, we think that reading comes from

17  the *Barnes* case, from the *Lemon* case, and even from the *Dyroff*

18  case in the Ninth Circuit, Your Honor.

19          **THE COURT:**  But none of those cases say what you just

20  said.

21          **MR. JASINKSI:**  You're right, Your Honor.

22          **THE COURT:**  It's an extension -- you're trying to make

23  an extension of that.  None of those cases say that.

24          **MR. JASINKSI:**  Hundred percent correct.  That is true,

25  Your Honor.

1          **THE COURT:**  Okay.  So you want me to read *Barnes*

2     and -- what were the other two?

3          **MR. JASINKSI:**  *Barnes*, *Lemon*, and actually *Dyroff* and

4     I'd love to speak to *Dyroff*.

5          **THE COURT:**  As -- you want me to read those as saying

6     that the means by which they obtain it is irrelevant.

7          All right.  So you can reflect on *Dyroff*.  I'm not sure

8     that I agree with you, but go ahead.

9          **MR. JASINKSI:**  Well, let me use *Dyroff* as an example,

10    Your Honor.  In that case, you may recall the issue was that

11    the platform had facilitated a connection between a young man

12    and a drug dealer, and ultimately the young man purchased

13    heroin.  It was laced with fentanyl and he died, and his mother

14    brought a claim against the platform.

15         And the Ninth Circuit concluded that the platform is

16    immunized from liability under Section 230 because ultimately

17    the claim was based upon the information that the platform had

18    allowed this third-party drug dealer to communicate and thereby

19    connected the young man and the drug dealer.

20         This is different because it is as though Meta is in

21    possession of the heroin.  The CSAM is heroin.  Having it in

22    your possession, knowingly having it in your possession, is

23    illegal.  So it is not a claim that relies upon publication.

24    Publication is irrelevant.

25         In *Lemon*, for example, although the Snap filter was used

1    to create a post, the court said that it didn't -- at the end

2    of the day the claim didn't rely in any way upon that post

3    being published.  It didn't matter whether it was published.

4        The same is very true here, Your Honor.  And I could offer

5    the Court a hypothetical, which is similar to the *Batzel* case,

6    which is another Ninth Circuit case, an early one.

7        Imagine that somebody sends an e-mail to Meta containing

8    CSAM and says "I'm attaching child pornography that I would

9    like you to post on Meta," and the Meta employee reviews the

10   material, it is unmistakably CSAM, and makes the editorial

11   decision to post it.

12       I take it Meta would say that in that scenario it's

13   immunized because it made an editorial decision about posting

14   third-party content.  And I would say it's --

15           **THE COURT:**  Hold on.  Would you -- I'll let you

16   respond, but would you say that it's --

17           **MR. SCHMIDT:**  I don't know.  That's not the question

18   before the Court.  There's no such allegations in this case.

19   The allegations in this case are not *Dyroff*.

20           **THE COURT:**  So you don't want to respond to the

21   hypothetical.  Keep going.

22           **MR. SCHMIDT:**  It is hypothetical.  It has nothing to

23   do with the pleadings within the complaint.

24           **THE COURT:**  So you don't want to respond, that's fine.

25       Go ahead.

1          **MR. JASINKSI:**  I can understand Mr. Schmidt's

2    reluctance to respond because I think if you look at the *Batzel*

3    case, the argument would have to be that it's immunized under

4    Section 230 because it was provided to Meta for purposes of

5    posting and Meta decided to post it.

6          But the critical difference is the knowing receipt and

7    possession of CSAM is itself a crime that is unlike

8    receiving -- that is unlike receiving defamatory content or

9    other content.  Albeit not protected by the First Amendment,

10   defamatory material is not criminal in nature.

11         **THE COURT:**  Where do you discuss *Batzel* in your

12   filing?

13         **MR. JASINKSI:**  Your Honor, *Batzel* is not in these

14   briefs.  It's a case that was presented to the Court earlier in

15   the earlier round of briefing, but my hypothetical is based on

16   that -- on the scenario in that case, Your Honor.

17         **THE COURT:**  Okay.  What else?

18         **MR. SCHMIDT:**  Your Honor, if I may respond to that.

19         **THE COURT:**  Go ahead.

20         **MR. SCHMIDT:**  Thank you.

21         Not only is *Batzel* not cited, *Dyroff* is not cited.

22   There's no argument based on *Dyroff* in the pleadings -- in the

23   filings nor is there any argument that *Dyroff* allows this type

24   of claim to proceed.  Just this case is different than *Dyroff*,

25   which is why it wasn't cited.  *Lemon* isn't cited.

1    What is cited are a host of cases both from the Ninth

2    Circuit and the *Doe #1* decision and from various district

3    courts around the country that address this direct question or

4    analogous questions, cases both within the Ninth Circuit and

5    outside the Ninth Circuit, and find that these kind of

6    allegations are clearly barred by Section 230.

7        That case law in turn is consistent with broader case law

8    in the Ninth Circuit and outside the Ninth Circuit recognizing

9    that the mere fact that content might be criminal doesn't

10   change the Section 230 analysis because otherwise Section 230

11   would mean nothing.

12       The *Carafano* case from the Ninth Circuit, for example,

13   involved cruel and sadistic identity theft that led to

14   horrifying threats against a woman.  That was covered by

15   Section 230.

16       In *Doe 1* itself quoting *Gonzalez vs. Google*, the Ninth

17   Circuit addressed this point about whether illegal content

18   takes an allegation outside of Section 230, and it did so

19   because, of course, Section 230 itself has an exception to its

20   applicability where there's a criminal charge being brought.

21       The Ninth Circuit said that limitation on Section 230

22   immunity extends only to criminal prosecutions and not to civil

23   actions based on criminal statutes, and there's a host of cases

24   that recognize that proposition.

25       All of those cases are consistent with a baseline purpose

1    of Section 230 and with the formulation of the 230 test the

2    court -- the 230 test that the Ninth Circuit and every other

3    circuit has repeatedly recognized.

4        In terms of the policy underlying Section 230, the Court

5    we think rightly recognized in its earlier 230 ruling that one

6    of the policies, one of the core policies, under Section 230

7    was to not provide an adverse incentive, not to monitor or

8    remove any harmful content from their websites.  That policy is

9    implicated with a claim like this which says "You're not doing

10   enough.  You should be doing more."

11       **THE COURT:**  So you make a number of arguments, and I

12   just want to go through these quickly.

13       First, Meta argues that plaintiffs do not allege that it

14   had actual knowledge that it received or possessed any instance

15   of CSAM.  That's at 22.

16       **MR. SCHMIDT:**  Yes, Your Honor.

17       **THE COURT:**  Do you agree with that?  And if not, what

18   paragraphs in the complaint suggest or allege otherwise?

19       **MR. JASINKSI:**  You're going to have to forgive me,

20   Your Honor, because I thought your question was directed to

21   Mr. Schmidt initially.  So could you repeat it for me?

22       **THE COURT:**  Well, it was addressed to him initially.

23   He confirmed.

24       So plaintiffs do not -- Meta argues plaintiffs do not

25   allege that Meta had actual knowledge that it received or

1   possessed any incidents of CSAM.  If you don't agree with that,

2   what paragraphs allege -- make those allegations?

3        **MR. JASINKSI:**  I don't agree with that.  I'm going to

4   answer the Court's question.  I also don't think that that is

5   relevant to the Section 230 inquiry.

6        But bear with me a moment, and I'll address the

7   paragraphs.

8                         (Pause in proceedings.)

9        **MR. JASINKSI:**  So there are two components, of course.

10  It's possession and knowing possession.  I think that the

11  complaint -- and we incorporate many paragraphs by reference in

12  the New Mexico complaint -- are replete with examples of where

13  Meta has possession of CSAM.  The New Mexico Attorney General's

14  Office had done an extensive investigation into this, and there

15  are a number of paragraphs cited in that complaint that we

16  cross-reference that reflect that.

17       We also allege, for example, I'll direct the Court --

18  these are just paragraphs I have written down -- to paragraphs

19  173 and 418 of our complaint, 167 of the New Mexico complaint.

20       Meta was told by law enforcement victims and press reports

21  about the prevalence of child pornography on its platforms.

22  I'm citing our complaint at 412, New Mexico at 74, New Mexico

23  at 198, our complaint at 416.

24       I mean, Meta even sometimes warns users the content may

25  contain images of child sexual abuse, and that's in New Mexico

```
 1    at 183.

 2         There are a number of allegations in the master complaint.

 3    Now, they are general.  And I know that Meta takes issue with

 4    the fact that we also in our brief point to individual

 5    short-form complaints that tell individual plaintiff stories.

 6    But the reason for doing so, Your Honor, is because there are

 7    general arguments -- of course, 230 is one of them -- that

 8    apply to everybody with respect to this issue.

 9         But ultimately the victim of the CSAM is the one who has

10    the claim, and so there are examples in the short-form

11    complaints of individuals who allege having made specific

12    reports to Meta about the presence of their CSAM on the

13    platform.

14         THE COURT:  So, Mr. Schmidt, I'm not looking at those

15    paragraphs right now and I'm trying to tease this out.

16         You say that there's no allegation of possession or

17    receipt.  If I find differently, how does that affect your

18    argument given that I thought your argument was different?  And

19    that is, that whether or not you possess it, it's still --

20    you're still immune.

21         But is there something -- it's hard to believe that the

22    defendants don't know it's there.  I think there probably are

23    allegations that you know it's there.  I don't know if that

24    means you possess it if it's -- but tease that out.

25         MR. SCHMIDT:  Sure.  I think there's two responses to
```

1    the question Your Honor is asking, and they go to the two

2    separate arguments we're making, Section 230 and then the

3    actual statutory requirement itself.

4         In terms of Section 230, these arguments don't matter.

5    They're exactly what every court has addressed; that when a

6    service only has this material because the user posts it, that

7    is publisher-type activity.  That's the heartland

8    publisher-type activity that is a claim in the words of

9    *Roommate.com* "to exclude material that third parties seek to

10   post online."

11        And Your Honor's earlier decision, that's a claim that

12   seeks to hold the company liable for harmful content not

13   otherwise removed.  So that's the Section 230 part of the

14   answer.

15        In terms of the statute itself, our argument is that the

16   knowledge that's required is not the knowledge that there's

17   some possibility of CSAM across a master service.  If that were

18   enough, that's always a possibility with any service no matter

19   how many efforts they take.  In fact, the recognition of that

20   fact is why Section 230 exists because that's always possible

21   and we don't want to disincentivize efforts to address that.

22        What they need to show is actual knowledge of a specific

23   piece of CSAM in terms of explicit material and child material,

24   and that's not what they plead.  What they plead is "You don't

25   respond to notices.  You must know it's out there somewhere."

1   Not a specific instance.  That's what we think the statutes

2   required.

3        They don't have any contrary case, and that's why we think

4   they've got to turn to the short-form complaints to try to

5   prove this point when those complaints aren't properly before

6   the Court under the procedure Your Honor has set for us, at

7   least as to Meta.

8        **THE COURT:**  Well, you're not bringing the motion as to

9   the short-form complaints.

10       **MR. SCHMIDT:**  That's correct, Your Honor.

11       **THE COURT:**  So the short-form complaints may have

12  these counts because -- is that where we're landing? -- because

13  if, for instance, a plaintiff expressly sent a notice to the

14  defendant that said, "This is here, you need to take it down,"

15  and a defendant refused, is that sufficient under the statute?

16       **MR. SCHMIDT:**  That's --

17       **THE COURT:**  Because now you know and you possess and

18  you still possess because you didn't take it down.

19       **MR. SCHMIDT:**  Yeah, it's clearly not sufficient under

20  Section 230.  That was directly the allegation in *Doe 1 vs.*

21  *Twitter*.  That's been the allegation in other cases.  That's an

22  allegation that's repeatedly made as to all kinds of content

23  under Section 230 where law from this circuit and courts around

24  the country say notice liability doesn't change, Section 230

25  claims of notice don't change Section 230.  It would be a

1  radically different statute if it did.

2      And in terms of notice under the CSAM statute, that, I

3  think, is a question that's not here because that's not pled in

4  the master complaint, which is all we're moving on.

5          **THE COURT:**  Response.

6      **MR. JASINKSI:**  I'm not entirely sure, Your Honor, how

7  Meta proposes that the Court would dismiss these counts from

8  the master complaint but then acknowledge that individuals may

9  bring these claims in the short-form complaints under the same

10 theories.

11     I mean, I agree in principle with Mr. Schmidt that

12 ultimately the question is knowing possession or knowing

13 receipt.  And so the issue of generalized knowledge I think

14 goes to the fact that you can have deliberate ignorance, as we

15 describe in the briefing.  We think that Meta is not allowed to

16 stick its head in the sand.

17     But there are also going to be, and are, there are

18 individual plaintiffs who in their short-form complaints will

19 be able to make the allegation that they specifically notified

20 Meta and that that information was not taken down.

21     But there are examples of that as well particularly in the

22 New Mexico Attorney General's complaint.  I mean, there are

23 examples of where the investigators scraped Meta for CSAM and

24 identified it.

25     So, you know, I don't -- I think the two work in tandem,

1    Your Honor -- the second amended complaint, master complaint,

2    and these short-form complaints -- when you have the types of

3    claims like these, which by their nature are going to require

4    additional individualized facts that only these individual

5    plaintiffs can provide.

6         THE COURT:  So a response.  How is it that I can grant

7    the motion where you acknowledge that individual plaintiffs

8    may, who by the nature of how this process works -- right? --

9    they've adopted the master complaint as the baseline and

10   provided additional allegations to support the claim?  What are

11   you suggesting?

12        MR. SCHMIDT:  Yeah, I think it's very important that I

13   state my position clearly.  I'm not acknowledging that they

14   state a claim.  I'm taking the position based on CMO3, which

15   directed the briefing in these cases, that it's not before the

16   Court.  It's not properly before the Court.

17      We asked early on to brief short-form complaint issues.

18   The plaintiffs opposed that, and in CMO3 the Court directed us

19   to focus on the master complaint, which is what we've done.

20        THE COURT:  Are there any bellwether plaintiffs that

21   have CSAM allegations?

22        MR. JASINKSI:  I'm looking behind me, Your Honor,

23   because I don't know the answer to that question.

24        MR. SCHMIDT:  I don't understand there to be any.  I

25   might be wrong, but I don't -- I don't think there are,

```
 1   Your Honor.
 2          THE COURT:  How many -- how many of the plaintiffs
 3   have additional allegations with respect to CSAM?
 4          MR. SCHMIDT:  31, Your Honor.
 5          THE COURT:  31?
 6          MR. SCHMIDT:  May I just say, when Your Honor has a
 7   moment, one more thing in response to Your Honor's question?
 8          THE COURT:  Sure.
 9          MR. SCHMIDT:  I do think ultimately the Section 230
10   bar will govern the various short-form complaints absent
11   something really unusual that we haven't seen that's not before
12   the Court, and the reason for that is the core argument that's
13   being made to get around Section 230 is the one that the
14   Section 230 test rejects.  The test is where liability is based
15   on excluding material that third parties seek to post online.
16   That's the core of the complaint here, whether drawing on cases
17   from outside the CSAM context or cases applying that principle
18   in the CSAM context holding --
19          THE COURT:  Do you know, Mr. Schmidt, whether the
20   30-odd short-form complaints, are those all brought by a
21   particular law firm?
22          MR. SCHMIDT:  I don't know that they are, Your Honor.
23          THE COURT:  All right.  Ms. Hazam is saying, no, it's
24   not.  Okay.
25                    (Pause in proceedings.)
```

1          **THE COURT:**  Okay.  Well, I'll figure out whether or

2     not I can tease that out at this juncture.

3          Anything else?

4          **MR. JASINKSI:**  I have some responses, if I may,

5     Your Honor.  I don't want to --

6          **THE COURT:**  Go ahead.

7          **MR. JASINKSI:**  First, just to address the *Doe vs.*

8     *Twitter* case, it is a Ninth Circuit decision.  It's unreported.

9     It's nonprecedential.  The lodestar in that case was a TVPRA

10    claim, the trafficking statute.

11         I grant you that, and Mr. Schmidt, that the case says what

12    it says.  We think it's wrong, wrongly decided, not consistent

13    with Ninth Circuit precedent, and not a case that Your Honor

14    should follow.  The analysis in the *MG Freesites* in the

15    Northern District of Alabama we think has it right.  Receipt

16    and possession are alone criminal acts and not shielded by

17    Section 230.  And we think this flows from *Barnes*, and *Barnes*

18    is a case that we've all focused on and Mr. Schmidt's mentioned

19    today.  So let me -- let me talk about that just briefly, if I

20    may.

21         In *Barnes*, the Ninth Circuit explained that courts must

22    examine each claim to determine whether a plaintiff's theory of

23    liability would treat a defendant as a publisher or speaker of

24    third-party content.

25         Section 230 thus bars liability when the duty that the

1   plaintiff alleges the defendant violated derives from the

2   defendant's status or conduct as a publisher or speaker.

3        Here it does not derive from that.  It derives from the

4   receipt and possession.  I understand that the receipt may come

5   by the instantaneous publication of third-party users, but the

6   claim is not based upon the fact of publication.

7        And as I tried to tease out in my hypothetical, the notion

8   that when -- that if Meta were to receive a post for

9   publication via e-mail, it could be liable for knowingly

10  possessing CSAM in the period during which it possessed it

11  before it published it but then have immunity by publishing it,

12  I would submit is absurd and not the intent of the Congress and

13  not what the plain language of the statute or Ninth Circuit

14  precedent requires.

15       **THE COURT:**  It would seem to me that with respect to

16  the 30-plus short-form complaints, that there are overarching

17  principles upon which the lawyers have brought those claims

18  that would allow for briefing on the issue.  That is, each of

19  the individual facts might be different, but that's not really

20  the question.  The question is possession, notification, and

21  other more general principles.  Would you disagree with that

22  approach or with that assessment?

23       I haven't looked at them, but the statute is the

24  statute --

25       **MR. JASINKSI:**  Right.

1          **THE COURT:**  -- and the defendants are one step removed

2    from the content.  So there has to be some kind of analytical

3    thread upon which those claims are being brought.

4          **MR. JASINKSI:**  And that is true, Your Honor.  I would

5    say I -- of course I agree with Mr. Schmidt that the

6    Section 230 issue is a gating issue, and we think we prevail on

7    that.  I'm not sure the extent to which -- unless an

8    individual -- well, if Your Honor concluded that it matters how

9    Meta receives CSAM and if it receives it by a post, that that's

10   barred, then I suppose an individual plaintiff would have to

11   show there was CSAM that arrived some other way.

12        But I do think --

13        **THE COURT:**  Well, isn't that -- isn't that all that I

14   have in front of me?

15        **MR. JASINKSI:**  Yes, I think so.  But, I mean, I guess

16   the point, Your Honor, is that on that issue we think you can

17   conclude Section 230 does not bar the claims as alleged in the

18   second amended complaint.

19        We also believe the second amended complaint alleges

20   knowledge of possession -- possession and knowledge, but grant

21   you that those are largely generalized allegations, and so

22   there will be more specific allegations that each individual

23   plaintiff in their short-form complaints needs to proceed on.

24        **THE COURT:**  Assume for purposes of argument that I

25   don't think that there is sufficient allegations in the

1    complaint.  Part of me is -- you know, part of this is

2    operating blind as to what else is out there.  Do I need to

3    have additional briefing with respect to what the individual --

4    individual plaintiffs are asserting?

5        MR. JASINKSI:  With respect to briefing, Your Honor,

6    we identified five short-form complaints in our brief and

7    they're short.  I don't know that the Court needs more

8    briefing.

9        THE COURT:  Okay.

10        MR. JASINKSI:  If the Court thinks that the master

11    complaint needs more allegations, of course we could, if

12    Your Honor gave us leave, amend and include those examples in

13    it, but I think that would be form over substance.

14        THE COURT:  Mr. Schmidt.

15        MR. SCHMIDT:  I don't think the short-form complaints,

16    which are not before the Court, are going to be able to

17    overcome Section 230.  The only allegations about Meta's,

18    quote, "possession" as alleged of this material is because a

19    third party posted it in Meta's capacity as a publisher.

20    That's it.  Nothing like the hypothetical, which would never

21    happen in real life, nothing in terms of any other form of

22    misconduct, and that's what places this so squarely within

23    Section 230.

24        THE COURT:  Yeah.  I think what -- and I'll go back

25    and look -- what concerned me is your view that there was no

 1    allegation of actual knowledge and that you were somehow

 2    resting on that, or no allegation of possession and that you're

 3    resting on those issues as part of other issues.  Because it

 4    does seem to me that there is knowledge and it does seem to me

 5    that there is possession, but it may be irrelevant.

 6         So the question is:  Can you still get there if I disagree

 7    with your view that you've taken that you had no knowledge?  I

 8    just don't think that that's -- I think that's a bit

 9    disingenuous.

10         **MR. SCHMIDT:**  Yeah, I would say two things on that.

11    Yes is the answer to Your Honor's question, and the yes is

12    Section 230 which addresses allegations of knowledge,

13    allegations of notice, and says that's not enough.

14         And all of Section 230 case law outside of this context

15    dealing with other kinds of problematic content, terrible

16    content, makes the same point.  Knowledge doesn't change or

17    allegations of knowledge, which is what we have here, don't

18    change the Section 230 analysis.  So that's the first answer is

19    yes to Your Honor's question, we don't need to depend on the

20    knowledge point.

21         But in terms of just to be precise in what we're trying to

22    argue on the knowledge point, what the plaintiffs seem to be

23    pleading, as we understand it, and they make this point in

24    their opposition both by invoking circumstantial evidence and

25    by then invoking short-form complaints that aren't before the

```
 1   Court, what they seem to be pleading is that at a certain level

 2   you must know something is out there.

 3        That's not our argument.  Our argument is:  The statute

 4   requires specific knowledge of a specific child of specific

 5   sexual content, and that's not pled in the complaint.  And if

 6   what they're saying were enough, we'd have a whole lot of cases

 7   applying the statute in this type of setting.  We don't have

 8   any.

 9        THE COURT:  But what I'm saying -- and, again, I

10   haven't seen all of the short-form complaints.  What I'm saying

11   is that it could be -- right? -- in a short-form complaint that

12   the defendant was put on notice that there was and, therefore,

13   because they're on notice, they have knowledge of a specific

14   child of specific sexual content on their platform.

15        MR. SCHMIDT:  And that's where my first answer kicks

16   in, the Section 230 answer.  That wouldn't change the 230

17   analysis because the notice is in the capacity as a publisher

18   where the claim is you need to remove something.  That's the

19   heartland of Section 230.  Whether there's notice or not is the

20   Ninth Circuit and I believe every other circuit to address the

21   issue has found.

22        THE COURT:  All right.  I'll go back and look.

23        Let's go ahead and move to Count 16 through 18.

24        MR. SCHMIDT:  Thank you, Your Honor.

25        MR. JASINKSI:  Thank you, Your Honor.
```

1          **MR. SCHMIDT:**  Your Honor, I don't mean to speak for my

2     colleague from Snap, but did Your Honor want to hear the

3     companion Snap arguments on this issue, which do go to

4     short-form complaints?

5          **THE COURT:**  I don't -- well, is there anything else

6     that needs to be said, Mr. Blavin?  I think the issues are the

7     same.

8          **MR. BLAVIN:**  Your Honor, we agree that the issues are

9     the same, that Section 230 would apply here and bar those

10    short-form complaints.

11         And I would just note that the short-form complaints with

12    respect to the CSAM allegations against Snap -- and these are

13    the DHKS and Doe complaints -- are dedicated to describing

14    criminal acts of third parties who generated and published this

15    content on Snapchat in contravention of Snap's own policies,

16    and that the only allegations as to Snap here concern the

17    third-party publication of that content and Snap's alleged

18    failure to remove it.

19         But there's no allegation whatsoever in those short-form

20    complaints that describe any, quote/unquote, "possession"

21    separate and apart from Snap's publication of third-party

22    content.  So I just want to make that clear, that this isn't,

23    you know, an allegation which, you know, someone in the

24    corporate suite was posting or storing CSAM on corporate

25    servers.  It's part and parcel of Snap's role as a publisher of

 1    third-party content; and for the reasons Mr. Schmidt

 2    articulated, Section 230 would equally bar those claims.

 3        I also just want to make one point, Your Honor, that

 4    plaintiffs' counsel noted that the *Doe 1 vs. Twitter* case is

 5    unpublished.  Of course, it's still highly persuasive precedent

 6    that the Court should follow.  It specifically involved a

 7    possession claim.  The Ninth Circuit specifically said that

 8    Section 230 barred, quote, "a viable claim for possession and

 9    distribution of CSAM."

10        So the Court was already addressing this argument that

11    possession could stand apart but, moreover, that case was

12    following a preexisting published Ninth Circuit decision, *Doe*

13    *vs. Reddit*.  It cited that case in its decision.  And *Doe*,

14    again, held that Section 230 applied to claims regarding

15    Reddit's alleged failure to remove CSAM.

16        So for both of those reasons, Your Honor, we think the

17    analysis should apply equally to the short-form complaints

18    asserted against Snap.

19            **THE COURT:**  Okay.  Thank you.

20            **MR. JASINKSI:**  Your Honor, Matthew Jasinski.

21        And I'm going to defer to my cocounsel, Mr. Marsh, on this

22    Snap-specific piece, but I did want to address Mr. Blavin's

23    remark on the previous argument that I had with Mr. Schmidt.

24        We don't think that *Reddit* is an appropriate case to point

25    to here.  The claim addressed on appeal in *Reddit* was

 1    exclusively the plaintiffs' claim under the TVPRA.  That's the

 2    trafficking statute.  That statute does not bar knowing

 3    possession of child pornography but, more broadly, imposes

 4    liability on anybody who knowingly benefits from participation

 5    in a sex-trafficking venture.  So I think that's a much broader

 6    claim, and I don't think *Reddit* provides much guidance.

 7         And I'll ask Mr. Marsh to address Snap specifically.

 8         **MR. MARSH:**  Good afternoon, Your Honor -- good

 9    morning, Your Honor.  James Marsh from the Marsh Law Firm

10    representing the plaintiffs on the Snap short-form complaints.

11         Snap today says that they are not liable because third

12    parties gave them contraband.  We've been hearing that excuse

13    since the Garden of Eden, Your Honor.

14         Let me try to articulate our claims in a way that is --

15         **THE COURT:**  So I've already had a lot of argument on

16    this.  I need you to be specific to Snap.

17         **MR. MARSH:**  Yes.

18         **THE COURT:**  We don't have all day.

19         **MR. MARSH:**  Specifically with Snap, in our papers we

20    address three statutes:  2258A, 2252 and 2252A, and 2255.  This

21    is how those statutes work in combination to result in

22    negligence on behalf of Snap.

23         It is Snap's failure to report under 2258A, which is a

24    mandatory reporting statute that results in their possession of

25    CSAM under Section 2252 and 2252A, that creates their liability

1   under Section 2255.

2       We have specific allegations in our short-form complaints

3   that talk about these statutes and how they work together to

4   create liability on behalf of the defendants.

5       In terms of knowledge, I think it's something that bears

6   discussing.  There's been a lot of talk here about knowledge.

7   Section 2255, which is a statute that I helped create back

8   20 years ago, creates liability based on criminal predicates of

9   which 2252 and 2252A are.  I'm sure Your Honor is very familiar

10  with these in the CSAM cases that come before this court.

11      Those statutes, 2252 and 2250A -- 2252A, are criminal

12  statutes that need to be proven in a civil context by a

13  preponderance of the evidence, not by beyond a reasonable doubt

14  as in the criminal context.

15      If the Court finds possession under those statutes because

16  the defendants have not invoked or exercised their safe harbor

17  under 2258A, which is the reporting statute, then they have

18  liability for possession.

19      What's really important and that we speak about in our

20  papers are the various ways under criminal law for a defendant

21  to have knowledge; and, again, that knowledge being based on a

22  preponderance of the evidence and not by beyond a reasonable

23  doubt.

24      So as we articulate in our papers, willful blindness is a

25  form of actual knowledge.  That's a United States Supreme Court

case, criminal case, and actual knowledge can be proved through
inference from circumstantial evidence.  Again, these are
criminal cases.  That's a Ninth Circuit case, *Gunther*.

Companies cannot escape the reach of federal statutes by
deliberately shielding themselves from clear evidence of
critical facts that are strongly suggested by the
circumstances.  And, in fact, circumstantial evidence can be
used to prove any fact, including facts from which another fact
can be inferred.  That's a Ninth Circuit criminal case.

And we also discuss a specifically CSAM case, that
evidence that a person has searched for CSAM on the internet
and has a computer containing child pornography images can
count as circumstantial evidence.  This includes evidence of
material on a cache.  Knowledge can also be imputed when a
defendant has not viewed CSAM.  That's a criminal case, *United
States vs. Ruiz Castillo*, Ninth Circuit 2020.

Actual possession exists when there's direct physical
control over a thing.  That's United States Supreme Court case
*Henderson vs. United States*.

And constructive possession is established when a person,
the lacking such physical custody, still has power and intent
to exercise control over the object.  That's a Ninth Circuit
criminal case *Vasquez* and an Eleventh Circuit case *Little*.

So when we're talking about whether or not the plaintiffs
have made out an adequate case of knowledge and whether or not

1    the defendants exercised their safe harbor obligations, I think

2    we have more than shown what we need to show under 2255 for a

3    violation of 2252, 2252A, and their failure to report under

4    2258A.

5              **THE COURT:**  Response.

6              **MR. BLAVIN:**  Yes, Your Honor.  In *Doe vs. Twitter*, it

7    involved a 2252A claim just like the claim asserted here

8    involved allegation of notice, knowledge, and possession, just

9    as like those asserted here, and the Ninth Circuit held, again

10   following *Doe vs. Reddit*, that 230 barred that claim.  So the

11   recitation of the various criminal elements were considered and

12   rejected by the Ninth Circuit in applying Section 230.

13        Very briefly, Your Honor, because he mentioned -- the

14   plaintiffs' counsel mentioned 2258A, which is the reporting

15   element of CSAM.  First of all, none of the short-form

16   complaints at issue assert that as a standalone cause of

17   action.  It was in the original master complaint.  It was

18   withdrawn from the master complaint as to Snap.  It has not

19   reasserted in the short-form complaints.

20        But, moreover, plaintiffs could not bring a standalone

21   Section 2258A claim because the statute does not provide for

22   private right of action, and multiple courts have held that.

23   The *Doe vs. Twitter* case, the Northern District held that

24   although Section 2258A establishes a duty to report under

25   criminal law, that section does not purport to establish a

1  private right of action.   The *Mindgeek* case cited in our papers

2  from the Central District of California held the same.

3      But, again, that claim is not even asserted in the

4  short-form complaints applied against Snap.   It's just raised

5  in the briefing.

6      But, Your Honor, at the end of the day, Section 230

7  plainly bars these claims regardless of whether the plaintiff

8  could theoretically raise or sufficiently plead a technical

9  violation of these statutes.

10     But I would just say briefly on the merits, Your Honor, no

11 court has ever recognized a 2252 or 2258A claim based on the

12 allegations which are alleged here, which, again, as to Snap,

13 involve nothing more than its role as a publisher of

14 third-party content.   I mean, the courts have held that

15 Section 230 barred those claims, but even --

16         **THE COURT:**  Slow down, Mr. Blavin.

17     **MR. BLAVIN:**  Yes, Your Honor.   I apologize.

18     But even apart from that, if you look at the actual cases

19 which have held that there is a 2252A claim or 2252 claim,

20 these cases involve situations where the platforms materially

21 contributed to the creation of CSAM.   And these were really

22 porn website operators such as the *MG Freesites* case, the *Doe*

23 *vs. Mindgeek* case.   And these cases involved allegations of

24 creating thumbnails for videos, creating and suggesting tags

25 indicating CSAM for uploaders to use, and instructing users to

```
1   use titles and tags indicating CSAM to attract more users.

2   There's just absolutely zero allegations in the complaint

3   anything approaching that type of activity as to Snapchat.

4           THE COURT:  All right.  Let's move on.

5           MR. MARSH:  May I respond briefly, Your Honor?

6           THE COURT:  No.

7           MR. MARSH:  Thank you, Your Honor.

8           THE COURT:  Counts 15 through 18.

9       You're welcome.

10          MR. TELLIS:  Good morning, Your Honor.  Roland Tellis

11  on behalf of the plaintiffs.

12          MS. LANGNER:  Good morning, Your Honor.  Bailey

13  Langner with King & Spalding for the defendants.

14          THE COURT:  All right.  You may proceed, Ms. Langner.

15          MS. LANGNER:  Thank you, Your Honor.

16      Your Honor, there are a few things I'd like to address

17  today.  First, I'd like to talk about why this Court should

18  address now the claims for loss of consortium, wrongful death,

19  and survival actions.  There was a suggestion in plaintiffs'

20  brief that that -- these rulings should be deferred.

21      I would next like to discuss the derivative nature of

22  these claims and what that means for purposes of this motion.

23      And then, finally, I will turn to several separate

24  independent reasons why loss of consortium claims brought by

25  plaintiffs in certain states in this MDL should be dismissed
```

 1    outright.

 2         There are three reasons why it is necessary and

 3    appropriate to rule on loss of consortium, wrongful death, and

 4    survival actions at this time, and the Court should reject

 5    plaintiffs' request to brief these issues individually later

 6    on.

 7         First, plaintiffs put these issues -- these claims at

 8    issue now by including them in their master complaint.

 9    Plaintiffs could have individually pleaded these three causes

10    of actions in their short-form complaints and left them out of

11    the master complaint, but they chose not to do that.

12         Second, Your Honor, there are a substantial number of

13    cases that include these claims.  By defendants' count, today

14    there are 107 cases involving loss of consortium claims out of

15    268 personal injury cases in the MDL, as an example.  These

16    issues are cross-cutting and should be decided now.

17         And then, finally, Your Honor, deciding these issues now

18    will have the practical effect of streamlining discovery.  As

19    you know, discovery is underway in all of these matters; and of

20    the 12 bellwether --

21         **THE COURT:**  Any of the -- yeah, that's what I was

22    going to ask.  Do any of the bellwethers have these?

23         **MS. LANGNER:**  Yes, Your Honor.  Of the 12 bellwether

24    cases, there are five of loss of consortium claims brought by

25    parents, and four out of five of those cases were brought under

state laws requiring dismissal of the loss of consortium
claims.

There's one plaintiff parent located in Georgia, which
limits loss of consortium to spouses only.  There are two other
plaintiff parents that are in New York and Virginia
respectively, and both of those states have rejected filial
loss of consortium claims that are claims -- that is claims
brought by parents for loss of consortium.

And then, finally, a fourth parent is in Illinois, and
Illinois only permits loss of consortium claims in cases
involving the death of a child, and there is -- there's no
death of a child in that Illinois case.

Dismissing the claims now would mean, for example, that
these plaintiff parents do not have to prove loss of
consortium, they do not have to provide deposition testimony on
that subject; and, understandably, those are often difficult
and sensitive topics.  Dismissing the claims now would avoid
having the parents to testify on those claims.

Taking a step back, Your Honor, a broader point, as we
point out in our brief, loss of consortium, wrongful death, and
survival actions are all derivative claims.  They are
derivative of the decedent or injured plaintiff's personal
injury claims.

If the underlying personal injury claim is dismissed or
limited, any loss of consortium, wrongful death, or survival

action should likewise be dismissed or limited.  None of this

is in dispute, Your Honor, and what we are asking for at this

time is that the Court issue an order to that effect, an order

stating that to the extent a personal injury plaintiff's claims

are dismissed or limited based on Your Honor's prior motion to

dismiss ruling or any order flowing from argument today, that

the derivative claims are likewise dismissed or limited.

**THE COURT:**  Look, these claims seem to be relatively

straightforward with respect to what the states require.  If

there's no claim, there's no claim.  I don't know why I

wouldn't rule.  I certainly think that with respect to any

bellwether, those need to be resolved sooner rather than later.

When I am looking at 50 different states, those are

obviously going to -- it's going to take a long time or perhaps

it just makes -- we just need to make sure that we understand

the state's law.

I was surprised when I saw these claims to begin with.

It's not what I would typically think of as loss of consortium,

but response.

**MR. TELLIS:**  The reason, Your Honor, we thought this

was better dealt with on an individual basis, because there's a

qualitative nature of a loss of consortium claim.  Did the

child die?  Did the child not die?  Were there allegations of

comfort, support services, et cetera, that can't be gleaned

from the master complaint?  That was the reason we suggested

 1    these would be better served on an individual basis.

 2        But we don't dispute or quibble with the notion that these

 3    are derivative in nature and there has to be wrongful conduct.

 4    And if Your Honor says there's no wrongful conduct, they can't

 5    form the basis of the complaint; but that may be a basis to

 6    limit the claims, but not a basis to dismiss them because as

 7    Your Honor has already held, we have viable claims here.

 8        **THE COURT:**  So do you disagree, though, that the

 9    following states do not allow as a matter of law consortium

10    claims brought by nonqualified family members --

11        **MR. TELLIS:**  Right.  So --

12        **THE COURT:**  -- Alabama, California, Connecticut,

13    Delaware, Georgia, Indiana, Kansas, Maine, Maryland, Michigan,

14    Minnesota, Mississippi, Missouri, New Hampshire, New York,

15    North Carolina, Pennsylvania, South Dakota, Virginia, or the

16    District of Columbia?

17        And, by the way, I don't even know if I have plaintiffs

18    from all those states.  So I certainly am not particularly

19    interested in not resolving an actual issue.  If there are no

20    plaintiffs from these states, I don't know why it would be

21    briefed.

22        But do you disagree that those states have specific

23    qualified family members; and if you don't have one, there is

24    no claim?

25        **MR. TELLIS:**  No.  No, we don't -- we don't disagree.

But the point we made was that the confusion in the cases as
you get down into the granular state law is that some states
recognize loss of consortium as a standalone claim, others
don't but permit consortium -- loss of consortium type remedies
to be recovered through other claims, wrongful death,
et cetera.

    Our point was simply we don't -- we don't -- if there's a
state's law that says a parent cannot bring a standalone loss
of consortium claim for the loss of a child, of course we don't
dispute that other than to say that if you dismiss that,
Your Honor, it should be without prejudice to that parent's
ability to recover consortium-like remedies through other
claims, and that's the point we made.

    We put -- we put in an appendix in which we made clear
that consortium-type damages -- loss of companionship, support,
so forth -- is permissible in those states through other causes
of action.  Just if you're going to dismiss the standalone
claim, just make it without prejudice to the ability for those
parents to recover similar remedies through other -- through
other claims.

        **THE COURT:**  If those states -- if you -- if plaintiffs
understand that those states do not allow a standalone claim,
why are they being brought in the first instance forcing a
motion on the point?

        **MR. TELLIS:**  Well, I don't think that -- it's like

1    putting the briefing before the complaint.  I'm not sure --

2         **THE COURT:**  No, it's not.  You have a Rule 11

3    obligation to only bring claims upon which there is a possible

4    legal basis; and if a state says a parent cannot bring a

5    consortium claim for the injuries or death of a child, then I

6    don't understand the Rule 11 argument in the first instance for

7    bringing the claim.

8         **MR. TELLIS:**  Well, I would say this:  I don't think --

9    I'd have to go and look at the states you describe, but let's

10   just take a couple, for example, where there is no specific

11   case saying that a parent can do it but says, for example, a

12   child can bring a claim.

13        There is case law, for example, in Connecticut, where

14   there are extensions of that theory that say simply because

15   case law suggests that only a child can bring a claim when a

16   parent dies, doesn't mean that a parent can't bring one.  And

17   so we've tried to argue in cases where there isn't a state

18   recognition of a filial claim, that there ought to be one.

19        Connecticut is a great example, Your Honor.  There's

20   only -- there's no appellate decision that says a parent can

21   bring one.  There are competing trial court decisions, and the

22   argument is:  Well, the basis for why a child can bring one,

23   that is, that a parent provides support, doesn't exist when a

24   child passes away.  Children don't typically provide support,

25   particularly if they're like mine, or services.

1    But those cases recognize that consortium is about more

2 than just services.  It's about the sentimental, emotional

3 relationship, loss of companionship, loss of comfort, and that

4 emotional connection doesn't run one way from just a parent to

5 a child.  It runs from a child to a parent as well.  So there's

6 no good reason.  There's no public policy reason why those

7 claims should be prohibited.

8    THE COURT:  So in California, for instance, the four

9 elements of a cause of action for loss of consortium include a

10 valid and lawful marriage between a plaintiff and the person

11 injured.  That's California law.  Is there any California

12 plaintiff who is trying to assert this on behalf of a child

13 when the law says you can't meet the first element?

14    MR. TELLIS:  Yeah, I don't know if there is a

15 California plaintiff who has filed a short-form complaint

16 alleging a loss of consortium.  Certainly the master complaint

17 brings it on behalf of all plaintiffs, but --

18    THE COURT:  That is my point --

19    MR. TELLIS:  I understand.

20    THE COURT:  -- that if I've got California law that

21 says, "Hey, the first element is you've got to have a

22 marriage," I don't understand why I have to be doing the work

23 to analyze California short-form complaints or what the Rule 11

24 basis would be for those plaintiffs to bring it in the first

25 instance.

1         Now, it could be that there are other states for whom this

2    is, you know, a much broader-based approach, and for those I

3    can look at that.

4         **MR. TELLIS:**  But, Your Honor, we haven't asked you to

5    go -- we put in an appendix that says "These states don't

6    recognize a standalone claim."  If Your Honor is going to

7    dismiss those, we don't take issue with it other than it should

8    be without prejudice.

9         We haven't tried to have Your Honor work through every

10   state where there's clearly a prohibition.  We've put an

11   appendix that acknowledges those states in which a standalone

12   claim doesn't exist.  We've only asked, though, that in those

13   states we've indicated examples where through an unlabeled

14   personal injury claim, it's not clear whether, for example, the

15   plaintiff was alleging a loss of consortium claim or something

16   else.  Loss of consortium type damages were awarded, and so our

17   position was simply do it without prejudice.

18        **THE COURT:**  Any response?

19        **MS. LANGNER:**  Yes, Your Honor.

20        And to address your question, there is at least one

21   California plaintiff.  My office looked into this last night,

22   and we did find one plaintiff.

23        My response to my colleague's other points, Your Honor,

24   we're not asking for -- the relief that he brings up is not

25   what we're asking for.  These plaintiffs have brought

1   standalone loss of consortium claims, and we are asking that if

2   a state law prohibits loss of consortium claims by parents,

3   that those standalone claims be dismissed.

4         **THE COURT:**  All right.

5         **MS. LANGNER:**  And if I may, Your Honor, address the

6   decision that was referenced in Connecticut.  That seems to be

7   one of the only states that the plaintiffs dispute.

8         The plaintiff cited to a case *Perez vs. Stanford*, which

9   was a 2021 Connecticut Superior Court opinion, for the

10  proposition that loss of filial consortium was permitted in a

11  case involving catastrophic injuries to a minor child.

12        We have two other cases that we've cited, Your Honor, more

13  recent decisions, where the courts came to the opposite

14  conclusion.

15        **THE COURT:**  Well, are they equal -- are they all Court

16  of Appeal?  Is one controlling and the other not?

17        **MS. LANGNER:**  Your Honor, all three of them are trial

18  court -- Superior Court cases.

19        But what I was going to say is, the case that plaintiffs

20  cite to you, *Perez vs. Stanford*, in reaching its decision, the

21  *Perez* court relied on the *Campos vs. Coleman* decision, which is

22  a Connecticut Supreme Court case that recognized the reverse of

23  what we're talking about here, which is a cause of action by a

24  minor child for loss of parental consortium.

25        And that reasoning of the *Perez* case and the underlying

1   *Campos* case was rejected by the two cases that defendants cite,

2   *Stewart* and *Menefee*, and they -- both of those cases find --

3   found the reasoning and reliance on *Campos* flawed.  And the

4   flaw in the reasoning is this, Your Honor:  In *Campos* the case

5   that permitted the minor child to bring a parental loss of

6   consortium claim, the court expressly limited that right to

7   minor children due to the special obligations and legal duties

8   that flow from parents to their minor children.

9        The court acknowledged that love and affection continues

10   between parents and their adult children, but expressly

11   precluded adult children from bringing loss of consortium

12   claims.

13        The *Campos* court stated (as read):

14           "Adults do not have the same legal entitlements with

15       respect to their parents as minor children and are

16       presumptively autonomous and responsible for their own

17       well being."

18        The *Campos* court also limited the damages for minor

19   plaintiffs to the date of injury until the date that the minor

20   child reached the age of majority, again indicating that this

21   is -- this is just an issue for minor children.

22        And recognizing this flawed argument, the court in the

23   cases that defendants cite, *Stewart*, stated that it would be

24   incongruous to conclude that a presumptively autonomous adult

25   child may recover for loss of consortium based on injuries to

1    her child when a presumptively autonomous adult child cannot

2    recover for loss of consortium arising from injuries to the

3    parent.

4        The same legal obligations and entitlements identified in

5    *Campos*, the claim -- the case underlying the case cited by

6    plaintiffs to support a claim for loss of parental consortium

7    do not exist here.

8        One other thing, Your Honor.  Connecticut courts have

9    found that permitting third-party liability is the exception

10   rather than the rule; and as such, absent clear appellate

11   authority permitting filial consortium claims, and there is

12   none in Connecticut, this Court should decline to extend loss

13   of consortium to Connecticut plaintiffs here.

14       One final note, Your Honor.  There were statements that

15   are instructive on this point as well.  Defendants cite to

16   Restatement Second of Torts, Section 693, which permit spousal

17   loss of consortium claims.  There are a number of Connecticut

18   courts that follow and have relied on Restatement Second 693,

19   again, as it relates to spousal loss of consortium claims.

20       The corollary Restatement that relates to filial loss of

21   consortium claims, that's Section 703, there are no Connecticut

22   cases that defendants are aware of that cite to or rely on that

23   provision.

24       So, in short, Your Honor, there's no authority indicating

25   that a Connecticut court, Connecticut Appellate Court, would

1    permit a filial loss of consortium claim; and there is

2    authority to the contrary, the *Campos* decision, that suggests

3    that adults cannot recover loss of consortium type claims for

4    family relationships, again setting aside spouses.

5             **THE COURT:** Okay. Thank you.

6             **MR. TELLIS:** Your Honor, if you prefer -- I hesitate

7    to say it, but I will. If you'd like us to take a second look

8    and dismiss before you rule any short-form claims or claims by

9    plaintiffs in states that clearly don't recognize a standalone

10   claim for loss of consortium, we're happy to do that.

11            **THE COURT:** Less work is always good, Mr. Tellis, when

12   one's plate is overflowing.

13            **MR. TELLIS:** Understood.

14            **MS. LANGNER:** Your Honor, may I make one final point?

15   The plaintiffs concede in their brief that claims for

16   medical aid, medical treatment, and medications are not

17   recoverable and should be dismissed. The fact that they might

18   be able to recover these expenses under some other theory of

19   liability, like wrongful death, is not persuasive -- not a

20   reason why they should be permitted to seek those claims under

21   a loss of consortium claim; and we would, therefore, request

22   that the Court limit plaintiffs' claims accordingly.

23            **THE COURT:** So I'm not sure I understood that to be

24   plaintiffs' position.

25            **MR. TELLIS:** This is part and parcel of the same

1    argument, which is if we -- in the loss of consortium claim, if

2    we ask for medical costs as a recovery, it shouldn't be

3    permitted simply because it's put into the loss of consortium

4    claim.  And, therefore, if there's no loss of consortium claim,

5    then everything that's pled in there should go, and our

6    position is you are entitled to recover it through other

7    claims.  So if you're going to dismiss the loss of consortium

8    claim and has the medical costs in it, it shouldn't preclude a

9    plaintiff from recovering it elsewhere.

10          **THE COURT:**  I think that that's pretty obvious.  I'm

11   not looking at damages in every single claim that is brought.

12          **MR. TELLIS:**  Understood.

13          **THE COURT:**  So that's not in front of me.  And to the

14   extent there is any misunderstanding about it, I'll just

15   footnote it.

16      Okay.

17          **MR. TELLIS:**  Thank you, Your Honor.

18          **MS. LANGNER:**  Thank you, Your Honor.

19          **THE COURT:**  Anything else?

20          **MR. SCHMIDT:**  Yes, Your Honor.  Paul Schmidt again for

21   Meta.

22      May I make one factual point in response to a question

23   Your Honor asked?

24          **THE COURT:**  Sure.

25          **MR. SCHMIDT:**  On the question about short-form

1    complaints alleging CSAM in the bellwether pool, we have

2    checked.  We saw one where the box was checked for CSAM but

3    where there were no allegations beyond the second amended

4    complaint.

5        **THE COURT:**  Okay.  I understand there have been a

6    couple of new defendants; is that right?  Or complaints brought

7    against a couple of new defendants, Roblox and Discord.  Where

8    are we on that?  I don't think I have -- I take it there's

9    no -- yeah, where are we?

10       **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

11       I do not have any statistics with regards to that, but I

12   believe that we have present today counsel who may have named

13   one or more of those defendants in complaints.  If Mr. Bergman

14   could approach the podium to speak to that.

15       **THE COURT:**  Just let me know.  Have they been served?

16   Yes or no.

17       **MR. BERGMAN:**  Yes, Your Honor.

18       **THE COURT:**  And when is the response from them due, or

19   have you -- all right.  Come on forward.

20       Do I have anybody in the audience from Roblox or Discord?

21   No?  On the defense side?

22                        (No response.)

23       **THE COURT:**  Okay.  Have you talked to counsel for

24   those defendants?

25       **MR. BERGMAN:**  We have not as of yet, Your Honor.

1          **THE COURT:**  All right.  Well, make sure you talk to

2     them before the next CMC so we know how we're going to fold

3     them in, if at all.

4          **MR. BERGMAN:**  Very good, Your Honor.  We will.  Thank

5     you.

6          **THE COURT:**  All right.  Anything else from the

7     plaintiffs?

8          **MS. HAZAM:**  Nothing further, Your Honor.

9          **THE COURT:**  Anything else from the defendants?

10          **MR. SCHMIDT:**  Nothing further, Your Honor.

11          **THE COURT:**  All right.  Well, then, since I am not

12     going to see you until July 12th, I wish you-all a Happy Fourth

13     of July.  I've spent a lot of time talking to a lot of

14     prospective jurors about Fourth of July and our Constitution

15     and the right to a trial by jury and how important it is that

16     they spend four months with me.

17          I'll say this:  If your clients do not pay their employees

18     for jury service, they should, because I spend a lot of time on

19     your cases and many judges spend a lot of time on your cases

20     and once in a while -- and last time I did one of these was

21     2016, it doesn't happen all the time -- we have a hard time

22     finding jurors who aren't going to lose their home or, you

23     know, can't make ends meet if they serve.  And there are a

24     number of corporate partners and institutions who do allow

25     their employees to serve in those long-cause actions, and we

1   appreciate it.

2        So I would just encourage you-all to think about that

3   because it really does matter for democracy and for right to a

4   trial by jury.  Defendants, as I tell them, you know, I can't

5   just send them to prison.  They have a right to have the

6   Government prove that they're guilty of what the Government

7   says they're guilty of, but I can't afford people those rights

8   without having jurors.  So I thank the jurors and I note those

9   companies who are paying their employees to sit there and to do

10  their duty.

11       So, anyway, with that, Happy Fourth of July and we'll see

12  you in about a month.

13            **THE CLERK:**  Court is adjourned.

14                (Proceedings adjourned at 11:23 a.m.)

15                         ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, June 24, 2024

8

9

10

11    _____

12           Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25