Pages 1 - 115

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA          )
ADOLESCENT ADDICTION/PERSONAL  )
INJURY PRODUCTS LIABILITY      )
LITIGATION                     )
                               )   NO. 22-MD-03047 YGR (PHK)
                               )
_____)

San Francisco, California
Thursday, August 8, 2024

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

                    SEEGER WEISS LLP
                    55 Challenger Road, Floor 6
                    Ridgefield Park, New Jersey 07660
           BY:  **AUDREY C. SIEGEL, ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN
                     & BERNSTEIN LLP
                    275 Battery Street, 29th Floor
.                   San Francisco, California 94111
           BY:  **LEXI J. HAZAM, ATTORNEY AT LAW**
                **PATRICK I. ANDREWS, ATTORNEY AT LAW**

                    MOTLEY RICE LLC
                    401 9th Street NW, Suite 630
                    Washington, D.C. 20004
           BY:  **PREVIN WARREN, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1 | **APPEARANCES**:   (CONTINUED)

2 | For Plaintiffs:

3 |                       MOTLEY RICE LLC
                          28 Bridgeside Boulevard
                          Mount Pleasant, South Carolina 29464
4 |              BY:  **JESSICA L. CARROLL, ATTORNEY AT LAW**

5 |                       MOTLEY RICE LLC
                          One Corporate Center
6 |                       20 Church Street, 17th Floor
                          Hartford, Connecticut  06103
7 |              BY:  **JESSICA C. COLOMBO, ATTORNEY AT LAW**

8 |                       GIBBS LAW GROUP LLP
                          1111 Broadway, Suite 2100
9 |                       Oakland, California 94607
              BY:  **ANDRE MICHEL MURA, ATTORNEY AT LAW**
10 |

11 | Federal/State Liaison Counsel:
                          BEASLEY ALLEN LAW FIRM
12 |                       218 Commerce Street
                          Montgomery, Alabama 36104
13 |              BY:  **JOSEPH G. VAN ZANDT, ATTORNEY AT LAW**

14 | For Plaintiff St. Charles Parish School Board:
                          RON AUSTIN LAW
15 |                       400 MANHATTAN BOULEVARD
                          HARVEY, LOUISIANA 70058
16 |              BY:  **RON A. AUSTIN, ATTORNEY AT LAW**

17 | For Plaintiff State of California:
                          CALIFORNIA DEPARTMENT OF JUSTICE
18 |                       455 Golden Gate Avenue - 11th Floor
                          San Francisco, California 94102
19 |              BY:  **MEGAN M. O'NEILL**
                     **DEPUTY ATTORNEY GENERAL**
20 |                  **EMILY C. KALANITHI**
                     **SUPERVISING DEPUTY ATTORNEY GENERAL**
21 |
                          CALIFORNIA DEPARTMENT OF JUSTICE
22 |                       OFFICE OF THE ATTORNEY GENERAL
                          1515 Clay Street, Suite 2000
23 |                       Oakland, California 94612
              BY:  **JOSHUA OLSZEWSKI-JUBELIRER**
24 |                  **DEPUTY ATTORNEY GENERAL**

25 |          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiff State of New Jersey:
                          NEW JERSEY OFFICE OF
3                            THE ATTORNEY GENERAL
                          New Jersey Division of Law
4                         Data Privacy & Cybersecurity
                          124 Halsey Street, Fifth Floor
5                         Newark, New Jersey 07101
                     BY:  **VERNA PRADAXAY, DEPUTY ATTORNEY GENERAL**
6

7   For Plaintiff Commonwealth of Kentucky:
                          KENTUCKY OFFICE OF THE
8                            ATTORNEY GENERAL
                          Office of Consumer Protection
9                         1024 Capital Center Drive, Suite 200
                          Frankfort, Kentucky 40601
10                   BY:  **J. CHRISTIAN LEWIS**
                          **ASSISTANT ATTORNEY GENERAL**
11

12  For Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.;
    Facebook Holdings, LLC; Facebook Operations, LLC; Facebook
13  Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC;
    Siculus, Inc.; and Mark Elliot Zuckerberg:
14                        COVINGTON & BURLING LLP
                          1999 Avenue of the Stars, Suite 3500
15                        Los Angeles, California 90025
                     BY:  **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**
16
                          COVINGTON & BURLING LLP
17                        620 Eighth Ave
                          New York, New York 10018
18                   BY:  **GREGORY L. HALPERIN, ATTORNEY AT LAW**

19                        COVINGTON & BURLING LLP
                          Sales Force Tower
20                        415 Mission Street, Suite 5400
                          San Francisco, California 94105
21                   BY:  **ISAAC D. CHAPUT, ATTORNEY AT LAW**
                          **E. KATE PATCHEN, ATTORNEY AT LAW**
22                        COVINGTON & BURLING LLP
                          One City Center
23                        850 Tenth Street, NW
                          Washington, D.C.  20001
24                   BY:  **MICHAEL X. IMBROSCIO, ATTORNEY AT LAW**

25          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1   **APPEARANCES**:   (CONTINUED)

2   For Defendant Snap, Inc.:
                        MUNGER, TOLLES & OLSON LLP
3                       560 Mission Street, 27th Floor
                        San Francisco, California  94105
4                  BY:  **JONATHAN H. BLAVIN, ATTORNEY AT LAW**

5                       MUNGER, TOLLES & OLSON LLP
                        355 South Grand Avenue, 35th Floor
6                       Los Angeles, California 90071
                   BY:  **ROWLEY J. RICE, ATTORNEY AT LAW**

7

8   For Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd.,
    TikTok Ltd., and TikTok, LLC:
9                       FAEGRE DRINKER BIDDLE & REATH LLP
                        300 North Meridian Street, Suite 2500
10                      Indianapolis, Indiana 46204
                   BY:  **ANDREA PIERSON, ATTORNEY AT LAW**

11

                        KING & SPALDING LLP
12                      1180 Peachtree Street
                        Atlanta, Georgia 30309
13                 BY:  **GEOFFREY DRAKE, ATTORNEY AT LAW**

14

15  For Defendants YouTube, LLC and Google LLC:
                        WILSON, SONSINI, GOODRICH & ROSATI
16                      650 Page Mill Road
                        Palo Alto, California 94304
17                 BY:  **ANDREW KRAMER, ATTORNEY AT LAW**

18                      MORGAN, LEWIS AND BOCKIUS, LLP
                        300 Grand Avenue, 22nd Floor
19                      Los Angeles, California 90071
                   BY:  **YARDENA R. ZWANG-WEISSMAN**
20                      **ATTORNEY AT LAW**

21

22

23

24

25

**Thursday - August 8, 2024**                                          **1:12 p.m.**

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Court is now in session.  The Honorable Peter H. Kang presiding.

Now calling 22-md-3047, In Re:  Social Media Adolescent Addiction and Personal Injury Products Liability Litigation.

Counsel, when speaking, please approach the podium and state your appearance for the record and court reporter.

(Pause in proceedings.)

**THE COURT:**  All right.  Good afternoon.

**ALL:**  Good afternoon.

**THE COURT:**  I apologize for the problem with my laptop.

Okay.  As I try to remember to do, I'm going to give you the updated list of *pro bono* cases that need volunteer counsel.

For those of you who were not here the last time I announced these, the Court has a robust *pro bono* program, and there are always good cases that need good counsel, and I've decided to take advantage of so many of you in the room here to try to help the program out.

There's one case in front of Judge Illston involving Napa Hospital where I think it's a civil rights claim that needs *pro bono* help.

There is -- I think there are two prisoner civil rights

1    cases that still need help.  One in front of Chief Magistrate

2    Judge Donna Ryu.  It's a civil rights claim involving

3    Contra Costa's Detention Center.

4        And then there's another case in front of

5    Judge Gonzalez Rogers which involves the California

6    Rehabilitation Center in Norco, California, again, a civil

7    rights claim.

8        So I think I've said this before, but at the risk of

9    repeating myself, when I was a young lawyer, I got some of my

10   best first in-court experience doing *pro bono* cases.  These are

11   great opportunities for young lawyers, even senior lawyers, who

12   want to get more opportunities for stand up -- for standing up

13   in court and maybe taking things to trial.

14       So please, fedpro -- f-e-d-p-r-o -- @sfbar.org is their

15   email address.  You can also look them up on the S.F. Bar

16   Association's website.  They are always looking for good

17   counsel, and certainly, the Court appreciates anything.  So

18   tell folks in your firms, tell your friends, tell people in

19   your bar associations about the cases.

20       Okay.  So I'm going to -- to try to encourage more of

21   this, I'm going to give a little bit of praise to the parties

22   in the plaintiffs' TikTok defendants' dispute who emailed us

23   last night to say that you'd resolved the -- at least the

24   reportedly unripe dispute, but resolved the dispute involving

25   RFPs 198, 200 to 205.  So congratulations to you-all.

1    The Court appreciates that, and that's exactly the kind of work

2    that I know you're doing, you're working on, but I want to

3    encourage that by giving those folks a shout-out at the

4    beginning.

5        All right.  So shall we turn to the ripe disputes in the

6    DMC statement?  Unless there's something preliminary somebody

7    wants to talk about.

8        **MS. HAZAM:**  Good afternoon, Your Honor.  Lexi Hazam

9    for plaintiffs.

10       **THE COURT:**  Good afternoon.

11       **MR. IMBROSCIO:**  Good afternoon, Your Honor.  Michael

12   Imbroscio from Covington & Burling on behalf of Meta.

13       **THE COURT:**  Good afternoon.

14   Okay.  So --

15       **MR. IMBROSCIO:**  It's a preliminary matter, actually.

16       **THE COURT:**  Oh, sure.  Go.

17       **MS. HAZAM:**  If we may, Your Honor.

18       **THE COURT:**  Yes.

19       **MS. HAZAM:**  Before you get to the ripe disputes, one

20   of which we would ask the Court to allow us more time on

21   because we are making progress.  We can get to that in a

22   moment.

23       But, first, we wanted to advise the Court that the parties

24   are in discussions regarding a possible proposed joint

25   extension of the schedule.

1          **THE COURT:**  Okay.

2          **MS. HAZAM:**  So we are in discussions about that, and

3  we do not have anything further that we can report to the Court

4  at this moment.

5          **THE COURT:**  Okay.

6          **MS. HAZAM:**  But we are continuing those discussions,

7  and we will report to the Court on them as soon as we are able.

8          And we wanted to alert the Court to that, particularly

9  given that the schedule otherwise has some upcoming deadlines

10  that we would be proposing to move that would take place

11  shortly after the next status conference, including the

12  deadline for substantial completion of production of documents.

13          **THE COURT:**  Is this an overall case schedule or just

14  the discovery schedule?

15          **MS. HAZAM:**  Overall, including aspects of discovery.

16          **THE COURT:**  Okay.  I believe Judge Gonzalez Rogers

17  took her CMC off calendar this week.

18          **MS. HAZAM:**  She did.

19          **THE COURT:**  This month, or whatever it is.

20          **MS. HAZAM:**  We would have reported, I think, the same

21  to her tomorrow and have not been able to, but we will explain

22  if we are able to make a written submission.

23          **THE COURT:**  I glanced at your CMC statement.  Did you

24  mention it in there?

25          **MS. HAZAM:**  We did not because it was not yet

1    something we could mention.

2        THE COURT:  Well, she might not have canceled it if

3    you'd put that in there, but I can't speak for her.  But I

4    certainly -- I'm certainly interested in it; so, yes, keep me

5    informed --

6        MR. IMBROSCIO:  We will.

7        THE COURT:  -- as to all that.

8        And, obviously, if the parties can agree on dates, which

9    I'm sure you will, then, you know, unless I see something

10   really unusual in that, I don't think I'll have much trouble

11   working with those new dates with you-all.  So let me know.

12       MR. IMBROSCIO:  Thank you, Your Honor.

13       MS. HAZAM:  Thank you, Your Honor.

14       THE COURT:  In the meantime, because of the way

15   things -- because she didn't have her CMC today so she

16   didn't -- you weren't able to get any indication from her on

17   whether she was going to allow dates to slip or not.  You said

18   substantial completion.  We are starting to come up on some

19   interim deadlines.

20       I'm going to assume you're all going to be able to work

21   out individual extensions of things like substantial completion

22   and working around that while she works on formally approving

23   any changes of dates.  But if you need help on that, you can't

24   come -- raise it with me because, obviously, if the whole

25   schedule is going to change and it's just a matter of just the

1  procedure of getting it formalized and you're bumping up

2  against another deadline, I don't want either side or any party

3  to feel like they can be jammed because of that.  All right?

4  So be aware that I'm sensitive to that.

5          **MR. IMBROSCIO:**  Thank you, Your Honor.

6          **MS. HAZAM:**  Understood, Your Honor.  Thank you.

7          **THE COURT:**  Okay.

8      All right.  Who's talking about discovery limits?

9          **MS. PIERSON:**  Your Honor, just one other preliminary

10  matter.

11      Andrea Pierson, Faegre Drinker, on behalf of the TikTok

12  defendants.

13      Just one other preliminary matter.  Within the status

14  section of the report, we addressed the device imaging

15  production --

16          **THE COURT:**  Yeah.

17          **MS. PIERSON:**  -- issue, and we've been filing each

18  week a series of joint status reports on where we are on that.

19      We thought it might be helpful to just advise the Court of

20  the latest information that we have with respect to that --

21          **THE COURT:**  Okay.

22          **MS. PIERSON:**  -- and then also perhaps to get some

23  direction from the Court on next steps.

24          **THE COURT:**  Okay.

25          **MS. PIERSON:**  We have been conferring and making some

progress, as you can see from the length of the reports that
we've been providing; but at a very high level, as you -- as we
know today or as the facts stand today, we know that the
bellwether plaintiffs used at least 93 different devices to
access the defendants' platforms, 38 of which are still within
the possession's [sic] custody.

We've been informed by the plaintiffs as recently as last
night that of the 38 devices identified as being in plaintiffs'
possession, thus far only ten devices from three plaintiffs
have undergone full, complete forensic imaging.

The parties have submitted three status reports since July
the 11th, and we have another status report due to you today.
Perhaps this report might take the place of that, or we're
happy to --

**THE COURT:**  I actually read that statement in the DMC
statement to mean you were just going to give me the report
verbally, not that you were going to file a separate --

**MS. PIERSON:**  That's perfect.

**THE COURT:**  It didn't seem logical for you to write
something if you were just going to tell me anyway.

**MS. PIERSON:**  That's perfect.  So that's the report on
the statistics.

You know, I will say from the defendants' perspective, we
feel like very little progress has been made since we met with
you on July the 11th, and we certainly think we need to be

1    moving faster with respect to this issue.  Some --

2         **THE COURT:**  So on that point, I didn't drill down into

3    it at the last DMC, and I know you weren't the one speaking to

4    this; but certainly, the impression I got was that all the

5    devices in the -- in the plaintiffs' side's possession and

6    custody had been or were, you know, substantially complete to

7    being imaged.  There was no -- nobody had told me that only ten

8    of 38 by that point had been imaged; right?

9         And part of the argument made to me at the time was that

10   to avoid complete inspection and handover of the devices, you

11   were prepared with the images to allow -- right?  That was kind

12   of the premise on which I acted.

13        So the question then is:  What's taking so long if you've

14   got 38 in possession?

15        **MR. ANDREWS:**  Yeah, Your Honor.  Patrick Andrews,

16   Lieff Cabraser, for the plaintiffs.

17        So my understanding is -- and I can't speak for my

18   colleague who was here at the last conference presenting that

19   issue, but I believe she was referring to the logical imaging

20   that had been done before, and the imaging -- many more than

21   ten devices have undergone that level of imaging.

22        **THE COURT:**  So let me stop you there because I didn't

23   drill down.  How many have been logically imaged?

24        **MR. ANDREWS:**  My understanding is there's -- for every

25   bellwether plaintiff, they have at least one device that has

1    been logically imaged, so -- and then, additionally, more

2    devices.  So my understanding is around 15 devices have been

3    imaged.  Then --

4            **THE COURT:**  Okay.  How much more time are you going to

5    need to finish imaging, just logically imaging the remaining --

6    what? -- 13 -- 23 devices?  I want to do the math right.

7            **MS. PIERSON:**  Just to clarify, Judge, a logical image

8    is not a full bit-for-bit image, which plaintiffs had agreed to

9    provide to us, and we require a full forensic image.

10           **THE COURT:**  Okay.  So is logical imaging quick -- done

11   more quickly than a full bit-for-bit image?

12           **MR. ANDREWS:**  Yes, it is done more quickly.  And

13   that's what we initially did for our bellwether plaintiffs'

14   devices.

15           **THE COURT:**  But not all 38?

16           **MR. ANDREWS:**  But not all 38.  So we did that for

17   their current devices.

18       But the full forensic imaging requires a much more

19   in-depth process that our current vendor was not able to

20   fulfill for our bellwether clients -- our bellwether clients.

21       So we had to -- one thing that we've done since that

22   hearing, Your Honor, is we've identified and hired a new vendor

23   that can perform this level of forensic imaging.  We've hired

24   him to perform that imaging for all of the bellwether devices.

25           We've worked with him on a process for collecting all of

1   the devices across the 12 bellwether plaintiffs, which includes

2   obtaining replacement cell phones for plaintiffs that are

3   having their current devices imaged.  Because without

4   replacement devices, they would have to be without their phones

5   for potentially weeks, and it's the type of thing that they

6   need to have on hand in case they have an emergency and need to

7   contact their parents.

8       So there are a lot of, like --

9       **THE COURT:**  One person talk at a time.  All right?

10      The logistics of getting this done, you can talk about

11  that, but I'm really more concerned about the time.  How

12  long -- when are you going to be done?  What's taking so long?

13      **MR. ANDREWS:**  So in terms of how much longer we need,

14  we need probably until the end of this month to complete it in

15  total, but within --

16      **THE COURT:**  For all 38?

17      **MR. ANDREWS:**  For not all 38.  We've identified 31

18  relevant devices.  So 38 devices have been identified as being

19  within the possession, custody, and control.  There have been

20  31 relevant devices that we intend on imaging -- doing the full

21  forensic imaging on.

22      **THE COURT:**  When are those going to get done?

23      **MR. ANDREWS:**  With -- before the end of the month.

24      **THE COURT:**  That's a three-week span.  So when you say

25  "before the end of the month," you mean next week? tomorrow?

```
 1          MR. ANDREWS:  Well, many of them will be imaged within
 2    the next week.
 3          THE COURT:  How many?
 4          MR. ANDREWS:  I don't have a figure on hand, but at
 5    least five will be imaged by the end of next week.
 6          THE COURT:  So you're doing five a week.  Is that
 7    what --
 8          MR. ANDREWS:  Well, it depends on the bellwether
 9    plaintiff, Your Honor, because everyone is at a different stage
10    in obtaining a replacement device and shipping their current
11    devices to the vendor to get them imaged.
12       So right now, we're at the place -- we're at a point where
13    I can confidently say at least five will be imaged by the end
14    of next week because they're in the process of being sent to
15    the vendor for imaging.
16          THE COURT:  How many have completely been imaged?
17          MR. ANDREWS:  Ten.
18          THE COURT:  Completely?
19          MR. ANDREWS:  Completely.
20          THE COURT:  And we all understand what "completely
21    imaged" means; right?
22          MS. PIERSON:  We do, Your Honor.  It's --
23          THE COURT:  And that satisfies the defendants?
24          MS. PIERSON:  It does.  It's a full file forensic
25    image.
```

1          THE COURT:  Have you started running searches on those

2    ten?

3          MR. ANDREWS:  We have not begun searches on the full

4    forensic imaging yet, but we have run searches on the logical

5    images and began productions on those.

6          THE COURT:  That's 15.  So that leaves us another 16

7    to get done between -- in the -- so you can get 16 done by the

8    end of August, is what you're telling me, the other 16?

9          MR. ANDREWS:  I believe so, Your Honor; and if for

10   some reason we run into a snag, we can update the defendants

11   and work with them on that.  But I don't have any reason to

12   think that we can't get the remainder of them done by the end

13   of this month.

14         THE COURT:  Is there any reason why you can't be using

15   a second vendor to, like, double-track this?

16         MR. ANDREWS:  There are only so many vendors that can

17   do this level of imaging, and coordinating with one vendor is

18   ideal because we have a lot of chain-of-custody issues and

19   things that we want to make sure that we're keeping everything

20   consistent.

21         MS. PIERSON:  Judge, I apologize for interrupting, but

22   I'm told that on the Zoom, they're not able to hear your

23   microphone.

24         THE COURT:  My microphone?

25         MS. PIERSON:  Yes.  Apologies.

 1          **THE CLERK:**  Just his?

 2          **MS. PIERSON:**  Just his.

 3          **THE COURT:**  Wow.  It's definitely on.  Why don't you

 4    just turn it up.

 5          What I say is less important than what they say anyway.

 6                          (Laughter.)

 7          **THE COURT:**  Okay.  Well, okay.  So when are you going

 8    to start rolling productions of the complete searches on the

 9    ten completed ones?

10          **MR. ANDREWS:**  So the other issue, Your Honor, is that

11    there is a real CSAM concern because these are all teenagers

12    sending their primary devices in to our vendor.  There are a

13    lot of issues in terms of wanting to make sure that we do a

14    full check for and the vendor is confident that there is no

15    CSAM on any of these devices.

16          So that is the first step, once they get imaged, is making

17    sure that that doesn't exist.

18          But -- and the ones that have been imaged so far, we have

19    run into those issues.  So we're working through a protocol of

20    handling those issues and then quickly producing documents.  I

21    can't give you a date by which those issues will be resolved,

22    but we're working as quickly as we can.

23          **THE COURT:**  Can you work up some very -- it doesn't

24    have to be a formal protocol.  Can the parties work up just an

25    agreement that if something happens to be inadvertently

 1   produced that is CSAM, there will be, you know, a procedure in

 2   place to delete it, claw- -- or do whatever is necessary under

 3   the law to handle it?

 4           **MS. PIERSON:**  Certainly, Your Honor.

 5           **THE COURT:**  Okay.  So if you work out that agreement,

 6   that should alleviate the concern of having to -- worrying

 7   about -- overly about CSAM on the devices.

 8       I don't want there to be delays because of issues like

 9   this where you can work it out kind of after the fact, similar

10   to a privilege clawback approach; right?  I mean, I understand

11   there are legal issues with CSAM, but you can work out an

12   agreement between the parties to try to mitigate those things

13   after the fact and get -- at least get the data to the other

14   side.  Do you understand?

15           **MR. ANDREWS:**  Understood.

16           **THE COURT:**  Okay.  I'm going to give you till

17   August 30th to finish all the -- what you're calling the

18   hundred percent complete imaging of all the devices; right?

19       And you're going to finish five by the end of next week,

20   I'm going to expect a minimum of five the following week, and

21   then the remainder by the end of August; right?

22       And so -- and I'll say this:  If any devices aren't fully

23   imaged and, you know, in the pipeline for searches and

24   production by that time, I'm going to seriously start

25   reconsidering, for any such devices, a full inspection

1  available to the defendants.  Do you understand that?

2  **MR. ANDREWS:**  Understood, Your Honor.

3  **THE COURT:**  Because it was sold to me, the idea was

4  sold to me and the argument was made -- not by you but your

5  side -- to limit and prevent a full inspection because the

6  imaging had been so complete at that time, and there was no

7  indication given to me that it was not as complete as you're

8  now explaining to me.  Do you understand?

9  **MR. ANDREWS:**  Understood, Your Honor.

10  **THE COURT:**  And I don't understand if there was a

11  problem with the previous vendor, why you didn't act more

12  expeditiously last month -- right? -- to get on top of this.

13  It's not -- it's not an issue that your side has been unaware

14  of.  Okay?  So all I can tell you is, you know, the ball is in

15  your court to work quicker and as quickly as possible on this.

16  Okay?

17  **MR. ANDREWS:**  Understood, Your Honor.

18  **THE COURT:**  All right.

19  **MS. PIERSON:**  Your Honor, if I may, I have just a

20  couple of other asks.

21  **THE COURT:**  Yeah.

22  **MS. PIERSON:**  Certainly, our understanding following

23  the July 11th hearing was that a rolling production would start

24  of the forensic images that had already been made as to the

25  databases that the plaintiffs volunteered to give to us.  That

obviously hasn't happened, and you understand our concern with
the pace of the imaging itself.

    But there are two other things that we think would be
helpful to keep us moving on parallel tracks.

            **THE COURT:**  First, I know you already raised it in the
status report.  I can't believe you can't finalize search
terms.  All right.  I mean, we've talked about this in a larger
context, other things, and I think I've issued opinions in
other cases on this.

    I mean, lawyers -- you don't want me in there tinkering
with search terms for you -- right? -- because I'm not going to
come up with the best resolution at that granular level of
detail.  This is something that lawyers are uniquely positioned
to do.  All right?  And, again, it's not an issue that as if
you didn't know that it was out there.

    So I want you to finalize your agreed-upon search terms by
the end of next week.  There's no reason to delay that.
All right?  And there's no reason why it can't be done in that
time.

            **MS. PIERSON:**  Related to that, Your Honor, we'd ask as
well that, then, the search terms be applied and that
production of the text-searchable files begin, you know,
immediately and be completed within some relatively short
period of time.

            **THE COURT:**  I think I said that at the last DMC.

1    Certainly, as soon as the search terms are done, I want rolling

2    productions of all the devices that are already imaged or --

3    and as they come online as being imaged; that there be no delay

4    in running those search terms on those devices.  Okay?

5         **MR. ANDREWS:**  Understood, Your Honor.  Many of the

6    text-searchable ESI sources from these devices are included in

7    the logical image, and we've already begun production on those.

8         **THE COURT:**  That's great.  Good.

9         **MS. PIERSON:**  I think one challenge we have with that,

10   Your Honor, is that to the extent that some limited data has

11   been produced in response to requests for production, it's not

12   correlated to any particular device.

13       So you remember when we spoke in -- at the last hearing, I

14   talked about putting together the threads of this tapestry.

15   You know, it's a more difficult way to do it than simply

16   producing the entire forensic image.  If we're to put the

17   threads together to form the tapestry, we need to know what

18   device the data came from.  It can't just be a data dump

19   without correlation to a device.

20       **MR. ANDREWS:**  If I may, Your Honor, we've offered on

21   repeated occasions to set up a meet and confer with our

22   respective ESI vendors to talk about how to go about making

23   such productions and how we can work on a system to provide

24   them with the information that they want, and we've yet to hear

25   back from the defendants on a time to schedule such a -- such a

1    meet and confer.

2        **THE COURT:**  That meet and confer, since it's going to

3    require the ESI vendors and we're not going to rash it out

4    here, I agree something like that has to be done because,

5    again, they need to know from which device the data came from.

6        I assume -- maybe I'm being simplistic.  I assume it's a

7    matter of adding a field to the data or a header or something;

8    but there should be a way, either in the file as it's produced

9    or in the name of the file, to identify which device it came

10   from.  I mean, you did give them the chart of devices, so it

11   isn't like you don't know which devices will go with which

12   data.

13       So work that with the ESI vendors by the end of next week.

14   I don't -- again, this is one of those things where the ESI

15   folks really should be able to work this out.

16       **MR. ANDREWS:**  Yes.  Understood, Your Honor.

17       And just one additional point on the productions to date.

18   The search terms have not upheld plaintiffs from making

19   productions.  We've been making productions based on our

20   initially proposed search terms.  So any specific nuances that

21   we're kind of finalizing and finishing, those aren't holding

22   productions up.

23       **THE COURT:**  Good.  Good.  Because we need to keep this

24   train rolling.  So, keep it rolling.

25       **MS. PIERSON:**  Your Honor, related to that, would it be

1    appropriate to set a deadline?  If we are to agree to search

2    terms by the end of next week, could we set a deadline maybe

3    30 days after that for production of information from the --

4         **THE COURT:**  No.  I want a status report -- let's see.

5    Today is the 8th.  I want a status report on Monday, the

6    19th -- all right? -- to update me on where you are on the

7    search terms, where you are on fully imaging, how many are

8    still in the pipeline to be imaged, and all that.

9         One of these status reports -- I think the first of these

10   status reports had, it was like a meta dispute about -- not to

11   make a joke -- had a hyperdispute or a second-level-order

12   dispute about what to put in the reports.  I think that's

13   actually in this month's DMC statement.

14        You know, this is just a status report on this one little

15   piece of it.  If you're still working things out, I think -- I

16   mean, you can certainly take philosophically the approach that

17   we take in the DMC status reports.  If there's a dispute and

18   you've fully met and conferred on it, you can identify it as a

19   ripe dispute and tell me.  And if there's a dispute that you

20   both reasonably think is on the horizon that's going to come to

21   a head and it's going to require Court intervention, you can

22   give me a heads-up on that in the same kind of summary form

23   you-all do in the DMC status reports.

24        But I don't need briefing on all the disputes because the

25   status reports are not the place for full briefing; it's to

 1  give me the status on what's coming up.

 2      **MS. PIERSON:**  Thank you.

 3      **THE COURT:**  But more importantly, I'm putting your

 4  feet to the fire.  I want those device- -- I mean, in the grand

 5  scheme of things, it's not that many devices.  Get them done.

 6  Okay?

 7      **MR. ANDREWS:**  Understood, Your Honor.

 8      **THE COURT:**  Okay.

 9      **MS. PIERSON:**  There is a third parallel track.  And I

10  promise it's the last one, Your Honor.

11     I mean, there -- as you can tell from the status reports,

12  there are ten different things that we could bring to you

13  today.  We're bringing really just three.  One is the forensic

14  images and the protection; two is the search terms.

15     But then the third issue is, you may recall we had a long

16  discussion about device identifying information and app

17  identifying information.  We attached to the status reports, as

18  Appendix A, a table that lays out the columns for that.  We're

19  still missing a lot of device identifying information.

20     And this matters because we, on our side, have to work

21  with our expert and our vendor to think about what databases

22  are contained within each device that we might need.

23     The list that we started with was the list that the

24  plaintiffs volunteered at the last hearing, but we anticipate

25  there will be additional databases that we require in order to

get a full picture of device usage.  So our request is just for

the device identifying information.

       **THE COURT:**  One person at a time.

  What's the hangup in getting them the full charts?

       **MR. ANDREWS:**  So we've -- we've identified all of the

relevant devices in our charts, and then we've identified

applications installed on many of those devices.

    The remainder of the information is stuff that we have

offered to meet and confer about with our ESI vendors so that

we can get a full picture of what it is that they're really

looking for.

    The system-level and -- the operating-system-level and the

knowledgeC-type database information, we really have to

complete those full file imaging images in order to have a full

picture of what's available.

       **THE COURT:**  Maybe I'm misunderstanding.  What you're

looking for is just what -- the device identifying data?  Like

what model it is and all that?

       **MS. PIERSON:**  Make, model --

       **THE COURT:**  And then what --

       **MS. PIERSON:**  -- operating system.

       **THE COURT:**  And what apps are loaded on that device?

       **MS. PIERSON:**  What apps are loaded.

  It's the things in Appendix A that we listed.  These

aren't things that the ESI vendors have to talk about.  They're

1    objective on the device.

2          **THE COURT:**  So what's the --

3          **MR. ANDREWS:**  So the stuff that we have, so the

4    information about the make, the model, the applications

5    installed on the device, we've supplied to the defendants.

6          **THE COURT:**  I'm hearing you haven't.

7          **MS. PIERSON:**  It's incomplete.  It's incomplete.  I

8    understand that it may take time.  We might not get it all on

9    exactly the same day.

10         But you recall the conversation that we had about how

11   knowing what operating system is on the device is critical.  It

12   changes the databases within the device and how we identify

13   which databases we require.  This is information clearly on the

14   device.  It's not hard to find.

15         **THE COURT:**  Again, was there a misunderstanding or

16   lack of communication here on what it is they're looking for in

17   this -- for this set of data?

18         **MR. ANDREWS:**  So this is the only time I've heard it

19   framed as the operating system that's on the device, not the

20   hist- -- the operating system history on the device.

21         And for the operating system history, we need to do the

22   full file image.

23         For the operating system on the device, we're able to

24   supply that information quickly upon imaging the devices, but

25   right now many of the devices are in transit.  So it's

1    something that the most efficient process is to complete the

2    imaging and just provide the operating system and the IMEI-type

3    information at the time we perform the imaging.

4         **MS. PIERSON:**  I don't think this is --

5         **THE COURT:**  While it's probably easy, if they had the

6    phone in hand, to tell you the operating system.  (A) if

7    they're in transit and if you want the historical operating

8    system, that's not something you can look at from just looking

9    at the phone.

10         **MS. PIERSON:**  I think the short answer and solution to

11    this, Your Honor, is we attached Appendix A; it's a table.  The

12    plaintiffs need to complete the table.  And if that happens,

13    you know, on a rolling basis, we understand.  There may be some

14    devices that are in transit.  But they need to complete

15    Appendix A.  It's all of the information we discussed.

16         **THE COURT:**  How hard is it to complete Appendix A

17    per device?

18         **MR. ANDREWS:**  Your Honor, Appendix A is a 148-page

19    wish list that the defendants have.  It's not a simple thing.

20    It's something that we need to be able to work with them on

21    identifying what it is they actually need rather than filling

22    out 148 pages of discovery on discovery.

23         **MS. PIERSON:**  It's not 148 pages.  It's a simple Excel

24    chart.  Here -- we can confer, if that's --

25         **THE COURT:**  There hasn't been --

1          **MS. PIERSON:** -- necessary but --

2          **THE COURT:** I don't think -- it doesn't sound to me

3    like there's been sufficient or even in-depth meet and confer

4    as to what needs to be on that chart and how big the chart has

5    to be and what exactly you're looking for in the chart.

6          So by next Friday, get together, talk about it, try to

7    come -- not "try" -- come to agreement on what that chart

8    should be.  It should be reasonable -- right? -- because you

9    want it quicker.  The shorter it is, the more quickly you can

10   get it; right?  So there's -- because you know you're going to

11   get other data on the back end anyway; right?  So --

12         **MS. PIERSON:** That's fine, Your Honor.  We just need a

13   chart with identifying information for the devices and the

14   apps, and we need it completed.

15         **THE COURT:** Okay.  You understand it may not have a

16   hundred percent of what you're looking for at the end of day,

17   but it may be good enough for your purposes going forward.

18   Okay?

19         **MS. PIERSON:** Understood, Your Honor.

20         **THE COURT:** All right.  So meet and confer on it.  If

21   the chart is as simple as what I hope it will be, then it won't

22   require, you know, the ESI vendors to be involved because,

23   presumably, any layperson could open up the phone and take

24   screenshots of what apps are on it and what the current OS is.

25         **MR. ANDREWS:** Understood, Your Honor.

1        **THE COURT:** Okay. If it's that simple. I don't know

2   if it is. But try to work it out. I'm encouraging you to work

3   it out.

4        **MS. PIERSON:** Thank you, Your Honor.

5        **MR. ANDREWS:** Thank you, Your Honor.

6        **THE COURT:** Okay. And I'll look for your status

7   report on the 19th.

8      Okay. So that completes everything on the joint status

9   report on forensic imaging and device data; correct? Is there

10  anything else in this report we need to go through?

11       **MR. DRAKE:** It doesn't sound like it.

12     Jeffrey Drake, King & Spalding, for the TikTok defendants.

13       **THE COURT:** All right. So are we -- where are we now?

14       **MR. DRAKE:** Well, I had a related issue, Your Honor,

15  that I could save to the end, but I thought I might just raise

16  it right now, which relates to the status and pace of discovery

17  as it relates to the school district plaintiffs.

18     We provided an update in the joint report. I think it's

19  fair to say that it's moving a little bit more slowly than we

20  would like. And I think one of the big things that's slowing

21  it down at the moment that I wanted to raise, because it

22  relates to the topic that Ms. Pierson just raised, is that of

23  search terms and custodians as it relates to the school

24  districts, which, of course, are, unlike the personal injury

25  plaintiffs or even their phones, multimillion-dollar or

1    multibillion-dollar corporate organizations.

2         We basically are making almost no progress on the search

3    terms and custodians at this point, Your Honor; and I was

4    wondering if, just like you did with respect to the defendants

5    back in May, we could just put a deadline down for completing

6    those conferrals, maybe August 23rd or something around then,

7    and then we provide a status update to Your Honor.

8         **MR. WARREN:**  Your Honor, may I be heard, please?

9         Previn Warren for the plaintiffs.

10        This is the second issue today that the defendants are

11   attempting to raise that was not flagged as a ripe dispute

12   heading into this conference.

13        I think that the parties ought to have an opportunity,

14   pursuant to Your Honor's standing order, to actually talk

15   through these issues and come to terms on what we can agree to

16   before they just get sprung on the other party.  And so I

17   really object to this even being a topic that Mr. Drake can

18   stand up and try to interject.  We haven't even gotten to the

19   actual disputes that the parties attempted to raise here, which

20   is what we came prepared to discuss.

21        If there's an issue about the pace of productions, we're

22   happy to address the same issues on defendants' side, how slow

23   they have been in actually rolling out custodial files, how

24   they stonewalled actually producing hyperlinked documents --

25        **THE COURT:**  Let's not expand the scope of --

1          **MR. WARREN:**  I agree completely.  Let's not.

2          **THE COURT:**  Okay.  So I'm going to give you probably

3   the same admonition I've given in previous DMCs; right?  Work

4   harder on this stuff.  If there's an agreement to meet and

5   confer -- if there's a willingness to meet and confer, which

6   there should be and it sounds like there is, meet and confer on

7   it.

8          You know, at this point, I'm not going to require, like,

9   an interim status report; but certainly, I would expect to see

10  progress to have been made between now and the next DMC on this

11  unripe issue in the report there; and, hopefully, it will

12  disappear and you will have worked everything out.

13         Because I'll just give you my general, same thing I said

14  to the previous set of lawyers.  You know, things like search

15  terms and logistics on discovery, these are things lawyers

16  should be able to work out.

17         **MR. DRAKE:**  We couldn't agree more, Your Honor, and

18  it's -- we look forward to having a meet and confer and

19  actually getting some on the books and moving forward with

20  this.  So thank you for your --

21         **THE COURT:**  I'm hearing a willingness --

22         **MR. DRAKE:**  Thank you for your help.

23         **THE COURT:**  -- to meet and confer, so you've got that

24  willingness on both sides.

25         **MR. WARREN:**  Always.

1          **MR. DRAKE:**  Wonderful.  Thank you.

2          **MR. WARREN:**  We have been, and we'll continue to do

3     so.

4          **MR. DRAKE:**  Great.  We'll get something scheduled

5     immediately.  Thank you, Judge.

6          **THE COURT:**  Okay.

7       All right.  Anything else preliminary before we get to the

8     ripe issues?

9       Okay.  Who's going to talk about discovery limits, then?

10         **MR. WARREN:**  Your Honor, Previn Warren for the

11    personal injury school district plaintiffs.  I'm happy to

12    address that for our side.

13         **MS. SIMONSEN:**  Good afternoon, Your Honor.  Ashley

14    Simonsen, Covington & Burling, for the Meta defendants and

15    speaking on behalf of the defendants.

16         **THE COURT:**  Okay.  You know, again, it's line drawing

17    here; right?  I mean, one side wants 15 extra rogs and 17 extra

18    RFAs; the other side wants to do two and two or maybe some -- I

19    don't understand why you weren't able to work this out --

20    right? -- because it's horse-trading in terms of numbers;

21    right?

22      I can draw some lines for you, but I don't think anybody's

23    going to be -- neither side is going to be happy with it.  I'm

24    happy to do it now if you want me to draw some lines for you.

25    Make your arguments.  But if you tell me you'd rather try to

1    horse-trade on this and work out a deal, I'm open to that too.

2         **MS. SIMONSEN:**  Your Honor --

3         **MR. WARREN:**  Your Honor, we're very much open to

4    horse-trading either by agreement or by judicial fiat, as you

5    would prefer.

6         I think the issue here is that we have wanted and tried to

7    engage in a discussion about numerical limits that would apply

8    to case-specific written discovery.  The problem is defendants

9    have taken the position that it's zero because the discovery

10   limits order was already entered and that's it.  So we've been

11   essentially negotiating against ourselves.

12        We made an initial offer that would have given us the same

13   amount of written discovery that the defendants were getting

14   against the bellwethers.  We subsequently came back and reduced

15   those numbers.

16        All we've really seen from the defendants is attempting to

17   cut into our existing limits by allocating certain

18   interrogatory and request for admissions to --

19        **THE COURT:**  Well, I did see -- there was, at one point

20   at least, an offer for two extra or something, I mean, over and

21   above the 45.  That was on the table.  It looks like it was --

22   maybe I'm misreading.  But I'm going to -- okay.  So I'm going

23   to cut that part short.

24        **MR. WARREN:**  Sure.

25        **THE COURT:**  I think I've said -- I think I even said

at the time of the DLOs, but I think I've said at other DMCs,

if there's a good reason for extra discovery beyond certain

limits that I've set and you have a good reason, not just

because you want it, but there's actually a good, rational

reason, I'm open to hearing it; right?

And so the defendants' position that the DLO is carved in

stone and that no additions are allowed, I'm not going to

uphold that. So to me, that's inconsistent with what I've said

repeatedly, I think, through the course of this case.

With that in mind, would you rather try to work out a deal

here, or do you want me to start drawing lines here based on

arguments you want to make today?

**MS. SIMONSEN:** Well, I think, Your Honor -- Ashley

Simonsen for the Meta defendants -- one point of clarification

is not that our position was that they get zero case-specific

RFAs and rogs. That's not our position at all.

**THE COURT:** Right. I understand. Your position was

they could allocate some of the 45.

**MS. SIMONSEN:** Yes, precisely.

But I think with Your Honor's guidance in mind, that it

sounds like you're open to the parties negotiating

case-specific RFA and rog limits in add- -- that would be in

addition to the 45.

I think we probably should go back to the negotiating

table and confer further with plaintiffs. I imagine we can

1  reach an agreement.

2      **THE COURT:**  Okay.  And I -- to be -- this touches on

3  another issue that is raised, I know we're going to bring up

4  later.

5      This applies to the JCCP as well -- right? -- because the

6  scope of discovery where it overlaps both cases, I think

7  Judge Kuhl was pretty clear that I should be the one, at least

8  as an initial matter, to hear that if it's, obviously, only

9  specific.  And so things like numerical limits cuts across all

10 the plaintiffs across all the cases, and so I just want to make

11 sure everybody's clear on that.

12     Is there somebody from the JCCP here?

13     **MR. WARREN:**  Mr. VanZandt is here.  He's one of the

14 co-leads in the JCCP.

15     **THE COURT:**  I just want to make sure there is somebody

16 here.

17     Why don't you introduce yourself, for the record.

18     **MR. VANZANDT:**  Sure.  Joseph VanZandt, Beasley Allen,

19 for the JCCP plaintiffs.

20     And, yes, you're right, Your Honor.  That's our

21 understanding from Judge Kuhl's minute order in the last

22 hearing, is that Your Honor would set numerical limits.

23 Judge Kuhl did indicate that the -- some of the initial RFAs

24 that the JCCP plaintiffs have issued were proper and defendants

25 would respond to those but did defer to Your Honor to set the

1  numerical limits.

2      **THE COURT:**  Okay.  So I want you-all -- whether you

3  appoint the MDL lawyer -- some lawyer on the MD- -- on the

4  plaintiffs' side, whether it's MDL or whatever, to be the point

5  person to negotiate the limits with the defendants, that's up

6  to you-all; right?  But I want to make clear that this covers

7  everyone.  All right?

8      **MR. WARREN:**  Yes, Your Honor.  This is an issue that

9  for us is very important to resolve quickly.

10     What I would ask is that perhaps Ms. Simonsen,

11  Mr. VanZandt, and I can actually go try to resolve this; and if

12  we're unable to, we literally bring it back to you today, by

13  the end of this hearing, to see if we can get a resolution

14  because we don't want this to bleed into the next DMC.

15     **THE COURT:**  I'm around this afternoon.  I'm not going

16  home until, you know, after business hours, so...

17     **MR. WARREN:**  All right.  Thank you very much.

18     **MS. SIMONSEN:**  Your Honor, we're always happy to speak

19  with the plaintiffs.  This is something that we will each have

20  to take back to our respective clients.  I know that my clients

21  may not be available this afternoon to sign off.

22     **THE COURT:**  Well --

23     **MS. SIMONSEN:**  So I just want to flag that for

24  Your Honor.  But we're --

25     **THE COURT:**  I'll say to you what I usually say when

1    I'm -- I don't think anybody here has had me as a settlement

2    conference judge.  Certainly, lawyers can reach a deal with

3    that caveat and with the understanding that you'll go back and

4    recommend it to your client; right?  And so if that's as far as

5    can be done, that's great, because I assume most clients are

6    reasonable.  If their outside lawyers say they should accept a

7    deal, then it's just a matter of the formality.

8            **MS. SIMONSEN:**  Thank you, Your Honor.

9        I did have one clarifying question.

10           **THE COURT:**  Yeah.

11           **MS. SIMONSEN:**  There were three special

12   interrogatories served by the JCCP plaintiffs in the JCCP.

13   Judge Kuhl indicated that Your Honor would decide whether those

14   three interrogatories would come out of the limits that

15   Your Honor would otherwise set for the JCCP and MDL plaintiffs

16   on interrogatories.

17       And what I'm wondering is if you would like us to make

18   part of our conferral with the plaintiffs the extent to which

19   those three interrogatories are live, if you will, and part of

20   whatever numerical limit they are permitted.

21           **MR. WARREN:**  We have no problem making that part of

22   the discussion.  I think -- well, maybe this is a point of

23   clarification on our side, but our understanding in -- with

24   respect to the applicability of the numerical limits to the

25   JCCP is that each bellwether, whether it's in the MDL or the

1    JCCP would be allocated a certain number of written discovery

2    requests to ask.  You know, to the extent the JCCP has already

3    asked some of those, those would count against those limits

4    unless, of course, the JCCP would -- you know, opts to withdraw

5    those for whatever reason.

6         Is that Your Honor's understanding as well?

7              **THE COURT:**  Yes.

8              **MR. WARREN:**  Okay.

9              **MS. SIMONSEN:**  Your Honor, just to clarify, I think

10    that there may be more nuance here than Mr. Previn [sic] is

11    revealing.

12         It is the defendants' position that what the plaintiffs

13    should be doing is coordinate to serve common interrogatories

14    and requests for admission or at least majority common

15    interrogatories and requests for admission on the defendants

16    because, otherwise, we could be facing -- you know, let's say

17    they get, you know, five interrogatories for, you know, every

18    ten bellwether plaintiffs.  It's 50 different interrogatories

19    that we might have to serve when, surely, there is at least

20    some common ground across these bellwether plaintiffs in terms

21    of what they need to seek from the defendants.  And we know

22    that's the case because so far, they have served identical

23    requests for production across the two proceedings.

24         The -- I believe that in the MDL, where at least as to

25    Meta, the plaintiffs have served two interrogatories, they may

1    not have been bellwether specific, but at least with respect to

2    requests for production, those have been consistent across all

3    of the plaintiffs in the JCCP and the MDL.  And we would submit

4    that the same should be the case with respect to

5    interrogatories and requests for admission.

6         **MR. WARREN:**  I'm not entirely sure I understand

7    Ms. Simonsen's position here.

8         I think the idea is that each bellwether would have an

9    opportunity to make a decision what they want to do with the

10   written discovery that they're allocated.  If it's serving the

11   same for each one, that may be that client's choice.  If it's

12   serving different ones, that may be that client's choice.

13        I mean, this is intended to be an opportunity to be

14   distinct, unlike the general liability discovery that was

15   subject to the Court's earlier discovery limits order.

16        **THE COURT:**  Since I'm hoping you can work this out,

17   one thing I want you -- I'll give you a little bit of guidance

18   and you can keep this in mind.

19        As we have done with kind of the plaintiffs writ large,

20   there are common rogs; right?  For the bellwethers as a

21   subgroup, there may be a way to parse it out where there's a

22   set of common rogs among all bellwethers in the MDL and all

23   bellwethers in the JCCP which is maybe only one or two common

24   for that subgroup; and then, in addition, each individual one

25   gets their own -- you know, so it's -- so, in other words,

1  you've got a subgroup of common rogs for the subgroup of

2  bellwethers; right?  And then each individual bellwether has

3  their own individual number; right?

4      And so that way, this addresses Ms. Simonsen's concern,

5  which is if they are truly repetitive across all bellwethers,

6  which could happen -- right? -- then you could use the

7  common -- a common bellwether set of rogs -- right? -- number

8  of rogs; right?  And you could jigger the numbers and kind of

9  work out a deal to move numbers around if you want.

10      I'm just throwing that out there as part -- to consider as

11  part of your deal.  It seems to me it has some appeal,

12  unless -- because you know what kind of discovery you're going

13  to serve -- you're sure that every rog served by every

14  bellwether is going to be unique to that bellwether.

15      **MR. WARREN:**  Even if they aren't, I don't understand

16  why there needs to be a delimited common set or what that

17  accomplishes.  I think the point is --

18      **THE COURT:**  To avoid repetition because, in other

19  words, if all -- and I forget.  There's how many?

20      **MR. WARREN:**  There's 12.

21      **THE COURT:**  12 in the MDL and --

22      **MR. VANZANDT:**  21.

23      **THE COURT:**  -- 21, right; so, 30, whatever.

24      If everybody individually serves the exact same rog,

25  you're just killing trees -- right? -- because all you're doing

1    is you're going to cut and paste the same rog across each

2    individual bellwether and then they're going to cut and paste

3    their response across each of those rogs; right?  And what does

4    that serve?

5         **MR. WARREN:**  Well, I think the issue, Your Honor, is

6    that each of these bellwethers is an individual.

7         **THE COURT:**  I'm not saying they don't get their own

8    individual numbers.

9         **MR. WARREN:**  I understand.  But they may have more or

10   less individualized issues, depending on their case.  So they

11   may have a desire to utilize those common rogs more or less,

12   depending on how individualized their circumstances are.  For

13   example, there may be a client that has a lot of issues around

14   having reported their CSAM to one of the defendants and the

15   defendants not having taken that down.

16        **THE COURT:**  And maybe I wasn't explicit when I said

17   working out a deal where there's this subdivision of common per

18   bellwethers and individuals per bellwethers, but also with a

19   provision that you can move those numbers around per

20   bellwether; right?

21        So, in other words, if there's one bellwether who is only

22   ever going to -- so what that means is, across the group of

23   bellwethers, there's really only going to be one common rog

24   because this one bellwether has so many specific issues.  You

25   can try to jigger the -- come up to an agreement to jigger the

1    numbers.  These are presumptive numbers.

2        This is an idea; right?  If you can't come up with cutting

3    it that way, then I would propose that you try to work out a

4    way to avoid killing as many trees by trying to figure out a

5    way to serve rogs that are, quote, "common per bellwether" in,

6    like, one document as opposed to 12 or 31 documents.

7        Do you understand?  Just --

8            **MR. WARREN:**  We'll give it a shot, Your Honor.

9            **THE COURT:**  -- I'm worried about kind of just the

10   rigmarole of too much -- too much paper.

11           **MS. SIMONSEN:**  And, Your Honor, to be clear, we have

12   no problem with any common interrogatories being served in one

13   document on behalf of all bellwether plaintiffs; and, in fact,

14   our proposal had been that even though there would be --

15   you know, we would be answering on behalf of all bellwether

16   plaintiffs, that that would still only count as one

17   interrogatory against the limit.  So we're in full alignment on

18   that issue.

19       I think the dispute between the parties is, of the overall

20   rogs that the bellwether plaintiffs are permitted to serve,

21   what proportion of them should be required to be common across

22   all bellwether plaintiffs and what proportion of them may the

23   bellwether plaintiffs choose to serve individually?

24       And I would --

25           **THE COURT:**  You mean, you're not talking about the 45?

1    You're talking about whatever number you come up with here?

2         **MS. SIMONSEN:**  Correct, Your Honor.

3         **THE COURT:**  What I'm hearing, unless you've got a good

4    response to that, each case at some level is going to be

5    differentiated where there's no way to know across all of them

6    how to -- that's why I was saying you might have an escape

7    clause to jigger the numbers because I don't know if there's

8    any way to know or require that they all be common.

9         **MS. SIMONSEN:**  I think that's something we can discuss

10   further with the plaintiffs.

11        I mean, just as one illustration of how common these types

12   of inquiries can be, we negotiated an extensive defendant fact

13   sheet where we were able to identify common requests across all

14   bellwether plaintiffs that we are responding to.

15        There are any number of other issues like those that I

16   could imagine plaintiffs could at least try to coordinate so

17   that they're not issuing sort of different variations of what

18   are essentially the same request across different bellwether

19   plaintiffs; right?

20        If there's some required coordination, which is, of

21   course, the point of these coordinated proceedings is to

22   facilitate that kind of coordination, I think it would be very

23   helpful, particularly given the case schedule we are on.

24        It would also be consistent with the approach that we've

25   taken in the discovery limitations order with respect to other

discovery limits.  For example, the State Attorneys General get

32 identical interrogatories on the Meta defendants for each

State AG.  So they've got to serve 32 of the same, but then --

excuse me.  This is the Meta defendants on the AGs are allotted

32, but then they're allowed to serve six AG-specific

interrogatories.

So, you know, approximately, you know, one-fifth,

one-sixth of the overall total number of interrogatories

permitted to be served can be case specific; but otherwise,

there should really be an effort, we would submit, Your Honor,

for these plaintiffs to coordinate because there's going to be

a lot of common information that they're going to be seeking.

**THE COURT:**  I didn't hear an unwillingness for there

to be coordination on, quote, "common rogs."

**MR. WARREN:**  There's certainly not an unwillingness to

talk this out with the defendants.

I do want to observe, though, that the defendants are

trying to have it both ways.  They have served interrogatories

on each of the bellwethers that sometimes overlap, sometimes

don't.  Sometimes they're very similar but with slightly

different wording.  They have put us through the exact exercise

they're trying to avoid for themselves, which, you know -- and

that horse is already out of the barn.  We already have had to

respond to that written discovery.

So it doesn't seem fair that they should get the benefit

1   of this brand-new mechanism when they've availed themselves of

2   exactly the thing that they're talking about.

3           **THE COURT:**  I'm not ordering a mechanism.  But if you

4   can work something out to at least mitigate or address this

5   concern, I think you should try to.  Otherwise, you know --

6   well, try to work it out because it --

7           **MR. WARREN:**  We will.

8           **THE COURT:**  Yeah.

9           **MR. WARREN:**  We'll try to work it out this afternoon;

10  and if we can't, we will bring it back to Your Honor.

11          **THE COURT:**  All right.  So contact Ms. Fox if you need

12  to come back.

13          **MR. WARREN:**  Thank you.

14      And I think Mr. VanZandt had a point for the JCCP.

15          **THE COURT:**  Sure.

16          **MR. VANZANDT:**  Joseph VanZandt.

17      Just to point out for the JCCP, we are endeavoring to work

18  together, when we can, on issues.  For example, all the RFPs

19  that have been issued, approximately -- I can't remember the

20  number -- they were identical to what the MDL did.  That makes

21  sense.

22      Here, we are talking not only plaintiff-specific but also

23  now state-specific discovery.  So, for example, in the JCCP, we

24  issued special interrogatories under the California code which

25  are slightly different.  And so -- and also for RFAs, we have

affirmative offenses -- defenses to deal with in the JCCP.  So there are slight variances.

And the concept of having to do one document for all bellwether discovery, again, we don't think would work.  Our discovery is being issued under California law.  We're under different schedules.  There's different deadlines that apply.

So we're certainly going to endeavor -- I mean, at the end of the day, by necessity --

**THE COURT:**  For example, if you're using the form rogs, those are going to be the same across all the bellwethers; right?

So I guess the point is -- I want to save the trees -- if you're able to consolidate and, you know, reduce repetition, I think you should because it just seems the rule of reason should apply.

**MR. VANZANDT:**  Okay.  And we've shown -- this is premature.  This hasn't happened yet.  The RFPs were identical.

There has been -- there have been no case-specific interrogatories or RFAs in the MDL.  So whether or not they're going to be identical or not, that's to be determined.

**THE COURT:**  Right.  Okay.  So --

**MS. SIMONSEN:**  And I appreciate the point Mr. VanZandt just made, which I think illustrates that there is a lot of room for common ground on what they can serve.

**THE COURT:**  It sounds like we've got the beginnings of

```
 1    a deal to be made in the hallway.

 2            MR. VANZANDT:  Thank you, Your Honor.

 3            MS. SIMONSEN:  Thank you, Your Honor.

 4            THE COURT:  All right.  So that's discovery limits.

 5        Let's take a short break for the staff to reset.  And

 6    maybe I can get my computer to work.

 7                    (Recess taken at 2:04 p.m.)

 8                (Proceedings resumed at 2:18 p.m.)

 9            THE CLERK:  Recalling 22-md-3047.

10            THE COURT:  Okay.  Next issue is PI plaintiffs'

11    responses to defendants' RFPs, which was the subject of the

12    letter brief filed two days ago.

13            MS. COLOMBO:  Good afternoon.

14            MR. HALPERIN:  Good morning, Your Honor.

15            MS. COLOMBO:  Oh, go ahead.

16            MR. HALPERIN:  Sure.

17        Good afternoon.  Greg Halperin for the Meta defendants.

18            MS. COLOMBO:  Jessica Colombo, Motley Rice, on behalf

19    of the personal injury plaintiffs.

20            THE COURT:  All right.  So it's only been a couple of

21    days, but I have briefly reviewed the brief.

22        So there have been -- it looks like there have been

23    attempts to narrow and come to some agreement on this.  Is

24    there -- is it really -- I mean, it sounds -- have you really

25    broken down, or are you still trying to talk it through?
```

1        **MS. COLOMBO:**  Well, Your Honor, I think with respect

2   to the first group of requests that pertain to third parties,

3   there have been attempts on the side of the plaintiffs.  We

4   have agreed to search for responsive documents with respect to

5   the plaintiffs.

6        But for us, the real -- the real sticking point has been

7   expanding that search to include all of this information for

8   third parties.  And with respect to whether we have broken down

9   on that issue, I think for defendants, that has been a sticking

10  point as well.

11       **THE COURT:**  So I'm clear, there is no longer dispute

12  as to searching for documents for these Requests 32, 33, 34,

13  and 66 specific to the plaintiffs; is that right?

14       **MS. COLOMBO:**  Yes, Your Honor.

15       **THE COURT:**  Okay.  And then --

16       **MR. HALPERIN:**  If I could just, Your Honor.

17       **THE COURT:**  Yeah.

18       **MR. HALPERIN:**  Our understanding -- and Ms. Columbo

19  can correct me if I'm wrong -- is that is true as to 32, 33,

20  and 34.  The dispute as to 66 is as to the plaintiffs

21  themselves.

22       **MS. COLOMBO:**  Yes, that is correct.  I'm kind of

23  discussing 66 separately as that pertains to information

24  relating to the plaintiffs.

25       **THE COURT:**  Okay.  So, but as I understand, there is

1  agreement for -- between the parties for plaintiffs to search

2  for documents responsive to 32, 33, and 34.

3      **MR. HALPERIN:**  As to the plaintiffs themselves, but

4  not their family members, correct.

5      **MS. COLOMBO:**  Yes, Your Honor.

6      **THE COURT:**  Okay.  So I'm going to so order that.  So

7  it's so ordered.  So it's more than just an agreement.

8      Okay.  I guess, Ms. Colombo, I mean, I do note the

9  requests on their face -- but it sounds like this is not the

10  intent -- on their face are not time limited in any way.  So,

11  for example, there do appear to be some outer bounds to those

12  requests that may be out of the bounds of proportionality; but

13  I don't believe the defendants are looking, for example, for

14  foreclosures that happened in 1993.

15      **MR. HALPERIN:**  I believe, Your Honor, everything is

16  limited to the relevant time period.  It's just in the

17  instructions portion of the RFPs.

18      **THE COURT:**  All right.  So thank you for that

19  clarification.

20      With that clarification, you know, there is a protective

21  order in place.  If it is limit- -- truly limited to parents,

22  legal guardians, and people they reside with, give me your best

23  shot why that's not proportional.

24      **MS. COLOMBO:**  Sure, Your Honor.  I'll do my best.

25      So --

1          **THE COURT:**  You're not arguing it's not potentially

2     relevant within the scope of discovery; right?  It's really a

3     proportionality argument?

4          **MS. COLOMBO:**  So, Your Honor, I would say it's both.

5     There is a proportionality argument.  But to the extent these

6     events happened and had no connection to the plaintiff's mental

7     health and no impact on the plaintiff's mental health, I think

8     we would say that it's not relevant whether a caretaker went

9     through an adoption process, because at least with respect to

10    RFPs 32 and 33, that also includes caretakers, which

11    Mr. Halperin can correct me if I'm wrong but that's not a

12    defined term.

13         So to the extent "caretaker" could encompass someone who

14    is simply providing childcare, we think that the relevance of

15    the information that they're seeking here is marginal, if -- if

16    it exists at all.

17         **THE COURT:**  I mean, on the face -- well, maybe I was

18    focusing on the -- all right.

19         All these requests refer to household members -- right? --

20    and parent, legal guardian, or anyone with whom the plaintiff

21    resided.  So I don't see -- is "caretaker" somehow embedded in

22    here through the definitions?  Or --

23         **MR. HALPERIN:**  It is not, Your Honor.  And, in fact,

24    in the most recent letter we sent to plaintiffs narrowing our

25    RFPs, which was our July 26 letter, we narrowed the definition

1    of "household" to biological parent, stepparent, legal

2    guardian, or anyone with whom the plaintiff user resided part-

3    or full-time during the relevant time period.

4        **THE COURT:**  Okay.  So does that resolve "caretaker" in

5    at least the scope of the people who are the third parties at

6    issue?

7        **MS. COLOMBO:**  So I don't think that's the issue,

8    Your Honor.  Caretakers are explicitly listed in the request

9    separate from household members.

10        **THE COURT:**  I'm just -- I'm not seeing -- at least as

11    reproduced in the brief, I'm not seeing the word "caretaker."

12    I see parent, legal guardian, anyone with whom plaintiff

13    resided.  I'm seeing household members.  That's all I'm seeing.

14        **MR. HALPERIN:**  And if I may, Your Honor, going back to

15    the July 26th letter, we expressly told plaintiffs (as read):

16        "Defendants propose that these productions be

17        provided for any biological parent, stepparent, legal

18        guardian, or anyone with whom the plaintiff user

19        resided, either part-time or full-time, during the

20        relevant time period.  Please confirm if you will run

21        this narrowed search."

22        **MS. COLOMBO:**  So then caretakers are not at issue

23    anymore, Your Honor.

24        What I would say on that is we do still think that these

25    are too broad, both in the third parties that are involved.

1    Anyone that resided in the household for -- or the plaintiff

2    resided with part-time or full-time could potentially encompass

3    people who really have no information that bears on the issues

4    in this litigation.  It could be family members.  It could

5    be -- it could be parents that the plaintiffs reside with for a

6    very limited time throughout the year.  So that's kind of on

7    the people.

8        But I think on the substance -- substance of the requests,

9    the bigger issue for us here is really that these requests are

10    so broad and not really narrowed in any way to be connected to

11    the issues in this case.  So I think that it's helpful to kind

12    of look at exactly what it is the defendants are asking for.

13        So by way of example, for Request Number 33, that is a

14    request where the defendants are asking for all documents

15    related to any civil investigations or proceedings, which would

16    encompass family court documents, truancy court documents,

17    juvenile court documents, divorce records.

18        So that means that if a member of a plaintiff's household,

19    whether that be a sibling or a family member who's not part of

20    the immediate family, or resided with the plaintiff for a very

21    limited period of time, went through a divorce or a custody

22    battle, that that would be within the request that the

23    defendants have made.

24        So for us, to search for all of these documents that might

25    not have any -- have had any impact on the plaintiff's mental

health and has the potential to pull in information that is
sensitive and private for third parties who did not sign up to
have their sensitive and private -- private information aired
in this litigation, for us, that's just not proportional to the
needs of the case.

MR. HALPERIN:  Your Honor, a few responsive points.

First, as to the scope of the people involved, all we're
asking for are documents in the possession, custody, or control
of the user plaintiffs themselves.  So to the extent that these
potential events pertain to someone who lived in the household
only a very short period of time, they're likely not to be in
the user plaintiff's documents at that point.

Second, as to the breadth of the requests, Ms. Colombo is
going back to the original request as written, not the
narrowing that we've agreed to over the course of our
negotiations.  We are not seeking any civil lawsuit at this
point.  We are seeking very specific civil lawsuits.

And, third, as to the sensitivity or private nature of
these documents, as Your Honor referenced, we do have a
protective order in this case, and we've followed it even in
this very briefing.  We've brought to Your Honor's attention,
in the course of the letter briefing, very specific examples
where these sort of events have implicated --

THE COURT:  In the interest of time, confidentiality
is not going to win the day for the plaintiffs here.  So --

1          **MS. COLOMBO:**  Your Honor, may I make one additional

2     point?

3          **THE COURT:**  Sure.

4          **MS. COLOMBO:**  So looking at -- looking at this idea of

5     anyone who's resided in the house, for example, if a nanny

6     lived in the house and went through a family court proceeding

7     or went through an adoption proceeding, it is possible that

8     there might be ESI that reflects a text or an email, for

9     example, that reflects that that happened, but it's hard for us

10    to envision how that has any impact on the plaintiff's mental

11    health or any relevance here.

12         So really, our issue is just the overbreadth of these

13    requests and the fact that we already have very expansive

14    search terms that are -- that we're running in these cases that

15    are meant to get at all potentially relevant documents related

16    to mental health.

17         **THE COURT:**  Let me be clear.  Defendants aren't asking

18    for a search of some extra universe of documents that haven't

19    been collected yet; correct?

20         **MR. HALPERIN:**  We are not.  We're asking for two

21    things, Your Honor:  searches of the repositories themselves

22    and, if the plaintiffs know of responsive documents pursuant to

23    the ESI protocol, they should produce those notwithstanding

24    search terms.

25         **THE COURT:**  Okay.  So, I mean, to the extent the

 1    bellwethers, some of them are adolescents or were children

 2    during the relevant time period, they may -- I mean, as counsel

 3    pointed out, they may have nothing -- right? -- which is good

 4    for you, I guess, in that sense; right?  And so why not run the

 5    searches and prove they have nothing?

 6           MS. COLOMBO:  So, certainly, Your Honor.

 7       I think where we might run into potentially responsive

 8    documents, you know, a lot of these young people's lives are

 9    lived online, so there could be texts or emails where they're

10    just texting their friends and saying, you know:  This is

11    what's going on with my nanny or my aunt or anyone.

12       So we have not run the searches yet because, you know, we

13    still have been discussing the breadth of --

14           THE COURT:  You understand -- I mean, as I understand

15    the defense's argument, if they get discovery and if it's shown

16    that a nanny who lived in the house maybe for ten years --

17    right? -- or more with a particular bellwether, at the

18    deposition, presumably their plan -- tell me if I'm wrong -- is

19    to ask that particular bellwether "Did this nanny's divorce" --

20    or maybe she got arrested or whatever; right?  All these fall

21    within those categories of what's being requested here.

22       "If something happened to that nanny, did that affect you?

23    How did it affect you?"

24       I assume that's the purpose of asking for all this.

25           MR. HALPERIN:  Absolutely, Your Honor.

1          **THE COURT:**  Right.  And if the answer is "no," that's

2     actually good -- in some sense, it's good for you; right?  I

3     mean, to some extent, some of this discovery is -- I assume

4     you're probably going to think about using it on the plaintiff

5     side; right?

6          So I don't see -- (a) I don't see how it's beyond the

7     scope of relevance, first, and I don't really hear an argument

8     that it's not potentially relevant because it either proves

9     something or it proves a negative; right?  And (b) if they're

10    not asking for a brand-new search, they're just asking for you

11    to come up with search terms that would capture what they think

12    is here, I don't see the extra burden.

13         So I don't really -- what I'm going to ask you to do is --

14    I mean, there have been proposals on search terms to get at

15    this.  I hope you've heard me repeatedly talk about I'd hope

16    you can work that out.

17         Given that we're not talking about a brand new collection

18    and all that, it's just running an extra set of search terms

19    just for the bellwethers, I just -- I don't see the burden

20    here.

21         And I do think -- to the extent there's an argument it's

22    not relevant, I don't agree.  Relevant for discovery purposes,

23    not for the case.

24         And given the limitations -- this is all subject to the

25    limitations that the defendants have put on the requests as

they've narrowed it through the meet and confer.  So defendants

don't get to go back to the broader, originally drafted

requests.

Okay.  You understand that.

All right.  So, okay.  So let's talk about Request 66 and

romantic breakups.  So I guess the question here is:  Is there

a way to get at this in the meet and confers?

I mean, there was some indication that the plaintiffs were

going to give some kind of chart or some summary information of

what happened because some of these plaintiffs didn't

experience any of this -- right? -- and some may have --

right? -- may have.  And so I thought there was going to be

some -- one of the footnotes said there was going to be an

exchange of information just categorically as to which

bellwethers have these kinds of events in their lives, and then

you could go from there; right?

So, for example, if, hypothetically, a bellwether

plaintiff had a crush on their middle school teacher, it was

never disclosed -- right? -- but they felt -- you know, and

nothing ever came of it -- right? -- I don't know if that's

something that -- if you disclose that in, like, chart form, I

don't know if that's something the defendants are going to care

about; right?

And I don't even know if that falls within the definition

of "heartbreak" here.  But, see, there are outer boundaries to

1  what people could reasonably describe as heartbreak --

2  right? -- that I think might be helped if -- I mean, you'd have

3  to go back and interview your clients.  But one way, instead of

4  trying to run searches on it and potentially come up with stuff

5  that is totally irrelevant, is come up -- in the meet and

6  confers, come up with a chart of "These are the events" -- for

7  example, some of these bellwethers may never have anything that

8  they say ever broke their hearts; right?  So that would help

9  narrow the dispute some.

10      So is there any way to get at it that way or try to

11  crack -- because it seems -- I mean, it's not impossible, but

12  there's going to be some art to coming up with search terms to

13  get at this in a way that is going to satisfy everyone.

14      **MS. COLOMBO:**  Your Honor, plaintiffs are more than

15  willing to engage in an exchange of information that would then

16  help the defendants figure out where to focus for purposes of,

17  you know, as they've stated, trying to figure out events that

18  might have had an impact on the plaintiff's mental health.

19      Really, I think our issue is just taking a full -- full

20  inventory of, in some cases, nearly or over a decade worth of

21  romantic -- romantic breakups, particularly at a time when

22  young people are just starting to explore romantic

23  relationships.  We think that that is unnecessary.  And if we

24  could proceed in a more targeted way, that's something that we

25  have always been willing to do.

1          **THE COURT:**  I mean, have you tried -- I haven't seen

2     exactly what your proposals are, and I haven't parsed what all

3     the proposals are to narrow this.

4          Have you tried to limit it to, like, relationships that

5     lasted a minimum of six months?  You know what I mean?  Some

6     way to avoid kind of the one-week, you know, fling that

7     probably wouldn't have an effect on anyone.

8          **MR. HALPERIN:**  Yeah, we're certainly happy to do that.

9     We haven't talked the specifics of exactly what a breakup means

10    because their position has just been no breakups.

11         But I do agree with Your Honor's opening suggestion that

12    we handle this on a case-by-case basis.  As Your Honor saw in

13    the footnote, we did ask the plaintiffs to identify which of

14    these events happened to individual plaintiffs.  Plaintiffs

15    have said they're willing to do that.  They haven't yet done

16    it.  I would ask that that be done fairly expeditiously so that

17    we can consider it as part of the search term negotiations that

18    are due to be wrapped up next Friday.

19         **THE COURT:**  I mean, it sounded like there's not --

20    there's a willingness to try to go back and try to figure out

21    which plaintiffs actually even had any kinds of these events in

22    their lives that are of any note; right?

23         **MS. COLOMBO:**  Yes, there's certainly a willing [sic]

24    on the side of the plaintiffs, Your Honor, to work to narrow

25    this.

1    In terms of that initial exchange of information, I'm not
2    sure that we've discussed that up into this point; so this is
3    the first that I'm hearing of that proposal.  But we would be
4    more than happy to do that.

5    And to the extent that that would allow the defendants to
6    focus on the relevant information -- or potentially relevant
7    information here, that's certainly something that we're willing
8    to discuss.

9    **THE COURT:**  So with respect to Request 66, it sounds
10   like you should meet and confer and try to work that out
11   because there's (a) ways to separate out bellwethers for whom
12   this is just not relevant and not an issue; and then, even for
13   those who it may even potentially be relevant, there are
14   probably only a limited number of events in their lives that
15   are even potentially relevant, again, given length and scope of
16   relationships and all that.

17   **MS. COLOMBO:**  Yes.

18   And, Your Honor, I do want to just correct a statement
19   that was made in the brief.  Defendants had cited an example
20   with respect to a particular bellwether, Mullen, who they have
21   discovered evidence suggesting that there may be a relevant
22   breakup.

23   We had -- we had included in the brief that that plaintiff
24   was running case-specific search terms to get at issues related
25   to this relationship.  But there was a miscommunication, and

that plaintiff has not been running plaintiff-specific search

terms, although they have seen and produced documents related

to that relationship.  That is my understanding.

      **THE COURT:**  Is the representation that they will

run --

      **MS. COLOMBO:**  The representation in the brief is that

they already were.

      **THE COURT:**  But, I'm sorry.  Is the representation now

that you are going to?

      **MS. COLOMBO:**  I would have to confer for -- confer

with counsel for that plaintiff.  I'm sure that they would be

willing to discuss that with the defendants.

   We have started to propose and run plaintiff-specific,

case-specific search terms; and those communications have kind

of -- or those correspondence have kind of broken off to

individual counsel for those cases.

      **THE COURT:**  So you need to -- you do need to do this

expeditiously.  So for that -- for privacy, I won't give the

name; but for that particular bellwether, it seems to me if

it's already been identified, I don't -- you can go back and

talk to their individual counsel, but I don't see a reason not

to run the search terms and get those documents produced for

that one, you know, pretty quickly because it can't be that

huge a universe of electronic files.

      **MS. COLOMBO:**  Understood.

1          **THE COURT:**  And for the rest of them -- I'm going to

2     say what I said on the other issues.  For the rest of them with

3     regard to Request 66, I'm going to expect to see significant

4     progress, if not full agreement, by the time we come back for

5     the next DMC.

6          So that gives you plenty of time to work it out but,

7     you know, doesn't give you leave to drag your feet on working

8     it out until 28 days from now.  Do you understand?

9          **MR. HALPERIN:**  Yes, Your Honor.

10         **MS. COLOMBO:**  Understood, Your Honor.

11         **THE COURT:**  Okay.  Good.

12         **MS. COLOMBO:**  Thank you.

13         **THE COURT:**  And I appreciate that.

14         So I think -- is the order clear on how we're going to

15    handle Requests 32 to 34?

16         **MS. COLOMBO:**  Yes, Your Honor.

17         **MR. HALPERIN:**  Yes, Your Honor.

18         **THE COURT:**  Okay.  So, you know what?  We'll reference

19    this in the DMC order; but if you could put in a -- like a stip

20    and order specific to Requests 32 to 34 -- because some of it

21    is reflected in your letters on how --

22         **MR. HALPERIN:**  Sure.

23         **THE COURT:**  -- you've narrowed things -- I think that

24    might, just for the record, be easier for you-all and for me,

25    frankly.

1          MR. HALPERIN:  We're happy to prepare --

2          THE COURT:  So specific --

3          MR. HALPERIN:  -- something.

4          THE COURT:  -- to that one, submit a stipulation and

5    proposed order just so everybody knows exactly what has to get

6    done for those requests.

7          MR. HALPERIN:  I apologize for speaking over

8    Your Honor.

9      But we're happy to prepare something, share with opposing

10   counsel, and submit.

11         THE COURT:  All right.  And why don't you include what

12   you're planning on doing for Request 66 there as well.

13         MR. HALPERIN:  Will do.

14         THE COURT:  Okay?

15         MS. COLOMBO:  Thank you, Your Honor.

16         THE COURT:  Can you get that to me by early next week?

17   mid next week?

18         MR. HALPERIN:  I think we can target Monday,

19   Your Honor.

20         THE COURT:  There you go.  Okay.  All right.  Two

21   down.

22     Do we need to talk about what should be in the JCCP

23   bellwether discovery in the DMC statements?  Is that really --

24         MS. SIMONSEN:  Your Honor, Ashley Simonsen for the

25   Meta defendants.

```
 1        I had hoped we wouldn't have to discuss this and that it

 2   would be non-controversial that we could provide updates to

 3   Your Honor by JCCP bellwether discovery, but the plaintiffs

 4   would not allow us to include it in the DMC statement.  And

 5   this was their proposal for resolving the dispute, was to

 6   present it to Your Honor.

 7            MS. HAZAM:  And, Your Honor, we had also hoped that we

 8   would --

 9        (Stenographer interrupts for clarification of the record.)

10            MS. HAZAM:  Of course.  Thank you.  Lexi Hazam for the

11   personal injury and school district plaintiffs.

12        We had also hoped that we wouldn't have to bring this to

13   Your Honor because we think that the defendants' request is

14   unreasonable and only serves to burden this Court.

15        Judge Kuhl has now ruled in her minute order from

16   August 2nd that she is overseeing JCCP bellwether written

17   discovery; and, therefore, what defendants had proposed

18   doing -- which was including pages, I think something in the

19   arena of the eight to ten pages of charts, listing all of that

20   discovery, listing the status of defendant fact sheets for the

21   JCCP bellwethers -- we thought was a burdensome introduction to

22   this statement which has never included information like that

23   before and would be burdensome for the parties to compile about

24   a litigation that the MDL plaintiffs are not directly involved

25   in.
```

1      The parties to the JCCP can, of course, provide that

2  information to their court, which is actually overseeing that

3  discovery and resolving disputes about it.

4      We are willing, however, as we have indicated in the

5  statement and to defendants, to include a brief status update

6  about what's happening in the JCCP, the same way we have each

7  month in the case management conference statement for

8  Judge Gonzalez Rogers, and to attach the most recent JCCP

9  status report, which would contain the JCCP parties' own

10  reports to that Court about its bellwether discovery.

11      And I also know that the JCCP wishes to be heard on this.

12          **THE COURT:**  Mr. VanZandt.

13          **MR. VANZANDT:**   Joseph VanZandt for the JCCP

14  plaintiffs.

15      We agree with Ms. Hazam on this issue.  We -- you know,

16  writing these statements is a big burden.  Very helpful.  But

17  between the DMC statement, the CMC statement, the JCCP CMC

18  statement, our lives a lot of times revolve around writing

19  these statements.

20      And making one, a statement like the DMC statement here,

21  necessarily more complex, requiring the JCCP plaintiffs to put

22  a chart in that we're not even doing for our own court, is

23  going to require us to be directly involved in reporting what's

24  happening with bellwether plaintiffs.  We just think it would

25  be not a good use of the parties' time and resources doing

1    that.

2         Certainly, we always are happy to pass along any reports

3    and updates we provide to Judge Kuhl to Your Honor through the

4    JCCP statements that we're already drafting.  And many times

5    those are on different schedules.

6              **THE COURT:**  Okay.  So --

7              **MS. SIMONSEN:**  Your Honor, may I just briefly respond?

8         I want to be clear that we were not insisting on including

9    detailed eight to ten pages of updates.

10        I did offer to Ms. Hazam, when we were trying to negotiate

11   this, could we just condense our summary of the discovery into

12   a couple of paragraphs; and plaintiffs' response was no.  They

13   would not allow us to include any updates on JCCP bellwether

14   discovery.

15        So I think what would be helpful is just for Your Honor to

16   confirm that we are allowed to include basic information about

17   discovery served on JCCP bellwether plaintiffs, discovery

18   served by JCCP bellwether plaintiffs.

19        And any disputes that are brewing between the parties with

20   respect to that discovery, some of which Your Honor just

21   recognized, is going to be common across the proceedings; and

22   Your Honor is going to be managing, as I understand it, any

23   common issues with respect to bellwether discovery, to the

24   extent they arise, between the MDL and the JCCP.

25        Plaintiffs have insisted on including very detailed

updates on the discovery of defendants to date.  We're simply

wanting to provide Your Honor with up-to-date information.

And that's our position.

**THE COURT:**  Okay.  So this is just administrative at

this point.  So, yes, attach the most recent JCCP status

report.  And really, because it probably includes things that

go beyond discovery that I don't probably need to see, you

could even just rip out the pages that are irrelevant to things

that I'm thinking about here.  So you can attach that to the

DMC status reports.

You can continue to provide a short summary of what's

going on in the JCCP to the extent, you know, that's somewhat

helpful.  It's at least good for background, but it doesn't

need to be, you know, pages and pages on that.

But it is, I think, clear that because of the overlap

between the cases and the way Judge Kuhl is coordinating with

Judge Gonzalez Rogers and this Court, and certainly there is a

long precedent and history of state-federal coordination in

these kinds of situations, if there's a dispute that you-all

reasonably anticipate is within the realm of disputes that I'm

going to decide, at least as an initial matter, it should be in

the ripe dispute section here.  All right?  And if it's an

unripe dispute that still falls within the ambit of things that

I'm probably going to hear, it should be in the unripe dispute

section.

1          **MS. SIMONSEN:**  Yes, Your Honor.

2          **THE COURT:**  And other than that, I don't think I --

3     because I'll have the statement, I'll have the summary of

4     what's going on, and then I'll have whatever detail you want to

5     give me on specific disputes.  I don't know if I need anything

6     further from the JCCP in the DMC status reports.

7          **MS. HAZAM:**  Agree, Your Honor.

8          And if I may, we have no objection to presenting to

9     Your Honor disputes that will come before Your Honor.  That is,

10    of course, the purpose of our statements.  So if there are ripe

11    disputes for Your Honor's attention, they'll be there; unripe

12    disputes will be there.

13         We do differ with Ms. Simonsen's characterization of what

14    this Court is handling with regards to JCCP bellwethers

15    vis-à-vis Judge Kuhl, and I know that Mr. VanZandt will speak

16    to that.

17         So what we would propose is that -- we often have a one-

18    to two-paragraph, at most, update of general developments in

19    the JCCP that we submit with our case management conference

20    statements every month to Judge Gonzalez Rogers.  We would

21    include that here.  We would also attach the statement, or the

22    relevant portions thereof, from the JCCP.  We think that is

23    sufficient.

24         The defendants want to recite all of the discovery

25    statistics from the JCCP, how many requests have been made.  We

1    do not think we should be doing that.

2              **THE COURT:**  You already won.

3              **MS. HAZAM:**  Okay.  Thank you.

4              **THE COURT:**  So I'm not asking for all the statistics,

5    and I'm hearing Ms. Simonsen saying she's not demanding or

6    really asking for that.

7              **MS. SIMONSEN:**  That's right, Your Honor.

8         We would just -- we would, though, like to be able to tell

9    Your Honor, for instance, of the 21 JCCP bellwether personal

10   injury plaintiffs, 20 of them have served three interrogatories

11   each.  The following interrogatories are common across that

12   bellwether discovery with interrogatories served by the MDL

13   bellwether JCCP plaintiffs.

14        A dispute has arisen with respect to one of those common

15   interrogatories, which I understand would be a dispute that

16   would be presented to Your Honor because it's a dispute about

17   what the defendants must produce in response to an

18   interrogatory that all bellwether plaintiffs have served.

19        We would then give Your Honor an update on that dispute.

20   It would be in the unripe or the ripe dispute section.  That's

21   perfectly fine.

22        I mean, but just to illustrate, like, it would have been,

23   I think, helpful for Your Honor to know in advance of

24   discussing this discovery limitations issue exactly how many

25   rogs and RFAs had been served by the JCCP bellwether

1   plaintiffs, were they common, but we were not allowed to put

2   that information in front of Your Honor, and it's just basic

3   updates.

4       What I want to be clear on is, Ms. Hazam is trying to,

5   I think, constrain the short update to the types of updates

6   we've been providing to Judge Gonzalez Rogers; but because

7   Judge Gonzalez Rogers is not overseeing JC- -- any discovery,

8   those updates have not included much information about

9   discovery.

10      **THE COURT:**  The short update should philosophically

11  track the short updates you've been providing to me on what's

12  been going on in the MDL; right?  Again, not pages and pages;

13  right?  And I'm not going to put a hard limit of one to two

14  paragraphs, but I'm not expecting more than one to two

15  paragraphs in general.

16      **MS. SIMONSEN:**  Understood, Your Honor.

17      And I think the pages and pages were merely charts that we

18  had agreed could be moved to the appendix, like we did with the

19  charts that pertained to the MDL plaintiffs.

20      **THE COURT:**  To be honest, unless there's something

21  important in the charts, I'm probably not going to parse them

22  in detail anyway, so...

23      **MS. SIMONSEN:**  Fair enough, Your Honor.

24      **THE COURT:**  All right.

25      **MS. SIMONSEN:**  And we'll take that into account going

1    forward for the MDL updates as well.

2         **THE COURT:**  Okay.

3         **MR. VANZANDT:**  Joseph VanZandt.

4         Unfortunately, we've now kind of gone away from the

5    administrative aspect.

6         And Ms. Simonsen has misrepresented what Judge Kuhl's

7    order said as to which judge is going to handle what issues.

8    Judge Kuhl never said or her order never said that Your Honor

9    would be handling all common issues related to bellwether

10   plaintiffs.  Judge Kuhl's order was explicit that to the extent

11   it's a bellwether-specific plaintiff or a JCCP bellwether, that

12   she would handle those issues and those disputes.

13        So we're now relitigating what we argued about in front of

14   Judge Kuhl last week, and what Ms. Simonsen said is not what

15   Judge Kuhl's order was.

16        **THE COURT:**  Well, I mean, her minute order says what

17   it says, and what she said at the conference last week is what

18   she said, and I assume everybody's going to abide by it.

19        I do take her point.  It did come through to me that, you

20   know, if I happen to rule on something that is common to both

21   cases, she's probably going to take it into account; right?

22        So, and I do think there is some understanding that if it

23   is discovery in the MDL that overlaps with the discovery in the

24   JCCP, her -- I mean, she gave the one example of numerical

25   limits; but philosophically, if there's an overlap like that

1    where it affects -- a decision here would affect both cases --

2    right? -- then it should come to me as an initial matter.

3    That's kind of philosophically my understanding of her

4    approach.

5        How that gets applied to specific disputes is going to be

6    up to you-all to work out; but, again, I'm assuming you're

7    going to apply the rule of reason there and, you know, try to

8    figure out which is the appropriate court.

9        But I guess don't be surprised if you try to bring

10   something in front of her and she's going to tell you to come

11   back to me.

12       **MR. VANZANDT:**  Your Honor, certainly, Judge Kuhl

13   taking into account issues that you have ruled on as related to

14   the MDL bellwethers is one thing.

15       Another thing is what I understand Ms. Simonsen to be

16   proposing:  that if it's some common issue, even if it

17   relates to a bellwether JCCP plaintiff, that we would have to

18   come to Your Honor to raise something as it's related to a JCCP

19   plaintiff.

20       **THE COURT:**  How could it be common if it's specific to

21   one bellwether JCCP?

22       **MR. VANZANDT:**  Well, that's the problem.  Defendants

23   are attempting to be able to litigate every time we write a

24   statement as to what issues are and are not common and then to

25   parse which judge is going to address that, which goes against

1    the spirit of what Judge Kuhl has said.  If it's a JCCP

2    bellwether plaintiff issue, she will address that.  If

3    Your Honor addresses something before she does, she will

4    consider that.  And we will deal with that with her, not that

5    we're bringing disputes regarding JCCP bellwethers to

6    Your Honor.

7        THE COURT:  Are you doing the same thing with her that

8    you're doing for me?  Are you giving her kind of an update of

9    what are unripe disputes on the horizon?  I mean, are you --

10       MS. SIMONSEN:  We generally give her updates on

11   discovery and how it's been proceeding.  To date, because most

12   of that has been on the defensive side, I don't think we've

13   actually had much opportunity to raise disputes with respect to

14   bellwether discovery, but I would imagine we would do the same

15   thing there.

16       THE COURT:  You are meeting with her monthly; right?

17       MS. SIMONSEN:  Correct, Your Honor.

18       THE COURT:  Okay.  So my -- I mean, I can't -- well,

19   my strong suggestion, directive is to raise with her -- give

20   her a heads-up, like you're giving to me, of unripe disputes;

21   and in that context, if you already know there's a dispute as

22   to who you think should be deciding that issue, ask her --

23   right? -- at that month; right?

24       MR. VANZANDT:  Right.

25       THE COURT:  And she can give you maybe more guidance

1  on which way to go.

2      But, you know, I will say this:  I'm here to manage

3  discovery.  That's my job in this case; right?  So I

4  certainly -- you know, if you want to bring disputes to me, I'm

5  not going to -- I'm probably going to be more receptive to

6  hearing them anyway because that's -- I mean, that's the limits

7  of my role anyway.

8      **MR. VANZANDT:**  Understood, Your Honor.

9      And we did exactly that with Judge Kuhl just last week.

10 We indicated that there was going to be a dispute about the

11 extensive third-party subpoenas issued in the JCCP.  Judge Kuhl

12 indicated that she would handle that.  So we're meeting and

13 conferring on that dispute, and we'll be taking that to

14 Judge Kuhl.

15     **THE COURT:**  Okay.  But, again, if you exercise the

16 able judgment you all have, you should try to figure out which

17 judge is more appropriate instead of trying, you know, to

18 artificially shoehorn one into the other.  Because I'll tell

19 you, neither Court wants to feel like they're being played off

20 against the other; right?  So just keep that in mind too.

21     **MR. VANZANDT:**  Understood, Your Honor.  And we're

22 not -- we're certainly not trying to shoehorn issues.

23     Our position is just simply that if it's a discovery issue

24 related to a JCCP bellwether plaintiff whose case is in front

25 of Judge Kuhl and will be tried in front of Judge Kuhl -- and

1    Judge Kuhl was extensively involved in the selection and the

2    pools of those plaintiffs -- that she should be addressing that

3    issue instead of having to argue about what's a common issue,

4    what's not.  JCCP plaintiff discovery handled in the JCCP,

5    recognizing Your Honor's orders on discovery limits as to the

6    defendants and on any orders that Judge Kuhl could take into

7    account, and the MDL bellwether plaintiff discovery would

8    happen here.

9        We're not going to -- we're not -- the JCCP is not going

10   to find a common issue and then go to Judge Kuhl and say,

11   "Well, you should decide this as to the MDL plaintiffs because

12   it's a common issue."  That would be completely nonsensical.

13       **THE COURT:**  Okay.  I don't think we need to talk --

14   this is something -- it's going to get resolved through

15   implementation more than trying to draw kind of semantic bright

16   lines between what goes into which court.

17       But, again, this is, again, something you should be able

18   to work out anyway.  So -- but if you don't, I mean, either she

19   or I is going to decide whether -- which Court is going to hear

20   it.  So that's all I can tell you.

21       **MS. SIMONSEN:**  Thank you, Your Honor, and we

22   appreciate your guidance on the common discovery issues that

23   have been presented to date.

24       **THE COURT:**  Okay.  So then the letter brief I got this

25   morning on foreign investigations, who's going to talk about

1    that?

2        **MS. SIMONSEN:**  Ashley Simonsen again for the Meta

3    defendants.

4        **MS. HAZAM:**  And Lexi Hazam again for the plaintiffs,

5    MDL plaintiffs.

6        **THE COURT:**  Okay.  So, first, there is apparently

7    agreement or close to agreement on what to do about domestic

8    U.S. investigations.

9        **MS. HAZAM:**  Actually, Your Honor, what we have to

10   report is some progress on the overall issues here, enough that

11   I think we would like to request the Court allow us to continue

12   with some meet and confer to see if we can come to a final

13   compromise.

14       We had further discussions just this morning; and while we

15   are not there, we are much closer to there.  And so I think it

16   would make sense to do that.  I think we're in agreement on

17   that.

18       **THE COURT:**  Great.  I should start handing out gold

19   stars to lawyers who work out disputes that don't require --

20       **MS. HAZAM:**  Your Honor, it's the Olympics.  So --

21       **THE COURT:**  -- football helmets.

22       **MS. HAZAM:**  -- in the spirit.

23       **THE COURT:**  Great.  Okay.  So I'm going to hold

24   abeyance on deciding this; and you tell me -- what? -- within a

25   week or so whether it's resolved; and we'll -- at this point,

1    I'm going to -- I won't terminate it as moot, but I'm going

2    to -- I feel like that's where it's going to end up.

3           **MS. HAZAM:**  Thank you, Your Honor.  We would like to

4    resolve it soon, so a week would be appropriate.

5           **THE COURT:**  Great.  Thank you for that update.

6        Okay.  Relevant time period.  I guess it's Mr. VanZandt

7    again.

8           **MR. VANZANDT:**  Thank you, Your Honor.  Joseph

9    VanZandt.

10          **THE COURT:**  Okay.  So, first of all, Ms. Simonsen, my

11   understanding is Meta -- and I just want to understand what

12   Meta has already agreed to do, which is using the search terms

13   for -- I think basically for features but generally using

14   search terms you've agreed to.  If documents hit prior to 2012,

15   you're not going to withhold them.  And you're not doing

16   restrictive searches to cut off by date for those search terms.

17   Is that right?

18          **MS. SIMONSEN:**  So what we're doing, Your Honor, to

19   make sure I'm clear, is we're running feature-specific terms

20   and feature-specific terms only, prior to 2012.

21       For each set of feature-specific terms, we are running

22   them back to January 1st of the year of launch of that feature.

23       I will say that many of the features that Your Honor

24   ordered feature-specific discovery on do go back quite far in

25   time.

1      To the extent documents hit on what are quite broad

2  feature-specific terms, notwithstanding the term "feature

3  specific," to the extent documents that hit on those terms are

4  responsive to any of plaintiffs' requests for production of

5  documents, we intend to produce them, assuming they are not

6  privileged.  We are not limiting what we are going to produce

7  to things like, for instance, technical and implementation

8  documents.

9      **THE COURT:**  And just to be clear, you're not limiting

10  them based on date either?

11      **MS. SIMONSEN:**  Only -- no, not based on date.  Only --

12  right.

13      So, for instance, if -- I believe we were -- we ran some

14  terms relating to algorithmic feeds back to 2009.  Let's just

15  take for an example a term that we're running back to 2009.  If

16  we pull back from our search terms a document relating to

17  algorithmic feeds from 2004 -- or 2006 -- excuse me -- it's not

18  going back to 2004 -- and it's responsive to plaintiffs'

19  request for production, we would produce it.

20      **THE COURT:**  Okay.  So, Mr. VanZandt, why doesn't

21  that -- with that understanding of what they're doing, what is

22  missing?  Why doesn't that get to what you need?

23      **MR. VANZANDT:**  Sure.  Joseph VanZandt.

24      So, respectfully, Your Honor, that's not sufficient.  So

25  even defendants' own briefing, the best that they can say of

JCCP plaintiffs getting evidence going back related to these
youth issues in our case, the best that they can say is that we
might, we should, or we'll likely get documents because of
these search terms.

And the algorithmic issue Ms. Simonsen used is not a good
example.  If you actually look at the search term examples that
Meta used in the DMC, search terms that they're saying are
going to produce these youth-related parental controls, age
verification issues are -- I'll just give you five of them --
underage -- the term will be "underage" and "abuse" or
"exploit."  So the next ones will be "teen" within 15 words of
"conversation"; "youth" within 15 words of "message"; and "end"
within five words of "news feeds."

It's virtually impossible to imagine how, other than sheer
happenstance, that the terms like that would reveal documents
related to things like parental controls and age verification.

And to that point, of the production that we've received
so far from Meta, the current production of documents before
2012 amounts to less than .07 percent of the document
production; only about 251 documents of the, I believe, 600,000
documents that have been produced.

And the problem is highlighted even more if you look at
some of the key C-suite Meta employees who were there prior to
2012.

So, for example, Andrew Bosworth, the chief technology

1    officer from 2006 to present, his custodial file, there are

2    four documents that date back before December 31st, 2012.

3        Kris Cox, chief product officer since 2005, there's one

4    document in his file dating back to December 31st, 2012.

5        Adam --

6        **MS. SIMONSEN:**  Your Honor, may I just interrupt for a

7    moment, because we have --

8        **MR. VANZANDT:**  I wish you wouldn't.

9        **MS. SIMONSEN:**  Well, we have --

10       **MR. VANZANDT:**  I'm in the middle of talking.

11       **MS. SIMONSEN:**  -- prior agreements, though, that the

12   names of specific custodians are not something that is to be

13   disclosed on the public record.  So...

14       **MR. VANZANDT:**  Okay.

15       **THE COURT:**  Refer to people just --

16       **MR. VANZANDT:**  Understand.

17       **THE COURT:**  -- generically as an officer.

18       **MR. VANZANDT:**  Understand.

19       The former head of Instagram, one document dated before

20   December 2012.

21       The former chief operating officer from 2007 to present,

22   no documents.  None.  Out of 10,000 documents, none before

23   July 1, 2013.

24       The outgoing chief operating officer at Meta from 2008 to

25   2022, no documents before April 1 of 2014.

1        And then, finally, the founder and CEO of Meta, there from

2   2004 to present, there are zero documents dated on or before

3   December 31st, 2012, out of 8,000 documents produced.

4        So it is going to be -- it would be pure happenstance that

5   documents related to things like age verification and parental

6   controls would come up.  Defendants can't even guarantee it.  I

7   mean, they're hedging on words like "may" and "could," and

8   that's just not sufficient when we're talking about the

9   critical importance of this evidence as it relates to

10  negligence and punitive damage claims in the JCCP.

11       MS. SIMONSEN:  Your Honor, the reason there are not

12  many documents yet in plaintiffs' hands from before 2012 is

13  because, as Your Honor is aware, Meta originally collected

14  documents based on the relevant time period that it had

15  proposed.

16       Then, through negotiations and presentation of disputes to

17  Your Honor, the time period was expanded with respect to

18  feature-specific discovery back before 2012.

19       It was not until that point in time, which I think was a

20  month or two ago, that we were able to get all of the documents

21  falling within that universe before 2012 into our systems to

22  review, run the right search terms.

23       We have expressly informed plaintiffs that we have

24  substantially completed custodial file productions for the 36

25  or '7 anticipated deponents only based on the relevant time

1    period as we originally defined it.  The rest of the materials

2    are coming, and we have an agreement that the rest of the

3    materials will be produced by September 20th.

4         And with respect to, I believe, five anticipated deponents

5    who are scheduled to be deposed earlier, we're completing those

6    productions sooner.  And I don't believe any of the names that

7    I heard Mr. VanZandt say are within any of those early

8    deponents.

9         So that's the reason they don't have documents yet from

10   before 2012.

11        It is not hypothetical to imagine that documents hitting

12   on some of these search terms are going to be responsive to a

13   lot of plaintiffs' document requests.  I mean, an example would

14   be we've got the word "infinite," "endless begin," "endless

15   end," "pause," or "never-ending," any of those terms within

16   five of "scroll," "feed," "news feed," or "newsfeed."

17        These are very broad terms.  And so, you know, I don't

18   think there's any reason to doubt -- and I think the bottom

19   line too is that Your Honor previously indicated that to the

20   extent plaintiffs could come to you after receiving productions

21   and show a specific need for broader discovery, Your Honor

22   would be open to that.  Well, we haven't produced the documents

23   yet.  So it is, at best, premature for the plaintiffs to be

24   raising this.

25        My final point would be, Your Honor, that you did order

time-period-specific search terms for only certain features,

concluding, under a careful proportionality analysis, that

going back to January 1st of the year of launch for every

feature was a proportional approach to the case.

So while it, I think, is quite likely that plaintiffs

would get any documents relating to parental controls and age

verification before 2012 that may exist based on the search

terms we're running that are feature specific, it simply wasn't

Your Honor's order that plaintiffs get documents relating to

those specific features from before 2012.

**MR. VANZANDT:**  Your Honor, that's -- that's part of

the problem.  Your Honor's prior ruling is related to feature

specific, and it's tailored more to a product liability type

case, which is what the MDL is.  There may be a negligence

aspect to this case, but that has not been ruled on yet.  And

so your order -- Your Honor's order on that was following

Judge Gonzalez Rogers' order regarding a product liability

case.

In the JCCP, Judge Kuhl has explicitly ruled that

defendants' platforms are not products.  There is no product

liability case.  So we are dealing with only a negligence case,

which is a broader concept.

And explicitly, her -- Judge Kuhl's order consistently

discusses about defendants' conduct, their platform as a whole.

It is not a -- it is not a -- it is not a -- sorry -- design --

feature -- that's what I'm looking for.  It's not a
feature-by-feature concept that this Court is currently ruling
on.  It does go back to the reasonableness of their conduct and
the platforms as a whole and just focusing in on two really key
issues, and that would be age verification and parental
controls.

So age verification.  Going back to 2005, Facebook became
available to high school students in 2005; and then in 2006,
anyone 13 years or older were allowed to join.

And so under this current ruling, the search terms related
to things like age verification and parental controls would
only apply to the years that those things were launched.

And so for age verification, the first rudimentary age
verification that was put into place in 2013, which we believe
was insufficient, it was, again, 2013, almost eight years after
they began allowing people on there who had to be 13 years or
older.  It's eight years later before age verification is
implemented, and so we would get no discovery about age
verification going back for the first seven years.

THE COURT:  Ms. Simonsen, if you ran a search -- I
don't know if "age verification" as a phrase is a search term.
Let's assume hypothetically it is.  Just so I'm clear on what
you're doing, if you run that search term and something comes
up before 2013, you're going to produce it; right?

MS. SIMONSEN:  Oh, certainly, Your Honor.  For any of

1    the features that were launched on or after January 1st, 2012,

2    we will produce documents relating to those features to the

3    extent they hit on the search terms that we are running from

4    2012 and later.

5         THE COURT:  If something comes up before, like in 2005

6    or 2008?

7         MS. SIMONSEN:  So we're not running -- there are two

8    sets of terms.  There are the terms we're running from 2012

9    onward, and those were carefully negotiated by the parties.

10   Because those terms are so broad, including words like "youth,"

11   "teen" as standalone terms, there are not necessarily

12   feature-specific terms for every feature because any document

13   that says the word "teen" is going to be pulled in for review;

14   right?

15      Now, we're not running any feature-specific terms for

16   features launched after January 1st, 2012, before that date, in

17   accordance with Your Honor's order.

18        THE COURT:  Okay.  So with the understanding that it's

19   possible the substantial completion deadline may get pushed and

20   the discovery period may be extended, why don't we wait and see

21   whether there really is a problem.  Because, I mean, you have

22   incomplete information on what's actually going to end up being

23   produced --

24        MR. VANZANDT:  Right.

25        THE COURT:  -- especially from some of these older

1    employees; and until you've got the universe there -- and

2    Ms. Simonsen -- I don't know if you -- she's correct.

3        If you find something in the document production that

4    points you to a direction that hasn't been picked up by the

5    search terms, I'm not foreclosing you from coming back.  And,

6    you know, probably what I'm going to do then, in that case, is

7    probably suggest very strongly that you work out, like, some

8    targeted search terms for those particular custodians, for

9    example; right?

10        And I'm not precluding that.  I'm not saying I'm going to

11    do it, but I'm also not saying I'm not going to do it.

12        But I do think there is certainly every opportunity to

13    come back to me and ask for more discovery.  But I don't think,

14    based on the current record -- because it's incomplete as to

15    what you are going to get once the productions are done based

16    on the currently -- currently implemented search terms.

17            **MR. VANZANDT:**  Understood.

18        And I believe I understood Ms. Simonsen, she just

19    acknowledged that terms like "youth" and "teen," those are not

20    going to be run all the way back prior to 2012 and even the --

21    even the feature-specific search terms.

22        But I do want to make clear what our ask is here.  We're

23    being very narrow.  So we've identified a subset of 15 of the

24    RFPs.  That's only 5 percent of the entire RFPs in this case.

25    And we already have negotiated with the defendants the

1    agreed-upon core youth search terms, which is a limited list of

2    search terms.  So it's very, very narrow what we're asking, and

3    it would only be related to 22 custodians who were at the

4    company before 2012.

5        So we're not looking to undo anything.  95 percent of what

6    Your Honor has ordered, the RFPs are untouched.  But we do

7    believe that this is really a critical issue here, and so we

8    would be doing this, and very limited.

9        I understand what Your Honor is saying, and I think that

10   makes sense.  But I would ask this:  Even in the meantime, we

11   could be working with the defendants to confer and do run hits

12   for these search terms -- the terms have already been

13   negotiated; they have the documents and custodians -- so we

14   could see what actually is.  Do run hits for these youth terms

15   for that time frame and see what the issue is.

16       **THE COURT:**  I mean, I actually assumed when you're

17   negotiating, part of the negotiation often is to get hit

18   reports.  You haven't done that?

19       **MS. SIMONSEN:**  No.  We absolutely did that,

20   Your Honor.  We ran -- we gave them many hit reports relating

21   to the terms that we are running over the general relevant time

22   frame.

23       **THE COURT:**  Do it for these other terms.

24       **MS. SIMONSEN:**  Because we were able to, as I recall

25   correctly, accept plaintiffs' proposal on feature-specific

1     terms without modification, I don't believe we produced hit

2     reports on feature-specific terms, but that's because we were

3     not claiming any kind of burden.  We agreed to run the terms

4     that the plaintiffs were requesting.

5              **THE COURT:**  I do think in the interest of time,

6     because we're waiting for you to finish the production --

7     again, it may turn out that some of these older -- not

8     "older" -- these employees who have been around longer don't

9     have anything because, just over time, things disappear and

10    just, you know, go away and are not kept.

11         So -- and as the plaintiffs receive more documents, you

12    may want to refine some of the terms as well.  You may want to

13    refine some of the custodians and maybe narrow it even further.

14         So I would suggest very strongly that you continue to meet

15    and confer on this as you get more information and run hit

16    reports so you can talk intelligently about how much more work

17    and how many more documents this is going to sweep in.  Because

18    if it's, like, a handful of extra documents, even across all

19    the other custodians, why fight about it; right?

20             **MS. SIMONSEN:**  Your Honor, the issue is that running

21    brand-new search terms over the files of 22 or more custodians,

22    whatever the number is, is not as straightforward as you may

23    think because there is a -- there is sort of a two-step process

24    involved in pulling in the relevant set of custodial files

25    based on the search terms that have been agreed upon.

         If we have to go back and repull based on new search
terms -- I will tell you, Your Honor, we spent a massive amount
of time and resources negotiating these terms already with the
plaintiffs.  The JCCP plaintiffs were very much welcome to the
table for those negotiations.

         And I think it's really inefficient.  It's really,
frankly, I think, unfair to Meta, which has been a very good
faith actor in all this, to require us to now go back and redo
this process because the JCCP plaintiffs want to throw a few
more search terms in for what is supposed to be narrow,
feature-specific discovery before 2012.

         We may be voluntarily agreeing to substantially broaden
it.  But to be clear, we believe Your Honor's ruling, which
limited pre-2012 discovery to feature-specific discovery, was
the right ruling.  And that is the position we would take, even
if plaintiffs do come back with some request for new search
terms to pick up more general liability discovery, as they
refer to it.

         So I just want that to be clear.  I think we should wait
and see.  If there is some specific document plaintiffs think
they need or that's missing that's, frankly -- it would,
I think, in our view, have to be feature specific as to the
specific features that Your Honor permitted discovery back to
that point in time -- we'd be happy to talk with them about it.
Of course they can come to us if they think that we need to run

1    something broader, and we will certainly talk with them.

2         But I think it's premature to be, in the middle of us

3    trying to get massive productions out the door in a really

4    short period of time, interfering with that, which it would, to

5    try to be running a whole new set of hit reports.

6         **THE COURT:**  I mean, you could prioritize.  You don't

7    have to do all the search terms.  You could run sample search

8    terms of what the plaintiffs think are the most important five,

9    or whatever, three search terms across only one or two

10   exemplary -- so, for example, the oldest employee of Meta,

11   like, his files -- and see what comes up; right?  Because,

12   again, maybe very little comes up, and you're arguing about

13   something that's a tempest in a teapot.

14        **MR. VANZANDT:**  So --

15        **MS. SIMONSEN:**  I appreciate Your Honor's guidance.

16        I do think -- I mean, what Mr. VanZandt is essentially

17   asking is for Your Honor to reconsider your prior ruling

18   without any change --

19        **THE COURT:**  But I'm not doing that, and I'm not -- but

20   I am -- like I said, if there's a good reason to come back for

21   more discovery that's beyond the limits I've set -- within

22   reason; right?  And it has to be a good reason, not just

23   because somebody just wants it; right? -- then make the pitch

24   and we'll talk about it, and hopefully, you actually agree to

25   it.

 1          But it does seem to me that, just as on the plaintiff

 2     side, they need to wait and see how many documents you actually

 3     do end up producing from pre-2012 or whatever, it does help

 4     understand the scope of the dispute to run some sample hits.

 5          You don't have to run all the new terms.  You could

 6     pick -- I suggest the plaintiffs pick, you know, the top three

 7     or top five, a subset of those terms that you think are the

 8     most important.  But you were able to identify for me age

 9     verification and parental controls.  There are probably search

10     terms that go directly to that; right?

11          **MR. VANZANDT:**  So, Your Honor, these search terms are

12     a little different because, as Ms. Simonsen is indicating,

13     they're suggesting that they're going to run feature-specific

14     search terms.  The problem is, if the feature didn't exist,

15     that's not going to be part of that.

16          We're talking more general search terms related to ages,

17     young, youth, adolescents, child, because we're talking

18     eight years.

19          **THE COURT:**  Yeah.  And so when I'm talking about

20     running hit reports, I'm talking about running hit reports on

21     the new terms that you said you've negotiated or you've already

22     talked about.

23          **MS. SIMONSEN:**  We have not, Your Honor.  I really have

24     to resist this because what Mr. VanZandt is suggesting is that

25     we go back and, even though we've negotiated a relevant time

1    period for a set of general search terms, Mr. VanZandt now

2    wants us to go back and run, as I understand it, all of those

3    I think it's over 300 search terms --

4          **MR. VANZANDT:**  No, no, no.

5          **MS. SIMONSEN:**  -- or some subset even, over a set of

6    documents that was -- that was collected merely to satisfy

7    Your Honor's directive that feature-specific discovery before

8    2012 occur.

9          And it's just not appropriate.  It's inconsistent with

10   Your Honor's prior ruling.  You've already decided the issue.

11   There are no new facts, no changes in circumstances, no new law

12   that would -- that would justify requiring us to go back and

13   completely revisit this.

14         And I have to emphasize, it was very, very difficult to

15   arrive at a set of terms that was as broad as what plaintiffs

16   were demanding while also ensuring we could meet the

17   substantial completion deadline that we have committed to for

18   all of these 35-plus anticipated deponents by September 20th.

19         So I just would ask that Your Honor -- I take the

20   guidance.  We will be happy to confer with the plaintiffs if

21   there's something, particularly if it's feature specific from

22   before 2012, that they think is missing.

23         But to revisit general discovery before 2012 at this point

24   in time, they just haven't made the showing they would need to,

25   which is to get reconsideration of Your Honor's prior ruling.

1          **THE COURT:**  I guess maybe we're talking in

2     abstractions.  Is the -- is age verification not feature

3     specific?  Is parental control not feature specific?

4          **MS. SIMONSEN:**  Age verification and parental controls

5     are two features that were not launched prior to 2012.  So what

6     that means is the search terms that were negotiated from 2012

7     forward are intended to encompass any documents that might

8     relate to those features.

9          Those terms are very broad.  They include 20-plus

10    standalone youth terms like "teen," "young," "youth," that sort

11    of thing; and so any document hitting on, for instance, the

12    term "teen" is going to be pulled back.  And if it also

13    discusses the implementation of parental controls or age

14    verification, it will be -- and it's responsive to the

15    plaintiffs' RFPs, it will be produced.

16         **THE COURT:**  Well, it sounds to me like what you need

17    to do, then, before you can run even sample hit reports, which

18    I do think at some level is going to be useful for me to help

19    figure out whether or not any further discovery going back to

20    that historical time period is even warranted, is work out

21    three -- okay? -- three sample search terms -- right? -- that

22    you think cover whatever you think you want to take discovery

23    on -- right? -- from that early period.

24         It could be the phrase "age verification."  It's not going

25    to be the entire universe of large, you know, sets of search

terms from 2012 onward that have been previously negotiated.

It's going to be targeted.  As I understand, you've already

represented it's a limited number of search terms.

**MR. VANZANDT:**  Your Honor, we're proposing across 22

custodians to run 20 search terms that the parties have already

negotiated that are core youth search terms.  That's the entire

universe of what we're requesting.  I certainly understand your

instruction on doing some samples.

**MS. SIMONSEN:**  I believe Mr. VanZandt is conflating

the issue.  There are over, I think -- there are hundreds of

search terms that the parties negotiated to run from 2012

forward.  We then negotiated feature-specific terms to run from

2012 backward.

We have not negotiated any general terms or other terms to

run from 2012 backward.  And if I looked at this list, I

imagine it's going to include really broad words like "teen"

and "youth" and "young."  It's not going to be targeted.

So, again, what they are seeking is broad liability

discovery from before 2012, and that's just not consistent with

Your Honor's order enforcing principles of proportionality.

We're already going back to 2012, 12 years of general liability

discovery.

**THE COURT:**  Okay.  So in all of plaintiffs' arguments,

although the theory of liability is general negligence and all

that, you are pointing to specific features.  I mean, to prove

1    negligence, you have to point to exactly where the negligence

2    occurred, such as they did not implement age verification when

3    you thought they should have; right?

4            **MR. VANZANDT:**  Right.

5            **THE COURT:**  And so this attempt to distinguish kind of

6    broad-based platform-as-a-whole liability as opposed to

7    feature-specific product liability, for purposes of discovery,

8    I don't actually -- because they blend into each other and I

9    don't see a hard line between them.

10        But I do think, again, for my benefit -- right? -- work

11   out three to five targeted search terms that you think would

12   hit on documents that predate 2012 for a limited number of

13   custodians -- right? -- and maybe two -- right? -- just to get

14   some statistics here.  Right?

15        So first you need to work out what those limited number of

16   search terms are, and then you need to work -- and then you

17   need to identify which of the two custodians you want to do.

18        And then hopefully by that time, you'll have received more

19   documents through the productions; right?  And then Meta can

20   take the time to run some sample hit reports to see what this

21   sample hit -- search term hits on those custodians' documents.

22        And I'm not giving you hard deadlines to do it because I

23   understand that there's other things going on; but do it,

24   you know, with all deliberate speed; right?  Because I assume

25   at the next DMC, there's going to be a dispute now over whether

```
 1   or not I should, in fact, order more discovery pre-two
 2   thousand -- more documents pre-2012, and it would help for me
 3   to have those statistics on what came up in these sample
 4   searches.
 5        MS. SIMONSEN:  If I may, Your Honor.
 6        What I'm hearing is that you'd like us to run three to
 7   five targeted search terms.  Do I understand correctly that
 8   that's feature-specific search terms?  Because there is not --
 9   it's not going to be instructive for us to run a term like
10   "teen" before 2012 -- right? -- or many of the very broad terms
11   that we've agreed to run.
12        THE COURT:  Again, like I said, yes, I do think it
13   should be feature specific or at least feature targeted because
14   the theory of liability, even in the JCCP case, is going to --
15   you have to point to which features should have been
16   implemented.  You can't just say it was negligent as a whole.
17   Like, what does that mean?
18        MR. VANZANDT:  So Ms. Simonsen's proposal would be for
19   us to search for features eight years before they existed.
20        Instead, we want to know what Meta and the leaders at Meta
21   were talking about in 2005 and 2006 when they decided to let
22   teenagers on their platform or they decided to allow 13-year --
23   someone 13 years old with no age verification and no parental
24   controls.  They likely weren't discussing a feature that didn't
25   come into existence previously.
```

1    So we're looking at very specifically what was happening

2    around the time frame that former president Sean Parker of the

3    company said that they consciously knew what they were doing

4    and they did it anyway.  That is not related to a feature.

5    It's related to their conduct, and it's related to their notice

6    and intent.

7    If they -- if they discussed whether or not children of a

8    certain age should be on there or not and they did do nothing

9    to prevent it, they didn't implement a feature, we need to know

10    what's those discussions were.

11    **THE COURT:**  You just used the word "feature."  That's

12    my point.  In order for them to have notice of what they should

13    have done, there should have been -- the feature comes up in

14    that context; right?

15    **MR. VANZANDT:**  The feature is necessary because of a

16    harm that was happening.  So they could be discussing potential

17    harms to youth that could have -- that could happen that they

18    were seeing.  It doesn't have to be tied to a -- to a specific

19    feature.

20    **THE COURT:**  Well, I think if the terms are targeted

21    enough and they're focused on a feature, they're going to --

22    they're going to pick up the documents that relate to them.

23    And you come back again and say, "Look, we now have

24    one-half of a report or a report from this week, but there was

25    one from the previous week that didn't come up and it's clear

1    they're related."  You know what I'm saying?  It's not going to

2    be perfect; right?

3         **MR. VANZANDT:**  Yeah.  But we're explicitly not asking

4    to search for things like age verification.  Instead, we are

5    asking 20 terms related to underage users.  That's what we're

6    trying to get at.  It's terms such as "young," "youth,"

7    "adolescent," "child."

8         If in 2006 Mark Zuckerberg is discussing "child" in

9    relation of who's on their platform, that is very, very

10   relevant if they're talking about harm to those children.  So

11   we are looking to sample these search terms.

12        **THE COURT:**  Even under California rules, that's going

13   to be overbroad and oppressive.  You can't just ask for any --

14   because the word "teen" could come up in so many different

15   contexts.

16        **MR. VANZANDT:**  Your Honor, the whole case is about

17   teens and children.  I mean, that's what this entire litigation

18   is about.

19        **THE COURT:**  But he could be talking about, like, you

20   know, teenagers' favorite flavor of bubble gun.  It has nothing

21   to do with this case.

22        **MR. VANZANDT:**  Why would they be talking about that

23   internally?  They're talking about getting teens addicted to

24   their platform.  That's what we're alleging they planned all

25   along.

1      **THE COURT:**  Again, you've got to come up with more

2   targeted terms to get at what you're getting at because just

3   general terms here -- this is why I think the features are a

4   good way of -- a lens of looking at what your negligence claim

5   is going to be because the harm is related to the feature that

6   was or wasn't implemented.

7      **MR. VANZANDT:**  Your Honor, the harm in the JCCP, we're

8   not -- it's not a feature-based case.  It is about --

9      **THE COURT:**  You're arguing --

10     **MR. VANZANDT:**  It is about their conduct --

11     **THE COURT:**  I've read the briefing.  You're arguing

12  that they knew -- you said it to me -- that they had notice

13  that this was a potential harm and that they should have

14  implemented this feature; right?  That's part of your thesis;

15  that the key to the negligence, as I understand, been briefed

16  to me that I've seen, is that the lack of the feature when they

17  had notice of the harm is part of the theory of the case;

18  right?

19     **MR. VANZANDT:**  And we need to know --

20     **THE COURT:**  Tell me if I'm wrong.

21     **MR. VANZANDT:**  Sure.  And we need to know when they

22  had notice of the harm.

23     **THE COURT:**  First, am I wrong in understanding that's

24  kind of the general thesis of the case?

25     **MR. VANZANDT:**  We need to know when they had notice of

1    the harm.  Searching for the title of a specific feature that

2    didn't come into existence eight years from that time is not

3    very helpful.

4        **THE COURT:**  This is where I want you to work out,

5    because I'm not saying the search term has to be the feature,

6    but there's got to be a way to come up with a search term that

7    captures the concept of the harm and the feature at the same

8    time.

9        I mean, you-all are smart.  You know how to craft search

10    terms.  There has to be a way to come up with something that's

11    not just the word "age verification" -- right? -- but addresses

12    what you're getting at -- right? -- that would capture both the

13    harm and the feature; right?

14        But I think getting away completely from the feature which

15    addresses the harm is going to -- you get -- you get way too

16    overbroad then.

17        **MR. VANZANDT:**  And then just one last thing.  I don't

18    want this to go unsaid.

19        Ms. Simonsen said there's been no changes in

20    circumstances.  I know the last time we were here talking, the

21    JCCP bellwether pool had just been selected.  There's been

22    changes; plaintiffs in, plaintiffs out.  But as it stands right

23    now, we have three bellwether plaintiffs, one who started

24    Facebook in 2006, one who started in 2008, and one who started

25    in 2009.

1    So that's really what has led partly this push because

2    they're going to be missing critical evidence for what was

3    going on in the company when they started using the products.

4    The features implemented in 2012 or later are not helpful for

5    those plaintiffs.

6         **MS. SIMONSEN:**  And, Your Honor, plaintiffs will get

7    documents going back to 2006, the earliest date they've

8    identified that the bellwether plaintiffs that have been

9    selected used the platforms.

10    If anything, this argument only underscores why they

11    absolutely should not get anything going back before 2006,

12    which is something else they've been seeking.

13    And Mr. VanZandt's argument about the feature-specific

14    issue, Your Honor is exactly right.  Both in this Court and in

15    the JCCP, the Courts, in deciding the motion to dismiss the

16    demurrer there, adopted a feature-specific framework, and

17    that's because the JCCP plaintiffs' negligence claim was

18    equally predicated on challenging specific features of

19    defendants' platforms.

20    That's in their master complaint at paragraphs 295 and

21    439.  They allege that an array of design features embedded in

22    defendants' services work in combination to induce various

23    harms.

24    In paragraphs 929 through '30, they specify the challenged

25    features for their negligence claim.

1    And the JCCP Court, even in its demurrer ruling, framed

2  the negligence analysis on a feature-specific basis.  The Court

3  said (as read):

4         "Plaintiffs are clear that they seek to prove

5         injury to minors from the features that defendants

6         used on their platforms, and that plaintiffs'

7         allegations and their" -- quote -- "'harms' were

8         caused by the design features of defendants'

9         platforms is critical to this Court's decision."

10        That's at the demurrer order, pages 10 and 39.

11        Also at page 56, the Court held (as read):

12         "Because the master complaint can be read to

13         state that defendants' design features themselves

14         caused plaintiffs' harms, the demurrer cannot be

15         sustained."

16    So it's -- it's -- there is no distinction.  The mere fact

17  that there are not product liability claims that remain in the

18  JCCP has nothing to do with the fact -- with the reality that

19  what remains are claims that are feature focused, both in the

20  MDL and the JCCP.

21         **THE COURT:**  Well, as I said, I think you two should

22  work out -- these are just sample search terms; right?  Work

23  them out in a way that -- I mean, it's not going to be perfect

24  for either side; right?  It can't be so narrowly focused.  It

25  can't be just the word "age verification," or it can't be just

1    "the feature," but it should be broad enough to encompass the

2    concept -- because search terms are just conceptual anyway --

3    the concept that would pick up the harms that they're talking

4    about from the lack of the features, if you understand what I'm

5    talking about.  Right?

6         **MS. SIMONSEN:**  Yes, I do understand Your Honor's

7    suggestion.  And, I mean, we're happy to confer with them.

8         I do want to just reserve the right to continue to argue

9    that regardless of the outcome of those searches, we don't

10   think additional discovery is warranted but --

11        **THE COURT:**  The reason I need the searches and the hit

12   reports is so I can figure out how burdensome and how overbroad

13   this is anyway.  Because, like I said, it could be five

14   documents and everybody could be happy; or it could be

15   5 gazillion documents and then we've got to rethink what we're

16   going to do.  And I'm not going to make -- I can't make a

17   judgment in the vacuum here.

18        **MR. VANZANDT:**  Understood.

19        And, Your Honor, for the record, I would also like to

20   reserve the right to continue arguing with Ms. Simonsen on this

21   issue.

22        **THE COURT:**  Everybody's supposed to keep meeting and

23   conferring.  So, yes, you should.

24        **MR. VANZANDT:**  Sure.

25        **THE COURT:**  Yes.

1      **MR. VANZANDT:**  But to just kind of show what

2  Ms. Simonsen did, reading a bunch of picked-out allegations, I

3  could do the same thing, that don't defer -- don't refer to

4  products from the demurrer ruling of Judge Kuhl.

5      (As read):

6          "Whether or not defendants are liable should be

7          determined by focusing on the defendants' conduct.

8          Defendants are alleged to have facilitated use of

9          their platforms of youth underage by 13."

10     It's not talking about any specific -- so I could go

11  through three pages of more general allegations that

12  Ms. Simonsen left off.  But at the end of the day -- and I'll

13  stop with this.  At the end of the day, I mean, negligence is

14  not about specific features.  It is about how Meta reacted when

15  they found out about the harm.  And it is not always going to

16  be tied to specific features, and that's really all we're

17  trying to get at here.

18      **THE COURT:**  Well, let's take it a step at a time.

19  Work out the search terms, get some sample hit reports and see.

20  And, hopefully, the search terms, they're going to be

21  negotiated in a way that hopefully will address both sides'

22  concerns about underbreadth and overbreadth.  Okay?

23      I will say -- this has come up a couple of times -- the

24  Sean Parker interview, I don't know if the plaintiffs have done

25  this, but that's an example of -- I assume you've served

1    discovery asking for what was he talking about or getting at,

2    what was he referring to.

3        And so, to me, there are ways to get at your general

4    liability/general negligence discovery if you can point to

5    something specific that's already in the record to say, "We

6    need follow-up discovery on that." And, again, I don't think

7    Meta's going to oppose that if it's rational, reasonable, and

8    proportional. All right?

9        So --

10            **MR. VANZANDT:** Understood, Your Honor.

11            **THE COURT:** -- I'm not foreclosing you from taking

12    that discovery.

13        It's a matter -- here, we're talking specifically about

14    the documents and the document searches.

15            **MR. VANZANDT:** Okay. Thank you for hearing us on this

16    issue again. Thank you.

17            **THE COURT:** Okay. All right.

18            **MS. SIMONSEN:** Thank you, Your Honor.

19            **THE COURT:** I'm afraid I'm going to hear it again,

20    aren't I? I'm happy to hear it.

21        Okay. So for the ease of staff, let's take a break again.

22    Ten minutes.

23            **THE CLERK:** 3:40.

24                    (Recess taken at 3:31 p.m.)

25                    (Proceedings resumed at 3:43 p.m.)

1          THE CLERK:  Now recalling 22-3047.

2          THE COURT:  Okay.  Are we done with the ripe issues?

3   Because TikTok got resolved; right?

4          MR. WARREN:  Your Honor, there is one other issue

5   that's listed as ripe in the statement which concerns Meta's

6   production of hyperlinked documents.

7          THE COURT:  Oh, right.

8          MR. WARREN:  Before getting to that, though, I did

9   want to note that Ms. Simonsen and I had an opportunity to

10  briefly touch base on the case-specific discovery issue, and

11  I think I can represent -- or I'll let Ms. Simonsen represent

12  herself.

13         MS. SIMONSEN:  Your Honor, we just wanted to

14  clarify -- Ashley Simonsen again, Covington & Burling, for the

15  Meta defendants -- that given travel schedules, we won't be

16  able to meet and confer on those limits immediately after this

17  session today, but we will confer with plaintiffs tomorrow.  We

18  believe and will absolutely endeavor to come with a

19  counteroffer to an offer that Mr. Warren has already made.

20         THE COURT:  Great.  Good to hear.

21         MR. WARREN:  And I appreciate Ms. Simonsen getting my

22  name right, for the record.

23      So on the issue of Meta hyperlinked documents, so I think

24  the parties are getting closer here, but I did want to sort of

25  flag for the Court what the issue is.

1          The issue is that, as we have looked through the documents

2     produced to date, it has become clear that our fears have been

3     realized.  About 30 percent, if not more, of all documents

4     produced by Meta contain one or more links to other documents

5     which are not attached as family members and are not otherwise

6     knowable to us.

7          It is our belief that many of those documents already

8     exist in the production set or will be produced, but we have no

9     way of relating those to the links as they appear in the

10    documents.

11         What has really compounded this problem is the slow pace

12    at which Meta has responded to our requests for hyperlinked

13    documents.  The last request we made was five months ago, and

14    Meta made the production last night.  That was simply 17

15    documents where we were identifying hyperlinks that we were

16    expecting to get a response to.

17         So what we have asked Meta to do is to -- is a protocol

18    whereby we can provide them with a list of documents containing

19    hyperlinks and, within 14 days, they will identify what those

20    links are elsewhere in the production or produce the documents.

21         So that has been our offer to Meta.  We think that is a

22    fair offer that the Court should ultimately so order; but in

23    fairness to Mr. Chaput, he has not had a chance to confer with

24    his client to get us a response to that.

25         So that is ultimately what we are seeking, plus sufficient

 1   information so that in our discovery database, we can actually

 2   make that relationship.  And we've provided a template to Meta

 3   that they can just fill out that our vendor can then take and

 4   ingest and actually make those relationships clear.

 5        This is becoming increasingly urgent as depositions become

 6   scheduled.  We cannot show up to the depositions with a handful

 7   of documents that are essentially incomplete.

 8        And I do have an example of one such document so you can

 9   see the extent of the problem, which I'd like to hand up to

10   the Court just to illustrate where we are this with.  So if I

11   may approach.

12                (Document handed up to the Court.)

13        **MR. CHAPUT:**  If I may, Isaac Chaput, Covington &

14   Burling, on behalf of the Meta defendants.

15        It was my understanding prior to this conference that this

16   issue was not going to be substantively argued today, so I'm a

17   little bit surprised, frankly, that Mr. Warren is now handing

18   documents up to the Court that I haven't seen before, we

19   haven't talked about, or anything like that.

20        Mr. Previn -- Mr. Warren -- excuse me.  I apologize.

21   Mr. Warren's offer that he referenced was made this morning.  I

22   told him that I'm conferring with my client about it and that I

23   would get back to him as soon as possible.

24        This issue simply is not ripe, Your Honor.  And I think

25   that consistent with Your Honor's prior guidance, the parties

1  need to confer before we start raising things with the Court

2  and submitting loads of information that really isn't pertinent

3  for resolution at that moment.

4      **MR. WARREN:**  Your Honor, I really disagree.  It's

5  listed as ripe in the DMC statement.  I think the defendants

6  have come to the conference today with numerous new disputes

7  that were listed as status updates that they've wanted

8  the Court's clarification on.

9      And we're not asking the Court to take any action.  We're

10  providing an update.  We're informing the Court of the offer

11  that we've made to Meta.  And we expect a response from Meta

12  promptly, because this has been a very serious issue for us.

13      You know, I know that there is a potential extension on

14  the horizon that the parties are working through.

15  Notwithstanding that, the defendants have come to Your Honor

16  earlier today and asked for essentially accelerated productions

17  of things likes device images that would have to happen even if

18  there is a months' or more long extension.

19      So this is a very basic request that has come to the

20  attention of Your Honor before.  It has become a big problem

21  for us.  So we are simply alerting Your Honor to this issue.

22  I'm hopeful that Meta actually responds to our request in a

23  positive manner and agrees to what we proposed.  If not, we

24  anticipate coming back to Your Honor promptly on this.

25      **THE COURT:**  Since I'm not being asked to do anything

today, you don't -- there's no need for you to -- you're not

waiving any argument by not arguing this issue substantively,

Mr. Chaput.  So I understand that you need to work this out.

You're trying to work it out.  So I absolutely encourage that.

**MR. CHAPUT:**  I will just say, Your Honor, this is not

a new issue.  The parties knew all along that collection of

hyperlinks was going to be a problem.  Your Honor resolved it

in connection with the ESI protocol.  We are following the ESI

protocol.  We are getting them documents as quickly as we can

or finding the documents that are referred to.  It is a manual

process, and it does take time.

That -- all of that said, as I said, I am conferring with

my client about plaintiffs' request that was made this morning

in terms of this 14-day schedule, and we will get back to them.

**MR. WARREN:**  Your Honor, I just want to be clear about

when Mr. Chaput says they're working as fast as they can.

The individual plaintiffs in this case are being asked to

give full forensic images of their devices within a matter of

days.

Meta has taken five months to produce hyperlinked

documents that appear in 17 documents.  This is incredibly

dilatory behavior; it's not excusable; it can't work.  And

that's the new information that's come to light, not the fact

of the issue, but the fact that Meta's going to take this long

to respond to our requests.

1          **THE COURT:**  Okay.  Well, hopefully, you'll be able to

2    work out a protocol whereby documents identified by hyperlinks

3    are, if not expeditiously, reasonably quickly collected and

4    produced.  And certainly, five months seems pretty long.  So

5    whatever procedures internally you and your folks have to do

6    with probably contract attorneys, whoever's trying to find --

7    or ESI folks who are trying to find the hyperlinked documents,

8    you've got to figure out a way to speed that up anyway because

9    the volume is going to get bigger, I assume, anyway.

10          **MR. CHAPUT:**  Well, the volume may get bigger but,

11    hopefully, remain consistent with what the ESI protocol does

12    say, which is that the volume needs to be reasonable and

13    proportionate as well.  So --

14          **THE COURT:**  Well, 17 is not -- not documents --

15          **MR. CHAPUT:**  It was -- Your Honor, it was 17

16    documents.  The 17 documents, in fact, contained hundreds of

17    hyperlinks.  So that is part of the issue; right?  Your Honor,

18    is not hearing the full picture because we're arguing this live

19    instead of with the benefit of having fully conferred and

20    actually presented a ripe dispute to Your Honor --

21          **MR. WARREN:**  Your Honor --

22          **MR. CHAPUT:**  -- but we will be conferring.

23          **MR. WARREN:**  I apologize.  I didn't mean to cut you

24    off.

25          This was presented as a ripe dispute.  It's listed as a

1    ripe dispute.

2         And I do want to note, Mr. Chaput's point that there are

3    hundreds of hyperlinks that appear in 17 documents is an exact

4    illustration of the problem we're confronting.  Again, that's

5    17 out of over 100,000 documents that have been produced to us

6    so far that contain these links.

7         We have been incredibly judicious in what we've been

8    asking for.  And the volume does need to increase

9    substantially, perhaps beyond what the ESI protocol

10   contemplated, because we just can't go forward understanding

11   this information unless Meta actually produces what are in

12   effect attachments, although they're coming under a different

13   name with a different technical specification.

14        **THE COURT:**  Again, I'm not hearing anybody asking me

15   to make any rulings here.  All I can say is -- you know what

16   I'm going to say; right? -- work this out, if you can, because

17   this is really just a procedural -- it's a process -- right? --

18   to find the hyperlinked documents and get a process going that

19   everybody can work with.

20        It probably won't be as fast as the plaintiffs want, but

21   it can't be as slow as what the defendants have been doing.  So

22   try to work out something that is reasonably expeditious here.

23   Okay?

24        **MR. CHAPUT:**  We hear you, Your Honor.

25        **THE COURT:**  Okay.

1          **MR. WARREN:**  Thank you, Your Honor.

2          **THE COURT:**  Are we done with -- are we done for today?

3          **MR. WARREN:**  From the plaintiffs, yes, Your Honor.

4          **MS. SIMONSEN:**  Same from the defendants' perspective.

5     Thank you, Your Honor.

6          **THE COURT:**  There you go.

7          All right.  So we're adjourned till the next hearing.  Is

8     there...

9          Oh, you know what?  This is just more of a question.

10    I think there was an administrative motion filed in connection

11    with the request to submit additional information on state

12    agencies; and then there was, like, a second one filed, like,

13    immediately after, which by all appearances appears to be

14    identical and not superseding the first one.  So should we just

15    terminate the first one as moot?  Did the paralegal hit "file"

16    twice, or what happened there?

17         **MR. LEWIS:**  Chris Lewis for the AGs, Your Honor.

18         I think the first one can be taken as moot.

19         **THE COURT:**  Terminated as moot.  Will do.

20         All right.  And just make sure, if your paralegals or

21    secretaries happen to hit "submit" -- file it twice and that

22    happens again, I think there's a way in the system to -- and if

23    there isn't, send an email to Ms. Fox to -- because we --

24    otherwise, something voluminous like that, we've got to do a

25    comparison to try to figure out was there an intent here to

```
 1   file something that superseded the other or was it just a
 2   mistake.
 3            MR. LEWIS:  We'll do that, Your Honor.
 4            MR. CHAPUT:  Your Honor, if I may briefly.  Isaac
 5   Chaput for the Meta defendants.
 6        The document that plaintiffs' counsel handed up to
 7   the Court is marked "Highly Confidential - Competitor."  So I
 8   just wanted to make sure that that wasn't going to end up
 9   somehow filed or in the Court's records so that it's publicly
10   accessible.
11            THE COURT:  I handed it back.
12            MR. CHAPUT:  Okay.  I hadn't realized that.
13   Thank you, Your Honor.  That was all.
14            THE COURT:  Mr. Warren, why don't you take it back
15   because I'm not going to need it.
16                      (Document handed down.)
17            THE COURT:  So just for the record, I've returned the
18   document, so it's not in the court records at all at this
19   point.
20            MR. CHAPUT:  Thank you, Your Honor.
21            THE COURT:  Okay.  Anything further?
22                      (No response.)
23            THE COURT:  Okay.  When am I going to start hearing
24   from some younger lawyers?
25            MS. HAZAM:  You did today, Your Honor.
```

1          **THE COURT:**  All right.

2      Okay.  Well, look forward to seeing your status reports

3   and hearing that you've resolved everything.

4      We're adjourned.

5          **THE CLERK:**  We're off the record in this matter.

6   Court is in recess.

7                 (Proceedings adjourned at 3:55 p.m.)

8                          ---o0o---

9

10                   <u>**CERTIFICATE OF REPORTER**</u>

11      I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:  Sunday, August 11, 2024

15

16                          *Ana Dub*

17   _____

18          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter

19

20

21

22

23

24

25