Pages 1 - 153

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PETER H. KANG, MAGISTRATE Judge

IN RE:  SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY        ) No. 22-MD-03047 YGR (PHK)
PRODUCTS LIABILITY LITIGATION    )
                                 ) San Francisco, California
                                 ) Thursday
_____ ) September 12, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:         LIEFF CABRASER HEIMANN AND BERNSTEIN LLP
                        275 Battery Street
                        29th Floor
                        San Francisco, California 94111
                   BY:  **LEXI J. HAZAM**, ESQ.

                        LIEFF CABRASER HEIMANN AND BERNSTEIN LLP
                        250 Hudson Street
                        8th Floor
                        New York, New York 10013
                   BY:  **KELLY MCNABB, ESQ.**


                        MOTLEY RICE LLC
                        401 9th Street NW
                        Suite 630
                        Washington, D.C. 20004
                   BY:  **PREVIN WARREN, ESQ.**
                        **NELSON DRAKE, ESQ.**

                        MOTLEY RICE LLC
                        28 Bridgeside Boulevard
                        Mount Pleasant, South Carolina 29464
                   BY:  **JESSICA CARROLL, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:   **Debra L. Pas, CSR 11916, CRR, RMR, RPR***
              *Official Reporter - US District Court*
              *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          SEEGER WEISS LLP
                            55 Challenger Road
                            Sixth Floor
                            Ridgefield Park, New Jersey 07660
                    BY:  **JENNIFER SCULLION, ESQ.**

                            BEASLEY ALLEN CROW METHVIN PORTIS &
                              MILES PC
                            234 Commerce Street
                            Montgomery, Alabama 36103
                    BY:  **JOSEPH VANZANDT, ESQ.**


**For School District Plaintiffs:**
                            LEVIN SEDRAN AND BERMAN LLP
                            510 Walnut Street
                            Suite 500
                            Philadelphia, Pennsylvania 19106
                    BY:  **MICHAEL WEINKOWITZ, ESQ.**


**For Plaintiff City of Providence:**
                            KESSLER TOPAZ MELTZER AND CHECK LLP
                            280 King of Prussia Road
                            Radnor, Pennsylvania 19087
                    BY:  **MELISSA YEATES, ESQ.**


**For Plaintiff B.S. Filed on Behalf of Minor J.D.:**
                            SOUTHERN MED LAW
                            2762 B M Mongomery Street
                            Suite 101
                            Birmingham, Alabama 35209
                    BY:  **MARC MANDICH, ESQ.**


**For Plaintiff State of California:**
                            CALIFORNIA DEPARTMENT OF JUSTICE
                            455 Golden Gate Avenue
                            11th Floor
                            San Francisco, California 94102
                    BY:  **MEGAN O'NEILL**
                            **DEPUTY ATTORNEY GENERAL**

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff State of New Jersey:
                     NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
 3                   Division of Law
                     124 Halsey Street
 4                   Fifth Floor
                     Newark, New Jersey 07101
 5              BY:  VERNA PRADAXAY
                     DEPUTY ATTORNEY GENERAL
 6

 7
     For Plaintiff State of Colorado:
 8                   COLORADO DEPARTMENT OF LAW
                     1300 Broadway
 9                   Sixth Floor
                     Denver, Colorado 80203
10              BY:  BIANCA MIYATA
                     SENIOR ASSISTANT ATTORNEY GENERAL
11

12
     For Plaintiff Commonwealth of Kentucky:
13                   KENTUCKY OFFICE OF THE ATTORNEY GENERAL
                     Office of Consumer Protection
14                   1024 Capital Center Drive
                     Suite 200
15                   Frankfort, Kentucky 40601
                BY:  CHRISTIAN LEWIS, COMMISSIONER
16

17
     For Defendant Meta Platforms, Incorporated:
18                   COVINGTON & BURLING LLP
                     1999 Avenue of the Stars
19                   Suite 3500
                     Los Angeles, California 90025
20              BY:  ASHLEY M. SIMONSEN, ESQ.

21
                     COVINGTON & BURLING LLP
22                   Sales Force Tower
                     415 Mission Street
23                   Suite 5400
                     San Francisco, California 94105
24              BY:  ISAAC CHAPUT, ESQ.
                     SERENA SAFFARINI, ESQ.
25
```

1    <u>**APPEARANCES:    (CONTINUED)**</u>

2    **For Defendant Meta Platforms, Incorporated:**
                     COVINGTON & BURLING LLP
3                     One City Center
                     850 Tenth Street, NW
4                     Washington, D.C. 20001
                BY:  **PAUL SCHMIDT, ESQ.**
5

6
     **For Defendant Snap, Inc.:**
7                     MUNGER, TOLLES & OLSON LLP
                     355 South Grand Avenue
8                     35th Floor
                     Los Angeles, California 90071
9                BY:  **FAYE PAUL TELLER, ESQ.**

10
                     SKADDEN ARPS SLATE MEAGHER & FLOM
11                     1440 New York Avenue, N.W.
                     Washington, DC 20005
12                BY:  **JOHN BEISNER, ESQ.**

13

14   **For Defendant TikTok:**
                     FAEGRE DRINKER BIDDLE & REATH LLP
15                     90 South 7th Street
                     Suite 2200
16                     Minneapolis, Minnesota 55402
                BY:  **AMY FITERMAN, ESQ.**
17

18                     KING & SPALDING LLP
                     50 California Street
19                     Suite 300
                     San Francisco, California 94111
20                BY:  **BAILEY LANGNER, ESQ.**

21
                     KING AND SPALDING LLP
22                     633 W. Fifth Street
                     Suite 1600
23                     Los Angeles, California 90071
                BY:  **BRITTANY LITZINGER, ESQ.**
24

25

**APPEARANCES:   (CONTINUED)**

**For Defendant Tiktok:**

        KING AND SPALDING LLP
        1185 Avenue of the Americas
        New York, New York 10036
      **BY:  MICHAEL VIVES, ESQ.**


        KING AND SPALDING LLP
        1180 Peachtree Street
        Atlanta, Georgia 30309
      **BY:  GEOFFREY DRAKE, ESQ.**


**For Defendant YouTube:**

        WILMER CUTLER PICKERING HALE AND DORR
        60 State Street
        Boston, Massachusetts 02109
      **BY:  CHALOEA WILLIAMS, ESQ.**


        MORGAN LEWIS AND BOCKIUS LLP
        300 S. Grand Avenue
        22nd Floor
        Los Angeles, California 90071
      **BY:  YARDENA ZWANG-WEISSMAN, ESQ.**

               —   —   —

1                    **P R O C E E D I N G S**

2    THURSDAY, SEPTEMBER 12, 2024                    1:09 P.M.

3                         ---oOo---

4         **THE CLERK:**  Now calling 22-MD-3047, In Re Social Media

5    Adolescent Addiction and Personal Injury Products Liability

6    Litigation.

7         Counsel, when speaking please approach the podiums and

8    state your appearances for the record every time you speak.

9         And the court reporter today is Debra Pas.  Thank you.

10        **THE COURT:**  Good afternoon, everyone.

11        You all teed up a bunch of issues for today's -- this

12   month's hearing.  So what I've -- with the assistance of my

13   staff, we've put together a schedule to try to keep us -- keep

14   the train running on time so we try to hit everything.  And so

15   I'm going to call time at each phase so that we reserve time.

16        If we get to some of the later issues and there is --

17   we've run out of time -- because the court reporter has a hard

18   stop, I think, around 4:30.  We're only going to take two

19   breaks and ten minutes each.  And if we run out of time at the

20   end, you have no one to blame by your colleagues from the

21   previous subsections who went over their allotted time, and

22   we'll figure out what to do otherwise.

23        Before we dive into the issues that have been teed up for

24   disputes to resolve, is there anything anybody wants to raise

25   as a housekeeping matter or a general matter or something

1    that's outside the DMC statement?

2              **MR WARREN:**  Not from plaintiffs, Your Honor.

3              **MR. SCHMIDT:**  At some point, Your Honor --

4              **THE COURT REPORTER:**  I'm sorry, counsel.  You need to

5    state your name.

6              **THE COURT:**  For the record.

7              **MS. HAZAM:**  For the record, Lexi Hazam for plaintiffs.

8              **MR. SCHMIDT:**  Paul Schmidt for Meta.

9         At some point, it doesn't have to be now, but we would

10   just like to just briefly speak to Your Honor's Friday ruling

11   on the AG discovery and where we stand on that because I think

12   that's going to -- we're meeting-and-conferring on that right

13   now, but I think we already have issues that I just want to

14   flag for the Court because they may come up to the Court in

15   short order, but we're going to --

16             **THE COURT:**  You're not going to ask me to reconsider

17   that opinion, are you?

18             **MR. SCHMIDT:**  I am not, no.  We are not asking for any

19   reconsideration of it.  We appreciate the work the Court did on

20   entering that opinion.

21        What I think we're going to ask for is enforcement of that

22   opinion because from our perspective we're already -- we've

23   been able to meet-and-confer, which it's only been a week.  So

24   disappointing, but not remarkable.

25        But the position that has been taken on

1  meeting-and-conferring is a little remarkable in terms of

2  acting as if the order doesn't exist.  We've given the states a

3  pretty specific proposal in terms of let's talk about

4  custodians here and search terms here and document production

5  here.

6      What we've gotten back is:  We're not going to do it that

7  way.  We're going to have 250 meet-and-confers, even though

8  Your Honor's order said that's not how this is going to work,

9  on Pages 38 to 41.  We're going to have no search terms.

10 You're going to have to show relevance for every agency.  We're

11 going to object on an agency-by-agency basis, even though they

12 objected as a party five and a half months ago.

13     Essentially the only anything that would change in their

14 view of your order is we'd have AG lawyers in all these

15 meet-and-confers, but everything else would be the same.  So

16 we're conferring on that.  I think we've got one set up for

17 Monday or Tuesday to talk.

18     In the meantime, they have told us, I guess yesterday,

19 that they intend to appeal and seek a stay.  We will oppose

20 that.  There is no way we could get a stay and keep them on

21 track in these cases.

22     But we suspect that if we're not successful in the

23 meeting-and-conferring, we may need to come back for

24 enforcement of the order.

25     There's a small secondary issue, which is we've asked

1  again where do you stand on the holds, the issue that we talked

2  about, I think, two DMCs ago, and haven't gotten a response on

3  that and, hopefully, that's something we're able to work out.

4      **THE COURT:**  With the understanding you're taking up

5  time from the other issues, because this is not a ripe issue

6  yet.  You're just --

7      **MR. SCHMIDT:**  It's not.

8      **THE COURT:**  Okay.

9      **MR. SCHMIDT:**  It's a realtime crunch from our side.

10  That's why I just wanted to flag it for Your Honor real quick.

11      **THE COURT:**  Okay.

12      **MS. MIYATA:**  Bianca Miyata for the State AGs, Your

13  Honor.

14      If the Court would prefer, I'm happy to leave this to the

15  end of the hearing, should you prefer, but there are a couple

16  points that Mr. Schmidt raised that I would like to respond to

17  briefly.

18      I'm hearing a little echo sort of on that.  I hear an

19  echo, and I'm also hearing that the folks on video can't hear.

20  So passing that on to you.

21      **THE COURT:**  I'll leave it up to staff to make sure

22  Zoom is working.

23      It's not a ripe dispute in any event, and I know you're

24  going to continue meeting-and-conferring.  I urge you to try to

25  work things out, as always.  But if it turns into a ripe

```
 1  dispute, I assume you'll do the letter briefing and we'll go
 2  from there.
 3         MS. MIYATA:  Appreciate that, Your Honor.
 4     We do take issue with Mr. Schmidt's representation, but
 5  don't see the need to take the Court's time up with that at
 6  this point in time with the heavy docket we have today.
 7         THE COURT:  So you're not agreeing with everything
 8  that's -- reserve your right to dispute whatever has been said
 9  and you're not waiving your right to dispute it later, so I get
10  that.
11         MS. MIYATA:  Thank you, Your Honor.
12         MR. SCHMIDT:  If we can progress this, if we're not
13  able to get resolution, so we can tee it up out of time just
14  because it is urgent, we would appreciate having that as an
15  option, if we can't progress.
16         THE COURT:  There's no requirement to put it in the
17  DMC.  If you file a letter brief and you say to me in the
18  letter brief, "We would like this to be resolved quickly," I
19  could set a quick hearing.  We'll do, you know, whatever needs
20  to get done.
21         MR. SCHMIDT:  Thank you, Your Honor.
22         THE COURT:  But work out those issues in your
23  meet-and-confer.
24         MR. SCHMIDT:  We will, Your Honor.
25         MS. MIYATA:  In terms of teeing it up out of time, I
```

1   just want to be clear.  I don't believe that that means that we

2   would bypass the Court's normal process of

3   meeting-and-conferring, as well as filing a letter brief should

4   we not be able to come to agreement upon objections or concerns

5   here.

6           **MR. SCHMIDT:**  I got it by Your Honor's ruling that we

7   promptly meet-and-confer.  We called them -- we emailed them on

8   Sunday.  We will absolutely meet-and-confer.

9           **MS. MIYATA:**  And we have been emailing with opposing

10  counsel since Sunday, since the weekend.

11          **THE COURT:**  I assume you meant teeing up a hearing to

12  get this resolved quickly, not -- nobody is going to bypass the

13  briefing requirements or anything.

14          **MS. MIYATA:**  Thank you for that clarification.

15          **MR. SCHMIDT:**  Thank you, Your Honor.

16          **THE COURT:**  All right.  So given our full agenda

17  today, why don't we -- before we turn to the letter briefs, why

18  don't we talk about JD's routine device.  Who is going to

19  handle JDs laptop?

20          **MS. ZWANG-WEISSMAN:**  This is Yardena Zwang-Weissman

21  for the YouTube defendants.

22          **MR. MANDICH:**  Good afternoon, Judge Kang.  Marc

23  Mandich for Plaintiff JD.

24          **THE COURT:**  Good afternoon.

25      So as an initial matter, I understand, at least from

 1    counsel's representations, this is a device that is --

 2    plaintiffs' done -- I assume done a correct analysis and taken

 3    the position that it's not a main device or whatever, I forget

 4    whatever terminology we're using, and therefore didn't need to

 5    be swept into the normal electronic discovery procedures.

 6            **MR. MANDICH:**  That's correct, Your Honor.

 7            **THE COURT:**  What I don't know, and it's not clear

 8    here, is there are statements made that JD used the device

 9    occasionally -- I don't know if that was exactly the word, but,

10    you know, let's use the word "occasionally" -- to watch YouTube

11    videos.  One person's "occasionally" may be another person's

12    "habitually."

13        So can you provide any meat on the bones as to what

14    "occasionally" means?

15            **MR. MANDICH:**  I can.  I thought you might be curious

16    about that, so I had another conversation with her about it.

17        So step back, just to give you the context.  She goes to

18    Alabama Virtual Academy.  This laptop is what she uses to do

19    school every day.  It's not a laptop that's made available to

20    her by her school that she's using here and there.  This is how

21    she attends school.  It's used predominantly for school

22    activities.

23        To the question of the extent to which she's used it for

24    any social media access, she's never downloaded any of the apps

25    onto this laptop.  She's never visited Facebook, Instagram,

1   TikTok or Snap on this laptop.  And as far as YouTube,

2   occasionally.  She's had it, I think, somewhere between three

3   to four years.  There was a prior school laptop that wasn't

4   working correctly.  They changed it out before this litigation.

5        In that time, it's difficult, especially for kids, to

6   estimate, you know, exactly how many times, but she -- probably

7   a handful of times that she's used it to go on the YouTube site

8   and access a video on there.

9        **THE COURT:**  Were you able to determine whether she was

10  watching YouTube videos for school purposes?  Like, was it part

11  of an assignment or was it for personal purposes?

12       **MR. MANDICH:**  She's not -- hasn't been assigned

13  anything by the school to, you know, specifically access

14  YouTube or use it.

15       She has used it for school-related purposes, if she's

16  looking up, you know -- one of the examples she gave me was,

17  you know, if they got an assignment on a book to read or

18  something and she didn't have it, she would maybe look up, you

19  know, "audio book on YouTube."

20       She also has used it for personal reasons, but the amount

21  of times she's done that is very few and far between, and her

22  best estimate to me was maybe a handful of times.

23       **THE COURT:**  "A handful of times" meaning less than a

24  dozen?  Less than 100?

25       **MR. MANDICH:**  That's how I took it.  I think certainly

1    less than 100.  Now, a "handful" I would think, you know, a

2    dozen or so is probably the neighborhood we're talking about,

3    over a number of years.

4        And one other thought, and I think you're probably keyed

5    in to this from the briefing, it's expensive.  It's time

6    consuming to do the physical imaging of the device.

7        From our perspective, the value add in terms of relevant

8    discovery documents you'll get from this is far surpassed by --

9        **THE COURT:**  We're not even at burden yet.  I got your

10   points there.

11       Okay.  So if it really is only a handful of times, why

12   does this -- why does this matter?  Why do you need this

13   laptop?

14       **MS. ZWANG-WEISSMAN:**  Your Honor, we heard from counsel

15   a moment ago a lot of wishy-washy language.  He just said she

16   used it predominantly for school activities.  Predominantly is

17   not entirely for school activities.

18       He said:  It's very different for kids to estimate how

19   often they use these devices and for what purpose.

20       That is precisely true.  I think we would agree that it

21   may be difficult at times for kids to give accurate

22   approximations for device use.

23       He also said that she used it for personal reasons.  We

24   know that that's true based on the discovery served today.

25       Counsel also said that that was probably how he

1  understood -- I believe he said "how I took it" when he had

2  those communications with the plaintiff in this case.

3      And, again, this is a bellwether plaintiff.  This is not

4  just a plaintiff in these proceedings.

5      Now, Your Honor, when we turn for a moment and look at the

6  discovery that is sworn under oath and has been conducted in

7  this case to date, we see something that provides a little bit

8  more clarity.

9      In discovery she answered -- Plaintiff JD answered under

10  oath that she used a school-issued device to access defendants'

11  platforms.  That was in her plaintiff fact sheet as early as

12  March of this year.  That was the first instance.

13      The second instance she repeated those, the same

14  disclosures, in her amended plaintiff fact sheet.  That was in

15  May of 2024.

16      She then served verified interrogatory responses stating

17  that she specifically -- and I quote, she specifically recalls

18  using her school-issued laptop to watch videos on YouTube.

19  That was in July of this year.

20      She admits that she has used this particular notebook for

21  years.  She says that she uses it currently, and presently, and

22  regularly.

23      So this is not some tangential device that may be used on

24  occasion.  And if, in fact, it turns out that that is the case,

25  that's something that we should be able to investigate and

1  uncover through the course of discovery.

2      So the only reason, Your Honor, that this device is not

3  presently on the spreadsheet for forensic imaging is because

4  plaintiff herself made the unilateral decision not to include

5  it on that spreadsheet.

6      **THE COURT:**  Okay.  So help me out here.  What is it

7  that would be on the laptop that you wouldn't get from -- the

8  rest of her history on YouTube that you wouldn't get from your

9  own files?  What -- what are you looking for?

10      Because if it is really just primarily a school-use

11  laptop, I'm not sure what -- what is it that you wouldn't get

12  from other sources that could be on that laptop?

13      **MS. ZWANG-WEISSMAN:**  Well, even if we take counsel's

14  representations today at face value, it is clearly the case

15  that she did not use the device exclusively for school.

16      So separate and apart even from her use of YouTube, she

17  could have used other apps, other devices, spent time on that

18  device --

19      **THE COURT:**  He just made a representation to the

20  Court, right, as an officer of the court, he made a

21  representation that he talked to her and she said she didn't

22  download and use any -- access any of the other apps.

23      **MS. ZWANG-WEISSMAN:**  There's many other different

24  uses, Your Honor, besides just from apps that can be downloaded

25  on a particular device.

1      And if, Your Honor, this is a device that, as described in

2  discovery responses, is used regularly, is used currently for

3  not just school purposes, there is no difference between this

4  particular device and the way she uses it than any other

5  device.

6      And I would note one other important fact about this

7  particular bellwether plaintiff, Your Honor.  This bellwether

8  plaintiff, JD, is homeschooled.  So as counsel represented, she

9  uses this device in connection with her homeschooling, which

10 means she is on it very often and uses it for purposes

11 throughout her days.

12     So there are -- there's a ton of discovery, much like a

13 personal device, that could be attained from this particular

14 school-issued notebook, and she has it in her present

15 possession, custody and control, which is very different than

16 some of the devices we had talked to Your Honor about

17 previously, which may have been returned to the school years

18 earlier and clearly might be another story.

19     But this is something that is regularly in use, not

20 exclusively used for school purposes, and we, as defendants,

21 should be able to probe into the use of -- in that device.

22         **THE COURT:**  Have you started talking about scheduling

23 her deposition?

24         **MR. MANDICH:**  We haven't yet.  At least not that I'm

25 aware of.  There may be group discussions on tiering the

1  plaintiffs.

2      **MS. ZWANG-WEISSMAN:**  Your Honor, plaintiffs are in the

3  very preliminary stages of providing documents to defendants

4  and that includes, of course, as we've talked about many times

5  here, the forensic images from the devices that are important

6  to prepare for those depositions.

7      **THE COURT:**  She has identified other main devices or

8  at least one other main device that she does use regularly?

9      **MR. MANDICH:**  Yes.  And her regularly-used devices

10  that she used to access social media have both been imaged,

11  both for logical and physical imaging in both those devices.

12      **THE COURT:**  Is her school able to give her a

13  replacement for the two or three days she would be without it

14  if I do order the imaging?

15      **MR. MANDICH:**  I would have to make that inquiry.  I'd

16  also have to make the inquiry that if she can't, that she can

17  be absent for a couple days from school so her parents don't

18  face, you know, a truancy charge.

19      **THE COURT:**  I'm talking about, can she get a

20  replacement laptop to keep attending school while they image

21  it?

22      **MR. MANDICH:**  I would have to make an inquiry on that.

23      **THE COURT:**  Here's what we're going to do.  I take the

24  point that there's been some wishy-washiness.

25      How much time do you need to confer with her or her family

 1  about getting a replacement from the school and seeing how

 2  feasible and how quickly that can be done?

 3      **MR. MANDICH:**  It's a conversation not with them, but

 4  with Alabama Virtual Academy.  So I have -- they have been very

 5  accessible to me, my client.

 6      As far as Alabama Virtual Academy, I don't know.  I've

 7  never spoken to them, but I would do my darnedest to -- a

 8  couple weeks?

 9      **THE COURT:**  Okay.  So I'll give you two weeks to

10  report back -- you can do it by status report -- on getting her

11  a replacement, whether it's temporary even, you know, a

12  replacement laptop from the school so that she doesn't miss

13  school.  If that can be done, then the laptop that she has now

14  would then be turned over for imaging.  Preferably over a

15  weekend, if that can be done, to again minimize disruption to

16  her school attendance.

17      **MR. MANDICH:**  Okay.  Fortunately, with the imaging of

18  her main devices, the -- it was two business days that it was

19  gone.  I think it was actually three, is what it turned out to

20  be, but I don't think that our vendor will be able to do it

21  over a weekend.

22      **THE COURT:**  Okay.  So I don't know how your -- I

23  thought since they are the one asking for it, that they, the

24  plaintiffs, would -- the defendants would be doing the imaging

25  through their vendors.

1          Is it through your vendor that it gets done?

2          **MR. MANDICH:**  Well, the way we have been producing

3  documents, besides just the defendants' documents from Download

4  Your Data, is through search terms, and we are -- we maintain

5  our position we would have an objection to just turning over an

6  entire device's history to the defendants.

7          **MS. ZWANG-WEISSMAN:**  Your Honor, this is a device

8  imaging issue, not a search term issue.

9          **THE COURT:**  Okay.  Report in the status report whether

10  -- talk to the vendor.  See if either side's vendor, just who

11  is going to do the imaging; or if you can find a third vendor

12  who can do it over the weekend, again, to minimize the

13  disruption.  Try to get it done over a weekend, if you can.  If

14  that can all be done, work reasonably together to work out a

15  schedule for the hand-over transfer and imaging and then the

16  return back.  Okay?

17          **MS. ZWANG-WEISSMAN:**  Absolutely.  Thank you, Your

18  Honor.

19          **THE COURT:**  Okay.  All right.

20          Another one I hope we can resolve quickly.  Damages

21  computation under Rule 26.  Who is handling that one?

22          **MS. YEATES:**  Good afternoon, Your Honor.  Melissa

23  Yeates for the school district plaintiffs.

24          **THE COURT:**  Thank you.

25          **MS. LITZINGER:**  Good afternoon, Your Honor.  Brittany

1    Litzinger on behalf of the defendants.

2         **THE COURT:**  Good afternoon.

3      So I'm clear -- I think I'm clear from the briefing.

4    Plaintiffs have provided at least a number without a

5    calculation as to the number, is that right, or am I just

6    misremembering?

7         **MS. LITZINGER:**  No.  Plaintiffs have not provided any

8    information for the non-bellwether school districts.

9         **THE COURT:**  Okay.  So --

10        **MS. YEATES:**  I think Your Honor may be referring to an

11    unripe dispute about the bellwether school districts.

12        **THE COURT:**  Okay.  No one has cited me any cases in

13    which the requirements of Rule 26 to provide a computation of

14    damages was completely eliminated from a case.

15     Does anybody know of a case that says that I've got the

16    authority to override and exempt someone from that part of

17    Rule 26?

18        **MS. YEATES:**  Your Honor, that's not the position that

19    the school district plaintiffs are taking.  We're not asking to

20    be exempted from Rule 26.

21     The cases that we have cited, including *Juul*, including

22    *Focal Point*, have found that Rule 26 requires an iterative

23    process throughout discovery.  There are initial disclosures

24    under Rule 26(a) throughout the discovery process.  Those

25    initial disclosures are supplemented through Rule 26(e).

1      And in complex litigations such as this it's standard

2  practice for those disclosures to provide computations of

3  damages and be supplemented at the time of expert discovery.

4  And that is recognized by Judge Spero in *Focal Point*.  Judge

5  Corley recognized that in the *Juul* case.

6      The issue here is two-fold.

7      Number one, the issue is that supplementation will require

8  expert testimony.  And so in *Juul* defendants argued, similarly

9  to defendants here, that damages computations would be

10 required.  They argued that was required under Rule 26 and it

11 should be included in the PFS.

12     And Magistrate Judge Corley rejected that and she said:

13          "Quantification and allocation of damages is more

14      appropriate through expert discovery."

15     So, yes, it should be provided under Rule 26, but the

16 timing is what is in dispute here.

17     And the non-bellwether school district plaintiffs are

18 happy to provide those damages if and when they proceed through

19 discovery in line with the Court's schedule.  And the cases

20 that we have cited, *Juul*, *Focal Point* and *Naxos* all find that

21 it's appropriate to supplement under Rule 26(e) to provide

22 those damages at the time of expert testimony pursuant to the

23 Court's schedule.

24     The second issue here is that this is an MDL, and so the

25 handful cases that defendants cited, they are not complex

litigation.  They are not MDLs where there is a bellwether

process.

    And in a bellwether process like this, the entire point of

the bellwether process is so that the case can proceed

proficiently and swiftly towards resolution and towards trial.

    So the discovery is focused on the bellwether school

districts.  That's what we have been providing.  Those are the

past compensatory damages that we did provide already.  We did

not think those were appropriate to provide in advance of

expert discovery, but defendants wanted that.  And so we

agreed.  In order to avoid burdening this Court with the

discovery dispute, we said:  Okay.  For the bellwether

plaintiffs we will provide, we will supplement at this time in

advance of expert discovery, understanding that we reserved our

rights to refine those through expert discovery pursuant to the

Court's schedule, but we did provide those computations of

damages for the bellwethers.

    But for the non-bellwethers it's not relevant at this time

of the litigation.  They are not subject to discovery.  It's

not proportional to the needs of this case, and it will not

drive the resolution of this MDL, which is what the bellwether

process was established to do.

        **MS. LITZINGER:**  Your Honor, if I may respond.

    Plaintiffs have not cited to a single case that

demonstrates that they are somehow exempt or that the

1    non-bellwether school district cases are exempt from their

2    obligations under Rule 26(a).

3        They did not seek relief from this Court given the proper

4    mechanisms under Rule 26(a), which they could have raised

5    before submitting their initial disclosures.  They did not.

6        To the contrary, when they served their initial

7    disclosures without the requisite damages computations, they

8    incorporated by reference their plaintiff fact sheet.

9        They continuously repeated throughout the next several

10   months and confirmed their intention that they would provide

11   these damages computations with their forthcoming plaintiff

12   fact sheets.  And then in April of this year they served their

13   plaintiff fact sheets without the damages computations.

14       Now, after a very extensive meet-and-confer, they have

15   changed their position and now claim that the non-bellwether

16   school districts are somehow not obligated to provide this

17   information pursuant to Rule 26(a) until discovery commences

18   for the non-bellwether cases.

19       This is unavailing for several reasons.  So, first, on its

20   face Rule 26 contemplates that information should be disclosed

21   without awaiting a discovery request.  Rule 26 also states that

22   disclosures must be based on information that's reasonably

23   available to the parties, and that a party is not excused from

24   its obligation to make these disclosures because it has not

25   fully investigated the case.

1          Now, here at this stage defendants are only requesting

2     information regarding past compensatory damages, which are

3     concrete and available to the school district plaintiffs now.

4     They have identified certain categories of past compensatory

5     damages that they are alleging in their plaintiff fact sheets

6     for the non-bellwether cases, including property damage, costs

7     incurred in hiring additional mental health professionals.  And

8     these are all within the possessions of the school district

9     plaintiffs now.

10         For example, with respect to property damage, the school

11    districts already know the cost of the property damage that has

12    been incurred, including any relevant repair amounts.

13         With respect to the increased hiring of mental health

14    professionals, that the non-bellwether school districts claim

15    each district should know how many mental health professionals

16    they have hired in the district, the salaries of each of these

17    professionals, et cetera.  So they can very easily calculate

18    these past compensatory damages.

19         There's no reason why they can't provide this information,

20    and they have provided some limited information for the

21    bellwether school districts, but there is really no difference

22    between those and the non-bellwether districts.

23         Plaintiffs also argue that the non-bellwether school

24    districts should be treated differently because they fall

25    within this MDL structure.  However, this is also unavailing

1   for quite a few reasons.

2        So first, Rule 26(a)(1)(B) expressly lists different types

3   of proceedings that are exempt from the Rule 26(a) initial

4   disclosures.  These include actions for review of an

5   administrative record, forfeiture actions in -- arising from a

6   federal statute along with seven other categories.  These

7   carve-outs do not include MDL proceedings.  They do not include

8   non-bellwether MDL cases.

9        And the school district plaintiffs have cited no authority

10  for the proposition that their obligations under Rule 26(a)

11  should be deferred until discovery in the non-bellwether cases.

12       Further, as I stated earlier, the school district

13  plaintiffs did not seek relief under the mechanism provided by

14  Rule 26(a), which allows a party to challenge the propriety of

15  initial disclosures at the outset before they are served.  And

16  as a result, defendants have been significantly prejudiced by

17  not having this requisite information.

18       The school district plaintiffs claim that defendants can

19  just use the information provided for the bellwether districts

20  and extrapolate that to non-bellwether school districts.

21  However, this is not the case for a few reasons.

22       The damages information provided for the bellwether cases

23  varies widely.  For example, one bellwether school district

24  plaintiff is alleging approximately $7 million in damage versus

25  another bellwether school district is alleging approximately

$760 million.  This is a difference of more than $700 million just between two bellwether plaintiffs.

These damages don't seem to be tied to concrete characteristics of the districts.  For example, the larger school districts do not always have the higher damages amount, nor do these damages amounts seem correlated to geography or demographics.  So it's nearly impossible for a defendant to extrapolate this information from the bellwether cases.

Plaintiff in their briefing and today cited to several cases that they state support their position.  However, these are all very distinguishable from what we're asking for here.

For example, *Focal Point Films* was raised.  This case involved a forward-looking claim for future profits.  That's not what defendants are asking for here.

*Naxos* considered the timeliness of supplemental disclosures rather than the adequacy of initial disclosures. Also not at issue here.

And *Juul* did not address Rule 26 at all.  That case related to a plaintiff fact sheet.

So for these reasons defendants respectfully request that plaintiffs be ordered to provide this information within 30 days.

          **MS. YEATES:**  May I respond --

          **THE COURT:**  I know your arguments.

Hypothetically if I were to order you to start -- I mean,

1    discovery has been going on for awhile, right, and you know

2    your clients.

3        Presumably if I were to order you today to start

4    collecting just those two categories of damages, past damages

5    raised by counsel, which is property damage and costs and

6    increased hiring, how long would it take to get that

7    information from your -- from the non-bellwether school

8    districts?

9        **MS. YEATES:**  It would take a significant amount of

10   time.  There are over 200 non-bellwether school districts.

11   This is opening full-blown discovery on those school districts.

12       Defendants already admitted that they want document

13   production --

14       **THE COURT:**  That's not my question.

15       How long would it take you to get property damage numbers

16   and increased hiring numbers from the non-bellwether school

17   districts?  A couple weeks?  A month?

18       **MS. YEATES:**  It would take several months.

19       **THE COURT:**  Several months?

20       **MS. YEATES:**  It was a very substantial, time-consuming

21   process when the bellwether school districts agreed to do this.

22   It already placed a burden on them and interfered with their

23   ability to produce custodial productions.  We've already had to

24   move the custodial production deadline out.  Substantial

25   completion has been moved to November 5th.  Those school

 1    districts are working hard to meet that deadline.  They have

 2    collected millions of documents.

 3        For the non-bellwethers to have to go through that

 4    process, 50 percent of the non-bellwether school districts are

 5    represented by the same counsel as bellwether school districts

 6    or leadership counsel.  It's a diversion of resources.  It's a

 7    distraction from the bellwether process.  It will threaten to

 8    disrupt this Court's schedule and it undermines the

 9    efficiencies of the entire bellwether process.

10        When we went before Judge Gonzalez Rogers in February, we

11    talked about all of her criteria in terms of geography, in

12    terms of size, number of students, reduced lunch, economics of

13    the school.  She put together this representative sample for a

14    reason.

15        The reason MDLs are created and a bellwether process is

16    created is so that you can have a representative sample.  And

17    the -- the delta that -- that defense counsel is talking about

18    in terms of a range of damages shows there is a representative

19    sample.

20        We have 12 bellwethers.  They are from different parts of

21    the country.  They are different sizes.  They have different

22    funding.  Some have to -- have increased resources.  Some

23    couldn't increase resources because they don't have that kind

24    of funding, and so they had to divert resources.

25        But if you look at that, the example she gave, the school

district with ten times the amount of damages is ten times the size.

And so this is what happens in an MDL like this.  You can put together a grid.  You can look at size, geography.  You can extrapolate, to the extent you really need it, for settlement purposes.  They have not had any settlement discussions.  There is no need for this information at this time.

Rule 26 also talks about proportionality and how discovery and when discovery should be provided.  There is no reason for it to be provided right now.

**THE COURT:**  We're not talking discovery here.  We're talking initial disclosures.  All right?  So, and I'm not opening the door to full-blown discovery here by any means.

So I -- when you say "several months," all right, I mean, if you started the process and started on a reasonable rolling basis, when could you start rolling out these two categories of numbers for the non-bellwether school districts?  Starting in about a month?

**MS. YEATES:**  We ask for 120 days.  We cannot do it in a month.  We are right now trying to meet the Court's --

**THE COURT:**  You can do it on a rolling basis.  It would take 120 days to get the first one out?

**MS. YEATES:**  Yes, Your Honor, because we are focused on getting out custodial productions.  They have requested hundreds of priority deponents.  Those bellwether school

```
 1   districts are collecting millions of documents.

 2       We are working hard to meet Judge Gonzalez Rogers'

 3   schedule to move towards substantial completion, expert

 4   discovery and trial.  That is what will move this case towards

 5   a resolution, not damages for non-bellwether school districts.

 6       THE COURT:  You could have asked -- you didn't ask her

 7   to stay all discovery for the non-bellwethers.

 8       MS. YEATES:  But that's essentially what has happened

 9   because the only discovery for the non-bellwethers is the PFS

10   and the supplemental PFS.  And defendants --

11       THE COURT:  But you raised --

12       MS. YEATES:  -- negotiated the PFS --

13       THE COURT:  And you raised --

14       MS. YEATES:  Excuse me?

15       THE COURT:  One person talks at a time for the

16   Reporter.

17       MS. YEATES:  Yes.

18       THE COURT:  When you raised all that with her, did

19   you -- I mean, did you ask her to exempt the non-bellwethers

20   from the Rule 26 disclosure?

21       MS. YEATES:  No, but we're not asking now to be

22   exempted either.  We're asking to --

23       THE COURT:  Well, in essence, you are.  Because if you

24   say we're going to do it, by the time we -- if we have to by

25   the time of expert discovery, then you are exempt.  You are
```

```
1    staying all discovery on -- at least as to Rule 26 disclosures
2    until the end of fact discovery.  That's what you're asking
3    for.
4         MS. YEATES:  The only discovery that is proceeding now
5    for the non-bellwethers is the PFS and the supplemental PFS.
6         THE COURT:  That's why we're here; right?
7         And I'm not talking discovery.  There is a difference
8    under the Federal Rules between disclosure, which is mandatory
9    and doesn't require discovery requests, and discovery.  We're
10   talking about disclosure here.
11        Did anyone on your side ask her to exempt the
12   non-bellwether school districts from disclosures?
13        MS. HAZAM:  Your Honor, Lexi Hazam for plaintiffs.  I
14   may be able to speak to this better simply because Ms. Yeates
15   was not yet appointed to leadership when we had early
16   discussions about how discovery would proceed.
17        Neither side specifically addressed initial disclosures in
18   early conversations with Judge Gonzalez Rogers, to the best of
19   my recollection.
20        We did, however, have any number of conversations about
21   how discovery -- which I think, while Your Honor is technically
22   correct perhaps and the disclosures are distinct -- was
23   envisioned as obtaining of facts from our plaintiffs.  And that
24   conversation was such that the obtaining of facts from
25   plaintiffs would be limited to the PFS and DFS for
```

 1    non-bellwether plaintiffs.  That was very much part of the

 2    conversations we had both with Judge Gonzalez Rogers and with

 3    Judge Kuhl in the JCCP.

 4          So that was always our understanding and, frankly, we were

 5    surprised and taken aback by this effort by the defendants to

 6    obtain much more at this point in time from the non-bellwether

 7    school districts because this was not anticipated by earlier

 8    discussions between the parties or with the Court.

 9          To be clear, the answer to your question is no, neither

10    side explicitly addressed initial disclosures with the Court.

11          **MS. LITZINGER:**  Your Honor, if I may comment.

12          This information was due seven months ago, back in

13    February, and despite defendants, you know, perhaps not having

14    raised this before, they -- defendants really shouldn't have to

15    remind plaintiffs of their obligations under the Federal Rules,

16    you know, at the outset of discovery.

17          **THE COURT:**  How quickly did you send a deficiency

18    letter to them on this particular point?

19          **MS. LITZINGER:**  We met-and-conferred about this issue

20    over the course of several months, and plaintiffs repeatedly

21    assured us that they would be providing the damages

22    computations and that they would be included in the plaintiff

23    fact sheets.  And when we received the plaintiff fact sheets,

24    they did not contain these computations.

25          **MS. YEATES:**  The first meet-and-confer we had about

1    the --

2            **THE COURT:**  To that point, did you make a

3    representation -- did your side make a representation to the

4    defendants that damages information for even the non-bellwether

5    school districts would be included in the plaintiffs' fact

6    sheets?

7            **MS. YEATES:**  Not that I'm aware of, but that actually

8    doesn't make sense to me because the fact sheets were jointly

9    negotiated.

10           **THE COURT:**  You're saying not that you're aware of,

11   but I'm seeing nodding negative over here.

12       Can somebody who was involved in those discussions tell me

13   whether those representations were made?

14           **MR. DRAKE:**  Yeah.  I will, Your Honor.  Geoffrey

15   Drake, King and Spalding, for the TikTok defendants.

16       Certainly don't need to rescue Ms. Litzinger, who is doing

17   an excellent job arguing this issue for us.

18       I just wanted to come up because I did argue this issue

19   before Your Honor, maybe it was back in March, when we had a

20   little bit of a dispute concerning the initial disclosures and

21   we had a dispute at that time about the need for the plaintiff

22   to provide disclosures.  Plaintiff said they would not provide

23   those disclosures and that they would provide all the

24   information from Rule 26 in their plaintiff fact sheets.

25       We received those.  This information is obviously not in

 1    there.  It hasn't been provided in addition.  And we engaged in

 2    the processes that this Court spells out in terms of letter

 3    writing, meet-and-confer.  The issue finally has now reached

 4    its head and is before the Court here today.

 5         And I think Your Honor is clearly on the right track in

 6    terms of picking some limited information that we could get in

 7    a certain period of time so that we can have this information

 8    to which we're entitled and begin to assess it to help us in

 9    defense of our cases.

10         Thank you.

11             **THE COURT:**  I see another person who wants to speak to

12    the issue?

13             **MR. WEINKOWITZ:**  Your Honor, I think --

14             **THE COURT REPORTER:**  Counsel, your name, please.

15             **MR. WEINKOWITZ:**  Mike Weinkowitz on behalf of the

16    plaintiffs.

17         And not that my co-chair did not do a fine job, but I

18    think one of the things that you need to consider, if you

19    would, is efficiency.

20         It is going to be very difficult to meet the current

21    schedule if we have to shift resources so that the

22    non-bellwether school districts are supplementing this

23    information.

24         The defendants will ultimately get this information, but

25    we should be focusing on the bellwether cases and we are

```
 1    providing information in those bellwether cases, and it is

 2    taking a considerable amount of time.

 3        The defendants getting this information is not going to

 4    advance the ball in terms of them assessing settlement.  They

 5    can extrapolate from the numbers that they've already gotten

 6    based on the -- based on the type of cases that they have

 7    gotten, but --

 8            THE COURT:  Let me ask you this.  The argument was

 9    made over here that because the ranges of numbers from the

10    bellwethers, it's impossible to correlate, which school

11    districts correlate to which of the 12; right?

12        What's your view on whether they can and how can they?

13            MR. WEINKOWITZ:  They absolutely can correlate by

14    population.  They can correlate by geography.  And they can

15    correlate by the other information that they are getting in the

16    bellwether discovery about each of the schools and about their

17    damages.

18        We are currently in discovery.  They are receiving

19    documents, and they are receiving interrogatory answers, and

20    they are getting ready to take depositions.  They will be able

21    -- they can extrapolate now, but they will be able to be more

22    precise in their extrapolation as discovery goes on.  And

23    taking resources away from the bellwether is not going to lead

24    to any further efficiency.

25        I'll be honest.  I have -- I've been in a number of mass
```

tort MDLs.  We have never done Rule 26 disclosures on the plaintiffs' side in a mass tort because it doesn't lend to any information and it creates sufficient inefficiencies in a mass tort case like this.

We have complied with the defendants' request on Rule 26 in the bellwether cases to give them a calculation on past damages so that they have the information they need and they can now extrapolate.  We're not going to be able to meet the schedule if we have to shift resources.

Non-bellwether cases -- in effect, the case for the non-bellwether cases is stayed.  Discovery is stayed.  Doing this now is really going to cause significant problems in the overall case.  We'll get to it.  We're going to get to it. They are going to get their information, but right now we're not going to be able to meet the schedule.

**THE COURT:**  I hear you.  So when can you -- given the exigencies of other schedules, from your point of view, not until the first day before expert discovery or the last day before expert discovery, when is a reasonable time, you think, when you can get these two categories of numbers to the other side?

**MR. WEINKOWITZ:**  I think we -- if push came to shove, we could start with a limited number of cases in the bellwether pool -- in the non-bellwether pool about 120 or 200 days from now, and we could roll -- we could perhaps roll into the future

1    and keep that a rolling production.

2        But we would need to identify specific -- remember,

3    schools are teaching children now; right?  They are back in

4    school.  So that -- and these are not multi-billion dollar

5    corporations like TikTok and Facebook.  So this is a -- I get

6    it.  We sued.  We sued.  But it's a hard thing.

7        So I would say starting at 200 days from now we could

8    start rolling.  But I would just ask Your Honor to just

9    reconsider just deferring this for a period of time so that we

10   can get through bellwether discovery.

11       **THE COURT:**  Well, I mean, if I order the rolling

12   disclosures of property damages and increased hiring costs

13   starting 200 days from now, is that going to seriously divert

14   resources from bellwether discovery in the interim?

15       **MR. WEINKOWITZ:**  If it's not in the full bellwether

16   pool and it's in a limited subset, it could be -- it could be

17   doable.

18       **THE COURT:**  Well, I'm talking about starting a

19   rolling.  So I'm not saying do all 200 on --

20       **MR. WEINKOWITZ:**  Yeah, no.  We -- look.  That's better

21   than what the defendants are asking for, yes.

22       **THE COURT:**  Okay.  So here is what we're going to do.

23   I don't even know what 200 days is from today.  Whatever 200

24   days is from today start the rolling supplemental disclosure

25   under Rule 26 of property damages and increased hiring costs

1   for the non-bellwether school districts.

2       I'm going to want to see status reports on this in the

3   DMCs on how you're doing in terms of starting to collect the

4   information and then actual -- rolling out of the actual

5   supplemental disclosures once that 200-day deadline passes.

6   Okay.

7           **MR. WEINKOWITZ:**  Thank you, Your Honor.

8           **THE COURT:**  That's a start date.  All right?  And I

9   want you to work together on a meet-and-confer to work out a

10  schedule for completing it, too.  Because it's not like one on

11  day 200 and then none for -- right?

12          **MS. YEATES:**  We understand.

13          **THE COURT:**  So the rule of reason applies.

14          **MS. YEATES:**  Thank you, Your Honor.

15          **MS. LITZINGER:**  Thank you, Your Honor.

16          **THE COURT:**  Okay.  I'm told for the record 200 days

17  from today is March 31, 2025; is that right?

18          **MR. DRAKE:**  Geoffrey Drake, King and Spalding.

19      I think that's right, Your Honor.  I think it's about

20  three days before the whole -- the whole discovery period ends

21  before they have to produce a --

22          **THE COURT:**  I didn't realize it was that far out.

23  200, I think that's -- that's contrary to what I intended.

24      Start the -- you may want to stand up again.

25      I'm going to start the rolling production 120 days from

```
 1  today, which is a number that your colleague had floated

 2  earlier.  All right?

 3         MR. WEINKOWITZ:  Your Honor, with all due respect --

 4  Mike Weinkowitz again -- can we get a little bit more than

 5  that?  Can we get 180?

 6         THE COURT:  Where does 180 bring us, Ms. Fox?

 7         THE CLERK:  March 11th.

 8         THE COURT:  No.  I mean, again, we're talking less

 9  than a month before the end of the extended fact discovery

10  cut-off.

11         MR. WEINKOWITZ:  Yeah, but that's -- that fact

12  discovery is not for the non-bellwether plaintiffs.  Like,

13  we're not going to be taking discovery in the non-bellwether

14  school district cases up to that point in time.  Discovery may

15  go on beyond that.

16         MR. DRAKE:  Geoffrey Drake, King and Spalding.

17      That's true that that discovery cut-off doesn't apply to

18  the non-bellwethers.

19      The point I was making, that I think Your Honor was

20  hinting at, which is the plaintiff stood up here several months

21  ago and said "we can finish this entire case in four months,"

22  and now they can't produce any data on damages for their own

23  clients in seven months?

24         THE COURT:  Okay.  I'll give you 150 days.  All right?

25  What's 150 days from today?
```

1          **THE CLERK:**  Well, 151 would be Monday, February 10th.

2          **THE COURT:**  Okay.  Monday, February 10th.

3          **MR. WEINKOWITZ:**  Thank you, Your Honor.

4          **MS. LITZINGER:**  Thank you.

5          **THE COURT:**  Okay.  Let's do -- who is talking about

6     Meta's org charts?

7          **MS. SAFFARINI:**  Good afternoon, Your Honor.  Serna

8     Saffarini for Meta.

9          **MR. DRAKE:**  Nelson Drake for the plaintiffs.

10         **THE COURT:**  Good afternoon.

11    So I think I know how Workday works.  How burdensome is it

12    to ask for this pictographic representation of just the current

13    organizational structure?

14         **MS. SAFFARINI:**  It's quite burdensome, Your Honor, and

15    especially when considering the breadth of this request for

16    pictographic representations.

17    So just to set the stage here, there are 140 teams, and

18    then 335 teams and 23 allocation areas that themselves contain

19    about 1200 teams.  So now we're getting up close to 2,000

20    separate teams that need to be pictographically represented and

21    need to be manually queried within Workday instead of -- in

22    order to build out these reports.

23    And we also wanted to make sure that it was clear that

24    these --

25         **THE COURT:**  Let me stop you there because, like I

1  said, I'm slightly familiar with how Workday works because

2  actually I have a case involving Workday.

3      But it's impossible in Workday just to ask for the

4  pictorial representation of a team?  You have to manually go in

5  and list every individual on the team?

6          MS. SAFFARINI:  No, Your Honor.  You would be able to

7  search by team, but you would need to do that, the search, for

8  each team that's being requested.

9          THE COURT:  Okay.  So how much time reasonably would

10  it take to create these pictographs?

11         MS. SAFFARINI:  From our discussions -- I mean, we

12  would have to talk to the employees that would actually be

13  making these queries, but these were taking -- I mean, the

14  information that we already provided in Excel spreadsheet form

15  took many weeks to query and put together.

16         THE COURT:  "Many" is two or 100 weeks?  What does

17  "many" means?

18         MS. SAFFARINI:  I would -- I don't, standing here

19  today, have an exact number of kind of labor hours that it took

20  to prepare them, but it was quite burdensome to do, even for

21  the Excel spreadsheet form, let alone in graphical form where

22  you have to put together these Excel -- or these PDF documents,

23  which are not themselves necessarily labeled in a way that is

24  usable.  And so then having to kind of collect these and

25  manually arrange them in a way that actually looks like some

1    kind of -- of org chart is just -- is many, many hundreds of

2    hours of work we would estimate.

3         **THE COURT:**  Okay.  I was under the impression that

4    Workday spits out an electronic file that is the pictograph.  I

5    didn't realize there was a manual collation assembly part of

6    this.

7         Is that your understanding how Workday works?

8         **MR. DRAKE:**  That is my understanding, yes, Your Honor.

9         **THE COURT:**  Okay.  If you're getting the information

10   in Excel spreadsheet form, why do you need the pictographs?

11        **MR. DRAKE:**  Well, first of all, Your Honor, the

12   pictographs are easier, in our estimation, to just visually

13   look at.  Spreadsheets contain many columns.

14        Meta has noted that there are thousands of employees,

15   right, that might be covered.  And we don't necessarily believe

16   that -- the pictographs need to be produced, right, for all of

17   the organizations on one individual document or one individual

18   chart.  You can break these down into smaller individual

19   queries, right, and produce the documents that way.

20        But that said, if it is that difficult, they have not

21   produced Excel charts for the 335 teams or the 23 allocation

22   areas either.  Those teams were identified after Meta responded

23   to RDWQs.

24        333 of those teams, right, are responsible for safety and

25   are not identified in their existing productions.

1           And then the additional 23 allocation areas were

2     identified after reviewing documents which were produced

3     subsequent to the service of those DWQs; right?

4           So I -- we believe that there is just a broader universe

5     that the current productions do not currently cover.  And

6     because of how relevant they are and directly responsive to the

7     RFPs themselves, they should be produced.

8           **THE COURT:**  So why haven't you been able to produce

9     all the Excel spreadsheets?

10          **MS. SAFFARINI:**  So to clarify, Your Honor, in response

11    to a DWP request, we did produce Excel spreadsheets for the 335

12    teams that we identified, which included all of the information

13    that would be on a pictographic representation, which is the

14    team, and then the team group that that sits in, the allocation

15    area that that team group sits in.

16          **THE COURT:**  I thought you said you didn't get all 335

17    team's spreadsheets.

18          **MR. DRAKE:**  We didn't get the employees, Your Honor.

19    We did get a spreadsheet that identifies the teams themselves,

20    which was a response to a question asking about the teams.

21          But the broader question, and what we believe is

22    responsive to the RFPs, is the employees and the positions of

23    the employees that worked within those teams.

24          **THE COURT:**  Why haven't you produced those yet?

25          **MS. SAFFARINI:**  Your Honor, those were not called for

1    in the DWQ request that there were responding to.

2          **THE COURT:**  So are those easier to produce than the

3    pictographs?

4          **MS. SAFFARINI:**  The employment information?  Well,

5    this gets back to kind of the -- the core of this argument is

6    that we have already produced this detailed employment

7    information for all of the custodians, all of the direct

8    reports of the custodians and every single person up above the

9    custodians up to Mark Zuckerberg in our reporting line

10   productions.

11         We then, in response to this DWQ, were asked a fairly

12   vague question, which was:  Any other units that conduct

13   activities that are intended to protect the safety and

14   well-being of people.  So this was kind of a broad request.

15         We specified in our written response that we incorporate

16   by reference all of those reporting line reports, which

17   covered, the best we estimate, around 750 teams.  And we're

18   adding this additional set of teams that we believe share

19   responsibility, touch on, have somebody on them at some point

20   who worked in this kind of area.

21         So we were not understanding that to now require 4- or

22   5,000 more names with these 11 fields of information,

23   including, you know, hire date, termination date, location,

24   things that really reasonably would not be expected to be on an

25   org chart in the first place and are not responsive either to

 1   the DWQ request, No. 68, nor to the original RFPs that we're

 2   discussing today.

 3          **THE COURT:**  So she's saying they weren't responsive or

 4   asked for in the RFQs.  Were they?  Are they?

 5          **MR. DRAKE:**  Your Honor, the DWQ in 222 they were asked

 6   for, and those 140 teams were identified based on the custodial

 7   reporting lines that Meta produced to us earlier.

 8          However, the 335 teams plaintiffs were not aware of and --

 9   until Meta served the DWQ responses to us.  And so we went back

10   and we said:  Hey, can we please have, you know, these 335

11   teams.  And we noted that two of those teams were covered by

12   their 140 teams that they had already produced.  And Meta

13   responded no.  Right?

14          And they can't have it both ways.  Like, they don't want

15   to give us the pictographs.  They don't want to give us the

16   employee directory exports.

17          And, Your Honor, these are requests for production.  They

18   are not DWQs; right?  They're separate discovery vehicles.  We

19   identified the teams and we basically said that these teams are

20   responsive to these RFPs and you have not produced those

21   directories.

22          And the RFPs are pretty on point.  It's -- you know, 68

23   is:

24              "All employees responsible for the development,

25          design, testing, implementation of named features."

1    69 is:

2        "Employees" --

3        **THE COURT:**  Slow down for the court reporter.

4        **MR. DRAKE:**  Sorry.

5        "Employees whose principal responsibilities are to

6    protect the safety of users on their platform."

7        And 290 addresses the trust and safety team, which is an

8    allocation area plaintiffs identified as well --

9        (Court reporter clarification.)

10        **MR. DRAKE:**  ...which is an allocation area that we

11    identified as one of the 23 allocation areas in our brief.

12        **THE COURT:**  So?

13        **MS. SAFFARINI:**  Yeah.  So to start to clarify this,

14    140 teams that in DWQ 222, which counsel references, we did

15    produce these entire fields of information about everybody who

16    was ever on the team.  Not even tethered to whether they were a

17    custodian or a noticed deponent.  And likely almost none of

18    them will actually be at issue or interviewed in this case.

19        All told, we have produced this information for 5,000

20    people.  And I think what counsel's representation about, you

21    know, their request and that we said no, it really undersells

22    the amount of meeting-and-conferring we've had.

23        I mean, I've personally been on several meet-and-confers

24    where we were first just explaining the spreadsheets

25    themselves, making sure that plaintiffs were oriented and

1   understood what the information was that we presented to them.

2        And then we have several times made the offer to have

3   plaintiffs, for example, identify a subset of teams that are

4   actually relevant or individual people that they think are

5   relevant.  Not every single team that they have heard about,

6   and not certainly 2,000 teams, and with a much more limited

7   targeted request that is actually a proportionate burden to

8   what is needed for this case.

9        Meta was happy to negotiate, but as soon as we made that

10  offer, plaintiff said no and wanted to come to court.

11       **THE COURT:**  Is it 335 teams that are currently in

12  dispute?  Is that the universe of teams that we're talking

13  about?

14       **MS. SAFFARINI:**  With the 23 allocation areas that they

15  added, it's actually closer to 2,000 teams.  Because the

16  allocation areas kind of sit at the top.  Then they have team

17  groups within them.  And then by the time you get to the team

18  leader --

19       **THE COURT:**  Are you asking for Excels of every person

20  in every allocation area, or are you just asking for the people

21  in the 335 teams?

22       **MR. DRAKE:**  So it is both, Your Honor.  The allocation

23  areas were allocation areas that we identified through our

24  review of documents.

25       However, I disagree with the characterization that our

initial position was all of the teams within that area.  We

requested that Meta provide us with those teams, just the team

names, so that we could, you know, horse trade and go back and

forth and truly try to identify those that are most relevant.

Meta has not to date provided us with those names.

We do know, based on what they have provided to us, that

there are about 11 teams that are covered for three of those

allocation areas.  But of the 21 remaining allocation areas, we

don't believe any of those teams are covered.

And those teams have titles that lead us to believe they

are relevant, including trust and safety, which I mentioned

earlier.  Central integrity, which is Meta's term of art for,

like, safety and integrity at Meta.  Core data science, which

is responsible for the handling of user data in integrity

studies.

So it's not necessarily that we believe that every single

one of those teams is relevant, but we don't know what we don't

know, and we can't narrow our request any further if Meta

refuses to share the team names with us for those 23 allocation

areas.

As for the 335 teams, Meta identified them as being

principally responsible for safety, privacy, or integrity as of

December 23rd, 2023 in its response to the DWQs.  So we're not

really sure how those teams could be considered irrelevant.

THE COURT:  So let's -- well, first let's focus on the

335, this last point.

I think you said earlier that of those teams it may be only one or two people who tangentially work on safety, privacy or integrity, but it sounds like from the discovery response that's not what's going on here.

So I'm just trying to figure out, are each of those 335 teams involved in the safety, privacy, integrity?

**MS. SAFFARINI:**  So I'm looking at the discovery response now, and I'm not sure what counsel specifically is referring to.

What we represented was that this identifies technical organizational unit that --

(Court reporter clarification.)

**MS. SAFFARINI:**  ...that share responsibility for issues related to these areas.

And certainly not that they did not say that they were principally responsible.

And, again, in that same response we incorporated by reference the reporting line information that was produced for the agreed-upon custodians, which, again, got covered, 750 teams that were not duplicated here, but also have -- a significant amount of information has been provided about people on those teams.

**THE COURT:**  Okay.  So what I'm -- of the 335 teams, are you able to identify the people within each team who do

 1  work on safety, privacy or integrity?

 2       **MS. SAFFARINI:**  That would be certainly more manual

 3  effort because it would require interviewing people and asking

 4  what they were specifically working on.

 5       I mean, what counsel has now said is -- you know, read out

 6  a few, a small subset of these 335 teams that they believe are

 7  relevant.  And that is the kind of negotiation that Meta has

 8  been open to.  If they specifically want a listing of people on

 9  the trust and safety team, Meta is open to doing so.

10       But the problem we have faced in these negotiations is

11  that -- and this is kind of a more global issue, is we're

12  really being penalized for being so forthcoming.  Because as

13  soon as plaintiff seized on the existence of data, they want it

14  without having to date articulated any specific need for it.

15  And even today they just say:  Well, we know they exist and so

16  we want every piece of information you have about everyone.

17       I mean, within Workday they want 90,000 fields, without --

18       **THE COURT:**  I'm not at the fields.  I'm just trying to

19  get -- I'm at the first point, which is getting them the

20  information of who is who and where they sit in the

21  organization.

22       So it sounds like -- A, it sounds like there needs to be

23  more meet-and-confer on this.  And if you -- I mean, to the

24  extent you've got insight into -- like, if you're taking the

25  position that some of these teams are only tangentially

1    involved in these issues or there's only one or two people

2    involved and you know who they are, you can easily find out who

3    they are, I think you need to share that information with

4    opposing counsel to narrow the request.  All right?

5         And if they make those representations to you that, you

6    know, of the 335 teams really only these X number of them, you

7    know, devote a substantial amount of time to these things,

8    you're in a better position to figure out where you want to

9    prioritize your discovery request, I assume; right?

10        **MR. DRAKE:**  Yes, Your Honor.

11        And we would just like to point out that their response on

12   the shared responsibility is Meta's response; right?  We didn't

13   identify these teams as being responsible.  We did not know

14   they existed.

15        And I don't necessarily --

16        **THE COURT:**  I get all that; right?  What I'm -- what

17   I'm ordering Meta to do is share in the meet-and-confers.  I'm

18   ordering more information about what the teams do; right?

19   Whether -- it's your position that even though you did identify

20   them in the response, that whether -- this at least qualitative

21   description to plaintiffs as to how involved they are in

22   safety, privacy, integrity and the other issues in the case so

23   that they can -- you can make an intelligent cut at narrowing

24   this dispute down to an agreeable number of teams, right, and

25   then get them the Excel spreadsheets.

1    All right?  I'm not going to order the pictographs because

2    it sounds like those are too burdensome to produce.

3        On the allocation areas, again, what I heard was you

4    didn't identify all the teams that fall under all the

5    allocation areas they have identified.  You need to.  Am I

6    right?

7        **MS. SAFFARINI:**  Well, Your Honor, to clarify.  This

8    was a request that they made and then when we sent them a

9    letter back, they said we're taking it to the Court.  So we

10   really didn't have the opportunity.

11       **THE COURT:**  All right.  So I think there could be

12   more, better communication here to either resolve or at least

13   narrow the dispute down to a manageable size.

14       So get them the identification of the teams that fall

15   under the different allocation areas.  All right?  And some of

16   them may overlap the 335.  Some may overlap with ones you've

17   already produced discovery on.

18       So you can figure out again what the scope of the problem.

19   And, again, you may find out from disclosure of information,

20   basic disclosure of the information what the teams do, like,

21   you don't care about half those teams.

22       Assuming, again, the rule of reason applies.  You're not

23   going to ask for unnecessary Excel spreadsheets on teams that

24   really have nothing to do or very, very little to do with the

25   issues in the case.  Understand?

1          **MS. SAFFARINI:**  And, Your Honor, one issue to flag as

2    well with this is we don't really know where these 23

3    allocation areas came from.

4          When we are looking in our system, we're not necessarily

5    even identifying all of them.  So this 1200 teams was a subset

6    of those 23 allocation areas because, I mean, team names

7    change.

8          So if -- if plaintiffs can work with us to actually help

9    us figure out where they even got this information, whether

10   they truly exist as allocation areas of the company, I think

11   that would be --

12         **THE COURT:**  I was under the assumption from the

13   footnote that "allocation area" was a term of art within Meta.

14         **MS. SAFFARINI:**  Yes.  But plaintiffs made a list and

15   said that they were allocation areas, but we don't know that

16   they are allocation areas.  I mean, it's their list.

17         **THE COURT:**  Okay.  Do you know now where they came

18   from?

19         **MR. DRAKE:**  I mean, yes, Your Honor.  They came from

20   base number documents that Meta produced to us.

21         This is the first I'm hearing Meta ask for those

22   documents, and I'm happy -- we're happy to identify those and

23   provide them.

24         **THE COURT:**  Okay.  I think I set this in prior DMCs.

25   The more you communicate on those issues, the more you can

1    actually resolve them because I don't think you want me going

2    team by team saying "yes," "no" on each one.  That's not a good

3    use of my time or your time either.

4         So it sounds like with better communication as to, you

5    know, how closely related a particular team or allocation area

6    is to the case, then the plaintiffs can narrow down the ones

7    you really want the Excel info on and then you can go from

8    there on whether you need any follow-up after that.  Okay?

9         **MR. DRAKE:**  Yes, Your Honor.  And just real quick on

10   the pictograph issue.

11        We don't feel that Meta has met its burden argument here.

12   If it is truly an export from Workday and they were not able to

13   articulate why it is not, there is no reason why those

14   shouldn't be produced to us particularly because they are not

15   backward-looking pictographs.  They only exist as of today.  So

16   every day that passes the information changes.

17        **THE COURT:**  Right.  So, again, maybe this is part of

18   your meet-and-confer.  If you think that the Workday suite, I

19   forget what they called it, the platform, is able -- you know,

20   you put in a few queries and then it's like an Oracle system we

21   do on the accounting side, it spits out a report.  If it's able

22   to do that without a lot of manual collating of stuff, then

23   bring that information to the other side.

24        I would expect you to be able to do that because then the

25   burden issue kind of goes away if it's just simply typing in a

1   query in and getting a report electronically.

2        MS. SAFFARINI:  Right.  And we have investigated this

3   and it's certainly more burdensome than that.

4        THE COURT:  Please communicate your information on

5   these; not just your positions, but actual information on

6   these.  I assume that everybody can find out from Workday

7   exactly how hard or easy it is to create the pictographs.

8   Okay?

9        MR. DRAKE:  Yes, Your Honor.

10       THE COURT:  Okay.  Report on this back to me at the

11  next DMC.

12       MR. DRAKE:  Sure.

13       THE COURT:  So start those meet-and-confers promptly

14  and reasonably and hopefully it will resolve it by the next

15  time we meet.

16       MR. DRAKE:  Yes, Your Honor.

17       MS. SAFFARINI:  All right.

18       THE COURT:  Let's see.  Why don't we take our first

19  break now.  It's a little bit early, but why don't I do it now

20  since we're moving to another issue.  Ten minutes.

21       THE CLERK:  Court is in recess.

22      (Whereupon there was a recess in the proceedings

23       from 2:13 p.m. until 2:25 p.m.)

24       THE CLERK:  Recalling 22-3047 In Re Social Media

25  Adolescent Addiction and Personal Injury Products Liability

1    Litigation.

2             **THE COURT:**  Okay.

3             **MR. MANDICH:**  Judge, I want to put something on the

4    record before we roll into the next --

5             **THE COURT:**  Sure.

6             **THE COURT REPORTER:**  Counsel, your name again, please.

7             **MR. MANDICH:**  Marc Mandich.

8         So I just wanted to note for the Court, should the Court

9    recall, we have negotiated and agreed to substantial completion

10   deadlines for search term discovery for the bellwether

11   plaintiffs.  Ours is the 18th for this plaintiff.  For this one

12   device, in the event you order that we need to image it, it

13   would be difficult, if not impossible, to meet that

14   October 18th deadline for this device.

15        I spoke to my opposing counsel during the break and we

16   will meet-and-confer once we know some more information about

17   how long it will take, but I just wanted to raise that to the

18   Court's attention that very likely, I'm not -- I don't want to

19   push our whole substantial completion deadline.  We're working

20   hard to meet that.  We will meet that for her other devices.

21   But this is a new development that's going to affect it just

22   for this device, being able to meet that.

23            **MS. ZWANG-WEISSMAN:**  Yardena Zwang-Weissman for the

24   YouTube defendants.

25        Again, as I said before, this is not search term related

1    discovery.  We are talking about forensic imaging, but I

2    absolutely agree with counsel that we're willing to

3    meet-and-confer and will report back in two weeks on this issue

4    as well.

5              **THE COURT:**  I expect you to work out a reasonable

6    exception to substantial completion for this one device if it's

7    needed.

8              **MR. MANDICH:**  Thank you, Your Honor.

9              **THE COURT:**  Okay.

10             **MS. ZWANG-WEISSMAN:**  Thank you, Your Honor.

11             **THE COURT:**  All right.  Thank you.

12        All right.  So who's going to talk about TikTok's

13   personnel files?

14             **MS. SCULLION:**  Good afternoon, Your Honor. Jennifer

15   Scullion for the plaintiffs.

16             **THE COURT:**  Good afternoon.

17             **MR. VIVES:**  Good afternoon, Your Honor.  Michael Vives

18   for the TikTok defendants.

19             **THE COURT:**  Good afternoon.

20        Okay.  So the case law, to the extent I've been able to

21   review it in the time allowed, doesn't create a privilege as to

22   the personnel files.  It just recognizes that there's

23   confidential information in them.

24        Explain to me why the protective order at the highest

25   level of confidentiality isn't enough to satisfy or address

1  that confidentiality concern?

2          **MS. SCULLION:**  Sure, Your Honor.

3      In plaintiffs' view it is.  We think we've made the

4  showing under the case law to show that the specific

5  evaluations, performance reviews, bonus information, that is

6  tied to the areas of conduct at issue here.  We've made the

7  showing of clear relevance.  And the -- the cases do then say

8  the confidentiality issue, privacy issues, can be adequately

9  addressed through a protective order such as we have here.

10     So we agree.  We think we do have enough protections for

11 confidentiality and that we've made the showing required under

12 the case law.

13         **MR. VIVES:**  Your Honor, we would disagree with that

14 for a few reasons.

15     First, we've cited a lot of case law where Courts have

16 denied this discovery where protective orders are in place.  So

17 the mere fact that there is a protective order simply cannot be

18 enough.

19     And the question here is whether plaintiffs have met their

20 burden, whether they have shown to the standard that's required

21 under California law to get access to these materials, it's

22 really a fundamental debating issue.  It's about, have they met

23 that burden?  Can they get access to these documents?  Not

24 about what a protective order applies to, which is how can you

25 use those documents after you've gotten access to them.

1    So I don't think this issue can simply be foreclosed by

2    virtue of there being a protective order.  Otherwise, there

3    wouldn't be.  And several MDL courts that we have cited to, I'd

4    be happy to walk you through, where this discovery has been

5    rejected.

6          THE COURT:  So tell me if I'm wrong.  They are not

7    asking for the complete personnel files.  They're only asking

8    for the parts of the personnel files that I guess they say are

9    relevant to the claims at least that talk about, for example,

10   evaluations, that talk about things like user engagement and

11   things like that.

12    I mean, you're not asking for the entirety of the

13   personnel file?

14          MS. SCULLION:  That's exactly correct, Your Honor.

15    We've made clear -- as part of the meet-and-confer

16   process, we did make clear we're not seeking the entire

17   personnel file.  So we're not -- like some of the cases they

18   cite where people were asking for the entire HR or personnel

19   file, which can implicate privacy concerns around health

20   information, Social Security numbers, family information, we're

21   talking about documents that discuss what these deponents did

22   in the relevant areas, what TikTok thought about what they did

23   in the relevant areas, whether TikTok rewarded them for their

24   performance in those areas or disciplined them for their

25   performance in those areas.

1      If those documents were emails or a PowerPoint in a

2  custodial file, there's no doubt they would be responsive and

3  produced.  In fact, TikTok has produced such information from

4  the custodial files.  Its relevance doesn't change just because

5  it's sitting in a personnel file.

6      In fact, the case law says, and this is the -- the *Hawaii*

7  *Corp.* case back in 1980 said:  In fact, performance evaluations

8  are inherently reliable because they are made at the time of

9  the conduct.  They are not made through the lens of litigation.

10  They are made for a different purpose.  They give you specifics

11  about what was that individual employee doing?  What were their

12  goals?  What were their objectives?  What were they doing?  How

13  well did they do it?

14      And as Your Honor has pointed out, we've then narrowed

15  that down to what type of conduct, and we've come up with the

16  eight categories that we've listed in footnote five in

17  plaintiffs' portion of the joint letter brief:  The named

18  features, which are already defined in our RFPs, user

19  engagement, platform design, health, wellness, the safety, age

20  verification and parental controls, warnings, terms of service,

21  terms of use, marketing and advertising, to the extent that it

22  includes the U.S., and CSAM.  So we have narrowed it down to

23  the relevant areas.

24          **THE COURT:**  So with those limitations.  So we're

25  avoiding things like family information, Social Security

numbers and all of that, do the same and confidentiality

concerns apply?

**MR. VIVES:**  I think they do, Your Honor.  And I just

wanted to make sure the record is clear what plaintiffs are

actually requesting because they are asking for more than any

MDL Court has granted as to a specific deponent.  They're

asking that for an entire slate of deponents, including

individuals they have yet to identify.

And they are asking for personnel -- or performance

reviews.  They are asking for peer reviews.  They are asking

for reviews from a manager.  They are asking for specific

compensation figures, and they are asking for discipline

records.  And this idea that they have narrowed their request

to relevant areas, it's essentially every single deponent;

right?

So they are basically saying:  If we choose to depose

someone, that gives us the right to get access to this

information.  And that is simply not what the law has said in

California.

There is strong privacy protections here under the

California Constitution.  Because what the case law has said

when this issue has come up is that in order to get access to

this material, the litigant needs to make a showing that goes

far beyond the general relevance argument that plaintiffs'

counsel has addressed.

1          What they need to show is that the materials are clearly

2     relevant; that there is a compelling need for the particular

3     documents for a specific witness; and that they can't get

4     access to this information from other means.  They haven't

5     engaged with the standard.

6          We've invited them on several meet-and-confers to actually

7     explain why they need this information as to specific

8     witnesses, and they just simply haven't done it.

9          And I'm happy to walk you through some of the case law

10    that says in California that is what they need to meet,

11    including MDLs that have rejected the precise request that

12    plaintiffs are making here, because they haven't made this

13    particularize showing.

14          **MS. SCULLION:**  Should I respond, Your Honor?

15          **THE COURT:**  Sure.

16          **MS. SCULLION:**  With respect to the California

17    Constitution, the standard is, in fact, the same as what the

18    federal courts apply more generally to personnel records, and

19    that's shown even in the cases that defendants have cited; the

20    *Bernal* case, the *Williams* case.  I know the *Williams* case was

21    at least then Magistrate Judge Corley.  I'm not sure if *Bernal*

22    was as well.  And the standard is the one that we've said that

23    we have met.

24          We've shown the clear relevance.  We're talking about the

25    areas of conduct at issue in this case and TikTok's either

rewards and motivations to, for example, prioritize user growth
and user engagement over health and wellness and safety. And
we already have threads showing that that is a concern among
employees, that there is that kind of prioritization. We've
shown it's clearly relevant.

We've shown that there's a compelling need for these
materials because we won't get them elsewhere. You know, and
the cases have recognized that it's really not enough to say:
Well, you can ask someone at deposition.

And, again, looking at the *Hawaii Corp.* case, they
recognize that a contemporaneous record of what the employee
did and what the employer thought about what the employee did.
It's not through the lens of litigation.

Similarly in the *Williams* case and in the *Knopp* case, the
other case we've cited. All of them recognize that the actual
personnel records themselves cannot be substituted for through,
for example, deposition testimony.

I mean, particularly when you're talking about self
evaluations and goals that an employee has set. Certainly,
that's relevant to put in front of that witness, to say: Here
is what you said you were doing and why.

And similarly with respect to how their employer responded
to that and said: Here is what we thought about what you did.
Here is what we think we want you to do more. Here is what we
want you to prioritize more if you want to seek advancement.

1    All of that is certainly relevant in a case going to how

2  they designed this platform, how they operate this platform,

3  and our fundamental contention that they put growth, user

4  engagement over the health and wellness of children.

5        **THE COURT:**  So to counsel's point.  You already have

6  some information, some documents that actually form the basis,

7  I think, of why you're asking for the relief.

8        **MS. SCULLION:**  Your Honor, to the extent that -- from

9  what we can gather it is drafts of performance evaluations,

10  notes that a supervisor had compiled in order to deliver a

11  performance evaluation.  Those kind of things.

12    Now, they happen to sit in the custodial file.  So we've

13  already been -- those things have already been produced to us,

14  but there are certainly more.  The whole picture is going to be

15  in the personnel records.

16    Our understanding -- our understanding from references

17  we've seen is that there is something called a perf system that

18  was put up.  It's a centralized platform, it looks like, in

19  which people input their own self evaluations.  They, you know,

20  identify who is going to do their 360 review.  All those kind

21  of things.  And then the other reviews can go into that system.

22  So there is a system out there where this information resides.

23    And, again, the fact that this information talking about

24  what I'm doing, why I'm doing it, what my supervisors think

25  about it, am I getting a bonus.  The fact that information sits

1    in that system as opposed to in their custodial file doesn't

2    make it any less relevant.  And with the showing we've made

3    here it is discoverable.  It can be protected through the

4    protective order to address any confidentiality concerns.

5          THE COURT:  But to the point, do you really need this

6    for every single deponent?

7          MS. SCULLION:  Well, Your Honor, it's not as if we're

8    taking depositions of, like, very low level employees.  And I

9    had the list -- yeah.  Thank you.

10        I mean, the folks that we're taking are, you know,

11   relatively, you know, senior folks who had important

12   decision-making authority, for example.  The head of the minor

13   safety project.  The global policy issue lead for mental

14   health.  Head of growth.  Senior director of public policy.

15   The global issue leader for minor safety.  These are the levels

16   that we're talking about.

17        And, yes, I do think for those types of individuals, we

18   certainly do want to see what goals were they setting for

19   themselves --

20         THE COURT:  But I think you listed by title about

21   five, six people there?

22         MS. SCULLION:  I can keep going if you like.  I

23   apologize.

24         THE COURT:  The briefing says there are 20 deponents

25   at issue; is that right?  Are they all of that level?

```
 1              MS. SCULLION:  They are -- I'm looking at the list
 2    right now.  They are all folks who have either "head," "global"
 3    "head," "senior director," "leadership" or "manager" in their
 4    titles.
 5              THE COURT:  Well --
 6              MS. SCULLION:  I could hand this to you, if you like.
 7              THE COURT:  It's okay.
 8         I mean, if you know anything about corporate America, the
 9    title "manager" doesn't necessarily connote much depending on
10    the corporation.
11              MS. SCULLION:  So, for example, it's different from,
12    like, a line engineer, you know.
13              THE COURT:  You're talking to somebody who was an
14    engineer.  A lot of engineers are given the title manager when
15    they first join an organization.
16         So title alone -- let's put it this way, it is not
17    necessarily determinative of level of responsibility.
18         Do you have org charts or anything that show where these
19    people sit in the hierarchy of the organization?
20              MS. SCULLION:  My understanding is we do not have org
21    charts.
22         To the rescue once again.
23              MR. WEINKOWITZ:  I'm happy to answer.  Mike Weinkowitz
24    on behalf of the plaintiffs.
25              THE COURT:  Okay.
```

1        **MR. WEINKOWITZ:**  One of the reasons that this

2   information is particularly important is because we have been

3   repeatedly told by TikTok they have no charts.  They have no

4   organizational charts.  They have no lists of individuals with

5   titles.  And this information -- we're limiting this to only

6   deponents.  And we are picking the deponents who have the

7   relevant information in the litigation.  We aren't going carte

8   blanche across the board.

9        There are no organizational charts.  They can't give us

10  information about who the individuals are.  They've given it.

11       So the answer to your question is no, there are no

12  organizational charts systematically.

13       **MS. SCULLION:**  I guess I would add also in terms of

14  the case law and whether we're going beyond where any other MDL

15  has ever gone, you look at *National Prescription Opiates*, which

16  I was involved in.  And there the Special Master ordered, over

17  the objection of one of the defendants, the production of,

18  again, performance evaluations, opioid related; bonus,

19  compensation, opioid related.  Similar to what we're doing

20  here.

21       And in that case, in fact, in fact, they did it on both

22  sides.  Both plaintiff and defendants were ordered to produce

23  personnel records.

24       Similarly in the *Pradaxa* case Judge Herndon ordered

25  production of evaluations and bonus and compensation

1    information.  And there he specifically rejected the argument

2    that -- for compensation, for example, that it had to be

3    product related.

4        So certainly other Courts have recognized in the broad

5    relevance of this information where what is being done and why

6    it's being done internally is relevant.

7            **MR. VIVES:**  Your Honor, if I could respond to a few

8    things.

9        You know, I think the point that you're raising is the

10   central issue here; right?  Plaintiffs -- what the case law

11   says is you really need to take a scalpel here.  You need to be

12   very specific in what you seek.  And that is not what they are

13   doing.

14       And I want to just talk about one case because in their

15   papers they suggested that we were in some ways

16   mischaracterizing what happened in an MDL, in the *Xarelto*

17   litigation, because I think that is very instructive.

18       What happened there is the plaintiffs made a request that

19   defendants produce personnel file materials for every single

20   deponent.  It was a request that is almost identical to what's

21   happened here.  The judge in the first instance rejected that

22   out of hand, said you haven't met the showing that's required.

23   You need to make an individualized showing.  You haven't done

24   that, and you can't rely on general broad based arguments to

25   support and get at these privacy protected materials.

1        Eventually, you know, that case continues and plaintiffs

2   then did actually attempt to make a showing on an individual

3   basis as to specific witnesses.  And they ended up getting some

4   personnel materials for two witnesses, specific types of

5   documents that they supported.

6        And so there's other examples in the case law like that,

7   and plaintiffs just have refused to engage.

8        And I think you're flagging what is really the central

9   issue here because not only are they seeking -- will they

10  likely seek to apply this issue as to TikTok, as to a variety

11  of different employees at TikTok.  Because right now they have

12  told us 20 deponents.  They said they are likely to take 40;

13  right?

14       And so we don't even know who this is going to apply to.

15  We don't know what positions they are going to be in.  But

16  they're also going to seek to take this and apply it to other

17  defendants who are sitting in the room today; right?

18       So I think there some a lot, I think, that is at stake

19  here.  And plaintiffs are trying, based on highly general

20  arguments, to really trample the privacy rights of non-party

21  employees, and I don't think it's appropriate.  If they need

22  to -- if they want to do that, they need to actually make the

23  showing that the law requires, and they have simply refused to

24  do that.

25            MS. SCULLION:  Your Honor, we have made the showing

similar to what was done in *3M*, where similarly broad discovery

was ordered with respect to personnel materials.  The *Benicar*

case also similarly we've mentioned.  *Pradaxa* before.  *National*

*Prescription Opiates*.  We cite even non-MDL cases, the *National*

*Credit Union* case.

Here in this district then Magistrate Judge Corley ordered

production of personnel information in the *Williams versus MoFo*

case.  Another MDL, the *Trasylol* law case.  This is not the

first case in which the conduct of employees and why they were

doing what they were doing is at issue.

There are cases where that's not at issue.  You know, a

breach of contract case where the only question is, you know,

was that, in fact, delivered or was that service, you know,

done.  Those probably wouldn't need this.

But, for example, we've cited the cases outside of even

the product liability context where, let's say, an audit is at

issue, which was the case in the *National Credit Union* case,

for example.  And they want to get at, what's the quality of

the auditors?  Who are the auditors?  What's the feedback going

to them?  Were they given bonuses?  Why were they doing what

they were doing?

Same as here.  Why were these employees doing what they

were doing?  Were they setting the priorities, as we allege, to

put user growth and engagement over health and safety?

And, again, I'm cautious because we're in open court.  We

did cite in the letter brief some documents already, which,

again, indicate that internally employees had expressed concern

about prioritization of what their goals were and how that --

that factored into the OKRs, the core metrics for the company.

So this is not something that we are pulling out of thin

air.  We see it already in the documents.

And it's really just -- we also cited to the Court

examples of performance evaluations where you can see that the

kind of issues that we're talking about are being discussed:

Goals to drive user engagement, drive growth.  They've produced

documents with respect to goals for user wellness and safety.

Certainly relevant.

So to make an individualized showing right now, we don't

have all the documents to do that.  In other cases you may have

had a different schedule where you've had all the production

and then a long time for depositions.  And maybe you could

afford to go in and make these dossiers, if you will, and come

back to the Court and have the -- in *Xarelto* the Court looked

at things in camera for each individual.

I don't think it's needed here under the case law, and I

don't think it's -- as a practical matter, that's going to

work.  I don't see how we make individualized showings in a

time frame that's going to get us to these depositions.

**MR. VIVES:**  Can I respond quickly?  I understand

there's a lot.  I'll just try to hit this real quickly.

1          So *Pradaxa* and *3M* that were cited by counsel, those Courts

2    explicitly did not apply the standard that has been, you know,

3    adopted in California courts.  So there it is not applicable.

4          Secondly, on the documents.  We noted in our brief that

5    plaintiffs truly have just mischaracterized what these

6    documents say.  And I'm happy to hand you the documents because

7    it has been a pattern in this letter briefing, and it's just

8    not -- what they are saying the documents say they just simply

9    don't support.

10         So, and lastly, this idea that maybe there is a reference

11   to user growth in some document.  The idea that that could be

12   used to then get at personnel files for everyone regardless of

13   what team you're on, regardless of what department you're on,

14   regardless of what you work on just doesn't -- just doesn't

15   make sense.  It's not the showing.  They have failed to

16   actually engage with what the law requires.  And I think

17   counsel has acknowledged she actually can't meet the law.

18         I think the argument you're going to hear from them is,

19   well, there's going to be 120 depositions here in this

20   litigation, so you can't require us to do this.  But just

21   because this is a large litigation doesn't mean that that

22   allows individual's private -- confidential protected materials

23   to just get turned over because it's going to be difficult to

24   make the showing.  That just -- that just can't be the

25   standard.

1        And so, you know, I'll end there.  I know we have a busy

2   day.

3        **THE COURT:**  Have you -- some of this, for example,

4   whether people have gotten bonuses based on user engagement

5   metrics and all that, have you -- I mean, that's -- have you

6   asked whether -- through discovery have you asked whether the

7   company has that policy or practice, not getting -- outside the

8   scope of personnel files.

9        **MS. SCULLION:**  Sure.  So we have asked for information

10  on how the company awards bonuses, and TikTok has agreed to

11  provide that, but what we need is to see for this particular

12  employee, especially on a year-over-year basis.

13       Imagine, not hard to imagine, a year where an employee

14  gets an evaluation that says:  Well, you're doing okay, but we

15  really think that -- we'd like to see you prioritize more

16  projects that go to the company's core metrics, which include

17  user engagement and did not include wellness, for example.  The

18  employee gets that message and you can see what bonus or not

19  bonus that employee got that year.

20       And the next year suddenly we see that employee changing

21  their priorities and being rewarded with a bonus.  That is

22  relevant to our claim that that is the environment TikTok has

23  set up to run its platform, and that is what is injuring

24  children, is that misprioritization within the company.

25       So just getting the -- I'm sorry.  So just getting the

1    bonus policy at large is not going to get us to what that

2    actually did operationally with these employees on a day-to-day

3    basis, year-over-year basis.

4         **THE COURT:**  I mean, to some extent the bonus numbers

5    are also in the accounting system; right?  You don't need to

6    get that out of the personnel files; right?

7         I mean, again, some of this information is available

8    through discovery in ways that don't implicate the personnel

9    file issue.

10        **MS. SCULLION:**  Right.  But I think what we get in the

11   personnel file is that it gets tied to the performance and the

12   review.  Just getting it out of the accounting system isn't

13   going to tell us what the supervisor thought, for example,

14   about why that employee should or should not get that bonus in

15   that particular bonus period.

16        **THE COURT:**  Okay.  But I'm -- for purposes of these

17   questions I have been focusing on the actual dollar figure

18   numbers and the bonuses.

19        By themselves you can get those without implicating the

20   privacy issues here; right?

21        **MR. VIVES:**  I mean, I think one way to try to get at

22   that information that plaintiffs have not tried is to take the

23   policies that we're going to produce and ask them at their

24   deposition:  What is your bonus?  How much money have you made?

25        Because at the end of the day the case law that plaintiffs

have cited to us to support their claims for specific dollar
amounts, they -- they also -- they don't -- they are not
applicable.

One is about a sales rep. It's the *Abilify* litigation.
You know, the compensation discovery that was granted there was
as to sales reps in pharmaceutical litigation who are calling
on bellwether plaintiffs because they are incentivized to sell
more drugs; right? Had an actual incentive comp plan. That is
not what we're dealing with here.

And the other case they cited to us is the *Tylenol*
litigation, where the Court said if somebody has
decision-making authority, the ability to bind the company,
then that is a person whose specific dollar amounts are at
issue.

And the offer that we got from plaintiffs during our
meet-and-confers is if anyone makes over 150 grand, then they
are entitled to their compensation, their bonuses.

And so I think the prudent thing here is to take this step
by step. We're producing the documents. There is less
intrusive means than the personnel files. They should take the
depositions. See if they can make a showing. And if they can,
then maybe we'll be back here before you or maybe we'll be able
to work out actually how this material should be produced.

**THE COURT:** Okay. I actually am going to -- because
we do need to start wrapping this up, otherwise your colleagues

1    on the other issues are going to get mad when I cut them off,

2    so real quick.

3          **MS. SCULLION:**  So *Pradaxa*, I think Judge Herndon

4    addressed the question of bonuses and compensation.  I think we

5    have made the showing that we do expect to see the relevant

6    information in these personnel files in terms of, again, the

7    goals are being set and how they are being evaluated.

8        These are not check-the-box kind of evaluations.  These

9    are narratives where things are discussed back and forth

10   between the employee and the employer.

11       And one more thing -- I apologize, Your Honor -- my

12   colleague would like to be able to address the issue of

13   personnel materials with respect to the other defendants since

14   it was raised.

15         **THE COURT:**  Okay.

16         **MR. WARREN:**  Thank you, Your Honor.  Previn Warren for

17   the plaintiffs.

18       We are not hiding the ball about the fact that, depending

19   on Your Honor's ruling, we will, in fact, seek this information

20   from the other defendants.  We're not being mysterious about

21   that.

22       I think part of the idea here is to, you know, raise some

23   of these issues in the context of a specific defendant so that

24   the parties can go back and apply that logic and ruling to

25   other defendants.  And I think this is highly appropriate here.

I mean, there are always multiple avenues to get at any piece of discovery. You can get it from an accounting system. You get it from a personnel file. You get it some other way.

We've chosen what we believe to be a targeted way at getting the information we actually need that will be relevant to the deposition before the deposition happens so that we can actually ask the deponent about how their compensation was tied to some of these core metrics. I think it's entirely appropriate.

And so, yes. I just want to be transparent with the Court that, you know, what counsel is saying about what we're going to do is exactly what we're going to do. And I don't think there's any problem there. I think that's an efficiency to the MDL and we're doing that intentionally.

**THE COURT:** Okay. I do think it's not proportional to ask for this for all 20 -- or for every single person you're going to depose at TikTok.

I also think it's not helpful for TikTok not to provide information about where people sit in the organization, right, in order for plaintiffs to prioritize who is actually an important person or not.

And so of the -- right now we're talking 20 people at TikTok. I want you to meet-and-confer, and I want TikTok to identify where those 20 people sit in the organization hierarchically; right? And if I'm right, the managers are

1   fairly low level people.  They're probably not that important

2   for these purposes in establishing what plaintiffs want to

3   establish.

4        And I want you to prioritize a subset of the 20.  All

5   right?  And of those 20, you don't get the entire personnel

6   file.  Plaintiffs don't want the entire personnel file.  You

7   get self evaluations and performance reviews only.  You don't

8   get the other stuff.  You don't get a vaguely broad category

9   called similar documents.  You get the self evaluations and

10  their performance reviews limited to the -- what is it, the

11  eight categories of topics; right?

12       So I normally don't allow this, but if you -- there are --

13  there's truly confidential and personal information on a

14  particular document, I'll allow TikTok to redact for relevance

15  and for privacy purposes, all right, if appropriate, if it's

16  not responsive to the eight, eight categories that we're

17  talking about in footnote five, all right, of the letter brief.

18       Is that clear?

19            **MR. VIVES:**  So I guess you want us to

20  meet-and-confer -- well, I guess a few things.

21       First of all, we have provided plaintiffs with actual

22  information where these people sit.  We responded to an

23  interrogatory request and gave them 100.  I think nearly every

24  single person they were asking for we've told them where they

25  sit in the company.

1   But I just want to make sure I actually understand the

2 process.  So you want us to have that meet-and-confer, and then

3 there are certain individuals that then you think for self

4 evaluations and performance reviews they are entitled to?

5 Like, how do we decide that piece of it?  Because I'm not sure

6 that was clear to me.

7   **THE COURT:**  I'm assuming that plaintiffs will be

8 reasonable and not ask for documents from the personnel files

9 for all 20 people.  Because in order for plaintiffs to make the

10 point and create the record they need, I don't think they need

11 it from all 20 people.

12   And certainly if my supposition is that some of the people

13 on the list, even though they are entitled manager, are not in

14 a high level position to effect company policy in a meaningful

15 way, they will drop out if you're given that information.

16   To the extent you think you've already given that

17 information, give -- you may need to give more for them to make

18 that decision because it means they will be able to weed people

19 out further.  Okay?  It's part of the communication during

20 meet-and-confers that I talk about constantly.  Okay?

21   **MR. VIVES:**  Sure.

22   **MS. SCULLION:**  Your Honor, if I may?

23   **THE COURT:**  Let me finish.

24   **MS. SCULLION:**  I'm sorry.  Sorry.

25   **THE COURT:**  All right.  So once you've got that list

1   of the people that's been weeded out, then TikTok will make the

2   production from their personnel files of self evaluation and

3   performance reviews only.

4           **MR. VIVES:**  Okay.

5           **THE COURT:**  And like I said, you can redact for

6   relevance and privacy issues; right?

7       And it's got to be -- and the relevance is defined by the

8   eight topics, I guess, listed in the footnote.

9           **MR. VIVES:**  Yeah.  And I guess would Your Honor be

10  potentially open to an in camera review of some of these

11  materials?  Because I think at the end of the day that's where

12  a lot of these cases have gone; that, you know, in camera

13  review can be necessary to actually suss out some of these

14  privacy materials.

15      I think, you know, if you would be open to it, I think it

16  would be potentially helpful to take a subset of these and

17  submit them to you for in camera review because --

18          **THE COURT:**  If I'm allowing you to redact for privacy

19  issues and for relevance, all right, I don't think I'm going to

20  need an in camera review.

21      If even with that you still think there's something that's

22  responsive to the limited categories that have been identified

23  that still implicates a concern that goes to discoverability,

24  even with the protective order's protections in place, you can

25  make the request.  But I highly doubt an in camera review is

 1    going to be required with those limitations on the scope here.

 2        All right.  I'm not foreclosing the plaintiffs from coming

 3    back and asking for more discovery.  Like I said, it's up to

 4    them to figure out how they want to take discovery to establish

 5    their case; right?  And so they could ask for it through the

 6    accounting on the bonuses.  They can get the information in

 7    other ways that don't necessarily implicate the personnel

 8    files.

 9        But as to the personnel files, I think the only place to

10    get the self evaluations and performance reviews is from those

11    files alone.  All right.  And so I do find they have made the

12    showing for that, for that limited scope of document

13    production.

14        Go ahead.

15        **MS. SCULLION:**  One clarification.  You mentioned self

16    reviews, performance reviews -- self evaluations rather,

17    performance reviews.

18        I understand TikTok also has a 360 review system.  Would

19    that be included, where you're asking your colleagues to

20    provide their reviews?

21        **THE COURT:**  Because -- no, I don't think so.  Because

22    360 reviews won't -- the point you're making is that people are

23    being compensated or motivated by what their bosses are telling

24    them to do, not necessarily about what their colleagues are

25    saying about them.

1          **MS. SCULLION:**  The other category, Your Honor, is I

2     understand that employees set -- in addition to a self

3     evaluation, they set goals, these OKRs and goals for

4     themselves, which -- frankly, it's not even clear to me that's

5     part of the personnel file.  But if that resides solely for

6     some reason in what they call a personnel file, we think that

7     also would be relevant, again, to show what is that employee

8     setting as their goal, perhaps, for example, in light of their

9     last review where they were told to prioritize X and Y and Z

10    and then, lo and behold, we see they do, in fact, go ahead and

11    do that.

12          **THE COURT:**  Presumably a self evaluation will refer

13    back to their goals.

14          **MS. SCULLION:**  I guess what I would ask, Your Honor,

15    we're talking without seeing what these documents fully look

16    like yet at this point.  I would just ask if we could have

17    leave to come back and present that to Your Honor, if we do

18    see, in fact, that there is a --

19          **THE COURT:**  Well, just to give you guidance and avoid

20    future more motions practice.

21          If within TikTok there are self evaluation that refer to

22    goals and list out the goals -- I mean, I don't know why you

23    would withhold the goals as a separate matter anyway.  But to

24    the extent there is a dispute on that, I would hope you would

25    be able to work it out in a reasonable meet-and-confer fashion.

1      **MS. SCULLION:**  The only other thing I was going to ask

2  for clarity on is in terms of redaction, I understood Your

3  Honor to be referring to truly personal information, not

4  wholesale blocking out of -- of narratives that might happen to

5  discuss, you know, something -- something else that the

6  employee is working on.

7      Are you talking about just, like, the Social Security

8  number, or -- or "I was going through cancer treatments this

9  year" or --

10      **THE COURT:**  Certainly that.  Certainly that.

11      But, again, if on a particular page of a performance

12  review, part of it talks about one of the topics in your

13  footnote, then that part would not be redacted.  But a

14  different part of the page is talking about sexual harassment

15  or tardiness, right, and it's a whole paragraph, I would expect

16  TikTok would have the ability to redact that completely

17  irrelevant paragraph out, all right, as a block.

18      **MS. SCULLION:**  Understood.

19      **THE COURT:**  And certainly, again, TikTok, you know,

20  the rule of reason applies.  I assume you're not going to

21  overredact.

22      **MR. VIVES:**  Of course.

23      Thank you, Your Honor.  We appreciate it.

24      **THE COURT:**  Okay.

25      **MS. TELLER:**  Your Honor, Faye Paul Teller for the Snap

1    defendant.

2        If I could, just in particular with this argument and

3    respond to Mr. Warren's comment about the effect on other

4    defendants.

5        Maybe this goes without saying, but I think I speak on

6    behalf of all of the other defendants to say that this is, as

7    we've discussed today, a particularized showing and plaintiffs

8    have, in fact, not conferred with any of the other defendants

9    about the viability of getting this.  For Snap we didn't even

10   have deposition notices until last week.

11       So I just want to make sure that Your Honor is, of course,

12   reserving judgment on whether and to what extent this is

13   appropriate for the other defendants.

14       **THE COURT:**  I assume -- whether the discovery requests

15   have even been served or pursued, yes, it is still something

16   that's in the works.

17       **MR. WARREN:**  Your Honor, I only mentioned this because

18   it was mentioned by my colleague on the other side of the aisle

19   as some, you know, thing that we were going to do that was

20   untoward.  I just want to be very clear it's a thing that we

21   plan to do that is not untoward.

22       No, we haven't met-and-conferred about it.  We plan to do

23   that and, of course, we'll have ongoing discussions with

24   opposing counsel.

25       **MS. TELLER:**  Thank you, Your Honor.

```
 1              THE COURT:  That's what I expected.

 2        Okay.  Who wants to talk about Meta's hyperlinked

 3   documents?

 4              MR. WARREN:  Your Honor, Previn Warren for the

 5   plaintiffs.  I believe I have the pleasure on that particular

 6   issue.

 7              THE COURT:  All right.

 8              MR. CHAPUT:  Good afternoon, Your Honor.  Isaac

 9   Chaput, Covington and Burlingame, on behalf of the Meta

10   defendants.

11              THE COURT:  Okay.  So it actually would have helped if

12   you provided a chart.  But comparing your two competing

13   proposals and bullet points -- tell me if I'm wrong -- it

14   appears that both parties are in agreement on the first four

15   bullet points in their entirety.  Tell me if I'm wrong on that.

16              MR. CHAPUT:  I believe that is correct, Your Honor.

17        I would add, however, one asterisk to that, which is that

18   the timing that Meta has agreed to is dependent on the volume

19   limitation that we discuss in the text preceding that because

20   the 30 days, we don't think, is going to be achievable if the

21   Court orders the 50 documents per week request, as opposed to

22   the 50 hyperlinks per week request that Meta has made.

23              MR. WARREN:  And, Your Honor, I would just add that I

24   do think there's broad agreement on the contours here.  The

25   issue is one of volume and timing.  That's where at least
```

 1    plaintiffs see the default line.

 2         **THE COURT:**  Okay.  I've said this before.  In

 3    meet-and-confers you know your cases better than I do and you

 4    know the burdens and the exact issues better than I do.  When

 5    it comes to, like, line drawing in terms of numbers, you're in

 6    a better position to negotiate that than I am.

 7         I understand the conceptual dispute is one side wants a

 8    limitation based on number of documents requested per week in

 9    this process.  The other side wants a limit on number of

10    hyperlinks requested per week regardless of how many documents

11    they appear in.

12         Has anyone done a study or done some sampling to see on

13    average how many hyperlinks show up in a particular document,

14    on average?

15         **MR. WARREN:**  Yes, Your Honor.  We would say in

16    response to that a few points.

17         First of all, in terms of the volume of documents that

18    contain hyperlinks, we believe that to be 30 percent of the

19    total production, which at present is over 1 million documents

20    and will surely grow potentially by multiples, but we expect

21    that percentage number to stay roughly the same.  So right now

22    it would be about 300,000 documents.

23         There is a wide variance in the number of hyperlinks in

24    any given document.  I would guesstimate on average it's about

25    three to four hyperlinks per document.  That's where we're

 1   seeing it fall.

 2        But, again, there could be some highly probative documents

 3   that have 20 hyperlinks and some highly probative documents

 4   that have zero.  It's a wide range, but that's about where

 5   the -- I would say the median would be.

 6        For us this -- and I do want to assure the Court the

 7   parties have extensively met-and-conferred on this issue,

 8   including in an effort to find a middle ground number.  We are

 9   just too far apart to get there, and we've tried.

10        And part of the issue is that we -- we do see the world

11   differently.  This is conceptual for us.  With depositions

12   coming heavy in a matter of three to four weeks, we simply do

13   not have the time to continue to wait and to be at the mercy of

14   the defendants on when they can get around to producing this.

15   And the first hyperlink request that we made, it took them four

16   months.

17        **THE COURT:**  We talked about this last time.

18        **MR. WARREN:**  Right.  Okay.

19        **MR. CHAPUT:**  And, Your Honor, we've worked very hard

20   to work on our processes to make sure that we're getting things

21   out the door faster.  I think the proposal that we made to

22   plaintiffs is a good faith effort to show the Court that we're

23   very serious about that.

24        And, you know, I would just point out that plaintiffs'

25   claim of extreme prejudice here just doesn't actually make that

1    much sense to me when you think about what they've asked for

2    over the last month since the last time we're here, which is

3    only about 100 hyperlinks total; right?

4        And so if there were this huge corpus of hyperlinks that

5    they needed produced, they could have been making those

6    requests in the intervening few weeks, but we only have

7    received three requests, totaling about 100 documents, since

8    the beginning of August.

9        **MR. WARREN:**  May I respond to that briefly?

10       Part of the issue is that we're still getting the

11   documents in the door.  The productions are getting made in

12   real time and we have to review them.

13       **THE COURT:**  Okay.  All right.  So here is what we're

14   going to do.

15       I'm going to find the middle ground.  Okay?  So it's going

16   to be plaintiffs will not make more than one hyperlink

17   production per week with each request limited to hyperlinks

18   from 50 documents or 200 separate hyperlinks, whichever is

19   lower.  Does that make sense?

20       **MR. WARREN:**  It does, Your Honor.  And we would -- we

21   appreciate the Court's decisive ruling on that issue.  Thank

22   you.

23       **THE COURT:**  Okay.  Because -- and, you know, you can

24   report to me on the next DMC if it turns out to be wholly

25   unworkable and you're just completely backed up.  And I'm

probably going ask for a declaration or something showing how

many resources you've thrown at this and how many people to

show the burden.  Okay?

          **MR. WARREN:**  Yes.  And, Your Honor, I do want to say

that what Mr. Chaput is representing as a low volume is, in

part, from an effort by us to exercise self-control and not

just find every hyperlink and throw it their way.  We are

trying our best to find the stuff that we think we need that is

going to matter.  But I think what Your Honor as set forth as a

ruling will be workable for us.

     There is one attendant issue, and I think only one more,

which concerns the timing of hyperlink requests where a

deposition is about to take place within 30 days.

     So there's an example actually that's pertinent.  There

are two deponents whose depositions are scheduled October 21st

to 22nd and October 24th to 25th.  Those custodial files will

only be produced on September 20th per the parties' agreements.

So we would have to, in essence, review the entirety of those

files and produce the hyperlink request the next day in order

to get those back the day before the depositions.  It -- it

just doesn't work.

     And so we've proposed to Meta -- and, again, this is an

issue that I think will flow down to the other defendants.  I

want to be transparent about that.  But what we proposed to

Meta is something we think is fair, which is if we're putting

 1   in a request that concerns hyperlinked documents within the

 2   custodial files of someone who is about to be deposed within 30

 3   days, that they accelerate the production of that and attempt

 4   to get those to us within 14 days.  And, of course, if there

 5   are extenuating circumstances, we will confer about that.

 6   We'll talk about it.  We'll be reasonable.

 7          THE COURT:  They already said in the briefing they are

 8   agreeable to be accelerating.  So the issue is you want the

 9   hard 14-day deadline.

10          MR. WARREN:  I don't know if I would say it's hard,

11   but we want a target so there's something to hold them to.

12          THE COURT:  Remind me.  When are you getting the

13   custodial files for these two witnesses?

14          MR. WARREN:  September 20th.

15          MR. CHAPUT:  Your Honor, I would just point out that

16   is the deadline for us to complete those productions.  That

17   doesn't mean we haven't been making rolling productions for

18   those custodians already on an ongoing basis.  So it's not like

19   they are going to have to start from scratch the day after they

20   get those productions.

21          THE COURT:  Okay.  And do you have any sense,

22   Mr. Chaput, about how much more there is to be produced to

23   complete --

24          MR. CHAPUT:  I apologize, Your Honor.  I don't have

25   those figures handy.

```
 1          THE COURT:  Okay.  And the depos are October 21 and --

 2          MR. WARREN:  They span from the 21st to the 25th.

 3   They are each two-day depositions.  And then there's a gap day.

 4          THE COURT:  Help me out.  I know it's going to be

 5   hard.  Roughly on average how big have the productions been?

 6   800 trillion gigabytes or one kilobyte?

 7          MR. WARREN:  We can only hope for 800 trillion

 8   gigabytes, Your Honor.

 9          MR. CHAPUT:  I apologize, Your Honor.  I'm not -- the

10   size of each custodial file has varied substantially from

11   custodian to custodian based on a host of factors.  So it's

12   hard for me to extrapolate.

13          THE COURT:  The deponents, are they relatively

14   high-level people who have been there a long time who we would

15   expect have large numbers of files?

16          MR. WARREN:  Yes.  And, of course, these are examples.

17   There are other issues like this.

18          THE COURT:  Well, this is the immediate problem.

19          MR. WARREN:  Yes.

20          THE COURT:  Okay.  So for the immediate problem, I

21   mean, the timing is what it is.  All I can -- I mean, because

22   we don't know the volume yet and we don't know the volume of

23   what we're going to request yet once you've reviewed it, all I

24   can do is say:  Look, communicate almost daily on status.

25          And I do want you to communicate to your colleague here,
```

1    like, how complete is your custodial production of these two

2    witnesses to date and when -- you know, can it be completed

3    before because there's nothing left or there's very little

4    left; right?

5         And keep them informed.  Because if they've already gotten

6    the production or part of the productions of those custodial

7    files and haven't asked for hyperlinked documents from what

8    they have already reviewed of them, right, maybe there won't be

9    a lot and it's not a problem; right?  But this is an issue

10   where I do think constant communication about progress both

11   ways.

12        And then I want plaintiffs to communicate back to Meta how

13   far along you are in the review and, you know -- and don't

14   ask -- I don't think you're going to, but don't ask for the

15   hyperlinks, like, in one fell swoop.  Do it on a rolling basis

16   all right, as you come across them.

17        **MR. WARREN:**  Well, Your Honor, we would be happy to do

18   that, but I think the process you just set forward is one

19   request per week.  So we need a little more guidance on which

20   to do.

21        **THE COURT:**  Okay.

22        **MR. CHAPUT:**  And, Your Honor, I would just say that

23   because this is a manual process, if we have requests coming in

24   multiple times a week, just the burden of tracking everything

25   alone is going to make it completely inadministrable.

1      **THE COURT:**  You can keep it one a week, but that

2  doesn't mean you cannot communicate about how many -- you know,

3  in terms of the production how many documents are going to be

4  produced that week and how many are going to be done by

5  whatever.  And you can tell him as the week goes on how many --

6  you can say:  There's nothing.  We don't have anything yet.

7      **MR. WARREN:**  Your Honor, we're happy to do that,

8  consistent with the bounds of protecting our attorney work

9  product, of course.

10      But what I do want to suggest is that, you know, for the

11  documents that are produced on September 20th -- and there

12  certainly will be some -- it's not practicable for us to

13  assemble the requests into one document that is, you know,

14  workable for Mr. Chaput in under, say, seven days.

15      It's also not practicable for us to absorb the return

16  information with less than a week before the depositions are

17  set.  That's how we got to basically a 14-day turnaround time.

18      And I would return to that request because I think it is a

19  reasonable one that -- and it doesn't have to apply to the

20  custodial files previously produced for these people, as to

21  which I completely take Your Honor's point, that we ought to be

22  working through that and making requests, which we have done;

23  but for those that are produced on September 20th, I think that

24  timing is -- there just isn't another framework.

25      **THE COURT:**  All right.  So I'm looking at the calendar

1    now.  This is just for these two deponents and not -- right?

2    It's to -- what I'm about to say applies to these two

3    deponents.  Okay?

4         Plaintiffs will -- over the following two weeks, so what

5    is it?  So the week of September 23rd and then the week of

6    September 30th, once each week -- are you planning on doing it

7    every Friday or every Monday?

8              **MR. WARREN:**  We could.  I mean, whatever --

9              **THE COURT:**  Pick whatever -- come to some agreement on

10   whatever that one day a week will be.  All right?

11        Let's assume it's a Friday just for -- since the

12   production is on a Friday.  So on the 27th there will be a

13   request for hyperlinks and on the 4th of October there will be

14   a request for hyperlinks.  All right?

15        On a rolling basis, since you will start to get the

16   request for hyperlinks before this, Meta, I'm going to order

17   you to substantially complete production of all the requested

18   hyperlinked documents by October 14th and communicate

19   transparently to plaintiffs if there are specific hyperlinked

20   documents that are problematic, that may need to be produced

21   after the 14th, but in no event any later than the Thursday

22   before the first deposition for that first deponent.

23             **MR. WARREN:**  Thank you, Your Honor.

24             **MR. CHAPUT:**  Your Honor, I have very significant

25   concerns that we'll actually be able to do that.

1      You know, we've put in footnote seven all of the steps

2  that are required here.

3      Again, it is a manual process.  There is just a lot of

4  back-and-forth and human time that has to get devoted to this.

5  Not just at our firm and with our vendor, but also with our

6  client.

7      We will do our best.  We will communicate with plaintiffs

8  about it.  I just need to make my record that I do not have

9  confidence I actually can make that happen, although we will

10  try.

11          **THE COURT:**  It's only one hyperlinked document.  You

12  know, I don't think that should be a problem.  We don't -- the

13  problem is we don't know the volume yet; right?  And it may be

14  a very, very small volume; right?

15      I'm assuming plaintiffs are going to be very cautious and

16  reasonable in the number of hyperlinked documents they are

17  going to ask for.

18          **MR. WARREN:**  We will in each request request 50

19  documents or 200 separate hyperlinks, whichever is lower.  And

20  we will do our best to --

21          **THE COURT:**  Well, no more than 50.

22          **MR. WARREN:**  No more than, absolutely.

23          **THE COURT:**  That's not a floor.  It's a ceiling.

24          **MR. WARREN:**  It's a ceiling.  But, Your Honor, the

25  reality is with the 300,000 documents that have hyperlinks

1   already, I want to be really transparent with the Court.  It's

2   not likely that we're going to be coming in a lot lower than

3   those numbers because it -- we -- we would be leaving so much

4   probative information on the table that we have to go ask

5   these.

6        It's almost as if we had a litigation where there were no

7   attachments to emails and you had to show up and ask the

8   deponent about the email and the attachment they're talking

9   about, but you don't know what the attachment is.

10        I mean, it's unworkable.  It creates so many opportunities

11   for mischief regarding authenticity, regarding admissibility,

12   regarding personal knowledge.  We want to bust through this.

13        I think what Your Honor has alighted on is fair.  We will

14   work within those confines.  We will do our best to be as

15   reasonable as we can be.  That's what we can promise.

16        **THE COURT:**  Mr. Chaput, if you're unable to produce

17   the majority or a substantial number of the hyperlinked

18   documents, would there be -- I mean, I hate to ask this.

19        Is there an ability to reschedule the depositions?  Are

20   these people available at a later date?  Is plaintiffs amenable

21   to doing that?

22        **MR. WARREN:**  Your Honor, it's not that we wouldn't

23   want to do that, but we -- we have gone through a grueling

24   process --

25        **THE COURT:**  I hear a lot of laughter, so...

1          **MR. WARREN:**  I think the laughter speaks for itself.

2          **THE COURT:**  Okay.

3          **MR. WEINKOWITZ:**  You know, I do want to say on the

4    burden issue, I heard a lot of wishy-washy language from my

5    colleague.  A lot of -- you know, there's a lot of

6    back-and-forth to do this, a lot of human time.  It's a manual

7    process.  I don't know what any of that adds up to.

8          The burden here seems to boil down to they pull the doc

9    I.D. of a hyperlink.  They run it through their database, and

10   they run it through their client's database, and then they get

11   the information.

12         I mean, that's what the footnote bottoms out in.  It

13   doesn't seem that hard, especially given the resources

14   available to this client.

15         **MR. CHAPUT:**  Your Honor, if I may make just a few

16   points.

17         So, first, Mr. Warren represented that this is -- as if

18   they are litigating a case where they have not a single

19   attachment anywhere in the production.  And that's simply not

20   true; right?  In many instances we ultimately are able to find

21   the documents that they are asking about in our production.

22   That -- that takes time to find it, but it's in the production;

23   right?

24         So it's not as if the document isn't there or they have

25   been deprived of information.  And, of course, it has Meta data

1    showing that the custodian had access to the document or it was

2    their document; right?

3        So they've already been able to tie the document we're

4    talking about back to the deponent they are talking about.  But

5    that doesn't mean there's not a burden on us to go out and find

6    that document.  We're willing to undertake the burden.  We're

7    doing our best to keep up.

8        The other point I would make is, and we've heard this a

9    number of times from the other side, and I have -- I find it

10   somewhat ironic, which is the complaints about how we're

11   basically producing too many documents.  And I just have to say

12   that it strikes me as a little bit rich when these are

13   documents that we're producing, of course, in response to their

14   very substantial demands for production of documents.  So it

15   shouldn't come as any surprise to anyone that this is a

16   document-heavy litigation.

17       And the final point that I would make, Your Honor, is just

18   on the 200 documents, the ESI order that Your Honor put in

19   place, of course, does have a reasonableness and

20   proportionality component to requests for production of

21   hyperlinks.  200 hyperlinks a week for the rest of this

22   discovery period would be many, many, many thousands of

23   documents.  It far exceeds what we had in mind in terms of a

24   number of hyperlinked requests that would be reasonable at the

25   outset.

1    And I just do want to note we may be back at some point to

2    tell the Court it has become way too much and the burden needs

3    to stop.

4    So I didn't want Your Honor to be surprised if I find

5    myself here talking about hyperlinks again.

6    **THE COURT:**  I think I said earlier that if you want to

7    come back and argue burden, you can come back and do that.

8    Make the record for it and bring the record if you want to do

9    that.

10    **MR. CHAPUT:**  Understood, Your Honor.

11    **MR. WARREN:**  May I raise one other point?

12    It's not -- I will put all that to one side because I

13    think that's done, but this is important and it's separate.

14    **THE COURT:**  Okay.

15    **MR. WARREN:**  And it concerns authenticity.

16    So on a meet-and-confer that Mr. Chaput and I had, I

17    think, yesterday or the day before, the issue was raised by

18    Meta for the first time that even if Meta produces to us a

19    chart linking a hyperlinked document to the source document,

20    which is what they will be doing and what they've done, that

21    they will not acknowledge the authenticity of that linkage;

22    that that chart will not be sufficient to establish the

23    authenticity.

24    But the problem is we have no other way of doing it

25    because the hyperlink is inaccessible to us.  We can't click

 1   it.  That's the whole point of us making the request.

 2        So maybe this is an unripe issue.  I don't know.  But I

 3   want to flag it for Your Honor, that it is a serious source of

 4   concern for us as we embark on these depositions where we

 5   otherwise would seek to take some of those evidentiary

 6   problems, those kinds of -- that ground brush, we would seek to

 7   clear that out.

 8        If they are going to say:  We gave you the chart.  This is

 9   the linkage, but no authenticity here.  That's a real concern

10   for us that we would like resolution from the Court on.

11        **THE COURT:**  Authenticity goes to admissibility at

12   trial.  I mean, why is that an issue for me and not Judge

13   Gonzalez Rogers?

14        **MR. WEINKOWITZ:**  Well, it may very well be an issue

15   for Judge Gonzalez Rogers, Your Honor.

16        **MR. CHAPUT:**  Your Honor, I agree this is not a ripe

17   issue.  It wasn't briefed.  We've barely spoken about it.  This

18   just is not something that should be taking up the Court's time

19   today when we haven't finalized our meet-and-confers and Your

20   Honor has many other things on your calendar.

21        **MR. WARREN:**  That's fine.  We can table it, but I did

22   want to raise it, make Your Honor aware of it.

23        **THE COURT:**  For our intrepid court reporter, let's

24   take another ten-minute break.

25        **MR. WARREN:**  Thank you, Your Honor.

1          **MR. CHAPUT:**  Thank you, Your Honor.

2          **THE CLERK:**  Court is in recess.

3      (Whereupon there was a recess in the proceedings

4       from 3:24 p.m. until 3:35 p.m.)

5          **THE CLERK:**  Recalling 22-MD-3047, In Re Social Media

6  Adolescent Addiction and Personal Injury Products Liability

7  Litigation.

8      Counsel, when speaking, approach the podiums and state

9  your appearance for the record.

10          **THE COURT:**  Who is going to talk about school district

11  plaintiff search terms?

12          **MS. McNABB:**  Good afternoon, Your Honor.  Kelly McNabb

13  for the school district plaintiffs.

14          **MS. WILLIAMS:**  Good afternoon, Your Honor.  Chaloea

15  Williams on behalf of the YouTube defendants, and I will be

16  arguing on behalf of all defendants.

17          **THE COURT:**  Good afternoon.

18      Okay.  So I'm a little disappointed that you couldn't

19  figure out where to brief things either in the DMC or whatever.

20  I thought I made this clear.

21      The DMC statement, if it's a discrete issue that you think

22  I can resolve at the DMC, you can certainly brief it there if

23  it's a small enough issue.  If it requires a letter brief, you

24  should put all the arguments as to that issue in the letter

25  brief with a summary in the DMC.  That's kind of the

 1    separation.

 2        So I'm a little disappointed you weren't able to follow

 3    that.  But to the extent I haven't given that clear enough

 4    guidance explicitly before, that's how I see the separation, so

 5    that you're not putting a lot of argument in one and a lot of

 6    argument in another.  I've got to figure out where the disputes

 7    are and what I need to decide.

 8        Is that clear?

 9        **MS. WILLIAMS:**  Yes, Your Honor.  And I'm happy to

10    speak a little bit about that process if Your Honor would be

11    interested.

12        **THE COURT:**  I'm not at all.

13        **MS. WILLIAMS:**  Okay.

14    (Laughter.)

15        **THE COURT:**  Yeah.  I mean, procedural stuff like that,

16    I think I've made clear.  Going forward, I think I've made

17    clear.

18        So, okay.  So on the merits of this, again, I don't think

19    you want me going search term by search term saying "yes,"

20    "no," thumbs up or thumbs down.

21        What I'm hearing from the brief, the gestalt of what I'm

22    getting is that the search terms are -- are pulling in too many

23    documents and that there's not enough time with the budget cuts

24    and all that to review, process and get through all the

25    documents that the search terms are picking up.

```
 1          Is that kind of where we are?
 2          MS. McNABB:  Yes, Your Honor.  This is Kelly McNab for
 3   the plaintiffs.  That is correct.
 4          THE COURT:  So I have figured out one way to speed up
 5   your budget cap in terms of processing the documents.  Okay?
 6          Under 34 C.F.R. 99.31, which is the federal -- the Federal
 7   Education Rights and Privacy Act, under Section 99.31(a):
 8              "An educational agency or institution may disclose
 9          personally identifiable information from an education
10          record of a student, of a student, without the consent
11          required by Section 99.30 if the disclosure meets one or
12          more of the following conditions."
13          Under subpart 1.1 of this Section 99.31, one of those
14   qualifications is:
15              "The disclosure is to comply with a judicial order or
16          a lawfully issued subpoena."
17          So I'm -- I'm going to focus first on "lawfully issued
18   subpoena."  I actually did my own legal research, both Wright
19   and Miller and Moore's Federal Practice and case law
20   interestingly agrees that you can serve subpoenas on a party;
21   that there is -- there is support in the -- the rule itself and
22   the way it's drafted to serve subpoenas on a party.
23          So what I would order is that for the school district
24   documents, that you serve subpoenas for what you're going after
25   that would be covered by the search terms.
```

1    It's kind of working backwards, but do you understand what

2    I'm saying?

3    **MS. WILLIAMS:**  Yes, Your Honor.  So the subpoenas

4    would include the RFPs that we have already issued.

5    **THE COURT:**  Essentially it would replicate the RFPs,

6    okay, so that they wouldn't be capturing anything more than the

7    search terms that are already at issue.  Okay?  I don't want to

8    inject new or more or additional search terms into the process.

9    Okay?

10    And because of that, you don't need to redact the

11    documents when you produce them because the statute and the act

12    specifically exempts you from having to redact the personally

13    identifying information, the confidential information, if it's

14    in response to a subpoena.

15    **MS. McNABB:**  Yes, Your Honor.  My understanding,

16    however, is that notice must still be provided to the

17    individual.

18    **THE COURT:**  You're right.

19    "The educational institution may disclose information

20    under Paragraph A-91 of the section only if the agency or

21    institution makes a reasonable effort to notify the parent

22    or eligible student of the order or subpoena in advance of

23    compliance so that the parent or eligible student may seek

24    protective action."

25    And so -- but that's all you're required to do, is make a

1   reasonable effort to notify the parent or eligible student;

2   right?

3       And so you know whose files they are.  You've got the

4   contact information, because every school has the contact

5   information for the parent or student involved.

6       Doing it by subpoena without having to redact things even

7   with the notice, the reasonable effort to make notice, is going

8   to be faster.  This is my point.  It's going to relieve you of

9   the concern of burden and time crunch that's been briefed to me

10  if you do it this way.

11      **MS. McNABB:**  Your Honor, Kelly McNab for the

12  plaintiffs.

13      I do think the notice requirement is quite burdensome.  It

14  is not a generic notice that can be given.  It has to be a very

15  specific notice given.  And given the volume of documents that

16  we are seeing in the records, it would be quite substantial to

17  give notice.  And we are talking about a ten-year time period.

18      That mans that plaintiffs have proposed a solution to

19  FERPA to defendants, which I think would dovetail with what

20  Your Honor is thinking.

21      What we have suggested was we would -- for any FERPA

22  implicated document, so individual student records, we would

23  provide a slip sheet and then a metadata log for FERPA

24  documents and defendants then can review the log and determine

25  what if any of those documents they actually need.

```
1          So it would be akin to what's happening with the

2     hyperlinks, but getting more -- having a good faith

3     meet-and-confer on:  Do you actually need those FERPA

4     documents?

5          And then perhaps we go down the path of:  If you actually

6     do need that document, issuing a subpoena and then if -- if

7     it's required, providing individualized notice to the -- to the

8     student who would be implicated is one method to address FERPA.

9          THE COURT:  Is this a proposal you've previously

10    agreed to?

11         MS. WILLIAMS:  Your Honor, our understanding -- first

12    of all, this proposal with respect to providing the log and

13    providing a slip sheet came up in our very last meet-and-confer

14    and we were prepared to confer on the ways that we can assist

15    the school districts in meeting their beliefs with respect to

16    their FERPA obligations.

17         But what's at stake and what's been at issue and what is

18    the reason why we're here today at an impasse is the

19    2.5 million budget document cap that plaintiffs mentioned on

20    the eve -- or on, in fact, the last day of our negotiations.

21         If what I'm hearing is there's no longer a budget cap and

22    we can continue to meet-and-confer over the scope of the

23    documents that are being returned on our hit terms, we're happy

24    to do that and we're happy to also meet-and-confer about this

25    proposal and hear more about what plaintiffs are thinking in
```

terms of slip sheets and logs.  And that's something that is

not a ripe dispute before this Court.

     The ripe dispute was the budget cap.  If that budget cap

is no longer an issue, then we don't really have a dispute that

merits the Court's additional attention and we're happy to

continue meeting-and-conferring.

          **THE COURT:**  Are you happy to continue

meeting-and-conferring?

          **MS. McNABB:**  No, Your Honor.  Ms. Williams hit on it.

It is not just FERPA that's at issue.

     What's at issue is the extraordinary amount of documents

that defendants' overly broad search terms are hitting on.

FERPA is just one unique issue that the school districts have

to contend when reviewing the documents.

          **THE COURT:**  She's offering to continue

meeting-and-conferring to narrow or eliminate some of the

search terms to narrow the burden in terms of overbreadth.

          **MS. WILLIAMS:**  Correct, Your Honor.

     And we have taken very seriously the Court's guidance that

we should be working collaboratively.  We have provided three

counter proposals.  We've drafted over -- or modified over 100

terms.  We have reduced the document count by over 10 million.

     And we were willing to continue meeting with plaintiffs.

We had asked for, for example, responsiveness sampling, other

ways to get at eliminating false hits, but we were told on

```
1   September 6th, which was the deadline to conclude negotiations,

2   that there was a 2.5 million document budget cap and anything

3   above that was not possible.

4       So untethered to the relevance of our terms or what we

5   believe to be the proportionality of the needs of this case, we

6   just needed to wholesale drop 90 percent of our terms without

7   an informed decision-making process.  That is not reasonable.

8   It's certainly not supported by the law.  And it's certainly

9   not consistent with Your Honor's guidance about taking a

10  collaborative approach to reaching an agreement on search

11  terms.

12      THE COURT:  So assuming my approach to use the

13  subpoena process to avoid the need to redact things eliminates

14  the budget cap, which it should, can you just now go on the

15  substantive meet-and-confer on the search terms and narrow

16  those?

17      I saw in the briefing you had agreed to a proposed 200

18  terms.  They had proposed 240.  I assume there's overlap

19  between them.  Isn't there a middle ground to be reached there,

20  200 and 240 terms?

21      MS. McNABB:  Your Honor, the difference is that they

22  are asking for an additional 240.  Not that we're asking for

23  200 and they're asking for 240.  They are asking for an

24  additional 240.

25      And the FERPA issue is not the largest issue at stake.
```

1  It's the number of irrelevant documents that we would need to

2  review.

3      What defendants are asking -- setting aside FERPA, what

4  they are asking for the plaintiffs to do is to review over

5  8 million documents.  What that would mean, setting aside

6  FERPA, is that plaintiffs would need to hire over 520

7  attorneys --

8          **THE COURT:**  All that assumes that you use their search

9  terms, which I'm not ordering you to do.  I'm saying try to

10  work out a lower number of search terms, or a narrower set of

11  search terms.

12          **MS. WILLIAMS:**  Your Honor, if I could briefly on that

13  point.

14      We proposed a number of options over the course of

15  negotiations, technical considerations that the parties had

16  come up with, ways to eliminate false hits.  We've come to

17  meet-and-confers prepared to discuss that.  What we were told

18  is that there was a budget cap, and there was no way to work

19  around that cap, and that is not a position that we can

20  negotiate from, Your Honor.

21          **MS. McNABB:**  Your Honor, when we sent defendants our

22  proposal, it was around 2.5 or 2.6 million documents that

23  plaintiffs would have to review.  That is what's feasible under

24  the schedule.

25      Mr. Chaput just talked about what is feasible under the

1   schedule.  What can we get done?  That is what we can get done.

2   We can't get done with 800 million documents.

3       So what we're asking for is, and we are fine.  It's -- we

4   have been down this path before with Meta.  Let's set a cap and

5   we will reach an agreement with the cap.  But the ESI protocol

6   does not require responsiveness sampling.  Defendants didn't do

7   responsiveness sampling.

8       What we need to do is sit down -- and I'm happy to invite

9   Ms. Williams over to the Lieff Cabraser office tomorrow

10  morning, and we can get this done tomorrow morning before the

11  CMC, to reach what the terms will be to -- to get at a document

12  count that plaintiffs can actually reach by the November 5th

13  substantial completion deadline.

14      **THE COURT:**  So it sounds like you're both willing to

15  meet-and-confer.  That's -- problem solved; right?

16      **MS. WILLIAMS:**  Yes, Your Honor.

17      Our point is that there is not a magic number here.  It's

18  not 2.5 million.  It's not 8 million.  We're happy to

19  meet-and-confer about this as long as plaintiffs are going to

20  come to the table with solutions that are workable, and so far

21  they haven't.

22      They've told us that there was a budget cap, end of story,

23  2.5 million or bust.  And that's just not consistent with the

24  needs of the case and it's not consistent with Your Honor's

25  position.

1          **THE COURT:**  Okay.  I don't think you should be driving

2     the search terms based on a hard cap on how many documents you

3     think you can gets reviewed.

4          But on the other hand, you've got to be sharing hit counts

5     with them so that they know what's -- you know, why there is a

6     problem, right, and why it's pulling in too many documents.

7          And conversely Meta has good to come up with proposals,

8     either eliminate terms, narrow terms or, you know, to -- and

9     then you run another hit count to see how that solves it.  And

10    then -- I mean, this is part of the negotiation.  And then you

11    come up with a set of terms that works from their side in terms

12    of numbers and burden and time, and from your side in terms of

13    picking up the documents that you think are going to be

14    relevant.

15         **MS. WILLIAMS:**  Yes, Your Honor.  We've shown that

16    we're willing to make movement toward progress every time we

17    receive a hit report, Your Honor.

18         I've personally been responsible for reviewing these hit

19    reports and making decisions about how we can further narrow

20    terms because the reality is we don't want to review a bunch of

21    irrelevant documents, and I've made that representation to

22    plaintiffs during our meet-and-confer.

23         So if we can continue to get hit reports that are

24    reflective of our counterproposals, if plaintiffs are willing

25    to engage on technological solutions to narrow the scope of the

1    documents, I think we're -- I don't know that we have to do it

2    tomorrow.  I'm happy to go to your office and visit out -- and

3    visit at that point.  I think we can continue the

4    meet-and-confer process we have been engaging, as long as

5    there's not this arbitrary cap on documents, Your Honor.

6           MS. McNABB:  Your Honor, we need to put an end to the

7    search term negotiation.  We are less than 40 days out,

8    business days out from the deadline for substantial completion

9    of document production.

10         My concern is if we don't talk about a budget -- and a

11   budget is what is proportional.  There are limits.  There are

12   limits to what can be done.  That's why there is

13   proportionality in the Federal Rules --

14         THE COURT:  It is a little bit backwards to start with

15   a budget and say we work backwards from there.  You run the hit

16   reports and you come up and you figure out what -- how

17   burdensome the search terms -- I mean, you know roughly what

18   you can process; right?

19         But taking a position that there is a hard number that

20   you're not going to go over is not the way, I don't think, the

21   negotiation should go.

22         MS. McNABB:  And, Your Honor, we're not saying there's

23   a hard number.  We're saying it cannot --

24         THE COURT:  She represented that you said there's a

25   hard number.  So that's what I'm reacting to.

1          **MS. McNABB:**  There's not a hard number.  We're not

2    saying it's 2.5 million documents and that's it.  We're already

3    with our own search terms at 2.6.  So the defendants are coming

4    up with this 2.5 number, 2.5 million number of their own.

5          It cannot be -- the gap cannot be though between 2.5 and

6    8 million.  8 million, we cannot do.  We cannot do more than --

7    much more than where we're at.

8          We are telling defendants what is feasible for us.  The

9    approach that we have taken with a budget cap is an approach

10   that Meta itself came up when the parties could not agree on

11   search terms for Meta.  It's an exercise we've been through.

12   It was something that worked on that.  It is a solution that we

13   were hoping we could reach with defendants here and what would

14   be feasible for the school districts to get done without having

15   to go back to the Court and ask for a schedule extension again.

16          **MS. WILLIAMS:**  Your Honor, sorry.  Just to get again

17   on the -- 2.5 is not a number that I pulled out of nowhere.  I

18   have attended all of these meet-and-confers.

19          Counsel, who is before the Court right now, in fact,

20   mentioned the 2.5 million number, but that's regardless.  We

21   were told there is a budget cap and we were not given any

22   opportunities to negotiate around it.

23          Moreover, our understanding is that cap is connected to

24   plaintiffs' FERPA obligations.  That is the position they

25   were -- they took when they introduced the concept of the cap.

1    Your Honor has proposed a solution, and I haven't heard

2    plaintiff say that solution is impossible to implement, that

3    would alleviate the concerns about reviewing documents on a

4    document-by-document basis or any other impediments to their

5    ability to review a larger number of documents.

6    So I'm hearing a lot of shifting of the position, but the

7    reason we are here today is because there was a cap, and the

8    cap was necessary so that they can fulfill their obligations

9    under FERPA, and Your Honor has proposed a solution to that.

10    So we should be operating based off of what are the terms?

11   Are they relevant?  What are the terms returning?  How can we

12   work together to eliminate false hits?  That's what discovery

13   requires.  That's, in fact, what most of the cases plaintiff

14   cited required, and that's what we're prepared to do.

15        **MS. McNABB:**  Your Honor, Ms. Williams misunderstood

16   what plaintiffs' position was if that is how she understood our

17   meet-and-confer.  It is not about FERPA --

18        **THE COURT:**  I don't want to rehash who said what.

19   We're forward looking here.  Okay?

20    Meet-and-confer tomorrow if you can.  Meet-and-confer

21   promptly if you can't meet tomorrow.  Sorry, I don't know if

22   you're local or not; but if you are, they are over in Oakland.

23   You can -- just go over tomorrow and maybe hash this out

24   tomorrow.

25    It seems like I've given enough guidance -- first of all,

1    there are ways to get around the redaction FERPA issue, which

2    I'm going to order.  So if you can't come up with another way

3    to reduce the FERPA burden, I'm going to order that.  Okay?  So

4    that can't be a reason for limiting or arguing time limits

5    or -- I'm getting rid of that part of having to go through and

6    redact -- review things for redaction.  Okay?  So I want you

7    all to keep that in mind when you're talking about burden here

8    and timing.

9         But on the other hand, I mean, you said it yourself.  Meta

10   can't be asking for search terms that yield a -- you know, a

11   disproportionately unreasonable number of documents, too.  I

12   mean, as you said yourself, you don't want to review that many

13   when they come back your way either.

14        So there has to be a middle ground here in terms of the

15   number of search terms and the crafting of the search terms.

16   I've got to believe that.

17        **MS. WILLIAMS:**  And, Your Honor, we're happy to

18   continue negotiating with plaintiffs over that.

19        **THE COURT:**  Okay.  Do you need more guidance from me

20   or can we move on to the next issue?

21        **MS. McNABB:**  No, Your Honor, no guidance.  Although I

22   would -- I take that back.  Yes, I would like guidance.

23        We need to set a hard deadline on when these search terms

24   are going to be done and --

25        **THE COURT:**  Status report in a week on your

```
 1   meet-and-confers.  I'm going to expect you to be done in a

 2   week.

 3           MS. WILLIAMS:  Your Honor, my only point on that is if

 4   there is going to be a status report, we are going to need hit

 5   reports that are responsive in a timely manner.

 6           THE COURT:  I said exchange your reports reasonably

 7   and timely with each other.

 8           MS. McNABB:  Your Honor, just for some context on the

 9   hit reports.  Defendants' terms are so broad that it took one

10   of our vendors over nine hours to run a hit report for one

11   school district.  The vendor is usually able to run multiple

12   hit reports at a time and turn it around in an hour.  These are

13   completely overbroad terms.

14       I do need to make a record that if we are ordered to

15   review substantially more documents than what we're currently

16   at, we will not be able to meet this schedule.  Whether it is

17   for FERPA or otherwise, we will not be able to meet the

18   schedule.

19       There are -- as Mr. Chaput already argued on behalf of

20   Meta, there are limits to what we can do.  So we -- if

21   defendants want to continue to meet-and-confer, they need to

22   reduce the amount to what is actually feasible in the schedule.

23           THE COURT:  Sounds like one of the arguments you're

24   going to make tomorrow when you meet-and-confer with them.

25           MS. McNABB:  And my colleague just raised another
```

1    issue.  We need to explore the notice issue a little further,

2    and we may request some additional briefing on the subpoena

3    issue with FERPA.  We just would like to meet-and-confer with

4    our client -- excuse me, meet with our clients on that.

5              **THE COURT:**  In that regard I would draw your attention

6    to 2018 Westlaw 10798040, *Pitino versus University of*

7    *Louisville Athletic Association* where Magistrate Judge Lindsey

8    specifically identified the use of a subpoena as a way to avoid

9    FERPA issues.

10       In this opinion Magistrate Judge Lindsey also cites an

11   advisory letter dated June 22, 1998 from the Family Policy

12   Compliance Office, the Division of the Department of Education

13   that oversees FERPA compliance, which wrote that:

14        "A subpoena is lawfully issued when it's issued in

15        compliance with state law."

16   This is a federal case in this opinion.  It says:

17        "There is no requirement that a court verify that the

18        subpoena was issued in accordance with state law in order

19        for it to be deemed lawfully issued for FERPA compliance."

20   He admits:

21        "It may not be common practice for a party to

22        subpoena discovery materials from the opposing party, but

23        because the records -- here Mr. Pitino -- Coach Pitino

24        seeks are governed FERPA, a subpoena to the opposing party

25        would be appropriate."

```
 1          So there is support in the case law and, as I said, in

 2    Wright and Miller for using the process.  And there's nothing

 3    in the regulation stat of FERPA that says what -- the method of

 4    notice.  It just says reasonable notice.

 5               MS. McNABB:  Thank you, Your Honor.

 6          We certainly do want to find a way around FERPA and to

 7    figure out how we can make it workable.  It is a very serious

 8    issue for our clients.  So we will take this back.  We will

 9    discuss with our clients and, hopefully, we can come to a

10    resolution on the FERPA issue as well.

11               THE COURT:  Just so your clients understand, the

12    regulation says it can either be in response to a subpoena or a

13    Court order.  And so if you need a Court order ordering the

14    production without having to redact, I'm -- submit a

15    stipulation proposed or I'll do that.  Okay?

16               MS. McNABB:  Okay.  Thank you, Your Honor.

17               MS. WILLIAMS:  Thank you, Your Honor.

18               THE COURT:  Okay.  Plaintiff search terms -- we did

19    that.  Bellwether discovery limits.

20               MR. WARREN:  Hello, Your Honor.  Previn Warren for the

21    plaintiffs.

22               MS. SIMONSEN:  Good afternoon, Your Honor.  Ashley

23    Simonsen, Covington and Burling, for the defendants.

24               THE COURT:  Since this issue implicates the JCCP, is

25    somebody from the JCCP on --
```

1          **THE CLERK:**  Mr. Van Zandt is on Zoom.

2          **THE COURT:**  Oh, all right.  Mr. Van Zandt.

3          **MR. VAN ZANDT:**  Yes, Your Honor, I'm here.

4          **THE COURT:**  You can hear me, Mr. Van Zandt?

5          **MR. VAN ZANDT:**  I have difficulty hearing you, Your

6    Honor.  I can hear the parties, but it's difficult to hear you.

7          **THE COURT:**  Is this any better?  Is this any better?

8          **MR. VAN ZANDT:**  Yes.  Thank you.

9          **THE COURT:**  Okay.

10     All right.  Who wants to go first?

11         **MS. SIMONSEN:**  I'm glad to start, Your Honor.

12     I think we can keep this pretty simple.  I know we're

13   toward the end of a long day.  You know, the parties have

14   agreed on limits for the personal injury and the school

15   district plaintiffs across the two proceedings, both on

16   interrogatories and Requests For Admission.

17     We've also agreed on how the numbers will be split between

18   common and individual.  And I think you probably have that

19   chart in front of you, so I won't go through the details here.

20     There are really just three issues that we would

21   appreciate Your Honor's guidance on.  And at the outset I want

22   to be clear that these outstanding issues relate only to the

23   interrogatories and Requests for Admission that are the subject

24   of these limits.

25     In other words, we're not talking here about the form

interrogatories and Requests for Admission that Judge Kuhl has allowed the JCCP bellwether plaintiffs to serve with respect to defendants' affirmative defenses.  We understand those are separate and apart from these limits.  We're not arguing about those, including the fact that they were allowed to serve Form Rogs in connection with five of their Request for Admission on affirmative defenses.

So the first issue is should the MDL bellwether plaintiffs get to serve five additional interrogatories in addition to the seven that each bellwether plaintiff would get under the parties' agreement relating to affirmative defenses.  And specifically what they want is for each of the 12 bellwether plaintiffs to be able to serve five interrogatories on any affirmative defense of their choice, which although they have invoked parity with the JCCP is not what Judge Kuhl ordered in the JCCP.  She identified five specific affirmative defenses that she thought might be amenable to something like form interrogatory 17.1.  They want to have flexibility to do anything -- they want to do it on all of our affirmative defenses essentially by dividing it among the 12 personal injury plaintiffs.

I think -- honestly, I hate to bring up a process point, but the big issue here is we actually started negotiating this back in, I think, May was the first time plaintiffs made a proposal to us about limits.  And at no time until September

1    4th did they raise this idea that they should get five

2    additional Requests for Admission.

3        And the reason that process point is important, Your

4    Honor, is that we come to these negotiations in good faith.  We

5    make moves up as they make moves down.  And then to get to the

6    end of the process and present to Your Honor an agreement but,

7    oh, they also want these five additional.  If you decide you

8    want to meet in the middle, well, then we end up in a different

9    place than we would have if from the beginning they had made

10   clear that they were requesting that.

11       And I think the fact that they didn't ask for these

12   interrogatories on affirmative defenses earlier just

13   demonstrates that they don't really need them.  It's something,

14   I think, that maybe at the last minute they threw in because

15   they feel like they don't want the JCCP plaintiffs getting

16   something that they perceive to be more.

17       But they could have a month ago, on August 1st, when Judge

18   Kuhl ordered that the JCCP plaintiffs could serve five

19   interrogatories on affirmative defenses said, "Hey, we want

20   that too," but they didn't.

21       So what we assumed was they are going to serve whatever

22   interrogatories they want to serve on affirmative defenses

23   within these limits that we have been negotiating.

24       And I think that process point is important because, you

25   know, Your Honor has really encouraged the parties to come to

1    these negotiations in good faith.  We really try to do that.

2    We try to make honest moves.  We don't try to spring new things

3    on the other side at the last minute.  And, unfortunately,

4    that's what happened here.  And that's, unfortunately, why

5    we've had to burden Your Honor with this dispute.

6         So that's the first issue.

7         The second is whether the common interrogatories and

8    Requests for Admission should have to be identical across the

9    bellwether plaintiffs in the two proceedings.  It's -- it's

10   only three of the interrogatories and it's only four of the

11   Requests for Admission that the -- that the defendants are

12   asking to be common.

13        The plaintiffs in the two proceedings have said they can

14   manage to coordinate among the 12 and the 21 plaintiffs to

15   serve common interrogatories, three common interrogatories.

16   They served completely identical requests for production across

17   the two proceedings.  So I don't know why they can't coordinate

18   on Rogs and RFAs.

19        That's what Your Honor contemplated, I thought, when we

20   were last here.  You specifically referenced a set of common

21   Rogs among all bellwethers in the MDL and all bellwethers in

22   the JCCP.  And you also observed that you didn't hear any

23   unwillingness from the plaintiffs to negotiate with us on that

24   premise.

25        And what Mr. Warren said is:  We're happy to talk to

1    defendants.  He didn't say:  But we're going to insist that the

2    commonality has to be only within the MDL or the JCCP.

3         So, again, we went back.  We met-and-conferred on the

4    terms that Your Honor suggested.  And, again, we're not

5    insisting that every single one of these be common, even though

6    we think that they probably could be.  We're only asking for

7    about half of each set to be common.

8         The third issue is pretty, I think, narrow.  It's

9    essentially whether Your Honor should set a cap -- or a limit

10   of zero for form interrogatories.  The MDL plaintiffs have said

11   that they don't intend to serve form interrogatories.  So the

12   only issue is do the JCCP plaintiffs get to do it.

13        It's a little unclear to me why we even have this dispute

14   because the JCCP plaintiffs told us in conferrals on the

15   Requests for Admission and form interrogatories that they

16   weren't intending to serve any more written discovery.  So, and

17   they are going to -- they are getting form interrogatories,

18   right, with respect to the affirmative defenses.

19        So I'm a little unclear why they feel the need to reserve

20   the ability to serve more Form Rogs, but nevertheless here we

21   are.

22        We think that given that Judge Kuhl asked for Your Honor

23   to set common limits for these two sets of plaintiffs across

24   these two proceedings, that it is appropriate for Your Honor to

25   also set a limit on, you know, the specific type of

1    interrogatory that can be served.

2        And there's plenty of other vehicles that the JCCP

3    plaintiffs can use if they need discovery that, you know, would

4    get them something like a form interrogatory.

5        So those are the three disputes.  We would ask that Your

6    Honor resolve them, obviously, in the -- in the defendants'

7    favor, and happy to answer any questions the Court may have.

8        **THE COURT:**  Just so I'm clear, on issue two, when you

9    say "identical," do you mean identical across -- across both

10    the JCCP and the MDL as an -- at large as one giant group or is

11    it identical for the bellwethers in the JCCP and identical for

12    the bellwethers in the MDL?

13        I just want to make sure I understand what kind of

14    identicality you're asking for.

15        **MS. SIMONSEN:**  Thank you, Your Honor.

16        The identicality is identical across all of the personal

17    injury plaintiffs in both the MDL and the JCCP, which, again,

18    is what we discussed at the last DMC, Your Honor.

19        I believe -- I mean, I took a note down and said that we

20    should go back and talk about a set of common Rogs among all

21    bellwethers in the MDL and all bellwethers in the JCCP.

22        And that's consistent with the general approach under the

23    discovery limitations order.  There's, you know, an allocation

24    of a certain number of interrogatories and Requests for

25    Admission that can be served among groups of parties on the

 1    other parties across the two proceedings.  And we think that

 2    that makes good sense.

 3          Here the JCCP and MDL plaintiffs are always mentioning how

 4    great a job they do at coordinating, and they are bringing --

 5    these personal injury plaintiffs are bringing virtually the

 6    same claims on virtually the same complaints.  Their master

 7    complaints are very similar, pursuing very similar theories of

 8    liability.  Their counsel are actually the same across the two

 9    jurisdictions for a number of the bellwethers.  So, you know,

10    for three interrogatories of the seven to have to be common

11    between the two makes good sense.

12          And the other reason that that would be valuable is then

13    there aren't minor differences that I will tell you I would

14    anticipate the JCCP plaintiffs would try to exploit so that

15    they can then try to take a dispute that's actually common

16    across the two proceedings to Judge Kuhl.

17          This way if they are required to coordinate and serve the

18    same interrogatory, we have clarity that a dispute that arises

19    with respect to that interrogatory is one that should be

20    brought to one Court so that we're not burdening two separate

21    Courts with what is essentially the same dispute.

22          And I suspect that that may be part of why there is a

23    resistance here, but I don't know.

24          **THE COURT:**  Well --

25          **MR. WARREN:**  May I be heard, Your Honor?

1          **THE COURT:**  Let's not presume people are going to

2     raise disputes unnecessarily.

3          **MR. WARREN:**  Thank you, Your Honor.  And I think I

4     actually would like to start there.

5          And I do want to say that actually over the years of

6     litigating I think the working relationship I have with

7     Ms. Simonsen among the most productive and cordial I've had

8     with opposing counsel.

9          As you'll see at the beginning of this joint letter brief,

10    the meeting-and-conferring on this issue was extensive.  Often

11    very late into the night after the kids are asleep we're trying

12    to sort this stuff out.

13         To that end, I do think it's unfortunate that she's

14    impugning the motives of me and of Mr. Van Zandt in terms of

15    how she's describing the process issues, what's motivating the

16    process issues.  I don't intend to get into that.  I don't

17    think it's productive, and I don't think it will help us reach

18    resolution or Your Honor reach resolution.

19         What I do want to say is that there is a bit of having it

20    both ways in the arguments that Ms. Simonsen has presented

21    here.

22         On the one hand, she insists that there should be common

23    limits set and she looks to have homogeneity among all the

24    bellwether pools.  But then when it comes to the fact that

25    Judge Kuhl has already ordered five additional

interrogatories -- form interrogatories and RFAs outside of these numerical limits, she wants those to be off limits to the MDL.  And we think that's not right.

The truth of the matter is I have no idea what the affirmative defenses in this case will be.  I haven't seen any answer.  I don't know if the affirmative defenses will vary among bellwethers.  I don't know how many affirmative defenses there will be.

So I'm not in a position and none of the bellwether counsel are in a position to even evaluate how much discovery on that issue they would need.

Nonetheless, we have said we would accept a cap of five Requests for Admission and five accompanying Form Rogs.  Of course, that procedural vehicle doesn't exist in federal practice, but we take the text and use it, and we would just have to choose.  Maybe there's going to be 20 affirmative defenses for a bellwether and we would be stuck with only asking after five.  We have accepted that self limitation in part to try to reach resolution and because that feels like parity with what the JCCP has.

So we're not asking for the sun, moon and the stars.  We're asking for a pretty reasonable extension beyond the numerical limits that's not only consistent with what Judge Kuhl has ordered, but actually insofar as she has taken jurisdiction over that issue of affirmative defenses is --

 1   actually -- ought to be complied consistently.

 2       I think it would create a disjunct between the

 3   jurisdictions that actually -- and I hesitate to use this word,

 4   but Ms. Simonsen used it, that the defendants could exploit in

 5   the future to say:  We like this jurisdiction.  We don't like

 6   that.  We are going to create differences that don't need to

 7   exist.

 8       So that's issue number one.  I'm going to try to use

 9   Ms. Simonsen's number to go keep this clean.

10       Issue number two shouldn't be an issue.  We don't think,

11   just as a baseline matter, there should be any such thing as

12   common written discovery.  But we've made huge concessions on

13   that point.  We've already agreed to serve two interrogatories

14   that are common across all 33 bellwethers, both in the MDL and

15   in the JCCP.  The JCCP has already served special interrogatory

16   one, special interrogatory two, and we said we'll serve those

17   too.

18       We just want one more interrogatory that we've said will

19   be common to just the 12 MDL personal injury bellwethers, just

20   one.  And that is not acceptable to the defense.  They insist

21   that pool has to be homogenized across all the bellwethers,

22   across both jurisdictions, and we think that's an unreasonable

23   position.

24       Now, I hate that we're having to draw a line in the sand

25   over a single interrogatory, but as noted, we've really worked

 1   hard to try to find an agreement here and so that's where we

 2   are.

 3        Now, it does extend to the four, quote/unquote, common

 4   Requests for Admission --

 5        (Court reporter clarification.)

 6        **MR. WARREN:**  It does extend also to the four common

 7   Requests for Admission that the parties have agreed ought to be

 8   common.  There, too, there is a dispute over whether "common"

 9   means just the MDL or the MDL plus the JCCP.

10        **THE COURT:**  Just so I know the record, of the RFAs

11   you've served, are any of them common or identical to what's

12   been done in the JCCP?

13        **MR. WARREN:**  I don't believe so.

14        **THE COURT:**  Replicated the RFAs is what you did with

15   those two Rogs?

16        **MR. WARREN:**  I don't believe so.  And by and large I

17   think we've been waiting to serve our written discovery until

18   we know what the limits are so we can make smart tactical

19   decisions about what to serve and not what to serve.

20        But, you know, it may very well be those numbers wind up

21   being the same as the JCCP, but we just want the flexibility on

22   our own.

23        And, again, I don't even think these 12 individual people

24   should have to coordinate on this given that it's supposed to

25   be case specific discovery, but we're willing to go there, but

```
1   we don't want to go all the way there.  I just don't think
2   that's fair and reasonable.
3        You know, the Form Rog issue, I'll largely hand that over
4   to Mr. Van Zandt.  The only thing I'd say is it was presented a
5   little differently by Ms. Simonsen now than what I understood
6   the dispute to be before.  What I had understood her to be
7   saying is that the MDL personal injury bellwethers could not
8   serve interrogatories if they happened to use the text of the
9   California procedure Form Rogs, and that doesn't make sense to
10  us.
11       I mean, there are certain things in the Form Rogs that we
12  very well may want to ask about.  For example, Form Rog 16.0
13  concerns contributory causes from third parties.  That might
14  wind up being something we care about.  You know, will we
15  parrot the text or the format?  Highly doubtful.  But we just
16  want the flexibility to do that.
17       I don't know if I'm hearing Ms. Simonsen say anything
18  differently, but I just wanted to make that record.  I will
19  otherwise hand it over to Mr. Van Zandt.
20            MR. VAN ZANDT:  Thank you.  Can you hear me okay, Your
21  Honor?
22            THE COURT:  Yes.
23            MR. VAN ZANDT:  Okay.  So I do want to correct an
24  inaccuracy of what Ms. Simonsen said.
25       The JCCP at no time has said we are limiting to only five
```

1    requests for admissions.  We, in fact, issued more already and

2    potentially will based on any affirmative -- additional

3    affirmative defenses that defendants raise.

4        What happened is that we issued more than five.  Judge

5    Kuhl said that some of them were premature, so they were held

6    in abeyance, and she -- she forced the defendants to answer

7    five.

8        And Judge Kuhl has specifically said in a minute order

9    from August 1 that the JCCP Court will decide whether to allow

10   additional written discovery, interrogatories and RFAs to be

11   produced -- I'm sorry, to be propounded by plaintiffs

12   concerning defendants' affirmative defenses.

13       And so we certainly reserve that right to additional

14   affirmative defenses, and Judge Kuhl said that's something she

15   would handle.

16       Certainly Judge Kuhl said that Your Honor would set the

17   numerical limits for discovery and the JCCP have been working

18   cooperatively with the MDL and with Ms. Simonsen on those

19   discussions.  But we have reserved our right to issue special

20   interrogatories and using discovery mechanisms that are

21   available in state court.

22       And, also, you know, this seems to be what happened --

23   what's happening here is that defendants are attempting to

24   create common issues and to force common discovery, but they

25   are ignoring the nuances of individual cases.

1          I think we're in the same position as Mr. Warren.  We need

2     to have that flexibility based on the individual facts of these

3     cases to issue discovery that are appropriate to the cases at

4     hand.

5          And I do want to correct again, this is something we

6     argued in front of Judge Kuhl multiple times.  We will be in

7     front of Judge Kuhl again on Monday.  Judge Kuhl has never

8     indicated that the MDL would handle and decide all common

9     disputes as it relates to bellwethers.  Judge Kuhl has

10    specifically said that she would oversee any discovery disputes

11    regarding JCCP bellwether cases.

12         So, again, that keeps the incentive of the Court.  We're

13    unable to find any record of the judge, however, saying that.

14    And the JCCP plaintiffs certainly reserve our right to have

15    discovery disputes related to JCCP bellwethers to be heard by

16    Judge Kuhl.

17         **THE COURT:**  Mr. Van Zandt, can you clarify?  There's a

18    representation that your clients, the JCCP, don't need to serve

19    any further Form Rogs?  Is that -- am I remembering correctly?

20         Is that correct or are you -- you maybe want to reserve

21    the right, but -- or maybe you've already decided you don't

22    need any more Form Rogs.

23         **MR. VAN ZANDT:**  No, Your Honor.  We've never said

24    that.

25         **MS. SIMONSEN:**  Your Honor, Mr. Creed represented

1    during a conferral, the first conferral we had on the Request

2    for Admission and Form Rogs, that the JCCP plaintiffs did not

3    anticipate serving any more written discovery than what they

4    had already served, which was three special interrogatories,

5    one Request For Admission for each one of defendants'

6    affirmative defenses, and an accompanying Form Rog 17.1.  That

7    is what Mr. Creed said.

8        It sounds like the JCCP plaintiffs maybe want to retract

9    that statement, which is fine, but that is a statement that I

10   heard and that everyone on the defense side heard them make

11   when we had this meet-and-confer.  And that's why I'm a little

12   puzzled.  But, again, maybe they've changed what they think

13   they need.

14       I do just want to be clear.  I didn't mean to suggest that

15   the JCCP plaintiffs have limited themselves to five RFAs on the

16   affirmative defenses.  What I said is that at this time Judge

17   Kuhl has limited them to five.  And I was making that point in

18   the context of explaining that what the MDL plaintiffs are now

19   asking for is different from what Judge Kuhl ordered.

20       The defendants recognized that Judge Kuhl said the JCCP

21   plaintiffs could come back to her and seek permission to serve

22   the remainder of the Requests for Admission and Form Rog 17.1

23   interrogatories that they served down the road.

24       We understand that they have the right to go back and ask

25   her to do that, and we're not -- we're not claiming they don't

 1    have that right.  We're not asking Your Honor to count out of

 2    these limits that we're asking you to set any additional

 3    affirmative defense related discovery she orders.

 4         **MR. WARREN:**  Your Honor, what they are asking is that

 5    Judge Kuhl's order has no bearing here, and that to us is

 6    inappropriate.

 7         Now, I think the conceptually appropriate thing,

 8    analytically right thing, is for her order in full to apply

 9    here.  There's five affirmative defense related RFAs and Rogs

10    that we serve now.  There's others that get held an abeyance,

11    et cetera.

12         We're not taking that position, not because we think it's

13    wrong.  We think that makes the most sense and would keep both

14    of these litigations as -- on the same track as possible.  But

15    just in the nature of compromise -- and I'm going to hold

16    myself to the compromise I already made -- we'll limit

17    ourselves to five.

18         To be clear, that's the only reason there would be a

19    variance in our position here, is just because I'm trying to

20    honor what I said, not because it makes any sense.

21         **MS. SIMONSEN:**  Your Honor, if I may.  That request was

22    never made.  And if -- one thing we could do if the JCCP -- or

23    if the MDL plaintiffs want five additional RFAs, is we could

24    say:  Well, the MDL plaintiffs get 12 -- I'm sorry.  They want

25    five more Rogs.  They get 12 Rogs each, and the JCCP plaintiffs

```
 1   get two Rogs each.

 2        I mean, that was what I would have expected the plaintiffs

 3   to come to us with after Judge Kuhl entered her ruling, and

 4   they didn't.  And that's -- we're not trying to -- it was on

 5   them to decide, right, how they wanted parity between the two

 6   proceedings, and it's not what they requested.

 7             THE COURT:  Well, we're forward looking now, so

 8   whatever was said in the meet-and-confers obviously didn't

 9   resolve it.  So to some extent it's moot.

10        Okay.  So on the bellwether MDL plaintiffs' request for

11   additional -- it's both additional Rogs and RFAs, right?

12             MR. WARREN:  It would be RFAs with the Form Rog 17.1

13   appended to it.  So is that --

14             MS. SIMONSEN:  That is not -- no.  My understanding

15   was that --

16             THE COURT:  I just want to figure out what the ask is.

17             MS. SIMONSEN:  There was a clarification made that

18   they would ask -- they would only serve five interrogatories,

19   which would basically mirror the language of form interrogatory

20   17.1, but --

21             THE COURT:  He's shaking his head no.  So what --

22             MR. WARREN:  I'm shaking my head because we offered

23   that as part of a proposed deal that the defense rejected.  So,

24   I mean --

25             MS. SIMONSEN:  Oh, I'm sorry.  I thought that was a
```

 1    clarification of their position.

 2         **THE COURT:**  What is the ask today?

 3         **MR. WARREN:**  The ask today is that we be able to serve

 4    five Requests for Admission about defendants' affirmative

 5    defenses with the accompanying text of California Form Rog 17.1

 6    with each of those.  And then that bucket of discovery does not

 7    count against the numerical limits that we've otherwise agreed

 8    and that appear on Page 4 of the JLB, the joint letter brief.

 9         **THE COURT:**  Okay.  And five was just a number you came

10    up with as a compromise, is that --

11         **MR. WARREN:**  It's a number we came up with in

12    compromise keyed off, in part, of where Judge Kuhl, you know,

13    was tentatively at, with the understanding -- I don't want to

14    take anything away from what Mr. Van Zandt said, that she's

15    deferred some of the other issues, but it's five.

16         **THE COURT:**  Okay.  So, remind me.  I haven't looked

17    back, what are the answers -- is there a date for the answers?

18         **MS. SIMONSEN:**  No, because the -- we're waiting for

19    Judge Gonzalez Rogers to rule on the Motions to Dismiss.  We do

20    understand that she expects to issue an order by the end of

21    this month.  So I would imagine close to the end of October.

22         **THE COURT:**  Okay.  So here is where I'm at on that,

23    and it's kind of in line with what you said, Mr. Warren.  We

24    actually don't know how many affirmative defenses are going to

25    be asserted and at that level you don't actually know how many

1    Rogs -- you may only need one.  You may not need any.

2        So why don't we wait until the answers come in.  All

3    right?  And you take a look at them.  Try to meet-and-confer

4    again after the answers come in.  We'll see how many

5    affirmative defenses are raised.

6        It may be that what you need in terms of discovery related

7    to the affirmative defenses is already going to be covered or

8    is already covered by what you've served and this issue may be

9    either narrowed, mooted or amenable to resolution without me

10   setting some numbers now.

11       Because I feel like we don't know the contours of the

12   problem yet.  It's only a month away.  Why don't we wait and

13   see how big the issue is.  And maybe you're able to work it out

14   at that point.  Okay?  I appreciate you've been trying and I've

15   seen in the other disputes have been real commendable efforts

16   to meet-and-confer on all the disputes in the case.  So thank

17   you for that, and I'll count on you to continue that.  So it's

18   only one month more on this.

19           **MR. VAN ZANDT:**  Your Honor?

20           **THE COURT:**  Yeah.

21           **MR. VAN ZANDT:**  I just want to clarify one thing for

22   the record really quickly.

23       So Mr. Creed never said that the JCCP plaintiffs were not

24   serving any more RFAs or Form Rogs -- I'm sorry, let me start

25   over.

1          What Mr. Creed did say is that we're not serving any more

2    RFAs or Form Rogs on the affirmative defenses.  If defendants

3    raise additional affirmative defenses, we would certainly

4    reserve that right.  But we have reserved the right to serve

5    Form Rogs on other items, including RFAs that we may decide to

6    serve down the road in the case.

7          **THE COURT:**  That's outside the scope of the

8    affirmative defenses; right?

9          **MS. SIMONSEN:**  (Nodding.)

10         **THE COURT:**  So we're --

11         **MR. WARREN:**  And I would just say on the record, Your

12    Honor, I think if defendants are willing to accept the limit of

13    five in a meet-and-confer right after this, we would take it.

14    If not, I think we would -- the door would be open because we

15    would have to do what -- exactly what Your Honor just said,

16    which is look at what they propound in their pleadings and

17    figure out how much discovery -- it might be more than five.  I

18    don't know.

19         **MS. SIMONSEN:**  Your Honor, I think they, too, would

20    have to assent to make a showing of good cause why the 45

21    interrogatories, plus 45 Requests for Admission, plus seven

22    additional --

23         (Court reporter clarification.)

24         **MS. SIMONSEN:**  ...plus the seven additional

25    interrogatories and seven additional Requests for Admission are

1    not enough to get them what they needed.  I think it kind of

2    cuts both ways.

3         **THE COURT:**  So, again, this goes to why I think you

4    need to see what actually is in the affirmative defenses to see

5    how big a problem this is because it may -- it may be that it's

6    not a big problem.

7        Have the parties reached any kind of agreement whether

8    discovery in the JCCP that is specific would be admissible or

9    applicable to the MDL?  Is that -- sometimes that happens, when

10   people -- when you are co-pending cases.

11        **MR. WARREN:**  I don't think we've ever discussed that.

12        **MS. SIMONSEN:**  Not to my knowledge have we discussed

13   that.

14        **THE COURT:**  Okay.  Just float that out there for

15   something to think about.  It's another way to avoid

16   duplication and avoid gamesmanship in terms of trying to play

17   one Court off the other.

18        **MR. WARREN:**  I assume Your Honor is just talking about

19   the, quote/unquote, case specific discovery.

20        **THE COURT:**  Yeah, yeah.

21        **MR. WARREN:**  We have not discussed that.

22        **THE COURT:**  Okay.  So the previewing was a little

23   opaque on this.  So I want to make sure I understand what the

24   plaintiffs have done.

25        You've already -- of the three Rogs that they -- that

```
 1  Meta -- the defendants want to be identical across the

 2  plaintiffs, the group of plaintiffs we're talking about, you've

 3  already served two that are identical anyway?

 4         MR. WARREN:  We've committed to serving two that are

 5  identical.  We haven't actually served them.

 6         THE COURT:  So what they are asking for, if I'm

 7  correct, is one Rog that is common only to the MDL bellwether

 8  plaintiffs; is that right?

 9         MR. WARREN:  Correct, Your Honor.

10         MS. SIMONSEN:  That's right.  And, Your Honor, I think

11  we actually probably would have been fine with that.

12      But the issue, as Mr. Warren eventually recognizes, is

13  that they -- their -- at this point their position is they will

14  not make any of the four common RFAs common across the two

15  proceedings.

16      So of the total seven personal injury requests that we've

17  asked be common -- namely, three interrogatories and four

18  Requests for Admission, they are offering to make two of them

19  common across the two proceedings.

20         THE COURT:  Two of the Rogs?

21         MS. SIMONSEN:  Yeah.  Two of the Rogs and -- well, two

22  of the three total common Rogs, right, and zero of the four

23  common RFAs.

24      I think that -- I mean, I don't know if maybe a middle

25  ground is we give them the one -- one of the three common
```

interrogatories can be common only within the two proceedings,
and one of the four common Requests for Admission can be common
within only the two proceedings, but with the other three being
identical across --

          **THE COURT:**  Both proceedings.

          **MS. SIMONSEN:**  -- both proceedings.

          **MR. WARREN:**  I don't see the utility there.

    Look, again, these are all -- where we landed is the
process of a long negotiation.

    Our position is that all seven Requests for Admission
should be individualized because we've got individual kids,
individual circumstances.  It doesn't make any sense to say:
All 12 of you have to sort out exactly what the same discovery
is going to be.  Let alone expand that, you know, by 21 other
people.

    I mean, I think sometimes the defendants get in a habit of
just saying:  Well, the lawyers are the same.  But we represent
people.  We represent individual human being people that have
individual circumstances to their cases.  And they deserve the
chance to propound individual discovery about what they faced
at the hands of defendants and their platforms.  That's what
this is ultimately about.

    And so we've compromised on some of this.  But there have
to be limits at some point.  So we're coming to Your Honor and
just asking you to call a ball and strike here and just say:

 1    Look, common across 12 individual kids is enough commonality.

 2            **MS. SIMONSEN:**  But, Your Honor, they are getting four

 3    individualized interrogatories per plaintiff.

 4            **THE COURT:**  We're talking about RFAs here.

 5            **MS. SIMONSEN:**  Well, so they are getting three --

 6    sorry.  They are getting, yeah, three individualized RFAs.

 7    They are getting four individualized interrogatories.

 8            And, you know, if you think about it, Your Honor, it's

 9    actually our discovery of them where there's more of a need for

10    individualization because, like, we, as defendants, maintain a

11    certain type of information about users; right?

12            So there can be a request for information from each

13    bellwether plaintiff and there is no reason to think that it

14    needs to be different across the bellwether plaintiffs.  And we

15    know that because the defendants' fact sheet negotiation, which

16    was extensive, is -- is a document that has a uniform request

17    for information as it pertains to every single one of the

18    plaintiffs.

19            And I have yet actually to hear an example of, you know --

20    well, it's not so much an example.  I think that plaintiffs

21    have struggled to come up with an example of why they need all

22    of these to be individualized, but they certainly don't need

23    all of them to be individualized.

24            I think four individualized interrogatories is plenty.

25    Four individualized RFAs is plenty.  And we're just asking them

```
1    to coordinate on the remainder.

2         And they have to -- here is the thing.  I mean, they have

3    already agreed to make them common within a proceeding.  So

4    they have already agreed that there is a way to make these

5    things useful without having them actually be individualized.

6         I mean, the JCCP plaintiffs have essentially recognized,

7    we can serve the same four -- the same three interrogatories on

8    behalf of 21 bellwether plaintiffs, and we can serve the same

9    four RFAs on behalf of all 21 bellwether plaintiffs.

10        So the individualized argument doesn't really apply here

11   when they've already agreed they could make them common across

12   a corpus of plaintiffs.

13             MR. WARREN:  It's a compromise.

14             THE COURT:  Yeah.  So I hear everybody's arguments.

15        So just so I'm absolutely clear, the three Rogs of which

16   you've already committed to would be common across both

17   actions.  Those are the three common -- referred to as three

18   common in the chart; right?

19             MR. WARREN:  Yes, Your Honor.

20             THE COURT:  Okay.  What you're asking for is that one

21   of them be identified or designated as common only within the

22   MDL.

23             MR. WARREN:  Yes, Your Honor.

24             THE COURT:  Granted.

25             MR. WARREN:  Thank you.
```

1          **THE COURT:**  For the RFAs, again, what we're talking

2     about are the three individual -- no, four common RFAs in the

3     chart that are designated as four common?

4          **MS. SIMONSEN:**  Yes.

5          **THE COURT:**  And the ask from Meta is that they be

6     common across both actions?

7          **MS. SIMONSEN:**  Correct, Your Honor.

8          **THE COURT:**  And the ask here is that they all be

9     common just in the MDL?

10          **MR. WARREN:**  Yes, Your Honor.

11          **THE COURT:**  All right.  Let's go two and two.

12          **MR. WARREN:**  Very well.

13          **MS. SIMONSEN:**  Thank you, Your Honor.

14          **THE COURT:**  Okay.  On the Form Rogs.  I'm not sure

15     what the ask is because if the JCCP is saying they still might

16     serve some depending on what happens if you serve more from the

17     defenses or outside the scope of affirmative defenses and on

18     the issue -- let's focus on the MDL.

19          I don't think -- I don't think it's -- I don't think

20     there's any basis for -- a good basis in the law for one side

21     to dictate to the other side how they should draft their Rogs.

22     You can object to them certainly, but to say the Rog must be

23     drafted or can't be drafted in this way ex-ante, I don't -- I'm

24     not sure I've seen that happen procedurally.

25          **MS. SIMONSEN:**  Well, I think what we're asking Your

1    Honor is effectively that the limits that Judge Kuhl asked Your

2    Honor to set include a limit of zero form interrogatories.

3    We've -- you know, she asked Your Honor to set limits on how

4    many Requests for Admission and interrogatories could be

5    served.

6            THE COURT:  Yeah, but, I mean, if they take up one of

7    the Rogs that they have in their bucket of Rogs to serve and

8    they choose to phrase it in a way that -- I mean, it can't be

9    exactly like what's in the California Form Rog anyway because I

10   think there's reference of other things.  It will be -- I mean,

11   they could always change a word or two and say:  We're not the

12   same thing.  So, right?  And then we head into an argument of

13   whether it's substantially the same thing.  I don't think it's

14   worthwhile.

15       You can always object and -- you know, on the merits of

16   it, right, but in terms of, like, the phrasing and whether or

17   not it mirrors a Form Rog substantially or, you know,

18   substantively, that they could have -- that somebody could

19   serve in state court, I don't see why there should be an

20   ex-ante prohibition on that.

21           MS. SIMONSEN:  Just to maybe put a little more meat on

22   the bones, Your Honor.

23       I think we're specifically concerned about Form Rog 17.1

24   which asks for any Request For Admission that's denied that the

25   denying party state all facts, identify all knowledgeable

 1  people, identify all documents supporting the denial, which is

 2  essentially three interrogatories.

 3          **THE COURT:**  Then you make that objection and you work

 4  out the objection and meet-and-confer; right?

 5          **MS. SIMONSEN:**  That's helpful, Your Honor.  Thank you.

 6          **THE COURT:**  I'm not barring them from how they are

 7  going to phrase their Rogs, but certainly if they run the risk

 8  of, you know, drafting Rogs that have so many subparts they

 9  start to look like multiple Rogs jammed into one, that's a risk

10  that they run; right?

11      So I think both sides understand you can always raise the

12  dispute with me if you can't resolve it, but I think plaintiffs

13  are going to be reasonable in how they draft their Rogs and

14  you're going to be reasonable in how you object.

15      It's also partly similar to the first issue.  We don't

16  exactly know the scope of the dispute yet because they haven't

17  served the Rogs yet.

18          **MS. SIMONSEN:**  That's helpful, Your Honor.  Thank you.

19          **MR. WARREN:**  The guidance is clear.  Thank you.

20          **THE COURT:**  All right.  And then I don't think I need

21  to do anything for the JCCP on that Form Rog issue because

22  there is no ask there really.

23          **MS. SIMONSEN:**  Correct, Your Honor.

24          **MR. WARREN:**  Thank you, Your Honor.

25          **MR. VAN ZANDT:**  That's correct, Your Honor.  Thank

 1   you.

 2        **THE COURT:**  Okay.  I did not think we would get

 3   through every issue.

 4        So there was -- in the joint status report on forensic

 5   imaging, I know there's one more due today.  And there was an

 6   indication that the parties expected to submit letter briefing

 7   prior to this DMC on an issue.  I don't know if that's been

 8   resolved, and so I can get that out of my mind or where we are

 9   on that.

10        **MS. CARROLL:**  Sure.  Thank you, Your Honor.  Jessica

11   Carroll for the plaintiffs.

12        We submitted an email to Chambers to let you know that we

13   had come to agreement on interim deadlines --

14        **THE COURT:**  Okay.

15        **MS. CARROLL:**  -- for specific bellwether plaintiffs,

16   and we will include that in the device imaging status report

17   that we will submit tomorrow.

18        **THE COURT:**  All right.  Thank you for that.  Okay.

19   And then any clarification?

20        **MS. FITERMAN:**  I don't think so, Your Honor.

21        **THE COURT REPORTER:**  Counsel, your name.

22        **MS. FITERMAN:**  Amy Fiterman on behalf of the TikTok

23   defendants.

24        There had been discussion that we were going to move the

25   status reports to Thursdays, and there was a question of

```
 1   whether Your Honor wanted a status report for this week or just

 2   wanted to wait until next week, but it doesn't matter.

 3   Whatever Your Honor would like.

 4          THE COURT:  Well, does it make a difference to you

 5   whether it's this week or next week?

 6          MS. FITERMAN:  I think there may be more to report if

 7   -- until next week because the parties are going to have a

 8   meeting of the vendors, as Your Honor had requested, and that

 9   has now been set for next week, so we could report after that.

10          THE COURT:  When next week?

11          MS. FITERMAN:  Next Thursday.

12          THE COURT:  Okay.  So give me the report on Friday

13   next week then.

14          MS. FITERMAN:  Okay.

15          MS. CARROLL:  Thank you, Your Honor.

16          THE COURT:  So on the Meta hyperlinks issue, there

17   were so many bullet points and subparts to the resolution of

18   that, and I think you understand how I've resolved it.

19       Normally we would put this in the DMC order, but I'm going

20   to put the onus on the parties to come up with a proposed,

21   jointly proposed order to resolve that specific dispute, all

22   right, so that you've got all the language in there that is

23   appropriate in line with what I said verbally here.

24          MR. WARREN:  Yes, Your Honor.  And we will have the

25   benefit of the transcript to guide us there.
```

```
 1              THE COURT:  Okay.  Is that okay, Mr. Chaput?

 2              MR. CHAPUT:  Yes.  We will do that, Your Honor.  Thank

 3     you.

 4              THE COURT:  Another housekeeping issue.

 5         Based on an email from counsel, Meta and plaintiffs

 6     resolved the disagreement on RFPs 286 and 287, which is great.

 7     I think, according to my staff, that resolves the dispute at

 8     docket 1056.  So should we now list that as resolved?

 9              MS. HAZAM:  Your Honor, Lexi Hazam for plaintiffs.

10     That's correct.

11              MS. SIMONSEN:  Yes, that's correct.

12         I take your word that's the right docket number.  I don't

13     remember off the top of my head, but it is RFPs, yes, the ones

14     you mentioned.

15              THE COURT:  Okay.  And are there -- I don't think

16     there are -- are there any other disputes that you've resolved

17     informally that require something to be noted on the docket on

18     my end?

19         Was there -- there was a request somewhere for me to so

20     order an agreement in something, as I recall, like in a

21     footnote?

22              MR. WARREN:  Oh, yes.  It's me, Your Honor.  I'm the

23     problem, it's me.  Previn Warren for the plaintiffs.

24         Yes, we did reach agreement on case specific written

25     discovery about school district bellwethers, and I think you
```

```
 1   could so order that.  I don't know if it was a footnote or text
 2   or something.
 3           MS. SIMONSEN:  I think that's right, although I
 4   hate -- I hate to bring this up, but I do think there is one
 5   open dispute on that, which is what is the meaning of "common"
 6   with respect to the school district plaintiffs' Rog and RFA
 7   limits.
 8       So we did reach an agreement that the school district
 9   plaintiffs have nine interrogatories and nine Requests for
10   Admission.  We agreed that they get five individual
11   interrogatories, four common; five common Requests For
12   Admission, four individual.
13       I would guess Your Honor would like us to split the common
14   into --
15           MR. WARREN:  I'm not sure that's a thing we can do
16   because the school district cases were --
17           MS. SIMONSEN:  Oh, you're right.  Excuse me.  It's not
18   an issue because there are no school districts in the JCCP.  My
19   apologies.
20           MR. WARREN:  I don't know if I would go that far,
21   but --
22           MS. SIMONSEN:  At this time.  At this time.
23           THE COURT:  Just so the record is clear, why don't you
24   submit a very short proposed order jointly on that agreement,
25   just so it's cleared out of the docket and gone.
```

```
 1          MR. WARREN:  We can do that.

 2          MS. SIMONSEN:  Would you like a proposed order on the

 3   discovery limitations overall?

 4          THE COURT:  Whatever you've agreed to in that footnote

 5   or in connection with that footnote.  And that's -- are you

 6   referring to other discovery?

 7          MS. SIMONSEN:  I'm just referring to the issue we just

 8   discussed, which were the limitations as to the personal injury

 9   plaintiffs.

10          THE COURT:  Yes, yes.  So many issues resolved there,

11   yes.

12          MS. SIMONSEN:  Thank you, Your Honor.

13          THE COURT:  That will give you more time to bill.

14      (Laughter.)

15          MR. WARREN:  Doesn't help me, Your Honor, but thanks.

16          THE COURT:  And I do want to say for the record I have

17   noticed, maybe, that lawyers who I think have not really

18   appeared before me, multiple lawyers, have appeared today and

19   argued.  I want to commend them all.  And it's great seeing the

20   variety of attorneys, both in terms of age diversity and gender

21   diversity and ethnic diversity, coming before me.  So I commend

22   both sides for their efforts there and certainly encourage

23   that.

24      You've heard me do this previously because you're all from

25   many different law firms.  The *pro bono* program is still in
```

1  search, is constantly in search of *pro bono* counsel.  So just

2  remember it's fedpro@sfbar.org.  Especially for the younger

3  attorneys, there are great attorneys to get trial experience

4  and substantive motion practice experience.

5       So anything further from the plaintiffs?

6          **MR. WARREN:**  No, Your Honor.

7          **THE COURT:**  Anything further from the defendants?

8          **MS. SIMONSEN:**  No, Your Honor.  Thank you.

9          **THE COURT:**  Okay.  Thank you.  See you at the next

10 hearing.

11         **THE CLERK:**  We're off the record in this matter.

12 Court is in recess.

13      (Proceedings adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Sunday, September 16 2024