Pages 1 - 80

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY      ) **NO. 22-MD-03047 YGR**
PRODUCTS LIABILITY LITIGATION.)
_____)
OFFICE OF THE ATTORNEY GENERAL)
STATE OF FLORIDA, DEPARTMENT  )
OF LEGAL AFFAIRS,             )
                Plaintiffs,  )
   v.                         ) **NO. 23-CV-05885 YGR**
                             )
META PLATFORMS, INC.,         )
INSTAGRAM LLC,                )
                Defendants.  )
_____)

Oakland, California
Friday, September 13, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          FLORIDA OFFICE OF THE ATTORNEY GENERAL
          Consumer Protection
          135 West Central Boulevard
          Orlando, FL  32801
   **BY:**  **DONNA C. VALIN, ESQ.**
        **KAREN E. BERGER, ESQ.**

          LIEFF, CABRASER, HEIMANN AND BERNSTEIN
          275 Battery Street, 29th Floor
          San Francisco, CA 94111
   **BY:**  **LEXI J. HAZAM, ESQ.**
        **MICHAEL I. LEVIN-GESUNDHEIT, ESQ.**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox , CSR No. 14421, RMR, CRR
          United States Official Reporter

1    **APPEARANCES:**  (continued)

2    For Plaintiffs:

3                        LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                         250 Hudson Street, 8th Floor
4                        New York, NY 10013
                    BY:  **KELLY K. McNABB, ESQ.**
5
                         MOTLEY RICE, LLC
6                        401 9th Street Northwest, Suite 630
                         Washington, DC 20004
7                   BY:  **PREVIN WARREN, ESQ.**
                         **NELSON DRAKE, ESQ.**
8
                         MOTLEY RICE, LLC
9                        28 Bridgeside Boulevard
                         Mt. Pleasant, SC 29464
10                  BY:  **JESSICA CARROLL, ESQ.**

11                       ANDRUS ANDERSON, LLP
                         155 Montgomery Street, Suite 900
12                       San Francisco, CA 94104
                    BY:  **JENNIE L. ANDERSON, ESQ.**
13
                         BEASLEY ALLEN LAW FIRM
14                       218 Commerce Street
                         Montgomery, Alabama  36104
15                  BY:  **CLINTON K. RICHARDSON, ESQ.**

16                       KESSLER, TOPAZ, MELTZER, AND CHECK, LLP
                         280 King of Prussia Road
17                       Radnor, PA 19087
                    BY:  **MELISSA L. YEATES, ESQ.**
18
                         LEVIN, SEDRAN AND BERMAN, LLP
19                       510 Walnut Street, Suite 500
                         Philadelphia, PA 19106
20                  BY:  **MICHAEL M. WEINKOWITZ, ESQ.**

21                       COLORADO DEPARTMENT OF LAW
                         1300 Broadway, 6th Floor
22                       Denver, CO 80203
                    BY:  **BIANCA MIYATA, ESQ.**
23

24              **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

25

1   **APPEARANCES:**  (continued)

2   For Plaintiffs:

3                CALIFORNIA DEPARTMENT OF JUSTICE
               455 Golden Gate Avenue, 11th Floor

4                San Francisco, CA 94102
        BY:  **MEGAN O'NEILL, ESQ.**

5                **EMILY KALANITHI, ESQ.**

6                CALIFORNIA DEPARTMENT OF JUSTICE
               1515 Clay Street, Suite 2000

7                Oakland, CA 94612
        BY:  **JOSHUA E. OLSZEWSKI-JUBELIRER, ESQ.**

8

9                KENTUCKY OFFICE OF THE ATTORNEY GENERAL
               OFFICE OF CONSUMER PROTECTION
               1024 Capital Center Drive, Suite 200

10               Frankfort, KY 40601
       BY:  **JOHN C. LEWIS, ESQ.**

11

12                BOIES SCHILLER FLEXNER LLP
               2029 Century Park East, Suite 1520
               Los Angeles, California  90067

13        BY:  **ALISON L. ANDERSON, ESQ.**

14                BOIES SCHILLER FLEXNER LLP
               44 Montgomery Street, 41st Floor

15               San Francisco, California  94104
       BY:  **JOSHUA M. STEIN, ESQ.**

16                **NICHOLAS A. SANTOS, ESQ.**

17                NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
               DIVISION OF LAW

18               124 Halsey Street, P.O. Box 45029
               Newark, NJ 07102

19        BY:  **VERNA PRADAXAY, ESQ.**

20

  For Defendants:

21                WILSON, SONSINI, GOODRICH & ROSATI
               12235 El Camino Real

22               San Diego, CA 92130
       BY:  **SAMANTHA A. MACHOCK, ESQ.**

23

24       **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

25

```
 1   APPEARANCES:  (continued)

 2   For Defendants:

 3                  COVINGTON AND BURLING, LLP
                    One City Center, 850 Tenth Street, Northwest
 4                  Washington, DC 20001
              BY:  PAUL W. SCHMIDT, ESQ.
 5                 TIMOTHY C. HESTER, ESQ.

 6                  COVINGTON AND BURLING, LLP
                    1999 Avenue of the Stars, Suite 3500
 7                  Los Angeles, CA 90067
              BY:  ASHLEY M. SIMONSEN, ESQ.
 8
                    MUNGER, TOLLES AND OLSON, LLP
 9                  560 Mission Street, 27th Floor
                    San Francisco, CA 94105
10            BY:  JONATHAN H. BLAVIN, ESQ.

11                  KING & SPALDING, LLP
                    1180 Peachtree Street, Northeast, Suite 1600
12                  Atlanta, GA 30309
              BY:  GEOFFREY DRAKE, ESQ.
13
                    SKADDEN ARPS SLATE MEAGHER & FLOM
14                  1440 New York Avenue, N.W.
                    Washington, D.C.  20005
15            BY:  JOHN H. BEISNER, ESQ.

16                  WILLIAMS & CONNOLLY LLP
                    680 Maine Avenue, SW
17                  Washington, D.C.  20024
              BY:  JOSEPH A. KEYES, ESQ.
18

19

20

21

22

23

24

25
```

<u>**Friday - September 13, 2024**</u>                                    <u>**2:42 p.m.**</u>

**P R O C E E D I N G S**

---o0o---

**THE CLERK:** Court is now in session. The Honorable Yvonne Gonzalez Rogers now presiding.

**THE COURT:** Good afternoon, everyone.

**THE CLERK:** Thank you. Please be seated.

(Pause in the proceedings.)

**THE CLERK:** These proceedings are being court reported by this court. Any other recording of this proceeding, either by video, audio, including screenshots or other copying of the hearing is strictly prohibited.

Your Honor, now calling the civil matters 22-MD-3047-YGR, In Re: Social Media Adolescent Addiction Personal Injury Products Liability Litigation; and 23-CV-5885-YGR, Office of the Attorney General, State of Florida, Department of Legal Affairs versus Meta Platforms, Incorporated, et al.

Parties' appearances will be included in today's minutes. Thank you.

**THE COURT:** All right. Thank you. I forgot my binder. I will be right back.

(Pause in proceedings.)

**THE COURT:** Okay. I need to start with a logistical issue which is that the stipulation regarding using the Zoom platform has expired.

1          So, at this point my perspective would be that unless I

2     hear an objection, we will continue to use the Zoom platform

3     and there's a lot of interest, there are a lot of lawyers.  It

4     seems to me an appropriate thing to do and there is nothing

5     evidentiary.

6          So, if there is an objection, speak now.

7                         (No response.)

8          **THE COURT:**  The record will reflect there is no

9     objection noted, and there are a lot of lawyers in the

10    courtroom.

11         Okay.  Why don't we go ahead and start with the argument

12    on the Florida complaint.

13                    (Pause in the proceedings.)

14         **THE COURT:**  Appearances, please.

15         **MR. HESTER:**  Good afternoon, Your Honor, Timothy

16    Hester on behalf of the Meta Defendants.

17         **THE COURT:**  Appearances.

18         **MS. VALIN:**  Donna Valin, Florida Attorney General.

19         **THE COURT:**  Okay.  Let's start with you Mr. Hester it

20    is your motion.

21         **MR. HESTER:**  Yes, Your Honor.  I thought I would begin

22    by just setting the table as to why this issue arises.

23         When the Court gave the State of Florida leave to amend

24    its complaint, the State re-filed in the Middle District of

25    Florida and it also asserted a lexicon objection.

1    And because of that decision by the State of Florida, it

2 requires resolving both issues of venue and personal

3 jurisdiction.

4    This would be -- would have been avoided if Florida would

5 have followed the approach of the other three -- 33 Attorneys

6 General in this MDL.

7    So, let me begin just with a quick overview of what the

8 issues are.  First, as an introductory matter, the COPPA claim

9 should be dismissed on the basis of improper venue, dismissed

10 without prejudice.

11    The claim against Meta Payments should be dismissed with

12 prejudice because there is no allegation in the complaint that

13 the payment services of Meta Payments have anything to do with

14 the State's COPPA and FDUTPA claims.

15    That leaves the personal jurisdiction questions on the

16 FDUTPA claims as to Meta Platforms and Instagram.

17    There is no pendent jurisdiction because there is no COPPA

18 venue here -- in the Middle District of Florida; and,

19 furthermore, there is not a common nucleus of operative facts

20 between the COPPA claim and the FDUTPA claim.

21    Meta Payments cannot be a basis for asserting personal

22 jurisdiction over Meta Platforms or Instagram because the Meta

23 Payments claim should be dismissed, as I will discuss.

24    And in any event, there is no common enterprise between

25 Meta Payments and Meta Platforms and Instagram.

1      And then that leaves the final question of personal

2   jurisdiction under conventional due process principles as to

3   Meta Platforms and Instagram.

4      I don't know if we will have to go all the way to the end

5   of that nesting of arguments, but -- as to that issue as well,

6   there is no personal jurisdiction -- no specific personal

7   jurisdiction in the Middle District of Florida over those two

8   entities.

9      So, let me begin with COPPA venue.  There is --

10      **THE COURT:**  The way we will do this is we will take

11   each of these issues, I will hear from both of you and we will

12   move on.

13      **MR. HESTER:**  Okay.  Thank you, Your Honor.

14      So, let me begin with COPPA venue.  There is a nationwide

15   service of process provision under the COPPA statute, but that

16   does not establish venue.

17      COPPA specifically incorporates the venue standard of

18   Section 1391.  Venue is proper in a judicial district where a

19   substantial part of the events or omissions giving rise to the

20   claim occurred.

21      **THE COURT:**  Can I interrupt?  First, and I just want

22   to ask a very quick question on choice of law.  You both cited

23   Eleventh Circuit choice of law issues.

24      Typically in MDLs we would use the law of the circuit in

25   which the district court sits, which is the Ninth Circuit, not

1   the Eleventh Circuit; but you didn't brief the Ninth Circuit

2   law.  You briefed Eleventh Circuit law.

3        Our initial review of the differences between the two

4   circuits is that there is really no -- no material difference.

5   Would you very quickly address the choice of law issue?

6        **MR. HESTER:**  Yes, Your Honor.  I notice, as I look

7   back at the briefs, that there was a heavy weight on Eleventh

8   Circuit law.  There are some Ninth Circuit cases we rely on for

9   some of these propositions.

10        I agree with the Court; that there is no meaningful

11   difference in the law, and these are all federal procedural law

12   questions where I think the law of this forum would govern.

13        **MS. VALIN:**  Yes, Your Honor.  I agree.  Most of the

14   cases we don't dispute what the cases say and -- in either

15   district.

16        **THE COURT:**  In either circuit.

17        **MS. VALIN:**  Either circuit.

18        **THE COURT:**  Okay.

19        **MR. HESTER:**  So, Your Honor, going back to this venue

20   question and whether a substantial part of the events or

21   omissions giving rise to the claim occurred in the Middle

22   District of Florida, as the Court well knows, there are two

23   requirements for a COPPA claim.  One, whether the service is

24   directed to children or second, whether the service knowingly

25   collected under 13 information.

1    Neither of those occurred in the Middle District of

2    Florida, and the State does not even allege this.

3    The State instead argues that the alleged collection of

4    under 13 data itself suffices for venue.  Now, that's clearly

5    not right.

6    The State could not state a COPPA claim based merely on

7    data collection from children.  It would instead have to make a

8    showing either that the service was directed to children or

9    that there was knowing collection.

10    So, I think that tells us that a substantial part of the

11    events giving rise to the claim did not occur in the Middle

12    District of Florida.

13    **THE COURT:**  I understood this to be not just the

14    collection but the failure to provide notice disclosure --

15    adequate disclosure to the parents; is that right?

16    **MS. VALIN:**  That's correct.

17    **THE COURT:**  If it's a failure to provide adequate

18    disclosure to the parents, those parents are in Florida.

19    **MR. HESTER:**  The parents are in Florida, Your Honor,

20    but the bases of the claim have to be either that there was a

21    knowing collection from under 13 children or that the service

22    was directed to children.

23    In other words, the notice by itself is simply -- it's at

24    the end of the process.  It's if COPPA applies, there would

25    have to be a notice provision; but the two core substantive

 1    elements of the claim have to occur in the Middle District of

 2    Florida or substantial part of those elements has to occur in

 3    the Middle District of Florida.  And that's not alleged.

 4         And I think when we look at the complaint, I think the

 5    State's complaint demonstrates why venue is not proper in the

 6    Middle District of Florida.

 7         In paragraphs 96 and 99 of the complaint, there is an

 8    allegation of actual knowledge based on the failure to

 9    implement age gating.

10         The allegation is to target it to children.  The other

11    prong of COPPA is based on the Instagram registration process,

12    the content on Instagram and advertising on Instagram.  And

13    that's in paragraph 120 of the complaint.

14         Then in paragraph 15 of the complaint, the allegation is

15    that Meta Platforms, quote, "formulated, directed and

16    controlled the acts and practices of Facebook and Instagram."

17         So, that's the allegation.  Meta Platforms had the

18    control.  The allegation is to target it to children and actual

19    knowledge are set forth in those paragraphs that I have just

20    referred to.

21         There is no allegation in the complaint that Meta

22    Platforms did any of this in the Middle District of Florida.

23         And the State bears the burden of proof on venue.  That's

24    established in the *Kiya Foods* case we cite in our briefs, and

25    it is also established in the *Piedmont Label* decision out of

 1    the Ninth Circuit, 598 F.2d at 496.

 2        So, we don't have even allegations from the State that the

 3    two core prongs of the COPPA claim substantially occurred in

 4    the Middle District of Florida.

 5            **THE COURT:**  All right.  Response.

 6            **MS. VALIN:**  Your Honor, first, as the core claim of

 7    COPPA is the collection of data from under 13 users, the "or"

 8    is a condition.  And Counsel -- Meta has failed to acknowledge

 9    that it is the collection of the data.

10        It's an interactive -- it is a highly interactive platform

11    that under 13 users -- that that platform is served to them in

12    the Middle District of Florida.

13        Those same kids, when they read the terms of service, they

14    agree to provide broad sweeping data back to Meta.  Those

15    children live in the district.

16        They -- this broad sweeping data includes everything from

17    GPS location to everything from a microphone, everything these

18    kids say.  It includes their camera roll, all of their

19    interests.  And the data notice goes on and on, multiple

20    paragraphs and then also includes "and other data."

21        That data -- Meta capitalizes on that broad sweeping data;

22    performs reports based on the location and the interest of

23    these kids and then provides advertising opportunities.

24        That includes advertising opportunities to businesses

25    located in the Middle District of Florida.  We have named five

 1    in paragraph 50, and also the broad sweeping data collection is

 2    in 37 to 47.

 3        And then Meta also -- then the cycle continues.  So, the

 4    kids are then served these advertising opportunities and

 5    advertising from these local advertisers; and then their data

 6    is continued to be collected.

 7            **THE COURT:**  Okay.  So, those are not paragraphs that

 8    you referenced.  So, how can I ignore those paragraphs?

 9            **MR. HESTER:**  Those are simply paragraphs dealing with

10    the collection of data.  They can't state a claim based on the

11    collection of data.  That, by itself, does not state a COPPA

12    claims.

13        And I think when you look at the paragraphs that I cited,

14    96 and 99 and 120, those are the paragraphs where the State

15    undertakes to establish the allegations that support these two

16    prongs of COPPA.

17            **THE COURT:**  Okay.  Response to that.

18            **MR. HESTER:**  Sorry, Your Honor.

19            **THE COURT:**  A response to that.

20            **MS. VALIN:**  Yes.  It's the State's position that it is

21    the prong related to the collection of data and that Meta has

22    mischaracterized the requirement that -- and that's a

23    condition.  It is or and not the two prong requirement as

24    Mr. Hester stated.

25            **THE COURT:**  So, that seems to be the core dispute then

1  with respect to this issue; right?  No one disagrees on what

2  the law says; right?  Is that correct?

3          **MS. VALIN:**  Yes, that's correct.

4          **THE COURT:**  Is that correct?

5          **MR. HESTER:**  I agree that there's these two prongs

6  that have to be established for them to state a COPPA claim,

7  Your Honor.

8          **THE COURT:**  So, that's not what my question was.  It

9  sounds to me like I just heard between the two of you the core

10 issue.

11     She is focused on a set of allegations, which you think

12 are insufficient.  You are focused on a different set.  I have

13 to go look at them and decide.

14     We are not arguing about the law.  We are arguing about

15 the application of the law to those particular allegations;

16 correct?

17         **MR. HESTER:**  Yes, Your Honor.  And there is one more

18 point if I could make it briefly.  If the collection of data by

19 itself is enough to establish COPPA venue, then there would be

20 COPPA venue in every judicial district in this country because

21 the collection of data by itself could be alleged in any

22 jurisdiction in this country.  These are social --

23         **THE COURT:**  And is there something wrong with that?

24         **MR. HESTER:**  Yes, it is clearly not the law.  COPPA

25 clearly limits venue to the -- to the jurisdictions where the

1   substantial part of the events or omissions occurred.

2       There is no concept of nationwide venue under COPPA, and

3   that would be, I think, a rather startling outcome to suggest

4   that venue could be proper anywhere in this country simply by

5   the collection of data.  It has to be something more than

6   simply the collection of data.

7           **THE COURT:**  Is that your view; that there is

8   nationwide venue?

9           **MS. VALIN:**  No, Your Honor, there is not nationwide

10  venue.  It is the standard venue provision, but under COPPA the

11  States Attorney General are granted this authority.

12          **THE COURT:**  A logical extension of your argument is

13  that venue would be established nationwide?  Is that your

14  perspective?

15          **MS. VALIN:**  No, Your Honor.

16          **THE COURT:**  Then how is it that the Middle District is

17  so different from the rest of the nation?  What you have

18  suggested -- and, look, yesterday I finished closing arguments

19  in that trial that I have been in all summer.  So, I will go

20  back and I'm going to look at all of this, but your argument

21  taken to its logical extension would suggest that anywhere that

22  children are, there is venue.

23          **MS. VALIN:**  Your Honor, I would respectfully like to

24  make a clarification.

25          **THE COURT:**  Okay.

1          **MS. VALIN:**  There is venue as to Florida as to its

2    residents.  The COPPA statute clothes each Attorney General

3    with the -- to be able to vindicate the rights of under 13

4    users in the residence of that State.

5          So, for example, in this case venue would be proper in

6    Florida as we have alleged; and then also there are -- there's

7    some loosening in the venue joints.  So, there also could be

8    more than one, but I would say that --

9          **THE COURT:**  Yes, but just answer my question.  It

10   sounds like the theory is that if there are residents and

11   children anywhere in the United States, then the Attorney

12   General has the right to have venue in that State.  I don't see

13   what makes Florida any different from any other place in the

14   United States.

15         **MS. VALIN:**  Yes, Your Honor, I would agree with that

16   as to Florida's claim.  So, this -- today we are here on

17   Florida's claim.  If New Mexico wanted to bring a COPPA claim

18   in New Mexico, then we would have to look at the general venue

19   statute, which addresses the -- has to give rise and there has

20   to be a substantial event giving rise to the claim.

21         So, that would only be -- or at least it would be fact

22   dependent on whichever State Attorney General brought the case

23   and then used its enforcing authority.

24         The way Mr. Hester or Meta is characterizing this case is

25   to say that no matter what Attorney General brings a COPPA

```
1   claim throughout the United States, the only proper venue would
2   be where the company is located, which in this case is the
3   Northern District of California.  That would really bootstrap
4   every Attorney General, who their priority is to, you know,
5   vindicate the rights of their children and logically would
6   bring that type of case in their own forum.
7            THE COURT:  Next issue.
8            MR. HESTER:  All right, Your Honor.  The next issue is
9   the claim against Meta Payments.
10       The complaint in paragraph 26 allegation that Meta
11  Payments is, quote, "the licensed money transmitter for Meta
12  and allows its users to send money virtually over its
13  platforms."
14       The State asserts two claims in its complaint; one under
15  COPPA and one under FDUTPA.  Neither claim has anything to do
16  with the transmission of money or the sending of money
17  virtually.
18       There is no relation between virtual money transmissions
19  and claims of addictive features or alleged misrepresentations,
20  and there is no with relation between virtual money
21  transmission and claims under COPPA.  They are just completely
22  separate from each other.
23       And there is, in fact -- I read through the complaint very
24  carefully yesterday again.  There is nothing alleged against
25  Meta Payments in relation to those claims.
```

1    So, the State's sole basis for its claim against Meta

2 Payments is a common enterprise liability theory.  And they

3 can't meet these standards.

4    There is, of course, a general principle of respecting

5 corporate forums and not imposing liability on one corporate

6 entity for the actions of another.

7    Now, what that yields as an exception where there is

8 common enterprise liability, but that involves fact patterns

9 where several corporations working together are alleged to have

10 materially participated or cooperated in a common scheme.

11    **THE COURT:**  So, Meta did not bring this motion with

12 respect to the multistate AG's complaint.  How would a ruling

13 here inform all of the -- that complaint?  And do I need to

14 wait to hear from the rest of the Plaintiffs and/or, you know,

15 is this something you anticipate dealing with in summary

16 judgment?

17    **MR. HESTER:**  Well, I think we had viewed it as a

18 summary judgment issue in relation to the claims in the

19 multistate.

20    Here, it is served up much more acutely because it is

21 being asserted as a basis for jurisdiction over Meta Platforms

22 and Instagram.

23    So, it becomes -- it comes much more to the fore at a

24 motion to dismiss.  We do have a motion to dismiss pending

25 against -- against the claims that includes Meta Payments, but

1  we didn't need to call this issue out in the same way in

2  relation to the multistate because it doesn't matter in the

3  same way that it does here where the State is trying to latch

4  on to the fact that Meta Payments is incorporated in Florida as

5  a basis to get jurisdiction over the other two entities;

6  Meta --

7        THE COURT:  So, how -- to the Plaintiffs' side, how is

8  it that Meta Payments -- separate and apart from Meta --

9  contributed to the alleged COPPA and FDUTPA -- do you use an --

10       MS. VALIN:  It's a tough one.

11       THE COURT:  How do you --

12       MS. VALIN:  I say FDUTPA.

13       THE COURT:  FDUTPA?

14       MS. VALIN:  But it has been called FDUTPA, FDUPA.

15       MR. HESTER:  I say tomato.

16       MS. VALIN:  Whatever we -- whatever sounds good to

17  myself.

18       THE COURT:  Okay.  So, you know what I mean, those

19  violations.  I don't -- I don't understand other than, you

20  know, this allegation that the real reason that you are

21  bringing them in is for jurisdictional purposes, how any of

22  these claims relate to a payment company.

23       MS. VALIN:  Absolutely they do, Your Honor.

24     Meta Payments is the payment processor and that is the

25  financial connection between the users and Meta when it comes

1    to the financial piece.  And in the -- and that's in paragraph

2    22.

3        They manage, secure and process payments made through Meta

4    and the COPPA and the FDUTPA claims are interconnected through

5    the collection of this personal consumer's data including the

6    details of the consumer's financial transactions, which are

7    managed and secured by Meta Payments.  That's paragraph 44.

8        So, in the terms of service we discussed it -- excuse

9    me -- discussed, the broad sweeping data includes when these

10   children are on the platforms and using payments.

11       So, it's as broad sweeping as including credit card

12   information, every detail about the purchase.  So, all of those

13   do connect Meta Payments with the overall scheme that's been

14   really replete throughout the State's complaint and ties -- it

15   is really part of the tie-in together.

16           **THE COURT:**  So, if I grant it as to Meta, does that

17   mean that you no longer have a claim?  Is it necessary?

18           **MS. VALIN:**  As to -- if you grant the motion as to --

19           **THE COURT:**  If Meta Payments is not in this case, do

20   you still have a claim?

21           **MS. VALIN:**  Yes, Your Honor.

22                    (Pause in the proceedings.)

23           **MS. VALIN:**  Well, I should say it depends on how you

24   rule.  It is an alternative basis for jurisdiction.  So -- and

25   the State's position is that pursuant to COPPA nationwide

```
 1   service we have jurisdiction.  We also have venue pursuant to
 2   COPPA, and then we have pendent personal jurisdiction, which we
 3   could piggyback in the State's FDUTPA claim by virtue of a
 4   common nucleus of operative fact.
 5            MR. HESTER:  Your Honor, just --
 6            THE COURT:  What are the specific allegations of Meta
 7   Payments' design or Meta Payments' involvement with Meta's
 8   design of the harmful platform features?  Is there any?
 9            MS. VALIN:  There are no specific --
10            THE COURT:  Okay.  How about with respect to
11   concealment of harms, are there any allegations that Meta
12   payments has contributed to that?
13            MS. VALIN:  They are included together as Defendants,
14   and they are all part of that broad scheme of collecting data.
15            THE COURT:  So --
16            MS. VALIN:  So not specifically, Your Honor.
17            THE COURT:  -- each Defendant -- each Defendant is
18   entitled to individual treatment, and it sounds like you don't
19   have -- I mean, what you are saying is that they have got this
20   portion, which you have told me about, the financial
21   information; but it's a separate corporate forum.
22        And from what you just said it sounds like they actually
23   have no actions from that corporation relative to the harmful
24   platform features or concealment of harms or the actual
25   collection.
```

1          **MS. VALIN:**  Not specifically, Your Honor, and that

2    is -- becomes irrelevant; and I would like to move onto the

3    next point, which is a common enterprise liability, which is

4    often used in consumer protection claims where there is no

5    requirement as -- what you just said, to require the State to

6    have specific allegations related to the allegations to the

7    claims.

8          And I would like to discuss a couple of cases related to

9    common enterprise.  One of the first ones I would like to talk

10   about is a Middle District of Florida case where in -- Florida

11   Attorney General, an FTC joint case against Life Management

12   where Judge Mendoza described this common enterprise liability.

13         He said (as read:) "There is not one universal or

14   mandatory test to determine whether a common enterprise exists.

15   Instead, the pattern and framework of the whole enterprise must

16   be taken into consideration."

17         "Courts consider a variety of factors including common

18   control, the sharing of office space and officers, whether

19   business is transacted through a maze of interrelated

20   companies, unified advertising and evidence which reveals that

21   no real distinction exists between the corporate defendants."

22         And it boils down to does the State of Florida allege --

23   properly allege common enterprise?  This is not a new concept.

24   The multistate complaint has -- this allegation as well.

25         And Florida in detail -- and I can go through the

allegations in the complaint, 25 to 27 -- Defendants operated

under common control.  Meta Payments wholly owned subsidiary of

Meta Payments Platforms.

Paragraph 25, they share common headquarters and senior

executives.  They exercise control over important policy and

staffing decisions related to Meta.

Twenty-five to 27, Meta reports revenue and expenses.

**THE COURT:**  Okay.  You really need to slow down so the

court reporter can actually report properly.

**MS. VALIN:**  Yes, Your Honor.

**THE COURT:**  Go ahead.

**MS. VALIN:**  Twenty-five to 27, Meta reports revenue

and expenses for entire family of products demonstrated by

quarterly Q10 filings.

Thirty-eight and 40 are the terms of service.  Instagram,

as one of Meta's products, provided to by Meta Platforms, Inc.

and refers to the Meta company products as one product

offering.  No distinction there between Meta products.

Paragraph 18, Meta re-branded, transformed Facebook to the

Metaverse encapsulating its subsidiaries including Meta

Payments and products into a shared work.

Forty-two -- and this is I would say one of the most

significant points is that the data collected is shared across

these Meta companies for an indeterminate amount of time,

transferred across borders with other countries and shared

 1    across Meta companies.

 2            **THE COURT:**  All right.  A response.

 3            **MR. HESTER:**  Yes, Your Honor.  The common enterprise

 4    liability theory has been applied in cases where there is

 5    clearly a common scheme being carried out by multiple corporate

 6    entities working together.

 7            And I think that's reflected very clearly in the cases

 8    that are cited by the State in its own brief at page 20.  For

 9    instance, *People versus Debt Resolve*, which is one of the cases

10    the State highlights.  There were ten corporate entities,

11    quote, "working together as a unit to carry out the deceptive

12    scheme."

13            That's the common thread you see in these common

14    enterprise cases; namely, corporate entities -- whether

15    somewhat shells or not -- coming together to carry a common

16    scheme.

17            That is very different from the normal principle that

18    corporate entities are respected, and there is no allegation

19    here that Meta Payments had anything to do with alleged design

20    features, with -- anything to do with alleged

21    misrepresentations, anything to do with the COPPA claims.

22            And I think -- so, we don't have the same situation that

23    gets applied in these common enterprise cases where the core

24    point is all these companies work together in a common scheme.

25            Again, another one I would cite to the court is *FTC versus*

*HES Merchant Services*.  Also quoted in the State's brief at page 20, and I will just quote one sentence.

Quote, "Each company played a crucial role in the scheme and no company could operate the scheme independently."

That doesn't fit the allegations here at all.  There is no allegation that Meta Payments had anything to do with the conduct being challenged in the State's complaint.  It is not a common enterprise liability case.

**THE COURT:**  Next issue.

**MR. HESTER:**  So, Your Honor, I think the next question is whether the claims against Meta Payments and the COPPA claims can establish personal jurisdiction over Meta Platforms and Instagram.  And I can cut that up into two pieces.

The first piece would be Meta Payments, but I think we have already somewhat discussed that.  If the claim against Meta Payments is dismissed, there is no basis to rely on the fact that Meta Payments is incorporated in Florida as a basis for a claim against Meta Platforms or Instagram; but in any event, there is no -- nothing alleged in the complaint that goes beyond what would be a normal corporate subsidiary relationship with its parent or with other corporate affiliates.

So Meta Payments I think we can set aside as a basis for personal jurisdiction over Meta Platforms or Instagram.  That --

1          **MS. VALIN:**  May I respond, Your Honor, before we move

2     on?

3          **MR. HESTER:**  Should I stop there?

4          **THE COURT:**  Sure, all right.

5          **MS. VALIN:**  Meta has cited a case that is very

6     instructive relating to whether or not in the common

7     enterprise -- and I will back up one step.  Meta has

8     mischaracterized what's required in an allegation for common

9     enterprise and conflated the independent individual liability.

10         Under these consumer protection statutes, there is also

11    individual liability that requires participation or control.

12    And throughout Meta's briefing, it appears that that standard

13    has been conflated.  So, I just wanted to make sure that I

14    pointed that out for the record.

15         And that also, the case that is cited here -- and I

16    quote -- it was -- the procedural posture is appropriate

17    because it is a motion to dismiss.  The court applied the

18    factors and found that at the motion to dismiss stage --

19         **THE COURT:**  Stop, stop.  You didn't tell me what case

20    you are citing from.

21         **MS. VALIN:**  Oh, I'm sorry, Your Honor, *People versus*

22    *Debt Resolve*.

23         **THE COURT:**  All right.

24         **MS. VALIN:**  It's a New York Attorney General case

25    brought in New York, and the court noted at the motion to

```
 1  dismiss stage (as read:) "Plaintiff need only allege facts
 2  plausibly supporting the existence of a common enterprise and
 3  not prove that such an enterprise, in fact, exists."
 4       "The arguments advanced by the defendants stated that the
 5  complaint did not sufficiently allege their involvement" --
 6  exactly like this case -- "and various parts of the scheme."
 7       And the court found that unavailing and did not require
 8  specific allegations as to each Defendant to the conduct --
 9          THE COURT:  Well, again, you are -- I mean, that --
10  that case also talks about a defective scheme, so I don't know
11  that it's far off base on that.
12       Now, the question is, you know, whether the allegations
13  are plausible to allege a scheme.  This isn't anything that's
14  new.  District courts every week around this country deal with
15  motions to dismiss.  Used to be when I was practicing, we
16  didn't file motions to dismiss.  Now they are filed in
17  virtually every case.  So, we understand what the word
18  "plausible" means.
19       It's not proven.  It's not summary judgment.  I understand
20  what "plausible" means, but even that case talks about a
21  scheme.  They have to have a scheme.
22       And it's not just -- you know, it's not just being a
23  subsidiary; right.  Just because someone is a subsidiary
24  doesn't mean that they are -- not every subsidiary qualifies
25  as -- under this -- under this heading.  There has to be more.
```

1    There has to be a scheme; right?  You don't disagree with that,

2    do you?

3            **MS. VALIN:**  I agree with you.  We are not claiming any

4    sort of liability pursuant to that relationship, but I will say

5    there is an entire section in the State's complaint that --

6    I believe it is at the heading -- talks about the scheme, the

7    entire scheme -- and we will talk about it more during pendent

8    personal jurisdiction -- where there is a scheme between, you

9    know, everything from the interactive platforms that then --

10   then next, it's the terms of service, the unfettered data

11   collection, which then turns into targeted advertising, which

12   then goes -- it is a cycle -- then goes to the compulsive

13   design features.

14       That's what -- it all stems from the data collection

15   because that's what drives the monetizing of the data, and the

16   design features that Meta designs which are irresistible to

17   kids so that they can --

18           **THE COURT:**  Yeah, but all of that seems to relate to

19   Meta.  I don't -- Meta Payments just seems to be out there

20   collecting the money.

21           **MS. VALIN:**  And the data which is the gold.  At the

22   point of sale and purchase when the advertisements are working

23   is when the payments are made, and those advertisements served

24   to these children are opened and then they make a payment to

25   buy a product.

1          **THE COURT:**  So, are you saying that payment -- Meta

2     Payments is more than a payment processor?

3          **MS. VALIN:**  Yes, that's what we have alleged; that it

4     is the financial driver and connector between the child and

5     Meta.

6          **THE COURT:**  So Meta is not getting the money?

7          **MS. VALIN:**  Well, that's the point of that scheme

8     and --

9          **THE COURT:**  What if it was something -- what if it was

10    another company like some Visa company, some payment processor,

11    any third party, you would sue them too?

12        Right, I mean, we have companies out there used to process

13    payments.  They loop in.  They loop out.  They loop in.  They

14    loop out.  That's all they do.  What does this company do

15    that's different than some third party who was just going to be

16    processing payments?

17         **MS. VALIN:**  It's the State's allegation that data is

18    collected and used, and that's later down the road as we do

19    discovery and have proof.

20         **THE COURT:**  I'm not asking for proof.  I'm asking what

21    your theory is so I can understand that this isn't just some

22    other wheel out there that's kind of ancillary to everything

23    that is going on.

24         **MS. VALIN:**  Your Honor, if it was a third party

25    processor, we would look at this very differently.  This is a

1    Meta product.  It shares the data indeterminately with Meta.

2    And it is the State's position that they all work together and

3    without them --

4            **THE COURT:**  Focus for me on your view regarding the

5    difference between a third party payment process and Meta

6    Payments.  How is a third party -- how are they any different?

7            **MS. VALIN:**  Because a third party -- including the

8    arguments I have made regarding common enterprise -- unless

9    there was some other connector, Meta Payments is part of this

10   Meta suite of products where it holds itself out as one, and it

11   reports revenue as one.  It shares office space, officers.

12       And it's the State's position that because that data is

13   collected at this very -- it's really a -- gold when it comes

14   to data collection would be at the point where a consumer is

15   purchasing an advertiser's product, and it -- reports are made

16   based on this type of use with the children.  And then it

17   happens all over again.

18           **THE COURT:**  All right.  Next issue.

19           **MR. HESTER:**  So, Your Honor, I believe that there is

20   just not a sufficient basis for Meta Payments to serve as a

21   basis for personal jurisdiction over Meta Platforms or

22   Instagram because we still haven't heard any link between a

23   payment processing service and the claims that are asserted

24   here.

25       So, I don't think we can -- we can properly rely on Meta

1  Payments being incorporated in Florida as a basis for personal

2  jurisdiction over these other entities.

3       And, of course, as the Court is well aware, there is a

4  general principle that the incorporation of Meta Payments in a

5  state isn't imputed to its parent or to another subsidiary.

6       So then we go to COPPA as a basis for personal

7  jurisdiction, which is, I think, really more what the State is

8  relying on; and we have talked about why venue is improper.

9  And if the COPPA claim is dismissed, as we submit it should be,

10  we never get to this complicated question of pendent

11  jurisdiction; and we don't need to go further than venue to

12  reject COPPA as a basis for jurisdiction over the FDUTPA

13  claims.

14       And, of course, in the *Action Embroidery* case out of the

15  Ninth Circuit, the court did make clear, personal jurisdiction

16  must exist for each claim asserted against a Defendant.

17       So, putting aside personal jurisdiction over the COPPA

18  claims, there has to be separately personal jurisdiction over

19  the FDUTPA claims.

20       And the State in this regard is relying on the doctrine of

21  pendent jurisdiction.  That jurisdiction requires a factual

22  overlap in the claims.

23       As the *Action Embroidery* case says, out of the Ninth

24  Circuit, the claims have to arise out of, quote, "a common

25  nucleus of operative facts."

 1          And the State can't establish that here.  There isn't a

 2     common nucleus of operative facts.  The COPPA claims are

 3     entirely different from the claims of misrepresentation or

 4     allegedly addictive features.

 5          As we have discussed, the factual question in COPPA is

 6     whether a service is child directed or whether Meta knowingly

 7     collects under 13 data.  Those facts have nothing to do with

 8     the separate claims of misrepresentation or allegedly addictive

 9     features.

10          Now, the State says in its brief at page 8 that both COPPA

11     and FDUTPA, quote, "relate to collecting children's data."

12          First of all, that's not the correct legal test.  The

13     claims have to, quote, "derive from the same operative facts,"

14     not just somehow be related in some indirect way.

15          THE COURT:  And here, it seems to me that if I was

16     trying this case, here or anywhere else, I wouldn't want to try

17     this twice.  Why would I try this twice for these two claims?

18          All of the evidence or much of the evidence overlaps

19     between these two issues.  Now, they are not identical, but I

20     don't see why I would try two cases if I had these separate

21     claims.

22          And for me, as a trial judge, that's what operative -- the

23     overlap of the operative nuclear facts -- or the common nucleus

24     of operative facts is fundamentally trying to get at.

25          MR. HESTER:  Well, I think, Your Honor, there is one

1   question is whether they would be tried together as a matter of

2   logic in the Court's docket and the rest; but I don't think it

3   establishes pendent jurisdiction because the COPPA claims

4   involve this very different fact pattern; namely, did you

5   knowingly collect data from U-13 users or did you target your

6   service directly at children.

7         That has nothing to do with the misrepresentations, and it

8   has nothing to do with the alleged addictive features.  So,

9   there are different operative facts involved.  So, that's the

10  reason that pendent jurisdiction can't be established here.

11        It's not enough that a COPPA claim might also give rise to

12  a state unfair practices claims as a legal matter.  That's not

13  the test.

14        And the facts here in relation to COPPA involve different

15  proof.  It's -- the classic cases that you see with pendent

16  jurisdiction involve circumstances where the State -- where a

17  state claim and a federal claim are based on the same facts and

18  they -- and it could prove up -- those facts could prove up a

19  federal claim or a state claim.  That's the classic pendent

20  jurisdiction scenario.

21        **THE COURT:**  You would agree, though, that both claims,

22  stem from the alleged unlawful collection of children's data?

23        **MR. HESTER:**  I don't think I would agree, Your Honor.

24  The allegations of addictive design features aren't involving

25  whether children's data was collected or not, and the

1    misrepresentation claims about Meta's services that doesn't

2    involve the collection of children's data.

3              THE COURT:  All right.  So, response.

4              MS. VALIN:  Your Honor, if we go to the count -- the

5    FDUTPA count, as it relates to unfairness -- paragraph 136, it

6    is actually the first paragraph that has any facts --

7    specifically discusses in that count the -- that Meta fails to

8    adopt effective age gating, which age gating, as really set out

9    in detail in paragraphs 93 to 100, relate to COPPA and that

10   ineffective roadblock for kids that are under 13.

11        And it says it right there in that paragraph that Meta's

12   unfair acts include but are not limited to Meta's choice to

13   target its social media platforms to children including Florida

14   children who are under age 13 by knowingly designing its social

15   media platforms to include features in order to promote

16   compulsive, prolonged and healthy use by children as failure to

17   adopt effective age gating procedures to prevent access by

18   under age users.

19        And then goes on again to the next paragraph to discuss

20   these features that the State alleges are unfair.  It states

21   right in the next paragraph that -- that the features employed

22   by Meta's platforms -- such as infinite scroll, content, auto

23   play and disruptive alerts, are unfairly used by Defendants to

24   extract additional time and attention from children whose

25   developing brains aren't equipped to resist those manipulative

1    tactics.

2        And then moving onto the misrepresentations portion of the

3    FDUTPA count in paragraph 139, if we look at E and F related to

4    the misrepresentations, they directly relate to an effective

5    misrepresentations of proper age gating, which again relates to

6    COPPA, under 13 users.

7        And then in the next paragraph, section F, Meta's

8    collection of user data.  Misrepresentation is Meta's

9    collection of user data was not for the purpose of causing

10   those users to become addicted to the social media platforms.

11       In reality that was one of the purposes for which

12   Defendants collected user data.

13           **THE COURT:**  Let me ask you a question:  Mr. Hester, if

14   I ruled that pendent jurisdiction was lacking for the FDUTPA

15   claim, wouldn't I be bound to dismiss the multistate

16   complaints, their State law claims, for lack of subject matter

17   jurisdiction?  Isn't that the natural extension of what you are

18   asking me to do?

19           **MR. HESTER:**  There is a question of personal

20   jurisdiction, Your Honor.  So I don't think it is raised in the

21   multi-district litigation because all of those complaints have

22   been direct filed here.

23       The issue we are grappling with, the reason we are in this

24   procedural exam question is that the State of Florida has

25   chosen a different path.  It filed its complaint in the Middle

```
 1  District of Florida although I should say, its Meta complaint
 2  is captioned Northern District of Florida -- Northern District
 3  of California but we construe it as intent to litigate this
 4  case in Florida.
 5      All of the other AG cases have direct filed or been
 6  transferred here without a lexicon objection.  So, this issue
 7  isn't presented as to personal jurisdiction.
 8                   (Pause in proceedings.)
 9      MR. HESTER:  So, Your Honor, that was what I wanted to
10  say on pendent jurisdiction.  I do think the Court doesn't need
11  to reach it if it agrees with what I think is the even easier
12  point; namely, there is not venue here as to the COPPA claim.
13      So, then it leads to the last piece of this puzzle, which
14  is whether there is specific personal jurisdiction in Florida
15  for the claims against Meta Platforms and Instagram.
16      And, again, that's -- it's framed up because the State has
17  chosen to proceed this way.  And as the Court well knows, there
18  is two prongs for specific personal jurisdiction; whether the
19  claims arise out of or relate to Meta's alleged contacts in
20  Florida and whether Meta has purposely availed itself of
21  Florida's jurisdiction.
22      I think the easier point to resolve in relation to
23  specific personal jurisdiction under due process standards is
24  that the State's claims as pled don't arise out of or relate to
25  the contacts that it alleges from Meta in Florida.
```

1    The State alleges these contacts in its complaint:  Meta

2  has an office in Miami.  Meta sells advertising to Florida

3  entities.  Meta's former chief operating officer Sheryl

4  Sandberg met with Florida entrepreneurs.  Meta has initiatives

5  to minority owned businesses, and Meta has programs designed to

6  teach entrepreneurs how to promote their businesses on

7  Facebook.

8    The State's FDUTPA claims do not arise out of or relate to

9  those alleged contacts even if we accept them, as we must on

10  this motion, as true.

11    Advertising offices in Miami, dealing with entrepreneurs,

12  that's not the basis for the claims of misrepresentation or

13  allegedly addictive design features.

14    And the point is very significantly illustrated, very

15  clearly by the Supreme Court's decision in *Bristol Myers*.

16    *Bristol Meyers* had very significant activities in

17  California.  They were unconnected to the claim at issue, and

18  the court held that those unconnected activities could not

19  establish specific personal jurisdiction.

20    *Bristol Meyers* had five research and lab facilities in

21  California, 250 sales representatives, a State lobbying office

22  in California; but there was no jurisdiction over a claim that

23  did not arise out of or relate to those contacts.

24    As the court said in *Bristol Meyers*, the suit -- quote,

25  "the suit must arise out of or relate to the defendant's

contacts with the forum."

And the State doesn't even realistically allege that here and they couldn't.  There is no real basis to say that the contacts the State alleges with -- between Meta and Florida have anything to do with the claims of either allegedly addictive features, misrepresentations, or the COPPA claim as we have been discussing.

Now, the State argues in response in its brief that its claims arise out of or relate to Meta's Florida contacts because the claims relate to Meta's business model or that Meta, quote, "served the Florida market."

And that is clearly the incorrect legal test.  That is not the law on personal jurisdiction.

**THE COURT:**  Well, I think the -- the State is probably focusing on some other facts.  Why don't you state those?  I'm not sure that I agree with you, but I don't think those are the facts that they are focusing on.

**MS. VALIN:**  Yes, Your Honor.  In fact, we have got -- the complaint is replete again with this -- and I agree with Meta that the allegations that were raised are not connected, and we didn't use those to connect.

The allegations that we are using to connect are similar to those from the COPPA discussion earlier; that the -- Meta's serving this platform -- that's the contact -- an interactive, customizable selling advertising opportunities related to all

```
 1    of that data that's collected from the terms of service and
 2    policies and then serving that data to the Florida based
 3    advertisers that are specified in paragraph 50; generating
 4    reports based on those -- those children and their locations,
 5    their GPS, on and off the platforms.  And then the design
 6    features come into play, which are really just an enabler --
 7         THE COURT:  What design features happen there?  And
 8    you don't -- you can't allege that they did, and there are, you
 9    know, a myriad of cases where companies have products in states
10    other than their state of incorporation and that doesn't -- and
11    that doesn't create personal jurisdiction.
12         MS. VALIN:  I may have misspoke.  The features that
13    the children use on their apps are the features that -- that,
14    you know, result in compulsive -- it's they are irresistible --
15    all of that is happening based on that --
16         THE COURT:  Well, let me ask -- you know, there are a
17    whole series of, let's say, automobile cases.
18         MS. VALIN:  Yes.
19         THE COURT:  So, I will ask you for your statement
20    about how those -- the theory behind those would not control to
21    your detriment, and then let me hear from you on the -- again,
22    I don't know if I'm saying this right -- but the uBid, Inc.
23    versus GoDaddy, Seventh Circuit case, which does not work to
24    your benefit.  So, I will hear from each of you on those cases.
25         MS. VALIN:  Your Honor, the State's case is in line
```

with the automobile -- Ford Motor Company; specifically that we
are talking about that the design didn't occur in the forum
where the product malfunctioned.  Ford, though, served that
market and the injury occurred there even though the Ford
vehicle wasn't designed in the State where the accident
occurred in Montana, and the design didn't occur there; and the
automobile wasn't sold there.

     The only thing that occurred was that they were driving,
the residents -- the plaintiffs didn't even reside there.  They
just happened to be driving through Montana; but because Ford
had served the market with its vehicles -- even though it
wasn't the same vehicle.  One of them was a Crown Victoria but
it wasn't -- they did sell Crown Victorias in that state -- but
the court held that because Ford serves the market and the
injury occurred there, that that was proper for a rising out of
or relating to the claim and extended it from requiring a
but-for arise out of analysis and extended that to the much
less related to or affiliated with the forum.

     And in this case, the injuries to these children occurred
in the State of Florida, and I don't think that Meta would
disagree with that.

          **MR. HESTER:**  Your Honor, may I respond on *Ford Motor*?

          **THE COURT:**  You may.

          **MR. HESTER:**  So, on *Ford Motor*, the court did say that
personal jurisdiction could be established where the claims

1    arise out of or relate to the contacts in the State but said

2    that "relates to" imposes real limits on personal jurisdiction;

3    and the court there did not analyze the question simply by

4    whether Ford served the market in Montana.

5        Rather, the court focused very specifically on the fact

6    that Ford advertised and sold the exact models of cars that

7    were involved in the accident.

8        So, the court was looking for a specific relationship

9    between Ford's activities in the forum and the claims asserted

10    in relation to an accident involving those very same models of

11    cars.

12        So, it wasn't simply this gauzy business model idea that

13    Ford served the market.  That's not -- that's not what *Ford*

14    stands for at all.  It was very specifically analyzing the

15    facts of what Ford was doing in Montana.  That's why the claims

16    were said to relate to that specific activity by Ford in the

17    state.

18        The Court asked me also about the *uBid* case, and that

19    really relates more broadly to this question of physical

20    activity in a state giving rise to this purposeful availment,

21    which is really -- the *uBid* case really stands for this

22    question of purposeful availment, but that was a case where

23    uBid had placed physical ads in the State of Illinois.  In

24    addition to its internet activity, it had physical activity in

25    the State.

 1          And I would quote from 623 F.3d at 428 where the Seventh

 2     Circuit said defendants placed, quote, "physical ads in the

 3     forum state."

 4          And it is very clear that physical activity in a state is

 5     to be distinguished from internet activity, and we see in *Ford*

 6     that the court specifically reserved on the question of how its

 7     doctrines would apply to internet.

 8          We see that in the *Walden v. Fiore* case where the Supreme

 9     Court said the same thing and in the *Huffington Post* case that

10     we cited out of the Fifth Circuit, that -- where the court

11     distinguished the *Keaton* case, which also involves the sales of

12     physical goods, magazines into the State of New Hampshire.

13          The court said sending -- and I'm now quoting from

14     *Huffington Post*, 21 F.4th at 325 -- (as read:) "sending tens of

15     thousands of magazines to a state is an affirmative act that

16     displays the publisher's intent to target that state; but,

17     quote, websites are different."

18          And I think there is a broad recognition that these cases

19     involving physical activity in a state are different.  Indeed,

20     even in *Ford*, one of the points the court highlighted was that

21     if Ford didn't like it, it could sever its connections with the

22     state.  That's 141 Supreme Court at 1027.

23          That is not possible for social media services, and that's

24     why I think there has been a recognition that there has to be a

25     different approach applied.  It can't just simply be that there

 1  were users in a state who were using the service.

 2      And, in fact, the *Walden v. Fiori* case, I think, makes

 3  that very clear; that activities of users are not what gives

 4  rise to personal jurisdiction because those are decisions by

 5  third parties and not by Meta.

 6      So, I think -- but going back, I have -- we have kind of

 7  blended together purposeful availment and arising out of or

 8  relating to.

 9      The claims asserted here are not ones that arise out of or

10  relate to the contacts that are alleged in the complaint -- I'm

11  sorry -- the claims that are alleged in the complaint because

12  what is alleged in the complaint in relation to these FDUTPA

13  claims -- we are not dealing with COPPA here.  We are only

14  dealing with FDUTPA.

15      And the FDUTPA claims are addictive features or

16  misrepresentations, and those -- the contacts that Counsel has

17  talked about now involving advertising -- advertising has

18  nothing to do with those FDUTPA claims.  And as to the FDUTPA

19  claims, the contacts alleged in the complaint are not the ones

20  on which these claims are based.

21      So, I think the case law is quite clear; that if there is

22  not suit related conduct in the forum that relates to the --

23  that gives rise to the claims, the claims don't arise out of or

24  relate to the contacts in the state; and I think for this

25  purpose, we have to put the data collection issues, which are a

1  COPPA issue, to one side because the question is their FDUTPA

2  claim here.

3          **THE COURT:**  Okay.

4          **MS. VALIN:**  Your Honor --

5          **THE COURT:**  Response.

6          **MS. VALIN:**  -- we disagree with Meta.

7          **THE COURT:**  Yes, I know.

8          **MS. VALIN:**  As we just highlighted, but I won't take

9  this Court's time to go through again all of the allegations

10  within the FDUTPA count.

11          **THE COURT:**  Okay.

12          **MS. VALIN:**  But also in the introduction, I would like

13  to point out that almost the first paragraphs -- 2, 3, 4, 7 --

14  almost half of the allegations in the introduction, which

15  relate to both COPPA and FDUTPA, talk about data collection,

16  monetizing that data, targeted advertising.

17          **THE COURT:**  Okay.  Thank you.

18          **MS. VALIN:**  Thank you.

19          **THE COURT:**  All right.  Let's talk about a couple of

20  other things.  Thank you.

21          **MR. HESTER:**  Thank you, Your Honor.

22          **MS. VALIN:**  Thank you.

23                    (Pause in proceedings.)

24          **THE COURT:**  As I indicated to you through a courtesy

25  e-mail, I will accept your schedule through November 25, 2025.

1    And I know that you have tried to kind of maintain the -- the

2    intervals for what followed; but, frankly, you have me working

3    through the holidays.  I'm not going to do it, not when I have

4    got 30 lawyers sitting in here.  So, no, I'm not going to do

5    that.

6         And not only that, you give me no time to resolve your

7    summary judgments; and I don't think that you want to prep for

8    trial without knowing what the answer to the summary judgment

9    question is.

10        So, you have the hearing happening at about the exact time

11   when, under my standing order, you would have to be exchanging

12   exhibits for trial.  It makes no sense.  So, that's what I

13   wanted to tell you in terms of your schedule.

14        And in order to -- I guess what I would say is are there

15   going to be -- oh, and not just summary judgment but Dauberts,

16   and lawyers cannot resist Dauberts.  Just like you can't resist

17   motions to dismiss, you just can't seem to resist them.

18        So, I'm expecting that I will get some.  So, I can't do

19   all of this work in three weeks with a law clerk.  Can't.

20        So, let me ask some questions so that we can get a better

21   sense of how this should work.  One is on the summary

22   judgments, will there be summary judgments -- do you anticipate

23   having summary judgments relative to -- for which you will have

24   the entirety of the record at the close of fact discovery?

25   That's really a question to the Defendants.

1          **MR. SCHMIDT:**  Paul Schmidt for Meta, Your Honor, yes,

2     we do.

3          **THE COURT:**  So, it seems to me that some of this,

4     right -- it helps to -- I mean, I know I haven't given you any

5     answers, but it isn't that I haven't been working on it.  It's

6     just that I'm working on it in pieces, and you will get the --

7     the complete answer, but it has helped to have the briefing

8     come in, in intervals.

9          So, does it make sense to have summary judgments relative

10    to specific Plaintiffs, whatever it is that you think you are

11    thinking of, Mr. Schmidt, teed up sooner and parallel to expert

12    discovery?

13         **MR. SCHMIDT:**  I think the challenge -- there might be

14    some issues where that is possible.  The challenge is there

15    will be real interplay between some of our summary judgment

16    arguments on issues like causation, both general and specific

17    and the expert challenges.  I don't think those could be

18    de-linked, but we could certainly look at whether there will

19    be -- and those issues in turn, I think, will affect some of

20    our merits issue like where we stand on Section 230.  Those I

21    don't think can be de-linked.

22         There might be other more targeted issues that could be,

23    but I think the bulk of the issues that we have are going to

24    get wrapped up with experts; but if other Defendants have a

25    different view, I would invite them to do so.

1          **THE COURT:**  I thought Judge Kuhl was going to require

2   briefing on general causation sooner than -- sooner rather than

3   later.  Let me just say that.

4          **MS. HAZAM:**  Your Honor, Lexi Hazam for Plaintiffs.

5   I believe that's a subject of a hearing on Monday in the JCCP

6   before Judge Kuhl.  The parties have briefed that issue in

7   their status conference statement that went in yesterday.

8          The Plaintiffs have taken the position that there should

9   not be phasing in that manner that Defendants are seeking with

10  very early -- from the Plaintiffs' point of view -- briefing on

11  general causation while fact discovery is still midstream.

12         That is something that the Defendants sought at an earlier

13  point here in the MDL also and that the Court at that time did

14  not grant.

15         So, we would share the position of the JCCP; that general

16  causation briefing should not be taking place in the midst of

17  fact discovery.

18         We also believe that some of that fact discovery is, in

19  fact, relevant to general causation.  As this Court has

20  recognized previously, Defendants themselves conduct studies of

21  their users, their internal documents and witnesses that are

22  quite relevant to that point for Plaintiffs.

23         **MR. SCHMIDT:**  Your Honor, if I may briefly respond, we

24  are taking that view in the JCCP; that we do think that general

25  causation experts can be addressed early in the JCCP.  If that

1    was something Your Honor was open to, we think that would make

2    sense to coordinate here.

3        In terms of the points Ms. Hazam made, that is different

4    than what we had asked for earlier, which would have involved

5    more limited discovery.  They are not being limited -- the

6    Plaintiffs are not being limited in their discovery.

7        And to the point about needing certain depositions before

8    going into the expert process, there is ample time -- and I

9    think Your Honor observed this in discussing the schedule the

10   other day.  There is ample time in the schedule for them to

11   prioritize those depositions they think they need even if we

12   did have an acceleration of expert discovery in the JCCP or, as

13   we would invite the Court to consider here if that happens in

14   the JCCP.

15       **MS. HAZAM:**  Your Honor, Lexi Hazam for Plaintiffs.

16   Just to respond briefly on that last point, we vigorously

17   disagree that it is feasible to Plaintiffs or that we are in a

18   position to determine exactly which witnesses have the relevant

19   information and knowledge as to general causation at this point

20   in time and to advance their depositions within an already

21   compressed discovery schedule.

22       I believe that the date on which Defendants are seeking

23   this briefing to at least begin in the JCCP is in February.

24       We have worked hard with Meta to schedule early

25   depositions this fall in accordance with what was submitted to

1   Your Honor as part of our administrative motion last week, and

2   that is what the parties have jointly determined is feasible.

3       We simply don't think it is advisable in a case like this

4   to be briefing general causation prior to the close of fact

5   discovery.

6           **MR. SCHMIDT:**  Your Honor, Paul Schmidt.

7           **THE COURT:**  So, I am looking at the schedule.  Under

8   the schedule, non-case specific experts that -- that doesn't

9   happen until May, June and July of next year.  Am I missing

10  something?

11          **MS. HAZAM:**  No, that's correct, Your Honor.  The close

12  of fact discovery -- under the new schedule that Your Honor has

13  tentatively approved through November 25th -- is April 4th of

14  2025.  That is a four-month extension of the fact discovery

15  deadline.  And the initial liability expert reports, which

16  would include also general causation, are due about five weeks

17  thereafter on May 16th, which is actually a shorter period

18  between the close of fact discovery and those initial reports

19  being due than we had previously.

20      So, those -- that deadline was advanced more than by the

21  two months we were advancing the entire schedule request if

22  that makes sense.

23          **MR. SCHMIDT:**  And, Your Honor, our point would simply

24  be I don't know that there is a ripe issue we are presenting to

25  the Court on this point right now because we did want to see

1    where we came out with Judge Kuhl before having proposed this;

2    but if where we came out was, as Ms. Hazam said, with expert

3    reports in the JCCP in February, we would be substantially

4    complete with Defendant's discovery at the beginning of

5    November.

6         That is four months or three months to be able to take

7    depositions, and we will have started -- at least on the Meta

8    end -- depositions by the point of that substantial completion.

9         **MS. HAZAM:**  Your Honor, if I may just on one further

10   point, we think it would be fundamentally unfair for Plaintiffs

11   to have to advance all of their discovery that much.

12        There is a reason for the schedule extension that we

13   sought, which would give us until April, that would, I think,

14   essentially undermine the -- the extension that both sides

15   agreed was needed.

16        I also think it would be fundamentally unfair for

17   Defendants to be able to continue to have wide ranging

18   discovery on Plaintiffs until April when Plaintiffs would have

19   to advance not only fact discovery but, in fact, expert

20   discovery also.

21        **MR. SCHMIDT:**  Well, if I may respond, Your Honor,

22   there is no way we are going to complete Plaintiff discovery

23   before April because of the slow pace of Plaintiff discovery

24   across the Plaintiff groups.  That's just not going to be

25   feasible, and we are concerned that for some of the Plaintiff

1    groups we won't even be able to get it done by April.

2        We are not talking about advancing all discovery.  We are

3    saying in a practical sense, you don't need to have every

4    deposition.  The idea that their experts are going to rely on

5    the deposition of every one of our witnesses makes no sense at

6    all; and there is no precedent for that in any case or in

7    Rule 702 expert standards.

8        To the extent they need specific people to explain data or

9    otherwise, they have the opportunity to do that; but I don't

10   think at the end of the day this is something if Your Honor

11   doesn't want to we need to reach right now.

12       I think it makes sense to see where we land with Judge

13   Kuhl.  And then if we can reserve the right to come back to,

14   Your Honor, we would be grateful for that.

15           **THE COURT:**  Well, I think that the determination of

16   how quickly I can get you answers to your questions, your

17   motions, depends on how many motions I have.  And it would seem

18   to me that you-all aren't working on anything else, so you

19   won't have any trial conflicts because you are only working on

20   this.  So if I say we go to trial, we go to trial, right,

21   unless are you working on other things?

22                       (Laughter)

23           **MR. SCHMIDT:**  I don't want to speak for every lawyer

24   in this room on the Defense side, I think it is fair to say

25   these cases dominate our work.

1        **THE COURT:**  Yeah.  So, I don't think that starting a

2   jury trial on February 10th, given that I don't even have a

3   hearing -- and under your schedule the hearing doesn't happen

4   until December 19th, that that's feasible, period.

5        So, what -- do you-all know -- it would be helpful to me

6   to understand what your thinking is today, and I don't have to

7   hold you to it -- and "today," I mean relative because I would

8   like to go home and I'm sure you would like to go to dinner.

9        I would like to understand what you were thinking in terms

10  of summary judgments; how many, what are the issues, what

11  experts you are going to have, whether you think you are going

12  to challenge the experts.

13       Sometimes I can look at this and say, okay, yeah, no, I'm

14  not going to let you do that because it is a waste of time in

15  terms of -- you know, it frequently happens in antitrust cases

16  where I have got the -- I have got the Ph.D. from Stanford

17  versus the Ph.D. from MIT, and they want to bring a Daubert.

18  Now, sometimes, you know, there may be something there but

19  usually there is not.

20       So, in order to understand or to gauge how much time I

21  need, I need to have a sense of what kinds of issues you want

22  me to resolve.

23       So, what I'm going to ask you to do is think about that

24  and make that part of your next submission for our next

25  conference.  I will give you the schedule until November 25th,

```
 1   but then I need more information before I'm going to give you
 2   the rest of the schedule; but I can tell you, February 10th is
 3   probably -- unless, you know -- unless you decide to bring no
 4   motions.  If there are no motions, then sure, let's do
 5   February 10th.  Sounds like a good day.
 6        MR. SCHMIDT:  I think we are in the opposite
 7   direction, Your Honor.
 8        MS. HAZAM:  Understood, Your Honor.  And, again, it
 9   certainly is, I don't think, anyone's thinking in the schedule
10   that we presented to burden the Court over the holidays; but
11   that may have well have been the effect.  So, our regrets for
12   that suggestion.  I think we were just trying to follow the
13   intervals, and we probably did not give due attention to where
14   the dates were falling.  So, we are happy to have that
15   discussion with the Defense.
16        Because the Defense is going to be the origin of probably
17   most, at a minimum, of the summary judgment motions, it would
18   be very helpful for us to know what they are.
19        Also, they are aware of who many of our experts are
20   already because of the disclosure requirements under the
21   protective order.  We have no visibility currently into their
22   experts.  So, to have an informed discussion about this, we
23   would be going into it on unequal footing.
24        So, our hope would be that the Defendants would be
25   forthcoming in sharing with us their intentions in this regard
```

so that we can give your -- give the Court the feedback it

seeks.

      **MR. SCHMIDT:**  We will certainly talk with the

Plaintiffs.  Two things.  I joined in what Ms. Hazam said in

not wanting to burden the Court over the holidays or the

Court's colleagues.

    Our biggest concern is the one the Court flags; that we

think and we continue to think that if we proceed to summary

judgment, there will be substantial issues in these cases about

whether they can proceed in terms of expert methodology, in

terms of causation, in terms of Section 230.

    And so, our priority on the Defense side is absolutely

giving the Court the time to consider those issues because they

are thorny issues, and I think they are going to be

substantial.

    In terms of conferring with the Plaintiffs, we will do our

best to outline in general terms what we anticipate.  We

obviously don't know the methodology their experts are going to

use.  They know that.

    We don't how the case specific facts will work out, and

that might influence, say, a Section 230 motion; but we will

tell them what we were thinking right now based on what we

know.

      **THE COURT:**  Well, and that will -- again, I always

prefer to get schedules that are informed, and I can't do that

 1   without that information.  And then, you know, I try very hard

 2   to stick to the deadline because lawyers operate off of

 3   deadlines.

 4       I can tell you in this trial that I had -- well, we are

 5   still now waiting for a jury verdict.  I had one side yelling

 6   and screaming that they needed more time.  And, frankly, I

 7   didn't give it to them, and I'm glad I didn't.  It was the

 8   right answer.  You are never going to be completely ready, but

 9   you go anyway and that -- and that focuses you.

10       So, let's get some more information at our next

11   conference.  Okay.

12           **MS. HAZAM:**  Your Honor, may I ask --

13           **THE COURT:**  Go ahead.

14           **MS. HAZAM:**  Just for further guidance as to the

15   reporting back to the Court on this issue, would you like us to

16   be proposing a modified schedule for after November 25th, 2025,

17   or would you like us to wait?

18           **THE COURT:**  No, you don't have to do that.  Now, that

19   I know what the topics are, I can fill it out.  What I need to

20   know is what the sub -- you know, what is -- what is the scope

21   of the anticipated motion work.  That's what I need to know.

22           **MS. HAZAM:**  Understood, Your Honor.

23           **MR. SCHMIDT:**  Understood, Your Honor.

24           **THE COURT:**  Okay.  There is this new class action,

25   *Abraham versus Meta*, that I related.

1          **MS. ANDERSON:**  Good afternoon, Your Honor, Alison

2    Anderson with Boies, Schiller and Flexner for Ajita Abraham on

3    behalf of her minor child and others similarly situated.

4          **THE COURT:**  You are a little late to the party.

5          **MS. ANDERSON:**  Yes, as the parties have indicated to

6    us as well.  Obviously, you know, in looking at these cases, we

7    thought that there are important issues for a national --

8    potentially -- class for both nationwide injunctive relief as

9    well as, you know, other relief.  And in looking at the

10   materials, we -- we sought and think that's an important case

11   to bring on behalf of our client.

12         **THE COURT:**  Have you talked to the Plaintiffs' Counsel

13   here?

14         **MS. ANDERSON:**  So, as of -- it was three days ago that

15   we received the member case notice.  So, I think on our agenda

16   is to basically do that; to start speaking with lead Plaintiffs

17   Counsel -- and, in fact, we spoke about this right before this

18   hearing -- as well as Defense Counsel and talk about the best

19   way forward; that both doesn't rock the boat efficiency wise

20   but also addresses, you know, what we see as potentially

21   different needs of our clients.

22         **MS. HAZAM:**  Your Honor, Lexi Hazam for Plaintiffs.  We

23   did speak just briefly before this hearing today.  I did want

24   to alert the Court to the fact that, as the Court may recall,

25   there are two class cases already pending in the MDL that raise

1    similar claims including for nationwide injunctive relief

2    against Meta.  One of them was filed two years ago; one of them

3    about a year ago.

4         What we think should happen is a discussion with MDL

5    leadership, Meta, the AGs, who obviously also have claims

6    against Meta, and Counsel in the three class cases; and I think

7    that would be the logical next step here.

8         In any event, we don't think there is anything that should

9    change where the focus of the case is now, which is discovery

10   moving apace towards trial, as has just been discussed with the

11   Court, especially since the same liability discovery is needed

12   by all Plaintiffs who have claims against Meta.

13        **MS. ANDERSON:**  Your Honor, if I may, the two class

14   actions there are, are different than ours; but, you know, we

15   understand the point.  And, you know, also I would just point

16   to other MDLs where there are separate tracks for class action

17   versus personal injury; for example, the *Blue Cross* one with

18   Judge Proctor and the *Takata Air Bags* one with Judge Moreno.

19        But, again, I think it is a little premature.  I think we

20   need to sit down with lead Plaintiffs' Counsel; sit down with

21   Defense Counsel, AG Counsel and just really think through it;

22   and we need to get up to speed with all of the case management

23   orders and what's gone on with the case to really think through

24   the way that we think we can best handle the efficiencies as

25   well as addressing the needs, you know, of all of our clients.

1          THE COURT:  Ms. Simonsen, did you want to be heard?

2          MS. SIMONSEN:  Thank you, Your Honor, yes, Ashley

3   Simonsen, Covington & Burling for the Meta Defendants, Your

4   Honor.

5          As Ms. Hazam noted, there are already two class actions

6   pending.  I did want Your Honor to be aware, if you weren't

7   already, that one of them is filed by a law firm that is among

8   Plaintiffs' leadership.  And, therefore, there is already

9   effectively representation by Plaintiffs' leadership in terms

10  of the class actions and in terms of thinking through the types

11  of discovery that might be needed.

12         I share Ms. Hazam's view that the liability discovery

13  that's taking place should be adequate to cover the class

14  actions that are stayed under orders that Your Honor has

15  already entered that specify that unless Your Honor grants

16  leave for further proceedings to go forward, any cases that are

17  joined to these cases, this MDL, are stayed.

18         And I do think it is notable -- and the only reason we

19  spoke before this conference was because Ms. Hazam and I

20  approached counsel for this new class.

21         THE COURT:  Did you intend to file this as an MDL

22  direct member case?

23         MS. ANDERSON:  No, Your Honor, we did not; and we just

24  received three days ago --

25         THE COURT:  Why not?

1          **MS. ANDERSON:**  We did not because we do think there

2    are different issues to be addressed as a potential class.

3          **THE COURT:**  Like what?

4          **MS. ANDERSON:**  Like the nationwide injunctive relief

5    for 18 and under.  The other class is 13 and under.  We think

6    that's important.  Also, you know, timing.  Obviously, I think

7    there is an impact there.

8          And when you think about discovery issues that are

9    different, I mean, right now one thing that comes to mind

10   immediately is just preservation of data, you know, beyond

11   certain bellwether Plaintiffs; you know, issues of

12   representative data; you know, those types of things that I

13   think make this case a little bit different.

14        We did not oppose, I will note, that this case is related.

15   Obviously, we see there can be a lot of efficiencies in working

16   with --

17        **THE COURT:**  You still have not articulated to me the

18   difference between -- other than 18 versus 13, you haven't

19   really articulated a difference between your case and the other

20   two class actions that have already been filed.

21        **MS. ANDERSON:**  Well, I do think the 18 and under is a

22   significant difference, but I also think that we are very

23   focused on preserving data; and I think when we had looked at

24   it, we did not see preservation on a classwide status for 18

25   and under, the data being preserved.  We don't see discovery

```
 1   for that data.  And so, that is what we see that is a different
 2   issue.
 3           MS. SIMONSEN:  Your Honor --
 4           THE COURT:  You don't file a lawsuit to preserve data.
 5   I am talking about the substance of your claim because what
 6   this looks like is, you know, is Boies Schiller is trying to
 7   come in after the fact to tag along and disrupt.  That's what
 8   it looks like.
 9           MS. ANDERSON:  We certainly don't seek to disrupt, so
10   that's absolutely not on our agenda.  We absolutely want to be
11   efficient, and so we are not seeking to disrupt.
12       I think there are -- if you look at what is left out -- is
13   14 to 18, and what is also left out are -- and other states
14   that are not represented by the AGs.  And so, this is a broader
15   class action group.
16           MS. HAZAM:  Thank you, Your Honor.
17           THE COURT:  Go ahead.
18           MS. HAZAM:  If I may, I just wanted to point out that
19   there are overlapping class definitions between these three
20   class cases, one of which has a class definition of any person
21   who used Instagram or Facebook and suffered mental health
22   issues.  So --
23           THE COURT:  Could you give me the case numbers again
24   of the class actions?
25           MS. HAZAM:  Yes, presuming I can read the small print
```

on my chart.  I believe I can.  So, the first class action

filed two years ago in September of 2022 is a case *VP v. Meta*.

It is case number 4:22-CV-06617.  That case was initially filed

in state court and then removed to federal court.  The class

there is represented by Seeger Weiss and Social Media Victims

Law Center.

And then there is a case *Cedric Williams versus Meta*

initially filed in July of 2023.  That case number is

4:23-CV-04154 represented by Lemon Law and Poulin Willey

initially filed in the Western District of Louisiana, and

that's the one that has the very broad definition that I just

indicated.

I also just wanted to, of course, note that the existing

Plaintiffs in this action are seeking injunctive relief as, of

course, are the AGs, which by its very nature would likely be

nationwide.

And I also just wanted to note -- and I'm happy to have

discussions with counsel in this class case about this -- we

have had extensive meet-and-confers with the Defendants about

preservation.  We have had disputes about preservation, which

have been raised before a magistrate judge.  We have had orders

issued as to preservation.  We are certainly happy to discuss

those with counsel and bring them up to speed.

MS. ANDERSON:  And, Your Honor, if I can just address

the two cases, the *VP versus Meta* case, that's the under 13 but

1  also does not include the claims such as failure to warn and

2  the other sort of PI claims but is really based on state claims

3  and Unruh Civil Rights Act claims.

4      And then the *Cedric Williams versus Meta* appears to be

5  based in Louisiana claims, and it is hard to read from the

6  complaint while they sort of allege all similarly situated, it

7  is based on Louisiana claims.  So, it may only appear to be a

8  Louisiana class action.

9          **THE COURT:**  All right.  Meet and confer and we will

10  talk about it next time.

11          **MS. ANDERSON:**  Thank you.

12          **MS. HAZAM:**  Thank you, Your Honor.

13          **THE COURT:**  The State AGs are objecting to discovery

14  ruling; is that right?

15          **MS. MIYATA:**  Bianca Miyata for the State AGs.  That's

16  correct, Your Honor, the State AGs do intend to file objections

17  to Magistrate Judge Kang's order and its broad conclusion that

18  non-party State agencies as well as even elected officials are

19  subject to party discovery in this case.

20      When it comes to the format and the length of that

21  objection, we wanted to note that it is quite a lengthy order.

22  It includes 40 pages of common analysis, but we believe that

23  the order rests on two particular common conclusions that are

24  critical before engaging in state-by-state analysis.

25      And in order to streamline this Court's consideration of

1   that ruling, we would propose that we file a single joint

2   submission addressing these common conclusions in a ten-page

3   filing, which we could file by September 20th.

4        I believe the rules deadline to file objections is,

5   indeed, September 20th.  And then, of course, we stand ready to

6   address any state-by-state analysis or state-by-state issues

7   should the Court find it helpful or necessary then in a second

8   step; however, understanding the Court's limited time and the

9   burden of reviewing state-by-state briefing, we wanted to offer

10   this as a streamlined proposal for how this could be addressed.

11        MR. SCHMIDT:  Our response to that -- and we don't

12   think that makes sense.  Our response to that is driven by one

13   overriding concern which is timing and three quick points on

14   the timing.

15        One is this discovery dispute is not kind of an

16   isolated -- kind of contained discovery dispute.  It runs

17   across the entire State AG cases.  All State AGs, the bulk of

18   their discovery, it will guide our discovery from them all the

19   way through depositions.  So, it is a massive issue that we

20   have to resolve before we can progress the case against the

21   State AGs.

22        Two, we are grateful that Your Honor just extended the

23   fact discovery window because we do have concerns particularly

24   with the State AGs about them meeting their discovery

25   obligations.

1    In the absence of this order, we had started the third

2 party subpoena process because we were just running out of time

3 and that was incredibly burdensome and incredibly inefficient,

4 and we barely have anything as a result of that.

5    And then, three, we have already been prejudiced by this

6 delay.  We served discovery in February and this issue has been

7 pending as a legal matter for six months.

8    So, all that makes our central priority the timing.  We

9 don't think their timing makes sense for the simple reason

10 that, as I understand what they are suggesting, it's a two-step

11 process where we need to win at both steps to get the discovery

12 that we think we are entitled to.

13    They want to brief some general issues.  If they lose

14 those general issues, then they want to preserve the ability to

15 go state-by-state; and that makes no sense at all.

16    We think these are clean issues.  Judge Kang made a point

17 of saying he didn't appreciate the state-by-state briefing and

18 the manner of the state-by-state briefing and the burden --

19        **THE COURT:**  He did not appreciate?

20        **MR. SCHMIDT:**  He did not, yeah, at the end of his

21 opinion at --

22        **THE COURT:**  I haven't read it.

23        **MR. SCHMIDT:**  Yeah, at page 248 he made a point of

24 saying the separate briefing that is being requested again is a

25 backstop if they don't win on the first issue or set of issues

1    was unduly burdensome.  It wasn't backed up by oral argument

2    from the State AGs, and it resulted in a large number of the

3    arguments overlapping and repeating.

4         **THE COURT:**  So, remember, that the objection of a

5    magistrate -- to a magistrate judge's discovery order has a

6    different threshold.  It is not insignificant.  The default is

7    expect to lose this motion.

8         And so, I want to just remind everybody, Judge Kang, you

9    know, was a partner at Baker & Botts.  He is not -- he knows

10   what he is doing.  So, it is absolutely viewed as a second bite

11   at the apple.  There have been times when I have overruled a

12   magistrate judge on a discovery issue, but I can tell you in

13   the almost 13 years that I have been here, it is few and far

14   between.

15        **MS. MIYATA:**  We understand, Your Honor, and we did not

16   undertake this decision lightly; and it is exactly for this

17   reason that we seek to admit this to Your Honor in the most

18   streamlined and efficient way as possible.

19        **THE COURT:**  Well, it seems to me if you are ready to

20   go, you know, then we can do normal motion.  You know, you can

21   file your brief next Friday.  You can file an opposition the

22   Friday after and a reply the Friday after that.  I may not even

23   take argument on it.

24        **MR. SCHMIDT:**  May I ask a clarifying question?  As I

25   understand local Rule 72-2, we don't even need to respond

1    unless the Court directs a response.  If the Court wants a

2    response now, we can certainly do that but --

3        THE COURT:  I think that given the issues --

4        MR. SCHMIDT:  Yeah.

5        THE COURT:  -- briefing is important.

6        MR. SCHMIDT:  Okay.

7        MS. MIYATA:  Your Honor, we are happy to file our

8    brief on Friday, but I -- just seeking some clarification as to

9    whether the Court would prefer for that brief to address the

10   two common issues that I have identified or address all of the

11   State specific analysis --

12       THE COURT:  I am not -- I am not going to tell you how

13   to brief an objection.  I don't know if it's going to be

14   enough.  If I need extra briefing, I will ask for extra

15   briefing.  I know that you-all are quite happy to give me extra

16   briefing.  So, what I can also tell you is I may read it all

17   and say denied, we are done.

18       MS. MIYATA:  Understood, Your Honor.  In the event

19   that we should -- you know, should we be addressing each

20   state-by-state issue; however, I do want to flag for the Court

21   that it would be impossible to do that in a five-page

22   submission; and in that case --

23       THE COURT:  You can have -- I will give you a regular

24   law and motion page limits but not more.

25       MS. MIYATA:  And would that apply to a common motion

1  then or state-by-state?  Because unfortunately, I do have to

2  make a record that the Court engaged in over six pages of

3  analysis per state, and each state was permitted a single page

4  to make its arguments.

5      Now, you know, I understand that these things take a lot

6  of time and are certainly burdensome for the Court; but if the

7  Court would prefer to see briefing for all the states and for

8  the common issues in one fell swoop, I think we would need to

9  insist that each state -- not insist -- but respectfully

10  request that each state also receive multiple pages to address

11  its own state specific law and laws and errors of -- errors of

12  law, rather, that were not an acknowledged in the order.

13      **MR. SCHMIDT:**  We would object to that, Your Honor.  We

14  have findings from Judge Kang on this; that they asked for the

15  same thing with Judge Kang.  It was unduly burdensome.  They

16  repeated the same arguments over and over with only slight

17  variations from state to state.  They didn't even come to the

18  hearings to argue the issues in the case with most of the AGs.

19  This is something straightforward that we think can be briefed

20  in the period that Your Honor has allowed.  And --

21      **MS. MIYATA:**  I believe --

22      **MR. SCHMIDT:**  -- we would object -- obviously, if

23  Your Honor would find further briefing helpful, then Your Honor

24  will tell us.  This is one we don't want to brief further on

25  the Defense side.  We think it's a pretty clear issue.  But

1    what we would object to is what I think they are trying to do

2    is reserve a second bite at the apple.

3         **THE COURT:**  They are not going to get a second bite at

4    the apple.

5         **MS. MIYATA:**  I must push back at this representation

6    that we didn't vigorously pursue this issue before the

7    magistrate.  We briefed it.  We have argued it several times

8    and merely appearing through consolidated representation

9    doesn't mean that the states didn't find this issue to be of

10   utmost importance.  And that is why we bring it up to the Court

11   because of the significant consequences that this has for State

12   government as well as for the AG's ability to bring independent

13   enforcement actions in its state courts without opening up all

14   state agencies and all elected state officials to needless and

15   burdensome unrelated discovery.

16        **MR. SCHMIDT:**  Here is our concern, Your Honor, they

17   chose to bring this case in federal court.  We are not the

18   litigant.  We are not the plaintiffs in this case.  They are.

19   They chose to bring it in a consolidated fashion.

20        They chose to invoke Your Honor's jurisdiction and Judge

21   Kang's jurisdiction.  They stood before Your Honor and said,

22   "We are ready to go with a fast trial date."

23        They agreed to the recent continuance with a trial date,

24   and now they are putting up a procedure that fundamentally

25   frustrates that.  They can't have it both ways and say, "We are

```
 1   going to stay in this discovery pool and in this trial pool;

 2   but we need the maximum amount of time."  We need to follow a

 3   process that we already have judicial findings on was unduly

 4   burdensome and led to substantial delay in presenting this

 5   issue to Your Honor with the benefit of Judge Kang's decision.

 6          MS. MIYATA:  My colleague and I are speaking past each

 7   other.  We are very happy to address state-by-state specific

 8   issues.  We merely ask for a sufficient page limit within which

 9   to do so.

10          THE COURT:  I don't know what you mean by that.

11          MS. MIYATA:  I don't think that we are trying to get a

12   second bite --

13          THE COURT:  What do you mean -- how many pages are you

14   asking for?

15          MS. MIYATA:  Certainly, Your Honor.  I think the

16   presumption would be that each state could file a five-page

17   objection on it's own --

18          THE COURT:  No.

19          MS. MIYATA:  -- but I believe that we could do it in

20   three pages per state.

21          THE COURT:  You said there are common issues.  So you

22   get the common issues plus what?

23          MS. MIYATA:  Plus three pages per state would be our

24   request.

25          THE COURT:  Denied.
```

1        **MS. MIYATA:**  We were permitted one page before the

2   magistrate.  And then I believe that the Court [sic] took five

3   to six pages per state to make its argument, some of which

4   included laws and issues that were not actually discussed or

5   presented to the Court.  So, I think it would be quite

6   difficult for us to adequately address those without having

7   sufficient space, Your Honor.

8        **THE COURT:**  Well, I will give you 50 pages and every

9   AG is -- I can separately set an argument and you are each

10   individually welcome to come and argue, all 35 of you or 36.

11   What number are we at, 33?

12        **MS. MIYATA:**  Thirty-five, Your Honor.

13        **MR. SCHMIDT:**  That's correct.

14        **THE COURT:**  All right.

15        **MR. SCHMIDT:**  And, Your Honor, there is a companion.

16        **THE COURT:**  50, 50 and 25.

17        **MR. SCHMIDT:**  So sorry, may I confirm the dates on

18   those?  It is next Friday for the 50.

19        **THE COURT:**  You have already done this.  A week, a

20   week and a week.

21        **MR. SCHMIDT:**  Okay.

22        **MS. MIYATA:**  And, Your Honor, with the Court's

23   indulgence, there is one companion issue that I will turn to my

24   colleague Ms. O'Neill to address.

25        **MR. SCHMIDT:**  If I may just finish what I was going to

```
 1   say, Your Honor, the lurking issue here is, of course, our

 2   ability to progress discovery while this issue is pending while

 3   we do have the concern that a lot is being asked of Your Honor

 4   to look through this material.  It would not be surprising if

 5   it would be very quick -- let me say it differently -- if

 6   Your Honor was able to rule within a week of our submissions,

 7   which we are not asking for.

 8       And so, we intend to proceed under Judge Kang's order.  I

 9   don't think that issue is before the Court.  We talked and my

10   understanding is there will be a request for a stay before

11   Judge Kang that hasn't been made yet even though we were before

12   him yesterday, but we will oppose that request.  Our concern is

13   progressing the case.

14       THE COURT:  So, the difference is, is that if I don't

15   agree with the AGs, I can deny this in one page.  I certainly

16   am not going to regurgitate everything that Judge Kang did.

17       MS. MIYATA:  Understood, Your Honor.

18       MR. SCHMIDT:  Thank you.

19       THE COURT:  I will tell you what I tell all litigants.

20   Discovery orders are not appealable.  Do not expect analysis.

21   You will get a decision.  And that is all you will get.

22       MR. SCHMIDT:  Thank you, Your Honor.

23       MS. O'NEILL:  Good afternoon, Your Honor, Megan

24   O'Neill on behalf of the People of the State of California with

25   hopefully a quick note and request.
```

1   The California Department of Justice has been in

2 communication with Governor Newsom's office, and I have been

3 authorized to convey the position of the California Governor's

4 Office.

5   The Governor's Office and the agencies under its control

6 will not comply with the order regarding State agencies and

7 will not provide the Attorney General with access to documents

8 because the Governor's Office does.  It is not a party to this

9 litigation and the Court lacks jurisdiction over it.

10   The Governor's Office would like the opportunity to

11 formally present its position through a submission to the

12 Court.  I have been informed that the Colorado Governor's

13 Office does as well, and I also understand that State agencies

14 and elected officers from other states in the multistate

15 coalition are similarly situated and may also like the

16 opportunity to be heard.

17   If the Court has guidance as to the form or timing of

18 this -- these submissions, we can then inform the Governor's

19 Office and other interested agencies of that guidance.

20   This could potentially take the form of a statement of

21 interest and could be submitted simultaneously or at the same

22 time as the State AG's objections next Friday.  Again, we would

23 ask the Court's guidance as to the proper form of these

24 submissions.

25   **MR. SCHMIDT:**  This is the first time we are hearing

1   this statement.  I think it is notable that the statement is

2   being made through an AG lawyer.  The suggestion that there is

3   some distinction is only being communicated to us in the court

4   through an AG lawyer.

5        It goes to, I think, the central point of Judge Kang's

6   ruling.  It's reinforced by the complaint.  The complaint from

7   California is brought on behalf of the People of the State of

8   California.  There is a fundamental ability -- a fundamental

9   question about their ability to proceed on their claims, which

10  is harm to the citizens of California -- and that's true for

11  other states too -- if what they are saying is we can have the

12  AG stand before the Court and communicate the view that we

13  don't belong in this court, but they don't speak for us; that

14  we are not part of their lawsuit.

15       That has to affect either the discovery we get or their

16  ability to proceed in these cases.

17           MS. O'NEILL:  Your Honor, if I may respond briefly, to

18  be clear, I do not represent the Governor's Office; and I have

19  just been authorized to convey this message.

20           THE COURT:  Well, who does?

21           MS. O'NEILL:  Excuse me?

22           THE COURT:  Who does?

23           MS. O'NEILL:  In this particular matter I do not know

24  exactly who will be representing the Governor's Office.

25           THE COURT:  Who generally represents the Governor?

1      **MS. O'NEILL:**  I believe that the Governor can use the

2    Attorney General's Office and can also hire outside counsel.

3                      (Pause in the proceedings.)

4      **MS. O'NEILL:**  Your Honor, I would just note that the

5    Governor's Office and these other agencies were not parties

6    below, and this is exactly why we are asking about the proper

7    procedure for these agencies and entities to put their position

8    formally before the Court.

9      The State agency order rests on a number of incorrect

10   understandings about the relationships between the Attorney

11   General and State agencies controlled by other independent

12   executive officials especially State governors, and we think it

13   is appropriate and necessary to allow these agencies to present

14   their positions directly so that the Court can understand the

15   reality of the situation created by this order.

16     **MR. SCHMIDT:**  I actually think that position has been

17   waived.  If that was the argument they wanted to make, that

18   should have been made to Judge Kang.  It shouldn't be made for

19   the first time when they receive an order that they don't like

20   after fully litigating it for six months.

21     **THE COURT:**  I would agree.  Take it to Judge Kang

22   first.  We will proceed on my track and the net effect of this,

23   if he decides differently, is that the AGs may be separated in

24   its entirety.

25     **MS. O'NEILL:**  Can I make one clarification,

1     Your Honor?

2              **THE COURT:**  You may.

3                        (Pause in proceedings.)

4              **MS. O'NEILL:**  Judge Kang's standing order does not

5     permit the filings of declarations.  For the most part we were

6     limited in the evidence that we were permitted to provide to

7     Judge Kang in the first instance below, and that is just an

8     additional reason why it is appropriate --

9              **THE COURT:**  Did you ask?  Did you ask?  Did the

10    Governor ask?

11             **MS. O'NEILL:**  The Governor did not ask.

12             **THE COURT:**  Did you ask on behalf of the Governor?

13             **MS. O'NEILL:**  We did not ask on behalf of the

14    Governor.

15             **THE COURT:**  Go to Judge Kang.  I will not play games

16    with the AGs.  You cannot have your cake and eat it too.  Do

17    you understand?

18             **MS. O'NEILL:**  Understood.

19             **THE COURT:**  Do you understand?

20             **UNIDENTIFIED ATTORNEY:**  Yes, Your Honor.

21             **THE COURT:**  All right.

22                        (Pause in proceedings.)

23             **THE COURT:**  I will let him know it's coming.  Anything

24    else you want to discuss today?

25             **MR. SCHMIDT:**  Not from our side, Your Honor.

1          **THE COURT:**  Anything from the Plaintiffs?

2          **MR. SCHMIDT:**  I do have one other issue.  I apologize.

3          **THE COURT:**  All right.  While you are making your way

4    forward, I did have one question that I would ask you.  I'm

5    presenting to the -- to all the MDL judges at our upcoming

6    conference on the nuts and bolts of MDL cases.

7          Would anybody like me to communicate anything to all these

8    judges?  Anything you would like us to know?

9                          (Laughter)

10         **THE COURT:**  If you have some great idea, let me know.

11   You had an issue?

12         **MS. MACHOCK:**  Yes, Your Honor --

13         **THE COURT:**  Your name.

14         **MS. MACHOCK:**  Samantha Machock from Wilson Sonsini on

15   behalf of the Google and YouTube Defendants.

16         **THE COURT:**  Okay, what's up?

17         **MS. MACHOCK:**  We wanted to speak with Your Honor about

18   our request in the case management statement for supplemental

19   briefing or further motion practice on the implications of the

20   Ninth Circuit recent decisions.

21         **THE COURT:**  I don't need it.  Denied.

22         **MS. MACHOCK:**  Your Honor, may I --

23         **THE COURT:**  No.  Denied.

24         **MS. MACHOCK:**  Okay.

25         **MR. SCHMIDT:**  Thank you, Your Honor.

1           **THE COURT:**  No, there is no one who wants to suggest

2    anything about litigating MDL cases?  Mr. Beisner, you talk to

3    the judges all the time.  I guess you have plenty of access?

4                           (No response.)

5           **THE COURT:**  All right.  Go ahead.

6           **MR. SCHMIDT:**  We on the Defense side really do believe

7    in the importance of giving MDL courts the opportunity to fully

8    consider Rule 702 expert challenges when they are made.  That

9    is an issue that the Defense regularly is concerned about.

10          **THE COURT:**  A quick question on that, just since it is

11   Friday at 4:30.

12          **MR. SCHMIDT:**  Only if I can give a Friday at 4:30

13   quality answer, Your Honor.

14          **THE COURT:**  So, in England there is a rule that

15   requires all experts to sign a certification that they

16   understand that they have an independent obligation to the

17   Court to be -- and I can find the exact words -- but basically

18   to be -- you know, honesty and integrity, kind of a Rule 11 but

19   for experts.  What do you think about that?

20          **MR. SCHMIDT:**  I think it's a nice idea.  I think on

21   the Defense side we feel like we see experts on the other side

22   who say one thing in court that varies from what they are

23   willing to say in their published works and their academic

24   work, and that's problematic from the Defense side.

25          **THE COURT:**  Well, I see it on both sides.

1          **MR. SCHMIDT:**  And I'm sure it happens on both sides.

2          **MS. HAZAM:**  I would agree, Your Honor -- Lexi Hazam

3    for Plaintiffs -- that it does happen on both sides, and I

4    would join my colleague is saying that I think that's a great

5    idea.  I am somewhat familiar with --

6          **THE COURT:**  Do you agree to do it in this case?

7          **MR. SCHMIDT:**  We would need to consult with our

8    clients.

9                         (Laughter)

10          **MR. SCHMIDT:**  I couldn't commit to that for all

11    Defendants.  We will consult with our client on that.

12          **THE COURT:**  All right.

13          **MR. SCHMIDT:**  That's a heck of a Friday at

14    4:30 answer.

15          **THE COURT:**  It is but you raised it.

16          **MR. SCHMIDT:**  Yes.

17          **THE COURT:**  So, I will put in my next order that goes

18    out the language of the English rule.

19          **MR. SCHMIDT:**  Okay.

20          **THE COURT:**  The very first MDL I received I had when I

21    was a state court judge, I had been using a form of conduct of

22    professional responsibility for lawyers, and I required the

23    lawyers to come up with their own agreed upon statement of

24    professional responsibility.

25      That agreement turned into the Northern District

 1   Guidelines For Professional Conduct.  It was written by the

 2   lawyers coming out of an MDL.

 3          **MR. SCHMIDT:**  Interesting.

 4          **THE COURT:**  I have been trying to get people to sign

 5   on to this idea on experts because I think it might help -- and

 6   Carl Shapiro, with whom I have had this conversation on the

 7   antitrust side -- I think it might help with some of the

 8   Daubert issues because there are times when it just -- you

 9   know, if people would just be a little more responsible, then

10   we could focus on the real issues.

11          And like I said, sometimes I have granted portions of a

12   Daubert but rarely on many big issues because you have got

13   experts on both sides who are -- you know, who are well known

14   in their sphere; but if I could have experts who would say,

15   "Yes, I have an obligation.  I am not just a hired gun but I

16   understand I have another responsibility and that is to not

17   defraud the Court," that might help.

18          So, I will put it out there.  Talk to your clients.  If

19   you would be willing to do it, that might help the profession

20   and the judiciary.

21          **MS. HAZAM:**  Thank you, Your Honor.  Quite willing to

22   consider that.

23          **THE COURT:**  Okay.  Enjoy your dinner.  Safe travels.

24   We are adjourned.

25          **MR. SCHMIDT:**  Thank you, Your Honor.

1                **MS. HAZAM:**  Thank you, Your Honor.

2           **THE CLERK:**  Court is adjourned.

3                 (Proceedings adjourned at 4:36 p.m.)

4                        ---oOo---

1
2
3                    **CERTIFICATE OF REPORTER**
4         I certify that the foregoing is a correct transcript
5    from the record of proceedings in the above-entitled matter.
6
7    DATE:    September 16, 2024
8
9
10
11    _____
12        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
         United States District Court - Official Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25