**Pages 1 - 200**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: SOCIAL MEDIA ADOLESCENT   )
ADDICTION/PERSONAL INJURY        )
PRODUCTS LIABILITY LITIGATION.   )
                                 )
                                 )    **NO. 4:22-MD-03047-YGR**
_____      )

                         Oakland, California
                         Friday, October 25, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
              LIEFF, CABRASER, HEIMANN AND BERNSTEIN
              275 Battery Street, 29th Floor
              San Francisco, CA 94111
         BY:  **LEXI J. HAZAM, ESQ.**

              MOTLEY RICE, LLC
              401 9th Street Northwest, Suite 630
              Washington, DC 20004
         BY:  **PREVIN WARREN, ESQ.**

              ANDRUS ANDERSON, LLP
              155 Montgomery Street, Suite 900
              San Francisco, CA 94104
         BY:  **JENNIE L. ANDERSON, ESQ.**

              LEVIN, SEDRAN AND BERMAN, LLP
              510 Walnut Street, Suite 500
              Philadelphia, PA 19106
         BY:  **MICHAEL M. WEINKOWITZ, ESQ.**

              COLORADO DEPARTMENT OF LAW
              1300 Broadway, 6th Floor
              Denver, CO 80203
         BY:  **BIANCA MIYATA, ESQ.**

(Appearances continued on following page.)

```
APPEARANCES (CONT.'D)

For Plaintiffs:
                    OFFICE OF THE ATTORNEY GENERAL
                    455 Golden Gate Avenue, 11th Floor
                    San Francisco, CA 94102
            BY:  MEGAN O'NEILL, ESQ.

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    1515 Clay Street, Suite 2000
                    Oakland, CA 94612
            BY:  JOSHUA E. OLSZEWSKI-JUBELIRER, ESQ.

                    BEASLEY, ALLEN, CROW, METHVIN,
                    PORTIS & MILES, PC
                    234 Commerce Street
                    Montgomery, AL 36103
            BY:  JOSEPH G. VANZANDT, ESQ.
                 CLINTON K. RICHARDSON, ESQ.

                    FLORIDA OFFICE OF THE ATTORNEY GENERAL
                    Consumer Protection
                    135 West Central Boulevard
                    Orlando, FL 32801
            BY:  DONNA C. VALIN, ESQ.

                    PENNSYVANIA OFFICE OF ATTORNEY GENERAL
                    Mezzanine Level, 1251 Waterfront Pl #201,
                    Pittsburgh, PA 15222
            BY:  JONATHAN BURNS, ESQ.

                    KESSLER, TOPAZ, MELTZER & CHECK, LLP
                    280 King of Prussia Road
                    Radnor, PA 19087
            BY:  TYLER S. GRADEN, ESQ.

                    COLORADO DEPARTMENT OF LAW
                    1300 Broadway Street
                    Denver, CO 80203
            BY:  SHANNON W. STEVENSON, ESQ.

                    NEW JERSEY DIVISION OF LAW
                    Data Privacy & Cybersecurity Section
                    124 Halsey Street, 5th Floor
                    Newark, NJ 07101
            BY:  KASHIF T. CHAND, ESQ.
                 THOMAS HUYNH, ESQ.

 (Appearances continued on following page.)
```

**APPEARANCES (CONT.'D):**

For Plaintiffs:

                NEW JERSEY DIVISION OF LAW
                25 Market Street
                Trenton, NJ 08611
        BY:  **VERNA J. PRADAXAY, ESQ.**

                OFFICE OF THE ATTORNEY GENERAL
                Kentucky State Capitol
                700 Capital Avenue, Suite 118
                Frankfort, Kentucky 40601
        BY:  **JACK HEYBURN, ESQ.**

                ARIZONA ATTORNEY GENERAL'S OFFICE
                Consumer Protection and Advocacy
                2005 North Central Avenue
                Phoenix, AZ 85004
        BY:  **NATHAN E. WHELIHAN, ESQ.**

                OFFICE OF THE ATTORNEY GENERAL
                165 Capitol Avenue
                Hartford, CT 06106
        BY:  **KRISLYN LAUNER, ESQ.**

                DELAWARE DEPARTMENT OF JUSTICE
                820 North French Street
                Carvel State Office Building
                Suite 5th Floor
                Wilmington, DE 19801
        BY:  **RYAN T. COSTA, ESQ.**

                OFFICE OF THE INDIANA ATTORNEY GENERAL
                Consumer Protection
                302 West Washington Street
                Suite IGCS, 5th Floor
                Indianapolis, IN 46204
        BY:  **CORINNE GILCHRIST, ESQ.**

                COOPER & KIRK, PLLC
                1523 New Hampshire Avenue, Northwest
                Washington, DC 20036
        BY:  **MEGAN M. WOLD, ESQ.**

(Appearances continued on following page.)

```
APPEARANCES (CONT.'D):

For Plaintiffs:
                    OFFICE OF THE ATTORNEY GENERAL
                    1885 North 3rd Street
                    Baton Rouge, LA 70802
              BY:   LONNIE C. STYRON, ESQ.

                    MARYLAND ATTORNEY GENERAL'S OFFICE
                    Saint Paul Plaza, 200 Saint Paul Place,
                    Baltimore, MD 21202
              BY:   PHILIP D. ZIPERMAN, ESQ.

                    NORTH CAROLINA DEPARTMENT OF JUSTICE
                    Consumer Protection Division
                    P.O. Box 629
                    Raleigh, NC 27602
              BY:   CHARLES G. WHITE, III, ESQ.

                    RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL
                    150 South Main Street
                    Providence, RI 02903
              BY:   STEPHEN N. PROVAZZA, ESQ.

                    SOUTH CAROLINA ATTORNEY GENERAL'S OFFICE
                    P.O. Box 11549
                    Columbia, SC 29211
              BY:   CLARK C. KIRKLAND, JR.

                    OFFICE OF THE ATTORNEY GENERAL
                    202 North 9th Street
                    Richmond, VA 23219
              BY:   JOELLE GOTWALS, ESQ.

                    WISCONSIN DEPARTMENT OF JUSTICE
                    Public Protection Unit
                    P.O. Box 7857, 17 West Main Street
                    Madison, WI 53707
              BY:   COLIN R. STROUD, ESQ.

                    OHIO ATTORNEY GENERAL'S OFFICE
                    615 West Superior Avenue, Suite 11th Floor
                    Cleveland, OH 44113
              BY:   KEVIN R. WALSH, ESQ.

    (Appearances continued on following page.)
```

```
APPEARANCES (CONT.'D):

For Plaintiffs:
                    WEST VIRGINIA ATTORNEY GENERAL'S OFFICE
                    State Capitol Complex
                    1900 Kanawha Boulevard
                    Building 6, Suite 401
                    Charleston, WV 25305
               BY:  ANN L. HAIGHT, ESQ.

                    BOIS, SCHILLER, FLEXNER, LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA 94104
               BY:  JOSHUA M. STEIN, ESQ.
                    NICHOLAS ANTONIO SANTOS, ESQ.
                    DILLON YANG, ESQ.

                    GIBBS LAW GROUP, LLP
                    1111 Broadway, Suite 2100
                    Oakland, CA 94607
               BY:  ANNA KATZ, ESQ.
                    TAYLER WALTERS, ESQ.

                    OFFICE OF THE ATTORNEY GENERAL
                    28 Liberty Street
                    New York, NY 10005
               BY:  KEVIN C. WALLACE, ESQ.

                    QUINN, EMANUEL, URQHART, OLIVER & HEDGES
                    50 California Street, 22nd Floor
                    San Francisco, CA 94111
               BY:  EMILY C. KALANITHI

                    OFFICE OF THE ATTORNEY GENERAL
                    445 Minnesota Street
                    St Paul, MN 55101
               BY:  CAITLIN M. MICKO, ESQ.

For Defendants:
                    COVINGTON AND BURLING, LLP
                    The New York Times Building
                    620 Eighth Ave
                    New York, NY 10018
               BY:  GREGORY L. HALPERIN, ESQ.
                    CHRISTOPHER YEUNG, ESQ.

(Appearances continued on following page.)
```

```
APPEARANCES (CONT.'D):

For Defendants:
                    COVINGTON AND BURLING, LLP
                    1999 Avenue of the Stars, Suite 3500
                    Los Angeles, CA 90067
           BY:  ASHLEY M. SIMONSEN, ESQ.
                ANSEL CARPENTER, ESQ.
                GAVIN W. JACKSON, ESQ.

                    COVINGTON AND BURLING, LLP
                    One CityCenter
                    850 Tenth Street, Northwest
                    Washington, DC 20001
           BY:  MICHAEL X. IMBROSCIO, ESQ.

                    MUNGER, TOLLES AND OLSON, LLP
                    560 Mission Street, 27th Floor
                    San Francisco, CA 94105
           BY:  JONATHAN H. BLAVIN, ESQ.

                    KING & SPALDING, LLP
                    1180 Peachtree Street Northeast, Suite 1600
                    Atlanta, GA 30309
           BY:  GEOFFREY DRAKE, ESQ.

                    WILSON, SONSINI, GOODRICH & ROSATI, PC
                    12235 El Camino Real
                    San Diego, CA 92130
           BY:  SAMANTHA A. BOOTH MACHOCK, ESQ.

                    COVINGTON AND BURLING, LLP
                    620 Eighth Ave
                    New York, NY 10018
           BY:  GREGORY L. HALPERIN, ESQ.

                    COVINGTON AND BURLING, LLP
                    1999 Avenue of the Stars, Suite 3500
                    Los Angeles, CA 90067
           BY:  ASHLEY M. SIMONSEN, ESQ.

                    MUNGER, TOLLES AND OLSON, LLP
                    560 Mission Street, 27th Floor
                    San Francisco, CA 94105
           BY:  JONATHAN H. BLAVIN, ESQ.

(Appearances continued on following page.)
```

**APPEARANCES (CONT.'D):**

For Defendants:

           KING & SPALDING, LLP
           1180 Peachtree Street Northeast, Suite 1600
           Atlanta, GA 30309
      BY:  **GEOFFREY DRAKE, ESQ.**

           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
           1440 New York Avenue, Northwest
           Washington, DC 20005
      BY:  **JOHN H. BEISNER, ESQ.**

           KING & SPALDING
           1700 Pennsylvania Avenue, Northwest
           Washington, DC 20006
      BY:  **DAVID P. MATTERN, ESQ.**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                   Official United States Reporter

1   **Friday, October 25, 2024**                          **9:01 a.m.**

2                      **P R O C E E D I N G S**

3                          ---o0o---

4        **THE COURT:**  Good morning, everyone.

5        **THE COURTROOM DEPUTY:**  Calling case 4:22-MD-3047-YGR,

6   In Re:  Social Media Adolescent Addiction Personal Injury

7   Products Liability Litigation.  The list of counsel making an

8   appearance will be attached to the minutes.

9        **THE COURT:**  Okay.  A lot to do today.  Given how much

10  we have to do, we may end up taking a break so that the court

11  reporter doesn't get mad at me and stop working.  We do have a

12  court reporter who is remote with us.

13       So earlier this week -- you may or may not know, I think

14  you probably do, you all are in the know -- the judges had our

15  annual MDL conference, and I always try to take a few things

16  away from that conference to help me better -- do a better job,

17  I hope.  We share a lot.  We learn a lot.  And so we're going

18  to talk about some ideas, changes, decisions with respect to

19  that issue.

20       The first is, in preparation for these proceedings, I

21  always read your joint case management statement and request

22  for an agenda, and I understand from your MDL colleagues that,

23  in general, the process is a disaster.  That everybody wants to

24  say their peace, that people want to relitigate, that it takes

25  hours and hours and hours to do, which is a total shame,

1    because I think I give you all, generally speaking, an

2    opportunity to say your peace.

3        All I'm really looking for is an agenda, the basic outline

4    of what it is you need to discuss, so that I can discuss it

5    with you, not so that I can read it.  If any of you ever go to

6    trial with me, you will learn that before the jury enters the

7    courtroom, the first thing we do is people go to the mics and

8    they give me their list of issues.  I don't want argument, I

9    don't want statements, I just want the list so that I can

10   figure out what's the most important thing to talk about.  We

11   have a limited period of time.  We start with the most

12   important, and if we don't get to the bottom, then we talk

13   about it after the jury leaves.

14       That's the point of the statements, to give me the list of

15   basic issues.  Maybe a paragraph on a perspective so that I can

16   think about it before I get to the bench.  But what I did when

17   I learned, because I didn't realize that this was such a

18   problem, the following is going to happen from now on:

19       First page of that statement should be an agenda for the

20   day.  I want one page, one page that gives me the update on

21   JCCP and discovery.  One page.  Why?  Because I talked to Judge

22   Kang.  I talk to Judge Kuhl.  I don't need your views in more

23   than one page.  And then you each get five pages, that's it.

24   Each side gets five pages.  I don't care what you put in there.

25       And like 403 motions in limine, you have time limits.  So

1    I generally deny most of those motions.  You can take a note

2    for trial.  It's repetitive.  Okay, if they want to use their

3    limited number of hours to give repetitive evidence, that's up

4    to you.  You get five pages, that's it.  So 12 pages.  Two

5    pages are already telling me what you have to do, and then you

6    get five.

7         Do not repeat things that you've already told me.  If

8    there's something in a prior CMC statement, I don't need a

9    two-line reference to the docket.  I have all the CMC

10   statements.  Just give me the date, CMC statement from

11   November 22nd, Docket Number X.  I can find it.  Don't repeat.

12   I am hoping that that will save you all a bunch of time.

13        The other thing I did, and I do not want to embarrass any

14   of you because you're all good lawyers, I redlined your last

15   CMC statement, and I'm going to send the redline to liaison

16   counsel by e-mail, and you can see how much stuff is in there

17   that I really didn't need to hear again or need to know.  I

18   just need the headline.  That's all I need.  I think at one

19   point I got a really nice, succinct paragraph on an issue from

20   the defense.  That's all I needed.  I did not need the four

21   pages that followed.  Why?  Because I can ask you about it,

22   which is much more informative to me.  Okay?

23        There are some other ideas that we'll talk about later,

24   but that is the first one.

25        There is a stay order that was mentioned in there about

1  plaintiffs with Discord and Roblox.  Where are we on that

2  issue?

3          **MR. WARREN:**  Your Honor, my understanding is that the

4  plaintiffs --

5          **THE COURTROOM DEPUTY:**  Can you please state your

6  name?

7          **MR. WARREN:**  Thank you for the reminder.  Apologies.

8  Previn Warren for the personal injury and school district

9  plaintiffs.

10      My understanding, although I wasn't personally involved in

11  the discussions, is that the personal injury plaintiffs who

12  have claims against those defendants and counsel for those

13  defendants have agreed to a stay.

14          **THE COURT:**  Well, that's what I read.

15          **MR. WARREN:**  Yeah.

16          **THE COURT:**  But I thought they were going to give me

17  an order to be issued, or is that not -- so if I don't have to

18  issue an order, that's fine.  I thought I needed to issue an

19  order.

20          **MS. SIMONSEN:**  Ashley Simonsen, counsel for the Meta

21  defendants.

22      Your Honor, as we stated in the statement, the defendants

23  were not consulted on this stipulation.  We would want the

24  opportunity to confer with the other parties, namely plaintiffs

25  and Discord and Roblox about any stipulation that they'd like

1    to put before Your Honor, and we stated that in the CMC

2    statement.  So I hope we'll be included in those conferrals.

3        I do want to note that even it was cases are stayed as to

4    Discord and Roblox, while we're not taking any position now as

5    to whether we will need discovery from those defendants, there

6    are bellwether plaintiffs that have asserted claims against the

7    four main defendants.  We've also asserted claims against

8    Discord and Roblox.  And so there may be a need for some

9    discovery, and we simply would want to make sure that any stay

10   would not impact our ability to take any discovery that we

11   need.

12            **MR. WARREN:**  Sounds like the parties should meet and

13   confer.

14            **THE COURT:**  Sounds like it.  Okay.

15            **MR. WARREN:**  Thank you, Your Honor.

16            **THE COURT:**  I'll just make a note, more to come.

17       On the bellwether issue, I have talked to all of the

18   district judges, all of the district chief judges and all of

19   the circuit judges, and everyone has agreed that I can go to

20   those various places to try those cases.  They've been quite

21   gracious.  There's still a lot of paperwork that needs to be

22   done.  The chief still needs to agree.  But we're making

23   progress, which is all I wanted to let you know.  So, and I've

24   told all of them I don't know that they will ultimately be

25   chosen, but to the extent that they are, I've got terrific

1    cooperation with my colleagues.  Okay?

2        Okay.  With respect -- do I have -- I issued an order on

3    the Attorney Generals' claims.  The Montana claims were on the

4    sideline.  Where are we?  Have you met and conferred on that?

5    I see someone coming to the mic.

6        Yes.

7            **MS. WOLD:**  Your Honor, I'm Megan Wold on behalf of

8    the State of Montana.

9        Montana reached out to Meta to meet and confer in advance

10   of today's conference, but we didn't hear back from them.  It's

11   our position that Your Honor's order would apply equally in

12   Montana, so I think if Meta disagrees with that it would be up

13   to them to say so.

14       Your Honor had mentioned one of the status conferences in

15   March of this year.  The order to show cause procedure that

16   you've used in the past, that would certainly be acceptable to

17   Montana.

18           **THE COURT:**  Okay.  Is there some view from Meta that

19   it doesn't apply to Montana?

20           **MS. SIMONSEN:**  Your Honor, we intend to get back to

21   Montana I think today on this.  And I'll be candid with Your

22   Honor that I don't -- I am not the person who has our precise

23   position on this at the moment.  But I assure Montana, we will

24   get back to you promptly, and we can commit to do that today.

25           **THE COURT:**  Okay.  I want to know what the answer is.

1    If I can -- any process I can avoid, I try to avoid.

2         **MS. SIMONSEN:**  Understood.

3         **THE COURT:**  So you have -- today is the 25th.  So

4    file your position by November 1st, if we can -- so you get one

5    week.  Obviously if I don't have to -- I don't know why it

6    wouldn't apply, and if we can just get that in writing, then we

7    can move forward.  Okay?

8         **MS. SIMONSEN:**  I think that's right, Your Honor.  And

9    we'll probably be able to do it sooner than that.

10        Thank you.

11        **THE COURT:**  Thank you.

12        **MS. WOLD:**  Thank you, Your Honor.

13        **THE COURT:**  All right.  Let's talk about expert

14   discovery.  Who's speaking on the defense side on the topic?

15        **MR. IMBROSCIO:**  Your Honor, Michael Imbroscio form

16   Covington & Burling for Meta.

17        **THE COURT:**  Okay.  Ms. Hazam, can you state your

18   appearance?

19        **MS. HAZAM:**  Lexi Hazam on behalf of plaintiffs.

20        **THE COURT:**  Okay.  This MDL is not Judge Kuhl's case.

21   And I don't mean it in the sense of who's presiding, I mean it

22   in the sense of scope and complexity, and I'm not changing my

23   process to match hers.  And by the way, she knows that.

24        What I will do -- well, and let me say also, the

25   California Code of Civil Procedures has requirements that she

1   must follow, and I'm not bound by that structure, and I won't

2   use that structure when I don't think it's appropriate.

3        In this case -- and I believe the reason that Judge Kuhl

4   is moving quickly on causation is because she has the same

5   concerns.  In this case causation is another hurdle for

6   plaintiffs.  So she wants to resolve -- I mean, you know, on

7   her end if it can't get that hurdle, it's off to the court of

8   appeal.  Here, until -- it seems to me until you -- I don't

9   know what your experts are going to say about causation.  And I

10  raise causation at the very beginning, as I believe Judge Kuhl

11  did, as well.

12       So I don't want expert reports that speak past each other.

13  While it may be --

14       Turn off the phone, whoever's phone is on.

15       While it may be that the California process requires

16  simultaneous expert reports -- and by the way, I order them all

17  the time.  I frequently order simultaneous reports when I think

18  it's appropriate.  Here I do not, because I want to know what

19  it is the plaintiffs are prepared to have experts say, and then

20  I need a response from the defendants.  So I don't want them

21  guessing what it is your experts are going to say, I want them

22  to respond to what your experts are saying.

23       Now, if you want to forego a reply brief or a reply

24  report, that could shorten the process.  Do you want to do

25  that?

1          **MS. HAZAM:**  We do not, Your Honor.

2          **THE COURT:**  Okay.  I didn't think you would.  I

3    wouldn't if I was in your shoes.  So the most that I'm willing

4    to do is the following.

5          I looked at your schedule again, and in the schedule, from

6    the time the reports are due, defendants have seven and a half

7    weeks to respond.  The reply is due three weeks after that.  I

8    am prepared to change this order to say we'll keep our own

9    deadlines but to expand it to say, or seven weeks after the

10   filing of the report.  So if you can get your expert report out

11   instead of in May, in April, or in March, or in February, then,

12   by definition, the defense will have to respond sooner.

13         And it can be rolling.  You get the most -- so does the --

14   yeah, you're on the -- you're on the screen with your eyebrow

15   raised.

16         **MR. IMBROSCIO:**  I'm sorry.

17         **THE COURT:**  That's okay.  Everybody knows you had a

18   question.  You don't understand what I mean by that, so let me

19   explain.  And that's why I don't like.  I think Zoom's better

20   or in person.

21         **MR. IMBROSCIO:**  Thank you, Your Honor.

22         **THE COURT:**  You say you're going to have 20 experts.

23   Right?

24         **MS. HAZAM:**  Approximately, yes, between all of the

25   plaintiffs.  And that includes general and case specific.

1          **THE COURT:**  Okay.  So you also said that it was I

2    think 50-50.  So about 10, then, for general causation.

3          **MS. HAZAM:**  General liability experts, which is

4    general causation, but also additional topics.  Anything that

5    is not case specific, Your Honor.

6          **THE COURT:**  Okay.  Are you going to have -- how many

7    experts are you going to have on causation, general causation?

8          **MS. HAZAM:**  I understand the question.

9      I would estimate in the arena of five to six for the

10   private plaintiffs, meaning the personal injury and school

11   district plaintiffs.  The AGs may have additional experts that

12   may not technically be characterized as general causation, but

13   may be similar.  They could speak to that.

14         **MS. MIYATA:**  Bianca Miata for the state AGs.

15     That's correct, Your Honor.  I believe in addition to

16   those five to six general causation experts that Ms. Hazam

17   mentioned, the AGs would have an additional three is my

18   estimate.

19         **THE COURT:**  Okay.  People may want to file lots of

20   *Daubert*s.  As you know, my rule only allows for three.  I

21   understand the perspective of the defense that they don't think

22   it's enough.  I can tell you that many of my colleagues, their

23   rule is you prioritize your *Daubert*s, and the first one that is

24   denied, we stop.  That is, as soon as you get a denial, we

25   don't look at any other ones.  Thought that was an interesting

 1    approach.  Forces you to really focus on what's important.

 2        But the general causation issues are going to be -- are

 3    going to be critical.  So to the extent that you can focus on

 4    getting those reports out, then if there are nothing there --

 5    and I'm sure that the defense is going to say there is

 6    something there -- then we can advance briefing and we can move

 7    this thing faster.  So, you know, I don't know how much

 8    discovery they need to issue those opinions.  There is

 9    certainly a lot of discovery already out there.  They obviously

10    have views already.

11        So, you know, this can get advanced, but we are going to

12    do it in a manner in which I've structured this.  So, or at

13    least I should say that's my going-in position.

14        Does anybody wish to be heard?

15        **MS. HAZAM:**  Plaintiffs wish to be heard, Your Honor.

16        We understand the Court's instructions and will abide by

17    them.  I want to make clear that we negotiated the prior

18    schedule in good faith at the time, and that of course included

19    the staggered disclosures that Your Honor refers to, and we

20    understand that Your Honor would like to keep that structure.

21    We --

22        **THE COURT:**  And let me also say, even if you had

23    advocated for it differently at the outset, I wouldn't have

24    agreed, because I don't think it's appropriate in this case.

25        **MS. HAZAM:**  Understood, Your Honor.  And we

1    appreciate that feedback.

2        We made suggestions for certain changes, not solely

3    because the JCCP court asked us to consider it and consult with

4    one another and then with Your Honor, but also because we

5    thought that there were certain aspects of what the JCCP court

6    was trying to achieve that would serve this MDL well also.

7        So, for example, getting to the possibility of a *Daubert*

8    hearing earlier was something that Your Honor had indicated

9    previously might be helpful to the Court.

10        **THE COURT:**  And under my approach, we can.  It's

11    really in your hands.

12        **MS. HAZAM:**  Understood, Your Honor.  I appreciate the

13    opportunity to see if we can move some of this up.

14        The other component of the JCCP schedule that we thought

15    was helpful and worth consideration, at least here, was the

16    selection of the trial pool of bellwethers at an earlier date

17    prior to the expert reports, which is the manner in which it's

18    being done in the JCCP, because that likely will result in

19    fewer expert reports and allow the schedule to proceed faster.

20    So it would be on the basis of fact discovery only.

21        We had proposed a date of March 28th for that, which is

22    just prior to the close of fact discovery.  We currently have a

23    full 24 bellwether plaintiffs in the pools, 12 in each category

24    of personal injury plaintiffs and school district plaintiffs.

25        **THE COURT:**  And that's a separate issue, so let's put

1    that one to the side.  Do you all wish to be heard on the

2    schedule with respect to general causation?

3            **MR. IMBROSCIO:**  Yes, Your Honor, briefly.

4        In general that seems fine to us.  I think there can

5    sometimes be a definitional issue which we talked about today

6    between what is science general causation versus general

7    liability.  As long as they're willing to put forth all of

8    their science general causation witnesses together, then we

9    will respond in seven weeks.

10       The reason I raised my eyebrow earlier, and I apologize,

11   is we don't want to get half of their general causation people

12   and then the next half comes on the deadline.  As long as it's

13   done at the same time, I think we can make that work.

14           **THE COURT:**  Well, I don't know ... well, I don't know

15   who they are.

16           **MR. IMBROSCIO:**  Neither do we.  Yeah, yeah.

17           **THE COURT:**  And so it's hard to have a rule.

18       Let me also say this.  Nine -- well, I don't know how

19   you're going to split them out.  You have five to six on

20   general causation for one group, three on the other.  The five

21   to six, are they three with respect to private plaintiffs and

22   three with respect to school districts, or are they intended to

23   be across the board of all the sets?  And I ask that for a

24   couple of reasons:

25       One, an AG case would be tried separately, a personal

1    plaintiff case would obviously be tried separately, and a

2    school district case would be tried separately.  What I tend to

3    not allow are multiple experts who are saying the exact same

4    thing.  So know now that you will not be allowed at trial to

5    have multiple experts who are duplicative of each other.

6         Now, if they come to it from a different perspective,

7    that's not duplicative.  So duplicative is, you know, people

8    with the same background.

9         Mr. -- how do I say your name again?

10            **MR. IMBROSCIO:**  Imbroscio, Your Honor.

11            **THE COURT:**  Imbroscio.

12            **MR. IMBROSCIO:**  Thank you.

13         **THE COURT:**  So I don't want to get a motion that

14    we've got duplicative experts because they all agree causation

15    exists; denied.

16            **MR. IMBROSCIO:**  Of course.  Understood.

17         **THE COURT:**  Okay.  You say "of course," but I have

18    lawyers giving me law professors as experts on elements of

19    claims, and they don't understand that that's not an -- that

20    law professors can't be -- opine on the application of class

21    certification to a case.  So I just want to be really clear.

22            **MS. HAZAM:**  Your Honor, if I may?

23         **THE COURT:**  Yeah, so I don't know how you've -- I

24    don't know what perspective any of these folks are coming from.

25    I don't know if you're still in the process of working this out

1    or what, but it's hard for me to say -- yeah, it's hard for me

2    to do this in a vacuum.

3            **MS. HAZAM:**  Understood, Your Honor.  I think it's

4    challenging perhaps for all of us at this stage, but I would

5    say that Mr. Imbroscio's comments with regards to the Court's

6    proposal that you could have some reports come in earlier than

7    the required deadlines and be on a rolling basis suggests to me

8    that, in fact, defendants' position is going to be that all

9    expert reports other than specific causation reports that are

10    specific to particular bellwethers would have to come at the

11    same time, which I think would defeat, to some extent, the

12    Court's purpose.

13            I do understand that if it is a, what we would call a core

14    general causation expert, that those, it may make sense to have

15    all of them, coming from their different perspectives, without

16    duplication, at once.  But I don't know that that automatically

17    carries over to other kinds of general liability experts, and

18    it may be that some subset of that, whether it's all the

19    general causation at once or it's some of the other experts,

20    could be done on a rolling basis.  I think that's difficult for

21    all of us to specify now, but I do believe there should be

22    openness to a discussion of exactly what the Court has

23    proposed, which is you don't have to have all of the general

24    liability expert reports at the same time.

25            **THE COURT:**  Yeah.  So, again, I don't know.  Right?

1    We're in October, and these reports are not due under the

2    current scheduling order until --

3                **MS. HAZAM:**  May 16th, Your Honor, the opening

4    reports.

5                **THE COURT:**  Okay.  So it would be -- I mean, I guess

6    what I'd like to know is when is it -- if I asked you to

7    disclose the names and general area upon which someone was

8    going to opine, when could you be ready to disclose that?

9                **MS. HAZAM:**  I think we'd have to confer with one

10   another and with the AGs also about that timing.

11       It also depends, Your Honor, on the progress in fact

12   discovery.  We believe, the plaintiffs believe, that in this

13   case much of the evidence regarding causation issues is with

14   the defendants.  And while we are approaching the close of

15   document discovery, the substantial completion date, we are

16   going to see many thousands, hundreds of thousands of documents

17   produced at the end.  And then we have very important witnesses

18   that speak to these issues, and scheduling their depositions is

19   not entirely within plaintiffs' control.

20       One of the concerns we had about contemplating general

21   causation happening before the close of fact discovery, would

22   be that there would be depositions after reports that are

23   relevant to those topics and that could incentivize some

24   gamesmanship in such scheduling.  So we're --

25                **THE COURT:**  Look, the way we can deal with that in

terms of gamesmanship is that, like we do, or at least like I

do in class certification cases, I do allow a short period of

time for experts to kind of amend the -- not the core opinions,

but perhaps amend the basis for the opinions that may get

bolstered because something comes up after the fact that is

consistent with their view, so that they are not precluded at

trial from testifying as to that fact.

So that can be done without stopping a, you know, the

progress of getting their core opinions out based upon what

they have, so that we could achieve an earlier, you know,

earlier hearings as to the *Daubert*s.

**MS. HAZAM:**  Understood, Your Honor.  And we

appreciate that point.  And if we are able, in our estimation,

to accelerate the initial reports at all, we may be seeking

exactly that accommodation.  But I think we need to meet and

confer to determine when we might be able to make a, I think,

identification disclosure along the lines of what Your Honor is

suggesting, and whether we could do earlier reports than

May 16th.  It may be that we don't believe we can and that we

just stick with the current schedule, but we appreciate at

least that opportunity to see if things can be accelerated, and

we'll explore that and also explore how that may assist in

avoiding experts sitting for multiple depositions in the way we

were seeking to in coordinating with the JCCP.

But we understand Your Honor's instructions.

1          **THE COURT:**  Okay.  That's fine.  If, in the JCCP, one

2     of these experts has already issued a report -- well, actually,

3     do they -- are they going to issue a report?

4          **MS. HAZAM:**  So it's a good question, Your Honor.

5          I think the JCCP -- and there are counsel for the JCCP

6     here who could speak to this, as well, but I believe their

7     intent is to propose to Judge Kuhl that simultaneous initial

8     reports be on May 2nd, which is what we proposed in our latest

9     recommendation to the Court and would be prepared to live with,

10    even if reports are staggered in the MDL.

11         So we would be striving for the same date that the JCCP

12    plaintiffs are seeking for initial reports, understanding that

13    the current deadline from the Court is two weeks later, on

14    May 16th.

15         **THE COURT:**  Okay.  All right.  Well, we have -- we

16    still have time to figure this out.

17         **MR. IMBROSCIO:**  If I may very briefly, Your Honor.

18         Just I think I've tried to be clear earlier.  I am not

19    conflating general causation science witnesses with general

20    liability conduct witnesses, or however it may be, they can be

21    spread across.  My only point was for the ones that are going

22    to come in and say there's general causation, from a science

23    perspective it should be done in the same cycle I guess is all

24    I was suggesting.

25         **THE COURT:**  Well, the reality is that even based upon

1    what I've said, they're only -- they're only seeking to move it

2    up two weeks.  They would just like your reports at the exact

3    same time.  And I'm not -- I don't think that's appropriate in

4    this case.

5            **MR. IMBROSCIO:**  Fair enough.  And you won't be

6    surprised to hear that we will probably not agree to that

7    suggestion in the JCCP.

8            **THE COURT:**  Okay.  We talked a little bit a moment

9    ago about -- let's talk about the bellwethers.  And, you know,

10   when we had what I would call a revolving door with respect to

11   those four slots on the *Lexecon* issue.  You know, I asked

12   whether it would make a difference to the parties if I agreed

13   to try them, so that way you get consistency across various

14   jurisdictions.  Really, it's a difference in jury pools and

15   things like that, because bellwethers are there to give you

16   information.  So to the extent that we can get information

17   through these trials, that's -- that was the manner in which I

18   obviously, you know, stopped the cycle of the merry-go-round

19   for those four seats.

20       But it then occurred to me the other problem that I

21   frequently hear happening in MDLs is that you get all the way

22   to trial, bellwethers are selected, and at the last minute,

23   plaintiffs dismiss or defendants pick off plaintiffs with big

24   settlements.  So what I'm going to tell you now is, again, an

25   approach to help stop some of the gamesmanship.  I will only

1    try trials in pairs:  One defense case, one plaintiffs' case.

2    The plaintiffs will not get multiple cases at the expense of a

3    defense case.  Okay?

4        So if we're trying four cases:  Defense, plaintiff,

5    plaintiff, defense.  That's the way they'll be tried.  And if

6    you run out, then you run out.

7            **MS. HAZAM:**  May I ask a question to clarify it, Your

8    Honor?

9            **THE COURT:**  You may.

10           **MS. HAZAM:**  Is it Your Honor's intent that these

11   cases would be tried together in a single trial, or is Your

12   Honor --

13           **THE COURT:**  No.

14           **MS. HAZAM:**  -- just speaking of ordering?

15           **THE COURT:**  I'm talking about ordering.

16           **MS. HAZAM:**  Would Your Honor mind restating the order

17   that you have in mind?  Is it just alteration, or did you mean

18   to identify the first --

19           **THE COURT:**  I actually -- so for every four --

20           **MS. HAZAM:**  Yes.

21           **THE COURT:**  -- defense goes first, then plaintiff,

22   then plaintiff again, and then defense.  I guess I could do

23   plaintiff, defense, defense, plaintiff, but it's going to be

24   one of the two.

25           **MS. HAZAM:**  Understood.

1          So these are four consecutive trials?

2               THE COURT:  Correct.

3               MS. HAZAM:  And the idea is to have equal

4     representation of plaintiff and defense picks.

5               THE COURT:  Correct.  And if you start buying people

6     off or dismissing because you found you didn't have a good

7     plaintiff, it's on you, but you won't get your bellwethers at

8     the expense of the other side.

9               MS. HAZAM:  Understood, Your Honor.

10         And plaintiffs have no issue with that arrangement.  I

11    don't know if the Court intends today to determine which side's

12    pick would be first in this sequence.

13              THE COURT:  No, I don't.

14              MS. HAZAM:  Okay.  Thank you.

15              THE COURT:  And I will probably pick it myself

16    depending ultimately on the cases.  So I'm just letting you

17    know now that this is one of the ways in which I intend to help

18    with the gamesmanship that I understand from my colleagues

19    happens routinely in these MDLs.

20              MR. IMBROSCIO:  We have no objection.  That seems

21    like a perfectly appropriate way to deal with it.

22              THE COURT:  I know.  See, I have the best products

23    liability lawyers in the courtroom, and so I know there aren't

24    going to be any of these issues with y'all, but just in case.

25    Trust, but verify.

1          **MS. HAZAM:**  Understood, Your Honor.

2          **THE COURT:**  Okay.  You couldn't agree on expert

3    witness certifications.

4          **MS. HAZAM:**  Your Honor, if I may just briefly before

5    we leave the schedule.

6          **THE COURT:**  Go ahead.

7          **MS. HAZAM:**  And if Your Honor isn't prepared to

8    address this today, it's fine.

9          But we would like at some point to talk about the

10   possibility of having the winnowing to the trial pool earlier,

11   at the close of fact discovery versus partway through expert

12   reports, in part to reduce the expert report burden and perhaps

13   allow that schedule to go more quickly.  That's the way it is

14   being done in the JCCP.  Of course, that does not dictate

15   things here, but we think it would be appropriate.

16         **THE COURT:**  My -- again, the reason that I put that

17   schedule together is because I think causation matters.  And in

18   terms of -- if cases are picked for bellwethers before people

19   know what the experts are going to say about those individuals,

20   it could, I think, inappropriately skew the bellwethers.  So I

21   understand that there is a cost, but given how critical it is,

22   and I don't know what your experts are going to say, I am not

23   inclined without more understanding of how you're going to deal

24   with causation, frankly.

25         So I just ... yeah.

1          **MS. HAZAM:**  Understood, Your Honor.

2      There are a total of 24, 12 in each group.  We were not

3  suggesting that we get to the ultimate size of the trial pool

4  necessarily prior to expert discovery or prior to at least

5  specific case expert discovery, but we do think that those

6  pools could be reduced somewhat, for example, from 12 down to

7  eight in each category, through a process that seems fair that

8  involves input of both sides.  And then the pools could shrink

9  further based on those expert reports.

10          **THE COURT:**  Okay.  Thoughts?

11          **MR. IMBROSCIO:**  I think one of the challenges is what

12  you said when this first came up a few months ago, which is

13  having the -- what the plaintiffs' specific causation expert is

14  going to say will inform the judgment as to which are the best

15  plaintiffs to pick in the bellwether.  So we would suggest

16  keeping the schedule as it is.

17          **THE COURT:**  Okay.  I will look at it again.  And I

18  don't think that a reduction is necessarily a bad idea if the

19  other ones are kind of held in abeyance.  But again, to stop

20  some of the gamesmanship, perhaps what I would do is -- and I

21  don't want to commit to it right now, but perhaps I could have

22  a process which would say, okay, here -- you know, here is the

23  pool.  Each of you give me six strikes.  The other side doesn't

24  know.  And if it matches and you all -- then you both in a

25  sense agree.  And I might put some parameters around that so

1    that you're not just striking, you know, the other side's

2    folks.  You know, then it would be appropriate where there's

3    agreement to put those on the side.  I'd have to think about

4    it.

5              **MS. HAZAM:**  Plaintiffs would be amenable to such a

6    process.

7         Our proposal is not to have this become in any way

8    one-sided, it's just to have a small reduction to reduce the

9    burden and be able to move faster.  So our proposal is not that

10   we unilaterally in any way determine those that would be

11   removed from the pool.

12             **THE COURT:**  Yeah.  Or ... yeah.

13             **MR. IMBROSCIO:**  One challenge that I can see in that

14   is the cross-strikes make sense when the original set was

15   chosen randomly.  When they're chosen the way they were we may

16   end up in a situation that you anticipated, which is we're

17   going to strike theirs, they're going to strike ours.

18             **THE COURT:**  Well, not if I say you can't.  That's my

19   point.  If I say you can strike -- well, maybe I -- I don't

20   know.

21             **MR. IMBROSCIO:**  It's a tricky issue.

22             **THE COURT:**  Right.

23        Maybe I say ... you know, maybe I'll have you rank them,

24   give me your ranking.  So I -- let me think on it.

25             **MR. IMBROSCIO:**  We will.

1          THE COURT:  Because -- and if you all can agree on a

2   process that's fine, but I do think it benefits everybody to

3   have fewer, right, the cost of having fewer experts on both

4   sides.  The question is:  How do we get there in a way that

5   leaves us with a pool that is -- that will actually give

6   information.

7          MS. HAZAM:  I think we'd be happy to meet and confer

8   with that in mind, Your Honor.

9          THE COURT:  So I'm happy to be creative, I just don't

10  know how we get there yet.  And I ... so we need to think about

11  it.

12      Okay.

13          MR. IMBROSCIO:  If I may before I sit down, I just

14  wanted to -- Mr. Schmidt wanted to pass along his apologies.

15  He's in a deposition, and I'm a poor substitute for my good

16  friend.  But he wanted to pass that along.

17          THE COURT:  Well, I'm sure he's having lots of fun.

18          MR. IMBROSCIO:  So I've heard.

19          THE COURT:  Okay.  On expert witness certification.

20  So clearly defense proposal, Subsections C and D, are no-goes.

21  I'm not going to force people to do something that's not

22  required by the rule.

23      One interesting thing that the defendants noted in their

24  statement that I -- that I will share with you.  While the

25  federal rules allow judges to have experts, especially in

```
 1  antitrust cases, we all pretty much agreed that we don't,
 2  because experts come to the table with perspectives, and
 3  frequently experts have perspectives that either comport with
 4  the defendants' view of the world or the defense view of the
 5  world.  And so just getting your own expert doesn't really
 6  help, because that person's view may be skewed.  So it's better
 7  to just let the experts battle it out.  That's why we tend not
 8  to do that.  It just adds.  It adds another layer, and you
 9  just, you know, you're trying to be as neutral as possible.
10      It does look like there is some measure of overlap between
11  plaintiffs' view and defendants' view, so what I'd ask each of
12  you to comment on is what is objectionable about the other
13  side's approach.
14      So either one of you can start.
15          MR. WARREN:  I'm happy to go first.  Previn Warren
16  for the personal injury and school district plaintiffs.
17      I am not sure there is a lot of daylight between Items 1
18  and 2 in our list and Items A and B in defendants' list.  I
19  think it may just be a question of -- largely of verbiage.  So
20  might I propose that perhaps the parties could meet and confer
21  to align those two statements and come up with a draft
22  certification that each side's experts would have to sign, and
23  I believe that we'd be able to do that.
24          MR. BLAVIN:  I agree with that, Your Honor.
25          THE COURT:  Excellent.  Okay.
```

```
 1          (Reporter clarification.)
 2              THE COURT:  Oh, yes.
 3              MR. BLAVIN:  Apologies.  Jonathan Blavin on behalf of
 4   Snap.
 5              THE COURT:  Thank you.  Okay.  Terrific.
 6              MR. WARREN:  Thank you, Your Honor.
 7              THE COURT:  Okay.  Let's go ahead now and move to the
 8   arguments on Judge Kang's order.
 9              MS. STEVENSON:  Good morning, Your Honor.  I'm
10   Shannon Stevenson, Solicitor General for Colorado, on behalf of
11   the state AGs.
12              MR. HALPERIN:  Good morning, Your Honor.  Greg
13   Halperin for the Meta defendants.  I've got several colleagues
14   with me, as well, depending on whether Your Honor wishes to
15   hear state-specific argument, but I'll be handling the general
16   argument.
17              MS. STEVENSON:  And, Your Honor, with respect to the
18   state --
19              THE COURT:  You said Halperin?
20              MR. HALPERIN:  Halperin, yes.
21              MS. STEVENSON:  Your Honor, we have 21
22   representatives from the state attorneys general here; three of
23   us who have divided up the common argument portions, and then
24   the remainder who are happy to address their state-specific
25   issues and any questions you might have on those.
```

1      **THE COURT:**  Okay.  Well, let's first talk about the

2  standard of review, because the standard of review is critical,

3  and I think the states got it wrong.

4      **MS. STEVENSON:**  Your Honor, certainly we are acutely

5  aware of the deference that Your Honor gives to the magistrate

6  judges.

7      **THE COURT:**  It's not me, it's the statute.

8      **MS. STEVENSON:**  Right.

9      **THE COURT:**  Title 28, Section 636(b)(1)(A) and Rule

10  72 explicitly say, explicitly say that the standard refers to

11  clearly erroneous and contrary to law.  It is not a de novo

12  standard, this is not a dispositive motion, and there is no

13  basis for the AGs to make an argument that it should be.

14      So start there.

15      **MS. STEVENSON:**  Right.

16      We believe, Your Honor, that the order is contrary to law,

17  contrary to binding Ninth Circuit precedent in *Citric Acid*.

18      **THE COURT:**  I need you to explicitly acknowledge that

19  this is not a de novo standard.

20      **MS. STEVENSON:**  Yes, Your Honor.

21      I think there -- when you get to certain questions of law,

22  it's reviewed de novo versus, you know, as would be compared to

23  a clear --

24      **THE COURT:**  What does the statute say?

25      **MS. STEVENSON:**  Your Honor, we understand it is

1    contrary to law, and I believe that's the argument that we've

2    set forth and that we're prepared to make today, that it's

3    contrary to the binding precedent found in the *Citric Acid*

4    test.

5           **THE COURT:**  And you understand that you referenced a

6    de novo standard in your reply brief.

7           **MS. STEVENSON:**  I accept your representation on that,

8    Your Honor.

9        I do think it is a little bit tricky when you're trying to

10   ask the Court to review and interpret statutes how you approach

11   that, and when you're looking at a legal issue it's different

12   than looking at a factual issue, and I think that's probably

13   what we were talking about.  But we certainly understand that

14   the hurdle that we have to get over here is to show that the

15   magistrate's order was contrary to law.

16          **THE COURT:**  Response?

17          **MR. HALPERIN:**  We certainly agree, Your Honor, that

18   the standard is contrary to law.  We think it's very clear from

19   the Court's order and from the parties' briefing that the test

20   for control isn't disputed; that Judge Kang applied the test

21   for control, and that he really made at least four fact-based

22   determinations that were critical to which Judge Kang held in

23   this case.

24       He looked at who were the parties in the case, who were

25   the parties suing on behalf of.  That's a fact-based

1    determination.

2        He looked at:  Are the AGs going to represent these

3    agencies?  He asked the AGs, will you represent the agencies in

4    question.  That's a fact-based determination.

5        He asked:  Are you asserting privilege over your

6    communications with those agencies?  Another fact-based

7    determination.

8        And he asked, fourth:  Are there financial interests of

9    the agencies and the attorneys general in common under these

10    specific circumstances?  Another fact-based determination.

11        On top of that, he applied his discretion to control the

12    matter of discovery consistent with Rule 1, which he has broad

13    discretion to do.

14        So based on all of those facts, based on the totality of

15    the circumstances, we do believe that the standard is not de

16    novo review.  The standard is did he clearly err or make

17    findings contrary to law.

18        **THE COURT:**  Do you disagree that he made those

19    factual findings?

20        **MS. STEVENSON:**  I disagree that those are factual

21    findings in the way that my colleague has described, and I

22    think the fundamental question here is, is there a legal right

23    to obtain documents on demand.  And the order does not provide

24    what that legal right is.  That's the legal failing that's at

25    issue here, and that's why the order is contrary to law.

1          And I think there are subissues underneath that that are

2    legal issues and some that could conceivably be characterized

3    as factual issues, but this was also Meta's burden to prove,

4    and they came forward with no evidence on anything.

5              THE COURT:  I thought that -- and you can remind me

6    if I'm wrong; the order was 285 pages -- that Judge Kang asked

7    the states for specific information, and most, except for one,

8    refused or did not provide it.

9              MS. STEVENSON:  That's correct.

10             THE COURT:  Okay.  So haven't you waived it?  He

11   asked you for information, you don't provide it, so you waive

12   it.

13             MS. STEVENSON:  I'm sorry.  The states didn't provide

14   the information except for one?

15             THE COURT:  Correct.

16             MS. STEVENSON:  No, I don't think that's correct.

17        He asked us to fill out a chart that said if we would

18   represent agencies if he were to issue an order finding

19   control, and we provided that chart and answered those

20   questions, and then we had the one-pagers to address the other

21   questions.  So I believe everybody answered all of the

22   questions that were asked.

23        But, Your Honor, I think the problem here is even

24   accepting all of the questions that he asked and the findings

25   that he made, those do not amount to establishing a legal right

1    for the AGs to obtain agency documents on demand, and that's

2    our fundamental position in this case.

3        When you look to the binding Ninth Circuit precedent on

4    this issue found in *Citric Acid*, found in *Petroleum Workers*,

5    what it requires is for the judge to look at what is the legal

6    relationship of these parties outside of this lawsuit, and to

7    point to something, whether it's the Constitution, whether it's

8    a statute, whether it's a contract, that gives that party the

9    legal right to demand the nonparty's documents on -- or to

10   obtain the nonparty's documents on demand, and that is what is

11   missing from the order.

12       And, you know, there are serious consequences to that.  I

13   think we're here, and --

14           **THE COURT:**  Stop.

15       What's the response on that issue?

16           **MR. HALPERIN:**  As to the -- on the waiver issue, or

17   the issue that counsel just raised?

18           **THE COURT:**  The one she just raised.

19           **MR. HALPERIN:**  I think it's not contrary to binding

20   Ninth Circuit precedent.

21       *Citric Acid* provides the test.  There has been no court

22   that has said, here's how you look and define legal right.

23   It's a fact-based analysis, as Judge Kang said:  "No court has

24   attempted to limit or compile all factors relevant to an

25   analysis under the *Citric Acid* legal control test," he writes

1    at page 6.

2        Multiple courts, though, have done the exact same analysis

3    under the same legal right test that Judge Kang applied and

4    come to the same conclusion.  I'd point Your Honor to *In Re:*

5    *Generic* out of the Eastern District of Pennsylvania did the

6    same analysis under the same legal right test.  *Raoul versus*

7    *Monsanto* from the Southern District of Illinois did the same

8    thing, applying the same legal right test.  The *Freyre* case out

9    of Florida did the same thing under the same legal right test.

10       And particularly instructive, Your Honor, is *Raoul*, where

11   the Court said, particularly salient to this particular issue

12   on whether an Attorney General represents state agencies are

13   two things:

14       "One, whether the party and the related nonparty exchanged

15   documents in the ordinary course of business."  And there's no

16   doubt that where these attorneys general are required to

17   represent state agencies and do represent state agencies, that

18   they do exchange documents in the ordinary course of business.

19       "And, two, whether there is any benefit or involvement by

20   the nonparty in the litigation."  There clearly is that here,

21   as well, in many states here.  Any recovery by the attorneys

22   general on behalf of their state will go into the general fund,

23   where it will go to benefit these state agencies.

24       So applying those two factors alone, as well as the others

25   that I referenced earlier, meet the legal control test.

1    **THE COURT:** All right. A response?

2    **MS. STEVENSON:** Your Honor, my colleague didn't

3    answer the question, and this is the exact problem. What is

4    the legal right that the attorneys general have to demand --

5    obtain the agency documents on demand? It's not answered in

6    the order, he didn't answer it now, and this is the problem.

7    The whole reason for the *Citric Acid* test is so that if

8    there's noncompliance, the Court can order the party to do

9    something, and here there's just nothing that the Court could

10   order us to do that we have the power to do. And I disagree.

11   He's walked through all these factors. The factors aren't the

12   test here. The test is legal right to obtain documents on

13   demand. And to the extent he's trying to blur the lines with

14   the cases that do the practicality test, that's not what we're

15   talking about here.

16   Voluntary compliance of people willingly exchange

17   documents *Citric Acid* has said is not enough, and the

18   theoretical possibility of compliance is not enough, or the

19   theoretical ability to get documents on demand.

20   And so, again, we think in these types of cases, and

21   clearly under the Ninth Circuit law, the Court --

22   **THE COURT:** You need to slow down.

23   **MS. STEVENSON:** Sorry.

24   The Court has got to point to what is the legal right, the

25   legal right that exists outside of this lawsuit to go get those

1    documents.  And we -- it's not found in the magistrate's order,

2    and it wasn't just found in my colleague's answer.

3            **THE COURT:**  Okay.  You want to respond, or not?

4            **MR. HALPERIN:**  Yes, Your Honor.

5            **THE COURT:**  She's saying that you haven't identified

6    the legal right.  So what is the legal right?

7            **MR. HALPERIN:**  The legal right is the right to manage

8    litigation on behalf of the State, to control litigation and to

9    represent these agencies in the course of defending themselves

10   against issues that come up, legal issues that come up in the

11   state.  And that's again and again what courts have looked at,

12   *Generic*, *Freyre*, *Board of Shelby County, Tennessee*, *In Re:*

13   *Generic* and *Raoul* have looked to those -- that very specific

14   fact and said that establishes a legal right applying the same

15   standard.

16           **THE COURT:**  So why isn't that good enough?

17           **MS. STEVENSON:**  Because, Your Honor, he's still not

18   pointing to any specific legal right.  If you were to tell me

19   what should I go do, if an agency says no --

20           **THE COURT:**  If your -- if you as -- if the State of

21   Colorado receives a hundred million dollars as a result of

22   this, this doesn't go to -- that doesn't go to the AG.  Right?

23   It goes to the state.

24           **MS. STEVENSON:**  It goes to the general fund, correct.

25           **THE COURT:**  Correct.  And all of those agencies

1    benefit.

2              **MS. STEVENSON:**  Potentially.  They have no right to

3    benefit.

4         And I think you're raising an important point, which is

5    that the -- as distinguished from some of the cases he's

6    talking about, in this case we have no agencies that are

7    parties, with the exception of two states that can talk about

8    that.  They didn't participate in the investigation of this

9    case.  We're not seeking any relief on their behalf.  They're

10   not entitled to any relief.  They don't participate in any of

11   the risk of this lawsuit.  They don't fund the lawsuit with

12   money or resources.

13        These are actions brought exclusively in the -- within the

14   powers of the attorneys general in their consumer protection

15   enforcement capacity.

16             **THE COURT:**  So do I understand it, then, that if the

17   Attorney General chooses to investigate an agency, they can't

18   collect documents?

19             **MS. STEVENSON:**  They could, Your Honor, but the

20   Attorney General would have to have a reason to investigate an

21   agency, which is absent here.  And that --

22             **THE COURT:**  Is there any Attorney General

23   representative in this courtroom that could not obtain

24   documents from an agency if they were investigating that

25   agency?  If so, could you please rise and come to the

1  microphone.  None?

2      All right.  The record will reflect that no one has come

3  to a microphone.

4      So an Attorney General has the right, the ability and the

5  power to obtain documents from an agency that it chooses to

6  investigate.  That's what I understand.

7      Well, come forward.  Don't raise your hand.

8      All right.  If you'll please stand to the side so that --

9  I've got two people who want to speak.

10          **MR. KIRKLAND:**  Your Honor, Clark Kirkland for the

11  State of South Carolina.

12      The State of South Carolina --

13          **THE COURT:**  Hold on.  Hold on.

14          **MR. KIRKLAND:**  Yes, Your Honor.

15          **THE COURT:**  Clark Kirkland?

16          **MR. KIRKLAND:**  Yes, Your Honor.

17          **THE COURT:**  Okay.  You have a very heavy accent, so I

18  had to find your name on my list.

19      Go ahead, Mr. Kirkland.

20          **MR. KIRKLAND:**  There is no statutory authority in the

21  state of South Carolina that gives the Attorney General the

22  right to walk into a state agency and just ask for the

23  documents without legal compulsion.

24          **THE COURT:**  Without what?

25          **MR. KIRKLAND:**  Without legally compelling them to

1    through some kind of motion.

2         THE COURT:  So what process do you use?  Do you issue

3    a subpoena?

4         MR. KIRKLAND:  Yes, Your Honor.  The Attorney

5    General's office, in at least the Consumer Protection Division,

6    has the ability to issue --

7         THE COURT:  Not in -- I'm asking any attorney general

8    in the office.  Do not give me a division.

9         MR. KIRKLAND:  Okay.  The Attorney General does not

10   have the ability to just go demand documents from a state

11   agency.  There is not a statutory mechanism that allows us to

12   do that.  Under the South Carolina Constitution, each -- which,

13   I can bring up the exact section, each agency has been labeled

14   separately and apart forever.  That is Section --

15        THE COURT:  No, just -- I don't need -- is it -- did

16   you give that information to Judge Kang?

17        MR. KIRKLAND:  Um ...

18        THE COURT:  Did you identify that statute for him?

19        MR. KIRKLAND:  We did not identify that particular --

20        THE COURT:  Why not?

21        MR. KIRKLAND:  I do not have an answer for that, Your

22   Honor.

23        THE COURT:  Well, why haven't you waived it, then?

24        MR. KIRKLAND:  Um, well, I believe Your Honor asked

25   for oral arguments today on --

1          **THE COURT:**  Yeah, but didn't you waive it?

2      I am here.  He has spent hundreds of hours on this topic.

3  He asked you for information.  The standard of review here is

4  different.  I am asking you why you didn't give him that

5  information.

6          **MR. KIRKLAND:**  Uh, Your Honor, we gave the most

7  pertinent information, which is our statute that explicitly

8  forbids us in this particular case from obtaining documents

9  from the state agencies.

10         **THE COURT:**  Why is this particular case relevant to

11  control?

12         **MR. KIRKLAND:**  Your Honor, because Section 59.16 of

13  the South Carolina Code says:  "When the Attorney General

14  institutes or defendants an action on behalf of the State of

15  South Carolina," which is the case here, "pursuant to any power

16  granted by the common law, the Constitution of South Carolina

17  or the South Carolina laws, he acts in the interest of the --

18  he acts in the public interest of the state of South Carolina

19  and not as the legal representative or attorney of any

20  department or agency of state government, including the

21  executive, legislative, judicial branches or boards.

22      "Departments, agencies or boards are not parties to these

23  actions, and the documents or electronically stored of

24  information of such departments, agencies or boards are not in

25  the possession, custody or control of the Attorney General."

1    And we did cite to that as our main argument.

2         **THE COURT:**  Okay.  Response --

3         **MR. HALPERIN:**  Yes, Your Honor.

4         **THE COURT:**  -- from South Carolina.

5         **MR. HALPERIN:**  Possession, custody or control is a

6    matter of federal law.  South Carolina can't legislate that it

7    doesn't meet a federal standard.  The -- as Magistrate Judge

8    Kang found, it's for him to decide, applying the *Citric Acid*

9    test, whether South Carolina possesses -- has possession,

10   custody or control.

11        Judge Kang found, looking at the statutes, that South

12   Carolina represents the agencies in question, just like the

13   many other states he addressed, and said there's privilege

14   issues here, they've told me they may assert privilege.  He

15   said, they've told me they may represent the agencies, and

16   based on a totality of factors, I find they have possession,

17   custody or control, regardless of whether the South Carolina

18   legislature tries to get its way around that test.

19        **MR. KIRKLAND:**  Your Honor, if I may?

20        **THE COURT:**  You may.

21        **MR. KIRKLAND:**  So in Judge Kang's ruling, in almost

22   eight pages of South Carolina analysis he does not mention

23   Section 59.16 at all, and that language controls here.

24        And on page 219 of ECF 117 -- 1117, he states:  "There is

25   no statutory, legal or administrative rule cited which

1    prohibits the South Carolina Attorney General from accessing

2    the documents of the state agency at issue."  He specifically

3    says there is no statutory, legal or administrative rule cited.

4    And that was our main argument, was the state law that is clear

5    on its face that we do not have custody, possession, control of

6    their documents.

7             **THE COURT:**  Any other response?

8             **MR. HALPERIN:**  Yes, Your Honor.

9        He has an entire section at the outset of his order where

10   he says the federal standard governs, I need to apply *Citric*

11   *Acid*.  And so that is directly responsive to the specific

12   statute, and I can get you that page if you give me a moment,

13   Your Honor.

14            **MR. KIRKLAND:**  And, Your Honor --

15            **THE COURT:**  So why --

16            **MR. KIRKLAND:**  To apply the *Citric* --

17            **THE COURT:**  Stop.

18            **MR. KIRKLAND:**  Okay.

19            **THE COURT:**  It is my prerogative to interrupt you.

20            **MR. KIRKLAND:**  Yes, ma'am.  Yes, Your Honor.

21            **THE COURT:**  Why is it, in your view, that the federal

22   standard doesn't control?

23            **MR. KIRKLAND:**  Your Honor, it's not our position that

24   the federal standard doesn't control.  We agree under Rule 34

25   you look for legal control and access of these documents.

1    Judge Kang's order looks at other state statutes in other state

2    cases that are older than the act that I am mentioning.  Those

3    cases have been abrogated by this act, which he does not

4    analyze at all.

5         It is a common principle of the legal field that if a

6    legislature disagrees with court rulings on the subject, that

7    they can legislate --

8              THE COURT:  What is the date the act?

9              MR. KIRKLAND:  The current act is 2023-2024, and it's

10   the South Carolina Appropriations Act.  It's cited in our

11   briefings.

12        And on top of that, you know, he looks at other state law

13   to get to the control test and he ignores this law.  You can't

14   find legal control under some state law and ignore the most

15   pertinent and controlling factor on it.  And this did come

16   after the *Purdue* and *Generics* rulings that they cite to.

17        And I'd further argue that --

18             THE COURT:  So back to my original question.  If

19   you're -- if the Attorney General is investigating an agency,

20   do they have to -- what do they have to do to get documents?

21             MR. KIRKLAND:  We would have to issue some kind of

22   legal process, whether it be a civil investigative demand, or a

23   Rule 45 subpoena, or something like that.

24             THE COURT:  So, so if you could do a civil

25   investigative demand, that's what?  Tell me what that is.  It's

1    a letter, isn't it?

2              **MR. KIRKLAND:**  It is a statutory mechanism for --

3    with demanding documents, similar to discovery in another case.

4              **THE COURT:**  Okay.  So you could issue a letter that

5    says, we have authority to come in and get these documents, and

6    then you go on and get the documents.  Right?  Am I right?  Yes

7    or no.

8              **MR. KIRKLAND:**  Yes, Your Honor, but -- yes.

9              **THE COURT:**  Okay.  So that's different than filing a

10   lawsuit, filing an indictment, issuing a subpoena.

11             **MR. KIRKLAND:**  Your Honor, that is a legal right, but

12   they would have their own counsel who would be opposed to us on

13   that who would then defend that action, and we still would not

14   just be --

15             **THE COURT:**  It's not an action if you're sending them

16   a letter.

17             **MR. KIRKLAND:**  Well, to enforce it you have to file

18   an action.  It's like if they don't comply, the next step is to

19   file an action.

20             **THE COURT:**  If you don't comply.

21             **MR. KIRKLAND:**  Yes, Your Honor.

22             **THE COURT:**  But in the first instance have you -- how

23   long have you been with the AG's office?

24             **MR. KIRKLAND:**  Almost nine years, Your Honor.

25             **THE COURT:**  Okay.  Have you ever issued one of those

1  letters?

2          **MR. KIRKLAND:**  Yes, Your Honor.  We --

3          **THE COURT:**  Have you ever had to file a lawsuit to

4  get them to comply, ever?

5          **MR. KIRKLAND:**  Your Honor, I'm unaware of any

6  instance where the South Carolina Attorney General filed an

7  action to compel discovery with its investigative demands.

8          **THE COURT:**  So they just produce documents based upon

9  your letter to them.  Correct?

10          **MR. KIRKLAND:**  In many cases.

11          **THE COURT:**  You've never had to file a lawsuit to

12  compel them to respond.  Correct?

13          **MR. KIRKLAND:**  Yes, Your Honor.  I'm not aware of any

14  cases of that.

15          **THE COURT:**  All right.  Who are you?

16      (To Ms. Stevenson:)  No, sit down.

17      Who are you?

18          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor.  Josh

19  Olszewski-Jubelirer for the People of the State of California.

20          **THE COURT:**  Okay.  Go ahead.

21          **MR. OLSZEWSKI-JUBELIRER:**  Just at the outset, Your

22  Honor, I wanted to say the order does not rely in its reasoning

23  on the ability of state attorneys general to investigate state

24  agencies, to issue civil investigative demands or investigative

25  subpoenas.  Meta never raised this argument.  There is no

1    showing by Meta that any of these --

2          THE COURT:  Can you answer my original question?

3    When I got to the mic, when I asked if there was anybody who

4    had been denied the opportunity to get documents, what happens

5    in California?

6          MR. OLSZEWSKI-JUBELIRER:  Your Honor --

7          THE COURT:  Have you ever had to file a lawsuit to

8    get documents as the AG investigating a department?  Yes or no.

9          MR. OLSZEWSKI-JUBELIRER:  Your Honor, I -- I --

10         THE COURT:  Yes or no?

11         MR. OLSZEWSKI-JUBELIRER:  I have not investigated a

12   department at the Attorney General's office.

13         THE COURT:  Well, that's the question pending.  Sit

14   down.

15        Who are you?

16         MR. COSTA:  Ryan Costa on behalf of the Delaware

17   Attorney General's office.

18        Regarding your specific question, we have a statute, a

19   specific statute, where -- it's Title 29 of the Delaware Code,

20   Section 2508(b).

21         THE COURT:  Hold on.  I don't see you on this -- oh,

22   Ryan Costa?

23         MR. COSTA:  Costa, yes.

24         THE COURT:  Okay.  Go ahead.

25         MR. COSTA:  Okay.  Title 29 of Delaware Code, Section

1    2508(b) provides that in certain circumstances such as an

2    investigation, we do have, the Attorney General does have

3    access to state agency and official documents and records.

4    However, there's a specific exception that says that:  "The

5    Attorney General shall not have the right of access for

6    purposes of discovery, and any civil actions" --

7              THE COURT:  You need to slow down.

8              MR. COSTA:  I apologize, Your Honor.

9        It says that:  "The Attorney General shall not have the

10   right of access for purposes of discovery in any civil actions

11   brought by or in relation of the Attorney General."

12             THE COURT:  And did you raise that issue with Judge

13   Kang?

14             MR. COSTA:  We did, Your Honor.

15             THE COURT:  You cited that code section?

16             MR. COSTA:  Yes.  That was the focus, the primary

17   focus of our argument in the --

18             THE COURT:  All right.  A response on Delaware.

19             MR. HALPERIN:  Yes, Your Honor.

20       Judge Kang specifically addressed that statute and said

21   that the Attorney General was misreading it, relying

22   specifically on the second sentence of the statute that had to

23   be read in tandem with the first sentence of the statute, which

24   gave the Attorney General the, quote, "right of access at all

25   times to the books, papers, records and other documents of any

```
 1   officer, department, board, agency, instrumentality or
 2   commission of the state government."  And he said when you read
 3   those two in tandem, there's actually a statute that gives the
 4   Attorney General the exact right to do what we're asking them
 5   to do in this case.
 6             THE COURT:  All right.  A response?
 7             MR. COSTA:  Yes, Your Honor.
 8        Respectfully, we believe that the magistrate judge
 9   fundamentally misreads the statute.  We believe it's clear that
10   we do not have that --
11             THE COURT:  Okay.  So, again, moving back to the
12   standard.
13             MR. COSTA:  Yes.
14             THE COURT:  Is there a Supreme Court case in Delaware
15   that disagrees with his opinion?
16             MR. COSTA:  The --
17             THE COURT:  There is or there isn't.  Is there or
18   not?
19             MR. COSTA:  It's slightly more complicated, because
20   the statute also was just passed in 2022.  So the answer is,
21   no, there's not a Supreme Court case addressing or interpreting
22   this statute.
23             THE COURT:  Is there any court of appeal decision
24   that indicates that his interpretation is wrong and contrary to
25   law?
```

1          **MR. COSTA:**  There is not.  But the General Assembly,

2    when it passed the statute, provided a bill synopsis that

3    describes their legislative intent in adopting the statute.

4          **THE COURT:**  And have you read former-Justice Scalia's

5    view of statutory interpretation and his view of legislative

6    history?

7          **MR. COSTA:**  I am familiar with Justice Scalia's view

8    of legislative history; however --

9          **THE COURT:**  The words are the words, right?

10         **MR. COSTA:**  What's that?

11         **THE COURT:**  The words are the words.

12         **MR. COSTA:**  If they are plain and unambiguous.  And

13   we believe they are plain and unambiguous to not -- to cut off

14   any right of access that we have.  But the legislature, the

15   General Assembly, published, made a public record at the time

16   they adopted this statute, saying that their purpose "was to

17   intend to ensure that state agencies, departments, boards,

18   officers, instrumentalities and commissions will have the

19   discovery protections afforded to nonparties in such litigation

20   by applicable rules of civil procedure or state or federal rule

21   or law."

22         **THE COURT:**  So my question to you is the same as the

23   other:  Has the Attorney General ever in the state of Delaware

24   investigated an agency?  And if so, were they able to get

25   documents?

1          **MR. COSTA:**  My answer to that question is that the

2    statute actually explicitly provides that in the case of an

3    investigation --

4          **THE COURT:**  Well, this was in 2022, before 2022.

5          **MR. COSTA:**  The language regarding us having access,

6    that preexisted 2022.  The first sentence of 2508(b) preexisted

7    2022.  And after some of the cases cited by Meta, like *Purdue*,

8    after we went through that experience, the General Assembly

9    decided in response to pass an amendment to 2508(b) to adopt

10   this --

11        (Reporter clarificaiton.)

12         **MR. COSTA:**  It was an amendment to 29 Delaware Code,

13   Section 2508(b) that was passed in 2022, and that was the

14   amendment that added the language, the second sentence that

15   cuts off our right of access.

16         **THE COURT:**  Prior to 2022, it was pretty clear that

17   this would have been answered the way Judge Kang answered it,

18   and what you're saying is, well, the legislature didn't like

19   that, so they added some statutory language to eliminate or to

20   protect their agencies from discovery.

21        That's what I hear you saying.

22         **MR. COSTA:**  Our office would not agree that it was

23   clear prior to 2022, but we concede that there were some cases.

24   We believe there are other cases that go the opposite way, but

25   there are some cases, like *Purdue*, that found in a similar way

1    to Judge Kang, Magistrate Judge Kang.  And in response to that,

2    the Delaware General Assembly passed this statute to address

3    the issue specifically.

4         **THE COURT:**  And, once again, the Attorney General

5    doesn't have -- if it's doing its own investigation, it has

6    access to documents.  Correct?  That's what I also understand

7    you saying.

8         **MR. COSTA:**  In accordance with the first section of

9    the statute.

10        **THE COURT:**  So the answer to my question is "yes"?

11        **MR. COSTA:**  Yes, Your Honor.

12        **THE COURT:**  All right.  Thank you.

13     Next.

14        **MR. PROVAZZA:**  Good morning, Your Honor.  Stephen

15    Provazza on behalf of the State of Rhode Island.

16     I want to be clear that I -- I'm unaware of what happens

17    in the criminal division.  We also have a criminal prosecution

18    division which we're walled off from.  But in terms of our

19    civil division, we cannot access agency documents absent a

20    demand.  And I think my brother, Mr. Kirkland from South

21    Carolina, mentioned a CID, a civil investigative demand.  If we

22    were to ask for agency documents as part of an investigation,

23    we would have to issue that type of demand.

24        **THE COURT:**  Right.  And --

25        **MR. PROVAZZA:**  But it has to be tied --

1          **THE COURT:**  So demand is a letter.

2          **MR. PROVAZZA:**  Well, Your Honor, it has to be a

3    letter that is signed by agency counsel that meets a certain

4    legal standard, that we believe it's in the public interest to

5    make an investigation about a potential violation of law.  And

6    so we have to make sure we meet that standard before we issue

7    it, and --

8          **THE COURT:**  And I take that under Rule 11, when you

9    signed onto this complaint seeking hundreds of millions of

10   dollars from this defendant, or these defendants, that you

11   believed you had an adequate basis for it, and you also

12   believed that the State was entitled to recover hundreds of

13   millions of dollars on those representations.  Is that correct?

14         **MR. PROVAZZA:**  Well, that is correct, Your Honor.

15         **THE COURT:**  Okay.  So you thought you had a basis for

16   it in the first instance?

17         **MR. PROVAZZA:**  Yes, Your Honor.

18       And I -- and if our office was to issue a civil

19   investigative demand, which we call -- it's another word for an

20   administrative subpoena, that would have -- we would have to

21   sign it, and we have to --

22         **THE COURT:**  All right.

23         **MR. PROVAZZA:**  -- verify we meet a certain legal

24   standard.  And absent --

25         **THE COURT:**  So have you ever been refused documents?

1          **MR. PROVAZZA:**  So we -- we've -- we've been

2     refused -- we've never had to go to court to enforce a civil

3     investigative demand against a state agency in my four years at

4     the office.

5          **THE COURT:**  Okay.  What else do you want to say?

6          **MR. PROVAZZA:**  If there's not a legal mechanism for

7     us to ask for documents, for example under a consumer

8     protection act, under our Rhode Island antitrust act, we just

9     can't issue a civil investigative demand unless it's tied to an

10    actual violation of law.  So we can't -- it has to be tied to a

11    legal mechanism.

12         And that's all for now, Your Honor.

13         **MR. CHAND:**  Good morning, Your Honor.  Kashif Chand

14    from the New Jersey Division of Law.

15         **THE COURT:**  Actually, hold on.  I didn't give you an

16    opportunity to respond on Rhode Island.

17         Mr. Provazza, go ahead.  Any response?

18         **MR. JACKSON:**  Thank you, Your Honor.  Gavin Jackson

19    for the Meta defendants.

20         I would just flag, I think that you are making the correct

21    analysis looking to whether the State has other means by which

22    to obtain these documents, and I would simply note that the

23    State of Rhode Island, in its brief, points to a *Rhode Island*

24    *v. BTTR.*  And as we flagged in our opposition that this is an

25    unpublished and unreported oral order handed down by the Rhode

1    Island Superior Court.

2        And in looking at that transcript and the order that was

3    given, Mr. Provazza, in -- and I believe it was Mr. Provazza as

4    counsel for the State of Rhode Island in that *BTTR* case, when

5    the superior court judge indicated that he may be likely to

6    quash a subpoena that was served by the Rhode Island Attorney

7    General on the DMV, Mr. Provazza indicated that he believed he

8    had, quote, other mechanisms by which he could obtain those

9    documents, including by a civil investigatory demand, by simply

10   sending a letter to a state agency requesting those documents.

11   And he repeatedly, Mr. Provazza repeatedly flagged to the

12   superior court judge in that case that should the motion to

13   quash be granted, he would seek permission from the judge or at

14   least flag for the judge that he would seek those documents via

15   those other means, either via letter simply requesting that

16   information, as you previously flagged, Your Honor, or a civil

17   investigatory demand, again, as we've heard a little bit about

18   today.

19        **MR. PROVAZZA:**  And so that is a great example, Your

20   Honor, of a case where we issued a third-party subpoena, a

21   Rule -- under Rhode Island civil procedure to the DMV to get

22   records regarding a defendant.  The defendant moved to quash.

23   The Court granted the motion to quash as to six of the nine

24   requests in our third-party subpoena.  And as I notified the

25   judge in that instance, our office can either issue a CID to

1    get those documents, or there's a -- by letter, there is a

2    process under the federal law regarding driver privacy,

3    information privacy for vehicle registrations, and we can fill

4    out a form that's available to the public and every private

5    counsel to request information that's related to a case.

6        The judge in that case instructed that should we obtain

7    any information through those other means, that we would not --

8    he caused that he would not like us to use that information

9    during the case without filing a further motion to allow that

10   information to be used in a deposition or for purposes of the

11   case.  I think that's a good example where we were denied

12   access to documents we thought were necessary to prosecute our

13   own claims and then denied the ability to use those as part of

14   the case.

15           MR. JACKSON:  Your Honor, we would simply note that

16   the point is that Mr. Provazza appeared confident in that

17   hearing that he could obtain those documents simply by

18   requesting the agency, and we think that that meets the right

19   to obtain test as outlined in Judge Kang's lengthy order.

20           THE COURT:  Okay.  Thank you.

21           MR. PROVAZZA:  Thank you, Your Honor.

22           THE COURT:  New Jersey.  Kashif Chand?

23           MR. CHAND:  Thank you, Your Honor.  Kashif Chand on

24   behalf of the New Jersey Division of Law, on behalf of

25   plaintiffs Matthew J. Platkin, Attorney General for the State

1    of New Jersey, and state agency Division of Consumer Affairs.

2    Your Honor, to address your question initially, we, under

3    the New Jersey Consumer Fraud Act, have subpoena power to

4    investigate other agencies or other entities that may have been

5    in violation of the law.  That requires us to, to the extent

6    that we wanted to enforce that document request, that subpoena,

7    we would need to issue a subpoena.  We could issue letters and

8    requests --

9        **THE COURT:**  That's one division.

10       **MR. CHAND:**  Yes?

11       **THE COURT:**  That's one division.  Do you have

12   information with respect to all divisions of the Attorney

13   General?

14       **MR. CHAND:**  Yes, Your Honor.

15   With regards to how New Jersey is structured, the New

16   Jersey Attorney General only supervises the Division of Law and

17   Public Safety.  He does have the legal statutory authority to

18   counsel other agencies, but that authority is separate and

19   apart from his enforcement authority under the New Jersey

20   Consumer Fraud Act.  That authority only gives him the right to

21   obtain documents related to the issues and his enforcement of

22   the Consumer Fraud Act.  It does not give him the ability to

23   simultaneously request documents from agencies that are adverse

24   in those actions.

25   So to the extent that, you know, you had adverse agencies

1    or agencies that are being regulated by agency -- other

2    agencies, he does not have simultaneous authority to request or

3    demand those documents.

4        He also sits as a --

5            THE COURT:  So --

6            MR. CHAND:  Yes, Your Honor.

7            THE COURT:  -- the AG in New Jersey cannot go to an

8    agency and get documents if they're -- if they believe it's

9    appropriate?

10            MR. CHAND:  To the extent that there is authority in

11    terms of his different roles as an enforcer, if there is a

12    violation of the Act, he would be able to get documents through

13    that subpoena power in New Jersey under the Consumer Fraud Act.

14    That's NJSA 56:8-4, 5 and 6.

15            THE COURT:  And is anything that you're telling me

16    new?

17            MR. CHAND:  Well, I would like to --

18            THE COURT:  Yes or no.  Is anything that you've just

19    told me new information, or did you give all of this --

20            MR. CHAND:  Yes, the --

21            THE COURT:  -- information to Judge Kang?

22            MR. CHAND:  Yes, the information related to the

23    statutory authority to issue a subpoena is new information

24    here.

25            THE COURT:  Why didn't you tell Judge Kang?

1          **MR. CHAND:**  The focus was on the legal right to

2    documents, and we focused our brief on information relating to

3    the conflicts of interest.  And within those documents we cited

4    to -- we cited to comment -- letters from and directives from

5    prior attorney generals, which sets forth our conflicts

6    analysis.  The May 14, 2019, letter from AG Grewal, which sets

7    forth how we address conflicts when you do have adverse

8    agencies regulating other agencies or where there's a conflict

9    between agencies.  The way New Jersey is set up is the Attorney

10   General is appointed; he is not elected.  He sits as a coequal

11   cabinet-level excessive of the cabinet.  And so in that way he

12   does not have the right to demand documents from other coequal

13   cabinet members.

14          **THE COURT:**  All right.  A response on New Jersey.

15          **MR. YEUNG:**  So just to address that point, in the --

16          (Reporter clarification.)

17          **MR. YEUNG:**  Sorry.  Chris Yeung from Covington &

18   Burling representing Meta.

19          One point.  The AG in New Jersey actually stipulated to

20   provide agency documents in the *Generic* case.  So if they

21   wanted to do it, they could.

22          The remaining arguments here have all been considered by

23   Judge Kang.  What I hear is actually just a disagreement with

24   how he analyzed the so-called dual role, that the AG may play

25   enforcer and adviser.  Judge Kang went quite in depth on that

1    point in his decision and just I think simply disagrees with

2    what New Jersey has said.

3            **THE COURT:**  With respect to the dual role analysis

4    done by Judge Kang, is there a Supreme Court opinion of New

5    Jersey to the contrary?

6            **MR. CHAND:**  No, Your Honor, but --

7            **THE COURT:**  So I just need --

8            **MR. CHAND:**  -- there is Supreme Court --

9            **THE COURT:**  I am going to let you speak.  I need you

10   to focus on my question.  Okay?  Is there any court of appeal

11   decision in New Jersey that specifically is contrary to what

12   Judge Kang indicated?

13           **MR. CHAND:**  Not that I am aware of, Your Honor.

14           **THE COURT:**  Okay.  Now, you can tell me what you'd

15   like.

16           **MR. CHAND:**  I would just like to -- the way the New

17   Jersey Supreme Court has defined what New Jersey government is,

18   is to describe it as so varied, so multi-facetted, so extensive

19   that to regard it as one unitary monolithic client is

20   unrealistic, and effectively Judge Kang's order does that.

21           **THE COURT:**  What case is that, and was it cited to

22   Judge Kang?

23           **MR. CHAND:**  Yes, Your Honor.  This is the In Re:

24   Advisory Comment on Professional Ethics, Opinion 621.

25           **THE COURT:**  Opinion 621?

```
 1              MR. CHAND:  Yes, Your Honor.

 2              THE COURT:  So is that ...

 3              MR. CHAND:  It's an ethical opinion.  The --

 4              THE COURT:  So it's not a court case.

 5              MR. CHAND:  Yes, Your Honor.

 6              THE COURT:  And it's not -- and it's ...

 7         Okay.  So the Supreme Court actually didn't view this.  A

 8    subcommittee of the Court giving ethical opinions issued an

 9    opinion?  Is that like one judge?

10              MR. CHAND:  The Supreme Court reviewed an opinion

11    that was coming out of the ethical body in New Jersey, which

12    was looking at a part-time legislative associate --

13              THE COURT:  How many Supreme Court justices are there

14    on the New Jersey Supreme Court?

15              MR. CHAND:  I believe there are nine.

16              THE COURT:  And is there a nine-person, nine-judge

17    opinion that indicates, that states what it is you just said a

18    few minutes ago?

19              MR. CHAND:  Not that I'm aware of, Your Honor.

20              THE COURT:  All right.  So this is -- this is some --

21    okay.  It's some committee opinion.

22              MR. CHAND:  Yes, Your Honor.

23              THE COURT:  So it has no binding effect.  That's why

24    it's called an opinion?

25              MR. CHAND:  Yes, Your Honor.  That's accurate.
```

1          **THE COURT:**  Okay.  Next.

2          **MR. WHELIHAN:**  Good morning, Your Honor.  Nathan

3   Whelihan on behalf of the Arizona Attorney General's office.

4          **THE COURT:**  Okay.  Hold on.  Let me find you.  Nathan

5   Whelihan, W-h-e-l-i-h-a-n?

6          **MR. WHELIHAN:**  (Nods head.)

7          **THE COURT:**  Okay.  Go ahead.

8          **MR. WHELIHAN:**  Your Honor, to answer your initial

9   question of whether our office has the ability to obtain

10  documents from agencies, I'll try to answer the question in its

11  entirety.  But first for the Civil Division, our ability to

12  issue civil investigative demands, CID's, is predicated by

13  statute on the -- we have to have a reasonable belief that

14  there's a violation of the Arizona Consumer Fraud Act for us to

15  issue those subpoenas.  We can -- excuse me, CID's.  We can't

16  issue CIDs to the Department of Education because we sued Meta.

17         **THE COURT:**  So, again, though, in any event it's a

18  letter, right?

19         **MR. WHELIHAN:**  What's that?

20         **THE COURT:**  These are letters that you send asking

21  for documents?

22         **MR. WHELIHAN:**  Yes, letters with specific demands

23  saying, please produce this, please provide that.

24         **THE COURT:**  And you go in and get your documents.

25     Have you ever been required to go to court to get -- to

```
 1   get documents?

 2           MR. WHELIHAN:  I'm not aware of any instance in which

 3   we've issued a CID to an agency.  When we -- from the --

 4           THE COURT:  You need to slow down.

 5           MR. WHELIHAN:  Sorry.

 6       In the civil context, you know, in my experience with the

 7   office, I've issued public records requests to agencies and

 8   been told no, and then we have to decide whether or not we want

 9   to sue over public records laws, you know.  The -- and we have

10   that ability here.  You know, we could issue public records

11   requests to these agencies, but so far we've been relying on

12   voluntary cooperation.

13       You know, of course in the criminal context there are

14   times when the Attorney General can, if it believes there's a

15   criminal violation, investigate the agency, issue subpoenas,

16   get documents, bring charges.  Certainly there is that ability.

17   But in the civil context, we -- I can't issue a CID to the

18   Department of Education.  I can't -- you know, I'm relying on

19   their cooperation.  I don't have a mechanism by which I can

20   compel them, and Meta has pointed to no mechanism by which.

21       And another thing.  In Arizona, the Attorney General

22   doesn't have -- the Attorney General's authority is purely

23   statutory.  We have no parens patriae authority.  It arrises --

24   we -- you know, this was all put in the briefing.

25           THE COURT:  He's not hearing you because you're
```

1     talking so fast you're getting muffled.

2              **MR. WHELIHAN:**  Sorry.

3         We don't have parens patriae authority in Arizona.  We

4     cited this in the briefing in the oral argument six months ago

5     to Judge Kang.

6         You know, meta simply hasn't pointed to the mechanism by

7     which we could go get documents from these agencies.  And, you

8     know, so we have to hope that they cooperate with us.  And if

9     they stop cooperating with us, we're gonna rely on an order

10    from Judge Kang to somehow hope to force them to do it?  Just

11    threaten them with sanctions?  You know, we're not really sure.

12    We're ...

13             **THE COURT:**  Okay.  Any response?

14             **MR. CARPENTER:**  Very briefly.  Ansel Carpenter for

15    the Meta defendants.

16        First, I think it's important to note, Arizona is one of

17    the states that a federal court a few years ago already ordered

18    to turn over agencies' documents.  I'm not aware of those

19    agencies' noncompliance as a result of the order in that case.

20        In addition, I believe I heard my friend say that they

21    would have to rely on public records requests.  I think Judge

22    Kang rejected that in his order, and there's no clear error in

23    that analysis that I saw the AGs try to raise.  We're relying

24    and Judge Kang relied on much broader authorities than what

25    Arizona's counsel just referred to, the statutes in Arizona

1    that provide that the Attorney General is the exclusive legal

2    officer for the agencies we're talking about here.

3        The -- just two other quick points, if I could.

4        The first is that Arizona just disclaimed any parens

5    patriae authority.  I'm not sure that quite adds up, because in

6    this case, under the federal COPPA statute states can only

7    bring COPPA claims as parens patriae.

8        This last point I would make is that in this appeal to

9    Your Honor, Arizona's really narrowed the issue to only two

10   agencies.  We think they've waived any other state-specific

11   arguments aside from all of the states' common arguments.  With

12   those two agencies, we think we explained in our briefing why

13   they're no different from the others, although I'm obviously

14   happy to answer any of the Court's questions on that point.

15           MR. WHELIHAN:  I can address all that now if you

16   would like, Your Honor, but ...

17           THE COURT:  Go ahead.

18           MR. WHELIHAN:  So first of all, there were a couple

19   of mischaracterizations there.  The statute, as we pointed out

20   multiple times, you know, we are not the exclusive legal

21   provider for the agencies at issue here, particularly to the

22   two that we are particularly challenging.  We are not -- in no

23   way waive our argument as to the four agencies over which we

24   found control that we -- which the order found that we have

25   control, that we are not specifically challenging our

1   state-specific section.  We fully join the general argument

2   that will be presented here, but we decided to use our limited

3   allotment of space to argue in the alternative if Your Honor

4   disagrees with the general proposition that, you know,

5   representation equals control, or if Your Honor is inclined to

6   agree with that proposition.

7          **THE COURT:**  Is there any Supreme Court authority or

8   any court of appeal authority in Arizona that indicates that

9   the decision of Judge Kang was wrong?  That is, explicitly did

10  he make a decision that is contrary to a citeable decision by

11  the Supreme Court or the court of appeal in Arizona?

12         **MR. WHELIHAN:**  There is no decision.  What we are

13  arguing is contrary to fact, contrary to the reality in

14  Arizona, is the fact that we do not represent two of the six

15  agencies over which he found us to have control.

16         **THE COURT:**  And let me -- let's make sure, because

17  the line's getting longer and longer, and you all paid for your

18  flights to come to lovely Oakland, so I understand you want to

19  speak.

20      I understand that this is difficult, hence the 285-page

21  decision.  I understand that it may represent some challenges.

22  But if there is -- it is not clear to me that anyone has a

23  decision from a Supreme Court or of a court of appeal from your

24  state that says anything that this is contrary to law.  And,

25  you know, the reality is that we should have never gotten here.

1    You all should have figured out a process.

2        The states are suing these defendants for hundreds of

3    millions of dollars that you want to go into the states'

4    covers, and we've got a nice, efficient, streamlined approach

5    for you to use so that you don't have 35 of these cases

6    progressing in various other places, and you will have your day

7    in court, and perhaps you will get hundreds of millions of

8    dollars into your coffers.  And yet you want this to be

9    one-sided.

10       So in the past parties have figured this out.  They have

11   figured out a process to make the -- to make this more fair,

12   and for whatever reason you chose not to do it.  So when you

13   come up here -- and you just happen to be here, Mr. Whelihan,

14   and I'm looking beyond you -- when you come up here, the first

15   thing I want to know is, is there a Supreme Court decision or a

16   court of appeal decision that you cited to Judge Kang that said

17   that what -- was contrary to what he decided.  I suspect that

18   none of you will be able to answer that in the affirmative

19   because he's a very good judge, and he tried to figure out a

20   way to resolve this problem for you all that you could not

21   resolve on your own.

22       Next.

23           **MR. WHELIHAN:**  Yes, Your Honor.  If I could address a

24   couple of points.

25       First, the states' coffers issue.  In Arizona, the money

1    that would be recovered from this would go into consumer

2    protection funds that we use to fund our own office.  Our

3    office is severely underfunded, and we rely on that.  We would

4    have to cut multiple positions in our criminal divisions and

5    other places if we didn't get -- if we didn't regularly bring

6    enough money to fund our own office.  And I, in oral arguments

7    I made that clear to Judge Kang six months ago.

8         Earlier, counsel for Meta also stated the *Generic Farm*

9    ruling.  This is also an issue that came up in the oral

10   argument to Judge Kang six months ago.  You know, in Arizona we

11   never had to comply with that order because there was a further

12   meet and confer after that order came out, and the parties in

13   the Antitrust Division, our Antitrust Division and the parties

14   in that case decided that they already had everything they

15   needed, and so no further discovery was needed.  We never had

16   to do the discovery.  And I told Judge Kang that, that this

17   would be an unprecedented thing in Arizona.  We've never had to

18   do it before.  We don't know, you know, how that would work.

19        And, you know, I -- you are correct.  There is no Supreme

20   Court, no appellate court division -- decision in Arizona that

21   touches on this issue.  But I have to return to the point that

22   there is also nothing besides the general statutory framework

23   that, upon request of certain agencies in Arizona, we are to

24   act as their legal counsel.  We don't have a mechanism to

25   compel the production of documents from these agencies.  I

1    don't believe that Meta can point to anything besides the

2    general statutory framework.  I don't believe Judge Kang's

3    order points to anything besides the general statutory

4    framework.

5        And in the instance, you know, we made representations to

6    the Court clearly of the nine agencies that Meta was interested

7    in, we -- if a subpoena was sent to them, we would represent

8    four of them and we would not represent the other five.  He

9    believed us on three of them, and on two of them he took our

10   representations to the Court, and he said that they were an

11   error of law because there was no clear statutory framework

12   that exempted them from the prohibition on spending state funds

13   to hire their own counsel.  When we had told -- I came and told

14   Judge Kang six months ago and in briefings that, in fact, the

15   Arizona Department of Education does employ legal counsel, the

16   Rule 45 subpoena that was issued by Meta in July to the

17   Department of Education was responded to by that counsel.  Up

18   and to this point, Meta has been working with the Department of

19   Education.  Our office has had nothing to do with it.

20       Likewise, the Office of Strategic Planning, the Governor's

21   Office of Strategic Planning and Budgeting, as I told Judge

22   Kang six months ago in oral argument, is a subset of the

23   governor's office, which Judge Kang recognized that we did not

24   have control over because there is a statutory exemption for

25   them that allows them to spend state funds on their own

 1    counsel.  They have their own counsel.  She represents -- she

 2    and her colleagues represent the governor's office and the

 3    Office of Strategic Planning and Budgeting.

 4         So, again, I would ask at the very least that Your Honor

 5    overturn his ruling as to those two agencies, since we do not

 6    represent them, we haven't represented them and we will not

 7    represent them.  And that's not because of any choice that we

 8    made, it's just the reality.  It's just the facts on the ground

 9    in Arizona.  And I know that there's not a statutory, there's

10    not the Supreme Court case, but it's just how things are, and I

11    don't think Meta has anything that they can say that would show

12    that we do represent those agencies.

13              **THE COURT:**  All right.  Response?

14              **MR. CARPENTER:**  Thank you, Your Honor.  Just two

15    quick points.

16         The first one --

17              **THE COURT:**  You'll have to remind me again who you

18    are.

19              **MR. CARPENTER:**  Ansel Carpenter, from Covington and

20    Burling, Your Honor.

21         Just two points.

22         The first is because counsel mentioned a

23    mischaracterization, we don't think Judge Kang mischaracterized

24    the statute.  We don't think we mischar' --

25              **THE COURT:**  Is Meta negotiating its subpoena with the

1    AG's office or private counsel for the Department of Energy?

2            **MR. CARPENTER:**  I don't believe the Department of

3    Energy is at issue.

4            **THE COURT:**  Education.

5            **MR. CARPENTER:**  For the Department of Education, my

6    understanding is it is not with the Attorney General's office.

7            **THE COURT:**  So that's -- he's accurately representing

8    that view.

9            **MR. CARPENTER:**  He's accurately representing that

10   fact, but what Judge Kang relied on, because it was what was

11   presented to him, if the statute.  So Arizona Revised Statute

12   41-192(a), which says that unless an agency is exempted, the AG

13   represents it.  Then the Revised Statute 41-192(d) includes the

14   exemptions.  Neither of the two agencies that we are talking

15   about are exempted.  Arizona, as I believe counsel just

16   conceded, is not able to point to any other statute that

17   exempts them or any other court case that represents them.  All

18   it presented to Your Honor was an organization printout from a

19   web page, I believe, for the Department of Education, and a

20   similar type of press release document from the other agency,

21   from the Office of Strategic Planning and Budget.

22       We would submit those aren't the sort of things that

23   constitute a clear error in Judge Kang's analysis of the actual

24   statutory law that applies in Arizona.

25           **THE COURT:**  All right.  Next state.

1              **MR. WHELIHAN:**  If I could briefly respond, Your

2     Honor?

3              **THE COURT:**  Briefly.

4              **MR. WHELIHAN:**  The -- we have represented to Judge

5     Kang in oral argument six months ago, again, that there are

6     conflicts with the Department of Education.  The superintendent

7     of the Department of Education has sued our Attorney General.

8     There of different parties.  He used to be the Attorney General

9     of the state.  There are disagreements over school vouchers,

10    over bilingual education, over our criminal department's

11    investigations of the Department of Education.  And because of

12    that, they don't come to us with requests for legal work.  It's

13    not by our choice.  It is because, as we represented to this

14    Court previously, there are conflicts.  They do not let us

15    represent them in these matters.  When the subpoena went to

16    them they have their own counsel.

17        I admit that the statute doesn't exempt them and that in

18    normal times we might represent them, but these aren't normal

19    times because of the very real and actual conflicts that exist

20    between our office and the Department of Education.  And,

21    again, the Office of Strategic Planning and Budgeting is, for

22    all intents and purposes, a part of the government's office.

23              **THE COURT:**  Next state.

24              **MR. ZIPERMAN:**  Good morning, Your Honor.  Phil

25    Ziperman on behalf of the Maryland Attorney General's office.

```
 1              THE COURT:  Okay.  Hold on.
 2              MR. ZIPERMAN:  No, Your Honor, there's no --
 3              THE COURT:  Hold on.
 4              MR. ZIPERMAN:  I'm sorry.
 5              THE COURT:  Okay.  I don't show you on the list.
 6              MR. ZIPERMAN:  I checked in this morning.
 7              THE COURT:  We don't check in in the morning.  We
 8    check in --
 9              MR. ZIPERMAN:  I'm sorry.
10              THE COURT:  -- in advance, because there are too many
11    lawyers, as you can see, in this courtroom.  So ...
12              MR. ZIPERMAN:  I'm sorry, Your Honor.  I'm not sure
13    what -- why I'm not on your list.
14              THE COURT:  And then I had a list from the plaintiffs
15    that gave me all of the states who were going to have state-
16    specific argument.
17         So, Maryland?
18              MS. MIYATA:  Your Honor, I can speak to that.
19         To the extent that Mr. Ziperman was not on the list
20    submitted to chambers, I -- apologies.  Bianca Miyata for the
21    state AGs.
22         If Mr. Ziperman was inadvertently left off of the list
23    submitted to chambers, that was my error and I apologize for
24    that.
25              THE COURT:  Okay.
```

1          **MS. MIYATA:**  Mr. Ziperman is on the list from this

2     morning, but it appears that Maryland is in the name column and

3     Philip Ziperman is in the state column, which is clearly not

4     the case, even though Mr. Ziperman is indeed Maryland, so ...

5          **MR. ZIPERMAN:**  Thank you.

6          **THE COURT:**  Okay.  I see.  I got it.  Thank you.

7       All right.  And it's Ziperman, Z-i-p-e-r-m-a-n.

8          **MR. ZIPERMAN:**  That's right, Your Honor.  We don't

9     spell it correctly.

10          **THE COURT:**  Proceed.

11          **MR. ZIPERMAN:**  Your Honor, to answer the question

12     you've been asking, no, I'm unaware of any Maryland state or

13     Fourth Circuit precedent, for that matter, that would address

14     the situation.

15       To answer the original question you asked, Your Honor,

16     which is whether my office has the authority to investigate

17     another state agency, the answer is "no," and I think the logic

18     of the question is somewhat undermined by Judge Kang's

19     decision.  Judge Kang relied primarily on argument that my

20     office has a statutory obligation to be counsel to these

21     Maryland agencies.  We can't both be their counsel and

22     investigate them at the same time.

23       Now, I believe the Maryland agency can impanel a grand

24     jury, our criminal division can to conduct a criminal

25     investigation.  That's not something I've ever been involved

1  in.  Maryland has a state prosecutor's office that would

2  investigate state agencies.

3      If we want documents from a state agency we normally ask

4  for them.  I've never been in a circumstance where we've had to

5  issue a subpoena.

6          THE COURT:  Right.  But you ask for them and you get

7  them.

8          MR. ZIPERMAN:  In most instances.  But if the -- if

9  we don't, the only mechanisms --

10          THE COURT:  You said that you've never had to go to

11  court.  So if you ask for them, you get them.

12          MR. ZIPERMAN:  Your Honor, I think that's true, but I

13  don't believe that gives us control, because if the agency says

14  no ...

15          THE COURT:  Well, how do you know?  You've never had

16  an agency say, "no."

17          MR. ZIPERMAN:  We've had agencies that have not said

18  "yes" either.  I mean, we've had situations where they didn't

19  respond to our requests and we didn't pursue it, but I don't

20  want to mislead you.  In most instances, if we ask for

21  documents, the answer's "no."  I mean, excuse me, the answer is

22  "yes."

23      I can tell Your Honor I met with the governor's chief of

24  staff this morning and three of their attorneys, and Maryland

25  may be one of those states where we're going to be told "no."

1      **THE COURT:**  And so, then -- and we haven't gotten

2    there.  Then I would have to figure out whether you can be a

3    part of this litigation.  Right?

4      **MR. ZIPERMAN:**  Your Honor --

5      **THE COURT:**  You've come to federal court, again,

6    seeking hundreds of millions of dollars.  With that comes

7    responsibility.  So how is it from a policy perspective that it

8    is fair that you can choose to come into a federal forum and

9    then decide you don't want to follow or comply with federal

10   rules regarding or a federal order regarding disclosure?

11     **MR. ZIPERMAN:**  Your Honor, we've explained to the

12   governor's office that we could face a sanction.  It's not a

13   position we want to be in.  We've explained to the governor's

14   office that this is an important case to both my office and to

15   Maryland consumers, but that's all we can do.

16      The other -- I'm sorry.  The other points I wanted to

17   make, Your Honor, is our focus with our argument in front of

18   Judge Kang was focusing on this issue of the attorney/client

19   relationship.

20     **THE COURT:**  Uh-huh.

21     **MR. ZIPERMAN:**  We brought our case in the narrowest

22   capacity that it could be brought.  The case was brought as the

23   Maryland Attorney General, not as the State.  We specifically

24   didn't pray damages in the case, and that was a very --

25     **THE COURT:**  Say that again?

 1            **MR. ZIPERMAN:**  We specifically did not pray any

 2    damages in the case.

 3            **THE COURT:**  Yeah, let me take a look.  Because as I

 4    started looking for the prayers for relief, most AGs were

 5    asking for damages.  So I'll check yours.

 6            **MR. ZIPERMAN:**  I believe that those claims have been

 7    withdrawn, Your Honor.  Maryland also only brought a COPPA

 8    claim.

 9        I'm sorry, Your Honor.  I'll wait for you to check.

10            **THE COURT:**  So am I wrong?  All state -- have all

11    states -- Ms. Miyata, have all states withdrawn claims for

12    monetary relief?

13            **MS. MIYATA:**  Your Honor, I don't have the record cite

14    to hand, but early on in this litigation after we conferred

15    with Your Honor about the case schedule, we did represent to

16    the Court that we would not be seeking damages on behalf of the

17    state agencies, that's correct.  There are requests under the

18    states' various consumer protection acts for penalties, but

19    that is not the same as damages to compensate agencies.

20            **MR. ZIPERMAN:**  And for the record, Your Honor,

21    Maryland didn't bring a claim under its consumer protection

22    act.

23            **THE COURT:**  Well, for some reason the prayer for

24    damages -- was Maryland -- I thought I had the most recent

25    complaint.  I'm not seeing the prayer.  Maybe I pulled up a

1    wrong binder.

2         All right.  Go ahead.

3         **MR. ZIPERMAN:**  So the focus of our argument in front

4    of Judge Kang was this separation of the office's two function.

5    And while it's true, everything Meta says is true about

6    Maryland law, which is the Maryland Attorney General does act

7    as counsel for these various agencies, Maryland also has -- the

8    Attorney General's office has a dual role of enforcing

9    Maryland's laws, and that's what we're doing here.  We didn't

10   name any Maryland agencies in the complaint.

11        I'm just going to very briefly go through what I

12   understand are the factors that all of these decisions that

13   Judge Kang relied on, rely on to name an AG as someone having

14   control over the state agency.

15        Is the state a plaintiff in the case?  The answer is "no."

16   I understand they're going to argue that we have to act as a

17   parens patriae for the state under COPPA, but we brought this

18   case as the Maryland Attorney General.  So even under COPPA,

19   the Maryland Attorney General is permitted to sue under COPPA.

20        Is there an agency or an agency employee that's named as a

21   party in our claim?  No.

22        Are there damages sought?  I've already said that:  No.

23        Is there a sister corporation-type relationship between

24   the Maryland AG's office and other state agencies that Meta

25   served subpoenas on?  No.

1    Is there a statute that gives Maryland's Attorney General

2    office specific access to the documents of these agencies that

3    was -- there were statutes in Ohio and Pennsylvania cited some

4    of the decisions.  The answer again is "no."

5    Maryland brought this case in the narrowest capacity

6    possible with the intention of avoiding just this circumstance.

7    Now, we don't take the position that Meta isn't entitled

8    to seek these documents, although in our discussions with Meta,

9    I've got no idea what they're seeking.  And particularly given

10   the fact that we're not praying damages, it seems to me that

11   much of the information they're seeking is largely irrelevant,

12   but we'll cross that bridge when they tell us what it is they

13   actually want.

14   But when they served their Rule 45 subpoenas on our

15   agencies, we cooperated.  What we did is actually -- what they

16   did is they called the principal counsel for those agencies,

17   they didn't call me.  Although now they're arguing that I'm the

18   attorney that represents these agencies.  And if I was the

19   attorney representing these agencies, I guess I would have

20   appreciated a phone call, but we didn't get that phone call.

21   They were dealing directly with the agencies.

22   And so all we're saying, Your Honor, is, you know, we're

23   in the same position Meta's in.  If we wanted these documents

24   now, we'd have to issue a Rule 45 subpoena or a public -- I

25   suppose we could ask, and it's possible --

1          **THE COURT:**  I'm not sure that you're in the same

2    position.  Right?  You just spoke to the governor and three of

3    his aides.

4          **MR. ZIPERMAN:**  You're right, Your Honor.

5          **THE COURT:**  I mean, so it is not the same.

6          **MR. ZIPERMAN:**  You're right.

7      I have an office.  I don't have the same office as their

8    counsel.  Their counsel are embedded with each of the agencies.

9    They're in a different building.  But I know their names, I

10   know their phone numbers, and we have a common boss.  So

11   there's a big difference.  When the boss has a position on a

12   legal issue and the agency has a different position on that

13   legal issue, that AAG's loyalty is to their client, not to the

14   Attorney General.

15     And believe me, Maryland's one of those states where we

16   flip-flop Democratic and Republican governors over the years,

17   and I can't count how many times I've been to the legislature

18   to argue a point that is being countered by some of the same

19   agencies.  So they're very different political animals in

20   Maryland.  They're very different and separate political

21   entities.  And the real concern I have is, Your Honor, is is

22   that if the governor's office -- and in their defense, they're

23   very, very concerned about setting a precedent in a legal court

24   that every time when the Attorney General brings a case, a

25   Maryland agency can be -- as a third party can be required to

1    produce documents, including documents that, Your Honor, again,

2    I don't -- this is an issue for another day, but for the life

3    of me -- we just sent Meta a letter.  They served a request on

4    the Department of Commerce, and we've just sent them a letter

5    explaining the Department of Commerce's mission, which has

6    nothing to do with the privacy of kids.  Again, we just brought

7    a COPPA claim, and they already searched their documents and

8    can't find anything.

9         And so to have this result where we can be penalized --

10             THE COURT:  Well, I mean, again, that's the next --

11    that's the next bridge.

12             MR. ZIPERMAN:  Yes, Your Honor.  And --

13             THE COURT:  And the issue of sanctions is not lost on

14    me.

15             MR. ZIPERMAN:  Understood.

16             THE COURT:  And the issue of overreach is not lost on

17    me.  And so the question is where is the balance.

18             MR. ZIPERMAN:  I'm sorry, Your Honor.

19             THE COURT:  If I had -- if you had a department who

20    was -- who had records relative to COPPA investigations and you

21    didn't want to work with the defendants to produce those, I

22    might strike your complaint; that is, your version, you know,

23    your portion of it.

24         Now, if they're asking for something that has absolutely

25    nothing to do with this and you don't produce, I might say,

1  well, okay, they didn't produce, but I'm not going to issue a

2  sanction.  Sanctions must be commensurate with the issue.

3          **MR. ZIPERMAN:**  Well, your Honor, we're working with

4  Meta to the fullest extent we have authority to.

5      When they issue -- so they issued Rule 45 subpoenas on

6  each of these agencies.  As I said, they contacted agency

7  counsel.  They were separately negotiating with agency counsel

8  to limit those requests.  Agency counsel was calling us and

9  saying, what's this case all about, I have no idea.  We filled

10  them in.  We sent them the discover.  Excuse me, I'm jumping

11  the gun.  We can advise them, we can answer questions, and we

12  encouraged them to comply.

13      Judge Kang issued his order.  Meta has now withdrawn all

14  of its Rule 45 subpoenas.  Meta has said that they are no

15  longer honoring any of the limitations that they were

16  previously discussing with those agencies, and Meta has refused

17  to talk to agency counsel.  Now, they want to deal exclusively

18  with us.

19          **THE COURT:**  Why is that?  Why is that?  Doesn't that

20  in fact hinder the progress of this litigation?

21      Who's going to answer the question?

22          **MR. HALPERIN:**  Yes, Your Honor.

23      We held the Rule 45 subpoenas in abeyance because it was

24  inefficient for us to keep negotiating on an agency-by-agency

25  basis, when we had an order from the Court telling us that

1  these are parties and we should be negotiating them on a

2  state-by-state basis.  We're not telling the agencies, don't

3  send us the documents that you've collected already.  We've

4  simply told them we don't want to keep doing exactly what Judge

5  Kang told us would be inefficient to do, negotiate with 130

6  different agencies, when we're supposed to be negotiating with

7  a state-by-state basis.

8          **THE COURT:**  Well, you may find yourself back at

9  ground zero if I do something else.

10          **MR. HALPERIN:**  We understand that, Your Honor.  We --

11          **THE COURT:**  That's a pretty big risk.

12      (Reporter clarification.)

13          **MR. HALPERIN:**  I apologize.  This is Greg Halperin

14  from Covington on behalf of Meta defendants.

15      We certainly understand that.  We were mindful, though,

16  Your Honor that we had a very thorough, very well-reasoned, in

17  our view, 285-page order from the Court that then the agencies

18  appealed under a Rule 72 standard.  So we did take that risk,

19  Your Honor, and we understand it, but we had an order from the

20  Court saying negotiate, meet and confer with the AGs.  And so

21  that's what we tried to do.  The AGs said we're not interested,

22  many of them.  We're not going to give you search terms.  We're

23  not going to give you custodians.

24      We were back before Judge Kang yesterday, who gave the AGs

25  a deadline to do exactly that, so that we could keep this case

1    moving.  And that really is what we're trying to do.  Two days

2    after we got this order, we reached out to the AGs and said, we

3    want to have a conversation with you.  We want to talk about

4    search terms, we want to talk about custodians, and we want to

5    hear from you if you're telling us this agency doesn't actually

6    have relevant documents.  We'd like to take that back.  We'd

7    like to have what normally happens at discovery, where the

8    parties meet and confer and they come to a reasonable agreement

9    on the scope of discovery.

10           **MR. ZIPERMAN:**  May I, Your Honor?

11           **THE COURT:**  Well, there was a much more efficient way

12   to do it than you've all chosen to do.

13           **MR. ZIPERMAN:**  Your Honor --

14           **THE COURT:**  We're going to stand in recess for 20

15   minutes.

16        (A recess was taken from 10:57 a.m. to 11:20 a.m.)

17           **THE COURT:**  Okay.  We are back on the record.  The

18   record will reflect the parties are present.

19        Who's up next?

20           **MR. ZIPERMAN:**  I was starting to answer.

21        Your Honor, I'm not saying that Meta's not cooperating at

22   all, but the position they took, at least with Maryland, was

23   that all prior discussions are off, we're starting from scratch

24   again, and --

25           **THE COURT:**  That would be a problem.

1          **MR. HALPERIN:**  I'm not sure that quite accurately

2     describes the situation, Your Honor.

3          **THE COURT:**  Well, perhaps.  I don't want to hear it,

4     but I'm telling you it's going to be a problem.

5          **MR. HALPERIN:**  Understood, Your Honor.

6      I'm happy to I think explain the situation, but we can

7     move to the next topic if you'd prefer.

8          **THE COURT:**  Anything else?

9          **MR. ZIPERMAN:**  Your Honor, I guess I just wanted to

10    finish with the point that I understand Your Honor's questions

11    about our subpoena authority, and certainly it's true, we have

12    it.  You know, the problem I have with the logic that Judge

13    Kang applied to his order is is that somehow we have control

14    because --

15         **THE COURT:**  Look, I'm not saying -- you're going to

16    have to reframe the argument.  In part, because I am not here

17    to decide whether I would have decided the issue differently.

18    The issue is whether you can point me to law.

19         **MR. ZIPERMAN:**  Your Honor, the answer is "no."

20         **THE COURT:**  And that's your prob' -- and now that's a

21    problem.  So what I'm left with if I disagree with the breadth

22    of what it is he has said is a problem, and -- right?  So

23    there's the practical issue and there's the legal issue.

24         **MR. ZIPERMAN:**  Right.

25         **THE COURT:**  And the legal issue is actually pretty

1    straightforward, which is I need law to show that what he did

2    is different, is contrary.  Not whether I would have done it

3    differently, and perhaps I would have.  Which is why I said

4    this is going to be a problem for you.

5            **MR. HALPERIN:**  Understood, Your Honor.

6            **MR. ZIPERMAN:**  And, Your Honor, our position is is

7    that applying the law that Judge Kang applied to the Maryland

8    circumstance where we brought the narrowest claim we could, the

9    law was applied miscorrectly, incorrectly.

10        That's it, Your Honor.  Thank you.

11           **THE COURT:**  Except you can't cite me to a case.

12           **MR. ZIPERMAN:**  No, I can't, Your Honor.  There's no

13   Maryland law that says that the Maryland AG can just walk to

14   another agency, say, could you give us your documents.

15           **THE COURT:**  Yeah, except you have done it in the

16   past.

17           **MR. ZIPERMAN:**  But we've asked.  That doesn't mean we

18   can control.

19           **THE COURT:**  Next.

20           **MR. ZIPERMAN:**  Thank you, Your Honor.

21           **MR. WALLACE:**  Your Honor, Kevin Wallace on behalf of

22   the New York Attorney General.

23           **THE COURT:**  Okay.  Go ahead.

24           **MR. WALLACE:**  Your Honor, I'm just going to try and

25   directly answer the questions you've asked of the various

1    states.

2        First, when the Office of the Attorney General in most

3    instances is in need of documents and information from other

4    state agencies, we issue an administrative subpoena to the

5    agencies.  There are limited instances where statutory

6    authority requires state agencies to cooperate with our request

7    in investigations specifically in the New York state Martin

8    Act, which is our securities enforcement statute.  That's

9    General Business Law, Section 23(a).

10       I am not aware of any instances where we have litigated in

11   court with a agency of the State over one of our subpoenas.  I

12   am aware of litigation between different state agencies, in

13   particular our Office of Comptroller and what was the

14   liquidation bureau of our state insurance department that is

15   now a different agency.  But specifically to the question

16   you've been asking, for our subpoenas I am not aware of a case

17   where that has happened.

18       I am also not aware of any decision from the court of

19   appeals of the State of New York or another appellate

20   department that directly addresses this issue, although our

21   position is and was that Magistrate Kang's decision does

22   conflict with a district court decision in the Northern

23   District of New York; that is, *Boardman versus National*

24   *Railroad*, 233 F.R.D. 259.  But again, not a state appellate

25   decision.

1          **THE COURT:**  So district court as in federal district

2     court?

3          **MR. WALLACE:**  Yes, it was the federal district court.

4     I believe it's a magistrate decision from the Northern District

5     of New York, and it is on the question of the interpretation of

6     the New York state Constitution and the same statutes that

7     Magistrate Kang was looking at.

8          I just did want to mostly take a moment to address the

9     fairness issue, and it's certainly not our position that Meta

10    should be going into summary judgment and trial without

11    discovery from the various state agencies, and, in fact, our

12    position is, just factually, is the office of the governor has

13    outside counsel and is in the process of negotiating with Meta

14    and has agreed to cooperate and produce documents if they are

15    under the rubric of a Rule 45 subpoena, and that is for eight

16    of the nine agencies that they are seeking.

17         We are working to facilitate a response from the one other

18    agency that is not part of -- that doesn't fall under this

19    umbrella for the governor's counsel.  And we are, in fact, due

20    to meet and confer with Meta on Tuesday about that issue, and

21    it's the same position, that the agency will produce documents

22    under Rule 45, as opposed to conceding that the documents are

23    in our possession.

24         And I just wanted to point out that in Judge Kang's

25    decision, incorporating counsel for these state agencies is

1    perfectly consistent with what he ordered.  In fact, in the

2    last page of his decision he orders, quote, "the parties,"

3    parens, "including counsel for the state agencies," closed

4    parens, "are ordered to promptly meet and confer regarding a

5    mutually agreeable and reasonable date for the state agencies

6    to substantially complete their respective productions of

7    documents in response to either the Rule 34 requests, or to the

8    extent applicable, Rule 45 subpoenas."

9        And I understand from my colleagues that's New York's

10   position, that we are now going beyond just the agencies that

11   received Rule 45 subpoenas, and all of the agencies that

12   they're asking for are in the process of negotiating with them.

13       **THE COURT:**  Well, I've got the list for New York.

14   Which is the one that is not?

15       **MR. WALLACE:**  The Department of Education.  They are

16   independent of the governor, and so their in-house counsel are

17   directly negotiating that and we are facilitating that

18   conversation with Meta.

19       **THE COURT:**  Okay.

20       **MR. WALLACE:**  And I was just going to add for the

21   record that I understand that all of the states are, in fact,

22   we're cooperating with the Rule 45 subpoenas that they did

23   receive, and we're in the process of either negotiating how the

24   production would return or making a production.

25       **THE COURT:**  Okay.  I'm not sure how that comports

1  with what I just heard, that Meta has stopped discussions with

2  respect to Rule 45 subpoenas.

3         **MR. WALLACE:**  I believe they were until they received

4  the letter saying, stop Rule 45, let's move to Rule 34.

5         **MR. HALPERIN:**  If I may, Your Honor?

6         **THE COURT:**  Who's lead on this issue?  Are you lead?

7         **MR. HALPERIN:**  Overall I am, Your Honor.

8         **THE COURT:**  And your name again?

9         **MR. HALPERIN:**  Greg Halperin.

10        **THE COURT:**  All right.  Go ahead.

11        **MR. HALPERIN:**  Your Honor, what happened was we had

12  been in the process of negotiating with certain agencies that

13  had gotten -- we prudentially served Rule 45 subpoenas during

14  the pendency of this issue with Judge Kang.  For certain

15  agencies we had gotten, and it's a small number, we had gotten

16  further along in the process than others.  For those agencies,

17  we told them, send us the documents you have.  I'm looking at

18  an e-mail from October 4th to the State of Kentucky, where, as

19  to two agencies we said they should, quote, "produce the

20  documents that they have collected in response to the subpoenas

21  issued to them."

22     Where the conversations had progressed far enough, we

23  said, we want you to give us what you have.  From many of the

24  agencies we hadn't gotten that far because it's a laborious

25  process of serving subpoenas, reaching out to counsel, they

1    have time to respond to the subpoenas.  For those, where we

2    were basically at square one, we said, we now have an order

3    from Judge Kang saying negotiate state by state.

4           **THE COURT:**  You still have to do the same thing.

5    It's not as if, under the federal rules, you get to issue an

6    order or you get to issue a request and it has to be complied

7    with in totality, because frequently it's overbroad.  So

8    there's constant negotiation.

9           **MR. HALPERIN:**  Absolutely, Your Honor.  And that's

10   the negotiation we've been trying to have.

11          What we've said and what Judge Kang ordered us to do

12   yesterday is to have that conversation and that negotiation on

13   a state-by-state basis with 35 states, rather than doing it

14   with 275 separate agencies.

15          **THE COURT:**  Anything else?

16          **MR. WALLACE:**  Nothing from New York, Your Honor.

17          **THE COURT:**  Next.

18          **MS. MIYATA:**  Your Honor, briefly on the point that

19   you were just -- Bianca Miyata for the state AGs.

20          Briefly on the Rule 45 point that Your Honor was just

21   inquiring into, I did want to provide just a tiny bit more

22   texture about that with the Court's indulgence.  And that would

23   be that, you know, in the negotiations of these subpoenas, and

24   I think when the state agencies and the AGs learned that Meta

25   asked the agencies to hold those subpoenas in abeyance, we have

1    tried to confer with Meta about to what extent those requests

2    under the Rule 45 subpoenas overlapped and in part satisfied

3    what they were seeking, and with the Rule 44, to really

4    determine what work has been done and what remains and what are

5    you seeking above and in addition to that, and Meta declined to

6    have those conversations with us and his --

7              THE COURT:  Why?  Why?

8              MR. HALPERIN:  We have done that, Your Honor.  What

9    we've said is we want to do it --

10             THE COURT:  Why did you decline to have those

11   conversations?

12             MR. HALPERIN:  We did not decline to have those

13   conversations.

14             THE COURT:  Okay.  So she's lying to me?

15             MR. HALPERIN:  It's not inaccurate, Your Honor, that

16   we've got a different perspective as to what the first step is,

17   and we addressed that with Judge Kang yesterday.  Their

18   perspective is we should go immediately to talking about the

19   specific RFPs rather than doing what was done as to Meta on the

20   defensive end, which is we have a set of RFPs, let's talk

21   globally about a set of custodians and search terms.  We've had

22   a disagreement about what the right process is, not should we

23   have a process.

24        We took that to Judge Kang yesterday, and Judge Kang

25   agreed with us that the first step is they provide us

1    custodians and search terms.  That happened just yesterday.  We

2    have not refused to confer with the states or the agencies, we

3    just have a difference of opinion about the process.

4        **MS. MIYATA:**  If I may respond to that just briefly,

5    Your Honor.

6        I believe, you know, from our perspective we want to do

7    what we can within the bounds of our authority and the bounds

8    of our representation to make this process move further, which

9    is why we've been trying to do this since the Rule 45 subpoenas

10   were issued.  I think if we -- starting from the perspective

11   that we have to -- I don't want to rehash any of the disputes

12   that we discussed about search terms and custodians yesterday,

13   because I understand that Your Honor's time is valuable and

14   important, and we've already had that conversation.  But I

15   think trying to gain a larger understanding of how this fits

16   into the work that has already been done is important.

17       Our state agencies have important work to do serving the

18   public, and they want to do this, as well, but they don't want

19   to duplicate work.  And it's difficult for them to understand

20   and for us to understand how we can do that if the work that's

21   been done thus far in the Rule 45 subpoenas is now to just be

22   set to the side in favor of starting a new process negotiated

23   with a new group of people.

24       **MR. YEUNG:**  Your Honor, may it please -- Chris Yeung

25   from Covington.

1    I've had some of these conversations that I would just

2 like to put a little bit more texture on what my colleague has

3 said.

4    Just to backtrack a little bit, of the subpoenas that

5 we've served, we've received documents for only 29 agencies.

6 After Judge Kang's order, we have proposed a process that

7 involves search terms and custodians for the states to comply

8 with the order.  In the context of those discussions --

9    (Simultaneous crosstalk.)

10    **THE COURT:** -- satisfied if they respond to the Rule

11 45?  Doesn't that shortcut everything?

12    **MR. YEUNG:**  We didn't --

13    **THE COURT:**  Doesn't it shortcut everything?

14    **MR. YEUNG:**  We didn't issue subpoenas to every agency

15 that was on the order, because it would -- because we didn't --

16 it's a lot of agencies.  We just started the first wave.

17    And then Judge Kang's order came in, and we told the

18 states, if you want to have a discussion about the agencies,

19 let's do that in conjunction with the search terms discussions.

20 There are 20 states who have agreed to do that with us.  We are

21 having those discussions.

22    As we told Judge Kang, there are 14 that want us to narrow

23 our RFPs, which have been outstanding for eight months, before

24 we even have a search term discussion.  That's the process

25 dispute that we were having before Judge Kang.  He's issued his

ruling.  He's told us all to have those meet and confers

together, which is what we wanted.

     And I have personally been on meet and confer calls with

representatives from 15 agencies, plus, you know -- maybe 15 is

a slight overstatement.  Multiple agencies, seven, eight

agencies, plus the Attorney General, trying to work through

these issues in at least one of the states.  So we are, in

fact, having those discussions with the states who have opted

into the process of actually agreeing to utilize search terms

and custodians.

     So that is what's actually going on.

          **MS. MIYATA:**  And I think we can, you know, we can

talk at length about the chicken-or-the-egg question of do we

start by talking about the scope of the RFPs first, or do we

start by proposing search terms and custodians first.  Again,

don't want to rehash that, but I think what I did want to

represent to the Court is that I think the perception that I'm

hearing from the other side is that the state agencies and the

states have simply put up a stone wall and have not tried to

have these conversations and tried to get them the information

that they are seeking and that they are requesting, and that I

believe is wholly inaccurate.

          **THE COURT:**  All right.  Next state.

          **MS. GILCHRIST:**  Corinne Gilchrist on behalf of the

State of Indiana.

1      Your Honor, I want to start by addressing the questions --

2          **THE COURT:**  Everybody should start the way the last

3   lawyer started from New York, Mr. Wallace.  Answer my questions

4   first.

5          **MS. GILCHRIST:**  Yes, Your Honor.

6      There is not a Supreme Court decision directly addressing

7   the question of legal control in the manner in which Judge

8   Kang's order addressed it.  There are state Supreme -- there is

9   state Supreme Court case law regarding representation and the

10  governor's authority to hire his own counsel or her own counsel

11  for responding to litigation, for engaging in litigation.

12         **THE COURT:**  Was that presented to Judge Kang?

13         **MS. GILCHRIST:**  It was.

14         **THE COURT:**  Okay.

15         **MS. GILCHRIST:**  *Holcomb v. Bray* is the case cite,

16  Your Honor.

17      And the second question that Your Honor posed to the

18  states --

19         **THE COURT:**  Stop.

20         **MS. GILCHRIST:**  Yes.

21         **THE COURT:**  *Holcomb v. Gray*.

22         **MS. GILCHRIST:**  *Bray*.

23         **THE COURT:**  How did he -- did he get it right?  Did

24  he get it wrong?  For Meta, *Holcomb v. Bray*.

25         **MR. CARPENTER:**  Oh, apologies, Your Honor.  If you

```
 1   just give me one moment to find it.

 2        I'm not entirely sure if Judge Kang addressed it

 3   explicitly, but my memory of that case is that it doesn't say

 4   anything about the issue before the Court here, it's just a

 5   state-specific version of the common arguments the states have

 6   made, that there is a divided executive, and that sometimes the

 7   governor retains counsel that Attorney Generals don't.  But I

 8   think Judge Kang's order and the common arguments persuasively

 9   address that issue.

10             THE COURT:  Is that right?

11             MS. GILCHRIST:  Your Honor, our position is that

12   Holcomb v. Bray stands for the proposition that we do not

13   represent the agencies in every circumstance, and --

14             THE COURT:  Well, isn't that what he just said, that

15   it is divided government?

16             MS. GILCHRIST:  Yes.  In Indiana the executive, the

17   governor is the executive through our Constitution, and our

18   Attorney General is statutorily created and derives our

19   authority from the statutes.

20        So the question that magistrate judge asked the states to

21   address in the one-page briefing on this issue for the state-

22   by-state specifics was specifically whether there is state law

23   or constitutional authority that prohibits the AG from

24   accessing documents, whether there is --

25             THE COURT:  And is there?
```

1          MS. GILCHRIST:  -- applying the *Citric Acid* test --

2          THE COURT:  And is there?

3          MS. GILCHRIST:  There is no basis for our accessing

4    those documents on demand --

5          THE COURT:  So --

6          MS. GILCHRIST:  -- as is required through the --

7          THE COURT:  So if you -- so now answer the second

8    question that I've been asking folks.

9          MS. GILCHRIST:  If --

10         THE COURT:  If an AG needed to get documents from an

11   agency, would they be able to send a letter and go get them?

12   Would they have to file a lawsuit?  What is the process?

13         MS. GILCHRIST:  In the context of if we are in an

14   investigative posture, Your Honor, seeking documents?  I wanted

15   to clarify the question.

16         THE COURT:  All contexts.

17         MS. GILCHRIST:  Okay.  So from a consumer protection

18   investigation perspective -- and we did cite to our civil

19   investigative demand statute in the briefing, because it allows

20   for -- that is the investigative tool that we use.  Indiana can

21   serve it on third parties or targets for information

22   relevant --

23         (Simultaneous crosstalk.)

24         THE COURT:  -- able to comply, correct?

25         MS. GILCHRIST:  It is similar, more similar to an

1  administrative subpoena.  It is not self-enforcing, however.

2  So ...

3          THE COURT:  Have you ever had to go to court to

4  enforce it?

5          MS. GILCHRIST:  Yes.  Not against a state agency, to

6  my knowledge, but we can file a petition to enforce --

7          THE COURT:  That's all we're talking about are state

8  agencies.  Have you ever had to go to court to enforce it

9  against a state agency to your knowledge?

10          MS. GILCHRIST:  Not to my knowledge, Your Honor, no.

11          THE COURT:  So as you all recall, I ordered

12  production of thousands of documents by the defendants to all

13  of you based upon these kinds of investigative letters.  Right?

14  You were able to entirely bypass the Code of Civil Procedure

15  because I ordered the defendants to give it to you wholesale,

16  and these are the kinds of letters we're talking about.  Right?

17          MS. GILCHRIST:  It is a -- yes, it's a civil

18  investigative demand.  We would typically not pursue those

19  while in litigation, and that was the reason that we cited it

20  as a lack, as evidence of the lack of our on-demand access, as

21  is required by the *Citric Acid* test.  Practically speaking are

22  we potentially able to work with the agency contacts that we

23  know to obtain the documents?  Potentially.  But that is our

24  concern with the legal error here is that the legal control

25  test requires --

1    (Simultaneous crosstalk.)

2    **THE COURT:** -- you have not clarified any state

3    Supreme Court or appellate authority that indicates that this

4    was clear error.  What you've identified are some practical

5    problems.

6    **MS. GILCHRIST:** Well, Your Honor, the burden -- we

7    believe the legal error is in the burden-shifting of the State

8    to prove a negative, that we do not have the authority, as

9    opposed to pointing to, which is the requirement in the *Citric*

10   *Acid* test, a statement of authority to obtain legal access to

11   the documents on demand.  So it is -- there is not authority

12   that allows us to -- that states the Indiana Attorney General

13   has custody or control of these documents, has an access -- has

14   a right to access these documents for these agencies that are

15   under the constitutional executive in Indiana.

16   **THE COURT:** All right.  Response.

17   **MR. CARPENTER:** Thank you, Your Honor.

18   I think the authorities are laid out in our briefing and

19   Judge Kang's order.  I'm happy to discuss them, but I don't

20   want to belabor the point.  So the only additional thing I

21   would add is that my understanding is that in the *Generic*

22   litigation in Pennsylvania, Indiana ended up stipulating to

23   getting a lot of these documents for the other party.  So

24   there's clearly some ability to obtain them from the state

25   agencies.

1          **THE COURT:**  Next state.

2          **MS. GILCHRIST:**  Thank you, Your Honor.

3          **MR. BURNS:**  Good morning, Your Honor.  Jonathan Burns

4     from Pennsylvania.

5          To answer your question, no, I am not aware of a Supreme

6     Court case regarding our investigatory subpoena authority.

7     What I would say is specifically in the opinion, our statute,

8     Section 208 of the Commonwealth Attorneys Act says that we have

9     access to books and papers specifically for duties under the

10    Act.  And the legal error that occurred with respect to the

11    Pennsylvania Office of Attorney General was the Court held that

12    we are ordered to represent the agencies in this particular

13    situation because of the language used in Section 204 of the

14    Commonwealth Attorneys Act, where it said we sh' -- that the

15    Office of Attorney General shall represent the agencies, and he

16    stopped at that portion of the statute.

17         And this was something that was raised during the argument

18    with the magistrate.  I said to the magistrate, well, later in

19    that particular provision there is a section that describes the

20    process, and the process is this:  The Attorney General can

21    decide whether we represent the agencies if it is efficient or

22    in our best interests, and the Judge's order does not describe

23    that provision whatsoever.  It --

24         **THE COURT:**  So how -- one, how is it not more

25    efficient?  And, two, isn't it, in fact, in your best interest?

```
 1    Because if you're ordered to, don't you want to avoid

 2    sanctions?

 3              MR. BURNS:  It's -- so to address both those

 4    questions, the second one, the second one, the best-interest

 5    question, that's really putting the cart before the horse,

 6    because in order to get to the best interest --

 7              THE COURT:  Isn't it in your best interest to be able

 8    to litigate a case?  I mean, this is what this is about.  You

 9    have come proactively into court on behalf of your state, and

10    you are attempting to shield yourself from information from the

11    State.

12              MR. BURNS:  We -- we are not attempting to shield the

13    informations.  In fact, our agencies have been -- two of the

14    five agencies that Meta seeks discovery from also received Rule

15    45 subpoenas.  Those agencies responded to the Rule 45

16    subpoenas, they negotiated with Meta directly, and they --

17    after they sent that information to Meta, Meta asked for the

18    encryption key to download the documents, they received the

19    documents, and then they said, oh, by the way, this does not

20    satisfy your Rule 34 discovery obligations from the

21    magistrate's order.  So --

22              THE COURT:  Why not?  Why not?

23              MR. HALPERIN:  Well, Your Honor, the documents that

24    were provided to us were just the agency unilaterally selected

25    custodians.  We don't know how the documents were provided to
```

```
 1   us.

 2       Our point was simply, in party discovery, consistent with

 3   how Meta has been producing documents, there's --

 4           THE COURT:  Don't you understand that this is not a

 5   typical case?

 6           MR. HALPERIN:  We certainly understand it's not a

 7   typical case.

 8           THE COURT:  Okay.

 9           MR. HALPERIN:  Our point is simply maybe what they've

10   given us is everything they have, but they just dumped

11   documents on us.

12           THE COURT:  Oh, and you all don't know what dumping

13   documents is like?

14           MR. HALPERIN:  Your Honor, it -- on the defensive

15   side --

16           THE COURT:  It was gratuitous.  I understand that.

17   Sit down.

18           MR. BURNS:  Your Honor, my understanding from the

19   agencies is that their counsel -- and just a brief

20   understanding of their representation.  There's an Office of

21   General Counsel.  That OGC is able to represent all of these

22   agencies in question.  And so what happens is one of the

23   answers to your previous question about why this is not in our

24   best interest or inefficient is because that OGC has offered to

25   coordinate the discovery for all of these agencies.  So they
```

1    can issue -- and they have said this.  We can -- Meta could

2    issue Rule 45 subpoenas.  The point person would be the Office

3    of General Counsel, and he would help facilitate that

4    discovery, or, excuse me, that response to the Rule 45

5    subpoenas.

6        In our case, what happens is -- and this is why it's not

7    in our best interest, because our office has a finite number of

8    resources, and if I am taken off of the prosecution of the

9    case, I have not been able to participate in depositions, there

10   are various aspects of the case that I am unable to report on

11   to our front office, and that happens because I spend my time

12   trying to figure out what we're going to do about discovery.

13       So the best-case scenario is that our agencies, who have a

14   point person, are able to respond to Meta's Rule 45 subpoena,

15   which they have done, and my understanding is that they were

16   actually in negotiations and it wasn't a document dump.  Maybe

17   I'm incorrect about that because I wasn't involved in those

18   conversations, but that's what I was informed of.

19       And so what we would like to do is to make sure that it

20   is -- because it is in our best interest to maintain our

21   attorneys on the prosecution of the case, we decided not to

22   represent the agencies in this action.  And what the magistrate

23   did was he said you shall represent the agencies, which trumps

24   our statutory obligation to make that decision on our own.  It

25   doesn't -- the statute does not provide that the Court is able

1   to decide what is in the best interest of the agency or most

2   efficient.  The statute gives that to us.  It's in -- the

3   statute is also in the legislative history, which is cited in

4   the papers.

5       So what ultimately we would like to do and have offered to

6   Meta is to go through the Rule 45 process, and both myself have

7   communicated with Meta, offered a meet and confer, but saying

8   that ultimately the agencies are attempting to go through this

9   process, and it would be quicker if we did it that way, as it

10  has been throughout the litigation.

11          **THE COURT:**  All right.  Next?

12          **MR. BURNS:**  Thank you.

13          **THE COURT:**  Thank you.

14          **MR. STYRON:**  Good morning, Your Honor.  Or afternoon,

15  Your Honor.  Chris Styron, Louisiana Attorney General's Office,

16  on behalf of the State of Louisiana.

17      I am not aware of any Louisiana Supreme Court authority

18  related to Louisiana's authority to issue investigative

19  subpoenas.  However, I am aware of a Third Circuit case in

20  Louisiana that specifies that our authority under our Louisiana

21  unfair trade practice statute related to civil investigative

22  demands only applies to prelitigation discovery.  And so we do

23  not have that tool and are not able to obtain any documents

24  from Meta or anyone under our CID authority.

25      Also, I would like to mention that Louisiana -- Judge Kang

1    in his order heavily relied on Louisiana law and a

2    misinterpretation of Louisiana law in determining control under

3    federal law, so in that regard the Court has made Louisiana law

4    relevant.

5        That specific statute is Louisiana Revised Statute, Title

6    49, Section 257.  Judge Kang indicated that that statute

7    requires the Louisiana Attorney General to represent all

8    agencies in any matter regarding or related to tort or

9    contract.  The Judge misinterpreted that statute, which

10   requires that the agencies are involved in the tort and are in

11   the litigation.  And I'm certainly willing to go through that

12   analysis and read the language of the statute, but my general

13   point is that the court has made Louisiana law relevant.  There

14   was a misinterpretation that was relied upon heavily to

15   indicate that the Louisiana Attorney General has control in

16   this case.

17       THE COURT:  That's a factual determination, isn't it,

18   based upon evidence that you provided to the Court?

19       MR. STYRON:  Your Honor, we --

20       THE COURT:  The Court asked for specific information

21   from each of you and then made a factual determination based

22   upon what you provided.  Isn't that true?

23       MR. STYRON:  Your Honor, if I recall correctly, at

24   that time Judge Kang requested that we provide very limited

25   information.  I believe the request was whether there was any

1    law that prevented the AG from representing these agencies.  We

2    provided what law we could find related to this issue,

3    similarly or potentially related, and that law was the one that

4    Judge Kang is now relying on to say that the Attorney General

5    shall represent these agencies here, where it's clear that the

6    law only applies when the agency's involved in the tort.

7         So to attempt to answer your question, that seems to be a

8    legal -- an incorrect legal opinion.

9         **THE COURT:**  Revised 49, Section 267?

10        **MR. STYRON:**  Louisiana Revised Statute, Title 49,

11   257(a).  It states specifically that:  "The Attorney General

12   shall represent the State and all departments and agencies of

13   state government in all litigation arising out of or involving

14   tort or contract."

15        Judge Kang incorrectly concluded that because this

16   litigation arises out of tort, the statute applies, and

17   therefore the Attorney General has to represent state agencies

18   identified by Meta.  But the Court, or Judge Kang, misread or

19   ignored the explicit text of the statute, which says that the

20   Attorney General shall represent these agencies in litigation,

21   in the lawsuit, as a part of the litigation.  So the statute

22   only applies when the agencies are in the litigation and are a

23   part of the underlying tort either as a plaintiff or defendant.

24        And there are -- Meta, nor Judge Kang cited any case law

25   to support the fact that that statute applies when there is no

1  agency-related tort or an agency is not in the litigation.

2  There are no reported cases that say otherwise.

3          **THE COURT:** Did you answer my initial questions?

4          **MR. STYRON:** Your Honor, I attempted to. I'm not

5  aware of any Louisiana Supreme Court decision that --

6          **THE COURT:** You do have CIDs prelitigation where you

7  can, you don't even need a litigation to go in and get

8  documents when you're investigating agencies. Isn't that the

9  corollary of your statement? You say you can't issue them

10  after litigation.

11          **MR. STYRON:** Your Honor --

12          **THE COURT:** Doesn't that mean that you can before?

13          **MR. STYRON:** Your Honor, there's a very specific

14  standard under that statute, which requires the Attorney

15  General to provide evidence of an unfair trade practice, and it

16  can only be issued prelitigation. We're far beyond that.

17  Potentially at the time, prelitigation, we could have sent a

18  third-party CID to Meta, but that's the equivalent --

19          **THE COURT:** I'm not talking about your ability to

20  send things to Meta. Many of you did send things to Meta. I'm

21  asking you about your ability to get documents from these

22  agencies.

23          **MR. STYRON:** Excuse me, Your Honor. At the --

24          **THE COURT:** And by the way, there is -- under your

25  view, there is no litigation to which they are a part. So you

1    could go in there, you could give them a letter, say, I need

2    these documents, and they'd have to give them to you.  Right?

3            **MR. STYRON:**  No, Your Honor.  And I'm sorry, I don't

4    believe I'm making my point.  My point is that there has to be

5    litigation that they are in related to tort.  Meaning that, for

6    example, Meta --

7            **THE COURT:**  I'm not talking about the statute, I'm

8    talking about CIDs.

9            **MR. STYRON:**  Under the civil investigative demand,

10   prelitigation if we were investigating Meta, we could have

11   issued --

12           **THE COURT:**  I'm not talking about Meta.  Don't you --

13   if you were investigating an agency --

14           **MR. STYRON:**  Okay.

15           **THE COURT:**  -- could you do the same thing?  You

16   could go in and you could get the documents you need.

17           **MR. STYRON:**  No, Your Honor.

18           **THE COURT:**  You can't investigate an agency?

19           **MR. STYRON:**  No, Your Honor.

20       In very limited circumstances, which are very unlikely,

21   because the Louisiana unfair trade practice statute requires

22   acts in trade and commerce, and agencies typically aren't

23   involved in trade and commerce.

24           **THE COURT:**  So there's no circumstance under which

25   you could go and get documents from an agency?

 1          **MR. STYRON:**  There's no circumstances under Louisiana

 2    law as a civil enforcement authority to demand an agency to

 3    give documents to our office.  No, ma'am.

 4          **THE COURT:**  How about criminal?

 5          **MR. STYRON:**  I'm not a criminal attorney.  I can only

 6    assume that if there's some allegations of fraud, potentially

 7    there could be some criminal demands, but that's not the

 8    situation.

 9          **THE COURT:**  So your agency has never collected

10    documents?  Never once collected documents from an agency?

11          **MR. STYRON:**  Not by demand.

12          **THE COURT:**  Then how?

13          **MR. STYRON:**  My assumption is that we could request

14    the documents and they could voluntarily give them to us.

15          **THE COURT:**  Okay.  So you could request them and they

16    could agree to give them to you.  And that's what would

17    typically be done?

18          **MR. STYRON:**  The same way we could request them of a

19    company or any other individual.  But it's not a requirement

20    under Louisiana law.

21          **THE COURT:**  I'd like a statement from the defense on

22    this basic proposition that a lawyer should be viewed as

23    controlling documents.  And in particular, the plaintiffs argue

24    that Covington, for instance, does not control the documents of

25    its lawyers -- of its client, so it was an error to somehow

1   base the opinion on the notion that just because you're a

2   lawyer, that would give you the right to their documents.

3           **MR. HALPERIN:**  I don't believe, Your Honor, that

4   Judge Kang made that conclusion.  I also don't believe, Your

5   Honor, that the analogy to private outside counsel is apt here.

6   Covington's clients have a choice among --

7           **THE COURT:**  All right.  Stop.

8     So did he not make that conclusion?  And this isn't to

9   you.  I think that there were three common argument lawyers

10   identified.

11     Did he make that conclusion or not?

12           **MS. STEVENSON:**  I'm sorry, Your Honor.  Can you say

13   that again?  Which conclusion?

14     (Reporter clarification.)

15           **MS. SIMONSEN:**  Shannon Stevenson for the state AGs.

16           **THE COURT:**  Did Judge Kang conclude -- well, at least

17   I understood your argument to be that he concluded that because

18   the AGs were representing, or the lawyer for the agencies, by

19   definition, or at least that was part of the analysis, they

20   should be deemed to be in control of the documents.  And the

21   argument I thought by the AGs was that, well, Covington is the

22   lawyer for Meta.  That doesn't mean that Covington can be

23   deemed to be in possession and control of Meta's documents.

24     Am I missing the argument?

25           **MS. SIMONSEN:**  No.  That's exactly right, Your Honor.

1      **THE COURT:**  Okay.  He just argued that that

2  conclusion wasn't made by Judge Kang.

3      **MS. SIMONSEN:**  No, I think that was a fundamental

4  tenet of his entire ruling.

5      **THE COURT:**  And do you have a cite to the order?

6  Because for some reason Mr. Halperin doesn't think that that's

7  in the order.

8      **MS. SIMONSEN:**  Yes, one second.

9      So, Your Honor, it's in the part where he cites this --

10  the legal rights or the necessary corollary to legal duties.

11  And if I could find the ... if I can find that one cite, I can

12  give it to you.

13      Ah, twenty-eight to 33.  Thank you.

14      **THE COURT:**  Okay.  What does he say?

15      **MS. SIMONSEN:**  So in the middle of page 29 of the

16  order, and he says:  "In the state government's context, a

17  legal relationship between the state Attorney General and the

18  agency establishes a direct legal link between the agency and

19  the plaintiff, either directly where the Attorney General is a

20  named plaintiff, or through counsel, thus supporting a finding

21  of control.

22      "As the designated legal representative for a state

23  agency, the Attorney General has professional and ethical

24  obligations to access all relevant documents to provide

25  effective legal counsel and representation.  This is legally

1   mandated and goes beyond a mere practicality, ensuring that the

2   Attorney General can fulfill their duties under the federal

3   rules."

4           **MR. HALPERIN:**  And, Your Honor, if I may?

5           **THE COURT:**  You may.

6           **MR. HALPERIN:**  That was exactly my point is he made a

7   finding that they are legally mandated to represent the

8   agencies.  He made a finding in the state governance context.

9   He did not make a finding that all lawyers everywhere have

10  control over their clients' documents.  That's the point that I

11  was asserting, Your Honor, he did not make a finding about.

12          **THE COURT:**  It is the analogy, isn't it?  And how is

13  that an accurate analogy?

14          **MR. HALPERIN:**  Well, Your Honor, just last week in

15  the *New Mexico versus Johnson & Johnson* case that we submitted

16  to Your Honor supplemental authority, the Supreme Court of New

17  Mexico considered this exact same thing and said that --

18          **THE COURT:**  Well, the Supreme Court of New Mexico

19  also said it was not -- it was not ultimately opining whether

20  or not the plaintiff there wanted to go back and amend its

21  complaint to exclude the agencies that had been listed in the

22  complaint, suggesting that if the agencies were no longer

23  listed in the complaint, then that link would be severed.

24          **MR. HALPERIN:**  That may be so, Your Honor.  I'd need

25  to go back and look at the opinion.

1          **THE COURT:**  And I don't recall seeing any agency

2     actually listed in the complaint.  Are agencies listed?

3          **MR. HALPERIN:**  Agents are not listed, nor are they

4     excluded.  And as we talked about before, Your Honor, there

5     are --

6          (Simultaneous crosstalk.)

7          **THE COURT:**  -- New Mexico isn't directly on point.

8     The New Mexico court made a specific reference to that issue.

9     The problem was that they were listed in the complaint.

10         **MR. HALPERIN:**  Well, Your Honor, New Mexico also

11    looked at this attorney/client relationship point, and that's

12    the thing that I think is relevant to the Court here.

13         **THE COURT:**  Well, yes, it's relevant because that

14    helps you, but that doesn't mean that you can avoid the fact

15    that that complaint actually was brought explicitly by the

16    agencies in part.

17         **MR. HALPERIN:**  That is true, Your Honor.  And there

18    are other cases where that is not the case, including *Generic*,

19    including Freyre and the other cases I've cited.

20         My point was simply that that court looked at whether AGs

21    are akin to outside counsel and said that they are not in light

22    of this statutory mandate that they -- the attorneys general

23    have to represent the agencies in this case.

24         **THE COURT:**  Response.

25         **MS. STEVENSON:**  Your Honor, let me, just to go back

to whether the Court's order was directed just at AGs.  And I'm looking now at the bottom of page 31 of the order.  It says: "Indeed, one court has noted that, in general, an attorney is presumed to have control over documents in its clients' possession.  Thus, to the extent a state attorney general represents a state agency for discovery, it would be presumed to have control over the documents in the client's possession." So he's relying on a case that actually doesn't have anything to do with state attorney generals, it's just lawyers in general, and obviously we challenge the notion.

I don't even -- I wouldn't argue that, you know, Covington has a responsibility or a right to go seize documents from its own client, I mean, and I think that's, you know, one layer of the problem here.  Certainly they have duties to the Court to be candid about what they're doing, but that doesn't extend to a right, a lawyer's right, to control their clients' documents.

And then the next step where I think this goes even further is to suggest that the Attorney General bringing an action under his consumer protection enforcement authority somehow sweeps in all of the various, you know -- and this is part of our trouble with the order is that it's so sweeping, it would apply to any of the dozens of agencies and elected officials and judicial officers that the AGs are and oftentimes statutorily mandated to represent.  And so if that were all that was needed, the expanse of that ruling would be

1    tremendous.  And as we've seen as it's played out here, maybe

2    agencies aren't being represented by state attorneys general,

3    they're being represented by outside counsel.  So they --

4         **THE COURT:**  So I have a list, and I take issue with

5    your representation on that point.  Long before you arrived,

6    the states identified when they were represented versus not,

7    and most are.

8         **MS. STEVENSON:**  The state agencies, Your Honor?

9         **THE COURT:**  Correct.

10        **MS. STEVENSON:**  I think the chart reflects that

11   the -- my reading of the chart where the states provided this

12   information was that most of them said it was a discretionary,

13   and that some said it's mandated.

14        **THE COURT:**  Well, Category 1, which says that they

15   are not, is virtually empty.

16        **MS. STEVENSON:**  Right, I agree.  I think we weren't

17   at the point where the agencies needed representation, and so

18   most of the ones went into the middle column, which was we

19   don't know whether we're going to or not.

20        **THE COURT:**  But they could.

21        **MS. STEVENSON:**  They could.  But again, I don't think

22   that's dispositive here, because again --

23        **THE COURT:**  Well, it may not be dispositive, but it

24   may also not be clearly erroneous.

25        All right.  Next state.

1          **MS. GOTWALS:**  Good afternoon, Your Honor.  Joelle

2     Gotwals from the Commonwealth of Virginia, Office of the

3     Attorney General.

4          **THE COURT:**  Go ahead.

5          **MS. GOTWALS:**  To Your Honor's direct questions first,

6     I am not aware of any Virginia Supreme Court or other appellate

7     case addressing the discrete issue of whether or not the Office

8     of the Attorney General, by virtue of its representation of

9     state agencies, has legal control over its documents.  However,

10    I am aware of a case from 2012 called *Cuccinelli v. Rector &*

11    *Visitors of the University of Virginia*, 283 Va. 420, from 2012,

12    in which the Supreme Court of Virginia indicated that under the

13    Fraud Against Taxpayers Act, which is not at issue in this case

14    but is nevertheless relevant to the Court's specific inquiry,

15    that the Office of the Attorney General could not obtain

16    documents from the University of Virginia, a public institution

17    in the Commonwealth, via a civil investigative demand.

18         The civil investigative demand statute at issue in this

19    case is Virginia Code 59.1-9.10, which is the civil

20    investigative demand statute used both by the consumer

21    protection section in its enforcement authority, as well as the

22    antitrust division.  It's, in fact, in the antitrust statute in

23    the Commonwealth.

24         There are no direct Virginia Supreme Court cases on point

25    as to the authority of that statute.  However, it is a statute

that allows for the discretion of the Attorney General to issue

civil investigative demands where there is reasonable cause to

believe that a party has engaged in, is engaging in, or will

engage in violations of the Virginia Consumer Protection Act or

the Virginia Antitrust Act.

        **THE COURT:**  You need to slow down.

        **MS. GOTWALS:**  Apologies, Your Honor.

    I've spoken to the brief recess with my section chief, who

has been with the office for 30 years, and we have never, in 35

years, issued a civil investigative demand to a state agency

pursuant to that authority.

    I cannot speak to whether or not a state agency would

comply with that.  There is a general requirement that public

officials comply with our civil investigative demand statute.

That is within the statute, a general requirement that they

comply with our investigations.  However, we have no authority

one way or the other whether or not a CID issued to a state

agency, because we have never done so, would in fact be opposed

by that state agency.

    I can tell you generally --

        **THE COURT:**  Well, you just said that there is a

requirement that they comply.

        **MS. GOTWALS:**  There's a requirement they cooperate.

There's not a requirement that they comply.  The express

language of the statute is that they cooperate and participate

1   in the investigation to the extent necessary.  And that is a

2   separate subdivision than the subdivision that authorizes us to

3   issue the civil investigative demand, which is effectively a --

4       **THE COURT:**  What is the public authority statute that

5   says that they must comply --

6       **MS. GOTWALS:**  So the statute --

7       **THE COURT:**  -- or cooperate?

8       **MS. GOTWALS:**  The statute at issue, Your Honor, is

9   Virginia Code 59.1-9.10.  The subdivision of that statute that

10  requires that, generally speaking, public officials cooperate

11  in the investigation is Subdivision "L" of that statute.  And

12  there has been no Virginia Supreme Court case law interpreting

13  the scope or breadth of that requirement that they cooperate;

14  however, our statutory authority to issue a civil investigative

15  command is not unlimited.  It's not unlimited in scope, and

16  it's not unlimited in breadth.

17      **THE COURT:**  Where is the scope identified?

18      **MS. GOTWALS:**  So the scope as I described, Your

19  Honor, is within the Virginia Consumer Protection Act,

20  59.1-201.1, which authorizes us to issue civil investigative

21  demands under this civil investigative statute.

22      I do want to point out for the Court as it's been posed to

23  other states, that the case of *Cuccinelli versus Directors of*

24  *the Visitors of the University of Virginia* was not cited in our

25  briefing because the question posed by this Court, whether or

1  not a Virginia Supreme Court had ever ruled on whether or not a

2  civil investigative demand could be issued to a state agency

3  was not --

4          **THE COURT:**  You need to slow down.

5          **MS. GOTWALS:**  I apologize, Your Honor.

6      The question of whether or not the Virginia Attorney

7  General's office had the authority to issue a civil

8  investigative demand to a state agency was not before

9  Magistrate Judge Kang.  Accordingly, this case, *Cuccinelli*

10  *versus UVA*, was not cited in our briefing.

11      And I would also point out again that this is a different

12  civil investigative demand statute than the one that the

13  consumer protection section would use to enforce its authority

14  under the Virginia Consumer Protection Act.  It's the Fraud

15  Against Taxpayers Act.

16      Two other points I'd like to make additionally, Your

17  Honor, on behalf of the Commonwealth.

18      One of the issues that Your Honor was just discussing with

19  counsel for the state AGs is whether or not this order

20  misunderstands the nature of the attorney/client relationship

21  and gives it akin to legal control.  And in Virginia, the

22  statute that is relevant to the representation of state

23  agencies is Virginia Code 2.2-507.  That statute provides that:

24  "All legal service in civil matters for the Commonwealth, the

25  governor and every state department," et cetera, "including in

1    the conduct of civil litigation in which they are interested,

2    shall be rendered and performed by the Attorney General."  So

3    that statute first and foremost presupposes that the executive

4    branch, the governor and the agencies, are interested,

5    interests in the present litigation.

6         The Office of the Attorney General has brought this action

7    as a civil prosecutorial enforcement action under the Virginia

8    Consumer Protection Act.  It's exercising its authority under

9    the Virginia Consumer Protection Act, which is extended not

10   only to the Attorney General in our statute, Your Honor, but

11   also to Commonwealth attorneys, county attorneys, city

12   attorneys and town attorneys in the Commonwealth who are all

13   akin to district attorneys in the state of California.  So

14   those are prosecutors.  So not only does the Attorney General

15   have enforcement authority, but so do the prosecutors at the

16   local, town and city level in the Commonwealth.  This statute

17   treats our authority and the authority by which we brought

18   claims in this action as a civil prosecutor, not in our

19   representation of state agencies.

20        So the reference to legal service in cases in which the

21   governor's office, agencies, et cetera, are interested, is

22   inapposite here because they're not interested.  We're bringing

23   this pursuit through our enforcement action.  However, even if

24   the statute is relevant, it provides in its Subsection C that

25   if, in the opinion of the Attorney General, it is impractical

1  or uneconomical for such legal service to be rendered by him or

2  one of his assistants, he may employ special counsel for this

3  purpose.

4      The agencies at issue in this case, Your Honor, that were

5  issued Rule 45 subpoenas, though they are represented by advice

6  counsel at the Office of the Attorney General, did in fact

7  employ outside counsel to represent them in the Rule 45

8  subpoenas, because the Attorney General's office, in its

9  discretion pursuant to the statute, found it to be both

10 uneconomical and impractical for the Office of the Attorney

11 General, not to mention the consumer protection section, who I

12 represented before you today, to do that --

13        **THE COURT:**  I don't know what I have to -- how many

14 times I have to ask you to slow down.

15        **MS. GOTWALS:**  I apologize, Your Honor.

16        **THE COURT:**  Seriously, has anybody ever tried to be a

17 court reporter?  Probably not.

18        **MS. GOTWALS:**  Well, then I extend my apologies, as

19 well, to the court reporter, for the speed at which I've

20 spoken.

21     The issue, Your Honor, is that the misunderstanding of the

22 nature of this legal representation presupposes legal control

23 of those documents by the Office of the Attorney General, and

24 in this case the Office of the Attorney General is not even

25 representing those agencies in response to the Rule 45.

1   Outside counsel was hired.  And it is within the discretion of

2   the Attorney General's office and those agencies to do that,

3   and they've done so in this case.  And, in fact, Meta's counsel

4   was meeting and conferring with that outside counsel before

5   issuing correspondence to her that those Rule 45s had been held

6   in abeyance.

7        The reason that this representation is relevant not only

8   to the nature and scope of Virginia's representation in this

9   case, but also because we don't have authority under the

10  statutes which we use to bring our claims to seek damages for

11  the Commonwealth.  We cannot do it.  Our statutory authority is

12  for injunctive relief, civil penalties and restitution for

13  Virginia consumers.  That does not extend to damages for state

14  agencies or money for the Commonwealth.  And, in fact, in order

15  to obtain damages for state agencies in other similar cases,

16  such as our action in state court against Purdue Pharma, we had

17  to bring a tort claim in order to recover those damages,

18  because we do not have statutory authority to collect damages

19  for state agencies.

20       So they are not an interested party in this case, we can't

21  get damages for them, and our representation under the Virginia

22  Consumer Protection Act does not extend to those state

23  agencies.  Which is why, when they got Rule 45 subpoenas, they

24  hired outside counsel.

25       **THE COURT:**  Response.

1          **MR. JACKSON:**  Gavin Jackson for the Meta defendants.

2    I'll keep this brief so as not to belabor the point.

3          Just as a threshold matter, I would note that my colleague

4    conceded that several of the authorities, *Cuccinelli* and I

5    believe the authorities related to the CID were not briefed

6    before Judge Kang, so I would submit that it is not clearly

7    erroneous for him to have based his decision on the authorities

8    that were before him.

9          And my second point, and this is just a very, very brief

10   point, is that I do think that Judge Kang's order and our

11   briefing explained why it is that this -- that the -- not only

12   does the Commonwealth have an obligation to represent the

13   agencies here, but also the agencies are interested in Judge

14   Kang's citation to the *Hitachi* case about the general interest

15   that agencies have as part of the government for any civil

16   penalties that flow into whatever fund.  Because as Your Honor

17   mentioned, it is not just, as I assume at least, not just held

18   by the Attorney General.

19          **MS. GOTWALS:**  May I speak to that one point directly,

20   Your Honor?

21          **THE COURT:**  You may.

22          **MS. GOTWALS:**  The civil penalties under the Virginia

23   Consumer Protection Act as a point of law actually go to our

24   revolving fund which fund the litigation efforts of the

25   Consumer Protection Section of the Office of the Attorney

1    General.  They do not default to the general fund.

2         **THE COURT:**  So the court reporter got nothing about

3    what you said.  You going to say it again?

4         **MS. GOTWALS:**  Thank you, Your Honor.  I appreciate

5    the opportunity to do that.

6         Under the Virginia Consumer Protection Act, any civil

7    penalties obtained from Meta by the Commonwealth under this

8    action would, first and foremost, go to the revolving fund,

9    which funds the litigation efforts of the Department of

10   Consumer Counsel and the Department of Law, the Office of the

11   Attorney General.  They do not default to the General

12   Assembly's general fund.

13        **THE COURT:**  Response?

14        **MR. JACKSON:**  I would -- Gavin Jackson for the Meta

15   defendants.

16        I would point back to, I think, a broader argument

17   about --

18        **THE COURT:**  Do you have any response to that specific

19   representation of funding?

20        **MR. JACKSON:**  Not to the specific representation, but

21   I'm not familiar or as familiar with the ruling from it.  I

22   would just flag that I believe my colleague mentioned that it

23   would not default to the general fund but did not rule out that

24   it would never go to a general fund or end up in the hands of

25   an agency.

1          **THE COURT:**  Do you have any indication that it would?

2          **MR. JACKSON:**  Based on my current understanding, no,

3     Your Honor.

4          **MS. GOTWALS:**  Your Honor, I would just cite to the

5     statute, Virginia Code 59.1-206(a):  "In any action brought

6     under this chapter, if the Court finds that a person is

7     willfully engaged in act or practice in violation of the

8     Virginia Consumer Protection Act, they may recover for the

9     literary fund," which we colloquially refer to as the revolving

10    fund, "a civil penalty."

11         The statute provides that the money will go first and

12    foremost to the revolving fund, Your Honor.

13         **THE COURT:**  Ms. Miyata, can you tell me where it is

14    that -- well, when we were talking about damages award and the

15    right to a jury trial, et cetera, and you said that you

16    withdrew all of your claims for damages, is that -- was the

17    withdrawal in the context of the revised complaint, or is there

18    some other document that I should be looking at?

19         **MS. MIYATA:**  Your Honor, I believe -- apologies.

20    Bianca Miyata for the state attorneys general.

21         I believe that that was included in the subsequent case

22    management statement.  If you give me five minutes, I can find

23    the document number for that.

24         **THE COURT:**  Okay.  I'd appreciate it.  Thank you.

25         All right.  Next.

1          **MS. HAIGHT:**  Your Honor, Ann Haight for West

2    Virginia.

3          **THE COURT:**  Okay.  Hold on just a minute.

4          **MS. HAIGHT:**  I think I'm on the very last page on the

5    list.

6          **THE COURT:**  No, I had a nice little one-page chart.

7      Go ahead.

8          **MS. HAIGHT:**  Okay.  I do not have, from West

9    Virginia, any specific cases that relate to a control issue,

10   but there is a case that relates to the fact that in this case,

11   the tax commissioner, who was being represented by the Attorney

12   General, in one of the decisions says:  "For his part, the tax

13   commissioner, like any other client in an attorney/client

14   relationship, was not required to accept that advice," which

15   was advice from the Attorney General.  So we do have something

16   that suggests that we wouldn't have ultimate control.  That

17   case was submitted to the magistrate judge.

18      In terms of can we do CIDs, or in our case informal

19   requests or subpoenas, yes, we can.  We have done friendly

20   subpoenas to other agencies.  We have never had to enforce them

21   in court.  There may have been decisions not to go forward in

22   some instances.

23      And on behalf of West Virginia, which is similar to what

24   Maryland's already indicated, we only brought COPPA claims.  We

25   did not assert any state consumer protection claims, so that

1   that has some limitation on what information may be gathered.

2        The other thing is if -- talking about the Rule 45

3   subpoenas and the rule -- the request for production, for the

4   Rule 45 subpoenas, those were being handled, the two agencies

5   that received them, by their general counsel, until they were

6   told to stop.  And then now with requests for production out

7   to, I believe it's those two, plus three more, they all have

8   their own general counsel that are trying to gather

9   information.

10        THE COURT:  Okay.  Thank you.

11    Next?

12        MR. WHITE:  Good afternoon, Your Honor.  Charles

13  White for the North Carolina Attorney General's office.

14    I'll start with your question regarding investigative

15  demands.  Our tool for consumer protection actions is found in

16  Chapter 75 of the North Carolina General Statutes.

17        THE COURT:  So, you, too.  Maybe, Kelly, could you

18  get a piece of paper with a marker that says: "slow down" --

19        MR. WHITE:  Perhaps I should get a tattoo.  I always

20  forget.  I apologize, Your Honor.

21        THE COURT:  -- that we can paste over there?

22    All right.  Go ahead.

23        MR. WHITE:  So, yes.  Chapter 75 of the North

24  Carolina General Statutes grants the Attorney General authority

25  to investigate unfair and deceptive trade practices, and those

```
 1    statutes are focused on investigations of businesses,

 2    corporations and persons doing business in the state.

 3            THE COURT:  Okay.  I know there's a really good

 4    coffee shop across the way.  My preference is for the small

 5    outfit rather than the big multi-global outfit.

 6            MR. WHITE:  And I will have tea next time.

 7            THE COURT:  You probably all went there.  You drank a

 8    lot of coffee during the break.

 9            MR. WHITE:  And --

10            THE COURT:  So Chapter 75.

11            MR. WHITE:  Chapter 75, Your Honor.

12        This morning, in the course of consulting with my

13    colleagues at home, including a former 25-year division chief

14    for consumer protection, are not aware of any instances that we

15    have used that with respect to agencies.

16        There's also a North Carolina Supreme Court --

17            THE COURT:  So how do you get documents when you need

18    them?

19            MR. WHITE:  There are instances where we have

20    voluntarily requested documents from agencies.  I will note

21    that there have also been times before where we have been

22    denied access to those documents by agencies.

23            THE COURT:  And then you just dropped it?

24            MR. WHITE:  We have not litigated in those cases.

25            THE COURT:  Okay.  But there have been plenty of
```

```
 1   instances, then, when you voluntarily requested it and they
 2   complied.  Right?
 3            MR. WHITE:  And I think that practical compliance
 4   would speak to perhaps the practical ability to obtain
 5   documents test that is used in other circuits.  I don't think
 6   it's enough to show that the Attorney General has access to the
 7   documents on demand in every case, including this one.
 8            THE COURT:  All right.
 9            MR. WHITE:  And --
10            THE COURT:  Talk about that test.
11            MR. JACKSON:  Thank you, Your Honor.  Gavin Jackson
12   for the Meta defendants.
13        I agree that that would satisfy the practical ability
14   test, which is not at issue here.  I would just make the
15   broader point that Judge Kang was not relying on a practical
16   ability test, he was looking at the overall framework and when
17   it is that the state attorney general must or is likely to
18   represent the state agencies for the reasons that were outlined
19   in great detail in his order.  That is what gives the legal
20   right to obtain, not the practical ability that he may send a
21   request and the agency may comply with that request.
22            THE COURT:  What are the components of the practical
23   ability test?
24            MR. WHITE:  I believe, Your Honor, it's the ability
25   to work with companies, usually in the context of corporations,
```

1    to have a regular exchange of documents or some sort of

2    relationship akin to that.

3            **THE COURT:**  Is the practical ability test, in your

4    view, has it ever been used between an Attorney General and a

5    state agency?

6            **MR. WHITE:**  I know there are.  I can't specifically

7    name those off the top of my hand, focused here today on the

8    legal control test.

9            **THE COURT:**  Does anybody in this courtroom understand

10    or can tell me the components or elements of the test in the

11    context of an attorney general and an agency?  Anybody?  Raise

12    your hand.

13    I've stumped a bunch of lawyers.  All right.

14            **MR. HEYBURN:**  There's the general test.

15            **THE COURT:**  All right.  Let me hear the general test,

16    but --

17            **MR. HEYBURN:**  So the order cites --

18            **THE COURT:**  State your name.

19            **MR. HEYBURN:**  This is Jack Heyburn on behalf of the

20    Kentucky Attorney General.

21    And I agree that the order does up front say that it will

22    be applying the legal right test, but it does cite a number of

23    practical ability cases, one of which it block quotes at

24    page 7, and that gives us the practical ability test.

25            **THE COURT:**  Okay.

 1          **MR. HEYBURN:**  Which is then applied throughout the

 2   order.  And that looks to commonality of ownership, exchange or

 3   intermingling of directors, officers or employees, exchange --

 4          **THE COURT:**  But that's not -- that's not an

 5   attorney -- that isn't in this context.

 6          **MR. HEYBURN:**  I think you would apply it the same in

 7   the state context.  You would ask whether there's an exchange

 8   of documents, any benefit or involvement of the nonparty in the

 9   litigation.  You basically look to what is the practical

10   relationship, particularly the furnishing of documents, history

11   of furnishing of documents.  That's a key part that is a factor

12   in the practical ability test, but *Citric Acid* says pretty

13   explicitly that a history of voluntarily furnishing documents

14   has no role in the legal right test.

15          **THE COURT:**  All right.

16          **MR. WHITE:**  And Your Honor, if I may, we do have a

17   North Carolina Supreme Court case that touches on one of the

18   other issues that both Meta and the order rely on pretty

19   significantly, and that's the idea that there is a mandatory --

20          **THE COURT:**  Do you have a case?

21          **MR. WHITE:**  It is *Martin v. Thornburg*, 379 S.E.2d

22   472.

23          **THE COURT:**  And was it cited?

24          **MR. WHITE:**  It was not cited in our brief to the

25   magistrate, and the reason for that is that the underlying

statute, which we believe is fairly clear, permits agencies to

hire their own inside counsel.  And what the order does is

transform that statute into saying that the agencies may never

hire separate counsel from the Attorney General's office.

That's not what the plain text of the statute says.  The

statute simply restricts agencies from hiring private counsel.

　　　And so the reality is is --

　　　　　THE COURT:  Hold on.

　　　"The statute says that agencies cannot hire private

counsel."  Didn't you just say that?

　　　　　MR. WHITE:  Yes, Your Honor.  No --

　　　　　THE COURT:  So, that's fine.  I don't have the

statute in front of me.

　　　So who else can they hire if not the Attorney General,

since they are prohibited by statute from hiring private

counsel?  I'm assuming they're not getting pro bono counsel,

are they?

　　　　　MR. WHITE:  That's the distinction:  Private counsel

in the sense hiring outside law firms.  They're permitted to

employ in-house counsel as employees of their own departments,

and in this case we have been working since the entry of the

order with in-house counsel and several of those agencies to

comply with the order.  And especially with respect to subpoena

requests and public records responses, agencies often do opt to

use those in-house counsel.  As we heard mentioned this morning

1   a little while ago, that choice that the agencies have is a

2   distinguishing factor that breaks the supposed degree of close

3   coordination and mandatory attorney/client relationship that is

4   supposedly giving rise to the Attorney General's control of

5   documents for any litigation, including this one.

6           THE COURT:  Okay.  Next.

7           MS. MIYATA:  Your Honor, if I may briefly just to

8   answer your question from earlier.  Bianca Miyata for the state

9   AGs.

10      The cite I was thinking of was Document 618, on page 7,

11  and that is a case management statement.  Starting at line 5, I

12  think we clarified:  "The state attorneys general do not intend

13  to seek restitution in a form that's measured by the amount of

14  money expended by individuals, state agencies, or the states as

15  a result of Meta's alleged conduct."  I'm sorry, "misconduct."

16  I misread that word.  "The state attorneys general do intend to

17  seek statutory civil penalties, among other remedies."

18      And as I recall our discussion with the Court during the

19  conference in chambers that was not -- I don't believe that

20  that was on the record, but I believe in that conference we had

21  represented that there were certain states seeking a remedy in

22  the nature of disgorgement, but not actual damages.

23          THE COURT:  So the requests for disgorgement have

24  been withdrawn?

25          MS. MIYATA:  The requests for disgorgement remain,

1    but that's specifically for profits that result I think from

2    the -- from the very specific misconduct being alleged in this

3    action.

4            THE COURT:  Are all states seeking disgorgement?  It

5    doesn't look like it.

6            MS. MIYATA:  Your Honor, as I stand here today I do

7    not believe that they are.  Unfortunately, I could not give you

8    a breakdown on the fly of which ones are and which are not.

9    Some state statutes permit for the request of that sort of

10   remedy, and I think as you heard from my colleague, Ms. Gotwals

11   from Virginia, some states do not.

12           THE COURT:  Mr. White, looks like you are.  Correct?

13     And where would the disgorgement of profits that you are

14   seeking, do those go back to the general fund which all of

15   these agencies would profit from?

16           MR. WHITE:  Your Honor, we don't currently have a

17   plan for the disposition of any disgorgement that would be

18   received from this case.  It's possible that it would need to

19   be appropriated by the General Assembly.  It's just a fact-

20   dependent circumstance that we don't have insight into right

21   now.

22           THE COURT:  Well, the AG's office, is there no

23   statute that says where the monies have to go?

24           MR. WHITE:  There is a statute that says we can seek

25   disgorgement.  I am not aware of any statutes off the top of my

 1  head specifically mandating its disposition.

 2         THE COURT:  Have you ever received disgorgement in a

 3  case before?

 4         MR. WHITE:  I believe so, but I don't recall how

 5  specifically it was disposed of.

 6         THE COURT:  Where was it -- well, did you actually

 7  receive it?

 8         MR. WHITE:  Again, I believe so.

 9         THE COURT:  And where did you deposit it?

10         MR. WHITE:  I think it may have been appropriated by

11  the legislature to a variety of state agencies.

12         MS. MIYATA:  And, Your Honor, Bianca Miyata from the

13  State AGs speaking at this point about how things work in

14  Colorado.

15     I know that when there are penalties from a Consumer

16  Protection Act claim, those penalties do go back into the

17  general fund, but then monies from the general fund have to be

18  appropriated and allocated by the legislature.  And while those

19  may go to -- those may go to support agency endeavors, they may

20  also go to support other initiatives on the part of the State.

21         THE COURT:  Right; but it goes back to the State.  I

22  mean, in --

23         MS. MIYATA:  I take your point.

24         THE COURT:  I think I've taken a note about one state

25  for whom those funds fund that agency.

1          **MS. MIYATA:**  I take your point, Your Honor.

2          **THE COURT:**  But if they're going back to the State,

3     that suggests that this is -- much more strongly -- that it's

4     being done on behalf of the State, not just an agency.  So --

5          **MR. WHITE:**  Your Honor, if I could make a brief point

6     regarding North Carolina.

7          We are also seeking civil penalties which by law does not

8     go to the state agencies that Meta has identified, but after

9     being appropriated by the General Assembly will go to the local

10    school districts.  And just as a general matter, that kind of

11    attenuated financial interest in the litigation we don't

12    believe is enough to say that the Attorney General has control

13    over agency documents for the purpose of litigation.

14         **THE COURT:**  I don't think that there is any one

15    factor that's dispositive.

16         All right.  Next.

17         **MS. MICKO:**  Good afternoon, Your Honor.  Caitlin

18    Micko on behalf of the State of Minnesota.

19         **THE COURT:**  M-i-c-k-o?

20         **MS. MICKO:**  That's correct, Your Honor.

21         **THE COURT:**  All right.  Go ahead.

22         **MS. MICKO:**  Okay.  I want to address the Court's

23    questions.

24         Like my colleagues before me, the Minnesota Attorney

25    General may issue a civil investigative demand pursuant to

1  Statute 8.31.  It's akin to a subpoena, where parties can move

2  to quash.

3           **THE COURT:**  Have they ever in your knowledge?

4           **MS. MICKO:**  We -- yes.  And let me be clear.

5           **THE COURT:**  And I want to be specific.  Not just any

6  party.  I don't -- I'm more interested in agencies.

7           **MS. MICKO:**  Thank you.  I was just about to make that

8  clarify.

9      We know of no instance where our office has issued a civil

10  investigative demand to a state agency.

11          **THE COURT:**  How do you get documents when you need

12  them?

13          **MS. MICKO:**  In the past, we have issued Rule 45

14  subpoenas.

15          **THE COURT:**  How many times has that happened?

16          **MS. MICKO:**  I know of at least two, one of which was

17  cited in our brief, the case *State versus Juul*.

18          **THE COURT:**  And who did you issue subpoenas to?

19          **MS. MICKO:**  To state agencies.  I apologize, I don't

20  know the specific state agencies, but ...

21          **THE COURT:**  As in *Juul*, J-u-l-l?

22          **MS. MICKO:**  J-u-u-l.

23          **THE COURT:**  And to whom did you issue?

24          **MS. MICKO:**  I apologize.  I don't have the exact name

25  of the agencies, but they were issued to state agencies.

1              **THE COURT:**  Hmm, okay.

2              **MS. MICKO:**  Your Honor, the magistrate judge found --

3    erred in finding that the Minnesota Attorney General's office

4    has --

5              **THE COURT:**  So I need you to answer my other

6    question.

7              **MS. MICKO:**  Sure.

8        So we do have Minnesota Supreme Court case law that is

9    relevant to the question of control, and the first is the

10   question of whether or not we have the ability to legally

11   obtain documents from state agencies.  And Magistrate Judge

12   Kang relies on 13.393 for his finding that we have an explicit

13   legal right, and this is wrong as a matter of law.  Which, I

14   would like to point the Court to *Energy Policy Advocates versus*

15   *Ellison*.  It's a 2022 Minnesota Supreme Court case, 980 N.W.2d

16   146.  It explains the point of 13.393, which is that under the

17   Data Practices Act, where people can make public information

18   requests, attorney/client privileges are not eroded.  So they

19   are -- they maintain.  And that's the extent of what 13.393 is

20   intended to mean, and Magistrate Judge Kang misread that

21   statute.

22             **THE COURT:**  Okay.  Response?

23             **MR. CARPENTER:**  Thank you, Your Honor.

24        Because we've been discussing this issue of where funds

25   are deposited, I want to point out that under Minnesota law --

1    **THE COURT:**  I'm not asking that question.  I'm asking

2    you to respond to the specific statute.

3    **MR. CARPENTER:**  Sure, Your Honor.

4        So that statute is an exception to the broader Minnesota

5    data access law, and I think there are a few problems with

6    Minnesota's arguments about it.

7        The first one is that that's not the primary authority

8    that we or Judge Kang rely on.  We relied on other broader

9    statutes that give the Attorney General authority over

10   agencies' legal affairs and to represent them.  And on, for

11   example, a federal district court decision, the *St. Jude*

12   decision, holding that the attorney/client relationship between

13   state AGs and state agencies, which is mandated by law,

14   requires close coordination.

15       I think this issue of the Minnesota Data Access Act is

16   secondary to that, so to the extent the Court thinks that act

17   is relevant, that's just a law that says that, in general,

18   agencies shouldn't be disclosing nonpublic data to the public.

19   I think as Judge Kang correctly held, that doesn't bar, for

20   example, production of documents in discovery.  So the

21   subsection that we're now talking about, 13.393, just makes

22   that explicit.  It says -- I won't read it out because it's

23   quite long, but one thing it says is that the usual rules or

24   statutes around production of documents and discovery are not

25   set aside.  And I don't think that the *Energy Advocates* case

1    that my colleague on the other side just cited says anything

2    different.  In that case, it dealt with the attorney/client

3    privilege and said that was one sort of rule that was

4    preserved, but it wasn't a holding that that exception only

5    applies to the rule in general.

6        If I could just make a few other points about that data

7    access law, too.

8        The first is that even if it applied, at most, it would

9    apply to one agency.  Or apologies, Your Honor.

10        The other thing to note about that law is that the

11    subsection we're talking about explicitly says, quote:

12    "Notwithstanding any other provision of the law."  So even if

13    the Court disagrees with me today and disagrees with Judge Kang

14    about what that law means, that subsection comes into play.

15        If the Court would like, I'm also happy to discuss the

16    issue of how funds are deposited in North -- Minnesota, but I

17    defer to the Court.

18        (Reporter clarification.)

19        **MR. CARPENTER:**  Yes.  No, I'm sorry.  Ansel Carpenter

20    on behalf of Meta.

21        **THE COURT:**  All right.  Go ahead.

22        **MR. CARPENTER:**  Thank you, Your Honor.

23    Under Minnesota Statute, Section 8.31, Subdivision 3, it

24    requires that:  "All sums recovered by the Attorney General,"

25    quote, "including civil penalties, shall be deposited into the

1    general fund."

2           **MS. MICKO:**  Your Honor, if I may?  I have one more

3    Supreme Court precedent I'd like to discuss.

4        Magistrate Judge Kang relies heavily in his opinion

5    relating to Minnesota about the relationship between the

6    Attorney General and state agencies and makes the conclusion

7    that because the Attorney General's office in a separate and

8    distinct function may serve as outside counsel in matters, that

9    therefore the attorney/client relationship is imputed to the

10   entire office, including this law enforcement action, and

11   therefore we have control over the documents.

12       The *Hennepin County versus McLaren* case, which is 402

13   N.W.2d 535, Minnesota, 1987, is in direct conflict with this,

14   because it holds that the government is a unique body that for

15   which the rules of conflict and attorney/client privilege are

16   different, and that we can represent and we do represent state

17   agencies that may be in conflict with one another.  And so this

18   is also an error of law and a basis to overturn Magistrate

19   Judge Kang's order.

20           **THE COURT:**  Response?

21           **MR. CARPENTER:**  So just on that last specific point,

22   I think, if anything, that would cut the other way, because it

23   shows that the Attorney General can work out conflicts if

24   needed.  But I think Judge Kang made a broader point in the

25   order that's right, which is that just because -- you're not

1    deprived of control over another party's documents just because

2    you might have a conflict in a separate arena with them.  I

3    think there is an example of companies, where Company A might

4    have control over the other's documents whether because of a

5    contract or anything else, and those companies also might be

6    adverse in other litigation.

7         Other than that, unless the Court has Minnesota-specific

8    questions, I'm happy to rest on our brief.

9              **THE COURT:**  Next.

10             **MR. CHAND:**  Kashif Chand from the New Jersey Division

11   of Law, Your Honor.

12             **THE COURT:**  I thought I already heard from New

13   Jersey.

14             **MR. CHAND:**  You did, Your Honor.  I would like to

15   correct --

16             **THE COURT:**  Wait 'til everybody has a chance to

17   speak.

18        Next.

19             **MS. VALIN:**  Good afternoon, Your Honor.  Donna Valin

20   for the Office of the Florida Attorney General.

21             **THE COURT:**  Go ahead.

22             **MS. VALIN:**  I'd like to first add that, and as it

23   relates to your question regarding investigative subpoenas,

24   Florida is in a unique position, and one of only two states, I

25   believe, that has brought this action on behalf of the Florida

1    Attorney General and the Department of Legal Affairs and not on

2    behalf of the State, and that becomes an important distinction

3    as I move to some of the topics.

4        First, under Florida's Unfair and Deceptive Trade

5    Practices Act, FDUTPA, the enforcing authority cannot bring an

6    action, investigative action, against a state agency by virtue

7    of its definition of a consumer.  A consumer has to be an

8    individual or a corporation and, as thus, doesn't come into the

9    purview of its authority.  However, in -- as I phoned a friend

10   during the break, our agency has requested documents in the

11   opioids litigation and were refused.  And as a result of that

12   refusal by a state agency, the State of Florida drafted

13   legislation and had a bill put in place to require that agency

14   to produce documents.

15       That statute was included in the original filing to Judge

16   Kang, Section 409.9072 Florida Statutes.

17          **THE COURT:**  So I take it it has not yet passed?

18          **MS. VALIN:**  No, it is passed, and that's how the

19   Attorney General was able to obtain those records.

20          **THE COURT:**  Okay.  So how does the statute work, and

21   what was the agency that refused to produce in opioids?

22          **MS. VALIN:**  It was the Agency for Health -- I'm

23   sorry, excuse me.  Department of Health.

24          **THE COURT:**  So back up a little.

25       So Florida sues in the opioid, attempts to get documents

1    from the Department of Health, or the defendants attempted to

2    get documents?

3            **MS. VALIN:**  It's my understanding that it's the

4    plaintiffs, but I just got all of this information during the

5    break, so I'm not sure of all of the specifics related to the

6    back facts related to that process.

7            **THE COURT:**  All right.  Anything else?

8            **MS. VALIN:**  Yes, Your Honor.  I have a couple of

9    other points.

10       Mr. Halperin today has referenced the *Fyeyre* case on

11   multiple occasions.  *Freyre versus Hillsborough County*, in the

12   Middle District of Florida.  It's a case where the State of

13   Florida was named as the defendant.  That is also a case that

14   has been vacated, but for our purposes today it's also

15   illustrative from our perspective.  That case was brought as

16   the State of Florida was the defendant in that case, and the

17   governor was the executive that was determined to have control

18   over state agency documents and not the Florida Attorney

19   General.

20           **THE COURT:**  Okay.

21           **MS. VALIN:**  And the third point that I'd like to make

22   today is that in the magistrate's order and throughout all of

23   the order, required representation equals control, from what I

24   can gather.  And he also applied that by excluding some

25   agencies for the State of Arizona.

1    In his order -- and I'd like to just read this portion

2    here, that:  "While the Florida Attorney General is a separate

3    entity, although the Florida Attorney General does bring the

4    instant action in its own independent authority, this does not

5    outweigh the requirement that the Florida Attorney General must

6    statutorily act as the Florida agency's counsel."  That's on

7    page 77, beginning line 5.  And then further down on this page

8    states, line 22:  "Accordingly, it appears undisputed that

9    under the Florida statutory scheme, each state agency at issue

10   here will be represented by the Florida Attorney General in

11   this matter for discovery."

12       And there are a couple of different statutes that have

13   been cited, cited throughout by Meta, cited by us and cited

14   here on this page, and Florida submits that the statutes were

15   applied in error.  And if I could take a moment to explain,

16   beginning with 16.014, which is a statute that -- pardon me.

17   Let me just open it up here.  I'm sorry, 16.015, which requires

18   the Department of Legal Affairs in the Attorney General's

19   office:  "Shall be responsible for providing all legal services

20   required by any department."  But the important distinction

21   here is it has to be required.

22       Answering a discovery or a subpoena request, Rule 45 even,

23   is not required to have the Florida Attorney General step in to

24   be counsel.  There's a robust contracting process that was also

25   included in the first filing to Judge Kang in that it must be

required.  For example in this case, discussing Rule 45

subpoenas, we have a state of almost 10,000 employees within

the state agencies, 50 agencies for the State of Florida.  And

the particular agencies that were served Rule 45 subpoenas,

they have legal counsel, they have general counsels that have

been communicating with Meta and from my understanding had

already been doing extensive hit counts using search terms

provided by Meta.

So I wanted to just add that these agencies, certainly

it's not compulsory to use the Florida Attorney General for

legal representation, and we haven't contracted, which is a

requirement, or entered any agreement with any state agency to

provide any legal representation.  And that is one statute.

And then the other statute is 16.01 Florida Statutes.  And

here -- and that's why earlier I made the distinction that this

case was brought on behalf of the Attorney General and is in a

unique position, and only one of two states.  I believe New

Jersey is the other state.  If I'm missing one, I apologize.

But in the case there that as a -- the Attorney General "shall

appear in behalf of the State, all suits or prosecutions, civil

or criminal and in equity, in which the state may be a party,

or in anywise interested."

And, again, the State is not -- is a different -- it's

completely different than this State -- Florida State Attorney

General, Department of legal affairs, and this statute

1  specifically relates to the State in total.  And the example in

2  the *Freyre* case is perfect, because that's when the Attorney

3  General represented the named State of Florida as a defendant.

4  And even then, there is contracting and a series of agreements

5  that take place when the Attorney General is to represent a

6  state agency.

7          **THE COURT:**  Response?

8          **MR. CARPENTER:**  Thank you, Your Honor.  Ansel

9  Carpenter for the Meta defendants.

10         Let me start where Florida's counsel just did, which is

11 with the fact that Florida's office captioned the state as

12 brought by the Attorney General rather than the State of

13 Florida.  It's true also of Maryland and New Jersey are the

14 three states where this has happened.

15         As courts have held -- we cited this in our briefing, but

16 a few examples are *Shelby County* or the *Compagnie Francais*

17 case.  Even when the Attorney General brings a suit in its own

18 name, that's a suit, in sum and substance, by the State,

19 because the Attorney General is only acting on behalf of the

20 State and can only act on behalf of the State.  I think that's

21 particularly true with the claims here.

22         As I mentioned earlier, under COPPA, the AG can only bring

23 a suit as parens patriae on behalf of a state, as Florida had.

24 But even setting that aside, as Judge Kang's order recognized,

25 if the AG were truly the only party in any sense of that word

1    or were truly the only entity before the Court, they could

2    still exercise control over third parties' documents.  That's,

3    in fact, what every case about third-party document control is

4    about, so I don't think it's dispositive.

5         Second, moving to the authorities that the Florida's

6    counsel just talked about, I think it leaves off the list our

7    opening authority, which is Florida Statute 16.015, which says,

8    quote:  "The AGs" -- excuse me.  "AGs are responsible," quote,

9    "for providing all legal services required by any department

10   unless otherwise provided by law."

11        Counsel mentioned Section 16.014.  There is also another

12   subsection that follows that, which is 015.  And those two,

13   when read together, as Judge Kang recognized, mean that the AG

14   "shall appear and attend to in behalf of the State all suits,

15   including in courts of the United States, where the State is a

16   party or otherwise interested."

17        On the *Freyre* case, I don't think that is a correct

18   reading of it.  That case held, quote:  "The OAG, as counsel

19   for the State in this suit, is obligated to obtain all relevant

20   discovery from these departments."  So, yes, the governor was

21   named as a party, that is true, but that doesn't change the

22   fact that the Court was performing a control analysis.

23        Counsel also mentioned that that case was vacated.  But to

24   be clear, it was vacated only as part of a settlement, not, for

25   example, because it went up on appeal and was reversed or

1    vacated.  So I think Judge Kang was perfectly entitled to rely

2    on it, because I think his order recognized just because a case

3    is vacated as part of a settlement doesn't mean that it doesn't

4    have something valuable that later courts can look to when

5    performing a similar analysis.

6        And, of course, even if *Freyre* were not persuasive, and it

7    is, there are a number of other cases that took the same basic

8    approach Judge Kang did and reached the same basic conclusion

9    he reached.

10       Unless the Court has any other questions, otherwise I

11   would rest on the briefing.

12            **THE COURT:**  Next.

13        **MS. VALIN:**  If I may just correct counsel?

14       I did read into the record 16.015 and not 16.014, as

15   referenced.

16       Thank you, Your Honor.  And thank you.

17            **THE COURT:**  Thanks.

18        **MS. WOLD:**  Good afternoon, Your Honor.  I am Megan

19   Wold on behalf of the State of Montana.  I think I can be very

20   brief.

21       Montana did not ask to be heard orally at today's hearing,

22   so --

23            **THE COURT:**  I'm not seeing your name.  All right.

24        **MS. WOLD:**  That's right.

25       I only want to stand up to the extent that any of your

1    questions were directed to state attorneys general who were

2    present.  Didn't want to be deemed to have waived an argument

3    by not standing up.

4        So I just would reiterate that Montana does not have a

5    legal right to access the documents of the six state agencies

6    that are at issue for the reasons that we cited in the

7    briefing.  If you'd like me to elaborate, I'm happy to.  But

8    again, Montana did not ask to be heard today on this issue.

9        **THE COURT:**  Well, do you want to respond to my

10   questions, or not?

11       **MS. WOLD:**  I'm happy to.

12       I don't have any additional precedent to cite besides what

13   is in the briefing, although I think it's very clear and very

14   solid authority that under the Montana --

15       **THE COURT:**  Do you have any Cal' -- do you have any

16   cases from the Supreme Court of Montana?

17       **MS. WOLD:**  To the extent there are relevant cases,

18   they're explicated in the briefing.  I was just going to cite

19   the constitution and statute, but it's in the briefing.

20       And with regard to how Montana would obtain documents from

21   an agency if it wished to, it's possible that there are very

22   limited circumstances in which it could issue a CID.  Typically

23   it would issue a subpoena or use another type of legal process.

24   And in all of those examples, they would not be self-enforcing.

25   Montana would need a court's participation to enforce those if

1    an agency did not wish to provide or did not agree.

2           **THE COURT:** Are you aware of anytime that it had to?

3           **MS. WOLD:** I'm aware of times when the State has sued

4    state agencies, and I am not aware of any times in which the

5    State has issued a CID to a state agency.  And that's the

6    extent of my knowledge today.

7           **THE COURT:** Are you aware of any time the State

8    issued a CID or a subpoena, where it had to enforce it by way

9    of lawsuit?

10          **MS. WOLD:** I am not aware one way or the other on

11   that, so I couldn't say in either direction.

12          **THE COURT:** Okay.  Thank you.

13          **MS. WOLD:** Thank you, Your Honor.

14          **MR. STROUD:** Good afternoon, Your Honor.  Assistant

15   Attorney General Colin Stroud on behalf of the State of

16   Wisconsin.  I'm going to do my best --

17          **THE COURT:** Hold on.  I'm trying to find you.

18          **MR. STROUD:** Sure, sure.

19          **THE COURT:** Colin Stroud?

20          **MR. STROUD:** Correct.

21          **THE COURT:** All right.  Go ahead.

22          **MR. STROUD:** I'd like to do my best to try to answer

23   your two questions first, and then if I may, I have a few

24   additional points I'd like to raise.

25         With regard to the investigation issue, I'm not aware of

```
 1   our office ever issuing subpoenas to other state agencies in

 2   investigating them.  If there were --

 3            THE COURT:  How do you get documents, then?

 4            MR. STROUD:  If there were an instance where we

 5   needed documents from a state agency, my understanding is that

 6   we would request them informally and they would be provided.

 7   I'm not aware of an instance in which we have gone to court to

 8   compel another agency to provide documents to us.

 9       If that answers the one question, I will turn to the

10   second question about authority.

11       I'm not aware of any Wisconsin Supreme Court or court of

12   appeals authority that directly contradicts the order that

13   Judge Kang issued.  There are two cases that I believe are

14   relevant.  One of them was cited in our initial brief to Judge

15   Kang, the other was not.  I'm happy to explain why it was not

16   cited.

17       If that answers your questions, I just have a few other

18   things I'd like to say.

19            THE COURT:  Well, talk about the two cases.

20            MR. STROUD:  Two cases.

21       The first is *Koschkee versus Evers*.

22            THE COURT:  How do you spell that?

23            MR. STROUD:  I think it's K-o-s-c-h-k-e-e.  It was

24   cited in our brief, the initial brief on the motion.

25            THE COURT:  Okay.
```

1          **MR. STROUD:**  In that case the Wisconsin Supreme Court
2     held that independent constitutional officers in Wisconsin must
3     be able to take legal positions contrary to the Attorney
4     General, so that they are required to have their own
5     representation so that they can assert their own legal views in
6     a matter.

7          In this case, Judge Kang found that we represent the
8     governor of Wisconsin, other state agencies, as well.  We do
9     not represent the governor in this case.  And by suggesting
10    that we do, the Court is requiring independent constitutional
11    officers to proceed under a common umbrella of representation,
12    and the Wisconsin Supreme Court has held that they are entitled
13    to take contrary positions to the Attorney General, which would
14    not be able to do under this posture.

15         The second case that I wanted to discuss was *City of Oak
16    Creek*, or *State versus City of Oak Creek*.  That was cited in
17    our briefing to Judge Kang.  And the reason that I believe it
18    is relevant to today's proceedings is it confirms something
19    that the Wisconsin Supreme Court has held for over a hundred
20    years, which is that the Wisconsin Attorney General lacks
21    common law powers and duties and derives his authority solely
22    from statute.

23         In this case, our position is that in the absence of
24    explicit statutory authority saying that we can obtain
25    documents from other state agencies we cannot act, because the

1    Wisconsin constitution provides that the Attorney General

2    requires statutory authority before he can act.

3         The last thing I want to address is the basic finding with

4    regard to Wisconsin that we represent the governor in this case

5    and, by extension, other state agencies.  We do not represent

6    the governor in this litigation.  I'm happy to go through the

7    statutory structure underlying the nature of our representation

8    in this case because I think it is relevant, and it was cited

9    by Judge Kang and cited by Meta.

10        Wisconsin Statute 165.25 describes the powers of the

11   Department of Justice.  There are three provisions that have

12   been cited in connection with this ruling.  The first is

13   165.25, Sub 1.  That statute is completely inapplicable to this

14   proceeding.  It pertains only to representation in Wisconsin

15   state court.  It refers to specifically cases on appeal or on

16   remand.  It has no applicability to the type of proceeding

17   we're talking about here.

18        165.25, Sub 6, refers to representation in defense of

19   cases, and it provides that agencies may request that the

20   Attorney General represent them in defense cases.  Again, that

21   statute has no applicability here.  This is not an instance

22   where we are being asked to defend agencies being sued, and no

23   request was ever made in filing this case under that provision

24   of the statute, so it is inapplicable here.

25        The portion of the statute that is relevant here is

1  165.25, Sub 1M, which provides that the governor may request or

2  authorize the Attorney General to file suit or represent the

3  State, or agencies, officials, employees of the State in a

4  civil matter.  That is what happened in this case.  The

5  governor authorized the Wisconsin Attorney General to bring a

6  lawsuit in the name of the State.  We represent the State in

7  this case.  We do not represent the governor.

8       Judge Kang's order suggested that because we represent the

9  governor, we have access --

10         **THE COURT:**  You said the governor authorized the AG

11  to bring the lawsuit?

12         **MR. STROUD:**  That is correct.

13         **THE COURT:**  Doesn't that cut against your argument?

14         **MR. STROUD:**  It doesn't, because it doesn't show that

15  we represent him in this litigation.

16       So, for example, if we wanted to settle this case, we do

17  not need the governor's authority to do that.  The governor

18  does not dictate how we litigate the case.  His involvement is

19  purely presuit, authorizing the suit in the first instance.

20  But when the Attorney General proceeds with the litigation, his

21  client is not the governor.  He is not representing the

22  governor in that sense.

23       One last point I want to make.

24         **THE COURT:**  And where do the monies go in Wisconsin?

25         **MR. STROUD:**  My understanding with regard to the

1    Wisconsin state statute that we've sued under there is a civil

2    penalties provision, but also a provision that provides for the

3    payment of monetary loss to consumers, essentially.  So that

4    money would -- to the extent we receive money under that

5    provision of the statute, it would go to consumers and not the

6    State.

7         **THE COURT:**  How does one do that in Wisconsin?

8         **MR. STROUD:**  It varies by case.  We've had different

9    methodologies.  In some instances the money is sent to the

10   Attorney General's office so that we can disburse it to

11   consumers.  In some instances a third-party vendor might be

12   hired to help administer the funding.  In some instances the

13   defendants would pay it directly to the consumers by court

14   order.

15        **THE COURT:**  Any monies that are more generic; that

16   is, including civil forfeitures, for instance, that are being

17   sought?  Where do those monies go?

18        **MR. STROUD:**  I can't speak confidently on that issue.

19   My understanding is that they go to the school fund, but I

20   can't be a hundred percent confident in that, Your Honor.

21        **THE COURT:**  Okay.

22        **MR. STROUD:**  And if I may, one last point, unless you

23   have other questions about the monetary fees.

24        **THE COURT:**  No, go ahead.

25        **MR. STROUD:**  The last point I want to make is there's

1  one agency in particular, the Department of Public Instruction,

2  that Meta seeks documents from.  Judge Kang held that we

3  represent the governor, and because the governor represent --

4  or controls other state agencies, we have control, by

5  extension, over those agencies' documents.  That logic cannot

6  extend to the Department of Public Instruction.

7      The Department of Public Instruction is headed by a

8  superintendent, who is separately elected and is an independent

9  constitutional officer.  She is not subject to the governor's

10  control.  And so the logic that we represent the governor and

11  can therefore get documents from other agencies cannot extend

12  to the Department of Public Instruction, because that agency is

13  headed by a distinct independent constitutional officer that

14  the governor does not control.

15      Thank you, Your Honor.

16          **THE COURT:**  Thank you.

17      Response?

18          **MR. JACKSON:**  Your Honor, Gavin Jackson for the Meta

19  defendants.

20      I think that our motion outlines our responses to these

21  points, so unless you have further questions, we're happy to

22  rest on our briefing.

23          **THE COURT:**  I haven't memorized your -- I had a few

24  other things on my plate.  A quick response would be

25  appreciated.

1          MR. JACKSON:  Certainly, Your Honor.

2          THE COURT:  Especially given this last point.

3          MR. JACKSON:  Yes, yes.

4          THE COURT:  So public -- the superintendent --

5          MR. STROUD:  The Department of Public Instruction.

6          THE COURT:  Right; is headed by a superintendent who

7    is an independent constitutional officer.

8          MR. JACKSON:  Yes, Your Honor.  Happy to walk through

9    that.

10         On the last point about the Department of Public

11   Instruction, I am also not familiar with precisely how the

12   funding system works.

13         THE COURT:  This isn't a funding question.

14         MR. JACKSON:  Yes, and I'll get to it.  But it

15   sounded like there was a possibility that the monies that would

16   be obtained from Meta would go towards the public schools, and

17   I'm not sure whether that would be within the control --

18         THE COURT:  That's not what Judge Kang focused on.

19         MR. JACKSON:  Yes.

20         THE COURT:  He focused on the fact that the

21   governor -- he made a link between the governor and the

22   superintendent.  A response on that specific issue.

23         MR. JACKSON:  Yes, Your Honor.

24         We would submit that it -- based on the record that was

25   presented to Judge Kang, we don't think that that was clearly

1    erroneous.  But even if it were clearly erroneous, we would

2    submit that the reasoning that applied to the other agencies

3    still holds.

4            THE COURT:  Okay.  Was that not presented?

5            MR. STROUD:  I believe that it was, Your Honor.

6            THE COURT:  Okay.  Next.

7            MR. STROUD:  Thank you.

8            MS. LAUNER:  Good afternoon, Your Honor.  Krislyn

9    Launer for the State of Connecticut.

10            THE COURT:  Okay.  Go ahead.

11            MS. LAUNER:  To answer your questions, Your Honor,

12    the Attorney General does not have any statutory authority to

13    either subpoena state agency records or issue CIDs for those

14    records.

15            THE COURT:  How do you get records, then?

16            MS. LAUNER:  If we need records from a state agency

17    we ask for them.  If they are not provided, I am unaware of any

18    legal action that's been taken to get those records.

19            THE COURT:  So every time you've asked for them

20    you've gotten them?

21            MS. LAUNER:  To the best of my knowledge, yes.

22            THE COURT:  Go ahead.

23            MS. LAUNER:  I am unaware of any Supreme Court or

24    appellate court cases that discuss the Attorney General's legal

25    control over state agency documents.

1          THE COURT:  Okay.

2          MS. LAUNER:  And your third question about money, if

3    the State of Connecticut were to receive any money as a result

4    of this case, it would go into the general fund for the

5    legislature to distribute as it sees fit.

6          THE COURT:  Okay.

7          MS. LAUNER:  And, Your Honor, if I may, a couple

8    points about the magistrate order.

9          THE COURT:  Sure.

10         MS. LAUNER:  Magistrate Judge Kang relied heavily on

11   Connecticut General Statutes 3-125 to -- for the preposition

12   (sic) that the Attorney General must represent all state

13   agencies in litigation; however, he did misconstrue that

14   statute.  The Statue 3-125 does give the Attorney General

15   authority to represent state agencies but does not require the

16   Attorney General to represent state agencies in every case.

17   The Attorney General must approve and oversee the hiring of any

18   outside counsel, but he is not required to appear for state

19   agencies in every matter.

20         THE COURT:  Okay.  Anything else?

21         MS. LAUNER:  That is it, Your Honor.

22         THE COURT:  Okay.  Next.

23         MR. WALSH:  Good afternoon, Your Honor.  Kevin Walsh

24   from the Ohio Attorney General's office.

25         I am not aware of any Supreme Court authority from Ohio

1    showing that the order was clearly erroneous.

2         As far as getting documents, the magistrate judge order

3    cites a statute, 1331.16, and says that that statute expressly

4    grants the Ohio Attorney General the explicit legal right to

5    obtain and access the documents of the agencies at issue here.

6    That statute is an antitrust statute.  It's known as the

7    Valentine Act.  It can only be applied in monopoly and

8    antitrust investigations and ultimate enforcements of the

9    statute.  So I believe it is clearly erroneous for the order to

10   cite that statute as giving us an explicit legal right to

11   access documents here.

12           **THE COURT:**  All right.  How do you get documents?

13           **MR. WALSH:**  Well, we would have to go the way you

14   talk about, the CID to the state agencies.  We'll hope for

15   volunteer compliance, which we're trying to do, or go the CID

16   route.

17        As far as funding, the -- the penalties coming out of the

18   consumer protection statute in Ohio is kind of funny.  A

19   quarter, one-fourth of the penalties go to the treasurer of the

20   county that you file in if it's filed in Ohio.  The remainder

21   goes to something called the Consumer Protection Enforcement

22   Fund, which is a statutorily created fund that essentially

23   serves to fund the consumer protection section of the Ohio

24   Attorney General.

25           **THE COURT:**  Okay.  Anything else?

1          **MR. WALSH:**  No, Your Honor.

2          **THE COURT:**  Okay.  Thank you.

3      Next.

4          **MR. OLSZEWSKI-JUBELIRER:**  Hello, Your Honor.  Josh,

5  Josh Olszewski-Jubelirer for the People of the state of

6  California.

7      First you asked for a state appeals court decision that's

8  contrary to Judge Kang's order.  We have that in California.

9  That is *People ex rel. Lockyer versus Superior Court*.  This is

10  a co-national case, 122 Cal.App.4th 1060.  It's a 2004 case.

11          **THE COURT:**  What division?

12          **MR. OLSZEWSKI-JUBELIRER:**  I'm sorry?

13          **THE COURT:**  What division?

14          **MR. OLSZEWSKI-JUBELIRER:**  Apologies, Your Honor.

15  Fourth District, Division 1.

16          **THE COURT:**  Okay.

17          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, *Lockyer* holds

18  that when the Attorney General brings a lawsuit under the UCL

19  and the FAL, the two statutes, state statutes that the People

20  bring here, the party plaintiff, the People, do not include

21  state agencies.  State agencies are not parties to such a case.

22  That's in the decision at -- apologies, page 1076.

23      Furthermore, the Court held that the people, by

24  prosecuting this action, were not deemed to have possession,

25  custody or control over documents of any state agency.  Such

1    documents must be obtained by subpoena.

2              THE COURT:   Okay.  And was this cited?

3              MR. OLSZEWSKI-JUBELIRER:   Yes, Your Honor, several

4    times.

5              THE COURT:   And remind me, then, how he distinguished

6    it.

7              MR. OLSZEWSKI-JUBELIRER:   Your Honor, the magistrate

8    distinguished it because the order appears to believe that it

9    does not apply *Citric Acid's* legal right test.

10             THE COURT:   Okay.

11             MR. OLSZEWSKI-JUBELIRER:   If I may say a couple of

12   points on that, Your Honor.

13             THE COURT:   Sure.

14             MR. OLSZEWSKI-JUBELIRER:   The reasoning on *Lockyer* is

15   fully applicable to this case.  It expressly defines the scope

16   of the People to not include state agencies.  It emphasizes

17   that agencies are separate and distinct from the People and

18   from each other, and it holds that the People do not have

19   control for those reasons.  This is entirely in line with the

20   arguments that courts have considered when applying a legal

21   right test, that in a divided executive, when an independently

22   elected constitutional officer, like the Attorney General, does

23   not have those agencies under his authority, he does not

24   control those agencies for the purposes of Rule 34.

25             Turning to investigations.  I've spoken with others in my

1    office since I was last up here, and we are not aware of any

2    civil investigation into state agencies.  We have -- the

3    Attorney General's office does occasionally investigate state

4    agencies criminally, and the means of obtaining documents in

5    those cases would be a search warrant, which, of course,

6    requires probable cause to believe that a crime has been

7    committed.

8         **THE COURT:**  So the AG has never gotten documents from

9    a single agency?

10        **MR. OLSZEWSKI-JUBELIRER:**  In the course of

11   investigating, occasionally the AG will voluntarily ask

12   agencies to provide documents to assist in the investigation.

13   If --

14        **THE COURT:**  And I assume they're provided?

15        **MR. OLSZEWSKI-JUBELIRER:**  Sometimes they are

16   provided.  I'm not --

17        **THE COURT:**  Are you aware of any circumstance where

18   they were not?

19        **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I cannot say

20   for sure.  I would have to double-check with my colleagues on

21   one particular instance that I'm thinking of.

22        I will say in this case, since the order has come out we

23   have asked the agencies subject -- that are at issue in this

24   case, at issue, for access to those documents, and they have

25   all refused.  That's entirely consistent with *Lockyer's*

1    instruction that the People are not -- do not have control over

2    their documents.

3        I will say, at the end of the road, as *Lockyer* says, the

4    fact that those agencies will not provide documents to us is

5    not the end of the road for Meta's desires to obtain those

6    documents.

7        **THE COURT:** If I decide that you are under an order

8    to provide them and you do not get them or you do not produce

9    them, then my option are sanctions, and those sanctions at the

10   extreme are that you are -- your allegations are stricken from

11   the complaint.

12       **MR. OLSZEWSKI-JUBELIRER:** Absolutely, Your Honor.

13   And that is the exact position that courts like *American*

14   *Express, Warner Chilcott*, which considered an action by the

15   California Attorney General and found that the California

16   Attorney General did not have control over state agency

17   documents, that's the exact virtual veto concern that cases,

18   those cases have been concerned with. We do not -- the

19   Attorney General has -- is independently elected and

20   independently accountable to the People to protect their

21   interests. The legislature --

22       **THE COURT:** Where does the money go?

23       **MR. OLSZEWSKI-JUBELIRER:** The money in UCL and FAL

24   cases goes -- half of it goes to the county in which the action

25   was filed, half of it goes to the general fund. I'm sorry, not

1    to the general fund, apologies.  To the general fund.  But by

2    statute, both of those monies to the county and to the general

3    fund "shall be for the exclusive use by the Attorney General,

4    the district attorney, county counsel and the city attorney for

5    the enforcement of consumer protection laws."

6            **THE COURT:**  How does it work in an MDL?

7            **MR. OLSZEWSKI-JUBELIRER:**  In an MDL?  In terms of

8    where does some of the money go to?  Like which county?

9            **THE COURT:**  Right.

10            **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I have thought

11    about that question.  I haven't asked others in my office.

12    Certainly the Court we are standing and sitting right here is

13    in Alameda County, and my supposition would be that half of it

14    would go to Alameda County.  But again, that is for the

15    exclusive use of the Attorney General and the district attorney

16    or other prosecutors for the enforcement of consumer protection

17    laws.

18        We also have a disgorgement remedy, Your Honor, and those

19    disgorgement monies are paid into a special consumer

20    restitution fund, which is only to be paid out to consumers who

21    are entitled to restitution in other consumer protection cases,

22    but where defendants do not have sufficient funds to pay

23    judgments.

24        If I may make just a couple of other points, Your Honor.

25            **THE COURT:**  Sure.

1          **MR. OLSZEWSKI-JUBELIRER:**  The order was contrary to

2    law in determining that attorneys control their clients'

3    documents.  Attorneys do not control their clients' documents,

4    and certainly not -- they do not have the legal right to obtain

5    on demand clients' documents in order to produce them in

6    litigation in which they are not parties, and *Lockyer* holds

7    that in this case those agencies are not parties.

8          Now, Meta has conceded in its oppositions that the order

9    was also wrong in its interpretation of how the Attorney

10   General relates to the agencies in terms of representing them

11   when they need representation.  The order concluded based on

12   its reading of the statutes that all of the agencies at issue

13   would be or must be represented by the Attorney General absent

14   consent by the Attorney General for those agencies to represent

15   themselves or to hire outside counsel.

16         And it is true that those agencies, if they came to us, we

17   would have a conversation and could authorize them to hire

18   outside counsel.  There is one exception, and that is the

19   California Department of Education, which Meta points out, as

20   well, in its opposition.  The California Department of

21   Education does not need any consent or a conversation with the

22   Attorney General to represent itself in a judicial forum.  In

23   fact, in this case in response to Meta's Rule 45 subpoena,

24   the -- my understanding based in part on Meta's production of

25   those documents to us, is that the California Department of

```
 1    Education represented itself in negotiating with Meta on that

 2    subpoena, they produced documents to Meta, and we now have them

 3    now only because Meta has reproduced them back to us.

 4              THE COURT:  Okay.  Any response?

 5              MR. YEUNG:  Sure.  Why don't I start with -- this is

 6    Chris Yeung from Covington.

 7         Why don't I start with Lockyer.  My esteem colleague

 8    talked about Lockyer, talked about how it -- and you asked the

 9    question:  Is Judge Kang wrong that it didn't apply the Citric

10    Acid test.  Gave you a lot of reasons, but what I didn't hear

11    is that Lockyer applied the Citric Acid test, because it

12    didn't.  That's how Judge Kang distinguished the case.  There

13    was no error.

14              THE COURT:  All right.  Any response on that?

15              MR. OLSZEWSKI-JUBELIRER:  Your Honor, I agree it does

16    not apply Citric Acid, but it answers the question in the sense

17    part of the Judge's reasoning is that the State -- these

18    agencies are somehow part of the State, and maybe they're

19    agents of the State that have this close connection with the

20    State, and that makes them, you know, more likely to be subject

21    to party.  But Lockyer is very clear that those agencies are

22    separate and distinct from the People, and the People is the

23    plaintiff in this action.

24              THE COURT:  Okay.

25              MR. YEUNG:  And I'll go on.
```

1    Judge Kang, in the California-specific section of his

2  opinion, did, in fact, cite several federal court decisions,

3  district court decisions that postdate *Lockyer*, like *Qulliam* --

4  like *Pulliam*, I'm sorry, and *Quiroga*, these are on page 52,

5  that support his decision.

6    I think all there is here is a disagreement over Judge

7  Kang's reading of the -- reading -- valuing the persuasiveness

8  of different authority.  This is not clear error.  There are

9  cases that support Judge Kang's decision that he cited to in

10  his opinion, and they have not provided anything here to

11  suggest it's clear error.

12    The second point I'd wait --

13    **THE COURT:**  Wait.

14    Response.

15    **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, the cases that

16  I believe counsel's referring to, *Pulliam versus Lozano*,

17  there's a case called *Quiroga*, the order also cites your case

18  called *Mitchell*, these cases were not raised by either of the

19  parties below, they were the Court's independent research.  And

20  I think part of the reason why they're not raised is that these

21  are prisoner civil rights cases against a prison official or

22  multiple prison official defendants, and the only thing that

23  these cases say is that in the Court's experience, when a

24  prison official is a defendant, the attorney representing that

25  prison official is -- has been able to obtain documents from

1   the prison agency.

2       So part of the issue is do officials -- do officials or

3   employees have control over their employer's documents.  That

4   is not the case here.  There's no suggestion that the People

5   are an individual official employed by some other entity or any

6   of these 13 agencies at issue.  And secondly, these decisions

7   rely on the same practical ability of reasoning that was

8   rejected in *Citric Acid.*

9       So *Citric Acid* says very explicitly prior ability to

10  obtain documents voluntarily is not sufficient for the legal

11  right test, and this is the only thing in the decision.  It

12  says, you know, they -- the prison official defendant, or in

13  some cases the Attorney General, are able to obtain documents

14  from the prison agency in the course of defending this

15  official.

16      First of all, CDCR is not one of the 13 agencies at issue

17  here, so that is also distinguishing.

18      I will say *Mitchell*, which the Court says relied on common

19  counsel, says nothing about common counsel.  It merely says

20  that high-ranking prison officials have control over documents

21  at their prisons, like the warden has control of documents at

22  the prison or at CDCR.

23          **THE COURT:**  All right.  Last comment.

24          **MR. YEUNG:**  So last comment.

25      So I heard a lot of disagreement with those decisions.  I

1    don't -- that's, again, disagreement with how Judge Kang read

2    them.  It's not clear error.  If you look at -- read the

3    decisions that he relied on, I believe they do support our

4    position.

5         The final point that I will make is California did, in the

6    *Generic* case, did in fact enter into a stipulation where they

7    agreed to produce agency documents.  If they wanted to do it,

8    they could do it.

9              THE COURT:  All right.  Moving on to *Abraham versus*

10   *Meta*.

11             MS. MIYATA:  Your Honor, my apologies.  Bianca Miyata

12   for the state attorneys general.

13        I believe there are two states who have not been heard on

14   the three questions that the Court asked for state specific.

15             THE COURT:  I didn't see anyone standing in line.

16             MS. MIYATA:  Oh, I apologize.  So I believe Colorado

17   and Kentucky remain on that list.

18             THE COURT:  All right.  Let's go ahead and take a

19   10-minute break, because I don't want the court reporter to

20   have a problem.

21             MS. MIYATA:  Thank you, Your Honor.

22             THE COURT:  Ten minutes.

23        (A recess was taken from 1:29 p.m. to 1:40 p.m.)

24             THE COURT:  Okay.  We're back on the record.  The

25   record will reflect that the parties are present.

1        Ms. Miyata.

2              **MS. MIYATA:**  Thank you, Your Honor.

3        Briefly, Bianca Miyata for the state AG of Colorado.

4        I wanted to touch on the three questions that you've asked

5   every state here today.

6        The first question, whether there's a Supreme Court case

7   or appellate authority that's directly opposed to Magistrate

8   Judge Kang's order.  There is not a case that touches on

9   document control in Colorado in that manner, but there is a

10  Colorado Supreme Court case that acknowledges the AG's ability

11  to act in its enforcement capacity against agencies it's

12  otherwise representing.  And I think the natural conclusion of

13  that case, as well as the order read together, would be that

14  the AGs would have legal control and the right to access

15  documents for two adversely litigating parties, which clearly

16  creates somewhat of a conundrum.

17       On your second question, whether I'm aware of enforcement

18  of a civil investigative demand or subpoena against a state

19  agency, I am not aware of that happening in my time with the

20  AG's office, but I can say that the AG's office certainly can

21  and does enforce civil investigative demands against other

22  entities, and there may be a wide variety of reasons why they

23  would not do so against a state agency, including the delicate

24  balance of relationships there between state agencies and

25  including the desire, you know, there may be an analysis as to

1  just why they would not want to enforce it.  It's not due to a

2  lack of ability.

3          **THE COURT:**  So same question to you, though.  So how

4  do you get documents when you need them?

5          **MS. MIYATA:**  Well, when we -- and this being

6  specifically from state agencies?

7          **THE COURT:**  Correct.

8          **MS. MIYATA:**  So in this role as CP counsel, when I

9  need documents from a state agency, we can ask.  We can also

10  issue a civil investigative demand.  I can say in a previous

11  role I held in the AG's office when I was agency counsel, it

12  was not unusual at all for one particular agency to need

13  documents from another agency and then to have to litigate that

14  through to completion.  I --

15          **THE COURT:**  Well, but agency and agent versus agency

16  are different from the Attorney General and an agency.

17          **MS. MIYATA:**  I understand that, Your Honor.  That

18  is --

19          **THE COURT:**  Have you ever come across a situation

20  where, if an AG asked, it wasn't produced?

21          **MS. MIYATA:**  I have not come across that situation,

22  Your Honor, but I have to be frank.  I'm not aware of many

23  situations where the AG would be asking an agency to

24  voluntarily give up documents in the course of an

25  investigation.  I think those decisions are taken very

1    seriously.

2         I think that I did touch already about Your Honor's

3    question about the general fund with regard to Colorado, but I

4    can give you a cite for that in case it's helpful.  It's

5    Colorado Revised Statute 6-1-112 that specifies that civil

6    penalties do revert back to the State's general fund, which is

7    then allocated as the legislature sees fit.

8              **THE COURT:**  Okay.

9              **MS. MIYATA:**  And then if the Court would indulge me

10   in just making two additional points specific to the State of

11   Colorado, and then I will sit down.

12        There's -- I think we've heard about -- we've heard some,

13   you know, variations on a theme here today, especially

14   regarding the common argument and our concerns with some of the

15   conclusions in this court order specific to Colorado.  I think

16   you saw that the Court cited Colorado Statute 6-1-116,

17   Subsection 4, which is a statute that allows state agencies to

18   enter into a data-sharing or information-sharing agreement with

19   the Attorney General for enforcement purposes of the Consumer

20   Protection Act.  This statute is specific to licensing

21   authorities.  But I did want to highlight this, because I think

22   that the fact that this statute even agrees kind of underscores

23   the fact that voluntary compliance is necessary.  There is not

24   a legal right to access; otherwise, this statute would be

25   completely superfluous and wouldn't really have any meaning.

1    I noted in the order as well as in my colleagues' response

2   on this topic that they said these agencies aren't licensing

3   agencies.  I'd like to push back against that, because I think

4   many of the agencies from whom Meta is seeking documents are

5   actually licensing authorities.  When I look at this list,

6   these agencies, Department of Education, Behavioral Health

7   Administration, Human Services, the Department of Regulatory

8   Agencies, they issue licenses to a wide variety of individuals

9   and entities for a wide variety of purposes.  So this statute

10   is indeed on point for the agencies we're talking about here

11   today.

12    Which I guess just brings me, you know, to my conclusion,

13   which is that these agencies I've just spoken about were

14   collaborating and cooperating with Meta about the fulfillment

15   of any Rule 45 subpoenas that Meta chose to issue to them, and,

16   you know, we continue to be open and, you know, very amenable

17   to working through that process in the furtherance of getting

18   them documents.

19        **THE COURT:**  Okay.  Thank you.

20        **MS. MIYATA:**  Thank you.

21        **MR. YEUNG:**  I'll just pick up on that last point.

22        **THE COURT:**  I'm not asking for your comment.

23        **MR. YEUNG:**  Oh, sure.

24        **THE COURT:**  Next.

25        **MR. YEUNG:**  Okay.

1          **MR. HEYBURN:**  Hello, Your Honor.  Jack Heyburn on

2     behalf of the Commonwealth of Kentucky.

3          To Your Honor's three questions, our office does have the

4     ability to issue CIDs.  To our office's knowledge, we have

5     never issued one to an agency, nor have we ever used it to

6     fulfill a discovery request.

7          There is a provision of the Consumer --

8          **THE COURT:**  How do you get documents?

9          **MR. HEYBURN:**  Informally.  And there is a provision

10    of the Consumer Protection Act, Kentucky Revised Statute

11    367.160, that gives the Attorney General a right to access to

12    evidence and materials from two special agencies, and that is

13    the Department of Insurance and the Public Services Commission,

14    and that gives us a legal right to documents from those

15    agencies about cases in front of those agencies.  That's in the

16    same section as a general provision contemplating cooperation

17    between our office and other agencies, but the General Assembly

18    clearly knows how to give our office a legal right to

19    documents, and they did so in two very narrow ways.

20          **THE COURT:**  Was that statute cited to Judge Kang?

21          **MR. HEYBURN:**  Yes.

22          **THE COURT:**  And how did he distinguish them?

23          **MR. HEYBURN:**  Judge Kang relied on the neighboring

24    provision that contemplates cooperation between the Attorney

25    General and other agencies.

1          **THE COURT:**  And what statute is that?

2          **MR. HEYBURN:**  That is KRS 367.160.

3      If the cooperation language granted us a legal right to

4  documents throughout --

5          **THE COURT:**  Hold on.  I thought the right to access

6  from those two specific entities was 367.160.

7          **MR. HEYBURN:**  It's the same section, and there are

8  different subsections within that statutory --

9          **THE COURT:**  Which are the subsections?

10          **MR. HEYBURN:**  So Subsection 1 is the cooperation

11  amongst agencies language.

12          **THE COURT:**  Okay.

13          **MR. HEYBURN:**  And then Subsections 2 and 3 grant the

14  Attorney General the legal right to access documents from those

15  specific agencies that I discussed.

16          **THE COURT:**  All right.

17          **MR. HEYBURN:**  The one point that I'll add on that

18  statute is that if the cooperation language granted our office

19  a right to access to documents across the Kentucky executive

20  branch, then the General Assembly wouldn't have needed to

21  specify in those two neighboring provisions where we have

22  access to documents from specific agencies.

23      Moving on to --

24          **THE COURT:**  Then what does it refer -- I don't have

25  it in front of me, so what does it refer to if it says that it

1    must -- that there must be general cooperation?

2         **MR. HEYBURN:**  It's cooperation with all of the

3    functions of the Kentucky Consumer Protection Act.  So not just

4    litigation, but there's a number of other functions

5    contemplated in the sections that are referenced, such as

6    putting together materials on consumer protection or holding

7    conferences and the like.  So it's a broad directive to

8    cooperate, but cooperate does not mean control.

9         **THE COURT:**  Okay.  Response.

10        **MR. CARPENTER:**  Thank you, Your Honor.

11       That statute, which does say that the agencies have to,

12   quote, fully cooperate with the Attorney General in carrying

13   out its duties is probably enough on its own.  It's the exact

14   sort of access statute that courts have looked before.

15       So, for example, the *Generic* court in Pennsylvania looked

16   at a similar statute that you heard about earlier today.  If

17   fully cooperate with the Attorney General and enforcing --

18        **THE COURT:**  Subsections 2 and 3 specifically grant

19   authority with respect to two agencies.  How is that not

20   superfluous if your argument is that Subsection 1 refers to

21   everything?

22        **MR. CARPENTER:**  So two responses to that, Your Honor.

23       The first is I think it's not unusual for a legislative

24   body to set out a general rule.  So, for example, fully

25   cooperate, and then to apply it in more --

1      **THE COURT:**  Do you have any -- what authority do you

2   have for that proposition?

3      **MR. CARPENTER:**  I don't have any authority for that,

4   and that was not cited in the briefing.

5      **THE COURT:**  Your next point?

6      **MR. CARPENTER:**  Yes, Your Honor.

7      The other point is that, even setting that statute aside,

8   Kentucky's briefing in this appeal ignores the other

9   authorities that Judge Kang relied on.  So, for example,

10  Revised Statute 15.020, Subsection 1, which makes the AG the

11  chief legal officer, or 15.020, Subsection 3, which says that

12  the AG shall attend to all litigation and legal business of any

13  department.

14     **THE COURT:**  Okay.  I'm not so sure I'm convinced, but

15  I'll take a look at them.

16     **MR. HEYBURN:**  That brings me to my next point,

17  actually.

18     The order cites those provisions to say that our office

19  would represent the target agencies.  We are not representing

20  the target agencies, and we don't have to.  *Johnson v. Merideth*

21  which we cited, the pincite is -- the case cite is 291 Ky.

22  829 -- discusses the statutory framework that's in effect now,

23  whereby agencies can request for the Attorney General to

24  represent them, but they can also employ their own counsel.

25  And that case is from 1942.  And it's an important case,

1    because before that, the Attorney General claimed exclusive

2    authority to represent agencies and officers of the

3    Commonwealth, and that case concerned the law that put into

4    place the current scheme.  And our office, at the time,

5    actually decried it as "the ripper bill" that was ripping away

6    our exclusive authority to represent officers and agencies of

7    the government, but our Supreme Court upheld that structure in

8    that case, *Johnson v. Merideth*, and as it stands now, agencies

9    can come to us and request representation, we can decline, we

10   can accept, and they can also employ their own counsel.

11       Your Honor also asked about the flow of funds.  If we were

12   to get civil penalties or disgorgement in this case, Kentucky

13   Revised Statute 48.005, Subsection 4, provides a waterfall of

14   how those funds are used.  First they go to the Attorney

15   General to pay for litigation fees, then they go to any

16   consumers if there is a need to pay restitution to consumers,

17   then any remaining funds go to the general fund, and funds in

18   the general fund need to be appropriated.  So the bare fact

19   that funds are in the general fund doesn't mean that any of

20   these agencies have an entitlement to those funds.

21       In terms of Supreme Court decisions directly contrary to

22   the magistrate's ruling, I discussed *Johnson v. Merideth*.

23   There are a number of cases discussing the separateness of the

24   executive, the governor and the Attorney General.  *Cameron v.*

25   *Beshear* is one, which is 628 S.W. --

1        THE COURT:  So those are general proposition.

2   Anything specific?

3        MR. HEYBURN:  That is all on the specific cases that

4   directly rebut the order's holdings.

5        THE COURT:  Okay.

6        MR. HEYBURN:  I would just add, as well, that

7   Kentucky's agencies, the ones that have received subpoenas,

8   have been cooperating with those subpoenas.  One of the

9   agencies has produced documents, I believe about 3000 of them.

10  Another compiled a set that they did not produce at Meta's

11  request.  And that really goes back to the larger point that I

12  think applies to all of the states here.

13       The state agencies are ready, willing and able to comply

14  with the Rule 45 subpoenas, because they are not parties to

15  this case and there is an established way to get discovery from

16  nonparties, and that's through subpoenas.  That way, Meta can

17  go directly to those nonparty agencies instead of having to

18  filter their discussions through the Attorney General, which,

19  in our case, we're not representing those agencies.  It's a

20  much more efficient process, and it gives --

21       THE COURT:  Well, it's more efficient for you, not

22  for them.

23       MR. HEYBURN:  It --

24       THE COURT:  And as many of you in this courtroom have

25  said, you frequently get things done informally, you have

1    relationships, you know how the thing works.  Again, in my view

2    you all should have taken care of this and not wasted so much

3    in terms of judicial resources to get a ruling that, you know,

4    that's taken a huge amount of time.

5        And I will, I'm sure, be addressing that pretty quickly.

6    Not today, but pretty quickly.

7        **MR. HEYBURN:**  The very last point I would make is

8    that, of course, under the legal right test, the voluntary

9    furnishing of documents is not a factor in whether there's

10   control or not.

11       And with that, that's all I have unless Your Honor has any

12   further questions.

13       **THE COURT:**  No, thank you.

14       **MR. COSTA:**  Good afternoon, Your Honor.  Ryan Costa

15   on behalf of the Delaware Attorney General's office.  I'm just

16   up here to take one minute to answer your third question

17   regarding the flow of funds.

18       The Delaware Attorney General's office has a consumer

19   protection fund.  If any funds are received through this case,

20   they would go into that fund.  It's provided by statute 6

21   Delaware Code 2727.  And any money in those funds is to be

22   spent on the enforcement of our consumer fraud act and

23   antitrust acts.  Not only does it not go to the other agencies,

24   but it doesn't go to the DOJ as a whole, unless the director of

25   the Office of Management and Budget approves our request.

1  There is a cap of $10 million.  Over that cap it does revolve

2  into the general fund, but not until then.

3      That is all I have.

4          **THE COURT:**  Okay.  Thank you.

5          **MR. YEUNG:**  Your Honor --

6          **THE COURT:**  No.

7          **MR. YEUNG:**  Okay.  Thank you.

8          **MR. CHAND:**  Your Honor, Kashif Chand from the New

9  Jersey Division of Law.  I just wanted to take just one -- a

10  few seconds to correct something that was said on the record

11  earlier.

12      We cited to a Supreme Court case, In Re:  Advisory

13  Committee on Professional Ethics, Opinion 621.  The cite is 620

14  A.2d 880.  I want to clarify that that was a decision that is

15  binding in New Jersey.  There was seven justices, and that was

16  the full panel of justices that heard that issue, and it is

17  binding authority in New Jersey.

18      Thank you.

19          **MR. ZIPERMAN:**  Your Honor, Phil Ziperman for the

20  Maryland Attorney General's office.  I just wanted to clarify

21  one point that was made while my colleague was from Florida is

22  here.

23      Meta argued that the state AGs that only brought cases in

24  their capacities as state AGs can only do so on behalf of the

25  state.  That's just simply not true.  My office can only bring

1  affirmative litigation cases to enforce those statutes that

2  it's authorized to enforce.  We bring consumer protection cases

3  not -- through the consumer protection division.  We bring

4  antitrust cases through the antitrust division.  We bring

5  security cases through the securities division.

6      There are some instances where, if Maryland wants to

7  prosecute a case, for example in tort, it would need to get the

8  governor's permission, but it would still be prosecuting that

9  case in the Attorney General's capacity.  There is no law in

10  Maryland that says that we can only prosecute cases as the

11  Attorney General through the state.  That's just not true.

12          **THE COURT:**  Okay.

13          **MR. ZIPERMAN:**  Thank you.

14          **MR. CARPENTER:**  Would you like a response, Your

15  Honor?

16          **THE COURT:**  No.

17          **MR. CARPENTER:**  Happy to rest on the briefing, then.

18          **THE COURT:**  *Abraham versus Meta*.  Appearances.

19          **MR. STEIN:**  Joshua Stein on behalf of Abraham.

20          **MS. HAZAM:**  Lexi Hazam on behalf of MDL plaintiffs.

21          **MS. SIMONSEN:**  Ashley Simonsen on behalf of Meta.

22          **THE COURT:**  Okay.  I've read the statement.  You have

23  a very short time to add anything.

24          **MR. STEIN:**  We will rest on our submission, Your

25  Honor.

1           **MS. HAZAM:**  As will we, Your Honor.

2           **MS. SIMONSEN:**  As will we, Your Honor.

3           **THE COURT:**  Okay.  I'm not going to let Boies

4    Schiller come in here with a class action that it thinks does

5    something that the other cases do not.  You all don't do

6    anything really different.  The kinds of arguments that are

7    being made really do not do justice to the nature of the

8    actions that have already been brought and have been litigated

9    for close to two years.  So I can't force you to dismiss it,

10   but you're certainly not going to disrupt the process.  So you

11   can proceed in the normal course.  Understood?

12          **MR. STEIN:**  Your Honor, just a point of

13   clarification.  When you say in the normal course, are you

14   indicating that the case is stayed or some other posture, Your

15   Honor?

16          **THE COURT:**  Well, I expect that when you came here

17   you didn't want this answer, so you tell me what you're gonna

18   do with it.  But you certainly are not going to get in the

19   flow.  If you want to ask to join the leadership committee, you

20   can ask to join.  Everybody has to re-up in a year, or actually

21   in December.  All of the applications for reappointment are

22   due.  My point is, is that you are not going to insert yourself

23   in your own way in your own case on the claim that it does

24   something different; it does not.

25          **MR. STEIN:**  Understood, Your Honor.

1    Our perspective, we represent a putative class of a lot of

2   people that are not represented currently and have due process

3   concerns about a stay.  We can meet and confer if some specific

4   request of how we'd like to proceed and see if that's workable

5   to the plaintiffs.

6        **THE COURT:**  That's fine.  I'll put you on for a CMC

7   and the next time the MDL meets.

8        **MR. STEIN:**  Thank you, Your Honor.

9        **THE COURT:**  Okay.  Some other miscellaneous issues

10  that I have, and then you can tell me if you all have anything

11  separate.

12    Typically in my class actions -- and I don't know if I've

13  done it here, so I just want to make sure that it's being done,

14  and this is really to the plaintiffs.  To the extent that you

15  are using vendors who are collecting information on behalf of

16  plaintiffs, I need you to ensure for me that your contracts

17  indicate that they will delete all that data and that they are

18  not using it for any other purpose other than what you

19  authorize.  Data is valuable, and I don't want these vendors

20  using it outside of this litigation.  So please confirm that.

21        **MS. HAZAM:**  Understood, Your Honor.  It is our belief

22  that all of our vendors do that, but we will explicitly confirm

23  for you at the next hearing.

24        **THE COURT:**  Okay.  Next.  At the conference I heard

25  some pretty significant horror stories about vendors and the

relationship of plaintiffs, or plaintiffs' friends and family
or associates who had relationships with the vendors which
created lots of increased costs and things like that.  You
know, these are the stories that give plaintiffs' lawyers bad
names.  So when -- so, one, I want you all to make sure that
you've done whatever investigation you need to do to make sure
that there is nothing going on behind the scenes that should
raise concerns about vendors.

Second, with respect to these applications to be
reappointed which are coming up, I want to -- everyone to
confirm whether the situation has changed.  I asked about
litigation funding before.  I want to know about it again.
Just because I asked in the first instance doesn't mean that if
the circumstances changed, I'm not interested.  So that needs
to be part of the disclosure to the Court.

We need to do a better job, and I include the Court in
this, in having a website or something so that individuals who
are not in the know have access to information, understand
what's going on, can get the information that they need.  When
I can we'll try to figure out how to make our website better,
but there is no one website for this MDL; everybody has their
own.  And I would ask you all to talk about whether that's
really the best way to keep people abreast of what's going on.
And I don't -- my initial instinct is that it's not.  So I
think that's important.

1        Other things that were recommended at the conference by

2   lawyers, not by judges.  There were three things that I want to

3   raise.  One is off-the-record conversations.  I tend not to

4   like to do off-the-record conversations.  I think the judiciary

5   is frequently criticized for not being transparent.  This is a

6   public -- this is an issue of interest with the public.

7        If -- so I'll say this once, and there are going to be

8   enough of you who are here by the end.  If there is some time

9   when you think that it would be helpful to have an off-the-

10  record conversation, we have liaison counsel, send me a note.

11  Sometimes, you know, if -- maybe we're down the road and, you

12  know, these cases are going to trial, maybe they're not.  But

13  maybe they're going to trial.  You're trying to settle them.

14  You need -- there's something that people are getting stuck on.

15  You need to have a conversation that you think will unstick

16  some of these knottier points, then let me know and I'm happy

17  to have it if it's useful.

18       But understand that I am going to -- one of my hesitation

19  is that we are a public forum.  Right?  I make the offer.  I

20  expect you'll remember it if you need it.  Okay?

21          **MS. SIMONSEN:**  Thank you.

22          **THE COURT:**  The other recommendation was -- and,

23  again, we can talk about this with the plaintiffs' counsel and

24  the applications -- that to the extent that leadership is not

25  accessible, and I'm assuming that you are, but maybe if you're

not, people are afraid of you -- I hear people are afraid of

me; I don't know why. But maybe there should be a complaints

person that people can go to if they have complaints about

leadership, and, you know, given Mr. Sieger's role maybe he's a

good person for it, I don't know, because he's not directly in

leadership anymore. But, so think about that, to try to make

sure that everybody's staying onboard.

        The other suggestion that was made that I am uncomfortable

requiring, apparently there are judges who require counsel on

both sides to have joint dinners, where the rules are that you

cannot talk about the case, you can only talk about each

other's lives, your kids, what's your favorite sporting event.

I don't know, drinks or something. Seems like a good idea, but

I'm a little hesitant to force you to do it.

        I've actually done that kind of intervention myself with

lawyers who are on the criminal side who regularly appear in

front of me, who regularly, you know, do lots of litigation

against each other when things get a little bit out of control.

If you need me to order you to do it, then let me know. That

could be one of these off-the-record things. But you might

think about it. People say it works really well to keep

conversations going. It's harder to be a jerk to someone when

you know them personally. I believe that. But I'm not

currently inclined to demand that you do it.

        Okay.

1          **MS. SIMONSEN:**  Thank you, Your Honor.

2      If I may, Ashley Simonsen for the Meta defendants.

3      I believe that we have a really good working relationship

4  together and have almost become -- I've come to feel that I

5  have friends in Lexi and Previn.  I think we do know about each

6  other's sort of personal lives, and I think the communication

7  has been very positive on that front, and I would be glad to

8  take up Your Honor's invitation with them to do more of that.

9  But I appreciate the sentiment, and I think we're already

10  really well on our way there.

11          **MS. HAZAM:**  Likewise, Your Honor.

12          **THE COURT:**  Okay.

13          **MS. HAZAM:**  It's easy to be voluntold on this, to use

14  a phrase that some of our clients do.

15          **THE COURT:**  Okay.

16          **MS. HAZAM:**  And we will be mindful of all of the

17  other points the Court has raised, including the issue with

18  regards to vendors.  I want to convey to the Court that we have

19  no reason to believe that there are any issues there, but we'll

20  be diligent in being watchful for that.  We did engage in

21  competitive bidding with almost all of our vendors, so there

22  was a process to identify the ones who are best suited to this

23  case and to make sure we were being efficient.

24      As far as a website goes, I think that is worthy of

25  further exploration.  I believe that BrownGreer has a website

1   that has certain information for plaintiffs, but I think the

2   Court is probably thinking for the larger public also, without

3   having to actually go through Pacer and enter the official

4   docket.  So we can work on that for sure.

5            **THE COURT:**  Okay.  Could you let me -- could you tell

6   me, I don't know if you know off the top of your head, what the

7   going rate is for document review that you all are being

8   charged?  Given remote proceedings these days and remote work,

9   I'm curious what the rate is that you all are using.

10           **MS. HAZAM:**  So it may vary some, Your Honor, with the

11  type of document review, whether it's first-level linear

12  document review or something that's for a more refined purpose

13  in support of a deposition or an expert, for example.  It also

14  varies according to whether the document reviewer is a staff

15  attorney at the law firm with the associated overhead and

16  benefits.

17           **THE COURT:**  I'm only talking about --

18           **MS. HAZAM:**  Contract?

19           **THE COURT:**  Contract.

20           **MS. HAZAM:**  Contract doc. review?

21      Again, varies both for the purpose, and over time with the

22  market changing it might be in the arena of something like $50

23  to $60 an hour for basic-level document review, and defendants

24  may have their own data points on this.

25           **MS. SIMONSEN:**  Ashley Simonsen for the Meta

1   defendants.  I was going to throw out a similar number, 50 to a

2   hundred an hour, depending on the level of seniority of the

3   contract reviewer.  That's my understanding.

4          THE COURT:  Okay.  Thank you.  CMC.  It's always good

5   to get on your calendars early, and my calendar is difficult.

6   Here are the dates that I'm thinking about.  Well, let me as

7   before we get there, because this will be the last thing.  Were

8   there anything else that you all want to talk about?

9          MR. WARREN:  Your Honor, Previn Warren for the

10  plaintiffs.

11      Just one quick question about the reappointment

12  applications.  Does Your Honor have a timeframe for that, or

13  will there be an order directing that?

14         THE COURT:  There is an order.  So if you look at the

15  original order, it gives you the annual timeframe.  I believe

16  they're due in December.  And then I don't have it off the top

17  of my head, but it was annual.

18         MR. WARREN:  It was a recurring?

19         THE COURT:  It was a recurring.

20         MR. WARREN:  Very well.  Thank you.

21         THE COURT:  Anything else?

22         MS. HAZAM:  Nothing further from plaintiffs, Your

23  Honor.

24         THE COURT:  Defense?

25         MS. SIMONSEN:  Your Honor, may I just clarify one

1  thing I mentioned earlier relating to Roblox and Discord?

2      I mentioned that they were in some of the bellwether

3  cases.  They're not actually named defendants, I wanted

4  clarify, but they've been identified on four plaintiffs and

5  their plaintiff fact sheets as social media apps that were used

6  by those bellwethers.  Happy to confer with plaintiffs about

7  the stipulation that they're working on already.  We just want

8  to make sure we are able to take discovery if we need to,

9  notwithstanding that claims against those defendants would

10 otherwise be stayed.

11         **THE COURT:**  Okay.  All right.  Is that it?

12         **MS. SIMONSEN:**  Yes, Your Honor.

13         **THE COURT:**  January 17th, 9:00 a.m.  That is a

14 Friday.  Any problems generally speaking?

15         **MS. SIMONSEN:**  Your Honor, for the defendants I'm not

16 aware that that would be a problem.

17         **MS. HAZAM:**  Likewise, Your Honor, for plaintiffs.

18         **THE COURT:**  Okay.  Then for February I can give you

19 either February 12th or February 19th.  Those are Wednesdays.

20 And in case it impacts it, the next day I can give you after is

21 March 21st, which is a Friday.

22         **MS. SIMONSEN:**  Your Honor, defendants might have a

23 slight preference for the 19th, but either would work.

24         **MS. HAZAM:**  And we're the opposite, Your Honor.  So

25 in that event I think the Court should simply choose.

1          **THE COURT:**  Okay.  April 23rd would be the next one.

2    That's a Wednesday, 9:00 a.m.

3          **MS. SIMONSEN:**  No issue for the defendants, Your

4    Honor.

5          **MS. HAZAM:**  Same for plaintiffs.

6          **THE COURT:**  And then we already have it on the

7    calendar.  We will not have one in May.  The next one after

8    that will be June 13th, but I need to move you to 2:00 p.m.

9    And that one's already on the calendar.  Okay.  I'll figure out

10   the February date.  Anything else?

11         **MS. HAZAM:**  Not here, Your Honor.

12         **MS. SIMONSEN:**  Nothing from defendants.

13         **THE COURT:**  Okay.  Everybody have safe travels, and

14   we'll see you next month.

15         (Proceedings concluded at 2:15 p.m.)

16                          **---o0o---**

17                  <u>**CERTIFICATE OF REPORTER**</u>

18         I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE:  Friday, November 1, 2024

21

22

23   _____

24         Stephen W. Franklin, RMR, CRR, CPE
          Official Reporter, U.S. District Court

25