UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 <br><br> Case Nos.: 4:22-md-03047-YGR-PHK |
| This Filing Relates to: <br><br> ALL ACTIONS | **JOINT LETTER BRIEF ON PERSONAL INJURY AND SCHOOL DISTRICT PLAINTIFFS' REQUESTS FOR PRODUCTION Nos. 317, 325, 335, 344-346, and 357 AS TO META DEFENDANTS** <br><br> Judge: Hon. Yvonne Gonzalez Rogers <br> Magistrate Judge: Hon. Peter H. Kang |

Dear Judge Kang:

Pursuant to the Court's Standing Order for Discovery in Civil Cases, the Personal Injury and School District ("PI/SD") Plaintiffs ("Plaintiffs") and the Meta Defendants ("Meta") respectfully submit this letter brief regarding a dispute about the PI/SD Plaintiffs' Requests for Production of Documents Nos. 317, 325, 335, 344-346, and 357.

Pursuant to the Discovery Standing Order and Civil Local Rule 37-1, the Parties attest that they met and conferred by video conference, email, and correspondence on numerous occasions before filing this brief. On October 29, 2024, lead trial counsel for the Parties involved in the dispute attended the final conferral. Because all lead counsel are not located in the geographic region of the Northern District of California or otherwise located within 100 miles of each other, they met via videoconference. Lead trial counsel have concluded that no agreement or further negotiated resolution can be reached.

Dated: November 7, 2024

Respectfully submitted,

*/s/Lexi J. Hazam*
LEXI J. HAZAM
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000

i

lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE, LLC**
401 9th St, Suite 630
Washington, DC 20004
Phone: (202) 386-9610
Email: pwarren@motleyrice.com

Co-Lead Counsel for Plaintiffs

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
cseeger@seegerweiss.com

Counsel to Co-Lead Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

Liaison Counsel

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
633 WEST FIFTH STREET, SUITE 2652
LOS ANGELES, CA 90071
Telephone: 213-787-8590
ejeffcott@forthepeople.com

JOSEPH VANZANDT
**BEASLEY ALLEN**
234 COMMERCE STREET
MONTGOMERY, LA 36103
Telephone: 334-269-2343
joseph.vanzandt@beasleyallen.com

Federal/State Liaisons

MATTHEW BERGMAN
GLENN DRAPER
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org
glenn@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
jbilsborrow@weitzlux.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR
NEW YORK, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

ALEXANDRA WALSH
**ANAPOL WEISS**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: 202-780-3014
awalsh@anapolweiss.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

Plaintiffs' Steering Committee Leadership

RON AUSTIN
**RON AUSTIN LAW**
400 MANHATTAN BLVD.
HARVEY, LA 70058
Telephone: 504-227–8100
raustin@ronaustinlaw.com

PAIGE BOLDT
**ANAPOL WEISS**
130 North 18th Street | Suite 1600
Philadelphia, PA 19103
Telephone: 202-773-0381
PBoldt@anapolweiss.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701-1100
tcartmell@wcllp.com

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KY 40202
Telephone: 859-600-6725
semery@justicestartshere.com

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
Telephone: 646-666-8908
carrie@cagoldberglaw.com

RONALD E. JOHNSON, JR.
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KY 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

JOSEPH E. MELTER
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
jmeltzer@ktmc.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: 212-213-8311
hnappi@hrsclaw.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

RUTH THI RIZKALLA
**THE CARLSON LAW FIRM, PC**
1500 ROSECRANS AVE., STE. 500
MANHATTAN BEACH, CA 90266
Telephone: 415-308-1915
rrizkalla@carlsonattorneys.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818-839-2333
rtellis@baronbudd.com
dfernandes@baronbudd.com

MELISSA YEATES
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205-855-5700
fu@dicellolevitt.com

Plaintiffs' Steering Committee Membership

*Attorneys for Individual Plaintiffs*


**COVINGTON & BURLING LLP**

By:  */s/ Ashley Simonsen*
Ashley M. Simonsen, SBN 275203
**COVINGTON & BURLING LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: +1 (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
**COVINGTON & BURLING LLP**
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com
          pschmidt@cov.com

*Attorney for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

**Plaintiffs' Position:**  Plaintiffs move to compel production of documents responsive to RFP Nos. 317, 325, 335, 344-346, and 357 (the "Requests"). As set forth below, each of the Requests is narrowly tailored to relevant issues. Meta's only genuine argument in opposition is that the issues addressed in these RFPs are not relevant. That is plainly incorrect. And any suggestion of undue burden is belied by the fact that Plaintiffs have agreed to limit Meta's search for documents responsive to these RFPs to the parties' agreed custodians and search terms.

For some of the Requests, Meta has agreed to search terms specifically targeting documents relating to the Request. Nonetheless, Meta is refusing to produce documents responsive to these Requests, unless the document explicitly discusses some other issue Meta deems relevant. First, by agreeing to search terms targeting these issues but refusing to produce documents discussing those same issues, Meta is pulling a bait-and-switch, leading Plaintiffs to believe they are producing documents on these important issues but then not producing those documents. In what were intensely negotiated search term discussions, Plaintiffs would not have agreed to jettison other search terms if they had known several of the search terms Meta was agreeing to include would have no impact on Meta's production. Second, each of the narrow issues addressed in these Requests, discussed below and attached as Exhibit A, is independently relevant. By refusing to produce documents responsive to these Requests unless they explicitly discuss some other relevant issue called for by separate RFPs, Meta is ignoring the relevance these issues have on their own and rendering the Requests null and void.

**RFP 317** seeks Meta founder and CEO Mark Zuckerberg's internal comments regarding Meta's 4Q17 performance, primarily Meta's MSI ("Meaningful Social Interaction") metric and its effects on daily usage of the Facebook Platform. Ex. A. As alleged in the Complaint, Meta's implementation of MSI was intended to increase user engagement on Facebook and often resulted in problematic use by users because MSI sets users up for feedback loops, keeping them on the platform for extended periods of time. However, top executives at Meta, including Mr. Zuckerberg, publicly extolled MSI as a benefit to all users, including teens, by connecting them more closely with their friends and family despite internal data showing that MSI was significantly increasing both usage and outrage on the platform. Like other Requests, Meta has agreed to a search term targeting this Request—"meaningful social interaction."

**RFP 325** seeks data from Meta's Onavo product, specifically Onava data comparing the Facebook or Instagram platforms with the TikTok, Snapchat, or YouTube platforms from 2017 forward. Ex. A. Meta utilized Onavo to monitor activity on competitors' apps. Meta did so because it was concerned these competitors were cornering the youth user market and Meta wanted to ensure it dominated that all important segment. An internal Meta presentation titled ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ META3047MDL-004-00016065; *see also* META3047MDL-014-00289988 (citing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; META3047MDL-004-00000217 (listing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Meta has, at least implicitly, acknowledged the relevance of Onavo when it agreed to run targeted searches for a small set of documents concerning Onavao (in response to RFP 324) and agreed to include Guy Rosen, Onavo's founder, as a document custodian. Similar to ignoring search terms it agreed to, Meta's inclusion of Guy Rosen as a custodian but refusal to produce documents relating to a product he created that has clear relevance to Plaintiffs' claims is prejudicial to Plaintiffs.

**RFP 335** seeks documents sufficient to show the results of product testing using Meta's Deltoid tool. Ex. A. Deltoid was used to conduct pre-launch product testing, including testing the impact on core metrics such as teen engagement. While Meta agreed to produce backtests relating to Named Features, backtests are performed after a product is launched, whereas the Deltoid tool is used to test impact on user engagement and other core metrics pre-launch. Both are relevant.

**RFP 344** seeks documents relating to "Break the Glass" measures at Facebook. Ex. A. Meta objects that documents relating to Break the Glass measures are not relevant. However, Meta's development of tools to essentially turn off platform features due to systemic issues on its platforms to prevent harm to users is relevant in any context. These tools did not exist in a vacuum and could have been available to address any harms, including harms affecting youth and teens on Meta's platforms. For example, if a Break the Glass measure was developed in the civic integrity department, but never deployed for user well-being, that would be relevant because it demonstrates steps Meta could have taken to protect youth users but chose not to.

**RFPs 345-346** seek documents relating to the Minimal Integrity Holdout population, a crucial aspect of Meta's product testing. Ex. A. The MIH population is a subset of users who see only the most bare bones set of integrity and safety features available on Facebook or Instagram. META3047MDL-020-00616013 ("The holdout group experiences only a minimal set of essential integrity rules (i.e., only the vital ones that we feel it would be unethical to remove"). Meta uses this "control group" to test the efficacy of its integrity and safety features. However, this means that individual users who are part of the MIH group necessarily receive a *less safe* experience than everyone else. It is unclear whether any of the Plaintiffs were swept up in the MIH "control group" of Meta's "long-running experiment." META3047MDL-020-00616003. If so, then that would be a key fact in understanding Meta's liability in this case. Furthermore, it is important that Plaintiffs understand the number of users included in MIH groups so that Plaintiff can better understand the reliability of Meta's product testing and the number of users potentially not impacted—good or bad—by a product feature. Given that the existence of the MIH group implicates youth safety by its very nature, Meta should produce all documents discussing MIH, irrespective of whether the documents happen to reference a Named Feature or happen to reference youth safety. Like other Requests, Meta has agreed to include a search term targeting this Request—(integrity w/3 holdout). But again, Meta is refusing to produce documents returned by that search term.

**RFP 357** seeks documents relating to Meta's Net Ego Unit space. Ex. A. Net Ego includes personalized recommendations and hashtags that can be inserted into users' feeds, possibly titled "suggestions for you." The goal of Net Ego's recommendations is increased user engagement. Indeed, in a November 2018 "Instagram Update," Net-Ego Units were cited as cause for increased growth in IGTV. META3047MDL-003-00141727. Net Ego has been used to promote engagement with Meta features, such as People You May Know ("PYMK"), a feature that is itself problematic and relevant for its propensity for connecting youth users with child predators. *See* META3047MDL-040-00054564 (citing Net Ego as increasing friend requests and DAP through PYMK). Because of Net Ego's clear relevance to increased user engagement, including with features known to be dangerous to youth, any discussion of Net Ego, including testing, launching and/or terminating the use of Net Ego Unit Space is relevant to Plaintiffs' claims.

Meta's statement confirms it is producing documents responsive to other Requests and doing nothing in response to these Requests. Meta justifies that course by arguing these Requests seek information that has no standalone relevance but, as explained above, that is wrong.

To escape the obvious need to produce documents responsive to the Requests, Meta provides an incorrect and misleading history of the parties' negotiations on search terms and the Requests, hoping to escape its obligations based on a non-substantive "gotcha." Contrary to Meta's suggestion, the parties' search term negotiations only resolved "RFPs where the Parties' current dispute is limited to what search terms will be run to capture responsive documents" (quoting A. Simonsen for Meta). The parties' correspondence listed the resolved RFPs, none of which are the Requests at issue here, and Plaintiffs' confirmed "there are no other RFPs where the Parties current dispute is limited to what search terms will be run" (quoting A. Walsh for PI/SD plaintiffs). Meta's attempt to expand that agreement is, at best, disingenuous. Indeed, *in two letters and three meet and confers concerning the Requests, Meta never raised this defense*.

Meta has no explanation for its agreement to include search terms specific to some of the Requests but then refusing to produce documents returned by those terms. Meta's suggestion that "Plaintiffs seek to require Meta to effectively translate each of these topics into a new, additional search term[s]" is wrong. Plaintiffs simply ask that Meta produce responsive documents returned by the agreed custodians and terms. Nothing more.

**Meta's Position.** The PI/SD Plaintiffs have served over 370 sweeping RFPs in 15 sets. The Parties resolved the majority of these RFPs months ago, in many instances with Meta agreeing to targeted searches for data or documents responsive to particularized requests. In many other instances, often with Plaintiffs' agreement, Meta responded by running 317 agreed search terms over the documents of 127 agreed custodians for over a decade, reviewing the documents that hit on the terms, and producing those that were relevant/responsive and non-privileged. By this process, Meta has produced over 1.8M documents.

The Requests now subject to dispute are RFPs 317, 335, 344–346, and 357. The Parties resolved these RFPs months ago while negotiating search terms, yet Plaintiffs now demand that Meta produce *all* documents returned by those terms that touch on the topics of these RFPs, regardless of whether those documents discuss the topic in a context relevant to this case, such as in relation to youth safety or well-being or one of the Named Features. The demand should be rejected.

As background, Plaintiffs served RFPs 317, 335, 344–346, and 357, as part of their set 13 Requests, in May 2024. At approximately the same time, in May and June, the Parties were negotiating custodians and search terms. The Parties agreed that all of the Requests in set 13 would be resolved by the production of relevant, non-privileged documents hitting on agreed search terms. Plaintiffs sought to treat 5 RFPs as exceptions, none of which are the RFPs now in dispute. Even for RFPs treated as exceptions, Meta's counsel explained during negotiations that Meta would produce documents touching on the topic of the RFP if they "also discuss the youth safety issues relevant here." Plaintiffs' counsel responded that "**[t]he PI/SD and State AG Plaintiffs agree with your suggestions**" (emphasis added).

That same principle applies with greater force to the RFPs now in dispute, which Plaintiffs never even raised as possible exceptions. Indeed, Plaintiffs confirmed this principle in correspondence

3

relating precisely to some of the RFPs now in dispute. For example, RFPs 345–346 relate to Minimum Integrity Holdouts, by which Meta may designate a small subset of content that violates its Community Standards to "hold out" from immediate enforcement. In a September 19 letter, Plaintiffs stated this about RFPs 345-346 (emphasis added):

> **RFPs 345-346.** Meta stated it understands Minimum Integrity Holdouts may be part of Backtests … and that Meta is looking for and will produce Backtests related to the Named Features. This does not conform to Plaintiffs' understanding of Minimum Integrity Holdouts (sometimes referred to as "Minimal" Integrity Holdouts). **To be clear, to the extent MIH are discussed in any way that relates to a Named Feature or other relevant issue, e.g., youth safety, problematic use, parental controls, such documents should be produced.** Please confirm Meta's agreement.

Plaintiffs now are reneging on this understanding and agreement. The RFPs now in dispute touch on issues that are not independently relevant, but rather might be relevant if discussed in the context of youth safety or one of the other key issues in the case. But parties are not required to produce information that is not relevant to the claims and defenses in a case, which would be outside of the scope of permissible discovery. Fed. R. Civ. P. 26(b)(1); *see* ECF No. 1025 at 7 (requiring Plaintiffs to "run the agreed upon search terms on the collected data files from the Bellwether PI Plaintiffs' devices and produce **relevant**, non-privileged ESI" (emphasis added)). RFP 317 concerns "Meaningful Social Interactions," which were changes to Meta's newsfeed algorithm that attempted to prioritize content that would lead to active interactions, and is not tied or limited to Youth issues. RFP 344 relates to "break glass" measures, which included changes to Facebook in connection with the 2020 U.S. presidential election, including changes that were designed to mitigate the spread of voter misinformation. RFP 335 relates to backtests, which are analyses used to assess metrics after a change has been made to the platform, and are not limited to named features. RFPs 345–346, as noted, relate to Minimum Integrity Holdouts, which, along with Meta's Community Standards, are broader than and not limited to Youth issues. Finally, RFP 357 relates to the "Net Ego Unit" space on a user's Feed, and again is not tied to Youth-related issues.

For all of these requests, Meta is producing non-privileged documents hitting on search terms that touch on the topic of the RFP if the document also discusses youth or one or more of the named features or addictive/compulsive use or potential harms to mental health. That is more than sufficient. Indeed, Plaintiffs already are receiving thousands of documents responsive to these RFPs (in relevant contexts). For example, there are over 12,400 documents that hit on the terms "Meaningful Social Interaction" or MSI in Meta's productions. Meta has also produced thousands of other documents hitting on terms that Plaintiffs propose.

Yet Plaintiffs seek to require Meta to effectively translate each of these topics into a new, additional search term to be run *on top of* those terms exhaustively negotiated and agreed, and to produce *all* documents touching on those topics—even if in an irrelevant context. That effort comes six months too late, on the eve of the deadline for substantial completion and briefing on RFP disputes, in any event is not warranted, and should be rejected. Given that Plaintiffs' demand would require Meta to search for all documents in Meta's collection that touch on the topics of RFPs 317, 335, 344–346, and 357, and to review and produce them even if irrelevant to

4

the issues in the case, Plaintiffs' demand also is unduly burdensome and unreasonable, and clearly disproportionate to the needs of the matter.

**Reply.**  Meta does not argue the topics of the disputed RFPs could not return some relevant information, but rather that they also have a tendency to return irrelevant information which need not be produced.  FRCP 26(b)(1).  For example, documents discussing "break glass" measures (**RFP 344**) in the context of a discussion of misinformation efforts in the 2020 elections would not be relevant.  But if a document discusses "break glass" measures in the context of youth safety (or other issues in the case) it would be relevant, and would be produced.  As noted, Meta has produced thousands of documents touching on the disputed RFP topics in relevant contexts, and Plaintiffs *agreed to* this reasonable relevance limitation several times in negotiations.

**RFP 317.**  This RFP seeks "A copy of Mark Zuckerberg's public and/or internal statements regarding [Meta's] Fourth Quarter performance in 2017, the MSI metric, and its effects on daily usage of the Facebook Platform."  Meta's Fourth Quarter 2017 performance, generally speaking, is not relevant, and is a matter of public record, as are Mr. Zuckerberg's comments on that performance; and as stated above, not every document that discusses MSI is relevant.

**RFP 325.**  Meta did not brief this RFP above because Plaintiffs withdrew their dispute on RFP 324, and the Parties' prior correspondence discussed RFPs 324-325 in tandem given that both concerned Onavo, an acquisition Facebook made in 2013.  As described above, when the parties were negotiating custodians and search terms, Plaintiffs sought to treat 5 RFPs as exceptions to the agreement that all RFPs in set 13 would be resolved through agreed search terms.  RFP 324, concerning Onavo, was one of those 5.  In response to Plaintiffs' proposal on RFP 324, Meta explained that it would produce documents about Onavo if the documents "also discuss the youth safety issues relevant here."  Plaintiffs agreed, stating that "[t]he PI/SD and State AG Plaintiffs agree with your suggestions …."  Now Plaintiffs hope to sidestep that agreement by demanding that Meta produce *all* documents that discuss Onavo in response to related RFP 325.  This Court should reject this gamesmanship.  In any event, Onavo, a start-up involved in data compression and analytics for mobile apps, is not independently relevant to these cases.  It is relevant, at most, in the context of a discussion of one of the issues in the case, such as youth engagement.  Tellingly, Plaintiffs cite in their brief documents produced by Meta that discuss Onavo – in the context of "US teens."  But that does not make Onavo independently relevant.

**RFP 335.**  RFP 335 seeks "the results of all backtests and/or uses of the Deltoid tool that measured the impact of product changes related to the Named Features on integrity metrics."  As with Onavo, not all uses of a Deltoid tool, and not all backtests, are relevant.  They are relevant at most if discussed in the context of the issues in the case, such as one of the named features.

**RFPs 345-346.**  Plaintiffs cite Meta-produced documents discussing MIH in relevant contexts.  This shows that Meta is producing what is relevant; Plaintiffs are not entitled to all documents with any mention of MIH, which has applicability beyond youth-related issues in the cases.

**RFP 357.**  Plaintiffs cite relevant documents produced by Meta discussing Net Ego.  But not all documents discussing Net Ego are relevant to the issues in the case.

5

## ATTESTATION

I, Ashley M. Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1 that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: November 7, 2024                                                                 */s/Ashley M. Simonsen*