Pages 1 - 179

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PETER H. KANG, MAGISTRATE Judge

| | |
|---|---|
| IN RE:  SOCIAL MEDIA ADOLESCENT )<br>ADDICTION/PERSONAL INJURY          )<br>PRODUCTS LIABILITY LITIGATION      )<br>                                                    )<br>_____ ) | No. 22-MD-03047 YGR (PHK)<br><br> San Francisco, California<br> Wednesday<br> December 11, 2024 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiffs:**          LIEFF CABRASER HEIMANN AND BERNSTEIN, LLP
                                   275 Battery Street
                                   29th Floor
                                   San Francisco, California 94111
                      BY:  **LEXI J. HAZAM**, ESQ.


                                   BEASLEY ALLEN CROW METHVIN PORTIS
                                     & MILES, P.C.
                                   218 Commerce Street
                                   Montgomery, Alabama 36103
                      BY:  **JOSEPH VANZANDT, ESQ.**
                                   **CLINTON RICHARDSON, ESQ.**


                                   WEITZ AND LUXENBERG, P.C.
                                   700 Broadway
                                   New York, New York 10003
                      BY:  **JAMES BILSBORROW, ESQ.**


                                   SIMMONS HANLY CONROY, LLP
                                   One Court Street
                                   Alton, Illinois 62002
                      BY:  **ELLYN HURD, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                    *Official Reporter - US District Court*
                    *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**
                        GIBBS LAW GROUP, LLP
                        1111 Broadway
                        Suite 2100
                        Oakland, California 94607
                   BY:  **ANDRE MICHEL MURA, ESQ.**


**For Plaintiff State of California:**
                        CALIFORNIA DEPARTMENT OF JUSTICE
                        455 Golden Gate Avenue
                        11th Floor
                        San Francisco, California 94102
                   BY:  **MEGAN O'NEILL**
                        **EMILY COSTELLO KALINITHI, ESQ.**
                        **DEPUTY ATTORNEYS GENERAL**


**For Plaintiff California Department of Health Care Services:**
                        CALIFORNIA DEPARTMENT OF JUSTICE
                        455 Golden Gate Avenue.
                        Suite 11000
                        San Francisco, California 94102
                   BY:  **ANNA THERESA FERRARI, ESQ.**


**For Plaintiff California Business, Consumer Services and Housing Agency:**
                        OLSON REMCHO, LLP
                        1901 Harrison Street
                        Suite 1550
                        Oakland, California 94612
                   BY:  **MARGARET PRINZING, ESQ.**


**For Plaintiff State of Louisiana:**
                        LOUISIANA DEPARTMENT OF JUSTICE
                        Consumer Protection
                        1885 N. Third Street
                        Baton Rouge, Louisiana 70802
                   BY:  **ASYL NACHABE, ESQ.**

**APPEARANCES:  (CONTINUED)**

**For Plaintiff State of Montana:**
                    COOPER AND KIRK, PLLC
                    1523 New Hampshire, NW
                    Washington, DC 20036
          BY:  **BRIAN W. BARNES, ESQ.**


**For Plaintiff State of Wisconsin:**
                    WISCONSIN DEPARTMENT OF JUSTICE
                    Public Protection Unit
                    P.O. Box 7857
                    17 West Main Street
                    Madison, Wisconsin 53707
          BY:  **COLIN R. STROUD**
               **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Michigan:**
                    MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
                    Corporate Oversight Division
                    525 W. Ottawa
                    Lansing, Michigan 48909
          BY:  **DANIEL JOHN PING**
               **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Minnesota:**
                    MINNESOTA ATTORNEY GENERAL'S OFFICE
                    445 Minnesota Street
                    Suite 1200
                    St. Paul, Minnesota 55101
          BY:  **JASON PLEGGENKUHLE**
               **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of New York:**
                    OFFICE OF THE STATE ATTORNEY GENERAL
                    New York State
                    28 Liberty Street
                    New York, New York 10005
          BY:  **KEVIN C. WALLACE**
               **SENIOR ENFORCEMENT COUNSEL**

**APPEARANCES:   (CONTINUED)**

**For Plaintiff State of Ohio:**
                    OHIO ATTORNEY GENERAL'S OFFICE
                    615 W. Superior Avenue
                    Suite 11th Floor
                    Cleveland, Ohio 44113
           BY:  **KEVIN ROBERT WALSH**
                **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Illinois:**
                    ILLINOIS ATTORNEY GENERAL'S OFFICE
                    115 S. LaSalle Street
                    Consumer Fraud - 26th Floor
                    Chicago, Illinois 60603
           BY:  **MATTHEW CHARLES DAVIES**
                **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Arizona:**
                    ARIZONA ATTORNEY GENERAL'S OFFICE
                    Consumer Protection and Advocacy
                    2005 N. Central Avenue
                    Phoenix, Arizona 85004
           BY:  **NATHAN E. WHELIHAN**
                **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Kentucky:**
                    KENTUCKY OFFICE OF THE ATTORNEY GENERAL
                    Office of Consumer Protection
                    1024 Capital Center Drive
                    Suite 200
                    Frankfort, Kentucky 40601
           BY:  **PHILIP HELERINGER, ESQ.**


**For Plaintiff State of Delaware:**
                    DELAWARE DEPARTMENT OF JUSTICE
                    820 N. French Street
                    Carvel State Office Building
                    5th Floor
                    Wilmington, Delaware 19801
           BY:  **RYAN THOMAS COSTA, ESQ.**

**APPEARANCES:   (CONTINUED)**

**For Plaintiff State of Indiana:**
                    OFFICE OF THE INDIANA ATTORNEY GENERAL
                    Consumer Protection
                    302 W. Washington Street
                    Ste IGCS, 5th Floor
                    Indianapolis, Indiana 46204
            BY:  **CORINNE GILCHRIST, ESQ.**


**For Plaintiff State of Rhode Island:**
                    RHODE ISLAND OFFICE Of THE
                     ATTORNEY GENERAL
                    150 South Main Street
                    Providence, Rhode Island 02903
            BY:  **STEPHEN PROVAZZA, ESQ.**


**For Plaintiff State of Kansas:**
                    KANSAS ATTORNEY GENERAL'S OFFICE
                    120 SW 10th Avenue
                    Topeka, Kansas 66612
            BY:  **KALEY SCHRADER, ESQ.**


**For Plaintiff State of New Jersey:**
                    NEW JERSEY ATTORNEY GENERAL'S OFFICE
                    Division of Law
                    124 Halsey Street
                    Fifth Floor
                    Newark, New Jersey 07101
            BY:  **THOMAS HUYNH**
                 **DEPUTY ATTORNEY GENERAL**


**For Plaintiff State of Colorado:**
                    COLORADO DEPARTMENT OF LAW
                    1300 Broadway
                    Sixth Floor
                    Denver, Colorado 80203
            BY:  **KRISTA BATCHELDER**
                 **SENIOR ASSISTANT ATTORNEY GENERAL**

**APPEARANCES:   (CONTINUED)**

**For Plaintiff State of South Dakota:**
                    OFFICE OF THE ATTORNEY GENERAL
                    2000 E. 52nd Street, N.
                    Sioux Falls, South Dakota 57104
            **BY:  AARON DEAN SALBERG, ESQ.**


**For Plaintiff State of Washington:**
                    OFFICE OF THE ATTORNEY GENERAL
                    800 Fifth Avenue
                    Suite 2000
                    Seattle, Washington 98104
            **BY:  ALEXANDRA KORY**
                    **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Nebraska:**
                    NEBRASKA ATTORNEY GENERAL
                    2115 State Capitol
                    Lincoln, Nebraska 68509
            **BY:  ANNA M. ANDERSON, ESQ.**
                    **ASSISTANT ATTORNEY GENERAL**


**For Defendant Meta Platforms, Incorporated:**
                    COVINGTON & BURLING, LLP
                    1999 Avenue of the Stars
                    Suite 3500
                    Los Angeles, California 90025
            **BY:  ASHLEY M. SIMONSEN, ESQ.**


                    COVINGTON & BURLING, LLP
                    The New York Times Building
                    620 Eighth Avenue
                    New York, New York 10018
            **BY:  CHRISTOPHER YEUNG, ESQ.**

**APPEARANCES:   (CONTINUED)**

**For Defendant Meta Platforms, Incorporated:**
                     COVINGTON & BURLING, LLP
                     One City Center
                     850 Tenth Street, NW
                     Washington, D.C. 20001
             BY:  **MICHAEL IMBROSCIO, ESQ.ESQ.**
                  **STEPHEN PETKIS, ESQ.**
                  **KHARI  LISTON CYRUS, ESQ.**


**For Defendant Snap, Inc.:**
                     MUNGER, TOLLES & OLSON LLP
                     350 South Grand Avenue
                     50th Floor
                     Los Angeles, California 90071
             BY:  **ARIEL TESHUVA, ESQ.**


**For Defendant TikTok:**
                     KING & SPALDING LLP
                     50 California Street
                     Suite 300
                     San Francisco, California
             BY:  **BAILEY LANGNER, ESQ.**


                     KING AND SPALDING LLP
                     1180 Peachtree Street
                     Atlanta, Georgia 30309
             BY:  **GEOFFREY DRAKE, ESQ.**
                  **RANIA KAJAN, ESQ.**


**For Defendant YouTube:**
                     WILSON SONSINI GOODRICH and ROSATI, PC
                     One Market Plaza
                     Spear Tower, Suite 3300
                     San Francisco, California 94105
             BY:  **LAUREN GALLO WHITE, ESQ.**


                         -  -  -

1    **P R O C E E D I N G S**

2    WEDNESDAY, DECEMBER 11, 2024                              1:21 P.M.

3                              ---o0o---

4        **THE CLERK:**  Now calling 22-MD-3047, In Re Social Media

5    Adolescent Addiction and Personal Injury Products Liability

6    Litigation.

7        Counsel, when speaking, please approach the podium and

8    state your name for the record.

9        **THE COURT:**  Good afternoon all.

10   (Counsel greet the Court.)

11       **THE COURT:**  Full house today.  Look at this.

12       Okay.  So let's take care of some easy stuff first.  So

13   with regard to the parties' stipulation with regard

14   compensation information for Meta deponents, we all noted there

15   are two different stipulations filed on the docket.  One is at

16   docket 1437, and the other one is at docket 1438.  And they may

17   be slightly different.  I couldn't -- we didn't have time to

18   run a compare.

19       Which one is the stipulation the parties want the Court to

20   entertain and then presumably agree to?

21       **MS. SIMONSEN:**  Good morning, Your Honor.  Ashley

22   Simonsen for the Meta defendants.

23       I believe I saw that plaintiffs' counsel filed the two

24   stipulations this morning, and I think I saw that the second

25   one was labeled a corrected stipulation.

```
 1          So I believe that would be the correct stipulation, but I
 2   would ask Ms. Hazam to confirm.
 3          MS. HAZAM:  Lexi Hazam for plaintiffs.
 4          Your Honor, I am looking at what I believe is that filing,
 5   and I believe that's accurate.  But if Jennifer Scullion is on
 6   the Zoom and able to confirm for us, that would be helpful.
 7          THE CLERK:  I don't have that name here.
 8          MS. HAZAM:  I believe she handled the actual filing.
 9   I think that that is accurate, Your Honor.
10          THE COURT:  Okay.  So unless I hear something
11   otherwise, we're going to look at 1438 and, I guess, deny 1437
12   as moot or withdrawn.
13          MS. SIMONSEN:  Very good.  Thank you, Your Honor.
14          MS. HAZAM:  Thank you, Your Honor.
15          I will also attempt to further confirm over the course of
16   this hearing, but barring hearing anything different, we can go
17   ahead that way.  Thank you.
18          THE COURT:  Okay.  All right.  So that was easy.
19   Easy, easy.
20          All right.  This morning, late this morning, we issued the
21   order on the dispute with regard to Mr. Lanterman and his
22   deposition.  That was issued late.  I don't know if people have
23   seen the order, but I'm not planning on hearing argument on
24   that issue at this point.  So if you haven't had a chance to
25   read the order, go ahead.  So that one is out of the way.
```

1          You saw the text notice on the docket with regard to

2    Docket Number 1375, the letter brief regarding the privileged

3    documents, the three Meta privileged documents in connection

4    with Mr. Rothchild's deposition.  That's almost done.  An order

5    will issue shortly.

6          Procedurally I'm just going to say this.  In order to

7    avoid obvious waiver of privilege issues, to the extent those

8    exhibits need to be revised by Meta in order to be then

9    attached to the order, even though it will all be filed under

10   seal, the Court plans to communicate those instructions to Meta

11   directly and, obviously, not with all the parties.  I assume

12   there is no objection to that.

13         **MS. HAZAM:**  No objection, Your Honor.

14         **THE COURT:**  Okay.  So that takes care of that issue on

15   the ripe disputes.

16         Let's go to what will be a quicker one.  Let's do TikTok

17   interrogatories, which is docket -- the letter brief is Docket

18   1420, I believe.

19         **MR. BILSBORROW:**  Your Honor, James Bilsborrow for the

20   plaintiffs.

21         We thought it might be efficient to argue the TikTok and

22   Snap interrogatories issues sort of simultaneously since the

23   legal arguments are the same essentially.

24         **THE COURT:**  Okay.  All right.  Okay.  So why don't we

25   have counsel for Snap approach also?

```
1              MR. BILSBORROW:  I am counsel for Snap.  My colleague
2    here is counsel for TikTok.
3              THE COURT:  Okay.
4              MR. DRAKE:  Well, they don't represent either of those
5    companies, Your Honor, but --
6              THE COURT REPORTER:  Counsel, your name, please.
7              MR. DRAKE:  Sorry, sorry.  Geoffrey Drake.
8              THE COURT:  A little mixed up.
9              MR. BILSBORROW:  I will see myself out.
10        (Laughter.)
11             MR. DRAKE:  Geoffrey Drake, King and Spalding, for the
12   TikTok defendants.
13        I would like to introduce Your Honor to my colleague, one
14   of the associates in our Atlanta office, Rania Kajan, who is
15   going to argue this issue for TikTok.
16             THE COURT:  Good afternoon and welcome.
17             MS. KAJAN:  Thank you very much.
18             THE COURT:  You want to make room for your colleague
19   behind you.
20             MS. TESHUVA:  Good afternoon, Your Honor.  Ariel
21   Teshuva, counsel for Snap.
22             THE COURT:  Okay.  So you want to enter an appearance
23   properly for who you represent?
24             MR. BILSBORROW:  Yes.  James Bilsborrow for the
25   plaintiffs and school district and personal injury plaintiffs.
```

```
 1              THE COURT:  Okay.

 2              MR. MURA:  Andre Mura for the plaintiffs as well.

 3              THE COURT:  Okay.  So I don't think I need to hear

 4    argument on the legal standard.  I actually don't think the

 5    parties fundamentally dispute the legal standard.

 6         The real dispute, as far as I can tell, is the application

 7    of the legal standard, is that correct, or did somebody really

 8    think there's a fundamental dispute on the legal standards

 9    here?

10              MS. KAJAN:  Rania Kajan, King and Spalding, on behalf

11    of the TikTok defendants.

12         I just had one point on that.  The plaintiffs argue in

13    their letter brief that we have the wrong standard in terms of

14    if a subpart can stand alone, then it's not a separate request.

15         And I just wanted to clarify that what they are saying is

16    basically that that's an overly restrictive view and that the

17    Court should instead apply the relatedness test.

18         But I just wanted to clarify that the cases are very clear

19    that that stand-alone test is really just an elaboration on the

20    relatedness test, and just a way that Courts within the Ninth

21    Circuit have said the relatedness test doesn't provide a whole

22    lot of guidance because you're still sort of grappling with,

23    well, what does it mean to be logically or factually subsumed

24    within and necessarily related to the primary question.

25         So they have just offered that as an additional sort of
```

1    subtest, I would say, for Courts to consider whether if -- to

2    consider whether something is subsumed within the primary

3    question, to look at the subpart and say:  If it can

4    stand-alone, then it is likely a discrete and separate

5    interrogatory.

6        And I just wanted to note that that standard is cited not

7    only in the cases that we relied on in our brief, but also in

8    many of the cases that plaintiffs relied on.

9            THE COURT:  I think, if I'm hearing you correctly, you

10   think the stand-alone issue is really a factor that goes into

11   the determination?

12           MS. KAJAN:  Correct.

13           THE COURT:  Okay.  Do you have any dispute with that

14   characterization of the law?

15           MR. BILSBORROW:  We think that the law is the

16   relatedness test.  And the question is whether any subparts are

17   logically or factually related to the primary question.

18           THE COURT:  Okay.  So as -- I think you're all

19   probably familiar from practice.  At least these -- these kinds

20   of disputes, I'm hoping these are the kind of things you can

21   all work out amongst yourselves, but you're asking the Court to

22   draw lines for you on how many interrogatories there are.

23       So for -- I think this is a comment to both Snap and

24   TikTok.  How many model features are we talking about in the

25   rogs that talk about model features?

```
 1        MR. BILSBORROW:  With respect to Snap, Your Honor, for
 2   the named features, which I think is the -- how we -- the
 3   nomenclature we use in the Snap brief, I think there's roughly
 4   15 named features.  And that's in Interrogatory Number 10.
 5        And so just to put some context on that, if you agree with
 6   Snap, they say that each -- each named feature we've served
 7   three rogs.  That puts us at 45 rogs.  And if you agree with
 8   Snap, that means we're done.
 9        And I don't think that was the parties' intent, for the
10   plaintiffs to be able to serve one interrogatory, especially
11   when that interrogatory concerns something essential to the
12   case, as the named features.  I don't think that was the intent
13   in capping the interrogatory limit at 45.
14        And if that is the correct way to interpret and count
15   rogs, I would submit that in a complex case like this, we need
16   more rogs then.
17        THE COURT:  Okay.  Rog 10 was to TikTok, not Snap.
18   Just so the record is clear.
19        MR. BILSBORROW:  I think it's both.
20        THE COURT:  You're right.  You're right.
21        So I saw in the briefing that for TikTok it's 13 named
22   features.  And you're saying -- I didn't see -- you say for
23   Snap it's about 15?
24        MR. BILSBORROW:  It's roughly 15.
25        THE COURT:  Do you have any dispute with that?
```

1          **MS. TESHUVA:**  Your Honor, Ariel Teshuva for Snap.

2      One of Snap's objections to plaintiffs' interrogatories is

3  to the vagueness of the definitions of "named features" and

4  "safety features."  They are not actually -- they are defined

5  by reference to paragraphs in the master complaints that do not

6  necessarily talk about features.

7      But assume -- I think 15 sounds like a correct ballpark.

8  And, of course, we're happy to confer with plaintiffs about the

9  final list of features.

10          **THE COURT:**  Okay.

11          **MR. MURA:**  Your Honor, Andre Mura for the plaintiffs.

12      We also think it's the same number of named features for

13  both Snap and TikTok.  We were just referring to the paragraphs

14  in the master complaint that lists them.

15      I understand that there's some question about how to count

16  them, but however they are counted, as 13 or 15, the essential

17  question was a disagreement about whether it's one versus

18  however number that is.

19      And you had asked about model features.  We -- we don't

20  have an answer from TikTok about how many model features or

21  safety features.

22      For model features we don't have an answer.

23      For safety features we were told it's at least three.  It

24  could be more.

25      So we -- we also don't know the answer to that for safety

1  features.  So that's why it's a bit of a moving target in terms

2  of figuring out how many interrogatories there are, if it's

3  going to track the number of features, which is, we think,

4  incorrect under the law and how to think about these types of

5  interrogatories.

6      **THE COURT:**  Okay.  Just so I have an understanding of

7  the scope of the issue, for TikTok how many safety features

8  does TikTok count?

9      **MS. TESHUVA:**  Your Honor, for purposes of counting

10  these interrogatories, we are willing to say that there are

11  three safety features, because that's at least the number.

12      And in terms of model features, as we've outlined in our

13  brief, for purposes of counting these interrogatories, we are

14  still looking into how many model features there are, given how

15  broad the definition is, but we are willing to even just

16  consider one model feature.

17      **THE COURT:**  One.

18      **MS. KAJAN:**  Correct.  Just for purposes of counting.

19      **THE COURT:**  Okay.  Okay.  Well, that's -- on the model

20  feature that simplifies things, because that means for Rogs 25

21  and 26, what is the argument then that those are more than one

22  rog each, if you're assuming model feature is one feature?

23      **MS. KAJAN:**  The six different subparts, Your Honor.

24      **THE COURT:**  You mean, the -- the part that says for

25  purposes of what itemize and describe means, and they say what

 1    that means.

 2          **MS. KAJAN:**  So our position is that each of these six

 3    is actually a distinct inquiry.

 4          So it says "itemize and describe," but then actually asks

 5    for the code, the date the feature was created, the identity of

 6    the person who created the model feature, the identity of the

 7    team responsible for it, the purpose, and then the weight given

 8    to each model feature.

 9          So our initial position is that those are six separate

10    inquiries.

11          However, I do want to note that in an effort to reach an

12    agreement on the set, since we were already battling over set

13    four, we did try to approach plaintiffs and say we're willing

14    to count just one model feature.  Which, to be clear, I think

15    based on their definition, there's no way we're going to have

16    one model feature, but we're willing to assume that.

17          And then we tried to offer a compromise position of three

18    rogs for 25 and three rogs for Interrogatory 26, and that was

19    not accepted.

20          **THE COURT:**  Okay.  What is -- is there a difference

21    between "model feature" and "user interaction" for purposes of

22    counting here?

23          **MS. KAJAN:**  There is no definition of "user

24    interaction" in the actual set that they served on us.  So

25    we're unclear on how we're going to interpret that.

```
 1        We're going to rely on the definition of "model feature"
 2   at this point because we don't have a definition for "user
 3   interaction."
 4        THE COURT:  What do you mean by "user interaction" if
 5   not "model feature"?
 6        MR. MURA:  Well, there might be some overlap, Your
 7   Honor.  And if they don't have an additional answer, that
 8   shouldn't count against plaintiffs.
 9        But we asked essentially two central questions for both:
10   How does TikTok select which videos to show users?  That's the
11   first question.
12        And the second question is just asking how does TikTok's
13   ranking system work?
14        And so both the subparts of those questions are all
15   logically subsumed by the question.
16        So even if there isn't much daylight between some of these
17   subparts in the question, that just reinforces our position
18   that this should be treated as one interrogatory and not
19   counted six times.
20        THE COURT:  Okay.  So you summarized what you think
21   the rogs go to as how the ranking -- how they select content
22   videos and the ranking features work, but there's other stuff
23   in here that goes to -- it's more discovery.  Like, you know,
24   what is the model number?  The date you created it?  That's not
25   how it works.  That's more factual information; right?
```

1          **MR. MURA:**  Well, Your Honor, it's the classic who,

2    what, where, which the cases say is logically subsumed to the

3    question about the model feature.  So to know anything about

4    the model feature, I think we need to know what it is, when it

5    was created and who it applied to.

6          And so those are the sort of questions that are logically

7    subsumed for each because we're essentially just asking how

8    does TikTok select which videos to show users.  We would need

9    to know what the criteria is, what period of time that it was

10   actually doing that.

11         So those are just the classic questions that both the

12   cases -- the *Tour* case, the Advisory Committee notes.  This

13   isn't limited to communications.  These are -- these are

14   classic, logically subsumed relevant questions under the

15   primary question that we've asked, which, again, is quite

16   simplistic:  How does TikTok select which videos to show users,

17   and how does TikTok's ranking system work?

18         **MS. KAJAN:**  Your Honor, if I may.

19         What Mr. Mura has just described in terms of the who,

20   what, where, how and when, the actual cases that plaintiff cite

21   that discuss that are very limited, and they are not properly

22   applied to this type of situation where we're talking about

23   distinct model features.

24         All of those cases involve interrogatories that discuss a

25   specific event or an individual communication or a particular

action, such that it would make sense in those circumstances to

have one interrogatory that discusses time and place and

content.  But those just don't translate well into this context

where we're talking about a number of different features that

are different from one another.

        **THE COURT:**  Here it's only one feature.

        **MS. KAJAN:**  Right.  There was a compromise position,

Your Honor.  I just want to clarify that.

    I'm almost positive that we will have more than one model

feature, but we are -- we are trying to be -- we did try very

hard to work this out amongst ourselves by compromising.

        **THE COURT:**  I appreciate that.

    So here is where I'm going to go.  Itemize is one thing.

Describe is another.  I think everything up -- in the second

sentence that goes up to the "identity of the person or team

responsible," that's itemizing.

    And then describing the model feature is "purpose for

which and weight given."

    So each of those rogs is two rogs; one for itemizing and

one for describing.  Okay?

        **MS. KAJAN:**  Thank you, Your Honor.

        **THE COURT:**  For safety features look at Rog 8, because

that's the one that I think is analogous to what we just went

through.

    Again, it says, "Describe the development and

1  implementation of each safety feature."

2      Development is one thing.  Implementation is another.

3  Your subparts small Roman numerals one through four go to

4  development, are examples of what goes to development.  Your

5  subparts small Roman numeral five to the end go to

6  implementation, if I'm reading them correctly.  So Rog 8 is two

7  interrogatories.

8      MS. TESHUVA:  Your Honor, may I be heard on the

9  argument that "safety feature" means that the rog should be

10  considered further compound because it requires a separate

11  response as to each safety feature.

12      THE COURT:  For Snap I didn't ask.  How many safety

13  features are there?  Three also?

14      MS. TESHUVA:  Well, so, again, plaintiffs' definition

15  of "safety feature" is quite vague and self-referential.  And

16  plaintiffs did not agree to confer on Snap's objection to the

17  definition, but we would say there are a minimum of ten safety

18  features.

19      THE COURT:  Your view on that.  There are a minimum of

20  ten safety features?

21      MR. BILSBORROW:  Well, there could be.  I think the

22  definition, for the record, is:  Any protection, tool,

23  intervention or feature you have implemented on the Snapchat

24  platform that is directed at the safety of youth.

25      Part of the reason for propounding that was to get Snap's

1    testimony on how many safety features it had implemented.

2         An interrogatory is an efficient way to do this, as

3    opposed to other discovery devices.

4              **MS. TESHUVA:**  Your Honor, Ariel Teshuva for Snap.

5         So as Mr. Bilsborrow quoted the definition of "safety

6    feature," "safety" is also a defined term and it means

7    well-being.  Safety, physical or mental health, and protection

8    from risk of extortion, sextortion, trafficking, bullying,

9    harassment, CSAM, victimization or -- and perdation.

10        We would contend that the interrogatory is essentially

11   asking for information about any feature that protects users

12   from each of these distinct areas of harm.

13        So the language of the interrogatory itself is calling for

14   responses on multiple features that plaintiffs chose not to

15   identify the specific features they are asking about, although

16   they identify them in the master complaint.  They have

17   identified them in other places.  Does not mean that they are

18   not asking about a set of distinct features.

19             **MR. BILSBORROW:**  May I respond to that, Your Honor?

20             **THE COURT:**  Sure.

21             **MR. BILSBORROW:**  As an initial matter, we have used

22   this definition of "safety" throughout the discovery period.

23   We negotiated, you know, hundreds of RFPs using this definition

24   of "safety."  So I think the parties understand what it means

25   at this point.

```
 1          Secondly, we agree.  We think we know what Snap considers
 2     some of the safety features, but part of the purpose of these
 3     interrogatories was to get Snap's testimony, evidence, on what
 4     it considers to be safety features on the platform, and their
 5     refusal to engage with us on that has prevented us from doing
 6     so.
 7          THE COURT:  I mean, if they asked a rog that said:
 8     List and -- or describe the development of anything you
 9     consider to be a safety feature, that would be one rog,
10     wouldn't it?
11          MS. TESHUVA:  Well, I --
12          THE COURT:  Anything you consider to be a safety
13     feature.
14          MS. TESHUVA:  I would contend that's not what they are
15     asking though.  They are asking about a defined term "safety
16     feature."
17          And just to make sure the record is accurate, we have
18     always objected to the definition of a "safety feature."  They
19     are asking about a defined term and a defined list of features
20     that the parties have used in other parts of discovery.  We've
21     used in search term negotiations.
22          And I would contend, first of all, I don't think it's
23     consistent with the case law to say that just because they are
24     asking about, you know, a vague term like "safety feature," it
25     gets to count as one rog, although it clearly means that it's
```

1   calling for information about a number of features.

2       It also just would allow them essentially to draft their

3   own any meaningful interrogatory limit.  They could just use a

4   vague term that -- contend that we should know what it means

5   and allow -- that would allow them to ask a limitless number of

6   questions essentially.

7           THE COURT:  I assume when you respond, you're going to

8   state all your objections and in some way, either in further

9   meet-and-confers or in the response itself, say what you think

10  "safety features" means.  And if they dispute what you think

11  "safety feature" means in terms of the way they've described

12  it, then you're going to meet-and-confer further; right?

13  That's how discovery works.

14          MS. TESHUVA:  Ariel Teshuva for Snap.

15      That is what we attempted to do.  We made our objections

16  to that term.  And when we met-and-conferred with plaintiffs,

17  they refused to engage us on our substantive objections,

18  including our objections to that term.

19      I agree, that's what should happen.  The parties should go

20  through and get a list of --

21          THE COURT:  At this point you should respond.  Make

22  clear what you think "safety feature" means and how your -- the

23  scope of what you're responding.  And maybe there's no dispute

24  after that, and you're done.

25          MR. BILSBORROW:  Your Honor, may I respond?

1          **THE COURT:**  Yeah.

2          **MR. BILSBORROW:**  Snap did serve responses and

3    objections.  They just didn't actually answer any of the rogs.

4          **THE COURT:**  Don't -- you don't need to repeat stuff in

5    the briefing.  I know all that.

6          So Rog 8 is two rogs, okay?

7          All right.  While we're on Snap, let's talk about Rog 1

8    and HipChat.

9          So looking at all the Subparts A through F.  A through D

10   appear all to be aimed at storage and/or archiving of HipChat

11   data.  So those A through D are one rog.

12         E is a completely different subject, which is whether the

13   data was produced in litigation and what that litigation was.

14   That's a separate rog.

15         And F is asking a contention as to whether or not the data

16   is still accessible or not.  That's a separate rog.

17         So Rog 1 is three rogs.

18         **MR. BILSBORROW:**  Understood, Your Honor.

19         I would note that Snap still hasn't provided a full answer

20   to this rog.

21         **THE COURT:**  I don't think that's the issue teed up for

22   today.  If they were withholding their responses based on this

23   motion, Snap needs to be answering the interrogatories at this

24   point.  They can't just simply respond with more objections.

25   Do you understand that?

 1          **MS. TESHUVA:**  Your Honor, we certainly understand

 2    that, and our -- we believe that we have fully responded to

 3    Interrogatory 1.  To the extent that plaintiffs believe

 4    otherwise, we're happy to confer with them.  But we believe we

 5    have fully responded to it, including by providing substantive

 6    information.

 7          **THE COURT:**  Okay.  I looked at the responses.  You

 8    need to respond and do more than just object.  Okay?  That's

 9    what I'm saying.

10          **MS. TESHUVA:**  For interrogatory set one, we have

11    provided a substantive response.  For set two, I understand

12    Your Honor's point.

13          **THE COURT:**  Okay.  So that takes care of -- I think

14    all those.

15          On the rogs, let's say, one through -- well -- let me make

16    sure I've got the right set.

17          Well, for TikTok it's the fourth set of rogs.  Where does

18    it start?  I guess it's two through -- two through six.  If I

19    understand the dispute is whether the breakdown by different

20    age groups is -- each one is a separate rog; is that the

21    dispute?

22          **MR. BILSBORROW:**  Yes, Your Honor.

23          **MS. KAJAN:**  Yes, Your Honor.

24          **THE COURT:**  Let me hear again from plaintiffs.  Why

25    aren't each of those a separate rog?  It's a separate group of

 1    people.

 2         **MR. MURA:**  Your Honor, each of those a separate rog.

 3    We split them up into separate questions.  So number two is

 4    just asking about age demographics.  How have TikTok's age

 5    demographics changed over time?

 6         Number three is asking about the time on the app.  How

 7    does time on the app vary by age over time?

 8         Number four is about the visits, the number of visits per

 9    day.  How does daily app session count vary by age over time?

10         Number five is time between the visits.  So when they put

11    down their phone and pick it up again.  How does that vary?

12         TikTok said it likely doesn't have that information, but

13    it still sought to count it five times.  But I think the law is

14    clear that if it doesn't have the information, then it doesn't

15    count.

16         **MS. KAJAN:**  Your Honor --

17         **MR. MURA:**  It --

18         **THE COURT:**  One at a time.

19         **MR. MURA:**  Okay.  Those are all of the piece.  They

20    are all asking for a separate question.

21         And the reason why there are different answers with

22    respect to age -- I mean, we're simply asking a straightforward

23    question about age.  But TikTok has different age information

24    for individuals, including the same individuals.

25         They have reported age.  That's the age that an individual

1    reports when they are signing up for TikTok.  There could be

2    multiple reported ages, because even the before 2020 a child

3    could start to register an account.  Report an age under 13.

4    Be blocked.  And then wait 24 hours or just wait no time and

5    then start a new account, reporting an age.  So there could be

6    multiple reported ages.

7         We have inferred age, which is how TikTok on the back end,

8    through the algorithm or through staff reviewing videos, will

9    infer an age.  And that's complicated, too, because for quite

10   awhile staff was told, for example, to use a nine-year old as a

11   reference for a 13-year old.  So you're going to have different

12   ages there.

13        You have users with no age gate data or inferred age

14   gates.  That's what TikTok calls age unknown.  And the reason

15   why they don't have an age unknown is because they had a

16   work-around.

17        So if you had an Instagram account or if you had a Google

18   account, you could create an account on TikTok without going

19   through the age gate.  And Instagram, before 2019, didn't have

20   an age gate at all.  So you're going to have individuals who

21   are coming in and they don't know the ages.

22        And then you have users with no age gate data, but with an

23   inferred age.  And that's non-age gate.

24        And, finally, you have users who have identified

25   themselves as adults, but TikTok has themselves inferred that

```
 1   they are minors.  That's hidden minors.

 2        So we're asking a single question about age, but it's the

 3   answers that are elicited that are -- that are multiple

 4   answers.  And the case law is clear that just because you have

 5   a single primary question, such as this about age, and it

 6   elicits multiple answers, doesn't make the interrogatory

 7   compound.  Compoundness isn't determined by the number of

 8   answers.  You look to the question.

 9        And so here the question is again -- and I was going over

10   them.  I'll do Number 6 and Number 9.

11        Number 6 is:  How does average revenue per user vary by

12   age over time?

13        And Number 9 is a question about who is using the safety

14   features.  Tell us the percentage of users using each safety

15   feature by age over time?

16        THE COURT:  So make sure -- I want to make sure I

17   understand.  When you want this time or any of this data by

18   age, you don't want it for every single user of that age that

19   falls within that age group, do you?  Or you want an average

20   within each subgroup?  Or what are you asking for?

21        MR. MURA:  We're asking it by decile, which is by ten.

22   So, and we would ask that the data be split up in that way so

23   that we can understand what it looks like for the highest

24   deciles, the power users.

25        So if we get a simple average, it's sort of going to wash
```

out the information that we need from this discovery.  So

that's why we've framed the question in this way.

     But we're essentially just asking for each of those a

straightforward question about age.  And it's complicated

because the answers elicited are going to be having to deal

with reported age, inferred age, unknown age.

     But, again, that doesn't change the nature of the question

just because the answers elicited are producing multiple

information.

     **THE COURT:**  So within each -- help me out.  Within

each decile, is that an average?  Again, what are you asking to

report?

     **MR. MURA:**  Zero to 10, 10 to 20.  I think it would

depend on the question.  So if we're asking how does time on

the app vary by age over time, and we're asking about -- we're

asking them to break down the time, and then we're asking them

to break down over the age over time.  So that's -- that's the

essential question of just how much time are their users

spending on the app.

     And we don't just want, like, one composite average

because that's not really going to tell you anything.  So

that's why we framed the question we have.  Visits per day.  I

mean, that also is going to matter in terms of the different

ages of the individuals.  And we're going to need to know

whether they are referring to the reported age, the age that

```
 1   they have inferred.

 2       If they just give us this data based on reported age, but

 3   they have inferred that these are minors or a different age or

 4   not adults or that they have lied, we need to know that

 5   information.  So that's why we've asked --

 6           THE COURT:  You want total number of visits per day

 7   for everybody in each decile?

 8           MR. MURA:  Yes, Your Honor.

 9           THE COURT:  Across -- so there's presumably

10   theoretically nine, ten deciles; right?

11           MR. MURA:  Across the relevant time period, yes.

12       And they originally counted every year of the relevant

13   time period as a separate question, but I believe that they --

14   they've dropped that.

15           THE COURT:  They have, but -- and are these break-outs

16   of unknown age --

17       (Interruption in the proceedings.)

18           THE COURT:  Okay.  So are these groupings -- that is,

19   hidden minors, non-age gate users -- are these all definitions

20   that TikTok uses?

21           MR. MURA:  Yes, Your Honor.

22           THE COURT:  Snap uses?

23           MR. MURA:  Yes.  We had five for TikTok.  I believe

24   there were three for Snap.  It's based on understanding of how

25   the company is tracking age.
```

1          **THE COURT:**  Okay.  What's your response to that.

2          **MS. KAJAN:**  Rania Kajan for the TikTok defendants.

3      Your Honor, I failed to understand in the briefing, and I

4  failed to understand again today, what the primary question

5  even is for Interrogatories 2 through 6.  What it is is

6  separate interrogatories, different questions for each of them

7  that ask for five different data pulls for each.  And that

8  number, that's going to take effort.  It's obviously going to

9  take some work.

10     And I think the discussion about how complicated this is,

11 just in discussing this before the Court, reflects how it's not

12 proper that each of these would be considered one

13 interrogatory.

14     And understanding that we dropped our objection about the

15 years, which we have, we're still talking about eight years of

16 data across these four interrogatories, 2 through 6, and for

17 five different data pulls for each.

18     And I just want to address Mr. Mura's point about how he

19 is assuming we are going to respond to these.  That's

20 completely speculative and unsupported.  And, more importantly,

21 it points out a consistency in plaintiffs' position here where

22 elsewhere in the brief they criticize the TikTok defendants for

23 supposedly counting the responses to these interrogatories as a

24 way to count them, as opposed to focusing on the questions.

25     And, yet, here they are asking the Court simultaneously to

count these user characteristic rogs as one each based on the

unsupported assumption that we're just going to respond to all

of them the same way, and that's just false.

      **MS. TESHUVA:**  Your Honor, Ariel Teshuva for Snap.

    I agree with everything my colleague said.  I would also

just add that these three different categories of data for Snap

are distinct.  Plaintiffs are treating them as if they are the

same and they come from the same place, and that is simply not

true.

    They -- our understanding is that in the ordinary course

of business, these categories of data are kept in different

places, which, again, illustrates why these are three different

questions that are grouped into one.

    As well as counsel just walked us through at length the

questions require Snap to perform calculations.  And under the

case law an interrogatory that requires distinct calculations

is considered a separate interrogatory.

    I think they are asking --

      **THE COURT:**  So I'm clear, when you're saying "kept in

separate places," you're talking about the category of null or

unknown age, and reported age between zero and 100, and

inferred age between zero and 100, those categories?

      **MS. TESHUVA:**  Yes.  My understanding is that at Snap

those categories of age data come from different repositories.

      **THE COURT:**  Okay.

1          **MS. KAJAN:**  Your Honor, if I could just add -- Rania

2     Kajan for the TikTok defendants -- across the cases there's

3     obviously the different standards about how to count these

4     interrogatories, and I think they are all somewhat related and

5     they have different terms:  The relatedness test, the

6     reasonable standard test, the individual subpart test, the

7     you-know-it-when-you-see-it test, all of these things.

8          One of the tests that is outlined in the case law within

9     this district is if you have to rely on separate information to

10    respond to a subpart, then it's a separate subpart.

11         And related to what my colleague said, it's also our

12    understanding that these different buckets of information, the

13    five in each of these, are going to require separate

14    information and different points of contact in order to provide

15    this information to plaintiffs.

16         **MR. BILSBORROW:**  Your Honor --

17         **THE COURT:**  All right.  Last chance to convince me of

18    something.

19         **MR. BILSBORROW:**  Sure.  Just with respect to Snap,

20    these categories of information -- null or unknown age,

21    reported age and inferred age -- are categories of information

22    that Snap clearly tracks.  They show up in various forms in --

23    among the same document custodians.

24         Our understanding is they are just querying their

25    database.  And so the fact that they store the data in

1    different places doesn't make these separate interrogatories.

2            **THE COURT:**  Okay.

3            **MR. BILSBORROW:**  It just means they're pulling the

4    data from a different place.

5            **THE COURT:**  So the rogs that don't ask for information

6    by decile are single rogs.  That is -- so for Snap that would

7    be Rog 2, I think.  That just asked for the total number.  And

8    6, the average revenue.

9        The ones that -- and for TikTok that would be also Number

10    2 and Number 6.  If I'm missing one, tell me.

11        But for all the ones that ask for decile, essentially what

12    plaintiffs are asking for is at least three dimensions of data.

13    That is, by age -- for example, typical time between apps by

14    decile, by age, and then by one, two -- five different

15    categories of the way age is tracked or broken out.  So

16    those -- the ones that ask for decile are -- for TikTok, it's

17    five different rogs.  Okay.

18        And this is without prejudice to you, you know,

19    withdrawing them and redrafting them a way.  If you're really

20    going after how these things track by age, you may want to

21    reconsider whether you need them broken out by each of these

22    subcategories or not.  Because I'm not sure you do, but it's up

23    to you.

24        But the way those decile ones are drafted, it's asking

25    for -- I mean, it's asking for at least three different

1    dimensions -- data in three different dimensions.

2         **MR. MURA:**  Your Honor, that -- our position is the

3    primary question is a question about age.  The fact that they

4    track it in these different ways doesn't make the question five

5    different questions.

6         If Your Honor counts it as -- decile as two questions, I

7    would understand.  But we don't even know if these are all the

8    categories by which they track age.

9         And if we're asking about a TikTok user's age, how does

10   TikTok and -- what age is it referring to?  Is it referring to

11   what it thinks the user -- what it thinks the user's age is?

12   The age that the user reported?  We shouldn't have to spend a

13   separate rog on each of those when TikTok has the information

14   about user age.

15        And we're asking a question, for example:  How much time

16   on an app does a user spend?  And so to answer that question,

17   it needs to provide -- it needs to answer that question per age

18   by providing a breakdown based on the various categories that

19   it has.  It still --

20        **THE COURT:**  Nothing stops you from defining what

21   age -- what definition of age you want.

22        **MR. MURA:**  So if I'm understanding Your Honor, if we

23   redefine age to reflect however many categories TikTok has --

24        **THE COURT:**  That's just another way of reformulating

25   these.

1        In other words -- look.  You're asking for breakdowns of

2   data across multiple dimensions.  It's -- I don't see how --

3   decile would be ten.  I don't think -- it's not two.  I mean, I

4   assume that was offered as a compromise.

5        The way you're asking it, it's really asking for all this

6   data broken out by age, by decile, using different -- different

7   categorizations of how age is defined.  Each of those

8   definitions of age is a different rog.

9        Now, you could ask it in a way that, you know, either has

10  age defined broadly the way you want it, right, that you're

11  going to use it.  Your experts are actually going to use.  I

12  don't know if your experts are going to use each of these

13  subtypes of age or not.

14       **MR. MURA:**  I do think it's going to be important for

15  our experts to know whether TikTok is tracking certain ages

16  that are unreported versus inferred.

17       **THE COURT:**  A, you do know that already because you've

18  got the documents.  That's where you got these from.

19       B, you've got other rogs here that identify, for example,

20  the total number.

21       **MR. MURA:**  We don't have the ability from the

22  documents to do that calculation, which is why we asked the

23  question.

24       And we can ask the question multiple ways, but at the very

25  least, Your Honor, they are important questions.  I mean, I

 1  think at some point we would need to come to Your Honor.  I've

 2  sort lost track of where we are in the numbers, but --

 3        THE COURT:  That's why we have a transcript and you're

 4  going to have to work it out.  And I'm sure they are counting

 5  carefully in terms of total number of rogs.

 6     That's my ruling.  Okay?  You know, you can redraft those

 7  to try to figure out if you want to get to it a different way.

 8        MR. MURA:  Can we reserve the right, Your Honor, if we

 9  get into a disagreement about the limits, to come back to the

10  Court to discuss that matter?

11        THE COURT:  Yes.  So I assume everybody always gets --

12  how many times people have said, "I reserve my rights."

13        MS. TESHUVA:  Your Honor, Ariel Teshuva for Snap.

14     I just wanted to clarify how this ruling applies to the

15  interrogatories to Snap.  We read this three to five as asking

16  for the information across four different dimensions.

17     The way Your Honor explained them, which is by age, by

18  decile, by year, and the type of age tracking, so would they

19  count as four interrogatories each?

20        THE COURT:  No.  The decile, that's not by year.

21  So -- oh, but you've dropped the objection as to year.  So I'm

22  not going to -- no.  So it's -- for Snap it's three.

23        MS. TESHUVA:  Thank you.  And that's 3 through 5.

24        THE COURT:  Rogs 3 through 5.  And then Rogs 2 and 6

25  are a single rog.

 1            **MS. TESHUVA:**  Okay.  And how does the ruling apply to

 2     Interrogatory 9, for which we made a similar objection?

 3            **THE COURT:**  That's a single rog also, because it's not

 4     asking by decile.

 5            **MS. TESHUVA:**  Thanks, Your Honor.

 6            **THE COURT:**  Okay.

 7        Okay.  Is there really a dispute on Rog 7 to TikTok?  To

 8     me, that looked like a single interrogatory.

 9            **MR. MURA:**  There is no dispute now that TikTok -- as I

10     understand it, now that TikTok has dropped the -- I think there

11     is no objection.

12            **THE COURT:**  All right.  So I think I've covered all

13     the rogs.  Yes?

14            **MS. TESHUVA:**  Your Honor, I believe that Interrogatory

15     10 has yet to be addressed, the one about the named features?

16            **THE COURT:**  I thought I...

17        (Brief pause.)

18            **MR. BILSBORROW:**  Your Honor, may we be heard on this

19     one?

20            **THE COURT:**  Sure.

21            **MR. BILSBORROW:**  James Bilsborrow for the plaintiffs.

22        The named features, of course, are a central issue in this

23     case.  Multiple Court rulings have centered on the named

24     features.  And in our view we're really asking about alleged

25     defects to a single product.  In Snap's case it's Snapchat.  In

 1    TikTok's case it's TikTok.

 2         And the cases that we cite are pretty clear that if you're

 3    asking about:  Tell me all the defects about your product?

 4    That's one rog.  We cite the *Cardenas* case.  We cite the

 5    *Heritage Nevada* case.

 6         And so we think that, A, this is one rog.  It's not

 7    compound.  It's asking for basic information about the named

 8    features.  Tell me when you implemented it?  Tell me who is

 9    responsible?  And tell me when you made major modification?

10    That's crucial information that we have.

11         And like I said at the beginning, if -- if each one of

12    these is -- if each named feature counts as three rogs, as Snap

13    as argued, we're pretty much at the limit.  And this is the

14    most efficient way to get this information.

15         And, A, we think we're right on the law; but, B, this is

16    so central to the issues in the case that we think that if Snap

17    is right, we need more rogs.

18         **MS. TESHUVA:**  Your Honor, Ariel Teshuva for Snap.  May

19    I be heard?

20         Counsel is wrong on the law and wrong on the equities

21    here.

22         First of all, as to the law, it -- the case counsel is

23    referring to did hold that an interrogatory that says identify

24    all of the defects in your product -- or I believe it was

25    served by the plaintiff -- by the plaintiff and it was -- by

1    the defendant and the interrogatory said:  Identify the basis

2    of your design defect, the defect that you allege underlie that

3    claim.

4         But that's not what -- the interrogatory that plaintiffs

5    have served has.  Plaintiffs, by their own admission earlier

6    today, have served an interrogatory that asks about at least 15

7    distinct features.

8              **THE COURT:**  You might want to slow down.

9              **MS. TESHUVA:**  I'll -- I hear Your Honor.

10             **THE COURT:**  For the court reporter's purposes.

11             **MS. TESHUVA:**  So, yes.  So they are asking about an

12   interrogatory that -- that seeks information about at least 15

13   distinct named features.  And under the cases that means that

14   they are asking at least 15 different interrogatories.  And

15   they are asking three different questions about each of these

16   features.

17        So as an example, in the *Am*. *Bankers* case, which is from

18   this court, from the Northern District, 2020 Westlaw 8996760

19   at 1.  In that case the interrogatory was about three different

20   insurance policies that were identified in the interrogatory

21   and that consisted -- counted as three different

22   interrogatories.  Just because they grouped the three different

23   policies in the interrogatory didn't make it one rog.

24        And as to the equities, I do want to point out two things.

25   First of all, the parties negotiated this 45 interrogatory

```
 1    limit.  It does not come from the Federal Rules.  And we made
 2    that concession based on the understanding that it would impose
 3    real limits on the parties.  They are already getting 20 more
 4    interrogatories than they would be entitled to under the
 5    Federal Rules.
 6        If plaintiffs thought that they needed more than 45
 7    interrogatories, first of all, they should have said that at
 8    the time.  And, second of all, they should have said that now,
 9    rather than serving compound interrogatories.
10        THE COURT:  I'm assuming they did say at the time they
11    needed -- I seem to recall discussion that they wanted more.
12        So you're repeating arguments from the brief.  I
13    understand where you're going.
14        Given the way the rogs are drafted, I'm going to construe
15    them as single rogs.
16        MR. BILSBORROW:  So Rog --
17        THE COURT:  Rogs 10 -- both Rog 10, for each -- each
18    of TikTok's.
19        MR. BILSBORROW:  Okay.  Thank you, Your Honor.
20        MS. KAJAN:  Your Honor, if I could be heard briefly on
21    Rog 10.
22        THE COURT:  Sure.
23        MS. KAJAN:  The concern that we have is if we're
24    talking about the way that this is drafted, and they are saying
25    for each named feature identify the following, and then it's
```

just a litany -- I understand that this one has three.  But

then it's just a litany of questions.  They are unrelated to

one another.  There isn't a -- I mean, is the primary question:

Identify the following?

I mean, this is -- I understand if we're going to talk

about date it was first implemented.  Persons with primary

responsibility.  Okay.

Then we get into major modifications.  Major modifications

is defined very broadly by plaintiffs, and for us we have 13

named features.  The fact that this would be one interrogatory

just doesn't seem to be -- to square with the case law in terms

of taking a pragmatic approach to these.  Looking at them

collectively.

And -- and in terms of the named features, it's not an

organic grouping of things that are grouped together.

Literally named features, they are, for us, a distinct group of

features.  They are only grouped together by plaintiffs' own

grouping and definitions, but they range -- for us, they cover

a wide variety of discrete topics:  Age verification, CSAM

reporting protocols, image filters, and it goes on.

So it just, in terms of the equities, doesn't seem like

this rog should count as only one.

And, also, just going forward, for plaintiffs to just ask

a question like that "identify the following," and then we're

just going to receive a litany of subparts that really are

```
 1   distinct questions.

 2           THE COURT:  Okay.  So I'm going to give both sides

 3   guidance.  You shouldn't be doing -- this is not a very

 4   well-drafted rog.  Okay?  Because there is no -- they are

 5   right.  There is no primary question here.  Do you concede

 6   that?

 7           MR. BILSBORROW:  Does it mean I win?  No, I'm just

 8   kidding.

 9       (Laughter.)

10           MR. BILSBORROW:  I take the guidance.  Yes, Your

11   Honor.

12           THE COURT:  So just so you all know, I'll let it go

13   this time, but don't -- don't -- this is not good practice.

14           MR. BILSBORROW:  Okay.  Understood.

15           MS. TESHUVA:  Your Honor, I apologize.  Just one more

16   note for the record.

17           THE COURT:  Sure.

18           MS. TESHUVA:  Ariel Teshuva for Snap.

19       As my colleague has just pointed out, Judge Gonzalez

20   Rogers' ruling in the Motion to Dismiss actually held that each

21   feature is a distinct product for purposes of the -- of the

22   Motion to Dismiss.

23       So that ruling, I believe, is also instructive as to why

24   these features should be different -- should be treated as

25   different and distinct for purposes of counting the rogs.
```

1          **THE COURT:**  I am going to modify my ruling.  Each of

2    Rog 10 is two rogs.  So I view subparts one and two as one rog.

3    And subpart three, the major modifications, as a separate rog.

4        Okay.  But I'll just say for the record, part of what's

5    motivating me here is the practicality of this because if I

6    find that these are each 13 to 15 rogs, we're going to be faced

7    with a motion for relief from the limit; right?  Because it's

8    going to be 30 -- then if I find it's 2 times 13, right, that's

9    26, you're already at the limit, aren't you, or close to it?

10         **MR. MURA:**  Your Honor, we may already be at the limit

11    with the age ruling.

12         **THE COURT:**  So just -- in terms of just my discretion

13    to manage discovery, as a practical matter, we're just going to

14    count it as two rogs each.  Okay?

15         **MS. KAJAN:**  Your Honor, if I may.  I understand the

16    Court's rulings.  Rania Kajan.

17        I just want to point going forward to plaintiffs.  The

18    *Cardenas* case and many other cases, those involve contention

19    interrogatories, and Courts uniformly treat those differently

20    than they do these types of interrogatories.

21        So I just want to offer that in the record for future

22    interrogatories.

23         **THE COURT:**  I'm going to -- just so I'll explain it.

24    One of the reasons you convinced me that major modifications is

25    different is there's -- that is -- what you consider to be a

```
 1   major modification and they consider is going to be a point --
 2   I believe, I'm going to predict, is going to be a point of
 3   discussion between the parties.  All right?  It's not merely
 4   just a factual.
 5          MR. BILSBORROW:  Your Honor, may I ask a question?
 6   We're already past the -- well past the 30 days when we needed
 7   the answers to these rogs.
 8      Can we put a limit as to when the parties will negotiate
 9   and we'll get answers from the defendants on the rogs we're
10   standing on?
11          THE COURT:  Can you go out in the hallway and come up
12   with a deadline, negotiated deadline, and come back and report
13   by the end of this DMC?
14          MR. BILSBORROW:  Absolutely.
15          THE COURT:  Why don't you do that?
16          MS. TESHUVA:  Thank you, Your Honor.
17          MS. KAJAN:  Thank you, Your Honor.
18          MR. MURA:  Thank you.
19          THE COURT:  Okay.  Let's turn to --
20          MS. HAZAM:  Lexi Hazam for plaintiffs, Your Honor.
21   Just one housekeeping matter.
22      I wanted to confirm that it is Docket Number 1438 that is
23   the correct version of the stipulation.  1437 erroneously
24   omitted the signatures.
25          Thank you.
```

```
 1              THE COURT:  Got it.  Thank you for that.
 2        Okay.  Let us talk about Docket 1422, JCCP's request to
 3   expand discovery.
 4              MR. VANZANDT:  Joseph VanZandt for the JCCP
 5   plaintiffs.
 6              THE COURT:  Good afternoon.
 7              MS. SIMONSEN:  Good afternoon, Your Honor.  Ashley
 8   Simonsen, Covington and Burling, for the Meta defendants.
 9              THE COURT:  Good afternoon.
10        So it took me a while.  I had to double read this a couple
11   times.  So plaintiffs are asking for two more custodians over
12   and above the three already identified in that -- that are at
13   issue in this part of the discovery; is that right?
14              MS. SIMONSEN:  No, Your Honor.  They are asking for a
15   total of five custodians in addition to the 25 -- they are
16   asking for new search terms to be run for five custodians.
17   Those five custodians are among the 25 pre-2012 custodians
18   already selected.
19              THE COURT:  And are three of the five Mr. Zuckerberg
20   and the two others, who have been identified by initials, as
21   part of this particular dispute?
22              MS. SIMONSEN:  Correct, for purposes of the three
23   sample search terms that Meta ran.
24              THE COURT:  Okay.  All right.  Putting aside the
25   search terms.  Why do you need to add two more custodians?
```

1          **MR. VANZANDT:**  Your Honor, your original instructions

2    were for plaintiffs to identify two or three custodians to run

3    its sample search terms against, and it was really a sampling.

4    We did that.  And based on the results, this is now our -- what

5    we're now seeking in terms of discovery.

6          We've limited it down to just four percent of the overall

7    custodians, to seek just these five search terms among these

8    five custodians, following the Court's guidance to limit to it

9    a very small number of key people that would have the documents

10   and limit the search terms, and that's exactly what we've done.

11         So it's not -- the ask hasn't increased.  This is the

12   first time the ask has officially been made.  Two or three was

13   just part of the sampling process.  The results of the search

14   terms have now led us to make this extremely narrow ask for

15   additional pre-2012 discovery.

16         **THE COURT:**  Okay.  So what is magical about these two

17   additional custodians?  Something that's not already subsumed

18   by the three that we have been talking about previously.

19         **MR. VANZANDT:**  Sure.  Well, it's actually Meta who

20   brought in two additional custodians.  The plaintiffs

21   originally requested custodians Mark Zuckerberg, Chris Cox and

22   Andrew Bosworth.

23         It was, I believe, the defendants who, if you will recall

24   from the last hearing, unilaterally selected their own

25   custodians to run the sample search terms.

1          **THE COURT:**  That's water under the bridge.  I know how

2     we got here.

3          **MR. VANZANDT:**  Sure.  So that's how there's two

4     additional custodians in the mix.  So the plaintiffs are still

5     sticking to the original requested custodians.

6          **THE COURT:**  What makes you believe that these two

7     additional folks have anything markedly different from what the

8     three that have been identified would have?

9          **MR. VANZANDT:**  Well, those are the ones Meta

10    identified in response to this.  And so --

11         **THE COURT:**  It was two to one.  You got

12    Mr. Zuckerberg.

13         **MR. VANZANDT:**  So the other two that we were -- that

14    plaintiffs are requesting, these are individuals who the search

15    terms, the results, show significantly more pre-2012 documents

16    than the two sample custodians that Meta -- that Meta selected.

17    And these are people who were -- one of them was the -- at the

18    company since 2005, the Chief Product Officer since 2005 to the

19    present.  And another was the Chief Technology Officer from

20    2005 to the present.

21         Compared to the two that Meta unilaterally selected, which

22    were at the company from 2009 and 2010, respectively, to the

23    present.  We're talking there VPs of engineering and

24    vice-president of the product group.

25         So Meta's -- Meta gets closer to that 2012 time frame that

1    we're discussing.  Plaintiffs get to the heart of the core

2    issue, looking back to go pre-2012 back to the date of these

3    custodians first dates of employment.

4        **THE COURT:**  Okay.  So I've already ruled multiple

5    times on this.  Nobody is getting discovery all the way back to

6    the first date of employment.  I think I've already said 2006

7    is -- that part you're only going to get, if anything, back

8    that far.

9        Okay.  What is it about the five new search strings that

10   you've proposed that aren't subsumed by the three test search

11   strings?

12       **MR. VANZANDT:**  All right.  So each of the search terms

13   are slightly unique.  I can go through them, but --

14       **THE COURT:**  Qualitatively.

15       **MR. VAN ZANDT:**  Sure.

16       **THE COURT:**  What are you going after with these five

17   terms that aren't already subsumed by the three?

18       **MR. VANZANDT:**  Right, Your Honor.  So for the first

19   search term, it's really focused on age verification, age

20   gating and attempts, if any, to keep underage, 13 years, off

21   Facebook.

22       The second is different in that that one is seeking

23   reports of harm to children on Facebook, especially early

24   notice of problems.

25       The other is related to Facebook's attempts to grow their

 1    youth market and the potential harm caused to youth.

 2         The fourth is related to language that Meta would use to

 3    try and target and track time spent on their app and potential

 4    negative consequences from that for youth.

 5         And, finally, the other would be knowledge of -- early

 6    knowledge of potential harms to any population, including

 7    youth.

 8         So they are all focused on the core issues of the case,

 9    which is youth usage, but they are all slightly different

10    variations.

11         And, again, the increase from three search terms to five

12    is because the three was the sampling, and the results really

13    informed our decision to focus this, five custodians, five

14    search terms, to keep this as limited as possible.

15         **THE COURT:**  Plaintiffs are correct, that this was

16    going to be an iterative progression.  You know, we weren't --

17    that wasn't a hard cap necessarily at the three folks.

18         What's the -- since these are already people whose files

19    have been collected, they are named -- previously named

20    custodians, so you don't have to go back and do a completely

21    new search, what's the -- what's the burden here?

22         **MS. SIMONSEN:**  There is enormous burden, Your Honor.

23    I want to step back for a moment and point out that we are not

24    in a world where this Court ruled that plaintiffs are getting

25    documents pre-2012 for three custodians.

Your Honor took the position that in case it might moot the dispute, Meta should run three sample search terms over three custodians' files in case they might turn up, say, a dozen or so files.

That's not what happened.  They returned over 30,000 documents of families from Mark Zuckerberg after de-duplication and eliminating out already produced documents and around, I think it was, 10,000 or so for the other two custodians.

So what this sampling exercise was intended to do was demonstrate to Your Honor whether there would be a burden on Meta of running these terms, and it conclusively showed that there would be.

Now, these individuals may already be custodians. However, their files were searched with the feature specific terms that the parties agreed to as part of their global deal on search terms.  And so it would be a matter of re-collection.

We would have to go back to those custodians full inboxes as they exist in Meta's systems to rerun these new five extremely broad lengthy search strings.  Re-collect the documents.  De-duplicate them against any documents previously pulled out.  Review them for responsiveness, privilege, confidentiality.  It would be a massive undertaking.

We estimate that it would be tens of thousands of documents.  Could be up to 100,000 documents.  We don't know exactly because we don't have hit reports for two of the five

custodians.

But I think -- I mean, just to kind of take a step back. At the last DMC where we argued this issue in October Your Honor expressed a hope that we might be able to reach agreement on a narrowed set of targeted search terms for the 2006 to 2012 documents to be run over a narrowed set of pre-2012 custodians.

And, you know, our view is that plaintiffs have actually expanded their ask from the three sample terms to five sample terms -- to five terms and from three custodians to five.

But I think more importantly, going back even further, at the June DMC where this first was raised by plaintiffs and they pointed Your Honor to an interview in 2017 with Sean Parker, what Your Honor instructed them was that they would need to find targeted document requests based on evidence that there is a document that precedes the default cutoff of 2012 to get any pre-2012 discovery, any more pre-2012 discovery. And Your Honor explained that the default could be overcome if you've got an evidentiary basis or a basis to find something specific after reviewing Meta's pre-2012 productions.

And plaintiffs now have those productions. They still have not come to the Court or to Meta with a specific document they think is missing. It's still the same refrain of essentially we think the general relevant time period should be expanded to be nearly 20 years long, not just 2012 to 2024, but all the way back to 2004 or at least 2006. And that's not what

```
 1   the Court contemplated when it ordered the parties to confer on

 2   these issues, when it said it would let plaintiffs come back to

 3   the Court with a specific targeted request if they had

 4   something specific that they really needed.

 5        And so what I come back to is this is a motion for

 6   reconsideration, very well reasoned orders on the relevant time

 7   period and search terms following extensive briefing and

 8   multiple arguments by the parties with zero showing of good

 9   cause.  No evidentiary basis.  No need for additional pre-2012

10   documents.

11        And we're passed substantial completion.  We are into

12   depositions.  We're already spending the entire month of

13   December focused on getting plaintiffs documents they want from

14   April 2024 through October 2024 relating to the newly launched

15   Instagram Teen accounts.  Those are going to be tens of

16   thousands of documents we're going to have to produce.

17        I don't think there's time left in the schedule and to get

18   the documents out the door in time for depositions to do the

19   type of expansion plaintiffs want.

20        So I would submit to Your Honor that this dispute needs to

21   be put to bed once and for all.  We need to move on.  The

22   plaintiffs' request needs to be denied.

23            THE COURT:  Just so I'm clear, have you processed and

24   produced the documents found as a result of the searches of the

25   three custodians you've already talked about?
```

1          MS. SIMONSEN:  No, Your Honor, because those were

2   only -- Your Honor ordered those search terms be run to produce

3   hit reports simply to inform the burden analysis.

4          THE COURT:  Okay.  If you've got the three original

5   search terms in front you or in mind, do any of them go to age

6   verification?

7          MS. SIMONSEN:  I don't have them in front of me.  I'm

8   going to have to pull them up, Your Honor.  I apologize.

9          MR. VANZANDT:  I have them, if you'll give me just one

10  second, Your Honor.

11      (Brief pause.)

12          THE COURT:  Were they a part of the -- was it attached

13  as Exhibit A?  I couldn't figure out which --

14          MS. SIMONSEN:  They weren't.  Those were the feature

15  specific search terms that the parties agreed on to run.

16          MR. VANZANDT:  I don't believe the three -- one of the

17  three specifically touched age verification.  They are all

18  touching on age on various issues there.

19      Your Honor, if I may.  Ms. Simonsen -- as Your Honor

20  noted, this has been an iterative process.  And when you sent

21  us away last time, you gave us instructions and guidance to

22  sort this out and figure it out without coming back to you.

23      Defendants completely refused to engage in that process.

24  And instead of it being iterative, they are now repeating

25  arguments from June, where we've -- this process has moved and

1    developed.  The plaintiffs have done what the Court has

2    requested.  They have done what Judge Kuhl has requested to

3    sort this issue out.

4        Your Honor originally said that if they run these sample

5    search terms and it brings back just a few, it may moot this

6    whole process.  That's not what happened.  So now Meta's

7    argument is essentially there's too many potentially relevant

8    documents from this time frame, which is no reason to not

9    produce this discovery.  This is an extremely small percentage

10   of documents that Meta would be producing, compared to the

11   overall 1.9 million documents that have been produced so far.

12       And as we've discussed before and quoted in the briefing

13   and last time the comments from Judge Kuhl, this is a slightly

14   different case based on the negligence ruling in the JCCP,

15   which is why these documents are so critical.

16       We are being extremely narrow in this ask.  And I think

17   Your Honor understands the difference between the sampling

18   versus the request.  We do believe -- we wish we could have

19   negotiated the custodians and the requests.  Meta refused to do

20   that, which is now why we've now made ask to Your Honor.

21       **MS. SIMONSEN:**  May I respond just very briefly?  I

22   promise it will be brief.

23       **THE COURT:**  I want somebody to answer my question,

24   too.

25       **MS. SIMONSEN:**  The reason that we did not -- it's

1    incorrect to say we didn't engage in this process.  Your Honor
2    urged the parties to go back and see if they could identify
3    something targeted and narrow.

4        What we got back was five lengthy search strings amounting
5    to over 180 separate search terms.  I think it's more search
6    terms than the feature specific search terms we already agreed
7    to run prior to 2012.

8        I mean -- and, again, with no specific articulation of
9    what exactly they think is missing, I don't know how we were
10   supposed to formulate any kind of counterproposal in that
11   scenario because they haven't told us what they think is
12   missing, aside from general concerns that they are not getting
13   every single document that might touch on what they describe as
14   general liability issues.

15       The point Mr. VanZandt made about the number of documents
16   they are requesting being an extremely small percentage of our
17   overall productions, we addressed in our brief.  That only
18   speaks to the enormity of the productions we've made, which is
19   over 2 million documents.

20       And I'm not going to repeat the arguments.  I know I think
21   I've made them a couple times to you before about the
22   difference between the negligence and the product liability
23   claims and the fact that even their negligence claims are based
24   on a feature specific framework, as Your Honor has previously
25   recognized.

1          **MR. VANZANDT:**  Your Honor, I can now answer your

2     question.

3          **THE COURT:**  Sure.

4          **MR. VANZANDT:**  So for the -- the first three search

5     terms that I went through were the ones that were the original

6     ones.  The last two were the additional.

7        So the first one does -- and I'm just not very good at

8     interpreting these search terms, but the first one does touch

9     on age verification, to answer your question.

10         **THE COURT:**  So actually the -- so the five terms that

11    you're talking about, the first three are the three sampling

12    terms we have been talking about; is that right?

13         **MR. VANZANDT:**  That's right, Your Honor.

14         **THE COURT:**  Okay.  Well, really, you're asking to add

15    a search term that goes to time spent -- tracking time spent

16    and another one that basically goes to harm to any population.

17         **MR. VANZANDT:**  Right.  We're seeking to add a search

18    term that would touch to tracking the time teens spent on their

19    app and potential negative consequences.

20        And then also seeking evidence regarding knowledge of

21    potential early harms to any population, not just children.  So

22    that would get to notice and Meta's attempts to resolve the

23    issue.  So evidence of early harms.

24         **THE COURT:**  Well, the time spent tracking and harms to

25    teens is close to the second one, harm to kids and growth to

1    market and harm to kids.  So that seems duplicative.

2       And harm to any population, again, your focus population

3    here is the teens.  And so if -- again, it seems duplicative

4    also.

5       So I'm not going to add search terms.  If you had to pick

6    between the Chief Product Officer and the Chief Technology

7    Offer -- I'm not going to give you both -- tell me why I should

8    pick one of them.  You must have them in some priority order.

9          **MR. VANZANDT:**  Right.  So, I mean, Your Honor, we've

10   not envisioned limiting it below those three.  We think those

11   three are extremely limited.  We're talking a very small

12   percentage of custodians.  And we are -- I mean, we

13   envisioned --

14         **THE COURT:**  Well, no.  You've already got -- the three

15   that are in -- that we've done the sampling on are in the mix.

16      I'm talking about you want to add whoever the CPO was and

17   whoever the CTO was.

18         **MR. VANZANDT:**  The additional ones?

19         **THE COURT:**  Yes.  Of those two, which is your Sophie's

20   Choice?

21         **MR. VANZANDT:**  Okay.  So for -- of the first two -- if

22   you'll bear with me just a second, Your Honor.

23      (Brief pause.)

24         **MR. VANZANDT:**  I may be misunderstanding this, and I

25   had to consult with a colleague.  Chris Cox is the one that we

```
 1   would specifically want to make sure that's -- I'm sorry.  I
 2   believe he may be part of those three already.
 3        So the three that we have included are Mark Zuckerberg,
 4   Chris Cox and Andrew Bosworth.  And you're asking which of the
 5   two that Meta selected we would prefer?
 6            THE COURT:  No, no, no.  Other way around.  There are
 7   three that we have been previously talking about,
 8   Mr. Zuckerberg and two identified by initials.  Okay?
 9        Basically you want to add two more.  And you told me one
10   of them is the Chief Product Officer since 2005.  The other one
11   is Chief Technology Officer since 2005.
12            MR. VANZANDT:  Okay.  I understand.  I misunderstood
13   your question.
14            THE COURT:  Who else do you want to add?
15            MR. VANZANDT:  Right.  So I would like to go back on
16   that.  Those other two are only in the mix because Meta
17   unilaterally put them in the mix.  We didn't -- we never asked
18   for those.  So that's not one of our asks.
19        We would be willing to drop the two that Meta asked for to
20   focus on Mark Zuckerberg, Chris Cox and Andrew Bosworth.  We
21   never asked for the others.
22            THE COURT:  Well, that's water under the bridge.  I
23   mean, we've had a whole hearing about how they got there and
24   whether there was enough communication or not.  I'm not going
25   to revisit that.  It is what it is.
```

```
 1        So as between these two, who is the more important to you?
 2            MR. VANZANDT:  Chris Cox.
 3            THE COURT:  Which is the CPO?
 4            MR. VANZANDT:  He is the Chief Product Officer at Meta
 5   from 2005 to the present.
 6            THE COURT:  Okay.  So I'm not going to add search
 7   terms.  I don't want to hear about adding more search terms to
 8   this pre-2012 period because I've ruled now.  Okay.  That's it.
 9        So the three sample search terms that you came up with,
10   I'm presuming those were, you know, your most important search
11   terms anyway.  And I'm going to add the -- am I supposed to --
12   should I name by name?  I want to make sure I'm not supposed to
13   name somebody by name.
14            MS. SIMONSEN:  There were two individuals identified
15   by initials LB and PR.
16        But, Your Honor, I want to understand.  The three
17   custodians for whom we previously ran plaintiffs' three sample
18   terms, there was not an extensive negotiation that went into
19   running those three sample terms because we were up against --
20   I want to understand if Your Honor is saying you're about to
21   order those three sample terms run and the documents produced.
22   Because we know that those three sample terms are going to
23   generate returns of tens of thousands of documents.
24        I may have misunderstood what Your Honor was saying.
25            THE COURT:  That's a misunderstanding.  So I'm going
```

```
 1   to add Mr. -- is it Hobbs?

 2            MR. VANZANDT:  The one -- I'm sorry, Your Honor.

 3            THE COURT:  The one you want to add?

 4            MR. VANZANDT:  Cox.  Chris Cox, C-O-X.

 5            THE COURT:  Okay.  The three search terms that were

 6   previously part of the sampling are the three search terms.

 7        The custodians are the three previous ones we've talked,

 8   Mr. Zuckerberg, LB, PR, and Mr. Cox.  That is it.  Okay.

 9            MR. VANZANDT:  Understood, Your Honor.  Thank you.

10            MS. SIMONSEN:  So do I understand really Your Honor is

11   ordering us to run their three very lengthy sample terms, which

12   we ran purely for purposes of sampling, not based on

13   negotiation.  You're ordering us to run those three sample

14   terms on these --

15            THE COURT:  Your briefing said that the hit reports

16   came back with around 11,000 documents for LB and PR

17   respectively.

18        Your colleagues in the state agency dispute have been

19   poo-pooing burden where hit reports from states are coming up

20   in well in excess of those numbers.  So I don't see there to be

21   a huge burden to processing and producing the 11,000 or so

22   documents from LB and PR.

23        And it's not a surprise that Mr. Zuckerberg would have

24   around 30,000.  Still not that many compared to how many he

25   could have in general.
```

```
1          So while I understand your attempts to make a burden
2     argument, I don't think -- I don't find it persuasive.
3          MS. SIMONSEN:  I think it's a very, very different
4     situation from the state agencies because we're talking about
5     their position on all of our discovery requests.
6          We've already produced nearly 2 million documents.  We've
7     already collected and reviewed millions of documents.  We are
8     past substantial completion.  We're into depositions.
9          And as I said, we are in the process already.  Our
10    resources are very focused right now on getting plaintiffs the
11    documents from outside the relevant time period on the other
12    end that they already requested.
13         May I ask, Your Honor, would it be possible at least to
14    give the parties an opportunity to confer on the three sample
15    terms?  Because we had to run those on very short notice so
16    that we could get reports to you.
17         THE COURT:  Yes.
18         MR. VANZANDT:  There were negotiations before those
19    sample search terms.
20         THE COURT:  I'm going to order you to try to
21    renegotiate those terms, if you can't make a good faith effort
22    to renegotiate them and try to, you know, come to mutual
23    agreement on, you know, addressing each other's concerns.
24         MR. VANZANDT:  We are certainly willing to do that,
25    Your Honor.
```

1        Again, Meta's concerns seems to be timing.  We're willing

2   to accept Your Honor's ruling as to the three sample terms,

3   which were negotiated and then finally end this once and for

4   all so they can stop worrying about the timing and substantial

5   completion.  We can run the terms, get the documents produced.

6        We certainly will confer, but that will further delay, and

7   Meta continues to add obstacles in the way to delay this and

8   then claim that we're too late because of the timing.

9        **MS. SIMONSEN:**  That's not a fair accusation, Your

10  Honor.  When you ordered -- when Your Honor ordered plaintiffs

11  to propose sample search terms in August, they waited, I think,

12  over three weeks to send us sample terms.  They were wildly

13  divergent from the instructions Your Honor gave about linking

14  specific concepts of harm to specific features.

15       They also proposed, I think, four sample terms, even

16  though Your Honor had said two to three.

17       So we went back to them and said:  It's got to be limited

18  to two to three, and you need to be linking concepts of

19  features and harms in your terms.

20       And by the time we got their search terms back, we were

21  upon the next DMC, and Your Honor had previously ordered that

22  we make progress on this.  And so we had to go ahead and run

23  the search terms.

24       And we did it against our two representative custodians.

25  That was how we selected those folks.  It wasn't an effort to,

```
 1    you know -- we had been trying to work with plaintiffs.  We had

 2    told them that we objected to the custodians they had selected.

 3         So I do think it's appropriate for there to be a further

 4    negotiation on these search terms.  We can do it next week.  I

 5    can commit that we'll work with them in good faith to try to

 6    get it done next week.

 7              THE COURT:  So ordered.  Finish it by the end of next

 8    week.

 9              MS. SIMONSEN:  Thank you, Your Honor.

10              THE COURT:  All right.

11              MR. VANZANDT:  Thank you, Your Honor.

12         Certainly, plaintiffs will confer on the search terms.

13    You know, it -- some of that -- obviously, the change in the

14    search terms could render some of the hit reports moot and

15    we're going to endeavor that.

16         Every time we've left on this issue and endeavored to work

17    it out, we've had to come back to discuss it before Your Honor.

18    So plaintiffs are here willing today to --

19              THE COURT:  Well, so just to be clear.  I'm not going

20    to add any more custodians.  I'm not going to add any more

21    search terms.  All right?

22         So the goal here is to narrow this so you can get it done.

23    Okay?  I'm going to say what I said last week.  A lot of this

24    discovery, you've just got to get it done.

25              MR. VANZANDT:  So just to understand Your Honor's
```

```
1   ruling.  So plaintiffs can have these -- the three search
2   terms.  We've limited it to these three search terms and now
3   we're supposed to now go narrow those even further?
4        THE COURT:  If you can.  If they've got legitimate
5   concerns that you agree with can be mitigated, then you should
6   do that; right?
7        I mean, again, it's a -- it's supposed to be a
8   collaborative process; right?  If the search terms are
9   demonstrably broad in some way that can be reasonably narrowed,
10  I don't see why you wouldn't agree to that, to expedite the
11  production of the documents especially.
12       MR. VANZANDT:  Understood, Your Honor.  Again, we did
13  discuss those and negotiate those, and we will do that again
14  and hope that we can resolve this specific issue without coming
15  back to Your Honor.
16       THE COURT:  I fully -- I will be very disappointed if
17  you have to come back to me on this issue yet again, okay.
18       MS. SIMONSEN:  Understood, Your Honor.  Thank you.
19       MR. VANZANDT:  Thank you, Your Honor.
20       THE COURT:  Time for a break I think.
21       THE CLERK:  We're off the record.
22       (Whereupon there was a recess in the proceedings
23        from 2:38 p.m. until 2:55 p.m.)
24       THE CLERK:  Now recalling 22-3047.
25       THE COURT:  Okay.  We saved the bigger issue for the
```

 1  closing, which is state agency discovery.

 2      **MS. SIMONSEN:**  Your Honor, if I may.  Ashley Simonsen,

 3  Covington and Burling, for the Meta defendants.

 4      I wanted to follow up on one quick item on the issue we

 5  just argued, which is that of the four custodians for whom Your

 6  Honor just ordered us to negotiate, one of them is scheduled to

 7  be deposed tomorrow.  She is one of the custodians that I heard

 8  Mr. VanZandt say plaintiffs -- it was not -- she was not one of

 9  plaintiffs' picks.  She was one of the two that Meta proposed

10  for purposes of sampling.

11      So I would ask that in order to avoid having to

12  potentially reschedule this deposition so we can get these

13  documents out before and given that it wasn't one of

14  plaintiffs' choices that we drop her from the list of four

15  custodians.

16      **THE COURT:**  Any objection?

17      **MR. VANZANDT:**  Your Honor, we certainly want the

18  deposition to move forward tomorrow.  Wouldn't agree to drop

19  this custodian only for that reason.

20      Certainly plaintiffs would prefer to go with our three

21  preferred custodians, and we would be willing to drop the

22  custodian then.  That would -- that would cure the issue.

23      We're not interested in -- so we don't want to drop the

24  custodian, but the deposition can move forward tomorrow.

25      **THE COURT:**  Okay.  You're going forward, then, with

1  the understanding that you're taking the risk that further

2  deposition of that witness may not be allowed, even if

3  documents are produced later.

4          **MR. VANZANDT:**  Understand, Your Honor.

5          **THE COURT:**  Okay.  You're accepting that risk.

6      They're not going to drop it.

7          **MS. SIMONSEN:**  Okay.  Thank you, Your Honor.

8          **MR. VANZANDT:**  Okay.  Thank you.

9          **THE COURT:**  Anything else before?

10     Okay.  What's the next issue?

11         **MS. HAZAM:**  We just wanted to clarify -- Lexi Hazam

12  for plaintiffs.

13     Your Honor, we just wanted to clarify a statement you made

14  earlier with regards to the letter brief that was submitted and

15  the forthcoming decision on the privilege dispute related to

16  Meta deponent Miki Rothschild.

17     Yes.  We're not sure we understand the Court's guidance

18  correctly on the procedural point about the sealing and the

19  communicating with the parties about it.  If could you repeat

20  that so that we make sure we understand it?

21         **THE COURT:**  The Court's intention is to attach revised

22  versions of the three exhibits to the order to show where any

23  changes to redactions would be made.  But in order for those

24  changes to redactions to be made, Meta would have to do them.

25  I can't send them to plaintiffs' counsel; right?

1          **MS. HAZAM:**  I see.  Understood.  And so in the initial

2    ruling would those -- exhibits would be provided solely to Meta

3    counsel; correct?

4          **THE COURT:**  I'm not going to issue the ruling to

5    Meta's counsel.  I'm just going to send the exhibits with

6    instructions on how to change them to Meta's counsel.  Once I

7    get them back, then I'm going to issue the ruling with those

8    attached as exhibits.

9          **MS. HAZAM:**  Understood.  And the parties have

10   submitted the dates for that deposition to the Court, just

11   making sure.

12         **THE COURT:**  I believe so.

13         **MS. HAZAM:**  Yes.

14         **THE COURT:**  Yes.

15         **MS. HAZAM:**  Thank you, Your Honor.

16         **MR. IMBROSCIO:**  Michael Imbroscio for Covington on

17   behalf of Meta.

18      That's fine.  The other wrinkle is confidentiality.  Those

19   documents attached, we need to sort out the confidentiality.

20   We're going to do our submission, I think it's on Monday.  The

21   due date is on Monday.

22      Documents themselves are still, set aside the privilege,

23   subject to the confidentiality order.  If they are going to be

24   attached to the order, it presents a challenge.

25         **THE COURT:**  When I -- okay.  So you've got a

1    procedural part.  When I issue the order, of course, it will be

2    filed under seal pursuant to the protective order.  It's going

3    to be -- not privilege issues because it's under the -- the

4    documents are under the protective order.

5        I think there's language -- there will -- there is or

6    there will be language that will order the parties to confer.

7    Look at the order itself and see which parts of it need to be

8    redacted for purposes of filing a public version, completely

9    public version of the order without the attachments.

10        MR. IMBROSCIO:  I think our deadline -- that makes

11    sense.  Our deadline is, like, Monday.  Should -- given the

12    imminence of it, should we wait and see what your order is and

13    then we can --

14        THE COURT:  What's the deadline for?

15        MR. IMBROSCIO:  Our deadline for -- for substantiating

16    the confidentiality for the original filing from three --

17        MS. HAZAM:  The briefing.  The briefing, Your Honor.

18        MR. IMBROSCIO:  The briefing, yes.

19        THE COURT:  Back up.  The briefing on --

20        MR. IMBROSCIO:  When we did the briefing, we attached

21    the documents.  They are in the court file, but they are

22    subject to the confidentiality.  We need the -- the 21 days

23    that will elapse on Monday for establishing what should or

24    should not remain confidential.

25        THE COURT:  In the briefing --

1          **MS. HAZAM:**  That's right.  In other words, attached to

2     the briefing were confidential documents beyond what Meta

3     submitted to Your Honor in chambers.  Does that make sense?

4          **THE COURT:**  Yes.

5          **MS. HAZAM:**  Okay.

6          **THE COURT:**  Well, that's a separate set of documents

7     from any order anyways.  There's no reason to delay that.

8          **MR. IMBROSCIO:**  Okay.

9          **THE COURT:**  You should -- that's just -- that's

10    logistically administrative, a large part, I would assume.  So

11    go ahead and do that.

12         Hopefully, the order part -- you'll have it anyway.  The

13    lawyers will have it.  You can go forward with whatever you

14    need to with the order.  Getting it -- you know, getting a

15    redacted public version of the order out is something I hope

16    you'll do, you know, promptly, but it -- it shouldn't delay

17    other stuff in the case.

18         **MR. IMBROSCIO:**  Understood.

19         **MS. HAZAM:**  Understood.  Thank you, Your Honor.

20         One other very brief housekeeping matter.  The -- Judge

21    Gonzalez Rogers has set the February case management conference

22    for February 12th, which I believe is a Wednesday.  And this

23    Court's discovery management conference is, I believe, still

24    set for the following week, either the 19th or the 20th.

25         The parties wanted to ask the Court if it would be

1   feasible to have the discovery management conference on the

2   same week as the case management conference, meaning the week

3   prior, and if possible on February 11th.  I believe that's a

4   Tuesday.

5            THE COURT:  Ms. Macias says no, not the 11th.

6            THE CLERK:  Not the 12th or the 13th.  The only day we

7   could have it is the Friday the 14th.

8            THE COURT:  If people want to say over until Friday

9   the 14th who are coming in from out of town?

10           MS. SIMONSEN:  Did I understand that the -- this is

11  Ashley Simonsen for the Meta defendants -- that the 13th does

12  not work?

13           THE COURT:  My calendar shows another discovery

14  management conference in another big case that day.

15           MS. SIMONSEN:  Got it.  Understood.

16           MS. HAZAM:  So neither of the dates next to the case

17  management conference are available; is that correct?

18           THE CLERK:  You're right.

19           MS. HAZAM:  Okay.  We will --

20           THE COURT:  So that week the available day is the

21  14th.  I mean, your CMC with Judge Gonzalez Rogers is in the

22  morning; right?

23           MS. HAZAM:  It is, Your Honor.  I don't yet know the

24  items that will be on the agenda.  Usually it finishes by

25  midday.  So we could discuss the possibility of doing it that

```
 1   afternoon afterwards.  Is that a possibility?
 2             THE COURT:  I'm told by my staff no.
 3             MS. HAZAM:  I am hearing from our side that there
 4   might still be a preference for the same week, if it's
 5   feasible.
 6             THE COURT:  The 14th?
 7             THE CLERK:  No the whole week.
 8             THE COURT:  No the whole week, I'm now told.
 9             THE CLERK:  Sorry.
10             MS. HAZAM:  That may answer that.
11             THE COURT:  Monday is President's Day.  Let's keep it
12   on calendar for where it is now and I'll -- after this I'll
13   talk to my staff further.
14             MS. HAZAM:  Understand.  Thank you, Your Honor.
15             MS. SIMONSEN:  Thank you, Your Honor.
16      And Mr. Drake has reminded me that in her order setting
17   the February 12th CMC, that judge indicated she might move it
18   to the afternoon.
19             THE COURT:  Oh, well, okay.
20             MS. SIMONSEN:  To the extent that date is still on the
21   table.
22             THE CLERK:  No.  Sorry.
23             THE COURT:  I will meet-and-confer with my staff.
24             MS. HAZAM:  Thank you for your consideration.
25             MS. SIMONSEN:  Thank you, Your Honor.
```

1          **MS. HAZAM:**  The personal injury is closed for

2    plaintiffs -- oh, there is one other thing for them.  Never

3    mind.

4          **MR. MURA:**  Andre Mura for the plaintiffs.

5       I just wanted to put on your radar, I mentioned this to

6    Mr. Drake before, that we're preparing a joint letter brief on

7    an issue that was in the unripe section about recall chats.

8    It's now -- we've narrowed our disputes, which I think is good,

9    but there still remains an aspect of the dispute that will be

10   coming to you in that letter brief on Friday.

11      I just wanted to let the Court know that so it was on its

12   radar.

13         **THE COURT:**  Which one?

14         **MR. MURA:**  It's --

15         **THE COURT:**  Unripe number -- do you have a number for

16   me?

17         **MR. MURA:**  I do not have it before me, Your Honor.

18         **MR. DRAKE:**  I have it.  Geoffrey Drake, King and

19   Spalding, for the TikTok defendants.

20      This would be --

21         **THE COURT:**  Unripe number --

22         **MR. DRAKE:**  -- Section G-5, "Timing of TikTok's

23   production of recalled log chats."

24         **THE COURT:**  So you're expecting to file something next

25   week on this?

1          **MR. MURA:**  This Friday, Your Honor.

2          **THE COURT:**  While we're on that.  With regard to Meta,

3   in the ripe dispute section a letter brief was supposed to have

4   been filed yesterday on Meta deponent -- question of Meta

5   deponent re compensation.  Did the stipulation resolve that?

6          **MS. SIMONSEN:**  Essentially yes, but in connection with

7   those discussions, we also resolved a separate question

8   relating to compensation questions in deposition.  So there was

9   no need to file the letter brief, so nothing to argue today.

10      Thank you, Your Honor.

11          **MS. HAZAM:**  Thanks, Your Honor.

12      And that completes everything that the personal jury and

13  school district plaintiffs had for today, but we wanted to make

14  sure the Court had no other inquiries for us.

15          **THE COURT:**  Are you folks planning to leave?

16          **MS. HAZAM:**  Perhaps.

17          **THE COURT:**  Well, I have to stay.

18          **MS. HAZAM:**  It will still be a very full courtroom.

19          **THE COURT:**  Okay.  So in the administrative section,

20  if you have the DMC statement in front of you, this is State

21  AGs -- oh, is there anything -- let me see.

22      While I'm doing it, Meta and the State AGs requested the

23  Court order limitations -- I'm looking at Section Roman Numeral

24  I-A-2.  Order limitations in regard to service of additional

25  RFPs with two qualitative exceptions.

1      Do you see where I am?

2            **MS. SIMONSEN:**  Yes.

3            **THE COURT:**  And I think you -- the parties asked me to

4      basically so order that agreement; is that right?

5            **MS. SIMONSEN:**  Yes, Your Honor.  Thank you.

6            **MS. O'NEILL:**  Megan O'Neill for the State AGs.  That's

7      correct.

8            **THE COURT:**  So ordered.

9            **MS. O'NEILL:**  Thank you.

10           **MS. SIMONSEN:**  Thank you.

11           **THE COURT:**  Okay.  And then Meta versus PI plaintiffs

12     was about compensation.  You filed the stip.  I didn't see

13     anything else there.

14           **MS. SIMONSEN:**  I think the only other item, Your

15     Honor -- this is Ashley Simonsen for Meta -- is a

16     memorialization of the parties' revised agreement on hyperlink

17     productions --

18         (Court reporter clarification.)

19           **MS. SIMONSEN:**  I think the only other item is a

20     memorialization of the parties' agreement on the hyperlinks.

21           **THE COURT:**  That right.  I have that highlighted.  So

22     we're looking at, again, for the record, DMC status report of

23     statement, Section B-3, Subparagraph 6.  The parties agreement,

24     pending the Court's consent, on the timeline for hyperlinked

25     documents.

1          You want me to so order that?

2          **MS. SIMONSEN:**  We're happy to just have it

3    memorialized in the DMC statement, Your Honor.

4          **MS. HAZAM:**  That's fine as well, Your Honor.

5          **THE COURT:**  All right.  So memorialized then.

6          **MS. SIMONSEN:**  Thank you, Your Honor.

7          **MS. HAZAM:**  Thank you, Your Honor.

8          **THE COURT:**  Thank you for resolving all those issues.

9          Okay.  So I don't think -- the section on YouTube and PI

10   plaintiffs, I don't think there's anything that you're asking

11   me to talk about today.  So I think your set of plaintiffs are

12   done for today.

13         **MS. HAZAM:**  Thank you, Your Honor.

14         **THE COURT:**  Again, unless there's something in the

15   unripe dispute section you wanted to talk about.

16         **MS. HAZAM:**  No.  I think the only matter was the one

17   raised by Mr. Mura just now.

18         **THE COURT:**  Okay.

19         **MS. HAZAM:**  Thank you, Your Honor.

20         **THE COURT:**  Okay.

21         **MS. SIMONSEN:**  Thank you, Your Honor:

22         **MR. SCHMIDT:**  Good afternoon, Your Honor.  Paul

23   Schmidt for Meta.

24         **MS. O'NEILL:**  And, again, Megan O'Neill for the People

25   of the State of California, speaking on behalf of the State

1    AGs.

2        **THE COURT:**  Okay.  So from what I can tell based on

3    Docket Number -- what is it -- 1441 regarding Kansas, and

4    Docket 1430, the letter brief on state agency production of

5    documents, and Docket 1429 California's update, tell me if I'm

6    wrong, because I could be wrong, the state agencies that are

7    refusing to comply with the discovery orders at all and are

8    demanding subpoenas are the New York Office of the Governor,

9    the New York State Division of the Budget, the -- the

10   California agencies we have previously discussed in a prior

11   hearing, and the Kansas Governor's Office, and all agencies, I

12   think, under the Kansas Governor.  Is that correct?  Are there

13   any others I'm missing?

14       **MR. SCHMIDT:**  Yes, there are others that aren't on

15   that list.

16       For the record, there are five governors -- five agencies

17   under the Kansas Governor's Office, as Your Honor noted.

18       In New York I think the list is broader.  The list we have

19   of agencies we have not deprioritized that are covered by the

20   letter that New York submitted are the New York Governor, the

21   Division of Budget, the Office of Children and Family Services,

22   the Council on Children and Families -- and I apologize if I'm

23   going too quickly -- the Department of Health, and the Office

24   of Mental Health.

25       **MS. O'NEILL:**  And, Your Honor I'm going to pass the

 1   podium to counsel for the relevant State AGs and agencies here.

 2         **THE COURT:**  So I have the list right, it's the Office

 3   of the New York Governor, New York State Division of the

 4   Budget, New York Children and Family Services.  Did you say

 5   New York Council?

 6         **MR. SCHMIDT:**  Council on Children and Families.

 7   That's a separate entity.  Council on Children and Families.

 8         **THE COURT:**  Is it council "on" or "and"?

 9         **MR. SCHMIDT:**  "On."

10         **THE COURT:**  All right.  Then New York Office of Mental

11   Health and New York Department of Health?

12         **MR. SCHMIDT:**  Yes, Your Honor.

13         **THE COURT:**  Okay.  And then the Kansas agencies, and

14   then the California agencies we've talked about previously.

15         **MR. SCHMIDT:**  Yes.

16         **THE COURT:**  Okay.  Okay.

17         **MR. SCHMIDT:**  We do have an update on California in

18   terms of their letter though, but we can take up the other ones

19   first.

20         **THE COURT:**  Okay.  You want to talk about New York

21   first?

22         **MR. WALLACE:**  Thank you, Your Honor.  Kevin Wallace

23   from the New York State Attorney General's Office.

24     I guess we would contest that the New York Department of

25   Health, the New York State Office of Children and Family

 1    Services and the Office of Mental Health and the Council on

 2    Children and Families are included within the letter from the

 3    Council to the Governor, but those entities have already

 4    received Rule 45 subpoenas and are engaged in the process of

 5    negotiating search terms and productions.

 6        So that while the legal position counsel is taking is the

 7    same, they are, in fact, engaged in the process of negotiating

 8    a production of documents from those agencies.

 9            **THE COURT:**  Okay.

10        **MR. SCHMIDT:**  Your Honor, I don't think the New York

11    AG can speak for those agencies.  The letter that was submitted

12    to the Court states the New York State Attorney General does

13    not represent the executive agencies in connection with this

14    matter.

15        Those are the very agencies -- those include the very

16    agencies that are listed.  And what they are asking for in the

17    letter, which we think is improper, long waived, not properly

18    raised now --

19            **THE COURT:**  You're talking about the letter that was

20    filed just before the DMC today?

21        **MR. SCHMIDT:**  There was some kind of ex parte

22    communication regarding it last night that Your Honor issued a

23    minute order on, and then it got refiled, I think, with a

24    pro hac request and then refiled again without the pro hac

25    request just the hearing.

1          **THE COURT:**  Okay.  So, first of all, it's very clear I

2    have ordered, Judge Gonzalez Rogers has ordered all the

3    attorney generals to be coordinating with all the agencies.  So

4    to the extent I take the report as to what's going on with the

5    agencies as a report, whether or not you represent them; is

6    that correct?

7          **MR. WALLACE:**  Correct, Your Honor.  We have been

8    involved in the -- or at least participating on the

9    communications between outside counsel for the Governor and

10   counsel for Meta.

11         **THE COURT:**  So I don't think it's improper for them to

12   be at least reporting to me on what those agencies are doing.

13       Did you dispute that you're in negotiations with those

14   one, two, three -- four agencies on search terms and

15   custodians?

16         **MR. SCHMIDT:**  No.  We've -- let me let Mr. Yeung

17   address that.

18         **MR. YEUNG:**  Christopher Yeung for Meta.

19       We have been having discussions.  To call them

20   negotiations I think may be a little more of a stretch.

21       They proposed four search terms to us well after the

22   November 1 deadline by which they had to propose search terms

23   to us that your court set.  They have yet to move off of those

24   search terms.  They have yet to provide any -- any movement.

25   And we think those four search terms, which are included in

```
 1    the -- which are included in the joint letter briefing, just
 2    are facially deficient.
 3         So, yes, they are discussing, but there has been no
 4    movement and we've narrowed several times in response.
 5              THE COURT:  I'm really trying to identify those folks
 6    first who are just simply not engaging at all.
 7         So whether you think they are substantially complying or
 8    even -- you know, whatever, they have actually communicated
 9    with you, so let's put them aside for a second.
10         So the agencies that are just simply not engaging at all
11    are New York Office of the Governor, New York State Division of
12    the Budget, the Kansas Governor's's Office and the agencies
13    under that, and subject to whatever update you have, the
14    California agencies; is that right?
15              MR. YEUNG:  Yes.
16              MR. SCHMIDT:  The only thing I would say, just as a
17    final point on these four New York agencies, is they did say in
18    their letter to the Court:  The executive agencies are not
19    subject to jurisdiction and are thus not bound by orders of the
20    Northern District of California.
21         So we will continue to negotiate with them subject to what
22    Your Honor rules today, but it's hard to do that when as we're
23    negotiating with them, they take this position that they are
24    not bound by the Court's orders.
25              THE COURT:  So I literally had no time to read Docket
```

 1    1443 that was submitted at the last minute.  To the extent it

 2    is an improper attempt to move for reconsideration of my prior

 3    discovery orders, it is improper and it's rejected.

 4         So that -- nobody is -- I mean, you want to -- I mean,

 5    people have appealed it, so I don't know at this point in the

 6    procedure whether anybody can ask for reconsideration, but even

 7    if you can't, this is not the way to do it.

 8         So to that extent -- I mean, people are free to say

 9    whatever they want.  It's a free country, but that doesn't mean

10    I'm bound by it and it's certainly not something that has been

11    properly presented to the Court.

12         I did see towards the end of it there is some request to

13    stay any discovery order.  Again, that is not procedurally

14    presented to me in any proper way.  So that's -- I don't even

15    know if I need to deny it formally.  It's just not -- it's not

16    proper.

17         **MR. WALLACE:**  Thank you, Your Honor.

18         It was late enough that I have not printed it, so I don't

19    have it in front of me, Your Honor.

20         I believe the request for a stay was something -- a

21    negotiating position they took early on and they have

22    withdrawn.  And the position they were taking was that if Meta

23    issued a Rule 45 subpoena, as they have done for some other

24    states, that they would produce the documents.  That's, I

25    believe, the bottom line position in the letter, but I confess

```
 1    I don't have it in front of me right now.
 2          THE COURT:  It's flat out, they -- Executive Agencies
 3    respectfully request the Court stay its September 6, 2024
 4    discovery order, blah, blah, blah, with respect to --
 5          MR. WALLACE:  Clear as day.  Understood.
 6          THE COURT:  It's not properly presented as a motion,
 7    so it's not even considered.  It's denied on procedural grounds
 8    at a minimum.
 9          MR. WALLACE:  I just wasn't sure, Your Honor, if there
10    are other issues you want to cover with those states, that we
11    should stay up or --
12          THE COURT:  Well, no.  Okay.  So as to the New York
13    Office of the Governor, the New York State Division of the
14    Budget, the Kansas agencies, why don't we -- is somebody here
15    from Kansas?  Why don't we hear from Kansas?
16          Is Kansas actually not engaging with Meta?
17          MS. SCHRADER:  Kaley Schrader for the Kansas Attorney
18    General's Office, Your Honor.
19          No.  We are actively engaging with our agencies in order
20    to get them to comply.  While noted in our filing today, that
21    those agencies are underneath the control of the Governor, some
22    of those agencies have been cooperate -- more cooperative, so
23    not all of them are refusing to comply.
24          Essentially we filed this notice today to inform the
25    Court -- we were not asking for reconsideration.  We were
```

 1    informing the Court of the governor's position.

 2         While I will say that they do oversee some of those other

 3    state agencies, that doesn't appear to be the other state

 4    agencies' position.  I think they look to our Governor's Office

 5    for guidance.

 6         We do have one of those agencies that was listed in there

 7    in particular, our Department of Health and Environment, that

 8    is preparing to produce documents.  So they are actively going

 9    through documents and preparing to produce those.

10         Our Governor's Office is requesting a Rule 45 subpoena.

11    We did let Meta's counsel know that last week, that that is the

12    position that the Governor's Office has taken.

13         I think you will also see by the filing today that our

14    Governor's Office has requested to be heard in this matter,

15    which we don't really have a position one way or another on it.

16    I think the Court has been pretty clear on your stance on

17    hearing the non-state or non-parties.

18         But as far as the other agencies go, they are actively

19    complying.  Even our Governor's Office has been complying.

20    They have provided custodians.  They did provide a hit report.

21    So we have been very actively engaging with them and with

22    Meta's counsel in order to negotiate to get the search terms

23    and all of that more reasonable so that our agencies are able

24    to comply.

25              **THE COURT:**  Other than the Governor's Office, are any

 1   other Kansas agencies demanding a subpoena before complying?

 2        **MS. SCHRADER:**  I believe that our Department of

 3   Administration and Department of Aging -- Disability and Aging

 4   Services have requested a subpoena.

 5        I do know -- and I apologize, I seem to have lost my

 6   sticky note.  I know some of our agencies have already received

 7   Rule 45 subpoenas.

 8        It really is the Governor's Office that is demanding the

 9   Rule 45 subpoena.

10        **THE COURT:**  Okay.  Does that comport with Meta's view

11   on what's happening in Kansas?

12        **MR. SCHMIDT:**  No, it doesn't, in the sense that we

13   don't know what's happening with Kansas.

14        Just this morning we received a filing from the AG saying

15   that these agencies, five plus the Governor, have not of yet

16   complied with the Court's September 6, 2024 discovery orders.

17   The next page of it said the Attorney General has been unable

18   to move the Governor to comply.

19        So we did not have Kansas, any Kansas agencies in this

20   facially-we-refuse-to-comply bucket in our motion because for

21   the first time we heard this this morning.  Some of them had

22   not complied with the search term or custodian requirements.

23   Some of them, in our very liberal definition of compliance,

24   had.

25        Now, we're not sure where that leaves them, if they're

1    taking the position that they don't control them and they can't

2    enforce as to them and we get a wave of communications that

3    we've never seen before.  An October 15th letter we've never

4    seen before that was submitted to the Court.  A November 14th

5    email with detailed hit terms we haven't seen.  A December 6th

6    letter that would have been useful before our joint filing on

7    the 9th that we just now see that's purportedly written to Your

8    Honor from counsel for the Governor.

9        So if their representation is it's just the Governor and

10    we really are going to get compliance from the others, I think

11    we accept that representation, that's consistent with our

12    course of dealing until today, the Governor should be put in

13    that category then.

14            **THE COURT:**  Okay.  All right.  What is the update with

15    California?  Maybe you want to go first?

16            **MR. SCHMIDT:**  Sure, I will go first.  Paul Schmidt for

17    Meta again.

18        California submitted a paper that we thought was not

19    proper on Monday reporting on discussions we've had with them.

20    We are having discussions with them.  I don't know if those

21    will lead to anything, but we are doing that in good faith.

22        The letter requested a stay, as did the New York letter

23    that we talked about earlier.  I was able to confer with

24    Ms. Prinzing before and she -- I'll let her represent, but she

25    represented to me that California is not, in fact, requesting a

 1   stay, the California Governor and these specific agencies, in

 2   which case we think the submission doesn't belong on the

 3   docket.

 4         THE COURT:  Okay.  All right.  Well, go back.  Are

 5   there any California agencies that are refusing to engage

 6   entirely?

 7         MR. SCHMIDT:  Well, it's the same California agencies.

 8   We offered to talk to them in confidence to see if there was

 9   some pathway to resolve things, which is why we don't think

10   this is a proper submission, from our perspective, until they

11   comply.  It's the same agencies that are refusing to engage in

12   the process.

13         THE COURT:  Okay.  Are there -- are the California

14   agencies refusing to engage in the process?

15         MS. PRINZING:  Good afternoon, Your Honor.  Margaret

16   Prinzing on behalf of non-parties:  The Office of the Governor,

17   the California Office of Data and Innovation, the Governor's

18   Office of Business and Economic Development, the Department of

19   Finance, the Department of Public Health, the Department of

20   Consumer Affairs, and the Business, Consumer Services and

21   Housing Agency.

22         I strongly disagree that we're refusing to engage in the

23   process.  While the Governor and the Executive Agencies

24   maintained their position with respect to the Attorney

25   General's Office not having control over the documents from

1  their offices for the reasons outlined in our letter

2  submission, it is our intent for the parties not to have to

3  litigate that issue further, for Your Honor not to have to

4  expend any more time on it --

5          THE COURT:  I'm not spending any more time on it.

6          MS. PRINZING:  Because we have engaged --

7          THE COURT:  I am not spending any more time on it.

8  This is not a proper motion for reconsideration, if that's what

9  it was intended to be.

10         MS. PRINZING:  It's absolutely not intended for that.

11 It was submitted with the caption as a "Status Report and

12 Statement."  The letter was intended to preserve our position.

13 It was not queued up as a motion or anything of that nature.

14     It was intended to preserve our position, but,

15 importantly, to inform Your Honor that we are engaging in the

16 process; that we have engaged with Meta in a meet-and-confer

17 effort to try to get the discovery that they need through that

18 process.

19         THE COURT:  Okay.  And has -- have the California

20 agencies provided hit terms, custodians and proposed search

21 terms?

22         MS. PRINZING:  We just received the search terms on

23 Monday afternoon.

24         THE COURT:  Have you proposed?

25         MS. PRINZING:  No.  We met-and-conferred with Meta,

1    and the -- the process was that Meta would provide us with

2    search terms, which we received on Monday, and the clients are

3    working with those search terms now.

4          THE COURT:  Okay.

5          MS. PRINZING:  We conferred right before this session,

6    and we will report to them back at the end of the week with

7    how -- what progress we're able to make.

8          THE COURT:  Are you going to provide hit reports?

9          MS. PRINZING:  We are working to provide hit reports.

10   But since we just received the search terms on Monday, it would

11   not -- it's simply not possible to provide hit terms in that

12   abbreviated period of time.

13         THE COURT:  I'm sure your colleagues have told you my

14   previous directions in this case on how negotiations like these

15   should go.  It is productive to be transparent and to provide

16   hit reports when you can, as quickly as you can.

17         MS. PRINZING:  That's absolutely our intention to do

18   so.

19         THE COURT:  Okay.

20         MS. PRINZING:  Again, subject to the meet-and-confer

21   discussions that we're having.

22         THE COURT:  Okay.  But your -- you've blown the

23   deadlines; right?  I mean, that's -- that's the problem I have

24   here.

25         Well, are they -- are they, in fact, engaging with you and

```
 1    are they -- despite having preserved their positions, are they

 2    trying to work things through with you or not?

 3            MR. SCHMIDT:  We don't know yet.  We had a productive

 4    discussion Friday that was driven by us.  That followed an

 5    earlier discussion.  We gave them our views on Monday in

 6    writing, and we're waiting to hear back.  So I don't know.

 7        What I can say is that there has been -- there has not

 8    been compliance with the terms of Your Honor's rulings.  And

 9    this is an instance, which is why I would have preferred that

10    it not be raised with the Court in the setting where we are

11    trying to be above and beyond reasonable with them, and now the

12    suggestion is we didn't give them terms early enough or

13    something like that.  That's just not fair.

14            THE COURT:  Okay.  What I want by Tuesday of next

15    week, very short, a one-page letter evenly divided between you

16    two parties with a plan to get this done as between -- a

17    schedule, that's all I want -- all right? -- to get this done

18    as between the two of you.  Okay?  And I'm expecting it to be

19    an agreed-upon schedule if -- because we're running out of time

20    and you've got to get this done.  Okay?

21            MS. PRINZING:  Understood, Your Honor.

22            THE COURT:  All right.

23            MR. SCHMIDT:  And we, obviously, need to hear back

24    this week to be able to even have a hope of doing that.

25            THE COURT:  If you can get them the letter before
```

```
 1  Friday to get that ball rolling, you should, if you can.  But
 2  you should start negotiating immediately that schedule to get
 3  this all done.  Okay?
 4          MS. PRINZING:  Absolutely, Your Honor.
 5      I do -- for the purpose of the record, we were retained
 6  recently, but our clients have been reaching out to Meta
 7  throughout October, November.
 8          THE COURT:  Glad counsel is involved.  I'm hoping --
 9  I'm going to be optimistic that you're able to work things out
10  on an expedited basis given the schedule in this case.
11          MS. PRINZING:  Understood, Your Honor.
12          THE COURT:  I don't think you were here at the last
13  discovery management conference, but the very clear directive
14  from Judge Gonzalez Rogers is to get this discovery done.
15  Okay?  And that means everybody is going to have to make
16  compromises and work hard to get it done.  I understand that,
17  but that's where we are.  Okay?
18          MS. PRINZING:  Understood.
19          MR. SCHMIDT:  And, Your Honor, just on that point.  We
20  have a pending direction from Judge Gonzalez Rogers on this
21  issue that we are working on and we've talked with the State
22  about.  I don't understand that to be affected in any way by
23  Your Honor's ruling.
24          THE COURT:  It is not.  It is not.  And your briefing
25  on the joint letter brief with regard to specifically the
```

New York Governor and the State Division of Budget, was -- is

it sort of a recommendation or something to Judge Gonzalez

Rogers, if I'm remembering correctly, for me to refer the

agencies to Judge Gonzalez Rogers for further proceedings.

I mean, in the interests of time, I don't need to do --

you just do it directly.  Go to her.

MR. SCHMIDT:  Okay.

THE COURT:  You know, this is not an issue where --

you know, procedurally it's not the way we do report

recommendations in this court anyways.

So she's going to -- she's already made clear she wants to

hear from you on what kind of relief you think you're entitled

to with regard to people who are simply not engaging at all,

and you should approach her with that.

MR. SCHMIDT:  And I take it we would do the same as to

the Kansas Governor.

THE COURT:  Anybody -- I think it applies to anybody.

She will clarify if I'm wrong or if you're wrong, but you're

free to approach her and say, you know, this is what -- I'm not

here to give you legal advice on how to approach her.

MR. SCHMIDT:  Understood, Your Honor.

THE COURT:  Okay.  All right.  That's the first

category of agencies.

The second category is the ones where it's -- I think what

Meta has referred to as the second category of agencies that

 1    are listed in Footnote 2 of Docket 1430, which is:  Agencies

 2    which have not provided some or all of the following -- some of

 3    the following:  Search terms, custodians, hit reports or

 4    transparency about alternative search methods.

 5         And there is a bunch of different states and a bunch of

 6    different agencies within those states.

 7              MS. O'NEILL:  Your Honor --

 8              THE COURT:  Everybody --

 9              MS. O'NEILL:  Excuse me.  I didn't mean to interrupt.

10              THE COURT:  Everybody has Docket 1430 on the list of

11    agencies in Footnote 2.

12         Is there anybody here representing any of those agencies

13    or from those states who wants to take issue with the fact that

14    they are listed as part of this category?

15              MS. O'NEILL:  Your Honor, may I be briefly heard?

16              THE COURT:  Sure.

17              MS. O'NEILL:  Megan O'Neill again from the State AGs.

18              THE COURT:  Sure.

19              MS. O'NEILL:  I wanted to just request whether the

20    Court might be willing to entertain overall argument on

21    cross-cutting issues from the State AGs.

22         There are, of course, counsel from many State AGs and

23    certain agencies here to discuss State specific issues, but we

24    thought it would be helpful for the Court to present certain

25    issues that cut across even categories two and three, and I

1    would be prepared to do so.

2              THE COURT:  Okay.  Before we get there, I just want to

3    make sure that the list in Footnote 2 is undisputed at this

4    point.

5              MS. O'NEILL:  Sure.  I would defer to my fellow State

6    AG counsel.

7              THE COURT:  Here they come.

8              MS. O'NEILL:  Trying to streamline things for you,

9    Your Honor, but I know it can't always be done.

10             MS. BATCHELDER:  Thank you, Your Honor.  Krista

11   Batchelder appearing on behalf of plaintiffs, but State of

12   Colorado.

13        So we do disagree with being put in this bucket of having

14   not provided search terms, custodians, hit reports or

15   transparency about alternative search methods that may be

16   employing the agencies that are listed here, the Behavioral

17   Health Administration, Department of Education, the Governor's

18   Office, and the Office of State Planning and Budgeting.

19        With regards to the Behavioral Health Administration, they

20   were served a Rule 45 subpoena on July 17th, and they produced

21   those documents on September 18th.  On September 23rd -- so

22   after the production.  That subpoena was held in abeyance.  And

23   then on November 14th counsel for Meta met-and-conferred with

24   counsel for the Behavioral Health Administration, and we agreed

25   to supplement our response if Meta had reason to believe that

 1    the prior production was incomplete.  And then we then agreed

 2    to run search terms through its principal agency, CDHS.  And

 3    CDHS has not produced anything to date, but did put a

 4    litigation hold in place on November 8th.

 5         With regards to the other agencies that were listed, we

 6    did provide search terms -- search terms for each of those

 7    agencies, as well as custodians.  We have not been able to

 8    provide hit reports.

 9         And this was explained to Meta that because our agencies

10    use Google Vault, we are limited to the number of characters

11    that we can actually include in a search string.  It's cut off

12    at 2,000.  And it also does the limiters in a different way.

13    It says "about" as opposed to a slash.  And so it makes it very

14    difficult.

15         And so we went back to Meta asking for some guidance on

16    how they would like us to change the search terms that we were

17    working with in order to fit within that 2000 word -- or

18    character limit, and we have not been able to reach an

19    agreement on that.

20         But I will say that we have been working actively with

21    Meta in order to get documents to them.  We have productions

22    ready.  We have already produced for one of -- at least one of

23    our agencies.

24         And I think at the end of the day the goal is to get them

25    the documents they are looking for.  It's just a matter of

1    doing it in a way that is manageable for the agencies.

2           **THE COURT:**  Okay.

3           **MR. SCHMIDT:**  Very quickly, Your Honor.

4           The agency discussed first, Behavioral Health, has

5    produced 262 documents total.  We heard an argument earlier

6    that 30,000 was not burdensome.  262.  They gave no custodians,

7    no search terms, and they wouldn't tell us -- they didn't give

8    us the transparency Your Honor directed.

9           The Department of Higher Education did do custodians and

10   terms, but not hit reports, as we heard.

11          The another ones did not do one or the other, and I can

12   walk through those in detail.

13          **THE COURT:**  Okay.  What I'm hearing is with regard to

14   Behavioral Health Administration, tell me if I'm wrong, they

15   are willing to run search terms through CDHS.

16          **MS. BATCHELDER:**  That is correct, because they are

17   under CDHS.

18          **THE COURT:**  Okay.  So by next Wednesday, a week from

19   today, I want a one-page letter, evenly divided between the

20   parties, that sets forth the schedule to get this done.  It

21   sounds like you're talking.  Just get it done.  Okay.

22          **MS. BATCHELDER:**  Okay.  Thank you, Your Honor.

23          **MR. YEUNG:**  Can I add thing to this?  Christopher

24   Yeung for Meta.

25          In connection with this briefing, counsel for the Colorado

1  agencies at issue said that they were willing to run Meta's

2  proposed search terms, which we propose, on the -- on a number

3  of the agencies subject to working out some technical issues,

4  like she talked about "about" limiters.

5      Our expectation is if we can work through the technical

6  issue of what is exactly the way you need to phrase a limiter,

7  you know, what types of wild cards are permitted, things like

8  that, that they would run the terms that we propose just like

9  they said they would.

10      **THE COURT:**  Did you say you would?

11      **MS. BATCHELDER:**  Yes, we did.

12      **THE COURT:**  Okay.

13      **MS. BATCHELDER:**  And I believe that was part of our

14  submission to Your Honor in the declaration.

15      **THE COURT:**  Okay.  Then, I mean, again --

16      **MR. YEUNG:**  Thank you.

17      **THE COURT:**  You should hold each other to your

18  statements.  Obviously, if -- it will expedite things if Meta

19  knows that there's a way to modify the search terms.  You

20  shouldn't be hesitant to do that if it's reasonable.

21      Do you understand that?  Mr. Yeung?

22      **MR. YEUNG:**  Yes, Your Honor.  I understand.

23      We're going to -- we will confer about ways of modifying

24  the terms in order to make them technologically feasible for

25  them.

```
 1            THE COURT:  Well, not only that.  But if they -- in
 2   the process of this working it out you need to modify the --
 3   substantively modify a couple of the search terms or some of
 4   the search terms --
 5            MR. YEUNG:  Understood.
 6            THE COURT:  -- I don't think you should be hesitant to
 7   do that.  Okay?
 8            MR. YEUNG:  Understood.  I mean, if something is not
 9   running correctly, we will certainly modify it.
10            THE COURT:  Okay.  All right.  Who is next?
11            MR. WALSH:  Your Honor, Kevin Walsh with the State of
12   Ohio.
13        Ohio is listed as a state that did provide -- provided
14   search terms without custodians for at least some agencies.  We
15   provided custodians for every agency.  I think we even --
16            THE COURT:  I don't see Ohio agencies listed in
17   Footnote 2.
18            MR. WALSH:  Yeah, we're down there.
19            THE COURT:  Are you?
20            MR. WALSH:  It's kind of buried in the middle.
21   Department of Children and Youth, right below the New York
22   line.
23            THE COURT:  That's Footnote 3.
24            MR. WALSH:  Page 4?
25            THE COURT:  Yeah.  You're in what I call category
```

1   three.  You're in the Footnote 3 group.

2       **MR. WALSH:**  We're in both.

3       **THE COURT:**  I don't see you in Footnote 2.  Are they

4   in Footnote 2?

5       **MR. YEUNG:**  No, I don't think so.

6       Kevin, this is Footnote 2 (indicating).  You may have an

7   earlier draft.

8       **MR. WALSH:**  Okay.  I have an earlier draft.  I'm

9   sorry, Your Honor.

10      **THE COURT:**  Okay.

11      **MR. WALSH:**  Wait.  So am I -- is this -- do you have

12  me in the footnote where we're not running search terms?

13      **MR. YEUNG:**  We have you in Footnote 3.

14      **THE COURT:**  You're in the footnote of the agencies

15  that are -- that basically have provided partial information,

16  but not --

17      **MR. WALLACE:**  Your Honor, Kevin Wallace for the

18  New York Attorney General.

19      I think the confusion is it's item two in Meta's list and

20  there is two footnotes that drop from it.  So Footnote 3 is

21  inside of category two within what they are listing.  I just

22  think it's a categorization question for all of us.

23      **MR. YEUNG:**  I think Kevin actually does have a -- I

24  have an older draft, because the Footnote 2 is much longer and

25  there was movement, as the AGs know.

1          THE COURT:  Well, while you're up here, let's --

2          MR. WALSH:  Yeah.  Right.  Okay.

3          THE COURT:  If you're in discussions and you haven't

4    provided search terms and you're not -- you're trying to engage

5    and you're trying to work things out, by next Wednesday I want

6    you both to submit a jointly submitted one-page letter that

7    sets forth the schedule for just getting it done.

8          MR. WALSH:  Okay.  Okay.  And our agencies are trying

9    to provide hit counts.  They have provided hit counts, every

10   one of them.  They just can't keep up.  It takes them so long

11   to get a hit count.  By the time we do that, we're -- the

12   negotiation is then moot.

13         THE COURT:  Okay.  So work out a schedule.  Meta --

14   you know, if you need to work out time in the schedule for hit

15   counts to be provided and then all that.

16         MR. WALSH:  Okay.

17         THE COURT:  Work it out amongst yourselves.  It sounds

18   like you're talking, so I encourage that.  Get it done.  Okay?

19         MR. WALSH:  Thank you, Your Honor.

20         MR. YEUNG:  Christopher Yeung for Meta.  Just one

21   clarification.

22         On November 26 the Governor's Office, who had been engaged

23   with us in discussions through Mr. Walsh here, retained new

24   counsel and new counsel essentially restarted the process.

25   Rejected the discussions that we had previously with Mr. Walsh

```
 1   and, you know, narrowed the search to one single piece of

 2   legislation and has -- you know, that has set us back

 3   significantly with respect to the Governor's Office.

 4        So I would ask -- I just wanted to make that -- put that

 5   on the record.  The schedule that we set and that we'll confer

 6   with Mr. Walsh on should, I think, apply to everybody,

 7   including the Governor's Office, who I understand retained new

 8   counsel.

 9             THE COURT:  You have been ordered to coordinate with

10   everybody; right?  So, you know, even if they have separate

11   counsel, you're supposed help coordinate and facilitate that.

12             MR. WALSH:  Okay.

13             THE COURT:  And I'm disappointed to hear that some new

14   counsel comes in and tries to restart everything.  It's your

15   side of the "V" that has accused Meta of trying to do

16   everything from scratch again.  So that -- that --

17             MR. WALSH:  And that is true.  Mr. Yeung is right.  A

18   couple weeks ago the Governor's counsel -- Governor hired

19   outside counsel to deal with this and we do not represent them

20   for purposes of --

21             THE COURT:  You've been ordered to help coordinate and

22   facilitate.  So I assume it doesn't stop you from picking up

23   the phone and trying to talk them through where things are and

24   where -- the directions I've been giving.  Okay?

25             MR. WALSH:  Okay.
```

```
 1                MR. YEUNG:  Thank you, Your Honor.

 2                MR. WALSH:  And is that one -- it's a half a page

 3     each?  One-page letter?

 4                THE COURT:  It's just a schedule.  I don't want

 5     argument.  I want you to work out a schedule just to get this

 6     done.

 7                MR. WALSH:  Thank you.

 8                THE COURT:  All right.  Who is next?

 9                MR. HUYNH:  Good afternoon, Your Honor.  Thomas Huynh

10     for the New Jersey Attorney General and the Division of

11     Consumer Affairs.

12                THE COURT:  So you're not representing the Department

13     of Health, Department of Treasury, the Governor's Office?

14                MR. HUYNH:  Oh, did you want only --

15                THE COURT:  Well, since we're -- I don't want you to

16     come up twice.

17                MR. HUYNH:  Oh, I'm sorry.  I could go back down, if

18     that would be more convenient for Your Honor.

19                THE COURT:  Well, I --

20                MR. HUYNH:  Oh, I should clarify.  So I represent the

21     Attorney General's Office, too.

22                THE COURT:  Yes, okay.

23                MR. HUYNH:  And the Attorney General's Office has been

24     facilitating negotiations with Meta for these agencies, so I am

25     equipped to talk about them.
```

1          **THE COURT:**  Okay.  So have these agencies failed to

2     provide -- they may have said they were going to, failed to

3     provide hit reports, custodians, search terms, transparency?

4          **MR. HUYNH:**  So, Your Honor, we would respectively try

5     to correct the record with regards to the categorization

6     Footnote 2.

7          So with regards to the Department of Health, New Jersey

8     actually provided the custodian for the Department of Health,

9     Jennie Blackney, program manager for Family Health Services, on

10    October 17, 2024.  We note that this was in supplementation to

11    an email that we originally sent other custodians to.  So it

12    may have been missed by Meta for that respect.

13         The reason we selected her is because with regards to the

14    Department of Health --

15         **THE COURT:**  Are you providing -- are the New Jersey

16    agencies here -- Department of Health, Department of Treasury,

17    Governor's Office -- prepared to provide custodians, proposed

18    search terms, hit reports and be transparent if you're

19    proposing alternative methods?

20         **MR. HUYNH:**  Yes.  With regards to the Department of

21    Health and Department of Treasury, we have already provided

22    custodians.

23         **THE COURT:**  Okay.

24         **MR. HUYNH:**  Then we've also provided hit reports for

25    some of the search terms.  We have been working with Meta to

 1   try and understand some of the technical limitations

 2   involving Microsoft Purview --

 3        (Court reporter clarification.)

 4        **MR. HUYNH:**  ...regarding Microsoft Purview, which we

 5   have been using to generate the hit reports.

 6        With regards to the Governor's Office, they provided us

 7   with hit reports last night and they ran it on the with five

 8   search, which was the original search that we were

 9   contemplating.  We're going back to them to discuss further

10   about the additional proximity limiters that we have been

11   discussing with Meta.

12        **MR. PETKIS:**  Your Honor, Stephen Petkis from Covington

13   on behalf of Meta.

14        To just respond briefly.  The categorization in Footnote 2

15   encompasses not just situations where we received no engagement

16   on custodians, but also situations, like the Department of

17   Health, where we've nominally received a name, but the agency

18   has taken the position that it refuses to run custodian search

19   terms and hit reports.

20        There's a reason why these agencies weren't put in

21   Footnote 1, which is the total non-engagement bucket.

22        So the position that New Jersey was taken on the

23   Department of Health is that we'll give you one name.  We won't

24   run any search terms, custodians.  We won't give you any

25   custodial --

```
 1          (Court reporter clarification.)

 2          MR. PETKIS:  Apologies.

 3          THE COURT:  He's very excited.

 4          MR. PETKIS:  Well, so, I think -- I think, Your Honor,

 5   I can be very brief in this.

 6      The problem is that there is a lack of agreement on

 7   whether or not to actually utilize that custodial name for the

 8   purpose of providing discovery.  For now, all we have is the

 9   name and a complete refusal to do so.

10          THE COURT:  So, okay.  Has there been a refusal to

11   negotiate additional or different custodians or explain why

12   this one custodian is enough?

13          MR. HUYNH:  Judge, we would respectfully push back to

14   that because we did actually run hit reports on the Department

15   of Health's custodian that we identified, and we did that for

16   the within 50, within 100, within 150 proximity limiters.

17      We have discussed with counsel, though, that we have some

18   concerns some of the ways that the Department may have run

19   that.  So we are happy to work with the Department and further

20   triage their technical prowess or the technical execution of

21   these search terms.

22      But, no, there isn't a refusal to run the search terms,

23   Your Honor.

24          THE COURT:  No, no.  That wasn't my question.

25      Is the refusal to engage on negotiating why your one
```

proposed custodian is enough versus whether they should be
allowed to identify and get more custodians?

      **MR. HUYNH:**  Oh, no.  Of course not, Your Honor.  We
would be willing to hear Meta out about other custodians as
well.

    We just provided this particular custodian because based
upon our conversations with counsel for the agency, they said
that this particular custodian was best suited, given that she
was program manager for the one program that within Department
of Health was child-facing, whereas the others were more really
adult-facing.

      **MR. PETKIS:**  Your Honor, two brief responses on that.

    First of all, the issue is actually worse, I think, than
we're discussing now because the issue is not whether or not to
only use that custodian or use a number of additional
custodians.

    The Department of Health, which has a number of
initiatives and focuses that are relevant to this litigation,
has taken the position that it can only do a targeted
collection and production -- we've received 47 documents -- and
that they will not provide custodial documents from the
Department of Health.

    If they are saying now that they will run the terms on
that custodian, that's news to me.

    But the second point is --

1          **THE COURT:**  Are you running search terms and are you

2    going to provide hit reports on that -- at least that one

3    custodian?

4          **MR. HUYNH:**  Judge, we've already provided hit reports.

5    As I discussed earlier, there are some concerns we have about

6    how the agency performed the hit report, but we are willing.

7          **THE COURT:**  Okay.  And are you willing to run search

8    terms against other custodians, if any others are identified?

9          **MR. HUYNH:**  Depending on negotiations with Meta, we

10   are willing to consider that, Your Honor.

11         **MR. PETKIS:**  Your Honor, it's -- it's, frankly,

12   difficult for us to negotiate given that we don't have insight

13   into who at the Department of Health might be working on these

14   issues.

15         But, further, just two very quick points.  We received the

16   hit count for the first time yesterday, and the hit counts for

17   this custodian for every single string that Meta proposed and

18   every single permutation of proximity limitation was zero

19   documents.

20         **THE COURT:**  Okay.  Well, that's clearly not a very

21   valuable hit report, is it?

22         **MR. HUYNH:**  Judge, so that's with regards to the

23   proximity limiters.

24         But we actually had also run hit reports again using "and"

25   as well, which generated a lot more documents than we were at

1   the time willing to produce because it would have been tens of

2   thousands or hundreds of thousands potentially.

3       So we are running hit reports against the Department of

4   Health.

5           **THE COURT:**  It sounds like you need to be much more

6   transparent about what hit reports you're running, what results

7   you're getting, who you're running them against and negotiate

8   all that.

9       Because I'm hearing from counsel for Meta is that there

10  was at least some communication from that agency that they

11  weren't going to run any hit reports at all.  They weren't

12  going to run any search terms at all.

13          **MR. PETKIS:**  Just a quick correction, Your Honor.

14      It's not so much that they would not run hit reports,

15  although that is true that we didn't know that until they

16  provided them yesterday.

17      And briefly with respect to the "and" connectors earlier,

18  the problem is that -- not the hit reports, but that they are

19  not agreeing to utilize the hit reports and the actual

20  custodians for the purposes of providing discovery.

21      In other words, they want to just do the targeted

22  collection and not actually provide custodial documents that

23  result from the hits.

24          **THE COURT:**  Is that -- is that your --

25          **MR. HUYNH:**  Judge, may I respond?

1          **THE COURT:**  Yes.

2          **MR. HUYNH:**  So Thomas Huynh for New Jersey again.

3      So with regards to that, our initial position is that

4  based upon what we provide in the targeted document production

5  to Meta, we wanted to work with them to see if there is a gap

6  left over that it would be appropriate for, say, a custodial

7  search or search terms.

8      The proposition is not that we would never be willing to

9  run hit reports or search terms, Your Honor.

10          **MR. PETKIS:**  Your Honor, we received 47 documents from

11  the New Jersey Department of Health.

12          **THE COURT:**  Yeah.  So, okay.  Two things.

13      If you're going to propose that use -- that use

14  alternative search methods other than search terms to comply

15  with your duties to search for and produce documents, you've

16  got to be transparent about how you did it and what the method

17  was and how you got them and who you got them from -- all

18  right? -- and let Meta know and negotiate that.  But it sounds

19  like if it's only 47 documents, it doesn't sound like a very

20  comprehensive search at all.

21      So what I'm saying is going forward I'm going to encourage

22  you all to focus on finalizing the search terms and hit reports

23  and getting the documents produced pursuant to the search terms

24  search, right, with custodians that you negotiate are

25  appropriate.  Okay?  It may be one.  It may be more.  I don't

```
 1    know.  I don't know who in the agency is relevant.  That's

 2    something for you to work out.  Okay?

 3            MR. PETKIS:  Thank you, Your Honor.

 4            MR. HUYNH:  Thank you, Your Honor.

 5            THE COURT:  Again, by next Wednesday I want a one-page

 6    letter brief with a schedule from you both on how to get this

 7    done.  Okay?

 8            MR. HUYNH:  Judge, may I clarify?  So with regards to

 9    the schedule, you just want dates; right?  Nothing else.

10            THE COURT:  I want dates, but I'm going to hold you to

11    them.  Okay?

12            MR. HUYNH:  Of course.

13            THE COURT:  And I don't want dates that are going to

14    impact -- where it's going to impact, you know, the rest of

15    discovery.

16        So if people are going into this thinking they are going

17    to negotiate dates that stretch out into March, you're sadly

18    mistaken.  Okay?

19        So you've got to get this done expeditiously.  Okay?

20    You've had months to work on this stuff.

21            MR. HUYNH:  Understood, Your Honor.  We shall do so.

22    Thank you.

23            MR. SCHMIDT:  Your Honor, may I just ask a

24    clarification about these letter briefs?

25        One concern that we have -- well, two concerns.  One
```

concern that we have on our end is, kind of conservatively,

we're now past three deadlines that Your Honor has set for

something to happen next week that should have happened

December 2nd, should have happened November 1st, should have

happened promptly after Your Honor's September order.  That

puts us in a really tough position.

    We've got to be able to come back to the Court and not

just say schedule, but if they dig in, be able to say they have

to do our terms.  Because otherwise we're just right back where

we were in September and where we have been since --

        **THE COURT:**  If for some reason you can't come to

agreement on the schedule, nothing stops you from filing a

motion asking for appropriate relief.

        **MR. SCHMIDT:**  Okay.

        **THE COURT:**  All right?  I mean, I'm not saying that

this is a replacement for that, but I -- what I -- because the

reason I'm putting -- I'm dealing with these as a category is

these appear, at least to me from what I'm hearing, to be

counsel and the agencies that are trying -- at least sound like

they are trying to work things out with you.

        **MR. SCHMIDT:**  Right.

        **THE COURT:**  And so in the spirit of, you know, hope

springs eternal that you can all work things out without having

to get to the point where you file a motion under Rule 37 or

otherwise -- all right? -- let's try to get there before we

```
 1   pull that trigger.
 2        But, again, you know, it's -- you know, I understand your
 3   concern and at some point, you know, you come to the Court with
 4   whatever relief you think you need at whatever point -- all
 5   right? -- and either I grant it or I don't.
 6        MR. SCHMIDT:  And I do want to underscore on that,
 7   part of what we're facing is we're now being told in
 8   meet-and-confer discussions:  We can't do anything like what
 9   you want in the time frame available.  Where the timing is
10   being used against us in these negotiations.
11        We've asked in our letter brief -- if we come back for
12   relief, we'll ask for some kind of recommendation that these
13   states be taken off the trial calendar.
14        THE COURT:  So on that, on that point, I think -- if
15   it's -- that's something you should go directly to Judge
16   Gonzalez Rogers on because I don't control her trial calendar.
17   And so if that's the relief you're asking for, she's the one to
18   ask it of.
19        MR. SCHMIDT:  We'll be guided by that.
20        The reason we framed it to Your Honor in terms of a
21   recommendation is just because she may want Your Honor's views
22   on where the state of discovery is and where the responsibility
23   lies, but we can take that to her.
24        THE COURT:  So I was going to say, to give you some
25   guidance here, I mean -- you know, I mean, you know the law as
```

```
 1   well as I do.  I mean, there are certain things I can do in

 2   terms of discovery sanctions that don't go to trial scheduling

 3   and overall case management.  That's not within my purview;

 4   right?

 5       And you're certainly -- I mean, you can be as creative as

 6   you want, I suppose, to try to figure out what kind of relief

 7   you can ask from me in terms of what I'm doing in the case,

 8   right, and whether some kind of sanction, such as maybe, you

 9   know, reducing number of hours for deposition available to one

10   side or the other as a sanction, or something like that; right?

11   I mean, I'm sure there must be a myriad of examples of

12   discovery sanctions in the case law that you can look to.

13            MS. O'NEILL:  If I can --

14            MR. SCHMIDT:  I guess hearing that one remedy, we

15   would probably request as a finding as to the fact that there

16   have been serial violations of Court ordered deadlines, because

17   that, I think, would be the predicate for Judge Gonzalez Rogers

18   acting.

19            THE COURT:  I'm sure you would certainly put that in

20   any briefing for relief to me on a discovery issue where you're

21   asking for relief.  It would certainly be in -- it would be in

22   the recorded, so thank you.

23            MS. O'NEILL:  May I briefly be heard on this, Your

24   Honor?

25            THE COURT:  Okay.
```

1              **MS. O'NEILL:**  Megan O'Neill for the State AGs --

2              **THE COURT:**  But I'm not entertaining motions for

3    sanctions.

4              **MS. O'NEILL:**  Understood.  And I just want to briefly

5    make a record that we, of course, do not believe that any of

6    these remedies that Meta's counsel has just mentioned are

7    warranted.

8         As you have seen, the state agencies are really working

9    hard, working cooperatively to -- to get this discovery done,

10   and we feel that it is Meta who has been injecting delay into

11   the process.

12        And I won't go on and on about this, but I do want to just

13   make that record; that we feel like the state agencies have

14   been doing their best and working around the clock.  And these

15   kind of remedies, whether they are discovery remedies or

16   remedies that go beyond, are simply unwarranted when the

17   agencies are working expeditiously and cooperatively to get

18   this discovery done.

19             **THE COURT:**  I've made -- certainly don't take any

20   comments I made.  I've made no decision.  I'm certainly not

21   voicing any opinion on any ultimate issue on sanctions of any

22   kind.

23        I'm just reacting to counsel's comments, that certainly

24   procedurally they are free to do whatever they want and you're

25   free to obviously brief the issues in opposition.

1              MS. O'NEILL:  Understood.

2              THE COURT:  And they may be fully unjustified.

3              MS. O'NEILL:  Understood.

4              MR. SCHMIDT:  May I be just heard briefly on that

5     point, because it's just -- it's not accurate from our point of

6     view.  It's not accurate as to Meta.

7          We've reached agreement with four states right up to the

8     deadline where they violated.  We've still reached agreement

9     with them.  We've limited our discovery for a broad range of

10    agencies.  That governs 22 states, the vast majority of states.

11    Governs 63 agencies.  Where they haven't met their search term

12    obligations, we've done that.  We've proposed search terms, two

13    rounds of those.

14         We've tailored and narrowed search terms, and we've worked

15    with them when they have given us incomplete hit reports.

16    Those are facts.  Those are undisputed.

17         Also undisputed is that there are court orders telling

18    them to do certain things.  They go back to us raising this

19    dispute in February where Your Honor found that the manner they

20    briefed this delayed it.  Telling them in September be quick.

21    Instead they appealed and asked for stays that were denied.

22    Telling them November 1st.  Telling them December 2nd.  Those

23    are objective facts, too.

24         And to say that this is Meta's fault is irreconcilable

25    with what's happened in the real world.

 1          **MS. O'NEILL:**  Your Honor, I need to respond briefly.

 2     I will keep it brief.

 3          Throughout this process --

 4          **THE COURT:**  I opened the door to this discussion.

 5          **MS. O'NEILL:**  Meta has -- I will keep this brief.

 6     Meta has insisted that all of the state agencies at issue

 7     here engage in expansive one-size-fits-all discovery.  And I

 8     understand why Meta wants to do that.  It's streamlined.  It

 9     makes sense.  For them.  But it's not appropriate for the

10     circumstances that we're in, where different state agencies are

11     of different sizes, have different technological

12     sophistication, have different mandates.

13          Meta's insistence on this, again, one-size-fits-all

14     approach has caused delay in reaching agreements and completing

15     discovery and resulted in the agencies expending enormous

16     amounts of time and resources on negotiations rather than on

17     getting documents to Meta.

18          Meta has refused to meaningfully engage with the state's

19     proposals to narrow search terms, use targeted searches,

20     deprioritize agencies, and to explain what is sought beyond

21     Rule 45 subpoenas.

22          I'm happy to expand.  I understand that you do not wish me

23     to, so I will leave it at that.

24          **THE COURT:**  This is not an issue that's before me

25     today.  Actually, you both are starting to say things that was

 1  in the briefing.

 2      Look, we're not at the point of specific remedies for any

 3  violations of court orders at this point, but I do -- I don't

 4  know how much more clear I can be.  I'm setting -- let's put it

 5  this way.

 6      I'm ordering -- for those of you just waiting to talk --

 7  all right? -- I'm going to be ordering everyone to be providing

 8  a one-page schedule to get this done and, boy, you know, I am

 9  going to hold you to that.  And Meta is fully within their

10  rights to seek relief if those schedules are not adhered to.

11  Okay?

12          **MR. SCHMIDT:**  All I would say, Your Honor, is that

13  argument was rejected by Your Honor in September, and they are

14  still fighting Your Honor's order.

15          **MS. O'NEILL:**  And Meta is engaging in the same tactics

16  as it was before.

17          **THE COURT:**  Okay.  So let's move on.

18      Do -- given my comment that I'm going to order all the

19  agencies who are waiting to talk to me to submit a one-page

20  schedule for getting things done with Meta, do you need

21  anything specific to raise with me?

22          **MR. WALLACE:**  Just -- Kevin Wallace for New York.

23      I take it the instruction, then, is for states and

24  agencies that are engaging that -- advance those negotiations

25  and have our schedule for you by Wednesday.

1          THE COURT:  Yes.

2          MR. WALLACE:  I don't have anything else to add about

3  the stays of the New York negotiations.

4          MR. SCHMIDT:  We would like to know who those states

5  are.  Because if they are not here, then they should be bound

6  by our terms as of this moment, in our view.

7          THE COURT:  So Colorado, we already went through.

8     Connecticut?  Anyone from Connecticut higher?

9     Okay.  So are you committed to coming up with a schedule

10  and abiding by it?

11         MS. SHAW:  Good afternoon, Your Honor.  Tess Shaw on

12  behalf of the Connecticut Attorney General's Office.

13     Yes, Your Honor.  The Attorney General's Office is

14  committed to submitting that one-page schedule.

15     And if I may briefly, for the record, clarify that in

16  Meta's briefing in Footnote Number 3 it mischaracterizes the

17  Connecticut Commission for Educational Technology as an agency

18  or commission that has not fully complied.  And I would like to

19  put on the record, Your Honor, that the Commission has fully

20  complied with its Rule 45 subpoena and, in addition, it has

21  provided search terms and custodians.

22         MR. YEUNG:  Christopher Yeung for Meta.

23     They have not provided us with hit reports, even though we

24  asked for them.  That's why they are in that bucket or in that

25  footnote.

1          **THE COURT:**  Can they get hit reports out?

2          **MS. SHAW:**  Your Honor, I do not have that information

3   with me.  I can consult with them.

4          **THE COURT:**  You need to.  All right?  So, again, you

5   really need to tell your agencies to get hit reports out when

6   they can.  Okay?

7          **MS. SHAW:**  Yes, Your Honor.  Okay.  Thank you.

8          **MR. SCHMIDT:**  Your Honor, can we have a date certain

9   for that?

10       I mean, this -- this is the problem.  Until we appear

11  before Your Honor, everything happens in the day before.  May

12  we have a date certain for Connecticut?

13         **THE COURT:**  The Commission on Educational Technology,

14  I mean --

15         **MR. SCHMIDT:**  May we get them Friday?

16         **THE COURT:**  Can you get them hit reports on Friday?

17         **MS. SHAW:**  Your Honor, I will need to consult with the

18  Commission.

19         **THE COURT:**  Well, how about this?  You're ordered to

20  provide the hit reports by Monday.  By Monday.  Okay?

21         **MS. SHAW:**  Okay.

22         **THE COURT:**  And you should be negotiating the schedule

23  with Meta, like, immediately, too.  Okay?

24         **MS. SHAW:**  Understood.

25         **THE COURT:**  Okay.  And all the directions I have been

giving to all the other agencies and states applies equally to

everyone.  So I assume you're all taking notes.

Okay.  Illinois?  Is anybody from Illinois here?

**MR. DAVIES:**  Sorry, yes.

Megan, do you want to go ahead?

This is Matthew Davies from the Illinois Attorney

General's Office.  I was ill, so was not able to fly out today,

so I'm appearing remotely.

I can speak to the Department of Public Health.  This was

an agency that was included in the letter briefing.  The agency

did respond to Meta's Rule 45 subpoena and said that they had

no materials.  And so I think there is just a dispute about

whether the agency needs to run the fulsome set of search terms

to cover the entirety of Meta's 70-plus requests over an agency

that has already said that they did not have anything that was

responsive.

**MR. YEUNG:**  Christopher for Meta.

Just to be candid, I think that representation was -- it

has been proven inaccurate.

When they told us that, we said:  Look on your website.

Your director is the co-chair of the Illinois Children's Mental

Health Partnership.

We asked for that as a custodian.  We asked for anybody

else who was part of that partnership, that's affiliated with

the Illinois Department of Public Health to be added as a

1    custodian.  They said no.

2         Since then the Illinois Attorney General has gone back to

3    the Illinois Department of Public Health and has produced a

4    handful of documents.

5         So we have real doubts as to the sufficiency of the search

6    that they initially conducted to come to the conclusion, which

7    they certified, that they have no responsive documents.  And as

8    a result, I think that they do need to produce -- they do need

9    to engage with a fulsome search process.

10        **THE COURT:**  Mr. Davies, does the director of the

11   Illinois Department of Public Health chair a mental health

12   partnership?

13        **MR. DAVIES:**  There is a mental health partnership and

14   the director is on it.  And we did offer, subsequent to that,

15   to run a limited set of search terms, which we provided to them

16   a week ago -- I don't remember -- that included that custodian.

17        I think there's just -- there is not a lot of

18   understanding from the agency's part about what it is that Meta

19   is actually seeking.  We have not really gotten an

20   understanding from them where they feel like there are gaps.

21   And when they did identify this initiative, we said that we

22   would follow up on it.

23        The idea of having to run search terms seems unnecessary,

24   but, you know, we have finally come to the point, like, where

25   if we want to get things done, we want them to get them done,

1    we need to be done.  So we did send them search terms,

2    custodians and a hit report.  And that hit report shows that

3    these are going to be somewhere in the several thousand

4    documents that would come of it.

5        So I -- you know, I'm happy to do that and to work with

6    the agency, and that's our proposal.  I'm not sure that

7    negotiating for another week is going to move this off of what

8    we have proposed.

9            THE COURT:  That sounds different from what we

10   reported --

11       (Audio distortion.)

12       (Court reporter clarification.)

13           THE COURT:  Mr. Davies, can you mute your phone?  I

14   think we are getting static on the line.

15       (Discussion held off the record.)

16           THE COURT:  I'll speak up.

17       Mr. Davies, it wasn't you.  It was somebody else's line

18   causing static.

19       Mr. Yeung, it sounds like they are agreeing to provide

20   search terms and hit reports.

21           MR. YEUNG:  So that -- they have recently made a

22   proposal which is facially inefficient.

23       And, again, we have real doubts as to the sufficiency of

24   their prior -- based on the prior experience, where they told

25   us we have nothing in response to the --

1          (Audio distortion.)

2          (Court reporter clarification.)

3          **MR. DAVIES:**  Just to be clear.  I didn't tell them

4    that, but counsel did.  The agency did not retain the Attorney

5    General's Office.  Agency counsel responded on their own behalf

6    prior to this Court's control ruling.

7          So we have gone back to the counsel.  We have provided

8    information to Meta about how they came up with that initial

9    response.  But I was not involved in this initial response.

10         And when Chris identified this initiative, one of our

11   search terms is the name of the initiative.  So that would

12   capture everything that has to do with that initiative, and

13   we're willing to produce that to them.

14         So I think there's just going to be a -- you know, this

15   may be a foreshadowing of what happens in some of these other

16   buckets.

17         But I think we are just so far apart that I want clarity

18   today because then I can start making things happen.  And maybe

19   if clarity is denied, just move forward with our proposal,

20   which is five or six custodians and a set of search terms.  And

21   this is from an agency that has already said that they don't

22   have much of anything or anything, because then I can start

23   moving that forward.

24         But last time I loaded that idea to opposing counsel, that

25   was met with a strong rejection of us moving forward without

 1    coming to an agreement first.

 2         **THE COURT:**  Assuming the custodians they proposed

 3    includes the director of the Department of Public Health,

 4    what's wrong going forward with those custodians and at least

 5    those search terms, if not some others you want to propose?

 6         **MR. YEUNG:**  So a couple of reasons.  The -- the

 7    individual -- the current individual who is the director,

 8    apparently, has only been the director for -- since 2022.  So

 9    it doesn't provide full coverage of the time period that is at

10    issue in this case.  That's point number one.

11         Point number two is that if you look at the terms that

12    they proposed, there are really only -- they proposed the name

13    of the partnership, yes.  They have not proposed more -- more

14    general terms that are designed to pick up discussions and

15    other documents that may not contain the name of the

16    partnership in its full form, but that discussed teen mental

17    health issues.  And that's a big -- that's where a lot of the

18    dispute is in terms of what we feel is sufficient in terms of

19    the search terms and what they're proposing.

20         Their proposal is in the letter briefing.  It is 20 terms

21    long.  And just looking at it briefly, there just isn't any

22    that capture the concept of teen mental health issues or any of

23    the potential harms or well-being that are relevant to this

24    case in their proposal.

25         Our terms do that.  And we're willing to discuss with

1    them, you know, how to narrow our terms or how to alter them or

2    what -- or whatever the case may be based on an informed

3    discussion using hit reports and a proper list of custodians.

4        We haven't gotten that level of engagement from the

5    Illinois Department of Public Health, either through their

6    internal agency counsel or through the Illinois Attorney

7    General.

8            **THE COURT:**  Mr. Davies, are you willing to engage in a

9    transparent collaborative discussion running hit reports on

10   Meta's terms, proposed terms, and negotiating a final set of

11   terms you both can agree to?

12           **MR. DAVIES:**  I mean, I've asked the IT people to run

13   Meta's terms, but I think you'll hear this from some of the

14   other agency counsel.  It's not really feasible --

15   technologically feasible for the -- for the centralized IT

16   agency that covers Illinois agencies to do these, sort of, hit

17   reports.

18       And I think there's just an assumption from Meta's counsel

19   that this agency has anything that has to do with teen mental

20   health.

21       You know, these agencies have very fulsome websites.  As

22   Mr. Yeung indicated, he went on the website and found

23   something.  And there is a lot of information on the website.

24       So I think what we're asking is, like, clarity about what

25   it is that we are trying to find with these search terms and

what they think is there and what may actually be within the

files.  Because the terms that we're getting are incredibly

broad, stand-alone terms or with very loose connectors that are

going to capture massive amounts of material that really are

not responsive.

So the idea to run and get tens and hundreds of thousands

of hits, which is the hit reports we're getting for our other

agencies, seems incredibly wasteful for an agency that really

does not have anything, has responded to the Rule 45 and said

they did not have anything, and then when pressed offered up

this initiative, which I think only started in 2022.

So it's not even like there's a gap there.  But we

provided five, six custodians, including ones back to 2015.

MR. YEUNG:  May I respond briefly?

THE COURT:  Sure.

MR. YEUNG:  This initiative has been around since

much -- it goes -- it started before 2012.  You can find it on

the public website.

And I think this is the fundamental problem.  The agency

tells us they have nothing.  We find something that says:  No,

you're wrong.  Here is something.  And now they want to say:

Well, we don't have much.

I have no confidence that that is the reality without any

information about hits to our terms.  I can't take their word

for it when it -- in our perspective, it's been demonstrated to

1    be inaccurate.

2              **THE COURT:**  Okay.  So, Mr. Davies, it is not

3    sufficient in a negotiation for you and your client to say:

4    Well, these search terms are returning massive amounts of

5    documents and, therefore, there's nothing we can do.

6         You need to counter propose terms that are more -- that in

7    your view are reasonable, that -- but that go, that address the

8    topics that Meta is looking for.  I mean, the --

9              **MR. DAVIES:**  Did --

10             **THE COURT:**  Mr. Davies, I'm talking.  This is Judge

11   Kang.  I'm talking.  Do you hear me?

12             **MR. DAVIES:**  I'm sorry.  As far -- you know --

13             **THE COURT:**  I want to make sure you can hear me

14   because the microphones are off.

15             **MR. DAVIES:**  I can hear you.

16             **THE COURT:**  Because we're having AV problems in here.

17        You need to be counter proposing modifications to Meta's

18   search terms and trying to convince them to drop some that you

19   think are either irrelevant or not -- or not germane.  And

20   that's part of the negotiation.

21        But it's not convincing to me for you to tell the Court

22   that the search terms yield massive amounts of documents and,

23   therefore, there's nothing we can do and they should simply use

24   our search terms.  That is not a negotiation.

25             Do you understand?

1          **MR. DAVIES:**  I understand, yes.  I would love to have

2    hit reports, and we will do our best.  I've asked for them and

3    I'll see what we can get.

4          **THE COURT:**  Okay.  So, again, I want to see a schedule

5    from you all within a week, on -- next Wednesday, on how to get

6    this done.  And I'm expecting give-and-take.

7          Mr. Yeung, that goes for your side too.  Okay?

8          **MR. YEUNG:**  Understood.

9          **THE COURT:**  If you need to drop search terms to get

10   this done, you need to do that.

11         **MR. YEUNG:**  Understood.

12         **THE COURT:**  Okay?  And if it is true that -- that even

13   your own research shows this particular agency probably doesn't

14   have a huge number of documents, then dropping search terms is

15   not a terrible thing for you either, especially if it expedites

16   things.  Okay?

17         **MR. YEUNG:**  Understood.

18         **THE COURT:**  All right.  Okay.  That's Illinois.

19         Minnesota is next.

20         **MR. PLEGGENKUHLE:**  Jason Pleggenkuhle on behalf of

21   Minnesota.

22         I want to -- so Meta mentioned two Minnesota specific

23   agencies.  I first want to discuss the Minnesota Department of

24   Human Services.

25         **THE COURT:**  Okay.

1          **MR. PLEGGENKUHLE:**  And that is an agency that we had

2    at the last discovery management conference raised.  It

3    received a Rule 45 subpoena in the summer.  It spent hours and

4    hours and did a very fulsome search and has completed its

5    production pursuant to the Rule 45 subpoena.

6          It's produced over 3500 pages of documents as a result,

7    which -- and the size of that is not surprising because it is

8    an agency that is primarily providing care to individuals.  And

9    Meta indicated it did not want patient level data.  So it just

10   does haven't a whole lot of, like, studies, research, some of

11   the things that Meta is interested in.

12         The agency has been fully transparent about how it

13   conducted the search.  Names of titles of officials that were

14   involved in the search.  It sent a six-page letter to Meta

15   describing the search at the end of November.  It's answered

16   follow-up questions about the scope of the search, whether it

17   covered other social media platforms other than Meta, whether

18   it involved just mental health harms to youth without regard to

19   social media.  It's answered yes to those questions.  So it has

20   been fully transparent.

21         And, yet, Meta is demanding that the agency basically

22   restart its discovery process over using the same

23   one-size-fits-all search terms as every other agency, agencies

24   that haven't conducted any search yet.

25         And so Minnesota is -- the Department of Human Services

position is that -- you know, it has asked:  Where is it

deficient?  Where -- where are there problems with its

production?

     And on the last meet-and-confer the Department of Human

Services had with Meta, Meta acknowledged it hadn't even

completed its review of what the agency had produced.

     So the agency is more than willing to do follow up

go get 'em searches, as Your Honor has directed.  Very happy to

do that.

     What it doesn't want to do is wipe away all this work that

it spent months and months doing and start all over again,

because that's not efficient and not consistent, what we

believe, with what Judge Gonzalez Rogers ordered.

          **THE COURT:**  What's wrong with what Minnesota has done?

          **MR. PETKIS:**  Your Honor, Steven Petkis again for Meta.

     The description of the amount of information that

Minnesota has provided for the Department of Human Services is

not reflective of our understanding of what's been provided.

     We have repeatedly asked for detailed information

regarding the process, the process that the Department of Human

Services undertook to collect and review those documents.  And

I just want to note, it was 451 documents.

     What they have provided us is the names of the individuals

who were responsible for the search and collection.  They have

not been forthcoming with information regarding the process,

```
 1   which is absolutely critical to our ability to understand what
 2   was done.
 3        And the idea that -- just taking a step back.  The idea
 4   that we can make a determination in good faith that custodial
 5   productions are not required on the basis of a targeted
 6   collection is exceptionally difficult until they've actually
 7   engaged what the Department of Human Services has not done to
 8   actually run search terms against custodians, provide hit
 9   counts.  If they were to do that, we might find there's a lot
10   of documents out there that they haven't looked at.
11        But they are not engaging in that process.  They are
12   asking us to take their word that they have done enough, and
13   it's hard to do.
14            THE COURT:  We talked about Minnesota last month;
15   didn't we?
16            MR. PETKIS:  Yes.
17            THE COURT:  So I thought I said last month if
18   Minnesota is not -- wants to do alternative ways of finding the
19   documents, you've got to let Meta know how the documents are
20   found; who the custodians were; what search parameters were
21   used, if you didn't use the ESI type search terms.  Has that
22   been provided?
23            MR. PLEGGENKUHLE:  Yes, Your Honor, it has.
24        We sent a six-page letter to Meta on November 20th
25   providing a description of the search.  We sent follow-up
```

 1    answers to their supplemental questions, asking about the scope

 2    of the search.  Again, whether it was -- whether it was

 3    inclusive of kind of all mental health harms to young people,

 4    not just ones that may be caused by social media.  The answer

 5    was yes.

 6        Date range.  Was the proper date range searched?  The

 7    answer was yes.

 8        In fact, they removed another agency, the Minnesota

 9    Department of Health, from this dispute because they

10    acknowledged it had provided the same type of information.

11    They removed the Department of Health.

12        Frankly, the only difference is the Department of Health

13    is an agency that's more on point to the issues in this case

14    and had more responsive information.  They produced 100,000

15    pages of documents and were removed.

16        Just because this agency is less on point, it appears that

17    they are being made to go through a more burdensome search

18    process than the Department of Health, even though they have

19    been fully transparent.

20        **THE COURT:**  If Minnesota sent you a letter saying how

21    they did the search and all that, I don't understand your

22    complaint.

23        **MR. PETKIS:**  I think it's not -- from our perspective,

24    Your Honor, the letter did not provide the level of detail that

25    we need to make a determination on whether or not custodians

1    and search terms are required.

2        We think, just as a general matter, that in order to get

3    that clarity, we need a discussion on custodians and search

4    terms.

5        And just briefly to respond to the Department of Health

6    example, the Department of Health has produced close to 14,000

7    documents.

8        The Department of Human Services, which has 7,000

9    employees, houses the Behavioral Health Administration, which

10   is entrusted with ensuring state-wide availability of mental

11   health programming and services for children's mental health,

12   they've produced 451 documents.  And they've not agreed to even

13   consider running an ESI search on custodians at that agency out

14   of the 7,000 employees that they have working on these youth

15   mental health issues.

16       **THE COURT:**  Have you tried to negotiate, like, a

17   limited number of custodians?

18       **MR. PLEGGENKUHLE:**  We're open to -- the Department of

19   Human Resources -- this is my understanding, I don't represent

20   them -- is open to additional conversations about deficiencies.

21   They have said repeatedly, you know, what is missing, because

22   we've done a fulsome search.  They haven't gotten a response

23   from Meta.

24       They said they are open to doing more go get 'em searches

25   if there's a certain program or area that wasn't searched, but

```
 1    it's our understanding everything was searched.

 2         And so this it's just -- this is a product of this agency

 3    having less responsive information because what it's doing, its

 4    primary mandate is providing patient level care to Minnesotans.

 5              THE COURT:  Okay.  But what I'm hearing is if you at

 6    least proposed one custodian within the agency and agreed to

 7    run some search terms -- maybe not all of them, but some search

 8    terms -- against them, that would give Meta confidence that the

 9    search that was done without -- the search that was done

10    previously is or is not sufficient, and you can go from there.

11              MR. PLEGGENKUHLE:  Well, Your Honor, my concern with

12    that proposal is Meta would demand running its extremely broad

13    search terms across numerous people at the agency and sticking

14    the agency with a very burdensome review of nonresponsive

15    information because of -- it knows what it has is highly

16    non-responsive given the search it's already done and the hours

17    it's put in.

18              THE COURT:  Well, I mean, I assume you proposed an

19    unlimited set of search terms just to test out your fear that

20    they haven't found everything that you think they should be

21    producing.

22              MR. PETKIS:  Your Honor, we're absolutely happy to

23    engage in these negotiations, as we have with every single

24    state that's in the room and not in the room today, including

25    by using deletion of terms, proximity limitations and other
```

1  creative solutions to try to result in a reasonable hit count.

2  The problem is that we cannot move these agencies off of

3  the idea -- many of them off of the idea that they do not need

4  to do an ESI search.  That is a problem that we continue or are

5  just running into the wall with a number of agencies because

6  they are taking the position, as you've just heard, that

7  because we received a Rule 45 subpoena -- which, by the way, we

8  only issued because they were refusing to provide discovery

9  during the pendency of that ruling.

10  We're being punished now because they undertook a process

11  that didn't involve the full scope of Rule 34 discovery that

12  you've now ordered.  And we're doing our best.  But until

13  now -- frankly, Your Honor, until now we've not heard that DHS

14  at Minnesota is willing to consider running a custodial search.

15  THE COURT:  Well, there you go.

16  MR. PLEGGENKUHLE:  And I don't know if -- I would have

17  to take it back to the agency, Your Honor.  I can't speak for

18  the agency.  I don't know if it is.  It's done a very fulsome

19  search already.

20  THE COURT:  Okay.  So you can tell the agency, look,

21  if they're not going to -- I mean, if only, what, 400-something

22  documents were produced from the agency and Meta has concerns

23  that the search wasn't adequate, right -- and I'm not saying

24  they have to boil the ocean -- but it certainly seems to me

25  that agreeing to run a limited number of, like, you know,

```
 1   sample search terms against a limited number of, you know,

 2   custodians is a way to allay -- either prove to Meta that,

 3   yeah, there are only about 400 or so documents within this

 4   agency that are relevant and producible.

 5        And if the sample search terms come up with, you know, a

 6   lot more -- and presumably you're going to negotiate those;

 7   it's not going to be every single search term Meta wants --

 8   that, to me, is an indication that they need to do more than

 9   what they did, including running ESI searches against certain

10   agreed custodians; right?

11        And if they don't, then, I mean, Meta is going to file a

12   Motion to Compel.  I mean, I don't understand the refusal to

13   try to work things out if you can.

14        MR. PLEGGENKUHLE:  I can take that back to the agency

15   and see what they are willing to do.

16        I think the concern is, they've explained also that the

17   Rule 34 requests entirely overlap with the Rule 45 requests.

18   And so starting over -- this does feel like starting over from

19   scratch.

20        THE COURT:  It is not -- okay.  The State AG -- you

21   argued to me in about five different briefs that Meta wants to

22   start all over again.  I don't see that as happening.  Okay?

23        What I've told them to do -- and they better be doing

24   this -- is to negotiate down the search terms, right, and avoid

25   duplication.
```

1    And they are nodding, so I'm assuming they've heard my

2    directive to that extent.

3    But, again, what I'm hearing here is not so much that you

4    need to go back and do a full-blown search.  You need to prove

5    to them that 400 documents is all there is.  That's essentially

6    your client's contention; right?  And how else other than

7    running some search terms, at least sample terms, against some

8    sample custodians do you plan to prove that to them?

9    **MR. PETKIS:**  And, Your Honor, if I could make just one

10    more point.

11    It's a very concrete example of the kind of intransigence

12    we're seeing.  Your Honor ordered every state who had not

13    reached agreement on search terms to submit a competing

14    proposal.  Minnesota didn't do so.

15    So we're not even at the level -- they have run hit counts

16    and we've engaged on search terms for one agency.  But even in

17    the context of this DMC, they didn't submit a competing

18    proposal to our proposed terms.  We consider that as pretty

19    close a waiver, but we're just not getting the level of

20    engagement we need.

21    What you're hearing from counsel, and I'm assured that

22    he's being honest that he doesn't control what they are doing,

23    but this is the kind of deflection we're getting, which is:

24    Well, we'll go back to the agency.  We'll see what they can do.

25    But it's not actually happening.  And so it's very hard.  We

```
 1   want to reach compromises and we have done so with four states.

 2       I would love to reach compromises with every single state

 3   in this room, but we need engagement on actually trying to meet

 4   on these terms.

 5           THE COURT:  I need to hear that Minnesota's Department

 6   of Human Services, and I think the Governor's Office, are

 7   willing to negotiate, including running sample hit reports and

 8   sample search terms on sample custodians.

 9           MR. PLEGGENKUHLE:  Again, I don't represent those

10   agencies.  I'm with the Attorney General's Office.

11           THE COURT:  Are you willing to commit that you will

12   recommend to them that they should consider it?

13           MR. PLEGGENKUHLE:  I can take this back to them and,

14   yes, see what they say in response.

15           THE COURT:  Okay.  I want to make 100 percent clear.

16   I mean, complete refusals to engage in discovery -- which this

17   is starting to get close to, right? -- starts getting into the

18   realm that we were talking about earlier, which I don't want to

19   open that door again.  Okay?

20       But you need to tell the agencies that -- you know, I

21   think I put in orders, I've certainly said in here, discovery

22   is supposed to be collaborative the way it is in the federal

23   system now.  You're supposed to talk to each other, right, and

24   give and take.

25       You can't just simply say:  Well, we ran a search using
```

 1   whatever -- you know, whatever method we did and that should be

 2   enough.  Take our word for it.  You know, if they propose,

 3   hopefully, a reasonable way to confirm and verify that that's

 4   enough, then that should do it; right?  If that procedure shows

 5   that there are gaps, then you need to come up with a way to

 6   find the gapped documents; right?

 7        **MR. PLEGGENKUHLE:**  Your Honor, I will take that back

 8   to the agency.

 9        I do want to make clear though, like, the suggestion that

10   especially the Department of Human Services is not engaging in

11   discovery when it's already done -- it spent over 70 hours

12   searching for documents for requests that completely overlap

13   with the Rule 34 request.  It has searched for ESI.  It just

14   hasn't run the search term and custodian requests that Meta is

15   demanding.  And it's been fully transparent with Meta with what

16   its done.

17        And it's asked -- it's tried to engage with Meta about

18   where are there deficiencies.  Meta hasn't even reviewed its

19   production.

20        **MR. PETKIS:**  That's actually not correct.

21        **MR. PLEGGENKUHLE:**  It hasn't completed it, at least

22   when we last conferred.  That was what they reported to us.

23        So, I mean, the agency is trying to engage.  It's

24   certainly not trying to not facilitate this.  It wants to be

25   done with its production.  What it doesn't want is to start all

 1    over again.

 2            THE COURT:  Well, the reason I'm starting over again,

 3    Meta understands that; correct?

 4            MR. PETKIS:  Absolutely, Your Honor.

 5        But just to be clear in terms of -- I do want to execute

 6    on what you recommended.  What we're going to do is put

 7    together a search term set for them to run against a sample

 8    custodian.

 9            What I would consider to be, and I think what our position

10    would be, is if that search hits on a number of documents which

11    they then de-duplicate against what they have already produced,

12    if it's showing a lot of document hits that they've not

13    reviewed, that would be kind of evidence that it's not been

14    sufficient, from our perspective.

15            THE COURT:  And then you go from there; right?

16            MR. PLEGGENKUHLE:  I can take that back to the agency

17    because, again, I can't speak for them.

18        But I would hope, too, that Meta would be responsive if

19    the agency did do that, that if the hits are showing just

20    unresponsive document after unresponsive document, that it's

21    not an effective search.

22            MR. PETKIS:  Your Honor, that's -- I mean, there is

23    unresponsive documents no matter when you do an ESI search.

24    Meta engaged in this exact process for many months.

25    Responsiveness rates change.

1          I mean, I think the review just needs to happen, from our

2    perspective.  We're not going to insist on, you know, if

3    there's one out of a million documents, to review all million

4    of those documents, but it is somewhere in the middle.

5          And so that's what we're trying to work through.  The

6    problem is we haven't had these discussions yet.

7              **THE COURT:**  There's a lack of data here.  So you do

8    need to engage more.  I appreciate that the agency has engaged.

9    My feeling is you just need to engage more.  Okay.

10             **MR. PETKIS:**  Thank you, Your Honor.

11             **THE COURT:**  Okay.  And then, again, I want a schedule

12   in a week.

13             **MR. PETKIS:**  Understand?

14             **MR. PLEGGENKUHLE:**  Understood.  Thank you.

15             **THE COURT:**  That was Minnesota.

16             **MR. SCHMIDT:**  Your Honor, one point on Minnesota and

17   Illinois.  I don't think we have dates for them.  Could we hear

18   from them by Friday?

19             **THE COURT:**  On?

20             **MR. SCHMIDT:**  Minnesota and Illinois?

21             **THE COURT:**  For?

22             **MR. SCHMIDT:**  I believe Illinois was supposed to

23   counter propose.

24         Minnesota was supposed to come back to us following

25   discussion with their agency.  May we hear from them by Friday?

```
1              THE COURT:  By Monday.

2              MR. SCHMIDT:  By Monday.

3              THE COURT:  Okay.  Missouri.

4              MS. O'NEILL:  Megan O'Neill for the State AGs.

5         I don't believe we have a representative from Missouri.

6    My understanding is that Missouri is in the process of

7    dismissing its claims.

8              THE COURT:  Oh, okay.  Is that correct?

9              MR. SCHMIDT:  Well, they have -- well...

10             MR. YEUNG:  We are discussing the terms of the

11   dismissal, but yes.

12             THE COURT:  All right.  Let's move on.

13        Nebraska.

14             MS. ANDERSON:  Anna Anderson for the State of Nebraska

15   Attorney General's Office.

16             THE COURT:  Good afternoon.

17             MS. ANDERSON:  Good afternoon.

18             THE COURT:  Okay.  So try to cut this shorter.  Is

19   Nebraska -- the Nebraska agencies, are they trying to engage in

20   providing custodians and negotiating search terms and providing

21   hit reports?

22             MS. ANDERSON:  Yes, absolutely.

23             THE COURT:  Is it a matter of timing?

24             MS. ANDERSON:  Absolutely.  Each agency is in a

25   different stage of timing.
```

1    I would like to point the Court's attention to the

2  Children's Commission.  The parties had previously agreed that

3  the Children's Commission would do a manual search.  That was

4  produced last week.  And it was a very small number of

5  documents.

6    So we met-and-conferred with Meta last week, and last week

7  we decided to run custodians and search terms.  That is in the

8  process, and the Children's Commission is committed to running

9  those search terms and complying.

10    **THE COURT:**  Okay.  Sounds like you're making progress.

11  So if we get a schedule by next week from Nebraska, is that --

12    **MR. SCHMIDT:**  May we get the results of the search

13  terms Monday consistent with Your Honor's other rulings?

14    **MS. ANDERSON:**  Sorry.  The -- do you mean the hit

15  reports or the search --

16    **MR. SCHMIDT:**  What I was going to ask, Your Honor, is

17  it's still unclear to us what we should be putting in these

18  submissions on Wednesday.

19    What is critical to us and what we think should be the

20  process is that these states that we're talking about should

21  give us hit report information on our search terms and counter

22  based on that with their search terms.  They have that data.

23  They are in the position to do that.

24    **THE COURT:**  Unless you've already started negotiating,

25  you've narrowed the search terms.

```
 1              MR. SCHMIDT:  Yeah.

 2              THE COURT:  So you shouldn't start from scratch.

 3              MR. SCHMIDT:  Right.  It would be what the last

 4     proposal for Meta was.

 5         And that we should get that by Monday so that we can have

 6     an intelligent schedule that we propose Wednesday, otherwise --

 7              THE COURT:  If requests for hit reports based on

 8     search terms are already pending, then yeah.

 9              MS. ANDERSON:  May I be heard on this briefly?

10         For the Children's Commission specifically, I just heard

11     from that Commission this morning with feedback on our proposed

12     search terms.  So I can have that to Meta tomorrow.

13         For the -- Department of Education is pending hit reports.

14     However, the Department of Education coded the ability to run

15     these sophisticated searches for the first time for this case.

16     So I have asked that counsel to have hit reports for me by the

17     end of this week, and they said they were committed to doing

18     that.  However, because these programs had never run hit terms

19     before, they were unsure how long it would take.

20         But I did communicate to Meta last week that I would be in

21     touch by the end of the week with the hit reports that we had.

22              THE COURT:  All right.  There you go.

23              MR. SCHMIDT:  If we get hit reports --

24              THE COURT:  No later than Monday.  No later than

25     Monday.
```

1          MS. ANDERSON:  Okay.

2          MR. SCHMIDT:  Thank you.

3      And we ask for that for all of these states that are in

4  the next week report bucket.

5          THE COURT:  So ordered.

6      Okay.  We already did New Jersey, didn't we?

7          MR. SCHMIDT:  We did.

8          THE COURT:  Okay.  Pennsylvania.

9      And just so you all know, the system turns into a pumpkin

10  promptly at 5:00 o'clock, so we're going to kick you out at

11  5:00.

12          MR. BURNS:  Good morning --

13          THE COURT:  Good morning.

14          MR. BURNS:  -- or good afternoon, Your Honor.

15  Jonathan Burns from the Pennsylvania Office of the Attorney

16  General.

17      I think we can hopefully move pretty quickly.  Our

18  agencies have provided -- well, I should say they have been

19  working off Meta's search terms.  They pushed back with some

20  concerns about those search terms.  Meta did not -- said please

21  run them anyways.  We did.

22      We then said we're getting a lot of hits that we think are

23  irrelevant to the searches and asked for some accommodation.

24  We employed a discovery vendor to try to weed some of that

25  stuff out.

1        That being said, we provided hit reports using their

2   search terms.  The number came back very, very large.  It was

3   over a million documents, 1.3 million documents.  And our

4   agencies have been willing to continue negotiating with them on

5   search terms, custodians and, you know, the additional

6   information that Meta has been seeking.

7        So I feel as if we are in the position to provide your

8   scheduling proposition order by Wednesday, and I think that

9   would take care of us, if Meta agrees.

10          **MR. YEUNG:**  Christopher Yeung for Meta.

11        Just to clarify.  What's missing from a lot of the

12   recitation were the dates that things actually happened with

13   Pennsylvania.  We didn't get hit reports until today.

14        Pennsylvania was an agency that was directed to give us

15   search terms and custodians by November 1.  That didn't happen.

16        There's no counter proposal to our terms in the joint

17   letter briefing like Your Honor directed.  Again, we think that

18   that is pretty much a waiver on any other counter proposal, but

19   we're willing to have this discussion.

20        But I don't want the fact that there hasn't been real

21   substantive engagement with our process, with the process that

22   this Court has directed, to be lost because that's -- that is

23   the core issue, timing.

24          **THE COURT:**  Okay.

25          **MR. BURNS:**  If I could respond very briefly?

1          THE COURT:  Sure.

2          MR. BURNS:  We did reach out to Meta earlier in the

3   process.  We didn't get a -- in October, I think, we tried to

4   engage them in meet-and-confers, and there was about a month of

5   delay before we reached out to them again.  And we do believe

6   we would be about a month farther along in this process, but

7   our agencies have represented to me that they are working the

8   best they can with the resources they have in trying to push

9   the ball forward.

10          THE COURT:  Okay.

11          MR. BURNS:  So, you know.

12          THE COURT:  All right.  So get the schedule to me by

13   next Wednesday.  I'm going to hold the agencies to it.

14          MR. YEUNG:  Thank you, Your Honor.

15          THE COURT:  I'm going to expect Meta to work quickly

16   on both sides, too.

17       Okay.  Who is here from Rhode Island.

18          MR. PROVAZZA:  Good afternoon, Your Honor.  Steven

19   Provazza on behalf of the Rhode Island Office of the Attorney

20   General.

21          THE COURT:  Good afternoon.

22       So is Rhode Island engaging with Meta on providing

23   proposed custodians, counter proposed search terms, hit

24   reports, et cetera, et cetera?

25          MR. PROVAZZA:  So, and I think there's two agencies at

issue for purposes of this discussion.  We -- other agencies

were in that process.  And I just want to -- and I think maybe

some guidance from Your Honor would be helpful here.

That the two -- two agencies we're really talking about,

you know, when you look at our how state government cuts up

healthcare, right, certain agencies do mental health.  Certain

agencies run the state hospital.  Certain agencies run the

Medicaid program.

So we're talking about two agencies within the umbrella of

our mental health services that aren't -- one of their core

functions isn't studying social media and mental health or

studying youth mental health in general.

And so when we talk about running search -- I mean, I can

commit to running search term hit reports, but I'm not sure

what that would tell us.  You know, if it's -- if it's a few

hundred documents, does that mean that's reasonable for us to

review or does that mean it's not likely to have responsive

documents?

And so, you know, we're willing to work with Meta on this,

but, you know, when Meta cited documents to me from these

agencies about youth, you know, youth tobacco use, youth

prescription drug abuse, the State's plan to address youth

mental health, none of those are necessarily tied to social

media or even tied to mental health.  Just youth cigarette use.

So when we run hit reports about cigarettes and vaping, of

```
 1    course, they are going to return documents.

 2        And so, you know, I just would put that to the Court and

 3    put that on the record that we would commit to running search

 4    terms reports by Monday.  Filing something with the Court on

 5    Wednesday.

 6        I just -- I'm not sure how that will move the ball on

 7    these two particular agencies.  And I just assume guidance

 8    later today, if we talk more about search terms, will provide

 9    that sort of guidance for how we -- we look at that.

10        THE COURT:  Specifically which two agencies are you

11    talking about?

12        MR. PROVAZZA:  The Executive Office of Health and

13    Human Services, and then the Behavioral Health and

14    Developmental Disability Services.

15        THE COURT:  Close.

16        MR. PROVAZZA:  Close.  We call them BHDDH, B-H-D-D-H.

17    So EOHHS is the umbrella organization under which all of Rhode

18    Island's healthcare agencies fold up into.

19        And so we're -- we're talking about prioritizing

20    custodians from the Department of Health, which is responsible

21    for public health.  Most likely it will have documents relevant

22    to the case about the connection between social media use and

23    youth mental health.

24        Whereas, you know, the other agencies run the state

25    hospital.  Run the state Medicaid program.
```

1          So I think we've -- we've identified 16 custodians already

2     as part of this umbrella.  And we can continue discussions with

3     Meta, but I think that we're prioritizing the most important

4     custodians.

5               **THE COURT:**  Okay.

6               **MR. PETKIS:**  Your Honor, Steven Petkis for Meta.

7          We've taken a very hard look at Rhode Island, as we have

8     with every other state.  We've de-prioritized four out of the

9     nine agencies that we were originally seeking discovery from.

10         The Department of Behavioral Healthcare and the Executive

11    Office of Health and Human Services have functions that are

12    directly relevant to the case regardless of whether or not they

13    mention social media.  Alternate causes are relevant.  This is

14    in our briefing.  The states have committed to provide

15    documents in response to RFPs that seek alternate causation

16    documents.

17         The position that Rhode Island has taken, as I understand

18    it, and as is reflected in their search term counter proposal,

19    is that a document is only relevant if it mentions social media

20    or it contains one of those social media terms.  That is a big

21    sticking point in these negotiations.  We disagree entirely.

22         With respect to the two agencies that are refusing to

23    perform a custodial search or provide any kind of hit counts,

24    I'll just also note that they've also not provided any

25    information, even though I've asked a number of times,

1    regarding how they actually verified that there are no

2    responsive documents at those agencies.  I suspect it's not

3    true.  But the way to test that is via custodians and hit

4    counts and that's what we've asked for.

5            MR. PROVAZZA:  So to just respond to those points,

6    Your Honor.

7        I think if we're talking about the documents responsive --

8    I mean, there are three RFPs -- 34, 35, 36 -- that talk about

9    reports and studies related to other potential cause of youth

10   mental health issues.

11       Might those agencies -- I mean, that -- an agency might

12   have a document that talks about tobacco and -- or your parents

13   abusing opioids and what that -- effect that has on you.

14       Is that something that would require a forensic ESI search

15   to dig up every possible discussion about that, or is that

16   appropriate for go get searches.  Because when we're looking at

17   who's citing the impact of youth mental health -- social media

18   on youth mental health, we're looking at the Rhode Island

19   Department of Health.

20       If we're just boiling the ocean at all agencies for any

21   kind of comment on what other -- what -- either someone who has

22   mental health or youth that have mental health, divorced from

23   that, causation, and causation somehow related to social media.

24       And I understand what Mr. Petkis is driving at is if

25   youth -- if a Department of Health looked and said, you know,

```
1   despite what's out there in the news, we actually think the

2   opioid epidemic is driving youth mental health issues and

3   social media is way less of a problem here in Rhode Island

4   based on the data.  That's the kind of document they are

5   looking for.  I think social media search terms would get you

6   that document, social media driven search terms.

7        So I -- you know, I think there's a disconnect between

8   technically responsive to three RFPs versus -- Requests for

9   Production 34, 35 and 36 and what are core relevant documents.

10       And I will note, Mr. Petkis, we will discuss by -- before

11  our joint filing next Wednesday getting them the information

12  they are asking for from those state agencies about what they

13  have done so far.

14       And I will just note for the record we've provided -- we

15  have made available counsel from both those agencies to answer

16  any questions they might have.  I think there's just a dispute

17  about Meta's satisfaction with those counsel's answers about

18  their search.  But we will follow up with them with any

19  information Meta requests by next Wednesday's filing.

20       MR. SCHMIDT:  Your Honor, this is a slightly

21  cross-cutting issue that we think Rhode Island gave up a long

22  ago, both through the filing of their complaint and through

23  their original discovery answers.

24       Their position is they can define the scope of our

25  discovery even as they take a different position in their
```

discovery from us.  They have looked very broadly in their

discovery for us.  They make very broad accusations.  They say

that we have profoundly altered the psychological and social

realities of a generation of young Americans.  That's the first

line of their complaint.  That makes other causes of that harm

and what they have said about other causes of that harm.

We shouldn't have to look for a document that says it's

opioids and not social media if there's a document that says

it's opioids.  And, by the way, I'm pretty sure Rhode Island

sued opioid companies on some of these issues.

That is replete throughout their complaint.  They have got

charts talking about how over time social media has changed

teen mental well-being in their complaint.  They have got

discussions about things we've asked about, like the COVID-19

pandemic blaming social media from harm from the COVID-19

pandemic.

They don't get to define what we think is relevant,

particularly when they are taking these views in their

complaint and when they've already committed to produce these

documents in their discovery responses.

This is what hit -- search terms and hit reports are for.

They should run the search terms and hit reports on our terms

and if they come back broad, then we have that negotiation.

But right now they are just saying no, we get to define

what we think is relevant for you.  And if it's not social

1    media, it's not relevant no matter how we've pled our claims

2    and no matter what we're alleging.  And that's not how

3    discovery works.

4         **MR. PROVAZZA:**  Your Honor, I would just note in terms

5    of proportionality, we're talking about a social media company

6    who -- their documents that discuss COVID-19, there's a

7    different likelihood of relevance there than a state department

8    that's administering the opioid epidemic relief fund.

9         And it's not like these agencies are not saying they are

10   going to -- not going to do discovery.  They will do go get

11   searches and custodial interviews.  They have committed to

12   that.

13        They just -- the ESI process is not a one-size-fits-all

14   for every Rhode Island state agency if we can prioritize and

15   get done the agencies that actually focus on this issue.

16        **MR. SCHMIDT:**  We've done that.  We've dropped some of

17   the agencies.  We had a Court order from Your Honor saying you

18   get it from these agencies.  Because when we sought that Court

19   order, they chose not to engage on that issue.  They chose to

20   say no way, no how.  So we've got that.

21        We've done what they said we should do.  We've dropped

22   some of those agencies.  They don't then get to say we get to

23   arbitrarily limit your discovery to something that uses the

24   term "social media" when they have put much broader claims at

25   issue and in terms of proportionality when they're seeking

 1   hundreds of millions, maybe collectively into the billions, of

 2   dollars from us.

 3         THE COURT:  So I'm not sure this issue was decided

 4   previously.  I think it was.  I think we've talked about it.

 5   You know, you can't -- the scope of discovery, right, is

 6   certainly broader than the scope of plaintiffs' claims against

 7   the defendants; right?  And so while social media is part of

 8   plaintiffs' claims, the defendants -- you understand part of

 9   their theory of defense is that there are these alternate

10   stressors out there.

11       So if there's any document, hypothetically, from some

12   agency somewhere that says 99 percent of all teen mental health

13   problems are attributable to Pokeman; right?  Right?

14         MR. PROVAZZA:  Oh my.

15         THE COURT:  I said hypothetically; right?

16         MR. PROVAZZA:  Of course.

17         THE COURT:  Of course, right, they would argue -- I

18   mean, you're free to argue the merits of that document and the

19   import of it, but in terms of discovery of it, you know, I -- I

20   do take their point; that it's within the -- the realm of

21   discoverable information.

22       And so to say that the agency shouldn't be required to do

23   any kind of ESI searches with search terms that go to

24   essentially one of their defense theories, right, I think is

25   not legally supportable.

1        Now, to your point about proportionality.  If these

2   agencies really don't do a lot with adolescents and they don't

3   really do a lot that -- in other ways that are relevant to the

4   case, then you -- in the negotiation with them on which search

5   terms to run, how many custodians to run, that's part of the

6   process; right?  You're certainly entitled to it and I would

7   expect you to make all those points to them and try to narrow

8   it down; right?

9        But that doesn't mean you get to cut off the discovery

10  entirely; right?  Because it may turn out that the custodian is

11  only a couple people and it's only, you know, a handful of

12  documents because it is only a couple people.  I don't know.

13  It could be, you know, a lot of people with a lot of documents.

14  I just -- I don't know.  Right?  So simply cutting it off at

15  the knees is not the way to go.

16        **MR. PROVAZZA:**  Understood.  And I assume that our

17  further discussion today about search terms, if any, will help

18  guide that discussion with Meta.

19        **THE COURT:**  Okay.

20        **MR. SCHMIDT:**  So we would ask that we get search term

21  and hit report information from them Monday on some of our

22  broader causation terms.

23        **THE COURT:**  Okay.  So I've gone through every single

24  state in Footnote 2 except for South Dakota.  Is there someone

25  from South Dakota here?

 1          Are you the last two states?  Anybody from the Footnote 3

 2     states that hasn't spoken yet?  Why don't you all come up?

 3     We've only got 15 minutes left, so we're going to do this real

 4     quick.

 5          **MR. SALBERG:**  I will try to be brief, Your Honor.

 6     Aaron Salberg appearing for the South Dakota Attorney General's

 7     Office.  For purposes of this discussion, I would like to talk

 8     about the Governor's Office of Economic Development.

 9          They have five employees, Your Honor.  They have hired

10     outside counsel.  They are unable to run -- technologically

11     unable to run search terms right now.  However, that was last

12     week.  They are telling us now they are able to run hit counts.

13     We're talking about five, probably, stand-alone computers.

14          We have identified them as unlikely to be able to produce

15     responsive documents.  Again, they have five employees.

16          Your Honor, their goal is to recruit and retain

17     businesses.  If they are talking about children, they are

18     talking about children in terms of is there a daycare next to a

19     business that an employer wants to set up?  They are not

20     talking in regards to mental health.  They are not talking in

21     regards to social media or anything of that nature.

22          They have -- we have provided a custodian for them.  They

23     are looking for search terms that the Attorney General's Office

24     has provided.  We don't have any stand-outs, but we have very

25     limited resources.

 1          Other offices, agencies in our government, are in similar

 2    terms.  Office of the Governor is also saying that it's not

 3    technologically feasible to run hit counts.  They are doing it

 4    manually.  It's my understanding that they were going to start

 5    production, if they haven't already.

 6          **THE COURT:**  Okay.  So my previous directive on this.

 7    If people can't do search terms because technologically they

 8    just can't -- all right? -- you've got to be transparent with

 9    Meta about how you're doing the manual searches or otherwise to

10    talk about the process.

11          If it's only five employees and there's one custodian and

12    they are not really working in areas that involve social media

13    or teens, why didn't you deprioritize the Governor's Office of

14    Economic Development?

15          **MR. PETKIS:**  Your Honor, I think we will ultimately

16    get there.

17          I think the problem with South Dakota is that negotiations

18    have not progressed nearly as far as they should because the

19    whole group of agencies is not providing the information that

20    we need, particularly with respect to search terms and hit

21    counts.  That's made it difficult.

22          The point on the Economic Development agency, I don't

23    think there has been much detailed discussion on that, even

24    amongst ourselves.  I think we probably will deprioritize that

25    one, as we have done in other states.

 1          **THE COURT:**  Okay.  So given the size of some of the
 2     agencies here, and including this Office of Economic
 3     Development, by next Wednesday figure out if you're going to
 4     drop -- deprioritize any of them.  Because it isn't worth
 5     wasting anybody's time on small agencies that have very limited
 6     relevance.
 7          **MR. SALBERG:**  Technologically the Attorney General's
 8     Office and rest of the agencies are having very severe burdens
 9     running these search terms.  We're running them one by one.
10     They are not being ran in groups.
11          We've had trouble with Boolean searches.  We've had
12     trouble.  We are working throughout matters, but it's holding
13     us up.  We have provided hit counts.  For example, the Attorney
14     General has, but, you know, it's not as fast as anybody wants
15     it to be, Your Honor.
16          **MR. PETKIS:**  Your Honor, may I briefly?
17          This is a remarkable argument that in a case where the
18     allegations span, as Mr. Schmidt mentioned, hundreds of
19     millions, potentially billions of dollars, the idea that
20     technological limitations of the computers or systems that they
21     are using are going to prevent them from providing the
22     discovery that Meta is entitled to and that Your Honor has
23     detailed in terms of scope, that they have committed to do so
24     in their RFPs, it is just not something that we think is
25     appropriate.

 1       And Meta has made concessions across the State group

 2  without perfect hit counts because we are trying to reach

 3  compromises.  And we recognize that there's risks on both sides

 4  and some of those compromises might lead us to not receive

 5  documents that we want.

 6       But the states are insisting on making perfectly precise

 7  decisions based on these hit counts, or even taking the

 8  position that they shouldn't have to provide discovery because

 9  their systems don't allow it.  We just completely disagree with

10  that.

11       **THE COURT:**  Well, what I'm hearing, South Dakota is

12  just having slowness problem.  Not that they can't or won't do

13  hit counts.

14       **MR. PETKIS:**  I think I disagree, Your Honor.  I think

15  what I just heard is that they may not be able to run Boolean

16  searches, which is using connectors like "and."  They may not

17  be willing to -- or able to do proximity limitations.  It

18  severely limits our ability to come up with a search term set

19  that captures the full scope of relevant documents.  We're

20  trying.

21       **MR. SALBERG:**  And on the other hand, Meta says that we

22  can run them without the ESL searches.

23       We're going back and forth here, Your Honor.  We're doing

24  the best we can.

25       **THE COURT:**  Well, okay.  So two things.  I think I've

 1    done this in other situations.  If you're making technological

 2    arguments that things are difficult to do, you need to have

 3    your IT folks there --

 4             **MR. SALBERG:**  We have.

 5             **THE COURT:**  -- as part of the discussion.

 6        And, you know, one option is for Meta to ask -- you know,

 7    ask for inspection of your systems and have their own IT folks

 8    go in and run searches, if it's just a matter of manpower and

 9    technological tool set, because there are certainly vendors out

10    there who can go to anybody's system and run searches, if

11    that's what's going on.

12        I mean, that's always an option Meta has under the rules.

13    All right?  So you need to go back to your clients and really

14    work harder on this.  I do want a schedule by Wednesday, too.

15             **MR. PETKIS:**  Thank you, Your Honor.

16             **THE COURT:**  So work harder, I guess, is the message.

17    Okay?

18             **MR. SALBERG:**  Thank you, Your Honor.

19             **THE COURT:**  Okay.  Who is next?  Real quick.  You've

20    got three minutes.

21             **MS. KORY:**  Alex Kory, Attorney General for Washington

22    State -- Assistant Attorney General for Washington State.

23        So we have no problem with the order to put together a

24    one-page schedule by next week.

25        What we are -- have been having issues with is, first, the

1    number of agencies that are impacted in Washington State.  Meta

2    has identified nine agencies, which is double or triple from

3    what other states are managing right now.  As a result, we've

4    got 103 custodians.

5         We have been asking since early October for agencies to be

6    deprioritized or to have go get 'ems for certain agencies.  I

7    appreciate that counsel offered to do that for two agencies

8    just earlier today, but that's the first time that that's been

9    offered for any Washington State agency, and that's creating a

10   lot of trouble getting us moving forward.

11        The second issue that we're facing is the search terms.

12   We have been going back and forth on search terms for the last

13   week here, and longer, and the -- the movement that Meta has

14   been making with us has been so incremental that it's

15   impossible to get to an agreement.

16        Meta agreed to remove two terms that we asked to have

17   removed, and in contrast we've added over 100 terms in the last

18   week alone.

19        So we have been making every effort we can to try to get

20   to an agreement here, and we're not getting reciprocated.

21        **THE COURT:**  All right.  In negotiations I don't expect

22   Meta to be adding terms.  All right?  In your negotiations you

23   should be removing terms as time goes on, because that's

24   presumably part of the negotiation.

25        All right.  And then secondly, if there are a large number

1    of agencies and -- I assume some of them can be deprioritized

2    at this point.

3         **MR. YEUNG:**  So Christopher Yeung for Meta.

4         Ms. Kory and I did speak earlier today.  We have already

5    discussed alternate approaches for two of the agencies.

6         Prior to that I don't think there has been -- we had asked

7    people to provide us with a written showing why is this agency

8    somebody who shouldn't be -- shouldn't be within the scope.  I

9    don't think we ever got that in writing from them.  But in any

10   event, that's -- those agencies are out.

11        In terms of us adding terms, that's not quite what

12   happened.  We made a proposal.  They made a proposal.  We

13   worked with their proposal and tried to marry our proposal to

14   their proposal.  So it was more of a shifting of our terms to

15   the proposal.

16        **THE COURT:**  Okay.

17        **MR. YEUNG:**  It wasn't --

18        **THE COURT:**  Work out a schedule.  Keep talking; right?

19   If you can deprioritize agencies, you should, because it sounds

20   like there is a lot.

21        And, again, you've got to get this done.  You've got to go

22   back to the agencies and start running hit reports.  Okay?

23        **MS. KORY:**  Understood, Your Honor.  Thank you.

24        **MR. YEUNG:**  Your Honor, just to be clear.  The

25   agencies that they have are -- that are at issue in Washington

1    were the ones in your order.  Most of them deal with -- the

2    ones that remain, deal with healthcare or children.  So they

3    just have a lot of agencies that deal with those issues.

4         **THE COURT:**  Okay.  If you've got good reasons why some

5    should be deprioritized, you need to tell them.  Be transparent

6    about that.  Okay.

7         **MS. KORY:**  Understood, Your Honor.  We have.  This is

8    the first offer that we've gotten to deprioritize any agencies,

9    which we appreciate and hope to move forward on.

10        **THE COURT:**  Okay.  Who is next?

11        **MR. WHELIHAN:**  Nathan Whelihan for the Arizona

12   Attorney General's Office, Your Honor.

13        **THE COURT:**  Two minutes.

14        **MR. WHELIHAN:**  Your Honor, there's a few points.  I

15   want to say we're in the same boat as Minnesota and Rhode

16   Island and --

17        **THE COURT REPORTER:**  I'm sorry, counsel.  You need to

18   slow down.

19        **MR. WHELIHAN:**  We're in the same boat as Minnesota and

20   Rhode Island in many cases.  I will try not to repeat those

21   arguments, but I want to note that we have made similar

22   proposals for one of our agencies as to Rhode Island and have

23   similar problems to Minnesota.

24        Also, I want to turn a little bit of the Court's attention

25   to the Court's previous -- you know, encouraging Meta to seek

```
 1   go get 'ems from agencies.

 2        In our last meet-and -- well, it may have been two

 3   meet-and-confers ago with Meta, we asked counsel, you know:

 4   Are there any go get 'ems that we can run for any of the

 5   remaining agencies at issue in Arizona?  And they told us we

 6   are not in a position to do that.

 7        Our Department of Child Safety has recently come to the

 8   conclusion, after proposing its own search terms and running

 9   Meta's own search terms, that search terms may just be

10   unworkable for that agency because every record they have is

11   relevant to children and relevant to harm to those children.

12   It's an agency that deals with, you know, taking people --

13   children and putting them in foster care, putting them --

14   reuniting them with their families.  And the vast majority of

15   the records are individual case files.

16        Meta has made clear it doesn't want those case files --

17             THE COURT REPORTER:  I'm sorry, counsel.  You need to

18   slow down.

19             MR. WHELIHAN:  If we're going to run search terms, if

20   that agency runs any search terms, it will necessarily pull

21   back millions of records.

22             THE COURT:  Well, wait.  On those points, I mean, if

23   they don't want individual case files, can't you limit the

24   custodians so it's people who don't have access to those case

25   files?  There must be people who aren't working with the case
```

```
 1    files who you can propose as custodians for that very reason.
 2    Not everybody in an agency is working with the case files;
 3    right?
 4          MR. YEUNG:  We made that proposal on a long
 5    meet-and-confer call that we had with them.  At the time they
 6    -- and we actually said can we focus on higher level people,
 7    you know, directors, et cetera, that are less involved in sort
 8    of the day-to-day.  We tried -- they said at the time:  I think
 9    we can work with that.
10          THE COURT:  So keep working with that then.  All
11    right?
12          MR. WHELIHAN:  They've run the search terms against
13    those custodians and pulled back millions of documents.
14          THE COURT:  Then you need to propose either narrowing
15    or dropping of terms.
16          MR. WHELIHAN:  The -- the problem is Meta is not
17    willing to work with us to narrow or limit those terms because
18    what we're able to provide is not a complete and perfect hit
19    report from those agencies.  It's not --
20          THE COURT REPORTER:  Counsel, please slow down.
21          MR. WHELIHAN:  It's not de-duplicated.  Sorry.
22          MR. YEUNG:  Again, that's not true.  DCS provided us
23    with a hit report, I believe, on -- it was in December.  The
24    date -- next day we narrowed it.  We narrowed our terms.
25          THE COURT:  My point -- we're running out of time.
```

1          **MR. WHELIHAN:**  If I may just put one more point on the

2    record.

3          Meta provided us a renewed proposal on November 22nd, and

4    then it -- on Friday night, November 29th, the day after

5    Thanksgiving, they provided us -- because agency counsel had

6    expressed interest in what they had agreed to with South

7    Carolina, they reverted their proposal to, okay, now we're

8    proposing the South Carolina term that has "phone" in it, even

9    though we previously told you that we would -- we dropped

10   "phone" and "phone" is irrelevant.

11         So they have returned -- they've added search terms back

12   because we expressed interest in South Carolina's proposal.

13         **THE COURT:**  Okay.  A, you can't -- you should be

14   narrowing conceptually and realistically.  You should be

15   negotiating.

16         You should be trying to find custodians that don't have

17   access to the large bulk of the files that we know are

18   irrelevant.  Okay?

19         And you need to be dropping search terms that are picking

20   up too much stuff.

21         **MR. YEUNG:**  We have.  We actually -- on November 29th

22   we actually gave -- after the call where they wanted the terms

23   that we agreed to, we actually gave them the option of

24   giving -- if you want the 22nd, fine.  If you want the 29th,

25   fine.  We were trying to being responsive to their concerns.

1          So, you know, they can't have it both ways.  We need to

2    have a discussion.  We're trying to have the discussion.

3    Trying to move the ball forward based on the feedback we get.

4    And we actually have narrowed their proposal significantly

5    since either of those.

6          **THE COURT:**  Good.  Keep working and get it done.

7          **MR. WHELIHAN:**  What's Your Honor's order as to

8    Arizona, or these Footnote 3 agencies?

9          **MR. YEUNG:**  I would say they have an outstanding -- we

10   gave them a proposal on the 10th.

11         **MR. WHELIHAN:**  You gave us a proposal yesterday as

12   well.

13         **MR. YEUNG:**  Yes.  Yesterday, the 10th.

14         **MR. WHELIHAN:**  Oh, that is yesterday.  Sorry, yes.

15         **MR. YEUNG:**  So they need to give us --

16         **THE COURT:**  So if there was a request for hit reports

17   that are due, they should be provided by Monday.  All right?

18   And you should work out the schedule for getting all this

19   discovery done to me by Wednesday.  Okay?

20         **MR. WHELIHAN:**  I will admit on the record that it's

21   likely that at least one or two agencies will not be able to do

22   that given their technical capabilities.

23         **THE COURT:**  I assume you're going to be transparent

24   and talk with Meta about what you can get when as quickly as

25   you can; but if some are done and ready by Monday, you

```
 1   shouldn't hold onto them.  Okay?

 2            MR. WHELIHAN:  Understood, Your Honor.

 3            THE COURT:  Okay.

 4            MR. SCHMIDT:  And, Your Honor, I understand those two

 5   orders; the schedule by Wednesday, the --

 6            THE COURT:  Hit reports.

 7            MR. SCHMIDT:  -- hit reports based on custodians and

 8   search terms by Monday, that to apply to -- I think there were

 9   a couple states where I don't know if it was expressly ordered,

10   but I think it applies to all the states we've had --

11            THE COURT:  I think you asked me this question.  It

12   does apply to all the states specifically, so...

13            MR. SCHMIDT:  Thank you.

14            THE COURT:  Okay.  So we're running out of time real

15   quick.  So who is left?

16            MS. O'NEILL:  Megan O'Neill for the State AGs.  I just

17   wanted a quick clarification.

18       When you were discussing with Mr. Schmidt the reports,

19   were you referring to the states in category two of Meta's

20   brief?

21            THE COURT:  Two and -- I guess, yeah.

22            MS. O'NEILL:  Footnotes 2 and 3?

23            THE COURT:  Yeah, Footnotes 2 and 3.  Those who are

24   working and who -- there are pending hit report requests

25   outstanding; right?
```

 1             MS. O'NEILL:  Thank you, Your Honor.  I just wanted to

 2     clarify.

 3             THE COURT:  Okay.

 4             MR. PETKIS:  Your Honor, very briefly.

 5         Just on that point, I mean, the other footnote of the

 6     states that we've received hit reports but we have been unable

 7     to reach a negotiation, in almost every circumstance, I think

 8     it may be every circumstance, we've countered and asked for hit

 9     counts to inform whether or not they can accept that counter.

10         I don't see any reason why the order should not also apply

11     to those agencies, which are a substantial share.

12             THE COURT:  What do you mean you've countered?

13             MR. PETKIS:  We've reached a point where the sides

14     have submitted competing proposals, but we have attempted to

15     narrow again.

16         And so that's -- we need -- where we have attempted to

17     narrow again, even if the agency is in a different footnote, we

18     would ask for hit counts by Monday.

19             MS. O'NEILL:  The agencies have also provided their

20     own proposals, the agencies that are in Footnote 4.  So I'm not

21     sure that that's accurate as to all states in Footnote 4.

22             MR. PETKIS:  And many of those agencies for their

23     proposals have not voluntarily provided hit counts to support

24     those proposals.

25         So all I'm asking is for any agency where there is an

1   outstanding hit count request, regardless of the footnote,

2   those hit counts be provided by Monday.

3          THE COURT:  Yes, that's correct.  If there is an

4   outstanding hit count request, it should be provided by Monday.

5          MS. O'NEILL:  I think it would be helpful to clarify

6   which states that applies to, because I think there may be

7   some --

8          THE COURT:  All the states in Footnotes 2, 3 and 4.

9   That's the request, right?

10         MR. PETKIS:  Yes, Your Honor.

11         THE COURT:  All the agencies, not the states in 2, 3

12  and 4.

13         MS. O'NEILL:  Understood, Your Honor.

14      I just ask any State AG counsel who disagrees with that to

15  please make that known.

16         THE COURT:  Okay.  Sorry.

17         MR. STROUD:  Good afternoon, Your Honor.  Colin Stroud

18  on behalf of the State of Wisconsin.

19         THE COURT:  Good afternoon.

20         MR. STROUD:  In October Wisconsin told Meta that eight

21  attorneys at each agency were gathering documents manually and

22  they would be produced.  We started producing them on

23  November 7th.

24      To date, we have produced 18,000 records from the various

25  agencies.  On November 7th we also provided search terms and

 1   custodians for Wisconsin agencies.

 2        We heard nothing from Meta until November 22nd, after

 3   hours.  We worked with them after getting the same generic

 4   proposals they sent that disregarded the targeted proposals

 5   that agencies made based on the collection they already did.

 6        We've tried to negotiate with them.  We've altered the

 7   initial November 7th proposals.

 8        We will work with them, but the agencies have already

 9   begun going through their documents.  They are going to

10   continue to do that because our understanding was get these

11   documents to Meta, and that's what we have been trying to do.

12             THE COURT:  Okay.  I appreciate that.

13        MR. PETKIS:  Your Honor, we went -- Wisconsin has been

14   sending us hit counts up til and including on Monday.

15        We sent a revised proposal, which counsel said he would

16   consider.  I think that proposal is now subject to Your Honor's

17   order that all of the Wisconsin agencies that are in play

18   provide hit counts by Monday.

19             THE COURT:  And, hopefully, you can come to agreement

20   and you work out a schedule, and you negotiate that, and I'll

21   see that on Wednesday.

22             MR. PETKIS:  Thank you, Your Honor.

23             THE COURT:  All right.  Who is left?

24             MR. PING:  Sorry, Your Honor.  Thank you.  Assistant

25   Attorney General Daniel Ping appearing on behalf of the

1    Michigan AG.

2        I had a lot to say about our agencies, but I'm going to

3    take Your Honor's instruction to take that up with Meta.

4            **THE COURT:**  Yep.

5            **MR. PING:**  Now, regarding that last little order, you

6    know, run the outstanding search string proposals.  For

7    Michigan, anyway, that only applies to the 24 of 92 strings

8    that hit at over 100k.  So we already know it's still going to

9    be in the multi millions.

10       So with your indulgence, Your Honor, we would like to be

11   able to go back to the drawing board rather than just engage in

12   that exercise when we know there's going to be a counter --

13           **THE COURT:**  I think what counsel is talking about, if

14   you've got a counter proposal, right, on reducing the hit count

15   and reducing either custodians or reducing the breadth of the

16   search, make the proposal but run another hit report to show to

17   them; right?  To counter propose what -- if what they have

18   proposed is yielding too many hits.

19           **MR. PING:**  All right.  I think I understand.  Thank

20   you, Your Honor.

21       And on this -- Michigan is in a Footnote 4 state, but

22   we -- we were kind of at the end of our line here with the way

23   that negotiations were going and we preemptively told Meta on

24   December 4, look, we can do go get 'ems.  They said no.

25       So I understand that we're subject to this one-page

```
 1   briefing.  But I'm really concerned, is putting it lightly,

 2   about the deadlines on, you know, whether it's December 23,

 3   January 10.

 4       I haven't heard a lot of talk today about review.

 5   Processing, uploading, but review.  I just wonder -- you know,

 6   I can't speak for the group here, but if we were looking down

 7   the road a little bit, this seems like we are, you know, not

 8   going to hit these -- you know, you said March is a -- just a

 9   dream.  Don't even think about March.

10       THE COURT:  You have a fact discovery cut-off of

11   April; right?  I mean, this can't extend into March because

12   they are going have to take -- they're going to need the

13   documents in order to take depositions, if any, of your state

14   agency witnesses.

15       MR. PING:  I needed to put it on the record, Your

16   Honor.

17       THE COURT:  Okay.  So you understand, you know, the

18   schedule you work out cannot impact the overall case schedule.

19   Okay.

20       MR. SCHMIDT:  And in our view it shouldn't extend back

21   dates Your Honor has already set for documents.

22       THE COURT:  We really are running out of time.  So

23   unless there is something urgent to talk about, we will --

24   either you can write -- I don't invite another motion, but you

25   can raise it at the next DMC.
```

1        Is there any -- if there's an emergency or something we

2   really need to talk about, last chance.

3        **MR. YEUNG:**  I just want to make one thing clear.  The

4   proposal they have to engage in -- I think they have to engage

5   in is the search term process that has already been directed

6   for Michigan, November 1.

7        If you look at the counter proposal that they made in the

8   joint letter briefing, it's do targeted searches for everybody.

9   That's not what was ordered.  They didn't even give us hit

10  reports for any -- any of our terms until the 3rd of December.

11  Then on the 5th they said we can't do them.

12       So that's not a negotiation.  It's a search terms process.

13  Your Honor has already directed that.  That is what Michigan

14  needs to do.

15       **THE COURT:**  You do need to engage on the search term

16  process.  Okay?

17       **MR. STROUD:**  Understood, Your Honor.

18       **THE COURT:**  Okay.  Real quick.

19       **MS. GILCHRIST:**  Your Honor, Corinne Gilchrist for the

20  State of Indiana.

21       We are also a Footnote 4 state.  We've had some productive

22  conversations with Meta about the search terms.

23       My concern is the -- we think we will be able to provide

24  additional search term reports to them on the second revised

25  proposal from Meta by Monday.  If we do not reach agreement,

however, I -- we have two of the agencies already.  It's still

totaling in the millions.  It's still not producing responsive

documents from a sample set of review.

     And so we are concerned that -- you know, what happens

next with the dispute.  We want to continue this moving

forward.  So when we set the schedule, I'm looking for

clarification from Your Honor as to if we've not reached

agreement on the terms, how that schedule should address that

situation.

          THE COURT:  Okay.  Like I said, if one side's terms,

Meta's terms, are yielding too many documents and hits in the

agency's view, you need to counter propose different terms --

          MS. GILCHRIST:  We have.

          THE COURT:  -- and narrow it down.  That's where the

negotiation comes in.  And provide hit reports to justify it --

          MS. GILCHRIST:  We have.

          THE COURT:  -- and work it out.

     And, you know, at some level I could -- you could do the

meet-and-confer here in front of me, but I don't think that's

productive.  This gets down to the nitty-gritty of, you know,

horse trading on the terms and trying to figure out how many

terms work and which ones yield the right amount of hits.

          MR. PETKIS:  And Your Honor has provided helpful

admonitions, including on social media limitations, which is

part of Indiana's proposal.  That will be helpful going forward

1  because we would expect that to come out of the next proposal

2  as well.

3          **THE COURT:**  What do you mean?

4          **MR. PETKIS:**  That their search term proposal requires

5  a social media term in every single document.

6          **THE COURT:**  We addressed that.

7          **MR. PETKIS:**  I agree.  I agree, Your Honor.  Thank

8  you.

9          **THE COURT:**  I won't say anything more on that.

10     Okay.  Anything else?

11         **MS. GILCHRIST:**  Well, just that, Your Honor, we have

12  proposed our counter.  We have given hit reports as to our

13  counter.  Our document proposal for the Department of Child

14  Services had 43,000 hits.  We are comfortable with that

15  proposal.

16     Meta countered their -- they do not have this information

17  from us yet because I just received it, but their counter to

18  our counter is still over a million documents for that agency.

19         **THE COURT:**  Sounds like you've got the better argument

20  at this point; right?

21         **MR. PETKIS:**  It sounds like we need the information

22  and we can have that discussion.

23         **MS. GILCHRIST:**  Okay.

24         **THE COURT:**  All right.  So work harder and talk more

25  openly and quickly with each other.

1          Any other urgent matters before we adjourn?

2          (No response.)

3          **THE COURT:**  Okay.  All right.  I want to thank the

4    Court Reporter and the staff for staying late.

5          **THE CLERK:**  We're off the record in this matter.

6    Court in recess.

7          (Proceedings adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>CERTIFICATE OF OFFICIAL REPORTER</u>**

I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Sunday, December 15, 2024