Pages 1 - 93

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

```
IN RE:  SOCIAL MEDIA          )
ADOLESCENT ADDICTION/PERSONAL )
INJURY PRODUCTS LIABILITY     )   NO. 22-MD-03047 YGR (PHK)
LITIGATION                    )
_____ )
```

San Francisco, California
Thursday, January 16, 2025

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, California 94104
BY: **JENNIE LEE ANDERSON, ATTORNEY AT LAW**

SEEGER WEISS LLP
55 Challenger Road, Sixth Floor
Ridgefield Park, New Jersey 07660
BY: **JENNIFER R. SCULLION, ATTORNEY AT LAW**
**CHRISTOPHER L. AYERS, ATTORNEY AT LAW**

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
BY: **LEXI J. HAZAM, ATTORNEY AT LAW**
**MICHAEL LEVIN-GESUNDHEIT ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              Official U.S. Reporter, CSR No. 7445

**APPEARANCES:**   (CONTINUED)

For the Plaintiffs:

MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, D.C. 20004
BY:  **PREVIN WARREN, ATTORNEY AT LAW**

MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
BY:  **ANNIE E. KOUBA, ATTORNEY AT LAW**

GIBBS LAW GROUP LLP
1111 Broadway, Suite 2100
Oakland, California 94607
BY:  **ANDRE MICHEL MURA, ATTORNEY AT LAW**

WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York 10003
BY:  **AARON FREEDMAN, ATTORNEY AT LAW**

For School District Plaintiffs:

LEVIN SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106-3697
BY:  **MICHAEL M. WEINKOWITZ, ATTORNEY AT LAW**

For Plaintiff State of Arizona:

ARIZONA ATTORNEY GENERAL'S OFFICE
2005 North Central Avenue
Phoenix, Arizona 85004
BY:  **NATHAN E. WHELIHAN**
     **ASSISTANT ATTORNEY GENERAL**

For Plaintiff State of California:

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
BY:  **MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL**
     **EMILY C. KALANITHI**
     **SUPERVISING DEPUTY ATTORNEY GENERAL**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:**  (CONTINUED)

For Plaintiff State of California:
                            CALIFORNIA DEPARTMENT OF JUSTICE
                            OFFICE OF THE ATTORNEY GENERAL
                            1515 Clay Street, Suite 2000
                            Oakland, California 94612
            BY:  **JOSHUA OLSZEWSKI-JUBELIRER**
                            **DEPUTY ATTORNEY GENERAL**

For Plaintiff California Department of Health Care Services:
                            CALIFORNIA DEPARTMENT OF JUSTICE
                            455 Golden Gate Avenue, Suite 11000
                            San Francisco, California  94102
            BY:  **BRENDAN P. RUDDY**
                            **ANNA T. FERRARI**
                            **DEPUTY ATTORNEYS GENERAL**

For Plaintiff California Business, Consumer Services and
Housing Agency:
                            OLSON REMCHO
                            1901 Harrison Street, Suite 1550
                            Oakland, California 94612-3597
            BY:  **MARGARET R. PRINZING, ATTORNEY AT LAW**

For Plaintiff State of Colorado:
                            OFFICE OF THE ATTORNEY GENERAL
                            COLORADO DEPARTMENT OF LAW
                            Business and Licensing
                            Ralph L. Carr Judicial Building
                            1300 Broadway, Eighth Floor
                            Denver, Colorado 80203
            BY:  **KRISTA BATCHELDER**
                            **ASSISTANT ATTORNEY GENERAL**

For Plaintiffs State of Colorado Governor's Office and the
Office of State Planning and Budget:
                            OFFICE OF THE ATTORNEY GENERAL
                            COLORADO DEPARTMENT OF LAW
                            Ralph L. Carr Judicial Building
                            1300 Broadway, Eighth Floor
                            Denver, Colorado 80203
            BY:  **JENNIFER SULLIVAN, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff State of Illinois:
                     ILLINOIS ATTORNEY GENERAL'S OFFICE
 3                   115 South LaSalle Street
                     Consumer Fraud, 26th Floor
 4                   Chicago, Illinois 60603
                BY:  MATTHEW CHARLES DAVIES
 5                   ASSISTANT ATTORNEY GENERAL

 6   For Plaintiff Department of Children and Family Services:
                     ILLINOIS DEPARTMENT OF CHILDREN
 7                      AND FAMILY SERVICES
                     1911/1921 South Indiana
 8                   Chicago, Illinois  60616
                BY:  MICHELLE G. CAMP
 9                   ASSISTANT TO THE GENERAL COUNSEL

10   For Plaintiff Commonwealth of Kentucky:
                     KENTUCKY OFFICE OF THE
11                      ATTORNEY GENERAL
                     Office of Consumer Protection
12                   1024 Capital Center Drive, Suite 200
                     Frankfort, Kentucky 40601
13              BY:  DANIEL I. KEISER
                     ZACHARY J. RICHARDS
14                   PHILIP HELERINGER
                     ASSISTANT ATTORNEYS GENERAL
15
     For Plaintiff State of New Jersey:
16                   NEW JERSEY OFFICE OF THE
                        ATTORNEY GENERAL
17                   Division of Law
                     124 Halsey Street
18                   Box 45029
                     Newark, New Jersey 07101
19              BY:  VERNA PRADAXAY
                     DEPUTY ATTORNEY GENERAL
20
     For Plaintiff State of New York:
21                   OFFICE OF THE ATTORNEY GENERAL
                     NEW YORK STATE
22                   28 Liberty Street
                     New York, New York 10005
23              BY:  KEVIN C. WALLACE
                     SENIOR ENFORCEMENT COUNSEL
24

25           (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

**APPEARANCES:** (CONTINUED)

For the Office of the New York State Governor:
                        SELENDY GAY PLLC
                        1290 Avenue of the Americas
                        New York, New York 10104
            BY:  **CLAIRE O'BRIEN, ATTORNEY AT LAW**

For Plaintiff State of Minnesota:
                        MINNESOTA OFFICE OF THE ATTORNEY GENERAL
                        445 Minnesota Street, Suite 1400
                        St Paul, Minnesota 55101
            BY:  **CAITLIN M. MICKO**
                 **ASSISTANT ATTORNEY GENERAL**

For Plaintiff State of Pennsylvania:
                        PENNSYLVANIA OFFICE OF THE
                           ATTORNEY GENERAL
                        Strawberry Square, 16th Floor
                        Harrisburg, Pennsylvania 17120
            BY:  **JONATHAN BURNS, DEPUTY ATTORNEY GENERAL**


For Defendant Meta Platforms Incorporated:
                        COVINGTON & BURLING LLP
                        1999 Avenue of the Stars, Suite 3500
                        Los Angeles, California 90025
            BY:  **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        One City Center
                        850 Tenth Street, NW
                        Washington, D.C.  20001
            BY:  **MICHAEL X. IMBROSCIO, ATTORNEY AT LAW**
                 **STEPHEN PETKIS, ATTORNEY AT LAW**
                 **MICHAEL N. KENNEDY, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        The New York Times Building
                        620 Eighth Avenue
                        New York, New York 10018
            BY:  **CHRISTOPHER Y.L. YEUNG, ATTORNEY AT LAW**
                 **PAUL W. SCHMIDT, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1  **APPEARANCES:**  (CONTINUED)

2  For Defendant Meta Platforms Incorporated:
                            COVINGTON & BURLING LLP
3                           Sales Force Tower
                            415 Mission Street, Suite 5400
4                           San Francisco, California 94105
                   BY:  **ISAAC D. CHAPUT, ATTORNEY AT LAW**
5
                            SHOOK, HARDY & BACON LLP
6                           2555 Grand Boulevard
                            Kansas City, Missouri  64108
7                  BY:  **MEGAN M. EGLI, ATTORNEY AT LAW**

8

9  For Defendant Snap, Inc.:
                            MUNGER, TOLLES & OLSON LLP
10                          560 Mission Street, 27th Floor
                            San Francisco, California  94105
11                 BY:  **JONATHAN H. BLAVIN, ATTORNEY AT LAW**

12                          MUNGER, TOLLES & OLSON LLP
                            355 South Grand Avenue, 35th Floor
13                          Los Angeles, California 90071
                   BY:  **LAURA M. LOPEZ, ATTORNEY AT LAW**
14                         **FAYE PAUL TELLER, ATTORNEY AT LAW**

15 For Defendant TikTok:
                            KING & SPALDING LLP
16                          1180 Peachtree Street
                            Atlanta, Georgia 30309
17                 BY:  **GEOFFREY DRAKE, ATTORNEY AT LAW**

18                          KING & SPALDING LLP
                            50 California Street, Suite 3300
19                          San Francisco, California 94111
                   BY:  **BAILEY J. LANGNER, ATTORNEY AT LAW**
20
                            O'MELVENY & MYERS LLP
21                          1999 Avenue of the Stars
                            Los Angeles, California 90067
22                 BY:  **LAUREN F. KAPLAN, ATTORNEY AT LAW**

23          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

24

25

**APPEARANCES:** (CONTINUED)

For Defendant YouTube:

          WILSON, SONSINI, GOODRICH & ROSATI
          One Market Street
          Spear Tower, Suite 3300
          San Francisco, California 94105
    BY: **LAUREN GALLO WHITE, ATTORNEY AT LAW**
        **JENNA K. STOKES, ATTORNEY AT LAW**

          WILSON, SONSINI, GOODRICH & ROSATI
          Columbia Center
          701 5th Avenue, Suite 5100
          Seattle, Washington 98104
    BY: **McKINNEY WHEELER, ATTORNEY AT LAW**

<u>**Thursday - January 16, 2025**</u>                          <u>**1:21 p.m.**</u>

P R O C E E D I N G S

---o0o---

THE COURTROOM DEPUTY:  Now calling 22-MD-3047,

In Re Social Media Adolescent Addiction and Personal Injury

Products Liability Litigation.

Counsel, when speaking, please state your name clearly for

the record and speak as slowly as you can for the court

reporter today.  Thank you.

THE COURT:  Good afternoon, everyone.

ALL:  Good afternoon, Your Honor.

THE COURT:  So you-all teed up a bunch of issues for

me.  So I'm going to -- first of all, just so you're all clear,

I am not going to hear any argument on Docket 1547, which is

the discovery letter dispute regarding Snap's assertion of

privilege in connection with 14 redacted documents.  My

intention is to rule on that on the papers as I did with the

other privilege dispute.  Is that understood?  So whoever was

preparing to argue that, you can step down.

And then what I'm -- given -- I think I told you this at

the last one.  I'm on criminal duty this month.  So given the

shortness of time available, what I'm going to do is, instead

of having what are normal kind of free-ranging oral argument,

I'm going to tell you what my plan is, at least as a tentative,

for each of the motions you've teed up.  I'm going to give you

1   a very short amount of time to tell me why I am either mistaken

2   as to a fact or as to the law, but you are not -- I'm going to

3   say it again -- not to repeat argument in the briefing.  I've

4   read the briefing.  Okay?

5       So if you just disagree with my tentative ruling, that's

6   fine, you can disagree with it, but trying to reargue the

7   merits that's already in the briefs is not the way to do that.

8   But if I've misunderstood a fact or misunderstood something,

9   obviously, I want to know that.  Okay?  Clear on that ground

10  rule?  Because, otherwise, we may not get to everything by the

11  end of today, and I'm hoping to do that, if I don't reign

12  you-all in a little bit.

13      And we're going to be on a bit of a chess clock too,

14  again, given just the number of issues you've teed up, so I may

15  cut you off.  So make your best arguments up-front if you need

16  any.  Okay?  And if I've ruled generally in your side's favor,

17  I mean, I learned as a young associate when to shut up.  Okay?

18  So discretion is probably the better part of valor there.

19      All right.  So I'm going to -- I picked out an order to

20  take these in, so let's start with Docket 1532, "Joint Letter

21  Brief Regarding Parental Attendance At Personal Injury

22  Bellwether Depositions."  Who's going to -- so let me -- I'll

23  let people approach who are going to argue that one.

24                   (Pause in proceedings.)

25          THE COURT:  Enter appearances.

**PROCEEDINGS**

1      **MS. KOUBA:**  Good afternoon, Your Honor.  Annie Kouba

2  with Motley Rice on behalf of the plaintiffs.

3      **MS. EGLI:**  Good --

4      **THE COURT:**  Okay.

5      **MS. EGLI:**  Good afternoon, Your Honor.  Megan Egli

6  from Shook Hardy & Bacon on behalf of the Meta defendants.

7      **THE COURT:**  Okay.  So specifically with regard to

8  plaintiff S.K., there are a lot of representations as to why

9  she needs her mother at the deposition but very few actual

10  facts in the record from which I can make a ruling on this.

11      So one thing -- one of my -- this is actually a part of a

12  question I have as a factual matter.  When you-all negotiated

13  the date for her deposition, did you do so knowing that it was

14  going to happen after she turned 18?

15      **MS. EGLI:**  Yes, Your Honor.

16      **MS. KOUBA:**  Yes, Your Honor.

17      **THE COURT:**  Okay.  So did -- because -- did the

18  plaintiffs insist that it be taken when she was still a minor

19  and you gave up on that point and got something in return, or

20  what was the negotiation?

21      **MS. KOUBA:**  Yes, Your Honor.  We requested that

22  plaintiff S.K. be allowed to have her mother there in person

23  since the dates that we offered to defendants were not amenable

24  to them.  And I think as we -- not to repeat the briefing, as

25  we stated, they wanted to take her plaintiff after she was --

1    take her deposition after she was 18.

2        With that in mind, we thought it would be a fairly

3    non-controversial accommodation that we ask that her mother be

4    allowed to be there for support to her.  We were surprised to

5    learn that that was not the case after we had already agreed to

6    a later date for her deposition so as not to slow down

7    litigation.

8        And that's how we ended up at this point.  We did not

9    realize this would be such a sticking point; and if we had,

10   perhaps we would have insisted that her deposition be taken

11   before she turned 18.

12       **MS. EGLI:**  And can I just clarify one thing,

13   Your Honor?

14       **THE COURT:**  Sure.

15       **MS. EGLI:**  It was our impression, when we were making

16   the deal and up until after the timing of the deposition was

17   set, that there were not going to be parents in attendance at

18   the deposition.  So it also came as a surprise to us that they

19   were planning to have her present.

20       **THE COURT:**  Okay.  I am -- well, I'm concerned at

21   least at the possibility that there was a knowing scheduling of

22   the deposition to avoid what would have been the automatic

23   attendance of her mother at the deposition; but I also -- as I

24   said, I don't have enough actual -- I have representations from

25   counsel.  I don't have enough actual facts.

 1    So I'm going to want a declaration from S.K. and her

 2  mother explaining to me why they think her mother needs to be

 3  at the deposition, and then I'll probably issue a ruling on the

 4  papers after that.  All right?  Can you get that to me within a

 5  week?

 6          MS. KOUBA:  Of course, Your Honor.  We can get that

 7  to you right away.  Happy to do so.

 8          THE COURT:  How about by Tuesday, then?

 9          MS. KOUBA:  Absolutely.

10          THE COURT:  I'll make you work on the holiday.

11    Okay.  And then one possibility -- and it depends on what

12  I see on the declarations.  And I want you to try to work this

13  out.  To address defendants' concerns that S.K. might not be as

14  forthcoming -- I guess is the way to put it -- at deposition on

15  certain topics if her mother is present in the room, similar to

16  the process that Judge Kuhl has worked out about prewarning and

17  working out timing as to questions on criminal conduct, drug

18  use, and sexual activity, I would expect you to try to work

19  something out so that when you're deposing S.K. and there's a

20  module of questions that implicate her relationship with her

21  mother or her interactions with her mother, that her mother

22  would step out just for that part of it.  Okay?

23          MS. KOUBA:  Yes, Your Honor.  I think that will

24  probably be completely amenable to the plaintiff.

25    I will represent that while you're working off of limited

1    information, it's our belief, in our conversations with

2    S.K., that -- and with her mother, who we also represent, that

3    there is no -- no secrets between them, and I doubt that it

4    would influence her testimony, very sincerely.  However, if

5    that is what Your Honor thinks will be best for both sides, we

6    can bridge that with our client and I think she's likely to be

7    amenable to it.  That said, I don't anticipate it being a

8    problem either way.

9              **THE COURT:**  You understand the proposal?

10             **MS. EGLI:**  I hear Your Honor, yes.

11             **THE COURT:**  Okay.  So try to work out a stipulation

12   on that point, then.  Okay?  And get me those declarations, and

13   I'll formalize all that.

14       Okay.  I mean, most of the briefing was focused primarily

15   on S.K.  Do I need to -- I don't think I need to issue a

16   blanket ruling for all minors.

17       The one thing I do want to point out is, I'm aware of

18   Judge Kuhl's minute order from last November which set some

19   ground rules on how to handle potential questioning on very

20   sensitive matters for -- especially for minors.  And I haven't

21   seen anything -- nobody's brought it to my attention in this

22   context.  I just -- I guess I've assumed.  I want to make

23   clear.  Are you-all abiding by those ground rules in

24   depositions in the MDL?

25             **MS. EGLI:**  Yes, Your Honor.

 1          **MS. KOUBA:**  Yes, Your Honor.  We have come to a

 2  separate agreement based upon Judge Kuhl's ruling that we will

 3  abide by the same parameters.

 4          **THE COURT:**  Great.  Okay.  So you've got the

 5  agreement.  I don't think you need me to take any action on

 6  that.  But just understand, I'm aware of her rules on that; and

 7  I think she's made clear and I've made clear we certainly don't

 8  want there to be any kind of even appearance of beneficial or

 9  advantageous discovery taken in one action versus the other in

10  terms of procedure.

11      So I'm heartened to hear you're following those ground

12  rules in the MDL.  I'm going to hold you to that.  Okay?

13          **MS. EGLI:**  Yes, Your Honor.

14          **THE COURT:**  Okay.  Does that resolve Docket 1532?

15          **MS. EGLI:**  There's one other issue in the briefing,

16  Your Honor -- I apologize -- regarding the Mullen case.  It's

17  at the very end of the parties' briefs.  It has to do with

18  attendance of a consortium plaintiff at one of the other

19  depositions.

20          (Co-counsel confer off the record.)

21          **MS. EGLI:**  Your Honor, apparently, they can't hear me

22  and Ms. Kouba on the line.

23          **THE COURT:**  On the Zoom?

24          **MS. EGLI:**  Yes.

25          **THE COURTROOM DEPUTY:**  This is the microphone.

1    **THE COURT:**  Well, the mic is right there.  I don't

2  know --

3    **THE COURTROOM DEPUTY:**  I don't want to move it away

4  from him because he's the most important, so...

5    **MS. EGLI:**  Yes.  I'll speak up.

6    **THE COURT:**  Okay.

7    (Discussion off the record between the Courtroom Deputy

8  and the Court.)

9    **THE COURT:**  I'm not sure I'm the most important to be

10  heard anyway.

11    Okay.  So I did say I read the briefing, and I did.

12  Remind me again.  Mullen?

13    **MS. EGLI:**  It's just an issue, Your Honor, of

14  defendants are requesting that plaintiffs inform us if

15  Ms. Mullen's mother is planning to attend the deposition so

16  that we can decide whether to put the mother's deposition first

17  so that she doesn't sit through the daughter's deposition.

18    So we're just asking to know whether that plaintiff's

19  mother is planning to attend.

20    **THE COURT:**  And --

21    **MS. KOUBA:**  Your Honor --

22    **THE COURT:**  Yeah.

23    **MS. KOUBA:**  -- if I may, we, Motley Rice, do not

24  personally represent Plaintiff Mullen.

25    However, I don't think there is any objection to letting

1    defendants know whether Ms. Mullen intends to attend the

2    deposition of her daughter.

3         However, on the larger scale of the loss of consortium

4    issue, it's plaintiffs' position that depositions should be

5    scheduled in a way that is most equally convenient for

6    plaintiffs and defendants and in a way that will move

7    litigation along without regard to who is scheduled first, as

8    both of them are parties and, by right, under the federal

9    rules, a party can attend another party's deposition.  So we

10   don't really see the issue with who goes first or second in

11   that scenario, which is a little bit different from S.K., where

12   the mother is not a party.

13        **THE COURT:**  So to an extent, you're correct; but

14   under the federal rules, the party taking the deposition gets

15   to notice it and figure out the scheduling, at least as an

16   initial proposal.  Under my standing order, you're supposed to

17   try to work out the scheduling without needing Court

18   intervention.

19        So, I mean, the practical result is, if you don't tell

20   defendants whether or not the mother is planning on attending

21   or not, then they're going to notice the mother's deposition

22   first.  I mean, as a practical matter, to me this should be

23   something you should be able to work out.  Right?

24        So I'm going to say this is resolved.  I'm just going to

25   order you to work it out.  Okay?

**PROCEEDINGS**

1          **MS. EGLI:**  Yes, Your Honor.

2          **MS. KOUBA:**  Yes, Your Honor.

3          **THE COURT:**  Okay.  Anything else on 1532?

4          **MS. EGLI:**  No, Your Honor.

5          **MS. KOUBA:**  Nothing from plaintiffs.

6          **THE COURT:**  One down.

7      Let's do together, because I think they're conceptually

8  related, Docket 1527 and 1528, the fact witness -- number of

9  fact witness depositions and treater witnesses.

10         **MR. WARREN:**  Good afternoon, Your Honor.  Previn

11  Warren for the plaintiffs.

12         **THE COURT:**  Good afternoon.

13         **MS. EGLI:**  And Megan Egli from Shook Hardy & Bacon

14  for the Meta defendants.

15         **THE COURT:**  Good afternoon.

16      Okay.  So -- well, if I -- does resolving one

17  automatically or generally resolve the other?  I'm trying to --

18  they're intertwined, so --

19         **MS. EGLI:**  We agree, Your Honor.  Defendants agree.

20         **THE COURT:**  Which one should we take first, I guess?

21         **MR. WARREN:**  I don't know if -- why don't we take

22  1528 first --

23         **THE COURT:**  Okay.

24         **MR. WARREN:**  -- if that pleases Your Honor.

25         **THE COURT:**  So the request, as I understand, is that

1   because there are a number of treater witnesses in the initial

2   disclosures, that -- well, wait.

3       First of all, have the plaintiffs identified all the key

4   treaters?

5           MR. WARREN:  I believe so, Your Honor.

6           THE COURT:  That's been done.

7       Okay.  And so it seems to me we're not in a position to

8   preemptively bar the plaintiffs from relying on declarations

9   from somebody hypothetically in the future.  That's not --

10  that's not how it works.  So you're not going to get that kind

11  of relief.  I don't even see where that's allowed under the

12  federal rules.  But I do take your point that if a surprise

13  declaration comes in from somebody who you hadn't deposed,

14  there's at least the potential for prejudice.

15      Now, it seems to me there's 28 days between when an

16  opposition brief comes in and when a reply is due.  What I see

17  in the briefing is that plaintiffs are committing, if they do

18  happen to put in a declaration from a surprise non-key treater

19  witness, that they'll make that person available for

20  deposition.

21      Am I misunderstanding the representation?

22          MR. WARREN:  You're not misunderstanding that at all,

23  Your Honor.  The only thing I'd add is that there are no

24  surprises because they're all in our initial disclosures.

25          THE COURT:  All right.  So the one thing I am going

1  to order you to do is if -- I mean, it's going to be your

2  choice; but if you do put in a declaration from a non-key

3  treater who wasn't deposed, you're not only going to make him

4  available for deposition, you're going to make him available

5  for deposition within the first one or two weeks of the reply

6  period.  In other words, you can't make him available for a

7  deposition the day before the reply brief is due.

8      MR. WARREN:  That's absolutely fine, Your Honor.  I

9  would -- we would expect the same courtesy from defendants; if

10  they present an affidavit at summary judgment of an individual

11  that we haven't deposed, that they would make them available

12  for deposition as well.

13      THE COURT:  That's actually later on in what I was

14  going to get to.  But you understand the order with regard to

15  making people available for deposition on your side?

16      MR. WARREN:  Absolutely.

17      THE COURT:  Okay.  And the concern raised by

18  defendants that "Well, trying to schedule depositions of people

19  who are busy healthcare professionals is going to be difficult

20  or hard," when you select, if you do select -- it's a whole

21  hypothetical -- if you do select a non-key treater to put in a

22  declaration, you're warned now you've got to make sure that

23  they're going to be available for deposition in that time

24  frame.  Right?

25      MR. WARREN:  Absolutely, Your Honor.  That's fair.

1    We'll do that.

2        THE COURT:  Okay.  So to go to the point you raised,

3    I don't know if you're planning -- I mean, it's not always that

4    plaintiffs file summary judgment motions.  Sometimes they do;

5    sometimes they don't.  I don't know.  But, yes, the same rule

6    would apply.  If it's somebody who wasn't deposed and it's a

7    person who you were aware of in the initial disclosures and

8    didn't depose them for whatever reason, yes, I would expect the

9    defendants to make that person available for deposition within

10   the reply period early, in the first one or two weeks.  Okay?

11       MR. WARREN:  Thank you, Your Honor.

12       THE COURT:  All right.

13       MS. EGLI:  Can I just make one point, Your Honor?

14       THE COURT:  Sure.

15       MS. EGLI:  And I think you're going to -- I think --

16   I probably would have handled the other motion first.  I think

17   we'll probably be getting there.

18       But with the number of treaters that are listed, we do

19   feel that there is prejudice in that we are not able to take

20   their depositions, and plaintiffs do have -- I know you don't

21   want me to repeat what's in the argument, but I just want to

22   make the point, and I don't know where we're going in the other

23   motion.

24       THE COURT:  I mean, since -- well, you're going to be

25   able to depose a non-key treater at some point if they become

1  relevant to the case now that I've made that ruling.  So

2  I think a lot of your concerns should go by the wayside at this

3  point.  No?

4           **MS. EGLI:**  It's just the concern, Your Honor, of

5  plaintiffs having the advantage of seeing our briefing and then

6  coming up with an off-the-record ex parte affidavit from a

7  treater that they previously told us was -- you know, they

8  didn't include on their key treater list.

9           **THE COURT:**  Yeah, but you're going to get to depose

10  them.

11           **MS. EGLI:**  Okay.

12           **THE COURT:**  I mean, I just --

13           **MS. EGLI:**  I hear you on that.

14           **THE COURT:**  That's why I just ruled the way I did.

15  Right?  So the answer is no.

16      I mean, at this point, since we've narrowed, hopefully,

17  the universe of people -- I mean, I've got to assume plaintiffs

18  are not intending to rely on non-key treaters.  That would be

19  weird if you did --

20           **MR. WARREN:**  We're not.

21           **THE COURT:**  -- in opposition.

22           **MR. WARREN:**  And I think we made that representation

23  in the papers.  At least as of this moment right now, we don't

24  have that intention.

25           **THE COURT:**  Okay.  So I think your concerns are

1    safeguarded by the fact that you've got this order that they've

2    got to make them available for deposition.   Okay?

3        All right.   So does that resolve 1527 and 1528?

4        **MR. WARREN:**   Your Honor, the only other issue I'd add

5    on 1527 is about non-treater depositions and the sheer number

6    of non-treater depositions that the defendants are attempting

7    to take, which at present is 74 over 11 plaintiffs.

8        We don't think there is a conceivable world in which they

9    can get that done in the amount allotted.   And so they're sort

10   of putting us to the paces of preparing those witnesses, kind

11   of making them feel like they're going to be under this,

12   you know, potentially intimidating obligation, only to have

13   those disappear when defendants realize they don't actually

14   have the time to do it.

15       And so we were, in effect, asking for some relief through

16   1527 on that issue.

17       **THE COURT:**   Are you really intending to depose every

18   single one of those people?

19       **MS. EGLI:**   Your Honor, these are all -- for the most

20   part, three-quarters of those witnesses are people that have

21   been listed by plaintiffs as witnesses who they may use to

22   support their claims.

23       And we feel hamstrung here.   There are -- now they've made

24   a representation that one of the witnesses would only have

25   irrelevant, duplicative information if we took her deposition,

1  one of the witnesses that they've listed; and yet they're

2  refusing to withdraw her from their initial disclosures.

3      So they've asked the Court to institute a short schedule,

4  have asked the Court to restrict our ability to take

5  depositions.  The Court has entered a 30-hour limit, and then

6  they listed something like -- it's not 74, but 69 witnesses,

7  I believe, non-treater witnesses as people that may support

8  their claims.  And so having asked the Court to restrict our

9  discovery in these cases, they've now overbroadly listed fact

10 witnesses.

11     And we're asking for some sort of relief that the Court

12 instruct plaintiffs to reduce the number of witnesses that

13 they've listed.

14         **THE COURT:**  Well, I assume that you've already made

15 that ask and the plaintiffs have said, "No, we're not going

16 to."

17         **MS. EGLI:**  Correct, Your Honor.

18         **MR. WARREN:**  That is correct, Your Honor.

19         **THE COURT:**  Right.  So, look, that's counsel's duty

20 to follow the rule and list people who fall within the scope of

21 Rule 26 as people who may have information that I think

22 supports their claims or defenses.

23     It's also your prerogative to depose as many people as you

24 think you can fit in the time frame there is.  I mean, it may

25 be a 30-minute deposition.  I don't know.  Right?

1    And my -- I mean, we've all worked -- people who have

2    worked on big cases in the past know that at some point you

3    start figuring out, when you start deposing the first few

4    people, that you could ask them about the other people, and you

5    start figuring out you actually don't need to depose the other

6    people on the list.  Right?

7    And so I'm not going to restrict who they notice for

8    deposition because they're fairly at play, at least right now,

9    but they may be withdrawn later.

10    And I do expect you to promptly tell each other when

11    you're going to take somebody's deposition off calendar because

12    you've realized they're not important -- right? -- and not wait

13    until the last minute.

14    **MS. EGLI:**  Absolutely, Your Honor.  We made it clear

15    to plaintiffs' counsel that we may very well take some of these

16    down; but given the schedule and the difficulty of scheduling

17    witnesses and some of the plaintiffs being deposed in March, we

18    have to get --

19    (Stenographer interrupts for clarification of the record.)

20    **MS. EGLI:**  I apologize.

21    Given the schedule and the difficulty of scheduling and

22    that some of the plaintiffs are not noticed for deposition

23    until March, we feel that we need to get depositions on the

24    calendar.

25    **THE COURT:**  I mean, that's fine.  As I said, I think,

1  earlier, it's your prerogative to try to notice the depositions

2  you think you want to take and work with each other on

3  scheduling them.

4     And then, again, the flip side of that is, work with each

5  other on taking them down when it turns out they're actually

6  not important or not somebody you think you need to depose at

7  the end of the day.  Okay?

8           **MS. EGLI:**  Yes.

9           **MR. WARREN:**  And, Your Honor, that's fine.  It's just

10  that we -- we will be insisting that they abide by the 30-hour

11  limit that Your Honor has set.  I mean, that's all it is.

12           **THE COURT:**  I didn't say anything about extending the

13  limits.

14           **MR. WARREN:**  Of course.  And I just wanted to make

15  that record.

16     The initial depositions that have been taken have

17  stretched late into the night.  So if they can pull it off with

18  half-hour depositions, then all the power to them.

19           **THE COURT:**  That's -- what is it?  It's like a

20  football game.  Time -- clock management is always important,

21  and I assume the coaches on that side of the V are working on

22  that to make sure they reserve as much time as possible.

23           **MR. WARREN:**  Thank you, Your Honor.

24           **THE COURT:**  All right.

25     Okay.  Does that resolve 1527 and '28?

1          **MS. EGLI:**  Yes.  Thank you, Your Honor.

2          **THE COURT:**  Okay.

3          **MR. WARREN:**  Thank you.

4          **THE COURT:**  Three down.

5      So, gold stars to the states whose agencies worked out

6  their production disputes with Meta in the late-night -- it

7  looked like late-night meet and confers to resolve some of --

8  even the last-minute resolution.

9      It's not on the docket.  I'm just going to say, the Court

10  received an email from Meta and all the New York agencies at

11  issue confirming that they have resolved all their disputes in

12  the status report about document production.

13      Is that correct?

14          **MR. YEUNG:**  Yes.  Chris Yeung for Meta.

15  Yes, that's correct.

16          **MR. WALLACE:**  Kevin Wallace, the New York Attorney

17  General.

18      The outstanding agencies had outside counsel, but I can

19  confirm they have expressed to us that they worked it out with

20  Meta.

21          **MR. YEUNG:**  Outside counsel's here.  I think she's

22  coming up.

23          **THE COURT:**  Okay.

24          **MS. O'BRIEN:**  Good afternoon, Your Honor.  Claire

25  O'Brien, Selendy Gay, on behalf of the officer -- the Office of

1  the New York State Governor.

2      I'm pleased to report that we have resolved our issues

3  and -- but are here to assist the Court if we can be helpful.

4          **THE COURT:**  No.  If you've resolved the disputes,

5  then bronze star to you-all for doing it.  Bronze because you

6  did it at the last minute, but --

7                      (Laughter.)

8          **THE COURT:**  -- you get in there.

9      Gold stars for the ones who did it even way before I had

10  to issue the order setting up this schedule.

11          **MS. O'BRIEN:**  And we had three of those, Your Honor,

12  so, great.

13          **THE COURT:**  Okay.

14          **MS. O'BRIEN:**  Thank you.

15          **THE COURT:**  So thank you on that.

16      So if I'm doing the counting right, that leaves Colorado

17  and Illinois, is that right, or have they resolved their

18  disputes?

19          **MR. YEUNG:**  You're right, Judge Kang.  Those are the

20  two states with agencies.  There are three agencies between

21  those two states.

22          **THE COURT:**  Okay.  So who's here for Colorado?

23          **MS. SULLIVAN:**  Good afternoon, Your Honor.  Jennifer

24  Sullivan from the Office of the Colorado Attorney General on

25  behalf of the Governor's Office and the Office of State

PROCEEDINGS

1   Planning and Budget, which are the only two agencies with a

2   dispute outstanding.

3           THE COURT:  Okay.  And do you have a colleague here

4   or --

5           MS. SULLIVAN:  I have a colleague, Krista Batchelder.

6           THE COURT:  Okay.  And, Mr. Yeung, you're arguing for

7   Meta on this issue.

8       So as I understand, as between Meta and the only two

9   remaining Colorado agencies with disputes, it simply comes down

10  to which custodians; is that right?

11          MR. YEUNG:  Correct.

12          THE COURT:  Okay.  So, Mr. Yeung, for the Office of

13  the Governor, the custodians you listed in your side of the

14  chart, are they in order of priority?

15          MR. YEUNG:  They are -- let me just double-check.

16      They are not.

17          THE COURT:  Okay.  Give me your order of priority

18  below Ms. Nathanson.

19          MR. YEUNG:  Chief of staff -- actually, you know

20  what?  They are in the order of priority.

21          THE COURT:  Okay.  So one, two, three, four.

22      And then same thing for the Office of State Planning and

23  Budget, what's your order of priority there?

24          MR. YEUNG:  Below Mr. Toy, they are in the order of

25  priority.

1      **THE COURT:**  Okay.  So I've threatened this in prior

2   orders.  I'm going to order you two to go out in the hall and

3   meet and confer one last time on this.  This is that kind of

4   thing where I really think lawyers should be able to work out a

5   deal.  All right?

6      So Meta should know, you're not going to get every single

7   custodian you want.  All right?

8      Colorado should know, you can't limit them to just one

9   custodian.  All right?

10     And go out in the hall and try to work it out.  Okay?

11     **MS. SULLIVAN:**  Your Honor, may I just clarify?

12  Because the Office of State Planning and Budget is very small.

13  It is 34 people.

14     **THE COURT:**  Okay.

15     **MS. SULLIVAN:**  So one custodian is the person with

16  the knowledge about this subject matter.

17     So I understand what the Court is saying.

18     **THE COURT:**  Okay.

19     **MS. SULLIVAN:**  I just wanted to make that point, but

20  I will -- we'll do our best.

21     **THE COURT:**  Try to -- that's why you need to try to

22  negotiate these things -- right? -- because -- I think I've

23  said this with regard to search terms as well -- you-all know

24  your cases better than I do and you know the details better

25  than I do; and if you leave it up to me to decide, I'm going to

 1   have less information than you-all have institutionally; I'm

 2   going -- but I'm going to make decisions if you leave it up to

 3   me.

 4        I'm going to give you one last chance to work this out and

 5   come back and report to me on it.  Okay?

 6             MR. YEUNG:  Thank you, Your Honor.

 7             THE COURT:  Anyway, go out in the hall and talk.

 8        Mr. Yeung, do you need to be here to talk about Illinois,

 9   or can somebody else handle that?

10             MR. YEUNG:  I do not.  My partner Mike Kennedy --

11             THE COURT:  Okay.

12             MR. YEUNG:  -- will be speaking on the Illinois

13   issues.

14             MR. KENNEDY:  Good afternoon, Your Honor.  Michael

15   Kennedy with Covington & Burling representing the Meta

16   defendants.

17             MR. DAVIES:  Matthew Davies from the Office of the

18   Illinois Attorney General, and then I have Michelle Camp from

19   the Department of Children and Family Services.

20             THE COURT:  Okay.  So just so I'm clear, all the

21   other Illinois state agencies have resolved their disputes with

22   Meta, and the only remaining disputes are only with the agency

23   called the Illinois Department of Children and Family Services,

24   or DCFS, and only with regard to search terms; is that right?

25             MR. DAVIES:  Correct.

1              THE COURT:  Okay.  And it looks like buried in your

2      briefing, there's still an open dispute about how you would

3      either cap, like, documents to be reviewed, if there'd be --

4      Meta had offered a 100,000 cap; and DCFS had said, "Well, we

5      couldn't do more than 10,000," or something like that.

6              MR. DAVIES:  Roughly accurate, yes.

7              THE COURT:  Right.  Okay.  So -- and going through

8      the chart of the proposals, so with regard to Search String 20,

9      which is in dispute, Meta had offered to omit the words "youth"

10     and "school" from the youth terms for purposes of that search

11     string.  I'm going to hold them to that.

12             MR. DAVIES:  Can I quickly point out, that search

13     string results in over 100,000 hits in and of itself.

14             THE COURT:  Okay.  And with regard to Search

15     String 22, Meta offered to omit the words "youth" and

16     "juvenile" from the youth terms for that.  I'm going to hold

17     them to that.

18          Also, Meta had offered to exclude documents that hit on an

19     agreed list of terms based on the sampling you did, such as --

20     terms such as "ACR," "QSR," and "critical event."

21          Do you have that list finalized?

22             MR. KENNEDY:  No, Your Honor.  We had identified four

23     such terms that's in an email, and we also said we would

24     consider adding additional terms to that list if we could see

25     sample documents.  Basically, the issue is to avoid hitting

1    emails that are talking about individual children.  So we were

2    open to additional lists, but for right now, we just have four

3    terms.

4             **THE COURT:**  Okay.  Do you have a list of proposed

5    terms to add to that list?

6             **MR. DAVIES:**  I do not.  Here today, I do not, no.

7             **THE COURT:**  Okay.  And then Meta had agreed to limit

8    and exclude documents that hit solely because it hits on a

9    signature block.  I'm going to hold them to that because that

10   seems like a reasonable thing.

11        So with that, if -- I'm going to do the same thing.  I'm

12   going to give you a chance to try to at least narrow this, if

13   not resolve this, in the hallway and come back and tell me if

14   you can.

15        I've already ruled on the things I'm going to hold Meta

16   to.

17        I will say -- I'm just going to give you some guidance --

18   it looks to me like Search String 11 looks pretty broad.  It

19   also seems to me that some of the connectors, like within 200,

20   seems pretty broad.  But I don't have the hit reports.  You-all

21   know what --

22             **MR. DAVIES:**  Yeah.

23             **THE COURT:**  -- hit reports result from these terms.

24        And I don't know if you've run alternates with shorter

25   connectors or not.

1          But if you're not able to work it out, I'm just going to

2    rule on the dispute -- okay? -- as presented.  So I'm going to

3    give you one last chance to try to work it out in the hallway

4    and come back.

5          **MR. DAVIES:**  Can I quickly bring up one thing?

6          **THE COURT:**  Sure.

7          **MR. DAVIES:**  The privilege part of -- I mean --

8    sorry.  The protective order piece of this and then the logging

9    piece of this, so part of the burden is having to find and pull

10   out the PHI information and then potentially log it.

11         And to date, we have a global protective order; but my

12   agency would like a very specific protective order that covers

13   the statutes, the Illinois-specific statutes and covers this

14   specific instance and would like -- the statutes, the Illinois

15   statutes require an order from the Court before some of this

16   material can be turned over.

17         So if this is going to happen, we would like those --

18         **THE COURT:**  I've run into similar arguments and

19   situations in other cases involving HIPAA information, and I

20   have ruled in those cases -- at least one other case that

21   the Court's model protective order complies with the federal

22   regulations on being a HIPAA-compliant protective order.  So I

23   don't know why the existing protective order doesn't satisfy

24   the same concern here.

25         **MR. DAVIES:**  I would have to defer to agency counsel

1    on that, but there is a Seventh Circuit one that I think

2    accounts for the Illinois-specific statutes.

3            **THE COURT:**  Okay.

4            **MS. O'BRIEN:**  Yes.  And, Judge, the Seventh Circuit

5    has a model protective order, which we've provided to counsel,

6    that includes Illinois state-specific statutes.  That's been

7    provided.  And that is routinely entered on all of our federal

8    cases involving the Department.  Even on cases where a parent

9    or a child is a party, the protective order is always entered.

10           Counsel would not agree to this on Friday.

11           **THE COURT:**  Why not?

12           **MR. KENNEDY:**  Your Honor, let me clarify that.

13           I didn't not agree to it.  What I said was -- my

14   colleagues have been approached by numerous other states with

15   similar issues, and my understanding is we're going to respond

16   on these sorts of protective order issues globally.

17           What I said was I'm not able to make a separate deal with

18   Illinois because there's so many other states at play and we

19   were coming up with -- you know, my understanding is we're

20   coming up with a response that covers a lot of states.

21           But I didn't say "no."  I just said, "We would have to get

22   back to you on that."

23           **MR. DAVIES:**  They haven't responded to the lead's

24   email about that, which was sent last Friday as well.  So

25   there's been radio silence about this.

1      **THE COURT:**  I'm going to give you some guidance on

2  this.  Right?  I mean, whereas you may want to respond globally

3  on this, if this is the holdup to getting these documents which

4  you want, it's not a reason not to agree to this.  Right?  And

5  if they were to file tomorrow a motion with me attaching a

6  proposed protective order, I'm going to set a very short

7  opposition deadline.  And if the Seventh Circuit is -- it's a

8  Seventh Circuit model order.  I haven't looked at it, I'm not

9  prejudging, but that's going to hold a lot of weight with me.

10  Okay?

11      **MR. KENNEDY:**  I understand, Your Honor.

12      **THE COURT:**  All right.  So this should not be a

13  hangup.  Okay?

14      So anything else before you head out in the hallway and

15  try to work it out?

16      **MR. KENNEDY:**  No, Your Honor.

17      **MR. DAVIES:**  All right.  We'll try.

18      **MS. O'BRIEN:**  Thank you, Your Honor.

19      **THE COURT:**  That's all I ask.

20      Okay.  So that's -- so just so the record's clear, that

21  was discussing Colorado's Joint Status -- Status Report 1561

22  and Illinois Status Report 1537.

23      Okay.  They're going to come back.

24      Let's talk about Snap's employee accounts, Docket 1544.

25      **MR. FREEDMAN:**  Aaron Freedman, Weitz & Luxenberg, on

1 | behalf of the personal injury and school district plaintiffs.

2 |      **MR. BLAVIN:**  Good afternoon, Your Honor.  Jonathan

3 | Blavin from Munger Tolles on behalf of Snap.

4 |      **THE COURT:**  Okay.  So, look, the Snap employee

5 | handbook -- is that what -- yeah -- says that the electronic

6 | communications about work are the property of Snap.  So the

7 | Stored Communications Act doesn't even apply because it's not

8 | the employees' property, by your own handbook; it's your

9 | property.  And you can disclose your own property under the

10 | Stored Communications Act.  So that's not a bar here.

11 |     Generalized concerns about privacy are addressed by the

12 | fact that we have a protective order in the case.  And just

13 | because the Snap employees may have some personal photos or

14 | family stuff in their accounts, you're not going to be

15 | producing those, I assume.  They're going to be irrelevant, so

16 | they're not work related.

17 |     Also, I assume a lot of the stuff is communications or

18 | chats in threads, and the threads are the things that are going

19 | to show you whether they're relevant or not.  And presumably,

20 | people don't mix their family pictures a lot with their

21 | work-related threads in a communications platform like this.

22 |     So I'm going to overrule your objections.  I don't see why

23 | you can't be producing this stuff.

24 |     So tell me why I'm wrong.

25 |      **MR. BLAVIN:**  Well, first, I'll just make sure that

PROCEEDINGS

1    the Court is aware of the difference between snaps and chats,

2    which do contain text.  We have agreed to collect and search

3    for responsive materials for Snapchat employees' chats.  And

4    those would include threads; they would also include embedded

5    images.

6           **THE COURT:**  You're repeating what's in the briefing.

7    I understand.

8           **MR. BLAVIN:**  Okay.  So the issue with respect to

9    snaps, just quickly, Your Honor, is that there's zero evidence

10   that any work-related communications occurred via snaps.  No

11   employee has testified to that.  The only employee who

12   testified to that at all is to the extent they're communicating

13   with employees, they're sharing photos/videos of their

14   children.

15          So, you know, it's not only producing, Your Honor.  It's

16   taking employees' personal photos/videos of family members,

17   friends, et cetera; putting that up on a separate review

18   platform; and having attorneys have to go through those

19   individually to see if there's any responsive material.  And we

20   would respectfully submit that it's disproportional.

21          **THE COURT:**  Objection overruled.  Because, I mean,

22   you're their lawyers; right?  You're not publishing stuff on

23   the review platform.  It's the same thing with their emails.

24   People use their work emails to communicate with family and

25   friends as well.

**PROCEEDINGS**

1    So, no, that's not persuasive.

2    Anything else?

3        **MR. FREEDMAN:**  Nothing from plaintiffs, Your Honor.

4        **MR. BLAVIN:**  I'm not going to reargue our brief on

5    the Stored Communications Act issue.  I'll just respectfully

6    state that we disagree with Your Honor's ruling and reserve the

7    right potentially to appeal it.

8        **THE COURT:**  Well, tell me if I'm wrong on what the

9    employee handbook says.  I mean, you're quoting it to me.

10   Nobody attached it.

11       **MR. BLAVIN:**  Yeah.  I have the employee handbook, and

12   I can pass it up to the Court.

13       **THE COURT:**  Well, no.  Do you agree that the employee

14   handbook tells employees that work-related snaps and chats are

15   the property of the company?

16       **MR. BLAVIN:**  Well, what I would say is what the

17   employee handbook says and the parts that they're citing to

18   it -- it says a couple of things that are worth noting.

19       First, with respect to the issue of, you know, what can be

20   potentially produced and what's considered a business record,

21   it says at page 19766 of the employee handbook that employees

22   should also be "mindful that internal and external email

23   messages are considered business records and may be subject to

24   discovery in litigation."

25       With respect to snaps, Your Honor, there is language in

1    the order, which is -- in the handbook, which is cited, that

2    Snap may monitor the use of Snapchat accounts; but it makes

3    clear that with respect to potential discovery and collection,

4    that's limited to emails.

5         The other thing I would note, Your Honor -- and this is

6    specifically with respect to former employees because the

7    dispute here really is:  Do we need to go to people who've left

8    the company and produce their Snapchat account material, even

9    though they're no longer employed?  And the employee handbook

10   does make clear, Your Honor, that it applies while they are

11   employees of Snap.  So, respectfully, we would assert that

12   these people are no longer at Snap.  They're no longer

13   employees.  The employee handbook wouldn't apply in that

14   circumstance.

15          THE COURT:  So Snap -- the briefing quotes the

16   employee handbook at Snap page 19766 as saying that (as read):

17          "All electronic communications, including email,

18      made by team members using Snap's devices, systems,

19      or networks are considered company property."

20   Does it say that?

21       MR. BLAVIN:  Let me look at the exact language that

22   they're referencing.

23          THE COURT:  Does it say that?

24       MR. FREEDMAN:  It does say that, Your Honor.  You

25   read that correctly.

PROCEEDINGS

1          **MR. BLAVIN:**  I would just add, Your Honor, that it

2    also includes this language that they're not business records

3    that are subject to discovery.

4          **THE COURT:**  That one sentence makes very clear to all

5    employees, even employees who've departed, that everything they

6    used on -- using Snap's devices, systems, or networks is not

7    theirs.  It belongs to the company.  So you don't need to go

8    back to any former employees.  It's already Snap's property by

9    its own handbook.

10       So, no, that objection is overruled.  And, no, the Stored

11   Communication Act argument lacks proper legal basis to make

12   that objection because you're not going to some employee's --

13   the contents of some employee's personal emails to try to

14   produce them.  All right?

15         **MR. FREEDMAN:**  And, Your Honor, I would just add one

16   thing.  We've had to take a number of depositions without that

17   information, those documents.  We've asked in the brief for

18   this information, which was not disclosed to us before the

19   substantial completion deadline, to be produced by -- I believe

20   it's January 24th.  We would just ask that the Court order that

21   timeline.

22         **MR. BLAVIN:**  Your Honor, we've made efforts and

23   I think to date we have produced Snapchat messages, you know,

24   approximately seven days in advance of each deposition.  We're

25   working as quickly as possible to get it out.

PROCEEDINGS

1      THE COURT:  Did you read my order from this morning

2  about Quips?

3      MR. BLAVIN:  Yes, Your Honor.  We will meet and

4  confer with the other side and resolve this issue.

5      THE COURT:  So I think that should provide you every

6  bit of guidance you need on --

7      MR. BLAVIN:  Yes.

8      THE COURT:  -- how to resolve production of snaps and

9  chats as well.

10      MR. BLAVIN:  Yep.

11      THE COURT:  And if it doesn't, woe betide the

12  attorney who comes before me to argue that they can't, in light

13  of that guidance.  Okay?

14      Does that resolve 1544?

15      MR. FREEDMAN:  Yes, Your Honor.

16      MR. BLAVIN:  Thank you, Your Honor.

17      MR. FREEDMAN:  Thank you.

18      THE COURT:  Let's do -- I don't care the order.

19  Let's do either 1541 or 1538, YouTube non-custodial databases

20  or RFPs 37 and 50 to YouTube.  Who's arguing those?

21      MS. SCULLION:  Good afternoon, Your Honor.  Jennifer

22  Scullion for the plaintiffs.

23      MS. WHEELER:  Good afternoon, Your Honor.  McKinney

24  Wheeler at Wilson Sonsini for YouTube.

25      THE COURT:  Good afternoon.  Is this your first

**PROCEEDINGS**

1  appearance in this case?

2          **MS. WHEELER:**  It is.

3          **THE COURT:**  Okay.  Good.  I like that.

4          **MS. SCULLION:**  Your Honor, if I might, if we could

5  update you on some resolution.

6          **THE COURT:**  Yes, of course.

7          **MS. SCULLION:**  Okay.  Which I think, if I get the

8  number right, I think it's 1538, which is with respect to --

9  sorry -- with respect to the user interfaces.

10         **THE COURT:**  1541.

11         **MS. SCULLION:**  Oh, I apologize.  Okay.  I had it

12  wrong.  Thank you.

13         **THE COURT:**  Right.  Historical versions of UIs.

14         **MS. SCULLION:**  Yes.  That one we have reached

15  resolution on.

16         **THE COURT:**  Excellent.  Okay.  So is it withdrawn as

17  moot or granted as agreed, or how do you want it resolved?

18         **MS. SCULLION:**  We have worked out an agreement in

19  principle that we think we will -- I don't know if we're going

20  to need a stipulation, a formal stipulation.  We -- so it's

21  moot, I guess.

22         **THE COURT:**  Okay.  So do both sides agree I can

23  withdraw it as moot and resolve it that way?

24         **MS. WHEELER:**  I think that's correct, Your Honor.

25         **THE COURT:**  Okay.  Love to hear that.  Okay.  So that

1    resolves 1541.

2        Okay.  So let's turn to non-custodial databases.  So on

3    this one, there's still no ripe dispute here?

4            **MS. SCULLION:**  We do have ripe dispute.  We do have

5    maybe some progress just in the hallway on one subpart of it.

6            **THE COURT:**  Okay.

7            **MS. WHEELER:**  That's correct.

8            **MS. SCULLION:**  I'm going to be careful today --

9    sorry -- to refer to the specific resource names that YouTube's

10   asked us to keep under seal, so I'm just going to refer to them

11   by their initials.

12       So it's with respect to Resource F --

13           **THE COURT:**  Okay.

14           **MS. SCULLION:**  -- that we may, in fact, be reaching a

15   resolution.

16       I would like to discuss that just very briefly after we

17   hear from Your Honor, obviously.

18           **THE COURT:**  Well, do you want to go out in the hall

19   and try to finalize resolving some of these or --

20           **MS. SCULLION:**  It's really just, Your Honor, if you

21   can tell, one of the main themes in our briefing is the process

22   to do the meet and confer.  Like I say, I think we may be

23   reaching a resolution on that one, but that's an issue which

24   we're going to want to have a very tight meet-and-confer

25   process to finalize that to make sure we actually have a

1    resolution and that we have someone from the company who can,

2    you know, be there and be sure that we do understand how this

3    resource can be searched so that we are being as effective as

4    possible in terms of the search.

5            **THE COURT:**  Okay.  So I don't want to interfere with

6    any ongoing negotiations here.  So what --

7            **MS. WHEELER:**  Your Honor, if I may just address that

8    point.  And it kind of relates to one of the other points in

9    dispute, which is the provision of someone from the company.

10       Just to clarify the nature of these sources, these are

11   products that are not necessarily in the control of YouTube.

12   They're Google products.  They're used by multiple teams.

13   There is not one person or even one team who has comprehensive,

14   authoritative knowledge of especially how these sources can be

15   searched, exported for legal discovery purposes.  These are

16   sources that are used for things like user complaints and

17   calendars, you know, that are not -- that are not routinely

18   exported for legal discovery purposes.

19       And so the concern with plaintiffs' request is that the

20   person that they want to be on the meet-and-confer calls

21   doesn't exist.  And the reason that it takes time is because we

22   have to go back and confer with multiple teams and figure out:

23   What is the search capability?  What is the syntax of search

24   terms?  And, you know, how can we export it in a way that's

25   readable?  How can we redact it for PII?

1    So just to -- just to set the stage, that's the nature of

2    the challenge with what plaintiffs are requesting.

3    I think we're -- YouTube also wants to resolve these as

4    quickly as possible.  So we're amenable to, you know, working

5    to make that happen quickly.  Just, it's a challenge because

6    there isn't one authoritative source of knowledge.

7           MS. SCULLION:  Your Honor, we understand that.

8    However, I mean, Your Honor has made crystal clear to all of us

9    that you want us to meet and confer and try and resolve these

10   issues.

11   Obviously, when it comes to YouTube's non-custodial

12   sources, the premise of that is we have people on the calls who

13   have the information and know how these -- what these sources

14   are, how they're searchable, or can get us the answers in real

15   time.

16   We've tried to explain to Your Honor in the brief -- and I

17   apologize.  I know it was quite dense in its detail -- that

18   what's happened repeatedly, unfortunately, is we put a question

19   such as "Can we use wild cards in doing the searching?" and the

20   answer is "We'll get back to you."  Three, four weeks go by.

21   We get an answer, and multiple times the answer has proven not

22   to actually be accurate or complete.

23   It's why we're here still now in the middle of January as

24   opposed to having issues, you know, either resolved or teed

25   them up earlier.

PROCEEDINGS

1    **THE COURT:** So help me understand. Is -- for

2   example, the F tube, is that software app provided by a third

3   party or is it an internally developed thing?

4    **MS. SCULLION:** This is Source F?

5    **THE COURT:** Yes.

6    **MS. SCULLION:** Our understanding is that Source F is

7   something within YouTube and Google, that they use it

8   routinely. Obviously, one of the problems is --

9    **THE COURT:** But they didn't get it from a third-party

10   vendor?

11    **MS. SCULLION:** I do not know for sure, Your Honor.

12    **THE COURT:** So do you know?

13    **MS. WHEELER:** That's correct. My understanding is

14   it's a --

15    **THE COURT:** What about the L resource?

16    **MS. WHEELER:** My understanding is that is a Google

17   product. They're --

18    **THE COURT:** Are any of these provided by third-party

19   vendors?

20    **MS. WHEELER:** No, I don't believe so, Your Honor.

21    **THE COURT:** Well, I think I've said this in other

22   contexts. When you're going to have meet and confers where

23   technological capability issues are at issue, you do need to

24   have somebody who understands the technology involved, because

25   otherwise you'd run into the exact problems that have led us

1    here today.

2        And I don't expect you to have one person who's the,

3    you know, dean of all -- one, two -- five of these.  Right?

4    But you may need five different people; you may need to have

5    ten different people available at different times on the call.

6        So instead of the lawyers being the conduit for questions

7    and then there being a delay back and forth, that's not an

8    efficient way to do this.  You need to find the people who do

9    know about this stuff.

10       And to the extent you're able -- I'm not saying -- I'm not

11   forcing you to but -- you're able to find somebody at Google

12   who will voluntarily join because they happen to be the guru

13   about the B resource and they're willing to join just as a

14   courtesy, try to do that -- right? -- because you can cut

15   through a lot of these questions and just get it done.

16            **MS. WHEELER:**  Understood, Your Honor.

17       A concern that YouTube has is that these are -- many of

18   these individuals are -- you know, they're engineers; they're

19   engaged in the day-to-day function of trying to make this

20   happen.  We just don't want these individuals -- it seems

21   unreasonable to have them be trapped on long meet-and-confer

22   calls with an endless series of questions.  And so if there

23   could be some kind of limitation, you know, maybe half an hour

24   with an individual, you know, on this source.

25            **THE COURT:**  How long have the meet and confers been?

1          **MS. SCULLION:**  The meet and confers sometimes will go

2     90 minutes.

3          But, Your Honor, I think you've seen from the briefing,

4     the questions have been outstanding since October.  I mean,

5     these are not new issues, and they shouldn't have taken

6     multiple rounds of three or four weeks to try to resolve.  And

7     I don't think I've ever been in a position where we've said "We

8     need other folks" because the answers have just been so much

9     flip-flop.

10          You know, even with respect to the Source F, you know,

11     this is a source that we understand contains complaints and

12     tracking of complaints; and as you saw from the briefing, the

13     initial description we got from YouTube was that it had limited

14     search capability, et cetera.  It was only in the course of a

15     meet and confer about a month after we got that chart where

16     counsel for YouTube happened to mention that they had done a

17     sample and used wildcards -- something they specifically said

18     wasn't able to be used -- to search that resource.

19          And we said, "Well, wait.  What are you talking about?"

20          And we come to learn there's this export table that is

21     fully searchable through an SQL query, which you can use

22     Boolean; you can use a wildcard.

23          And like I say, now we are hopefully coming to a point

24     where we can resolve what we're going to do in terms of

25     searching Source F.

1    But that's the kind of stuff that, it shouldn't happen.

2  We need people on the call who really actually know how these

3  resources work to give us complete, accurate information.

4    And we've highlighted -- the same issue has come up with

5  Source B, where we're told there's limitations on its

6  searchability; but then YouTube actually sent us links to

7  documents that are apparently made available to developers,

8  talking about how you can search what we understand to be the

9  same source, that suddenly it looks like you can use

10  connectors, for example, when doing the searching.

11    When we asked and said, "Is that accurate?  Is this

12  describing searching Source B?" the answer once again is "We'll

13  have to get back to you."

14    We still don't have that answer.  I mean, we have no more

15  time to have three and four weeks go between the meet and

16  confers.  We need the answers.

17    **MS. WHEELER:**  Okay.  Well, I would just -- just to

18  respond to what they've described about the process is, part of

19  the reason for the back-and-forth is that the questions that

20  plaintiffs are asking, the level of insight that they have been

21  seeking and been granted is unprecedented.

22    We -- YouTube just has not done these processes ever

23  before.  And so part of the reason -- I can understand the

24  frustration.  YouTube is not trying to hide the ball here.

25  There hasn't been -- you know, it's -- YouTube has been

1   learning about the process and the capabilities as plaintiffs

2   have asked questions.  And they have asked follow-up question

3   on follow-up question, and it seems to be getting to the point

4   where we just need to move forward.  YouTube would also like to

5   move forward.

6       But the level of detail that plaintiffs are seeking is not

7   reasonable or proportionate to -- and one fact they'll offer is

8   that in Source F, there -- YouTube has run all of the

9   plaintiffs through the system and, out of all of them, there

10  was one hit of a user complaint submitted through the system.

11  And so it just seems like there's -- and we would argue that

12  the only relevance is -- of information in this source is as

13  pertains to communications that parties have actually had

14  through this source.  And it just seems like that is -- it

15  hasn't occurred fundamentally.

16      So it's -- plaintiffs have asked for questions above and

17  beyond, and YouTube has tried to provide answers, and it's just

18  really difficult to compile again and again, based on these

19  endless series of questions, to respond quickly because YouTube

20  has not done that before.

21          **THE COURT:**  All right.  Now, I know where you both

22  are coming from, so I'll leave it up to you to work this out.

23      Either you make -- you find the people who know how to

24  answer these technical questions instead of you having to relay

25  them back and forth to different people, and have them be on a

 1    meet and confer.  And schedule it within a week, ten days at

 2    the most, and try to get those people.  If it has to be

 3    multiple people and multiple calls, then do it that way; and,

 4    hopefully, that will cut through it.

 5        And I'm expecting plaintiffs not to unduly extend the time

 6    of the meet and confers and just get their questions in.  If

 7    you've got the questions already submitted to YouTube, then

 8    that should help prepare the person who's going to be on the

 9    call who knows how to answer the technical feasibility

10    questions.

11        If you're not able to do that, I would consider granting

12    plaintiffs the ability to take one, two, three -- four?  Are

13    there four?  One, two, three -- four 30(b)(6) depos of about an

14    hour each to get these questions answered.  And then you can

15    designate someone to -- who knows.  Right?  And you can

16    designate whoever is most knowledgeable or who can be prepared

17    under 30(b)(6) to be knowledgeable to answer the questions,

18    because that's the other way to do this.  Okay?

19        **MS. SCULLION:**  Your Honor, thank you for that.  I

20    mean, we certainly think it would be within our rights to have

21    asked for 30(b)(6) -- for those 30(b)(6) on these issues; but

22    the time it takes to do that, for them to get somebody ready --

23    we just want somebody on the phone answering the questions.

24    And we appreciate Your Honor's guidance on that.

25        **THE COURT:**  As I said, my preference is you do the

**PROCEEDINGS**

 1  meet and confer; but if they're not able to schedule it

 2  promptly, within a week or two, then you've got to do the

 3  30(b)(6) and just get it done that way, because if what I'm

 4  hearing from them is it's just too difficult to find people who

 5  can attend the meet and confer, then they're going to be forced

 6  to sit for a deposition.

 7      So that's kind of your choice whether you tell an engineer

 8  you've got to sit for a deposition or just jump on a call for

 9  an hour.  Okay?

10      **MS. WHEELER:**  Thank you, Your Honor.

11      And we would just ask that plaintiffs, to the extent that

12  they have those questions, that they do provide those in a

13  really clear format in advance so that we can try to prepare

14  the questioners.

15      **MS. SCULLION:**  We have, and we'll continue to do

16  that.

17      Your Honor, I just would underscore that the idea that

18  YouTube is still learning about these sources is very

19  problematic.  These are sources, as we laid out in the brief,

20  that contain core information:  the design of the features at

21  issue, external complaints about YouTube, internal comments.

22      **THE COURT:**  You're repeating what's in the briefing.

23      **MS. SCULLION:**  They should have investigated this and

24  come to the table in October knowing about these sources and

25  how they're -- because they made representations about what is

1  in there and the searchability.  So they already made

2  representations in October that have proven to be incorrect or

3  incomplete, which is why we're still here.

4          THE COURT:  Okay.

5          MS. GALLO WHITE:  Very briefly, Your Honor.  Lauren

6  White with Wilson Sonsini on behalf of YouTube.

7      I just want the record to be clear.  I think Ms. Scullion

8  may have misrepresented something that my colleague said.

9      It is not that YouTube is learning about these sources.

10  It is that YouTube is learning about the searchability in the

11  context of legal discovery because the requests that plaintiffs

12  have made are unprecedented.  We have been as accommodating as

13  reasonably possible.  But we hear Your Honor's order.

14          THE COURT:  Okay.  We're not done with this because

15  there's some other pieces to this that I think we haven't

16  addressed, but I think the court reporter needs a break.

17          MS. GALLO WHITE:  Okay.

18          THE COURTROOM DEPUTY:  We're going to go off the

19  record for ten minutes.  It's 2:18; so 2:28, please.

20              (Recess taken at 2:18 p.m.)

21              (Proceedings resumed at 2:31 p.m.)

22          THE COURTROOM DEPUTY:  We are back on the record in

23  Multidistrict Litigation 22-3047.

24          THE COURT:  Okay.

25      Okay.  The second request in Docket 1538 was for

 1   plaintiffs' proposed sampling of the F --

 2              **MS. SCULLION:**  Yes.

 3              **THE COURT:**  -- data.

 4              **MS. SCULLION:**  Your Honor, I think --

 5              **THE COURT:**  Has that --

 6              **MS. SCULLION:**  -- that is the one we --

 7              **THE COURT:**  -- been resolved?

 8         (Simultaneous speaking.  Stenographer interrupts.)

 9              **MS. SCULLION:**  I apologize.

10      Your Honor, it's not fully resolved yet.  We have a

11   proposal from YouTube.  I have not yet been able to confirm

12   with my technical people, who I've been texting with to try to

13   confirm it.  We were going to ask, if we could, Your Honor,

14   could you maybe put us at the end of the line today, see if we

15   can resolve it?

16              **THE COURT:**  Okay.  And then the third request was a

17   deadline for YouTube to provide some additional information

18   about custodial sources.  Has that been resolved?

19              **MS. SCULLION:**  Yes.

20              **MS. WHEELER:**  Okay.  I'm not sure we're totally clear

21   on the additional information that plaintiffs were seeking, and

22   maybe this goes back to the provision of knowledgeable people.

23      We just -- to identify the right people to bring on the

24   calls, those -- that needs to be keyed off of plaintiffs

25   providing a definitive list of questions about each of these

**PROCEEDINGS**

1    sources.

2        And so, you know, we heard Your Honor say a week to

3    ten days.  Maybe a week to ten days from when plaintiffs

4    provide not the questions that they think are outstanding from

5    previous meet-and-confer calls, but the questions they intend

6    to ask; that YouTube needs that to comply and to identify the

7    right people to bring.

8        **THE COURT:**  Based on your representation that you've

9    already given those questions, I assume you're going to get

10   that to them by tomorrow at the latest.

11       **MS. SCULLION:**  Absolutely, Your Honor.

12       **THE COURT:**  All right.  So a week or ten days from

13   tomorrow.  And if you don't get it to them by tomorrow --

14       **MS. SCULLION:**  Understood.

15       **THE COURT:**  -- it's going to kick over.  Okay?

16       **MS. WHEELER:**  Understood.  Thank you.

17       **THE COURT:**  So it sounds like you're going to,

18   hopefully, resolve 2 and come back and tell me or not.  And it

19   sounds like my instructions on 1 also resolve 3; is that right?

20       **MS. SCULLION:**  Yes.

21       **MS. WHEELER:**  Yes.

22       **THE COURT:**  Okay.  So go in the hallway and work on 2

23   and come back at the end of the hearing --

24       **MS. SCULLION:**  Thank you, Your Honor.

25       **MS. WHEELER:**  Thank you, Your Honor.

PROCEEDINGS

 1          THE COURT:  -- and we'll see if you resolved it.

 2     Okay.  Who is here to talk about Docket 1525, 30(b)(6)

 3     depositions of states?

 4          MR. RICHARDS:  Good afternoon.  Zachary Richards from

 5     the Kentucky Office of the Attorney General for the state AGs.

 6          MR. PETKIS:  Good afternoon, Your Honor.  Stephen

 7     Petkis from Covington & Burling on behalf of the Meta

 8     defendants.

 9          THE COURT:  Okay.  So on the first issue or one of

10     the issues in dispute, which is -- and it leads to other

11     issues -- is Meta's depo notice.  And I'm assuming -- I think

12     you said this, but I want to make it clear for the record.

13     The Appendix A, which is the 30(b)(6) notice to Kentucky, the

14     topic lists are the same for every other state too; is that

15     right?

16          MR. PETKIS:  That's correct with respect to the

17     states that have consumer protection claims.

18          THE COURT:  Okay.  So I am going to sustain the

19     state's objection to providing a 30(b)(6) witness on contention

20     deposition topics.  And so the record's clear, by my reading,

21     those are Topics 22, 23, all the way down to 29, and then 36,

22     37, and 38.

23     And the basis for that is, in this district, there is a

24     venerable line of cases going back to when Magistrate

25     Judge Brazil was on the bench, starting with *McCormick-Morgan*,

 1    *Inc. vs. Teledyne*, 134 F.R.D. 275, which is, I think, one of

 2    the seminal cases on this particular issue -- that opinion was

 3    reversed on other grounds, so his ruling on this issue was not

 4    reversed -- holding that as a matter of discovery management

 5    and appropriateness of timing and sequencing of discovery,

 6    contention depositions under 30(b)(6) are, especially in a

 7    complicated case, are not appropriate and that contention

 8    interrogatories are the appropriate way to get to that.  There

 9    are exceptions.  There are cases noting exceptions.  Those

10    don't apply in this particular case.

11         More recent cases following *MMI vs. Teledyne* are

12    *Yahoo! vs. MyMail*, 2'17 Westlaw 2177519.  Judge van Keulen

13    ruled the same way in a breach of contract case.  And then

14    *3M vs. Kanbar*, K-a-n-b-a-r, 2007 Westlaw 1794936, that was

15    Judge Lloyd reaching the same result, essentially, in a

16    trademark case.

17         So that, I think, resolves many of the disputes about

18    privilege issues and appropriateness of a lot of the topics in

19    the deposition notice.

20         As to the dispute over relevant time period, some of the

21    depo topics use the phrase "within the relevant time period"

22    and others didn't.  So in light of the ruling here, I want you

23    to meet and confer and -- because it looks to me like some of

24    these are topics that you don't really -- they don't seem to be

25    geared at getting at historical information.  It's more like

 1    current budget stuff or current things.  So I want you to meet

 2    and confer, and you may have to either redo the notice or at

 3    least say, by agreement, which topics go back to 2012 and which

 4    don't just so that the states can adequately prepare their

 5    witnesses, knowing which ones this is really an issue in.

 6        On the general objection by the states that the relevant

 7    time period shouldn't go back to 2012, I'm going to overrule

 8    that just generally because, as a blanket objection, I don't

 9    think it's appropriate.  I think it's -- the real --

10    procedurally, the practical thing is, for some of these, if

11    Meta insists on asking questions that go back to 2012 or '13

12    and the state no longer has that information, then the normal

13    30(b)(6) answer is "We've investigated and we don't have that

14    information.  So as a party, we don't know because it's too

15    old."  Right?

16            MR. RICHARDS:  Understood, Your Honor.

17            THE COURT:  All right.  So I'm not going to bar the

18    deposition on that ground.  A lot of it is going to be topic

19    and question dependent and based on what preparation each state

20    is able to do for their witnesses, and I'm assuming they're

21    going to do the required preparation for each of their

22    witnesses.

23        And then on the issue of whether this implicates the state

24    agency control issue that was part of -- a large part of the

25    discussion in discovery disputes last year, I think that's a

1    red herring and it's irrelevant.

2         The 30(b)(6) notice is addressed to each state as a state,

3    as a party; it's not addressed to the agencies.  And so as the

4    responding party to the deposition notice, it is up to each

5    state, as a party, to decide whom they want to pony up and

6    present as the representative witness for each topic.  And so

7    it may be an agency person; it may not be an agency person.  It

8    may require talking to an agency person; it may not require

9    talking to an agency person.

10        But this is not -- they're not trying to get at discovery

11   from an agency by these notices.  They're asking the state to

12   provide a witness.  And it's up to the state to decide who they

13   want to provide.  It's totally within your control.  Okay?

14        **MR. RICHARDS:**  Okay.  I would just ask, Your Honor,

15   there's an underlying question here about the bindingness of

16   the testimony from a state agency.  I think it also relates to

17   the overbreadth issue that we've raised just on the plethora of

18   topics in the notice.

19        And so insofar as the state AGs would be putting up

20   witnesses from other agencies who might have agency-specific

21   information, it would be helpful to understand the bindingness

22   of that testimony on the litigants.

23        **THE COURT:**  Again, that's not how Rule 30(b)(6)

24   works.  You present a witness on behalf of the state --

25   right? -- the party, to testify on behalf of the state.  It may

**PROCEEDINGS**

1    or may not be an agency person; it may be -- it may be

2    somebody -- it could be -- I mean, I've seen cases where people

3    put up expert witnesses.  It could be whoever you choose.

4         That person has to then be prepared to answer questions on

5    that particular topic.  Now, of course, it is often the case

6    that sometimes the topics are so broad that it requires an

7    encyclopedic knowledge of an individual and it's -- they may

8    not know everything that comes up at the deposition; but they

9    do need -- they're under an obligation to be prepared to answer

10   questions on that topic.

11        And so it is -- to the extent they're able to answer after

12   adequate preparation, then that is binding in the sense that

13   they're representing the state and they were prepared by the

14   state to talk on that topic.  I don't care whether they're an

15   agency person or not.  It's up to you whether they're an agency

16   person or not.  It's not up to Meta.  It's not up to me.

17        And if the answer is "Well, that's such a detailed

18   question, there's no way to prepare to answer that but we'll

19   try to get" -- the usual thing -- "we'll try to get you that

20   answer later," that's usually what happens.  And sometimes the

21   answer is "We looked into that and we just don't know.  As a

22   party, we take no position on that."  Right?  Because it's

23   just -- it's a weird detail that nobody has ever looked into or

24   is incapable of knowing.  I mean, it really depends on the

25   question.  All right?

1    But in terms of bindingness, the way 30(b)(6) works is you

2    pick the witness who's going to bind -- quote, "bind,"

3    represent the party on a particular topic; and it could be --

4    it looks like it could be multiple people, each one with a

5    different set of topics.  Right?  And it's up to you to prepare

6    them adequately.

7        **MR. RICHARDS:**  I would just also -- I think we -- the

8    state AGs have, you know, compared the -- you know, reviewed

9    Your Honor's order from September 6th and looked at the

10   language of Rule 30 and Rule 34; and I think this, you know,

11   concerns the language in Rule 30 about reasonably available and

12   the difference in scope under those two rules.

13       And so I think our position would be that soliciting the

14   information which might be within the agency's knowledge would

15   go -- would not be reasonably available to the AGs just based

16   on the way those topics are written.

17       **THE COURT:**  Again, you're misunderstanding.  This is

18   where I said I think it's a red herring; it's a misnomer.

19       Under Rule 30(b)(6), the party here -- it's not the

20   state AG -- I mean, there's a couple of states where the AG is

21   the party, but for the most part, the state is the party;

22   right?  And the state has a responsibility as a party to

23   identify a person to testify on behalf of that party with

24   regard to that issue.  Right?

25       And it is often the case in very large corporations, very

 1  large entities, whoever that person is, they may need to talk

 2  to multiple people and review multiple documents to be prepared

 3  to testify on that topic.  Right?  But that's not some untoward

 4  way of getting discovery from those people who they talk to to

 5  prepare for.  That's the normal process.  Right?

 6          MR. RICHARDS:  I understand that, Your Honor.  And I

 7  would just -- you know, and not to reargue the briefing, but

 8  I think -- we're not aware of any situation where a state has

 9  been designated in this way, where multiple agencies have been

10  wrapped up.

11      The definition, you know, of the responding parties in the

12  notice does apply to those agencies in your September 6 order.

13  And our review of the case law, including cases Meta cited,

14  we're not aware of any situation where multiple agencies are

15  wrapped up into one 30(b)(6) notice, even if the party is a

16  state.

17      In those instances in the cases we've reviewed, they're

18  distinguishable because the agencies have either received a

19  notice themselves or, in the corporate context, the facts have

20  been so different and the notices, again, in those cases have

21  been to one entity.  So we're not aware of any case law or --

22  you know, that says that multiple entities could be wrapped up

23  in that one 30(b)(6) notice.

24          THE COURT:  That happens all the time.  You send a

25  depo notice, a 30(b)(6) depo notice to a conglomerate, General

**PROCEEDINGS**

 1   Electric, and they've got to pony up a witness to speak on

 2   behalf of the conglomerate.

 3       I mean, it may require talking to other people to prepare.

 4   That's the whole purposes of Rule 30(b)(6).  As a party, you're

 5   supposed to find someone who can be prepared.  We're not

 6   dealing with California state law where it's got to be the

 7   person most knowledgeable.  Right?  You've got an obligation to

 8   prepare the person -- reasonably, of course -- right? -- to

 9   answer questions on the topic.  Right?

10       And so, again, it's not -- there's no wrapping up of

11   people -- of agencies as a party here.  That's why I think the

12   argument and that line of discussion is really orthogonal to

13   this because under Rule 30(b)(6), the witness is just supposed

14   to talk to whoever they need to.  Again, it may not be an

15   agency.  They may just be able to prepare to answer the

16   question based on review of some documents.  I don't know.

17   Right?  And it's going to depend topic by topic.

18       But I think trying to posit that this is an attempt to get

19   at depositions of agencies is -- starts with the wrong

20   supposition -- right? -- because, again, it's up to you to

21   decide how to prepare the witnesses best -- right? -- and it

22   may or may not include agencies.

23           **MR. RICHARDS:**  I understand that, Your Honor.

24       And I would just also say that, you know, perhaps using

25   your General Electric example, the states don't view themselves

1   as such a monolithic entity.

2        And just to use Kentucky as an example, you know, as

3   opposed to, like, the federal government or something like

4   that, these are dual executives.  Kentucky is a state that has

5   one party of a Governor and one party of an Attorney General.

6   And so we think sort of forcing them to come together and make

7   a statement on behalf of the state or take a position on behalf

8   of the state, as an entity, would not account for that

9   dual executive function and the fact that there might not be a

10  coherent statement to provide on behalf of the state *qua* state.

11       **THE COURT:**  Well, I think partially that argument has

12  been rejected in the previous motion.  I know it's under

13  Rule 34, but that concept was previously rejected.

14       And, again, here, the state is the entity that's the

15  party.  Right?  And, again, as a party -- because I took out

16  the contention topics, most of what's left is just factual.

17  And as a party, you have to be able to answer factual questions

18  if you know -- right? -- if the party knows.  Right?

19       And sometimes a party as an entity, a corporation, a large

20  entity, a government entity, takes a position that it doesn't

21  know -- right? -- or it takes no position, or it's done a

22  reasonable investigation and can't find that information.

23  Right?  Again, it's going to be very question specific and it's

24  going to be very topic specific.

25       And, again, I'm going to leave it up to you to, you know,

 1  negotiate and talk about overbreadth because that's a different

 2  issue.  Right?  And, again, that's going to be very specific to

 3  each question, I think.

 4        **MR. PETKIS:**  Your Honor, if I could, just because

 5  time is short in terms of getting these depositions taken, I'd

 6  hate to have to come back to Your Honor for further guidance on

 7  this issue.

 8        Obviously, we've put a lot of work into -- both the Court

 9  and the parties, into the document discovery.  It is Meta's

10  intention, just that so we're not hiding the ball, to use

11  documents that we've obtained in discovery during these

12  30(b)(6) depositions.

13        You know, my fear is that without sufficient guidance, the

14  position that many state representatives might take, when

15  presented with a document, say, from the Department of Health

16  or Department of Education, is to say, "Well, I'm not educated

17  on that.  That's the Department of Education or that's the

18  Department of Health.  It's not the state."

19        And for these depositions to be meaningful, it's -- again,

20  it's not that we're taking a deposition of the agency because

21  if we had wanted that, we would have done that via 30(b)(6),

22  but we do expect the states to be educated on the information

23  they've produced pursuant to Your Honor's orders.

24        **THE COURT:**  Well, I mean, again, yeah, so generally,

25  they need to be prepared to testify on the topic as noticed.

1     If there are specific documents you know -- and everybody

2   knows what the hot documents are.  If there are specific

3   documents that you know you're going to want to ask a witness

4   about -- a party witness about at deposition, you could amend

5   the notice to include "Be prepared to talk on this topic,

6   including but not limited to what's in Document Bates Number

7   XYZ."  Right?  And that way, you've got your record that you

8   wanted a witness who could talk about this specific document if

9   it's that important.

10     **MR. PETKIS:**  Understood.  I mean, I think we have,

11   you know, grave concerns about identifying our deposition

12   exhibits in advance; but I hear Your Honor, that, you know, we

13   will do our best in the further negotiations.

14     **THE COURT:**  Part of the rules of federal procedure in

15   the discovery process -- the modern discovery process is to

16   avoid litigation by ambush; and so --

17     **MR. PETKIS:**  Understood.

18     **THE COURT:**  -- at some point the documents -- the

19   exhibits that are interesting to the parties become known

20   through the course of depositions anyway; and to some extent,

21   you already probably know what documents you're going to use to

22   a large extent.

23     **MR. PETKIS:**  Well, I would agree with you in a normal

24   case, Your Honor.  I will just note that we're expecting

25   documents to come in very late in this case, including after

1  the depositions are scheduled to begin.  So I think we're in a

2  little bit of a bind in terms of identifying documents

3  sufficiently in advance as a result of this process.  But I

4  understand.

5          **THE COURT:**  We're speaking hypothetically.

6          **MR. PETKIS:**  Exactly.

7          **THE COURT:**  So take the depositions and see if you

8  get what you need out of them; and if you need to negotiate,

9  adjourning and coming back after a week or whatever, I leave it

10  up to you to try to work those things out.  Right?  Because if

11  it becomes apparent that you meant XYZ in this topic and the

12  witness was prepared on ABC and there was just a

13  misunderstanding because the topic is written in a way that

14  wasn't clarified, again, communication between lawyers is

15  helpful to avoid that.  But if it requires cooperation and

16  adjourning and coming back, I assume you're going to do that.

17  Okay?

18          **MR. PETKIS:**  Of course.

19          **MR. RICHARDS:**  I would just say, the situation

20  counsel just illuminated, I think, is a big concern for us, and

21  the suggestion about documents is certainly a helpful one.

22      I think we do still have overbreadth concerns.  And we've

23  always maintained the position we're not intimately familiar

24  with the goings-on of the other agencies.  And so having a

25  heads-up of what topics might cover, I think, does, you know,

1   implicate this practicalities concern that the states have with

2   being able to cover such broad information for so many

3   individuals.

4        And not to belabor the point, but I just want to make a

5   record that the state AGs have brought this case not on behalf

6   of the state government; it's on behalf of the People.  We're

7   not seeking damages on behalf of state agencies, and we think

8   that should inform what the reasonable scope of these

9   depositions would be.

10        **THE COURT:**  Well, as a party, because it is --

11   whether you're bringing it on behalf of the People, I think the

12   captions always say "The State" -- or "The Commonwealth of

13   Kentucky," whatever the state is.  Right?

14        And if you're going to tell me, all you state AGs out

15   there, that none of you are going to ever argue to the jury or

16   to the judge that "The State believes X" -- right? -- you're

17   never going to say that because "We're dual executive and we're

18   not a monolithic thing, so we don't have a unified theory or

19   belief as to one thing ever" -- right? -- then maybe I'd start

20   to listen to that.

21        But you and I both know you're never going to argue that;

22   that you're going to argue to the jury that the state believes

23   X, Y, and Z, and you're going to take firm positions on what

24   you think the facts are -- right? -- and what your theory of

25   the case is.  Tell me if I'm wrong.

PROCEEDINGS

1          **MR. RICHARDS:**  I think perhaps that misses a little

2   bit of nuance in that the state AGs have in many instances --

3   and I think certainly in Kentucky -- the sole prosecutorial

4   power under the Consumer Protection Act.  And so we might use

5   the word "state," but I think it's used in the context of State

6   Attorneys General in their *parens patriae* authority, not on

7   behalf of the Governor or agencies.

8          **THE COURT:**  Right.  But you're going to take a

9   position as a party -- that's what Rule 30(b)(6) is all about.

10  Right?  You're taking a position as a party on the facts.

11  Right?  As a party, you either know facts or you don't; and if

12  you know them, you're supposed to prepare the witness to

13  testify as to them.  It's not -- you're trying to turn it back

14  into a control issue over the agencies, and I just think that's

15  not the issue here because that's not how Rule 30(b)(6) works.

16         **MR. RICHARDS:**  I understand that, Your Honor.  And

17  we're certainly not trying to go back to control because, as

18  you know, your order did examine control as it concerns

19  documents.  I think this speaks to the practicalities --

20  right? -- of being able to probe all that disparate

21  information.

22         **THE COURT:**  Well, again, so taking, for example, just

23  one example (as read):

24          "Identification and description of the agencies,

25      offices, departments, divisions, and committees of

1          the State for which the State has brought claims on

2          behalf of or who are represented by the State

3          Attorney General's Office in this litigation."

4          I mean, as a party --

5                **MR. RICHARDS:**  Yeah.

6                **THE COURT:**  -- the state is able to identify those;

7     right?

8          There's no -- you're not going to have a witness go,

9     "I don't know because I don't know the intricacies of the

10    agencies and we are not of one mind and we're not a monolithic

11    board-like entity from *Star Trek*."  Right?  That's not --

12    right?  That's not what's going on here.  Right?

13         So by excising the contention depo topics, I really think

14    most of your concerns are gone because most of what's left are

15    purely factual things like that.

16               **MR. RICHARDS:**  And to use another example, you know,

17    there are notice topics in here about public health services

18    offered by the state.  That would -- definitely is not within

19    the wheelhouse of the state AGs.  Or research about natural

20    disasters or climate change.

21         So I understand your direction to work with counsel to

22    narrow and discuss how we can refine it.  I just wanted to make

23    a record that I think that, as written, the topics are going to

24    implicate a lot of information that is outside -- now that

25    we've struck the contention rogs, perhaps the majority of

**PROCEEDINGS**

1    information is outside of the AG's direct --

2         **THE COURT:**  Well, wait.  Let's be clear.  The depo

3    notices are not directed to the AG's Office.

4         **MR. RICHARDS:**  Understood.

5         **THE COURT:**  They're directed to the state.  And the

6    state, as a party, has an obligation to prepare a witness to

7    testify on the topics.  Right?  And the breadth of the topics,

8    that's a different issue.  But as a general matter, you have to

9    have somebody available to testify on the topics.  Right?

10        **MR. RICHARDS:**  That is what Rule 30(b)(6) requires,

11   Your Honor, yes.

12        **THE COURT:**  Yes.

13        **MR. RICHARDS:**  And I think our position is that this

14   is going to be a tough one to meet the standard for that, just

15   based on the variety and breadth of these topics.

16        **THE COURT:**  You may have to pony up a hundred

17   different people.  I don't know.  This is part of the

18   negotiation with Meta over either narrowing the topics -- so,

19   for example, I'm going to beat up on Meta a little bit now.

20        The topics that go to -- what? -- the budgeting and the

21   finances, where are those?

22        Yeah.  So, for example, Topic 19 (as read):

23             "The State's technology budget and actual

24        expenditures, including expenditures on digital

25        advertisements," et cetera.

**PROCEEDINGS**

1     Topic 19, why would you need a 30(b)(6) witness on that?

2  That's a document request.  I mean, that's just asking for the

3  budget numbers.  Why do you need a witness on that?

4     **MR. PETKIS:**  Your Honor, quite simply, we don't have

5  the documents yet, and so we have grave concerns that we're not

6  going to receive the documents in time.  And we want to at

7  least reserve our ability to take a deposition on those topics,

8  including to the extent that the documents are not clear on

9  their face.

10     **THE COURT:**  All right.  How about a deposition on

11  written question, then?  I mean, this is -- you're just asking

12  for dollar figures here.

13     **MR. PETKIS:**  Yeah, I think -- we're happy to consider

14  approaches like that in order to narrow, to get at what we

15  really care about.  I think --

16     **THE COURT:**  Because some of these are things where it

17  could either be a rog or a document request or a depo on

18  written question.  I don't think they need to prepare a witness

19  to memorize or -- they could have a note with them on what the

20  budget numbers are.  I mean, I think you'd rather get that in

21  writing some other way, wouldn't you?

22     **MR. PETKIS:**  I agree, Your Honor.  If we had perfect

23  clarity on exactly what type of discovery we're going to get,

24  we might be able to take some of these off entirely or narrow

25  them.  We just don't have that clarity right now.

1    **THE COURT:**  I will point out that you have other

2  vehicles for getting at some of the discovery in some of these

3  topics and several -- more than some, several of these topics,

4  other than by depo notice and other than by waiting for

5  documents.  Okay?

6      So I'm sure you've got team members who are itching to use

7  the full panoply of available discovery tools under the Federal

8  Rules of Civil Procedure.

9    **MR. PETKIS:**  Your Honor, if I could, very briefly,

10  I just -- to revisit the contention issue, and not to reargue

11  it, but Topic 29, I just had a question on that because I

12  wasn't sure.  That one doesn't strike me as a contention

13  interrogatory -- contention topic, and I wasn't sure that the

14  plaintiffs identified it that way either.  That seeks

15  information regarding just factual analyses or studies on these

16  issues, not their litigation recovery.

17    **THE COURT:**  Costs, injuries, or harms associated.

18      So do the states agree that 29 is not a contention rog?

19    **MR. RICHARDS:**  Give me moment to review, please,

20  Your Honor.

21      I think it does -- I think it is a contention style of

22  topic because it's asking us for how are we quantifying costs,

23  injuries, or harms associated with social media platforms.  And

24  I think the costs and injuries and harms are all relevant legal

25  claims for our Consumer Protection Act.

**PROCEEDINGS**

1    And, again, not to relitigate the brief, but I think this

2    also gets into expert issues that we are going to be, you know,

3    having people quantify information produced from Meta to us and

4    then make a position on that.

5        So I do think costs has an expert component, injuries and

6    harms have an expert component, and these are claims relevant

7    to our Consumer Protection Acts.

8        **THE COURT:**  I will -- well, if what you're arguing is

9    that it's the analyses -- identifying analyses or studies that

10   are separate and apart from contentions in the case --

11       **MR. PETKIS:**  Correct.

12       **THE COURT:**  -- why don't you edit 29 and then try

13   to -- I think you should resubmit -- re-serve the 30(b)(6) as

14   edited and see if you can clarify it to get it away from

15   contentions.  Okay?

16       **MR. PETKIS:**  Happy to, Your Honor.  And I think

17   candidly, that may be some confusion with some of these other

18   topics as well, just in the sense that we're seeking the

19   states' knowledge separate and apart from what their experts

20   are doing in --

21       **THE COURT:**  The rest of them have the word "contend,"

22   "allege," "relief sought," no.

23       **MR. PETKIS:**  Understood, Your Honor.  They're phrased

24   perhaps imprecisely.

25       But what I'm trying to get at is, I think the information

**PROCEEDINGS**

1  sought, separate from the allegations in the case, might be

2  something that we try to reword and resubmit, including on 29

3  but it's not limited to 29.

4       **THE COURT:**  Okay.  So to address the point made here,

5  if, currently, the state doesn't have knowledge of something

6  because they're waiting for an expert report, the answer you're

7  going to get from the 30(b)(6) witness is "We don't know

8  because, as a state, we haven't done that analysis."  Right?

9       **MR. PETKIS:**  And I think we're happy to take that

10  testimony.

11       **THE COURT:**  Okay.  All right.  So that's your answer

12  on -- if it really is something the state doesn't know and it's

13  only something the state would, quote, "know" after it receives

14  an expert report and that's the position you're happy sticking

15  with in this litigation, you're going to be stuck with it, but

16  that certainly -- that certainly happens in cases.  Okay?

17       **MR. RICHARDS:**  Understood.

18       **THE COURT:**  All right.  Anything else?

19       **MR. PETKIS:**  No, Your Honor.

20       **THE COURT:**  Anything else from the states?

21       **MR. RICHARDS:**  Let me confer with my colleague.

22  I'm having much backup, Your Honor.

23           (Co-counsel confer off the record.)

24       **THE COURT:**  And I apologize to the court reporter for

25  the rapidity of my speech.

1          **MR. RICHARDS:**  I think -- my colleague has just asked

2     a question with respect to the timeline for edited notices and

3     the degree of editing we might receive in response to that.

4          I think, you know, understanding the timeliness and

5     urgency to get discovery done, I think, you know, we would need

6     to see meaningful edits from Meta on several of these topics

7     and would appreciate some guidance on the timeline of that.

8          **THE COURT:**  Have the states served objections to --

9     written objections to the 30(b)(6)s?

10         **MR. RICHARDS:**  Yes.

11         **THE COURT:**  Okay.  So you've had some meet and confer

12    about your overbreadth and other concerns?

13         **MR. RICHARDS:**  Yes.

14         **THE COURT:**  All right.  So can you get it to them by

15    Tuesday?

16         **MR. PETKIS:**  Yes, Your Honor.

17         **THE COURT:**  Tuesday.

18         **MR. RICHARDS:**  Great.

19         **THE COURT:**  Okay.  Any other -- I see people

20    approaching.

21         **MR. DAVIES:**  Recall Illinois?

22         **THE COURT:**  Oh, okay.

23         Anything further on this issue before we move on?

24         **MS. O'BRIEN:**  Your Honor, if I may be heard.

25         **THE COURT:**  Sure.

1      **MS. O'BRIEN:**  Claire O'Brien, Selendy Gay, on behalf

2   of the non-party Office of the Governor of the State of

3   New York.

4      Your Honor, I'm not intending to litigate something that's

5   not ripe and reiterate that we're here to be cooperative with

6   all parties, but we -- the procedural protections and

7   requirements for non-parties are very important to my client.

8   This goes beyond this one case for my client.

9      And so we would request the opportunity to be heard in the

10  event that a separate -- constitutionally separate executive

11  seeks to designate a witness from another branch of the --

12  another section of the executive branch without procedural

13  requirements such as a Rule 45(b) subpoena.

14     Thank you.

15     **THE COURT:**  Are you just stating something for the

16  record, or are you asking --

17     **MS. O'BRIEN:**  We would request the opportunity to be

18  heard in the event that those procedural requirements are not

19  observed, such as a Rule 45(b) subpoena -- excuse me -- a

20  Rule 45 subpoena.

21     **THE COURT:**  Wait.  A Rule 30(b)(6) depo notice has

22  been served on the State of New York as a party; right?

23     **MS. O'BRIEN:**  My understanding from the New York

24  Attorney General is that they received a Rule 30(b)(6)

25  deposition notice.

1          The agencies themselves, as non-parties, have -- are not a

2     part of the response-and-objection process; and so to the

3     extent that any of their employees who are employed by a

4     separate -- a constitutionally separate executive in that

5     branch are designated without the sort of appropriate non-party

6     procedural protections, we would just request an opportunity to

7     be heard.

8          Again, I'm not trying to litigate something that's not

9     ripe.  As Your Honor said, it depends who the attorneys general

10    designate.  But we would just request that opportunity to be

11    heard as non-parties.

12          **THE COURT:**  Well, (a) that's hypothetical because you

13    haven't raised -- that issue isn't ripe yet; and (b) I do think

14    my order from last year made pretty clear my guidance on this

15    issue, so I'm not -- I don't think I'm going to be very

16    receptive to relitigating that issue.

17          But let's hope -- I mean, like I said to your colleague

18    here, it is up to the State of New York, as a party, to decide

19    who to designate as a witness; and presumably, you designate

20    people who want to or volunteer to be the 30(b)(6)

21    representative of the party.  Right?  And if there's some

22    intramural discussion that needs to happen for that to -- that

23    person to be represented, I assume that in the normal course

24    you work that out.

25          But, again, this is not -- 30(b)(6) is not a way to get to

 1    discovery at an agency because they didn't serve a 30(b)(6) on

 2    the agency.  Right?  And so I really don't think that's the

 3    issue here.  I'm not going to give you leave right now to raise

 4    an issue that I don't think is germane.

 5        **MS. O'BRIEN:**  Understood, Your Honor.  We just

 6    requested the opportunity.

 7      Thank you for the opportunity to be heard.

 8        **THE COURT:**  All right.  Do you want to speak on

 9    behalf of New York since she got --

10      **MR. WALLACE:**  Kevin Wallace for the New York State

11    Office of the Attorney General.

12      I think I'll just agree that it's not ripe at this point,

13    and if we need to address it in the future, we can.

14        **THE COURT:**  And I would just give you guidance.  I

15    assume you're going to find someone or people to be the

16    30(b)(6) representatives who are -- people who are appropriate

17    and prepared and are going to do it without the need for

18    additional disputes here.

19        **MR. WALLACE:**  And I -- these have been, like,

20    somewhat difficult issues to negotiate; but we're going to do

21    our best, given the guidance we have from Your Honor.

22        **THE COURT:**  Okay.  All right.  So you can make very

23    clear to your colleagues in New York that smart lawyers know

24    how to read a judge's prior orders and glean from that how that

25    judge would apply it in even slightly different but adjacent

PROCEEDINGS

```
 1   situations.  Okay?
 2             MR. WALLACE:  Understood, Your Honor.
 3             THE COURT:  All right.  Does that resolve 1525?
 4             MR. RICHARDS:  Zach Richards for Kentucky.
 5        I believe so at the time, Your Honor.
 6             MR. PETKIS:  Yes, Your Honor.
 7             THE COURT:  Okay.  Zipping through these.  That's
 8   great.
 9        So let's recall -- was it Illinois who wanted to come
10   back?
11             MR. DAVIES:  Yeah.  1537, I think.
12             THE COURT:  Okay.
13             MR. DAVIES:  Matthew Davies from the Office of the
14   Illinois Attorney General.  And then --
15             MS. CAMP:  Michelle Camp, C-a-m-p, from the Illinois
16   Department of Children and Family Services.
17             MR. KENNEDY:  And Michael Kennedy with Covington &
18   Burling for the Meta defendants.
19             MR. DAVIES:  I was hoping to catch the tailwinds of
20   that last argument, which is to point out, like, Illinois made
21   a lot of concessions as a state during these negotiations and
22   is looking at close to a million documents that we produced to
23   Meta from four other agencies who I garnered a lot of ire from
24   in this negotiation process.
25             THE COURT:  I don't know any lawyer who's collecting
```

1    documents from their client who is greeted with open arms and

2    joy by their client.

3              MR. DAVIES:  Yes, certainly.

4        And I wanted to be clear that we take the privacy and

5    confidentiality of children's sensitive information very

6    seriously, and we take the amount of money and burden that

7    these agencies are incurring very seriously.

8        And I can report to you we have not reached agreement and

9    we're willing to put this to you.  We came up to 15,000.  They

10   went down to 45,000.  I'm willing to allow them to select new

11   search terms, whatever search terms they want, and I'll even

12   work with them to back out -- if we can come up with terms that

13   can back out PHI stuff, I'm willing to do that too.  We want,

14   like, a cap, and I think 15,000 for an agency --

15             THE COURT:  How would you back out the PHI stuff?

16             MR. DAVIES:  There are terms.  "ACR" is, like --

17        What is ACR?

18             MS. CAMP:  Administrative case review.

19             THE COURT:  So that's part of the list of terms that

20   you said you could extract?

21             MR. KENNEDY:  Correct, Your Honor.

22             THE COURT:  Okay.

23             MR. DAVIES:  So that was our final offer.

24             MR. KENNEDY:  Your Honor, before you rule, can I be

25   heard very briefly?

PROCEEDINGS

1          THE COURT:  Sure.

2          MR. KENNEDY:  We have come down.  We have met them

3    more than halfway.  And, in fact, just since we were in the

4    hallway, we came down from 100,000 to 75,000.  They came up --

5    last week they were at zero.  They came up to 10,000 and then

6    15-.

7          So then I went and consulted with my client and got

8    authorization to meet them halfway, 45,000.  That was my --

9    that was an offer I gave right before we came back into

10   session.

11         So I say this because I don't want it to seem like we're

12   at 15- and 45- and Your Honor should just split the difference.

13   We have made massive movement in our position just since this

14   hearing started.

15         And so, you know, we think the right number here, given

16   the -- you know, given the agency's remit and given what

17   14 other agencies with similar remits in other states have

18   agreed to, is really a hundred thousand.

19         THE COURT:  Okay.  All right.

20         MR. KENNEDY:  But we have made every effort to reach

21   agreement here today.

22         THE COURT:  Have you reached any agreement on the

23   search terms in the chart in your meet and confers, or are

24   there still open disputes as presented?

25         MR. DAVIES:  The agreed-upon ones will result in

**PROCEEDINGS**

1  7- to 8,000.  I'm happy to scrap that and to do whatever they

2  want to do to get to 15-.  We have not had that discussion

3  about how we would get to --

4      **THE COURT:**  I'm going to stick you with the -- the

5  agreed ones are agreed, so we're not going to go revisit those.

6  That's done.

7      Okay.  This is not the kind of thing I'm going to read

8  from the bench.  I will issue an order shortly on this one.

9      And it's submitted?

10     **MR. KENNEDY:**  Yes.

11     **THE COURT:**  Submitted?

12     **MR. DAVIES:**  And can we get a follow-up on the

13  protective order piece of it too?

14     **THE COURT:**  Yes.

15     **MR. DAVIES:**  Because I'm going to allow Michelle Camp

16  to talk about this because we did not get a satisfactory

17  answer, but she will be able to explain why.

18     **THE COURT:**  Okay.

19     **MS. CAMP:**  And, Judge, we do need a protective order

20  with the Illinois-specific statutes included.  It is a

21  violation of -- it's a Class A misdemeanor, in fact, if I was

22  to provide this information in violation of our state statutes.

23  And I cannot provide to Facebook, without a protective order,

24  this information.

25     **THE COURT:**  Does the state statute require the

1    protective order to specifically, explicitly reference the

2    state statute?

3              **MS. CAMP:**  It does, yes.  I mean, yes, a protective

4    order would reference the state statute.

5              **THE COURT:**  But is that reference -- because

6    sometimes, like in HIPAA, HIPAA doesn't require specifically

7    referencing HIPAA; right?

8              **MS. CAMP:**  Correct, yes.  And the model protective

9    order that I, again, provided, the HIPAA order is Part B.  The

10   HIPAA order is not sufficient for our purposes.

11       Either the Court can order the Department directly, on the

12   record and in writing, that DCFS shall produce, then fine; but

13   I cannot, minus -- barring that or the protective order,

14   produce the documents.

15             **THE COURT:**  Okay.  Why can't you agree to just a

16   short amendment of the protective order to reference the state

17   statutes and --

18             **MR. KENNEDY:**  So --

19             **THE COURT:**  -- comply with --

20             **MR. KENNEDY:**  So what I've --

21             **THE COURT:**  -- state law?

22             **MR. KENNEDY:**  What I've said is I -- candidly, this

23   is an issue we're dealing with with 30 other states, and it's

24   not an issue that I personally have been across.

25       What I said in the hallway and what I said last week is,

1   you know, I expect we should be able to work something out.  If

2   this is Illinois law, then, you know, I'm sure we can come up

3   with a suitable amendment to the protective order.

4        But I also -- you know, I think first we should resolve

5   the search terms issue.  I mean, I don't think they're

6   producing anything tomorrow.  You know, this is an issue I

7   thought we had a little bit of runway to figure out.

8        And we also confirmed in the hallway that the protective

9   order issue is not the only thing keeping DCFS from agreeing on

10  producing ESI.

11       So all I can say is, I think we'll work in good faith to

12  get this done.  Sitting here today, I have no reason to think

13  it won't get done.  I just didn't think it was an issue we

14  needed to resolve before the search terms.

15            THE COURT:  Okay.  Well, since you can't reach

16  agreement on it today, then it's submitted and presented to me;

17  right?

18            MS. CAMP:  Yes, Your Honor.

19            THE COURT:  Is that the status of that?

20            MR. KENNEDY:  Well, the protective order issue?  I'm

21  not sure they've even filed the protective order with

22  the Court.  I mean, the filing we did on Tuesday didn't even --

23  I don't believe it really even discussed this.

24            THE COURT:  You're right.  Well, I may or may not

25  address it in the order that's going to resolve 1537 --

1   right? -- just to give -- at least to give you guidance.  Okay?

2       All right.  So, submitted?

3               **MR. KENNEDY:**  Yes.

4               **THE COURT:**  Submitted?

5               **MR. DAVIES:**  Submitted.  Thank you.

6               **THE COURT:**  An order will issue in due course on

7   1537.

8               **MS. CAMP:**  Thank you, Your Honor.

9               **THE COURT:**  I don't see Mr. Yeung.  Is Colorado

10  still -- oh, he's right there.

11      Is anybody else who's ready to come back ready to come

12  back?

13              **MS. SCULLION:**  Your Honor, we did some further

14  horse-trading and we've reached a deal.

15              **THE COURT:**  Make appearances.

16              **MS. SCULLION:**  Oh, sorry.  Jennifer Scullion for the

17  plaintiffs.

18              **MS. WHEELER:**  And McKinney Wheeler for YouTube.

19              **MS. SCULLION:**  We have resolved the Source F issue

20  after some further horse-trading.

21              **THE COURT:**  Okay.  So --

22                   (Cell phone interruption.)

23              **MS. SCULLION:**  I'm so sorry.  Oh, my gosh.

24      I sincerely apologize.

25              **THE COURT:**  Okay.  So help me out.  Does that resolve

**PROCEEDINGS**

 1  the entirety of 1538 now, or do you still need me to issue an

 2  order?

 3       MS. SCULLION:  I understand that we, with

 4  Your Honor's guidance in terms of the ten days to -- and have

 5  some technical folks part of the meet and confer, I think we

 6  are resolved at this point.

 7       THE COURT:  Okay.

 8       MS. WHEELER:  Correct.

 9       THE COURT:  Since you've reached this by agreement --

10  I've done this in other situations -- submit a short proposed

11  order that memorializes whatever it is you think you've agreed

12  to, and also take into account what I've said from the bench

13  that helps resolve this.

14       MS. SCULLION:  Wonderful, Your Honor.  Thank you.

15       THE COURT:  Can you get that to me by tomorrow or

16  Tuesday?

17       MS. SCULLION:  If we could have till Tuesday, if I

18  could, because we're going to first concentrate on getting them

19  the questions on the resources, if that's okay with you.

20       THE COURT:  Yes.

21       MS. SCULLION:  Okay.

22       THE COURT:  So a proposed order will be expected on

23  Tuesday of next week.

24       MS. SCULLION:  Thank you very much, Your Honor.

25       MS. WHEELER:  Understood.

1          **THE COURT:**  Thank you.

2          **MS. WHEELER:**  Thank you, Your Honor.

3          **THE COURT:**  Thank you for working that out.

4      Okay.  I saw Mr. Yeung, and then I don't see him any

5  further.  If Colorado is not ready, I don't want to rush them.

6      So there is some housekeeping I wanted to raise anyway.

7  Who's here for TikTok?

8          **MR. DRAKE:**  Geoffrey Drake, King & Spalding, for the

9  TikTok defendants.

10     I don't know if this relates to the personal injury school

11 district cases, Your Honor, or the State Attorney General

12 matter.

13         **THE COURT:**  I don't recall, but this is truly just a

14 housekeeping issue.

15     We talked about this before.  Back on September 10th,

16 2024, Docket 1127, the parties filed a sealing motion for a

17 prior TikTok discovery dispute letter and never filed the

18 follow-up that's required to that to actually file the sealed

19 and redacted version of that.

20     And so I think I've talked to you about making sure your

21 paralegals get on that.  It's still out there, and it keeps

22 showing up on my list of pending motions.  So if you don't do

23 something, say, by the end of next week on that, I'm just going

24 to unseal the letter.  Okay?

25         **MR. DRAKE:**  Understood, Your Honor.  I'll go take

1    care of that right now.

2              THE COURT:  And then --

3              MR. DRAKE:  Thank you.  Thanks for the opportunity to

4    clean that up.

5              THE COURT:  And then -- I forget if this is a TikTok

6    issue -- Docket 1554 and Docket 1528 appear to be duplicates of

7    each other, and I forget which party filed it.  So should I

8    withdraw one as moot or --

9              MR. DRAKE:  These are TikTok-related motions,

10   Your Honor?  I'm sorry.  I don't have the docket.

11             THE COURT:  Plaintiffs filed them, I'm told.

12             MR. WEINKOWITZ:  Your Honor, Mike Weinkowitz for the

13   plaintiffs.

14        I'm not sure what those are.

15             THE COURT:  1524 and 1528.  I thought I had them.

16             THE COURTROOM DEPUTY:  1524 has already been marked

17   as an erroneous entry.

18             THE COURT:  It has?

19             THE COURTROOM DEPUTY:  By someone in the

20   Clerk's Office.  Just letting you know.

21             THE COURT:  Oh, okay.  Then that's been taken care of

22   by the Clerk's Office on our end.

23        Okay.  So that was the only housekeeping I had.

24        I just want to confirm.  And you can stay up here and just

25   tell me this.  I didn't see anything in the status report on

**PROCEEDINGS**

1  the administrative side that required any action by the Court

2  at this time.  I just want to confirm my understanding there.

3      MR. WEINKOWITZ:  Mike Weinkowitz on behalf of the

4  plaintiffs.

5     That's my understanding.

6      MR. DRAKE:  Yes, I believe that's correct,

7  Your Honor.

8      THE COURT:  Okay.  And, I mean, I saw the report on

9  what -- the contingency plan on the People's case against

10 TikTok.  Again, it seems not ripe for me to do anything.  There

11 doesn't appear to be anything for me to do at this point, but I

12 just want to make sure I understand that correctly as well.

13      MR. DRAKE:  I believe that's correct, Your Honor, but

14 my colleague, Ms. Kaplan from O'Melveny, will address that

15 particular issue.

16      THE COURT:  Okay.

17      MR. RUDDY:  Good afternoon, Your Honor.  Brendan

18 Ruddy on behalf of the People.

19      THE COURT:  Of the State of California?

20      MR. RUDDY:  Of the State of California.

21      THE COURT:  Because we've got multiple states here.

22      MS. KAPLAN:  And Lauren Kaplan at O'Melveny on behalf

23 of the TikTok defendants.

24      THE COURT:  Okay.  Am I correct that there's really

25 nothing for me to do at this point?  Right?

PROCEEDINGS

```
 1              MR. RUDDY:  You're correct, Your Honor.

 2              MS. KAPLAN:  That's correct, Your Honor.

 3              THE COURT:  That was my only question.  Okay.

 4              MR. DRAKE:  Your Honor, I'm sorry.  Can I get that

 5    docket number that you referenced that had the outstanding

 6    sealing issue?  I want to make sure I get that resolved.

 7              THE COURT:  1127.

 8              MR. DRAKE:  1127.  Thank you, Your Honor.

 9              THE COURT:  Okay.  Are Colorado and Meta ready to

10    talk?

11              MR. YEUNG:  Christopher Yeung for Meta.

12         Yes.  And we've reached an agreement to resolve the

13    issues.

14         MS. SULLIVAN:  Your Honor, Jennifer Sullivan for

15    the Governor's Office and OSPB.

16         And we have reached an agreement with regard to the

17    custodians.

18              THE COURT:  Congratulations.  And thank you for that

19    work.

20         So to the extent 1561 has a gavel on it or needs any kind

21    of action, we'll just say it's resolved; right?

22              MS. SULLIVAN:  Resolved.

23              MR. YEUNG:  Yes.

24              THE COURT:  Okay.  Thank you.  Thank you for that.

25              MS. SULLIVAN:  Your Honor, just if I may?
```

1          **THE COURT:**  Yes.

2          **MS. SULLIVAN:**  I just want to assert that as

3   non-parties to this action, we are here in the spirit of

4   cooperation and voluntarily, and nothing about our appearance

5   should be construed as a waiver of any objections.

6          **THE COURT:**  You've said your piece --

7          **MS. SULLIVAN:**  Thank you.

8          **THE COURT:**  -- and you know my views on all those

9   issues.

10      I'm not going to relitigate them.

11          **MS. SULLIVAN:**  Thank you very much.

12          **THE COURT:**  Okay.

13          **MR. YEUNG:**  Thank you, Your Honor.

14          **THE COURT:**  All right.

15                      (Pause in proceedings.)

16          **THE COURT:**  My goodness, are we done?  Is there

17   any --

18                          (Laughter.)

19          **THE COURT:**  I didn't think we'd get through it this

20   quickly.

21      Any other -- I'll open the floor.  Any other issues people

22   need to raise with me at this point?

23                      (No audible response.)

24          **THE COURT:**  I see people shaking their heads "no."

25      All right.  Then we are adjourned until the next hearing.

**PROCEEDINGS**

1          Oh, we did flip the dates in February to accommodate the

2     parties' request from December to do that because the schedule

3     works.  So you-all saw that; right?

4               **ALL:**  Yes.  Thank you, Your Honor.

5               **THE COURT:**  All right.  Thank you.

6               **THE COURTROOM DEPUTY:**  We're off the record in this

7     matter.

8          Court is in recess.

9                    (Proceedings adjourned at 3:19 p.m.)

10                        ---oOo---

11

12               <u>**CERTIFICATE OF REPORTER**</u>

13          I certify that the foregoing is a correct transcript

14     from the record of proceedings in the above-entitled matter.

15

16     DATE:  Sunday, January 19, 2025

17

18

19

20                    _Ana Dub_

21     _____

22          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

23          CSR No. 7445, Official United States Reporter

24

25