*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IN RE: SOCIAL MEDIA | ) | **Motions for Interlocutory** |
| ADOLESCENT ADDICTION/ | ) | **Appeal/Case Management** |
| PERSONAL INJURY PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | NO. C 22-03047 YGR |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | Pages 1 - 66 |
| | ) | |
| _____ | ) | Oakland, California |
| | | Wednesday, February 12, 2025 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiffs:        Lieff, Cabraser, Heimann &
                         Bernstein
                       275 Battery Street, 30th Floor
                       San Francisco, California  94111
             BY:   LEXI J. HAZAM, ATTORNEY AT LAW

                       Motley Rice LLC
                       401 9th Street NW Suite 630
                       Washington, DC  20004
             BY:   LOUIS M. BOGRAD,
                       PREVIN WARREN, ATTORNEYS AT LAW


             (Appearances continued next page)


Reported By:        Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

# A P P E A R A N C E S (CONT'D.)

```
For Plaintiffs:          Gibbs Law Group
                         1111 Broadway, Suite 2100
                         Oakland, California  94607
                    BY:  ANDRE M. MURA, ATTORNEY AT LAW

                         Andrus Anderson LLP
                         155 Montgomery Street, Suite 900
                         San Francisco, California  94104
                    BY:  JENNIE LEE ANDERSON, ATTORNEY AT LAW

For Plaintiff State      California Department of Justice
of California:           1515 Clay Street, 20th Floor
                         Oakland, California  94612-0550
                    BY:  EMILY KALANTHI,
                         JOSHUA E. OLSZEWSKI-JUBELIRER,
                           DEPUTY ATTORNEYS GENERAL


                         California Department of Justice
                         455 Golden Gate Avenue, 11th Floor
                         San Francisco, California 94102
                    BY:  MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL


For Plaintiff State of   Colorado Department of Law
Colorado:                1300 Broadway, 6th Floor
                         Denver, Colorado  80203
                    BY:  KRISTA BATCHELDER,
                           DEPUTY SOLICITOR GENERAL

For State of New York:   New York State Office of the Attorney
                         General
                         28 Liberty Street, 23rd Floor
                         New York, New York  10005
                    BY:  KEVIN C. WALLACE, ATTORNEY AT LAW

For PLAINTIFF:           Pennsylvania Office of the Attorney
                         General
                         Strawberry Square, 16th Floor
                         Harrisburg, Pennsylvania  17120
                    BY:  JONATHAN BURNS,
                         DEPUTY ATTORNEY GENERAL
```

<pre>
 1                 A P P E A R A N C E S  (CONT'D.)

 2

 3    For Plaintiff State     Kansas Attorney General's Office
      of Kansas:              120 SW 10th Avenue,
 4                            Topeka, Kansas  66612
                        BY:  SARAH DIETZ,
 5                             ASSISTANT ATTORNEY GENERAL

 6

      For New Jersey          New Jersey Office of the Attorney
 7    Plaintiffs:               General, Division of Law
                              124 Halsey Street, 5th Floor
 8                            Newark, New Jersey  07101
                        BY:  THOMAS HUYNH,
 9                           VERNA J. PRADAXAY,
                               DEPUTY ATTORNEYS GENERAL
10

11                            Beasley Allen Crow Methvin Portis &
                                Miles, P.C.
12                            218 Commerce Street
                              Montgomery, Alabama  36104
13                      BY:  CLINTON R. RICHARDSON, ATTORNEY AT LAW

14    For Plaintiff State of  Office of the Arizona Attorney General
      Arizona:                Consumer Protection and Advocacy
15                              Section
                              2005 N. Central Avenue
16                            Phoenix, Arizona 85004
                        BY:  NATHAN WHELIHAN,
17                             ASSISTANT ATTORNEY GENERAL

18    For Plaintiff           Olson Remcho
      California Executive    1901 Harrison Street, Suite 1550
19    Agencies:              Oakland, California  94612
                        BY:  MARGARET R. PRINZING, ATTORNEY AT LAW
20
      For Plaintiff           Office of the Kentucky Attorney
21    Commonwealth of           General
      Kentucky:               Office of Consumer Protection
22                            1024 Capital Drive, Suite 200
                              Frankfort, Kentucky  40601
23                      BY:  ZACHARY RICHARDS,
                             ASSISTANT ATTORNEY GENERAL
24

25
</pre>

```
1                    A P P E A R A N C E S (CONT'D.)

2

3    For South Carolina        South Carolina Attorney General's
     Plaintiffs:               Office
4                              P.O. Box 11549
                               Columbia, South Carolina  29211
5                         BY:  CLARK C. KIRKLAND, JR.,
                               ATTORNEY AT LAW
6
     For Virginia              Office of the Attorney General
7                              202 North 9th Street
                               Richmond, Virginia  23219
8                         BY:  JOELLE GOTWALS, ATTORNEY AT LAW

9    For Washington State      Washington State Office of the
     Plaintiffs:                Attorney General
10                             Consumer Protection
                               1125 Washington Street SE
11                             Olympia, Washington  94504
                          BY:  CLAIRE MCNAMARA,
12                               DEPUTY ATTORNEY GENERAL

13

14   For the Meta              Covington & Burling LLP
     Defendants:               One City Center
15                             850 Tenth Street, NW
                               Washington, DC  20001-4956
16                        BY:  MICHAEL X. IMBROSCIO,
                               PAUL W. SCHMIDT, ATTORNEYS AT LAW
17
                               Covington & Burling LLP
18                             1999 Avenue of the Stars, Suite 3500
                               Los Angeles, California  90067
19                             ASHLEY SIMONSEN, ATTORNEY AT LAW

20                             Covington & Burling LLP
                               Sales Force Tower
21                             415 Mission Street, Suite 5400
                               San Francisco, California  94111-5356
22                        BY:  MARTY MYERS, ATTORNEY AT LAW

23                             Davis Polk & Wardwell LLP
                               450 Lexington Avenue
24                             New York, New York  10017
                          BY:  JAMES P. ROUHANDEH, ATTORNEY AT LAW
25
```

```
 1                A P P E A R A N C E S  (CONT'D.)

 2


 3   For Defendant Snap     Munger, Tolles & Olson
     Inc.:                  560 Mission Street, 27th Floor
 4                          San Francisco, California  94105
                       BY: JONATHAN H. BLAVIN, ATTORNEY AT LAW
 5


 6   For Defendant TikTok   King & Spalding LLP
     Inc.; ByteDance, Inc.: 1180 Peachtree Street, N.E.
 7                          Suite 1600
                            Atlanta, Georgia  30309-3521
 8                     BY:  GEOFFREY M. DRAKE, ATTORNEY AT LAW

 9


10   For Defendant Alphabet Williams & Connolly LLP
     Inc.; Google, LLC;     680 Main Avenue, SW
11   YouTube, Inc.:         Washington, DC  20024
                       BY:  JOSEPH G. PETROSINELLI,
12                          ASHLEY W. HARDIN, ATTORNEYS AT LAW

13


14   For Federal Insurance  Holwell Shuster ^ Goldberg LLP
     Company:               425 Lexington Avenue
15                          New York, New York  100017
                       BY:  BLAIR KAMINSKY, Attorney at Law
16
                            Clyde & Co.
17                          150 California Street, 15th Floor
                            San Francisco, California  94111
18                     BY:  JASON CHORLEY, ATTORNEY AT LAW

19


20   For Hartford Casualty  Saul Ewing LLP
     Insurance Co.:         1919 Pennsylvania Avenue, NW,
21                          Suite 550
                            Washington, DC  20006
22                     BY:  MATTHEW J. ANTONELLI, ATTORNEY AT LAW

23   For Zurich American    Skarzynski Marick & Black LLP
     Insurance Company:     500 West Madison Street, Suite 3600
24                          Chicago, Illinois  60661
                       BY:  TIMOTHY H. WRIGHT, ATTORNEY AT LAW
25
```

## A P P E A R A N C E S (CONT'D.)

```
For Old Republic          Kennedys CMK LLP
Insurance Company:        101 California Street, Suite 1225
                          San Francisco, California  94111
                    BY:   TRAVIS WALL, ATTORNEY AT LAW
```

--oOo--

```
 1    Wednesday, February 12, 2025                    2:04 p.m.
 2                        P R O C E E D I N G S
 3                           --o0o--
 4
 5        THE CLERK:  Good afternoon, everyone.  These
 6    proceedings are being court reported by this Court.  Any other
 7    recording of this proceeding, either by video, audio,
 8    including screenshots or other copying of the hearing, is
 9    strictly prohibited.
10        Your Honor, now calling the civil matter 22-MD-3047-YGR,
11    In Re: Social Media Adolescent Addiction Personal Injury
12    Products Liability Litigation.
13        Today's appearances will be added to the minutes.
14        THE COURT:  Thank you.
15        Okay.  As is our custom and practice as noted, we have the
16    sign-up sheet outside, and we will attach those in terms of
17    appearances.
18        Everybody should remember that when you come to the
19    podium, you should identify yourself for the record for people
20    listening and to help the court reporter.  As I indicated,
21    we've been on the record since eight this morning, so be
22    patient with us, okay?  We'll try to be patient back.
23        I have three things on my list.  One is the hearing on the
24    motions for interlocutory appeal.  There seems to be a issue
25    with regard to dismissals, and then the case with the
```

1    insurance or issue with the case regarding the insurance

2    coverage.

3         First I'll ask, is there anything else that has come up

4    that you want to discuss that I didn't list?

5         Anything from the plaintiff?

6              **MS. HAZAM:**  No, Your Honor.

7              **MR. WARREN:**  No, Your Honor.

8              **THE COURT:**  Anything from the defense?

9              **MR. SCHMIDT:**  No, Your Honor.

10             **THE COURT:**  Let's start with the -- let's get warmed

11   up, and we'll start with the little stuff.

12        How about the dismissals?  Who's going to deal with that?

13             **MS. SIMONSEN:**  Good afternoon, Your Honor.  Ashley

14   Simonsen, Covington & Burling, for the Meta defendants.

15             **MS. McNAMARA:**  Good afternoon, Your Honor.  Claire

16   McNamara, Washington State Consumer Protection Division, here

17   on behalf of the COPPA transitioning states.

18             **THE COURT:**  Okay.

19        So it doesn't sound like there's a disagreement about the

20   need or the desire to dismiss; it's only a question of the

21   mechanism.

22        And, you know, I'm happy to do it as a Rule 15 amendment.

23   I think that that's appropriate, and so just give me a

24   stipulation, and we'll be done with it.

25             **MS. SIMONSEN:**  Very good, Your Honor.

```
 1              MS. McNAMARA:   Thank you.

 2              MS. SIMONSEN:   Thank you.

 3              THE COURT:   All right.  See, one down already.  Makes

 4      me feel better.

 5          All right.  Let's go to the motions.

 6          Let's start with who will be arguing so I know who I'll be

 7      talking to.  This is on the motions for interlocutory

 8      certification.

 9          On the plaintiff's side, who will be arguing?

10              MR. WARREN:   Your Honor, Previn Warren for the

11      personal injury and school district plaintiffs.

12              MS. BATCHELDER:   Krista Batchelder for the state

13      attorneys general.

14              THE COURT:   Okay.  Hold on.  Where are --

15              MS. BATCHELDER:   With the Colorado Attorney General's

16      Office.

17              THE COURT:   Okay.  Got it.

18              MR. PETROSINELLI:   Your Honor, good afternoon.  Joe

19      Petrosinelli here for the Google/YouTube defendants.  We have

20      different people arguing different motions, so --

21              THE COURT:   So tell me how it -- how it breaks down.

22              MR. PETROSINELLI:   The motion by all defendants for

23      certification as to the school district claims is going to be

24      argued by my partner Ashley Hardin.

25              THE COURT:   Okay.
```

```
 1              MR. PETROSINELLI:  And then the motion of Google

 2     and -- and YouTube and Snap for certification, I'm going to

 3     argue that one.

 4         And then with respect to the attorney generals' motion for

 5     certification, that would be argued by Jim Rouhandeh

 6     representing Meta.

 7              THE COURT:  From Davis Polk.

 8              MR. PETROSINELLI:  Yes, Your Honor.

 9              THE COURT:  Okay.

10         So let's go ahead and start with the school districts.

11         You want to state your appearance.

12              MS. HARDIN:  Ashley Hardin from Williams & Connolly

13     on behalf of defendants, Your Honor.

14              THE COURT:  All right.  You may proceed.

15              MS. HARDIN:  Your Honor, I'd like to start with the

16     third prong of the 1292(b) standard, which I know you're quite

17     familiar -- but it's the fact that interlocutory appeal would

18     materially advance the termination of the litigation, and talk

19     a bit about the pragmatic considerations and why we feel that

20     getting that interlocutory review now is the smart, efficient

21     choice.

22         And I think that that is demonstrated if we look at

23     recent --

24              THE COURT:  Can I ask before you go down this road?

25              MS. HARDIN:  Yes, ma'am.
```

```
 1          THE COURT:  Are you suggesting that -- it wasn't
 2    clear to me whether you were suggesting dual tracking or
 3    whether you were suggesting that the other claims proceed and
 4    this one gets held in abeyance, because these cases are
 5    supposed to be going to trial in a year, and the likelihood
 6    that we have a decision back in a year is low.
 7          MS. HARDIN:  So --
 8          THE COURT:  So "yes" or "no," dual tracking or held
 9    in abeyance?
10          MS. HARDIN:  On the -- I'm just making sure I
11    understand your question, Your Honor.
12       The school district cases, we're asking for certification
13    on both of the claims.  And so those cases I think ultimately
14    would be held in abeyance.  I think -- we've not asked for a
15    stay at this point.  We're prepared to finish fact discovery
16    on April 4th, including in the school district cases.
17       If Your Honor is inclined to certify some of the questions
18    and then, of course, depending on what happens on some of the
19    other motions that are being argued today and whether there's
20    any impact on the personal injury cases, we think a stay might
21    make sense.  But it would -- the -- the appropriate contours
22    of that stay probably need to wait and see what exactly Your
23    Honor would do.
24          THE COURT:  Well, then, how can you argue pragmatism?
25          MS. HARDIN:  We certainly think, like we said, we are
```

 1      less than two months away from the finish of fact discovery,

 2      and as I said, we're prepared to go forward on that.

 3          We do believe that --

 4          (Interruption by the Official Certified Stenographic Court

 5      Reporter to clarify the record.)

 6              **MS. HARDIN:**  I'm sorry.

 7          If Your Honor certifies one or both of the questions that

 8      we're asking for, we think the pragmatism comes in because --

 9      take the nuisance case -- the nuisance claim, for example,

10      Your Honor.  If that case -- if that claim is certified, there

11      are efficiencies to be gained by not doing certain expert

12      discovery that would be required only in the school district

13      cases that is not duplicative of what would also be happening

14      in the personal injury cases.

15          For example, there would be abatement experts that will

16      only be relevant to the school district cases that would not

17      also be relevant to the personal injury cases and, therefore,

18      that could be carved off.

19          But our -- our pragmatic considerations, Your Honor, are

20      primarily that we've seen what happens in litigation like

21      this.  And we have some recent examples from other large

22      litigations, large MDLs, that involve nuisance claims.  The

23      opioid litigation, for example, Your Honor.

24          In recent memory, it's one of the largest MDLs, largest

25      litigations in the country.  It was MDL'd in late 2017.

 1    Motions to dismiss were filed in 2018 before the MDL judge.

 2              **THE COURT:**  You --

 3              **MS. HARDIN:**  I'm sorry.

 4              **THE COURT:**  She has literally been typing nonstop

 5    since eight o'clock this morning with three 20-minute breaks.

 6              **MS. HARDIN:**  Apologies, Your Honor.

 7              **THE COURT:**  Seriously.  Slow down.

 8              **MS. HARDIN:**  I understand.

 9       Motions to dismiss in the opioid MDL were filed in 2018,

10    arguing, much as we have done here, that nuisance is not broad

11    enough to cover these types of claims.

12       Those motions were denied.  Defendants in those cases

13    requested certification to the Sixth Circuit on 1292(b).

14    Those were denied.  In the intervening years --

15              **THE COURT:**  Did -- did defendants take a direct

16    appeal to the Sixth Circuit?

17              **MS. HARDIN:**  After the conclusion of the trial, Your

18    Honor, that involved the pharmacies, that is exactly what

19    happened.

20              **THE COURT:**  And then...?

21              **MS. HARDIN:**  And then -- that was in 2000 and -- I

22    think the trial was in 2022.  The appeal went up to the Sixth

23    Circuit.  And the Sixth Circuit certified the question to the

24    Ohio Supreme Court, and that ruling just came down in the

25    middle of December of 2024.

```
1             THE COURT:  And what did they say?

2             MS. HARDIN:  They said that the nuisance claim was

3    abrogated by statute in Ohio, which is exactly what the

4    defendants had argued all along, and it -- and that the claim

5    of nuisance was not valid.  After all of the time and expense

6    and trial and untold millions of dollars that were spent,

7    multiple bellwether trials, all to find out six years later

8    that the claim was not valid to begin with.

9         The same thing happened in the -- also in the opioid

10   litigation but in the Oklahoma State Court, Your Honor.  There

11   was a lengthy trial.  Millions of dollars, time and resources

12   from the parties and from the court, only to go up on direct

13   appeal to the Oklahoma Supreme Court and for that court to say

14   that nuisance was not a recognized cause of action.

15        Same thing with lead paint, Your Honor, in the row -- in

16   the lead industries case, which has been cited to Your Honor

17   extensively in the briefing of these cases.

18        And so we have the opportunity now to avoid that.  These

19   are, I think --

20            THE COURT:  How?  The Ninth Circuit doesn't control

21   state law.  The last time I was sitting by designation on the

22   Ninth Circuit and we certified something to the California

23   Supreme Court, it took four years.

24            MS. HARDIN:  I understand that, Your Honor.  There

25   are 38 states now involved in this litigation.  When we
```

1    briefed and argued the motion to dismiss before Your Honor and

2    when you issued your opinion, I believe, there were only 19

3    states at issue.  So it's not --

4            THE COURT:  It's increased, 'cause I thought it was

5    decreasing?

6            MS. HARDIN:  By --

7            THE COURT:  When you -- oh, you mean in terms of

8    school districts, not state AGs, because the state AGs are

9    leaving.

10           MS. HARDIN:  That's right.  There are now -- more

11   than half of the school district cases that are pending in the

12   MDL are cases that had not been -- are from states that were

13   not at issue when we briefed and argued the motion to dismiss.

14      We're not suggesting that we need guidance from all --

15   we're not suggesting we need guidance from all of those

16   supreme courts, Your Honor, but what we believe is the most

17   efficient at this point is to certify it to the Ninth Circuit.

18      If the Ninth Circuit feels that it needs guidance from one

19   or more of the state supreme courts, then it would have the

20   option to do that.  But given the breadth of states that are

21   at issue, we believe that that's the most efficient path at

22   this point.

23      It would also save judicial resources at this point, Your

24   Honor, because I think, as we've put in our reply, we now have

25   400 cases from the JCCP that are seeking to dismiss there and

```
 1    refile here.  So the differing opinions and the differing
 2    landscape that we have from the JCCP to the MDL is leading to
 3    blatant forum shopping.  And it's an opportunity to have
 4    appellate review in a case that is, of course, of extreme
 5    significance to the parties, lots at stake.  It makes
 6    efficient sense to get the answer now to whether these are
 7    even valid claims and not wait years.
 8        I understand the plaintiffs' argument is that we've
 9    already come so far in discovery and, therefore, it doesn't
10    make sense to do that now.
11        We disagree because, as I was saying at the beginning,
12    there is lots of work left to be done in these cases, more
13    work to be done than has been done.  We --
14            THE COURT:  Well, there's -- the only work to be done
15    right now is relative to the bellwethers.
16            MS. HARDIN:  Well, the discovery that's taking place
17    against the defendants, Your Honor, is -- is broad and deep
18    and it's --
19            THE COURT:  And you're suggesting that the discovery
20    to the AGs is not?  Because I just spent two hours last month
21    hearing from them about what the defendants were doing.
22            MS. HARDIN:  My client is not in those AG cases, Your
23    Honor, so I'm --
24            THE COURT:  I have --
25                    (Simultaneous colloquy.)
```

1          **THE COURT:**  Be clear.  I will consider the

2     perspectives of all of you collectively when we are talking

3     about this issue, so don't try to distance yourself.  And the

4     fact that the defendants are trying to play both sides of the

5     line will not help you with me.

6          **MS. HARDIN:**  Your Honor, our position, as I've said a

7     couple of times now, is we're happy to finish fact discovery.

8     But there's a lot of work done, including in the bellwethers,

9     on expert discovery.

10         As I said, there are experts that would be relevant to

11    school districts that are not relevant in the PI cases that --

12    or, as I understand it, to the state AG cases that we could

13    avoid.

14         Obviously bellwether plaintiffs trials themselves are

15    quite time-consuming and expensive.  They are a drain on the

16    court's resources, as you know.  And even if we were to

17    proceed in sort of the quote, unquote, normal fashion and have

18    some bellwether plaintiffs' trials, take some direct appeals,

19    those are also very likely to be years away.  And it's not at

20    all clear that even if we go that route, that we will get

21    the -- the guidance on these core threshold issues that we are

22    seeking now.  Because after a trial, there could be all sorts

23    of reasons why those issues were not reached.  It -- the

24    appeal --

25         **THE COURT:**  I did not understand that argument.

```
 1          It is inconceivable to me that if you go to trial on these
 2     claims and you appeal any verdict which is not satisfactory to
 3     you to that supreme -- appellate court and then up to the
 4     Supreme Court, that you wouldn't be appealing that particular
 5     issue.
 6          MS. HARDIN:  Well, I certainly agree, we might appeal
 7     on it, but the Court --
 8          THE COURT:  Well, you would certainly appeal,
 9     wouldn't you?
10          MS. HARDIN:  I feel certain, but that doesn't mean
11     that the Court of Appeals would reach that issue if there were
12     more narrow grounds on which the Court could decide the issue
13     such as causation or a failure of proof.
14          We had this exact experience in an opioids case, Your
15     Honor, where we did appeal on multiple issues, but the Court
16     can certainly say, even taking nuisance as broad enough to
17     cover these claims, it could be a failure of proof issue;
18     there could be a evidentiary --
19          THE COURT:  Did they really say it was a failure of
20     proof?  Is that what they -- that what the Court of Appeals
21     said?
22          MS. HARDIN:  In the case that I'm speaking of --
23          THE COURT:  Yes.
24          MS. HARDIN:  -- we argued multiple issues.  That is
25     one of them.  That case is actually now in the Fourth Circuit,
```

```
 1      been certified to the West Virginia Supreme Court on the issue
 2      of nuisance.  So we don't yet have a ruling from either the
 3      state supreme court or the Fourth Circuit.
 4         But that is a -- that is something that has been argued to
 5      the Court, which is it wouldn't necessarily have to reach that
 6      issue in order to decide the appeal.
 7               THE COURT:  How often in state common law cases where
 8      someone loses and a jury finds against you, have you ever seen
 9      a court throw out a verdict on failure of proof?
10               MS. HARDIN:  Your Honor, I've seen it a few times
11      actually.
12               THE COURT:  More often than not?
13               MS. HARDIN:  In my own practice, I -- I don't think I
14      could put a number on it, but I've certainly --
15               THE COURT:  More often -- I'm not asking you for a
16      number.  I think it is incredibly rare that a Court of Appeal
17      would say there was insufficient evidence for a jury to make
18      the finding.  They don't -- they don't tend to do that.  No,
19      they may say, the claim was not there to begin with.  That, I
20      understand.  But the argument that you're making is pretty
21      weak with that respect.
22               MS. HARDIN:  Well, I understand Your Honor's
23      perspective on it.  I guess what I would say is if those are
24      the issues that are going to go up on appeal regardless, and I
25      think what we're saying here is that really if -- whichever
```

```
 1    route we go, these are issues that the Court of Appeal is
 2    going to have to wrestle with, it is better to have that now
 3    and to know now what the legal landscape is.
 4         These are hundreds of cases, as Your Honor well knows.  We
 5    are trying to get information on both sides so that both sides
 6    may appropriately --
 7            THE COURT:  Why wouldn't it be better after summary
 8    judgment when we have more of a record?  Many of these issues
 9    are fact intensive, and the motion to dismiss is just a -- is
10    just the gateway.
11         And there was plenty of explanation in the order about how
12    the facts in these particular cases matter.  And -- and the --
13    appellate courts don't have those facts.
14            MS. HARDIN:  We understand -- we understand Your
15    Honor's ruling.
16         Our position is that these are threshold legal issues that
17    do not require the resolution of facts and that where taking
18    the facts as pled as true, which Your Honor did and must do at
19    this stage, they still don't satisfy the standard.
20         We don't -- there are certainly -- if we are at summary
21    judgment, there will be evidentiary issues, there will be
22    facts brought to bear, and we will certainly move at summary
23    judgment.
24         But we think there are threshold issues that can and
25    should be decided before we even get there.  And, again, these
```

1    are issues -- I don't think anyone disagrees that both sides

2    really regardless of how it plays out will want appellate

3    review.  We know that based on what's happening in the JCCP.

4    Judge Kuhl did dismiss the four cases in the -- in the JCCP on

5    her demurrer.

6             **THE COURT:**  And isn't that up on appeal?

7             **MS. HARDIN:**  It is about to be, Your Honor.  I think

8    plaintiffs have asked for an extension, and their opening

9    brief is due, I think, late this month or early next, but

10   we --

11            **THE COURT:**  So why don't we just allow that process

12   to proceed and then -- in parallel and when we get a ruling,

13   deal with it in terms of how it applies here at least with

14   respect to California?

15            **MS. HARDIN:**  We do believe they should proceed in

16   parallel.  There were only four states at issue on that

17   appeal, Your Honor, whereas now we have 38, so we -- we will

18   get some information from the California Court of Appeals

19   about those four states.  That's true.

20      We don't believe that's a reason to put on hold

21   information that could be useful to the parties and to the

22   Court for the remaining 34 states.

23      I'm happy to the address the other two prongs, Your Honor,

24   if you have questions about those.

25            **THE COURT:**  Response.

```
 1            MR. WARREN:  Thank you, Your Honor.  Previn Warren
 2    for the school district plaintiffs.
 3        Section 1292(b) is jurisdictional in nature.  It is a
 4    narrow exception to the final judgment rule.  It is to be
 5    applied only sparingly, and the burden very much falls on the
 6    movement -- movants.  It is a heavy burden according to
 7    well-established Ninth Circuit case law.
 8        I've heard my colleague on the other side speak about the
 9    practical efficiencies of --
10            THE COURT:  Well, I mean, she raised this issue of
11    what happened in Ohio.  Why is that not instructive, that we
12    should not waste resources only to hear six years later that
13    the claim shouldn't have been there in the first instance?
14            MR. WARREN:  Your Honor, I think there are -- you
15    know, I think we need to look at this particular case and --
16            THE COURT:  Try to distinguish that case first.
17            MS. HAZAMM:  I'll distinguish that case by saying
18    there -- there was one state law at issue.  Here, there are
19    over a dozen.  So if this goes up to the Ninth Circuit, we're
20    going to see certification to state supreme courts in over a
21    dozen states.
22        And all of the delays and all of the inefficiency and all
23    of the work that would entail briefing that, which
24    dramatically exceeds the work of simply continuing with the
25    case management schedule that Your Honor has thoughtfully set,
```

```
 1      finishing fact discovery, finishing expert discovery, getting
 2      summary judgment briefing in the bag, all of which is slated
 3      to be done this calendar year.
 4          At that point, there will be a full, complete factual
 5      record for any appellate court to review, you know, should
 6      appeals then be taken.
 7          But at this particular juncture, splintering the case over
 8      a dozen different ways would vastly decrease efficiency,
 9      vastly increase workload for the parties, and not provide the
10      benefits in the one example that my colleague Ms. Hardin has
11      cited.
12          So from a -- from a efficiency standpoint, I do not think
13      it is more efficient.  But we don't even get to that
14      consideration unless they can meet the three statutory
15      factors, which, again, are jurisdictional in nature.  And I
16      know my colleague will be addressing those, so I'll hold on --
17      on taking those up.  But I did just want that framing to be --
18      to be clear because this is -- at the end of the day, Your
19      Honor has discretion to deny this motion.  But Your Honor
20      doesn't have discretion to avoid the three statutory factors.
21      Those must be satisfied in order for the Ninth Circuit to have
22      jurisdiction on an interlocutory basis.
23              THE COURT:  Any response.
24              MS. HARDIN:  A brief response on that point, Your
25      Honor, which is I don't think there's any certainty or
```

1    guarantee or even likelihood that this will splinter into

2    dozens of cases if it goes to -- to the Ninth Circuit.  We

3    don't know what the Ninth Circuit would do.

4         Certainly has the option to certify questions to one or

5    more state supreme courts.  But I think that's a bit of -- of

6    a parade of horribles that we're not sure would happen.  We

7    actually think this is the most efficient way to resolve it.

8         We're in federal court.  This is -- this Court, at least

9    as to California, does not have the ability to certify a

10   question to the Supreme Court of California.  That's -- that's

11   not true with regard to other states, however.

12        But the efficient way here is to go up to the Ninth

13   Circuit.  That's where these cases will be headed eventually.

14   I think your question to my colleague on the other side is --

15   is the one we're asking ourselves, of course, which is why put

16   all of this time and effort if these are claims that shouldn't

17   be here in the first place.

18        The Court of Appeals may also just dismiss on *Erie* grounds

19   and suggest that the -- the state courts haven't themselves

20   allowed these types of claims to go forward and, therefore,

21   the federal court should not be doing that, so I -- I

22   certainly don't think we know there'll be --

23             **THE COURT:**  Even if you are right about nuisance, the

24   school districts still have negligence claims.  And that seems

25   to me to create a huge waste to certify one and not a second.

```
 1        We aren't going to go forward with all of this work on
 2   negligence.  I know you want both, but it's -- you have a much
 3   weaker argument with respect to negligence.  And then it
 4   becomes even weaker if what you're doing is asking me -- is to
 5   splinter them.
 6        MS. HARDIN:  Well, we certainly do ask for both.  I
 7   don't disagree with you, Your Honor, that our -- our argument
 8   is stronger on the nuisance claims, and we -- than it is on
 9   the negligence claims.
10        THE COURT:  But there's no pragmatism to go up on one
11   while staying everything through trial, and it's not trial of
12   everything.  It's trial on a handful of cases and -- on one
13   claim.  That makes no sense.
14        MS. HARDIN:  We think it does make sense, Your Honor,
15   and that's because when we -- when I talk about experts that
16   we might not need in the school district cases that are not
17   overlapping with the PI cases, they are at least off the top
18   of my head sort --
19        THE COURT:  So let's assume for purposes of argument
20   that you have a strong claim with respect to nuisance, a weak
21   argument, which I think you do, with respect to negligence.
22   Are you suggesting that you're having -- that causation
23   experts are going to be separate for nuisance than causation
24   experts for negligence?
25        MS. HARDIN:  I think the experts that would differ
```

1    predominantly between the two are these quote, unquote,

2    abatement experts that -- that plaintiffs will have which will

3    cover what they call -- is their abatement plan.  We can save

4    for another day our dispute about whether that's proper

5    nomenclature.

6         And also I do believe that there will be differences in --

7    in other damages, Your Honor, that would be different between

8    the two cases and --

9         **THE COURT:**  But how is it efficient for me to -- to

10   litigate fully negligence and then if you're wrong, which of

11   course I think you are because I wrote a long opinion telling

12   you why I think you're wrong, to then have to do a redo on

13   nuisance when everything else has gone forward on negligence?

14   It makes no sense.

15        **MS. HARDIN:**  From our experience, Your Honor, in the

16   opioid litigation, we believe that the nuisance claims are the

17   claims that are driving this litigation on the school district

18   side.

19        What happened in the opioid litigation is that as we went

20   through discovery and -- and neared trial, many of the

21   plaintiffs, who in those cases were local government entities,

22   cities and counties predominantly, dismissed their negligence

23   claims, and all we had was nuisance, and that -- there are

24   several legal reasons why that's true, one of which is this

25   abatement remedy.  It really does drive the nuisance claim on

1    their side.  It's where I think we will see the plaintiffs are

2    asking for the biggest dollars and the biggest damages.

3        And so if we are talking about resolution of these cases

4    on a mass scale, information about the validity of the

5    nuisance claim and whether abatement is [sic] or is off the

6    table is huge.

7        And so we do think it is a -- a game changer in these

8    cases, even if we're only talking about nuisance.  And, again,

9    in the opioid litigation, we think past is -- is prologue

10   here, Your Honor.  And those were the claims that remained

11   after years of that litigation.

12       And now we are seeing the rulings come out from the

13   appellate level from Oklahoma, Ohio, Maine -- we just

14   submitted a supplemental authority to Your Honor on Monday

15   where the Maine Supreme Court has ruled on an opioid case.

16       The Sixth Circuit now dismissing the verdict in -- against

17   the pharmacies, largely because of the Ohio Supreme Court

18   ruling from December, so we do think it is -- it is what will

19   drive these cases.  It will -- it is what will inform the

20   parties about the litigation risk and the real value of these

21   cases, so we do see a value even if only certifying the

22   nuisance question if that's where Your Honor is inclined.

23           **THE COURT:**  A response.

24       **MR. WARREN:**  Thank you, Your Honor.

25       My colleague referred to a parade of horribles.  It's a

```
 1    parade of realities.  The -- the charge of this Court was to
 2    make an Erie prediction as to what the highest state supreme
 3    courts would do when faced with the public nuisance question.
 4    And that's exactly what Your Honor did.  That's exactly what
 5    the Ninth Circuit would have to do.  And in order to actually
 6    get firm guidance from the state supreme courts, it would have
 7    to ask, so that's -- that's reality.  That's not a
 8    hypothetical.  That's -- that's precisely what would happen.
 9        And I think the movants' request is an invitation to chaos
10    in which we are now litigating in, instead of in one forum,
11    more than 13.  So that's -- that's one thing.
12        The other thing is I heard my colleague say a lot of
13    things about the structure of our cases, what experts we would
14    put forth, where the focus would be, where the damages would
15    be, but they don't have any basis to actually know that
16    because we haven't done expert discovery yet.
17        We ought to be able to be in the driver's seat of what we
18    present and how we present it and how important our nuisance
19    claim is relative to our negligence claim.
20        Now, the reality is I suspect the damages experts on the
21    school district side to be arguing on both claims at the same
22    time.  So there's no efficiency from our perspective in having
23    an expert opine on damages for negligence but not nuisance
24    because that's got shaved off arbitrarily.
25        So this is another instance where, you know, hypothesizing
```

 1    workload that hasn't happened yet is not a sound basis to do

 2    something that's going to create piecemeal appeals and

 3    frustrate what the Court has strived so hard to do, which is

 4    make this process efficient.

 5           **THE COURT:**  The one question that may be more of a

 6    legal question I think than public nuisance is the -- the

 7    overlay of 230, Section 230.

 8           Argument on that front.

 9           **MR. WARREN:**  Yes, Your Honor.  Would I start or were

10    you asking my colleague?

11           **THE COURT:**  It doesn't matter to me.

12           **MR. WARREN:**  I'm happy to give it a go in that case.

13           And I would say this:  The application of Section 230 to

14    the facts of this case has been highly fact intensive.  That

15    is the definition of a mixed question of law and fact.  A

16    mixed question of law and fact cannot drive a 1292(b)

17    interlocutory appeal, period.  And the law on that is clear.

18           I don't think there -- the movants have a single good

19    example of any court applying Section 230 in a factual vacuum.

20           Now they say, okay, it's applying the law to the

21    allegations in the complaint.  Well, that's always going to be

22    true on a motion to dismiss.  That doesn't change the fact

23    that it's a mixed question of law and fact.

24           And here, where Your Honor has taken great pains to tease

25    apart the different features at issue across four different

1    social media platforms, there's all the more reason to

2    understand how do those features actually work.

3        Well, we are finding out finally how they work.  We are

4    taking testimony from dozens of company witnesses, both past

5    and current.  And we are learning exactly how key features,

6    like the recommendation algorithm, do and do not harm people,

7    you know, with or without reference to content.

8        And what we're actually learning is content has a highly

9    subsidiary role here.  It may be the but-for cause, but, of

10   course, we know under established Ninth Circuit precedent

11   that's not enough to trigger 230 immunity.  But it's actually

12   how the recommendation algorithm structures and aggregates and

13   presents content that actually creates harm that wouldn't

14   otherwise have existed.

15       So we're learning not only about that but about all the

16   other features at issue.  And I think the Ninth Circuit will

17   want that information and need that information in order to

18   make an intelligent determination around the application of

19   Section 230.

20       So I think interlocutory review on issues of Section 230

21   is extremely premature, and the movants cannot carry their

22   heavy burden of seeking review right now.

23           **THE COURT:**  Response.

24           **MS. HARDIN:**  Your Honor, my colleagues are going to

25   address the -- the nuts and bolts of 230, but what I would say

 1   as it relates to the school district case is that they are

 2   unrelated.  The -- the legal issues at issue -- of course,

 3   we -- we moved to dismiss on Section 230 grounds.  But the --

 4   this 1292(b) request that we're making is about the validity

 5   of the nuisance claim and the negligence claim and whether or

 6   not the tort of public nuisance is broad enough to cover the

 7   claims as pled by the plaintiffs.

 8        So even taking as true all that they have alleged about

 9   how the platforms work, and what they do, and what the harms

10   are, and what the effects are, taking all of that as true,

11   that does not in our view -- we understand Your Honor saw it

12   differently, but in our view -- and we believe that at a bare

13   minimum the -- the -- it's pretty clear that the weight of

14   authority is that -- and given recent experience that it's --

15   it's not unlikely, I think we could say, that -- that we might

16   go the way of the opioid cases and of the lead paint cases.

17        So I think you can, for purposes of this motion on the

18   nuisance and the negligence claim on school districts, is put

19   Section 230 to one side.

20        Now, obviously, there are multiple motions and, as Your

21   Honor said, you're going to rule holistically and you're going

22   to do what's best for the whole, and so I think we can wait

23   and see what happens on the other motions, again, in terms of

24   what might make sense as to how these --

25             THE COURT:  Go ahead.  Finish off.

```
1              MS. HARDIN:  I would just say how we would ultimately

2     structure or -- or dual track the cases.  But I think you can

3     decide this 1292(b) motion on more narrow grounds that don't

4     involve some of the thornier Section 230 issues.

5              MR. WARREN:  May I briefly respond, Your Honor?

6              THE COURT:  You may.

7              MR. WARREN:  I think my colleague has finally shown

8     defendants' hand on the issue of the controlling question of

9     law.

10         To read the brief, you would think the relevant question

11    of law was how to apply Erie and whether Your Honor made an

12    appropriate Erie prediction, you know, quote, unquote,

13    extending state law.  But that's not at all what I just heard

14    Ms. Hardin say.

15         She said the question was, is tort of public nuisance

16    broad enough to cover these factual circumstances.  That's

17    actually what they're ultimately getting at.  And the problem

18    there is there's no substantial disagreement on that question

19    with respect to about a dozen states.  And I can list them

20    right now.  I mean, they include Alaska, for example; Arizona;

21    Colorado; Georgia; Indiana; Kentucky; Louisiana; Maryland;

22    Nevada; North Carolina; Pennsylvania; Utah; Virginia.  Those

23    are states as to which the defendants, the movants, were

24    unable to muster any authority to demonstrate a substantial

25    ground for difference of opinion.
```

1        So the second of the three jurisdictional factors has not

2   been satisfied, which means this Court actually cannot grant

3   interlocutory review, even if Ms. Hardin was right and it

4   would be the most practical and efficient thing to do, which

5   it isn't.

6            **THE COURT:**  All right.

7        Next?

8            **MS. HARDIN:**  May I respond to that, Your Honor, or --

9            **THE COURT:**  Briefly.

10           **MS. HARDIN:**  I'm not sure what my colleague believes

11   the "gotcha" is.  We certainly have two bases.  We do believe

12   that -- that the proper *Erie* response in this situation would

13   have been not to expand state law where a state supreme court

14   has not already done so.  But we certainly -- I think we're

15   quite clear in our briefing that we believe there is a

16   substantial ground for difference of opinion as to the merits.

17       We're not here to relitigate those merits today, Your

18   Honor, but, again I think it's -- the -- the point is there

19   are many cases -- indeed, now the count -- when we briefed it,

20   it was five of seven.  Now with Washington in the case, Your

21   Honor, it's seven of eight state supreme courts have come out

22   differently.  So there's certainly a substantial ground for

23   difference of opinion.

24       I don't think it can be disputed that it is a controlling

25   issue of law if the -- if the outcome were in the defendants'

1    favor, the cases would be over.  That's what's happening in

2    the JCCP, and now they're up on appeal.  And even if there is

3    an affirmance and the Ninth Circuit sees it as Your Honor sees

4    it, that is still the -- there could be narrowing, there could

5    be information given to the parties that would materially

6    advance the resolution of the litigation, so --

7            **THE COURT:**  I don't understand how the -- how there

8    would be narrowing.  What do you mean?

9            **MS. HARDIN:**  Well, a court could certainly suggest

10   that it's not -- that there could be -- some of the claims

11   could go forward as nuisance claims and some cannot.

12        For example, there could be issues, as we've talked about,

13   on the -- the types of issues that they -- they may not be

14   able to seek, for example, medical treatment.  Those could be

15   held to be too individualized and not complicating public

16   right.  Whereas, there could be some other of the --

17        Again, you know, we think they should all go out, but

18   there can certainly be, as Your Honor has done in a parsing,

19   that a Court of Appeals could -- could very well do that same

20   thing.

21        So there could be a less-than-full defense win at the

22   Ninth Circuit and still be a narrowing of these -- of these

23   claims that would narrow discovery, narrow experts, narrow a

24   trial.

25            **THE COURT:**  Anything else?

1        **MR. WARREN:**  Your Honor, I would -- I would simply

2   respond that heard a lot of "could bes" and "maybes," but

3   that's not enough to satisfy the heavy burden that movants

4   bear here.

5        **THE COURT:**  All right.

6   Who's next?

7        **MS. HARDIN:**  Thank you, Your Honor.

8        **THE COURT:**  Thank you.

9   Mr. Petrosinelli?

10       **MR. PETROSINELLI:**  Yes, thank you, Your Honor.

11       This is the motion -- it's a motion on behalf of -- I'll

12   call it Google, but I mean the Google defendants and Snap.

13   This one is a different kind of motion.  And I say that

14   because of this:  Meta and TikTok appealed this issue, the --

15   the issue of whether if an underlying design defect claim is

16   barred by Section 230, then a failure to warn claim should

17   also be barred.

18       **THE COURT:**  Right.

19       **MR. PETROSINELLI:**  No matter what the feature is and

20   what the defect is.  And that is before the Ninth Circuit.

21       The plaintiffs and the AGs, I believe, have moved to

22   dismiss that appeal on jurisdictional grounds, saying it

23   doesn't meet the collateral order doctrine, so --

24       **THE COURT:**  And when will that be decided?

25       **MR. PETROSINELLI:**  It's fully briefed and so --

```
 1            THE COURT:  When is it being argued?

 2            MR. PETROSINELLI:  I don't think there's an argument

 3   date set, and I'm not sure they would hear argument on it.  I

 4   think they might just decide on the papers, is my experience.

 5       But they -- they could ask for argument, but they have

 6   not.

 7            THE COURT:  When was the briefing complete?

 8            MR. PETROSINELLI:  Two weeks ago, I'm told, Your

 9   Honor.

10       So the reason why this is different is because the --

11   Google and Snap filed -- we filed our 1292(b) motion because,

12   a, we think it meets the standard for 1292(b).  But b, if the

13   Ninth Circuit wants to decide this issue, thinks it's worth

14   deciding now but finds some jurisdictional defect in the

15   collateral order doctrine -- in other words, if they think

16   we'd like to get to the merits, but --

17            THE COURT:  You don't think they'll tell us?  Since

18   when has the Ninth Circuit been shy?

19            MR. PETROSINELLI:  Well, they're not --

20            THE COURT:  They're not.  They're not shy.  They

21   could easily say, "we'd like to hear this.  This is

22   procedurally improper."

23            MR. PETROSINELLI:  For sure.  And --

24            THE COURT:  So why would I do anything until I hear

25   from them on that topic?
```

```
 1            MS. HARDIN:  Well, you wouldn't have to, but I guess

 2    the question would be --

 3            THE COURT:  If they want to hear it, they're going to

 4    hear it.  The Ninth Circuit is not shy about hearing things in

 5    which they have an interest.

 6            MR. PETROSINELLI:  Completely agree, Your Honor.

 7       And that's why we were trying to give them every option to

 8    hear it if they want to.

 9            THE COURT:  Yeah, but they'll hear it if they want to

10    anyway.

11            MR. PETROSINELLI:  That -- if they -- sure, they

12    could deny the plaintiffs' motion to dismiss and hear the

13    appeal, in which case, you're right, the 1292(b) wouldn't be

14    necessary.

15            THE COURT:  Right.

16            MR. PETROSINELLI:  For sure.

17            THE COURT:  But what I'm saying, though, is that

18    it -- it is -- is there no -- well, who's representing Meta?

19            MR. PETROSINELLI:  Mr. Rouhandeh.

20            MR. ROUHANDEH:  James Rouhandeh, Davis Polk.

21            THE COURT:  Come to the mic.

22       Now I haven't read your -- what's your name again?

23            MR. ROUHANDEH:  James Rouhandeh of Davis Polk.

24            THE COURT:  Did you not sign in?

25            MR. ROUHANDEH:  I -- perhaps I forgot.
```

```
 1              THE COURT:  Oh, wait.  Here it is.  I've got you.
 2       I suspect that you didn't bring your motion without
 3   grounds.
 4              MR. ROUHANDEH:  No, we -- we --
 5              THE COURT:  You have substantive grounds for your
 6   motion, don't you?
 7              MR. ROUHANDEH:  Yes.
 8              THE COURT:  And so if the Ninth Circuit really wanted
 9   to hear it, they'd grant the motion, wouldn't they?
10              MR. ROUHANDEH:  Yes.
11              THE COURT:  All right.  So I don't understand what
12   the issue is.  That is, I -- I don't understand why I should
13   get involved when Counsel Rouhan- --
14              MR. PETROSINELLI:  Rouhandeh.
15              MR. ROUHANDEH:  Rouhandeh.
16              THE COURT:  -- Rouhandeh has filed a perfectly good
17   motion that the Ninth Circuit is perfectly authorized to
18   accept or not.
19              MR. PETROSINELLI:  I think we are perfectly happy
20   if -- if what the Court is suggesting, which makes sense to
21   me, that if the Ninth Circuit decides this motion to dismiss
22   in the near term and it grants -- it denies motion to dismiss
23   and takes the appeal, that's great.  We don't need the
24   1292(b).  We could hold this in abeyance.
25       But if they -- I think the reason why we filed it, Your
```

1    Honor --

2          **THE COURT:**  The reason -- my point is if they don't

3    take it, then they don't want it, in which case I would

4    deny -- there -- the indication that they're giving me is

5    don't send this back to us.  We don't want it because we had

6    the opportunity to hear it, and we didn't take it.

7          **MR. PETROSINELLI:**  I suppose it depends on how they

8    rule on the -- in -- granting the motion to dismiss.  I mean,

9    if they said, you know, it just doesn't meet the collateral

10   order doctrine, I mean --

11         **THE COURT:**  It -- he's given them a path.

12         **MR. PETROSINELLI:**  I know he has.  I'm very grateful

13   for that.

14         **THE COURT:**  And so there's a path.  If they want it,

15   they'll take it.

16         **MR. PETROSINELLI:**  I think I'm just saying, Your

17   Honor -- what I would say is, if we want to wait till the

18   Ninth Circuit rules and see if they take it.  If they don't --

19         **THE COURT:**  Well, let me just say, I probably will

20   wait till the Ninth Circuit rules.  I don't know -- look, I'm

21   still -- I still haven't gotten to a number of your motions.

22   I'm trying.  But when I have something at the Ninth Circuit

23   and you're asking me to preempt and try to, you know, preempt

24   what they're doing and I've got other motions that I have to

25   deal with you, this isn't my highest priority.

```
 1              MS. HARDIN:  I'm perfectly happy to hold this in

 2    abeyance, Your Honor, and if the Ninth Circuit rules -- when

 3    they rule, see what they rule.

 4              THE COURT:  Any response?

 5              MR. WARREN:  Not really, Your Honor.  Let's wait to

 6    see what the Ninth Circuit does.

 7              THE COURT:  All right.

 8         Then we have -- well, Mr. Rouhandeh, I've got you -- does

 9    the -- people want to talk about the AG?

10                   (Pause in the proceedings.)

11              MS. BATCHELDER:  Krista Batchelder with the Colorado

12    Attorney General's Office.

13              THE COURT:  Okay.

14         Who wants to start?  No.

15              MS. BATCHELDER:  I mean, I guess I can start.

16         Does Your Honor want --

17              THE COURT:  Do you want to say anything else about,

18    what, you've got a -- you don't think I can rule on the motion

19    in any event; is that your point?

20              MS. BATCHELDER:  Oh, with --

21              THE COURT:  With respect to divestiture.

22              MS. BATCHELDER:  Is Your Honor saying because there's

23    a pending appeal, that you don't have the jurisdiction to

24    certify the 1292(b) at this time?  Because that was not the

25    position we're taking.
```

```
1                      (Simultaneous colloquy.)

2            MS. BATCHELDER:  Yeah, that is not the position we're

3   taking.

4            MR. ROUHANDEH:  That's our position, Your Honor.

5            MS. BATCHELDER:  The state attorneys general filed

6   our motion to dismiss arguing that it was, first of all, a

7   non-appealable order and then, second, that the collateral

8   order doctrine does not apply.

9       And to Your Honor's question about, well, if the Ninth

10  Circuit wants the issue, won't they just take it up?  We do

11  think that the Ninth Circuit might be hesitant to create a

12  precedent of allowing these -- I don't want to say frivolous

13  appeals, but these non-appealable order appeals going up and

14  creating a logjam every time there's a non-appealable order

15  arguing this collateral order doctrine in order to get issues

16  in front of them and just inviting that sort of conduct at the

17  district court level.

18      And so we are confident that our motion to dismiss will

19  prevail, simply because of that -- how narrow the collateral

20  order doctrine is.  And given that, that Your Honor should be

21  confident in proceeding on deciding whether or not to certify

22  both the state AGs motion to certify for interlocutory appeal

23  as well as that of the Meta defendants because we feel that

24  the 230 issue is so intertwined that it would not make sense

25  to hear one and not the other.
```

```
 1          At the very least we would like Your Honor to hear the

 2     arguments and, at most, stay issuing your ruling.  But we do

 3     think that the issue is ripe for Your Honor's review.

 4              MR. ROUHANDEH:  Your Honor, we would disagree.

 5     The -- this presents a really similar issue to what we just --

 6     Your Honor just addressed, which is they not only -- the state

 7     AGs not only moved to dismiss our appeal, they cross-appealed.

 8     So they have an appeal pending in front of the Ninth Circuit

 9     that raises the exact same question and set of issues that

10     they brought their 1292(b) motion on, which is whether Section

11     230 does protect the -- these various practices.

12          So the Ninth Circuit will rule on the cross-motions to

13     dismiss and will either dismiss both appeals --

14              THE COURT:  Right.

15              MR. ROUHANDEH:  -- keep ours, deny theirs, but

16     whatever happens, it's going to be a lot clearer picture after

17     that.

18          But what they have done is actually taken the same issue

19     and put it before the Ninth Circuit and after that, put it

20     before Your Honor.

21              MS. BATCHELDER:  Well -- and if I may respond, I

22     believe the reason the state attorneys general did that was to

23     preserve our issues.  We did not at any point believe that the

24     appeal was proper.

25              THE COURT:  Did you indicate that clearly in your
```

```
 1    papers?

 2              MS. BATCHELDER:  Yes, Your Honor.

 3              MR. WARREN:  Your Honor, may I be heard?

 4              THE COURT:  You may.

 5              MR. WARREN:  Thank you, Your Honor.  Previn Warren

 6    for the personal injury and school district plaintiffs.

 7         I just want to add one point to the mix here.  On my

 8    count, there's no fewer than 16 briefs that are proliferated

 9    on the Court's docket because of the movants' various desires

10    to jump the queue and go straight to the Court of Appeals.

11         I think that is a preview of the chaos to come if we

12    entertain a 1292(b) motion at this particular juncture.  There

13    is an efficient path forward, and that's letting a jury hear a

14    trial in a bellwether case in this courtroom.

15              THE COURT:  Well, what about their argument -- now,

16    we're back to where we were with Ms. Hardin.  She's arguing

17    that there are now six supreme courts that, in effect, would

18    disagree with your statement.

19              MR. WARREN:  I'm not sure those supreme courts have

20    disagreed with my statement about -- I mean, those supreme

21    courts have addressed the merits on public nuisance perhaps,

22    but I'm addressing the question of the material advancement of

23    the termination of litigation, which is the third prong of the

24    1292(b) factor.

25         And I don't think that any of those prongs is satisfied
```

1    here when state supreme courts have not actually and -- for

2    many of the states at issue here, created diversion case law

3    that creates a substantial ground for difference of opinion,

4    so I just think jurisdictionally, the Court can't.

5       Perhaps the Court -- perhaps with respect to a subset of

6    the states, maybe there's an argument -- there's a substantial

7    ground for difference of opinion.  But then that's going to

8    require the Court to certify just those states' public

9    nuisance claims and keep, you know, half a dozen, ten more

10   here, and that's the very splintering that the third prong is

11   designed to avoid.

12      So there's just no way to do this.  The other thing --

13          **THE COURT:**  Let me ask, what -- *JUUL*, which I cited

14   multiple times in the order, preceded this action.  Are there

15   any *JUUL* cases that are up on appeal to the various supreme

16   courts?

17          **MR. WARREN:**  Your Honor, I do not know the answer to

18   that question.  I'm sorry.

19          **THE COURT:**  Any of the defendants?  Does anybody with

20   all your hoards of researchers?

21      If you do -- anybody in the courtroom?  I think there are

22   40 lawyers.  Does anybody know whether *JUUL*'s up on appeal at

23   these state supreme courts?  I mean, if we think about it,

24   in -- in the world of common law, six, ten years, a blink of

25   the eye.  We've been at this for a long, long time, decades

```
1    and decades and decades.  And we don't get common law without

2    litigation.  We don't get answers without going through the

3    process.

4         MR. ROUHANDEH:  Your Honor, could I respond to

5    something the state AG --

6         THE COURT:  You may.

7         MR. ROUHANDEH:  They said they did this to preserve

8    their appeal.  I don't know what word -- I don't recall the

9    words that they used.  But I do recall these words.

10       They said to the Ninth Circuit, the Ninth Circuit cannot

11   decide our appeal without decide -- deciding the antecedent

12   question as to whether Section 230 applies at all.

13       Their position is that the Ninth Circuit, if they take our

14   appeal, must decide the same set of issues that they're asking

15   Your Honor to certify.

16       So it is up on appeal schedule, and we will see what the

17   Ninth Circuit says fairly shortly.  They actually ruled pretty

18   quickly on motions to dismiss, as I understand it, so we may

19   have that ruling pretty quickly.

20       And, obviously, the Ninth Circuit, as Your Honor said,

21   will decide what it wants to decide.  If it wants to decide

22   those as antecedent questions, it will.  If it wants to

23   dismiss their appeal and allow ours to go forward, they -- it

24   could do that.  It can also carry those motions to dismiss

25   with the appeal, so it seems to make sense to wait before Your
```

 1   Honor rules on the 1292(b) motion, which is it overlap -- in

 2   the Venn diagram, there's -- the two circles are exactly

 3   overlapping one another in terms of the issues that they are

 4   asking this Court to decide pursuant to 1292(b) and the Ninth

 5   Circuit to decide pursuant to their motion to dismiss --

 6             **MR. WARREN:**  Your Honor, may --

 7             **MR. ROUHANDEH:**  -- in cross-appeal.

 8             **MR. WARREN:**  May I very briefly respond?

 9             **THE COURT:**  Yeah.  No, thank you.  It's -- this is

10   all coming back to me.  I had been thinking about insurance

11   law all day, so --

12        Go ahead.

13             **MR. WARREN:**  I think the Venn diagram between what

14   the defendants are asking this Court to decide in their

15   1292(b) motion and what they've asked the court of appeals to

16   decide is also perfectly overlapping, so I think the argument

17   could very well be applied right back to the defendants and

18   should.

19        My second point is I'm told by my -- by my very able and

20   much smarter colleagues that the answer to your question about

21   *JUUL* is no, there are not cases up on appeal at the moment.

22             **MS. BATCHELDER:**  And if I may briefly respond for the

23   state attorneys general.

24        What we would like to leave with this Court is that if the

25   motion to dismiss at the Ninth Circuit right now is granted

```
 1    and that goes away for failure to meet the collateral order
 2    doctrine standard, what we would ask is that this Court
 3    certify the 1292(b)s of both the state attorneys general and
 4    the Meta defendants, because we do believe that this Section
 5    230 issue is crucial.
 6        And based on the time line, the sooner we can get it
 7    certified and get it under review, the more likely it is that
 8    we will get a ruling and some guidance on that prior to
 9    proceeding to trial.
10        MR. WARREN:  May I have one very brief point in
11    response, Your Honor?
12        THE COURT:  So just moving from where you left off,
13    that would suggest that the state attorneys general is asking
14    that I stay the entirety of their claims.  I mean, I -- I'm
15    not -- how -- how would I do it piecemeal?
16        You're moving to certify whether Section 230 shields Meta
17    from liability for any claims stemming from their unfair,
18    unconscionable practices, et cetera.
19        Why would I grant that and not grant a stay of the
20    entirety of all the AGs' claims?
21        MS. BATCHELDER:  Because I believe Your Honor's order
22    was specific to five specific features.
23        THE COURT:  No, I know, but if you're saying, oh, no,
24    wait, let us take something to the Court of Appeal, with
25    respect to that issue, why would I do this twice?  Why
```

1    wouldn't I just then stay all of the AGs' cases?

2            **MS. BATCHELDER:**  Because, Your Honor, we don't need a

3    stay because our deception claims overlap, and we're able to

4    proceed with discovery on all of the factors and all of the

5    issues.

6            **THE COURT:**  All right.  Say more.

7            **MR. ROUHANDEH:**  Your Honor, if I --

8            **THE COURT:**  No, let her finish.

9            **MS. BATCHELDER:**  So say more on --

10           **THE COURT:**  Yeah, I don't -- I don't know how it

11   is -- well, I don't know how it is that you anticipate

12   operating in parallel.

13           **MS. BATCHELDER:**  Because, Your Honor, the -- the

14   features -- the issue that we are sending up on or asking to

15   have sent up with regards to Section 230, that has large

16   implications with regards to the sort of injunctive relief

17   that we could obtain at the end of trial should we be

18   successful.

19       But it does not impact our ability to proceed with

20   discovery, with our experts --

21           **THE COURT:**  Well, it impacts your ability to go to

22   trial, doesn't it?

23           **MS. BATCHELDER:**  It would.

24           **THE COURT:**  And --

25           **MS. BATCHELDER:**  But what we --

1      **THE COURT:**  -- impacts your ability to have the

2    experts opine on all of the various issues, doesn't it?

3      **MS. BATCHELDER:**  That is not what we are finding as

4    we are working through.

5      **THE COURT:**  And how am --

6                (Simultaneous colloquy.)

7      **THE COURT:**  -- supposed to know that?  I mean, what I

8    certainly -- so are you saying that if I granted your motion

9    and you proceeded in parallel and perhaps you would get a

10   favorable ruling over -- which overruled my original finding,

11   that you wouldn't ask for additional -- that you would waive

12   any additional discovery, you would waive any changes to your

13   expert reports, you would waive all of that because it's all

14   the same?

15     Is that what you're arguing?

16     **MS. BATCHELDER:**  Our position was that it didn't --

17   it wasn't going to change how we were proceeding from this

18   point forward, that they could actually proceed on parallel

19   tracks, and -- I mean, I don't want to --

20     **THE COURT:**  How long do you think it's -- we're going

21   to have to wait?

22     **MS. BATCHELDER:**  Our calculation based on other

23   orders that are coming out is that it's about a 6-to-12-month

24   window.

25     And we don't have -- where we don't have a trial date yet,

1    that's why we're asking that this be certified now because
2    we're at least a year and a half out at this point in time.
3    So we feel that there is enough time to have this issue heard
4    while we continue to proceed and move forward with this case.
5    And ultimately, this would avoid potentially coming back on
6    appeal and having to revisit --
7            **THE COURT:**  That's always a potential.  It is always
8    a potential.  And everybody complains when they get adverse
9    rulings, partial or otherwise.
10       Got it on both sides.  That always happens.  Surprise,
11   surprise.
12           **MR. ROUHANDEH:**  Your Honor, if -- it would be only
13   fair if what they're asking is for certification of those
14   issues that --
15           **THE COURT:**  Yeah.
16           **MR. ROUHANDEH:**  -- the defendants --
17           **THE COURT:**  There you go --
18                   (Simultaneous colloquy.)
19           **MR. ROUHANDEH:**  -- against us.
20           **THE COURT:**  Let's throw it all out.
21                   (Simultaneous colloquy.)
22           **MR. ROUHANDEH:**  -- up on appeal now.
23       Your Honor on April 19, I believe it is, of 2024, asked
24   the state AGs, well, let me ask this, because Meta originally
25   wanted to appeal my decision and sought to have my approval on

1    that.  I denied it in part because I wanted to make sure we

2    got through the state AGs' complaint.

3        Then the Court goes on and says, do both parties want to

4    take it up to the Ninth Circuit to get the Ninth Circuit

5    review in parallel?  That was ten months ago.

6        If they thought these issues should be taken up by the

7    Ninth Circuit, why are they asking for that now as opposed to

8    when the Court invited them to make a motion ten months ago?

9    And now the motion that they would make, which we're now

10   several layers down the -- several steps down the road, if the

11   Ninth Circuit does this and they have this particular ruling,

12   then we would want to renew our 1292(b) motion.  And then we

13   would want to make a motion for our issues.  And you'd have

14   the whole case up there.

15       That -- that only makes sense and is only fair to the

16   defendants if there's a complete stay of the action -- state

17   AG action.

18         **MR. WARREN:**  Well, Your Honor, may I add one point

19   from the personal injury school district plaintiff

20   perspective?

21       It doesn't make any sense to have the claims of the state

22   AGs stayed but the personal injury school district claims

23   moving forward.  They should all be moving forward because

24   they all address similar issues concerning, you know,

25   deceptive statements by defendants and -- and other such

1    matters.

2            **THE COURT:**  Right.  But if the state -- I don't know

3    how you have standing to tell the state AGs and the defendants

4    what they want.

5            **MR. WARREN:**  I don't --

6            **THE COURT:**  But they --

7            **MR. WARREN:**  I'm not suggesting that.  But I do have

8    standing to -- to suggest that the 1292(b) motion should be

9    denied, and I do think it should be denied.

10       You know, for one thing, I think it was represented by

11   defendants' counsel that all the motions to dismiss had been

12   resolved.  Maybe I misheard.  But there are still motions to

13   dismiss pending from the personal injury plaintiffs, including

14   a negligence claim.  And, you know, it makes sense for all

15   those things to be dealt with at once.

16       You know, to the extent that the Ninth Circuit is going to

17   rule in 6 to 12 months, well, by that time, we're going to be

18   done with most of the hard work.  I mean, we may not have

19   tried the first case, but all the fact discovery and expert

20   discovery, *Daubert* briefing will be in the rearview mirror.

21   And at that point, you know, there really isn't any advantage

22   or economy to delaying the trial so that we can sit at the

23   Court of Appeals for 24 months.

24            **THE COURT:**  Okay.

25       Anything else critical you want to say?

```
 1            MR. ROUHANDEH:  Nothing for Meta.

 2            MR. WARREN:  No, Your Honor.  Thank you.

 3            MS. BATCHELDER:  None from the state AGs.

 4            MR. WARREN:  Not from the personal injury and school

 5    district plaintiffs.

 6            THE COURT:  No.

 7            MR. PETROSINELLI:  No, Your Honor.

 8            MS. HARDIN:  No, Your Honor.

 9            THE COURT:  All right.  So let's deal with the last

10    issue, then.

11            MR. WARREN:  Thank you, Your Honor.

12            THE COURT:  Meta is seeking to stay the coverage

13    action?

14            MR. MYERS:  Good afternoon, Your Honor.  May it

15    please the Court, Marty Myers from Covington, insurance

16    counsel to the Meta parties.

17            THE COURT:  Good afternoon.

18            MS. KAMINSKY:  Good afternoon, Your Honor.  Blair

19    Kaminsky on behalf of Federal Insurance Company.

20            THE COURT:  Okay.  Good afternoon.

21            MS. KAMINSKY:  Good afternoon.

22            THE COURT:  Okay.  What would you like to say?

23            MR. MYERS:  Your Honor, this isn't yet about the

24    merits of Meta's request to stay and suspend the coverage

25    litigation.  This is just about timing for motions, so we
```

1   appreciate you spent 80 percent of your day on insurance.

2   We'll try to make the last bit short.

3       Because of the overlapping --

4       **THE COURT:**  -- denied the motion to dismiss, which is

5   why I'm in this position of being in trial.  Or the motion for

6   summary judgment.

7                        (Laughter.)

8       **THE COURT:**  That's always the double-edged sword of

9   denying those motions.

10      **MR. MYERS:**  Well, with the stay, Your Honor, it might

11  just mean a few years from now.  And it's no mys- -- it's no

12  mystery that Meta thinks because of the overlapping issues

13  between the insurance litigation and the MDL, insurance

14  litigation should wait.  No reason not to.

15      But as I said, we're not going to address the merits of

16  that.  We simply requested leave to file Meta's motion to stay

17  or suspend the insurance case here and to suspend the coverage

18  litigation pending conclusion of the social media cases.

19      We requested leave to file Friday.  I'd like to briefly

20  update the Court on the status of the insurers' filed by

21  Hartford declaratory relief case against Meta, which was filed

22  in Delaware, because it bears on some of the timing.

23      Your Honor will recall that after that case got removed to

24  the court of Judge Noreika, it was noticed to the JPML, which

25  issued a conditional transfer order to send it to this Court.

```
 1          Not surprisingly, insurers have opposed that.  And the
 2     JPML has set a briefing schedule which I think concludes the
 3     end of February.
 4          Meanwhile, insurers -- well, Meta moved in the Delaware
 5     case to stay pending the JPML decision on whether the case is
 6     all going to get decided here.
 7          Insurers moved to remand to Delaware state court.  And
 8     just last Friday, insurers moved again to expedite decision
 9     both on Meta's motion to stay and on their motion to remand.
10          THE COURT:  You moved to expedite in New Jersey state
11     court?
12          MS. KAMINSKY:  We moved in Delaware federal court to
13     expedite consideration of the motion to remand and --
14          THE COURT:  Do you know how many cases those judges
15     have?
16          MS. KAMINSKY:  Not off the top of my head, Your
17     Honor.
18          THE COURT:  You should check before you ask some
19     judge to expedite something that is not urgent or critical.
20          What's so urgent about it?
21          MS. KAMINSKY:  Your Honor, we think it's important
22     that we resolve --
23          THE COURT:  What's so urgent?
24          MS. KAMINSKY:  Sure.  We think it's important that we
25     resolve where this litigation will be held so that the
```

 1    insurers' obligations with respect to these cases can be

 2    resolved.

 3         **THE COURT:**  I -- you know, I have in this courtroom

 4    some of the best litigators in the country.  And you don't do

 5    yourself justice by piling motions on our dockets.

 6         We were not very pleased when the bill to add judges to

 7    the federal judiciary did not pass or was not signed.

 8         We have hundreds and hundreds of cases.  And federal

 9    judges are working really hard to be good public servants.  So

10    save your urgency motions for when something is in fact

11    urgent.

12         I am sure that judge will get to it when they reasonably

13    can get to it, working as hard as they are with as little

14    staff as we have.  It -- it's just -- you all have to help us

15    do this.  And you're not frequently helping.  You're making it

16    worse.  And I would suggest that motion to expedite made it

17    worse.

18         It's important.  We know.  We're trying to get to it.  But

19    to add fuel to the fire, unprofessional.

20         **MS. KAMINSKY:**  I understand that perspective, Your

21    Honor.

22         **MR. MYERS:**  Your Honor --

23         **THE COURT:**  Go ahead.

24    So what -- so now where are we?

25         **MR. MYERS:**  Right.  So Meta had sought leave to file

 1    a motion consistent with Your Honor's comments, no rush to

 2    stay the coverage issues.  We had requested leave to file it

 3    Friday.  And -- and, frankly, we were concerned because of the

 4    activity in Delaware.

 5                THE COURT:  Yeah.

 6                MR. MYERS:  And we remain concerned.  Insurers --

 7                THE COURT:  But --

 8                MR. MYERS:  -- counter proposed that they would file

 9    motions to dismiss the case here -- the insurance case here,

10    which we've stipulated will happen on March 5.  And they had

11    proposed a briefing schedule.  Despite our concern about what

12    might happen in Delaware, in the interest of judicial

13    resources and conserving them, we have decided that we will

14    agree to have Meta's motion to stay or suspend the coverage

15    litigation briefed and heard alongside -- the same time their

16    motions to dismiss.

17         And we wanted to appear today, Your Honor, because meeting

18    and conferring over this stuff has not been particularly

19    successful, so we wanted to just get on the record and have

20    a -- a schedule set.  So what I think --

21                THE COURT:  So let's set -- so let's set the

22    schedule, but -- but I thought -- I thought you said that the

23    JPML was still trying to figure this out.

24                MR. MYERS:  It is, Your Honor.  Briefing on that

25    ends --

```
 1          THE COURT:  So why -- why am I entertaining motions

 2    if JPML is still dealing with whether or not the case is going

 3    to be here?

 4          MR. MYERS:  The question whether to stay and suspend

 5    the coverage cases --

 6          THE COURT:  Yeah.

 7          MR. MYERS:  -- is going to get decided.  And it's

 8    Meta's view that should be decided here because of the vast

 9    overlap.

10      So we think there isn't good reason not to proceed with

11    that ASAP.  It will also help Judge Noreika, and if Your Honor

12    decides this case should be stayed and the coverage litigation

13    suspended, it may effectively moot the JPML's decision.

14          THE COURT:  All right.  So what's --

15          MR. MYERS:  So what we have -- what they have

16    proposed and what we would agree to is the parties -- that

17    insurers file their motions to dismiss on March 5.

18          MS. KAMINSKY:  Um-hmm.

19          MR. MYERS:  Meta will file its motion to stay and

20    suspend coverage litigation also March 5.  Opposition briefs,

21    March 26; replies, April 2.  Hearing, we believe April 9 would

22    be what was called for on your calendar.  We appreciate it may

23    or may not be available, but that's the date that at least

24    Meta requests.

25          THE COURT:  No.  I -- I'm not going to have a hearing
```

```
 1    seven -- on two motions filed seven days before the hearing.
 2    I am in trial through the end of April.  I have four
 3    back-to-back trials.
 4         The one that I'm in, the continuation of the contempt
 5    hearings against Apple by Epic Games; a third breach of
 6    contract case, which I still haven't -- hopefully it settles
 7    today, but that's only a week.  And then my final trial on the
 8    BOP officer who is alleged to have assaulted inmates.
 9         So I'm in trial through the end of April.
10              MR. MYERS:  Your Honor, Meta appreciates the --
11              THE COURT:  So -- so -- and -- you can file them, so
12    get them on file.  But I still have two orders that I need to
13    get out for you.  And my goal is to get them out over the next
14    30 days or so.
15         So I'm not going to look at them and -- and what is the
16    basis for a motion to dismiss the insurance claim?
17              MS. KAMINSKY:  Your Honor, the -- the relief that
18    Meta is seeking is simply to stay their own coverage action.
19    That's their --
20              THE COURT:  I understand their motion.  I'm asking
21    you why you're bringing a motion to dismiss.
22              MS. KAMINSKY:  A motion to -- because their action
23    isn't actually seeking to resolve a dispute between the
24    parties.
25         Count one of their motion is literally a request to stay
```

 1   this action and to suspend other coverage litigation.  We

 2   don't think that's a proper count in a lawsuit.

 3       They brought a coverage dispute so that they could

 4   immediately seek a stay of that coverage dispute.  We don't

 5   think that's proper.

 6           **THE COURT:**  So you brought a declaratory relief

 7   action?

 8           **MR. MYERS:**  That is one cause of action, Your Honor.

 9   We have sued insurers for breach of contract, bad faith, and

10   declaratory relief.  It is all there.  Our request is and will

11   be --

12           **THE COURT:**  And because they're not providing

13   coverage, or there is -- or are they providing coverage under

14   a reservation of rights?

15           **MR. MYERS:**  Both as to different insurers.  Several

16   have agreed to defend recognizing the potential for coverage.

17   But they have placed limitations, we believe improperly, on

18   what they're going to defend, state AGs versus school

19   districts or not, versus individuals, so there's all kinds of

20   slicing and dicing.

21       But they're attempting to do, which Meta disagrees with

22   vehemently and we have not gotten to the big piece at the end,

23   which is what happens if and when there is a settlement or

24   judgment.

25       That's why it's premature.  And we wouldn't be here, Your

1    Honor, had they not preemptively sued in Delaware, and we have

2    sued here --

3         **THE COURT:** And they're -- they sued in Delaware on

4    the dec relief action?

5         **MR. MYERS:** Yes, solely dec relief, raising --

6         **THE COURT:** That they --

7         **MR. MYERS:** -- raising all of the issues that overlap

8    with issues here. Our alleged intent with respect to the --

9         **THE COURT:** Hold on. And --

10        **MR. MYERS:** Yeah.

11        **THE COURT:** -- their dec relief action is asking for

12   an order that there's no coverage?

13        **MR. MYERS:** Yes, Your Honor.

14        **THE COURT:** So how many insurance companies have you

15   sued?

16        **MR. MYERS:** I believe six.

17        **THE COURT:** Are they all represented by the same

18   counsel?

19        **MR. MYERS:** No, Your Honor. Three are represented by

20   counsel here. Others are represented by different counsel.

21        **MS. KAMINSKY:** That's correct, Your Honor.

22        **THE COURT:** You mean that you, Ms. Kaminsky,

23   represent -- oh, look. I'm in trial with your client.

24        **MS. KAMINSKY:** Indeed. I was not aware of that when

25   I came here today, Your Honor. I should have been.

1   **THE COURT:**  So you -- well, I have three insurance

2   companies on this list.  Do you represent more than Federal?

3   **MS. KAMINSKY:**  I only represent Federal, Your Honor,

4   in the litigation.

5   **THE COURT:**  Oh, I see.  So there's actually four, so

6   four -- I have lawyers for four insurance companies here, and

7   then there are two more.

8   **MR. MYERS:**  Yes, Your Honor.  The others are more or

9   less bystanders for the moment.  They haven't actively been

10   filing either in this court or in the Delaware action.

11   And I think it's fair to say that Hartford -- the two

12   Hartford entities and Chubb -- couple Chubb entities

13   represented by Ms. Kaminsky and Mr. Antonelli, who just came

14   up, have been the active movers on the insurance side.

15   **MS. KAMINSKY:**  We try our best to coordinate so we

16   can keep things streamlined, Your Honor.

17   I recognize maybe we don't always succeed, but that's been

18   our -- our effort.

19   **THE COURT:**  The motion to dismiss that you're

20   suggesting is one consolidated motion on behalf of -- or it

21   will be, whether or not you're suggesting it, one consolidated

22   motion on behalf of how many of these insurance companies?

23   **MS. KAMINSKY:**  So we haven't conferred on that

24   amongst insurers, but I'm -- we work together all the time --

25   **THE COURT:**  You haven't and it's -- you want to file

1    this in three weeks?

2             **MS. KAMINSKY:**  We haven't conferred on whether it

3    would be one motion or whether --

4             **THE COURT:**  It will be one motion.  It will not be

5    more than one motion.  Period.

6             **MS. KAMINSKY:**  Understood, Your Honor.

7      We're happy to coordinate with the other insurers on that.

8    I suspect it will be all of them, but I can't speak for them.

9             **THE COURT:**  And for purposes of Federal, are you --

10   what is the basis for the motion?

11            **MS. KAMINSKY:**  So, Your Honor, I -- I haven't

12   finalized, obviously.  But a key basis for one aspect of the

13   motion is that it is not -- you can't state a claim by simply

14   asking for a stay.  That's not a valid cause of action.

15      And that is count one of the Meta's complaint, is a stay

16   in this action.

17            **THE COURT:**  I don't understand.

18                   (Simultaneous colloquy.)

19            **THE COURT:**  Aren't they asking for coverage on this

20   MDL?

21            **MS. KAMINSKY:**  That -- so I think what they've asked

22   is to defer those counts until after this MDL is resolved.

23   And we don't think that makes sense because --

24            **THE COURT:**  It's typically what we do.

25            **MS. KAMINSKY:**  So, your Honor, I understand that as

1    to indemnity.  But as to the duty to defend, we can resolve

2    that in the first instance by comparing the allegations in the

3    complaints to the allegations -- to the terms of the policy.

4         **THE COURT:**  Right.  So -- so isn't that the issue?

5    I mean, if you're saying that the issue is that you don't

6    believe your clients should be covering this MDL, that's a --

7    is that a basis upon which you're going to bring the motion?

8         **MS. KAMINSKY:**  I'm not sure that would be the basis

9    for the motion to dismiss.  That will be a basis for a

10   subsequent motion practice, I think.

11        The other issue, Your Honor, is that there is first files

12   [sic] litigation in Delaware that was filed two months before

13   this litigation.  That was improperly removed to the federal

14   court by Meta, even though there's no diversity.

15        So another basis for the motion will be a request that the

16   litigation here be stayed in favor of the Delaware litigation.

17   Obviously, the motion to remand, as Mr. Myers said, is fully

18   briefed.  We hope to get a ruling on that as soon as we can.

19        And then -- and -- in the meantime, the JPML will decide,

20   depending on how the remand plays out, whether the Delaware

21   litigation should be transferred here.

22        So -- so our motion to dismiss will in part be asking this

23   Court to stay in favor of that first-filed action.  And

24   because of all this activity in Delaware and the JPML, I'm

25   glad that we have agreement on the briefing schedule.  And I

 1    would suggest it makes sense to wait to set a hearing until we

 2    have a better sense of how those procedural issues are going

 3    to play out, both in Delaware litigation and in the JPML.

 4         **THE COURT:**  I'm not ordering briefing until I

 5    understand this better.  I want you all to file a letter

 6    brief, joint, no longer than three pages.  If you argue about

 7    it, you each get a page and a half that sets this out in some

 8    logical way and gives me an update as to all of these various

 9    filings.

10         You should include in there the anticipated bases of each

11    of the motions.

12         **MS. KAMINSKY:**  Understood.

13         **THE COURT:**  I'll give you four pages, two a piece.

14    Once I read it, not at the end of a trial day, I'll make a

15    decision.

16         **MS. KAMINSKY:**  Your Honor --

17         **MR. MYERS:**  Thank you, Your Honor.

18         Can we have the time by which to submit that?

19         **MS. KAMINSKY:**  That's the second time we agreed on

20    something.

21         **THE COURT:**  How much time do you need?

22         **MS. KAMINSKY:**  I would suggest two weeks.

23         **MR. MYERS:**  We could easily do it early next week,

24    Your Honor.  I'd say Wednesday.

25         **MS. KAMINSKY:**  I'm fine with that, Your Honor.

```
 1              THE COURT:  That's fine.  Okay.  Wednesday.
 2        Thank you.
 3              MR. MYERS:  Thank you, Your Honor.
 4              THE COURT:  All right.  I think those are all the
 5   issues I have.
 6        Any other issues from the plaintiffs?
 7              MR. WARREN:  No, Your Honor.
 8              THE COURT:  From the defense?
 9              MR. SCHMIDT:  No, Your Honor.
10              THE COURT:  All right.
11        Let's see.  I'm scheduled to see you again March 21st.  On
12   March 21st, that will a morning hearing.  I'll be dark that
13   day in trial.  Okay?  So that will be 9:00 a.m.
14        I'll see you then.
15        We're adjourned.  Thank you.
16              THE CLERK:  Court is adjourned.
17              (Proceedings were concluded at 3:30 P.M.)
18                        --o0o--
19
20
21
22
23
24
25
```

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Monday, February 17, 2025